**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

WILLIAM THORPE, *et al.*,

   Plaintiffs,

v.

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al.*,

   Defendants.

CASE NO.  3:19cv00332

## MEMORANDUM IN SUPPORT OF DEFENDANT VIRGINIA DEPARTMENT OF CORRECTIONS' MOTION TO DISMISS

Forty-two years ago, the Virginia Department of Corrections opened Mecklenburg

Correctional Center, a brand new facility that was intended to house VDOC's highest-security-

level inmates, including Virginia's Death Row.  The prison, however, was plagued with issues

almost from the outset.  In 1981, the ACLU filed suit against VDOC, challenging various aspects

of the management of that prison.[1]  By consent decree entered in 1983, the lawsuit conditionally

settled.  But then, on May 31, 1984, six death row prisoners escaped from Mecklenburg,

including the notorious Briley brothers, who were at large for almost three weeks before being

recaptured in Philadelphia.[2]  VDOC responded with increased security measures at

Mecklenburg, including a prolonged lockdown.  The lockdown conditions and other security

---

[1] *Brown et al. v. Landon et al.*, No. 81-0853 (E.D. Va.).

[2] *See, e.g.*, Bill McKelway, *From the Archives: How the 1984 Escape from Virginia's Death Row Happened*, RICHMOND-TIMES DISPATCH (May 30, 2019).

1

measures prompted multiple riots and at least one hostage situation,[3] and ultimately led to the ACLU filing a motion to find VDOC in contempt for violating the 1983 consent decree.

The parties re-negotiated, and a modified consent decree was entered in 1985.  In the early 1990s, Mecklenburg was re-classified as a medium security facility, and Virginia's Death Row was re-located to the newly-opened Sussex I State Prison in 1998.  In 2012, Mecklenburg was closed, and the facility has now been physically demolished.

In the intervening years, VDOC constructed other new prisons, including Wallens Ridge State Prison (WRSP) and Red Onion State Prison (ROSP), which were intended, among other things, to house VDOC's highest-security level prisoners (designated as security level "S").  Although, initially, a large number of inmates were housed in segregation conditions at these facilities, VDOC has since made "considerable strides in reducing the use of restrictive housing in its facilities," making Virginia a national leader in this regard.[4]  Specifically, following the adoption of the Segregation Reduction Step-Down Program in 2011, "a significant number of individuals have progressed through the phases and successfully transitioned to general population settings; between its launch in 2011 and October 2018, the number of people in Security Level S . . . decreased from 511 to 72."[5]

---

[3] *See, e.g.*, Martin Weil, *Violence Erupts at Mecklenburg, Lorton Prisons*, THE WASHINGTON POST (July 13, 1984); *Inmates in Virginia Stab 2 and Hold 7 as Hostages*, N.Y. TIMES (Aug. 5, 1984).

[4] Vera Institute of Justice, Center on Sentencing and Corrections, *The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the Virginia Department of Corrections*, at p. 5 (Dec. 2018), *available at* https://storage.googleapis.com/vera-web-assets/downloads/Publications/safe-alternatives-segregation-initiative-findings-recommendations/legacy_downloads/segregation-findings-recommendations-virginia-dept-corrections.pdf.

[5] *Id.* at 11; *see also id.* at 17 ("The Step-Down Program is a pioneering and significant program for reducing the number of people in long-term restrictive housing.").

Regardless, in 2019, Plaintiffs filed this putative class action, challenging the constitutionality of the Step-Down Program at WRSP and ROSP. And they devote a substantial part of their complaint to discussing the consent decrees, entered by this Court, addressing the conditions of confinement at Mecklenburg Correctional Center. Plaintiffs contend, specifically, that the present administration of the Step-Down Program somehow violates certain provisions of the 34-year old consent decrees that applied to the management of a different prison. The Mecklenburg consent decrees are interwoven throughout their factual allegations, there is an entire count of the complaint alleging that Defendants should be liable for breaching those consent decrees, and the prayer for relief requests that this Court specifically enforce them.

The complaint, however, misrepresents one critical fact regarding the Mecklenburg consent decrees: Pursuant to the newly-enacted Prison Litigation Reform Act ("PRLA"), the consent decrees were entirely vacated, in 1997, by order of this Court. *See* 4/7/97 Order (attached as Exhibit 1).[6] Plaintiffs surely can offer no factual or legal basis for finding VDOC liable, in this separate federal civil action, for allegedly breaching consent decrees that were terminated 22 years ago.[7]

---

[6] Although courts typically do not stray from the four corners of the complaint when considering a Rule 12 motion to dismiss, courts may consider matters of public record, as well as documents integral to the complaint, but omitted by the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"). Public court records, which are subject to judicial notice, may therefore be considered by a court in the context of a Rule 12 motion. *Brooks v. Arthur*, 626 F.3d 194, 200 (4th Cir. 2010).

[7] Plaintiff's implication that the consent decree was only partially vacated in 1997 is categorically incorrect. *See* Compl. ¶¶ 85-86. The plain language of the 1997 court order—which is conspicuously absent from the attachments to the complaint—says otherwise. VDOC is puzzled by this omission, considering that the ACLU—which represents the offenders in this case—was also counsel of record in *Brown v. Landon,* and actively litigated that consent decree for a number of years.

With respect to the remaining allegations of the complaint, VDOC is immune from liability as to the constitutional claims brought under 42 U.S.C. § 1983, which also fail to state a claim because VDOC is not a "person" within the meaning of that statute.  The ADA and RA claims, as to the putative class representatives, are barred by the applicable statute of limitations, and they also fail to plausibly allege that the Plaintiffs were discriminated against on the basis of their disability.  VDOC therefore requests that this Court grant its motion to dismiss.

## STATEMENT OF FACTS

"[W]hen ruling on a defendant's motion to dismiss, a [trial] judge must accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted).  So viewed, and as pertinent to this motion, the essential allegations of the complaint[8] are as follows:

1.      In August 1981, seven inmates confined at Mecklenberg Correctional Center (MCC) filed a putative class action, challenging the conditions of confinement at that facility.  *See* Compl., *Brown et al. v. Landon et al.* (attached as Exhibit 2).  They subsequently submitted an amended complaint.  *See* Am. Compl., *Brown et al. v. Procunier et al.* (attached as Exhibit 3).

2.      In April 1983, the parties entered into a settlement agreement, which was incorporated into a consent decree issued by this Court.  *See* 4/8/83 Settlement Agreement (attached as Exhibit 4); 4/22/83 Court Order (attached as Exhibit 5); 8/2/83 Court Order (attached as Exhibit 6); 8/2/83 Memorandum Opinion (attached as Exhibit 7).

---

[8] VDOC disputes the underlying factual representations in the complaint, which are misleading at best, and often outright erroneous.  *Compare, e.g.*, Compl. ¶ 117 ("VDOC denies parole to otherwise parole-eligible prisoners while they are in solitary confinement at Red Onion and Wallens Ridge.") *with* Va. Code § 53.1-136 (vesting in the Virginia Parole Board—not the Virginia Department of Corrections—the authority to determine whether an inmate should be released on parole).  However, because those alleged "facts" have no bearing on the resolution of this motion, they will not be addressed in detail here.

3.      After the plaintiffs initiated contempt proceedings based on an alleged violation of the 1983 consent decree,[9] the parties executed a second, modified settlement agreement, which was also incorporated into a consent decree issued by this Court.  *See* 4/5/85 Settlement Agreement; 4/5/85 Court Order (collectively attached as Exhibit 8); *see also* Plaintiffs' Memorandum in Support of Entry of Modified Consent Decree (attached as Exhibit 9).

4.      By order dated April 7, 1997, the prior court orders memorializing the settlement agreements were expressly vacated, "pursuant to 18 U.S.C. § 3626(b)(2)," and the case was administratively closed.  *See* 4/7/97 Order (attached as Exhibit 1).

5.      VDOC adopted the Step-Down program in August 2012.  Compl. ¶ 130.

6.      Almost seven years later—on May 6, 2019—twelve inmates who are or have been confined at ROSP filed this putative class action against VDOC and various VDOC officials and employees, alleging that, since August 1, 2012, their constitutional rights have been violated through administration of the Step-Down Program at ROSP and WRSP.

7.      VDOC is the "executive agency responsible for operating and maintaining correctional facilities within Virginia."  Compl. ¶ 83.

8.      The complaint includes a putative sub-class of inmates with alleged mental disabilities.  The putative class representatives are Gary Wall, Brian Cavitt, Steven Riddick, and Dmitry Khavkin.  Compl. ¶ 124.

---

[9] The motion to show cause was submitted following the 1984 escape of several death row prisoners from Mecklenburg, which resulted in that facility being placed on intermittent lockdown for an indeterminate period of time.  *See* 12/3/84 Motion for Issuance of Order to Show Cause, at ¶ 6 (attached as Exhibit 10); *see also* Excerpt, Special Grand Jury Final Report, *Re: The Department of Corrections*, pp. 19-20 ("Increased zealousness in the wake of the infamous death escape certainly justified any extraordinary security measures that Mecklenburg undertook and which, in turn, provoked the A.C.L.U.") (attached as Exhibit 11).

9.      Plaintiff Gary Wall has been incarcerated at ROSP for at least "three years." Compl. ¶ 28.  He is serving a sentence of 43 years, 19 months, and 290 days, based on underlying convictions for robbery, assault and battery, felony injury to a correctional officer, and unlawful wounding.  *See, e.g.*, *Wall v. Barksdale*, No. 7:17cv00066 (W.D. Va.) (ECF No. 24-03); *see also Wall v. Ruffin*, 2012 U.S. Dist. LEXIS 119832, at *14 (E.D. Va. Aug. 22, 2012) (noting that Wall pled guilty to a reduced charge of unlawful wounding of a corrections officer and received an additional prison sentence of three years and seven months).

10.      Wall has progressed through various phases of the Step-Down Program at ROSP. However, he has an extensive history of disciplinary violations at that facility.  *See, e.g.*, *Wall v. Artrip*, 2018 U.S. Dist. LEXIS 119415, at *39 (W.D. Va. July 28, 2018).

11.      Plaintiff Brian Cavitt has been incarcerated at ROSP for "two years."  He was transferred to ROSP from a facility in Massachusetts.  Compl. ¶ 30.  Cavitt is serving two consecutive life sentences and an additional term of 20 to 25 years based on underlying convictions for first degree murder, burning of a dwelling, armed robbery, and assault and battery.  *See generally Cavitt v. Saba*, 57 F. Supp. 81, 86 (D. Mass. 2014); *Commonwealth v. Cavitt*, 460 Mass. 617 (2011).

12.      Plaintiff Steven Riddick has been incarcerated at ROSP for "four years."  Compl. ¶ 34.  He is serving a fifty-year sentence on an underlying conviction for the first-degree murder of his pregnant live-in girlfriend.  *See, e.g.*, *Riddick v. Commonwealth*, 2008 Va. App. LEXIS 237 (Ct. App. May 13, 2008).

13.      Riddick attempted to file suit over the Step-Down Program in 2017.  *See Riddick v. Dep't of Corr.*, 2017 U.S. Dist. LEXIS 211696, at *9-10 (W.D. Va. Dec. 26, 2017) ("Riddick complains at length about VDOC policies governing administrative segregation at Red Onion,

6

particularly the Step Down Program that set out criteria inmates must meet to earn additional privileges and move to less restrictive housing assignments," and summarily dismissing his constitutional claims regarding the Step Down Program under 28 U.S.C. § 1915A).

14.     Plaintiff Dmitry Khavkin has been incarcerated at ROSP for "six years," but is now in "general population."  Compl. ¶ 26.  He is serving a sentence of 24 years and 2 months on underlying convictions for second degree murder, assault and battery, and attempted robbery. *See Khavkin v. Clarke*, 2018 U.S. Dist. LEXIS 124077 (E.D. Va. July 23, 2018).

## ARGUMENT AND AUTHORITIES

When Judge Merhige vacated the Mecklenburg consent decrees in 1997, the underlying settlement agreements were also rendered unenforceable.  Moreover, even if there was a separate private agreement that somehow survived termination of the consent decrees, this Court lacks subject matter jurisdiction to enforce that agreement.  That is, there being no court order to enforce, there is no nexus for federal jurisdiction.  And although a party can bring a separate cause of action to enforce a private settlement agreement, the United States Supreme Court has made clear that a cause of action to enforce a settlement agreement is equivalent to a state-law breach of contract claim, subject to all of the applicable underlying rules and defenses— including, for example, the statute of limitations, the doctrine of laches, the reserved powers doctrine, the unmistakability doctrine, the sovereign acts doctrine, and the Eleventh Amendment protections afforded a state that has not waived its immunity to suit in federal court.

Because the consent decrees were vacated, the underlying settlement agreements are no longer operative, and Count I of the complaint fails to state a claim upon which relief can be granted.  Even if this Court were to determine that there was a private settlement agreement that survived termination of the consent decrees, VDOC is entitled to Eleventh Amendment

7

immunity as to any claim that VDOC breached that private settlement agreement, which would be, in essence, a state-law breach-of-contract action that could only be pursued in state court. That claim is additionally barred by the applicable five-year statute of limitations.

With respect to Counts II through V, because a state is not subject to suit under 42 U.S.C. § 1983, those claims, too, are subject to summary dismissal. Finally, the disability discrimination claims in Counts VI (ADA) and VII (Rehabilitation Act) fail to state a claim under either a theory of disparate treatment or failure-to-accommodate, and those claims, at least as to the putative class representatives, are additionally barred by the statute of limitations.

## I.      Applicable Legal Standards

Federal district courts are courts of limited jurisdiction. "Thus, when a district court lacks subject matter jurisdiction over an action, the action must be dismissed." *U.S. v. Jadhay*, 555 F.3d 337, 347 (4th Cir. 2009). A challenge to a court's subject matter jurisdiction can be raised at any time and is properly considered on a motion under Rule 12(b)(1) of the *Federal Rules of Civil Procedure*. The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion rests with the plaintiff, the party asserting jurisdiction. *See Williams v. U.S.*, 50 F.3d 299, 304 (4th Cir. 1995); *see also McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

"[T]he purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer

8

possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also* Fed. R. Civ. P. (8)(a)(2); *Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009). Also, although the Court must consider all of the factual allegations of the complaint as true, the Court is not bound to accept a legal conclusion couched as a factual assertion, *Iqbal*, 556 U.S. at 663-64, nor should the Court accept a plaintiff's "unwarranted deductions," "rootless conclusions of law" or "sweeping legal conclusions cast in the form of factual allegations." *Custer v. Sweeney*, 89 F.3d 1156, 1163 (4th Cir. 1996).

Generally, a Rule 12(b)(6) motion to dismiss "cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *Goodman v. PraxAir, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). However, a court may determine the merits of an affirmative defense raised in a motion under Rule 12(b)(6) if "all facts necessary to the affirmative defense clearly appear[] on the face of the complaint." *Id.*; *see also United States v. Kivanc*, 714 F.3d 782, 789 (4th Cir. 2013); *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005); *Penn v. 1st S. Ins. Servs.*, 324 F. Supp. 3d 703, 713-14 n.9 (E.D. Va. 2018).

The Fourth Circuit has noted that it is not clear "whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." *Andrews v. Daw*, 201 F.3d 521, 524 n.2 (4th Cir. 2000). It has been noted, however, that "[t]he recent trend . . . appears to treat Eleventh Amendment Immunity motions under Rule 12(b)(1)." *Haley v. Va. Dep't of Health*, No. 4:12cv00016, 2012 U.S. Dist. LEXIS 161728, at *5 n.2 (W.D. Va. Nov. 13, 2012). The underlying rationale is that, "although the Eleventh Amendment immunity is not a 'true limit' of [the] Court's subject matter jurisdiction, . . . it is more appropriate to consider [this] argument under Fed. R. Civ. P. 12(b)(1) because it ultimately challenges this Court's ability to

9

exercise its Article III power." *Beckham v. AMTRAK*, 569 F. Supp. 2d 542, 547 (D. Md. 2008)

(cited in *Haley*, 2012 U.S. Dist. LEXIS 161728, at *5 n.2).

## II.    When the Mecklenburg consent decrees were vacated pursuant to the PLRA, the underlying agreements were rendered unenforceable.

On April 26, 1996, President Clinton signed the Prisoner Litigation Reform Act

("PLRA") into law.  The PRLA imposes unique limits on a federal court's power to order

prospective relief in conditions-of-confinement litigation, providing, for example, that relief

"shall extend no further than necessary to correct the violation of the Federal right of a particular

plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).  This remedial federal litigation also targeted

existing federal consent decrees, many of which were decades-old, that had been entered without

a specific finding that the prison conditions being addressed actually violated the federal

Constitution.[10]  Through enactment of the PLRA, Congress therefore sought "to eliminate

unwanted federal-court interference with the administration of prisons."  *Woodford v. Ngo*, 548

U.S. 81, 93 (2006).

For this reason, in addition to limiting the types of prospective relief made available in

lawsuits challenging prison conditions, the PLRA provided for the immediate termination of

existing consent decrees that had, perhaps, swept more broadly than necessary.  Specifically,

"[i]n any civil action with respect to prison conditions, a defendant or intervener shall be entitled

to the immediate termination of any prospective relief if the relief was approved or granted in the

---

[10] *See, e.g.*, *Prison Reform:  Enhancing the Effectiveness of Incarceration:  Hearings Before the S. Comm. on the Judiciary*, 104th Cong. 573, at p. 31 (July 27, 1995) ("[O]nce a State has cured a specific constitutional violation identified by a court, ongoing remedial decrees should be terminated.  Court decrees should not operate in perpetuity once the State has come into compliance with the requirements of the Constitution, neither continuing court supervision nor permanent conditions and limitations are appropriate."); *accord Frew v. Hawkins*, 540 U.S. 431, 442 (2004) ("The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.").

10

absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2); *see also Cagle v. Hutto*, 177 F.3d 253, 256 (4th Cir. 1999); *Plyler v. Moore*, 100 F.3d 365, 369-70 (4th Cir. 1996).

The 1997 court order vacating the 1983 and 1985 Mecklenburg consent decrees expressly cites 18 U.S.C. § 3626(b)(2) as the basis for the Court's action. The question then becomes, when an existing consent decree is terminated under § 3626(b)(2) of the PLRA, does the incorporated settlement agreement survive and remain enforceable? The answer is no.

The Second Circuit, sitting en banc, thoroughly and thoughtfully addressed this issue in *Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999) (en banc). In that case, the district court, acting pursuant to § 3626(b)(2) of the PLRA, vacated various consent decrees from the 1970s that involved the conditions-of-confinement in New York City jails. In response, the inmates challenged the constitutionality of the PLRA. On appeal from a lower court judgment rejecting their due process challenge, a three-judge panel of the Second Circuit initially held that the PLRA "merely prohibits federal courts from enforcing such decrees and leaves parties free to seek enforcement of the consent decrees in state courts." *Id.* at 152. Upon rehearing en banc, however, the Second Circuit altered course. Specifically, the full court rejected the original panel's conclusion that "federal consent decrees not supported by the mandated findings remain enforceable in state courts on the theory that settlement agreements are both private agreements and consent decrees." *Id.* at 157. Rather, "[a]n agreement leading to a consent decree is normally conditional, setting out actions and forbearances to which the defendant agrees and stating that the settlement is conditioned on being so-ordered by the court." *Id.* And "[w]here the parties have made an agreement to settle conditional on approval by the federal court, there is

11

no enforceable agreement if the condition fails." *Id.* The Second Circuit therefore concluded, "if the federal court, though having once approved, withdraws its approval and terminates prospective relief, the condition upon which the parties agreed to bind themselves will have failed. In such circumstances, we see no basis, consistent with fundamental principles of contract law or with the Supremacy Clause of the Constitution, on which a state court would have the power to reinstate obligations originally imposed in the federal consent decree but terminated by the federal court." *Id.*

The Second Circuit further highlighted that the PLRA defines and treats "private settlement agreements" separately from "consent decrees," and in a manner that makes clear that the "concepts of consent decrees and private settlement agreements [are] mutually exclusive." *Id.* Specifically, "private settlement agreements," unlike consent decrees, are "not subject to judicial enforcement," and the enforcement of those agreements is expressly relegated to "State Court." *Id.* at 157-58 (quoting 18 U.S.C. § 3636(g)(6) & (c)(2)(B)). The Second Circuit concluded that "[t]he absence of any similar statement indicating state-court enforceability of federal consent decrees reinforces our view that Congress meant the Act to require the termination of consent decrees that are not supportable by need-narrowness-intrusiveness findings and not simply to make such decrees unenforceable by federal courts but enforceable by state courts," for "it would seem anomalous for Congress simply to transfer judicial enforcement of unnecessary relief from one forum to another." *Id.* at 158; *accord Shultz v. Wells*, 73 F. App'x 794, 796 (6th Cir. 2003) ("Given these definitions, it appears that the [PLRA's] concepts of consent decrees and private settlement agreements are mutually exclusive."); *Hazen v. Reagen*, 208 F.3d 697, 699 (8th Cir. 2000) ("We entirely agree with the Second Circuit's reasoning and adopt it as our own.").

12

Applying these principles to the case at hand, it becomes apparent that the 1983 and 1985 documents constitute consent decrees, within the meaning of the PLRA, rather than "private settlement agreements." Specifically, paragraph 39 of the original 1983 agreement provides:

> The parties shall submit this agreement to the Court in full settlement of all remaining issues in this case, except costs and attorneys' fees, and the parties shall request that the Court retain jurisdiction for such time as the Court deems necessary to enforce compliance with this agreement and any decrees which may issue herein. In addition to retaining jurisdiction and taking such action as may be necessary to enforce compliance, it is understood and agreed that six (6) months after the date of the entry of a decree herein, but only upon application by one or both of the parties thereto, the Court will conduct a hearing on any claim that the provisions of paragraph number 11(b) of this agreement are not being complied with.

4/8/83 Agreement (attached as Exhibit 4). The corresponding court order provides that the agreement was "adopted and approved," that the defendants were "hereby ordered to comply fully with the terms of the attached agreement," and that "the Court will retain jurisdiction for such time as may be necessary to enforce or modify this Order and settlement." 4/22/83 Order (attached as Exhibit 5). Four months later, the court issued another "decree," "approving and adopting the agreement of the parties," directing the parties "to forthwith commence implementation of the terms of the agreement," and noting that the Court "shall retain jurisdiction for such further orders as may be necessary in accordance with the settlement agreement." 8/2/83 Order (attached as Exhibit 6).

Similarly, after the plaintiffs later initiated contempt proceedings, the parties moved for a modification of what both sides expressly deemed a "consent decree." *See* Plfs' Mem. in Support of Entry of Modified Consent Decree (attached as Exhibit 9). And paragraph 37 of the new agreement contained equivalent language regarding retention of jurisdiction by this Court:

> The parties shall submit this agreement to the Court in full settlement of all remaining issue in this case, except costs and

13

attorneys' fees, and the parties shall request that the Court retain
jurisdiction for such time as the Court deems necessary to enforce
compliance with this agreement and any decrees which may issue
herein.

4/5/85 Agreement (attached as Exhibit 8).  Similarly, the corresponding court order provides:

This matter having come before the Court upon the application of
the parties *to modify the consent decree previously entered* and the
Court having examined the modified agreement of the parties
attached hereto . . . . and the Court finding that the attached
modified agreement is a fair and appropriate resolution of all the
remaining issues in this case . . . .

IT IS ADJUDGED AND ORDERED THAT:

1.    The plaintiffs' motion for contempt is withdrawn.

2.    The modified agreement of the parties attached hereto is
      approved and provisionally adopted by the Court.

3.    The defendants, their agents, employees, successors in
      office, and those acting in concert with them are hereby
      ordered to comply fully with the terms of the attached
      agreement.

* * *

5.    Upon this Order and modified settlement becoming final,
      the Court will retain jurisdiction for such time as may be
      necessary to enforce or modify this Order and settlement.

4/5/85 Order (attached as Exhibit 8) (emphasis added)

It is plain that, throughout the duration of those proceedings, the parties intended for the

Court to retain enforcement jurisdiction over the parties' agreements, that the agreements were

submitted to the Court and incorporated into a "decree" for that very purpose, and that the parties

expressly intended for their ongoing arrangement to be considered a "consent decree."  Because

the agreements expressly provided for ongoing judicial enforcement, they were "consent

decrees," rather than "private settlement agreements," within the meaning of the PLRA.  *See*

*Rowe v. Jones*, 483 F.3d 791, 796 (11th Cir. 2007) ("Based on the plain language of the PLRA,

14

judicial enforcement is thus the critical distinction between private settlement agreements and consent decrees."); *see also* 18 U.S.C. § 3636(g)(1) (defining "consent decree"); 18 U.S.C. § 3636g(2) (defining "private settlement agreement"),  And, for the reasons set forth by the Second Circuit Court of Appeals in *Benjamin*, once the court withdrew its approval and the consent decrees were vacated, the underlying agreements ceased to have any ongoing force or effect.  *See Benjamin*, 172 F.3d at 157; *see also Smyth v. Rivero*, 282 F.3d 268, 283 (4th Cir. 2002); *Johnson v. Stirling*, No. 9:18-3028, 2019 U.S. Dist. LEXIS 62311, at *3-4 (D.S.C. Apr. 11, 2019) ("[T]he Court lacks the authority or jurisdiction to enforce a terminated prison consent decree."); *Ward v. Ozmint*, No. 6:09-1594, 2010 U.S. Dist. LEXIS 118560, at *8 (D.S.C. Oct. 18, 2010) (same).

Also of note, this Court elected to vacate—rather than terminate—the 1983 and 1985 consent decrees.  As the First Circuit has explained, this distinction is of "practical significance." *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 662 (1st Cir. 1997).  That is, "[w]hile terminating a consent decree strips it of future potency, the decree's past puissance is preserved and certain of its collateral effects may endure."  *Id.*  "Vacating a consent decree, however, wipes the slate clean, not only rendering the decree sterile for future purposes, but also eviscerating any collateral effects and, indeed, casting a shadow on past actions taken under the decree's imprimatur."  *Id.*

Ultimately, because the parties entered into the 1983 and 1985 agreements with the expectation that they would be subject to judicial approval and enforcement, and particularly considering that the parties themselves referenced those agreements as "consent decrees," it follows that they are, in fact, "consent decrees" within the meaning of the PLRA.  Accordingly, once those decrees were vacated, the agreements that had been incorporated into those decrees were no longer enforceable.  *See Benjamin*, 172 F.3d at 157 ("[I]f the federal court, though

15

having once approved, withdraws its approval and terminates prospective relief, the condition upon which the parties agreed to bind themselves will have failed.").  Count I of the complaint, which seeks to hold VDOC liable for "breaching" those agreements, therefore fails to state a claim upon which relief can be granted.

### III.    Even if the alleged breach of the underlying agreement could be pursued through a breach-of-contract suit, VDOC is entitled to Eleventh Amendment immunity.

In *Kokkonen v. Guardian Life Insurance Company*, 511 U.S. 375 (1994), the Supreme Court addressed whether a federal district court possessed jurisdiction to enforce a settlement agreement, where the court had not retained continuing jurisdiction or authority over the case in the corresponding dismissal order.  Reasoning that "[f]ederal courts are courts of limited jurisdiction," the Supreme Court determined that "[e]nforcement of the settlement agreement" was "more than just a continuation or renewal of the dismissed suit," and, therefore, "requires its own basis for jurisdiction."  *Id.* at 377-78.  Accordingly, unless the district court incorporates the settlement agreement into a final order, or otherwise expressly reserves jurisdiction, "enforcement of the settlement agreement is for state courts."  *Id.* at 382.

Here, then, even if the underlying settlement agreements somehow survived the termination of the Mecklenburg consent decrees in 1997, the Plaintiff's attempt to hold VDOC liable for allegedly violating those settlement agreements presents a simple state-law, breach-of-contract dispute.  And although this Court may possess supplemental jurisdiction over certain state-law claims, it cannot exercise supplemental jurisdiction over state-law claims asserted against a sovereign entity.  That is, VDOC—as an executive-branch state agency—is entitled to Eleventh Amendment immunity from state-law claims brought in federal court.[11]

---

[11] This interpretation is consistent with the PLRA, which provides that "private settlement agreements," as opposed to consent decrees, should be enforced "in State court" in accordance with "State law."  18 U.S.C. § 3636(c)(2)(B).

The "ultimate guarantee of the Eleventh Amendment is that non-consenting states may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. Ala. v. Garrett*, 31 U.S. 356, 363 (2001). Accordingly, any supplemental state-law claims cannot proceed unless Plaintiffs can demonstrate: (1) an explicit waiver of the Commonwealth's Eleventh Amendment immunity, which would allow those claims to be heard in federal court, or (2) that this case falls within an exception to the Eleventh Amendment.

Here, the Commonwealth of Virginia has not consented to being sued in federal court for an alleged breach-of-contract. Although the Commonwealth has consented, under certain circumstances, to suit in state court,[12] the Supreme Court has unequivocally held that "a State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 n.9 (1984). Because the sovereign has not expressly and unequivocally consented to suit in federal court, VDOC is entitled to Eleventh Amendment immunity on this supplemental state-law claim. *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 251 (1985) ("The Eleventh Amendment forecloses . . . the application of normal principles of ancillary and pendent jurisdiction where claims are pressed against the State."); *Pennhurst*, 465 U.S. at 121 ("[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment[.]"); *Missouri v. Fiske*, 290 U.S. 18, 27 (1933) (holding that the Eleventh Amendment applies to bar suit against a sovereign even where the asserted basis for that jurisdiction is "ancillary and supplemental"); *In re Sec'y of the Dep't of Crime Control & Pub.*

---

[12] *See* Va. Code Ann. § 8.01-192; *Stuart v. Smith-Courtney Co.*, 123 Va. 231, 234, 96 S.E. 241, 242 (1918) (noting that the Commonwealth of Virginia has determined, by statute, that "proceedings based upon contracts will lie against the State and its agencies," and the Commonwealth is therefore not immune from a breach-of-contract action brought in state court); *accord Wiecking v. Allied Med. Supply Corp.*, 239 Va. 548, 552-53, 391 S.E.2d 258, 260 (1990).

17

*Safety*, 7 F.3d 1140, 1144-45 (4th Cir. 1993) (holding that the district court lacked jurisdiction to consider a claim against a state official, for even if the claim "might otherwise have fallen within the court's ancillary or pendent jurisdiction, the Eleventh Amendment deprived the district court of jurisdiction to entertain that claim, because it was in effect a claim against the state itself").

That the Mecklenburg settlement agreements were executed in the context of a prior federal proceeding is not sufficient—in and of itself—to constitute a waiver of the Commonwealth's Eleventh Amendment immunity, particularly considering the PLRA's express directive that private settlement agreements are to be enforced in state—rather than federal—court.  18 U.S.C. § 3636(c)(2)(B).  Once the consent decrees were terminated, any nexus for federal jurisdiction was lost.  Thus, as the Supreme Court made clear in *Kokkonen*, absent a court order retaining federal jurisdiction over the case, enforcement of the underlying settlement agreements (if they survived) presents a question of state law, over which this Court does not possess independent federal question jurisdiction, and which must therefore be presented in state court in accordance with applicable state-law procedures.  Accordingly, because the Commonwealth of Virginia has not consented to being sued, in federal court, for an alleged breach-of-contract, VDOC is entitled to Eleventh Amendment immunity on the asserted state-law claim.  *Jacobs v. College of William & Mary*, 495 F. Supp. 183, 190 (E.D. Va. 1980) (holding that the Commonwealth's waiver of immunity for breach-of-contract actions filed in state court did not "operate as a consent to be sued in federal court as well"); *see also Nahouraii v. Ind. Univ. of Pa.*, No. 2:11-cv-00973, 2015 U.S. Dist. LEXIS 9793, at *9-10 (W.D. Pa. Jan. 28, 2015) ("The court concludes that it does not have jurisdiction over" the "alleged breach of the settlement agreement," because in light of "Pennsylvania's limited waiver of immunity, claims alleging a breach of contract involving the Commonwealth of Pennsylvania may only be

brought before the Pennsylvania Board of Claims," and "[t]hat immunity also bars this Court from exercising its supplemental jurisdiction over the breach of contract claim."); *accord Bond v. Horne*, No. 2:11-cv-1342, 2015 U.S. Dist. LEXIS 107961 (W.D. Pa. Apr. 14, 2015).

For these reasons, Count I should be dismissed on the alternative ground of lack of jurisdiction.  *See, e.g.*, *Fleming v. Va. State Univ.*, 713 F. App'x 229, 230 (4th Cir. 2018) (per curiam) (holding that the district court did not err in dismissing an action "for breach of contract, defamation, and fraud for lack of subject matter jurisdiction based on Eleventh Amendment immunity"); *Abbas v. Woleben*, No. 3:13cv147, 2013 U.S. Dist. LEXIS 134446, at *14-15 (E.D. Va. Sept. 19, 2013) (dismissing breach-of-contract claim against MCV, which, as "an agent of the state, shares Virginia's Eleventh Amendment immunity," reasoning that MCV was entitled to immunity in federal court on the state-law claim); *Nofsinger v. Va. Commonwealth Univ.*, No. 3:12cv236, 2012 U.S. Dist. LEXIS 97857, at *37 (E.D. Va. July 13, 2012) (dismissing breach-of-contract claims against VCU as "barred by the Eleventh Amendment"), *aff'd*, 523 F. App'x 204, 206 (4th Cir.) ("Because VCU did not consent to suit, the district court properly dismissed [the] contract claims against VCU as barred by the Eleventh Amendment."); *Amaram v. Va. State Univ.*, 476 F. Supp. 2d 535, 531 (E.D. Va. 2007) (noting "this Court is not aware of any expression, statutory or otherwise, of the Commonwealth's acquiescence to federal jurisdiction," and therefore holding that the "Eleventh Amendment prohibits this Court from exercising subject matter jurisdiction over the breach of contract claim").

## IV.   Count I also is barred by the five-year statute of limitations applicable to breach-of-contract actions.

Even if this Court were to determine that the settlement agreements survived the 1997 termination of the consent decree, and even if this Court were to determine that it could properly assert jurisdiction over the state-law, breach-of-contract claim, Count I should be dismissed as

19

untimely.  Under Virginia law, actions alleging breach of a written contract are subject to a five-year statute of limitations.  Va. Code § 8.01-246(2).  This time period begins to accrue "when the breach of contract occurs," rather than "when the resulting damage is discovered."  Va. Code § 8.01-230; *see also Penn v. 1st Ins. Servs.*, 324 F. Supp. 3d 703, 706-07 (E.D. Va. 2018); *Van Dam v. Gay*, 280 Va. 457, 699 S.E.2d 480 (2010).

The complaint alleges that VDOC breached the 1983 and 1985 agreements by "re-implementing the arbitrary and indefinite system of solitary confinement that had failed at Mecklenburg" when it opened ROSP and WRSP in 1998 and 1999.  Compl. ¶¶ 14; 224-228.  It further alleges that VDOC breached the agreements by introducing the Step-Down program "[i]n 2012, after its failed attempt at a second phase program."  Compl. ¶¶ 15; 130-133.

The alleged "breach" of the settlement agreement therefore occurred when VDOC first established the Step-Down Program, which the complaint alleges happened, at the latest, in 2012.  The statute of limitations therefore commenced as of that date, and expired at some point in 2017.  This action, which was filed in 2019, is therefore untimely.  Because these relevant dates are evident on the face of the complaint, Count I is subject to dismissal under Rule 12(b)(6) on this alternative ground.[13]

---

[13] VDOC further notes that the substantive allegations of the complaint do not even plausibly allege that the settlement agreement was actually breached.  Specifically, the 1985 settlement agreement provides that "DOC has discontinued the phase program and does not intend to reinstate any similar program in the future.  *If in the future a similar program is considered by the DOC, before any such program is initiated, the Court and all counsel of record in this litigation will be notified by DOC*."  4/5/85 Settlement Agreement (attached as Exhibit 8) (emphasis added).  Accordingly, the mere establishment of the Step-Down Program, even if it is considered a "similar program" to the Mecklenburg "Phase Program," would not, in and of itself, violate the terms of the agreement.  It is the failure to give the required notice that might transgress the terms of the agreement.  And because Plaintiffs have not alleged that VDOC did not provide that notice—which is, under even the most liberal reading of that agreement, all they might have been required to do—Plaintiffs have not sufficiently alleged a breach-of-contract.

**V.    VDOC is immune from the allegations in Counts II through V of the complaint, which also fail to state a claim against VDOC.**

Counts II through V of the complaint allege that the "defendants" should be liable under 42 U.S.C. § 1983 for various alleged constitutional violations.  But as the United States Supreme Court has expressly held, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Because VDOC is an administrative subdivision of the Commonwealth, it cannot be sued under 42 U.S.C. § 1983.  *See, e.g.*, *Kelly v. Maryland*, 267 Fed. App'x 209, 210 (4th Cir. 2008) (per curiam) ("It is now well settled that a state cannot be sued under § 1983."); *Dingess v. Va. Dep't of Corr.*, No. 7:12cv00630, 2012 U.S. Dist. LEXIS 182920, at *3 (W.D. Va. Dec. 31, 2012) ("[T]he Virginia Department of Corrections . . . is not an entity subject to suit in an action for damages under § 1983.").  Accordingly, Counts II through V, as to VDOC, should be dismissed for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).

Moreover, because a suit against a state entity is a suit against the state itself, VDOC is entitled to Eleventh Amendment immunity.  Specifically, "neither logic, the circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of [42 U.S.C. § 1983] compels, or even warrants, a . . . conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several states." *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  Because state agencies are entitled to Eleventh Amendment immunity for claims brought pursuant to 42 U.S.C. § 1983, this Court also lacks jurisdiction to adjudicate the § 1983 claims against VDOC.  *See, e.g.*, *Madden v. Virginia*, No. 3:11cv241, 2011 U.S. Dist. LEXIS 69452, at *7-8 (E.D. Va. June 28, 2011) (granting a Rule 12(b)(1) motion to dismiss claims brought against the Commonwealth, reasoning that, because "Congress has not abrogated states' Eleventh Amendment immunity with regard to § 1983 . . .

21

the Eleventh Amendment bars federal jurisdiction over Plaintiff's claims against the

Commonwealth ," and "the Court thus lacks subject matter jurisdiction"); *see also Dingess*, 2012

U.S. Dist. LEXIS 182920, at \*3 ("[T]he Virginia Department of Corrections and its constituent

parts have Eleventh Amendment immunity and are not persons for purposes of § 1983.").

Accordingly, Counts II through V of the complaint, as to VDOC, should also be

dismissed for lack of jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).

**VI.     The ADA and RA claims (Counts VI and VII) fail to state a plausible claim.**

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  Similarly, under § 504 of the Rehabilitation Act, "no otherwise

qualified individual with a disability . . . shall, solely by reason of her or his disability, be

excluded from the participation in, or be denied  the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

To state a claim under either the ADA or RA, therefore, a plaintiff "must allege that (1) he has a

disability; (2) he is otherwise qualified to receive the benefits of a public services, program, or

activity; and (3) he was excluded from participation in or denied the benefits of such service,

program, or activity, or otherwise discriminated against, on the basis of his disability."  *Spencer*

*v. Early*, 278 F. App'x 254, 261 (4th Cir. 2008) (quotation omitted); *see also Constantine v.*

*Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).[14]

---

[14] "Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical
purposes because the analysis is 'substantially the same.'"  *Seremeth v. Bd. of Cty. Comm'rs*
*Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quoting *Doe v. Univ. of Md. Med. Sys.*
*Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995)).

As the Fourth Circuit has explained, Title II of the ADA generally "allows plaintiffs to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016). Of these, it appears that Plaintiffs have attempted to allege a disparate treatment claim, a failure-to-accommodate claim, or perhaps both. *See generally* Compl. ¶¶ 253-57, 262-64. As an initial matter, VDOC notes that none of the putative class representatives have specifically alleged what mental disability, precisely, they believe they are suffering from. *See* Compl. ¶¶ 26, 28, 30, 34. Nonetheless, even if some degree of mental impairment, sufficient to rise to a "disability" within the meaning of the ADA and RA, could be implied into the complaint, Plaintiffs' generalized allegations fail to plausibly allege the elements of a disability discrimination claim under either a disparate treatment or failure-to-accommodate theory of liability.

### a.    Disparate Treatment

To the extent Counts VI and VII might be construed as alleging a disparate treatment claim, Plaintiffs have not identified any "program" or "benefit," to which they are "otherwise entitled," that has been "denied" "by reason of" their "disability." First, merely being held in segregated housing is not the same thing as being denied a "service[], program[], or activit[y]." To the extent Plaintiffs contend their alleged mental "disabilities" are not adequately taken into account in the context of the Step-Down Program, this challenges the adequacy of the services being provided, not their deprivation in the first instance. *See, e.g.*, *Torrez v. Semple*, 2018 U.S. Dist. LEXIS 84404, at *21-22 (D. Conn. May 21, 2018) (where the inmate alleged that the prison officials "have not afforded him 'reasonable accommodations' by virtue of his confinement 'in restrictive conditions and not in the most integrated setting appropriate for his

23

needs,'" but did not "specify any service, program or activity from which he was excluded by the defendants," concluding that he had not stated a claim under the ADA); *Scherer v. Pa. Dep't of Corr.*, 2007 U.S. Dist. LEXIS 84935, at \*33-34 (W.D. Pa. Nov. 16, 2007) ("The fact that a prisoner possesses a qualifying disability of mental illness under the ADA and RA does not mean that any discipline imposed upon him must be a measured imposition of discipline in light of his disability.  This is because the discipline of RHU housing imposed on the Decedent does not equate with denying benefits to the Decedent."); *id.* at \*35 ("The Court understands that the Plaintiff's claim under the ADA and RA relates to the proper treatment of the Decedent through the services and programs made available to him in light of his disability.  The Court does not believe the ADA or RA requires housing of disabled inmates in a certain level of confinement, a certain institution, or a certain security level as such assignments are primarily matters of security delegated to the discretion of the individual state correctional departments.").

Second, to the extent Plaintiffs contend that they have been deprived the "benefit" of being held in general population conditions, they have not plausibly alleged that they are "otherwise qualified" for this "benefit."  Plaintiffs do not have a right to a specific security classification, *Sandin v. Conner*, 515 U.S. 472, 486-87 (1995), nor is an inmate's placement in general population guaranteed under VDOC policy or otherwise, *Meacham v. Dano*, 427 U.S. 217, 224 (1976).  Because VDOC is vested with the broad discretion to classify and house inmates, *see Gatson v. Taylo*r, 946 F.2d 340, 343 (4th Cir. 1991), the fact that Plaintiffs have remained in segregated confinement does not, in and of itself, state a plausible claim that they were denied a "benefit" or "service" for which they were "otherwise qualified."

Third, Plaintiffs have not plausibly alleged that they were discriminated against on the basis of their alleged "disability."  The complaint alleges, certainly, that inmates with mental

24

disabilities have remained in segregated housing at ROSP.  But the complaint does not plausibly allege that they were placed into restricted housing *because of* their "disability."  Nor does it plausibly allege that they are treated any differently, once they are placed in restricted housing, than any other inmate being held under the same conditions-of-confinement.  The gravamen of any disability discrimination claim is the discriminatory act itself—intentionally treating someone differently because they have a disability.  Plaintiffs do not allege that they were treated differently than any other inmate who is assigned to and then placed into segregated housing— the crux of their complaint appears to be, rather, that they *want* to be treated differently.  And this does not amount to a plausible disparate treatment claim under the ADA or the RA.

As one federal district court noted, under analogous circumstances, "[t]he purpose of the ADA and the Rehabilitation Act statutes is to 'eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied.'"  *Atkins v. Cnty. of Orange*, 251 F. Supp. 2d 1255, 1232 (S.D.N.Y. 2003) (quoting *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).  In *Atkins*, several mentally disabled inmates filed suit under Title II of the ADA and the RA, challenging a prison policy regarding their placement in "isolation."  Specifically, the inmates alleged that the prison was "punishing them for their symptoms of mental illness" and "thereby exacerbating their mental illness," while also "failing to provide alternative punishments to keeplock isolation and a reasonable accommodation so that punishments which exacerbate mental illness are not imposed."  *Id.* at 1231.  The court, however, found that these allegations did not state a claim under the ADA or the RA, noting that the plaintiffs "d[id] not allege that the mentally disabled are the only prisoners subject to [those conditions] while the non-mentally-disabled prisoners are excluded therefrom."  *Id.* at 1232. The

court concluded that, "[w]ith no allegation of disparate treatment, no claim for discrimination under the ADA or Rehabilitation Act lies." *Id.*

Similarly, here, Plaintiffs have not plausibly alleged that they have been treated differently than inmates without mental disabilities. That alone is fatal to any disparate treatment claim. *See id.*; *see also Smith v. N.C. Dep't of Safety*, 2019 U.S. Dist. LEXIS 59000, at *6-7 (M.D.N.C. Apr. 5, 2019) ("[T]he Complaint does not allege that the footwear that [the defendant] required [the inmate] to use on the job differed from that used by non-disabled prisoners or that Defendants provided the required footwear for free to non-disabled prisoners to work in the kitchen. Therefore, the Complaint fails to allege facts showing that Defendants treated Plaintiff differently than his nondisabled counterparts."); *Webb v. Arnone*, 2018 U.S. Dist. LEXIS 128482, at *25-26 (D. Conn. Aug. 1, 2018) (where the plaintiff, a death row inmate, "has not asserted that the defendants discriminated against him or treated him differently because of" his disability, but rather "claims that he was treated the same," and "seeks to be treated differently because of his disability," the inmate "fails to state a claim against the defendants under either the ADA or the RA"); *Mercado v. Dep't of Corr.*, 2018 U.S. Dist. LEXIS 87681, at *35-36 (D. Conn. May 25, 2018) ("[I]n order to prevail on his ADA claim, Plaintiff must [establish] not only that he was denied access to services, but that he was denied access specifically because of his disability. . . Plaintiff has offered no evidence that DOC officials subjected non-disabled inmates engaging in conduct similar to Plaintiff's to different disciplinary measures."); *Palakovic v. Wetzel*, 2015 U.S. Dist. LEXIS 83286, at *26-27 (W.D. Pa. June 25, 2016) (allegations that an inmate was placed into restrictive housing "on account of his serious mental illness" did not state a "plausible claim that [the inmate] was excluded from participation

26

in a service, program or activity of the prison by reason of his disability in violation of Title II of the ADA"), *vacated in part on other grounds*, 854 F.3d 209 (3d Cir. 2017).

For these reasons, Plaintiffs have not plausibly alleged a disparate treatment claim under the ADA or the RA.

      *b.*      *Failure to Accommodate*

To the extent that Plaintiffs are attempting to allege a failure-to-accommodate claim, they have not adequately alleged that they requested an accommodation, in order to access a benefit or service for which they were "otherwise qualified," and that their requested accommodation was then denied. Hence, they have not stated a plausible failure-to-accommodate claim.

First, as discussed in more detail above, Plaintiffs have not plausibly alleged that they are "otherwise qualified" for a "service" or "program," and that they have been unable to access that "service" or "program" because of their alleged "disability." *See generally* 42 U.S.C. § 12131(2). Simply alleging that Plaintiffs are held in segregated confinement does not plausibly allege that VDOC is not "accommodating" their unspecified mental disabilities in the context of a program or service. *See generally Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000) ("[T]he disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services might be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not.").

Second, Plaintiffs have not sufficiently alleged what accommodation they requested from VDOC, that VDOC then knowingly denied. Prospective ADA litigants in a failure-to-accommodate context must "propose a reasonable modification to the challenged public program that will allow them the meaningful access they seek." *Nat'l Fed'n of the Blind*, 813 F.3d at 507;

27

*see also Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015) (noting, in the context of a Title I failure-to-accommodate case, that the plaintiff must allege that the defendant "had notice" of her disability and then deliberately "refused to make any reasonable accommodation"). And this specific accommodation must be requested—and refused—<u>before</u> a failure-to-accommodate claim can be asserted. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012) (noting that the defendant medical school was not "obliged to accommodate [the student's] disability until he 'provided a proper diagnosis . . . *and requested specific accommodation*'" (quoting *Kaltenberger v. Ohio College of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998) (omission in original) (emphasis added))). Because Plaintiffs have not alleged that they actually requested a specific accommodation, that VDOC then denied, VDOC cannot be liable under a failure-to-accommodate theory of liability.

This approach dovetails with the fundamental premise that liability under the ADA and RA is predicated upon intentional acts of discrimination—in this context, deliberately failing to provide a requested accommodation, and knowing that your failure to do so will result in a disabled person not being able to meaningfully access a needed program or service. Simply alleging that a plaintiff has a disability that has not been accommodated is not enough, then, to state a plausible claim under the ADA or the RA. *Cf. Atkins*, 251 F. Supp. 2d at 1232 (noting that a mentally-disabled inmate who seeks to hold a prison liable under a failure-to-accommodate theory must specify the "precise affirmative measures necessary to render the disabled individuals' access to a specified service meaningful").

    c.  *There is no private right of action to enforce federal regulations that impose greater obligations than that imposed by the enabling statutes.*

Finally, to the extent that the Plaintiffs might be attempting to bring a cause of action against VDOC based on the alleged violation of certain implementing federal regulations, *see*

28

Compl. ¶ 254 (citing 28 C.F.R. § 35.130(b)(7); Compl. ¶ 255 (citing 28 C.F.R. § 35.152(b)(2)),

VDOC notes that those regulations are not enforceable by private individuals, particularly to the

extent they impose obligations greater than those contained in the enabling statutes themselves.

*See Alexander v. Sandoval*, 532 U.S. 275, 285 (2001); *see also Brown v. Dep't of Pub. Safety &*

*Corr. Servs.*, 2019 U.S. Dist. LEXIS 80218 (D. Md. May 13, 2019) ("[N]umerous courts have

concluded that there is no private right of action to enforce [the ADA implementing

regulations]."). Accordingly, to the extent Plaintiffs may seek to predicate their ADA or RA

claims solely on alleged violations of the ADA implementing regulations, they lack standing to

assert those claims as independent causes-of-action.

## VII.    The ADA and RA claims, as to the putative class representatives, are barred by the statute of limitations.

Finally, as to all four putative class representatives, their claims under the ADA and RA

are barred by the applicable statute of limitations. Given the similarities between the ADA and

the RA, courts apply the same limitations period to claims under both acts. *Semenova v. Md.*

*Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017). And, as a general rule, "the one-year

limitations period in the Virginia [Rights of Persons with] Disabilities Act applies to ADA

claims brought in Virginia." *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir.

2011); *see also Wolsky v. Medical College of Hampton Rds.*, 1 F.3d 222, 224 (4th Cir. 1993); Va.

Code § 51.5-46(B). The limitations period begins to run when the plaintiff knows or should have

known of the alleged discriminatory decision. *A Soc'y Without a Name*, 655 F.3d at 347-48.

All four named Plaintiffs allege that they have been housed at ROSP for more than one

year. Any claim that they have been discriminated against in the context of the Step-Down

Program would have accrued when they were first incarcerated at that institution. By waiting

several years to file this suit, Plaintiffs allowed the statute of limitations to expire. Accordingly,

29

any claims under the ADA and the RA, as to these four putative class representatives, should be dismissed on the additional grounds that they are facially time-barred.

## CONCLUSION

It is evident, from their 98-page complaint, that Plaintiffs believe they have a better idea how to run a prison system than the correctional professionals within VDOC.  Yet, rather than supporting VDOCs ongoing reformation efforts and attempting to meaningfully interact with departmental leaders, counsel for the Plaintiffs have elected, instead, to sue them.

Nevertheless, their claims, as to VDOC, must fail.  Because the Mecklenburg consent decrees were vacated 32 years ago, VDOC cannot be liable for a claimed breach of the underlying settlement agreements.  And even if some latent agreement between the parties survived the Court order vacating those decrees, the only appropriate forum for enforcing that agreement would be the Virginia state court system.  Plaintiffs, therefore, cannot use this forum to resuscitate decades-old litigation involving an entirely different prison—one that has not just been closed, but physically demolished.  Additionally, VDOC is entitled to Eleventh Amendment immunity as to the constitutional claims under 42 U.S.C. § 1983, under which it cannot be sued, anyways, because VDOC is not a "person" within the meaning of that statute.  And because the simple act of being held in restrictive housing does not "discriminate" against someone on the basis of their disability, not does it deny them a "program" or "service" to which they are otherwise entitled, the ADA and RA claims fail to state a plausible claim to relief.

For these reasons, VDOC respectfully requests that this Court GRANT its motion and DISMISS this state agency as a party to this litigation.

Respectfully submitted,

VIRGINIA DEPARTMENT OF CORRECTIONS, Defendant.

30

By:      /s/
Margaret Hoehl O'Shea, AAG, VSB #66611
Attorney for named Defendants
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2206
(804) 786-4239 (Fax)
Email:  moshea@oag.state.va.us

31

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2019, I electronically filed the foregoing

Memorandum in Support of Defendant VDOC's Motion to Dismiss with the Clerk of the Court

using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Alyson Michelle Cox (VSB #90646)
Daniel Bernard Levin (pro hac vice)
Kristen Jentsch McAhren (pro hac vice)
Maxwell Kalmann (pro hac vice)
Owen Pell (pro hac vice)
Timothy Lawrence Wilson , Jr. (pro hac vice)
White & Case LLP
701 13th Street NW
Washington, DC  20005-3807
alyson.cox@whitecase.com

Vishal Agraharkar (VSB #93265)
Eden B. Heilman (VSB #93554)
American Civil Liberties Union of Va.
701 E. Franklin Street, Ste. 1412
Richmond, VA  23219
(804) 532-2151
vagraharkar@acluva.org
eheilman@acluva.org

*Counsel for Plaintiffs*

And I hereby certify that I have mailed the document by United States Postal Service to the

following non-filing user:  N/A

/s/
Margaret Hoehl O'Shea, AAG, VSB #66611
Attorney for named Defendants
Criminal Justice & Public Safety Division
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 225-2206
(804) 786-4239 (Fax)
Email:  moshea@oag.state.va.us

32