IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WILLIAM THORPE <u>et al.</u>,

     Plaintiffs,

v.                                    Civil Action No. 3:19cv332

VIRGINIA DEPARTMENT OF
CORRECTIONS <u>et al.</u>,

     Defendants.

### MEMORADUM OPINION

Plaintiffs William Thorpe, Frederick Hammer, Dmitry Knavkin, Gerald McNabb, Gary Wall, Vernon Brooks, Brian Cavitt, Derek Cornelison, Christopher Cottrell, Peter Mukuria, Steven Riddick, and Kevin Snodgrass ("Named Plaintiffs") bring this action under 42 U.S.C. § 1983, on behalf of themselves and other similar situated prisoners who are, have been, or will be incarcerated in solitary confinement.  ECF No. 1 ¶ 23.[1]  The matter is before the Court on DEFENDANTS' STATEMENT OF POSITION IN SUPPORT OF TRANSFER TO THE WESTERN DISTRICT OF VIRGINIA (ECF No. 32) ("Motion to Transfer").  For the reasons set forth below, the Western District of Virginia is the more logical and convenient forum in which to

---

[1] 42 U.S.C. § 1983 affords no substantive rights.  It merely provides a procedural vehicle for suing in federal court for violation of federal rights by persons acting under color of state law.  <u>See</u> <u>Amato v. City of Richmond</u>, 875 F. Supp. 1124, 1132 (E.D. Va. 1994) (citing <u>Albright v. Oliver</u>, 114 S. Ct. 807, 811 (1994)).

adjudicate the claims here presented.  Accordingly, the case will be transferred.

## I. SUMMARY OF THE PERTINENT ALLEGATIONS

The Complaint alleges that the Plaintiffs and others similar situated "have been isolated in solitary confinement at Virginia's twin maximum security prisons," Red Onion State Prison ("Red Onion") and Wallens Ridge State Prisons ("Wallens Ridge") "and have remained in long-term solitary confinement for between two and 23 years." Compl. ¶ 1.[2] It is said that the Plaintiffs and the class members "are being subjected to prolonged confinement because of the Step-Down Program created and overseen by VDOC . . ." ECF No. 31 at 4.  As a result of their solitary confinement, the Plaintiffs allege that they have suffered "severe physical and mental health damage, including weight loss, auditory and visual hallucinations, emotional distress, Post-Traumatic Stress Disorder, severe sensory deprivation, and suicidal thoughts." Compl. ¶ 2.

The Plaintiffs bring this action on behalf of two classes of prisoners:

> (i) All persons who are currently, or will in the future be confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program (the "Injunction Class").

---

[2] The Complaint does not state the basis for the named Plaintiffs' incarceration.

> (ii) All persons who from August 1, 2012 to the present have been confined at Red Onion or Wallen Ridge at the "Level S" or "Level 6"security levels subject to any phase of the Step-Down Program (the "Damages Class").

Id. ¶ 207.  The Complaint challenges "VDOC's historic pattern of [allegedly] abusing administrative segregation under the guise of [] 'behavior modification' programming, which began when VDOC opened MCC in the 1970s," specifically the VDOC's use of solitary confinement.  ECF No. 31 at 4. The Plaintiffs seek "a remedy that will end VDOC's improper policies and prohibit their resumption at Red Onion, Wallens Ridge, and anywhere else within VDOC's jurisdiction."  Id. at 6.

On October 21, 2019, the Court ordered the parties to submit statements of position "addressing why this action should not be transferred to the United States District Court for the Western District or Virginia" under the rationale of the decision in Nicholas Reyes v. Harold Clarke, et. al., Civil Action No. 3:-18cv611."  ECF No. 30 at 1.  The Plaintiffs filed CLASS PLAINTIFFS' STATEMENT OF POSITION IN SUPPORT OF VENUE AND OPPOSING DISCRETIONARY TRANSFER (ECF No. 31).   The Defendants filed DEFENDANTS' STATEMENT OF POSITION IN SUPPORT OF TRANSFER TO THE WESTERN DISTRICT OF VIRGINIA (ECF No. 32), which the Court will treat as a motion to transfer venue.  Plaintiffs then filed their Reply (ECF No. 35).  Accordingly, the Motion to Transfer is ripe for review.

3

**A. Solitary Confinement and the Step-Down Program**

In August of 2012, VDOC announced the "Segregation Reduction Step-Down Program" (the "Step-Down Program"), Compl. ¶ 130, which was meant to provide a defined pathway for prisoners to transition out of long-term, indefinite solitary confinement and to improve prisoners' likelihood of success in general population.  The Step-Down Program is intended to "motivate increasingly good behaviors by deterring unwanted behavior'" and by changing a prisoner's "thinking and attitude [by] permit[ing] staff to force an inmate to restart the Program if he fails to comply with any of its requirements."  Id. ¶ 131 (citations omitted).  Under the Step-Down Program, prisoners "'earn additional privileges'" at each phase by demonstrating compliance with disciplinary rules, responsible behavior goals, and programming."  Id. (citation omitted).  The Step-Down Program has been implemented at both Red Onion and Wallens Ridge and is meant for prisoners "'who have presented the most serious disciplinary problems'"  Id.

Once it is determined that a prisoner should be placed in long-term solitary confinement, "the prisoner is classified Security Level S."  Id. ¶ 134.

> After a prisoner is classified Security Level S and arrives at Red Onion or Wallens Ridge, a committee named the Dual Treatment Team ("DTT") is required to conduct a battery of assessments to determine whether to place the prisoner in SM or IM based upon their

4

> identified risk level.   According to VDOC
> polices, the DTT consists of at least the
> following personnel from both Red Onion and
> Wallens Ridge: the Chief of Housing and
> Programs, a Unit Manager, the Institutional
> Program Manager, the Intelligence Officer, and
> a GMHP.

Id. ¶ 136.

The Step-Down Program provides a prisoner with two "pathways" out of solitary confinement: Special Management ("SM") and Intensive Management ("IM"). Id. ¶ 135. Prisoners are placed in the SM Pathway if they "display an institutional adjustment indicating repeated disruptive behavior at lower level facilities; a history of fighting with staff or offenders; and/ or violent resistance toward a staff intervention resulting in harm to staff, but without the intent to invoke serious harm or the intent to kill." Id. ¶ 140 (internal citations omitted).   Prisoners are placed in the IM pathway if they: "display a routinely disruptive and threatening pattern of behavior and attitude; or demonstrate potential for extreme and/ or deadly violence against other inmates or staff, as evidenced by their institutional adjustment history or most often through an extensive criminal history and lifestyle; or are incarcerated for a high profile and notorious crime that most often involved serious violence may be at risk from other offenders that believe they will earn a reputation for assaulting or killing the high profile offender." Id. ¶ 141.  In each Pathway,

the prisoner must progress through Phases 0, 1, 2, and SL-6.  Id. ¶ 152.

To determine if a prisoner should remain in solitary confinement, VDOC directs its staff to evaluate whether the prisoner has remained in his current Phase for the mandatory minimum period.  Id. ¶ 155.  SM prisoners must spend at least three months each in Phases SM-0, -1, and -2, and three months in each SM-SL-6 part 1 and 2.  Id.  IM prisoners must spend at least six months each in Phases IM-0, -1, and -2, and one year each in IM-SL-6 part 1 and 2.  Id.  If the prisoner has not spent the mandatory minimum time in his current Phase, he remains at that Phase, regardless of his behavior.  Id.  Prisoners must also demonstrate "progress" in three categories ("Step-Down Categories"): (1) programming; (2) disciplinary infractions; and (3) "responsible behavioral goals."  Id. ¶ 156.  Prison staff, supervised by the Unit Manager, rate prisoners in each of the three categories on a weekly basis and provide each inmate with a grade of "poor, acceptable, or good."  Id. ¶ 157.  The Complaint alleges that "prisoners who cannot complete the workbook series because of educational background, learning disability, cognitive disability, mental illness, or language barrier are evaluated on the same criteria as prisoners without those disabilities or barriers.  When such prisoners inevitably fail to complete programming, VDOC continues to hold them in solitary confinement."  Id. ¶ 162.

6

The Building Management Committee ("BMC") is responsible for making recommendations respecting whether a prisoner's progress in the three Step-Down Categories merits progression to the next phase. Id. ¶ 169. Prisoners have no ability to grieve or appeal review decisions affecting their internal status that are made by the Unit Manager/BMC. Id. ¶ 174. The Institutional Classification Authority ("ICA"), composed of a correctional officer and a counselor, conducts a review every 90 days "in order to ensure that the reclassification of Level S prisoners is consistent with policy." Id. ¶ 175 (internal citations omitted). ICA hearings are held at the prisoner's cell door and determine whether a change is required in the prisoner's "External status," or to the security-level classification in the VDOC-wide system that determines the prisoner's assignment to a maximum-security prison or lower level facilities. Id. ¶ 176.

The Complaint alleges that the "VDOC policy permits long-term solitary confinement on the IM Pathway, with attendant restrictions and lack of privileges, of inmates who belong in a protective custody unit or require additional security precautions for their safety and do not belong in a maximum-security setting at all." Id. ¶ 145.

**B. Alleged Acts and Omissions of the Defendants and the Defendants' Places of Residence**

**1. Virginia Department of Corrections**

The Virginia Department of Corrections ("VDOC") is the executive agency responsible for operating and maintaining correctional facilities within Virginia. VDOC "provides supervision and control over state correctional facilities and their programs and reentry services, which includes the Step-Down Program." Compl. ¶ 37. VDOC has "issued operating procedures governing the Step Down Program at Red Onion and Wallers Ridge." Id. VDOC has its regular place of business in Richmond, Virginia. Id. VDOC is a party to a settlement agreement in Brown v. Landon, the breach of which is the claim in Count I. Id.

**2. Harold Clarke**

Harold Clarke ("Clarke") is the Director of the VDOC, responsible for implementing and overseeing policies and procedures to determine long- and short-range at Red Onion and Wallens Ridge. Compl. ¶ 38. Clarke was involved in the creation of the Step Down Program and allegedly "knows or has reason to know that the Step Down Program permits long term solitary confinement without a legitimate penological purpose, . . ." Id. ¶ 39. Clarke's regular place of business is at the VDOC headquarters in Richmond, Virginia. Id. ¶ 38. He is sued in his individual and official capacity. Id.

8

### 3. Randall C. Mathena

Randall C. Mathena ("Mathena") is the VDOC Security Operations Manager. Compl. ¶ 40. Between October 2011 and January 2015, Mathena was the Warden at Red Onion, where he was responsible for the "care and custody of prisoners at Red Onion, for supervising daily operational activities, and for ensuring staff compliance with VDOC policies and procedures." Id. He was also involved in the development and implementation of the Step Down Program. Id. As the current Security Operations Manager, Mathena is the chairperson of a committee "responsible for performing review of prisoner classifications and pathway assignments in the Step-Down Program at Red Onion and Wallens Ridge." Id. Mathena is sued in his individual and official capacity and has a regular place of business at the VDOC headquarters in Richmond, Virginia. Id.

### 4. H. Scott Richeson

H. Scott Richeson ("Richeson") is the VDOC Deputy Director of Reentry and Programs. Compl. ¶ 41. Richeson has been responsible "for reviewing and approving updates to the Step-Down Program" as well as "supervising the mental health services within VDOC." Id. Richeson is sued in her individual and official capacity and has a principal place of business at the VDOC headquarters in Richmond, Virginia. Id.

**5. A. David Robinson**

A. David Robinson ("Robinson") is the VDOC Chief of
Corrections Operations and has been responsible for reviewing and
approving updates to the Step Down Program. Compl. ¶ 42. Robison
is sued in his individual and official capacity and has a regular
place of business at the VDOC headquarters in Richmond, Virginia.
Id.

**6. Henry J. Ponton**

Henry J. Ponton ("Ponton") is the VDOC Regional Operations
Chief for the Western District and was the former Regional
Operations Administrator in 2015 and 2016. Compl. ¶ 43. Ponton
is responsible for "approving the reassignment or transfer of any
inmate to Red Onion and Wallens Ridge for placement in Level S,"
the security level used by the VDOC for prisoners in long-term
solitary confinement, and is the ultimate authority over decisions
"regarding whether a prisoner should advance through the Step-Down
Program." Id. Ponton is being sued in his individual and official
capacity and has a regular place of business in Roanoke, Virginia.
Id.

**7. Marcus Elam**

Marcus Elam ("Elam") is the VDOC Regional Administrator for
the Western Region and is responsible "for approving any inmate at
Red Onion and Wallens Ridge for placement in Level S, and reviews
determinations by the wardens of Red Onion and Wallens Ridge to

assign prisoners from the Level S security classification." Compl. ¶ 44.  In addition, Elam is responsible for reviewing and approving updates to the Step-Down Program.  <u>Id.</u>  Elam is sued in his individual and official capacity and has a regular place of business in Roanoke, Virginia.  <u>Id.</u>

### 8. Denise Malone

Denise Malone ("Malone") is the Chief of Mental Health Services for VDOC, "which is responsible for stabilization of the mentally ill and minimization of psychiatric deterioration in the correctional setting."  Compl. ¶ 45.  Malone's responsibilities include supervision of those responsible for the provisions of mental health services at Red Onion and Wallens Ridge.  <u>Id.</u>  Malone is "also responsible for VDOC mental health treatment and associated policies and procedures and for the appropriate classification of VDOC prisoners based on mental health needs." <u>Id.</u>  Additionally, Malone is alleged to be responsible for ensuring that all VDOC policies and procedures, including the Step-Down Program, "comply with the mission of VDOC's Mental Health Services and its goal of minimizing psychiatric deterioration within VDOC Correctional Facilities."  <u>Id.</u>  Malone is being sued in her individual and official capacity and has a regular place of business in Richmond, Virginia.  <u>Id.</u>

11

### 9. Steve Herrick

Steve Herrick ("Herrick") is the Health Services Director within VDOC and "is responsible for the supervision of all health care personnel within VDOC, including at Red Onion and Wallens Ridge." Compl. ¶ 46. In addition, Herrick is responsible "for maintaining adequate personnel and infrastructure at all correctional facilities as required to provide adequate and preventative health care" and is formerly responsible for overseeing all mental health services within VDOC institution, including the Step-Down Program's mental health activities and the classification of prisoners with mental health issues at Red Onion and Wallens Ridge. Id. Herrick is sued in his individual and official capacity and has a principal place of business in Richmond, Virginia. Id.

### 10. Tori Raiford

Tori Raiford ("Raiford") is the Statewide Restrictive Housing Coordinator for VDOC and was United Manager of D Building at Red Onion until October 2015. Compl. ¶ 47. As Unit Manager, Raiford reviewed ICA reports. Id. As the Statewide Housing Coordinator, Raiford is responsible "for designing, planning, implementing, and overseeing operations of VDOC's solitary confinement or 'restrictive housing' program." Id. Raiford is sued in her individual and official capacity and has a regular place of business at VDOC headquarters in Richmond, Virginia. Id.

**11. Jeffrey Kiser**

Jeffrey Kiser ("Kiser") is the Warden of Red Onion and was the Assistant Order of Red Onion from 2011 to 2012. Compl. ¶ 48. As Warden,

> [Kiser] has the ultimate responsibility for the care and custody of prisoners at Red Onion, for supervising daily operational activities, and for ensuring staff compliance with VDOC policies and procures, including the Step-Down Program, and specifically, the activities of Red Onion staff and employees and administering and operating the Step-Down Program, . . .

Id.

Additionally, Kiser has the ultimate responsibility over decisions regarding a prisoner's progress through the Step-Down Program and was involved in developing and updating the Step-Down Program. Id. Kiser is sued in his individual and official capacity and has a principal place of business at Red Onion in Pound, Virginia. Id.

**12. Carl Manis**

Carl Manis ("Manis") is the Warden of Wallens Ridge and has

> the ultimate responsibility for the care and custody of prisoners at Wallens Ridge, for supervising daily operational activities, and for ensuring staff compliance with VDOC policies and procedures, including the Step-Down Program, and specifically, the activities of Wallens Ridge staff and employees administering and operating the Step-Down Program, . . .

Compl. ¶ 49.

13

As Warden, Manis also has the ultimate responsibility over decisions regarding a prisoner's progress through the Step-Down Program and was involved in developing and updating the Step-Down Program. Id. Manis is sued in his individual and official capacity and has a regular place of business at Wallens Ridge in Big Stone Gap, Virginia. Id.

## C. Conditions of Confinement Specific to Each Plaintiff

The Plaintiffs are, or have been, incarcerated in solitary confinement by VDOC at Red Onion and/or Wallens Ridge between August 1, 2012 and the present. Compl. ¶ 22.

### 1. William Thorpe

William Thorpe ("Thorpe") has spent approximately twenty-four years in solitary conferment at several VDOC institutions. Compl. ¶ 24. Thorpe is currently 58 years old and "faces the rest of his life in solitary confinement." Id. He was first placed in solitary confinement at Mecklenberg, underwent transfers to Red Onion, Wallen Ridges, and then went back to Red Onion where he is now on the IM Pathway. Id. Thorpe allegedly suffers from physical and mental harms "known to be associated with long term solitary confinement, including constant anxiety, problems with his eyesight, depression, agitation, anger, mood swings, bouts of disorientation, an inability to concentrate, weight loss, a rapid

heartbeat, sweating, shortness of breath, digestive problems, restlessness, and insomnia." Id.

### 2. Frederick Hammer

Frederick Hammer ("Hammer") has spent approximately eight years in solitary confinement at Red Onion on the IM Pathway. Compl. ¶ 25. Red Onion staff allegedly told Hammer that "he will remain in solitary confinement for the rest of his life due to press attention concerning his crimes," notwithstanding that Hammer has not committed any disciplinary infractions since 2009. Hammer allegedly suffers from physical and mental harms "known to be associated with long term solitary confinement, . . ." Id.

### 3. Dmitry Khavkin

Dmitry Khavkin ("Khavkin") spent approximately six years in solitary confinement at Red Onion. Compl. ¶ 26. Khavkin suffers from physical and mental harms known to be associated with long term solitary confinement. Id. Red Onion staff originally assigned Khavkin to the IM Pathway, and then reassigned him to the SM Pathway in 2018. After he agreed to act as a class representative, VDOC transferred him to general population. Id.

### 4. Gerald McNabb

Gerald McNabb ("McNabb") has spent approximately three years in solitary confinement at Red Onion on the IM Pathway and is currently serving a life sentence. Compl. ¶ 27. McNabb suffers

from physical and mental harms known to be associated with long term solitary confinement. Id.

### 5. Gary Wall

Gary Wall ("Wall") has spent approximately three years in solitary confinement at Red Onion on the IM Pathway and will be released from prison when he is 57 years old. Compl. ¶ 28. Wall suffers from physical and mental harms known to be associate with long term solitary confinement. Id.

### 6. Vernon Brooks

Vernon Brooks ("Brooks") has spent approximately four years in solitary confinement at Red Onion on the IM Pathway and will be released from prison when he is 53 years old. Compl. ¶ 29. Brooks suffers from physical and mental health harms known to be associated with long term solitary confinement. Id.

### 7. Brian Cavitt

Brian Cavitt ("Cavitt") has spent approximately two years in solitary confinement at Red Onion on the IM Pathway and is serving a life sentence. Compl. ¶ 30. Upon his arrival to Red Onion, the prison staff allegedly told Cavitt that he would "never see general population in the State of Virginia." Id. Cavitt suffers from physical and mental harms known to be associated with long term solitary confinement. Id.

### 8. Derek Cornelison

Derek Cornelison ("Cornelison") has spent approximately two and a half years in solitary confinement at Red Onion on the IM Pathway and will be released from prison when he is 61 years old. Compl. ¶ 31. Cornelison suffers from physical and mental harms known to be associated with long term solitary confinement. Id.

### 9. Christopher Cottrell

Christopher Cottrell ("Cottrell") has spent approximately seven years in solitary confinement at Red Onion on the SM Pathway and will be released from prison when he is 52 years old. Compl. ¶ 32. Cottrell does not receive transitional re-entry program services "otherwise available to prisoners at VDOC with release dates within five years." Id. Cottrell suffers from physical and mental harms known to be associated with long term solitary confinement. Id.

### 10. Peter Mukuria

Peter Mukuria ("Mukuria") spent approximately seven years in solitary confinement at Red Onion on the IM Pathway and will be released from prison when he is 63 years old. Compl. ¶ 33. Mukuria was allegedly told by Red Onion staff that "he will never see general population." Id. Mukuria suffers from physical and mental harms known to be associated with long term solitary confinement. Id.

### 11.  Steven Riddick

Steven Riddick ("Riddick") has spent over four years in solitary confinement at Red Onion on the SM Pathway and will be released from prison when he is 84 years old.  Compl. ¶ 34.  Riddick suffers from physical and mental harms known to be associated with long term solitary confinement.  Id.

### 12.  Kevin Snodgrass

Kevin Snodgrass ("Snodgrass") spent approximately four years in solitary confinement at Red Onion on the SM Pathway and will be released from prison when he is 72 years old.   Compl. ¶ 35. Snodgrass suffers lingering effects from years spent in solitary confinement.  Id.

## D. The Claims Asserted in the Complaint

### 1. Count I: Breach of Court-Ordered Settlement Agreement

In 1985, VDOC and the individual Defendants became bound to a Settlement Agreement in [Brown v. Landon, No. 81-0853-R (E.D. Va. Apr. 5, 1985)] (the "Brown Settlement").  Compl. ¶ 223.  Under the Brown Settlement, VDOC entered into permanent and binding obligations with respect to the Phase Program and SMU that required no ongoing court supervision.   Id.   The Plaintiffs allege that VDOC and the individual Defendants have breached and continue to breach their obligations under the Brown Settlement and, as a result of the breach, the Plaintiffs and class members "have suffered actual damages and substantial psychological and physical

harms which are present and continuing." Id. ¶ 229.  Further the
Plaintiffs assert that "VDOC should be enjoined from continuing to
operate the Step-Down Program pending a determination at trial of
the damages due to Named Plaintiffs and the class members for the
harms caused by VDOC's breach of the Settlement Agreement." Id.
¶ 230.

### 2. Count II: Violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution

The Plaintiffs allege that they possess a protected liberty
interest in avoiding long-term solitary confinement in Red Onion
and Wallens Ridge pursuant to the Step-Down Program and "are (or
were) entitled to meaningful periodic review of whether there is
(or was) a sustaining and valid reasons for continuing to hold
them in long-term solitary confinement" but that Defendants failed
to provide this meaningful review.  Compl. ¶¶ 232-233.  In so
doing, according to the Plaintiffs, the Defendants have violated
Plaintiffs' rights to procedural due process under the Fourteenth
Amendment.  Id. ¶ 235.

### 3. Count III: Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

The Plaintiffs allege that:

> Defendants are aware that many Plaintiffs have
> similar criminal histories and disciplinary
> infractions, and yet Defendants chose to
> continue to apply vague and overbroad criteria
> for placement in either the IM or SM Pathway,
> leading to divergent classifications for

19

> similarly situated prisoners who pose no
> threat to the safety and security of VDOC.
>     As a result of the overlapping criteria
> for placement in either the IM or SM Pathway,
> <u>Defendants are allowed to arbitrarily assign
> or reclassify prisoners to security
> classifications and privilege levels based
> upon nothing more than their own judgment.</u>
> Whether assigned to the IM or SM Pathway, a
> prisoner's ability or timeline in which to
> progress into the general population unit and
> a prisoner's access to VDOC resources and
> services are vastly different.

Compl. ¶¶ 237-238 (emphasis added). The Plaintiffs assert the
Defendants "thereby intentionally discriminated against Plaintiffs
based on non-penological reasons and violated their rights under
the Equal Protection Clause of the Fourteenth Amendment to the
U.S. Constitution" causing the Plaintiffs to suffer damages. <u>Id.</u>
¶¶ 245-245.

### 4. Count V: Violation of the Eighth and Fourteenth Amendments to the U.S. Constitution[3]

The Complaint alleges that:

> VDOC and each of the individual Named
> Defendants have violated Plaintiffs' Eighth
> and Fourteenth Amendment rights by subjecting
> them to indefinite and long-term solitary
> confinement that serves no legitimate
> penological purpose and that results in
> serious deprivations of basic human needs,
> significant mental and physical harms, and
> substantial risk of such harms. VDOC and each
> of the individual Named Defendants have been
> deliberately indifferent to such harms and
> risk of harms.

---

[3] The Complaint contains no Count IV.

Compl. ¶ 247.

### 5. Count VI: Violation of the Americans with Disabilities Act of 1990

The Complaint alleges that:

> Named Plaintiffs Riddick, Khavkin, Cavitt, and Wall are class members with mental health disabilities who are qualified individuals with disabilities as defined in the [Americans with Disabilities Act ("ADA")]. They have an impairment that substantially limits one or more major life activities, they have a record of such impairment, or they are regarded as having such an impairment. All Named Plaintiffs and class members with mental health disabilities incarcerated at Red Onion and Wallens Ridge meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants, including access to those programs and activities available to prisoners housed in VDOC's general population.

Compl. ¶ 251 (emphasis added). The Complaint also states that the VDOC violates the ADA in several ways, including "by failing to ensure that people with mental health disabilities have access to, are permitted to participate in, and reap the benefits of, programs, services, and activities." Id. ¶ 253. As a result, "Riddick, Khavkin, Cavitt, Wall, and other class members with mental health disabilities do not have equal access to prison activities, programs, and services for which they are otherwise qualified." Id. ¶ 256. Because of the Defendants allegedly discriminatory acts and omissions, the Plaintiffs allege that they

suffered injuries including pain and suffering, emotional distress, and an exacerbation of their mental illness.  Id. ¶ 258.

### 6. Count VII: Violation of Section 504 of the Rehabilitation Act of 1973

"Riddick, Khavkin, Cavitt, Wall, and other class members have disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. 794."  Compl. ¶ 260.  The Class Plaintiffs allege that VDOC "violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate people with mental health disabilities in its facilities, programs, activities, and services."  Id. ¶ 263.


## II. STANDARD FOR TRANSFERRING AN ACTION

28 U.S.C. § 1404(a), which permits the transfer of civil actions, provides that:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

To determine whether a § 1404(a) transfer of venue is appropriate, "a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum."  Koh v. Microtek Int'l, Inc., 250 F. Supp. 2d 627, 630 (E.D. Va. 2003); see also

_Seaman v. IAC/InterActiveCorp, Inc._, No. 3:18-cv-401, 2019 WL 1474392, *3 (E.D. Va. Apr. 3, 2019).

The party seeking transfer of venue bears the burden of showing that the transfer is warranted. _Beam Laser Sys., Inc. v. Cox Commc'ns, Inc._, 117 F. Supp. 2d 515, 518 (E.D. Va. 2000) (citation omitted}. However, "[t]he transfer of a case can be accomplished _sua sponte_." _Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co._, 628 F. Supp. 2d 674, 685 (E.D. Va. 2009) (citing _Jensen v. Klayman_, 115 F. App'x 634, 635-36 (4th Cir. 2004)). Once a court determines that transfer is possible, the court must "consider and balance" four factors to determine whether transfer is warranted: "(1) the weight accorded to plaintiff's choice of venue; {2} witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." _Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc._, 791 F.3d 436, 444 (4th Cir. 2015) (citations omitted). Ultimately, "[t]he decision whether to transfer an action pursuant to § 1404(a) 'is committed to the sound discretion of the district court.'" _BHP Int'l Inv. Inc. v. OnLine Exch., Inc._, 105 F. Supp. 2d 493, 498 (E.D. Va. 2000) (quoting _Verosol B.V. v. Hunter Douglas, Inc._, 806 F. Supp. 582, 591 (E.D. Va. 1992)).

## A. The Action Could Have Been Brought in the Western District of Virginia

The first step in the transfer analysis, which requires that both venue and jurisdiction with respect to each defendant be proper in the transferee district, looks to whether the action could have originally been brought in the Western District of Virginia. <u>Koh</u>, 250 F. Supp. 2d at 630; <u>Hengle</u>, 2018 WL 3016289, at *5. Neither party disputes that the case could have been brought in the Western District.

## B. The Section 1404(a) Factors Weigh in Favor of Transfer

In the second step of the § 1404(a) transfer analysis, a court must weigh the following factors: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." <u>Trs. of the Plumbers & Pipefitters Nat. Pension Fund</u>, 791 F. 3d at 444 (citations omitted). Weighing these factors together, the factors support transfer to the Western District of Virginia.

### 1. Plaintiff's Choice of Forum

The Plaintiffs' choice of forum, the Eastern District of Virginia, weighs slightly in favor of allowing the claim to remain in the Eastern District. "As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" <u>Trs. of the Plumbers & Pipefitters Nat. Pension Fund</u>, 791 F. 3d at 444 (quoting <u>Bd. of Trs. v.</u>

Sullivant Ave. Props., LLC, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007)). "But, if the plaintiff's choice of forum is neither the nucleus of operative facts nor the plaintiff's home forum, the plaintiff's choice is accorded less weight." Seaman v. IAC/InterActiveCorp, Inc., No. 3:18-CV-401, 2019 WL 1474392, at *4 (E.D. Va. Apr. 3, 2019) (citing Intranexus, Inc. v. Siemens Med. Sols. Health Servs. Corp., 227 F. Supp. 2d 581, 583 (E.D. Va. 2002)).

The record is not clear whether the Eastern District is home forum for the Plaintiffs. The allegations in the Complaint establish only that each of the Plaintiffs are, or have been, incarcerated at Red Onion or Wallens Ridge, which are both located in the Western District of Virginia.

The determination of the operative factual nucleus hinges on the interpretation of the allegations in the Complaint. Plaintiffs contend that the nucleus of operative facts is located within the Eastern District because their action "is predominantly a facial, constitutional challenge to how the VDOC Defendants in Richmond devised, created, authorized, and administered the solitary-confinement policies imposed on the Class Plaintiffs." ECF No. 31 at 8-9. The Defendants, on the other hand, maintain that the Complaint bears little relation to the Eastern District and instead focuses on the harm suffered as a result of the Step-Down Program

as administered by prisons located within the Western District of Virginia.  ECF No. 32 at 4.

Plaintiffs' allegations, similar to those in Reyes, stem from the allegedly unconstitutional impact that the Step-Down Program, as implemented at Red Onion and Wallens Ridge, two prisons located in the Western District, had on prisoners.  However, unlike the claims in Reyes, the Complaint focuses heavily on allegations that the Step-Down Program and VDOC policies "are procedurally inadequate as designed and do not actually evaluate whether any prisoner's solitary confinement serves any of the valid purposes of administrative segregation."  ECF No. 31 at 5; See, e.g. Compl. ¶ 16.[4].  Also, the Complaint challenges how the Defendants devised, formulated, implemented and continue to oversee the solitary confinement system imposed upon the Plaintiffs and the classes they posit.  In Reyes, on the other hand, the complaint focused on the "specific misconduct of Defendants and other individuals in the Western District of Virginia [as applied to Reyes].  For example, Reyes' Eighth Amendment mental health claims rely on the

---

[4] "The current Step-Down Program is a system of vague standards, contradictory goals, and malleable jargon used to conceal what is nothing more than an indefinite or permanent solitary confinement regime. Like the failed Mecklenburg solitary confinement program that VDOC had pledged to abolish permanently, VDOC's Step-Down Program offers prisoners no predictable way to progress out of solitary confinement while also making it virtually impossible to hold VDOC accountable for how the solitary confinement program is operated or administered."

alleged acts of deliberate indifference to his deteriorating mental health by [named defendants]." No. 3:18cv611, 2019 WL 4195344, at *10-11 (E.D. Va. Sept. 4, 2019). Here, the Plaintiffs concentrate their allegations on the VDOC's policies relating to solitary confinement, and not as heavily (as in Reyes) on the conditions of solitary confinement subject to each plaintiff.[5]

For instance, Count III of the Complaint in this case alleges a violation of the Equal Protection Clause of the United States Constitution based upon an issue with the design of the VDOC solitary confinement policy, namely the:

> lack of meaningful criteria and independent accountability for Defendants' decisions has created a system in which staff freely classify similarly situated prisoners differently without valid penological reasons or purposes. The subjective and discretionary decision-making process deprives Plaintiffs of any reliable and concrete steps they can take to progress out of the program, which disincentivizes prisoner improvement in behavior or self-development to earn privileges or lower restrictions.

Compl. ¶ 239. This allegation is not premised on the individual actions of the Defendants but, rather, the error in the VDOC's policy as a whole.

---

[5] See, e.g. id. ¶ 212 (stating that the Defendants have implemented the "Step Down Program without meaningful or independent accountability and have continually and knowingly implemented the Step-Down Program in a manner that ignores the serious harms or substantial risk of serious harms posed by solitary confinement pursuant to the Step-Down Program at Red Onion and Wallens Ridge.").

Thus, notwithstanding the allegations about the impact of the challenged policy on the individual Plaintiffs, the Complaint presents an emphasis on the VDOC policy decisions respecting development, and overall administration of the Step-Down Program are made. The VDOC Defendants "devised, created, authorized, and administered the solitary-confinement policies imposed on the Class Plaintiffs" in Richmond, where the VDOC headquarters are located. ECF No. 31 at 8-9. On the other hand, the Complaint also focuses heavily on the conduct of VDOC officials and employees who implemented the policies at issue. Most of those officials and employees are in the Western District of Virginia. On balance, the nucleus of operative facts is the Eastern District of Virginia.[6] Hence, the Plaintiffs' chosen forum is entitled to some, but not dispositive, weight.

---

[6] The Defendants correctly point out that "courts often give less weight to the plaintiff's choice of forum in class actions" because in such a case, "there will be numerous potential plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class'[s] claim." ECF No. 32 at 6 (quoting Byerson v. Equifax Info. Servs., LLC, 467 F. Supp. 2d 627, 633 (E.D. Va. 2006)). However where, as here, "the Plaintiffs' choice of forum is amenable to inexpensive discovery and trial" because it is home to both Defendants and key witnesses, a plaintiff's choice of forum is entitled to weight that is not materially diminished merely because the case is a class action. Byerson v. Equifax Info. Servs., LLC, 467 F. Supp. 2d 627, 633 (E.D. Va. 2006).

## 2. Witness Convenience

The second factor of the § 1404(a) analysis focuses on the convenience to the witnesses testifying at a trial. The convenience of witnesses is of considerable importance when considering a transfer, especially the convenience of nonparty witnesses, whose location should be afforded greater weight in deciding a motion to transfer venue. See Fitzgibbon v. Radak, No. 3:18-cv-247, 2019 WL 470905, at *4 (E.D. Va. Feb. 6, 2019); Koh, 250 F. Supp. 2d at 636-37. The party asserting witness inconvenience must offer sufficient details respecting the witnesses and their potential testimony, "by affidavit or otherwise," to enable the Court to assess the materiality of evidence and the degree of inconvenience. Koh, 250 F. Supp. 2d at 636. In other words, generally, "the influence of this factor cannot be assessed in the absence of reliable information identifying the witnesses involved and specifically describing their testimony." Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc., 702 F. Supp. 1253, 1258 (E. D. Va. 1988). To satisfy the burden that a forum is inconvenient for witnesses, generally the party seeking the transfer must provide particularized information of a witness' potential testimony, how that testimony is material and non-cumulative, or the degree to which it will be inconvenient to

access that testimony in the present district. See <u>Koh</u>, 250 F. Supp. 2d at 636.

The Defendants, who aim to transfer the case to the Western District of Virginia, admit that, at this stage, they do not know the identity, or the scope, of testimony of all non-party witnesses; but they state that, "given the nature of Plaintiffs' claims, involving the constitutionality of the conditions in which they and the putative class members have been confined at Red Onion and Wallens Ridge, it is likely that many of the non-party witnesses will be prison administrators, corrections officials, and other employees and staff located in the Western District." ECF No. 32 at 8.

In support of their request to transfer, the Defendants have submitted the affidavit of Defendant Ponton, the Western Regional Operations Chief for the Western District of the VDOC.   <u>See generally</u> ECF No. 32-1.   Initially, Ponton notes that, "[Red Onion], which is located in Pound, Virginia, is located approximately 368 miles from the federal district courthouse in Richmond, Virginia. It is 59 miles from the federal district courthouse in Abingdon, Virginia, and 29 miles from the federal district courthouse in Big Stone Gap, Virginia." <u>Id.</u> ¶ 4. Further, Ponton states that:

> specific potential witnesses have not yet been
> identified, but would include, from both ROSP
> and WRSP, the correctional officers,

lieutenants, and sergeants who would have interacted with the inmates on a daily basis; unit managers, who oversee the administration of the housing units and therefore also interact with the inmates on a daily or near-daily basis; numerous medical and mental health personnel, including nurses and qualified mental health professionals; case counselors; and other security personnel and administrators, including the wardens, assistant wardens, majors, chief of housing and programs, institutional investigators, disciplinary hearings officers, and grievance coordinators. Each of these categories of individuals, the identities of whom have changed over time, would have interacted with one or more of the individual plaintiffs or putative class members and would therefore be able to provide testimony about their conditions of their confinement, their state of mind, and whether they exhibited any signs of significant mental decline during their incarceration at ROSP or WRSP.

If this matter were to proceed to trial, the prolonged absence of numerous employees or non-party witnesses from ROSP would be incredibly disruptive to the operation of that maximum-security level facility, which houses approximately 778 inmates. If a significant number of ROSP employees were compelled to be absent from this facility, over a period of several days, in order to testify at a jury trial in Richmond, ROSP would need to take extraordinary steps to ensure the continuing safety and security of this facility.

Specifically, the absence of that number of employees would result in the prison being critically understaffed. ROSP would likely be compelled to either transfer a portion of its current inmate population to other VDOC facilities, and/or bring in correctional officers and employees from other VDOC facilities to help staff the prison.

Moreover, transporting the twelve named plaintiffs (or any non-party witnesses who are inmates) to Richmond for purposes of trial would also present logistical issues, the

31

severity of which would vary depending upon the number of non-party inmate witnesses called to testify. Considering the distance between ROSP and the federal courthouse in Richmond, any testifying inmates would need to be transported to the Richmond area the day before their scheduled testimony, and temporarily placed at a facility that could safely house level "S" inmates. For the reasons discussed above, temporarily transferring level "S" inmates presents logistical difficulties, which would be amplified in the potential absence of enough security officers to escort these inmates to the Richmond area. The transporting officers would be in addition to any ROSP staff members who would be called to testify at trial, and in addition to the number of officers who would need to be left behind to safely staff the prison. Additional logistical concerns include the possible need to house inmate witnesses at multiple separate facilities, depending upon their security levels and any "enemy" declarations in their inmate records.

For these reasons, if this case were to proceed to a jury trial, and if that trial were held in Richmond, the resulting staffing shortages at ROSP, caused by the absence of the parties and witnesses, would critically undermine the safety and security of that prison. Similar security concerns would exist at WRSP. Considering the many logistical difficulties posed by trying a case of this nature over 350 miles away from ROSP and WRSP, a Richmond trial would impose a significant burden on not just the named ROSP defendants, but would also greatly strain any remaining ROSP and WRSP staff and would deplete overall prison resources.

Id. at 2-5 (internal paragraph numbers omitted).

Ponton further explains that the above problems would not occur if the matter were tried in the Western District of Virginia.

32

That perhaps is an overstatement, but the logistical issues would be considerably less severe because:

> Considering the close proximity of ROSP and WRSP to those courthouses, the prison would be able to rotate shifts and allow for the temporary absence of employees who might need to appear in court to testify. Also, ROSP and WRSP are accustomed to transporting inmates back and forth to those courthouses to testify, and no relocation or reassignment would be required in order to bring those witnesses to court for purposes of testifying to the jury, and afterwards to return them to their regularly assigned housing.

Id. ¶ 17.

Notwithstanding the focus on VDOC policy in the Complaint, the Plaintiffs' claims arise, in material part, out of their confinement in Red Onion or Wallens Ridge and out of administration of VDOC policy at those prisons.  It is clear that the Plaintiffs will need to testify to support these claims.  The burden of moving and housing defendants for the duration of any trial falls on the Defendants.  Cf. Starnes v. McGuire, 512 F.2d 918, 931 (D.C. Cir. 1974) ("The burdens and dangers involved in transporting a prisoner across long distances are, in our opinion, a significant inconvenience to the Bureau of Prisons and will normally justify transfer.").  Further, in order to explain the circumstances surrounding each Plaintiff's confinement, Defendants, as they point out, will be required to call prison employees from Red Onion and Wallens Ridge to defend against the Plaintiffs' claims.  Keitt

33

v. New York, No. 12 CIV. 2350 (PAE), 2013 WL 3479526, at *3
(S.D.N.Y. July 10, 2013) (finding that witnesses in a prison abuse
suit were likely to be located at or near the correctional
facilities where the abuse occurred).  Given that the claims at
hand involve prolonged periods of alleged mistreatment of the
Plaintiffs and widespread maladministration of VDOC policies,
Defendants will be required to call a significant number of current
and former prison employees in order to defend themselves.  And,
that remains the case even though there will be testimony from
witnesses located in Richmond about formulation of the policy.

On the other hand, the Plaintiffs rightly assert that "any
non-party witnesses also are likely to reside in Richmond as they
will be testifying to the history and process of policymaking at
VDOC itself" and point out that eight of the twelve Defendants
reside in Richmond.  ECF No. 31 at 10.  In addition, to the extent
Plaintiffs require the testimony of non-party witnesses outside of
the Eastern District, the Plaintiffs note that video depositions
of those witnesses can be used at trial.  Id.; see Doka USA, Ltd.
v. Gateway Project Mgmt., LLC, No. WDQ-10-1896, 2011 U.S. Dist.
LEXIS 82380, at *35 (D. Md. July 25, 2011) (finding that the party
asserting witness inconvenience failed to show "that alternatives
to live testimony, such as video depositions, would be
inadequate").  Considering that a majority of the Defendants are
located within the Western District of Virginia and that the other

evidence before the Court strongly establishes that the Western District of Virginia will be the most convenient forum for the vast majority of witnesses, this factor weighs heavily in favor of transfer.

### 3. Convenience of the Parties

The moving party "must show (1) that the original forum is inconvenient for them and (2) that [the non-moving party] will not be substantially inconvenienced by the transfer." Seaman, 2019 WL 1474392, at *6 (citing Fitzgibbon, 2019 WL 470905 at *3; Koh, 250 F. Supp. 2d at 636). The Defendants have demonstrated that they will be inconvenienced by conducting a trial in the Eastern District of Virginia. While it is not now completely clear what the total of trial witnesses will be, it appears that this case will present a similar number of witnesses as the number of witnesses in Reyes and will require significant shifting of VDOC resources at Red Onion and Wallens Ridge to conduct a trial on this matter in the Eastern District of Virginia. Reyes, 2019 WL 4195344, at *13. The Plaintiffs have proffered no compelling evidence to show that they would suffer significant inconvenience as a result of a transfer. Thus, this factor strongly favors transfer to the Western District of Virginia.

### 4. The Interest of Justice

"The last factor for the Court to consider is 'the interest of justice,' which encompasses public interest factors aimed at 'systemic integrity and fairness.'" Seaman, 2019 WL 1474392, at *7 {quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30 {1988)). Judicial economy and the avoidance of inconsistent judgments are prominent among the principal elements of systemic integrity. See Fitzgibbon, 2019 WL 470905, at *4; U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd., 357 F. Supp. 2d 924, 937-38 (E.D. Va. 2005). Other factors include "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, and the possibility of harassment." Koh, 250 F. Supp. 2d at 639.

Both the avoidance of inconsistent judgments and judicial economy favor transferring the action to the Western District of Virginia.

> In the decades that the undersigned has been sitting in Richmond, this Court has not ever issued a final judgment as to whether the conditions at Red Onion and the Step-Down Program pass constitutional muster. However, the United States District Court for the Western District of Virginia regularly addresses those issues. Thus, the possibility for inconsistent judgments respecting the constitutionality of the conditions at Red Onion and the Step-Down Program will be greatly reduced if this matter is transferred to the Western District of Virginia.

36

Reyes, 2019 WL 4195344, at *14.

Furthermore, public safety and the efficient operation of Virginia's prison system are matters of great public interest. Having a trial in this Court will necessitate the transport of many inmates over long distances (with necessary stops) and the housing of those inmates for an unknown period. That process poses risk of escape, at worst, and difficult management of difficult (according to the Complaint) prisoners. To do that for just the Plaintiffs will necessitate the use of numerous VDOC guards. And, the record is clear that many VDOC witnesses, and perhaps prisoners other than the Plaintiffs, would have to travel from the Western District of Virginia to Richmond for trial. The record shows that this will have an adverse impact on staffing at Red Onion and Wallens Ridge. The public interest will be best served by not running the risks associated with transporting a number of difficult to manage prisoners over long distances and by avoiding significant constraints on the management of prisons.

Therefore, the interest of justice favors transfer to the Western District. Considered as a whole, the § 1404(a) factors strongly favor transferring the matter to the Western District of Virginia, the Defendants' request to Transfer (ECF No. 32) will be granted.

## III. CONCLUSION

For the reasons stated above, the Defendants' Motion to Transfer (ECF No. 32) will be granted and this action will be transferred to the Western District of Virginia.[7]

It is so ORDERED.

_____ /s/   *RSP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  April *20*, 2020

_____

[7] It will be up to the judges in that District to determine where, within the District, the case will be assigned and the trial held.
   Also, it is best to leave resolution of the various other motions (ECF Nos. 18, 21 and 36) to the transferee court.