# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

WILLIAM THORPE, et al.,

         Plaintiffs

v.

VIRGINIA DEPARTMENT
  OF CORRECTIONS, et al.,

         Defendants

**REPORT AND
RECOMMENDATION**
Civil Case No. 2:20cv00007

In this proposed class action, the 12 named plaintiffs bring this prisoners' civil rights lawsuit against the Virginia Department of Corrections, ("VDOC"), and certain VDOC officials and employees. This matter is before the court on the defendants' motions to dismiss, (Docket Item Nos. 18, 21) ("Motions"). The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report and recommended disposition.

## I.     Facts

The plaintiffs in this action – William Thorpe, Frederick Hammer, Dmitry Khavkin, Gerald McNabb, Gary Wall, Vernon Brooks, Brian Cavitt, Derek Cornelison, Christopher Cottrell, Peter Mukuria, Steven Riddick and Kevin Snodgrass – are all VDOC prisoners at either Wallens Ridge State Prison, ("Wallens Ridge"), or Red Onion State Prison, ("Red Onion"). The plaintiffs allege that they

have been held in long-term solitary confinement for between two and 23 years, which has caused them severe physical and mental health damage, including weight loss, auditory and visual hallucinations, emotional distress, post-traumatic stress disorder, severe sensory deprivation and suicidal thoughts. Plaintiffs allege that the VDOC's Segregation Reduction Step-Down Program, ("Step-Down Program"), at Wallens Ridge and Red Onion is "a system of vague standards, contradictory goals, and malleable jargon used to conceal what is nothing more than an indefinite or permanent solitary confinement regime." (Docket Item No. 1 at 6, ("Complaint")). They allege that the Step-Down Program "offers prisoners no predictable way to progress out of solitary confinement while also making it virtually impossible to hold VDOC accountable for how the solitary confinement program is operated or administered." (Complaint at 6.)

The plaintiffs also allege that the Step-Down Program is in violation of the settlement agreement entered into by the VDOC in *Brown v. Landon*, No. 81-0853-R (E.D. Va.), in which the VDOC agreed to cease using any version of solitary confinement "similar to" the Phase Program and Special Management Unit, ("SMU"), utilized at Mecklenburg Correctional Center, ("Mecklenburg").

The plaintiffs each allege that he "was originally sentenced to confinement in the general population and was later transferred to solitary confinement." The Complaint alleges the following regarding the 12 named plaintiffs:

1. William Thorpe has spent approximately 24 years in solitary confinement at Mecklenburg, Red Onion and Wallens Ridge.  Thorpe currently is participating in the Intensive Management,  ("IM"), Pathway. Thorpe suffers from constant anxiety, problems with his

eyesight, depression, agitation, anger, mood swings, bouts of disorientation, an inability to concentrate, weight loss, a rapid heartbeat, sweating, shortness of breath, digestive problems, restlessness and insomnia – physical and mental harms "known to be associated with long-term solitary confinement." Plaintiffs allege that Thorpe was subjected to solitary confinement at Mecklenburg and is within the class defined in *Brown*. At the time of the filing of the Complaint, Thorpe was 58 years old, and his VDOC release date is May 11, 2057. Plaintiffs allege that Thorpe has been told by unnamed VDOC employees that he will not leave solitary confinement on the IM Pathway, regardless of whether he commits any disciplinary infractions;

2.      Frederick Hammer has spent approximately eight years in solitary confinement at Red Onion on the IM Pathway. Hammer was serving time in the general population of Wallens Ridge in 2011 when he was transferred to Red Onion, where he has remained in solitary confinement ever since.  Hammer had not committed any disciplinary infraction from when he entered prison in 2009 until his transfer in 2011. Hammer suffers from anxiety, depression, agitation, anger, mood swings, bouts of disorientation, an inability to concentrate, thoughts of suicide or other self-harm, shortness of breath, headaches or migraines, restlessness and insomnia – physical and mental harms "known to be associated with long-term solitary confinement."  Hammer is serving multiple life sentences. Unnamed Red Onion staff repeatedly have told Hammer that he will remain in solitary confinement for the rest of his life due to press attention concerning his crimes;

3.   Dmitry Khavkin spent approximately six years in solitary confinement
     at Red Onion, first in the IM Pathway and, after October 2018, in the
     Special Management, ("SM"), Pathway. Khavkin suffers from
     depression, anxiety, post-traumatic stress disorder, schizoaffective
     disorder, psychosis, hallucinations, insomnia, hearing voices, agitation,
     mood swings, bouts of disorientation, an inability to concentrate, a
     rapid heartbeat, sweating, shortness of breath, digestive problems,
     headaches or migraines and restlessness – physical and mental harms
     "known to be associated with long-term solitary confinement."
     Khavkin is often confused, frightened, isolated and occasionally
     suicidal.  Khavkin lost at least 30 pounds while in solitary confinement.
     At the time of the filing of the Complaint, Khavkin's release date is
     August 11, 2049, when he will be 66 years old. Khavkin was transferred
     to general population after agreeing to act as a class representative in
     this action;

4.   Gerald McNabb has spent three years in solitary confinement at Red
     Onion in the IM Pathway. Plaintiffs allege that McNabb was subjected
     to solitary confinement at Mecklenburg and is within the class defined
     in *Brown*.  McNabb suffers from anxiety, anger, bouts of disorientation,
     an inability to concentrate, weight loss, shortness of breath, headaches
     or migraines and restlessness – physical and mental harms "known to
     be associated with long-term solitary confinement." McNabb is serving
     a life sentence;

5.   Gary Wall has spent three years in solitary confinement at Red Onion
     in the IM Pathway. Wall suffers from anxiety attacks, depression,
     weight loss, post-traumatic stress disorder, inability to concentrate,
     high blood pressure, pacing in his cell, insomnia, restlessness and

regular migraines – physical and mental harms "known to be associated with long-term solitary confinement." Wall's release date is April 19, 2032, when he will be 57 years old;

6.      Vernon Brooks has spent approximately four years in solitary confinement at Red Onion in the IM Pathway. Brooks was transferred to Red Onion as a general population inmate, but he was reclassified to Level "S"[1] solitary confinement for reasons unknown to Brooks. Brooks suffers from pacing, agitation, inability to concentrate, weight loss, insomnia and short-term memory lapses  – physical and mental harms "known to be associated with long-term solitary confinement." Brooks's release date is August 5, 2037, when he will be 53 years old;

7.      Brian Cavitt has spent approximately two years in solitary confinement at Red Onion in the IM Pathway. Cavitt suffers from pacing, anxiety, depression, bouts of disorientation and/or vertigo, insomnia, weight loss and constant headaches  – physical and mental harms "known to be associated with long-term solitary confinement." Cavitt has been diagnosed with oppositional defiant disorder. Cavitt is serving a life sentence. Upon his arrival at Red Onion, unnamed prison staff told Cavitt, who was transferred to Red Onion from a facility in Massachusetts, he "would never see general population in the State of Virginia;"

8.      Derek Cornelison has spent approximately two and one-half years in solitary confinement at Red Onion in the IM Pathway. Cornelison suffers from anxiety, depression, agitation, irrational anger, mood

---

[1] Security Level "S" is the security level VDOC uses for prisoners in long-term solitary confinement.

swings, bouts of disorientation, an inability to concentrate, sweating, shortness of breath, digestive problems, claustrophobia, headaches or migraines, restlessness, insomnia and thoughts of suicide or other self-harm – physical and mental harms "known to be associated with long-term solitary confinement." Cornelison has lost 20 pounds since his placement in long-term solitary confinement. Cornelison's release date is December 26, 2045, when he will be 61 years old;

9.   Christopher Cottrell has spent approximately seven years in solitary confinement at Red Onion in the SM Pathway. Cottrell suffers from anxiety, pacing, anger, thoughts of suicide or other self-harm and weight loss – physical and mental harms "known to be associated with long-term solitary confinement." Cottrell's release date is July 14, 2021, when he will be 52 years old. Cottrell is not receiving transitional re-entry programming or services otherwise available to VDOC prisoners with release dates within five years;

10.  Peter Mukuria has spent approximately seven years in solitary confinement at Red Onion in the IM Pathway.  Mukuria suffers from memory loss, severe anxiety, insomnia, racing thoughts, feelings of desperation, depression, agitation, irrational anger, mood swings, bouts of disorientation, an inability to concentrate, weight loss, digestive problems, headaches or migraines, insomnia, restlessness, thoughts of suicide or other self-harm and has engaged in self-harming behavior – physical and mental harms "known to be associated with long-term solitary confinement." Mukuria was told by unnamed Red Onion staff that he will never see general population. Mukuria's release date is September 20, 2049, when he will be 63 years old;

-6-

11.   Steven Riddick has spent over four years in solitary confinement at Red Onion in the SM Pathway. Riddick suffers from schizophrenia, major depressive disorder, anxiety, dizziness, blurred vision, persistent chest pain, hearing voices, agitation, irrational anger, mood swings, bouts of disorientation, an inability to concentrate, a rapid heartbeat, high blood pressure, sweating, shortness of breath, digestive problems, headaches or migraines, insomnia and restlessness – physical and mental harms "known to be associated with long-term solitary confinement." Riddick has lost 75 pounds while in solitary confinement. Riddick's release date is December 6, 2058, when he will be 84 years old; and

12.   Kevin Snodgrass spent approximately four years in solitary confinement at Red Onion in the SM Pathway. Snodgrass was transferred to Wallens Ridge in May 2018. Snodgrass suffers from paranoia, anxiety, issues with social interaction and increased tension around guards, which he claims are "lingering effects from years spent in solitary confinement." Snodgrass's release date is October 16, 2053, when he will be 72 years old.

Plaintiffs allege that the VDOC has never attempted to assess the impact of its solitary confinement practices on the health of prisoners, does not maintain a medical doctor or psychiatrist on staff at either Red Onion or Wallens Ridge and has not sought to prevent or ameliorate the harms of solitary confinement on any of the named plaintiffs or members of the proposed class, who are at substantial risk of serious harm due to the VDOC's solitary confinement policies and practices.

The plaintiffs allege that the VDOC is the executive agency responsible for operating and maintaining correctional facilities within Virginia. They allege that

the VDOC provides supervision and control over state correctional facilities and their programs and re-entry services, which includes the Step-Down Program. The VDOC is responsible for issuing regulations, policies, directives and operating procedures governing the operation of state correctional facilities and has issued operating procedures governing the Step-Down Program at Red Onion and Wallens Ridge. The VDOC is statutorily required to establish and maintain a clinical treatment program for certain prisoners within its custody, including clinical assessments of the prisoners and development of appropriate treatment plans. The VDOC also is responsible for developing and implementing a comprehensive re-entry plan for each inmate in its custody.

Plaintiffs allege that defendant Harold Clarke is the Director of the VDOC and is responsible for supervising and managing the VDOC and its system of state correctional facilities, including Red Onion and Wallens Ridge. Clarke is responsible for implementing and overseeing policies and procedures to determine long- and short-term goals for Virginia's correctional facilities and for reviewing and approving all policies and procedures designed to promote the safety and security of prisoners assigned to restrictive housing in state correctional facilities. Plaintiffs allege that Clarke has the discretionary authority to assign any prisoner to any VDOC institution. Clarke is sued in his individual and official capacities. Plaintiffs allege that Clarke was involved in the creations of Operating Procedure, ("OP"), 830.A, the VDOC's Segregation Reduction Step-Down Program, the Restrictive Housing Reduction Step-Down Program Operations Strategy Manual and subsequent updates, (collectively, the "Step-Down Program"). Clarke knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose, and knows or has reason to know that long-term solitary confinement causes severe mental and physical harms.

-8-

Plaintiffs allege that defendant Randall C. Mathena is the VDOC Security Operations Manager, who between October 2011 and January 2015, was the Warden at Red Onion. As Warden, plaintiffs allege, Mathena was responsible for the care and custody of Red Onion prisoners, for supervising daily operational activities and for ensuring staff compliance with VDOC policies and procedures.  They also allege that Mathena was involved in the development and implementation of the Step-Down Program.  As Security Operations Manager, plaintiffs allege, Mathena is chairperson of the External Review Team, ("ERT"), which is responsible for performing reviews of prisoner classifications and pathway assignments in the Step-Down Program at Red Onion and Wallens Ridge.  Plaintiffs further allege that Mathena knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms.  Mathena is sued in his individual and official capacities.

Plaintiffs allege that defendant H. Scott Richeson is the VDOC Deputy Director of Reentry and Programs, is or has been a member of the ERT, has been responsible for reviewing and approving updates to the Step-Down Program and is responsible for supervising the mental health services with the VDOC. Plaintiffs allege that Richeson knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms. Richeson is sued in her individual and official capacities.

Plaintiffs allege that defendant A. David Robinson is the VDOC Chief of Corrections Operations and is responsible for the daily operations and overall safety

of Virginia's correctional facilities, including supervising the VDOC's "restrictive housing" program and compliance with federal laws. They allege that Robinson is a member of the ERT and has been responsible for approving all staff members of the ERT. They further allege that Robinson has been responsible for reviewing and approving updates to the Step-Down Program. They allege that Robinson knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms. Robinson is sued in his individual and official capacities.

Plaintiffs allege that defendant Henry J. Ponton is the VDOC Regional Operations Chief for the Western Region and was the former Regional Operations Administrator in 2015 and 2016. As Regional Operations Chief, plaintiffs allege, Ponton is responsible for approving the reassignment or transfer of any inmate to Red Onion and Wallens Ridge for placement in Level S and has ultimate authority over decisions made by the Dual Treatment Team, ("DTT"), regarding whether a prisoner should advance through the Step-Down Program. Ponton has been a member of the ERT and has been involved in developing, reviewing and approving updates to the Step-Down Program. Plaintiffs allege that Ponton knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms. Ponton is sued in his individual and official capacities.

Plaintiffs allege that defendant Marcus Elam is the VDOC Regional Administrator for the Western Region and is responsible for approving any inmate at Red Onion and Wallens Ridge for placement in Level S and reviews

determinations by the wardens of Red Onion and Wallens Ridge to assign prisoners from the Level S security classification. Plaintiffs allege that Elam has served as a member of the ERT and has been responsible for reviewing and approving updates to the Step-Down Program.  They allege that Elam knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms.  Elam is sued in his individual and official capacities.

Plaintiffs allege that defendant Denise Malone is the Chief of Mental Health Services for the VDOC, which is responsible for stabilization of the mentally ill and minimization of psychiatric deterioration in the correctional setting. Plaintiffs allege that Malone is responsible for the supervision of all mental health clinical supervisors, including the supervisors responsible for the provision of mental health services at Red Onion and Wallens Ridge, and for VDOC mental health treatment and associated policies and procedures and for the appropriate classification of VDOC prisoners based on mental health needs.   They allege that Malone is responsible for ensuring that all VDOC policies and procedures, including the Step-Down Program, comply with the mission of the VDOC's Mental Health Services and its goal of minimizing psychiatric deterioration within VDOC correctional facilities. The allege that Malone is a member of the ERT and is responsible for handling grievance appeals, for approving the mental health program and trainings at VDOC institutions and for supervising and administering disciplinary actions for Qualified Mental Health Professionals, ("QMHPs"). Plaintiffs allege that Malone knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms.  Malone is sued in her individual and official capacities.

Plaintiffs allege that defendant Steve Herrick is the VDOC Health Services Director and is responsible for the supervision of all health care personnel within the VDOC, including those at Red Onion and Wallens Ridge. Plaintiffs allege that Herrick is responsible for maintaining adequate personnel and infrastructure at all correctional facilities as required to provide adequate and preventative health care. They allege that Herrick was formerly responsible for overseeing all mental health services within VDOC institutions, which included the Step-Down Program's mental health activities, as well as the classification of prisoners with mental health issues at Red Onion and Wallens Ridge. Plaintiffs allege that Herrick knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms. Herrick is sued in his individual and official capacities.

Plaintiffs allege that defendant Tori Raiford is the Statewide Restrictive Housing Coordinator for the VDOC and was Unit Manager of D Building at Red Onion until October 2015. In her role as Unit Manager, plaintiffs allege, Raiford was a member of the DTT and ERT and reviewed Institutional Classification Authority, ("ICA"), reports. As the Statewide Restrictive Housing Coordinator, plaintiffs allege, Raiford is responsible for designing, planning, implementing and overseeing operations of the VDOC's solitary confinement or "restrictive housing" program. Plaintiffs allege that Raiford knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms. Raiford is sued in her individual and official capacities.

Plaintiffs allege that defendant Jeffrey Kiser is the Warden at Red Onion and served as Assistant Warden of Red Onion from 2011 to 2012. As Warden, plaintiffs allege, Kiser has the ultimate authority for the care and custody of prisoners at Red Onion, for supervising daily operational activities and for ensuring staff compliance with VDOC policies and procedures, including the Step-Down Program, and, specifically, the activities of Red Onion staff and employees administering and operating the Step-Down Program, including Unit Managers, QMHPs and psychologists used by Red Onion. As Warden, plaintiffs allege, Kiser is the Facility Unit Head of Red Onion and has ultimate responsibility over DTT decisions regarding a prisoner's progress through the Step-Down Program. Plaintiffs allege that Kiser was involved in developing and updating the Step-Down Program. Plaintiffs allege that Kiser knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms. Kiser is sued in his individual and official capacities.

Plaintiffs allege that defendant Carl Manis is the Warden at Wallens Ridge. As Warden, plaintiffs allege, Manis has the ultimate authority for the care and custody of prisoners at Wallens Ridge, for supervising daily operational activities and for ensuring staff compliance with VDOC policies and procedures, including the Step-Down Program, and, specifically, the activities of Wallens Ridge staff and employees administering and operating the Step-Down Program, including Unit Managers, QMHPs and psychologists used by Wallens Ridge. As Warden, plaintiff's allege, Manis is the Facility Unit Head of Wallens Ridge and has ultimate responsibility over the DTT and the Building Management Committee, ("BMC"), or Unit Manager decisions regarding a prisoner's progress through the Step-Down Program. Plaintiffs allege that Manis was involved in developing and updating the

-13-

Step-Down Program. Plaintiffs allege that Manis knows or has reason to know that the Step-Down Program permits long-term solitary confinement without a legitimate penological purpose and that long-term solitary confinement causes severe mental and physical harms.  Manis is sued in his individual and official capacities.

Plaintiffs allege that the Phase Program utilized at Mecklenburg consisted of five levels, with prisoners earning additional privileges at each level, with eligibility to return to general population at the last level. Plaintiffs allege that, in order to progress to the next Phase level, Mecklenburg prisoners were required to comply with all prison rules, policies and regulations, to maintain positive "interpersonal relations with staff" and to show "satisfactory progress in programs assigned." Staff retained discretion to revoke an inmate's privileges, regress him in Phase level or even require him to restart the Program entirely, if they decided the inmate did not exhibit sufficient compliance. Plaintiffs allege that compliance with all three behavioral categories of the Program would not guarantee an inmate's advancement to the next step.  The Phase Program required prisoners to spend a mandatory minimum period of time in solitary confinement at each level. Prisoners in the SMU were not eligible for the Phase Program; they remained in long-term solitary confinement indefinitely. Plaintiffs allege that the Phase Program's standards for inmate advancement were ambiguous and vested prison staff with too much discretion over denying inmate progression through the program. Plaintiffs allege that the Program's subjective evaluation criteria were exacerbated by the VDOC's failure to train program staff and guards adequately.  They allege that the result was an unwritten policy of arbitrarily preventing prisoners from advancing through the Phase Program, thus leaving them in solitary confinement indefinitely. Plaintiffs further allege that the 1984 Mecklenburg Study Committee found that the VDOC used its Phase Program as part of a scheme to fill empty prison beds by placing in

-14-

solitary confinement prisoners who did not present a security risk, then keeping them there for a long as possible.

Plaintiffs allege, in August 1981 in *Brown*, Mecklenburg prisoners represented by the American Civil Liberties Union's National Prison Project sued the VDOC Director on behalf of a class of plaintiffs, including "all prisoners who are or will be confined at the Mecklenburg Correctional Center." The class alleged that the "totality of the conditions" at Mecklenburg fell "beneath standards of human decency, inflict[ed] needless suffering on prisoners and creat[ed] an environment which threatens prisoners' mental and physical well being and result[ed] in the unnecessary deterioration of prisoners confined there." The class alleged that the Phase Program "exacerbated" these conditions by permitting arbitrary imposition of solitary confinement "on prisoners for indefinite periods in the absence of objective criteria for release to other Department of Corrections institutions." The class alleged that these practices violated the prisoners' right to due process and the Eighth Amendment bar on cruel and unusual punishment.

The plaintiffs allege that the VDOC entered into a settlement agreement with a "class of all prisoners who are, or will be, confined in the Mecklenburg Correctional Center of the Virginia Department of Corrections." The settlement agreement binds the VDOC, "their agents, employees, and successors in office" and contains no sunset provision. The plaintiffs allege that the settlement agreement binds the VDOC on a department-wide basis to permanently abolish the SMU and commit that it will "remain abolished." The plaintiffs also allege that the settlement agreement also binds the VDOC to permanently discontinue the Phase Program, and the VDOC stated that it did "not intend to reinstate any similar program in the future." The parties in the case submitted the settlement agreement to the court,

which issued a Consent Decree on April 5, 1985. The plaintiffs allege that the VDOC moved to terminate the Consent Decree in February 1997, but they allege that the Consent Decree was terminated only regarding long-term solitary confinement at Mecklenburg. The plaintiffs allege that the VDOC has never sought any relief from the Consent Decree or settlement agreement from the court regarding the Phase Program or SMU.

The plaintiffs allege the VDOC undertook to replace Mecklenburg with two new supermax prisons – Red Onion and Wallens Ridge. They allege that these two prisons were designed to accommodate long-term solitary confinement throughout the prisons, and, since 2012, different areas of both prisons have been set aside for long-term solitary confinement use. Plaintiffs allege that the VDOC has faced issues finding ways to fill empty beds with a prisoner population that needs the high staffing complement and close supervision characteristic of maximum security prisons that also implement long-term solitary confinement.

The plaintiffs allege that the VDOC designed Red Onion and Wallens Ridge to accommodate 1,200 prisoner beds each, despite the fact that no statistics showed that Virginia needed, or would need, to house 2,400 inmates under higher custody conditions. The plaintiffs also allege that the VDOC did not design Red Onion and Wallens Ridge to be general population facilities. The plaintiffs further allege that replacing one maximum security prison – Mecklenburg – with two such facilities only exacerbated its economic incentives for keeping prisoners in long-term solitary confinement. Plaintiffs further allege that, in an effort to ensure that it could fill Red Onion and Wallens Ridge, the VDOC loosened its classification criteria to allow for prisoners to be placed in long-term segregation based on factors unrelated to a prisoner's behavior in prison, including a prisoner's crime of conviction, length of

-16-

sentence and education level. They allege that the VDOC also imported prisoners from other jurisdictions to fill Red Onion and Wallens Ridge.

The Complaint alleges that the prisoners in solitary confinement at Red Onion and Wallens Ridge spend "nearly all of their waking hours within the four walls of a single 8' x 10' cell – about half the size of an average parking space." (Complaint at 41.) It alleges that these prisoners spend 22 to 24 hours a day alone within their cell, which contains only a desk, toilet and sink.  The single exterior window is covered with opaque white film that prevents any view of the outside world. The solid steel cell door contains a small window and slot through which to pass food trays.  Prisoners receive all meals in their cells.  The Complaint alleges that prisoners are exposed to constant noise of other prisoners crying, screaming, wailing and beating on their cell doors.  Prisoners cannot control the artificial lighting in their cell, which stays on during all day time hours and is bright enough to read by, even during sleeping hours.  The plaintiffs claim that noxious smells, noise and light prevent restful sleep.

The Complaint alleges that prisoners held in solitary confinement experience no "meaningful physical contact and social interaction." Cells are designed to prevent contact with doors lined with strips along their sides and bottoms. Prisoners communicate with prisoners in adjacent cells by the HVAC vents.  Most of a prisoner's interaction is with prison staff, guards or QMHPs, who, during rounds, knock on cell doors and ask each prisoner a cursory question or offer a brief greeting. The Complaint alleges that these checks are designed to determine that a prisoner is still alive and not at imminent risk of committing self-harm, are not private and are not meaningful human interactions.  Prisoners who threaten to harm themselves are placed alone in a bare "strip cell" with no clothes or bedding, strapped to a gurney

and fed a liquid diet until they report that they no longer intend to harm themselves, at which time they are returned to their solitary confinement cells.

The Complaint alleges that prisoners in long-term solitary confinement at Red Onion and Wallens Ridge must endure "dehumanizing" cavity searches before being allowed to leave their cells. Before leaving his cell, a prisoner is required to strip naked before two officers, who inspect the prisoner's head, hair, mouth, torso, pelvic area, legs and feet. The prisoner is required to open his mouth, raise his arms, turn around, spread his legs, raise his penis and testicles, spread his buttocks, bend over, squat and cough. The Complaint alleges that prisoners in long-term solitary confinement are allowed out of their cells only for 15-minute showers three times a week and one hour of outdoor recreation per day, which was often revoked at the guards' discretion. When taken to outdoor recreation, prisoners are led in shackles by a leash to the outdoor recreation yard, which consists of a number of 5' by 9' recreation cages "that resemble dog kennels," which are empty without any recreational equipment. Prisoner are not allowed to speak to each other while in these recreation cages. If a prisoner needs to use the bathroom during their recreation time, he forfeits the rest of his recreation time.  Outdoor recreation space is not heated in the winter, and solitary confinement prisoners are not provided with suitable winter clothing. The Complaint alleges that staff often deny prisoners access to recreation or showers, resulting in prisoners spending up to 48 hours continuously in their cells.

Prisoners in long-term solitary confinement are entitled by VDOC policy to only one hour of noncontact visitation with family and friends per week. Visits are held in a visitation booth with a thick layer of Plexiglas between prisoner and visitor. Prisoners can talk to only one person at a time through a telephone in the booth. The Complaint alleges that the VDOC has not provided for privileged and confidential

legal visitations at either Red Onion or Wallens Ridge.  While Red Onion and Wallens Ridge have a visitation booth that allows prisoners to speak or exchange documents with another through a small slot, the Complaint alleges that prison staff often prohibit legal visits in these booths.  Instead, it alleges that legal visitation occurs in regular visitation booths, with lawyers and clients speaking over the in-booth telephones, which the Complaint alleges are monitored by prison staff.

The Complaint alleges that the VDOC denies prisoners held in long-term solitary confinement all "productive activities," such as structured art and creative writing programs. As an alternative to outdoor recreation, SM prisoners who have spent a minimum of nine months in solitary confinement or IM prisoners who have spent a minimum of 18 months in solitary confinement, may be required to roll sporks and salt and pepper packets into a napkin while shackled to a chair by the hands and feet or clean showers while shackled. If a prisoner refuses to work, prison staff revoke his privileges and extend the time he must serve in solitary confinement. The Complaint alleges that prisoners held in long-term solitary confinement are not permitted to earn good-time credit or earn such credit at a significantly reduced rate. The Complaint also alleges that the VDOC denies parole to parole-eligible prisoners while they are held in solitary confinement.

The Complaint alleges solitary confinement at Red Onion and Wallens Ridge is long-term, arbitrary and indefinite. It alleges that plaintiffs Thorpe and McNabb have been held in solitary confinement for more than a decade. It alleges that remaining infraction free, completing all required programming and refraining from any acts approaching violent behavior does not guarantee a prisoner's return to general population. It alleges that the VDOC's use of mandatory minimum solitary confinement  periods and arbitrary, irrational and largely illusory review procedures

guarantees that prisoners endure lengthy solitary confinement. The Complaint alleges that the conditions of solitary confinement and resulting mental and physical harms are "atypical and severe compared to the experience of prisoners in VDOC's general population." (Complaint at 47.)

The Complaint alleges that the VDOC adopted the Step-Down Program in August 2012. It alleges that the Step-Down Program "is little more than a rerun of VDOC's prior failed phase programs," including the Mecklenburg Phase Program. It alleges that both programs targeted the same prison population, have the same purpose and use the same methodology. The Complaint alleges that the Step-Down Program results in long-term solitary confinement without a valid penological purpose. It alleges that, once a prisoner is classified Security Level S, his only way back into general population is by participating in and progressing through the Step-Down Program's various phases.

The Complaint alleges that the Step-Down Program consists of two separate "Pathways:" Special Management, or SM and Intensive Management or IM. It alleges that, when a prisoner is classified Security Level S and arrives at either Red Onion or Wallens Ridge, the DTT conducts a battery of assessments to determine whether to place the prisoner in SM or IM "based on their identified risk level." According to VDOC policies, the DTT consists of the Chief of Housing and Programs, a Unit Manager, the Institutional Program Manager, an Intelligence Officer and a QMHP. The Complaint alleges "the DTT routinely sits as a committee of one decision maker, usually the Unit Manager of the building where the inmate will be housed." (Complaint at 53.)

While VDOC policy required Red Onion staff to explain key aspects of the

Step-Down Program to incoming prisoners during orientation, the Complaint alleges, the VDOC has admitted that its staff did not attempt to comply with this aspect of the policy until at least the latter half of 2017. Thus, it alleges, the majority of prisoners assigned or transferred to Red Onion and Wallens Ridge in long-term solitary confinement were enrolled in the Step-Down Program with little to no understanding of its contours or requirements. The Complaint alleges that the criteria for placement in either the IM or SM Pathways are vague, overbroad and include inappropriate criteria. It alleges that VDOC staff can and do place prisoners in solitary confinement for reasons having nothing to do with a prisoner's actual prison behavior or legitimate penological purposes.

The Complaint alleges:

…VDOC places prisoners in the SM Pathway if they "display an institutional adjustment history indicating":
A.      "repeated disruptive behavior at lower level facilities"; or
B.      "a history of fighting with staff or offenders"; "and/or"
C.      "violent resistance towards a staff intervention resulting in harm to staff but without the intent to invoke serious harm or the intent to kill."
        …
…VDOC places prisoners in the IM [P]athway if they:
A.      display a "routinely disruptive and threatening pattern of behavior and attitude"; or
B.      demonstrate "potential for extreme and/or deadly violence" against other inmates or staff, as evidenced by their "institutional adjustment history" or "most often" through "an extensive criminal history and lifestyle"; or
C.      are incarcerated for a "high profile and notorious crime that most often involved serious violence may be at risk from other offenders that believe they will earn a reputation for assaulting or killing the high profile offender."

(Complaint at 55.)  It also alleges that these criteria are undefined and necessarily subjective.  It further alleges that VDOC staff do not consider whether a prisoner's behavior is symptomatic of mental illness before placing him in solitary confinement.  The Complaint alleges that, pursuant to VDOC policy, an inmate can complete the SM Pathway in a minimum of 15 months of solitary confinement and the IM Pathway in a minimum of 30 months.  It further alleges that prisoners routinely are held in solitary confinement well beyond these mandatory minimum periods.

While completion of the SM Pathway can lead to return of a prisoner to general population, completion of the IM Pathway leads to placement in the IM-SL-6 Closed Pod, ("Closed Pod"), where the vast majority of IM prisoners will serve the rest of their sentences.  The Complaint alleges that the Closed Pod is misleadingly labeled as a general population pod, but, in reality, is a long-term solitary confinement unit with single-cell housing, segregated recreation, out-of-cell restraints, in-cell meals and cavity searches each time a prisoner leaves his cell.

The Complaint alleges that mentally ill, developmentally disabled or mentally retarded SM Pathway prisoners may eventually progress to the Shared Allied Management housing unit, ("SAM Pod").  IM Pathway prisoners are not placed in the SAM Pod.  To be eligible for the SAM Pod, an inmate must successfully complete the Step-Down Program on the SM Pathway. Also, if the VDOC determines that a prisoner on the SM Pathway who has otherwise completed the Step-Down Program should not be returned to general population, the prisoner may be placed in a specialized housing unit for such prisoners, the Secure Integration Pod, ("SIP"), but the IM Pathway does not include placement in the SIP. The Complaint alleges that SM Pathway prisoners may progress through phases with

-22-

increasing privileges while the IM Pathway does not have such phases.

In each Pathway, a prisoner must progress through Phases 0, 1, 2 and SL-6; Phase SL-6 is broken down into part 1 and part 2.  Regardless of Phase level, all prisoners in the IM and SM Pathways experience solitary-cell housing, daily body cavity searches, lengthy periods of social isolation without meaningful human contact, lack of work, education and recreational opportunities, no or reduced ability to accrue good-time credit and lack of meaningful mental health examinations and resources.  The Complaint alleges that these conditions are atypically and significantly harsher in comparison to those experienced  by VDOC prisoners in general population.

SM prisoners must spend at least three months each in Phase 0, 1 and 2 and SM-SL-6 part 1 and part 2. IM prisoners must spend at least six months in Phases 0, 1 and 2 and one year each in IM-SL-6 part 1 and part 2. In addition to the mandatory minimum time period required at each Phase, each prisoner must demonstrate progress in three categories, ("Step-Down Categories"): programming, disciplinary infractions and responsible behavior goals. Success in the programming category is measured by a prisoner's progress through fill-in-the-blank, self-directed workbooks entitled "The Challenge Series," which contains nine volumes. A prisoner is required to remain free of any disciplinary infractions. Behavioral goals evaluate prisoners based on whether they maintain some standard for personal hygiene, stand during daily counts, keep their cell in order and exhibit "satisfactory" rapport with staff and other prisoners. The Complaint alleges that a prisoner's success in behavior goals "is subject to virtually unfettered, arbitrary discretion by guards." (Complaint at 61.) Prison staff, supervised by the Unit Manager, rate prisoners in each of the three categories on a weekly basis. Using a Status Rating Chart, the Unit Manager and his

or her designee provide each prisoner with a grade of poor, acceptable or good. VDOC does not permit prisoners to obtain copies of their Status Rating Charts. The Complaint alleges that VDOC officials have destroyed Status Rating Charts, even during the course of ongoing litigation, preventing opposing parties and courts from reviewing the justification for retaining a prisoner in solitary confinement.  The Complaint also alleges that the Unit Manager may void all of a prisoner's progress in the Step-Down Program immediately and without notice, reassigning him to a lower Phase, including Phase 0, if the Unit Manager decides that a prisoner has performed poorly in any of the three Step-Down Categories.  The Complaint alleges that the Step-Down Program's categorical rating system amounts to a vague, subjective and discretionary decision-making process that has no penological purpose. It alleges that the VDOC continues to hold prisoners who fail to complete programming because they cannot complete the workbook series because of educational background, learning disability, cognitive disability, mental illness or language barrier in solitary confinement.

The disciplinary infraction category allows the VDOC to retain a prisoner in solitary confinement if he commits any disciplinary infraction, no matter how minor. The Complaint alleges that the disciplinary infraction category does not accommodate prisoners who cannot comply with institutional rules due to an intellectual disability or language barriers. The Complaint alleges the VDOC officials have admitted in sworn trial testimony that the responsible behavior category is "very discretionary" and "very subjective." It alleges that the category permits VDOC staff to retain a prisoner in solitary confinement based on inherently subjective judgments to justify retaining prisoners in solitary confinement for no valid penological purpose.

The Complaint alleges that the VDOC's periodic reviews of the status of prisoners in long-term solitary confinement violate prisoners' rights to substantive and procedural due process under the Fifth and Fourteenth Amendments  because decisions to continue a prisoner's solitary confinement are not based on whether the prisoner poses a continuing substantial danger to the general population, but, rather, are based on whether the prisoner has progressed according to the subjective, vague and irrelevant Step-Down Categories.  The Complaint alleges that these periodic reviews are conducted in secret, with no notice to the prisoner and no opportunity to be heard. The BMC reviews whether a prisoner's progress in the Step-Down Categories merits progression to the next phase. While VDOC OP 830.A states that the BMC includes several different staff members, the Complaint alleges, the Unit Manager often holds these internal status reviews as a committee of one on an ad hoc informal basis every 30 days or whenever an incident occurs. According to VDOC policy, these status reviews are to be documented on a Classification Hearing Docket – DOC 11F form, but the Unit Managers/BMC often do not document a basis for these decisions. If the form is completed, the Complaint alleges, a copy is not provided to the prisoner.  As a result, it alleges, many prisoners have no meaningful opportunity to understand why they remain in solitary confinement or how they can shape their behavior to return to general population. Also, there is no ability to grieve or appeal these status review decisions.

According to VDOC policy, the ICA, which is composed of a correctional officer and a counselor, conducts a review every 90 days of each Level S prisoner's external status, which refers to the security-level classification in the system that determines the prisoner's  assignment to a maximum security prison or lower level facility.  These ICA hearings are held at a prisoner's cell door, and the prisoner is not allowed to present witnesses or evidence. These ICA hearings last "only

moments," and the prisoner is handed an already completed ICA review form.

The Complaint alleges that prisoners who are placed in the IM Pathway face permanent solitary confinement and are ineligible for the Step-Down Program or return to general population. The farthest an IM prisoner may advance is Phase IM-SL-6 being housed in the Closed Pod, a solitary confinement unit, with conditions not meaningfully different from those in IM Phases 0-2 and atypical and significantly harsher than general population units in VDOC prisons.

In 2017, the VDOC amended its policies to provide for ERT reviews of the status of each IM prisoner to decide whether to assign particular IM prisoners to the SM Pathway and allow them an opportunity to rejoin general population. The Complaint alleges that the ERT does not perform independent checks on these review decisions. Rather, the ERT examines whether the original decision to place the prisoner on the IM Pathway was justified.  The ERT may reassign a prisoner to the SM Pathway only if the DTT erred when it originally decided to place the prisoner in the IM Pathway or if officials subsequently cleared the prisoner of involvement in the acts that originally justified his IM Pathway assignment. It alleges that VDOC policy and the Step-Down Program do not permit VDOC staff to change a prisoner's Pathway for any other reason.  According to VDOC policy, the ERT includes the VDOC Security Operations Manager, the Regional Operations Chief, the Chief of Offender Management, the Manager of Classification and Records, the Reentry and Programs Administrator, the Chief of Mental Health Services and the Chief Nurse. The Complaint alleges that the Unit Managers determine which prisoners will be reviewed, compile all information available to the ERT and have ultimate discretion to recommend or veto an IM prisoner's assignment to the SM Pathway.

While VDOC policy requires providing IM prisoners with review every
month by the Unit Manager or BMC, every 90 days by the ICA and every six months
by the ERT, the Complaint alleges, the outcome of these reviews is often
predetermined, in that IM prisoners will remain in solitary confinement until their
sentence ends.  It alleges that the VDOC does not provide IM prisoners with a
meaningful review of whether there is a valid, continuing penological justification
for retaining them in solitary confinement. In fact, the Complaint alleges that the
ERT has not provided many IM prisoners with any review despite years of solitary
confinement. It alleges that  IM prisoners have never seen or heard of the ERT.
VDOC policy does not allow prisoners to attend ERT review meeting or have prior
notice that ERT is reviewing their status. The ERT does not provide prisoners with
written explanations of its decision, and ERT decisions are not subject to appeal or
complaint through the VDOC's prisoner grievance procedures.

The Complaint alleges that the Step-Down Program, including its reliance on
indefinite solitary confinement, Pathway Criteria, mandatory minimum periods,
Step-Down Categories, incentive system and permanent IM solitary confinement
regime, has no valid basis in science. The Complaint alleges that, after introducing
the Step-Down Program, the VDOC has made statements that there are no
instruments or set of criteria that accurately predict a prisoner's level of
dangerousness to staff or other prisoners  and that a prisoner's  good behavior while
managed with Security Level S restraints was not a reliable predictor for a prisoner's
behavior once the restraints were removed. The VDOC has asserted that "… science
shows that a strong predictor of future behavior is past behavior." (Complaint at 73.)
The Complaint alleges that scientifically valid instruments and criteria capable of
predicting which prisoners pose an ongoing risk of violence existed before the

VDOC introduced the Step-Down Program. It alleges that the VDOC has recidivism-risk assessment tools available, but it refuses to use these tools for the prisoners held in long-term solitary confinement. It alleges that the VDOC uses the COMPAS Risk & Need Assessment System created by NorthPointe, Inc., to evaluate the institutional risk posed by all other prisoners incarcerated within the VDOC.  The Complaint alleges that the VDOC does not use COMPAS or any other "evidence based" tool to assess Security Level S prisoners held in long-term solitary confinement. It alleges that designating these prisoners as "non-scored security" status allows local prison staff to keep these prisoners in solitary confinement at their discretion and based on economic considerations. The Complaint alleges that the VDOC chooses to rely on the professional judgment of its inadequately trained prison staff to assess a prisoner's institutional risk.

The Complaint alleges that the VDOC uses the Step-Down Program's vague criteria and terms to conceal the true number of prisoners in solitary confinement at Red Onion and Wallens Ridge.  It alleges that the VDOC has falsely claimed that the Step-Down Program has reduced the number of prisoners and average time that prisoners stay in long-term solitary confinement and prevented the release of prisoners from long-term solitary confinement directly into the public.  It alleges that the VDOC falsely labels the IM Closed and Reentry Pods as general population units.

The Complaint alleges that, by the time the VDOC instituted the Step-Down Program in 2012, medical and scientific literature had consistently documented the severe and often permanent damage caused by prolonged solitary confinement. It alleges that subsequent studies have established that long-term solitary confinement leads to psychological trauma and neurological and physiological damage. It alleges

that the psychological harms caused by prolonged solitary confinement far exceed the discomforts and depression or anxiety associated with ordinary life in prison. It alleges that lengthy periods of time in solitary confinement cause a range of psychological symptoms, including the inability to maintain an adequate state of alertness and attention, memory deficits, lethargy, headaches, decreased appetite, nightmares, irritability, apathy, panic, major depression, paranoia, psychosis, hallucinations, loss of self-control, aggression, rage, "social death," loss of perceptual constancy, hypersensitivity to stimuli, suicidal and self-harming acts or ideation, restlessness and insomnia. It also alleges that long-term solitary confinement causes physical harm, including vision problems, shrinkage of neurons in sensory and motor regions of the brain, "social pain," which registers in the nerves as physical pain, out-of-control stress responses resulting in higher cortisol levels, increased blood pressure and inflammation, heart palpitations, narrowed arteries, stroke, digestive diseases, physical wasting, type 2 diabetes and premature death. It alleges that the VDOC's use of indefinite and long-term solitary confinement deprives prisoners of basic human needs, including meaningful social contact, adequate environmental stimuli, adequate sleep, adequate exercise and mental and physical health. It alleges that the VDOC's Step-Down Program does not ameliorate these deprivations, harms or risks, but, rather, it exacerbates them. It further alleges that the Step-Down Program punishes behavior that is recognized as symptomatic of the very harms solitary confinement causes and allows the VDOC to keep inmates in solitary confinement based on these infractions, exacerbating the mental and physical harm suffered. The Complaint alleges that the Step-Down Program deliberately inflicts unnecessary and wanton pain that shocks the conscience and violates the standards of decency that mark the progress of a maturing society. It alleges that the VDOC and each individual defendant impose and/or condone this harm by creating, administering or implementing the Step-Down Program and/or by

-29-

failing to properly diagnose or treat prisoners suffering the harms caused by the Program. It alleges that the VDOC and the individual defendants are deliberately indifferent, in that they know or should know that the long-term solitary confinement practices at Red Onion and Wallens Ridge, including the Step-Down Program, cause the harms alleged, and, yet, they expressly condone and/or fail to oppose these practices.

The Complaint alleges that the plaintiffs possess a protected liberty interest in avoiding long-term solitary confinement in Red Onion and Wallens Ridge, which arises from the VDOC policies mandating periodic review of prisoners in long-term solitary confinement and the atypical and significant hardship caused by the conditions of long-term solitary confinement. The Complaint alleges the defendants' use of vague and overbroad criteria for placement in either the IM or SM Pathway leads to divergent classification for similarly situated prisoners who pose no threat to the safety and security of the VDOC. It alleges that the Step-Down Program's requirements severely disadvantage prisoners with mental illness or mental health disabilities, effectively denying them any opportunity to progress out of long-term solitary confinement and resulting in them remaining in solitary confinement longer than other prisoners.

The Complaint alleges that plaintiffs Riddick, Khavkin, Cavitt and Wall have mental health disabilities and are qualified individuals with disabilities as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, ("Rehabilitation Act"). The Complaint alleges that these plaintiffs have an impairment that substantially limits one or more major life activities, have a record of such an impairment or are regarded as having such an impairment. The Complaint alleges that the defendants' actions

-30-

deny prisoners with mental health disabilities housed in long-term solitary confinement access to, participation in and the benefits of programs, services and activities available to prisoners housed in general population.  It alleges that the defendants have violated the ADA by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals" as required by 28 C.F.R. § 35.152(b)(2). It also alleges that the defendants have violated the Rehabilitation Act by discriminating against prisoners with mental health disabilities solely on the basis of their disabilities and by failing to reasonably accommodate prisoners with mental health disabilities.

The Complaint alleges that the defendants' actions breached the 1985 Settlement Agreement in *Brown* and violate the plaintiffs' rights under the Eighth and Fourteenth Amendments, the ADA and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 701 et seq.  The plaintiffs seek declaratory and injunctive relief and compensatory or nominal damages.

Plaintiffs attached several documents to their Complaint; these include the November 7, 1984, Report Of The Mecklenburg Correctional Center Study Committee, (Docket Item Nos. 1-2, 1-3, 1-4), various reports from the Joint Legislative Audit and Review Commission of the Virginia General Assembly, (Docket Item Nos. 1-7, 1-8, 1-9, 1-10 ), court documents from *Brown*, (Docket Item Nos. 1-5, 1-6), and VDOC documents regarding the Step-Down Program, (Docket Item Nos. 1-11, 1-12, 1-13, 1-14). The defendants also have provided several documents for the court's review, including various VDOC Operating Procedures and court documents from *Brown*.

Defendants' documents include the Complaint and Amended Complaint filed

in *Brown*, (Docket Item Nos. 19-2, 19-3), and the parties' 1983 Settlement Agreement, (Docket Item No. 19-4). Both sides have provided copies of the parties' 1985 Settlement Agreement and Order approving and adopting it, (Docket Item Nos. 1-5, 19-8). According to the Eastern District's April 5, 1985, Order, it modified the parties' previous agreement and its orders adopting it. (Docket Item No. 1-5 at 2.) According to the 1985 Settlement Agreement, which superseded all prior agreements, the SMU at Mecklenburg had been abolished and would remain abolished. (Docket Item No. 1-5 at 4.) The 1985 Settlement Agreement also stated that the VDOC had "discontinued the phase program and does not intend to reinstate any similar program in the future. If in the future a similar program is considered by the [VDOC], before any such program is initiated, the Court and all counsel of record in this litigation will be notified by the [VDOC]." (Docket Item No. 1-5 at 3.)

Under the Agreement, the VDOC agreed to "continue the practice of having all cell lights subject to internal controls." (Docket Item No. 1-5 at 4.) The VDOC also agreed to continue a written policy defining the circumstances under which toilets in segregation and isolation cells could be turned off. (Docket Item No. 1-5 at 4.) The VDOC also agreed that "no inmate shall be required to consume a meal in a cell with an unflushed toilet." (Docket Item No. 1-5 at 5.) The Agreement also addressed the use of restraints and the procedures to be followed once a prisoner was placed in restraints. (Docket Item No. 1-5 at 5.) The Agreement specifically stated: "The use of mechanical restraints within the cell shall be limited to those circumstances in which the inmate is engaging in suicidal, self-mutilative, self-destructive or other behavior which appears likely to cause injury to himself or others." (Docket Item No. 1-5 at 5-6.) The Agreement also required that most inmates receive at least five hours of outdoor recreation each week, weather permitting, and receive all their meals outside of their cells in the pod area. (Docket

-32-

Item No. 1-5 at 6.) The VDOC agreed to substitute metal detectors where feasible for strip searches and visual body cavity searches. (Docket Item No. 1-5 at 12.)

The Agreement stated: "This agreement is not to be construed to establish or change the standard of culpability for civil or criminal liability for any official, employee, agent, or representative of the Commonwealth of Virginia other than for the sole and limited purpose of enforcement of this agreement and any decrees which may issue herein." (Docket Item No. 1-5 at 16.) The Agreement further stated: "This agreement shall not be admissible in evidence in any proceedings or trials other than for the sole and limited purpose of enforcement of this agreement and the decrees on file herein." (Docket Item No. 1-5 at 17.)

The April 5, 1985, Order stated that the "defendants, their agents, employees, successors in office, and those acting in concert with them" were ordered to "comply fully" with the terms of the 1985 Settlement Agreement. (Docket Item No. 1-5 at 1.) The Order also stated that "the Court will retain jurisdiction for such time as may be necessary to enforce or modify this Order and settlement." (Docket Item No. 1-5 at 2.)

The defendants have provided the court with a copy of an order entered by the Eastern District on April 7, 1997, in which the court vacated its August 2, 1983, decree of the court as modified by its April 5, 1985, Order. (Docket Item No. at 19-1.)

The plaintiffs have provided the Red Onion State Prison and Wallens Ridge State Prison Security Level-S and Level-6 Operations Strategy Restrictive Housing Reduction Step-Down Program, ("Step-Down Program"), as updated in March

-33-

2014, August 2015 and September 2017, (Docket Item Nos. 1-11, 1-13, 1-14.) The
Step-Down Program, as updated in March 2014, (Docket Item No. 1-14) ("March
2014 Step-Down Program"), contains the signatures of defendants Robinson,
Richeson, Washington and Mathena, indicating that they had "received, reviewed
and approved the Restrictive Housing Reduction Step-Down Plan for Red Onion
State Prison and Wallens Ridge State Prison." (March 2014 Step-Down Program at
2.) The March 2014 Step-Down Program lists among its Project Goals the following:

1. To operate a prison management system that creates a pathway for
   offenders to step-down from Level S to lower security levels in a way
   that maintains public, staff, and offender safety, by applying the
   principles of evidence-based practices to ROSP and WRSP operations.
   …
4. To infuse evaluation into the operation design by setting observable and
   measurable standards as a means to ensure fidelity; and to infuse
   research into the plan as a means of assessing outcome effectiveness.
   Evaluation and research together will support the executive staff in
   determining areas of strength and areas of adjustment.

(March 2014 Step-Down Program at 6.) The March 2014 Step-Down Program also
stated that all Level-S offenders would be managed pursuant to Special Housing
Guidelines OP 861.3. (March 2014 Step-Down Program at 9.)

The March 2014 Step-Down Program stated that an ERT, external to Red
Onion and Wallens Ridge, would perform bi-annual reviews of each offender
assigned to Level S at Red Onion and Wallens Ridge.  These reviews would include
considering whether the offender was appropriately assigned to Level S, whether the
offender met the criteria for the IM or SM Pathway to which he was assigned and
whether the DTT had made appropriate decisions to advance the offender through

the Step Down Program.  (March 2014 Step-Down Program at 9.) The ERT would consist of the Chief of Corrections Operations, the Regional Operations Chief, the Regional Administrator, the Chief of Classification, the Chief Deputy Reentry and Programs Director Statewide EBP Manager, the Director of Mental Health Services, the Director of Psychiatric Services and the Chief Physician. (March 2014 Step-Down Program at 9.)

The March 2014 Step-Down Program required that the Regional Operations Chief or Regional Administrator would  provide an external review in advance of movement of an offender from any facility to Red Onion for placement in Level S, for reassignment from any lower classification to Level S, reassignment from Level S to Level 6 if the two Wardens did not agree and reassignment from Level 6 to Level 5. (March 2014 Step-Down Program at 9.) The March 2014 Step-Down Program also stated that the Warden where an offender was held was responsible for deciding whether an offender should be reassigned from Level S to Level 6. (March 2014 Step-Down Program at 10.) It also required the Red Onion Warden to make recommendations for reassignment of an offender from Level 6 to Level 5 with external review by the Regional Operations Chief or Regional Administrator. (March 2014 Step-Down Program at 10.) It also required consensus of the two Wardens for Level 5 transfers from Red Onion to Wallens Ridge; if consensus was not reached, the decision would be referred to the Regional Operations Chief. (March 2014 Step-Down Program at 10.)

The March 2014 Step-Down Program also stated that the DTT would include

the EBP[2] Manager, IPM,[3] Unit Manager, Intelligence Officer, QMHP, Medical Director, Counselor(s) and Corrections Officer. (March 2014 Step-Down Program at 10.) It stated that the DTT was responsible to review individual offenders and make recommendations advising the Regional Operations Chief and Warden if the team believed an offender may not meet criteria for Level S and regarding assigning Level S Intake/Orientation offenders at ROSP to IM or SM status, assigning IM offenders from Level S to Level 6 Closed Pod, assigning offenders to SM0, SM1, and SM2, assigning SM1 and SM2 offenders who had completed Intake/Orientation from Red Onion to Wallens Ridge, assigning offenders from SM2 to Level 6 at either Red Onion or Wallens Ridge and transfer of newly assigned Level 6 offenders from Wallens Ridge to Red Onion, assigning offenders from Level 6 to Level 5 at Red Onion, assigning offenders to return to earlier levels due to excessive disciplinary behavior or unsatisfactory performance and ensuring offenders' assignments have been completed, including criminogenic risk factors and medical/mental health factors. (March 2014 Step-Down Program at 10-11.) The March 2014 Step-Down Program states that Red Onion Level 6 offenders who have been moved to Level 5 will receive an interim review at 12 months to determine if the offender has stabilized at Level 5 and is eligible for transfer to Wallens Ridge or Sussex 1 State Prison. (March 2014 Step-Down Program at 11.) The Program also states that the DTT should meet at least monthly to dialogue on scenarios "as a means to strengthen their evaluation of high risk offenders." It states that the DTT should review the following factors: identifying possible offender motivators and triggers, investigating not only institutional adjustment history, but the history of street behavior and crimes, considering offender intent in addition to the results of their

---

[2] This acronym is not defined in the March 2014 Step-Down Program.
[3] This acronym is not defined in the March 2014 Step-Down Program.

actions, review and interpretation of assessment results and the offender's potential for high risk behavior. (March 2014 Step-Down Program at 11.)

The March 2014 Step-Down Program states that each Level S and Level 6 offender will be reviewed at a minimum of every 90 days by the ICA, or more frequently as necessary, to ensure the reclassification of Level S and Level 6 offenders is consistent with policy. The Program states that all Level S offenders arriving at Red Onion will be initially housed in the Intake/Orientation Unit and managed per Security Level S restraints and restrictions.  During an offender's stay in the Intake/Orientation Unit, an offender will receive a management path assignment, either IM or SM, a case plan will be developed with a program assignment, privilege status assignment will be made, and it will be determined whether an SM1 or SM2 offender should remain at Red Onion or be transferred to Wallens Ridge. (March 2014 Step-Down Program at 16.)  It states that programming will begin during the offender's stay in the Intake/Orientation Unit. (March 2014 Step-Down Program at 16.)

The March 2014 Step-Down Program states that, prior to completion of the Intake/Orientation process, each offender would be given the option to participate in the Step-Down Program. (March 2014 Step-Down Program at 18.)   Prior to completion of the Intake/Orientation process, each offender would be assigned to a management path, with those offenders who chose not to participate in the Step-Down Program being assigned to IM0 or SM0, which were "non-privilege statuses where offenders merely serve their time… [and] are provided with their basic requirements to meet constitutional standards such as, but not limited to, medical care, access to a law library, hygiene items, access to phones, in-cell education and religious programs, recreations, showers, and meals." (March 2014 Step-Down

Program at 18.)  The Program states that those offenders whose chose to participate in the Step-Down Program would begin the process to earn increasing privileges and eligibility for classification reduction and transfer to lower security level facilities. (March 2014 Step-Down Program at 18.)  The Program lists "three areas of commitment" for the offenders who participate in the Step-Down Program; these areas are: disciplinary violation goals, to reduce or eliminate disciplinary violations; responsible behavior goals, including personal hygiene, standing for count, cell compliance and "deportment; satisfactory rapport with staff and offenders;" and program participation goals. (March 2014 Step-Down Program at 18.) Programming at Level S includes completion of seven Challenge Series journals designed for in-cell programming. (March 2014 Step-Down Program at 19.) Programming would progress from in-cell programming to the use of therapeutic modules and program chairs to restrain offenders to small group participation. (March 2014 Step-Down Program at 19-20.)

The March 2014 Step-Down Program also establishes a Level S/Level 6 Reentry Program, to which Level S and Level 6 offenders will be diverted two years prior to their release. (March 2014 Step-Down Program at 21.)

The March 2014 Step-Down Program states that offenders with the potential for extreme and deadly violence, high risk of escape or high profile crimes and/or significant media attention and who may be targets of other offenders will be managed in the IM path. (March 2014 Step-Down Program at 23-24.) It states that offenders will be considered to have a potential for extreme and deadly violence if they meet the criteria of a history that indicates the willingness to carry out intentional serious or deadly harm, have street charges of murder or assault with intent to kill or institutional charges with the intent to seriously harm or kill staff or

offenders. (March 2014 Step-Down Program at 23.) The Program states: "This group is differentiated from other inmate groups by behavior that would include the intent to commit extreme/deadly violence, while other inmate groups might have been in fights buts lack the desire or intent to seriously injure or kill.  Despite a pattern of compliance, this group is seen as posing the greatest threat to corrections staff and other offenders in that they have proven the capability and willingness to commit deadly violence whether their routine behavior may have been generally compliant for long periods of time, or whether they have made it known that their intention is to kill whenever the opportunity presents itself." (March 2014 Step-Down Program at 23.)

The Program states that offenders "sentenced to prison due to a high profile and notorious crime that most often involved serious violence may be at risk from other offenders that believe they will earn a reputation for assaulting or killing the high profile offender."  It states: "This offender may be compliant and respectful towards corrections staff, and is considered in danger from other offenders due to their notoriety rather than posing a significant danger to others." (March 2014 Step-Down Program at 24.)

The March 2014 Step-Down Program states that offenders who have met the criteria to be assigned to "Security Level S, Intensive Management, may progress no further than Security Level 6, Closed Pod." (March 2014 Step-Down Program at 25.)

The March 2014 Step-Down Program states that offenders with a history of fighting with staff or offenders or violent resistance towards a staff intervention, but without the intent to invoke serious harm or the intent to kill, with a history of

patterns of repeated disruptive behavior at lower level facilities, resulting in harm to staff or inmates or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating behaviors such as throwing or attempting to throw bodily waste, breaking sprinkler heads, flooding cells and fire starting, but should not include behaviors such as verbal abuse, door pounding, throwing food, refusing to eat, refusing medical treatment or possession of a cell phone, with frequently recurring disciplinary violations or who intentionally commit disciplinary violations with the goal of remaining in Restrictive Housing will be designated to the SM Pathway (March 2014 Step-Down Program at 25-26.)

The Program states that SM offenders who chose not to participate in the Step-Down Program will remain at SM0 status with basic requirements, no privileges and without consideration for security reduction. (March 2014 Step-Down Program at 26.)   SM offenders who chose to participate in the Step-Down Program from Intake/Orientation will become eligible for SM1 status after proving a commitment to behavior and programming goals and after achieving certain other goals while in SM0 status.  While in SM0 status, offenders will complete the first of the Challenge Series Journals in Intake/Orientation and will advance to SM1 and SM2 status by continuing in the Challenge Series Journals 2 to 7 plus Anger Management. (March 2014 Step-Down Program at 26.) Offenders who initially refused to participate in the Program, but then chose to participate, will remain at SM0 status until they complete the Challenge Series Journals 1 and 2 and Anger Management and "meet designated positive behavior standards" to become "eligible" to advance to SM1. (March 2014 Step-Down Program at 27.)   The Program states that "[f]ollowing a successful period in IM or SM, offenders will be eligible for advancement and to step[]down from Level S … into general population at Level 6." (March 2014 Step-Down Program at 27.) According to the Program: "The purpose of Level 6 is to

-40-

reintroduce offenders into a social environment with other offenders and as a proving ground and preparation for stepping down to Level 5." It states that offenders at Level 6 will be assigned to "an appropriate program pod based upon the common characteristics and motivations that resulted in the offender's assignment to Level S initially." (March 2014 Step-Down Program at 27.)

These pods at Level 6 include: IM Closed Pod, SAM Pod, SIP and Step-Down Pod. The March 2014 Step-Down Program states that IM offenders in Level 6 will continue to be managed pursuant to Special Housing Guidelines OP 861.3, including single-cell housing, segregated recreation and out-of-cell shackles except for pod workers. (March 2014 Step-Down Program at 27.) The Program states that Level 6, Phase 1 offenders will have increased privileges over Level S offenders, but it does not state what these privileges are. It does state that IM Level 6, Phase 2 offenders are eligible to earn additional privileges, including limited in-pod job assignments, unsecured, programming in-cell and in secure chairs with up to five offenders in a group, video visitation and extended in-person visitation, JP4 players available for purchase in commissary with audio books and music, productive activities such as art and creative writing programs with out-of-cell meetings in secure chairs and Food Service Support work. (March 2014 Step-Down Program at 27.) It states that the restricted freedoms and interactions with staff and other offenders for IM offenders are "temporary." It further states:

> The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others. However, at the time of this writing, guidelines or models are not available for predicting safety with a population that has proven history of carrying out extreme and/or deadly violence.

(March 2014 Step-Down Program at 27-28.)

The March 2014 Step-Down Program defines Security Level S as a "level of high security for offenders who have presented the most serious disciplinary problems up to and including extreme or deadly violence." (March 2014 Step-Down Program at 38.)  It states that Level S offenders are permitted one hour of recreation in secure recreation pens each day, three showers a week and phone calls with programming delivered in cell initially with ability to advance to use of therapeutic modules, program chairs and possibly security tables. (March 2014 Step-Down Program at 38.)  The March 2014 Step-Down Program defines Security Level 6 as the "security level between Restrictive Housing ('S') and Level 5 that is the first step to introduce offenders who have been in Restrictive Housing into the general population." (March 2014 Step-Down Program at 38.)  It states that the "purpose of Level 6 is to begin the process of resocialization of offenders who have been housed in Restrictive Housing sometimes for extended periods of time. … Level 6 is the proving ground to help determine when an offender who has been housed in Restrictive Housing is ready to reintegrate into the less restrictive Level 5 setting." (March 2014 Step-Down Program at 38.)

Appendix F to the March 2014 Step-Down Program lists the IM Privilege Levels and IM Status Level Goals. (March 2014 Step-Down Program at 49-53.)  An IM offender must remain at each IM level for a minimum of six months before being eligible for promotion to the next level. (March 2014 Step-Down Program at 52.)  An IM offender is to be "rated each week by Correctional Officers, Counselors, and the Unit Manager as 'poor, acceptable, or good'" in each of the Responsible Behavior Goals of cell compliance, personal hygiene, count and respect. (March 2014 Step-Down Program at 54.)  The March 2014 Step-Down Program contains an IM Status Rating Chart. (March 2014 Step-Down Program at 55-56.)

Appendix G to the March 2014 Step-Down Program lists the SM Privilege Levels and SM Status Level Goals. (March 2014 Step-Down Program at 57-60.)  An SM offender must remain at each SM level for a minimum of three months before being eligible for promotion to the next level. (March 2014 Step-Down Program at 59.) An SM offender is to be "rated each week by Correctional Officers, Counselors, and the Unit Manager as 'poor, acceptable, or good'" in each of the Responsible Behavior Goals of cell compliance, personal hygiene, count and respect. (March 2014 Step-Down Program at 60.)  The March 2014 Step-Down Program contains an SM Status Rating Chart. (March 2014 Step-Down Program at 61-62.)

The Step-Down Program, as updated in August 2015, (Docket Item No. 1-13) ("August 2015 Step-Down Program"), appears identical in large part to the March 2014 Step-Down Program. The August 2015 Step-Down Program does state that defendant Tori Raiford was involved in updating the Program. (August 2015 Step-Down Program at 5.) The August 2015 Step-Down Program removed the Medical Director and added the Chief of Housing and Programs to the DTT. (August 2015 Step-Down Program at 10.) The August 2015 Step-Down Program removed from the DTT the responsibility for assigning offenders to SM0, SM1 and SM2 and to return offenders to earlier levels due to excessive disciplinary behavior or unsatisfactory performance. (August 2015 Step-Down Program at 11.)

The August 2015 Step-Down Program established BMCs as a "grouping of individuals directly involved in the operations of a specific unit" at Red Onion or Wallens Ridge. (August 2015 Step-Down Program at 12.) Each BMC included the Chief of Housing and Programs, a Unit Manager, a Counselor, Unit Security Supervisors and Security Line Staff and was to convene at least monthly to discuss

offender statuses and unit incentives and sanctions. (August 2015 Step-Down Program at 12.)   Under the August 2015 Step-Down Program, BMCs were responsible to review individual offenders and make recommendations regarding assigning offenders to SM0, SM1, SM2, IM0, IM1 and IM2, assigning offenders to return to earlier levels due to excessive disciplinary behavior or unsatisfactory performance, discussing and preparing recommendations to be presented to the DTT,  discussing and adjusting individual pod incentives and sanctions based on behavior, infractions, incidents, etc. and reviewing individual offenders upon being removed from security restraints prior to being returned to normal status. (August 2015 Step-Down Program at 12.)  The Program states that recommendations by the BMC will be made through dialogue and consensus; decisions will not be made by a voting majority. (August 2015 Step-Down Program at 12.)  It states that, if there is difficulty reaching consensus, then the Committee should default to the safer option. (August 2015 Step-Down Program at 12.)  It further states: "Decisions are the responsibility of the Chief of Housing and Programs." (August 2015 Step-Down Program at 12.)

The  August 2015 Step-Down Program stated that SM offenders were required to be charge free for only 90 days to be eligible for in-pod jobs. (August 2015 Step-Down Program at 60.)

The Step-Down Program, as updated in September 2017, (Docket Item No. 1-11) ("September 2017 Step-Down Program"), appears identical in large part to the March 2014 Step-Down Program as updated in August 2015. The September 2017 Step-Down Program removed the Project Goal of closely linking Red Onion and Wallens Ridge for the management and programming of Level 5 offenders. (September 2017 Step-Down Program at 7.)   The September 2017 Step-Down

Program also added Central Classification Services, ("CCS"), review of reassignment from any lower classification, Security Levels 1-5 to Level S. (September 2017 Step-Down Program at 11.) Nonetheless, it states that the Warden and Western Regional Operations Chief or his designee would have final approval for the increase to Security Level S.  (September 2017 Step-Down Program at 11.) This update added that the DTT would meet and interview offenders as part of the process to determine the offenders' Pathway. (September 2017 Step-Down Program at 12.)  It also added that the DTT would review the QMHPs' assessments on any mental health services provided for serious mental illness, including crisis intervention, screening, psychological assessment and psychoeducational services, individual and group therapy and treatment planning that may contribute to the appropriate housing. (September 2017 Step-Down Program at 12.)  The September 2017 Step-Down Program also added a requirement that a mental health assessment be performed on an offender during Intake/Orientation to identify if there was a history of psychotic disorders, bipolar disorders, major depressive disorders or any diagnosed mental disorder that might be associated with serious impairment in psychological, cognitive or behavioral functioning that substantially interfered with the offender's ability to meet the ordinary demands of living and required an individualized treatment plan by a QMHP. (September 2017 Step-Down Program at 19.)

The September 2017 Step-Down Program stated that each IM offender would have his case reviewed every 90 days during the ICA review. (September 2017 Step-Down Program at 59.) The BMC would review the ratings on each IM  and SM offender to determine when he had met the goals to be eligible for advancement to the next status level for recommendation to the appropriate ICA. (September 2017 Step-Down Program at 59, 65.) The Program also states: "An interim review can be

done for offenders performing exceptionally well and ready for advancement before the next routinely scheduled ICA meeting, or for offenders performing poorly requiring placing them back to a lesser status including IM0 when warranted." (September 2017 Step-Down Program at 59.) The September 2017 Step-Down Program stated that the BMC was responsible to evaluate overall performance and can decide to advance those offenders that are meeting advancement eligibility criteria. (September 2017 Step-Down Program at 59, 65.) It also stated that the BMC could decide to place an offender back to an earlier status if he did not meet the required standards. (September 2017 Step-Down Program at 59, 65.)

OP 830.A, "Segregation Reductions Step-Down Program," as effective February 15, 2018, (Docket Item No. 1-12) ("OP 830.A"), "established procedures for incentive based offender management which [would] create a pathway for offenders to step-down from security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A at 1.)  OP 830.A states that it "provides institution specific information concerning staff and offender responsibilities pertaining to segregation reduction and re-entry preparation…." (OP 830.A at 1.) According to OP 830.A, Security Level S is a non-scored security level reserved for offenders who must be managed in a segregation setting. (OP 830.A at 1.) It calls for Security Level S offenders to be assessed and assigned to either IM or SM. (OP 830.A at 1.) IM is for offenders with "the potential for extreme and/or deadly violence; they may have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other offenders. This group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic. The potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment…. Alternatively, the offender may present a routinely

disruptive and threatening pattern of behavior and attitude." (OP 830.A at 1.)  This category also includes offenders who are incarcerated for notorious crimes that put them at risk from other offenders. (OP 830.A at 1.) SM is for offenders who display an institutional adjustment history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or offenders or violent resistance toward a staff intervention resulting in harm to staff or other offenders without intent to cause serious harm or to kill or serious damage to the facility and where reasonable intervention at the lower security levels has not been successful in eliminating disruptive behaviors. (OP 830.A at 1-2.)

OP 830.A states that Security Level 6 is the first step down from Security Level S into general population. OP 830.A states that Security Level 6 offenders will be managed under OP 847.1 and would be placed in one of four Structured Living Units: IM Security Level 6 Closed Pod, SIP, SAM and Step-Down Pods Phase I and II. (OP 830.A at 2.) OP 830.A also states that the Building Management Team is a multi-disciplinary team comprised of staff assigned to work in a housing unit that tracks, measures and advances or lowers offenders to appropriate privilege levels based on established criteria. (OP 830.A at 2.) Members of the Building Management Team may include the Unit Manager, Security Supervisors, Counselor(s), Officer(s), Mental Health staff and Investigator(s). (OP 830.A at 2.)

OP 830.A states that offenders who meet the following criteria should be considered for assignment to Security Level S: aggravated assault on staff, aggravated assault on another offender with a weapon or resulting in serious injury without a weapon, serious escape risk, commission of crime of exceptional violence or notoriety, excessive violent disciplinary convictions, setting fire resulting in injury to persons or extensive property damage to state property, rioting resulting in

-47-

injury to persons or extensive damage to state property, seizing or holding hostages
or possession of firearms, ammunition, explosives or weapons. (OP 830.A at 2-3.)
The ICA, CCS, Warden of Red Onion, Western Regional Operations Chief or
designee Regional Administrator may assign an offender to Security Level S, but
the Warden of Red Onion and the Western Regional Operations Chief or designee
have final approval for the increase to Security Level S.  (OP 830.A at 3.)

Upon completion of intake, orientation and assessment upon arriving at Red
Onion, an offender will be referred to the DTT for assignment to either the IM or
SM Pathway based on "their identified risk level." (OP 830.A at 3.) OP 830.A
requires that each Security Level S offender complete a battery of assessment
instruments during their Intake/Orientation. (OP 830.A at 3.) OP 830.A states that
IM-0 is the initial privilege level for offenders placed in the IM Pathway. (OP 830.A
at 4.) IM offenders who choose to participate in the Step-Down Program may
progress to higher IM privilege levels; IM offenders who choose not to participate
in the Step-Down Program will remain at IM-0 status. (OP 830.A at 4.) OP 830.A
states that Security Level 6 is the lowest security level for offenders in the IM
Pathway. (OP 830.A at 4.)

OP 830.A states that IM offenders must meet goals in three areas –
disciplinary violations, responsible behavior and program participation – to be
eligible to advance to the next higher privilege level. (OP 830.A at 4.) Privilege
levels are IM-0, IM-1, IM-2 and IM-SL6. (OP 830.A at 4.) Responsible behavior
goals include being rated on personal hygiene, standing for count, cell compliance
and deportment, satisfactory rapport with staff and offenders; the offenders
compliance with responsible behavior goals are to be rated each week by
"Correctional Officers, Counselors, and the Unit Manager" as being either "poor,

acceptable or good." (OP 830.A at 4.)  OP 830.A states the Unit Manager will track each IM offender's disciplinary charges, and Treatment Officers will rate each IM offender's program participation each week as "incomplete, complete or positive effort." (OP 830.A at 4.) OP 830.A states that IM offenders who do not meet standards in the three goal areas can be returned to a lower privilege level by decision of the Building Management Team. (OP 830.A at 4-5.)

OP 830.A states that SM-0 is the initial privilege level for offenders placed in the SM Pathway. (OP 830.A at 5.) SM offenders who choose to participate in the Step-Down Program may progress to higher SM privilege levels; SM offenders who choose not to participate in the Step-Down Program will remain at SM-0 status. (OP 830.A at 5.)

OP 830.A states that SM offenders also must meet goals in three areas – disciplinary violations, responsible behavior and program participation – to be eligible to advance to the next higher privilege level. (OP 830.A at 5.) Privilege levels are SM-0, SM-1, SM-2 and SM-SL6. (OP 830.A at 5.) SM offenders have the same three goal areas and are rated in these areas in the same way and by the same personnel as the IM offenders. (OP 830.A at 5.)  Like IM offenders, SM offenders who do not meet standards in the three goal areas can be returned to a lower privilege level by decision of the Building Management Team. (OP 830.A at 6.)

OP 830.A states that, following a successful period on IM or SM status, offenders will be eligible for advancement to step-down from Level S to their first introduction into general population at Security Level 6.  (OP 830.A at 6.) Before advancement to Security Level 6, each offender will be formally reviewed by the ICA in accordance with OP 830.1, "Facility Classification Management;"

recommendations for advancement to Security Level 6 will be referred to the DTT, and the DTT's recommendations will go to the Warden for final decision. (OP 830.A at 6.) At Security Level 6, offenders are assigned to an appropriate program pod, including IM Closed Pod, SAM/SIP, SM Re-Entry, IM Re-Entry or Step-Down Pod. (OP 830.A at 6.)

OP 830.A states that Security Level 6 has two phases: Step Down Phase I and Step Down Phase II.  (OP 830.A at 6.) New transfers from SM to Security Level 6 will come out of their cells unrestrained individually with no other inmates present for at least the first seven days. (OP 830.A at 6.) Offenders in Step Down Phase I are single celled and unrestrained to shower and recreation, have in-pod recreation one tier at a time for one hour a day on days there is no outside recreation, have outside recreation one tier at a time for one hour three times per week; have programming in small groups and walk to meals one tier at a time with no more than one tier at a time in the dining hall. (OP 830.A at 6.)  Offenders in Step Down Phase II are double celled and unrestrained to shower and recreation, have in-pod recreation one tier at a time for one hour on days there is no outside recreation, have outside recreation one tier at a time for one hour three times per week, have programming in small groups and walk to meals one tier at a time with no more than one tier in the dining hall at a time. (OP 830.A at 6.)

Offenders in the SAM/SIP Pod are single-celled and meals are eaten in cell, move unrestrained to shower and recreation, and programming is delivered in Secure Chairs or small groups in pod. (OP 830.A at 7.) After a minimum of 30 days, offenders may participate in group meals in pod up to one tier at a time and participate in in-pod group recreation up to one tier at a time and outside group recreation up to one tier at a time, upon being reviewed and approved by the BMC.

(OP 830.A at 7.) SM offenders who do not meet the criteria for SAM/SIP status are placed in the Step-Down Pod; IM offenders are not eligible for Step-Down Phase I or II. (OP 830.A at 7.) IM offenders, following a successful period in IM, are eligible to stepdown from Security Level S to Level 6 in the IM Closed Pod Phase I or II. (OP 830.A at 7.)  IM Closed Pod Phase I offenders are managed per Special Housing Guidelines, found at OP 861.3, to include single-celled housing, segregated recreation and out-of-cell restraints. (OP 830.A at 7.) Privileges include limited in-pod job assignments, programming in cell and in security chairs up to five offenders at a time, JP5 players available for purchase in commissary for audio books and music, productive activities such as a structure art program and creative writing with out-of-cell meetings in security chairs and Food Service Support projects out of cell at a secure work station. (OP 830.A at 7.)

Upon 12 months of successful, charge-free housing assignment in IM Closed Pod Phase I, an offender may be eligible to progress to IM Closed Pod Phase II, upon approval of the BMC. (OP 830.A at 8.) Additional privileges available at Phase II are contact visitation in security chair, extended commissary spending limits and additional phone usage. (OP 830.A at 8.)  Two years prior to release, OP 830.A states, Level S and Level 6 offenders will be diverted into the Level S/Level 6 Reentry Program, which includes an accelerated level of programming and appropriate social interactions to prepare the offenders  for return to the outside community. (OP 830.A at 8-9.) Progression from restrained to unrestrained movement in Re-Entry is determined with the approval of the BMC. (OP 830.A at 9.)

OP 830.A states that a team external to Red Onion and Wallens Ridge will perform bi-annual reviews of each offender assigned to Red Onion and Wallens

Ridge Security Levels S and 6. (OP 830.A at 10.)  These reviews will include consideration of whether the offender is currently appropriately assigned to Level S, whether the offender meets the criteria for the IM or SM Pathway to which he is assigned, whether the offender requires a Pathway change and whether the DTT has made appropriate decisions to advance the offender through the step-down process. (OP 830.A at 10.)  The ERT will consist of the Security Operations Manager, Chairman, Regional Operations Chief of the Eastern and Central Regions, Chief of Offender Management, Manager of Classification and Records, Reentry and Programs Administrator, Chief of Mental Health Services and Chief Nurse. (OP 830.A at 10.)

OP 830.A states that the Western Regional Operations Chief will provide an external review in advance of and must approve an offender's movement from any facility to Red Onion for placement in Security Level S, reassignment of an offender from Level S to Level 6, if the two Wardens do not agree, and reassignment of an offender from Level 6 to Level 5. (OP 830.A at 10.) OP 830.A also states that Wardens are responsible for deciding whether an offender should be reassigned from Level S to Level 6 or from Level 6 to Level S. (OP 830.A at 10.) For reassignment from Level 6 to Level 5, the recommendation will be made by the Warden of Red Onion with external review by the Regional Operations Chief/Regional Administrator; for Level 5 transfers from Red Onion to Wallens Ridge, the decision will be made by a consensus of the Wardens of Red Onion and Wallens Ridge, and, if consensus cannot be reached, the decision will be referred to the Regional Operations Chief. (OP 830.A at 10-11.)

OP 830.A states that reassignment from a lower classification level to Level S will occur on recommendation of the referring facility to CSS to the Warden of

the primary Maximum Security Prison, Red Onion, to the Regional Operations Chief
or designee, the Regional Administrator. (OP 830.A at 11.) The Warden and Western
Regional Operations Chief or designee will have final approval for an increase in
security level. (OP 830.A at 11.)

OP 830.A states that the DTT, headed by both Chiefs of Housing and
Programs at Red Onion and Wallens Ridge  and including Counselors, Unit
Managers, Investigators/Intelligence Officers, QMHPs and Correctional Officers
from both Red Onion and Wallens Ridge, is responsible to review individual
offenders and make recommendations by consensus as to whether an offender may
not meet the criteria for Level S status, determining offenders' proper Pathways,
assignment of Level S offenders to IM or SM status, assignment of IM offenders
from Level S to Level 6 Closed Pod and IM Reentry, assignment of offenders from
SM2 to Level 6 and review of QMHPs' assessments on any mental health services
provided from serious mental illness. (OP 830.A at 11.)  OP 830.A states that the
DTT, in making its recommendations, should consider possible offender motivators
and triggers, investigate not only institutional adjustment history but also the history
of street behavior and crimes, offender intent in addition to the results of the actions,
assessment results and an offender's potential for high risk behavior. (OP 830.A at
11-12.)  OP 830.A states that the DTT will meet at least quarterly.

OP 830.A states that the BMC refers to a group of individuals directly
involved in the operations of a specific unit at Red Onion or Wallens Ridge and may
include the Chief of Housing and Programs, Unit Manager, Counselor, Unit Security
Supervisors, Security Line Staff, Treatment Officers and QMHPs. (OP 830.A at 12.)
The BMC is to meet at least monthly to make recommendations by consensus
regarding assigning offenders to SM0, SM1 or SM2, assigning offenders to IM0,

IM1 or IM2, assigning offenders to return to earlier levels due to excessive disciplinary behavior or unsatisfactory performance, discussing and preparing recommendations to be presented to the DTT and ICA, discussing and adjusting individual pod incentives and sanctions based on behavior, infractions, incidents, etc. and reviewing individual offenders upon being removed from security protocols due to behavioral issues and return to normal status. (OP 830.A at 12.) OP 830.A also states that each Level S offender will be reviewed at least every 90 days by the ICA to ensure the classification is consistent with policy. (OP 830.A at 12.)

The defendants also have provided OP 830.2, "Security Level Classification," effective April 1, 2018. (Docket Item No. 22-1) ("OP 830.2"). OP 830.2 states that it "establishes protocols governing the security level assignment of offenders within [VDOC] institutions." (OP 830.2 at 1.) OP 830.2 defines "Security Level" as "[a] measure of the degree of physical restraint and supervision that is required to maintain adequate control over an offender to prevent escapes, to minimize risk of staff and offender injury, and to maintain orderly facility operations while providing for the safety of the general public." (OP 830.2 at 1.)

OP 830.2 states:

1.    Classification of offenders into appropriate security levels and assignment to facilities equipped to provide appropriate security enhances public, staff, and offender safety by ensuring that each offender receives the appropriate level of control and management while reducing the operating cost of the DOC by ensuring that offenders are assigned to the least restrictive security level necessary and not subjected to excessive control and management.

2.    Security Levels in current usage are:

| Security Levels | Specialty Designation |
|---|---|
| 1 – Minimum | U- Unassigned |
| 2 – Moderate | D – Hearing Impaired |
| 3 – Medium | H – Non Compliant Grooming |
| 4 – Close | M – Secure Mental Health |
| 5 – Maximum | P – Protective Custody |
| 6 – Security Level S | T – Transition |
| Step-Down | X – Death Row |
| W – Work Center | S – Segregation |

(OP 830.2 at 2.)

OP 830.2 states that initial security level and institutional assignments for new offenders and parole violators received will be made by the ICA with approval of the Facility Unit Head or designee upon recommendation from treatment/security staff at the Reception Center. (OP 830.2 at 5.) OP 830.2 defines the ICA as the facility staff person designated to conduct offender case review hearings. (OP 830.2 at 1.) OP 830.2 also states that CSS will make the final decision on security level and institution assignment in certain cases, including for "Notorious Offenders," mental health unit referrals and cases with "unusual circumstances." (OP 830.2 at 5.)

Each new offender received into the VDOC will be assigned a Security Level U. (OP 830.2 at 5.) OP 830.2 states that a Classification Assessment must be completed in VACORIS[4] prior to the initial security level classification and reviewed and updated as necessary for any subsequent security level or annual review, but the OP does not otherwise explain what a Classification Assessment is.

---

[4] VACORIS is defined as the "computer-based VDOC offender information management system." (OP 830.2 at 2.)

(OP 830.2 at 2.) The OP also states that initial eligibility for specific Security Levels will be determined using the Initial Security Level Score Sheet in VACORIS for offenders receiving their first classification since entering the VDOC. (OP 830.2 at 3.) The OP states that the Security Level Score Sheets and the Security Level Scoring Guide, which provides guidance in completing the Score Sheets, are addenda to the OP, but these addenda were not attached to the copy of OP 830.2 provided to the court. (OP 830.2 at 3.)

OP 830.2 contains point score ranges for each security level, which for male offenders states that an offender should be scored 32 points or more to be assigned to Security Level 5. (OP 830.2 at 3.) The OP also states that, in addition to an offender's objective score, "decision makers must weigh information in the Pre-Sentence Investigation (PSI), institutional adjustment, nature of the offense(s), time to serve, and other factors affecting the level of risk an offender may pose to institutional order or to the community." (OP 830.2 at 3.) OP 830.2 also states that any offender may have their security level assignment changed on the basis of listed Mandatory Restrictors. (OP 830.2 at 3.) These Mandatory Restrictors apply to restrict an offender from assignment to a lower security level if an offender has more that 20 years remaining to serve, a history of certain violent offenses or escapes, disciplinary offense Code 100-108 convictions in the past 24 months or a detainer filed against him. (OP 830.2 at 4.) The OP states that an offender, regardless of a score within a particular security level, may have their security level assignment changed on the basis of a Discretionary Override. Discretionary Overrides may be used to assign an offender to a higher security level than indicated by his score due to assaultive prior facility conduct, serious prior criminal record indicates caution, severity of current offense, serious escape history/risk, recent pattern of poor facility adjustment, a need to establish stable adjustment in a general population and/or at

recommended security level prior to consideration for a lower level or "Other." (OP 830.2 at 4.) Discretionary Overrides may be used to assign an offender to a lower security level than indicated by his score due to exceptional facility conduct, singular nature of incident, prior success at lower level or "Other." (OP 830.4 at 4.)

OP 830.2 states that changes in an offender's security level will be determined by the score indicated on the Reclassification Security Level Score Sheet and any appropriate Mandatory Restrictors or Discretionary Overrides. (OP 830.2 at 5.) It further states: "Regardless of the score, all security level assignments must be made using the good judgment, experience, and expertise of the decision maker." (OP 830.2 at 5-6.) OP 830.2 states that each offender's security level will be reviewed annually or at "any time an offender's behavior or other factors indicate that the current security level assignment may not be appropriate." (OP 830.2 at 6.)

OP 830.2 lists several Segregation Qualifiers that indicate that an offender should be considered for assignment to Security Level S; these Segregation Qualifiers include an aggravated assault on staff, an aggravated assault on offender with a weapon or resulting in serious injury without a weapon, a serious escape risk, commission of crime of exceptional violence and/or notoriety, excessive violent disciplinary convictions reflecting inability to adjust to a lower level of supervision, setting a fire resulting in injury to persons or extensive property damage to state property, seizing or holding hostages, possession of firearms, ammunition, explosives or weapons, knowingly transferring HIV or other disease to another person or refusal to submit to testing, gang activity related to any Category I offense or a documented gang leadership role, a staff manipulator or predator and behavior that represents a threat level too great for the safety and security of a lower level institution. (OP 830.2 at 8.) OP 830.2 states that initial assignment to Security Level

S requires a formal ICA hearing and approval by the Facility Unit Head of the primary maximum security institution, Red Onion, and the appropriate Regional Operations Chief or designee. (OP 830.2 at 8.)  It further states that the CCS will review each reclassification assignment of offenders to Security Level S. (OP 830.2 at 8.)

The defendants also have provided a copy of OP 841.4, "Restrictive Housing Units," effective April 1, 2019. (Docket Item No. 22-2) ("OP 841.4"), which provides for the classification of offenders to General Detention and Restrictive Housing, sets the minimum standards for operation of restrictive housing units and minimum standards for the care and custody of offenders assigned to each of these statuses. (OP 841.4 at 1.) This OP defines Restrictive Housing as special purpose bed assignments under maximum security regulations and procedures for the personal protection or custodial management of offenders. (OP 841.4 at 2.) The OP states that the Restrictive Housing Units, ("RHUs") provide for personal protection and custodial management  measures exercised by the institution for the welfare of the offender, the institution, or both and will not be used as punishment. (OP 841.1 at 3.)

OP 841.4 requires that a corrections officer check each offender in General Detention or RHU at least twice per hour, no more than 40 minutes apart. (OP 841.4 at 9.)  It also states that offenders who are "violent or mentally disordered or who demonstrate unusual or bizarre behavior" will receive more frequent observation and that suicidal offenders will be under continuous observation. (OP 841.4 at 9.)  The OP requires a strip search of an offender assigned to an RHU before the offender exits his cell. (OP 841.4 at 9.) It also requires that an offender in General Detention or RHU status be placed in restraints and escorted by two corrections officers any

time he is removed from his cell. (OP 841.4 at 9.)  The OP also provides for the inspection of each RHU cell whenever an offender is removed from the cell. (OP 841.4 at 10.)

The OP provides that "at risk" offenders should receive a physical screening no less than every 14 days. (OP 841.4 at 10.)  The OP also requires that a qualified health care professional make daily visits with each offender held in Restrictive Housing. (OP 841.4 at 11.) It further requires that each offender on RHU status receive at least a weekly visit from a QMHP. (OP 841.4 at 11.) Restrictive housing cells should be well ventilated, adequately lighted, appropriately heated and maintained in a sanitary condition at all times. (OP 841.4 at 11.) RHU offenders are generally subject to the same mail regulations and privileges as offenders assigned to general population. (OP 841.4 at 12.) RHU offenders will not be provided access to kiosk to retrieve or send secured messages and will not receive packages. (OP 841.4 at 12.)

Offenders assigned to RHU status will receive the same number and type of meals served to the general population. (OP 841.4 at 12.) Food is not to be used as a disciplinary measure. (OP 841.4 at 12.) Whenever an offender refuses to eat, a record should be made. (OP 841.4 at 12.) General Detention and RHU status offenders are allowed two telephone calls per month and one noncontact, one-hour visit with no more than five persons once a week. (OP 841.4 at 13.) General detention and RHU status offenders will be permitted to shower and shave not less than three times each week. (OP 841.4 at 14.)

The defendants also have provided a copy of OP 830.1, "Institution Classification Management," effective June 1, 2017, (Docket Item No. 22-3) ("OP

830.1"), which provides for the organization, function and management of offender classification in VDOC institutions. (OP 830.1 at 1.) OP 830.1 defines classification as "[a] process for determining the needs and requirements of offenders, … an ongoing process that attempts to utilize all relevant information concerning the offender to identify and analyze individual strengths and weaknesses, address individual needs, and encourage proper adjustment to the prison setting and ultimately free society." (OP 830.1 at 1.) OP 830.1 requires Annual Reviews be conducted for each offender each year. (OP 830.1 at 2.) It also requires formal due process hearings for transfers for security reasons or to permanent protective custody, a decrease in good-time credit, a security level increase, pre-hearing detention, segregation assignments, reviews and releases, RHU assignment and removals and assignment and removals from SAM Units and Secure Diversionary Treatment Program, ("SDTP"), Units. (OP 830.1 at 3-4.) Formal due process hearings are not required for an increase in security level that occurs during a general population offender's Annual Review. (OP 830.1 at 7.) OP 830.1 states that the ICA is an experienced senior supervisory staff member who is appointed by the Facility Unit Head or a committee, chaired by an experienced senior staff member. (OP 830.1 at 4.)

OP 830.1 requires that an offender receive notice of all formal ICA hearings at least 48 hours prior to the hearing, unless an offender waives such notice. (OP 830.1 at 5-6.) The offender must be notified that he has a right to be present at the ICA hearing, to remain silent, to have to a counselor or other employee to advise him, to hear the testimony or statements presented, to call and question witnesses, to be advised verbally at the hearing and in writing within five working days of the ICA's recommendation and reason for decision, to receive a copy of the action of the final approving authority and to access to the Offender Grievance Procedure to

appeal all classification decisions.  (OP 830.1 at 6.)  The person who serves notice of an upcoming ICA hearing on an offender will record the names of any requested witnesses, indicate whether the offender waives 48-hour notice, have the offender sign the notice and provide a copy of the notice to the offender. (OP 830.1 at 6.)  The Facility Unit Head or designee will review each ICA action and will approve or disapprove of the ICA's recommendation. (OP 830.1 at 7.)

*II.     Analysis*

The defendants have moved for dismissal of plaintiffs' claims against them for failing to state claims upon which relief may be granted.  The VDOC argues that the plaintiffs' claim asserting a breach of the 1985 Settlement Agreement should be dismissed because the consent decrees entered pursuant to that agreement were vacated in 1997 and are no longer enforceable. The VDOC further argues that the VDOC is not a "person" within the meaning of 42 U.S.C. § 1983 and that plaintiffs' claims pursuant to the ADA and Rehabilitation Act are barred by the applicable statute of limitations. All defendants argue that the plaintiffs' due process claim must fail because the conditions of confinement in the Step-Down Program do not impose atypical and significant hardship compared to the ordinary incidents of prison life. All defendants also argue that plaintiffs' equal protection claim must be dismissed because they have not alleged that they are treated differently from other similarly situated individuals and have not properly alleged improper motive. All defendants also argue that plaintiffs' Eighth Amendment claim should be dismissed because their conditions of confinement do not constitute cruel and unusual punishment. The individual defendants further argue that they are protected from liability by qualified immunity and that they are entitled to dismissal of the plaintiffs' ADA and

Rehabilitation Act claims in their individual capacities since they are not "public entities."

In considering a motion to dismiss, all well-pleaded factual allegations contained in a complaint are to be taken as true and viewed in the light most favorable to the plaintiff. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," and it must allege facts specific enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Dismissal also may be appropriate where the complaint contains a detailed description of underlying facts, which fail to state a viable claim. *See Estelle v. Gamble*, 429 U.S. 97, 106-08 (1976).

Generally, a court may not consider matters outside of the pleadings on a motion to dismiss without converting it to a motion for summary judgment. *See* FED. R. CIV. P. 12(d); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). The court may, however, consider documents that are attached to or referenced in the complaint. *See Moore v. Flagstar Bank*, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (1990)).

I.      Breach of Contract Claims

In their Complaint, the plaintiffs allege that the VDOC's Step-Down Program and the conditions of confinement at Red Onion and Wallens Ridge violate the Settlement Agreements entered into by the VDOC in the *Brown* case. The Complaint acknowledges that the VDOC moved to terminate the Consent Decrees approving

the 1983 and 1985 Settlement Agreements in February 1997, but it alleges that the Consent Decree was terminated only regarding long-term solitary confinement at Mecklenburg. The plaintiffs allege that the VDOC has never sought any relief from the Consent Decree or Settlement Agreements from the court regarding the Phase Program or SMU.   Furthermore, the plaintiffs argue that the Prison Litigation Reform Act, ("PLRA"), affected only "prospective relief" pursuant to consent decrees and not "private settlement agreements."

The VDOC argues that, when the *Brown* consent decrees were vacated in 1997, the underlying Settlement Agreements were rendered unenforceable. Therefore, they argue, the plaintiffs cannot pursue a claim based on breach of these Settlement Agreements. In support of this argument, the defendants cite the Second Circuit's opinion in *Benjamin v. Jacobson*, 172 F.3d 144 (2nd Cir. 1999) (en banc).

As the Second Circuit in *Benjamin* recognized, the PLRA, enacted in 1996, required courts, upon motion of a party, to vacate any order for "prospective relief" entered before its enactment in a civil action with respect to prison conditions, if the order did not comply with the PLRA's requirements for entry of injunctive relief. *See* 172 F.3d at 154-56; 18 U.S.C. § 3626(b); *Miller v. French*, 530 U.S. 327, 331, 333 (2000); *Plyler v. Moore*, 100 F.3d 365, 369 (4th Cir. 1996). The PLRA defines prospective relief as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7).   The PLRA also states:

> Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a), if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled.

18 U.S.C. § 3626(c)(2). The PLRA also defines a "private settlement agreement" as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C. § 3626(g)(6).

In *Benjamin*, the Second Circuit recognized that certain private settlement agreements would remain enforceable even though the consent decrees adopting them were vacated under the PLRA's termination provision. *See* 172 F.3d at 157. The court reasoned: "Where the parties have made an agreement to settle conditional on approval by the federal court, there is no enforceable agreement if the condition fails. The parties may of course enter into an agreement that is not conditioned on such approval…." *Benjamin*, 172 F.3d at 157.  The plaintiffs, here, argue that the Eastern District's 1997 order vacated the 1983 and 1985 Consent Decrees, but it did not affect the validity of the underlying 1983 and 1985 Settlement Agreements, which remain enforceable as contracts under state law.

The 1985 Settlement Agreement stated that it superseded all prior agreements between the parties, including, specifically, the 1983 Settlement Agreement. (1985 Settlement Agreement at 1.) The 1985 Settlement Agreement contained a number of areas of prospective relief, including prospective relief that the VDOC must give notice to the Eastern District and all *Brown* counsel before initiating any future phase program and requiring continuation of certain conditions of confinement regarding in-cell lighting, ability to open cell windows, turning off water to cell toilets, use of in-cell restraints, amount of outdoor recreation, location of meals, uses of force, medical and psychiatric care at Mecklenburg, programming, use of the law library, access to reading materials, Saturday mail, food service and religious diets, group religious activities, Ramadan observance, search procedures for inmates and visitors

and attorney-client visitations.

The 1985 Settlement Agreement, however, does not state that the parties' agreement is conditioned upon the court's approval. The 1985 Settlement Agreement does state:

> …This agreement is not to be construed to establish or change the standard of culpability for civil or criminal liability of any official, employee, agent, or representative of the Commonwealth of Virginia other than for the sole and limited purpose of enforcement of this agreement and any decrees which may issue herein
>
> … This agreement was voluntarily and mutually agreed upon by the defendants and plaintiffs as a compromised settlement of disputes between the parties and no decrees which may issue, nor this agreement, nor any actions taken pursuant hereto constitute admissions that any condition, policy, procedure or acts or omissions of the DOC and/or [Mecklenburg] or any state official, employee, or agent was, or is, in any way improper, negligent, unconstitutional, or in violation of any rights of the plaintiff class or any member thereof, or caused or causes any injury or other deprivation or damage to the plaintiff class or any member thereof.
>
> … This agreement shall not be admissible in evidence in any proceeding or trials other than for the sole and limited purpose of enforcement of this agreement and the decrees on file herein. …
>
> …
>
> … The parties shall submit this agreement to the Court in full settlement of all remaining issues in this case, except costs and attorneys' fees, and the parties shall request that the Court retain jurisdiction for such time as the Court deems necessary to enforce compliance with this agreement and any decrees which may issue herein.

(1985 Settlement Agreement at 14-16.)

The 1985 Consent Decree approving the 1985 Settlement Agreement stated

that the court found that the agreement was a "fair and appropriate resolution of all of the remaining issues in this case except costs and attorneys' fees…" (1985 Consent Decree at 1.) The 1985 Consent Decree, in approving and adopting the 1985 Settlement Agreement, noted that the *Brown* case had been certified by the court as a class action pursuant to Rule 23(b)(1) and (2) of the Federal Rules of Civil Procedure. (1985 Consent Decree at 1.) Pursuant to Rule 23(e), the claims of the class could be settled only upon the court's approval. That approval was withdrawn when the court vacated its 1983 and 1985 Consent Decrees in 1997.  Nonetheless, courts have recognized that, even in the absence of court approval of settlement of the class claims, the named parties may be bound by their settlement agreement.

The Sixth Circuit has held that "…Rule 23 was never designed to protect the interests of parties who were fairly represented throughout the class-action litigation process…." *Whitlock v. FSL Mgmt, LLC*, 843 F.3d 1084, 1090 (6th Cir. 2016). The Sixth Circuit in *Whitlock* agreed with an earlier Third Circuit ruling that rejected the notion that a court's obligation to evaluate a settlement under Rule 23(e) was antecedent to enforcement of a binding settlement agreement upon the parties to the agreement. *See* 843 F.3d at 1094 (citing *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592-94 (3rd Cir. 2010)). In *Ehrheart*, the Third Circuit held: "The requirement that a district Court review and approve a class action settlement before it binds all class members does not affect the binding nature of the parties' underlying agreement." 609 F.3d at 593.

The VDOC argues that the parties to the 1983 and 1985 Settlement Agreements intended for the agreements to be considered "consent decrees" rather than "private settlement agreements" under the PLRA because the agreements expressly provided for ongoing judicial enforcement. In general, the interpretation

of a written contract is a question of law, and, as such, is an appropriate question to be resolved in a motion to dismiss. *See Pyott-Boone Elecs., Inc. v. IRR Trust, etc.,* 918 F. Supp. 2d 532, 537 (W.D. Va. 2013) (citing *Homeland Training Ctr, LLC v. Summit Point Auto. Rsch. Ctr.*, 594 F.3d 285, 290 (4th Cir. 2010)). Under Virginia law, when the terms of a contract are clear and unambiguous, a court must give them their plain meaning. *See Pocahontas Mining Ltd. Liab. Co. v. Jewell Ridge Coal Corp.*, 556 S.E.2d 769, 771 (Va. 2002).

> A contract is not ambiguous simply because the parties to the contract disagree about the meaning of its language. … Rather ambiguity arises when its language can be understood in more than one way or refers to two or more things at once. … When determining a contract's plain meaning, the words used are given their usual, ordinary, and popular meaning.

*Pocahontas Mining Ltd. Liab. Co.,* 556 S.E.2d at 771-72 (internal citations omitted). "Such an ambiguity, if it exists, must appear on the face of the instrument." *Video Zone, Inc. v. KF&F Props., L.C.,* 594 S.E.2d 921, 924 (Va. 2004). "When an agreement is plain and unambiguous on its face, the Court will not look for meaning beyond the instrument itself." *Eure v. Norfolk Shipbuilding & Drydock Corp., Inc.*, 561 S.E.2d 663, 667 (Va. 2002). The court should look to parol evidence in order to determine the intent of the parties, however, if the contract language is ambiguous, vague or indefinite. *See Cascades N. Venture Ltd. P'ship v. PRC Inc.,* 457 S.E.2d 370, 373 (Va. 1995). "In such a case, the proper construction of the contract is an issue for the trier of fact, and the court should receive extrinsic evidence to ascertain the intention of the parties and to establish the real contract between them." *Cascades N. Venture Ltd. P'ship,* 457 S.E.2d at 373; *see also, Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC*, 2016 WL 1247220, at *7 (W.D. Va. Mar. 24, 2016).

The issue before the court in this case is whether the parties to the 1985 Settlement Agreement intended to enter into an enforceable private settlement agreement regardless of court approval and continuing court supervision. The language of the 1985 Settlement Agreement does not clearly answer this issue. It does not contain a clear, unambiguous statement that the parties' agreement either was or was not contingent on the court's approval. The language that it does contain, at best, may imply such an agreement, in that the agreement recognizes that further court decrees "may issue." Where, as here, the language of the contract is ambiguous, vague or indefinite, the issue is one for the trier of fact to decide upon the evidence of the parties' intentions. Therefore, I will recommend that the court deny the Motions on this ground.

The VDOC further argues that, even if the plaintiffs could pursue a breach of contract suit against it, it is entitled to Eleventh Amendment immunity. In particular, the VDOC argues that under the Supreme Court's opinion in *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), a federal district court does not possess jurisdiction to enforce a settlement agreement, where the court has not retained continuing jurisdiction to enforce the settlement agreement. VDOC further argues that this court may not exercise supplemental jurisdiction over state-law claims asserted against a sovereign entity. *See In re Sec'y of the Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1144-45 (4th Cir. 1993). The plaintiffs argue that the VDOC waived any immunity it might have possessed when it entered into the Settlement Agreements, which explicitly state that the federal court would retain jurisdiction to enforce the agreements. *See Watson v. Texas*, 261 F.3d 436, 440-43 (5th Cir. 2001); *see also Pettigrew v. Oklahoma*, 722 F.3d 1209, 1213 (10th Cir. 2013) (a state can enter into a contract that waives its Eleventh Amendment immunity to

-68-

suits related to the contract).

It is true, "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States," *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000), unless a state's immunity has been abrogated or waived. *See Watson*, 261 F.3d at 440; *see also Barton v. Summers*, 293 F.3d 944, 947-48 (6ᵗʰ Cir. 2002). While a state's waiver must be unequivocal, it may be express or implied. *See Watson*, 261 F.3d at 441. In this case, the 1985 Settlement Agreement specifically stated: "… the parties shall request that the Court retain jurisdiction for such time as the Court deems necessary to enforce compliance with this agreement and any decrees which may issue herein." (1985 Settlement Agreement at 16.) The 1985 Consent Decree also stated that "the Court will retain jurisdiction for such time as may be necessary to enforce or modify this Order and settlement." (Docket Item No. 1-5 at 2.) Again, however, the court's April 7, 1997, Order vacated the 1983 and 1985 Consent Decrees.

As stated above, the 1985 Settlement Agreement is unclear as to whether it survived the court's vacating of the 1985 Consent Decree approving it.  If the 1985 Settlement Agreement remains enforceable against the parties, however, it appears the language set forth above would be sufficient to waive the state's immunity. *See Watson*, 261 F.3d at 441. Therefore, I will recommend that the court deny the Motions on this ground.

The VDOC also argues that the plaintiffs' claim based on breach of the 1985 Settlement Agreement is barred by the statute of limitations. Under Virginia law, a claim based on breach of a written contract must be brought within five years after the alleged breach. *See* VA. CODE ANN. § 8.01-246(2) (2015 & Supp. 2019), § 8.01-230 (2015); *Kerns v. Wells Fargo Bank, N.A.,* 818 S.E.2d 779, 783 (Va. 2018). The

-69-

court's records show that the plaintiffs filed this suit on May 6, 2019. Therefore, if the VDOC's alleged breach of the 1985 Settlement Agreement occurred prior to May 6, 2014, this claim would be barred.

The Complaint alleges that the IM program under the VDOC's Step-Down Program is equivalent to the SMU and that the SM program and the Step-Down Program are equivalent to the SMU or Phase Program. The Complaint alleges that these programs, begun as part of the VDOC's Step-Down Program, breach the VDOC's agreement to terminate use of the SMU and Phase Program and not reestablish any similar programs. The Complaint also alleges that the VDOC adopted the Step-Down Program in August 2012.

The VDOC argues that, if its adoption of the Step-Down Program breached the 1985 Settlement Agreement, that breach occurred in 2012, and the statute of limitations to bring a claim based on that breach expired in 2017. The plaintiffs argue that their breach of contract claim did not accrue, and, therefore, that the statute of limitations did not begin to run on this claim, until they were affected by the breach. As the Fourth Circuit has recognized, "Virginia law makes clear that 'the running of the statute is not postponed by the fact that the … damages do not occur until a later date.'" *Fluor Fed. Sols., LLC v. PAE Applied Techs.*, LLC, 728 F. App'x 200, 203 (4th Cir. 2018) (quoting *Caudill v. Wise Rambler, Inc.*, 168 S.E.2d 257, 260 (Va. 1969)). In fact, in *Kerns*, 818 S.E.2d at 785, the Virginia Supreme Court recognized that accrual for breach of contract turns "entirely on the breach" and not when damages occur.

Here, the breach alleged by the plaintiffs is the adoption of the Step-Down Program, which the Complaint alleges occurred in 2012. That being this case, I find

that the Complaint, on its face, shows that the plaintiffs' breach of contract claim is barred by Virginia's applicable statute of limitations. I will recommend that the court grant the Motions on this ground and dismiss this claim.

II.    § 1983 Claims

The Complaint raises a number of claims against the defendants under 42 U.S.C. § 1983, including claims that the defendants have violated their due process and equal protection rights and their right to be free from cruel and unusual punishment under the Eighth Amendment.  The defendants argue that they are immune from the claims. The individual defendants also argue that the plaintiffs' §1983 claims should be dismissed because they fail to state claims based on violations of their due process and equal protection rights and their right to be free from cruel and unusual punishment under the Eighth Amendment.

a.  Due Process Claim

Plaintiffs allege that their procedural due process rights have been violated because they do not receive "meaningful periodic review" of their placement in Security Level S.  Prisoners may not be deprived of life, liberty or property without due process of law. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). However, the Due Process Clause applies only when government action deprives an individual of a legitimate liberty or property interest. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972). Defendants argue that the court should dismiss this claim because the plaintiffs' allegations have not established denial of a protected liberty interest.

The Complaint alleges that plaintiffs possess a protected liberty interest in

-71-

avoiding long-term solitary confinement pursuant to the Step-Down Program. The plaintiffs allege that this protected liberty interest arises from (1) VDOC policies mandating periodic review of prisoners in long-term solitary confinement, including the Step-Down Plan and OP 830.A and (2) the prisoners' conditions of long-term solitary confinement, which impose atypical and significant hardship in comparison to the ordinary incidents of prison life.

To establish a protected liberty interest, an inmate must "[1] point to a Virginia law or policy providing him with an expectation of avoiding the conditions of confinement *and* [2] demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." *Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015) (emphasis in original). Defendants argue, even if the court assumes that the plaintiffs have established an expectation of avoiding confinement in segregation, their allegations do not establish that confinement in segregation housing imposes harsh and atypical hardships. In particular, the defendants argue that the Fourth Circuit has recognized that conditions more onerous than those described in the Complaint do not necessarily impose atypical and significant hardship within the meaning of the Due Process Clause. *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997).

In *Incumaa v. Stirling*, 791 F.3d 517, 530 (4th Cir. 2015), the Fourth Circuit held that the Supreme Court's opinion in *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005), required the atypical-and-significant hardship analysis to turn on three factors: "(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." Earlier this year, the Fourth Circuit, applying the above analysis, found

that a prisoner housed in administrative segregation at Wallens Ridge had demonstrated a genuine issue of material fact with regard to the atypicality and harshness of his confinement. *See Smith v. Collins*, 964 F.3d 266, 275 (4th Cir. 2020). The Fourth Circuit held that the conditions of confinement in administrative segregation at Wallens Ridge, as alleged by Smith, were almost identical to the conditions addressed by the Supreme Court in *Wilkinson*. *See Smith*, 964 F.3d at 276-77 (citing *Wilkinso*n, 545 U.S. at 214, 223-24). It further held that the magnitude or severity of these conditions, which also are almost identical to the conditions alleged in this case, weighed in favor of a finding the impose an atypical and significant hardship.

The plaintiffs also allege that their period of confinement in these conditions has been indefinite. *See Smith*, 964 F.3d at 277-78. The named plaintiffs allege that they have spent between two and eight years on one or the other pathways of the Step-Down Program.[5]  In *Smith*, the Fourth Circuit held that a four-year, three-month period in solitary confinement was significant enough to tip the indefiniteness factor in Smith's favor. *See* 964 F.3d at 279.  Other Circuit Courts have found that periods of confinement of up to two and one-half years did not give rise to a liberty interest. *See Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008) (segregation confinement for 12 months); *Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir. 1998) (segregation confinement for two and one-half years); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3rd Cir. 1997) (segregation confinement for 15 months).  Since each of the named defendants here have alleged that they have spent at least two years in segregation confinement in the Step-Down Program – and that their confinement

---

[5] Thorpe alleged that he has spent 24 years in solitary confinement at Mecklenburg, Red Onion and Wallens Ridge, but he does not allege how much of this time has been while participating in the Step-Down Program.

continues during this litigation, I find this sufficient to allege the type of indefiniteness required to pursue this claim. I note that several of the named plaintiffs also allege that they have been told that they will never be moved from segregation housing.

I also find that the plaintiffs have sufficiently alleged that their segregation confinement had collateral consequences on their sentences. *See Smith*, 964 F.3d at 279. In particular, the Complaint alleges that prisoners confined in segregation may earn good-time or good-behavior credit at a significantly lower rate than prisoners held in general population. (Complaint at 46.)   The Fourth Circuit in *Smith* recognized that the VDOC's Operating Procedure 830.3 sets out four good-time credit class levels, with Level I accruing the most credits and Level IV accruing none. *See* 964 F.3d at 280. The court also noted that, according to this operating procedure, a prisoner held in segregation is ineligible to progress to Level I. *See Smith*, 964 F.3d at 280.

Based on the above, I find that the plaintiffs have sufficiently alleged that they have been denied a protected liberty interest. The Motions do not challenge that the Complaint adequately alleged that the plaintiffs were not afforded adequate process to protect that interest. *See Smith*, 962 F.3d at 281. Therefore, I recommend that the court deny the Motions with regard to the plaintiffs' due process claim.

b.  Equal Protection Claim

To adequately plead a claim for violation of rights under the Equal Protection Clause of the 14th Amendment, a prisoner must allege that he has been treated differently from others with whom he is similarly situated and that the unequal

-74-

treatment was the result of intentional or purposeful discrimination. *See Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Mere conclusory allegations of discrimination are insufficient. *See Chapman v. Reynolds*, 378 F. Supp. 1137, 1140 (W.D. Va. 1974) (court will not look behind the determinations of prison officials on mere accusations that they are racially motivated). The prisoner must allege facts establishing that a discriminatory purpose was a motivating factor in the challenged act. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977).

The defendants argue that the plaintiffs have not sufficiently pled that they were treated differently from similarly situated prisoners. The defendants further argue that the plaintiffs have not sufficiently alleged that they purposefully discriminated against the plaintiffs based on an identifiable trait.

I find that the Complaint adequately alleges a violation of the plaintiffs' equal protection rights. The Complaint alleges that the vague and overbroad criteria for placement into either the IM or SM Pathways has resulted in prisoners with similar criminal and prison disciplinary histories being treated differently. It also alleges that each of the named plaintiffs suffers from mental illness or disability. It further alleges that the Step-Down Program severely disadvantages prisoners who suffer from mental illness or disability, in that it does not allow staff to meaningfully consider these conditions in setting programming requirements or in their periodic reviews, which results in these prisoners being held in solitary confinement longer than prisoners who do not suffer from these conditions.  It also alleges that the defendants are aware that the Step-Down Program severely disadvantages prisoners with mental illness or disability.  It further alleges that this intentional discrimination against prisoners with mental illness or disability is not rationally related to a

legitimate penological purpose, but, rather, is for the primary purpose of filling beds at Wallens Ridge and Red Onion. Therefore, I will recommend that the court deny the Motions on this ground.

### c. Eighth Amendment Claim

The Complaint alleges that the conditions of the plaintiffs' indefinite and long-term solitary confinement has violated their right to be free from cruel and unusual punishment under the Eighth Amendment. In particular, the Complaint alleges that prisoners in solitary confinement at Red Onion and Wallens Ridge spend 22 to 24 hours a day alone within their small cells. They receive all meals in their cells. They allege that they are exposed to constant noise, noxious smells and light. They allege that the cells are designed to prevent any type of meaningful interpersonal contact or social interaction with staff or other prisoners. They allege that any time they leave their cells, they must strip naked and be subject to "dehumanizing" cavity searches. The Complaint also alleges that prisoners in long-term solitary confinement are, at most, allowed out of their cells only for 15-minute showers three times a week and one hour of outdoor recreation per day. It further alleges that staff often deny prisoners access to recreation or showers, resulting in prisoners spending up to 48 hours continuously in their cells. When taken to outdoor recreation, prisoners are led in shackles by a leash to small outdoor recreation cages devoid of any recreational equipment. Prisoner are not allowed to speak to each other while in these recreation cages. Outdoor recreation space is not heated in the winter, and solitary confinement prisoners are not provided with suitable winter clothing. The plaintiffs further allege that prisoners in long-term solitary confinement receive only one hour of noncontact visitation with family and friends per week. Visits are held in a visitation booth with a thick layer of Plexiglas between prisoner and visitor.

Prisoners can talk to only one person at a time through a telephone in the booth. The Complaint also alleges that prisoners held in long-term solitary confinement are denied access to any "productive activities," such as structured art and creative writing programs. As an alternative to outdoor recreation, some prisoners in solitary confinement are required to perform prison jobs while shackled. If a prisoner refuses to work, prison staff revoke his privileges and extend the time he must serve in solitary confinement.

The plaintiffs further alleged that exposure to these conditions of long-term solitary confinement have caused them a litany of serious physical and mental problems, including problems with their eyesight, weight loss, rapid heartbeat, chest pain, sweating, shortness of breath, digestive problems, headaches or migraines, high blood pressure, pacing, insomnia, vertigo, dizziness, memory loss, restlessness, claustrophobia, anxiety, depression, agitation, anger, mood swings, racing thoughts, feelings of desperation, disorientation, an inability to concentrate, paranoia, tension, thoughts or acts of suicide or self-harm, post-traumatic stress disorder, schizoaffective disorder, schizophrenia, psychosis, hallucinations and hearing voices.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," as measured by society's evolving standards of decency. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). To demonstrate cruel and unusual punishment based on prison conditions, a plaintiff must establish a "serious deprivation of a basic human need" and that the defendants acted with deliberate indifference toward the conditions. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999). Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Subjectively, to amount to deliberate indifference, a prison official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer v. Brennan*, 511 U.S. 825, 837. (1994). Furthermore, such knowledge may be shown by circumstantial evidence such as the long duration of a cruel prison condition, s*ee Farmer*, 511 U.S. at 842, or that the risk was obvious, *see Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015).

While the Fourth Circuit previously had held to the contrary, *see In re Long Term Admin. Segregation*, 174 F.3d at 471-72, in 2019 the court recognized that solitary confinement conditions less onerous than those alleged by the plaintiffs, here, violated the Eighth Amendment prohibition on cruel and unusual punishment. *See Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019) (in-cell meals with one hour of outside of cell recreation five days a week violated Eighth Amendment). The court held that keeping prisoners in a cell at least 23 hours a day, alone, with "no access to congregate religious, educational, or social programming" posed "a substantial risk of serious psychological and emotional harm." *Porter*, 923 F.3d at 357. Four year earlier, in *Incumaa*, 791 F.3d at 534, the court recognized that "[p]rolonged solitary confinement exacts a heavy psychological toll…."

Considering the plaintiffs' allegations in light of these recent cases, I find that the plaintiffs have sufficiently alleged a claim under § 1983 for violation of their Eighth Amendment right to be free from cruel and unusual punishment, and I will recommend that the court deny the Motions on this ground.

      d.  Immunity

The defendants argue that the plaintiff's § 1983 claims should be dismissed because they are immune from liability. The VDOC argues that it cannot be held liable because it does not qualify as a "person" under § 1983. Neither a state, nor a state agency, is a "person" for purposes of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). Furthermore, the defendants argue that state officials sued in their official capacities are not "persons" within the meaning of § 1983. *See Will*, 491 U.S. at 71. The plaintiffs' Response does not challenge these assertions. Therefore, I will recommend that the court grant the Motions and dismiss the plaintiffs' claims under § 1983 against the VDOC or against any of the individual defendants sued in their official capacities.

The individual defendants also argue that they are protected from liability for damages by the doctrine of qualified immunity. Qualified immunity protects officials from lawsuits if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To overcome this shield, a plaintiff must demonstrate that: (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). A right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664, (2012) (internal marks omitted); *see also Malley v. Briggs*, 475 U.S. 335, 341, (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). The right must be established in a "particularized" manner. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If there is no controlling authority that specifically articulates the right, the right may still be clearly established if "a general constitutional rule already identified in the decisional law

... appl[ies] with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271 (1997).

Furthermore, while the doctrine of qualified immunity may be raised on a motion to dismiss, if it turns on a question of law, *see Jenkins v. Medford*, 119 F.3d 1156, 1159 n. 5 (4th Cir. 1997) (citing *Behrens v. Pelletier* 516 U.S. 299, 305-06 (1996)), it is an affirmative defense on which a defendant bears the burden, *see Latson v. Clarke*, 249 F. Supp. 3d 838, 866 (W.D. Va. 2017) (citing *Meyers v. Baltimore City,* 713 F.3d 723, 731 (4th Cir. 2013)). The defense of qualified immunity may be decided on a motion to dismiss only if the facts alleged, taken as true and construed in the plaintiffs' favor, would not demonstrate a violation of a constitutional right clearly established at the time of the alleged violation. *See Latson*, 249 F. Supp. 3d at 867. "'Most often, however, qualified immunity is tested at the summary judgment stage after the facts have been developed through discovery.'" *Latson*, 249 F. Supp. 3d at 867 (quoting *Alford v. Cumberland Cnty.* 2007 WL 2985297, at *3 (4th Cir. Oct. 15, 2007)).

With regard to the plaintiffs' Eighth Amendment claim, as stated above, the Fourth Circuit has now recognized that solitary confinement conditions similar to those alleged by the plaintiffs, here, violated the Eighth Amendment prohibition on cruel and unusual punishment. *See Porter*, 923 F.3d 348. The court's ruling in *Porter* came four years after it recognized in *Incumaa*, 791 F.3d at 534, that "[p]rolonged solitary confinement exacts a heavy psychological toll…." Even prior, however, this court had recognized that a prisoner's rights to humane conditions of confinement and to avoid deprivations that were not motivated by any legitimate penological justifications were clearly established. *See Latson*, 249 F. Supp. 3d at 867.

With regard to the plaintiffs' due process and equal protection claims, the defendants argue that they are entitled to qualified immunity because no court has specifically held that the VDOC's Step-Down Program violated prisoners' due process or equal protection rights. I believe the defendants' argument rests on too narrow of a view of the issue before the court. *See Wall v. Wade*, 741 F.3d 492, 502-03 (4th Cir. 2014) (issue is the courts' recognition of the prisoner's right involved and not the appropriateness of the prison's action alleged to have infringed on that right). In *Hewitt v. Helms* in 1983, the Supreme Court stated "… administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates." 459 U.S. 460, 477 n. 9 (1983). Furthermore, in *Incumaa*, the Fourth Circuit recognized that prisoners have a protected constitutional right in avoiding indefinite solitary confinement under conditions similar to the conditions alleged by the plaintiffs in this case. *See* 791 F.3d at 531-532.

Based on the above, I find that the Complaint alleges violations of the plaintiffs' clearly established rights under the Eighth Amendment and the Due Process and Equal Protection Clauses, and I recommend that the court deny the Motions on the ground of qualified immunity.

III.    ADA and Rehabilitation Act Claims

a.  "Public Entities"

The individual defendants have moved to dismiss the plaintiff's ADA and Rehabilitation Act claims against them because they are not "public entities" under these Acts, and, therefore, are not subject to suit in their individual capacities under

-81-

these Acts. Plaintiffs have conceded this argument is correct.  Thus, insofar as the Complaint raises claims against the individual defendants in their individual capacities under the ADA and the Rehabilitation Act, the Motions should be granted, and those claims dismissed.

b.  Statute of limitations

The defendants argue that the plaintiffs' claims under the ADA and the Rehabilitation Act are barred by the applicable statute of limitations. When a federal statute does not provide a statute of limitations, federal courts should apply the most appropriate statute of limitations from their state. *See Wilson v. Garcia*, 471 U.S. 261, 268 (1985); *Almond v. Kent*, 459 F.2d 200, 203 (4th Cir. 1972). Neither the ADA, nor the Rehabilitation Act, provides a statute of limitations for its claims. *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011); *Wolsky v. Med.l Coll. of Hampton Rds*, 1 F.3d 222, 224 (4th Cir. 1993). The Fourth Circuit has determined, in Virginia courts, the Virginia one-year statute of limitations found in the Virginia Rights of Persons with Disabilities Act, VA. CODE ANN. § 51.5-46(B), should apply in these cases. *See A Soc'y Without A Name*, 655 F.3d at 348; *Wolsky*, 1 F.3d at 225. The defendants argue that the plaintiffs' claims under these acts are barred because they were not brought within one year of their placement within the Step-Down Program.

In the Complaint, only named plaintiffs Riddick, Khavkin, Cavitt and Wall assert that they suffer from mental health disabilities.  At the time of the filing of the Complaint, each of these defendants had spent at least two years in solitary confinement in one of the Pathways under the Step-Down Program. Nonetheless, these plaintiffs argue that their claims under the ADA and the Rehabilitation Act are

not barred by the applicable one-year statute of limitations because the defendants' violations of these acts are continuing and because the limitations period did not begin to run until the plaintiffs knew or had reason to know of their injuries.

The so-called "continuing violation doctrine" has been applied in civil rights cases to expand the applicable limitations periods for bringing suit. *See Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 503-07 (E.D. Va. 2002). While the Fourth Circuit has not explicitly adopted a test for what constitutes a continuing violation, it has, in an unpublished opinion, defined a "continuing violation" as "'one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period.'" *Arellano v. Henderson*, 1998 WL 792233, at *2 (4th Cir. Nov. 16, 1998) (quoting *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997)); *see also Taylor v. Home Ins. Co.*, 777 F.2d 849, 857 (4th Cir. 1985) (act occurring outside of limitations period subject to redress because "[the] unlawful practice … continue[d] into the limitations period…"). This language suggests that a discrimination claim may not accrue until a plaintiff has reason to know he has been discriminated against. *See Burke v. AT&T Tech. Servs. Co., Inc.*, 55 F. Supp. 2d 432, 438 (E.D. Va. 1999). In fact, the Fourth Circuit has held that a cause of action accrues under a borrowed statute of limitations either when the plaintiff has actual knowledge of his claim or has constructive knowledge through the knowledge of his injury and who caused it. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006).

Also, the statute of limitations is an affirmative defense, meaning that a defendant generally bears the burden of pleading and proving its existence. *See Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir. 2006); *Phoenix Sav. & Loan,*

*Inc. v. Aetna Cas. & Sur. Co.*, 427 F.2d 862, 870 (4th Cir. 1970). A statute of limitations defense may be raised by way of a motion to dismiss pursuant to Rule 12(b)(6) only if the bar is apparent on the face of the complaint. *See Eriline,* 440 F.3d at 654*; Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005). Furthermore, the Fourth Circuit has recognized that, in the context of putative class actions such as this, a statute of limitations defense may present the need for a fact-intensive inquiry. *See Thorn,* 445 F.3d at 320-23 (resolution of statute of limitation defense may require trier of fact to examine particular circumstances of each individual class member).

While the Complaint in this case makes clear that each of these four named plaintiffs have been held in solitary confinement in the Pathways of the Step-Down Program for at least two years prior to filing suit, it does not clearly state when each first experienced the alleged discrimination based on their mental disabilities, which is the basis of their ADA and Rehabilitation Act claims. It also is important to note that the Complaint alleges that each of the defendants suffered from serious mental health issues, which could have affected their ability to recognize their injuries.

Based on the above, I recommend that the court deny the Motions on this ground.

c.  Failure to state a claim

The Fourth Circuit has held that, because the language of the ADA and the Rehabilitation Act is "substantially the same," the same analysis applies to both. *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n. 9 (4th Cir. 1995). To state a claim under either the ADA or the Rehabilitation Act, a plaintiff must allege:

> … (1) that he has a disability; (2) that he is otherwise qualified for the
> … benefit in question; and (3) that he was excluded from the … benefit
> due to discrimination solely on the basis of the disability.

*Doe*, 50 F.3d at 1265. Discrimination under these Acts includes not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability. *See Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 (4th Cir. 2012). The ADA and the Rehabilitation Act differ only with respect to the burden of proof on causation. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461-62 (4th Cir. 2012) (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69) (4th Cir. 1999)).

The defendants argue that the Complaint fails to state plausible claims for disparate treatment under the ADA and the Rehabilitation Act because it fails to identify the program or benefit they have been denied, fails to allege that they were otherwise qualified and fails to allege that they were discriminated against based on their disability. The defendants also argue that the Complaint fails to state plausible claims for failure to accommodate their disabilities because it does not allege that they requested an accommodation.

A review of the Complaint demonstrates that the defendants' first argument must fail. The Complaint alleges that the named plaintiffs are "qualified individuals" with mental health disabilities who are denied access to VDOC benefits

and programs available to other VDOC offenders because they are indefinitely housed in solitary confinement because of their mental health disabilities. (Complaint at 92-94.)  It further alleges that the Step-Down Program -- offenders' only avenue out of solitary confinement -- does not provide reasonable "modification" for prisoners with mental health disabilities.   The Complaint specifically lists the mental health conditions and/or symptoms suffered by each of the named plaintiffs. (Complaint at 11-16.) While the Complaint alleges that the plaintiffs' mental health problems were caused by their conditions of confinement in solitary confinement in the Step-Down Program, it also alleges that, due to these mental health problems, they continue to be housed in solitary confinement, and denied many of the benefits and programs available to other prisoners, because they cannot comply with the requirements of the Step-Down Program, which does not grant them any accommodation for their mental disabilities. (Complaint at 75-79, 92-95.) *See United States v. Georgia*, 546 U.S. 151 (2006) (refusal of prison officials to accommodate a prisoner's disability-related needs in prison programs constituted denial of benefits under ADA); *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) ("services, programs, or activities" language in ADA includes prison recreational, medical, educational and vocational programs).

The defendants are correct that the Complaint does not allege that the named plaintiffs requested any specific accommodations.   The defendant are incorrect, however, in their assertion that this flaw requires dismissal of the plaintiff's ADA and Rehabilitation Act claims. While the reasonable accommodation requirement usually does not apply unless triggered by a request, it also may apply when a person's disability and need for accommodation are obvious. *See Kiman v. N.H. Dep't of Corrs.*, 451 F.3d 274, 283 (1st Cir. 2006). Here, the plaintiffs have alleged that they suffer from serious mental health conditions, which have caused them to

either act out or fail to comply with the requirements of the Step-Down Program. They further allege that the defendants are aware of their mental health conditions and that these conditions result in the very behavior used to retain them in solitary confinement under the terms of the Step-Down Program. At this stage of the proceedings, I find this is sufficient to state a claim for failure to make a reasonable accommodation, and I recommend that the court deny the Motions on this ground.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   The language of the 1985 Settlement Agreement is ambiguous as to whether the parties intended to enter into a private settlement agreement, enforceable regardless of court approval;

2.   The plaintiffs' breach of contract claim is barred by Virginia's five-year statute of limitations for breach of written contracts;

3.   The VDOC and the individual defendants in their official capacities are not "persons" under § 1983;

4.   The Complaint sufficiently states claims under § 1983 against the individual defendants in their individual capacities for violation of the plaintiffs' clearly established due process and equal

protection rights and their rights to be free from cruel and unusual punishment under the Eighth Amendment;

5.      The individual defendants in their individual capacities are not "public entities" under the ADA and the Rehabilitation Act;

6.      It is not clear on the face of the Complaint that the plaintiffs' ADA and Rehabilitation Act claims are barred by the applicable one-year statute of limitations; and

7.      The Complaint sufficiently states claims under the ADA and the Rehabilitation Act.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant in part and deny in part the Motions.  The court should grant the Motions and dismiss the plaintiffs' breach of contract claim, the § 1983 claims against the VDOC and the individual defendants in their official capacities and the claims under the ADA and Rehabilitation Act against the individual defendants in their individual capacities. The court, otherwise, should deny the Motions.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those

portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

**ENTERED:**        September 4, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE