## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
Big Stone Gap Division

|  |  |  |
|---|---|---|
| WILLIAM THORPE, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00007-JPJ-PMS |
| | ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF RULE 72(B) OBJECTIONS TO MAGISTRATE JUDGE'S REPORT & RECOMMENDATION**

Mark R. Herring
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206 – Telephone
Fax: (804) 786-4239 – Facsimile
moshea@oag.state.va.us

September 18, 2020

Maya M. Eckstein (VSB #41413)
Trevor S. Cox (VSB #78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
tcox@HuntonAK.com

*Counsel for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARDS ................................................................................................... 3

    A.    The Court's review of the report and recommendation ........................................ 3

    B.    Dismissal standards................................................................................................ 4

ARGUMENT .................................................................................................................. 5

I.    The Magistrate Judge correctly recommended dismissal of Plaintiffs' breach-of-contract claim on statute-of-limitations grounds, but erred in finding the 1985 Settlement Agreement potentially enforceable and refusing to find VDOC immune from suit.......... 5

    A.    Plaintiffs cannot pursue a claim based on the 1985 Settlement Agreement, which became unenforceable upon the vacatur of the consent decrees in 1997. .............. 6

    B.    VDOC is immune from a breach-of-contract action.............................................. 9

II.    The Magistrate Judge erroneously concluded that Plaintiffs stated a due process claim. 11

III.    The Magistrate Judge erroneously concluded that Plaintiffs stated an equal protection claim.......................................................................................................... 15

IV.    The Magistrate Judge erroneously concluded that Plaintiffs stated an Eighth Amendment claim.......................................................................................................... 19

V.    Defendants are entitled to qualified immunity from Plaintiffs' § 1983 claims. .............. 21

    A.    The Magistrate Judge defined the relevant rights too broadly............................. 22

    B.    Plaintiffs' allegedly violated rights were not clearly established at the time the challenged conduct occurred.................................................................................. 25

VI.    The Magistrate Judge erroneously concluded that Plaintiffs stated claims under the ADA and Rehabilitation Act. .................................................................................... 28

    A.    The Magistrate Judge erred in finding that Plaintiffs alleged a continuing violation that is not barred by the statute of limitations..................................................... 28

    B.    The Magistrate Judge erred in finding that Plaintiffs adequately stated ADA and Rehabilitation Act claims..................................................................................... 31

CONCLUSION................................................................................................................ 33

**CERTIFICATE OF SERVICE** ................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Society Without A Name v. Virginia,*
   655 F.3d 342 (4th Cir. 2011) ...........................................................................29, 30

*Adams v. Bain,*
   697 F.2d 1213 (4th Cir. 1982) ..................................................................................4

*Adams v. Ferguson,*
   884 F.3d 219 (4th Cir. 2018) .............................................................22, 23, 24, 27

*Am. Fed'n of State, Cty. & Mun. Emps. v. Virginia,*
   949 F. Supp. 438 (W.D. Va. 1996), *aff'd,* 145 F.3d 182 (4th Cir. 1998) ...........9, 10

*Anderson v. Creighton,*
   483 U.S. 635 (1987)..........................................................................22, 23, 24

*Andrews v. Daw,*
   201 F.3d 521 (4th Cir. 2000) ..................................................................................5

*Arellano v. Henderson,*
   165 F.3d 910 (4th Cir. 1998) ................................................................................30

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011).............................................................................................23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................4

*Bane v. Va. Dep't of Corr.,*
   No. CIV.A. 705CV00024, 2005 WL 1388924 (W.D. Va. June 9, 2005)................33

*Barksdale v. Clarke,*
   No. 7:16cv00355, 2017 U.S. Dist. LEXIS 123518 (W.D. Va. Aug. 4, 2017)........27

*Beckham v. AMTRAK,*
   569 F. Supp. 2d 542 (D. Md. 2008) ........................................................................5

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)..........................................................................4, 20, 32

*Benjamin v. Jacobson,*
   172 F.3d 144 (2d Cir. 1999)...........................................................................6, 8

*Booker v. S.C. Dep't of Corr.*,
    855 F.3d 533 (4th Cir. 2017) ........................................................................25

*Bowler v. Ray*,
    No. CIV.A. 7:07CV00565, 2007 WL 4268915 (W.D. Va. Nov. 30, 2007) .........................12

*Brickey v. Hall*,
    828 F.3d 298 (4th Cir. 2016) ........................................................................21

*Brosseau v. Haugen*,
    543 U.S. 194 (2004).................................................................................23

*Cent. Radio Co. Inc. v. City of Norfolk, Va.*,
    811 F.3d 625 (4th Cir. 2016) ........................................................................16

*Chapman v. Reynolds*,
    378 F. Supp. 1137 (W.D. Va. 1974) ...................................................................15

*City & Cty. of San Francisco, Calif. v. Sheehan*,
    135 S. Ct. 1765 (2015)...............................................................................21

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) .....................................................................31, 32

*Cooper v. Gilbert*,
    No. 7:17cv00509, 2018 U.S. Dist. LEXIS 65096 (W.D. Va. Apr. 17, 2018) .........................27

*County of Oneida v. Oneida Indian Nation*,
    470 U.S. 226 (1985)..................................................................................9

*Custer v. Sweeney*,
    89 F.3d 1156 (4th Cir. 1996) .........................................................................5

*Delk v. Younce*,
    No. 7:14cv00643, 2017 U.S. Dist. LEXIS 36581 (W.D. Va. Mar. 14, 2017),
    *aff'd*, 709 F. App'x 184 (4th Cir. 2018)............................................................26

*DePaola v. Va. Dep't of Corr.*,
    No. 7:14cv00692, 2016 U.S. Dist. LEXIS 132980 (W.D. Va. Sept. 28, 2016),
    *aff'd*, 703 F. App'x 205 (4th Cir. 2017).........................................................24, 26

*Diamond v. Colonial Life & Acc. Ins. Co.*,
    416 F.3d 310 (4th Cir. 2005) .........................................................................3

*Doe v. Cook Cty., Illinois*,
    798 F.3d 558 (7th Cir. 2015) .........................................................................8

*Edelman v. Jordan*,
415 U.S. 651 (1974)............................................................................................9, 10

*Farmer v. Brennan*,
511 U.S. 825 (1994)...................................................................................................20

*Fauconier v. Clarke*,
966 F.3d 265 (4th Cir. 2020) ............................................................................15, 17

*Fayetteville Inv'rs v. Commercial Builders, Inc.*,
936 F.2d 1462 (4th Cir. 1991) ..................................................................................12

*Haley v. Va. Dep't of Health*,
No. 4:12-cv-00016, 2012 WL 5494306 (W.D. Va. Nov. 13, 2012)...........................5

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)...................................................................................................21

*Hewitt v. Helms*,
459 U.S. 460 (1983)...................................................................................................25

*Hines v. Youseff*,
914 F.3d 1218 (9th Cir.), *cert. denied sub nom. Smith v. Schwarzenegger*,
140 S. Ct. 159 (2019)................................................................................................24

*Hubbert v. Washington*,
No. 7:14cv00530, 2017 U.S. Dist. LEXIS 41695 (W.D. Va. Mar. 22, 2017).........27

*Jersey Heights Neighborhood Ass'n v. Glendening*,
174 F.3d 180 (4th Cir. 1999) ..............................................................................29, 30

*Johnson v. Quinones*,
145 F.3d 164 (4th Cir. 1998) .....................................................................................18

*Jordan v. Va. Dep't of Corr.*,
No. 7:16cv00228, 2017 U.S. Dist. LEXIS 150501 (W.D. Va. Sept. 18, 2017).......27

*Latson v. Clarke*,
249 F. Supp. 3d 838 (W.D. Va. 2017) .......................................21, 23, 25, 26, 28

*Love-Lane v. Martin*,
355 F.3d 766 (4th Cir. 2004) .....................................................................................28

*Lynch v. United States*,
292 U.S. 571 (1934)...................................................................................................11

*Malley v. Briggs*,
475 U.S. 335 (1986)...................................................................................................21

*Martin v. Duffy*,
    858 F.3d 239 (4th Cir. 2017) ...........................................................................15

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..........................................................................................11

*McMurray v. AGC Flat Glass N. Am.*,
    No. 2:09CV00077, 2010 WL 4068607 (W.D. Va. Oct. 14, 2010) ...........................3

*McNutt v. Gen. Motors Acceptance Corp.*,
    298 U.S. 178 (1936)............................................................................................4

*Mickle v. Moore*,
    174 F.3d 464 (4th Cir. 1999) ...........................................................................19

*Mitchell v. Forsyth*,
    472 U.S. 511 (1985)..........................................................................................21

*Muhammad v. Mathena*,
    No. 7:14cv00529, 2017 U.S. Dist. LEXIS 11734 (W.D. Va. Jan. 27, 2017) .........27

*Muhammad v. Smith*,
    No. 7:16cv00223, 2017 U.S. Dist. LEXIS 125335 (W.D. Va. Aug. 8, 2017)........27

*Mukuria v. Clarke*,
    No. 7:15-cv-00172, 2016 WL 5396712, *aff'd*, 706 F. App'x 139 (4th Cir.
    2017) ................................................................................................................24

*Mullenix v. Luna*,
    136 S. Ct. 305 (2015)...........................................................................20, 21, 22, 23

*Murray v. Wilson Distilling Co.*,
    213 U.S. 151 (1909)..........................................................................................10

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)..............................................................................................14

*Obataiye-Allah v. Va. Dep't of Corr.*,
    No. 7:15cv00230, 2016 U.S. Dist. LEXIS 133316 (W.D. Va. Sept. 28, 2016),
    *aff'd sub nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017)..........27

*Patchak v. Zinkle*,
    138 S. Ct. 897 (2018)........................................................................................11

*Pearson v. Callahan*,
    555 U.S. 223 (2009)..........................................................................................21

*Pickett v. Astrue*,
    895 F. Supp. 2d 720 (E.D. Va. 2012) ........................................................................4

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019) ...................................18, 19, 23, 26

*Pritchett v. Alford*,
    973 F.2d 307 (4th Cir. 1992) ................................................................................21

*Randall v. United States*,
    30 F.3d 518 (4th Cir. 1994) ..................................................................................4

*Rivers v. Bowman*,
    No. 6:18-CV-00061, 2020 WL 1538842 (W.D. Va. Mar. 30, 2020) .......................................3

*Rowe v. Jones*,
    483 F.3d 791 (11th Cir. 2007) ...........................................................................6, 8

*Saucier v. Katz*,
    533 U.S. 194 (2001).......................................................................................21, 22

*Scinto v. Stansberry*,
    841 F.3d 219 (4th Cir. 2016) ...............................................................................20

*Smith v. Collins*,
    964 F.3d 266 (4th Cir. 2020) ...........................................................................14, 26, 27

*Smith v. Gilchrist*,
    749 F.3d 302 (4th Cir. 2014) ...............................................................................21

*Smith v. Howell*,
    570 F. App'x 762 (10th Cir. 2014) .........................................................................24

*Snodgrass v. Gilbert*,
    No. 7:16cv00091, 2017 U.S. Dist. LEXIS 39122 (W.D. Va. Mar. 17, 2017)........................27

*Sylvia Dev. Corp. v. Calvert Cty., Md.*,
    48 F.3d 810 (4th Cir. 1995) ................................................................................16

*Taylor v. Home Ins. Co.*,
    777 F.2d 849 (4th Cir. 1985) ...............................................................................30

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
    551 U.S. 308 (2007)..........................................................................................12

*Torrez v. Semple*,
    No. 3:17-CV-1232 (SRU), 2018 WL 2303018 (D. Conn. May 21, 2018)............................31

*Turner v. Safley*,
    482 U.S. 78 (1987)...................................................................................15, 18

*U.S. v. Jadhav*,
    555 F.3d 337 (4th Cir. 2009) ...........................................................................4

*United States v. Midgette*,
    478 F.3d 616 (4th Cir. 2007) ...........................................................................3

*United States v. Raddatz*,
    447 U.S. 667 (1980)...........................................................................................3

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) ..................................................................... 17-18

*Vest v. Astrue*,
    No. 5:11CV047, 2012 WL 4503180 (W.D. Va. Sept. 28, 2012)........................3

*Wicomico Nursing Home v. Padilla*,
    910 F.3d 739 (4th Cir. 2018) .........................................................................31

*Wiley v. Doory*,
    14 F.3d 993 (4th Cir. 1994) ...........................................................................21

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)...................................................................................11, 14

*Williams v. United States*,
    50 F.3d 299 (4th Cir. 1995) .............................................................................4

*Wilson v. Seiter*,
    501 U.S. 294 (1991).........................................................................................18

*Wimmer v. Cook*,
    774 F.2d 68 (4th Cir. 1985) .............................................................................3

*Woodford v. Ngo*,
    548 U.S. 81 (2006)............................................................................................6

**Statutes**

18 U.S.C. § 3626(a)(1)(A) .....................................................................................6

18 U.S.C. § 3626(b)(2) .......................................................................................6, 7

18 U.S.C. § 3626(g)(1) ...........................................................................................8

18 U.S.C. § 3626(g)(6) ...........................................................................................8

28 U.S.C. § 636(b)(1)(C) ..............................................................................................4

42 U.S.C. § 12132 ........................................................................................................30

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ............................................................................................4, 5

Fed. R. Civ. P. 12(b)(6) ......................................................................................4, 5, 30

Fed. R. Civ. P. 72 ........................................................................................................3

Fed. R. Civ. P. 72(b) ....................................................................................................3

Fed. R. Civ. P. 72(b)(3) ...........................................................................................3, 4

**INTRODUCTION**

In this putative class action, twelve inmates filed suit against the Virginia Department of Corrections ("VDOC") and various VDOC officials, claiming that their constitutional rights were violated by their long-term confinement in segregated housing and VDOC's Segregation Reduction Step-Down Program (the "Step-Down Program")—a multi-step, incentive-based program designed to transition security level "S" inmates back into the general population when their conduct demonstrates that it is safe to do so. They also allege that the implementation of VDOC's Step-Down Program somehow violated a settlement agreement from the 1980s that involved a different prison (and different parties), and that they have been discriminated against on the basis of their disabilities, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Defendants filed two motions to dismiss Plaintiffs' various claims, which the parties briefed—and which Magistrate Judge Sargent largely recommended that this Court deny in the recent Report and Recommendation ("R&R"). Dkt. 70.

As specifically detailed below, Defendants object to each proposed finding of fact and conclusion of law decided adversely to them, including the following recommendations:

1.    The language of the 1985 Settlement Agreement is ambiguous as to whether the parties intended to enter into a private settlement agreement, enforceable regardless of court approval;

. . .

4.    The Complaint sufficiently states claims under § 1983 against the individual defendants in their individual capacities for violation of the plaintiffs' clearly established due process and equal protection rights and their rights to be free from cruel and unusual punishment under the Eighth Amendment;

. . .

6.    It is not clear on the face of the Complaint that the plaintiffs' ADA and Rehabilitation Act claims are barred by the applicable one-year statute of limitations; and

7.    The Complaint sufficiently states claims under the ADA and the Rehabilitation Act.

R&R at 87–88. Defendants also object to the Magistrate Judge's recommended disposition, to the extent it recommends denial of their motions to dismiss. *Id.* at 88.

Defendants have numerous, compelling reasons for objecting to the proposed findings of fact and conclusions of law in the Report & Recommendation:

- *First*, although the Magistrate Judge correctly determined that Plaintiffs' breach-of-contract claim was barred by the statute of limitations, she erred in finding the 1985 Settlement Agreement potentially enforceable and in refusing to find VDOC immune from suit on that claim.

- *Second*, the Magistrate Judge erred in concluding that Plaintiffs stated a due process claim because VDOC policies afford them adequate process.

- *Third*, the Magistrate Judge erred in concluding that Plaintiffs stated an equal protection claim. Plaintiffs failed to show they were treated unequally to similarly situated inmates, that Defendants intentionally discriminated against them, or that Defendants' alleged discrimination was not for a legitimate penological purpose.

- *Fourth*, the Magistrate Judge erred in concluding that Plaintiffs adequately pleaded an Eighth Amendment claim. Plaintiffs failed to support their claims with sufficient facts, including specific allegations related to Defendants' alleged deliberate indifference.

- *Fifth*, the Magistrate Judge erred in not finding Defendants entitled to qualified immunity. She defined the rights at issue too broadly, and ignored that Plaintiffs' allegedly violated rights were not clearly established at the time of the complained-of conduct.

- *Finally*, the Magistrate Judge erroneously concluded that Plaintiffs stated claims under the ADA and Rehabilitation Act. Plaintiffs did not allege a continuing violation that escapes the reach of the one-year statute of limitations, nor did they allege sufficient facts to support their claims.

For these reasons, and those discussed below, the Court should sustain Defendants' objections and grant their motions to dismiss.[1]

---

[1] In the interest of minimizing the unnecessary presentation of facts, Defendants assume familiarity with the factual and procedural background of this case and cite where possible to the Report and Recommendation and to previous filings and exhibits.

## LEGAL STANDARDS

### A.    The Court's review of the report and recommendation

Under Federal Rule of Civil Procedure 72(b), a district judge reviewing objections to a report and recommendation "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). *See McMurray v. AGC Flat Glass N. Am.*, No. 2:09CV00077, 2010 WL 4068607, at *1 (W.D. Va. Oct. 14, 2010) (Jones, J.) ("I must make a de novo determination of those portions of the report to which the plaintiff objects."); *Wimmer v. Cook*, 774 F.2d 68, 73 (4th Cir. 1985) "[A]ny individual findings of fact or recommendations for disposition by [the Magistrate Judge], if objected to, are subject to final *de novo* determination on such objections by a district judge"). Under a de novo standard, the "district judge in making the ultimate determination of the matter [must] give fresh consideration to those issues to which specific objection has been made by a party." *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quotation and citation omitted). Objections must be made with "sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007).

But "even absent an objection, the court retains the ability to review *sua sponte* a magistrate judge's report and recommendation." *Vest v. Astrue*, No. 5:11CV047, 2012 WL 4503180, at *1 (W.D. Va. Sept. 28, 2012). On matters for which there is no objection, "a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note); *Rivers v. Bowman*, No. 6:18-CV-00061, 2020 WL 1538842, at *1 (W.D. Va. Mar. 30, 2020) (same).

"[T]he Magistrate Judge's report and recommendation carries no presumptive weight . . . ." *Pickett v. Astrue*, 895 F. Supp. 2d 720, 723 (E.D. Va. 2012). "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). *See also* 28 U.S.C. § 636(b)(1)(C).

### B.    Dismissal standards

Because federal courts have only limited jurisdiction, "when a district court lacks subject matter jurisdiction over an action, the action must be dismissed." *U.S. v. Jadhay*, 555 F.3d 337, 347 (4th Cir. 2009). A challenge to a court's subject-matter jurisdiction can be raised at any time and is properly considered on a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The burden of proving subject-matter jurisdiction in response to a Rule 12(b)(1) motion rests with the plaintiff. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995); *see also McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

"[T]he purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court must consider all of the factual allegations of the complaint as true, the Court is not bound to accept a legal conclusion couched as a factual assertion, *Iqbal*, 556 U.S. at 663–64, nor should the Court accept a plaintiff's "unwarranted deductions," "rootless conclusions of

4

law" or "sweeping legal conclusions cast in the form of factual allegations." *Custer v. Sweeney*, 89 F.3d 1156, 1163 (4th Cir. 1996).

The Fourth Circuit has observed that it is not clear "whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." *Andrews v. Daw*, 201 F.3d 521, 524 n.2 (4th Cir. 2000). But this Court has noted that "[t]he recent trend, however, appears to treat Eleventh Amendment Immunity motions under Rule 12(b)(1)." *Haley v. Va. Dep't of Health*, No. 4:12-cv-00016, 2012 WL 5494306, at *2 n.2 (W.D. Va. Nov. 13, 2012). The underlying rationale is that, "although the Eleventh Amendment immunity is not a 'true limit' of [the] Court's subject matter jurisdiction, . . . it is more appropriate to consider [this] argument under Fed. R. Civ. P. 12(b)(1) because it ultimately challenges this Court's ability to exercise its Article III power." *Id.* (quoting *Beckham v. Nat'l R.R. Passenger Corp.*, 569 F. Supp. 2d 542, 547 (D. Md. 2008)).

## ARGUMENT

### I.  The Magistrate Judge correctly recommended dismissal of Plaintiffs' breach-of-contract claim on statute-of-limitations grounds, but erred in finding the 1985 Settlement Agreement potentially enforceable and refusing to find VDOC immune from suit.

Even though the Magistrate Judge correctly recommended dismissal of Plaintiff's breach-of-contract claim as barred by Virginia's applicable statute of limitations—a ruling that the Court should adopt—the Magistrate Judge erred in two ways with respect to this claim. First, the Magistrate Judge erred in concluding that vacatur of the 1983 and 1985 consent decrees did not also vacate the settling agreements they incorporated. Second, even if this Court were to determine an enforceable agreement survived vacatur of the consent decrees, VDOC would be entitled to

Eleventh Amendment immunity from that claim. Accordingly, the Magistrate Judge erred in rejecting VDOC's assertion of sovereign immunity from Plaintiffs' breach-of-contract claim.

A.    **Plaintiffs cannot pursue a claim based on the 1985 Settlement Agreement, which became unenforceable upon the vacatur of the consent decrees in 1997.**

The Magistrate Judge recommended denying the motions to dismiss because the 1985 Settlement Agreement did "not state that the parties' agreement is conditioned upon the court's approval." R&R at 65. In doing so, the Magistrate Judge gave short shrift to the critical fact that the agreement expressly provided for ongoing judicial enforcement. R&R at 66. Under the Prison Litigation Reform Act (the "PLRA") and case law interpreting it, that factor rendered the agreement unenforceable when the consent decree incorporating it was vacated. The Magistrate Judge erred in denying Defendants' motion on that ground.

In enacting the PLRA, Congress sought "to eliminate unwanted federal-court interference with the administration of prisons." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). As part of that mission, the PLRA limited federal courts' power to order prospective relief in conditions-of-confinement litigation, *see, e.g.*, 18 U.S.C. § 3626(a)(1)(A), and allowed for termination of existing federal consent decrees—like those at issue here—that swept too broadly or were entered without a specific finding that the prison conditions at issue violated the federal Constitution. *See* 18 U.S.C. § 3626(b)(2). In defining its terms and specifying what relief was terminable, the PLRA distinguished between "private settlement agreements" and "consent decrees." *See* 18 U.S.C. § 3626(g)(6) & (c)(2)(B)); *Benjamin v. Jacobson*, 172 F.3d 144, 157 (2d Cir. 1999) (en banc) (stating that the "concepts of consent decrees and private settlement agreements [are] mutually exclusive"). Specifically, "private settlement agreements," unlike consent decrees, are "not subject to judicial enforcement," and the enforcement of those agreements is expressly assigned to "State Court." *Id.* at 157–58 (quoting 18 U.S.C. § 3626(g)(6) & (c)(2)(B)); *Rowe v. Jones*, 483 F.3d 791, 796 (11th

Cir. 2007) ("[The PLRA's] legislative history makes it plain that Congress intended to distinguish consent decrees, which are judicially enforced agreements, from private settlement agreements, which are not judicially enforced.").

Throughout the proceedings related to the 1983 and 1985 agreements and the 1997 vacatur,[2] the parties manifested their intention that the Court retain enforcement jurisdiction over them. Thus, the 1983 and 1985 documents constitute consent decrees, within the meaning of the PLRA, rather than "private settlement agreements." That conclusion is bolstered by the following provisions:

- 4/8/83 Agreement ¶ 39 ("The parties shall submit this agreement to the Court . . . and the parties shall request that the Court retain jurisdiction for such time as the Court deems necessary to enforce compliance with this agreement and any decrees which may issue herein."), Dkt. 19-4;

- 4/22/83 Order (providing that "the Court will retain jurisdiction for such time as may be necessary to enforce or modify this Order and settlement"), Dkt. 19-5;

- 8/2/83 Order (in another "decree," "approving and adopting the agreement of the parties," and noting that the Court "shall retain jurisdiction for such further orders as may be necessary in accordance with the settlement agreement"), Dkt. 19-6;

---

[2] The history of these proceedings is recounted in VDOC's brief in support of its motion to dismiss, Dkt. 19.  Briefly stated, in August 1981, seven inmates confined at Mecklenberg Correctional Center (MCC) filed a putative class action in the U.S. District Court for the Eastern District of Virginia (the "Eastern District"), challenging the conditions of confinement at that facility.  *See* Compl., *Brown et al. v. Landon et al.* Dkt. 19-2; Am. Compl., *Brown et al. v. Procunier et al.,* Dkt. 19-3.  In April 1983, the parties entered into a settlement agreement, which was incorporated into a consent decree issued by the Eastern District.  *See* 4/8/83 Settlement Agreement, Dkt. 19-4; 4/22/83 Court Order, Dkt. 19-5; 8/2/83 Court Order, Dkt. 19-6; 8/2/83 Memorandum Opinion, Dkt. 19-7.  After the plaintiffs initiated contempt proceedings based on an alleged violation of the 1983 consent decree, the parties executed a second, modified settlement agreement, which also was incorporated into a consent decree issued by the Eastern District.  *See* 4/5/85 Settlement Agreement and 4/5/85 Court Order, collectively Dkt. 19-8.  By order dated April 7, 1997, the prior court orders memorializing the settlement agreements were expressly vacated, "pursuant to 18 U.S.C. § 3626(b)(2)," and the case was administratively closed.  *See* 4/7/97 Order, Dkt. 19-1.

7

- 4/5/85 Agreement (agreeing that "the parties shall request that the Court retain jurisdiction for such time as the Court deems necessary to enforce compliance with this agreement and any decrees which may issue herein"), Dkt. 19-8; and

- 4/5/85 Order (referencing the parties' application "to modify the consent decree previously entered" and noting that "the Court will retain jurisdiction for such time as may be necessary to enforce or modify this Order and settlement"), Dkt. 19-8.

Because the terms of these documents unambiguously provide for ongoing judicial enforcement, it is not necessary for a trier of fact to "look to parol evidence in order to determine the intent of the parties." R&R at 67. It also is unnecessary to answer the Magistrate Judge's hypothetical question—"whether the parties to the 1985 Settlement Agreement intended to enter into an enforceable private settlement *regardless of court approval and continuing court supervision*," R&R at 68 (emphasis added).

Given that the parties themselves referenced those agreements as "consent decrees" and expressly provided for ongoing judicial enforcement, they were "consent decrees," rather than "private settlement agreements," within the meaning of the PLRA. *See Rowe*, 483 F.3d at 796 ("Based on the plain language of the PLRA, judicial enforcement is thus the critical distinction between private settlement agreements and consent decrees."); *Doe v. Cook Cty., Illinois*, 798 F.3d 558, 565 (7th Cir. 2015) ("[T]he district court dismissed the suit, reserving jurisdiction to enforce the settlement's terms. (This reservation made the settlement a "consent decree" as defined in § 3626(g)(1), as opposed to a "private settlement agreement" under § 3626(g)(6).)"). Accordingly, once those decrees were vacated, the agreements that had been incorporated into those decrees were no longer enforceable. *See Benjamin*, 172 F.3d at 157 ("[I]f the federal court, though having once approved, withdraws its approval and terminates prospective relief, the condition upon which the parties agreed to bind themselves will have failed."). The Magistrate Judge should have granted Defendants' motion on that point.

## B.      VDOC is immune from a breach-of-contract action.

The Magistrate Judge also erred in denying sovereign immunity to VDOC on Plaintiffs'

breach-of-contract claim. The Magistrate Judge recommended denying VDOC's motion on that

basis because, assuming "the 1985 Settlement Agreement remains enforceable against the parties,"

there was language "sufficient to waive the state's immunity." R&R at 69. In reaching that

conclusion, she failed to consider the two contrary arguments below, which compel a finding of

immunity.[3]

First, VDOC could not have waived its Eleventh Amendment immunity in the 1985

Settlement Agreement because it was not a signatory to that agreement or a party in the underlying

litigation. Because the agreement contains no express declaration that VDOC itself waived its

immunity with respect to a future breach-of-contract action, any purported waiver would have to

be implied. But the Supreme Court has expressly rejected the concept of constructive consent in

the Eleventh Amendment context. *See Edelman v. Jordan*, 415 U.S. 651, 673 (1974)

("Constructive consent is not a doctrine commonly associated with the surrender of constitutional

rights.").[4]

---

[3] And without VDOC's having waived immunity, the Court lacks supplemental jurisdiction over the claim.  *See, e.g.*, *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 251 (1985) ("The Eleventh Amendment forecloses . . . the application of normal principles of ancillary and pendent jurisdiction where claims are pressed against the State."); *Pennhurst State Sch. v. Halder*, 465 U.S. 89, 121 (1984) ("[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment[.]").

[4] Nor could VDOC officials validly waive VDOC's Eleventh Amendment immunity.  As this Court has observed, "no official in the Department of Corrections . . . has the authority, under Virginia law, to waive the Commonwealth's Eleventh Amendment immunity, and thus the conduct or agreements of those officials could not establish a valid waiver."  *Am. Fed'n of State, Cty. & Mun. Emps. v. Virginia*, 949 F. Supp. 438, 443 n.4 (W.D. Va. 1996), *aff'd*, 145 F.3d 182 (4th Cir. 1998).

Second, the Magistrate Judge erred in recommending this Court deny VDOC immunity, given her determination that the language of the 1985 Settlement Agreement "is unclear as to whether it survived the court's vacating of the 1985 Consent Decree approving it." R&R at 69. Far from showing that the claim could proceed, the Magistrate Judge's conclusion that the relevant language is "ambiguous, vague [and] indefinite," R&R at 68, proves why the court lacks jurisdiction. As the Supreme Court explained in *Edelman* (and numerous cases since), "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated *'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction*.'" 415 U.S. at 673 (quoting *Murray v. Wilson Distilling Co*., 213 U.S. 151, 171 (1909)) (emphasis added). The Magistrate Judge's determination that the 1985 Settlement Agreement "does not contain a clear, unambiguous statement" on the critical issue—and that the "language that it does contain, *at best, may imply*" the answer to the waiver question, R&R at 68 (emphasis added)—is a concession that VDOC could not have waived immunity.

For both these reasons, the Court should reject the Magistrate Judge's recommendation to deny VDOC's sovereign immunity claim. "Given the reticence with which Virginia consents to suit in its *own* courts, this court will not accept a less explicit waiver of Eleventh Amendment immunity in federal court." *Am. Fed'n of State, Cty. & Mun. Emps.*, 949 F. Supp. at 443 n.4 ("Virginia zealously guards its sovereign immunity. Virginia courts have 'consistently held' that a waiver of sovereign immunity cannot be implied and that statutory language must explicitly and expressly grant consent to suit.").[5]

---

[5] A third argument in favor of immunity—a corollary to the above—is that, even supposing that the execution of the settlement agreements could validly waive VDOC's Eleventh Amendment immunity, the vacatur of the consent decrees (and the request for that relief), effectively withdrew

## II. The Magistrate Judge erroneously concluded that Plaintiffs stated a due process claim.

According to the Report and Recommendation, Defendants' motions to dismiss "d[id] not challenge that the Complaint adequately alleged that the plaintiffs were not afforded adequate process to protect [their alleged protected liberty] interest." R&R at 74. To the contrary, Defendants did challenge that conclusion, *see* Dkt. 22 at 19–21, and renew that challenge here.

VDOC policies provide for constitutionally sufficient process. Recognizing that "the requirements of due process are flexible and call for such procedural protections as the particular situation demands," *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (citation and punctuation omitted), the Supreme Court has identified three factors courts should consider when evaluating the sufficiency of process that has been afforded a litigant: "'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Id.* at 224–25 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Application of these factors shows that the procedural protections Virginia has implemented with respect to inmates assigned to security level "S" minimize the risk that an inmate will be erroneously placed in segregation, and they minimize the risk that an inmate will languish

---

VDOC's consent-to-suit. As the Supreme Court has explained, "[t]he contracts between a [sovereign] and an individual are only binding on the conscience of the sovereign and have no pretensions to compulsive force." *Lynch v. United States*, 292 U.S. 571, 580-81 (1934). Because "consent to sue the [sovereign] is a privilege accorded," that "consent may be withdrawn," and the "sovereign's immunity from suit" thereby resurrected. *Id.* at 581-82; *see also Patchak v. Zinkle*, 138 S. Ct. 897, 912 (2018) (Ginsburg, J., concurring) (noting that the government may withdraw its consent-to-suit and, in doing so, "reinstate sovereign immunity," even as "to pending litigation").

indefinitely in either internal pathway (or in the wrong pathway).[6] To begin with, VDOC policy sets forth the factors on which offenders may be assigned to security level "S." OP 830.A(IV)(A)(2);[7] *see also* OP 830.2(IV)(G)(2).[8] Before being assigned to security level "S," an offender receives an initial, formal hearing by the Institutional Classification Authority ("ICA"), review by Central Classification Services ("CCS"), and approval by both the Warden of ROSP and the appropriate regional administrator. OP 830.A(IV)(A)(3); OP 830.A(IV)(M)(c); OP 830.2(IV)(G)(3). Inmates receive advance notification and have the right to be present during that hearing. The ICA recommendation must be approved by the Warden and the Regional Chief, and inmates have the opportunity to file grievances relating to their segregation assignment.

Level "S" inmates then receive multiple periodic reviews—both internal and external, and formal and informal—to assess their program compliance and the appropriateness of their security-level, pathway, and privilege-level assignments. Those reviews include the following:

(1)  <u>Formal ICA hearings (every 90 days)</u>. Level "S" offenders are formally reviewed by the ICA at least once every 90 days to "determine whether to recommend that the offender continue in Segregation for a subsequent period of up to 90 days or be assigned to the general population." OP 830.A(M)(h); OP 830.2(IV)(G)(7). A formal ICA hearing triggers

---

[6] Plaintiffs allege that, if a prisoner is classified in the IM pathway, "VDOC policy does not allow him to be reassigned to the SM Pathway," Compl. ¶ 147, but that allegation is refuted by the language of the operating procedure itself. And "in the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

[7] Plaintiffs submitted VDOC Operating Procedure 830.A, *Segregation Reduction Step-Down Program*, as Exhibit 9 to the complaint (Dkt. 1-12), and its contents are therefore properly before the Court. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322 (2007).

[8] VDOC Operating Procedure 830.2, *Security Level Classification*, is available at https://vadoc.virginia.gov/about/procedures/documents/800/830-2.pdf. *See also* Dkt. 22-1 (same). As a publicly available official document, this VDOC Operating Procedures (and others cited herein) are subject to judicial notice and may properly be considered in the context of a motion to dismiss. *Bowler v. Ray*, No. CIV.A. 7:07CV00565, 2007 WL 4268915, at *1 (W.D. Va. Nov. 30, 2007).

procedural requirements, including 48-hour advance notification and the opportunity to be present at the hearing, as well as the right to appeal any classification decision through the offender grievance procedure. OP 830.1(IV)(B).[9]

(2)     Reviews by the External Review Team (twice a year). An external review team ("ERT") reviews each level "S" offender biennially to determine: (1) whether the offender is appropriately assigned to level "S"; (2) whether the offender meets the criteria for the internal pathway to which they are currently assigned; (3) whether a pathway change would be appropriate; and (4) whether the Dual Treatment Team has made appropriate decisions to advance the offender. OP 830.A(IV)(L)(1).

(3)     Informal reviews by the Dual Treatment Team (at least four times a year). The Dual Treatment Team ("DTT"), a facility-specific team, informally reviews level "S" offenders on an as-needed basis, but "at least quarterly," and specifically reviews any offender who is "being recommended to be considered for a status or pathway change." OP 830.A(IV)(M)(d)(iii); *see also* Compl. ¶ 136.

(4)     Formal reviews by the Multi-Disciplinary Team (every thirty days). ROSP, as a facility with a restrictive housing unit, also has a multi-disciplinary team ("MDT"), which evaluates each level "S" offender, through a formal ICA hearing, to develop an appropriate management path, including the establishment of mental health goals, disciplinary goals, responsible behavior goals, and programming assignments. OP 841.4(V)(H)(2). The MDT formally reviews each level "S" offender at least once every 30 days, in order to recommend whether the offender should continue at his current security level or be assigned to a less restrictive level. OP 841.4(V)(H)(2).[10]

(5)     Informal reviews by the Building Management Committee (as needed, but at least monthly). A Building Management Committee, comprised of individuals "directly involved in the operations of a specific unit," informally reviews all level "S" inmates, convening "at least monthly to discuss offender statuses and unit incentives and sanctions." OP 830.A(IV)(M)(f). The Committee may recommend changes to an inmate's

---

[9] VDOC Operating Procedure 830.1, *Institution Classification Management*, is publicly available at https://vadoc.virginia.gov/about/procedures/documents/800/830-1.pdf.   *See also* Dkt. 22-3 (same).

[10] VDOC Operating Procedure 841.4, *Restrictive Housing Units*, is available at https://vadoc.virginia.gov/about/procedures/documents/800/841-4.pdf.   *See also* Dkt. 22-2 (same).

privilege level, as well as discussing and adjusting individual pod incentives and sanctions. OP 830.A(IV)(M)(g); OP 830.A(IV)(D)(4)(b).

Moreover, level "S" offenders are rated weekly on their progress by prison officials and counselors, who are encouraged to communicate with each offender routinely on their ratings as an opportunity to acknowledge positive performance as well as to motivate them to improve when needed. OP 830.A(IV)(E)(5)(d). Level "S" inmates admitted to specialized units, such as a mental health unit or medical infirmary, are reviewed by staff to determine whether they should be reclassified. OP 830.2(IV)(G)(12). These safeguards largely mirror the procedural protections that the Supreme Court previously upheld. *See Wilkinson*, 545 U.S. at 225–29.

Thus, even assuming, in light of *Smith v. Collins*, 964 F.3d 266 (4th Cir. 2020), that Plaintiffs have a protected liberty interest in avoiding confinement as security level "S" offenders, their due process claim still fails because the process provided to them by VDOC is constitutionally sufficient. *Smith* does not alter that conclusion. According to Plaintiffs, their suit "mounts a predominantly facial challenge to VDOC policies that apply to multiple prisons." Class Plfs.' Statement of Position in Supp. of Venue & Opposing Discretionary Transfer at 1, Dkt. 31; *see also* Joint Rule 26(f) Report at 2 (characterizing Defendants' as violating due process by "maintaining facially inadequate review procedures"), Dkt. 29. They have explained that "this class action does not concern individualized incidents of misconduct or application of VDOC policies," nor does it "consider the capacity or characteristics of an individual inmate in a single facility, or the application of a policy to an individual." Dkt. 31 at 3. *Smith*, by contrast, involved the application (or alleged misapplication) of VDOC policies as to a specific plaintiff. *Compare id.* at 1 (stating that Plaintiffs' case is "[u]nlike *Reyes*—which involves an individual plaintiff making an as-applied challenge to *his* solitary confinement review decisions and to *his* conditions in confinement relating to specific misconduct of Red Onion staff"), *with Smith*, 964 F.3d at 278 ("Critically, even

14

though VDOC's Step-Down Program is designed to provide Level S prisoners with a pathway out of segregation, Smith asserts that the Program did not provide *him* with a viable path to release."). VDOC's framework plainly creates a defined pathway out of segregated housing and provides ample opportunity for periodic review, minimizing the risk of any ongoing and erroneous deprivation of a protected interest. Considered at the appropriate level of scrutiny—as a facial, rather than as-applied challenge—the relevant VDOC policies unquestionably provide adequate process, and therefore do not violate the Due Process Clause.

### III. The Magistrate Judge erroneously concluded that Plaintiffs stated an equal protection claim.

The Magistrate Judge was wrong to find that Plaintiffs adequately stated an equal protection claim. R&R at 75. The Equal Protection Clause, which prohibits States from denying persons "the equal protection of the laws," U.S. Const. amend. XIV, § 1, "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To make out an equal protection claim, "a plaintiff must plausibly allege 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (quoting *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017)). A plaintiff must also allege "that the disparity was not justified under the appropriate level of scrutiny," *id.*, and must provide factual allegations to support the claim; conclusory allegations of discrimination are insufficient, *Chapman v. Reynolds*, 378 F. Supp. 1137, 1140 (W.D. Va. 1974). In the prison context, this standard "is more demanding" still, because the court "accord[s] deference to the appropriate prison authorities" to account for "the unique health and welfare concerns" that arise in the prison environment. *Fauconier*, 966 F.3d at 277 (quoting *Turner v.*

15

*Safley*, 482 U.S. 78, 85 (1987)). Plaintiffs failed to vault these hurdles, and the Magistrate Judge erred in concluding they did.

First, Plaintiffs fail to allege specific facts showing that they were treated differently from similarly situated inmates. Without citing any allegations in the Complaint, the Magistrate Judge accepts that the criteria for placement in the IM and SM pathways have resulted in unspecified inmates "with similar criminal and prison histories being treated differently." R&R at 75. But such a conclusory allegation falls far short of what is required to state a claim. For instance, in *Fauconier*, the Fourth Circuit recently ruled that an inmate had sufficiently alleged an equal protection claim stemming from the prison's requirement that he reapply for his job following a period of hospitalization. 966 F.3d at 278. The court concluded that, although the allegations were "somewhat thin," Fauconier had carried his pleading burden by identifying in his complaint two other inmates who had not been required to reapply for their jobs. *Id.* In contrast, Plaintiffs do not identify any inmates who were treated differently; nor do they allege facts demonstrating that the inmates were similarly situated or detailing any purportedly unequal treatment. Plaintiffs instead rely on conclusory allegations that the Step-Down Program has led to different classifications for prisoners who pose no institutional threat. Compl. ¶¶ 237–39. The Magistrate Judge erred in overlooking these pleading deficiencies.

Second, the Magistrate Judge erred in concluding—again, without citation to any allegations by Plaintiffs—that Defendants' alleged "aware[ness]" that the Step-Down Program disadvantages prisoners with mental illness is sufficient to show intentional discrimination. R&R at 75. Courts place the bar much higher than that. To state an Equal Protection claim, a plaintiff must allege facts sufficient to show that the alleged "unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). In

determining discriminatory intent, courts consider: (1) evidence of a consistent pattern of actions impacting members of a particular class; (2) the historical background of the decision; (3) the sequence of events leading up to the decision; and (4) contemporary statements by decisionmakers. *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (quoting *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995)). The conclusory statement that Defendants were "aware" that inmates with mental illness are disadvantaged fails to satisfy the requirement to allege facts showing that discrimination was intentional or purposeful.[11]

Finally, the Magistrate Judge concluded that Plaintiffs adequately pleaded that Defendants' alleged discrimination was for the primary purpose of filling beds, rather than for any legitimate penological purpose. R&R at 75–76. That too was error. The Magistrate Judge failed to recognize that prison policies are presumptively reasonable and to assess Plaintiffs' allegations against the requirement to overcome that presumption. *See Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (to defeat a motion to dismiss, an inmate "must allege facts sufficient to overcome the presumption of reasonableness applied to prison policies").

In determining whether a plaintiff has plausibly alleged facts sufficient to overcome the presumption that prison policies are reasonably related to a penological interest, courts consider three factors. *Fauconier*, 966 F.3d at 277–78 (citing *Veney*, 293 F.3d at 732). These factors are:

---

[11] The Report and Recommendation notes Plaintiffs' contention that they have been discriminated against because some inmates are assigned to the IM pathway, and others to the SM pathway, without regard to their institutional risk. R&R at 75. But that assertion goes only as far as it says— that allegedly there was unequal treatment that was not motivated by institutional risk. It does not demonstrate that any unequal treatment was intentional. Plaintiffs also claim unwarranted significance from the fact that one consideration in an inmate's assignment to the SM pathway is whether he is "repeatedly disruptive," while the IM pathway involves a determination that an inmate is "routinely disruptive." *Id.* at 23–24. But the fact that the IM pathway and SM pathway determinations involve similar (but not identical) criteria does not establish discriminatory motive.

(1)     whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;"

(2)     "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and

(3)     whether there are "ready alternatives."

*Id.* (quoting *Veney*, 293 F.3d at 732).

Applying these factors shows that Plaintiffs have failed to demonstrate a lack of penological justification. First, the Step-Down Program is rationally related to a legitimate penological purpose. The Complaint states that the Step-Down Program assigns prisoners to the SM or IM Pathway based on their identified risk level, including their disruptive behavior, history of fighting, violent resistance to staff intervention, potential for extreme or deadly violence, and past serious violence. Compl. ¶¶ 138–41. These criteria are directly relevant to maintaining "[p]rison safety and security [which] are legitimate penological interests that [the court] must consider." *Veney*, 293 F.3d at 732. Second, Plaintiffs' requested accommodation of eliminating the Step-Down Program and all long-term segregation would have a significant harmful effect on prison guards and inmates by preventing VDOC from protecting staff, inmates, and the public from dangerous offenders. *See id.* at 733 (explaining that second-guessing judgments related to cell assignments "'would seriously hamper [the prison officials'] ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.'" (quoting *Turner*, 482 U.S. at 89)). Finally, the fact that the Step-Down Program requires an individualized assessment of each inmate's potential for violence supports a finding that it is rational, particularly in light of the deference courts grant prison officials in matters of prison administration. *See id.*

18

Because they cannot deny VDOC's legitimate interest in prison safety, Plaintiffs baldly assert that VDOC's primary purpose in adopting the Step-Down Program was filling beds at Wallens Ridge and Red Onion. But factual allegations in the Complaint show that the Step-Down Program is rationally related to prison safety. *See* Compl. ¶¶ 138–41. Plaintiffs' conclusory allegation, which is undermined by other allegations in the Complaint, is insufficient to overcome the strong presumption of reasonableness that courts in this Circuit give to prison policies. The Magistrate Judge erred in not requiring Plaintiffs to meet that standard.

## IV. The Magistrate Judge erroneously concluded that Plaintiffs stated an Eighth Amendment claim.

The Report and Recommendation erred in concluding that Plaintiffs alleged facts sufficient to state an Eighth Amendment claim. R&R at 76–78. To state such a claim based on conditions of confinement, a plaintiff must plausibly allege facts establishing "(1) that objectively, the deprivation of a basic human need was 'sufficiently serious' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Plaintiffs have not alleged facts sufficient to meet these requirements.

Contrary to the Magistrate Judge's suggestion, *see* R&R at 78, the Fourth Circuit has never found that segregated housing conditions, standing alone, violate the Eighth Amendment. *See Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019), *as amended* (May 6, 2019) (noting that "a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement"); *Mickle v. Moore*, 174 F.3d 464, 471 (4th Cir. 1999) (explaining that segregation "does not alone constitute cruel and unusual punishment"). The Fourth Circuit concluded that segregation was "a rational response to the threat to prison safety" where prisoners were placed in segregation based on their violent conduct in prison, rather than merely their

sentence, and had an avenue for progressing out of segregation. *Mickle*, 174 F.3d at 466–67. In 2019, the court found that the conditions of confinement on Virginia's death row violated the Eighth Amendment. *Porter*, 923 F.3d at 368. The court explained that, unlike in *Mickle*, the housing placement was not based on the inmates' in-prison conduct but solely on their sentences, and the inmates had no avenue for being removed from segregation. *Id.* at 359 ("Because *Mickle* involved a different set of facts than those adduced by our Plaintiffs, our decision cannot—and does not—overrule *Mickle*.").

The Report and Recommendation erred in finding *Porter* dispositive of the Eighth Amendment question here. R&R at 78. That conclusion ignores the material differences between this case and *Porter*. Here, for instance, as Plaintiffs concede, the Step-Down Program does not rely entirely on out-of-prison-conduct and provides an avenue out of segregated housing. Further, this Court must consider VDOC's arguments regarding its legitimate penological interest in the Step-Down Program, arguments that were not raised in *Porter*. *See Porter*, 923 F.3d at 363. As the Fourth Circuit has explained, "prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective." *Id.* at 363. *Porter*'s conclusion that conditions of segregation, absent any penological justification, violate the Eighth Amendment thus cannot support the same conclusion here.

Finally, the Magistrate Judge erred in failing to dismiss Plaintiffs' Eighth Amendment claim without having made any finding regarding deliberate indifference. R&R at 76–78. To establish an Eighth Amendment violation, a plaintiff must show that prison officials were deliberately indifferent to the alleged deprivation. *See Farmer v. Brennan*, 511 U.S. 825, 837

(1994). Deliberate indifference requires a showing that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [drew] the inference." *Id.* In other words, "[d]eliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 835). Plaintiffs fail to allege sufficient facts to satisfy this demanding standard, including any facts showing that Defendants recognized a substantial risk of harm. The Complaint makes only conclusory allegations that Defendants "were deliberately indifferent," Compl. ¶¶ 247, 249, or knew or should have known the substantial risk of serious harm from the Step-Down Program, Compl. ¶¶ 39–49, 204, 212, 241, 249. These allegations constitute no more than "labels and conclusions," which are insufficient to survive a motion to dismiss. *See Twombly*, 550 U.S. at 555.

## V.     Defendants are entitled to qualified immunity from Plaintiffs' § 1983 claims.

The Magistrate Judge erred in concluding that Defendants were not entitled to qualified immunity from Plaintiffs' § 1983 claims. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).[12] "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

---

[12] "[I]f there is a 'legitimate question' as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994). In other words, qualified immunity protects government officials when they act in legal "'gray areas.'" *Brickey v. Hall*, 828 F.3d 298, 303 (4th Cir. 2016) (quoting *Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014)).

A determination of qualified immunity as early in the litigation as possible is critical, as qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Although the Report & Recommendation correctly states that qualified immunity is often tested at summary judgment, *see* R&R at 80 (quoting *Latson v. Clarke*, 249 F. Supp. 3d 838, 866 (W.D. Va. 2017), "its establishment at the ***pleading*** or summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992) (emphasis added). As the Supreme Court has explained:

> The privilege is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. As a result, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

*Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (internal punctuation and citations omitted). "Because of the importance of qualified immunity 'to society as a whole,' the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 n.3 (2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

Against this backdrop, the Magistrate Judge made two critical errors. First, she defined the rights at issue too broadly. Second, the Magistrate Judge denied qualified immunity even though her analysis rests on decisions that did not "clearly establish" the rights until long after the conduct challenged in the Complaint. Thus, even if the Court concludes that Plaintiffs' § 1983 claims survive dismissal, Defendants—in their individual capacities—are entitled to qualified immunity.

### A.    The Magistrate Judge defined the relevant rights too broadly.

The Report & Recommendation correctly acknowledged that, in determining whether the defendants' violated Plaintiffs' constitutional rights, for purposes of qualified immunity, the rights "must be established in a 'particularized' manner." R&R at 79 (quoting *Anderson v. Creighton*,

483 U.S. 635, 640 (1987)). In rejecting Defendants' claims of qualified immunity, however, its analysis fell short of meeting that standard.

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308. Rather, the "dispositive question is whether the violative nature of ***particular conduct*** is clearly established. This inquiry must be undertaken ***in light of the specific context of the case, not as a broad general proposition***." *Id.* (quotations and citations omitted) (emphasis added). Courts must inquire not whether the right allegedly violated was broadly established but whether "it would be clear to a reasonable official that his conduct was unlawful ***in the situation he confronted***." *Saucier*, 533 U.S. at 201–02 (emphasis added). Otherwise, "Plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson*, 483 U.S. at 639.

Despite "repeated instruction from the Supreme Court" to avoid defining constitutional rights at too high a level, *Adams v. Ferguson*, 884 F.3d 219, 230 (4th Cir. 2018), the Magistrate Judge erred in rejecting Defendants' view of the rights as "too narrow" in favor of a broad articulation of the rights at issue. R&R at 81. (The Report and Recommendation did not attempt to define the equal protection right, however. *See id.*). For instance, with respect to Plaintiffs' Eighth Amendment claim, the Magistrate Judge found clearly established "a prisoner's rights to humane conditions of confinement and to avoid deprivations that were not motivated by any legitimate penological justifications." R&R at 80 (citing *Latson*, 249 F. Supp. 3d at 867).[13] But

---

[13] The Report & Recommendation also relates that, in *Porter*, the Fourth Circuit found that "solitary confinement conditions similar to those alleged by the plaintiffs, here, violated the Eighth Amendment prohibition on cruel and unusual punishment." R&R at 80. For the reasons stated above, *see supra* at Part IV, *Porter* is distinguishable. *See Porter*, 923 F.3d at 362 (noting that "a

that "general principle . . . hardly settles this matter." *Mullenix*, 136 S. Ct. at 309. The "relevant inquiry is whether existing precedent placed the conclusion that [defendants] acted unreasonably ***in these circumstances*** 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (emphasis added).

The Supreme Court has rejected similarly broad articulations of rights that do not take into account specific circumstances. In *Mullenix*, for instance, a police officer "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight [and] who twice during his flight had threatened to shoot police officers"; Mullenix fired six shots at the fugitive's car, four of which struck the fugitive and killed him. 136 S. Ct. at 307. In defining the right at issue, the Supreme Court rejected as too broad the "general principle that deadly force requires a sufficient threat." *Id.* at 309. *See also Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (in a similar case, examining whether clearly established law addressed the "'situation [Brosseau] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"). Likewise, in *Anderson*, the Supreme Court rejected as insufficiently specific the articulation of the "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." 483 U.S. at 640. The Court "faulted that formulation for failing to address the actual question at issue: whether 'the circumstances with which Anderson was confronted . . . constitute[d] probable cause and exigent circumstances.'" 136 S. Ct. at 309 (quoting *Anderson*, 483 U.S. at 640–41).

---

legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement").

Courts of appeal, including the Fourth Circuit, have followed the Supreme Court in narrowly defining Eighth Amendment rights.[14] This court should do so, too.

### B.   Plaintiffs' allegedly violated rights were not clearly established at the time the challenged conduct occurred.

Assuming, *arguendo*, that the Report & Recommendation defines Plaintiffs' allegedly violated rights at an appropriately specific level, the Report & Recommendation overlooks that they were not "clearly established" at the time the challenged conduct occurred. Plaintiffs filed suit in May 2019, asserting alleged constitutional violations in connection with the Step-Down Program, which ROSP began implementing in 2011. Yet the cases cited in the Report & Recommendation—purportedly showing that Plaintiffs' allegedly violated Eighth Amendment and due process rights are clearly established—post-date the filing of the Complaint and the complained-of conduct.[15]

With respect to Plaintiffs' Eighth Amendment claim, the Report & Recommendation says that the right at issue became clearly established with *Porter*—a decision that only appeared the

---

[14] *See, e.g.*, *Adams*, 884 F.3d at 227 (finding it was not clearly established that "an officer in charge of a state hospital system [who] knows that the system has a pervasive problem with waiting lists and empty beds, and . . . that numerous persons entitled to state beds, if denied help, face[d] a substantial risk of suffering serious harm, [could not] decline to intervene") (quoting plaintiff); *Hines v. Youseff*, 914 F.3d 1218, 1229 (9th Cir.) (finding that "the specific right that the inmates claim in these cases—the right to be free from heightened exposure to Valley Fever spores—was not clearly established"), *cert. denied sub nom. Smith v. Schwarzenegger*, 140 S. Ct. 159 (2019); *Smith v. Howell*, 570 F. App'x 762, 765 (10th Cir. 2014) (defining the right to be free from "a limited exposure to asbestos dust for a few hours").

[15] As noted above, the Report & Recommendation identifies no equal protection right in this context. *See* R&R at 81. That is not surprising. Every court to have considered the issue—including in a case brought by one of the Plaintiffs—has concluded that the different Step-Down pathways do not violate equal protection. *See, e.g.*, *Mukuria v. Clarke*, No. 7:15-cv-00172, 2016 WL 5396712, at *10-11, *aff'd*, 706 F. App'x 139 (4th Cir. 2017); *DePaola v. Va. Dep't of Corrs.*, 2016 U.S. Dist. LEXIS 132980, at *32-34 (W.D. Va. Sept. 27, 2016), *aff'd*, 703 F. App'x 205 (4th Cir. 2017).

week Plaintiffs filed their Complaint (and did not become final until twelve weeks later, when the en banc Fourth Circuit denied reconsideration). *See* R&R at 80 (noting that "the Fourth Circuit has now recognized that solitary confinement conditions similar to those alleged by the plaintiffs, here, violated the Eighth Amendment prohibition on cruel and unusual punishment"). But that "was not the state of the law at the time" for most of the period of activity challenged in the suit. *Latson*, 794 F. App'x 266, 270 (4th Cir. 2019). As the Fourth Circuit explained in *Latson*, until *Porter* no case law "clearly established and gave fair notice of an Eighth Amendment violation" stemming from "long-term solitary confinement"; it even acknowledged its own "contrary circuit authority at the time of the alleged violation." *Id.* at 270 (citing *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017)). Accordingly, it found that correctional staff were "entitled to qualified immunity." *Id.*

With respect to Plaintiffs' due process claim, the Report and Recommendation points to 1983 Supreme Court precedent that "[p]rison officials must engage in ***some sort of periodic review*** of the confinement" of inmates in "administrative segregation," R&R at 81 (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)) (emphasis added).[16] But it is instructive that the Fourth Circuit in *Smith* "note[d its] skepticism" that the "question of whether Smith had a clearly established protected liberty interest is straightforward." 964 F.3d at 282 n.11. Indeed, courts have, with the exception of *Smith*, uniformly rejected due process claims against Virginia's Step-Down Program, with its multi-tiered review.[17] And *Smith* involved particular circumstances not present here: a

---

[16] Notably, *Hewitt* also recognized that, in reviewing administrative segregation of inmates, "the decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions." 459 U.S. at 477 n.9.

[17] *See, e.g.*, *Delk v. Younce*, No. 7:14cv00643, 2017 U.S. Dist. LEXIS 36581, at *21-25 (W.D. Va. Mar. 14, 2017) (Moon, J.), *aff'd*, 709 F. App'x 184 (4th Cir. 2018); *DePaola v. Va. Dep't of Corr.*,

26

plaintiff's unique status as a practicing Rastafarian and "religious objector" whose path through the Step-Down Program was allegedly impeded by his non-compliance with VDOC's grooming policy. *Smith*, 964 F.3d at 278.

But even if *Smith* is deemed to have "clearly established" a due process right in this context, the Fourth Circuit did not issue that decision until July 2020—long after Plaintiffs filed suit (and after Defendants moved to dismiss on the basis of qualified immunity), and even longer after most of the challenged conduct occurred. Thus, while the Complaint alleges "Defendants have failed to provide . . . meaningful review" of "whether there is (or was) a sustaining and valid reason for continuing to hold" Plaintiffs in administrative segregation, Dkt. 1 at 88 ¶ 233, there are no allegations—indeed, by definition there cannot be any—of such failings by Defendants *since Smith*.

For these reasons, Defendants are entitled to qualified immunity to the extent their challenged conduct pre-dated any relevant clearly established law. *See Adams*, 884 F.3d at 229 ("In assessing whether [a defendant] is entitled to qualified immunity, we must differentiate the claims made against other defendants from those asserted against her.").

---

No. 7:14cv00692, 2016 U.S. Dist. LEXIS 132980, at *22-31 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd*, 703 F. App'x 205 (4th Cir. 2017); *Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15cv00230, 2016 U.S. Dist. LEXIS 133316, at *25-31 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd sub nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017); *Cooper v. Gilbert,* No. 7:17cv00509, 2018 U.S. Dist. LEXIS 65096, at *8-9 (W.D. Va. Apr. 17, 2018) (Conrad, J.); *Jordan v. Va. Dep't of Corr.*, No. 7:16cv00228, 2017 U.S. Dist. LEXIS 150501, at *23-26 (W.D. Va. Sept. 18, 2017) (Dillon, J.); *Muhammad v. Smith,* No. 7:16cv00223, 2017 U.S. Dist. LEXIS 125335, at *32-33 (W.D. Va. Aug. 8, 2017) (Conrad, J.); *Barksdale v. Clarke*, No. 7:16cv00355, 2017 U.S. Dist. LEXIS 123518, at *13-20 (W.D. Va. Aug. 4, 2017) (Kiser, J.); *Snodgrass v. Gilbert,* No. 7:16cv00091, 2017 U.S. Dist. LEXIS 39122, at *34-38 (W.D. Va. Mar. 17, 2017) (Conrad, J.); *Hubbert v. Washington*, No. 7:14cv00530, 2017 U.S. Dist. LEXIS 41695, at *12-18 (W.D. Va. Mar. 22, 2017) (Urbanski, J.); *Muhammad v. Mathena*, No. 7:14cv00529, 2017 U.S. Dist. LEXIS 11734, at *4-5 (W.D. Va. Jan. 27, 2017) (Conrad, J.).

**VI.    The Magistrate Judge erroneously concluded that Plaintiffs stated claims under the ADA and Rehabilitation Act.**

Although the Magistrate Judge correctly concluded that Plaintiffs' individual-capacity claims under the ADA and Rehabilitation Act should be dismissed because the individual Defendants are not "public entities," R&R at 81–82, she neglected to recommend dismissal of the corresponding official-capacity claims. The Court should dismiss those claims as duplicative of the claims against VDOC. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (official-capacity claim "is essentially a claim against the [entity] and thus should be dismissed as duplicative"); *Latson v. Clarke*, 249 F. Supp. 3d 838, 856 (W.D. Va. 2017) (dismissing official-capacity ADA and Rehabilitation Act claims as duplicative of claims against VDOC).

Plaintiffs' ADA and Rehabilitation Act claims should be dismissed altogether, however. As explained below, the Magistrate Judge committed two errors that led her to a contrary conclusion. First, in misapplying the continuing-violation doctrine, she found that Plaintiffs' claims were not barred by the statute of limitations. Second, she erred in concluding that Plaintiffs alleged facts sufficient to state ADA and Rehabilitation Act claims.

**A.    The Magistrate Judge erred in finding that Plaintiffs alleged a continuing violation that is not barred by the statute of limitations.**

Plaintiffs' ADA and Rehabilitation Act claims are barred by the applicable statute of limitations, which the Magistrate Judge correctly identified to be one year. R&R at 82. But the Magistrate Judge was mistaken in finding that Plaintiffs alleged continuing violations of the ADA and Rehabilitation Act, on the ground that Defendants have operated the Step-Down Program since 2012. R&R at 84. Fourth Circuit precedent requires at least one act of alleged discrimination within the limitations period for the continuing violation doctrine to apply, and Plaintiffs have identified none.

The Fourth Circuit has explained that if a plaintiff alleges "a series of separate acts" of discrimination constituting a continuing violation, "the limitations period begins anew with each violation"—provided that "the same alleged violation was committed at the time of each act." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011). In other words, the plaintiff must "cite [a] discrete act[] of discrimination that fall[s] within the limitations period." *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 189 (4th Cir. 1999). The Fourth Circuit has also cautioned that courts must distinguish "continual unlawful acts . . . from the continuing ill effects of an original violation because ***the latter do not constitute a continuing violation***." *A Soc'y Without A Name*, 655 F.3d at 348 (emphasis added); *see also Jersey Heights*, 174 F.3d at 189 ("alleged ongoing effects of the original decision" do not establish a continuing violation).

Plaintiffs' claims fall outside the continuing violation doctrine. They do not challenge a recent, discrete act of discrimination but, instead, ongoing effects from an allegedly discriminatory act in the distant past—either the adoption and implementation of the Step-Down Program (in 2011), or their placement in the Step-Down Program (more than a year before the Complaint was filed). Numerous Fourth Circuit decisions illustrate why this distinction dooms their claims.

In *A Society Without A Name*, for instance, the plaintiff organization alleged that Virginia discriminated against the homeless by removing homeless services from Richmond's downtown to a more remote location at the "Conrad Center" on Oliver Hill Way. 655 F.3d at 344–45. By the time the plaintiff brought suit, the limitations period had passed, but the plaintiff claimed that the site's continuous "provision of services to the homeless—including new services . . . from time to time"—established a continuing violation. *Id.* at 348. The Fourth Circuit rejected that reasoning. It explained that "[t]he fact that the Conrad Center is still located on Oliver Hill Way and continues to offer services to the homeless . . . does not amount to a continuing violation, but rather amounts

29

to the continuing effect of the original decision." *Id.* at 349. The Fourth Circuit reached a similar conclusion in *Jersey Heights*, which involved a highway construction project. The court concluded that there was no continuing violation because, "[a]t bottom, appellants' . . . argument rests on the alleged ongoing effects of the original decision to locate the highway in proximity to Jersey Heights." 174 F.3d at 189.

As in those cases, Defendants' ongoing operation of the Step-Down Program does not constitute a continuing violation. Plaintiffs have not challenged any discriminatory act that took place during the limitations period; instead, they allege ill effects resulting from the adoption of the Step-Down Program. Moreover, Plaintiffs cannot manufacture a continuing violation by alleging that Defendants' refusal to reconsider or modify the Step-Down Program revives the statute of limitations—the Fourth Circuit rejected the corresponding argument in *Jersey Heights*. It explained there that the government's refusal to reconsider the siting decision, and even its failure to consider or mitigate the effects of its decision, did not constitute a continuing violation. *Id.*

For these reasons, the Magistrate Judge erred in finding that the continuing violation doctrine applies, and the Court should reject her recommendation to deny Defendants' motion to dismiss.[18]

---

[18] The decisions cited in the Report and Recommendation are consistent with this conclusion. R&R at 83.  For instance, in *Arellano v. Henderson*, 165 F.3d 910 (4th Cir. 1998) (Table), the Fourth Circuit found that an employee was "merely feeling the effects of the alleged decision by her employer not to comply with the work restrictions. . . .  The actual discriminatory event occurred much earlier." *Id.* Likewise in this case. And in *Taylor v. Home Ins. Co.*, 777 F.2d 849 (4th Cir. 1985), where the Fourth Circuit found a continuing violation, although the employee alleged that he was demoted on account of age first in 1979 (outside the limitations period), he also alleged he was demoted again in 1981 (within the limitations period).  *Id.* at 856.

**B.    The Magistrate Judge erred in finding that Plaintiffs adequately stated ADA and Rehabilitation Act claims.**

Even if the statute of limitations did not bar Plaintiffs' ADA and Rehabilitation Act claims, the Court should dismiss them due to Plaintiffs' failure to plead violations of those statutes.

Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits or the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To survive a Rule 12(b)(6) motion, a plaintiff making an ADA discrimination claim must allege facts sufficient to satisfy three elements—"that (1) [he or] she has a disability, (2) [he or] she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he or] she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). "Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). Plaintiffs fail to state a claim under either the ADA or the Rehabilitation Act.

The Magistrate Judge erred in concluding that Plaintiffs adequately pleaded ADA and Rehabilitation Act violations by alleging that the Step-Down Program keeps Plaintiffs in segregated housing where they are "denied many of the benefits and programs available to other prisoners." R&R at 86. Although prison recreational, medical, educational, and vocational programs constitute services, programs, or activities under the ADA, numerous courts have concluded that segregated housing itself is not a sufficient basis for an ADA claim. *See* Dkt. 19 at 23 (citing, *e.g.*, *Torrez v. Semple*, No. 3:17-CV-1232 (SRU), 2018 WL 2303018 (D. Conn. May 21,

31

2018)). Thus, Plaintiffs argue that they are challenging the Step-Down Program, not segregated housing. But that argument, in turn, is belied by the Complaint, which shows that Plaintiffs' claim is fundamentally about segregation. *See* Compl. ¶¶ 16–19 (describing the Step-Down Program as a segregated housing program); Compl. ¶¶ 94–121 (factual allegations concerning segregated housing). Indeed, the only benefit of the Step-Down Program that Plaintiffs allege they were denied is the ability to progress out of segregation. Compl. ¶ 254 (claiming ADA violation based on failure to "provide mentally ill prisoners or prisoners with mental health disabilities with alternative means to progress out" of segregation); Compl. ¶ 255 (claiming ADA violation based on housing prisoners with mental illness in segregation). Plaintiffs simply have not alleged any benefit of the Step-Down Program other than the ability to return to the general population.

The Magistrate Judge also erred in concluding that Plaintiffs sufficiently allege disability discrimination because they claim that mental disabilities prevent them from participating in the Step-Down Program. R&R at 86. To show denial of a benefit on the basis of disability under Title II, plaintiffs must prove their disability "played a motivating role" in the adverse action. *Constantine*, 411 F.3d at 498 n.17. While the Complaint does include conclusory allegations that Defendants discriminated against Plaintiffs because of their disabilities, that is not enough— stating a claim requires factual allegations, not a conclusory recitation of the elements of the claim. *See Twombly*, 550 U.S. at 555. What the Complaint actually alleges is that Plaintiffs were placed in segregated housing based on "disruptive behavior." Compl. ¶ 143. That allegation concedes away disability as the motivating factor; indeed, it shows that maintaining order and safety in the prison setting was the motivating factor. In fact, the Complaint affirmatively alleges that VDOC staff do not consider mental illness when placing prisoners in segregated housing. Compl. ¶ 143. Thus, the Magistrate Judge's conclusion was erroneous.

32

Finally, the Magistrate Judge erred in concluding that Plaintiffs alleged facts sufficient to show that their "disability and need for accommodation [were] obvious." R&R at 86. Normally, "[p]rison officials need not anticipate an inmate's unarticulated need for accommodation or to offer accommodation *sua sponte*; the inmate must provide evidence of his disability and the severity of the mental or physical limitations resulting from it and he must request accommodation." *Bane v. Va. Dep't of Corr.*, No. CIV.A. 705CV00024, 2005 WL 1388924, at *4 (W.D. Va. June 9, 2005). Plaintiffs did not allege that they requested accommodations. But Plaintiffs also did not allege facts supporting the Magistrate Judge's conclusion that the need for accommodation was "obvious." The Complaint contains only conclusory statements that Defendants were aware of Plaintiffs' mental health conditions, Compl. ¶ 215, and placed them in segregation despite or because of their mental impairments, Compl. ¶ 253. Because such conclusory statements do not rise to an "obvious" level, the Magistrate Judge should have recommended dismissal of these claims.

## CONCLUSION

The Court should sustain Defendants' objections and grant their motions to dismiss in full.

September 18, 2020                    Respectfully submitted,

                                     /s/ *Maya M. Eckstein*

Mark R. Herring
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206 – Telephone
Fax: (804) 786-4239 – Facsimile
moshea@oag.state.va.us

Maya M. Eckstein (VSB #41413)
Trevor S. Cox (VSB #78396)
HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
tcox@HuntonAK.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of September, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By:    /s/ Maya M. Eckstein
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Defendants*