FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN  DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

WILLIAM THORPE, *et al*.,

                  *Plaintiffs*,

      v.                                CASE NO. 2:20-cv-00007-JPJ-PMS

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al*.,

                  *Defendants*.

## PLAINTIFFS' CORRECTED MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Tara Lee (VSB No. 71594)
Daniel Levin (*pro hac*)
**WHITE & CASE**LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
(202) 626-3600
tara.lee@whitecase.com
daniel.levin@whitecase.com

Michael Gallagher (*pro hac*)
Michelle Letourneau-Belock (*pro hac*)
**WHITE & CASE**LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200
mgallagher@whitecase.com
michelle.letourneaubelock@whitecase.com

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF VIRGINIA
701 E. Franklin St., Suite 1412
Richmond, Virginia 23219
(804) 644-8022

vagraharkar@acluva.org
eheilman@acluva.org

June 22, 2022                                    *Counsel for Class Plaintiffs*

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

CLASS DEFINITIONS ....................................................................................... 2

STATEMENT OF FACTS ................................................................................... 3

I.    THE STEP-DOWN PROGRAM AT RED ONION AND WALLENS RIDGE
      IMPOSES "SEVERE ISOLATION".............................................................. 4

II.   ALL LEVEL S AND LEVEL 6 PRISONERS AT RED ONION AND
      WALLENS RIDGE ARE GOVERNED BY THE STEP-DOWN PROGRAM .............. 10

III.  THE STEP-DOWN PROGRAM SYSTEMATICALLY MAINTAINS
      PRISONERS IN INDEFINITE LONG-TERM SOLITARY CONFINEMENT ............ 11

      A.    The Step-Down Program Requires Prisoners To Stay In The Program For
            A Mandatory Minimum Length of Time, And Most Prisoners Are Held In
            The Program Even Longer ................................................................... 11

      B.    The Criteria For Assignment And Assessment Are Vague, Contradictory,
            And Arbitrary ..................................................................................... 13

      C.    VDOC Systemically Denies Meaningful Review ................................. 17

      D.    The Step-Down Program Fails To Account For Mental Disabilities ............ 20

      E.    Plaintiffs Were Subject To The Step-Down Program ............................ 22

ARGUMENT .................................................................................................... 23

I.    CLASS CERTIFICATION IS PARTICULARLY APPROPRIATE FOR
      CHALLENGES TO CORRECTIONAL POLICIES AND PRACTICES .................... 23

II.   CLASS CERTIFICATION LEGAL STANDARD ......................................... 24

III.  THE CONSTITUTIONAL VIOLATION CLASSES SATISFY THE
      REQUIREMENTS OF RULE 23 ................................................................. 26

      A.    The Constitutional Violation Injunction And Damages Classes Satisfy The
            Requirements Of Rule 23(a) ................................................................ 26

            1.    Class Members Are So Numerous That Joinder Is Impracticable ............ 26

            2.    Plaintiffs Challenge The Legality Of Common Policies And
                  Practices .................................................................................. 28

            3.    Plaintiffs' Claims Are Typical Of Those Of The Class ............................ 31

        4.      Plaintiffs And Their Counsel Will Adequately Represent The
Classes.................................................................................................... 33

    B.    The Constitutional Violation Injunction Class Satisfies The Requirements
Of Rule 23(b)(2) ................................................................................... 34

    C.    The Constitutional Violation Damages Class Satisfies The Requirements
Of Rule 23(b)(3) ................................................................................... 35

        1.      Common Issues Predominate Across Plaintiffs' Claims ......................... 35

        2.      A Class Action Is Superior To Other Available Methods Of
Adjudication............................................................................................ 37

IV.    THE DISABILITY CLASSES SATISFY THE RULE 23 REQUIREMENTS.............. 38

    A.    The Disabilities Classes Satisfy The Requirements Of Rule 23(a) ..................... 38

        1.      Classes Members Are So Numerous That Joinder Is Impracticable......... 38

        2.      Plaintiffs Present Common Issues Of Law And Fact .............................. 40

        3.      Plaintiffs' Claims Are Typical Of Those Of The Class........................... 42

        4.      Plaintiffs And Their Counsel Will Adequately Represent The
Classes.................................................................................................... 43

    B.    The Disabilities Injunction Class Satisfies The Requirements Of Rule
23(b)(2) ................................................................................................. 43

    C.    The Disabilities Damages Class Satisfies The Requirements Of Rule
23(b)(3) ................................................................................................. 44

V.    CLASS COUNSEL ARE ADEQUATE TO REPRESENT THE CLASS UNDER
RULE 23(G)............................................................................................................. 45

CONCLUSION.................................................................................................................... 46

## TABLE OF AUTHORITIES

### CASES

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................24, 34, 35

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
    568 U.S. 455 (2013) .......................................................................................26, 35

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001) .........................................................................23, 32

*Ashker v. Governor of Cal.*,
    No. C 09-5796 CW, 2014 U.S. Dist. LEXIS 75347 (N.D. Cal. June 2, 2014) .................29, 30

*Baby Neal v. Casey*,
    43 F.3d 48 (3d Cir. 1994) .....................................................................................25

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015) ............................................................................24, 25

*Betts v. Reliable Collection Agency, Ltd.*,
    659 F.2d 1000 (9th Cir. 1981) ...............................................................................24

*Bradley v. Harrelson*,
    151 F.R.D. 422 (M.D. Ala. 1993) ...........................................................................24

*Braggs v. Dunn*,
    317 F.R.D. 634 (M.D. Ala. 2016) ...........................................................................27

*Brown v. Nucor Corp.*,
    576 F.3d 149 (4th Cir. 2009) .................................................................................29

*Brown v. Nucor Corp.*,
    785 F.3d 895 (4th Cir. 2015) .................................................................................35

*Bumgarner v. North Carolina Dep't of Corr.*,
    276 F.R.D. 452 (E.D.N.C. 2011) ................................................................... *passim*

*Butler v. Suffolk Cty.*,
    289 F.R.D. 80 (E.D.N.Y. 2013) .....................................................................36, 38, 45

*Castro v. PPG Industries, Inc.*,
    No. CV 20-2110 PA, 2020 U.S. Dist. LEXIS 200329 (C.D. Cal. Aug. 28, 2020) .................26

*Chisolm v. McManimon*,
    275 F.3d 315 (3d Cir. 2001) ..................................................................................41

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) ..............................................................................26

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ..................................................................................32

*Dockery v. Fischer*,
   253 F. Supp. 3d 832 (S.D. Miss. 2015).............................................................. *passim*

*Dunn v. City of Chicago*,
   231 F.R.D. 367 (N.D. Ill. 2003)..........................................................................36, 37

*EQT Prod. Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ..............................................................................27, 40

*Fisher v. Va. Elec. & Power Co.*,
   217 F.R.D. 201 (E.D. Va. 2003) .............................................................................37

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ..................................................................................26

*Holmes v. Godinez*,
   311 F.R.D. 177 (N.D. Ill. 2015)..............................................................................41

*Holsey v. Armour & Co.*,
   743 F.2d 199 (4th Cir. 1984) ..............................................................................28, 31

*Incumaa v. Stirling*,
   791 F.3d 517 (4th Cir. 2015) ..................................................................................4, 8

*In re Revco Sec. Litig*,
   142 F.R.D. 659 (N.D. Ohio 1992) ..........................................................................45

*Jones 'El v. Berge*,
   164 F. Supp. 2d 1096 (W.D. Wis. 2001) .................................................................42

*Knight v. Lavine*,
   No. 1:12-CV-611, 2013 U.S. Dist. LEXIS 14855 (E.D. Va. Feb. 4, 2013) ...........................27

*Langley v. Coughlin*,
   715 F. Supp. 522 (S.D.N.Y 1989)............................................................................45

*McGlothlin v. Connors*,
   142 F.R.D. 626 (W.D. Va. 1992)..............................................................................28

*Pa. Dep't of Corr. v. Yeskey*,
   524 U.S. 206 (1998)................................................................................................41

iv

*Parsons v. Ryan*,
    289 F.R.D. 513 (D. Ariz. 2013) ........................................................................................29

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ...............................................................................1, 23, 24, 29

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)........................................................................................................45

*Pino v. Dalsheim*,
    605 F. Supp. 1305 (S.D.N.Y. 1984)................................................................................37

*Porter v. Clarke*,
    290 F. Supp. 3d 518 (E.D. Va. 2018) ...............................................................................8

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ............................................................................................8

*Pritchard v. Cty. of Erie*,
    269 F.R.D. 213 (W.D.N.Y. 2010)..............................................................................37, 44

*Redmond v. Bigelow*,
    No. 2:13-CV-393, 2014 U.S. Dist. LEXIS (D. Utah June 18, 2014).....................................37

*Reyes v. Clarke*,
    No. 3:18-CV-611, 2019 U.S. Dist. LEXIS 146237 (E.D. Va. Sept. 4, 2019) ..........................4

*Riker v. Gibbons*,
    No. 3:08-cv-00115-LRH-RAM, 2009 U.S. Dist. LEXIS 35449 (D. Nev. Mar. 31, 2009) .....27

*Schilling v. Transcor Am., LLC*,
    No. C 08-941 SI, 2010 U.S. Dist. LEXIS 20786 (N.D. Cal. Feb. 16, 2010).........................38

*Scott v. Clarke*,
    61 F. Supp. 3d 569 (W.D. Va. 2014) .............................................................. *passim*

*Smith v. Collins*,
    964 F.3d 266 (4th Cir. 2020) ............................................................................................4

*Soutter v. Equifax Info. Servs. LLC*,
    307 F.R.D. 183 (E.D. Va. 2015) .....................................................................................45

*Stillmock v. Weis Mkts.*,
    385 Fed. Appx. 267 (4th Cir. 2010)................................................................................38

*Thomas v. FTS USA, LLC*,
    312 F.R.D. 408 (E.D. Va. 2016) .....................................................................................35

*Thorpe v. Virginia Department of Corrections*,
    No. 21-1714, 2022 U.S. App. LEXIS 16351 (4th Cir. June 14, 2022)............................ *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................................................... *passim*

*Wells v. Preferred Fin. Sols.*,
    No. 5:11-CV-422(MTT), 2013 U.S. Dist. LEXIS 176896 (M.D. Ga. Dec. 17, 2013)............28

*Wilcox v. Brown*,
    877 F.3d 161 (4th Cir. 2017) ...............................................................................................37

*Young v. Cnty. of Cook*,
    No. 06 C 552, 2007 WL 1238920 (N.D. Ill. Apr. 25, 2007)..................................................32

## STATUTES AND REGULATIONS

28 C.F.R. §§ 35.106, 35.107 ...........................................................................................41

28 C.F.R. § 35.130(b), (d)...............................................................................................41

28 C.F.R. App. A to Pt. 35 ..............................................................................................41

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*.............................................2

    42 U.S.C. § 12132...............................................................................................40

Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*...................................................................2

    29 U.S.C. § 794(a) .............................................................................................40

    29 U.S.C. § 794(b) .............................................................................................40

## RULES

Fed. R. Civ. P. 23 ............................................................................................. *passim*

FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER

## INTRODUCTION

Plaintiffs challenge the Virginia Department of Corrections' and the individual Defendants' (collectively, "VDOC") unconstitutional policy and practice of holding prisoners in extreme, indefinite, and long-term solitary confinement it its twin maximum-security prisons, Red Onion and Wallens Ridge State Prisons ("Red Onion" and "Wallens Ridge"). VDOC's common, one-size-fits-all policy—the "Segregation Reduction Step Down" or "Step-Down Program"—systematically denies prisoners' basic human needs and fails to account for prisoners' mental disabilities. By applying substantively flawed and arbitrary criteria, and denying prisoners meaningful review of Program decisions, VDOC's Step-Down Program programmatically forces prisoners to languish in solitary confinement for extended and unnecessary periods of time, despite the severe physical and mental health harms that VDOC knows this practice causes to prisoners. Prisoners remain in the Step-Down Program for years as a matter of policy and practice without a clear pathway out and only the most perfunctory form of periodic review by prison officials.

Courts routinely certify prisoner class actions challenging prison policies that violate constitutional and civil rights. *See, e.g.*, *Scott v. Clarke*, 61 F. Supp. 3d 569, 591 (W.D. Va. 2014) (certifying prisoners' Eighth Amendment challenge and citing numerous class certifications in prisoner litigations); *Bumgarner v. North Carolina Dep't of Corr.*, 276 F.R.D. 452, 457–58 (E.D.N.C. 2011) (certifying prisoners' Americans with Disabilities Act class action and noting class certification is common in "suits challenging conditions and practices at various detention facilities"); *Parsons v. Ryan*, 754 F.3d 657, 681, 688–89 (9th Cir. 2014) (certifying prisoner Eighth Amendment claims and stating "numerous courts" have certified prisoner challenges to systematic rights violations). Class treatment is likewise appropriate here, because the injunctive relief classes and the damages classes meet the requirements of Rule 23 of the Federal Rules of Civil Procedure.

**CLASS DEFINITIONS**

Plaintiffs are eleven current or former VDOC prisoners who each have been forced to spend between three and twenty-four years in solitary confinement at Red Onions and Wallens Ridge.[1]

Plaintiffs collectively allege causes of action for Fourteenth Amendment Due Process violations, Eighth Amendment violations, and violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA") and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("RA"). *See* Op. and Order on Mot. to Dismiss, ECF No. 101, at 27.

To enjoin the unconstitutional policies and practices that constitute the Step-Down Program and obtain compensatory damages for those constitutional violations, Plaintiffs seek certification of the following classes (together, the "Constitutional Violation Classes"):

Constitutional Violation Injunction Class: All persons who are currently, or will in the future, be confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program.

Constitutional Violation Damages Class: All persons who from August 1, 2012 to the present have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program.

Additionally, at least four of the eleven Plaintiffs have mental disabilities under the ADA and the RA.[2] To enjoin the unconstitutional and unlawful policies and practices under the Step-Down Program, which discriminate against, have a disparate impact on, and/or fail to accommodate individuals with ADA and RA-qualifying mental disabilities, and to obtain

---

[1] On June 17, 2022, Plaintiffs filed an unopposed motion for leave to withdraw Christopher Cottrell as a named Plaintiff. ECF 165. Therefore, Plaintiffs refer to eleven Plaintiffs throughout this memorandum of law.

[2] The four are Messrs. Steven Riddick, Dmitry Khavkin, Brian Cavitt, and Gary Wall. *See* Compl. ¶ 214.

compensatory damages for those violations, these four Plaintiffs additionally seek certification of the following classes of prisoners (together "Disabilities Classes"):

> <u>Disabilities Injunction Class</u>: All persons who are currently, or will in the future, be confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the ADA or the RA.

> <u>Disabilities Damages Class</u>: All persons who from August 1, 2012 to the present have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the ADA or the RA.

### STATEMENT OF FACTS

For twelve years, VDOC has warehoused prisoners in solitary confinement at Red Onion and/or Wallens Ridge under its Step-Down Program, despite knowing the substantial risk of serious physical or emotional injury resulting from time spent in long-term solitary confinement. The Step-Down Program is the only means by which the prisoners who languish in severe isolation at Red Onion and/or Wallens Ridge can hope to return to the general population, but the Step-Down Program provides no clear or evidence-based process for doing so. The written Step-Down policies themselves require prisoners to remain in segregation for a mandatory minimum amount of time while providing no maximum length of time for such isolation. The policies and implementing manuals use vague and arbitrary language—providing VDOC officials with unfettered ability and options to maintain prisoners in solitary confinement even when they pose no credible security threat, and for limiting their rights and privileges while in solitary confinement. In practice, prisoners on average spend years in severe conditions of isolation that pose a substantial risk of causing or exacerbating mental disabilities, without meaningful review of their housing assignment or mental condition.

The details of the VDOC's unlawful Step-Down policies and practices will continue to be uncovered and sharpened as factual and expert discovery progress in this case. However, it is eminently clear that there is a large class of prisoners who have been, are, or will continue to be subjected to those common policies and practices.

## I.   THE STEP-DOWN PROGRAM AT RED ONION AND WALLENS RIDGE IMPOSES "SEVERE ISOLATION"

Red Onion and Wallens Ridge were built as twin, high-security, "supermax" prisons designed to isolate and control prisoners separate from the general prison population. The Fourth Circuit and other courts recognize supermax prisons as "synonymous with extreme isolation[,] and, in fact, the conditions imposed upon prisoners in this case are extremely similar to those in cases where the Fourth Circuit has found them to be unacceptable. *See Thorpe v. Clarke*, No. 21-1714, 2022 U.S. App. LEXIS 16351, at *3 (4th Cir. June 14, 2022) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005)); *see also Incumaa v. Stirling*, 791 F.3d 517, 530 (4th Cir. 2015) (same; similar conditions to the Step-Down Program).

The severe conditions of confinement which apply to all prisoners in the Step-Down Program at Red Onion and/or Wallens Ridge are well documented. *See, e.g.*, *Smith v. Collins*, 964 F.3d 266, 272-273 (4th Cir. 2020); *Reyes v. Clarke*, No. 3:18-CV-611, 2019 U.S. Dist. LEXIS 146237, at *8-9 (E.D. Va. Sept. 4, 2019). "The 8' by 10' cells are isolated by design, featuring solid steel doors, wide distances separating cells opposite one another, and a small window." Ex. 17 (Expert Report of Dan Pacholke [hereinafter "Pacholke Report"], ¶ 77; *see also* Ex. 27 (Thorpe Affidavit), ¶ 11. VDOC staff check on prisoners and conduct reviews, even mental health reviews, from outside the door. *See, e.g.*, Ex. 29 (Donald Trent Dep., *Thorpe v. VDOC*, No. 20-0007 (June 17, 2022)); Ex. 30 (Justin Kiser Dep. *Reyes v. Clarke*, No. 7:16-cv-00485 (Oct. 8, 2020)), at 217:6–218:16 ("Usually the hearings took place at the offenders' cell doors."); Ex. 43 (June 4, 2017

Offender Grievance Response – Level I), at 1; Ex. 17, ¶ 79.  These communications ultimately require yelling around the edge of the door where it is impossible to make eye contact.  Ex. 17, ¶ 79.  A small tray slot is used to issue food trays, medicines, toilet paper, laundry, and other supplies, and to shackle individuals before removing them from their cells.  Ex. 17, ¶ 77.

Prisoners spend nearly the entire day in their small cells—where they eat, sleep, urinate, and defecate—and are subject to intrusive cavity searches whenever they leave or enter their cell. *See* Ex. 17, ¶ 79; *see, e.g.*, Ex. 27, ¶ 14 ("Each time I was permitted to leave my cell, I was forced to endure daily cavity searches.  This required me to strip naked before two officers, who would then inspect my head, hair, mouth, torso, pelvic area, legs, and feet.  I was also required to open my mouth, raise my arms, turn around, spread my legs, raise my penis and testicles, turn around to face the back of the cell, spread my buttocks, bend over so that guards could inspect my anus, squat, and cough."); Ex. 14, (VDOC Operating Procedure 841.4 (2021), at 11–12 [hereinafter "O.P."]); Ex. 31 (Garry Adams Dep., *Reyes*, (Sep. 23, 2020)), at 247:11–248:9; Ex. 32 (Jeffery Kiser Dep., *Reyes* (Oct. 8, 2020)), at 364:15–365:4; Ex. 33 (James Lambert Dep., *Reyes* (Oct. 15, 2020)), at 110:18–111:11.  The whole pod is comprised of concrete and metal and has no windows to the outside world.  Ex. 17, ¶ 80.

"When they are allowed to shower up to 3 times per week, [prisoners] do so in small showers at one end of the concrete 'recreation' area containing the combination table-chairs to which the prisoners are shackled when they are in that area, and around which the solitary cells are positioned in a wide U-shape."  Ex. 17, ¶ 80; Ex. 3 (2020 Step-Down Plan) at 49, 54.  The prisoners who do become eligible for limited out-of-cell work or programming are chained to such desks or in cages.  *See, e.g.*, Ex. 3 (2020 Step-Down Plan) at 13–14, 20, 39 (cages and security chairs used for programming); Ex. 33, at 110:3–17 (Q: "When an offender at SM-0 leaves their

cell, do they have to be restrained?" A: "Yes." Q: "Can you describe how they're restrained?" A: "Full restraints, hand restraints and leg restraints, and two certified officers have to be present.");; Ex. 20 (Cavitt Affidavit), ¶ 16; Ex. 24 (Mukuria Affidavit), ¶ 15.   However, out-of-cell programming is infrequent, and some prisoners in the Step-Down Program have never been to programming outside of their cell.  Ex. 17, ¶ 57.

When prisoners in the Step-Down Program are rarely taken outside, they are led in shackles and placed by themselves into one of a group of "recreation cages," with ferocious dogs standing ready to attack nearby.  *See, e.g.*, Ex. 17, ¶¶ 81–85; Ex. 27, ¶ 13 ("During outdoor recreation, I was taken out to the 'yard' in shackles connected to a leash.  I was then placed in a 'recreation cage' that resembles a dog kennel and was frequently barricaded with Plexiglas.  The cages were entirely empty and routinely covered in bird feces."); Ex. 42 (Aug. 28, 2010 Internal Incident Report); Ex. 33, at 165:4 ("I do remember going to the outside recreation cages").  VDOC's policy addressing out-of-cell time stated that "each institution should *strive to* confine offenders to their cells for less than 22 hours per day in restrictive housing units."  Ex. 15 (O.P. 841.4 (2019)), at 14 (emphasis added).  After Plaintiffs filed this lawsuit, VDOC, on paper, increased the minimum out-of-cell time to a total of four hours between all activities, Ex. 14, at 17, and permitted highly limited small group recreation in a yard for some (but not all) Step-Down prisoners.  *See* Ex. 3, at 31–32.  Whether these new "minimums," however, ameliorate the harsh, solitary confinement conditions is far from guaranteed.  There is substantial evidence already (discovery is ongoing) that prisoners have been—and are—regularly denied their outdoor recreation time and showers, making these "minimums" illusory.  *See, e.g.*, Ex. 26 (Snodgrass Affidavit) ¶ 4 ("The only time I was permitted to leave my cell was for a 15-minute shower three times per week, or for one hour of 'outdoor recreation' per day.  These opportunities to leave my cell were revoked regularly by

prison guards with no reason, or inconsistently provided.  I once went seven months with no shower or recreation.  In four years, I went to recreation fewer than 10 times."); Ex. 34 (Terie Boyd Dep. *Reyes* (Feb. 23, 2020)), at 39:18–21, (Q: "And you mentioned denial of recreation.  Can you elaborate on what you meant by that?"  A: "They would be denied being taken out to the cages, like outside."); Ex. 17, ¶ 81.

Prisoners' contact with the outside world is severely restricted.  For example, at Level S, they are allowed as few as two phone calls per month.  *See* Ex. 3, at 49–54.  Prisoners are often stripped of these phone privileges for a month or more based on minor infractions.  *See* Ex. 20, ¶ 4; Ex. 23 (Khavkin Affidavit), ¶ 12.  Unlike prisoners in general population, all prisoners in Level-S and most prisoners at Level-6 cannot make any contact whatsoever with family members or other visitors during visitations.  Ex. 3, at 58; Ex. 16 (O.P. 851.1 (2021)), at 13.  Ultimately, this means that individuals in solitary confinement may suffer years without *any* positive human contact—even so much as a handshake.

Solitary confinement also reduces prisoners' ability to earn early release.  In Virginia, prisoners receive a good time "Class Level" based on their "Class Level Evaluation Points," with Level I earning the most good time credits, and Level 4 earning no credit.  Ex. 13 (O.P. 830.3 (2021)), at 5, 10–11.  By policy, prisoners in solitary confinement may not advance to Class Level I, and in practice Red Onion would not advance prisoners at Level S beyond Class Level 3, significantly reducing their ability to earn early release.  *See* Ex. 13, at 7; *see also* Ex. 44 (Jan. 7, 2018 ICA Annual Hearing Form) (indicating prisoner would remain at Class Level 3 because, although he scored sufficient good conduct points to qualify for Class Level 2, "an x-override w[as] . . . utilized due to offender being Level 'S'"); Ex. 28 (Wall Affidavit) ¶ 28.

Courts in this Circuit have recognized that the isolating and restrictive conditions as described above are of the type "enormously divergent from those to which persons in general population are subject," and of the type that the Fourth Circuit in *Incumaa v. Stirling* recognized as imposing an "atypical hardship" for purposes of claims under the Eighth Amendment. *Reyes*, 2019 U.S. Dist. LEXIS 146237, at *59 (citing *Incumaa*, 791 F.3d at 521–22 (discussing the "atypical and significant hardship" imposed by the segregation policies and practices at Red Onion); *see also Smith*, 964 F.3d at 283 (reversing district court finding that the Step-Down Program at Wallens Ridge caused an "atypical and significant hardship").

Moreover, the dangers of such conditions of solitary confinement are well-known and ubiquitous in correctional science and legal jurisprudence. *See, e.g.*, Ex. 18 (Expert Report of Craig Haney [hereinafter "Haney Report"], at 19-82 (describing the thorough body of scientific evidence that supports that solitary confinement places persons at significant risk of serious harm); Ex. 17 (Pacholke Report), at 7-13 (describing the national movement limiting the use of solitary confinement in the correctional field); *Thorpe*, 2022 U.S. App. LEXIS 16351, at *18–19 (citing *Incumaa*, 791 F.3d at 534); *id.* at *20–21 (citing *Porter* as holding that "severe isolation alone can deprive prisoners of 'the minimal civilized measure of life's necessities,' violating the Eighth Amendment"); *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) ("Prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized."); *Porter v. Clarke*, 290 F. Supp. 3d 518, 532 (E.D. Va. 2018) (discussing the "large and growing body of literature—both academic and legal—discussing the potentially devastating effects of prolonged periods of isolation"). The Fourth Circuit in *Porter* noted that "the leading survey of the literature regarding such confinement found that 'there *is not a single published study* of solitary or supermax-like confinement in which nonvoluntary

8

confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, *that failed to result in negative psychological effects*." *Porter*, 923 F.3d at 356.

Plaintiffs here have suffered from the well-known physical and mental harms characteristic of time spent in solitary confinement, including depression, suicidal ideations, hallucinations, hearing voices, anxiety, insomnia, irrational anger, paranoia, and dramatic weight loss. *Compare*, Ex. 23, ¶¶ 18, 19; Ex. 20, ¶ 3; Ex. 28, ¶ 31; Ex. 25 (Riddick Affidavit), ¶ 14; Ex. 21 (Cornelison Affidavit), ¶ 25; Ex. 26 (Snodgrass Affidavit), ¶ 19; Ex. 24 (Mukuria Affidavit), ¶ 34, *with* Ex. 18, ¶ 41 (explaining that recent studies have identified numerous dangerous symptoms associated with solitary confinement, including "appetite and sleep disturbances, anxiety, panic, a sense of impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal").

VDOC was and is specifically aware of these risks. As the Fourth Circuit has observed in this case, "[i]t is more than plausible that the[] Defendants, who for years have had daily contact with Plaintiffs, were both 'aware of' the severe harms Plaintiffs have been suffering and could have 'drawn the inference' that confining Plaintiffs to solitary existence caused those harms." *See Thorpe v. VDOC*, 2022 U.S. App. LEXIS 16351, at *14–15. Moreover, VDOC's awareness dates back to the first phase program, introduced at Mecklenburg (the predecessor to Red Onion and Wallens Ridge), which was abolished by virtue of a settlement agreement after VDOC's own study determined that the phase program was "fundamentally flawed" because it was too discretionary and repeatedly forced prisoners to re-start the program. Ex. 46 (Mecklenburg Correctional Center Study (1984)), at 53. After VDOC opened Red Onion and Wallens Ridge in 1998 and 1999, it

9

eventually introduced a management program that similarly failed because it was too discretionary and, in VDOC's own words, led to little more than "warehousing offenders" in long-term and indefinite solitary confinement.  Ex. 35 (Amee Duncan Dep., *DePaola v. Clarke*, No. 7:16-cv-00485 (Oct. 3, 2018)), at 55:10; *cf. Thorpe*, 2022 U.S. App. LEXIS 16351, at \*14–15.

## II.    ALL LEVEL S AND LEVEL 6 PRISONERS AT RED ONION AND WALLENS RIDGE ARE GOVERNED BY THE STEP-DOWN PROGRAM

The Step-Down Program consists of the local VDOC Operating Procedure 830.A, its updates, operational manuals, and practices employed to manage prisoners in long-term solitary confinement at Red Onion and Wallens Ridge, as it interacts with other statewide VDOC policies.[3] Since its introduction in August 2012, the Step-Down Program has governed the lives of prisoners at Red Onion and Wallens Ridge who have been assigned one of the two highest security classifications within the VDOC: Level-S (the highest security classification) and Level-6 (the second-highest security classification).  *See* Ex. 1, at 1–2.  The Program purports to serve three purposes, namely: (1) identifying and isolating prisoners that prison officials claim pose a danger to other prisoners or staff; (2) implementing a periodic review system of a prisoner's risk and release to the general population and; (3) providing incentives or "privileges" for desired behavior. Ex. 3, at 7, 39, 43–44; Ex. 16, at 10–11.

All prisoners must "participate" in the Step-Down Program in order to be eligible for a lower security status.  As a matter of policy, those who do not participate in and complete the Program are not eligible for a lower security status.  *See* Ex. 3, at 20 ("Those who do not choose to participate will be assigned to IM 0 or SM-0 which are non-privilege statuses where offenders merely serve their time."); Ex. 36 (Randall Mathena Dep., *Reyes* (Sep. 22, 2020)), at 79:3–10,

---

[3] *See* Ex. 1 (O.P 830.A (2018)) (current version of the local VDOC Step-Down Policy); *see also* Ex. 3 (current version of the operational manual).

(explaining prisoners must "complete the Step-Down Program" to leave solitary confinement); *see also Smith*, 964 F.3d at 270 n.3 ("Although OP 830.A frames the decision to participate in the Step-Down Program as a choice . . . we note that the evidence submitted by Defendants in support of summary judgment strongly suggests that the Step-Down Program is the *only* mechanism through which prisoners may be released back to general population.").  Mr. Thorpe, for example, did not participate in the program and was held at IM-0 status for four years before VDOC transferred him to Texas following the filing of this lawsuit.  *See. e.g.*, Ex. 27, ¶ 9.

## III. THE STEP-DOWN PROGRAM SYSTEMATICALLY MAINTAINS PRISONERS IN INDEFINITE LONG-TERM SOLITARY CONFINEMENT

### A. The Step-Down Program Requires Prisoners To Stay In The Program For A Mandatory Minimum Length of Time, And Most Prisoners Are Held In The Program Even Longer

The Step-Down Program consists of two pathways: Intensive Management ("IM") and Special Management ("SM").  Ex. 16, at 25; Ex. 17, at 13.  The IM and SM Pathways are largely identical in terms of housing and privileges.  2020 Step Down Manual at 49, 54; Ex. 35, at 99:12–100:13.  Each pathway consists of three Level-S "privilege" levels: 0, 1, and 2.  Ex. 3, at 16; Ex. 1, at 4–5.  According to the written policy, prisoners progress through the levels and earn greater privileges by completing workbooks (which are offered only in English) in their cells; remaining free of disciplinary violations; and exhibiting so-called "responsible behavioral goals" consisting of "[p]ersonal hygiene," "[s]tanding for count," "[c]ell compliance," and "[d]eportment; satisfactory rapport with staff and offenders."  Ex. 3, at 20; Ex. 1, at 4; *see also* Ex. 37 (Arvil Gallihar Dep., *Reyes* (Aug. 21, 2020)), at 94:2–95:20; Ex. 38 (Jessica King Dep., *Thorpe* (June 1, 2022)), at 55:10–56:18.

Both pathways require prisoners to spend a mandatory minimum amount of time in each Level-S status.  The Step-Down Program, as stated in its manual, requires that an SM prisoner

spend at least 3 months at each Level-S status and that an IM prisoner spend at least 6 months at each Level-S status. Ex. 3 (2020 Step-Down Plan) at 50, 55. Thus, by the written policy itself, before being able to progress to the Level-6 phase of the Step-Down Program, the shortest period any prisoner spends in long-term solitary confinement at Level-S is 9 months for the SM pathway and 18 months for the IM pathway—no matter the reason the individual was assigned to the Step-Down Program or the behavior they exhibit while participating in the Program. *See* Ex. 38, at 134:5–136:12; Ex. 16, at 50, 55. As a result, a prisoner placed in long-term segregation for leading a sit-down in the prison recreation area must meet the same minimum time requirements as a prisoner placed in long-term segregation for assaulting prison staff. *See, e.g.*, Ex. 47 (May 2017 ERT Results Summary), at 8 (showing a prisoner who "led sit down on yard at ROSP" and a prisoner who "Received 11 charges at [another prison for] serious staff assault" were both assigned to the SM pathway).

Significantly, the Step-Down Program contains no maximum for the length of time a prisoner may spend in long-term solitary confinement either on the SM or the IM pathways. *See* Ex. 3, at 50, 55 (identifying minimums but no maximums); *see also* Ex. 35, at 20:8–14; Ex. 37, at 95:16–20 (Q: "And it didn't matter how long they had been at SM-0, if they didn't meet this particular requirement, the consensus decision would be that they couldn't progress to SM-1, right?" A: "That's what the policy said, yes."). Moreover, on the IM pathway after IM-2, prisoners subject to the Step-Down Program are moved to a Level-6 IM Closed Pod, where they are subjected to largely the same conditions of confinement as those of prisoners in Level-S. *See* Ex. 11 (O.P. 830.1 (2021)), at Appendix F (Level-6 "closed pod" prisoners remain in "single celled housing segregated recreation," and restraints when out of their cells); Ex. 16, at 30–31 (stating that prisoners at Level-6 are still restrained and that additional privileges compared to IM-2 are

12

not guaranteed); Ex. 39 (John Fleming Dep., *Reyes* (Sep. 27, 2018)), at 9:17–20 (explaining that IM Phase 2 is "technically a population pod but they're still fully restrained"); Ex. 24, ¶ 15 ("Upon completion of the IM pathway, I was then assigned SL-6 status, which is the same as Level S status except that I could walk to a shower alone and could work as a utensil prep worker while shackled to a table."). The only way for a prisoner on the IM pathway to ever leave solitary confinement is if they complete their sentence, or if they are hand-selected for transfer to the SM pathway by the External Review Team ("ERT"). *See* Ex. 3, at 18; *see also* Ex. 35, at 87:9–22 (explaining that for IM prisoners at Level-6, "there's always a possibility of being overturned back to an SM and getting to progress on to a Level-5. But for the most part, at this point, that's the best quality of life we can provide offenders at Red Onion as IM offenders to serve their time"). It is not unusual for prisoners to stay at this IM Level 6 status for years. Ex. 57, Ex. A.

Ultimately, VDOC uses its vague policies to maintain prisoners in solitary confinement for much longer than the nine or eighteen-month minimums. VDOC's own records illustrate that the average length of stay within the Step-Down Program at either Level-S or Level-6 is 9.45 years (3,452 days). *See* Ex. 17, at 35. The average length of stay within Level-S alone is 3.26 years (1,192 days). *Id.*; *see also Thorpe*, 21-1714, slip op. at 27–28 ("Plaintiffs allege VDOC does *not* provide a genuine opportunity to progress through the [Step-Down] [P]rogram—an allegation well supported by Plaintiffs' own extended residence in Red Onion and Wallens Ridge"). Prisoners are held in the Step-Down Program for an indefinite length of time for a variety of reasons, as explained below.

### B.   The Criteria For Assignment And Assessment Are Vague, Contradictory, And Arbitrary

From the day VDOC decides to place prisoners in the Step-Down Program, they are subjected to vague, contradictory, and arbitrary policies. This arbitrariness begins with VDOC's

very decision to place an individual in the Step-Down Program.  For instance, while Vernon

Brooks and another prisoner were found guilty of the same charge following an incident, Brooks

was sent to the IM pathway and the other prison was released to general population,.  *See* Ex. 58

(Brooks Affidavit), ¶¶ 7, 10.  Gary Wall was never provided a reason for why he was placed on

the SM pathway.  *See, e.g.*, Ex. 28, ¶ 5.

The arbitrariness also applies to VDOC's assignment of a given prisoner to the IM or SM

pathway.  According to the Step-Down Manual, the IM pathway is for prisoners who demonstrate

"the potential for extreme and/or deadly violence" or presents a "routinely disruptive and

threatening pattern of behavior and attitude," who represent a "high" escape risk, or who

committed a "high-profile and notorious crime."  Ex. 3, at 26–27; *see also* Ex. 48 (May 2018 ERT

Results Summary), at 22 (indicating prisoner was assigned to IM pathway because of "[h]igh

notoriety and violence of street crime").  The SM pathway is for a prisoner who instead displays

"repeated disruptive behavior" and a history of fighting or violent resistance "without the intent to

invoke serious harm or the intent to kill."  Ex. 3, at 28.  These vague guidelines allow for arbitrary

application.  *See, e.g.*, Ex. 24, ¶¶ 10, 17 ("The IM classifications are arbitrary, such that some IM

classified prisoners get into physical altercations and do not end up in long-term segregation, while

other prisoners have no history of violence in prison and still end up in long-term segregation.").

For example, in 2017 one prisoner was reassigned from the SM-0 to IM-0 pathway for refusing to

participate in the Step-Down Program and refusing to cut his hair.  *See* Ex. 47, at 5.

These vague guidelines also allow staff to place individuals on the IM pathway—and even

into solitary confinement itself—for reasons unrelated to their current dangerousness and to

maintain them there indefinitely.  For example, despite the fact that none of the Plaintiffs were

sentenced by a Court to languish in solitary confinement, Freddie Hammer and Brian Cavitt were

14

placed on the IM pathway seemingly for the notoriety of their crimes and actions outside of VDOC and told they would never be released from solitary confinement.  *See, e.g.*, Ex. 22, Hammer Affidavit ¶ 5; Ex. 24, ¶ 10; Ex. 23, ¶ 7; Ex. 20, ¶ 7; Ex. 21, Cornelison Affidavit ¶ 7; *see also Thorpe*, 2022 U.S. App. LEXIS 16351 at *34 (finding that VDOC's "rigid criteria based on prior criminal history cannot supply a penologically valid justification and evidence instead Defendants' goals to fill more beds," as alleged in the Complaint); *id.* at 35 ("If proven, such dissonance between legitimate penological goals and the process Step Down institutes may lead a trier of fact to conclude Defendants designed the program for an improper purpose, like economic gain."). These IM versus SM pathway decisions are also not subject to challenge by the prisoners.  Ex. 1, at 3; Ex. 3, at 11.

Once assigned to the IM or SM pathway, prisoners are subjected to yet another vague set of arbitrary standards.  Prisoners can advance in the Step-Down Program only if they achieve a progressively increasing number of "good" ratings and a decreasing number of "poor" ratings in various behavioral categories.  Ex. 3, at 50, 55 (indicating the categories are "Disciplinary Behavior," "Responsible Behavioral Goals," and "Program Participation").  The policy requires "good" ratings in *all* categories.  For example, a prisoner with no disciplinary violations who receives consistently poor ratings in personal hygiene because he failed to wash his clothes cannot progress.  *See, e.g.*, Ex. 3, at 50, 55; Ex. 45 (Nov. 13, 2019 Khavkin Officer's Log Sheet) at 9; Ex. 49 (May 2019 ERT Results Summary), at 2; *Smith*, 964 F.3d at 278 (discussing VDOC's failure to progress a prisoner through Step-Down who did not meet grooming policy due to religious objections).

The definitions of "good," "acceptable," and "poor" are not standardized, and VDOC staff receive no training on the differences between ratings.  Ex. 38, at 186:11–20 (Q: "So there isn't

15

something that tells them what it means to be acceptable, have acceptable responsible behavior versus poor responsible behavior?"  A: "No."); Ex. 40 (Michael Younce Dep., *Thorpe* (May 26, 2022)), at 174:15–20 (Q: "So they would make an assessment based on their own opinion?"  A: "Right.  Their self, they would make their own perception.").  Indeed, VDOC officials have admitted that many of the ratings categories, including programming, cell compliance, personal hygiene, standing for count, and respectfulness are not related to a prisoner's security risk.  Ex. 38 (King Dep.), at 189:21–191:6 (Q: "Okay.  Same thing with personal hygiene, same question. How does it relate to a prisoner's security risk?"  A: "It doesn't").  Moreover, the criteria that are to be evaluated are directly linked to behaviors that are symptoms of time spent in long-term solitary confinement itself.  As the Fourth Circuit observed, the Step-Down program "trains on-the-ground officers to *scout* for 'apathy, lethargy, [and] attention deficits,' 'poor grooming,' 'failure to maintain an orderly cell,' 'failure to complete the *Challenge* Series,' 'refusal to engage in programming,' 'lack of impulse control,' problematic 'attitude,' and 'disrespect towards staff'— the very symptoms solitary confinement generates." *See Thorpe*, 2022 U.S. App. LEXIS 16351, at *13–14.

Thus, the Step-Down Program abdicates meaningful review of prisoners' risk levels in favor of the prisoners' progression—or excuses for non-progression—through the Program.  Ex. 36, at 79:3–10 (Q: "if you believe that an offender did not belong in restrictive housing because they didn't pose a safety risk, could you still not remove that person from restrictive housing unless they had completed the Step-Down Program?"  A: "They have to complete the Step-Down Program."); *Smith*, 964 F.3d at 278; *see, e.g.*, Ex. 27, Thorpe Affidavit ¶ 9.  Such an abdication constitutes a clear constitutional violation. *See Thorpe*, 2022 U.S. App. LEXIS 16351 at *33–34

16

(citing numerous cases for the clearly established principle that "[w]hen a precarious situation ends, with it ends the State's authority to maintain prisoners in solitary confinement").

### C.   VDOC Systemically Denies Meaningful Review

According to VDOC, prisoners are provided with substantive and procedural process through formal reviews every 90 days by the "Institutional Classification Authority" ("ICA"). Ex. 1 (O.P. 830.A (2018)), at 12. The ICA is theoretically charged with conducting formal reviews of prisoners to evaluate their current status and recommend their advancement from Level-S to Level-6, and from Level-6 to Level-5. Ex. 1, at 12; Ex. 12 (O.P. 830.2 (2021)), at 11. The ICA hearing is the only hearing associated with progression through Step-Down where the prisoner is ostensibly afforded formal due process rights—notice, an opportunity to be heard, the right to prepare a defense, and the right to provide evidence. *See* Ex. 11, at 5–6; Ex. 38, at 180:11–15; Ex. 17, at 34 ("Th[e] [ICA review] is the only review for which they are supposed to receive notification and due process.").

In reality, the ICA provides no due process. It is not a decision-making body, but "just completes the necessary paperwork to make the changes" to the prisoners' statuses on the CORIS computer system. *See* Ex. 38, at 138:13, *see also id.* at 142:3–142:8 (Q: "But are they [the ICA] actually making any decisions? A: No."). ICA "hearings" are held outside a prisoners' cell door and are "typically conducted by the building lieutenant alone." Ex. 35, at 118:24–119:18. At this "hearing" (where prisoners are not allowed to provide witnesses or evidence), prisoners are handed pre-printed ICA hearing results which memorialize their level status. *See, e.g.*, Ex. 51; Ex. 52; Ex. 28, ¶ 10; Ex. 24, ¶ 11. The ICA handout often merely states vague recommendations to "remain at level" or "remain segregation." *See, e.g.*, Ex. 51 (Feb. 3, 2017 ICA Hearing Form); Ex. 52 (July 19, 2017 ICA Hearing Form).

17

The real decision-makers are the Dual Treatment Team ("DTT") and Building Management Committee ("BMC"). But these bodies do not provide due process. They meet with no formal procedural protections and involve the prisoners only at the discretion of the staff. *See* Ex. 37, at 92:19–93:9 ("[W]hen I first became chief of housing, the dual treatment team would meet about offenders being made Level S, but the offenders weren't present."); Ex. 38, at 177:21–178:16 (stating, with respect to the BMC meetings, that "[t]hose were very informal meetings"); Ex. 17, at 33 ("There is no requirement in policy that the BMC meets with the prisoners they are reviewing, . . .") While the warden has ultimate signature authority, *see* Ex. 3, at 10, 12, 14, a recommendation from the DTT or BMC not to advance a prisoner is decisive because the ICA never contradicts them and the warden does not progress a prisoner against their advice. *See* Ex. 38, at 131:22–132:6 (Q: "Okay. So after the dual treatment team has reviewed and made a recommendation, then the ICA will decide where within the SL six—which path within the SL six pathway the inmate is assigned?" A: "No. That has already been decided. The ICA just complete the necessary paperwork to make the changes on CORIS."); *id.* at 180:16–19 (Q: "Did the ICA ever contradict the BMC's decision?" A: "No."); *see also* Ex. 36, at 297:20–298:3 (Q: "So you had the authority to move someone from one privilege level to the next, even without the involvement of the Building Management Committee team?" A: "Yes, because I'm the warden. But I've never done that, and I would never do it.").

This blind agreement occurs in part because the DTT and BMC personnel—the Chief of Housing and Programs, the Unit Manager, the Counselor, and Corrections Officers—also sit on the ICA. *See* Ex. 3, at 11–12; *see also* Ex. 38, at 120:8–121:1 (Q: "So you would be part of the dual treatment team review and then also the classification authority?" A: "Yes." Q: "And is that the same for the unit manager and the lieutenant?" A: "Yes."). Furthermore, there is no

18

meaningful system to review the ICA's decision because the Unit Manager—a member of the BMC—is the reviewing authority, occasionally even reviewing his own decision. *See* Ex. 53 (Sep. 21, 2012 ICA Hearing Form); Ex. 40, at 153:7–154:5 (Q: "I'm seeing here that you signed the internal status review comments. Do you see that?" A: "Yes, ma'am." Q: "And then you also signed the administrative review; is that correct?" "That is the way it looks, yes, ma'am.").

Nor does the ERT—a body of officials from outside Red Onion that meets biannually and is empowered to make recommendations on classification—provide any kind of independent check on the decisions of the BMC or DTT. Ex. 3, at 9.[4]  The ERT does not recommend the reclassification of Level-S prisoners to the Level-6 phases of the Step-Down Program unless they have progressed through the three stages of Level-S in accordance with the Step-Down Plan, nor does it direct that prisoners move more quickly through Step-Down. *See, e.g.*, Ex. 48, at 6–13, 19–26 (showing the ERT recommended no prisoners at levels SM-0, SM-1, IM-0, or IM-1 for assignment to Level 6); Ex. 41, at 190:21–191:5 (Q: "Was there ever a time when the external review team determined that the dual treatment team had inappropriately kept an offender at a lower privilege level than the prisoner should have been at?" A: "Not to my knowledge."). Additionally, the ERT process does not provide procedural protections—it meets with prisoners only at its discretion, and prisoners have no right to present evidence or contest a decision. Ex. 41, at 142:4–7 (Q: "When you were on the external review team, did offenders ever participate in the external review team meeting?" A: "They did not.").

Although completion of the Step-Down Program is the only means by which a prisoner can progress out of Level-S or Level-6, VDOC affords prisoners no means to challenge the

---

[4] The ERT only first met with any of Plaintiffs in 2019 after the law suit was filed. *See e.g.*, Ex. 28, ¶ 20; Ex. 21, ¶ 8.; Ex. 58, ¶ 35.

decisions which control progression and completion of the Program.  Instead, VDOC asserts that the internal levels and statuses of the Step-Down Program are mere "privileges" carrying no substantive or procedural rights. Ex. 3 at 20 ("Offenders who . . . choose to participate . . . can begin the process to *earn* . . . eligibility for classification reduction and transfer"); Ex. 35, at 190:13–191:5 (Q: "No due process is required either if you're seeking to move the prisoner from IM-2 to IM-0?" A: "No, because it's a privilege status.").  Accordingly, the Building Management Team may, at any time, determine that a prisoner's inability to meet disciplinary, behavior, or self-improvement standards warrants an immediate downgrade of the prisoner's status level, lengthening their mandatory time in solitary confinement.  *See* Ex. 1, at 6.

Staff may even reduce a prisoner to Level 0 even for a disciplinary charge that was dismissed, and the prisoner has no recourse. *See, e.g.*, Ex. 35, at 191:24–192:20 (Q: "Mr. DePaola was an IM-2, and the reason he was dropped to IM-0 was for a grooming violation, and that grooming violation was dismissed.  And yet Mr. DePaola was not returned to IM-2." A: "Because he came in compliance only after refusing to become compliant . . . therefore the result of that was you were placed back and have to progress again."); Ex. 28, ¶ 6 (moving Mr. Wall back to SM-0 for a charge that was ultimately dismissed).  As such, prisoners have no redress for level changes and additions to their time in long-term solitary confinement.

Thus, the procedural protections afforded to prisoners in their progression through Step-Down are not meaningful.

### D.    The Step-Down Program Fails To Account For Mental Disabilities

The Step-Down Program also fails to account for mental disabilities in determining whether a prisoner should enter and how a prisoner should progress through the Program.  Neither O.P. 830.A, nor the Step-Down Program Manual provide—or even discuss the possibility of

providing—accommodations to individuals with disabilities, to ensure that their disabilities and symptoms thereof do not prevent them from progressing through the Step-Down Program. The only disability-related reference in those materials is to the SAM Pod, a *Level-6* Pod into which SM-pathway prisoners who are "mentally ill or seriously mentally ill" or have "intellectual disabilities" may be placed rather than being returned to general population. Ex. 8, at 3, 12. However, prisoners with disabilities generally must progress through the SM pathway on par with other prisoners *before* being assigned to a SAM Pod—whether or not their disabilities prevent them from being able to progress through the pathway. *See* Ex. 36, at 333:8–334:1, *Reyes* (Sep. 22, 2020) (no one went to the SAM Pod without having completed the Step-Down Program's requirements, and under policy, it was not possible to do so). For prisoners with disabilities on the IM pathway, the problem is the same, except there is no direct path to proceed to the SAM pod, given that the SAM pod is at the end of the SM pathway. *See* Ex. 3, at 32. Prisoners also fear the repercussions for requesting mental health treatment. *See, e.g.*, Ex. 22, ¶ 31 ("I am also fearful of reporting mental health concerns, because prisoners who reports [sic] such concerns are taken to a room and strapped down with no clothes. I am also afraid to contact a psychiatrist because of retaliation, and I believe I would be locked up forever.").

According to other VDOC mental health policies, some individuals who have been deemed by VDOC to have serious mental illness by virtue of a qualifying diagnosis paired with a severe functional impairment may be diverted to a "Secure Diversionary Treatment Program." Ex. 55, at 3. However, such a diversionary program still leaves individuals who have intellectual disabilities or mental illnesses which VDOC has failed to identify or label as causing "severe" functional impairments—or which may otherwise qualify as mental disabilities under the

Americans with Disabilities Act or Rehabilitation Act—without any recourse for necessary accommodations. *See* Ex. 25, Riddick Affidavit ¶ 14–15.

VDOC has assigned an ADA Coordinator to Red Onion. Ex. 10, at 3. However, in practice, the Red Onion ADA coordinator understands accommodations for mental disabilities to be the purview of the mental health staff. Ex. 38, at 229:10–15. Meanwhile, mental health staff have receive no training on providing accommodations to prisoners with disabilities; do not view it as their job; lack any authority to actually approve or provide needed accommodations for individuals with mental disabilities in the Step-Down Program; and are not familiar with who or what an ADA coordinator is, or whether Red Onion has one. Ex. 29, at 124:5–11; 291:15–292:6 (draft deposition transcript). In sum, VDOC provides no system or personnel to consider or provide accommodations to individuals with mental disabilities in the Step-Down Program.

By policy, prisoners may request reasonable accommodations for their disabilities by submitting a Reasonable Accommodation Request to the facility ADA Coordinator. Ex. 10, at 6. In practice, however, prisoners are not made aware of the ADA policy, the fact of the ADA coordinator, or the process for requesting accommodations. *See e.g.*, Ex. 17, ¶¶ 86–88 (detailing how "prisoners are overwhelmingly unaware of how to request accommodations for health needs"); Ex. 23, ¶ 18; Ex. 20, ¶ 26. By not providing accommodations for mental disabilities, the Step-Down Program not only denies equal access to increasing privileges such as showers, recreation and TV, but ultimately prevents such individuals from progressing through the Step-Down Program and integrating into the general population.

### E.    Plaintiffs Were Subject To The Step-Down Program

Plaintiffs are all prisoners who are, or who have been, held in long-term solitary confinement at Red Onion and/or Wallens Ridge as Level-S and Level-6 prisoners pursuant to

22

VDOC's Step-Down Program *See generally* Exs. 19–28, 58.  While detained as Level-S or Level-6, each of the Plaintiffs have been exposed to the conditions described above, which has caused them physical and mental injuries including, among other things, depression, anxiety, agitation, mood swings, bouts of disorientation, an inability to concentrate, weight loss, restlessness, and insomnia.  *See, e.g.*, Ex. 23, ¶ 18; Ex. 20, ¶ 3; Ex. 28, ¶ 31; Ex. 25, ¶ 15.

In this manner, Plaintiffs are similar to every other prisoner who is, has been, or will be held in Level-S or Level-6 at Red Onion and/or Wallens Ridge since 2012 and has been subjected to VDOC's constitutionally and statutorily inadequate Step-Down Program.

## ARGUMENT

### I.   CLASS CERTIFICATION IS PARTICULARLY APPROPRIATE FOR CHALLENGES TO CORRECTIONAL POLICIES AND PRACTICES

Courts have long recognized the importance of class action litigation to address unlawful prison conditions.  *See Scott v. Clarke*, 61 F. Supp. 3d 569, 591 (W.D. Va. 2014) (explaining that, particularly regarding Rule 23(b)(2), actions regarding prison conditions are "precisely the type of case for which class certification . . . was intended"); *see also Parsons*, 754 F.3d at 680 (citing *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ("[C]laims . . . involving detailed factual and legal allegations of specified systemic deficiencies in prison conditions giving rise to a substantial risk of serious harm, have long been brought in the form of class actions lawsuits.").  Class certification requirements are routinely met where prisoners challenge a system-wide correctional policy or practice applicable to each of them.  *See, e.g.*, *Scott*, 61 F. Supp. 3d at 591 (citing *Parsons*, 754 F.3d at 688–89) (discussing cases and noting that courts "regularly" certify classes of prisoners alleging unconstitutional policies); *Bumgarner*, 276 F.R.D. at 457–58 (noting that class certification is common in "suits challenging conditions and practices at various detention facilities").  This action is precisely such a case challenging common policies and practices,

because Plaintiffs challenge the Step-Down Program to which all prisoners in long-term solitary confinement at Red Onion and/or Wallens Ridge have been subjected since 2012.

## II.    CLASS CERTIFICATION LEGAL STANDARD

Class certification is appropriate where Plaintiffs satisfy the conditions of Rule 23(a) and one prong of Rule 23(b) of the Federal Rules of Civil Procedure.  *See Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Berry v. Schulman*, 807 F.3d 600, 608–09 (4th Cir. 2015).

Under Rule 23(a), certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(1)–(4).

For the injunction classes, Rule 23(b)(2) requires Plaintiffs to show that Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Notably, courts acknowledge that claims regarding the constitutionality of correctional policies or system-wide practices are readily amenable to class treatment under Rule 23(b)(2). *Scott*, 61 F. Supp. 3d at 591 ("[F]ederal courts regularly certify Rule 23(b)(2) classes in cases involving constitutional claims of prisoners alleging inadequate medical care and seeking injunctive relief"); *see also Parsons*, 754 F.3d at 688–89 ("[B]y allegedly establishing systemic policies and practices that place every inmate in ADC custody in peril, and by allegedly doing so with deliberate indifference to the resulting risk of serious harm to them, the defendants have acted on grounds that apply generally to the proposed class . . . rendering certification under Rule 23(b)(2) appropriate."); *Bradley v. Harrelson*, 151 F.R.D. 422, 427 (M.D. Ala. 1993) (noting that

Rule 23(b)(2) "is particularly applicable to suits . . . involv[ing] conditions of confinement in a correctional institution").

In fact, Rule 23(b)(2) is "almost automatically satisfied" for injunctive relief claims, *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994), and "has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities." *Bumgarner*, 276 F.R.D. at 457. Damages that are "incidental" to the injunctive relief may be awarded to a Rule 23(b)(2) class. *See Berry*, 807 F.3d at 609 ("[W]here monetary relief is 'incidental' to injunctive or declaratory relief, Rule 23(b)(2) certification may be permissible"); *see also Dockery v. Fischer*, 253 F. Supp. 3d 832, 851 (S.D. Miss. 2015) ("Damages can be awarded under Rule 23(b)(2), but they must be 'incidental,' meaning that they do 'not require additional hearings to resolve the disparate merits of each individual's case,' nor do they 'introduce new legal or factual issues, nor entail complex individualized determinations.'" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355–56 (2011))).

For the damages classes, Rule 23(b)(3) requires Plaintiffs to meet the requirements of predominance and superiority, that is to say, to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Under Rule 23(c)(5), a class "may be divided into subclasses that are each treated as a class," Fed. R. Civ. P. 23(c)(5), with each subclass required to "independently meet the requirements of Rule 23 for the maintenance of a class action[.]" *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 558 (E.D. Va. 2000) (quoting *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981)).

25

The decision to certify a class lies within the discretion of the district court.  *See Dockery*, 253 F. Supp. 3d at 845 ("As a general rule, a district court has broad discretion when deciding a motion for class certification.").  However, "federal courts should give Rule 23 a liberal rather than a restrictive construction." *Scott*, 61 F. Supp. 3d at 583 (quoting *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)).  Also, a district court's class certification inquiry is not "a full-blown trial on the merits[.]"  *Castro v. PPG Industries, Inc.*, No. CV 20-2110 PA, 2020 U.S. Dist. LEXIS 200329, at *5 (C.D. Cal. Aug. 28, 2020).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.").

## III.   THE   CONSTITUTIONAL   VIOLATION   CLASSES   SATISFY   THE REQUIREMENTS OF RULE 23

### A.   The Constitutional Violation Injunction And Damages Classes Satisfy The Requirements Of Rule 23(a)

Given the substantial overlap between the putative class members of the Constitutional Violation Classes, and the shared facts applicable to these individuals, we analyze the Rule 23(a) requirements for both classes together.

### 1.   Class Members Are So Numerous That Joinder Is Impracticable

The Constitutional Violation Classes are each so numerous that certifying each class under Rule 23(a)(1) is appropriate.  Rule 23(a)(1) requires a class to "be so numerous that joinder of all members is impracticable."  Generally, "if a proposed class size exceeds 25 plaintiffs, joinder is usually presumed impracticable."  *Scott*, 61 F. Supp. 3d at 584; *see also Knight v. Lavine*, No. 1:12-CV-611, 2013 U.S. Dist. LEXIS 14855, at *5 (E.D. Va. Feb. 4, 2013) ("The Fourth Circuit has affirmed certification for classes as small as 18 people." (internal citations omitted)).  While

26

the final number of Level-S and Level-6 prisoners during the class period will need to be determined from updated VDOC data, VDOC's own records list approximately 550 individuals who have been in the Step-Down Program since its inception through July 2021 (the latest data Plaintiffs have been provided).  The number is approximately 480 for Level-S individuals alone. Ex. 17, ¶ 70.  Similarly, VDOC's own records show that as of July 2021, approximately 90 individuals were currently classified as Level-S, with over 100 more classified as Level-6. Ex. 57, Ex. B.  As noted, the members of the proposed class are readily identifiable from VDOC records. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (though class members must be readily identifiable, "[t]he plaintiffs need not be able to identify every class member at the time of certification." (internal citations omitted)).

Moreover, in prisoner rights litigation, the fluidity of the prison population and the lack of an individual's access to counsel amplify the impracticability of joinder and "weigh in favor of finding that numerosity is met[.]"  *Scott*, 61 F. Supp. 3d at 584 (quoting *Riker v. Gibbons*, No. 3:08-cv-00115-LRH-RAM, 2009 U.S. Dist. LEXIS 35449, at *6 (D. Nev. Mar. 31, 2009); *see also Braggs v. Dunn*, 317 F.R.D. 634, 653–54 (M.D. Ala. 2016) (explaining that the "fluid nature" of a prisoner litigation class "counsels in favor of certification of all present and future members" (internal citations omitted)).  Those factors are present here and also weigh in favor of certification. Prisoners in the Constitutional Violation Classes have limited access to counsel.  The Constitutional Violation Injunction Class also consists of a fluid population, in particular future prisoners who cannot now be enumerated or identified or joined.

Based on the above information, the Constitutional Violation Injunction Class includes approximately 90+ individuals *and* any individuals that may in the future be placed in the Step-Down Program.  The Constitutional Violation Damages Class consists of approximately 550

individuals, encompassing any individuals that have been placed in the Step-Down Program from its inception to the present.  Both Constitutional Violation Classes thus far exceed the threshold for a finding of numerosity.

### 2.   Plaintiffs Challenge The Legality Of Common Policies And Practices

Plaintiffs' constitutional claims all arise from VDOC's common policies and practices, and the violations of the Eighth and Fourteenth Amendment, rendering certification of the Constitutional Violation Classes appropriate under Rule 23(a)(2).  Rule 23(a)(2) allows a class action where the claims "depend upon a common contention" that is "capable of class wide resolution."  *Wal-Mart*, 564 U.S. at 350.  "Even a single [common] question" of law or fact will suffice to satisfy the Rule.  *Scott*, 61 F. Supp. 3d at 585 (quoting *Wal-Mart*, 564 U.S. at 369).  The claims do not need to be identical, and their commonality should be liberally construed.  *See Scott*, 61 F. Supp. 3d at 586 (citing *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984)) (stating that "the commonality requirement does not require that all class members share identical factual histories"); *McGlothlin v. Connors*, 142 F.R.D. 626, 632 (W.D. Va. 1992) ("The requirement that questions of law or fact must be common to the class is to be liberally construed."); *see also Wells v. Preferred Fin. Sols.*, No. 5:11-CV-422(MTT), 2013 U.S. Dist. LEXIS 176896, at *17 (M.D. Ga. Dec. 17, 2013) (holding "commonality is not defeated simply because the putative class members may have interacted with different individuals or had different experiences").  To establish commonality, Plaintiffs must also "identify a unified common policy, practice, or course of conduct that is the source of their alleged injury."  *Dockery*, 253 F. Supp. 3d at 846, 848 (concluding that the "failure to act can also constitute a policy or practice").

In determining commonality, a court's task is greatly simplified in cases challenging a prison's solitary confinement conditions and procedures designed to affect a class of prisoners in

the same way.  For example, in *Scott,* which involved VDOC policies and practices and allegations that VDOC security staff wielded unfettered discretion to determine medical condition accommodations, this Court certified the proposed class of prisoners, finding that whether "VDOC systematically provides inadequate medical care . . . is a question of fact common to all class members."  61 F. Supp. 3d at 574–75, 585 (explaining that "numerous courts presented with similar factual circumstances have concluded that the prisoners' claims easily satisfy the Rule 23(a)(2) commonality requirement") (citing *Parsons*, 754 F.3d at 675–76); *Parsons*, 754 F.3d at 681 ("[T]he commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm.")); s*ee also Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009) ( explaining that "[t]his Court has noted before" that allegations of a common practice exercised in "unbridled discretion" raise questions of law and fact common to all class members).

Other courts have similarly found common issues of fact and law where plaintiffs challenged unconstitutional policies and practices regarding solitary confinement.  *See, e.g.*, *Parsons v. Ryan*, 289 F.R.D. 513, 523 (D. Ariz. 2013) (certifying subclass of all prisoners in state's isolation units because, among other things, the question of whether "[e]xtreme social isolation" was unconstitutional was common to the subclass members), *aff'd*, 754 F.3d 657 (9th Cir. 2014); *Ashker v. Governor of Cal.*, No. C 09-5796 CW, 2014 U.S. Dist. LEXIS 75347, at *19 (N.D. Cal. June 2, 2014) (certifying class challenging a policy as to solitary confinement and stating that "the fact that different inmates may exhibit different symptoms or respond differently to prolonged SHU confinement does not suffice to defeat commonality"); *Dockery*, 253 F. Supp. 3d at 848 (same).

Once again here, Rule 23(a)(2)'s commonality requirement is readily met.  As in similar prisoner class action cases, all class members allege that they are subject to the same, unconstitutional policies and practices at Red Onion and Wallens Ridge.  Key questions common to the Constitutional Violation Classes include, without limitation:

- Whether VDOC's use of solitary confinement deprives prisoners of basic human needs;

- Whether and to what extent conditions of confinement in the Step-Down Program impose atypical and significant hardship in relation to the ordinary incidents of prison life;

- Whether individuals subjected to the Step-Down Program are prevented from earning good-time credit during their time in the Program;

- Whether the Step-Down Program subjects individuals to indefinite solitary confinement;

- Whether and to what extent individuals subjected to the Step-Down Program are provided meaningful review of their assignments to or within Level-S or Level-6;

- Whether VDOC's use of solitary confinement pursuant to the Step-Down Program creates an unacceptable risk of significant mental and physical harm to prisoners;

- Whether and to what extent conditions of confinment in the Step-Down Program result in risk of psychological, physical, or other harm to prisoners;

- Whether and to what extent the risk of psychological, physical, or other harm to prisoners was obvious in medical and scientific literature, threatened past litigations against VDOC, Fourth Circuit decisions, and/or other sources;

- Whether and to what extent VDOC actually knew of those risks;

- Whether and to what extent individuals subjected to the Step-Down Program are kept in the Program as a result of mental disabilities, including traumas associated with long-term solitary confinement.

Additional common questions arising from the challenged policies and practices include, without limitation:

- Whether VDOC's Step-Down program creates a liberty interest in avoiding long-term solitary confinement under the Step-Down Program;

30

- Whether VDOC's Step-Down Program violates the rights to procedural due process of prisoners subject to it;

- Whether the conditions of confinement in the Step-Down Program impose an atypical and significant hardship in relation to the ordinary incidents of prison life;

- Whether the Step-Down Program affords constitutionally adequate review to protect Plaintiffs' interest in avoiding long-term solitary confinement;

- Whether the Step-Down Policy lacks adequate criteria to decide whether there is a valid penological purpose to maintain prisoners in long-term solitary confinement;

- Whether the conditions of confinement to which prisoners confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels are subject, cause those prisoners "serious or significant physical or emotional injury" or a "substantial risk" of such an injury;

- Whether VDOC is deliberately indifferent to these harms, in violation of the Eighth and Fourteenth Amendments to the Constitution;

- Whether VDOC's Step-Down Program lacks adquate criteria to decide whether there is a valid penological purpose to place or retain an inmate in solitary confinement;

- Whether Defendants inflict unnecessary and wanton pain on prisoners in the Step-Down Program without penological justification.

Each of these common questions leads to answers common to the class, advancing the litigation for all class members "in one stroke." *Wal-Mart*, 564 U.S. at 350; *see Scott*, 61 F. Supp. 3d at 586 (explaining that commonality is met where the claims of the class members "arise from similar practices and [are] based on the same legal theory") (citing *Holsey*, 743 F.2d 199 at 217 ("Despite the presence of individual factual questions, the commonality criterion of Rule 23(a) is satisfied by the common questions of law presented.")). Rule 23(a)(2) is satisfied.

### 3.      Plaintiffs' Claims Are Typical Of Those Of The Class

Plaintiffs' claims are typical of the members of the Constitutional Violation classes because they arise from Defendants' unconstitutional Step-Down Program, thus certification of the classes is appropriate under Rule 23(a)(3).   Rule 23(a)(3) requires that "the claims or defenses of the

31

representative parties [be] typical of the claims or defenses of the class."  Typicality does not require that Plaintiffs suffer under identical conditions or identical injuries.  Rather, "Rule 23(a)(3) requires only that their claims be "typical" of the class because demonstration of the facts necessary to establish their claims "would also prove the claims of the absent class members." *Scott*, 61 F. Supp. 3d at 589; *see Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006) (typicality does not require "that the plaintiff's claim and the claims of the class members be perfectly identical or perfectly aligned").  Minor differences do not defeat typicality.  *See Scott*, 61 F. Supp. 3d at 589 (citing *Armstrong*, 275 F.3d at 869) ("[N]amed plaintiffs' injuries [need not] be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs, and that the injuries result from the same, injurious course of conduct"); *see also Young v. Cnty. of Cook*, No. 06 C 552, 2007 U.S. Dist. LEXIS 31086, at *17 (N.D. Ill. Apr. 25, 2007) (finding in prisoner class action challenging strip searches that "[t]he likelihood of some range of variations in how different groups of new detainees were treated does not undermine the fact that the claims of each class share common factual basis and legal theory").  Further, courts have routinely found that the "'typicality' criterion has close conceptual connections to . . . 'commonality,'" and the requirements "tend to merge."  *Scott*, 61 F. Supp. 3d at 588–89 (quoting *Wal-Mart*, 564 U.S. at 349 n.5 (internal citations omitted)).

Here, Plaintiffs meet the typicality requirement for the same reason they meet the commonality requirement:  The claims of Plaintiffs and the putative class members arise from identical allegations, namely that Defendants instituted an unlawful Step-Down Program applicable to all prisoners assigned to Level-S and Level-6, which includes Plaintiffs and all putative class members.  This common set of policies and practices concerning long-term solitary confinement violate the Eighth and Fourteenth Amendment rights of both Plaintiffs and putative

class members.  Thus, the same proof concerning the Step-Down Program and the same legal arguments about whether it and VDOC's associated practices are unconstitutional from the basis of each class member's liability claims.

Plaintiffs share with all class members the same interest in ameliorating the unconstitutional practices and inhumane conditions at Red Onion and Wallens Ridge and obtaining redress for the injuries suffered.  If Plaintiffs succeed in proving that the Step-Down program and practices are unconstitutional, the resulting declaratory and injunctive relief would benefit all Level-S and Level-6 prisoners now and in the future.  Similarly, if Plaintiffs succeed in proving that Defendants should pay damages for those violations, all members of the Constitutional Violation Damages Class who were subject to the unconstitutional Step-Down Program would be entitled to compensation for those injuries.  *See infra*, Section IV.C; *see also Dockery*, 253 F. Supp. 3d at 850 (finding typicality met where plaintiffs showed that "the prison officials' alleged failure to take any action in the face of actual or constructive knowledge regarding the allegedly unconstitutional conditions existing at [the prison] affect all prisoners housed at that facility").  Thus, the typicality requirement is met here.

### 4.  Plaintiffs And Their Counsel Will Adequately Represent The Classes

The final Rule 23(a) requirement—that the "representative parties will fairly and adequately protect the interests of the class"—is also satisfied.  Fed. R. Civ. P. 23(a)(4).  As described above, Plaintiffs are "part of the class and possess the same interest and suffer the same injury as the class members." *Amchen*, 521 U.S. at 625.  Plaintiffs also do not have any interests in conflict with the proposed classes they seek to represent—Plaintiffs seek the same type of relief for all class members based on the same underlying facts.  *See, e.g.*, *Scott*, 61 F. Supp. 3d at 590 ("Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the

class as a whole."). Each Plaintiff has attested to his understanding and commitment to pursue claims on behalf of the class and not individually. *See, e.g.*, Ex. 22, ¶¶ 34–35; Ex. 27, ¶¶ 18-19.

Plaintiffs' class counsel is also adequate to represent the class. Plaintiffs are represented by White & Case LLP and the American Civil Liberties Union of Virginia ("ACLU"). Counsel together have been investigating Plaintiffs' claims and representing the interests of Plaintiffs for four years. Counsel brings a wealth of knowledge and experience to this matter—both concerning litigating matters in federal court and with class actions, and are ready and eager to continue to work on behalf of Plaintiffs and the proposed classes. *See* Ex. 60 (Declaration of Tara Lee); Ex. 61 (Declaration of Eden Heilman).

**B.    The Constitutional Violation Injunction Class Satisfies The Requirements Of Rule 23(b)(2)**

Because Plaintiffs challenge the constitutionality of VDOC's correctional policies and practices relating to the Step-Down Program, certification under Rule 23(b)(2) is appropriate. Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The rule was designed especially for civil rights cases like this one seeking broad declaratory or injunctive relief for a large class of persons. *See* Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment; *Wal-Mart*, 564 U.S. at 361 (explaining that "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture" (quoting *Amchem*, 521 U.S. at 617)).

The Constitutional Violation Injunction Class fits squarely within Rule 23(b)(2). Plaintiffs challenge the Step-Down Program which applies to all Level-S and Level-6 prisoners at Red Onion and Wallens Ridge and which has generated identical violations of law against each class member

(*i.e.* violations of each class member's 8th and 14th Amendment rights). Indeed, injunctive and declaratory relief is particularly necessary here because of the strong likelihood of ongoing and future harm, in light of VDOC's renewed attempt to reinstate a new version of Mecklenburg's Phase Program by imposing discretionary policies that result in regimes of indefinite solitary confinement. A single injunction requiring Defendants to adopt and adhere to constitutional segregation practices will bring relief to the proposed classes. Rule 23(b)(2) is therefore easily satisfied. *See Wal-Mart*, 564 U.S. at 365 ("[T]he validity of a (b)(2) class depends on whether 'final injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole*.'" (internal citations omitted)).

## C. The Constitutional Violation Damages Class Satisfies The Requirements Of Rule 23(b)(3)

Rule 23(b)(3) requires that: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) proceeding by class action "is superior to other available methods for the fair and efficient adjudication of the controversy." *Amgen Inc.*, 568 U.S. at 460. These predominance and superiority requirements are met here because the damages suffered by Plaintiffs arise from VDOC's systematic application of a common set of unconstitutional policies and practices in the Step-Down Program.

### 1. Common Issues Predominate Across Plaintiffs' Claims

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Satisfaction of the Rule 23(a) typicality requirement is a strong indicator that the predominance requirement of Rule 23(b)(3) is satisfied. *See Scott*, 61 F. Supp. 3d at 588-89 ("The commonality and typicality requirements of Rule 23(a) tend to merge."); *see also Brown v. Nucor Corp.*, 785 F.3d 895, 920 (4th Cir. 2015) (noting that while *Wal-Mart* "recalibrated what constitutes a common question,"

35

under Rule 23(a), the ruling is incidental to whether common questions predominate under Rule 23(b)); *Thomas v. FTS USA, LLC*, 312 F.R.D. 408, 421 (E.D. Va. 2016) ("[I]f common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied").

Here, Plaintiffs challenge VDOC's Step-Down Program, a systemic "behavioral modification system" that governs all aspects of their lives in long-term solitary confinement, including whether they may be considered for release from those conditions. VDOC's Step-Down Program consists of a number of policies that together constitutes Defendants' course of conduct resulting in constitutional violations. Here, the common questions of law and fact predominate for all putative class members and will ultimately determine whether VDOC's Step-Down Program violates the Eighth Amendment and Due Process Clause of the Constitution. These common questions predominate because the Step-Down Program applied to all class members, and if it is unconstitutional, it is unconstitutional as to each individual class member regardless of their individual experiences or injury. *See, e.g.*, *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 102 (E.D.N.Y. 2013) (holding that questions of prison conditions and whether defendants were deliberatively indifferent to those conditions are common questions that predominate where class members allege those conditions violate the constitution). These questions do not vary among class members and will be addressed with common evidence regarding the Step-Down Program, its application, and how it violates constitutional requirements. In any event, minor variances do not defeat predominance. *See Dunn v. City of Chicago*, 231 F.R.D. 367, 377 (N.D. Ill. 2003) (rejecting argument that "factual variations" in the periods of unlawful conditions defeat predominance and stating that the question of whether a defendant is liable as to a policy does not require individual

analysis); *Pritchard v. Cty. of Erie*, 269 F.R.D. 213, 219 (W.D.N.Y. 2010) (holding that common questions concerning the constitutionality of prison policies necessarily predominate).

The request for damages is no reason to deny certification. "Differences in damages among the potential class members do not defeat predominance if liability is common to the class." *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 213 (E.D. Va. 2003); *Redmond v. Bigelow*, No. 2:13-CV-393 (DAK), 2014 U.S. Dist. LEXIS 83694, at *22 (D. Utah June 18, 2014) (regarding prison policy cases, "damages may be individualized but that does not raise predominance concerns").

In any event, Plaintiffs here intend to seek standardized damages for the constitutional violations of the type that can be distributed formulaically among the class without extensive or individualized proof, as determined by the trier of fact. Courts have certified Rule 23(b)(3) prisoner classes applying this approach. *See, e.g.*, *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (noting the Fourth Circuit precedent falls "squarely in the [] camp" that holds deprivations of constitutional rights to be compensable separate from physical, mental, or emotional injury for purposes of the Prison Litigation Reform Act); *Pino v. Dalsheim*, 605 F. Supp. 1305, 1319 (S.D.N.Y. 1984) (holding that although "it is a difficult task to arrive at a monetary sum that can fairly compensate an individual for the unfavorable conditions he endured during his time in SHU . . . an award of $25.00 per day is appropriate.").

Because common issues predominate, the first requirement of Rule 23(b)(3) is satisfied.

### 2. A Class Action Is Superior To Other Available Methods Of Adjudication

For similar reasons, the class action device is the most fair and efficient method of resolving this case. A class action is superior under Rule 23(b)(3) where it is more likely to achieve its particular objectives in comparison to any other available procedure. *Stillmock v. Weis Mkts.*, 385 Fed. Appx. 267, 274 (4th Cir. 2010). That the class action device is the superior method to bring

claims challenging the validity of prison policy and pattern and practice claims is well-established. *See e.g.*, *Butler*, 289 F.R.D. at 102–03 (concluding that for an action challenging conditions of confinement, "proceeding as a class action is by far the superior method of adjudicating this controversy").  The alternative, ongoing *pro se* claims by numerous litigants on similar or nearly identical claims, and the resulting problems of inconsistent verdicts and collateral estoppel, is inherently undesirable.  *See Stillmock*, 385 Fed. App'x at 275 (citing cases for the proposition that class actions are superior to individual cases because class certification promotes consistency of results, giving defendants the benefit of finality and repose); *Schilling v. Transcor Am., LLC*, No. C 08-941 SI, 2010 U.S. Dist. LEXIS 20786, at *33–34 (N.D. Cal. Feb. 16, 2010) (as to the fact of individual litigations, "[r]ather than suggesting that a class action is not a superior method of adjudicating these claims, these cases indicate that a class action with the class represented by qualified counsel, is superior to numerous individual *pro se* cases").

## IV.   THE DISABILITY CLASSES SATISFY THE RULE 23 REQUIREMENTS

The Disabilities Classes challenge the same Step-Down Program as the Constitutional Violation Classes, but additionally allege that the Program discriminates against prisoners who have a disability, as defined by the Americans with Disabilities Act and the Rehabilitation Act. For those disabled individuals, Plaintiffs advance not only the Constitutional Violation Classes claims briefed above, but also claims specific to individuals with ADA and RA-qualifying disabilities.  Consequently, much of the arguments in support of certifying the Constitutional Violation Classes also support certifying the Disabilities Classes.

### A.   The Disabilities Classes Satisfy The Requirements Of Rule 23(a)

#### 1.   Classes Members Are So Numerous That Joinder Is Impracticable

The size of the proposed classes easily satisfies the numerosity requirement.  While the final number of Level-S and Level-6 prisoners during the class period who have mental disabilities

under the ADA and the RA remains to be determined from updated VDOC data and information,

VDOC's own interrogatory responses list more than 100 individuals who have been in the Step-

Down Program and suffered mental disabilities since its inception. *See* Response to Plaintiffs'

Interrogatory No. 1 (identifying 74 Step-Down prisoners that have or had "mental health condition

that substantially limits one or more of their major life activities"); Response to Plaintiffs'

Interrogatory No. 5 (identifying 42 Step-Down prisoners who had or have a "Serious Mental

Illness"); Response to Plaintiffs' Interrogatory No. 6 (identifying 94 individuals who had spent

time in a mental health unit since August 1, 2012). Of those individuals, VDOC's records indicate

that 6 were still in Level-S confinement and 16 were in Level-6 confinement as of July 2021. Ex.

57, Ex. C. These numbers themselves meet the Rule 23 numerosity requirement. *See, e.g.*, *Scott*,

61 F. Supp. 3d at 584 (finding that "[i]n general, if a proposed class size exceeds 25 plaintiffs,"

numerosity is satisfied).

As with the Constitutional Violation Classes, the population of individuals with mental

disabilities in the Step-Down Program is also fluid, further weighing in support of class

certification. *See id.* Moreover, the estimates from VDOC's interrogatory responses likely

understate the number of class members with disabilities. For instance, VDOC responded to

Interrogatory No. 1 using internal classifications that are much narrower than the class definition

and thus likely would not include all class members. *Compare* VDOC's Response to Interrogatory

No. 1 (listing individual with a Mental Health Code of 2S, 3, or 4) *and* Ex. 59 (VDOC O.P. 730.2),

at 3–4, 13–14 (mental health codes 2S and above generally require a "serious mental illness,"

which is defined to include "a Psychotic Disorder, Bipolar Disorder, Major Depressive Disorder,

Posttraumatic Stress Disorder (PTSD), or Anxiety Disorder, or any diagnosed mental disorder

(excluding substance use disorders) *currently associated with* serious impairment in psychological

cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living" (emphasis added)), *with* 28 C.F.R. § 35.108(d)(2) (stating that the following diagnoses qualify as disabilities in "virtually all cases," whether or not an individual is experiencing acute symptoms: "[m]ajor depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive compulsive disorder, and schizophrenia"). Nonetheless, the members of the Disabilities Classes will be readily identifiable from VDOC's interrogatory responses, supplemented by a review of VDOC medical and institutional files. *See EQT*, 764 F.3d at 358 (a class may be certified if a "court can readily identify the class members in reference to objective criteria").

## 2. Plaintiffs Present Common Issues Of Law And Fact

The Disabilities Classes present common issues of law and fact arising from VDOC's constitutional and statutory obligations to account for the disabilities of prisoners in the Step-Down Program and VDOC's failure to do so. As with the claims of the Constitutional Violation classes, claims brought by prisoners with disabilities predicated on prison policies and practices easily meet the commonality requirement, whether brought as constitutional claims or under disabilities laws. *See, e.g.*, *Scott*, 61 F. Supp. 3d at 586 (finding commonality based on plaintiffs' allegations regarding "VDOC's alleged systemic failure to provide a level of medical care to all of its residents that complies with constitutional norms"); *see also Bumgarner*, 276 F.R.D. at 456 ("[I]n a lawsuit wherein individuals with varying disabilities challenge policies and practices that affect all of the putative class members, factual differences regarding their disabilities does not defeat commonality"); *Holmes v. Godinez,* 311 F.R.D. 177, 218 (N.D. Ill. 2015) (finding commonality from alleged systemic discrimination against deaf and hard of hearing prisoners "which emanates

40

from generally applicable policies and procedures that altogether fail to account for deaf and hard of hearing inmates.").

Here, VDOC has certain obligations under Title II of the ADA and under the RA when dealing with inmates who have qualifying disabilities in the Step-Down program.[5]  *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a).  These obligations include (a) affording qualified individuals with disabilities the same opportunity to participate in and benefit from the Step-Down Program; (b) providing aids, benefits or alternative services that enable individuals in Step-Down to "gain the same benefit, or to reach the same level of achievement as that provided to others" in the Step-Down Program; (c) making reasonable modifications to the Step-Down Program to "avoid discrimination on the basis of disability"; (d) organizing their programs to provide prisoners with obvious or diagnosed mental illness equal access to the Step-Down Program; and (e) ensuring that individuals with disabilities are housed in the "most integrated setting[s] appropriate" to the person's needs.  *See* 28 C.F.R. § 35.130(b), (d); *Chisolm v. McManimon*, 275 F.3d 315, 324–25 (3d Cir. 2001) ("Regulations promulgated by the United States Attorney General require that public entities take certain pro-active measures to avoid the discrimination proscribed by Title II [of the ADA].").  VDOC also is obligated to provide notice of the ADA to VDOC prisoners and designate an ADA coordinator to carry out its responsibilities under the ADA.  28 C.F.R. §§ 35.106, 35.107.  It also has constitutional obligations towards individuals with disabilities.  *See, e.g.*, *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1118 (W.D. Wis. 2001) ("Credible evidence

---

[5] The Step-Down program is subject to the ADA and RA.  *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (explaining that "[t]he text of the ADA" applies to state prisons in their capacity as "public entit[ies]"); 29 U.S.C. § 794(b); *see also* 28 C.F.R. App. A to Pt. 35 (U.S. Dept. of Justice guidance, explaining application of ADA to correctional services); Op. and Order on Mot. to Dismiss, ECF No. 101, at 24.

indicates that Supermax is not appropriate for seriously mentally ill inmates because of the isolation resulting from the physical layout, the inadequate level of staffing and the customs and policies.").

Thus, key questions common to the Disabilities Classes include, without limitation:

- Whether VDOC's policies and practices account for and afford individuals with mental disabilities the same opportunity to participate in or progress through the Step-Down Program;

- whether VDOC's policies and practices provide a means for prisoners with mental disabilities to request and/or receive reasonable modifications to the Step-Down Program in order to ensure equal access to the Program for individuals with disabilities;

- whether the Step-Down Program discriminates against prisoners whose mental disabilities make them incapable of completing the program;

- whether reasonable alternatives to the Step-Down Program are provided to qualified individual with mental disabilities, including but not limited to diverting individuals with serious mental illnesses from the Step-Down Program altogether;

- whether the Step-Down Program's failure to account for, accommodate, or provide reasonable program alternatives to individuals with mental disabilities violates the Constitution; and

- whether the Step-Down Program's failure to account for, accommodate, or provide reasonable program alternatives to individuals with mental disabilities violates the ADA or RA.

Each of these common questions leads to answers common to the classes, such that the Disabilities Classes meet the requirements of Rule 23(a)(2). *See, e.g.*, *Wal-Mart*, 564 U.S. at 350

### 3. Plaintiffs' Claims Are Typical Of Those Of The Class

At least four Plaintiffs (Messrs. Riddick, Khavkin, Cavitt, and Wall) have indisputable ADA and RA-qualifying disabilities. *See e.g.*, Ex. 28, ¶ 31; Ex. 23, ¶ 18; Ex. 20, ¶ 3; Ex. 25, ¶ 14. These Plaintiffs meet the typicality requirement for the same reason they meet the commonality requirement:  The claims of these four Plaintiffs and all putative class members with mental disabilities arise from identical allegations, namely that the Step-Down Program fails to adequately

identify, account for, accommodate, and avoid discriminating against individuals with disabilities. Thus, the same common evidence concerning the Step-Down Program and the same legal arguments form the basis of each member of the Disabilities Classes' liability claims, allowing resolution of the claims of all members of the Disabilities Classes. *See, e.g.*, *Scott*, 61 F. Supp. 3d at 589 ("Here, Plaintiffs have alleged a broad variety of medical problems—diseases, physical afflictions, deteriorating conditions, and chronic pain—that are generally representative of the adverse health issues experienced by the entire prisoner population at FCCW."); *Bumgarner*, 276 F.R.D. at 457 (finding typicality where plaintiff and class claims "all arise from the same operative facts in that they all suffer the same injury as a result of DOC's policies and procedures . . . and discrimination because of their disabilities").

### 4. Plaintiffs And Their Counsel Will Adequately Represent The Classes

Messrs. Riddick, Khavkin, Cavitt, and Wall Plaintiffs do not have any interests in conflict with the proposed disabilities classes they seek to represent, seek the same type of relief for all disabilities class members based on the same underlying facts, and have attested to their commitment to pursue claims on behalf of the Disabilities Classes. *See, e.g.*, *Scott*, 61 F. Supp. 3d at 590 (finding the class representatives adequate because "Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole"). Class counsel is adequate to represent the disabilities classes for the same reasons stated in Section III.A.4 above and Section V. below.

### B. The Disabilities Injunction Class Satisfies The Requirements Of Rule 23(b)(2)

Like the Constitutional Violation Injunction Class, the Disabilities Injunction Class satisfies the 23(b)(2) requirements because it challenges the Step-Down Program as a system-wide set of policies and practices. As required by Rule 23(b)(2), an injunction to abolish the Step-Down

Program and end long-term solitary confinement at Red Onion and Wallens Ridge will benefit all members of the class.  *See Scott*, 61 F. Supp. 3d at 591 ("[F]ederal courts regularly certify Rule 23(b)(2) classes in cases involving constitutional claims of prisoners alleging inadequate medical care and seeking injunctive relief." (internal citations omitted)); *see also Bumgarner*, 276 F.R.D. at 457–48 (certifying class of prisoners with disabilities where prisoners challenged policies and practices applicable to the entire class, stating "Rule 23(b)(2) has been liberally applied in the area of civil rights, including suits challenging conditions and practices at various detention facilities, as well as claims for violations of the ADA and Rehabilitation Act").

### C.    The Disabilities Damages Class Satisfies The Requirements Of Rule 23(b)(3)

The Disabilities Damages Class—for the same reasons as the Constitutional Violations Damages Class—meets the predominance and superiority requirements of Rule 23(b)(3).  As for predominance, the Disabilities Damages Class—like the Constitutional Violations Damages Class—challenges the Step-Down Program itself, which governs every aspect of the lives of individuals in long-term segregation at Red Onion and/or Wallens Ridge, with or without mental disabilities.  The questions of law and fact common to the Disabilities Classes are aimed at determining whether VDOC's Step-Down policies and practices account for or provide means of accommodating individuals with disabilities, or diverting them from the Step-Down Program altogether.  These questions do not vary among class members and will be addressed with common evidence.  *See, e.g.*, *Langley v. Coughlin*, 715 F. Supp. 522, 556–57, 559–61 (S.D.N.Y 1989) (certifying Rule 23(b)(3) class of inmates as well as class of mentally ill inmates for "conditions of confinement" and practices and rejecting argument that the fact that they experienced different durations defeated predominance); *Pritchard*, 269 F.R.D. at 219 (finding that claims relating to a common strip search policy "predominate over those issues that are subject to individualized

44

proof").  Consistent with the Constitutional Damages Class, the Disabilities Damages Class will seek standardized damages compensation rather than individualized damages.  for superiority, the class action device is the preferred method for bringing claims challenging the validity of prison policy and practice—which the Disabilities Damages Class seek to do here.  *See e.g.*, *Butler*, 289 F.R.D. at 102–03.  Given the difficulty of litigating each prisoner's individual claims, a class action is the far superior method to adjudicate the present claims.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (recognizing that "most of the plaintiffs would have no realistic day in court if a class were not available"); *In re Revco Sec. Litig*, 142 F.R.D. 659, 669 (N.D. Ohio 1992) (where class members could not afford separate actions, class actions superior to other methods).

## V.   CLASS COUNSEL ARE ADEQUATE TO REPRESENT THE CLASS UNDER RULE 23(G)

Rule 23(g) governs the adequacy of class counsel and requires the Court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g); *see also Soutter v. Equifax Info. Servs. LLC*, 307 F.R.D. 183, 212 (E.D. Va. 2015).

Plaintiffs are represented by White & Case LLP and the American Civil Liberties Union of Virginia ("ACLU").  Counsel has spent four years investigating and prosecuting these claims on behalf of Plaintiffs.  Counsel's wealth of knowledge—both concerning litigating matters in federal court and with class actions—and experience in this matter renders them adequate to represent the proposed class in this matter.  Counsel are highly qualified to represent the proposed classes and respectfully request that they be appointed class counsel.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the attached Proposed Order certifying the Constitutional Violation Injunction Class, the Constitutional Violation Damages Class, the Disabilities Injunction Class, and the Disabilities Damages Class.

Dated: June 20, 2022

Respectfully submitted:

/s/ *Tara Lee*
Tara M. Lee (VSB No. 71594)
Daniel Levin (*pro hac*)
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20005
T: (202) 626-3600
F: (202) 639-9355
tara.lee@whitecase.com
daniel.levin@whitecase.com

Michael Gallagher (*pro hac*)
Michelle Letourneau-Belock (*pro hac*)
**WHITE & CASE** LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200
mgallagher@whitecase.com
michelle.letourneaubelock@whitecase.com

Vishal Agraharkar (VSB No. 93265)
Eden Heilman (VSB No. 93554)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF VIRGINIA
701 E. Franklin St., Suite 1412
Richmond, Virginia 23219
(804) 644-8022
vagraharkar@acluva.org
eheilman@acluva.org

*Counsel for Class Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of June, 2022, I emailed the foregoing Class Plaintiffs'

Memorandum of Law in Support of Motion for Class Certification to the Court and to all counsel

of record in this case, and a flashdrive was dispatched for delivery the following business day.

/s/ *Tara Lee*____
Tara M. Lee (VSB No. 71594)
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC  20005
T: (202) 626-3600
F: (202) 639-9355
tara.lee@whitecase.com