# Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

WILLIAM THORPE, *et al.*,

    *Plaintiffs*,

v.

VIRGINIA DEPARTMENT OF CORRECTIONS, *et al.*,

    *Defendants*.

CASE NO. 2:20-cv-00007-JPJ-PMS

## CORRECTED AFFIDAVIT OF GARY WALL

I, Gary Wall, declare the following under penalty of perjury pursuant to 28 U.S.C. §1746:

1. My name is Gary Wall. I am one of the named plaintiffs in *William Thorpe et al. v. Virginia Department of Corrections et al.*, No. 2:20-cv-00007. I am over the age of 21, and I am competent to give this affidavit and to testify regarding the matters in this affidavit.

2. I am a prisoner in Virginia Department of Corrections ("VDOC") custody. I am currently incarcerated at Wallens Ridge State Prison ("WRSP") in the general population. I was previously confined at Red Onion State Prison ("ROSP") during various periods of time between 1998 and 2019.

3. In December 2012, the year the Step-Down Program was implemented, I was assigned to security Level S at WRSP. I was placed on the Special Management ("SM") pathway at that time. I did not meet with anyone to discuss my placement, and I do not know the reasons I was placed on the SM pathway.

4. In 2013, while still in Level-S, I won a case involving excessive force from a dog bite while on the yard. I received money damages as a result. Correctional officers began to target me after that point. For instance, I received a false charge for a broken cell window in June 2013, which was later dismissed.

5. In August 2013, I had completed Step-Down Phase I and was set to progress to Step-Down Phase II, but was knocked back to Phase I because of the broken cell window charge that was later dismissed.

6. In September 2013, I was charged with "gathering around/approaching in a threatening manner," which pushed me back all the way to SM-0.  When I submitted grievances and asked to be moved out of Special Management, I was told to stop making grievances and to "let them go."  It took me almost 15 months to progress back to my pre-charge level of Step Down Phase I, which did not happen until January 2015.

7. In August 2015, I was beaten by correctional officers.  I lost consciousness because of the beating and suffered a broken left hand.  I was then sent to the Medical Unit at WRSP for roughly four weeks before being transferred to ROSP.

8. When I was moved to ROSP in November 2015, I was placed on the Intensive Management ("IM") Pathway, a more restrictive pathway than the SM pathway and with even fewer privileges.  VDOC policy requires that the Dual Treatment Team ("DTT") decide whether I would be placed on the IM or SM Pathway and inform me of how to advance through the program.  Despite this, I had not heard anything from the DTT and did not know that the DTT existed.  I did not learn that I was on the IM pathway until my first ICA hearing, over 100 days after my transfer.

9. Between November 2015 and July 2017, I was the subject of 12 ICA hearings.  During each hearing, I asked to be switched to general population.  These hearings occurred on November 17, 2015, February 22, 2016, June 9, 2016, September 2, 2016, November 18, 2016, February 3, 2017, May 1, 2017, July 14, 2017, October 4, 2017, December 13, 2017, March 14, 2018, and June 4, 2018.

10. All 12 hearings recommended that I stay in segregation with the exact same language.  The hearings took place at my cell door.  I was given a few minutes to state my case, but the paperwork with the decisions were always filled out before I even spoke.  I appealed every ICA Hearing within 90 days of the decision with no results.

11. I engaged in the Step-Down Program and eventually progressed to IM-2 in February 2017. By March 2017, I had met all goal levels in accordance with the Step-Down Program, was infraction-free for six months, and completed the *Challenge Series*.

12. On or around July 14, 2017, after completing all of the Step-Down Program requirements for the IM pathway in 18 months, I was set to progress to the IM Closed Pod pending the availability of bed space.  My institutional record says that the DTT recommended that I be released to the IM Closed Pod, but at no time did I ever meet with the DTT.

13. In July 2017, I received a charge for "disobeying an order" and had to start the six-month infraction-free clock all over again, as any charge—even non-violent charges—could reset the clock.  I received this charge for "blocking my vent" even though the pod footage showed nothing in my vent.  After I appealed this decision, the Grievance Response I received on November 9, 2017 stated that although I advanced to IM-2 status in December 2016 after completing the Step-Down Program, I would only be eligible for release to the D6 pod in January 2018 after I was infraction free for 180 days.

14. Even though I had completed the *Challenge Series* on March 2017, my December 2017 ICA hearing noted that I should stay in segregation until I complete my "annual case plan goal of completing the challenge series."  In response to my appeal of the December 2017 ICA hearing, I received a Grievance Response on January 18, 2018 saying that I would be eligible for release from IM to the D6 pod in January 2018.  The language was copied directly from the previous Grievance Responses that I had received.  The appeal response I received in January 2018 did not reflect the fact that I was set to move up to the D6 pod in January 2018.

15. On January 22, 2018 I received a Level II Grievance Response to my appeal of the December 2017 ICA hearing which affirmed the decision to keep me in IM due to me "not completing the Challenge Series."  This directly contradicted the previous Grievance Responses I had received—that stated I would be eligible for release from IM in January 2018—and was untrue considering I had completed the *Challenge Series* program.

16. In January 2018, I received a charge for masturbating during pill call. In February 2018, I received a false charge for ripping my pants and was pushed back down to IM-0. The masturbation charge got dropped on appeal because pod camera footage showed nothing of the sort had occurred. Despite the camera footage showing nothing had happened, the pants charge was never dropped. These charges were fabricated as a way to keep me in segregation. I appeared at an ICA hearing on March 14, 2018 which recommended I remain in segregation because I "refuse[d] to participate in the Step-Down Program."

17. On April 24, 2018 I received a Level I Grievance Response to my appeal of the March 2018 hearing stating that I was reduced to IM-0 privilege status despite one of the charges against me being overturned on appeal. I was also told that I would have to complete the *Challenge Series* again, despite previously completing the entire program twice.

18. I remained at IM-0 until September 20, 2018, when I finally progressed to IM-1. I then progressed to IM-2 on March 27, 2019.

19. Because this class action was imminent, I was fast tracked to the SM pathway on March 27, 2019 and classified as SM-2, the same day I progressed to IM-2.

20. It was not until May 2019, four years after the External Review Team began to meet bi-annually, and *after* this class-action lawsuit was filed, that I finally was reviewed by the ERT.

21. ERT reviews were supposed to occur every six months, per VDOC policy. When I had filed a grievance noting that ROSP was not complying with VDOC policy, I was told that ERT reviews are not grieveable. I have not been allowed to attend any ERT meetings.

22. I eventually progressed to Step-Down Phase 1 on July 16, 2019. On August 14, 2019, I was transferred to Sussex I State Prison. I was then placed in medical-related segregation on August 20, 2019 due to being severely underweight and having liver problems.

23. In the Sussex Prison handbook I read that I could receive an ADA Coordinator. When I was transferred back to ROSP in November 2019 and inquired about an ADA coordinator,

I was not given an answer. The staff at ROSP's roles and positions were continuously shifted and changed, so I could not request to speak with the right person.

24. I was eventually transferred to WRSP in February of 2021 after being attacked by another dog that severely mutilated my legs. When I was transferred, I was placed in a medical pod, segregation, and Phase I and II of the Step-Down Program until I was finally released to the general population in June 2021. I have been in the general population since.

25. As illustrated by the above, during my time in the Step-Down Program, non-violent and sometimes false disciplinary infractions prevented me from achieving the required six months of good conduct needed in order to progress through the Step-Down Program. Because of these infractions, I was forced to restart the SM program several times.

26. During my time in the Step-Down Program, I completed the *Challenge Series* three times, in 2012, 2017, and 2019.

27. I have never met or been contacted by the Building Management Committee, and do not know who sits on the committee or what they do.

28. While classified as SM-0, SM-1, SM-2, IM-0, IM-1, or IM-2, I was unable to earn Level-I good time credit.

29. While at ROSP on both the IM and SM Pathways, I was subject to long-term solitary confinement. During this time, I spent 22 to 24 hours a day in my cell alone on non-recreation or shower days. The conditions of solitary confinement denied me of nearly all-human contact. Nearly all of my personal interactions were with prison staff.

30. Each time I was permitted to leave my cell, I was forced to endure daily cavity searches. This required me to strip naked before two officers, who would then inspect my head, hair, mouth, torso, pelvic area, legs, and feet. I was also required to open my mouth, raise my arms, turn around, spread my legs, raise my penis and testicles, turn around to face the back of the cell, spread my buttocks, bend over so that guards could inspect my anus, squat, and cough. The experience of daily cavity searches was dehumanizing.

31. The conditions of my confinement have significantly affected my mental and physical health. I suffer from extreme bouts of depression, anxiety attacks, suicidal ideations, dizziness, high blood pressure, frequent migraines, and weight loss. I lost over 30 pounds while being held in long-term solitary confinement. As a 6 foot tall male I weighed 129 pounds while in solitary. One medical professional stated that my weight loss could be attributed to stress. I was prescribed "Boost" shakes as a nutritional supplement in order to cause weight gain. During my incarceration, I have submitted several requests for medical attention due to my weight loss that were not adequately acknowledged or responded to.

32. My confinement has also affected my religious practices. I am Muslim and participate in Ramadan. Friday services are not available to prisoners in segregation and I have suffered discrimination based on my religion from several guards. I was once told, "strap a bomb to yourself and kill yourself." Further, I have made requests to have my diet changed in accordance with my religion that have been thwarted by prison staff.

33. I have also been the subject of discrimination based on my race. I have been called the "n-word" and other racial epithets on numerous occasions. When being transported, the officers frequently use racial epithets in order to provoke inmates.

34. I agreed to be a Plaintiff in this lawsuit because I do not agree that the Step-Down Program is effective and I believe that it amounts to an unconstitutional violation of prisoners' rights.

35. I understanding that I am bringing this lawsuit on behalf of myself and everyone at Red Onion or Wallens Ridge who has had to go through the Step-Down Program and that I am seeking the same relief as my fellow class members.

36. I intend to represent everyone in this lawsuit and understand and accept my responsibilities in that regard.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge.

Signature_____

Dated this _____ of _____, 2022

Gary Wall
Wallens Ridge State Prison