**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

WILLIAM THORPE, *et al.*,

               *Plaintiffs*,

     v.

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al.*,

               *Defendants*.

CASE NO. 2:20-cv-00007-JPJ-PMS

**DEFENDANTS' BRIEF IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................................1

II.   FACTUAL BACKGROUND ....................................................................................3

    A.    The Step-Down Program Maintains Public, Staff, and Inmate Safety While
        Placing Inmates in the Most Appropriate Setting. ..........................................3

        1.    VDOC Imposes the Most Restrictive Conditions on Inmates for Whom
            It Is Undeniably Appropriate, After Individualized Review, Only for as
            Long as Necessary. ...............................................................................4

        2.    The IM and SM Pathways Give Each Inmate the Opportunity to Earn
            Privileges and Improve His Conditions of Confinement. ....................6

        3.    Security Level 6 Helps Reintegrate Inmates into the General Prison
            Population. ............................................................................................7

        4.    VDOC's Recent Policy Changes Provide Extensive Out-of-Cell
            Programming and Recreation. .............................................................10

    B.    VDOC Provides Each Inmate Regular Reviews to Determine Whether Less
        Restrictive Conditions Are Appropriate. .......................................................11

        1.    Each Inmate Is Subject to Appropriate Expectations at Each Tier of
            Confinement. ........................................................................................11

        2.    VDOC Conducts Regular, Fair Reviews of Inmates' Placement Within
            the Step-Down Program. ......................................................................13

        3.    The Step-Down Program's Review Process Has Evolved Over the Past
            Ten Years. ............................................................................................15

    C.    VDOC's Mental Health Screening and Programs Find Appropriate Placement
        for Each Inmate. .............................................................................................15

        1.    VDOC Makes Individualized Assessments of All Inmates' Mental
            Health Statuses and Needs. .................................................................15

        2.    VDOC's Programming Effectively Diverts Inmates with Serious Mental
            Illness From Restorative Housing Settings. ........................................17

    D.    The Data Regarding Current and Past Populations Demonstrate the
        Individualized Treatment of Inmates and the Efficacy of the Step-Down
        Program. ........................................................................................................18

    E.    VDOC Used Appropriate, Necessary, and Fair Confinement Conditions for
        the Named Plaintiffs. .....................................................................................21

III.  The Court Should Not Certify Any Classes ............................................................23

    A.    Plaintiffs Cannot Meet Their Burden for Certification of the Constitutional
        Violations Classes. ........................................................................................24

        1.    The Court Should Deny Certification of Either Constitutional Violations
            Class Because There Are No Common Questions or Answers. ...........25

a.   Plaintiffs' Facial Challenge Cannot Rely on Issues Relevant Only to As-Applied Analysis.................................................................25

b.   Plaintiffs' Eighth Amendment Claim Does Not Raise Common Questions that Have Common Answers. ....................................27

c.   Plaintiffs' Fourteenth Amendment Claim Does Not Raise Common Questions that Have Common Answers. ...................................29

2.   The Court Should Deny Certification of Either Constitutional Violations Class Because the Proposed Class Representatives Are Neither Typical Nor Adequate. ...................................................................................31

3.   The Court Should Deny Certification of a Constitutional Violations Injunctive Relief Class Because Plaintiffs Have Not Met Their Burden Under Rule 23(b)(2)..........................................................................33

4.   The Court Should Deny Certification of a Constitutional Violations Damages Class Because Plaintiffs Have Not Met Their Burden Under Rule 23(b)(3).........................................................................................35

a.   Variations in Each Inmate's Conditions of Confinement and Penological Justification for Each Condition Require Individualized Analysis. ..............................................................36

b.   Changes Over Time Require Fact-Intensive Analysis Regarding Different Inmates and Different Time Periods. ............................39

c.   Variations in Applicable Affirmative Defenses Preclude Class Treatment. ................................................................................40

d.   Damages Require Individualized Analysis, Contrary to Plaintiffs' Misrepresentation of the Cases They Cite. ................................44

B.   Plaintiffs Cannot Meet Their Burden for Certification of the Mental Health Disabilities Damages and Injunctive Relief Classes. ....................................45

1.   The Proposed Mental Health Disabilities Classes Fail Both the Express Numerosity and Implicit Ascertainability Requirements. ................................46

2.   The Court Should Deny Certification of Either Proposed Mental Health Disabilities Class Because There Are No Common Questions or Answers. ........................................................................................49

3.   Plaintiffs Cannot Satisfy the Typicality or Adequacy Requirements for the Proposed Mental Health Disabilities Classes. ................................50

4.   The Court Should Deny Certification of a Mental Health Disabilities Injunctive Relief Class Because Plaintiffs Cannot Satisfy Rule 23(b)(2). .........50

5.   The Court Should Deny Certification of a Mental Health Disabilities Damages Class Because Plaintiffs Cannot Satisfy Rule 23(b)(3). ....................50

IV.   CONCLUSION...................................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A Soc'y Without a Name v. Virginia*,
    655 F.3d 342 (4th Cir. 2011) ................................................32

*Adair v. EQT Prod. Co.*,
    320 F.R.D. 379 (W.D. Va. 2017).............................................35, 36, 46

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013).................................................................23

*Amaya v. DGS Constr., LLC*,
    326 F.R.D. 439 (D. Md. 2018)................................................48

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..............................................................50

*August v. Mich. Dep't of Corr.*,
    No. 2:16-cv-11224, 2018 WL 4679597 (E.D. Mich. Sept. 29, 2018) ....................................51

*Bass v. Perrin*,
    170 F.3d 1312 (11th Cir. 1999) ............................................37

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ................................................31, 40

*Burnette v. Fahey*,
    687 F.3d 171 (4th Cir. 2012) ................................................29

*Butler v. Suffolk County*,
    289 F.R.D. 80 (E.D.N.Y. 2013)..............................................36

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015)..............................................................26

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................24, 45

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ................................................45

*Dearduff v. Washington*,
    330 F.R.D. 452 (E.D. Mich. 2019) ........................................38

*DeSpain v. Uphoff*,
   264 F.3d 965 (10th Cir. 2001) ............................................26

*Ebert v. Gen. Mills, Inc.*,
   823 F.3d 472 (8th Cir. 2016) ..............................................28

*EQT Prod. Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ...............................24, 35, 46

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..........................................27, 38, 43

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) .............................................................31

*Greenhill v. Clarke*,
   944 F.3d 243 (4th Cir. 2019) ...............................................3

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ...............................23, 24, 40

*Hammond v. Powell*,
   462 F.2d 1053 (4th Cir.1972) ..............................................46

*Harris v. Rainey*,
   299 F.R.D. 486 (W.D. Va. 2014).........................................33

*Harvard v. Dixon*,
   No. 4:19-cv-212 (N.D. Fla. July 25, 2022), *slip op.* ............35

*Helling v. McKinney*,
   509 U.S. 25 (1993)..............................................................38

*Holmes v. Godinez*,
   311 F.R.D. 177 (N.D. Ill. 2015).........................................47

*Hudson v. City of Chicago*,
   242 F.R.D. 496 (N.D. Ill. 2007)..........................................26

*Hutto v. Finney*,
   437 U.S. 678 (1978).............................................................40

*Jamie S. v. Milwaukee Pub. Schs.*,
   668 F.3d 481 (7th Cir. 2012) ........................................35, 47

*Kelly v. Bishop*,
   No. RDB-15-3795, 2015 WL 8757936 (D. Md. Dec. 15, 2015)......................40, 41

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019)....................................24

*Lienhart v. Dryvit Sys., Inc.*,
    255 F.3d 138 (4th Cir. 2001) ...............................................................23, 31, 33

*Lightfoot v. D.C.*,
    273 F.R.D. 314 (D.D.C. 2011)...............................................................28

*Lowery v. Circuit City Stores, Inc.*,
    158 F.3d 742 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999)...................24

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012).................................................................46

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
    341 F.R.D. 128 (D. Md. 2022)...............................................................48

*Owens v. Balt. City State's Att'ys Office*,
    767 F.3d 379 (4th Cir. 2014) ...............................................................32

*Parent/Prof'l Advocacy League v. City of Springfield*,
    934 F.3d 13 (1st Cir. 2019).................................................................49

*Pearson v. Callahan*,
    555 U.S. 223 (2009)........................................................................43

*Phillips v. Sheriff of Cook Cnty.*,
    828 F.3d 541 (7th Cir. 2016) ...............................................................38

*Pino v. Dalsheim*,
    605 F. Supp. 1305 (S.D.N.Y. 1984)..........................................................44

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ............................................................43, 44

*Rhodes v. Chapman*,
    452 U.S. 337 (1981)....................................................................27, 43

*Rhodes v. E.I. Du Pont de Nemours & Co.*,
    253 F.R.D. 365 (S.D. W.Va. 2008)...........................................................33

*Richmond Med. Ctr. for Women v. Herring*,
    570 F.3d 165 (4th Cir. 2009) (en banc) ......................................................26

*Riddick v. Dep't of Corr.*,
    No. 7:17-cv-00268, 2017 WL 6599007 (W.D. Va. Dec. 26, 2017) .................................32, 51

*Ross v. Duggan*,
　402 F.3d 575 (6th Cir. 2004) ..................................................................26

*Sabata v. Neb. Dep't of Corr. Servs.*,
　337 F.R.D. 215 (D. Neb. 2020)..........................................................28, 51

*Sawyer v. Noble*,
　708 F. Supp. 2d 591 (W.D. Va. 2010) .....................................................51

*Scott v. Clarke*,
　61 F. Supp. 3d 569 (W.D. Va. 2014) .......................................................31

*Shiring v. Tier Techs., Inc.*,
　244 F.R.D. 307 (E.D. Va. 2007) ..............................................................31

*Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*,
　543 F.3d 597 (10th Cir. 2008) ...........................................................33, 34

*Snodgrass v. Day*,
　No. 7:15-cv-00075, 2015 WL 1931306 (W.D. Va. Apr. 28, 2015).........32

*Snodgrass v. Gilbert*,
　No. 7:16-cv-00091, 2016 WL 386630 (W.D. Va. July 13, 2016) ...........32

*Steimel v. Minott*,
　No. 1:13-cv-957, 2014 WL 1213390 (S.D. Ind. Mar. 24, 2014) ......47, 48

*Thomas v. Cty. of Los Angeles*,
　703 F. App'x 508 (9th Cir. 2017) ............................................................45

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
　445 F.3d 311 (4th Cir. 2006) .....................................................33, 40, 41

*Thorpe v. Clarke*,
　37 F.4th 926 (4th Cir. 2022) .............................................27, 29, 43, 44

*Tyson Foods, Inc. v. Bouaphakeo*,
　577 U.S. 442 (2016)................................................................................45

*United States v. Salerno*,
　481 U.S. 739 (1987)................................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
　564 U.S. 338 (2011)........................................................................ *passim*

*Wash. State Grange v. Wash. State Republican Party*,
　552 U.S. 442 (2008)................................................................................26

*Wilcox v. Brown*,
 877 F.3d 161 (4th Cir. 2017) ...............................................................44

*Williams v. Big Picture Loans, LLC*,
 339 F.R.D 46 (E.D. Va. 2021) ...........................................................48

*Wilson v. Seiter*,
 501 U.S. 294 (1991) ............................................................................27

*Yates v. Collier*,
 868 F.3d 354 (5th Cir. 2017) ..............................................................35

## Constitutional Provisions

U.S. Const., amend. VIII ...................................................................... *passim*

U.S. Const., amend. XIV ......................................................................29, 31

## Statutes

Americans with Disabilities Act of 1990, 42 U.S.C. § 1210 *et seq.*...................................... *passim*

Va. Code § 8.01–243(A)........................................................................32

## Rules

Federal Rule of Civil Procedure 12 .....................................................43

Federal Rule of Civil Procedure 23 ..................................................... *passim*

Federal Rule of Civil Procedure 65 .....................................................33

## I.      INTRODUCTION

The Court should not certify any class in this case.   Plaintiffs treat their request for certification as a given, relying on the fact that other courts have at times certified classes of inmates asserting Constitutional violations.   But when subjected to the rigorous analysis Rule 23 requires, Plaintiffs' request falls short.

Plaintiffs filed this case on the theory that the Commonwealth of Virginia improperly relies on long-term solitary confinement at its Red Onion and Wallens Ridge facilities, and its practices there are a continuation of policies the Commonwealth abandoned decades ago.   To date, the Court has had to consider Plaintiffs' claims through the lens of their allegations alone.   But to win class certification, Plaintiffs must meet their burden through actual evidence.   And the evidence demonstrates not only that the Commonwealth of Virginia employs best practices in its penological programs at Red Onion and Wallens Ridge, but has been nationally recognized for its reform efforts.

Contrary to Plaintiffs' assertions, data shows that inmates in the Step-Down Program ***do*** advance through the program and ***are*** returned to the general prison population, though according to individual inmates' own timelines.   By June of 2021, only 63 inmates remained in the Red Onion Level S unit.   Adoption of Restorative Housing in the Virginia Department of Corrections Fiscal Year 2021 Report (hereinafter "2021 General Assembly Report") at 6, attached as Exhibit 1.   Of the inmates who stepped down from Level S in 2021, 85 percent spent less than a year classified as Level S, and 45 percent spent less than six months.   *Id.*   Only 5 percent of inmates in the Step-Down Program remain in the program for more than 18 months.   *Id.*

Plaintiffs nevertheless ask the Court to certify four classes:   two seeking injunctive relief (Constitutional Violations Injunctive Relief Class and Mental Health Disabilities Injunctive Relief Class), and two seeking money damages (Constitutional Violations Damages Class and Mental

Health Disabilities Damages Class).  Not one of the classes meets the stringent requirements of Federal Rule of Civil Procedure 23.  Most importantly, Plaintiffs—who by all appearances are making as-applied rather than facial challenges to the policies of Defendant Virginia Department of Corrections ("VDOC")—fail to establish that there are common questions that will yield common answers.  That is the *sine qua non* of certification under Rule 23(b)(2) or 23(b)(3).

Plaintiffs' problems start but do not end there.  The proposed class representatives are inadequate for a host of reasons, and the claims they assert are not typical of the classes as a whole. It is unclear whether there is even a *single* member of the Mental Health Disabilities Injunctive Relief class, let alone enough members to permit class treatment.  An overarching problem for both proposed Injunctive Relief classes is that the proposed classes lack cohesion, a necessary requirement for certification under Rule 23(b)(2).  Plaintiffs have not explained what, exactly, they propose the Court enjoin when it (presumably) assumes control over the restorative housing program.

Plaintiffs' proposal for the Damages classes is even weaker.  Every claim that Plaintiffs assert will require adjudication of myriad individual issues.  That is clear just from comparing the facts applicable to the named Plaintiffs themselves.  Any class trial in this case would get bogged down in individual analysis on every claim.

This is not the place for the Court to step in.  The facts now in the record establish that the crisis Plaintiffs portrayed in their pleadings simply does not exist.  There certainly are not problems so endemic that the only solution is certification of deeply flawed classes.  This case does not fit within Rule 23.

## II.   FACTUAL BACKGROUND

**A.   The Step-Down Program Maintains Public, Staff, and Inmate Safety While Placing Inmates in the Most Appropriate Setting.**

The Step-Down Program is a "sophisticated, well-conceived program to better inmates' behavior and their confinement, as well as to improve safety and the overall operation of the prison." *Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019).   Restorative housing units (formerly referred to as "restrictive housing" in Virginia) are designed to provide for the safety and welfare of inmates, the corrective institution and its staff, and the general public. ███

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███. OP 425.4(III)(A)(1), attached as Exhibit 2.

Long-term restorative housing is ***not*** a punishment. ███████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████ *Id.* ███████████████████████████████████████████

███████████████████████████████████████████████████████████████.

Declaration of Randall Mathena (hereinafter "Mathena Declaration") at ¶ 9, attached as Exhibit 3.

To that end, VDOC began developing the "Long-Term Restrictive Housing Step-Down Program" ("Step-Down Program") in 2011.   First implemented at Red Onion State Prison ("Red Onion") and Wallens Ridge State Prison ("Wallens Ridge"), two of Virginia's maximum security detention facilities, the Step-Down Program is a "nationally recognized" program representing an "organizational shift" and "culture change" within VDOC to reduce the overall use of restrictive housing.   2021 General Assembly Report at 1.

Inmates in the Step-Down Program begin in Security Level S, a non-scored security level reserved for inmates who must be managed in a restorative housing setting. OP 830.A at 3, attached as Exhibit 4. Level S inmates are divided into two different pathways: Intensive Management ("IM")—inmates with the potential for extreme deadly violence—and Special Management ("SM")—inmates with a history of fighting or violence but without the intent to commit deadly harm. *Id.* Inmates who progress through their respective pathways "step down" from Security Level S to Level 6, which allows for greater socialization with other inmates in preparation for eventual reintroduction to the general population. *Id.*

The Step-Down program uses "observable standards" of inmate conduct, allowing the most securely managed inmates to "gradually step down to lower security levels in a way that maintains public safety, staff safety, and the safety of the incarcerated population." The Safe Alternatives to Segregation Initiative: Findings and Recommendations for the Virginia Department of Corrections (hereinafter "Vera Report") at 10, attached as Exhibit 5; OP 830.A(I). The Step-Down Program is not a "one-size-fits-all policy." *See* Memo. in Supp. of Mot. for Class Cert. at 1, ECF No. 170. Instead, it is a dynamic and adaptive "risk reduction model" that considers the individualized history and behavior of inmates in "aiming to motivate incarcerated people to make positive changes and providing programming to address needs and develop new skills." Vera Report at 10.

1.   <u>VDOC Imposes the Most Restrictive Conditions on Inmates for Whom It Is Undeniably Appropriate, After Individualized Review, Only for as Long as Necessary.</u>

VDOC uses long-term restorative housing only when an inmate's presence in the general population poses a direct threat to the safety of the inmate or others within the facility. Classifying or transferring an inmate to Level S requires a three-step approval process. OP 830.2 (VII)(C), attached as Exhibit 6. The inmate must first have a formal hearing by the Institutional Classification Authority ("ICA"). Formal ICA hearings require certain due process requirements,

4

including notice and the right to attend the hearing.  OP 830.1(II), attached as Exhibit 7.  If the ICA recommends the inmate be classified as Level S, that decision is reviewed by the Central Classification Services ("CCS").  OP 830.2(VII)(C)(2).  Finally, that decision must be approved by both the warden of Red Onion and the appropriate Regional Operations Chief.  OP 830.2 (VII)(C)(3).[1]

VDOC has developed a listing of "security qualifiers" indicating that an inmate should be considered for assignment to Level S.  These qualifiers do not automatically require placement in restrictive housing, but they do indicate the kind of serious and life-threatening behaviors that warrant Level S classification.  OP 830.2 (VII)(B).  Qualifiers include an inmate's disciplinary record while institutionalized, such as: a history of aggravated assault on staff; aggravated assault on other inmates with a weapon or resulting in serious injury; setting fires; rioting; seizing or holding hostages; possession of firearms or explosives; excessive violent disciplinary convictions; serious gang activity or leadership role; and/or manipulative or predatory behavior towards staff.  OP 830.2 (VII)(B); Mathena Decl. at ¶ 7.  For example, named Plaintiff Vernon Brooks was transferred to Red Onion's Level S restorative housing unit after he stabbed two other inmates behind the ear with a weapon.  See CP-20-cv-7_00001328, attached as Exhibit 8.  Brooks' transfer to Level S was due to that incident and an extensive prior history of violent assaultive behavior, possession of weapons, and gang-related activity.  See VADOC-00135480, attached as Exhibit 9.

Level S restorative housing can also be considered for inmates who pose a serious escape risk requiring maximum security supervision.  For example, named Plaintiff Brian Cavitt successfully escaped from a correctional facility in Nebraska and had a detailed plan for a second attempt in Massachusetts that involved plans to kill a guard.  See VADOC-00003758 – VADOC-

---

[1] VDOC no longer maintains restorative housing at Wallens Ridge.

00003767, attached as Exhibit 10.  On his arrival to Red Onion, Cavitt was placed into the Level S IM pathway due to the Massachusetts Department of Correction's recommendation "that this inmate always be treated and transmitted with the highest level of security available due to the fact that he will always pose a threat to the staff and Security and is determined to someday escape from custody."  *Id.* at VADOC-00003759*.*

On the whole, inmates housed in Red Onion's Step-Down Program as of June 2021 had on average more low-level Level 200 disciplinary offense convictions than inmates in short-term restorative housing, and almost twice as many more-serious Level 100 disciplinary offense convictions.  2021 Report at 6; *see also* OP 861.1(V) (complete listing of Level 100 and 200 offenses) attached as Exhibit 11.

      2.    <u>The IM and SM Pathways Give Each Inmate the Opportunity to Earn Privileges and Improve His Conditions of Confinement.</u>

As mentioned, under the Step-Down Program, Security Level S inmates are divided into the IM and SM pathways.  OP 830.A at 3.  The IM pathway is for inmates "with the potential for extreme and/or deadly violence" and who "have an institutional adjustment history indicating the capability for extreme/deadly violence against staff or other inmates." *Id.*

Within the IM pathway, inmates are divided into "privilege levels," of IM0, IM1, IM2 and IM-SL6.  OP 8.30A(D)(1).  The purpose of the privilege levels is to demonstrate the inmate's progress in the program and to reinforce positive behavior by unlocking earned privileges.  2020 Restrictive Housing Reduction Step-Down Program Guide at 28 (hereinafter "2020 Step-Down Guide"), ECF No. 174-3.  Inmates who choose not to participate in the Step-Down Program remain at IM0, where they are provided basic constitutional requirements and necessities, such as meals, clothing, and legal and religious materials, but do not receive additional privileges and are not eligible for a security level reduction.  OP 8.30A(D)(1)(a); Mathena Decl. at ¶ 10.

Inmates who do participate in the program gradually gain additional privileges.  For example, an inmate classified as IM0 can make two phone calls per month.  See 2020 Step-Down Guide at App'x F.  By progressing through the IM pathway to IM-SL6 Phase II, inmates can earn the privilege to make up to fifteen phone calls per month.  *Id.*  Other earned privileges include eligibility for in-pod jobs, additional access to library books, and increased commissary funds.  *Id.*

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████.  Mathena Decl. at ¶ 12.

The SM pathway is for inmates "who have frequently recurring disciplinary violations; have a history of fighting with staff or inmates or violent resistance towards a staff intervention, but without the intent to invoke serious harm or the intent to kill; and/or intentionally commit disciplinary violations with the goal of remaining in restrictive housing."  2021 General Assembly Report at 6.  The SM pathway has the privilege levels of SM0, SM1, SM2, and SM-SL6.  OP 830.A(e)(1).  Inmates placed in the SM pathway have greater privileges than those in the corresponding privilege level of the IM pathway.  *See* 2020 Step-Down Program Guide at App'x G.  Inmates earn additional privileges as they progress through the SM pathway, leading to materially different living standards for different inmates throughout the program.  *Id.*; Mathena Decl. at ¶ 13.

3.   <u>Security Level 6 Helps Reintegrate Inmates into the General Prison Population.</u>

Those inmates who meet the program requirements "step down" from Security Level S to Level 6. The purpose of Level 6 is to reintroduce inmates into a social environment with other inmates and act as a proving ground and preparation for stepping down to the general prison population.  2020 Step-Down Program Guide at 30; OP 830.A at 3.

To account for the differing circumstances and needs of inmates, Level 6 consists of several different program pods designed to be responsive to the needs of each sub-population. Inmates in the IM pathway can step down to the Level 6 IM Closed Pod, which is further subdivided into Phase I and Phase II. OP 830.A(F)(4). Inmates in the Closed Pod have greater privileges than those in Security Level S, and they can earn additional privileges such as in-pod job assignments and extended visitation benefits. OP 830.A(F)(4)(b). Inmates who advance to Phase II earn additional privileges, creating "an opportunity for an increased quality of life for inmates possibly facing a long term in high security." 2020 Step-Down Program Guide at 30; OP 830.A(F)(4)(c). Due to the high risk of violence associated with IM inmates, there is no direct step from the IM pathway to the general prison population. OP 830.A(D)(1)(b). ████████████

████████████████████████████████████████

███████████████████████████████. Mathena Decl. at ¶ 14; *see, e.g.,* External Review Team Recommend Change Form 10/17/2018 VADOC-00024215 ██████████████████████████████████ █████████████████.") , attached as Exhibit 12.

After completing SM1, inmates in the SM pathway progress to SM2, at which point their security level is reduced from Security Level S to Level 6. *See* OP 830.A(III).[2] █████████ ██████████████████████████████████ Mathena Decl. at ¶ 15.

---

[2] Although inmates at SM2 previously remained classified at SL-S, this was changed in 2020 to better reflect the privileges afforded to SM2 inmates and overall manner in which they are housed.



Inmates classified as SM2 also have recreation in unrestrained small groups to help acclimate inmates back into social settings.   2020 Step-Down Program Guide at 31.   ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.   Mathena Decl. at ¶ 16.

After completing SM2, inmates progress to Step-Down Phases 1 and 2, which are designed to reacclimate inmates "who have adjusted their routines and attitudes and acclimated to long periods of time alone with limited social interactions."   2020 Step-Down Program Guide at 33. Programming at this level supports responsible and self-directed behavior, as well as improved decision-making skills.   *Id.*   In Phase 2 of Step-Down, inmates can transition to a double cell, pending compatibility.   *Id.*   Following successful completion of Step-Down Phase 2, inmates are eligible to be reclassified to Security Level 5, which represents the full-privilege general population.   *Id.*

Upon reclassification to SL-6 and completion of SM2, and as an alternative to Step-Down Phases 1 and 2, inmates who meet certain criteria may also be eligible for placement into one of two specialized housing programs: the Secured Allied Management (SAM) Pod and the Secure Integrated Pod (SIP). The SAM Pod is for inmates who are easily bullied, manipulated, or taken advantage of by other inmates, often due to underlying mental or physical vulnerabilities. *Id.* at 31. The SAM Pod serves as an intermediary step where programming "focuses on stabilizing the [inmates'] mental status and increasing their resiliency to determine if they are appropriate for living in general population or if they should remain in a SAM environment." *Id.* The SAM Pod operates with a more intensive mental health focus and an increased staff presence of counselors and corrections officers attuned to the special needs of this population. *Id.* The goal of SAM pod is to determine whether these inmates can be successfully reintroduced to the general population or instead should remain in a SAM environment. *Id.*

The Secure Integrated Pod (SIP) is for inmates who have a pattern of intentionally committing numerous small disciplinary violations to remain in restrictive housing and avoid unwanted social pressures in general population. *Id.* at 32. The SIP Pod allows these inmates to develop a new social system with other likeminded inmates "as a means to reduce their misuse of [restorative housing] and ability to access programs and services that would be made available in general population." *Id*. SIP Pod programming focuses on strategies to prepare these inmates for the pressures of general population. *Id.* Inmates in SIP are eligible for privileges including meals outside of the cell, outside group recreation, job eligibility, and small group programming. *Id.*

4. <u>VDOC's Recent Policy Changes Provide Extensive Out-of-Cell Programming and Recreation.</u>

Since the introduction of the Step-Down Program in 2011, VDOC has continually worked to reform and improve the program and all aspects of restrictive housing to better serve the needs

of inmates, corrections staff, and the public. Since 2016, VDOC has partnered with the Vera Institute of Justice to identify additional opportunities for reform, both to improve the quality of life of inmates within the Step-Down Program and to reduce the use and need for restorative housing throughout all VDOC facilities.  *See* Vera Report at 5.  This initiative has led to measurable, concrete changes within the program.

For example, one of Vera's recommendations was to expand strategies to further increase out-of-cell-time for all inmates in restrictive housing "to mitigate the negative impacts of living in segregation, particularly on mental health, and to better prepare people for release to general population and ultimately the community."  *Id.* at 15.  In October 2018, VDOC put this recommendation into action, issuing new guidance for out-of-cell recreation mandating a minimum of 12 hours per week in outside recreation for inmates in IM0 and increasing to 18 hours per week for IM2 inmates. SM0 inmates also received a minimum of 12 hours per week in outside recreation, while inmates who progressed to SM2 became eligible for 20 hours per week unrestrained in the interior recreation yard.  *See* September 14, 2018 VDOC Memorandum, attached as Exhibit 13. One year later, VDOC expanded out-of-cell time for all inmates, including those in the Step-Down Program, regardless of specific pathway or privilege level, to 4 hours per day, 7 days per week, for a total of 28 hours per week.  *See* September 17, 2019 VDOC Memorandum, attached as Exhibit 14.

**B.    VDOC Provides Each Inmate Regular Reviews to Determine Whether Less Restrictive Conditions Are Appropriate.**

1.    Each Inmate Is Subject to Appropriate Expectations at Each Tier of Confinement.

The Step-Down Program is designed to positively shape inmates' behavior.  2020 Step-Down Program Guide at 43. The program rewards inmates who engage in positive personal and social behavior with incrementally earned privileges and, when necessary, deters unwanted

behavior through disciplinary sanctions.  *Id.*  To this end, "observable standards" are used to evaluate inmates and judge their progress through the program in three commitment areas: discipline, personal behavior, and programming.  *Id.* at 20.

First, inmates must substantially reduce or eliminate disciplinary violations.  Progress in this area demonstrates greater respect for authority, improved decision-making skills, and that the inmate is becoming more forward-thinking and less impulsive.  *Id*.  Charges are tracked for each inmate by the Unit Manager.  *Id.* at 56.

Second, inmates are assessed on several responsible personal behavior goals, including:

- personal hygiene, including an inmate's personal cleanliness and that of their clothing;

- standing for count;

- cell compliance, such as leaving cell windows clear and unobstructed, floor uncluttered, and property neatly stored; and

- respect, which includes an inmate's language, attitude, and patience.

*Id.* at 55.  Inmates are scored weekly for each of these well-defined goals by correctional officers, counselors, and the Unit Manager.  *Id.*  These goals are designed to help inmates develop routine patterns of responsible and mature behavior.  *Id.* at 20.

Third, inmates must participate in and successfully complete the program's educational curriculum.  The *Challenge Series* is a set of seven journals developed specifically for inmates in a restrictive housing setting.  *Id.* at 21.  Topics covered include rational thinking, criminal lifestyles, lifestyle balance, communication skills, violence prevention, and transition to social settings.  *Id.*  This "evidence-based program" is "proven to have a positive impact on [inmate] thinking, beliefs, and attitudes, which, in turn, support and reinforce responsible and mature behavior."  *Id.* at 20.  Inmates are rated weekly on their program participation and completion by counselors.  *Id.* at 56.

Programming for all Level S inmates begins in-cell. *Id.* at 22. As inmates progress through either the IM or SM pathway, they are exposed to programming in different settings. *Id.* For example, inmates in IM-SL6 can utilize therapeutic modules and security chairs in small group settings, while SM inmates who have advanced to Level 6 in the SAM, SIP, or Step-Down Pods can receive programming in unrestrained small groups. *Id.* This progression is a vital part of the Step-Down Program "as more effective programming is possible with increased counselor and inmate direct contact and in groups of peers facilitated by counselors or other treatment staff." *Id.* at 20. ███████████████████████████████████████████

███████████████████████████████████ Mathena Decl. at ¶ 17.

By clearly defining goals and expectations for inmates and balancing the benefits of incrementally earned privileges with the consequences of disciplinary sanctions, the Step-Down Program positively shapes the behavior of inmates and moves them "towards a set of goals for desirable inmate characteristics." 2020 Step-Down Program Guide at 43.

2.      VDOC Conducts Regular, Fair Reviews of Inmates' Placement Within the Step-Down Program.

Frequent and comprehensive reviews of inmates are an "integral" part of the step-down program model. Vera Report at 10. Inmates "are assessed regularly by multidisciplinary teams of staff using validated instruments to determine criminal risks, underlying reasons for behaviors that lead to placement in Security Level S, and motivation to change." *Id.*

First, Level S inmates are rated weekly on their progress by counselors and corrections officers. 2020 Step-Down Program Guide at 55. Officials are encouraged to routinely communicate with inmates about their ratings to reinforce positive behaviors and address areas where improvement is needed. OP 830.A(D)(3)(d); Mathena Decl. at ¶ 18.

Second, inmates are reviewed at a minimum of every 90 days by the ICA to "ensure that the reclassification of Level S inmates is consistent with policy." 2020 Step-Down Program at 13. Inmates receive 48-hour advance notice and the opportunity to be present for the hearing. OP 830.1(II). Inmates also have the right to appeal classification decisions through the inmate grievance procedures. *Id.*

Third, an External Review Team ("ERT"), comprised of officials based outside of Red Onion, performs bi-annual reviews of every inmate in Level S and Level 6. OP 830.A(J)(1). This review considers whether an inmate is assigned to the appropriate Level; whether an inmate in Level S meets the criteria for their assigned pathway; whether the inmate requires a change to either their pathway or Security Level assignment; and whether the inmate has been appropriately advanced in their assigned pathway. 2020 Step-Down Program Guide at 10.

Fourth, Level S inmates are informally reviewed by a Dual Treatment Team ("DTT") on an as-needed basis, but at least quarterly. OP 830.A(K)(d). DTTs are facility-specific teams headed by the Chief of Housing and Programs that include mental health associates, counselors, managers, and front-line corrections officers. *Id.* Through a process of dialogue and consensus, the DTT reviews inmates being considered for status or pathway changes. *Id.*; 2020 Step-Down Program Guide at 11.

Fifth, a Building Management Committee ("BMC") considers inmate statuses, unit incentives, and sanctions. OP 830.A(K)(e). The BMC includes officials "directly involved in the operations of a specific unit" and convenes at least monthly. *Id.*; 2020 Step-Down Program Guide at 12. In addition to providing recommendations to the DTT and ICA, the BMC evaluates the overall status of an inmate and considers whether assigned standards are being met. *Id.* The BMC advances inmates who meet advancement eligibility criteria from IM0 to IM1 and then IM2, or

14

from SM0 to SM1.  *Id.* at 52.  If an inmate is not meeting their disciplinary, behavioral, or health goals, the BMC can also return the inmate to a lower privilege level.  *Id.*

       3.     <u>The Step-Down Program's Review Process Has Evolved Over the Past Ten Years.</u>

As the Step-Down Program has matured over the past decade, VDOC's review process has evolved to better meet the goals of the programs and the needs of inmates.  For example, when the Step-Down Program was first implemented, the ERT only reviewed inmates on an annual basis.  *See* 2012 Restrictive Housing Reduction Step-Down Program Guide at  9, ECF No. 174-7.  In 2014, the ERT began reviewing inmates every six months.  *See* 2014 Restrictive Housing Reduction Step-Down Program Guide at 9, attached as Exhibit 15.  The ERT also has expanded the scope of its review, including inmates in Level 6 beginning in 2014.  *See* 2020 Step-Down Program Guide at 9.  In addition, the BMC was added in 2015, taking over some of the review functions previously handled by the DTT.  *See* 2015 Restrictive Housing Reduction Step-Down Program Guide at 12, attached as Exhibit 16.

**C.    VDOC's Mental Health Screening and Programs Find Appropriate Placement for Each Inmate.**

Plaintiffs inaccurately characterize both past and current VDOC practices regarding inmates with potential mental health issues.  The Court must look at the facts—not mere allegations—in deciding this motion.

       1.     <u>VDOC Makes Individualized Assessments of All Inmates' Mental Health Statuses and Needs.</u>

Upon entering a VDOC facility, all inmates receive a comprehensive mental health screening by a qualified mental healthcare provider to identify those with mental health and wellness service needs.  OP 730.2(II)(A), attached as Exhibit 17.  VDOC uses a "Mental Health Classification Coding System" as a means to provide "a standard approach through which the

mental health status and service needs of individual inmates may be examined."  OP 730.2(VI)(A).

The mental health classification codes are:

- MH-0: no mental health treatment needs;

- MH-1: minimal impairment;

- MH-2: mild impairment;

- MH-2S: substantial impairment;

- MH-3: moderate impairment; and

- MH-4: severe impairment.

OP 730.2(VI)(C).  Inmates with a code of MH-2S or higher have either a Serious Mental Illness

("SMI") designation—a diagnosed mental disorder that substantially interferes with the person's

ability to meet the ordinary demands of living—or have been diagnosed with a severe personality

disorder that leads the individual to experience significant functional impairment.  *Id*.  Inmates

with these codes must be assigned to a facility with full time mental health and wellness staff.  *Id.*

Inmates with a code of MH-1 or higher have their mental health status reviewed at least once per

year.  OP 730.2(VI)(E).

Although inmates with a classification of MH-2S or higher may have mental health

conditions that substantially limit one or more of their major life activities, VDOC does not

separately categorize inmates as having a "mental health disability."  Defendant VDOC's Answers

to Plaintiffs' Interrogatories at 3, ECF No. 174-58. Mental health conditions may develop over

time, and their impact on inmates can wax or wane, particularly through the use of medication or

other interventional treatments.  *Id.*  VDOC's Mental Health Classification Coding System creates

a set of standardized metrics that can be compared across programs and facilities, while also taking

16

into account the different mental health, security, and programming needs of individual inmates.

*Id.* at 4.

    2.    <u>VDOC's Programming Effectively Diverts Inmates with Serious Mental Illness From Restorative Housing Settings.</u>

████████████████████████████████████████████████████████

██████████████████████████████████████████. *See* Secure Diversionary Treatment

Program and SAM Referral Process Briefing at 1, VADOC-00067611, attached as Exhibit 18.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████" *Id.* ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████. *Id.*

    Evolutions in VDOC's programming have helped the agency make great strides in keeping

SMI inmates out of Restrictive Housing. ████████████████████████

████████████████████████████████████████████████████████

████████████████████. *See* Secure Diversionary Treatment  Manual 2.0 (hereinafter "SDTP

Manual 2.0") at 9, attached as Exhibit 19. ████████████

████████████████████████████████████████████████████████

████████. *Id.* ████████████████████████

████████████████████████████." *Id.* at 11. ████████

████████████████████████████████████████████████████████

██████████████████████████████████." August 2018

Preliminary Analysis of VDOC SDTP at 1, attached as Exhibit 20. ████████████████

███████████████████████████████████████████████████████████. *See*

SDTP Manual 2.0 at 14.

With the implementation of SDTP, VDOC transferred ***all*** SMI inmates out of Red Onion

and into SDTP facilities and no additional SMI inmates were transferred to Red Onion.   Vera

Report at 37.   As of June 2021, there were ***zero*** inmates in Red Onion with a Mental Health Code

of MH-2S, or higher.   2021 General Assembly Report at 10.   Of the 63 inmates then in the Red

Onion Step-Down Program, 19 were classified as MH-0, meaning they had no history or current

evidence of mental health impairments. *Id.*   Eleven others were classified MH 1 – minimal

impairment; and the remaining 33 were classified as MH-2 – mild impairment.   *Id.*   Currently, all

inmates being transferred into a Security Level S facility are screened upon arrival to see if they

qualify for an SMI designation.   OP 730.2(IV)(A).   ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████. *See* SDTP Manual 2.0 at 14.

**D.    The Data Regarding Current and Past Populations Demonstrate the Individualized
        Treatment of Inmates and the Efficacy of the Step-Down Program.**

By June 2021, only 63 inmates remained in the Red Onion Level S unit.   2021 General

Assembly Report at 6.   Of the inmates who stepped down from Level S in 2021, 85 percent spent

less than a year classified as Level S, and 45 percent spent less than six months.   *Id.*   Only five

percent of inmates in the Step-Down Program remained in the program for more than 18 months.

*Id.*

In fact, several of the named plaintiffs in this case successfully "stepped down" from Level

S in an expeditious manner.   ██████████████████████████████████████████

███████████████████████████████████████████████████████████

ERT Book October 23, 2019, excerpt attached as Exhibit 21. ██████████████████

18



. *Id.*

. *Id.*

. Excerpts from VADOC-00037970 at 5, attached as Exhibit 22.

*Id.*

*See* VADOC-00020177, VADOC-00020213, attached as Exhibit 23.

Excerpts from VADOC-00037970 at 4.

*Id.* at 5. *Id.* at 6.

.

*Id.* at 5. . *Id.* at 6.

*Id.* at 7. . *Id.* at 8.

*Id.* at 1.

. *Id.* at 2.

*Id*. at 6.

Plaintiffs' Motion for Class Certification includes a declaration from Peter Graham, a data consultant who organized and analyzed information about the class sample for Plaintiffs. But Graham's presentation of the data is error-ridden and incomplete.

All of Graham's assumptions in selecting data sets for analysis and in doing the analysis were provided to him by Plaintiffs' counsel. *See e.g.*, Graham Dep. at 36:19–37:13;40:1–41:5;

73:10–18; 75:20–78:1, excerpts attached as Exhibit 24. In fact, Graham did not actually perform an analysis—he created the logic and manipulated the data according to a set of certain assumptions designed to produce the numbers Plaintiffs' counsel wanted to see. In addition, Graham did not know who any of the Plaintiffs were, and was not even aware that the parties had agreed on a class sample. *Id.* at 99:12–19. As such, Graham did not, and could not have, checked the data sets he used to ensure his numbers had any relevance to the class. *See* Motion to Strike Graham at 5; Exh. 1 to Graham Decl., Exh. 57 to Pls.' Mot. for Class Cert (failing to include one named plaintiff and approximately 30 members—almost half—of the agreed-upon class sample). Graham's analysis is not adequately representative of the class which Plaintiffs actually seek to certify.

Furthermore, Graham's calculation of the number of days that certain inmates spend in Level S or Level 6 Restrictive Housing is simply wrong. In Exhibit A to his Declaration, Graham calculated that inmates spend on average 3.26 years in Security Level S and 9.45 years in either Level S or Level 6. *See* Exh. 1 to Graham Decl., Exh. 57 to Pls.' Mot. for Class Cert. But Graham failed to take into account inmate release dates when calculating his numbers. *See* Motion to Strike Graham at 8. When an inmate is released from VDOC's custody, their security classification remains the same as the last day of custody in the system data unless and until the inmate recidivates back into VDOC custody, at which time the system is updated to indicate a revised Security Level. *Id.* By ignoring release dates, Graham's analysis vastly overstates the average length of stay for inmates in Level S or 6. *Id.* When pressed on these errors, Graham admitted that he would not rely on such a faulty analysis as part of his normal work as a data analyst. *See* Graham Dep. 233:1–21.

Because the data sets Graham analyzed were not tied to the class definition, and because the results are so fundamentally unreliable, Graham has provided no analysis relevant to the class certification decision and his analysis should be disregarded.

**E.     VDOC Used Appropriate, Necessary, and Fair Confinement Conditions for the Named Plaintiffs.**

Named Plaintiffs were placed in Level S Restorative Housing because of their violent actions and extensive histories of disciplinary misconduct inside the prison system. ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████     *See* VADOC-00003704 – VADOC-00003707, attached as Exhibit 25.  Cavitt has also been involved in numerous other violent incidents and has threatened to stab other inmates and a corrections officer in the throat.   VADOC-00004086 – VADOC-00004087, attached as Exhibit 26. ████████████████████████████████████

████████████████.  *See* VADOC-00020459, VADOC-00020475, attached as Exhibit 27. Plaintiff Dmitry Khavkin was moved to Security Level S after he killed his cell partner in 2013. *See* VADOC-00000176, attached as Exhibit 28. ████████████████████

██████████████████████████████████     *See* VADOC-00019976 – VADOC-00019990, attached as Exhibit 29.████████████████████████████

████████████████████████████████████     *See* VADOC-00020177, VADOC-00020192, attached as Exhibit 30.  This representative sample of violent criminal activity, much of it occurring inside correctional facilities, belies Plaintiffs' expert Dan Pacholke's assertion that these are the type of inmates who become "easy keepers."  *See* Pacholke Report at 20, Exh. 17 to Pls.' Mot. for Class Cert.

The declarations of the named Plaintiffs are also rife with factual misstatements and inconsistencies. Gary Wall claims that he was not reviewed by the ERT until May 2019. Wall Decl. at 20, Exh. 28 to Pls.' Mot. for Class Cert. ███████████████████████ ██████████████████████████████████ *See* VADOC-000019746, VADOC-00019766, attached as Exhibit 31. William Thorpe implies that he was transferred out of state in May 2019 as retaliation for being involved in this lawsuit. *See* Thorpe Decl. at 3, Exh. 27 to Pls.' Mot. for Class Cert. In actuality, Thorpe was transferred because he was married to a former corrections officer at Red Onion. *See* VADOC-00113055, attached as Exhibit 32. All of these records were available to Plaintiffs and their experts—yet Pacholke never reviewed any of them to check the accuracy of the information the inmates were providing.

Kevin Snodgrass claims that he was not allowed to attend Step-Down Program classes, and therefore prevented from progressing in the Program, from March 2014 to June 2014. Snodgrass Decl. at ¶12, Exh. 26 to Pls.' Mot. for Class Cert. But VDOC logs show that Snodgrass attended classes in May of 2014. *See* VADOC-00012385, attached as Exhibit 33. Snodgrass also states that he was only "pulled" for Step-Down Program classes twice from April to June 2016 and subsequently prevented from progressing in the program. Snodgrass Decl. ¶ 12, Exh. 26 to Pls.' Mot. for Class Cert. But VDOC records show that Snodgrass attended four classes during this period and completed Challenge Book #4 to progress in the program. *See* VADOC-00012380 – VADOC-00012381, attached as Exhibit 34.

Derek Cornelison claims that he was never told how the Step-Down Program works and that he was not given the Challenge Series course materials until six months after he arrived at Red Onion. Cornelison Decl. ¶¶ 8–9, attached as Exh. 21 to Pls.' Mot. for Class Cert. Yet in a grievance filed six months after his arrival, Cornelison claimed that he had started his Step-Down

22

programming "immediately" upon intake and orientation to Red Onion, and that he had already completed the initial workbooks by that time.  *See* VADOC-00004354, attached as Exhibit 35; VADOC-00004355, attached as Exhibit 36.  Clearly, Cornelison knew how the Step-Down Program operated.

### III.    THE COURT SHOULD NOT CERTIFY ANY CLASSES

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks omitted).  Accordingly, Rule 23 "imposes stringent requirements for certification that in practice exclude most claims."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  Plaintiffs "bear[] the burden of establishing that the requirements of Rule 23 are satisfied" by a preponderance of the evidence.  *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001).

Rule 23 requires a two-step analysis for each proposed class.  First, the movant must show that the proposed class meets the prerequisites set forth in Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a).  In addition, "the class action must fall within one of the three categories enumerated in Rule 23(b)(3)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003).  Here, Plaintiffs seek certification of two classes under Rule 23(b)(2) and two classes under Rule 23(b)(3).

Rule 23(b)(2) authorizes class treatment only when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Supreme Court has instructed that "[t]he key to the (b)(2) class is the indivisible nature of the … remedy warranted."  *Dukes*, 564 U.S. at 360.  "Certification under this provision is appropriate 'only when a single injunction or declaratory judgment would provide relief to each

member of the class.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (quoting *Dukes*, 564 U.S. at 360).

Rule 23(b)(3) imposes a separate set of requirements.  To win certification, a movant must establish (1) that common questions—with common answers—predominate over individual questions, and (2) that class treatment is superior to other available methods of litigation.  *See* Fed. R. Civ. P. 23(b)(3); *Dukes*, 564 U.S. at 350.

Movants must satisfy Rule 23's requirements through evidence, not mere pleadings and self-serving allegations.  "Rule 23 does not set forth a mere pleading standard."  *Id*.  Instead, the movant must "satisfy [Rule 23] through evidentiary proof."  *Comcast Corp. v. Behrend*, 569 U.S. 27,  33 (2013).

Moreover, "[d]istrict courts have wide discretion in deciding whether or not to certify a class," *Gunnells*, 348 F.3d at 424, and the Court "may appropriately consider factors other than those listed in Rule 23 in determining whether to certify a class action."  *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 757–58 (4th Cir. 1998) (citation omitted), *vacated on other grounds*, 527 U.S. 1031 (1999).  "Since the requirements of Rule 23 are often 'enmeshed in the factual and legal issues comprising the plaintiffs' cause of action,' the district court must rigorously examine the core issues of the case at the certification stage."  *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir.), *cert. denied*, 140 S. Ct. 676 (2019) (citation omitted) (quoting *Dukes*, 564 U.S. at 351).

## A.     Plaintiffs Cannot Meet Their Burden for Certification of the Constitutional Violations Classes.

The Court should deny certification of the putative Constitutional Violations Classes primarily because Plaintiffs cannot show even a single important common question that will have a common answer across all class members.  Their brief lists purportedly common issues, but they

are common only at a superficial level.  Most importantly, Plaintiffs never explain what facts and

legal issues are relevant to the claims they actually are asserting, and the defenses they will have

to confront.  Any proposed class representative could identify at least one "common" issue, in any

case, if there were no need to tie it to the claims to be actually tried.  Plaintiffs' inability to satisfy

Rule 23(a)'s commonality factor requires denial of both the injunctive relief and damages classes.

Without a common issue, Plaintiffs necessarily fall short on Rule 23(b)(3)'s predominance

requirement as well.  Among other things, in their effort to meet their burden, they have flatly

misrepresented the holdings of several cases they cite.  Setting that aside, when the Court weighs

the critical individualized questions against the purported common ones, the scales quickly tip

against a finding that common questions predominate.

1.    The Court Should Deny Certification of Either Constitutional Violations Class Because There Are No Common Questions or Answers.

"What matters to class certification" is whether a class action would "generate common

answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350.  In other words, Rule

23(a) demands not only that each class member's claim "depend upon a common contention," but

that the common contention "is capable of classwide resolution—which means that determination

of [the contention's] truth or falsity will resolve an issue that is central to the validity of each one

of the [class member's] claims in one stroke." *Id*.  In determining whether a common question

will generate a common answer, the Court must consider any dissimilarities between the class

members.  *Id*. at 359.  This is because dissimilarities within the proposed class can "impede the

generation of common answers."  *Id*. at 350.

a.    *Plaintiffs' Facial Challenge Cannot Rely on Issues Relevant Only to As-Applied Analysis.*

Plaintiffs might argue that their claims must raise common issues because they are making

a facial challenge to VDOC policies.  But nowhere in their class certification brief do they say that

they are making a facial challenge, or explain which purportedly common issues relate to facial versus as-applied arguments.

"A facial challenge is an attack on a law itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). Facial challenges are disfavored. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

In contrast, an as-applied challenge is one which depends on the identity or circumstances of the plaintiff. *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172–73 (4th Cir. 2009) (en banc); *see also*, *e.g.*, *Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004) ("In an as-applied challenge, the plaintiff contends that application of the [policy] in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional."). An as-applied challenge is difficult to certify because it requires analysis of how the policy is applied to each individual class member. *E.g.*, *Hudson v. City of Chicago*, 242 F.R.D. 496, 505 (N.D. Ill. 2007) (as-applied challenge to ordinance necessarily entails analysis of how the ordinance was applied to each individual class member).

Prisoner conditions-of-confinement claims are inherently fact specific. *See DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("An inquiry into conditions of confinement by necessity relies on the particular facts of each situation."). If Plaintiffs are making as-applied challenges to the Step-Down Program, or discrete aspects of the Step-Down Program, those challenges will be highly individualized and fact specific. For instance, what privileges should Vernon Brooks have today? In which instances was his review flawed?

The facial versus as-applied distinction is of huge importance in determining whether Plaintiffs can satisfy Rule 23.  But Plaintiffs have chosen to elide over the difference.  They cannot have it both ways, gaining the advantages of a facial challenge for class certification purposes while hoping for the less rigorous analysis reserved for as-applied challenges on the merits.

> b.   *Plaintiffs' Eighth Amendment Claim Does Not Raise Common Questions that Have Common Answers.*

The Eighth Amendment prohibits "infliction of pain … that are totally without penological justification."  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quotations and citations omitted).  In prison litigation, the Eighth Amendment inquiry has two prongs:  "whether confinement conditions inflict harm that is 'objectively, sufficiently serious' to deprive prisoners of 'the minimal civilized measure of life's necessities' and whether officers subjectively acted with 'deliberate indifference to inmate health or safety' because they knew of but disregarded the inhumane treatment."  *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298–303 (1991); *Chapman*, 452 U.S. at 347)).

Plaintiffs include in their brief a list of questions purportedly common to the proposed Constitutional Violations classes.  But all of those questions fall into one of two categories:  either they are at such a high level as to be useless in determining how this case should be tried; or they are superficially common but clearly not susceptible to common answers.  For instance, Plaintiffs assert that the first "[k]ey question[] common to the Constitutional Violations Classes" is "Whether VDOC's use of solitary confinement deprives prisoners of basic human needs."  Memo. in Supp. of Mot. to Certify at 30.  The lawsuit does indeed pose that question—in fact, it could serve as a *summation* of the lawsuit.  That hardly makes it a "common question" relevant to the commonality analysis.  Plaintiffs have listed it, but they have given the Court no reason to think that there is a

common *answer*.  "[M]erely advancing a question stated broadly enough to cover all class members is not sufficient under Rule 23(a)(2)."  *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016).

Similarly, Plaintiffs ask the Court to find commonality based on questions like:  "Whether and to what extent individuals subjected to the Step-Down Program are kept in the Program as a result of mental disabilities, including traumas associated with long-term solitary confinement."  (*Id*.)  To answer that question, the factfinder will have to consider the individual inmate's mental health conditions, when the conditions first manifested, whether the conditions were caused or exacerbated by "long-term solitary confinement," and whether that specific inmate was kept in the Step-Down Program because of his mental health conditions.  Plaintiffs may want all of those questions answered for each inmate, but certainly those questions cannot just be answered once, with the result applied across the classes.

Plaintiffs' brief and their supporting declarations lodge numerous complaints against various aspects of their confinement.  But all of those complaints do not add up to a common question.  "The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences of the class; rather, Plaintiffs must first identify the 'policy or custom' they contend violates the dictates of [the Constitution] and then establish that the 'policy or custom' is common to the class."  *Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011).

Describing a set of practices that ***may*** apply to an inmate in restrictive housing is not sufficient to demonstrate that there is a common answer to drive this litigation.  *See Sabata v. Neb. Dep't of Corr. Servs.*, 337 F.R.D. 215, 264 (D. Neb. 2020) (finding prison isolation subclass "defies commonality").  Nor should it be enough to identify one umbrella policy, like the Step-

Down Program comprising a rubric of practices, when some proposed class representatives complain of some practices and others complain of other practices.

Merely adding so many proposed class representatives that at least one plaintiff is complaining about each aspect of the policy is not enough to demonstrate commonality. If anything, the need to join so many class representatives in a single action to cover all the relevant ground demonstrates why that ground is not common to all class representatives, or all members of the putative classes.

      c.     *Plaintiffs' Fourteenth Amendment Claim Does Not Raise Common Questions that Have Common Answers.*

Plaintiffs' Fourteenth Amendment claim is no more appropriate for class treatment than is their Eighth Amendment Claim. Setting aside defenses, the claim itself requires a two-step analysis. First, the Court must determine "whether Plaintiffs had a protectable liberty interest in avoiding security detention." *Thorpe*, 37 F.4th at 941 (citing *Burnette v. Fahey*, 687 F.3d 171, 180 (4th Cir. 2012)). The Court must "then evaluate whether Defendants failed to afford minimally adequate process to protect that liberty interest." *Id*. (citing *Burnette*, 687 F.3d at 181).

Plaintiffs correctly break the "protectable liberty interest" step into two questions: "Whether VDOC's Step-Down program creates a liberty interest in avoiding long-term solitary confinement under the Step-Down Program," and "Whether the conditions of confinement in the Step-Down Program impose an atypical and significant hardship in relation to the ordinary incidents of prison life." Memo. in Supp. of Mot. for Class Cert. at 30–31. That is consistent with the Fourth Circuit's two-pronged test for the existence of a protectable liberty interest. But Plaintiffs never explain why those two questions are important and are susceptible to common answers. Plaintiffs' first question cannot satisfy that test. The Fourth Circuit and this Court have ruled that VDOC's Step-Down Program creates a liberty interest in avoiding long-term

segregation.  An issue that is not subject to dispute is not relevant to Rule 23(a)—or 23(b)(3)—analysis.

The second question—whether the conditions of confinement impose an atypical and significant hardship—fails to satisfy commonality for a different reason:  it is not common at all.  The conditions of confinement for different inmates vary too much across the proposed classes to ever yield common answers.  For instance, surely not even Plaintiffs contend that the "hardship" on an inmate in IM0—the privilege level with the most restrictive conditions—is the same as on an inmate Level 6, which is on the cusp of General Population.  Yet if the Court accepts Plaintiffs' commonality argument, the Court will have to treat inmates at those two ends of the spectrum as identical.  That cannot be right.

Likewise, at trial Plaintiffs will have to prove whether Defendants failed to afford minimally adequate process to each of them.  And that is simply not a common question with common answer.  For instance, Plaintiffs suggest the Court can determine on a class-wide basis "[w]hether the Step-Down Program affords constitutionally adequate review to protect Plaintiffs' interest in avoiding long-term solitary confinement."  *Id*. at 31.  There is no common answer to that question.  Instead, answering it will require painstaking review of ERT logs and review committee minutes.  After all, the review was more than adequate for at least some inmates—it resulted in their exit from the Step-Down Program, after they successfully completed the programming and demonstrated that they could be re-socialized without posing a danger to staff or other inmates.  Plaintiffs assert that this question can be answered "in one stroke," *id*. (citing *Dukes*, 564 U.S. at 350), but they never explain ***how***.

What is it about each inmate's review process, as applied, that makes it susceptible to a common answer?  Plaintiffs leave it to the Court to answer that question for itself.  But there is no

good answer, because Plaintiffs' Fourteenth Amendment claim does not raise common questions with common answers.

2.  The Court Should Deny Certification of Either Constitutional Violations Class Because the Proposed Class Representatives Are Neither Typical Nor Adequate.

A proposed class representative's claim is typical when the class representative is "part of the class and possess[es] the same interest and suffer[s] the same injury as the class members." *Lienhart*, 255 F.3d at 146. "The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d. 331, 340 (4th Cir. 1998) (citation omitted). The analysis is grounded in principles of due process and serves a guidepost for whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

But "even where a putative class representative's claim is 'typical,' 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Lienhart*, 255 F.3d at 147 (quoting *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007)). "[T]o defeat class certification it is not necessary that the unique defense asserted against the putative class representative ultimately succeed. Instead, the presence of even an arguable defense peculiar to the named plaintiff may destroy the required typicality." *Shiring*, 244 F.R.D. at 313 (internal alterations and quotations removed).

Closely related is Rule 23(a)(4)'s adequacy requirement. *See Dukes*, 564 U.S. at 350 n.5 (typicality and adequacy analyses tend to merge). Adequacy focuses on potential conflicts between class representatives and absent class members. *Scott v. Clarke*, 61 F. Supp. 3d 569, 590 (W.D. Va. 2014) ("Plaintiffs do not have any interests in conflict with the interests of the members of the class they seek to represent.").

31

Plaintiffs argue that their claims are typical "for the same reason they meet the commonality requirement:  The claims of Plaintiffs and the putative class members arise from identical allegations."  Memo. in Supp. of Mot. to Certify at 32.  With that, Plaintiffs have encapsulated their problem with their class certification arguments writ large.  Plaintiffs are relying on their "identical allegations" when Rule 23 requires them to rely on **_facts_** and **_evidence_**.  Plaintiffs cannot merely assert their claims are typical "because they arise from Defendants' unconstitutional Step-Down Program."  _Id_. at 31.  If that were enough, **_every_** proposed class representative in **_every_** putative class action would satisfy the typicality requirement.  Plaintiffs never undertake to show that any **_one_** of them satisfies typicality, let alone that **_each_** of them does.

In fact, it is quite clear that Plaintiffs cannot make that showing.  By way of example, Snodgrass's claims are barred by _res judicata_ and collateral estoppel.  He filed a _pro se_ complaint alleging due process and eighth amendment violations associated with the Step-Down Program, along with numerous other claims, in March 2016.  On March 17, 2017, Judge Conrad granted the defendants (several of whom overlap with Defendants here) summary judgment on the relevant claims.[3]  By September 5, 2017, Snodgrass was back in General Population.

Similarly, at least some Plaintiffs' claims are subject to limitations defenses.[4]  Snodgrass, for example, moved from Level S to Level 6 in June of 2017.  Snodgrass returned to the general

---

[3] _See Snodgrass v. Day_, No. 7:15-cv-00075, 2015 WL 1931306 (W.D. Va. Apr. 28, 2015); _Snodgrass v. Gilbert_, No. 7:16-cv-00091, 2016 WL 386630 (W.D. Va. July 13, 2016); _Riddick v. Dep't of Corr._, No. 7:17-cv-00268, 2017 WL 6599007 (W.D. Va. Dec. 26, 2017).

[4] A two-year limitations period applies to Plaintiffs' § 1983 claims.  Section 1983, which does not contain a statute of limitations, borrows the statute-of-limitations period applied to a personal injury suit in the state where the action is brought.  _Owens v. Balt. City State's Att'ys Office_, 767 F.3d 379, 388 (4th Cir. 2014).  In Virginia, the applicable period is two years. Va. Code § 8.01–243(A).  A one-year statute-of-limitations period applies to Plaintiffs' ADA and RA claims.  June 15, 2021 Order at 24-25 (citing _A Soc'y Without a Name v. Virginia_, 655 F.3d 342, 347 (4th Cir. 2011)).

population at Security Level 5 just over two months later in August 2017.  Since that time, Snodgrass has not been subjected to restrictive housing conditions of confinement.  In addition, Snodgrass has been consistently classified as Mental Health Code 0 – meaning he has no history or current evidence of mental impairment which could have affected his ability to understand the alleged violations of his rights.

      3.      The Court Should Deny Certification of a Constitutional Violations Injunctive Relief Class Because Plaintiffs Have Not Met Their Burden Under Rule 23(b)(2).

The Court can only certify a Rule 23(b)(2) class if it is "cohesive."  *Harris v. Rainey*, 299 F.R.D. 486, 497 (W.D. Va. 2014) (quoting *Thorn v. Jefferson-Pilot Life Ins. Co*., 445 F.3d 311, 330 (4th Cir. 2006)).  Cohesion "is similar to but 'more stringent' than the commonality requirement of Rule 23(a)."  *Rhodes v. E.I. Du Pont de Nemours & Co.*, 253 F.R.D. 365, 371 (S.D. W.Va. 2008) (quoting *Lienhart*, 255 F.3d at 147 n.4).  A class is cohesive if "[t]here is no potential … for confronting individualized injuries resulting in divergent interests among class members, the hallmark of a non-cohesive class."  *Harris*, 299 F.R.D. at 497.

To know whether the class is cohesive, the Court must determine that the "final injunctive relief be appropriate for the class as a whole."  *Id.* (quoting *Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008)).  What that requires from a movant is evidence and arguments "sufficient to allow the district court to see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement."  *Shook*, 543 F.3d at 605 n.4.

Plaintiffs have utterly failed to explain to the Court what their proposed injunction would be.  Defendants sought supplemental discovery responses from Plaintiffs on the issue, but even their supplemented response provided no specific information about the injunction they claim to need.  *See*, *e.g.*, Thorpe's Supplemental Responses to Interrogatories Nos. 4 & 9, attached as Exhibit 37.  Thirty-thousand-foot descriptions of best practices do not suffice for an injunction.

Simply wishing for a special master to take over operation of VDOC's restorative housing units, or implement some alternative to the Step-Down Program, is not tangible enough for the Court to determine if it satisfies Rule 23(b)(2).  What injunction, specifically, do Plaintiffs contend this Court could enter that would provide relief to the putative class as a whole? They have not identified one.

Plaintiffs assert they want a "single injunction requiring Defendants to adopt and adhere to constitutional segregation practices."  Memo. In Supp. of Mot. to Certify at 35.  That cannot possibly be sufficient for the Court to find the putative class is cohesive. *Shook* is especially instructive on this point.  There, county jail inmates brought a putative class action alleging that jail conditions for mentally ill inmates violated the Eighth Amendment.  Now-Justice Gorsuch, writing for the Tenth Circuit, affirmed the district court's denial of class certification under Rule 23(b)(2), finding the proposed class was not cohesive—the putative class members' injuries were not sufficiently similar to be addressed in a single injunction that did not differentiate between class members.  *Id*. at 605–06.  In fact, "much of the relief plaintiffs seek would require the district court to craft an injunction that distinguishes—based on individual characteristics and circumstances—*between* how prison officials may treat class members, rather than prescribing a standard of conduct applicable to *all* class members."  *Id*. at 605.

Just so, and equally true here.  Plaintiffs have offered no substantive proposal, through their experts or otherwise.  They want the Court to assume control of a critical component of VDOC's operations, not to set down a single rule, but to make innumerable individualized determinations about proper housing and treatment for different inmates.  That does not suffice for Rule 23(b)(2) certification:

> That the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a

> substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final.

*Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 499 (7th Cir. 2012). Even assuming Plaintiffs had shown a common injury, they have not shown that their injury can be remedied by a single, classwide injunction.

The U.S. District Court for the Northern District of Florida recently denied class certification of a Rule 23(b)(2) class under very similar facts on the basis that the prisoner plaintiffs had "not specified the injunctive relief they seek" to cure purported constitutional violations. *See Harvard v. Dixon*, No. 4:19-cv-212 (N.D. Fla. July 25, 2022), *slip op.* at 3. It was not enough for the plaintiffs to identify the conditions they sought to change: "Plaintiffs must seek something more specific than an order requiring that [the state agency] do better." *Id*. at 5 (citing *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017)). Because the plaintiffs did not "specify the injunctive relief sought," they "necessarily … have not shown a single injunction would benefit all class (or subclass members." *Id*. at 6. That point is equally true here.

4. <u>The Court Should Deny Certification of a Constitutional Violations Damages Class Because Plaintiffs Have Not Met Their Burden Under Rule 23(b)(3).</u>

The predominance analysis here is simple: there are no material common questions, so common questions cannot predominate. But even if the Court identifies some common questions, myriad individual questions will still predominate and make class treatment unhelpful.

"'The mere fact that the defendants engaged in uniform conduct is not, by itself, enough to satisfy the predominance requirement." *Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 401 (W.D. Va. 2017) (quoting *EQT Prod. Co.*, 764 F.3d. at 366). Instead, the uniform conduct must somehow "relate to the controversy at the heart of the litigation" and "individual issues will not predominate." *Id.* Plaintiffs, "must therefore demonstrate both that a given practice was applied

to all class members *and* that the class members are similarly situated, such that questions about the propriety of that practice can be answered on a classwide basis." *Id.* (emphasis added).

     a.     *Variations in Each Inmate's Conditions of Confinement and Penological Justification for Each Condition Require Individualized Analysis.*

Plaintiffs claim that common questions predominate "because the Step-Down Program applied to all class members, and if it is unconstitutional, it is unconstitutional as to each individual class member regardless of their individual experiences or injury." Memo. in Supp. of Mot. to Certify at 36. But Plaintiffs have placed the cart before the horse. While the Step-Down Program applied to all the potential class members, Plaintiffs have done ***nothing*** to show that all the class members are similarly situated.

The conditions imposed on each inmate in restorative housing will vary depending on their level of confinement and any additional privileges or restrictions imposed on the inmate. To determine whether any purported condition of confinement is constitutional, the first question would be to determine the actual conditions imposed on each individual class member.

The Step-Down Program is not one singular set of conditions uniformly imposed on all inmates classified as Level S and Level 6. It is a management system composed of numerous policies that create evolving conditions of confinement and privileges as inmates progress through the program. Plaintiffs' citation to *Butler v. Suffolk County*, 289 F.R.D. 80, 102 (E.D.N.Y. 2013), illustrates this distinction. In *Butler*, the plaintiffs challenged common conditions that applied to all members of the proposed class equally—namely, that the poor sanitary and sewage conditions of the county's jails "exposed [inmates] to human waste on a regular and ongoing basis." *Id.* at 87.

In contrast, here there is no unifying similar situation between all proposed class members. Plaintiffs seek to group the conditions of IM0 inmates together with inmates in SM2 or even inmates located in the SAM Pod, despite the significant and material differences between the

methods of restraint, recreation, programming, and privileges of these units. Plaintiffs attempt to paper over these distinctions as mere "minor variances." Memo. in Supp. of Mot. to Certify at 36. They are not.

The fundamental principle of the Step-Down Program is that inmates progressively earn greater privileges and experience changing conditions of confinement as they advance through the different stages of Security Levels S and 6. Mathena Decl. ¶¶ 12–13. Even within Security Level 6, inmates have materially different living conditions, privileges, and programming depending on which restorative housing pod they are assigned—SAM Pod is different from SIP Pod, is different from the Step-Down Pod. The significantly different experiences of an inmate in IM0 and the SAM Pod are precisely the type of "dissimilarities within the proposed class" which have "the potential to impede the generation of common answers." *Dukes*, 564 U.S.at 350.

Similarly, the Court and jury will have to analyze the penological justification for the imposition of each condition, for each class member. For example, in *Bass v. Perrin*, 170 F.3d 1312, 1315 (11th Cir. 1999), the Eleventh Circuit considered inmates' Eighth Amendment challenge to suspension of outdoor recreation time. The appellate court found that while restriction on outdoor exercise can involve the "infliction of pain," the factfinder could not determine the restriction was "totally without penological justification" because of the threat posed by the specific inmates—who were incarcerated for violent crimes, engaged in violent behavior, and had attempted to escape during outdoor recreation. *Id*. Based on those individual facts and individualized analysis, the Eleventh Circuit determined that "complete denial to the plaintiffs of outdoor exercise, although harsh, did not violate the Eighth Amendment." *Id*. at 1317. Penological literature may have changed since *Bass*, but the need for individualized analysis of whether a condition fits a particular inmate has not.

Further, the variations in conditions of confinement across the proposed Constitutional Violations Damages Class materially affect whether there is "an unacceptable risk of significant mental and physical harm." A prisoner must show that he is presently suffering "serious harm" or is at "substantial risk" of suffering serious harm, and that prison officials are deliberately indifferent to that harm or risk. *Farmer*, 511 U.S. at 828. To be a viable injury, that "substantial risk" must be "sure or very likely to cause" serious medical harm in the imminent future. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (in "the next week or month or year").

If different class members are at different risk of harm, then the "door to individualized inquiry [is] left ajar." *Dearduff v. Washington*, 330 F.R.D. 452, 466 (E.D. Mich. 2019) (describing the different risks of substantial harm two different prisoners might face from the same policy). Where the difference in risk is significant, class adjudication is not possible. *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 555 (7th Cir. 2016) (decertifying class alleging delayed treatment because "the length of delay that is tolerable depends on the seriousness of the [inmate's] condition").

Here, the variations in potential harm are beyond substantial. Dr. Robert Morgan, Defendants' expert, makes exactly this point in his Report. *See* Report of Robert Morgan, Ph.D., attached as Exhibit 38. As he explains, "some inmates placed in restrictive housing experience" harm, the scientific literature "also demonstrates that these harms are not universally experienced and that some inmates even benefit from their placement in restricted housing." *Id*. at 8. In fact, even Plaintiffs' opinion witness Craig Haney had to concede that while the "risk of harm is present for everybody" in restrictive housing, the actual harm varies, and "not every inmate will experience all or even most of the negative psychological effects described in literature" regarding restrictive housing. Haney Dep. at 83:9–84:14, excerpts attached as Exhibit 39.

38

Plaintiffs argue that all members of the proposed class are subject to "vague and arbitrary" standards for system placement and assessment on review.  Memo. in Supp. of Mot. to Certify at 3, 13. But this argument turns the logic of the predominance requirement on its head.  If VDOC's multi-tiered review system gives corrections staff the discretion to treat inmates in an "arbitrary" manner that results in inconsistent outcomes, then by its very nature it is an individualized question that is not well-suited to a uniform, class wide resolution.  *See, e.g.*, *Dukes*, 564 U.S. at 355 (stating that Walmart's "policy" of allowing discretion by local supervisors over employment matters "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices").

Plaintiffs were required to prove through admissible evidence that conditions of confinement expose every class member to a similar risk of harm.  Plaintiffs fall well short of that mark.

> b. *Changes Over Time Require Fact-Intensive Analysis Regarding Different Inmates and Different Time Periods.*

The Court cannot adjudicate the claims of any Plaintiff or absent class member without accounting for the changes in the Step-Down Program over time.  Variations in conditions of confinement matter.  And perhaps nowhere are the variations so evident as when comparing the conditions of any given inmate in the Step-Down Program in, say, 2012 to any given inmate today.  Inmates today have access to more out-of-cell programming, and longer out-of-cell recreation.  Inmates today are subject to a different review process.  VDOC has implemented a series of policy changes incorporating industry best practices and Vera recommendations.  Plaintiffs' opinion witnesses levy plenty of criticisms against VDOC restrictive housing policies, but not even they can deny that the policies have changed over time.

For that matter, the passage of time itself is of critical importance in adjudicating each putative class member's claim.  The constitutionality of a condition of confinement cannot be evaluated without considering the duration of the condition itself.  *See Hutto v. Finney*, 437 U.S. 678, 686 (1978).  Here, duration of confinement varies widely across the putative class.  As the Supreme Court stated, even a "filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days," but "intolerably cruel for weeks or months."  *Hutto*, 437 U.S. at 686–87; *see also Kelly v. Bishop*, No. RDB-15-3795, 2015 WL 8757936 at *2 (D. Md. Dec. 15, 2015) ("The time period during which an inmate is deprived of a basic necessity is important in determining whether the deprivation was unconstitutional.…  The more basic the need the shorter the time it can be withheld.").

### c.  *Variations in Applicable Affirmative Defenses Preclude Class Treatment.*

The Fourth Circuit has "flatly held that 'when the defendants' affirmative defenses  may depend on facts peculiar to each plaintiff's case, class certification is erroneous.'"  *Gunnells*, 348 F.3d at 438 (quoting *Broussard*, 155 F.3d at 342).  And Plaintiffs, as the party that bears the burden of establishing compliance with Rule 23, bear the burden of demonstrating that resolution of the statute-of-limitation defense can occur on a class-wide basis.  *See Thorn*, 445 F.3d at 321–22 ("the standard justifications for allocating the burden of proving an affirmative defense to the defendant—efficiency and fairness—disappear when the thing to be proved is no longer the merit of the defense but compliance with Rule 23"). Plaintiffs cannot do so here, with respect to two critical affirmative defenses:  statutes of limitations and Qualified Immunity.

**First**, the claims of many named Plaintiffs and absent class members will be time-barred—specifically, any inmates designated 'Level S' or 'Level 6' more than two years before the filing of Plaintiffs' Complaint.  The law of the case demands an individualized analysis of claim accrual for those inmates designated 'Level S' or 'Level 6' more than two years before the filing of

Plaintiffs' Complaint.[5]   According to the Court, the continuing violations doctrine applies to Plaintiffs' claims because monthly internal reviews that apply criteria for pathway advancement constitute alleged unlawful acts, not alleged unlawful effects of an original violation. *Id.* at 25-26. Further, the limitations period begins to run when an inmate knew or should have known of the alleged violation of his rights. *Id.* at 25.   Finally, the Court has noted that Plaintiffs allege that they (and other purported class members) "suffered from serious mental health issues, which could have affected their ability to recognize their injuries."   Report and Recommendation at 84; accepted in part and rejected in part by June 15, 2021 Order.

In the context of noting that allegation, the Court identified the fact-intensive nature of the statute-of-limitations analysis in the context of ruling on Defendants' Motions to Dismiss: "the Fourth Circuit has recognized that, in the context of putative class actions such as this, a statute of limitations defense may present the need for a fact-intensive inquiry." *Id.* (citing *Thorn*, 445 F.3d at 320, for the proposition that "resolution of the statute of limitations defense will require the trier of fact to examine the particular circumstances of each individual class member").   In *Thorn*, the court, in affirming the district court's denial of class certification, noted that the "circuit's accrual rule, which focuses on the contents of the plaintiff's mind, is not readily susceptible to class-wide determination." *Thorn*, 445 F.3d at 320.

Therefore, the Court cannot rely solely on objective criteria to determine whether an individual purported class member's claim would be barred by the applicable statute of limitations. For Plaintiffs' Eighth Amendment claim, for example, an administrative determination of when a

---

[5] Although the Court reached its statute-of-limitation conclusions in the context of Plaintiffs ADA and RA claims, Defendants understand them to apply to the § 1983 claims as well. Otherwise, none of Plaintiffs' § 1983 classes can be certified as currently defined because they necessarily include inmates whose claims are barred by the statutes of limitations.

purported class member first was subjected to conditions of confinement that Plaintiffs allege are cruel and unusual, *i.e.*, when the alleged violation of his Eighth Amendment rights began, would be insufficient.  Even a determination of when the purported class member ceased to be subjected to those conditions would be insufficient.  Rather, for each purported class member who ceased to be subjected to such conditions before May 6, 2017, *i.e.*, two years before Plaintiffs filed their Complaint, a factfinder would have to determine whether the inmate, in light of his mental health issues, if any, knew or should have known that the conditions violated his Eighth Amendment rights at the time of Defendants' last alleged unlawful act that kept him in those conditions—and, if not, when he did obtain, or should have obtained, that knowledge.  That determination would require an inquiry into each purported class member's mental state.

The necessary analysis would be similarly subjective for Plaintiffs' Due Process, ADA, and RA claims.  For the Due Process claim, a factfinder would have to conduct an analysis for each purported class member who, before May 6, 2017, ceased to be subjected to conditions of confinement that Plaintiffs allege the class members had a liberty interest in avoiding.  The factfinder would have to determine whether, at the time Defendants last conducted an internal review that applied the criteria for pathway advancement that resulted in denial of advancement out of the conditions, a purported class member, in light of his mental health issues, if any, knew or should have known that his liberty interest had been violated—and, if not, when he did obtain, or should have obtained, that knowledge.  For the ADA and RA claims, a factfinder would have to conduct an analysis for each purported class member who, before May 6, 2018 (*i.e.*, one year before Plaintiffs filed their Complaint), ceased to be denied the benefit of moving to conditions of confinement to which Plaintiffs allege they were entitled.  The factfinder would have to determine whether, at the time Defendants last conducted an internal review that applied the criteria for

pathway advancement that resulted in denial of advancement on a discriminatory basis to the conditions, a purported class member, in light of his mental health issues, if any, knew or should have known of the alleged discriminatory decision—and, if not, when he did obtain, or should have obtained, that knowledge.

**Second**, in this case there will not be a one-size-fits-all answer for Qualified Immunity, or even an answer that can be neatly reduced to the date a single court decision was issued. Defendants moved to dismiss on Qualified Immunity grounds at the Rule 12 stage.  The Court held that it could not make that determination on the pleadings alone, and the Court of Appeals agreed—a fact record is required.  The Court of Appeals' reasoning in reaching that decision is important.

Defendants argued in their motion to dismiss that they were entitled to Qualified Immunity on the pleadings alone because until *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), the Fourth Circuit had not said that severe isolation alone violates the Eighth Amendment.  Defendants argued that as of the filing of this case, "the unconstitutionality of the officers' conduct was [not] clearly established."  *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

The Fourth Circuit agreed that until *Porter*, it had not specifically held that severe isolation violates the Eighth Amendment.  But the Court of Appeals held that "Plaintiffs adequately pleaded Defendants' deliberate indifference."  *Thorpe*, 37 F.4th at 934.  The Court of Appeals ruled that Qualified Immunity will turn not on when the appellate court held that "severe isolation alone can deprive prisoners of 'the minimal civilized measure of life's necessities.'"  *Id*. at *20–21 (quoting *Farmer*, 511 U.S. at 834 (quoting *Rhodes*, 452 U.S. at 347)).  Instead, the Court will have to look to what Defendants themselves knew about the ***actual*** conditions at Red Onion and Wallens Ridge, *id*. at *21–22—which as explained above, changed significantly over time.  In other words, the

Qualified Immunity analysis does not rest alone on the fact "[t]hat a reasonable corrections officer might not have known, before *Porter*, that isolation tends to cause severe injuries," but also on "whether these officers observed the injuries these Plaintiffs have pleaded and drew appropriate inferences as to what caused those injuries." *Id*. at *23. The simple test of when the Court of Appeals announced the relevant rule in *Porter* might have been a common question—but the test announced by the Court of Appeals in *Thorpe* raises, at a minimum, a question that has different answers for different time periods and different Defendants. And it is a question of the utmost importance in this case.

        d.    *Damages Require Individualized Analysis, Contrary to Plaintiffs' Misrepresentation of the Cases They Cite.*

True to its name, the proposed Constitutional Violations Damages Class is seeking monetary damages. Assuming Plaintiffs are entitled to damages, determination of those damages will require individualized inquiry.

Plaintiffs argue that the damages they seek can be determined on a classwide basis because the "intend to seek standardized damages for the constitutional violations of the type that can be distributed formulaically among the class without extensive or individualized proof." Memo. in Supp. of Mot. to Certify at 30. They represent to the Court that other "[c]ourts have certified Rule 23(b)(3) prisoner classes applying this approach." *Id*. They cite two cases for that proposition: *Wilcox v. Brown*, 877 F.3d 161 (4th Cir. 2017), and *Pino v. Dalsheim*, 605 F. Supp. 1305 (S.D.N.Y. 1984). But ***neither of those cases is even a class action***, let alone one finding that courts can apply "standardized damages," thereby transforming an individual question into a common one. *Wilcox* and *Pino* simply do not stand for the propositions Plaintiffs advance.

Defendants have not located any case in which a court certified a prisoner damages class based in whole or in part on the idea that a court can award "standardized damages" for

constitutional violations.  To the contrary, other courts have found that a named plaintiff cannot transform damages for constitutional violations into a common question by proposing that each class member should receive a set amount of money for each day the violation occurred.  *See Thomas v. Cty. of Los Angeles*, 703 F. App'x 508, 511 (9th Cir. 2017) (affirming decertification of a class because "the damages suffered by individual class members were insufficiently similar to be established through representative testimony about 'what it was like to sleep on the floors' at the County jail") (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016); *Dukes*, 564 U.S. 338).  Notably, Plaintiffs did not attempt even to preview a damages model that the Court could employ, were it to accept the proposition that damages are a common question.  That alone precludes the Court from finding that damages are a common question.  *See Comcast Corp. v. Behrend*, 569 U.S. 27.

**B.    Plaintiffs Cannot Meet Their Burden for Certification of the Mental Health Disabilities Damages and Injunctive Relief Classes.**

Plaintiffs' proposed Mental Health Disabilities Damages and Injunctive Relief Classes are even more flawed than their proposed Constitutional Violations classes.  The Mental Health Disabilities classes fail every requirement of Rule 23, across the board.

To state a claim under the ADA or Section 504, a plaintiff must show:  (1) that he or she is a qualified individual with a disability; (2) that he or she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of his or her disability.  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).  Plaintiffs argue that various aspects of the Step-Down Program are an ill fit for some inmates with mental health conditions, and that Defendants

should have done more to inform them about the ADA.  Memo. in Supp. of Mot. to Certify at 40–42.  But Plaintiffs' claims defy class adjudication.

      1.    <u>The Proposed Mental Health Disabilities Classes Fail Both the Express Numerosity and Implicit Ascertainability Requirements.</u>

For the Proposed Mental Health Disabilities classes, the problems of numerosity and ascertainability are linked.  Under Plaintiffs' own definitions, membership of the proposed classes is not ascertainable.  That alone precludes Plaintiffs from establishing numerosity.  By VDOC's reckoning, there are currently *zero* members of the putative Injunctive Relief Class—even including the proposed class representatives—and it is unclear what criteria Plaintiffs propose to inflate that number high enough to warrant class treatment.

Plaintiffs request certification of classes comprising individuals "confined at Red Onion or Wallens Ridge at the 'Level S' or 'Level 6' security levels … who suffer from mental health disabilities and are qualified as individuals with disabilities under either the ADA or the RA."  Mot. to Certify at 1-2.  The proposed Damages Class includes all such individuals since August 1, 2012, and the proposed Injunctive Relief Class includes all such current or future individuals.  The problem, from both a numerosity and an ascertainability standpoint, is that Plaintiffs offer the Court no objective criteria for determining who fits their proposed definition.

The U.S. Court of Appeals for the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'"  *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir.1972)); *see also Adair*, 320 F.R.D. at 391 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012)) ("'Many courts and commentators have recognized that an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria.'").

Plaintiffs' proposed class definitions would require the Court to determine whether an inmate has a qualifying disability to know whether that inmate is a class member or not. Under the ADA, a "disability" is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Courts have declined to certify classes of individuals with "disabilities" where the proposed classes include people whose disabilities have not been diagnosed or identified. *E.g.*, *Holmes v. Godinez*, 311 F.R.D. 177, 214 (N.D. Ill. 2015) (citing *Jamie S.*, 668 F.3d at 495); *Steimel v. Minott*, No. 1:13-cv-957, 2014 WL 1213390 at *12 (S.D. Ind. Mar. 24, 2014) (denying class certification because membership could only be determined "via a Court mandated individualized inquiry into the specific needs of each" potential class member). The Court would be in the impossible position of undertaking an individualized analysis of mental health just to determine who fits within Plaintiffs' proposed definitions.

Nor can Plaintiffs cure their problem by reference to VDOC's records. Plaintiffs say "VDOC's own interrogatory responses list more than 100 individuals who have been in the Step-Down program and suffered mental disabilities since its inception." Memo. in Supp. of Mot. to Certify at 39. But Plaintiffs' argument misstates the language of VDOC's discovery responses. VDOC does not categorize inmates as having a "mental health disability." VDOC's Interrogatory Answers at 4. VDOC stated that inmates with a "Mental Health Code of 2S, 3, or 4 *may* have a mental health condition" that qualifies as a disability under the ADA and RA. *Id.* (emphasis added). As VDOC noted, "mental health conditions may be managed or successfully treated through the use of medication or other interventions such that it does not qualify as a disability," and because mental health conditions may develop over time, the "impact on the inmate can wax

or wane." *Id.* at 3.  Plaintiffs have not even produced objective evidence that the proposed class representatives fit within this category, now or at any time in the past.

The lack of ascertainability also precludes a finding of numerosity.  Under Rule 23, Plaintiffs may pursue their claims as a class action if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Courts in the Fourth Circuit have found that there is no "bright-line threshold" at which point a class is so numerous that joinder is impracticable. *Williams v. Big Picture Loans, LLC*, 339 F.R.D 46, 57 (E.D. Va. 2021).  Instead, whether joinder is impracticable is a "fact-specific inquiry that depends not only on the number of class members but also on the circumstances of the case." *Id.*  Courts consider a number of factors when considering whether joinder is practicable, including "the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Id.*  As a general guideline, a presumption of impracticability only arises when there are at least 40 members of a proposed class. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 146 (D. Md. 2022).

Plaintiffs have done nothing to demonstrate that sufficient numbers of its proposed subclass are *actually* currently suffering from an ADA and RA-qualifying mental health disability. *See Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 447 (D. Md. 2018) ("[T]he burden is on the plaintiffs to show that other class members exist and that their joinder is impracticable; a court may not rely on mere speculation that numerosity has been satisfied.").  Plaintiffs have not even provided any objective evidence, such as medical records, establishing that the proposed representatives for the disability class suffer from ADA and RA-qualifying disabilities.  And, as VDOC has noted, all inmates with a qualifying SMI diagnosis have been transferred out of the Step-Down program and

new inmates are no longer placed in the program.  *See* Vera Report at 37.  Plaintiffs have not

demonstrated that the mental health subclass is sufficiently numerous.

>    2.    <u>The Court Should Deny Certification of Either Proposed Mental Health Disabilities</u>
>          <u>Class Because There Are No Common Questions or Answers.</u>

Plaintiffs have failed to establish that the claims of the proposed Mental Health Disabilities

Classes raise common questions that have common answers.  Plaintiffs assert, for instance, that

the Court can determine on a common basis "whether the Step-Down Program discriminates

against prisoners whose mental disabilities make them incapable of completing the program."

Memo. in Supp. of Mot. to Certify at 42.  But to determine whether Defendants "discriminate[d]"

against such a class member, the factfinder would have to determine the extent of the class

member's disabilities, then determine whether those disabilities precluded the class member from

completing the Step-Down Program, and then determine whether a reasonable accommodation

was available.  Those are not questions capable of resolution on a classwide basis.  Determining

whether a particular named Plaintiff has a disability will tell the Court nothing about a single other

inmate.

Plaintiffs' other purported common questions for the Mental Health Disabilities classes are

more of the same.  "Whether VDOC's policies and practices account for and afford individuals

with mental disabilities the same opportunity to participate in or progress through the Step-Down

Program" (*id*.) depends not only on the specific individual, but on the specific mental disability.

*See*, *e.g.*, *Parent/Prof'l Advocacy League v. City of Springfield*, 934 F.3d 13, 31 (1st Cir. 2019)

(question "does the failure to provide [school-based behavior services] violate the ADA?" likely

to yield individualized rather than common answers).

Merely asserting that a question will have common answers does not make it so.  Plaintiffs have fallen well short of demonstrating that their Mental Health Disabilities classes raise common questions worthy of a class trial.

3.      Plaintiffs Cannot Satisfy the Typicality or Adequacy Requirements for the Proposed Mental Health Disabilities Classes.

The proposed class representatives do not have claims typical of the proposed Mental Health Disabilities classes, nor are the adequate representatives.  The most obvious reason is that they have not established that they are members of the putative Damages class—and Plaintiffs have not established that anyone is a member of the putative Injunctive Relief class.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (stating that a class representative "must be part of the class and possess the same interest and suffer the same injury as the class members" to satisfy adequacy requirement).

4.      The Court Should Deny Certification of a Mental Health Disabilities Injunctive Relief Class Because Plaintiffs Cannot Satisfy Rule 23(b)(2).

Plaintiffs' proposed Mental Health Disabilities Injunctive Relief Class suffers from the same lack of cohesion as the Constitutional Violations class.  If anything, the problem is worse, because by VDOC's records, no one is in the class, including the proposed representatives.  Plaintiffs have not provided for the Court even a sketch of what their hypothetical injunction would entail, or how a single injunction would inure to the benefit of the hypothetical class.

5.      The Court Should Deny Certification of a Mental Health Disabilities Damages Class Because Plaintiffs Cannot Satisfy Rule 23(b)(3).

Plaintiffs' Mental Health Disabilities Damages Class presents nothing but individualized questions that will overwhelm any trial.  Most importantly, Plaintiffs allege a wide variety of mental health issues and disabilities of varying severity, many of which predate their time in VDOC custody.  For example, among the named plaintiffs for the disability subclass, Brian Cavitt

alleges he was diagnosed with depressive disorder and oppositional defiant disorder as a teenager, and Dimitry Khavkin alleges he was previously diagnosed with psychosis, PTSD, schizophrenia, paranoia, depression, and anxiety; but Gary Wall and Steven Riddick's affidavits allege no diagnosed mental disabilities.  *See Sabata*, 337 F.R.D. at 264 (proposed class improperly comprised "members [with] different disabilities requiring unique and disparate accommodations, vitiating any commonality").  Furthermore, Steven Riddick has already challenged the conditions of his confinement in court, and lost.[6]

These variances extend to the proposed subclass as a whole.  As mentioned, the effects of Restrictive Housing vary between inmates, with some experiencing no injury at all.  And Plaintiffs have provided no evidence showing how many proposed class members actually suffer disabilities caused by a mental illness.  *See August v. Mich. Dep't of Corr.*, No. 2:16-cv-11224, 2018 WL 4679597 at *5 (E.D. Mich. Sept. 29, 2018) (denying certification because "[p]risoners each have distinct mental health backgrounds, and the impact of the Facility's conditions will impact each differently," so the "varying levels of impact" affecting the likelihood of psychological trauma ); *Sabata*, 337 F.R.D. at 266 ("[I]n determining whether a policy is unconstitutional or violates the ADA or RA, it is necessary to examine its application to individual inmates and the effect it has on them.").  It is precisely such "dissimilarities within the proposed class" which the Supreme Court warned "have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 351.

Finally, "[e]ven assuming that there are common questions of liability among putative class members in this case, the compensatory damage issues would require individualized treatment, because of the unique medical situation for each inmate." *Sawyer v. Noble*, 708 F. Supp. 2d 591,

---

[6] *Riddick*, 2017 WL 6599007.

596 (W.D. Va. 2010).  If a particular inmate has a serious mental illness, then the accommodations necessary for that inmate require an individualized approach.  By the same token, if those accommodations were absent, then no classwide formula (as yet undescribed by Plaintiffs) could accurately calculate—or even estimate—the damages due to that inmate.

## IV.     CONCLUSION

Plaintiffs take it as a given that cases filed on behalf of prisoners are entitled to class certification.  But this is not the right case for class treatment.  Plaintiffs never demonstrate that truly common issues apply across their proposed classes, or that their proposed classes are sufficiently cohesive that a single injunction could provide a universal remedy.  Moreover, Plaintiffs' claims for damages raise inherently individualized issues that defy any class adjudication.  Plaintiffs lose nothing by litigating their own claims on their own behalf.  That is the proper course here.  The Court should deny Plaintiffs' motion and grant Defendants such relief as it deems appropriate.

August 26, 2022

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239Facsimile
moshea@oag.state.va.us

Respectfully submitted,

/s/ *Maya M. Eckstein*

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of August 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

<div style="margin-left:auto;">

By:    */s/ Maya M. Eckstein*
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Defendant*

</div>

53