## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WILLIAM THORPE, ET AL.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:20CV00007 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **VIRGINIA DEPARTMENT OF** | ) | JUDGE JAMES P. JONES |
| **CORRECTIONS, ET AL.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

*Tara Lee, WHITE & CASE LLP, Washington, D.C., and Michelle Letourneau-Belock, WHITE & CASE LLP, New York, for Plaintiffs; Maya M. Eckstein and Thomas R. Waskom, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Defendants.*

In this lawsuit challenging long-term solitary confinement as practiced in Virginia prisons, the plaintiffs have moved for class certification. The defendants have responded in opposition, arguing that the plaintiff's proposed classes do not meet the necessary requirements for such certification. For the reasons that follow, I will grant the Motion for Class Certification.

I.

The magistrate judge previously detailed the plaintiffs' claims and the facts alleged in their Complaint. *Thorpe v. Va. Dep't of Corr.*, No. 2:20cv00007, 2020 WL 10354128 (W.D. Va. Sept. 4, 2020), *R. & R. adopted in part, rejected in part*, 2021 WL 2435868 (W.D. Va. June 15, 2021), *aff'd*, 37 F.4th 926 (4th Cir. 2022)

(affirming denial of motion to dismiss based on qualified immunity).  I will briefly recount those facts and the plaintiffs' claims.

A. *Solitary Confinement and the Step-Down Program.*

Since 2012, the Virginia Department of Corrections (VDOC) has operated a so-called Step-Down Program (Program) in its two maximum security prisons.[1]  The Program purports to provide inmates placed in long-term solitary confinement an opportunity to earn a reduction in their severe conditions of confinement, leading them eventually to the general prison population.   The Program consists of VDOC Operating Procedure 830.A (Segregation Reduction Step-Down Program), associated guidelines (Security Level S and Level 6 Operations Strategy: Restrictive Housing Reduction Step-Down Program), and it is related to and affected by several other VDOC operating procedures, including those on the topics of security level classification, classification management, and restorative housing (solitary confinement).   A brief review of the current version of the Program and the associated VDOC policies and practices follows.[2]

---

[1]  VDOC has indicated that it no longer maintains solitary confinement at one of the two prisons, Wallens Ridge State Prison (Wallens Ridge).  Defs.' Br. Opp'n 5 n.1, ECF No. 195.  At oral argument and in their reply brief, the plaintiffs stated that they seek relief to address the Program that now only operates at a single facility, Red Onion State Prison (Red Onion

[2]  The effective date of the current Segregation Reduction Step-Down Program Operating Procedure is February 15, 2018.  The earlier version, effective February 18, 2013, does differ.  Pls.' Corrected Mem. Supp. Ex. 2, ECF No. 174-2.  For example, some

Security Level S (SL-S) is VDOC's highest inmate security classification, intended for those prisoners who VDOC believes require management in solitary confinement.[3]  Per current VDOC policy, assignment to SL-S requires a formal hearing, which comes with certain procedural protections such as the right to call and question witnesses and to be advised of the reason for the decision.  Such assignment also requires approval of the Facility Unit Head and the Regional Operations Chief.

After being classified at SL-S, inmates are assigned to one of two management pathways, Intensive Management (IM) or Special Management (SM), by recommendation of a Dual Treatment Team and based on the inmate's "identified risk level." Pls.' Corrected Mem. Supp. Ex. 1, Operating Procedure 830.A at 3, ECF No. 174-1.[4]  Inmates on the more restrictive IM pathway are those that purportedly

_____

of the privileges available at each privilege level are different from those privileges now in effect and described below.

[3] After the filing of this suit, VDOC began calling the subject housing "restorative housing."  Prior to 2021, VDOC referred to it as "restrictive housing."  I will refer to this housing arrangement in the more traditional way as solitary confinement.

[4] Since the plaintiffs' filing of their Corrected Memorandum of Law in Support, ECF No. 174, they have filed another amended memorandum to account for additional class counsel and to make a correction on page 20.  Pls.' Am. Mem. Supp., ECF No. 191-4.  The plaintiffs now also seek leave to amend certain sections of the amended memorandum to account for another change in class counsel.  Pls.' Mot. for Leave, ECF No. 264.  Despite these amendments, a majority of the exhibits submitted with the plaintiffs' corrected memorandum filed at ECF No. 174 remain operative, and therefore I will cite to that docket entry where appropriate.

have the potential for "extreme and/or deadly violence." *Id.* at 1.  In contrast, the SM pathway is for those inmates with a history of repeated disruptive behavior, fighting, or resistance "without the intent to invoke serious harm or the intent to kill." *Id.* at 1–2.  Inmates are not provided the same procedural protections for IM pathway assignments as they are for SM classification.

After being assigned a pathway, inmates are then given a choice as to whether they will participate in the Program.  Those who do not participate are designated and stay at the applicable initial privilege level, either IM0 or SM0, "which are non-privilege statuses where offenders merely serve their time." *Id.* at Ex. 3, Security Level S and Level 6 Operations Strategy, 20, ECF No. 188.  Thus, these inmates are ineligible for security level reduction, and in effect, any chance at living with the general prison population, and are must receive meals, clothing, and legal and religious materials in their cells.

Those who do chose to participate in the Program purportedly "can begin the process to earn increasing privileges and eligibility for classification reduction." *Id.* Inmates, in theory, can progress from privilege level IM0 or SM0, to IM1 or SM1, and then to IM2 or SM2 by meeting certain disciplinary goals — responsible behavior goals, including personal hygiene, standing for count, cell compliance, and satisfactory rapport with staff and others — and Program participation goals, which include the completion of journals.  Operating Procedure 830.A at 4–5, ECF No.

174-1.  To do so, inmates must receive a certain number of "good" ratings on their

goals and cannot receive more than a certain number of "poor" or "incomplete"

ratings.  Additionally, per current written policy, inmates on the IM pathway must

go six consecutive months without certain disciplinary charges before progressing

to a higher privilege level, which equates to a minimum of 18 months before an IM

pathway inmate is eligible for reduction to the second highest security level, Security

Level 6 (SL-6).    Security Level S and Level 6 Operations Strategy App. F at 50,

ECF No. 188.  Inmates on the SM pathway must go three consecutive months

without certain disciplinary charges to progress to the next privilege level.  *Id.* App.

G at 55.[5]  After successfully progressing through the Level S pathway privilege

levels, inmates then are then eligible to step down to SL-6.

Each IM/SM level brings increased privileges related to phone calls, in-cell

TVs, commissary allowances, and job eligibility.  *Id.* Apps. F, G at 49, 54.  However,

all SL-S IM and SM inmates are housed in a single cell, permitted only three showers

per week, and are limited to non-contact visits, except for attorney visits.  *Id.*; Pls.'

Corrected Mem. Supp. Ex. 16, Operating Procedure 851.1 at 12, ECF No. 174-16.

Intensive Management inmates are permitted only in-cell programming until it is

---

[5]  The security classification for SM inmates who reach SM-2 is now reduced from
SL-S to SL-6.  Security Level S and Level 6 Operations Strategy at 31, ECF No. 188.  In
other words, currently only two SM pathway privilege levels, SM0 and SM1, are part of
SL-S, where three IM privilege levels are: IM0, IM1, and IM2.

determined to be appropriate to move the offender to either what the VDOC calls "Therapeutic Modules," — small cage-like structures — or "Security Chairs," small chairs and tables to which the inmate is restrained.  Security Level S and Level 6 Operations Strategy at 22, 13, ECF No. 188.  For SM offenders, programming takes place in "approved program areas."  *Id.* at 22.  It is not until inmates on both pathways reach a certain stage in SL-6 that programming may be expanded to include small groups, and for SM inmates, unrestrained small groups.  *Id.*

At SL-6, IM inmates are eligible to earn even more privileges in Closed Phase I and Closed Phase II of that security status.  *Id.* at 30.  Eligibility to move from IM Closed Phase I at SL-6 to IM Closed Phase II requires twelve months of "successful and charge free housing assignment."  *Id.*   Phase II inmates "may be allowed to move unrestrained . . . at the discretion of the building committee."  *Id.*  However, IM inmates at SL-6 "will continue to be managed . . . [in] single celled housing, segregated recreation, and out of cell restraints."  Operating Procedure 830.A at 7, ECF No. 174-1.  SM inmates transferred similarly earn more privileges in Phase I and Phase II of the Program.  Only SM inmates who progress to Step-Down Phase II are allowed to live in two-inmate cells.  *Id.* at 6.

Inmates with mental health diagnoses may be assigned to a Secure Allied Management (SAM) pod instead of being required to complete SL-6 Phase I and II, but those inmates still must successfully meet SM1 and SM2 goals.  Security Level

S and Level 6 Operations Strategy at 31, ECF No. 188.  Programming in this pod focuses on "stabilizing the offenders' mental status and increasing their resiliency to determine if they are appropriate for living in general population or if they should remain in a SAM environment."  *Id.*

The Program encompasses several review processes that affect how participating inmates progress through it.  Inmates are formally reviewed "at a minimum of every 90 days . . . or more frequently as necessary."  *Id.* at 13.   As discussed previously, a formal hearing is required when VDOC is considering removing an inmate from general population status or when VDOC may increase the inmate's security level.  Operating Procedure 830.1 at 4, ECF No. 195-7.  Formal hearings are also required for removals from solitary confinement and removals from the SAM unit.  *Id.* at 5, 6.  However, at hearings constituting interim reviews of "on-going [] restorative housing assignments," inmates are not entitled to the right to hear the testimony or statement of the Reporting Officer or the right to call and question witnesses.  *Id.* at 8.

Additionally, there is a bi-annual external review team review of inmates assigned to SL-S and SL-6.  Operating Procedure 830.A at 10, ECF No. 174-1.  Notably, wardens are responsible for reassignment decisions from SL-S to SL-6 or SL-6 back to SL-S.  *Id.*  Wardens make recommendations, with a review by the

Regional Operations Chief or Regional Administrator, for an inmate's reassignment from SL-6 to Level 5. *Id.*

Counselors and corrections officers rate inmates on the Program goal categories each week, ratings which affect an inmate's ability to progress through the privilege levels. *Id.* at 5. Treatment Officers rate each inmate's Program participation which can have similar implications as the goal category ratings. "Offenders that do not meet the standards for disciplinary, responsible behavior, and/or self-improvement and programming can be placed back to a lower incentive level by decision of the Building Management Team." *Id.* at 6.[6] When an inmate "receive[s] a serious disciplinary offense or refuses over a period of time to meet standards for responsible behavior or program participation, the Building Supervisor or higher authority can decide to immediately lower an offender's status," a decision which is reviewed by the Building Management Team. *Id.*

The Dual Treatment Team informally reviews inmates and makes recommendations to the Regional Operations Chief and the Warden, including recommendations regarding whether inmates should move to higher privilege statuses. *Id.* at 11.

---

[6] The Building Management Team is defined as "[a] multidisciplinary team comprised of staff assigned to work in the housing unit that tracks, measures, and advances or lowers offenders to appropriate privilege levels based on established criteria." *Id.* at 2.

The Building Management Committee makes recommendations to the Dual Treatment Team and the Institutional Classification Authority (ICA) about inmates' privilege assignments, and it also makes recommendations, by consensus, to the Chief of Housing and Programs who has decision-making responsibility. *Id.* at 12. In other words, the formal ICA hearing decision discussed above relies on the Building Management Committee's recommendations. Pls.' Corrected Mem. Supp. Ex. 38, King Dep. at 180, ECF No. 174-38.

## B. *The Plaintiffs and Proposed Classes.*

The eleven named plaintiffs, William Thorpe, Frederick Hammer, Dmitry Khavkin, Gerald McNabb, Gary Wall, Vernon Brooks, Brian Cavitt, Derek Cornelison, Peter Mukuria, Steven Riddick, and Kevin Snodgrass, are or have been inmates at either Wallens Ridge or Red Onion, have been held in solitary confinement at SL-S and some later at SL-6, were or are subject to or were given the opportunity to participate in the Program and were subject to the applicable policies. The minimum amount of time any of the named plaintiffs have spent in the Program is over two years, with several of the named plaintiffs having spent at least five years in the Program, and several were subject to solitary confinement before VDOC implemented the Program and thus have spent even longer in solitary confinement within the VDOC system.

The plaintiffs report similar experiences during their time at SL-S and SL-6 in Red Onion or Wallens Ridge, including experiencing regular body cavity inspections, and spending upwards of 22 to 24 hours each day in an eight-by-ten cell with only very limited personal interactions with prison staff. Many of the named plaintiffs also report having experienced revoked recreation time, Program denials due to non-violent and even sometimes dismissed disciplinary charges, and failures on the part of VDOC officials to explain the Program or why they were initially assigned to a certain privilege pathway within the SL-S classification. Other plaintiffs report having completed Program requirements but experienced delays in advancement because it took extended periods of time to receive the next Program workbooks or because there was no room in the SL-6 closed pods. Several of the plaintiffs also report having received ICA hearing reports which explained their security status for the conclusory reason that they were housed appropriately, and others report not having the opportunity to participate in the hearings or experiencing that their security status decision had already been made prior to the hearing. Most of the plaintiffs report having experienced similar mental health effects, including weight loss, suicidal thoughts, trouble sleeping, trouble concentrating, depression, and anxiety. Some of the plaintiffs report that these conditions started after they were placed in solitary confinement. Others report having a history of health issues that were exacerbated by their time in such confinement.

The plaintiffs filed this action alleging, in relevant part, that the policies and practices associated with the Program violate the Constitution, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA) by requiring prisoners "to languish in solitary confinement for extended and unnecessary periods of time," because the Program's assignment and assessment criteria are vague and enforced arbitrarily, inmates are denied meaningful review, and the Program fails to account for mental disabilities.  Pls.' Corrected Mem. Supp. 1, ECF No. 174.  After the resolution of the defendants' Motion to Dismiss, the following claims survive:

> Count II: The defendants have violated inmates' liberty interest in avoiding long-term solitary confinement by using vague and subjective criteria and by failing to provide meaningful review in violation of the Fourteenth Amendment.

> Count V: The defendants have deliberately inflicted unnecessary and wanton pain on the inmates subjected to long-term solitary confinement in violation of the Eighth and Fourteenth Amendments.

> Counts VI and VII: The defendants have violated the ADA and the RA by holding inmates in solitary confinement who have mental disabilities without proper services, by selecting criteria that disproportionately prevents mentally ill inmates from progressing to the general population, and by failing to reasonably accommodate inmates with mental health disabilities.

The defendants, VDOC and its responsible officials, have raised certain affirmative defenses, including in relevant part, qualified immunity and statutes of limitation.

On June 20, 2022, the plaintiffs filed this motion to certify a class action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The plaintiffs seek to certify the following classes:

> *Constitutional Violation Injunction Class*: All persons who are currently, or will in the future, be confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program. [Class One]
>
> *Constitutional Violation Damages Class*: All persons who from August 1, 2012 to the present who have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program. [Class Two]
>
> *Disabilities Injunction Class*: All persons who are currently, or will in the future, be confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the ADA or the RA. [Class Three]
>
> *Disabilities Damages Class*: All persons who from August 1, 2012 to the present have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels subject to any phase of the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the ADA or the RA. [Class Four]

Pls.' Second Am. Mot. 1, ECF No. 264-1.

The defendants argue that the plaintiffs' motion should be denied in its entirety, contending that the plaintiffs have failed to satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements, as well as Rule 23(b)(3)'s predominance and superiority requirements, as to the constitutional violation

- 12 -

classes. The defendants also assert that the court should deny the constitutional injunctive relief class because the plaintiffs have not met their burden under Rule 23(b)(2), and that the plaintiff's disabilities classes fail all the Rule 23(a) requirements as well as the applicable Rule 23(b) requirements. The parties have fully briefed and argued the motion, and it is ripe for decision.

## II.

The Federal Rules of Civil Procedure require that a party seeking class certification satisfy four prerequisites: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). In addition, "the class action must fall within one of the three categories enumerated in Rule 23(b)." *Id.* 357 (citation omitted). Here, the plaintiffs seek certification of the two injunction classes under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class," and certification of the two damages classes under Rule 23(b)(3), which requires that common issues predominate over individual ones and that proceeding as a class is superior to other available methods of litigation. Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* At the certification stage, the court may be required to "probe behind the pleadings" and "take a close look at the facts relevant to the certification question." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006) (internal quotation marks and citation omitted). The "likelihood of the plaintiffs' success on the merits, however, is not relevant to the issue of whether certification is proper." *Id.* "[F]ederal Courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . judicial efficiency." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (internal quotation marks and citation omitted).

## A. *Rule 23(a) Requirements.*

### 1. Numerosity and Ascertainability.

To satisfy numerosity, the plaintiff must show that the class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). There is "[n]o specified number [that] is needed to maintain a class action. Rather, an application of the rule is to be considered in light of the particular circumstances of the case."

*Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (internal quotation marks and citation omitted).  A class of 74 members has been upheld as sufficiently numerous.  Indeed, a class of only 18 members has been approved.  *Id.*

Here, as of July 2021, almost five hundred individuals have spent time at SL-S since 2012.  Pls.' Mem. Opp'n Mot. Strike Ex. 1, Graham Rebuttal Decl. Ex. A, ECF No. 199-1.  Over five hundred inmates have been categorized as SL-S or SL-6 during that time.  *Id.*  As of that same date, almost 90 individuals were then-currently classified at SL-S, and over 200 at SL-S or SL-6.  *Id.* at Ex. B.  I therefore find that numerosity is satisfied as to both constitutional violations classes, Classes One and Two.  Furthermore, I find that class members are easily identifiable from VDOC records, satisfying Rule 23's implicit ascertainability requirement.  *EQT Prod. Co.*, 764 F.3d at 358.

I turn next to the two proposed disabilities classes, Classes Three and Four. The data compiled by the plaintiffs' data consultant shows that as of July 2021, the number of then-current individuals with mental health issues, defined as those from certain VDOC-provided subclass lists, was only eight.  *Id.* at Ex. C.  However, a VDOC discovery response lists 74 individuals who were assigned a VDOC mental health code of 2S, 3, or 4 at the time of their SL-S or SL-6 security level classifications, between August 2012 and July 31, 2021.   Pls.' Corrected Mem. Supp. Ex. 56, VDOC Obj. & Answers to Pls.' Interrogs. 4–5, ECF No. 172-5.

Mental health code MH-2S or higher covers inmates who, at a minimum, have a "documented significant DSM diagnosis with SMI criteria," defined as a "Psychotic Disorder, Bipolar Disorder, Major Depressive Disorder, Posttraumatic Stress Disorder (PTSD) or Anxiety Disorder, or any diagnosed mental disorder . . . that substantially interferes with a person's ability to meet the ordinary demands of living." *Id.* at Ex. 59, Operating Procedure 730.2 at 3–4, 14, ECF No. 174-61.

The plaintiffs' proposed disabilities classes are defined as encompassing individuals who are qualified as disabled under the ADA and RA.  Under both statutes, a person has a disability if they, in relevant part, have a "mental impairment that substantially limits one or more major life activities of such individual," have "a record of such an impairment," or are "being regarded as having such an impairment."  42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B) (defining disability as it is defined in the ADA).  Congress has directed courts, through an amendment to the ADA, to construe this definition broadly and "to the maximum extent permitted." *Williams v. Kincaid*, 45 F.4th 759, 766 (4th Cir. 2022) (internal quotation marks and citation omitted).   I find that the statutory definition encompasses those inmates classified as M-2S and higher based on the definitions within the VDOC's own classification policy, and likely encompasses individuals who are classified by the VDOC at even lower mental health classification codes.  Thus, the individuals reported by VDOC fit within the putative class, and I find that that number satisfies

Rule 23's numerosity requirement.  Furthermore, I agree with the plaintiffs that in terms of the Disabilities Injunction Class, Class Three, the "fluid nature of a plaintiff class — as in the prison-litigation context — counsels in favor of certification of all present and future members."  *Braggs v. Dunn*, 317 F.R.D. 634, 653 (M.D. Ala. 2016) (internal quotation marks and citations omitted).  The same can be said of the Constitutional Violations Injunction Class.

I also find that class members for both disabilities classes are ascertainable from VDOC records.[7]  VDOC policy requires initial mental health screening. Operating Procedure 730.2 at 5, ECF No. 174-61.  Additionally, VDOC policy dictates that additional evaluations should be completed at any time deemed necessary.  *Id.* at 12.  Mental health classifications are supposed to be entered into VDOC's data keeping system promptly.  *Id.* at 18.  Moreover, defendants' discovery responses, as well as other VDOC records, including medical records and mental health services progress notes, indicate that class members can be easily identified.

---

[7]  I need not decide whether ascertainability applies to Rule 23(b)(2) injunction classes (Classes One and Three) but join other courts that have granted Rule 23(b)(2) certification of injunctive classes including future persons who will be affected by a defendant's actions. *Scott v. Clarke*, 61 F. Supp. 3d 569, 572–73 (W.D. Va. 2014)*; Clarke v. Lane,* 267 F.R.D. 180, 199 (E.D. Pa. 2010); *Robert E. v. Lane*, 530 F. Supp. 930, 941 (N.D. Ill. 1981).

2.  Commonality.

The "threshold requirements of commonality and typicality are not high." *Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009) (internal quotation marks and citation omitted).  Commonality requires that there are questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  Although "[e]ven a single [common] question" suffices, not just any common question will do.  *Wal-Mart Stores Inc.*, 564 U.S. at 359 (citation omitted).  The common question must be of such a nature that its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  Put differently, although the rule speaks in terms of common questions, "[w]hat matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* (internal quotation marks and citation omitted).

Here, as highlighted by the plaintiffs, there are multiple factual questions common to the constitutional violation classes.  These include, but are not limited to, the following: (1) "Whether the Step-Down Program subjects individuals to indefinite solitary confinement;" (2) "Whether and to what extent do individuals subjected to the Step-Down Program are provided meaningful of their assignments to or within Level-S or Level-6;" and (3) "Whether VDOC's use of solitary confinement pursuant to the Step-Down Program creates an unacceptable risk of significant mental and physical harm to prisoners."  Pls.' Am. Mem. Supp. 30, ECF

No. 191-4.  There are also numerous applicable common issues of law, including, but not limited to, the following: (1) whether the Program violates an inmate's due process rights; (2) whether the Program provides adequate review to protect participants' interest in avoiding long-term solitary confinement; and (3) whether VDOC lacks adequate criteria for determining whether there is a valid purpose in maintaining inmates in solitary confinement.  *Id.* at 30–31.

As for the disabilities classes, common issues include, but are not limited to, the following: (1) whether the Program provides individuals with mental disabilities the opportunity to progress through it; (2) whether there are means for prisoners with mental disabilities to request and receive accommodations while in the Program to ensure equal access to its benefits; and (3) whether the Program discriminates against those inmates with mental illnesses.  *Id.* at 42.

These issues do not involve a challenge to "a constellation of disparate" practices under a vague umbrella of systemic failures, *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011), or overbroad complaints, such as alleged inadequacies in prison healthcare services, that is made up of "a breath-takingly wide variety of policies and procedures" and a variety of distinct complaints about the conditions in solitary confinement generally.  *Sabata v. Neb. Dep't Corr. Servs.*, 337 F.R.D. 215, 262 (D. Neb. 2020).  Rather, the issues all pertain to a single, albeit multi-faceted, VDOC program and related practices that are directly tied to

- 19 -

the Program and all four proposed classes. Underpinning this is evidence of VDOC's written operating procedures, that either are part of the Program or that trigger it or otherwise affect its operation, and affidavits from the named plaintiffs detailing common experiences in the Program, including experiences related to their initial security level classification, the review process, and their ability to progress through the Program.

The defendants argue that even if there are common questions, the plaintiffs' conditions of confinement claims are fact-specific, that the Program has changed over time, and that these differences, as well the challenges to different facets of the Program produce no common answers. I disagree. It is true that the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation" is a central tenant of class certification. *Wal-Mart Stores Inc.*, 564 U.S. at 350 (internal quotation marks and citation omitted). However, I find that any dissimilarities present here do not "impede the generation of common answers." *Id.* (internal quotation marks and citation omitted). The plaintiffs have more in common than just the fact that they are inmates with a variety of complaints about prison life that implicate numerous policies. *Sabata*, 337 F.R.D. at 266–67. Rather, the Program is the "glue" holding all the plaintiffs' experiences together. *Wal-Mart Stores Inc.*, 564 U.S. at 352. Even if inmates at varying stages of the Program experienced and will in the future experience evolving conditions to the extent that

they have or will progress through the Program, the evidence shows, as demonstrated both by the written policies that make up the Program, the plaintiffs' affidavits, and testimony from those familiar with the Program, that all of the named plaintiffs and absent class members began or will begin at the initial privilege levels of IM0 or SM0 and have experienced or will experience similar conditions of confinement, and uniform barriers to Program progression and review processes tied to the Program. Moreover, I do not find that the minor changes to the Program over time are significant enough to preclude certification. Finally, as applicable to the proposed disabilities classes, I find that any "factual differences regarding [plaintiffs'] disabilities [do] not defeat commonality" because the plaintiffs are challenging specific policies and practices, all tied to one VDOC program, that affects all class members. *Bumgarner v. NCDOC*, 276 F.R.D. 452, 456 (E.D.N.C. 2011).

In sum, all putative class members' claims arise from the same conduct and are based on the same legal theories. Thus, I find that there exist issues and answers that are sufficient to survive the commonality requirement as to the plaintiffs' four proposed classes.

### 3. Typicality and Adequacy.

Typicality concerns whether the class representatives are members of the class and "possess the same interest and suffer the same injury as the class members."

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks and citations omitted). The analysis is grounded in principles of due process and serves as a guidepost for whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at 157 n.13. It is closely related to the commonality requirement as well as the adequacy of representation inquiry. *Wal-Mart Stores Inc.*, 564 U.S. at 349 n.5.

The final Rule 23(a) requirement is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The inquiry is two-fold. First, proposed class representatives must be members of the class they purport to represent, and their interests must not conflict with those of the other class members. *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338–39 (4th Cir. 1998). Second, class counsel must be "qualified, experienced and generally able to conduct the proposed litigation." *Messer v. Bristol Compressors Int'l, LLC*, No. 1:18CV00040, 2019 WL 2550328, at *4 (W.D. Va. June 20, 2019) (internal quotation marks and citation omitted).

The plaintiffs contend that Rule 23's typicality requirement is satisfied for all classes for the same reasons the commonality requirement has been met — the plaintiffs' claims and those of putative class members arise from the same program applicable to all SL-S and SL-6 classified inmates, and that the same proof forms

the basis of each class member's liability claims.  As for the two disabilities classes, the plaintiffs also point to four plaintiffs that have "indisputable ADA and RA-qualifying disabilities."  Pls.' Am. Mem. Supp. 42, ECF No. 191-4.  The defendants, on the other hand, argue that unique defenses exist pertaining to certain plaintiffs that defeat typicality and adequacy, and that the plaintiffs have failed to establish that they are members of the proposed disabilities classes.

I begin with the two proposed constitutional violations classes, and I find that the plaintiffs have sufficiently established typicality and adequacy.  I agree with the plaintiffs that the evidence sufficiently shows that the plaintiffs' interests also advance the interest of the absent class members.  *Scott*, 61 F. Supp. 3d at 589.  The Fourteenth Amendment and Eighth Amendment claims of both the plaintiffs and the absent class members are based on a uniform program and accompanying policies that dictated the types of conditions to which class members were subjected and if and how class members were permitted to progress through the Program and earn the ability to reside with and have the privileges of the general prison population. The named and absent plaintiffs were all subject to the same allegedly unlawful practices that governed their placement at SL-S, and any minor variations in their actual experiences in confinement and at varying stages of the Program do not defeat typicality.  *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named

plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."). Nor do the named plaintiffs appear to have any interest antagonistic to the rest of the putative class.

The crux of defendants' argument regarding typicality as to the constitutional violations classes is that unique defenses exist as to a certain named plaintiff, namely Snodgrass (res judicata, collateral estoppel, and statute of limitations), and "some" others that are subject to limitations defenses. Defs.' Br. Opp'n 32, ECF No. 195. However, the existence of these arguable defenses is not the type that render the plaintiffs' claims atypical in that they would require considerable time for rebutting the defenses to which the other class members are not otherwise subject. *Cf. Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007). As discussed *infra*, individual hearings will not be necessary to determine if the defendants' asserted defenses are applicable. Rather, "it appears highly likely that th[ese] defense[s] can in fact be resolved on a class-wide basis, at least in large part." *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 398 (M.D.N.C. 2015), *aff'd,* 925 F.3d 643 (4th Cir. 2019). In other words, "[t]o the extent resolution of [plaintiffs'] defense[s] involve[] any inquiry into individual circumstances, such an inquiry is simple and mundane." *Id.* The existence of potential defenses by a small number of plaintiffs, as few as one, does not defeat typicality or adequacy.

I turn next to the proposed disabilities classes. The defendants dispute typicality as to the disabilities classes but do so in a conclusory manner by contending merely that the "proposed class representatives do not have claims typical" of the proposed classes. Defs.' Br. Opp'n 50, ECF No. 195. I disagree and I find that the plaintiffs have satisfied their burden.

Again, the named plaintiffs were all subject to the same Program rules and requirements, despite some minor differences in the privileges they were entitled to depending on when they first entered the Program, and the same evidence forms the basis of all named and absent class members' liability claims. The plaintiffs have submitted affidavits indicating similar mental impairments caused and/or exacerbated as a result of their experience in solitary confinement as part of the Program and evidence showing that there are no exceptions to the Program's requirements for inmates with mental health impairments. Moreover, it "does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different [] needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each []other or to every class member." *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). None of the named plaintiffs appear to have any interest antagonistic to the rest of the two putative disabilities classes.

Furthermore, the plaintiffs' evidence, in the form of affidavits, shows that four of the proposed class representatives — Cavitt, Khavkin, Riddick, and Wall — have a history of mental impairments that certainly would qualify as disabilities under the ADA and RA given those statutes' broad definition of disability, as discussed *supra*. For example, Wall reports suffering from depression, anxiety, suicidal ideations, and stress-related weight loss, ailments for which he submitted requests for treatment while he was incarcerated. Khavkin attests to depression, anxiety, Post-Traumatic Stress Disorder, and other diagnoses. Khavkin requested to see a psychiatrist while at Red Onion. Cavitt and Riddick also report having histories of mental illness diagnoses for which VDOC was aware. Thus, these plaintiffs have sufficiently established that they are members of the disabilities classes they purport to represent.

Finally, the defendants do not challenge the second prong of adequacy as to any of the classes, that which relates to class counsel. The record shows that class counsel has experience litigating complex class actions, including class actions involving prisoners, and there are no apparent conflicts of interest for counsel.[8]

---

[8] Since the time the present motion was initially briefed and was argued, the plaintiffs have moved for leave to file amended class certification materials to account for Covington & Burling LLP being substituted as lead counsel alongside co-counsel Ali & Lockwood and the ACLU of Virginia with White & Case LLP and Hogan Lovells US LLP withdrawing from the case. Pls.' Mot. Leave, ECF No. 264. The defendants do not oppose the motion, nor do they contest that counsel is adequate. Accordingly, I find it appropriate to grant the motion.

Accordingly, I find that the plaintiffs have sufficiently established Rule 23(a)'s typicality and adequacy requirements for all four proposed classes.

### B. *Rule 23(b) Requirements.*

Having concluded that Rule 23(a) prerequisites are met, I now turn to whether the plaintiffs have satisfied the predominance and superiority requirements of Rule 23(b)(3) as to the two proposed damages classes, Class Two and Class Four, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997), as well as to whether final injunctive relief is appropriate under Rule 23(b)(2) as to the proposed injunction classes, Class One and Class Three. *Wal-Mart Stores, Inc.*, 564 U.S. at 361.

### 1. *Damages Classes: Rule 23(b)(3) Predominance.*

To satisfy Rule 23(b)(3), a plaintiff must show that common questions of law or fact predominate over individual questions. "The predominance requirement is similar to but 'more stringent' than the commonality requirement of Rule 23(a)." *Thorn*, 445 F.3d at 319 (citation omitted). It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod. Inc.*, 521 U.S. at 623. The predominance inquiry focuses not just on the existence of common questions, but on how any common questions "relate to the controversy at the heart of the litigation.*" EQT Prod. Co.*, 764 F.3d at 366. I must determine whether the defendants engaged in practices that are common to all class members;

- 27 -

whether these common questions bear on the ultimate question of whether the defendants violated the Eighth and Fourteenth Amendments (Class Two) or the ADA and RA (Class Four); and determine if these common practices and questions are "sufficient to ensure that the class members' common issues [will] predominate over individual ones." *Adair v. EQT Prod. Co.*, 320 F.R.D. 379, 401 (W.D. Va. 2017) (citation omitted).

As discussed previously, common questions exist, as does a common program that was experienced by all class members in both damages classes. Furthermore, I find that the Program and the defendants' practices associated with it bears on the ultimate question of whether the defendants violated the Constitution and the ADA and RA. Thus, I turn to the final part of the inquiry — whether these common practices and questions which strike at the heart of the litigation are sufficient to ensure that the class members' common issue predominate over individual ones.

The defendants argue that individual issues predominate because there are varying conditions of confinement across privilege levels and over time, differing penological justifications for each condition, and that damages determinations will require an individualized analysis. However, I agree with the plaintiffs that the variances pertaining to the conditions of confinement and reasons for such conditions are inconsequential. The fact is that every class member is subject to the uniform set of policies that make up the Program. These policies strike at the heart

of the litigation here, governing things such as (1) how to advance; (2) the minimum length time for prisoners to advance and return to the general population notwithstanding their dangerousness, and (3) the frequency and quality of assessments of inmates while in the Program.  Moreover, as the record shows, every prisoner classified at higher privileges levels and at SL-6 was once at SL-S, either on the IM or SM pathway, which come with similar, restrictive conditions.  All prisoners at any privilege level at either SL-S or SL-6 are still subject to the same Program goals related to topics like hygiene, attitude, and Program participation and are evaluated based on the same metrics.  I also find that variations in conditions of confinement because of changes to the Program over time, for example, changes that increased out-of-cell time to four hours and permit limited small group recreation for SM2 prisoners, will not require a fact-intensive analysis nor do they indicate that individual issues predominate.

The defendants also maintain that there are variations in the applicable affirmative defenses across the proposed damages classes, pointing to statute of limitations and qualified immunity defenses, which they say are fact-intensive and therefore defeat predominance.  However, as discussed *supra*, "the presence of affirmative defenses does not 'automatically' render class certification inappropriate." *Krakauer*, 311 F.R.D. at 397.

The Fourth Circuit has opined that when the court is required to undertake a fact-intensive look at the record for each plaintiff, such as inspecting each plaintiff's individual deposition testimony to determine whether each had the knowledge required to determine the applicability of the statute of limitations defense, common issues do not predominate.  *Thorn*, 445 F.3d at 320–22.  However, "[a]ffirmative defenses will foreclose a finding that common issues predominate only where they are, for some reason, unusually important or are coupled with other individual issues."  William B. Rubenstein, 2 *Newberg and Rubenstein on Class Actions* § 4:55 (6th ed. 2022).

Here, the defendants argue that some putative class members' claims will be time-barred.  The defendants point to the rule that the statute of limitations begins to run when each plaintiff knew or should have known of his injury and argues that this would require the court to conduct an individualized inquiry to determine when each plaintiff became aware of his injury.

The plaintiffs concede that the applicable limitations periods are two years for the constitutional claims and one year for the ADA and RA claims.   They contend that the statute of limitations defense applies only to the damages class, and that the defendants' concerns are only pertinent to the claim accrual of those potential plaintiffs who fall outside the statute of limitations, and that such instances do not predominate.

I agree that the statute of limitations defense is only applicable to the two proposed damages classes, Class Two and Class Four, and I find that the plaintiffs have met their burden in showing that the statute of limitations defense can be resolved on a class-wide basis.  Federal law determines when the cause of action accrues, which triggers the applicable statute of limitations period.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).  The defendants are correct in pointing out that civil rights claims accrue when a plaintiff knows or has reason to know of the injury which forms the basis of the action.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011).

However, I do not find that the facts underlying this case require a complex, individualized inquiry to determine the accrual date.  Unlike in *Thorn*, where the asserted discriminatory treatment came in the form of differing, race-based life insurance rates and there was an issue as to whether and when each plaintiff knew of the hidden dual-rate practices, 445 F.3d at 316, the injury here does not stem from an obscured treatment of another class of persons.  Nor is the statute of limitations defense or claim accrual here dependent on some other obfuscation or misrepresentation that requires an inquiry into every putative class member's state of mind.  *Broussard*, 155 F.3d at 342.  Rather, the alleged injuries, both constitutional and statutory, stem from the class members' first-hand experiences with the Program rules and resulting conditions of confinement and their ability to

progress through the Program, which would have been apparent to class members as they were subjected to the Program and the associated policies and practices. Based on the evidence in the record thus far, the plaintiffs have shown that those policies and practices related to each of the plaintiffs' substantive claims are not made up of a single occurrence, but rather were, and in some cases still are, a continuing series of acts, meaning the limitations period is not triggered until the unlawful conduct has ended. *DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018). Accordingly, I find that any statute of limitations determination could be made objectively and administratively based on when a plaintiff exited the Program,[9] without an individualized, burdensome inquiry into each class member's state of mind. *Cf. Comer v. Life Ins. Co. of Ala.*, No. 0:08-228-JFA, 2010 WL 233857, at *7 (D.S.C. Jan. 14, 2010) ("Because determining when the statute began to run may be accomplished through the use of a simple spreadsheet or other database mechanism, the court finds that issues concerning the statute of limitations should not require mini-trials and do not prove fatal to the predominance analysis."). In other words,

---

[9] *Cf. Johnson v. Wetzel*, 431 F. Supp. 3rd 666, 676 (W.D. Pa. 2019) ("[The defendant] has not alleged a series of distinct wrongs but rather he has claimed that Defendants' conduct is part of a continuing seventeen-year practice of unconstitutionally restricting him to solitary confinement. The rationale underlying the continuing violation doctrine applies to this type of claim. Because [the defendant] filed suit within two years [the applicable limitations period] of his release from solitary confinement, he is entitled to challenge all conduct that was a part of that alleged violation of his rights, even conduct that occurred outside the limitations period.").

the determination is subject to a common analysis and proof. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 158 (D. Md. 2022) ("A statute of limitations question that can be answered by referring to objective information to determine whose claims fall inside and outside the applicable limitations period does not defeat predominance. In other words, individual variation may exist between plaintiffs.") (internal citations omitted).

"The paramount concern for the court is not merely the number of individual inquiries that may be required, but rather whether the nature of the individual inquiries involved is so complex as to outweigh the nature of the common issues sought to be resolved by class treatment." *Brooks v. GAF Materials Corp.*, No. 8:11–cv–00983–JMC, 2012 WL 5195982, at *8 (D.S.C. Oct. 19, 2012), *clarified.*, 2013 WL 461468 (D.S.C. Feb. 6, 2013).   Thus, to the extent that a time-barred prisoner's disability might have affected his ability to recognize his injuries, which might theoretically extend the applicable accrual date for that prisoner, I find that any such theoretical issue does not predominate given the common issues present here. *Id.* at *6 ("If each prospective class member's case was tried separately, each would have to present duplicative evidence and expert testimony . . . . It is a more efficient use of court and litigant resources to allow class treatment of these common issues despite the need for limited individualized inquiries regarding affirmative defenses.").

However, if it becomes apparent that the statute of limitations defense can no longer be determined objectively or administratively, or that the accrual determination requires more than limited individualized inquiries, a party may move, or the court may later determine it necessary, to decertify or otherwise modify the damages classes.

I turn now to the defendants' argument that its asserted qualified immunity defense creates individual issues as to the plaintiffs' Eighth Amendment claim that predominate. I disagree. Predominance is an issue when individualized inquiries are needed for each class member. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 149 (4th Cir. 2001). Here, the defendants' arguments pertinent to qualified immunity hinge on individual defendant's knowledge of the risk of substantial harm and the actual conditions and harm being caused at Wallens Ridge and Red Onion by application of the Program. I find that any necessary individualized inquiry into the defendants' knowledge regarding the alleged harms stemming from Program policies and practices would likely be applicable to all class members and is capable of producing class-wide answers.

As for the potential for varying damages, "the need for individualized proof of damages alone will *not* defeat class certification." *Gunnells*, 348 F.3d at 429. This is not a case where there is a factual dispute as to whether any of the plaintiffs were subject to the Program or VDOC practices. *Nestler v. Bishop of Charleston*,

- 34 -

No. 2:21-613-RMG, 2022 WL 884237, at *8 (D.S.C. Mar. 24, 2022) (involving a cause of action that included a fact-bound element of whether the plaintiffs were viewed in an invasion of privacy claim). Moreover, the plaintiffs seek standardized damages that can be calculated formulaically, for example, based on the time each plaintiff spent in confinement and were subject to the Program rules. To the extent that the damages issues end up requiring individual inquiries, I find that those issues may be appropriately bifurcated without undermining Rule 23(b)(3) predominance. *Kay Co. v. EQT Prod. Co.*, No. 1:13-CV-151, 2017 WL 10436074, at *16 (N.D.W. Va. Sept. 6, 2017).

Finally, the defendants contend that the "wide variety of mental health issues and disabilities of varying severity" impede class-wide determination. Defs.' Br. Opp'n 50, ECF No. 195. I disagree. Variations as to the type of mental health disability each putative disabilities class member experiences have no effect on the plaintiffs' common and predominate issues, such as whether the fact that the Program offers no flexibility prevents prisoners with disabilities at SL-S and SL-6 from advancing out of the Program and returning to the general population, and whether such fact violates the defendants' obligations under ADA and RA.

In sum, I find that plaintiffs have their burden in establishing Rule 23(b)(3) predominance for both damages classes.

However, I also find that it is appropriate to redefine the two damages classes pursuant to Rule 23(c).  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 302 F.R.D. 448, 462–63 (N.D. Ohio 2014) ("Ultimately, this Court's duty is to ensure the proper exercise of Rule 23. That duty includes the obligation to create a new definition *sua sponte* if the parties' own proposals are not adequate or accurate.")  The current definitions for Class Two and Class Four read as if all plaintiffs have been subject to the Program from 2012 to present, which based on the briefing, evidence, and the plaintiffs' representations at oral argument, is not accurate.  Accordingly, I find it appropriate to make a slight modification of Class Two and Class Four as emphasized below:

> Constitutional Violation Damages Class: All persons who *at any time* from August 1, 2012, to the present have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels and subjected to any phase of the Step-Down Program.

> Disabilities Damages Class: All persons who *at any time* from August 1, 2012, to the present have been confined at Red Onion or Wallens Ridge at the "Level S" or "Level 6" security levels and subjected to any phase of the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the ADA or the RA.

### 2. *Damages Classes: Rule 23(b)(3) Superiority.*

The superiority requirement ensures that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The court should consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*   I find that a class action is superior to other methods of adjudicating this controversy.   As to the first factor, the potential for damages compared to the financial burden for individual plaintiffs to litigate their claim, demonstrates the benefits of class-wide resolution.   With respect to the second factor, named plaintiffs Riddick and Snodgrass have brought individual actions, but those claims were either dismissed without prejudice,[10] amounted to interlocutory injunctive relief which the court found unwarranted,[11] or involved challenges to specific conduct not at issue here.[12]   Plaintiff Wall currently has a pending suit against certain VDOC defendants

---

[10] *Snodgrass v. Day*, No. 7:15CV00075, 2015 WL 1931306 (W.D. Va. Apr. 28, 2015*); Riddick v. Dep't of Corrs.*, No. 7:17CV00268, 2017 WL 6599007 (W.D. Va. Dec. 26, 2017).

[11] *Snodgrass v. Gilbert*, No. 7:16CV00091, 2016 WL 3866630 (W.D. Va. July 13, 2016)

[12] *Snodgrass v. Gilbert*, No. 7:16CV00091, 2018 WL 1972721 (W.D. Va. Apr. 26, 2018).

related to disciplinary charges brought against him and a specific allegation involving VDOC employees pulling Walls' arms through a cell tray slot. *Wall v. Clark*, No. 7:19-cv-260. I do not find that these cases undercut superiority, and the parties have not identified other ongoing litigations concerning the issues raised in this case. As to the third factor, the prisons are in this judicial district, and there is no reason that this court would not be the best forum to resolve the dispute. Finally, I do not find that the number of putative class members poses significant manageability concerns.

### 3. *Injunction Classes: Rule 23(b)(2)*<br>*Injunction as Appropriate Redress.*

Rule 23(b)(2) certification is reserved for cases where injunctive relief is necessary to redress a class-wide injury. *Wal-Mart Stores Inc.*, 564 U.S. at 360 ("In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."). The rule has two requirements: "that the defendant acted on grounds applicable to the class and that the plaintiff seeks predominantly injunctive or declaratory relief." *Thorn*, 445 F.3d at 330.

Here, the plaintiffs argue that Rule 23(b)(2) has been satisfied because the defendants have engaged in a common behavior, through the Program itself as well

as its application, that applies generally to the proposed injunction classes and also that all putative class members are harmed in essentially the same way: exposure to substantial risk of harm from prolonged time spent in solitary confinement, a lack of meaningful process, and a lack of ability for those with mental disabilities to progress through the Program.  The defendants, on the other hand, contend that the proposed classes lack cohesion and that the plaintiffs have failed to sufficiently provide details as to the hypothetical injunction or how a single injunction would benefit the proposed classes.

As an initial matter, the plaintiffs have stated that they seek an injunction that would abolish the Program and associated policies and their effect of creating long-term solitary confinement within VDOC.  Pls.' Reply Mem. 26, ECF No. 207.  The plaintiffs conceded at oral argument that the specific injunction they seek is still to be determined through discovery.  However, Rule 23(b)(2) "does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage." *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017).  The injunctive relief the plaintiffs seek here is not merely to address alleged general inadequacies and a variety of policies within Virginia's corrections system, relief that would shift with the fluid nature of the class.  *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597 (10th Cir. 2008).  Nor is it simply a challenge to VDOC's general use of solitary confinement in which they vaguely seek to change "unconstitutional conditions" of such housing.

Order, *Harvard v. Dixon*, No. 4:19-cv-0212 (N.D. Fl. July 25, 2022), ECF No. 419. Rather, the proposed injunctive relief is aimed at particular VDOC policies that are triggered upon and related to a single occurrence — an inmate's classification at SL-S and eligibility to the Program — and that dictate how and when an inmate is permitted to return to the general prison population.  Accordingly, I find that the requested relief is sufficiently specific.

Furthermore, I also find that class cohesiveness exists. "It is true that courts have observed that the certification requirements under Rule 23(b)(2) are particularly stringent as to cohesiveness." *Harris v. Rainey*, 299 F.R.D. 486, 497 (W.D. Va. 2014).  The focus is on "the *defendant's actions* affecting the class as a whole." *Thorn*, 445 F.3d at 330.  Here, the injunctive relief if granted, would apply to the proposed classes as a whole.  It is not a case where the court would have to craft an injunction that distinguishes between individual characteristics of the class members, *Shook*, 543 F.3d at 604, because all the class members, by class definition, are or will be subject to the policies associated the Program.  *Coreas v. Bounds*, Nos. TDC-20-0780, TDC-20-1304, 2020 WL 5593338 (D. Md. Sept. 18, 2020) (finding that claims based on policies and actions creating conditions of confinement at detention facilities are subject to global relief as to all classes).  Thus, "the nature of the relief sought is indivisible among the putative class members.  Put simply, the entire class wins or the entire class loses." *Harris*, 299 F.R.D. at 497–98. Therefore,

- 40 -

the plaintiffs have demonstrated that certification is appropriate for the injunctive relief classes under Rule 23(b)(2).

III.

For the reasons stated, it is hereby **ORDERED** as follows:

1. The Unopposed Motion for Leave to File Amended Class Certification Materials, ECF No. 264, is GRANTED;

2. Plaintiffs' Motion for Class Certification, ECF No. 166, as amended by Plaintiffs' Second Amended Motion for Class Certification, ECF No. 264-1, is GRANTED, pursuant to Federal Rule 23(a), 23(b)(2), and 23(b)(3);

3. The certified classes are defined as follows:

Constitutional Violation Injunction Class: All persons who are currently, or will in the future, be confined at Red Onion or Wallens Ridge at the Level S or Level 6 security levels and subject to any phase of the Step-Down Program.

Constitutional Violation Damages Class: All persons who at any time from August 1, 2012, to the present have been confined at Red Onion or Wallens Ridge at the Level S or Level 6 security levels and subject to any phase of the Step-Down Program.

Disabilities Injunction Class: All persons who are currently, or will in the future, be confined at Red Onion or Wallens Ridge at the Level S or Level 6 security levels and subject to any phase of the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the American with Disabilities Act or the Rehabilitation Act.

Disabilities Damages Class: All persons who at any time from August 1, 2012, to the present that have been confined at Red Onion or Wallens Ridge at the Level S or Level 6 security levels and subject to any phase of

the Step-Down Program and who suffer from mental health disabilities and are qualified as individuals with disabilities under either the American with Disabilities Act or the Rehabilitation Act.

4. Covington and Burling LLP, the American Civil Liberties Union Foundation of Virginia, and Ali & Lockwood LLP are appointed as class counsel for all classes;

5. Finding that for administrative efficiency purposes a limited number of class representatives is needed for each subclass, one class representative for each subclass must be designated, and class counsel must advise the court within 21 days of such selections and the qualifications for class representative of each such person selected, for approval and designation by the court;

6. Class counsel must submit a proposed notice and process for notice to class members within 21 days of entry of this Opinion and Order; and

7. Defendants may respond to class counsel's suggested class representatives and proposed notice and process within 14 days thereafter.

ENTER:  April 12, 2023

/s/  JAMES P. JONES
Senior United States District Judge