# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

WILLIAM THORPE, *et al.*,

        *Plaintiffs*,

    v.

VIRGINIA DEPARTMENT OF CORRECTIONS, *et al.*,

        *Defendants*.

Civil Case No. 2:20-cv-00007-JPJ-PMS

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THE *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF DR. ROBERT MORGAN**

I.   **INTRODUCTION**

Plaintiffs move to exclude the opinions of Dr. Robert Morgan, proffered by Defendants as an expert on the physical and mental effects of solitary confinement. Dr. Morgan has no basis to offer relevant or reliable opinions about the Virginia Department of Correction's ("VDOC") Step-Down Program. He did not interview any Plaintiffs or class members. He did not visit any VDOC facilities. He reviewed no documents about VDOC's Step-Down program. He has no knowledge of and could not describe any particulars of the conditions at issue in this litigation, and in fact could not remember which VDOC facilities are at issue in this litigation. He conceded during his deposition that "the conditions in the Virginia Department of Corrections and the stepdown program are outside the scope" of his opinions. In short, he failed to do any of the work necessary to render him qualified to testify as an expert or to offer opinions that would be helpful to the finder of fact about the conditions at issue in this litigation.

But nor is Dr. Morgan qualified to offer opinions about solitary confinement more generally. His exposure to and experience providing mental health services in segregation units is minimal and dated. His scholarship on this topic is more recent but equally minimal. Dr. Morgan has never received grant funding to study solitary confinement and in fact has had several funding requests rejected on the basis that his work is methodologically unsound. His purported qualifications thus rest primarily on a single 2016 so-called "meta-analysis" of other researchers' work. But even this publication is viewed as an extreme outlier in the field and has been widely criticized by other scholars.

Because Dr. Morgan lacks the requisite qualifications and failed to perform the basic work to offer relevant and methodologically sound opinions, his opinions are not helpful to the factfinder and should be excluded.

## II.     BACKGROUND

### A.     Morgan's background

Dr. Morgan is Dean of the College of Health and Human Services at Southern Illinois University.  Ex. 1, Morgan Rpt. at 2.  He received a Ph.D. in counseling psychology from Oklahoma State University.  *Id.*  Dr. Morgan previously held an active license to practice psychology in Texas, but the license is currently in deferment as he no longer practices.

Most of his clinical practice throughout his career has been devoted to evaluating the competency of criminal defendants to stand trial and assessing criminal responsibility, neither of which is at issue here.  Ex. 2, Morgan Tr. at 38:10-39:2.  And while Dr. Morgan cites "25 years of providing correctional and forensic services to inmates and criminal defendants," Ex. 1, at 5, he has very little experience assessing the risk of solitary confinement on prisoners.  The "25 years" includes a 10-year position at the Lubbock Mental Health Retardation Center, where he developed a jail-based competency restoration program, as well as approximately 1,000 forensic examinations related to criminal responsibility and competency to stand trial.  *Id.* at 5-6.  Neither issue has anything to do with the physical and mental effects of solitary confinement.

Dr. Morgan's publications do not make up for what he lacks in relevant clinical experience.  Dr. Morgan's scholarship only recently has turned to the topic of solitary confinement.  And while he has applied—unsuccessfully—"two or three times" for grant funding to study solitary confinement, each time he was rejected due to the reviewers' concerns about his methodology.  Ex. 2 at 99:15-100:15.  Of the 102 studies he has published, he conceded during his deposition testimony that only two or three concerned segregation or solitary confinement.  *Id.* at 98:13-22.  Dr. Morgan's claim to expertise in the field of solitary confinement rests almost entirely on a 2016 meta-analysis that purports to quantify the harms of solitary confinement.  This study disregarded decades of research in the field in favor of a

limited number of studies that are atypical of the field of solitary confinement. Unsurprisingly, Dr. Morgan's meta-analysis is almost universally viewed as an extreme outlier and widely criticized within the field. *See, e.g.*, Ex. 3, Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 Crime and Justice 365 (Jan. 2018) at 398.

The most recent of his few solitary confinement-related publications, a 2018 study in Kansas prisons, was a student project that he supervised. Ex. 2 at 227:5-20, 230:4-12. Dr. Morgan is listed fourth out of the four authors on that study. Ex. 1 at 46. The second solitary confinement-related publication, entitled, *"Questioning solitary confinement: Is administrative segregation as bad as alleged?"* appeared in Corrections Today. Ex. 10, Robert D. Morgan et al., *Questioning Solitary Confinement: Is Administrative Segregation As Bad As Alleged?*, CORRECTIONS TODAY (September/October 2017). Corrections Today is the magazine for the American Correctional Association, an association for practitioners in the correctional profession. Ex. 2 at 211:6-12. Although Dr. Morgan categorized this article as "peer-reviewed," publication in Corrections Today is not decided by research psychologists or psychiatrists, but rather by corrections industry professionals. *Id.* at 211:13-17. Moreover, Dr. Morgan's article appeared in the "Speak Out" section of the magazine, which is an opinion column. Ex. 7, Corrections Today Home Page at 4.

Dr. Morgan also testified for the defense in cases challenging solitary confinement in state and federal courts in Alabama, California, Kansas, Missouri, Oklahoma, and Texas, as well as in Ontario Province, Canada. Ex. 1 at 6. But several courts have harshly criticized and discounted Dr. Morgan's opinions on solitary confinement issues.[1]

---

[1] *See* Ex. 5, *Brazeau v. Attorney General (Canada)*, 2019 ONSC 1888 (2019) at ¶ 182 ("I do not give much weight to Dr. Morgan's meta-analysis conclusions"); Ex. 6, *Corp. of the Canadian*

### B. Dr. Morgan's Opinions and Methodologies

Despite his lack of relevant experience, Dr. Morgan purports to offer opinions as an expert on scientific literature on the physical and mental effects that solitary confinement has on prisoners. Ex. 1 at 7. Dr. Morgan frames his opinions as:

- "[S]cientific literature demonstrates that, although placement in restrictive housing correlates with experiencing certain physical and mental health effects, these effects are comparable to the effects of incarceration as a general matter, and do not rise to serious mental illness or place inmates at substantial risk of serious physical or mental harm."

- "Although the scientific literature demonstrates that some inmates placed in restrictive housing experience the harms described in the report of Dr. Haney, this literature also demonstrates that these harms are not universally experienced."

- "[T]here is no predictive method developed to date by which clinicians can reliably predict who will and who will not experience significant health consequences during a specified time period (or duration) of restrictive housing placement."

*Id.* at 8.

In forming his opinions, Dr. Morgan reviewed no documents specific to this case or the Virginia Departments of Corrections aside from Plaintiffs' complaint and reports prepared by Plaintiffs' experts Drs. Haney and Hendricks. Ex. 2 at 20:18-21:6; 21:11-15. He conceded that he is offering no opinions about conditions in the Virginia Department of Corrections and the Step-Down Program at issue in this case. *Id.* at 24:7-12.

### III. LEGAL STANDARD

In determining whether expert testimony is admissible under Rule 702 and the *Daubert* standard, trial courts perform a "two-step gatekeeping function" to evaluate admissibility.

---

*Civil Liberties Ass'n v. Her Majesty the Queen,* 2017 ONSC 7491 (2017) at ¶¶ 94-95 ("I do not accept Dr. Morgan's evidence that some [prisoners] will be harmed, and a significant number will not." "I specifically do not accept his evidence for concluding that some inmates will experience no serious permanent negative mental health effects from prolonged administrative segregation.").

*United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000). The trial court must ensure that the evidence (1) is based on scientific, technical, or other specialized knowledge and (2) will assist the trier of fact in understanding or resolving a fact at issue. *Id.*; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). The first prong "necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy." *Id.* at 260 (internal citations omitted). The second prong necessitates an analysis as to relevance. *Id.* "An expert's opinion is relevant if it has a valid scientific connection to the pertinent inquiry." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (internal quotations omitted).

Trial courts have "broad discretion to determine reliability in light of the particular facts and circumstances of the particular case," but "such discretion does not include the decision to abandon the gatekeeping function[.]" *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017) (internal quotations omitted). Because of the increased persuasiveness of expert testimony, "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry*, 178 F.3d at 261. In assessing relevance, trial courts have required that "a witness's expertise must be tailored, to some degree, to the specific opinions offered and the particular facts in the case; general expertise or knowledge on a broad topic or general field may be insufficient, depending on the facts of a case." *Mountain Valley Pipeline, LLC, v. 0.32 Acres of Land Owned by Terry*, No. 7:21-CV-00099, 2022 WL 4091860, at *4 (W.D. Va. Sep. 7, 2022).

IV.  ARGUMENT

    A.  **Dr. Morgan's opinions about the effects of solitary confinement are unsupported and unreliable.**

The *Daubert* standard for evaluating the admissibility of expert testimony applies to the social sciences. *See, e.g.*, *United States v. Barnette*, 211 F.3d 803, 815-16, 822 (4th Cir. 2000) (applying *Daubert* standard to forensic psychologist's expert testimony based on specific psychological assessment tool). To be admissible, an expert's opinions must be based on reliable methods and rooted in sufficient facts and data. *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). Factors bearing on an expert's reliability include "[w]hether a theory or technique … can be (and has been) tested; [w]hether it has been subjected to peer review and publication; [w]hether, in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and [w]hether the theory or technique enjoys general acceptance within a relevant scientific community." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-150 (1999) (internal quotation marks and citations omitted).

Dr. Morgan opines that the physical and mental effects of solitary confinement "are comparable to the effects of incarceration as a general matter" and "do not rise to serious mental illness or place inmates at substantial risk of serious physical or mental harm." Ex. 1 at 8. He further contends that "some inmates will experience deleterious effects, other inmates will experience no notable changes, whereas some inmates will even benefit from their placement in restricted housing." *Id*. But, as described above, Dr. Morgan did not perform any of the necessary work to offer such opinions about VDOC's Step-Down Program. *See, e.g.*, Ex. 2 at 21:11-15, 40:13-17; 109:10-110:3; 116:15-117:6 ("Q: Did you review the portion of Dr. Haney's report where he described his interviews with prisoners in the stepdown program and the

7

symptoms they reported to him? A. I read it over once. Q. And would you describe the symptoms as reported to Dr. Haney as mild to moderate? A. I didn't review it in enough detail to form an opinion on that. I was not going to opine on the conditions of inmates in restrictive housing in this case so I didn't – for lack of better words, I didn't do a deep dive . . ."). By his own admissions, his opinions are completely untethered from the issues in this case and therefore are irrelevant and would be confusing and unhelpful to a jury. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) ("An expert's opinion is relevant if it has a valid scientific connection to the pertinent inquiry. This ensures that the expert helps the trier of fact to understand the evidence or to determine a fact in issue." (internal quotations omitted)).

To be reliable, the methodology employed by a mental health expert must meet the same standards of intellectual rigor demanded in the expert's professional work. *See United States v. Barnette*, 211 F.3d 803, 815-16 (4th Cir. 2000) ("The *Daubert* test's gatekeeping requirement is to ensure that the expert witness in question in the courtroom employs the same level of intellectual vigor that characterizes the practice of an expert in the relevant field." (citing *Kumho Tire Co.*, 526 U.S. at 152)). Dr. Morgan is a forensic psychiatrist. Individual evaluation of a subject is essential in the field of forensic psychology. Forensic psychology practice guidelines require that "[f]orensic practitioners … only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings." Ex. 9, *Specialty Guidelines for Forensic Psychology*, American Psychological Association § 9.03 (Opinions Regarding Persons Not Examined). The guidelines further provide that "[w]hen it is not possible or feasible to examine individuals about whom they are offering an opinion" it is

8

required that they "make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony." *Id*.

Dr. Morgan admits that he cannot and would not testify concerning a criminal defendant's competency without first evaluating that individual. Ex. 2 at 39:15-18. But in this case, Dr. Morgan admits that he never spoke to any prisoners in any VDOC facility—let alone a prisoner incarcerated in the Step-Down Program. *Id*. at 23:1-10. He conducted no review of any medical records for the named Plaintiffs or any class members. *Id*. at 22:15-19. He further admitted that he is not equipped to offer any opinions concerning the mental health of any named Plaintiff or class members. *Id*. at 40:13-17.

Dr. Morgan's failure to perform the necessary work to offer relevant opinions is not limited to the effects of solitary confinement on the named Plaintiffs or other class members, but extends to basic information about the Step-Down Program itself. Dr. Morgan confirmed that he did not review any documents regarding VDOC's program other than litigation documents developed during this case (i.e., the Complaint and two Plaintiff expert reports). *See id*. at 21:11-15. He failed to visit any VDOC facilities and could not even name the VDOC facilities at issue in this litigation. *Id*. at 23:8-10, 23:17-21. Dr. Morgan also failed to review any evidence regarding specific conditions or experiences within Virginia's Step-Down Program. *Id*. at 257:5-9. Indeed, he does not even know basic facts about the Program, such as how long individuals remain in the Program. *Id*. at 26:11-19.

Dr. Morgan also lacks any basis to conclude that conditions in the segregation units that he studied are similar to VDOC's Step-Down Program. He concedes that the experience of being in solitary confinement can differ substantially depending on the policies and practices of a particular facility. *Id*. at 256:21-257:4 ("Q. Do you agree that the experience of being in

9

segregation can differ substantially depending on the criteria and policies, the specific conditions, the day-to-day practices in the particular facility at issue?  A. I do.").  But as set forth above, Dr. Morgan performed no work to analyze the conditions at issue in this case, and therefore he is unqualified to offer opinions about any harms arising from those conditions.  *Id*. at 257:5-9 ("Q.  And once again, you didn't review any evidence regarding the specific conditions or isolation experience specific to the Virginia step-down program, correct?  A. Correct.").  He also performed no work to compare his prior experiences with solitary confinement to the conditions at issue here.  *See, e.g.*, *id*. at 54:20-55:1 ("Q.  Do you have any understanding of how that compares to the review process in VDOC's step-down program?  A. No."); *id.* at 26:11-19, 116:21-117:8, 139:3-8, 142:10-17, 179:10-20.

Because Dr. Morgan conceded that he is not offering any opinions about conditions in the Virginia Department of Corrections or the Step-Down Program—the very Program and entity at issue in this case, Ex. 2 at 24:7-12—his opinions have no relevance to the facts and issues in this litigation and should be excluded.  *See Kovari v. Brevard Extraditions, LLC, et al*., 461 F.Supp.3d 353, 374 (W.D. Va. May 20, 2020) (finding that plaintiff's prisoner transportation expert "lack[ed] [] specific knowledge as to the circumstances of [plaintiff's] transport [and this] precludes him from offering an opinion as to whether [defendant's] policies caused [plaintiff] any harm"); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) ("[A]n expert's opinion is relevant if it has a valid scientific connection to the pertinent inquiry.  This ensures that the expert helps the trier of fact to understand the evidence or to determine a fact in issue." (internal quotations omitted)).

> **B.   Dr. Morgan is not qualified and his discredited 2016 "meta-analysis" is unreliable.**

Not only is Dr. Morgan unqualified to opine on the effects of solitary confinement in this case because he failed to review relevant materials, he lacks the necessary background and qualifications to offer sound and helpful opinions concerning the effects of solitary confinement more generally. An expert must be qualified by "knowledge, skill, experience, training, or education" to offer opinions on a particular subject. Fed. R. Evid. 702. Dr. Morgan is not.

Dr. Morgan's published and peer-reviewed articles on solitary confinement consist of a single meta-analysis concerning research conducted by others and a student's research project that Dr. Morgan supervised. Dr. Morgan admits that he never received grant funding for his research on solitary confinements, and his requests for such funding were denied "two or three" times. Ex. 2 at 99:15-17, 100:12-15. Dr. Morgan also confirmed that his forensic psychology practice did not involve any evaluation of mental health programs for prisons or jails. *Id*. at 40:18-41:1.

Dr. Morgan's opinions on the effects of solitary confinement primarily rest on his 2016 meta-analysis. Ex. 1 at 22-33. At least one court in Canada decided to not "give much weight to Dr. Morgan's meta-analysis conclusions" after hearing testimony concerning its serious errors. Ex. 5 at ¶ 182. This decision was manifestly correct; the study is methodologically flawed and unreliable for at least several reasons.

*First,* Dr. Morgan's meta-analytic study excludes most relevant data on the harms of solitary confinement. A meta-analysis is a tool to measure the magnitude of relationships between variables. *See generally* Ex. 8, Robert H. Fagard et al., *Advantages and Disadvantages of the Meta-Analysis Approach*, J. Hypertension (1996). The integrity of Dr. Morgan's meta-analytic approach requires that there be multiple, high-quality controlled studies whose effect

11

sizes can then be synthesized. *See id.* at S10-S12. As Dr. Morgan has conceded, the prison setting rarely lends itself to collection of meaningful quantitative data capable of generating the kinds of effect sizes on which meta-analyses depend. Ex. 2 at 181:2-17, 199:13-200:9. In other words, there are few quantitative, controlled studies of the effect of segregation on prisoners, because it is unethical to demand that prisoners endure the torture of solitary confinement solely for research. *See id.*

For this reason, much of the research on solitary confinement is qualitative. *See* Morgan Tr. at 199:13-200:9. But there is a substantial amount of it and the findings are robust. At least two U.S. Supreme Court justices—and multiple lower courts—have cited this research approvingly. *See Apodaca v. Raemisch*, 139 S. Ct. 5 at *9 n.8 (2018) (Sotomayor, J., concurring); *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) (stating that "penology and psychology experts, including scholars in the legal academy, continue to offer essential information and analysis" and observing that "research . . . confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price"); *Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) (explaining that "[n]umerous studies reveal that prolonged detention of inmates" in solitary conditions on death row has damaging results); *Grissom v. Roberts*, 902 F.3d 1162, 1175-78 (10th Cir. 2018) (Lucero, J., concurring) (citing research on solitary confinement including the work of Terry Kupers, Craig Haney, and Stuart Grassian); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (citing "[t]he robust body of scientific research on the effects of solitary confinement" as support for the conclusion that "the deprivations of protracted solitary confinement so exceed the typical deprivations of imprisonment" as to create a liberty interest in avoiding solitary confinement).

Dr. Morgan's meta-analyses artificially limited the universe of solitary confinement research. One arm of the meta-analysis reviewed 150 studies for potential inclusion in the meta-analysis but included just 14 (9.3%). Ex. 4, Morgan, et al., *Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being, Psychology, Public Policy, and Law*, Vol. 22, No. 4, (2016) 439-461 at 442. The second arm identified 40,589 such articles, but concluded that only 61 were related to the research question. It then excluded all but 19 for meta-analysis (31.15%). *Id.* at 442-43. Dr. Morgan acknowledged criticism that one study included in the meta-analysis—the so-called "Colorado Study" was over-weighted. Ex. 2 at 205:9-208:14. That alone is problematic, *see* Ex. 8 at S11, but the error is compounded given the enormous problems with the Colorado Study and the data underlying it—problems Dr. Morgan readily acknowledged. *Id*. at 206:17-209:4. This unrepresentative sample is not a sound basis for a meta-analytic study purporting to provide a comprehensive synthesis of the research.

## V.   CONCLUSION

For the reasons set forth above, the Court should exclude the opinions of Dr. Robert Morgan.

Dated:  September 8, 2023

Respectfully submitted,

*/s/ Megan A. Crowley*
Megan A. Crowley (*pro hac vice*)
Jared Frisch (*pro hac vice*)
Paul Wilson (*pro hac vice*)
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
mcrowley@cov.com
jfrisch@cov.com
pwilson@cov.com

William O'Neil (*pro hac vice*)
Matthew Phelps (*pro hac vice*)
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
woneil@cov.com
mphelps@cov.com

Vishal Agraharkar (VSB #93265)
Eden B. Heilman (VSB #93554)
Geri Greenspan (VSB #76786)
Matthew Callahan (*pro hac vice*)
ACLU of Virginia
701 E. Franklin Street, Ste. 1412
Richmond, VA 23219
Telephone: (804) 644-8022
vagraharkar@acluva.com
eheilman@acluva.com
ggreenspan@acluva.com
mcallahan@acluva.com

Kathryn Ali (VSB #97966)
Ali & Lockwood LLP
300 New Jersey Avenue, NW, Ste. 900
Washington, DC 20001
Telephone: (202) 651-2475
katie.ali@alilockwood.com

Maxwell J. Kalmann (*pro hac vice*
admission forthcoming)

14

1818 Library Street, 10th Floor
Reston, VA 20190
(650) 586-1043
maxkalmann@meta.com

*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on the 8th day of September, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants.

*/s/ Megan A. Crowley*
Megan A. Crowley (*pro hac vice*)
Jared Frisch (*pro hac vice*)
Paul Wilson (*pro hac vice*)
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
mcrowley@cov.com
jfrisch@cov.com
pwilson@cov.com

William O'Neil (*pro hac vice*)
Matthew Phelps (*pro hac vice*)
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
woneil@cov.com
mphelps@cov.com
