# EXHIBIT 5

2019 ONSC 1888 (CanLII)

**CITATION:** Brazeau v. Attorney General (Canada) 2019 ONSC 1888
**COURT FILE NO.:** CV-15-53262500-CP
**DATE:** 2019/03/25

## ONTARIO
## SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| **CHRISTOPHER BRAZEAU and DAVID KIFT** | ) ) | *James Sayce* and *Janetta Zurakowski* for the Plaintiffs |
| Plaintiffs | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | *Greg Tzemenakis, Stephen Kurelek*, *Sean Stynes*, and *Diya Bouchedid* for the Defendant |
| **THE ATTORNEY GENERAL OF CANADA** | ) ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| Proceeding under the *Class Proceedings Act, 1992* | ) | **HEARD**: February 13, 14, 15, 20, and 21, 2019 |

**PERELL, J.**

## REASONS FOR DECISION

### A.  Introduction and Overview

[1]    Through the Correctional Service of Canada, sometimes referred to as "CSC", the Federal Government operates penitentiaries and related penal institutions across Canada. Pursuant to the *Class Proceedings Act, 1992*,[1] the Plaintiffs Christopher Brazeau and David Kift sue the Federal Government of Canada about the operation of those penitentiaries.

[2]    On behalf of a class of inmates who are seriously mentally ill, Messrs. Brazeau and Kift allege that by placing mentally ill inmates in "administrative segregation," the Federal Government has breached the Class Members' rights under the *Canadian Charter of Rights and Freedoms.*[2]

[3]    By administrative segregation, the inmate is removed from his or her cell at the penitentiary within the ranges of cells for the general inmate population and isolated in a segregated area in a solitary cell with very limited access to others. Messrs. Brazeau and Kift say that administrative segregation is a euphemism for what is, in truth, solitary confinement, which

---

[1] S.O. 1992, c. 6.
[2] Part I of the *Constitution Act*, 1982, being Schedule B to the *Canada Act* 1982 (UK), 1982, c 11.

is a type of confinement defined by jurists and by criminologists and penologists, *i.e.*, by social scientists that study the punishment of crime and prison management, to be twenty-two hours or more a day of confinement without meaningful human contact.

[4]     In their class action, on behalf of the seriously mentally ill inmates, Messrs. Brazeau and Kift seek *Charter* damages and also punitive damages. They seek these damages in the aggregate to be awarded to the Class. After an aggregate base award to the Class Members, Messrs. Brazeau and Kift propose that there would be individual damage assessments of compensatory damages for each Class Member whose *Charter* rights have been violated and who have suffered pecuniary and non-pecuniary personal injuries.

[5]     By the design of Class Counsel, the Class Members are defined as inmates who have very serious mental illnesses. Appendix A of the Class Definition, set out below, uses the Global Assessment of Functioning scale (GAF), which is a numeric scale (1 to 100) used by mental health professionals to rate the social, occupational, and psychological functioning of adults. The lower the score, the worse the functioning. As defined, the Class Members have serious mental diseases, serious impediments, and low GAF scores; they are the sickest of the inmates suffering from mental illness.

[6]     In 2016, on consent, the action was certified as a class proceeding.[3]

[7]     During the course of the hearing of the summary judgment motion, because they discontinued certain claims that did not involve administrative segregation but were concerned about the CSC's alleged failures in providing health care to the Class Members, Messrs. Brazeau and Kift were granted leave to amend the Class Definition. After the hearing, there was a further amendment on consent to carve out from the Class Definition certain inmates in Québec penal institutions because they are Class Members in a parallel class action.[4] As a result, Messrs. Brazeau and Kift are the Representative Plaintiffs for the following class:

> All offenders in federal custody, who were placed in administrative segregation in a federal institution situated outside Québec after February 24, 2013, or who placed in administrative segregation in a federal institution anywhere in Canada before February 24, 2013 were diagnosed by a medical doctor with an Axis I Disorder (excluding substance use disorders) or Borderline Personality Disorder, who suffered from their disorder, in a manner described in Appendix A, and reported such during their incarceration, where the diagnosis by a medical doctor occurred either before or during incarceration in a federal institution and the offenders were incarcerated between November 1, 1992 and the present, and were alive as of July 20, 2013.

[8]     Appendix "A" of the class definition lists the ways in which inmates diagnosed with an Axis I Disorder (excluding substance use disorders) or Borderline Personality Disorder ("BPD"), suffered from their disorder and can be identified as Class Members. Appendix A states:

> (a) significant impairment in judgment (including inability to make decisions; confusion; disorientation); (b) significant impairment in thinking (including constant preoccupation with thoughts, paranoia; (c) delusions that make the offender a danger to self or others); (d) significant impairment in mood (including constant depressed mood plus helplessness and hopelessness;  (e) agitation;  (f) manic mood that interferes with ability to effectively interact with other offenders, staffs or follow correctional plan); (g) significant impairment in communications that interferes with ability to effectively interact with other offenders, staff or follow correctional plan; (h) significant impairment due to anxiety (panic attacks; overwhelming anxiety) that interferes with

---

2019 ONSC 1888 (CanLII)

2019 ONSC 1888 (CanLII)

ability to effectively interact with other offenders, staff or follow correctional plan; (i) other symptoms: hallucinations; delusions; (j) severe obsessional rituals that interferes with ability to effectively interact with other offenders, staff or follow correctional plan; (k) chronic and severe suicidal ideation resulting in increased risk for suicide attempts; (l) chronic and severe self-injury; or, (m) a GAF [Global Assessment of Functioning scale] score of 50 or less.

[9]     The class action was commenced on July 20, 2015, and the start date of the Class Period is November 1, 1992, which is the date the *Corrections and Conditional Release Act* ("*CCRA*")[5] came into force. The *CCRA* prescribes the current regime of administrative segregation. There is no prescribed end date for the Class Period, and it remains a running Class Period. The July 20, 2013 date by which a Class Member must have been alive is predicated upon the applicable provisions in the *Trustee Act*[6] to maintain actions for torts by executors and administrators. The Federal Government, however, submits that there are federal or provincial limitation periods from two to six years that apply and that would foreclose many claims and shorten the Class Period.

[10]     On consent, the following common issues were certified:

> 1. By its operation and management of the Federal Institutions from November 1, 1992 to the present, did the Defendant breach the Class Members' rights under section 7 of the *Charter*?
>
> 2. If so, were its actions saved by section 1 of the *Charter*?
>
> 3. By its operation and management of the Federal Institutions from November 1, 1992 to the present, did the Defendant breach the Class Members' rights under section 9 of the *Charter*?
>
> 4. If so, were its actions saved by section 1 of the *Charter*?
>
> 5. By its operation and management of the Federal correctional facilities from November 1, 1992 to the present, did the Defendant breach the Class Members' rights under section 12 of the *Charter*?
>
> 6. If so, were its actions saved by section 1 of the *Charter*?
>
> 7. If the answer to any of common issues (1), (3), or (5) is "yes", and the answer to any of (2), (4) and (6) is no, are damages available to the Class under section 24 of the *Charter*?
>
> 8. If the answer to common issue (7) is "yes", can the Court make an aggregate assessment of the damages suffered by all Class Members as a part of the common issues trial [summary judgment motion]?

[11]     Messrs. Brazeau and Kift bring a summary judgment motion for answers to all of the common issues. With the discontinuance of the claims involving health care but not involving administrative segregation, the summary judgment motion is designed to be dispositive of the action save for the individual issues trials. If Messrs. Brazeau and Kift succeed on their summary judgment motion, then the class proceeding would proceed with individual damages assessments

---

[5] S.C. 1992, c. 20.
[6] R.S.O. 1990, c. T.23, ss. 38 (1) and (3).

for the Class Members for compensation for their personal injuries.

[12]    Messrs. Brazeau and Kift submit that there are no genuine issues requiring a trial because the evidence establishes that every Class Member, all of whom suffer from a diagnosed severe mental illness, are too sick for any time in solitary confinement. They submit that it follows that there no genuine issues for trial that the Class Members' rights have been contravened: (a) under section 7 of the *Charter* to not be deprived of the right to life, liberty and security of the person except in accordance with the principles of fundamental justice, (b) under section 9 of the *Charter* not to be arbitrarily detained or imprisoned; and (c) under section 12 of the *Charter* not to be subjected to any cruel and unusual treatment or punishment.

[13]    Further, Messrs. Brazeau and Kift submit that there are no genuine issues requiring a trial that all the Class Members are entitled to both *Charter* damages and also punitive damages*, which, damages they submit, the evidence establishes are capable of being calculated and of being awarded in the aggregate pursuant to s. 24 of the *Class Proceedings Act, 1992*.

[14]    The Federal Government submits that the case is not appropriate for a summary judgment.

[15]    In the alternative, the Federal Government submits that administrative segregation is not the equivalent of solitary confinement. It submits that while in individual cases, administrative segregation may have been used in a way that contravenes an individual Class Member's *Charter* rights, administrative segregation for Class Members <u>was</u> (there is pending legislation that will stop the practice for some seriously mentally ill inmates) never a class-wide *Charter* breach. The Federal Government submits that administrative segregation is a legislatively authorized and appropriate and necessary last resort for managing a difficult and dangerous prison population and in accordance with the principles of fundamental justice. The Federal Government submits that individual cases of maladministration where the Correctional Service violates an inmate's *Charter* rights does not prove that there has been a class-wide or systemic *Charter* breach. Further, the Federal Government denies that the Class Members have any entitlement to *Charter* damages or that damages can be awarded in the aggregate.

[16]     For the reasons that follow, I grant the summary judgment motion - in part - and I dismiss it - in part.

[17]    The answers to the common issues are as follows:

a.  By its operation and management of the Federal Institutions from November 1, 1992 to the present, the Federal Government breached the Class Members' rights under section 7 of the *Charter* by the absence of an adequate review process for placements in administrative segregation. In other words, there is a class-wide breach of section 7 (misdescribed by Messrs. Brazeau and Kift as a breach of s. 9) of the *Charter* because the review process for administrative segregation contravened the *Charter*.

Without prejudice to any individual Class Member's claim at an individual issues trial to assert that his or her treatment was contrary to section 7 of the *Charter* in his or her particular circumstances, by its operation and management of the Federal Institutions from November 1, 1992 to the present, the Federal Government breached the rights under section 7 of the *Charter* of those Class Members: (a) who were <u>involuntarily</u> placed in administrative segregation for

2019 ONSC 1888 (CanLII)

more than thirty days; and (b) who were voluntarily placed in administrative segregation for more than sixty days.

    i. In other words, while individual Class Members may have suffered a violation of section 7 of the *Charter* by his or her placement in administrative segregation for less than thirty days, there was only a common or systemic breach suffered by two subclasses comprised of Class Members: (a) who were <u>involuntarily</u> placed in administrative segregation for more than thirty days; or, (b) who were voluntarily placed in administrative segregation for more than sixty days.

    ii. As the discussion below will explain, involuntary placements include both placements made at the request of the inmate (genuine voluntary placements) and also placements in which the inmate contrives or engineers an involuntary placement into administrative segregation.

b. For the subclasses (which may also be represented by Messrs. Brazeau and Kift as representative plaintiffs), the breach of section 7 of the *Charter* is <u>not</u> saved by section 1 of the *Charter*.

c. By its operation and management of the Federal Institutions from November 1, 1992 to the present, the Federal Government <u>did not</u> breach the Class Members' rights under section 9 of the *Charter*.

d. There being no breach, the question of whether the breach of section 9 of the *Charter* is saved by section 1 of the *Charter* need not be answered.

e. Without prejudice to any individual Class Member's claim at an individual issues trial to assert that his or her treatment was cruel and unusual, by its operation and management of the Federal Institutions from November 1, 1992 to the present, the Federal Government breached the rights under section 12 of the *Charter* of those Class Members (a) who were <u>involuntarily</u> placed in administrative segregation for more than thirty days; and (b) who were voluntarily placed in administrative segregation for more than sixty days.

    i. In other words, while individual Class Members may have suffered a cruel and unusual treatment by his or her placement in administrative segregation for less than thirty days, there was only a common or systemic breach suffered by the two subclasses comprised of Class Members: (a) who were involuntarily placed in administrative segregation for more than thirty days; or, (b) who were voluntarily placed in administrative segregation for more than sixty days.

f. For the subclasses, the breach of section 12 of the *Charter* breach is <u>not</u> saved by section 1 of the *Charter*.

g. Notwithstanding the principles from *Mackin v. New Brunswick (Minister of Finance)*,[7] vindication and deterrence damages are available to the whole class under section 24 (1) of the *Charter* for the breach of section 7 of the *Charter* regarding the inadequate review procedure for placements in administrative

---

[7] 2002 SCC 13.

2019 ONSC 1888 (CanLII)

segregation (misdescribed by Messrs. Brazeau and Kift as a breach of s. 9). In any event, vindication and deterrence damages are available to the subclasses that suffered a breach of sections 7 and 12 of the *Charter*.

h.  The court can make an aggregate assessment of the *Charter* damages suffered by the whole class for the breach of section 7 of the Charter and of the *Charter* damages of the subclasses that suffered a breach of sections 7 and 12 of the *Charter*. The court assesses those damages as $20 million, which is to be distributed, less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct.

   i.  The Federal Government is not liable for punitive damages on a class-wide basis but may be liable for punitive damages after the *Charter* damages are determined at the individual issues trials.

   ii.  How the $20 million, less Class Counsel's approved fees and disbursements, shall be distributed for the benefit of the class and the subclasses shall be determined by a distribution motion brought by Class Counsel.

[18]   In addition to answering the common issues, as set out above, I conclude that subject to individual Class Members rebutting the statute-bar, there is a six-year limitation period that applies to all claims, and, thus, the start date for the Class Period is July 20, 2009 for all but the Estate claimants, for which the start date is July 20, 2013. This means that without prejudice to the claims of Class Members that have an individual rebuttal to the tolling of the limitation period, Class Members' claims as a class from a placement in administrative segregation before July 20, 2009 are statute-barred.

[19]   Having regard to these answers, as I shall explain later in these Reasons for Decision, I recommend that the Representative Plaintiffs consider bringing a motion to amend the class definition.   I shall recommend that the words: "All offenders in federal custody who were diagnosed by a medical doctor with an Axis I Disorder …" in the class definition be replaced with the words: "All offenders in federal custody who had an Axis I Disorder …". And I recommend that the words: "where the diagnosis by a medical doctor occurred" be replaced with the words: "where the diagnosis occurred or could have occurred."

[20]   As I shall explain, in my opinion, the current Class Definition is under-inclusive. If the Class Member can prove that he or she had an undiagnosed Axis I Disorder or that a medical doctor ought to have diagnosed them as suffering from an Axis I Disorder, he or she should be included in the class unless they opt out of the class action. (While it is highly unlikely that a new Class Member would opt-out, since the class definition is being amended, the new Class Members have a right to opt out.)

[21]   There are Class Members that have claims that require individual issues trials for completion. The findings of fact made on this summary judgment motion carry forward as issue estoppels into any individual issues trials. While I shall make some observations in these Reasons for Decision, the procedural nature of those individual issues trials remains to be determined under s. 25 of the *Class Proceedings Act, 1992*. Depending on the quantum of each individual inmate's claim, the principles of proportionality in procedure may require dispute

resolution procedures ranging from a simple claims-qualification procedure to conventional trials pursuant to the *Rules of Civil Procedure.* I direct a motion to settle the procedures for the individual issues trials.

[22]    It further follows from the above answers that a distribution scheme is required for the $20 million, less Class Counsel's approved fees and disbursements, awarded as vindication and deterrence *Charter* damages for the class and for the subclasses of Class Members. While I shall make some observations in these Reasons for Decision about the distribution plan, the nature of the distribution plan remains to be determined under s. 26 of the *Class Proceedings Act, 1992*. I direct a motion to settle the distribution plan.

## B.  Methodology of the Reasons for Decision

[23]    To understand these Reasons for Decision, it shall prove helpful at the outset to explain the structure and the methodology of the Reasons for Decision, which must address complex substantive and procedural legal problems, some of them novel and exploratory of unexplored legal territory for class actions.

[24]    These Reasons for Decision are structured under the following twenty-six major headings.

- A. Introduction and Overview
- B. Methodology of the Reasons for Decision
- C. The Correctional Service of Canada, Prison Demographics and Culture, the Placement of Inmates, Mental Health Care, and Administrative Segregation
- D. A Survey History and Historiography of Solitary Confinement and Administrative Segregation
- E. *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*
- F. *British Columbia Civil Liberties Association v. Canada (Attorney General)*
- G. *Res Judicata*, Issue Estoppel, and Abuse of Process.
- H. Evidentiary Record
- I. The Correctional Investigator of Canada
- J. The Correctional Investigator's Reports
- K. The Battle of the Experts
- L. Messrs. Brazeau and Kifts' Expert Evidence
- M. The Federal Government's Expert and Correctional Service Evidence
- N. The Nature of Administrative Segregation and its Relationship to Solitary Confinement
- O. Discussion and Analysis: Methodology
- P. Jurisdiction to Grant Summary Judgment
- Q. Did the Federal Government Breach section 7 of the *Charter?*
- R. Did the Federal Government Breach section 9 of the *Charter?*
- S. Did the Federal Government Breach section 12 of the *Charter?*
- T. Limitation Periods
- U.  *Charter* Damages and Aggregate Damages

2019 ONSC 1888 (CanLII)

- V. Punitive Damages
- W. The Distribution Plan
- X. Amending the Class Definition
- Y. The Individual Issues Trials
- Z. Summary and Conclusion

[25]   Parts A and B are introductory and provide an overview of the outcome.

[26]   Part C (The Correctional Service of Canada, Prison Demographics and Culture, the Placement of Inmates, Mental Health Care, and Administrative Segregation) identifies the parties, sets out the legal and factual framework that governs administrative segregation, provides the general factual background of the circumstances of the Class Members and identifies some of the legal and factual disputes between the parties.

[27]   Part D provides a survey history and historiography of solitary confinement and administrative segregation.

[28]   Parts E to J provide the evidentiary background to the summary judgment motion and resolve a number of issues about the admissibility of evidence. Although Parts E to J contain some findings of fact, Parts C and D, and Parts K to N are the main factual background to the summary judgment motion and include the major findings of fact.

[29]   Parts O to V are the legal analysis and the discussion and explanation of the answers to the common issues along with a discussion of the additional matter of limitation periods.

[30]   Parts X to Y discuss important consequential procedural matters associated with Messrs. Brazeau and Kifts' action being a class action.

[31]   Part Z is a summary and a conclusion.

## C.  The Correctional Service of Canada, Prison Demographics and Culture, the Placement of Inmates, Mental Health Care, and Administrative Segregation

[32]   Canada is a confederation of the federal and provincial governments, and under the *Constitutional Act, 1867,*[8] (formerly the *British North America Act)* legislative authority is distributed between the governments. Pursuant to s. 92, paragraph 6, provincial governments have the legislative authority with respect to "The Establishment, Maintenance, and Management of Public and Reformatory Prisons in and for the Province." Pursuant to s. 91 paragraph 28, the Federal Government has legislative authority for "The Establishment, Maintenance, and Management of Penitentiaries."

[33]   Federal Government penitentiaries are currently regulated by the *Corrections and Conditional Release Act* ("*CCRA*") and SOR/92-620 (*Corrections and Conditional Release Regulations*).[9]

[34]   Under the *CCRA*, a Commissioner of Corrections is appointed by the Governor in Council (*CCRA* s.6).  Under the direction of the Minister of Public Safety and Emergency

---

[8] 1867 (U.K,), 30 & 31 Vict. c. 3.
[9] Penitentiaries in Canada were formerly governed by the *Penitentiary Act*, R.S.C. 1970, c. P-6 (repealed) and the *Penitentiary Service Regulations*, P.C. 1962-302, S.O.R./62-90 (repealed).

Preparedness, the Commissioner has the control and management of the Correctional Service of Canada ("CSC"), which operates federal penitentiaries and associated facilities across the country.

[35]   The Commissioner by order declares any prison defined in the *Prisons and Reformatories Act*[10] or any hospital to be a penitentiary. The Governor in Council may declare any place to be a penitentiary. (*CCRA* s. 7). The person who is normally in charge of a penitentiary is its "institutional head," and he or she is typically known and described as the warden of the penitentiary. Where a person convicted of a crime receives a sentence of two or more years in duration, the sentence is served in a federal penitentiary.

[36]   The Commissioner may make rules for the management and administration of the Correctional Service (*CCRA* s. 97). The Commissioner may designate any or all rules as Commissioner's Directives (*CCRA* s. 98). The Commissioner's Directives and Standing Operating Practices establish the operational policies of the Correctional Service. In the immediate case, the most important of these is *Commissioner's Directive 709 Administrative Segregation* ("CD 709"), which is the current policy guideline governing the use of administrative segregation.

[37]   The Commissioner may designate any staff member of the Correctional Service to be a peace officer (*CCRA* s. 10). The Commissioner may appoint a person or persons to investigate and report on any matter relating to the operations of the Correctional Service (*CCRA* s. 20).

[38]   Not including contract services, the Correctional Service has approximately 18,000 employees. There are approximately 1,725 heath care staff, including 1,329 health care professionals. Mental health services are provided by Interdisciplinary Mental Health Teams, the composition of which varies among sites but may include behavioural science technicians, behavioural counsellors, mental health clinicians, nurses, occupational therapists, physicians, psychologists, psychiatrists, and social workers.

[39]   The purpose of the Correctional Service is to contribute to the maintenance of a just, peaceful and safe society by: (a) carrying out sentences imposed by courts through the safe and humane custody and supervision of offenders; and (b) assisting the rehabilitation of offenders and their reintegration into the community as law-abiding citizens through the provision of programs in penitentiaries and in the community (*CCRA* s. 3). The Correctional Service is responsible, among other things, for the care and custody of inmates and for providing them with programs that contribute to their rehabilitation and their successful reintegration into the community (*CCRA* s. 5).

[40]   The paramount consideration for the Correctional Service is the protection of society (*CCRA* s. 3.1).

[41]   The principles that guide the Correctional Service are set out in s. 4 of the *Corrections and Conditional Release Act*. Those principles include using measures that are consistent with the protection of society, staff members, and offenders and that are limited to only what is necessary and proportionate to attain the purposes of the Act. The principles include recognizing that inmates retain the rights of all members of society except those that are, as a consequence of their sentence, lawfully and necessarily removed or restricted.

---

[10] R.S.C. 1985, c. P-20.

[42]     Over five regions, CSC operates ninety-one parole and sub-parole offices, forty-three penal institutions, including fifteen community correctional centres, and five Regional Treatment Centres ("RTC"). The RTCs are a hybrid of a penitentiary and a psychiatric treatment centre under provincial legislation. The RTCs purpose is to deal with the most significant impairments and mental health disorders. They provide interdisciplinary treatment to offenders with mental and physical health care needs.

[43]     There are different types of penitentiaries. There are maximum-security, medium-security, and minimum-security penitentiaries. There are multi-level security penitentiaries, which are some combination of maximum, medium, and minimum-security institutions. There are penitentiary clusters, a form of multi-level institution where separate penitentiaries are located on the same site.

[44]     Of the forty-three penal institutions, there are six maximum-security, nine medium-security, five minimum-security, twelve multi-level security and eleven clustered institutions. Included within the forty-three penal institutions are six institutions for women and thirty-seven institutions for men. Included within the forty-three penal institutions are three Aboriginal healing lodges that accommodate Aboriginal men with minimum-security classifications and one healing lodge for Aboriginal women with minimum and medium-security classifications.

[45]     There are approximately 14,000 inmates (also referred to as offenders or prisoners) in federal penitentiaries, the overwhelming majority of which are men. Over 70% were sentenced for violent crimes (20% murder; 50% manslaughter, robbery, assault, sexual assault). Many inmates have mental problems.

[46]     There is a dispute between the parties about the number of inmates who qualify for class membership as being diagnosed with an Axis I Disorder or Borderline Personality Disorder ("BPD"). With the dispute between the parties, the estimates are that class size varies between 7% to 18.3% of the inmate population over the Class Period.

[47]     Intolerance, bigotry, prejudice, hatred, and hostility are common in penitentiaries and inmates organize themselves into groups, whose members are compatible and protective of one another but antagonistic to other inmates. Some of these groups are "Security Threat Groups" (STGs), including: Aboriginal gangs, hate groups, outlaw motorcycle gangs, organized crime groups, prison gangs, street gangs, subversive groups, terrorist organizations, and white supremacy groups. Certain inmates in the prison population, such as pedophiles, perpetrators of heinous crimes, informants, Crown witness, and former police officers are ostracized and are targets for retaliation, revenge, and mob justice by other inmates.

[48]     Violence and criminal activities persist inside penitentiaries. Security Threat Groups use psychological intimidation and violence to ensure control and influence. The violence is often associated with an underground economy developed by inmates for the sale of contraband materials such as tobacco, drugs, and alcohol that are smuggled into the penitentiary or that are available and horded inside the penitentiary, for example, inmates may stash their medicines and sell them to other inmates.

[49]     Inmates reside in cells and may be double and even triple bunked. The Correctional Service decides where to place each inmate. Typically, the cells of the general population of inmates in a penitentiary are in ranges of cells. Section 70 of the *Corrections and Conditional Release Act* directs that the Correctional Service take all reasonable steps to ensure that

penitentiaries, the penitentiary environment, the living and working conditions of inmates and the working conditions of staff members are safe, healthful and free of practices that undermine a person's sense of personal dignity. In which institution and where in an institution to house an inmate is a serious and difficult problem for the CSC. One of the major problems for the Correctional Service is how to safely accommodate the incompatible groups of inmates who pose dangers one to another and to the staff of the penitentiary.

[50]     Each inmate is classified in accordance to his or her dangerousness and risk of escape. Approximately 20% of inmates are classified as minimum security. Approximately 60% of inmates are medium security. Approximately 15% of inmates are maximum security. The classification of the security risk is used to place the inmate in minimum-security, medium-security, or maximum-security penitentiaries.

[51]     Section 69 of the *CCRA* provides that no person shall administer, instigate, consent to or acquiesce in any cruel, inhumane or degrading treatment or punishment of an offender. Section 73 prescribes that inmates are entitled to reasonable opportunities to assemble peacefully and associate with other inmates within the penitentiary, subject to such reasonable limits as are prescribed for protecting the security of the penitentiary or the safety of persons. Section 75 prescribes that an inmate is entitled to reasonable opportunities to freely and openly participate in, and express, religion or spirituality, subject to such reasonable limits as are prescribed for protecting the security of the penitentiary or the safety of persons.

[52]     Sections 85 to 89 of the the *Corrections and Conditional Release Act* and Commissioner's Directives CD 800 (*Health Care*) and CD 843 (*Interventions to Preserve Life and Prevent Serious Bodily Harm*) address the matter of providing health care including psychiatric care, for inmates. Section 87, which is a provision of particular significance to the case at bar, states:

> *Service to consider health factors*
>
> 87. The Service shall take into consideration an offender's state of health and health care needs
>
>> (a) in all decisions affecting the offender, including decisions relating to placement, transfer, administrative segregation and disciplinary matters; and
>>
>> (b) in the preparation of the offender for release and the supervision of the offender.

[53]     The Correctional Service provides four levels of mental health care for inmates: (1) Primary Care, which is provided by mental health teams in the penitentiary and includes screening, triage, individual and group interventions; individual treatment planning and implementation, and monitoring and assessing inmates in administrative segregation; (2) Intermediate (Moderate Intensity) Care, which is care provided by the mental health team to inmates who require additional mental health care, including clinical care, psychiatric symptom management, and therapeutic recreation; (3) Intermediate (High Intensity) Care, clinical care *etc.*, available twenty-four hours every day by the mental health team at the penitentiary or at a Regional Treatment Centre (RTC); (4) Psychiatric Hospital Care, which is provided at a RTC (as noted above, there are five across Canada) or at an external psychiatric hospital.

[54]     The inmate may be placed in Intermediate Care or Psychiatric Hospital Care but must consent to treatment unless a treatment order is made by a court. If an inmate does not have the capacity to consent, provincial mental health legislation governs how a person may be held as an

involuntary patient and be provided treatment without consent. Involuntary treatment of inmates adheres to provincial legislation.

[55]   The Correctional Service decides where; *i.e.,* in what type of penitentiary, the inmate should be placed. The criteria for placement and transfers are set out in sections 28 to 30 of the Act. Each inmate is assigned a security classification of maximum, medium, or minimum (*CCRA* s. 30). Section 28 sets out the criteria for selection of a particular type of penitentiary for an inmate. Once assigned to a particular type of penitentiary, an inmate will be placed in a cell amongst the general population of inmates at the penal institution. As noted above, the Correctional Service decides on the level of mental health care for that inmate.

[56]   An inmate may be placed in a cell isolated from the general population. Sections 31 to 41 of the *Corrections and Conditional Release Act* along with sections 19 to 23 of SOR/92-620 (Corrections and Conditional Release Regulations) provides for administrative segregation and for a disciplinary system at Federal Government penitentiaries, which includes as one of its punishments, disciplinary segregation. When an inmate is placed in administrative or disciplinary segregation, he or she is separated and isolated from the general population of inmates.

[57]   The isolation from the general population, the physical configuration of the inmate's cell, and the daily experience of administrative segregation and disciplinary segregation are essentially the same. However, the policies and procedures of administrative segregation are different from the policies and procedures of disciplinary segregation, which, as already noted, is an outcome of the disciplinary system of isolating an inmate who offends the rules. Disciplinary segregation is a form of punishment; administrative segregation is a means to provide security amongst the inhabitants of the penitentiary.

[58]   Disciplinary segregation is a sanction imposed at the end of a disciplinary proceeding for a serious offence committed at the penitentiary. It results from a decision made by an Independent Chairperson. Disciplinary segregation is time limited and may not exceed thirty days for a single offence or forty-five days for multiple offences. In contrast, administrative segregation is administered and reviewed differently and may be for extended and indeed may be for an indefinite duration. As the discussion below will reveal, the potential indeterminacy of administrative segregation makes it a greater hardship and actually more punishing than disciplinary segregation.

[59]   Under s. 31 (3) of the *CCRA*, if the institutional head reasonably believes an inmate's safety is at risk then, the Institutional Head can administratively segregate that inmate for his or her own safety or until it can be determined how safety can be ensured.

[60]   The Federal Government's witnesses deposed that administrative segregation is necessary for the safety and security of the penitentiary and their inmates, CSC staff, visitors, and the public. The Federal Government's witnesses deposed that administrative segregation is used to maintain the security of the penitentiary and the safety of Correctional Service staff and of inmates by not permitting particular inmates to associate with other inmates for periods of time. They deposed that sometimes an inmate is placed in administrative segregation to secure his or her safety or the institution's safety pending a relocation of the inmate at a different institution sometimes with a different security rating where the inmate can be safely housed.

[61]   On the summary judgment motion, the Federal Government's witnesses deposed that the

2019 ONSC 1888 (CanLII)

decision to place an inmate in administrative segregation was dependent on multitude of factors and circumstances including: the particular circumstances of the immediate situation that posed a security threat; the inmate's health, behaviour, and history inside and outside the penitentiary; the inmate's attitude and wishes; the inmate's security rating; the relationship of the inmate to other inmates; the nature of the penitentiary's facilities; the availability of CSC staff and resources; and the size and demographics of the inmate population. The Federal Government's witnesses noted that some placements in administrative segregation are voluntary in the sense that the inmate requests for his or her own protection to be segregated from the general inmate population.

[62]    Under the *Corrections and Conditional Release Act,* an inmate in administrative segregation must be released at the earliest appropriate time. However, the Federal Government's witnesses deposed that release might be inappropriate where there was a high degree of risk that the inmate would carry out assaults or retaliation and where the inmate refused to leave segregation even though it has been determined by CSC that it was safe for them to do so. The Federal Government's witnesses deposed that the Warden has a responsibility to encourage the inmate to consider other options that would allow release from segregation; however, some inmates refuse to leave segregation. As there are inmates that voluntarily are placed in administrative segregation for their own protection, they may not wish to leave administrative segregation.

[63]    The number of placements in administrative segregation has decreased from over 8,000 per year to 6,000 per year between 1998 and 2017. Approximately 5% of inmates were segregated for interfering with an investigation (*CCRA* s. 31(3)(b)). Approximately 30% of inmates were segregated for their own safety (*CCRA* s. 31(3)(c). Approximately 65% of inmates were segregated for the safety of others (*CCRA* s. 31(3)(a)). The Federal Government's evidence was that between 30%-50% of those in administrative segregation are placed there at their own request.

[64]    The majority of administrative segregation placements (76% in 2016-2017) had a duration of less than 30 days. The median duration of administrative segregation has decreased from fifteen days to 11 days.

[65]    After an inmate is placed in administrative segregation, the placement is reviewed by the Institutional Segregation Review Board ("ISRB") at a hearing within five days after admission and then again within thirty calendar days and at least once every thirty calendar days thereafter. A review hearing may also be held at any time when the ISRB receives information that challenges the reasons for the inmate's admission in segregation. The ISRB makes a recommendation to the Institutional Head.

[66]    The Regional Segregation Review Board ("RSRB") reviews cases after thirty-eight days of administrative segregation and then every thirty days thereafter. It also reviews cases specifically referred to it to determine whether the administrative segregation should not be continued. The RSRB makes a recommendation to the Regional Deputy Commissioner.

[67]    For an inmate who has spent sixty days or more in administrative segregation, the case is reviewed by the National Long-Term Segregation Review Committee ("NLTSRC"). The NLTRC reviews cases where the inmate has been in segregation for sixty days and will review the case every thirty days thereafter. It also reviews the cases of inmates who have reached four placements in a calendar year or ninety cumulative days in a calendar year and it will review

such cases at least once every thirty days thereafter.

[68]    Commissioner's Directive 709 was amended in August 2017, and under the amended CD 709: (a) the Senior Deputy Commission must review the case when an inmate reaches sixty days of administrative segregation or who has reached four placements in a calendar year or ninety cumulative days in a calendar year; (b) the RSRB must review all cases where the inmate has been in segregation for thirty-eight days; and (c) the Regional Deputy Commissioner is required to review all recommendations of the RSRB at the forty-day mark and determine whether the placement in administrative segregation should continue. Under the amended CD 709, responsibility to chair the NLTSRC has been elevated from the Director General, Security to the Senior Deputy Commissioner, who now has the responsibility to determine whether an inmate is to be maintained in or released from administrative segregation.

[69]    The regulatory provisions and the policies associated with administrative segregation address the matter of the special needs of inmates with mental health problems. Commissioner's Directive 709, *Administrative Segregatio*n requires that before an inmate is placed in administrative segregation, the case is reviewed by a mental health professional to provide a written opinion as to whether there are mental health issues that could preclude the placement in segregation. When an inmate is placed in administrative segregation outside of regular health services hours, the case must be reviewed by a health professional within twenty-four hours.

[70]    While, until recently, it was not expressly a part of any Commissioner's Directives, the historic policy, which was not universally practiced, of the Correctional Service has been not to place inmates who were suicidal or self-harming into administrative segregation.

[71]    Commissioner's Directive 709 was amended in August 2017 to expressly state a prohibition on the use of administrative segregation for inmates: (a) with a serious mental illness with significant impairment; and (b) who are either actively engaging in self-injury that is likely to result in serious bodily harm or are at elevated or imminent risk for suicide. These inmates are "flagged" in the Offender Management System ("OMS") and cannot be placed into administrative segregation until they are "unflagged". Also, in August 1, 2017, Commissioner's Directive 843 (*Interventions to Preserve Life and Prevent Serious Bodily Harm*) was modified to expand the policy from the management of suicidal or self-injurious inmates to also address the needs of inmates with serious mental illness with significant impairment.

[72]    Under administrative segregation under the *Corrections and Conditional Release Act*, the inmate is out of his or her cell for a minimum of two hours daily, including the opportunity to exercise outdoors for at least one hour, and he or she may take a daily shower in addition to the two-hour period. The inmate may have books, a radio, and a TV. The inmate has or may have visits from: from an advocate (immediately upon placement); a health care professional (daily, usually a nurse); the Institutional Head (daily); a correctional manager (once per shift) to inspect the conditions of confinement; legal counsel (periodically); the inmate's Parole Officer to prepare the inmate's Reintegration Action Plan (periodically); visits by family and friends (periodically, on scheduled days); elders or religious advisors (as requested); teachers to provide homework and books for self-study (periodically). The inmate may make telephone calls to friends and family on the inmate's approved calling list and may attend appointments with health professionals.

[73]    An inmate in administrative segregation is visited by a health care professional every day to assess their physical and mental health. A mental health professional provides a written

opinion on the inmate's mental health status and about whether there should be a referral to mental health services within the first twenty-five days of placement and there is an assessment of current mental health status once every subsequent sixty days.

[74]    A health care professional (normally a nurse) must visit each inmate in administrative segregation every day: (a) to determine physical health care needs and any mental health concerns, including suicide or self-injury; (b) to report any information that might have an impact on the safety and security of staff, inmates and/or the institution with the appropriate staff; and (c) to refer the inmate to mental health services if appropriate.

[75]    Messrs. Brazeau and Kift submit that administrative segregation is the equivalent of what is known as solitary confinement, isolation, separation, cellular, lockdown, Supermax, the hole, or Secure Housing Unit ("SHU"), which is the confinement of a prisoner for twenty-two hours or more a day without meaningful human contact. They submit that by placing a Class Member in administrative segregation, the Corrections Services breaches its obligations under the *CCRA*. They submit that administrative segregation is often used as a means of punishment that circumvents the regime for regulating disciplinary segregation. Messrs. Brazeau and Kift submit that administrative segregation violates their *Charter* rights.

[76]    On the summary judgment motion, there was a highly contentious issue about whether administrative segregation qualifies as solitary confinement as it is defined by the United Nations, other organizations, and by academics, criminologists, mental health professionals, and jurists.

[77]    In the immediate case, how real and substantial or conversely how fictional and superficial was the human contact available to an inmate in administrative segregation and how clean and comfortable was the accommodation in administrative segregation or conversely how filthy and uncomfortable were the physical conditions were matters of controversy. Messrs. Brazeau and Kift submitted that the evidence showed that the physical conditions were deplorable and that there was no meaningful or authentic human contact. The evidence of the inmates was that much of the communication with them even by health care providers was by speaking through the food slot in the door to the segregation cell.

[78]    Messrs. Brazeau and Kift submitted that the evidence established that a placement in solitary confinement, *i.e.,* administrative segregation is harmful to every Class Member because: (a)  every Class Member is too sick to be placed in administrative segregation; (b) a placement into solitary confinement deprives every Class Member of needed psychiatric treatment; (c) a placement in administrative segregation causes psychiatric harm to every Class Member by exacerbating the Class Member's disease and by causing new mental diseases; and (d) a placement in administrative segregation causes permanent harm to every Class Member and is deleterious to the purpose of rehabilitating the inmate and returning him or her to the society outside the penitentiary.

[79]    There was a major dispute between the parties about the adequacy of the health care and most particularly about the adequacy of the psychiatric care for inmates with pre-existing serious mental health problems whom, it was submitted by Messrs. Brazeau and Kift, cannot receive therapy or adequate care while in administrative segregation and whom needed it more because solitary confinement makes mentally ill inmates more ill.

[80]    There was a highly contentious argument about whether the evidence showed that the

2019 ONSC 1888 (CanLII)

Correctional Service used administrative segregation as a form of punishment and as a way to avoid the regime of disciplinary segregation.

[81]    The Federal Government asserted that by legislative, regulatory, and policy design, administrative segregation was meant to be different and was in fact different from solitary confinement. The Federal Government submitted that that there was no breach of the *Charter*.

[82]    The Federal Government's witnesses deposed that the psychological effects of administrative segregation were idiosyncratic even for the most seriously mentally ill inmates and that the effects depended on the personality of the inmate, whether the segregation was voluntary or involuntary, the conditions of the confinement cell, and the duration of the placement.  Relying largely on the assertion that the Correctional Service complies with the CCRA and its regulations, the Federal Government denies that administrative segregation is the equivalent of solitary confinement, and it denies any breach of the Class Members' *Charter* rights.

[83]    On June 19, 2017, Bill C-56, *An Act to Amend the Corrections and Conditional Release Act and the Abolition of Early Parole Act* was tabled in Parliament. The Bill introduced a presumptive time limit for confinement in administrative segregation and a system of independent, external review. The Bill did not proceed beyond first reading.

[84]    On October 16, 2018, Bill C-83, *An Act to amend the Corrections and Conditional Release Act and another Act,* was tabled for first reading in the House. Bill C-83 will eliminate the use of administrative segregation but authorize Correctional Services to designate a structured intervention unit ("SIU") where inmates who cannot be accommodated in general population will be placed and allowed to spend at least four hours per day outside their cells to interact with other inmates and a minimum of two hours per day for programs, interventions, and services. Bill-C-83 also introduces patient advocacy services and will also establish a different review process for placements in administrative segregation.

## D.  A Survey History and Historiography of Solitary Confinement and Administrative Segregation

[85]    The history of solitary confinement and the study of its use in Canada and around the world are important parts of the factual background to this summary judgment motion and to Messrs. Brazeau and Kifts' class action and particularly relevant to their claims for *Charter* damages. This history is surveyed in this part of the Reasons for Decision.

[86]    As it happens, the history and historiography of solitary confinement and the history of the juridical, sociological, penological, and medical studies of solitary confinement are part of a body of scientific knowledge that is also a part of the factual narrative for the immediate case. And, as it happens, several witnesses, such as Dr. Grassian, Professor Jackson, Professor Mendez, Dr. Rivera, and Dr. Morgan, apart from their involvement in the immediate case as experts, had roles to play in the history and historiography of solitary confinement.

[87]    The early history of solitary confinement and its effect on prisoners is described by Justice Miller in the 1890 decision of the U.S. Supreme Court in *Re Medley*[11], Justice Miller stated:

---

[11] 134 U.S. 160 at pp. 167-168.

> Solitary confinement as a punishment for crime has a very interesting history of its own, in almost all countries where imprisonment is one of the means of punishment. In a very exhaustive article on this subject in the *American Cyclopedia*, Volume XIII, under the word "Prison" this history is given. In that article it is said that the first plan adopted when public attention was called to the evils of congregating persons in masses without employment, was the solitary prison connected with the Hospital San Michele at Rome, in 1703, but little known prior to the experiment in Walnut Street Penitentiary in Philadelphia in 1787. The peculiarities of this system were the complete isolation of the prisoner from all human society and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction. Other prisons on the same plan, which were less liberal in the size of their cells and the perfection of their appliances, were erected in Massachusetts, New Jersey, Maryland and some of the other States. But experience demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane, others, still, committed suicide, while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community It became evident that some changes must be made in the system, and the separate system was originated by the Philadelphia Society for Ameliorating the Miseries of Public Prisons, founded in 1787.

[88]   In 1829, the Philadelphia Prison in Pennsylvania, U.S. was one of the early adopters of the notion that prisoners could be rehabilitated by confinement in conditions of extreme isolation and separation from other prisoners in the penitentiary. It was theorized that the solitary confinement would inspire reflection and penitence and lead to the rehabilitation of the convicts. As practiced in the Philadelphia Prison solitary separation was very severe. Inmates were hooded when brought into the institution so as not to see or be seen by other inmates as they were led to their cells where they were to reside in isolation.

[89]   After his tour of North America, Charles Dickens in 1850, in his *American Notes for General Circulation* wrote about the penitentiaries in Philadelphia:[12]

> In the outskirts, stands a great prison, called the Eastern Penitentiary: conducted on a plan peculiar to the state of Pennsylvania. The system here is, rigid, strict, and hopeless solitary confinement. I believe it, in its effects, to be cruel and wrong.
>
> In its intention, I am well convinced that it is kind, humane, and meant for reformation; but I am persuaded that those who devised this system of Prison Discipline, and those benevolent gentlemen who carry it into execution, do not know what it is that they are doing. I believe that very few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers; and in guessing at it myself, and in reasoning from what I have seen written upon their faces, and what to my certain knowledge they feel within, I am only the more convinced that there is a depth of terrible endurance in it which none but the sufferers themselves can fathom, and which no man has a right to inflict upon his fellow-creature. I hold this slow and daily tampering with the mysteries of the brain, to be immeasurably worse than any torture of the body: and because its ghastly signs and tokens are not so palpable to the eye and sense of touch as scars upon the flesh; because its wounds are not upon the surface, and it extorts few cries that human ears can hear; therefore I the more denounce it, as a secret punishment which slumbering humanity is not roused up to stay. I hesitated once, debating with myself, whether, if I had the power of saying 'Yes' or 'No,' I would allow it to be tried in certain cases, where the terms of imprisonment were short; but now, I solemnly declare, that with no rewards or honours could I walk a happy man beneath the open sky

---

[12] *American Notes for General Circulation* by Charles Dickens, transcribed from the 1913 Chapman & Hall, Ltd. edition by David Price, The Project Gutenberg eBook https://www.gutenberg.org/files/675/675-h/675-h.htm

> by day, or lie me down upon my bed at night, with the consciousness that one human creature, for any length of time, no matter what, lay suffering this unknown punishment in his silent cell, and I the cause, or I consenting to it in the least degree.

[90]    A less extreme version of isolated confinement was adopted in New York State and at Canada's Kingston Penitentiary, which opened in 1835. However, because of experience from countries around the world that solitary confinement was causing psychiatric and physical illness and disease, by the 1900s the practice of solitary confinement as an institution-wide practice fell out of use in North America and elsewhere.

[91]    Although the scientific explanation for the harm caused by solitary confinement is a product of the later part of the twentieth century, that solitary confinements could have dire psychiatric consequences has been appreciated for well over a century.

[92]    Although solitary confinement declined as a general practice for all inmates in a penitentiary, it continued to be used as a special practice within penitentiaries in the United States, Canada, and across the world.

[93]    Prompted, in part, by events during the Second World War and the Korean War associated with the treatment of prisoners of war, the use of solitary confinement was heavily scrutinized and investigated by social scientists, and a consensus began to build that it was a harsh practice that in some places and in some conditions was tantamount to torture.

[94]    The scientific study of solitary confinement can be placed within the larger study of the psychological significance of social contact and on medical and psychiatric study of the effects of isolation and small group confinement. The study of the psychiatric effects of restricted environmental stimulation have been studied, among others, by the military (submarine service, polar exploration, brainwashing, and interrogation), by the aeronautical industry (long-term flight and space travel), and medical practitioners (patients in long-term traction, in iron lungs, and in blinding eye-patches following surgery). In Canada, funded by the United States' Central Intelligence Agency, researchers at McGill University (and at Harvard University) studied the medical effects of sensory deprivation. There is an enormous academic literature about solitary confinement and associated topics.

[95]    The prison conditions of captured combatants and of civilians was studied by world organizations. In 1957, the UN Economic and Social Counsel adopted the *Standard Minimum Rules for the Treatment of Prisoners* for the humane operation of prisons in accordance with human rights and the rule of law.

[96]    In Canada, under the now repealed *Penitentiary Act*, the practice of segregating and isolating an inmate was known as "dissociation," and it was governed by the now repealed *Penitentiary Service Regulations*. It took some time, but eventually, administrative segregation became the subject of judicial scrutiny and of law reform.

[97]    In the 1970s, in *McCann v. The Queen*,[13] Jack McCann, an inmate of the British Columbia Penitentiary, who had been in administrative segregation (dissociation) for 754 days in what was sardonically known as the "Penthouse" of the British Columbia Penitentiary and seven other inmates who had been placed in administrative segregation for extended periods of time successfully challenged the practice as cruel and unusual punishment contrary to s. 2(b) of the

---

[13] [1976] 1 F.C. 570 (T.D.).

*Canadian Bill of Rights*. Professor Jackson was the academic advisor to the plaintiffs' counsel and interviewed a group of prisoners who had been placed in the Penthouse, which was located at the top floor of the penitentiary. Professor Jackson's account of the interviews reads like a non-fiction version of Kafka's *the Penal Colony*.

[98]    Around the same time as the McCann litigation, the matter of the use of segregation in particular and the management of penitentiaries generally became the subject of study and law reform by the Federal Government. In the 1970s, the Solicitor General appointed James Vantour to deliver a report on the use of segregation, and after riots at the Kingston Penitentiary, an all-party House of Commons subcommittee chaired by Mark MacGuigan delivered a report about the federal penitentiary system. The subcommittee endorsed a recommendation of the Vantour Report that placements in segregation be reviewed by review boards.

[99]    In 1980, in *Martineau v. Matsqui Disciplinary Bd.*,[14] the Supreme Court held that the decisions of penitentiary authorities were subject to judicial review oversight and an administrative law duty to act fairly.

[100]   After the enactment of the *Charter* in 1982, the Federal Government ordered a review of the federal laws regarding penitentiaries. The Correctional Law Review reported that the regulation of administrative segregation, then known as dissociation, was deficient.

[101]   In 1983, Dr. Grassian (a witness for Messrs. Brazeau and Kift in the immediate case) published his very influential article in the *American Journal of Psychiatry* entitled *Psychopathological Effects of Solitary Confinement.*[15] The article reported on the effects of solitary confinement on inmates and identified a syndrome caused by solitary confinement.

[102]   On December 10, 1984, the United Nations General Assembly adopted the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment and Punishment* (1465 UNTS 85), which Canada ratified on July 24, 1987. The Convention prohibits torture and cruel, inhuman, or degrading treatment or punishment and imposes on each state party affirmative obligations to prevent such acts in any territory under its jurisdiction.

[103]   In 1985, in *Cardinal v. Director of Kent Institution*,[16] the Supreme Court held that the duty to act fairly applied to decisions about administrative segregation.

[104]   In 1990, the Federal Government released a comprehensive consultation package about amendments to the corrections law, which was followed by the enactment in 1992 of the *Corrections and Conditional Release Act* and its regulations.

[105]   In 1996, the Honourable Louise Arbour released the report of *Commission of Inquiry into Certain Events at the Prison for Women in Kingston*. The Arbour Commission investigated an incident in the Prison for Women in Kingston. In the incident, four Correctional Service officers were attacked by a group of inmates, five staff members were taken hostage, two inmates were killed, the institution was locked down, and the inmates were effectively left in administration segregation for an extended time because the officers refused to unlock the range of cells.

[106]   In her report, Justice Arbour set out the report of the penitentiary's psychologists of the effect of prolonged segregation on the mental health of the women inmates. The psychologists

---

[14] [1980] 1 S.C.R. 602.
[15] (1983), 140 *Am. J. Psychiatry* 1450.
[16] [1985] 2 S.C.R. 643.

report stated:

> Many of the symptoms currently observed are typical effects of long-term isolation and sensory deprivation. […] The following symptoms have been observed: perceptual distortions, auditory and visual hallucinations, flashbacks, increased sensitivity and startle response, concentration difficulties and subsequent effect on school work, emotional distress due to the extreme boredom and monotony, anxiety, particularly associated with leaving the cell or seg area, generalized emotional lability at times, fear that they are "going crazy" or "losing their minds" because of limited interaction with others which results in lack of external frames of reference, low mood and generalized sense of hopelessness.

[107]   The Arbour Commission, found that the rule of law was not a feature of the administration of the penitentiary, and, among other things, the Commission recommended: (a) for administrative segregation, the initial segregation be for a maximum of three days followed by a review for further segregation up to a maximum of thirty days; (b) an inmate not spend more than sixty non-consecutive days in segregation in a year; (c) after thirty days or if the days served in segregation during a year approached sixty, the Correctional Service should employ other options or the Correctional Service should apply to a court for a determination of the necessity of further segregation.

[108]   Following the Arbour Commission, the Correctional Service established the Task Force on Administrative Segregation. From 1998-2006, Professor Jackson was an independent member of the Task Force, an advisory group for the Commissioner. The Task Force's mandate was to address the recommendations of the Arbour Commission. The Task Force visited every segregation unit within the Correctional Service and provided advice to the Commissioner. The task force made findings about the operational realities of administrative segregation and made recommendations for practice reforms. In his expert's report for the case at bar, Professor Jackson stated that the systemic problems that the Task Force identified in relation to the treatment of mentally ill inmates were by and large not implemented and the problems continued.

[109]   There were other investigations of penitentiary practices in the years following Justice Arbour's report that made recommendations similar to those made by Justice Arbour's Commission including the Correctional Services Working Group on Human Rights chaired by Max Yalden (1997); the House of Commons Standing Committee on Justice and Human Rights which produced a report in 2000, and the Canadian Human Rights Commission, which in 2003 released a report entitled *Protecting Their Rights: A Systemic Review of Human Rights in Correctional Services for Federally Sentenced Women*.

[110]   In 2006, Dr. Grassian published an article entitled *Psychiatric Effects of Solitary Confinement*.[17]   The article was an extensive review of the academic literature about the medical effects of solitary confinement and it updated the work that he had completed for his journal article in 1983.

[111]   On December 13, 2006, the United Nations General Assembly adopted the *Convention on the Rights of Persons with Disabilities* (GA. Res. 61/106), which Canada ratified on March 11, 2010. Article 14 of the Convention provides that State parties should ensure that "the existence of a disability shall in no case justify a deprivation of liberty" and that persons with disabilities who are deprived of their liberty "shall be treated in compliance with the objectives

---

[17] (2006), 22 *Washington University Journal of Law and Policy* 325.

and principles in the present Convention, including by provision of reasonable accommodation."

[112]   On October 19, 2007, Ashley Smith, who was nineteen year's old and an inmate at the Grand Valley Institution for Women committed suicide in her segregation cell. There was a coroner's inquest. Ms. Smith committed suicide after extended periods in administrative segregation. In 2013, the coroner's jury delivered over a hundred recommendations including: (a) improving the conditions of administrative segregation; (b) requiring that both the institutional head of the penitentiary and also a mental health professional visit the inmate daily; (c) abolishing indefinite solitary confinement; (d) prohibiting placing a female inmate in segregation for periods in excess of fifteen days and for more than sixty days in a calendar year; (e) that female inmates with serious mental health issues be placed in a treatment facility not a security-focused penitentiary.

[113]   The Correctional Service rejected the jury's recommendations in the Ashley Smith inquiry. The CSC stated that the adoption of the recommendations would cause undue risk to the safe management of the correctional system. In its *Response to the Coroner's Inquest Touching the Death of Ashley Smith*, the Federal Government did, however, accept that long periods in administrative segregation was not conducive to the inmate's health or to meeting the goals of the correctional planning process.

[114]   In 2008, the Corrections Investigator (then Howard Sapers) did an investigation of the Ashley Smith tragedy, and he released a report dated June 28, 2008, entitled *A Preventable Death*. The Corrections Investigator concluded that Ms. Smith's death was preventable. He stated that had there been an independent adjudicator and a detailed review of the case alternatives would have been implemented to placing Ms. Smith in administrative segregation. He recommended that the immediate implementation of independent adjudication of segregation placements of inmates with mental health concerns, to be completed within 30 days of the placement, with the adjudicator's decision to be forwarded to the regional deputy commissioner.

[115]   In his 2009-2010 Annual Report, the Corrections Investigator noted the continuing problems associated with mentally ill inmates being placed in administrative segregation. The report stated:

> In the past year, I have been very clear on the point that mentally disordered offenders should not be held in segregation or in conditions approaching solitary confinement. Segregation is not therapeutic. In too many cases, segregation worsens underlying mental health issues. Solitary confinement places inmates alone in a cell for 23 hours a day with little sensory or mental stimulation, sometimes for months at a time. Deprived of meaningful social contact and interaction with others, the prisoner in solitary confinement may withdraw, "act out" or regress. Research suggests that between one-third and as many as 90% of prisoners experience some adverse symptoms in solitary confinement, including insomnia, confusion, feelings of hopelessness and despair, hallucinations, distorted perceptions and psychosis.
>
> […] There is growing international recognition and expert consensus that the use of solitary confinement should be prohibited for mentally ill prisoners and that it should never be used as a substitute for appropriate mental health care.

[116]   Corrections Canada declined to implement the recommendations of the Correctional Investigator. Instead, it undertook to arrange an external review of its practices associated with administrative segregation. It retained, Dr. Rivera (another witness in the immediate proceeding for Messrs. Brazeau and Kift) to prepare a report.

2019 ONSC 1888 (CanLII)

[117]   In May 2010, Dr. Rivera published her findings and recommendations in a report entitled *Operational Examination of Long-Term Segregation and Segregation Placements of Inmates with Mental Health Concerns in the Correctional Service of Canada*. She recommended, among other things, a reduction in the use of administrative segregation, particularly for prisoners with mental health issues, the development of alternatives to administrative segregation, and improvements to the physical and operational conditions of segregation.

[118]   While Dr. Rivera was undertaking her review, on August 13, 2010, Edward Snowshoe, a 22-year-old Aboriginal man who suffered from serious mental illness, committed suicide in a segregation cell at Edmonton Institution after spending 162 days in administrative segregation. The Honourable Justice James K. Wheatley, an Alberta Provincial Court Judge, conducted an inquiry and reported to the Minister of Justice and Attorney General of Canada. He concluded that the review procedure for administrative segregation had not functioned properly and that Mr. Snowshoe's plight while in administrative had gone unnoticed.

[119]   In August 2011, Professor Mendez, the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment submitted an interim report to the United Nations General Assembly with respect to solitary confinement. (Cruel Inhuman and or Degrading Treatment is referred to as "CIDT".) Solitary confinement was defined as the physical and social isolation of individuals who are confined to their cells for twenty-two to twenty-four hours a day. The Special Rapporteur concluded that in certain circumstances solitary confinement constituted torture as defined in Article 1 of the of the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, or constituted CIDT as Defined in Articles 1 and 16 of the *Convention* and Article 7 of the *International Covenant on Civil and Political Rights*.[18]

[120]   Here it may be noted that as a matter of international law, the Federal Government has agreed to be bound by the provisions of both the *Convention against Torture* and the *International Covenant on Civil and Political Rights*.

[121]   In his 2011 Report to the General Assembly, the Special Rapporteur stated that solitary confinement reduces meaningful social contact to an absolute minimum and that the resulting level of social stimulus is insufficient to allow the individual to remain in a reasonable state of mental health. He states that, if the insufficient social stimulus is occurs for even a few days, brain activity shifts toward an abnormal pattern. The Special Rapporteur wrote:

> Negative health effects can occur after only a few days in solitary confinement and the health risks rise with each additional day spent in such conditions. Experts who have examined the impact of solitary confinement have found three common elements that are inherently present in solitary confinement: social isolation, minimal environmental stimulation and "minimal opportunity for social interaction". Research can include anxiety, depression, anger, cognitive disturbances, perceptual distortions, paranoia, and psychosis and self-harm.

[122]   The Special Rapporteur specified that the circumstances where solitary confinement amounted to torture or CIDT were: (a) where the physical conditions were so poor and the regime so strict that they lead to severe mental and physical pain or suffering of individuals subject to the confinement; (b) the confinement was of indefinite duration; and (c) the confinement was prolonged. The Special Rapporteur reported that the placement in solitary

---

[18] 999 U.N.T.S. 171.

2019 ONSC 1888 (CanLII)

2019 ONSC 1888 (CanLII)

confinement of any duration of persons with mental disabilities was CITD.

[123]  The Special Rapporteur concluded that given the negative psychological and physiological effects of solitary confinement, which can manifest after only a few days, the practice should only be used in exceptional circumstances, as a last resort, for as short a time as possible, and subject to minimum procedural safeguards. He recommended an absolute prohibition on indefinite solitary confinement and on placements exceeding fifteen consecutive days and the abolition of its use for persons with mental disabilities.

[124]  In the 2010-2011 Annual Report of the Correctional Investigator, the Correctional Investigator stated that: the practice of placing mentally ill offenders or those at risk of suicide or serious self-injury in prolonged segregation must stop; the Correctional Service's approach to preventing deaths in custody must change; that inmates with mental health issues in long-term administrative segregation (beyond 60 days) were not being independently and expertly monitored; and there was not enough practical alternatives such as intermediate mental health care units to end the practice of placing inmates with mental health problems in long-term segregation.

[125]  In the 2011-2012 Annual Report, the Correctional Investigator recommended an absolute prohibition of placing mentally ill offenders and those at risk of suicide or serious self-injury in prolonged segregation. He said that this was in keeping with Canada's domestic and international human rights commitments.

[126]  In the 2014-2015 Annual Report, the Correctional Investigator recommended prohibiting segregation in excess of fifteen days for inmates suffering from serious mental illness. The Correctional Investigator objected to the fact that administrative segregation was being used as a punitive measure to circumvent the more onerous due process requirements of the disciplinary segregation system.[19] He recommended that the *Corrections and Conditional Release Act* be amended to significantly limit the use of administrative segregation for young offenders and for the mentally ill and to impose a maximum of no more than 30 continuous days of administrative segregation with judicial oversight or independent adjudication for a subsequent stay beyond the initial thirty day placement.

[127]  In 2015, the United Nations General Assembly acted on the reports of the Special Rapporteur. His opinions informed the United Nations' decision to update the *Standard Minimum Rules for the Treatment of Prisoners*. The revised rules were unanimously adopted by the UN General Assembly in 2015. These rules are known as the Nelson Mandela Rules" in honor of Mandela who spent twenty-seven years in prison, the first eighteen of which were on Robben Island, South Africa, where Mandala was placed in solitary confinement.

[128]  Rule 43 of the revised Mandela Rules state:

> *Rule 43*
>
> (1) In no circumstances may restrictions or disciplinary sanctions amount to torture or other cruel, inhuman or degrading treatment or punishment. The following practices, in particular, shall be prohibited:
>
> (a) indefinite solitary confinement;

---

[19] 2014-2015 Annual Report at p. 30.

(b) prolonged solitary confinement;

(c) placement of a prisoner in a dark or constantly lit cell ...

[129]   Although it did not involve a federal penitentiary, the most recent, and a distressing and disgraceful, incident in the history of administrative segregation in Canada is the matter of Adam Capay, a young member of Lac Seul First Nation whose murder charges in *R. v. Capay*,[20] were dismissed because of his experience in administrative segregation at a provincial prison pending his trial. His plight in solitary confinement was discovered and revealed by the Ontario Ombudsman who published a report on segregation practices in provincially run institutions.

[130]   For decades, the Federal Government's regime for administrative segregation has been criticized for the absence of a robust and timely adjudicative review process for placements in administrative segregation infused with the rule of law. The Arbour Commission of Inquiry and the Task Force on Administrative Segregation recommended that a placement in administrative segregation be reviewed within three days to determine whether it should be continued.

[131]   For decades, the Federal Government's regime for administrative segregation has been criticized for the failure to adequately monitor the segregated inmate's current mental health status, with a special emphasis on the evaluation of the risk for self-harm.

## E.   *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*

[132]   In *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*,[21] on January 27, 2015, in Ontario, the Canadian Civil Liberties Association, a national organization established in 1964 to protect and promote respect for and observance of fundamental human rights and civil liberties, sued the Federal Government.

[133]   In its action, the Association submitted that the legislation that authorizes administrative segregation is contrary to the *Charter*. The Association sought a declaration that sections 31-37 of the *Corrections and Conditional Release Act,* which permit the Correctional Service to remove an inmate from the general population of inmates in a penitentiary for a non-disciplinary reason are invalid because they infringe sections 7, 11 (h) and 12 of the *Charter*.

[134]   In December 2017, Associate Chief Justice Marrocco held that the administrative segregation sections of the *CCRA* contravened section 7 of the *Charter*, and the contravention could not be saved under section 1 of the *Charter*.[22] Associate Chief Justice Marrocco held that every inmate suffered a section 7 breach because of the Federal Government's failure to provide an independent review of the decision to place an inmate in administrative segregation.

[135]   Because he accepted that the security of the institution was a legitimate concern and because he accepted that the Correctional Service could adequately monitor inmates who are in administrative segregation to identify when an inmate's physical and mental health is deteriorating, Justice Marrocco concluded that the current legislative scheme that permitted prolonged administrative segregation did not inevitably result in treatment of an inmate that constitutes a cruel and unusual punishment contrary to section 12 of the *Charter*. Thus, he concluded that the legislation was contrary to section 7 but was not contrary to section 12 of the

---

[20] 2019 ONSC 535.
[21] 2017 ONSC 7491.
[22] *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, 2017 ONSC 7491.

*Charter*.

[136]   I pause to foreshadow that based on the evidentiary record in the immediate case, I agree with Justice Marrocco's decision with respect to section 7 of the *Charter,* but I disagree with his finding that there is no breach of section 12 of the *Charter* with respect to the seriously mentally ill inmates that are the Class Members of the case at bar.

[137]   In *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, the Federal Government was directed to redraft the legislation within twelve months of the decision. The Federal Government did not appeal the decision, but it applied for and was granted an extension of time to revise the legislation to April 30, 2019.[23]   The Canadian Civil Liberties Association did appeal the decision.

[138]   Associate Chief Justice Marrocco made the following factual and legal findings that are relied on by Messrs. Brazeau and Kift on this summary judgment motion: (a) the Mandela Rules promulgated by the United Nations represent an international consensus of proper principles and practices in the management of prisons and the treatment of those confined; (b) the placing of an inmate in in administrative segregation imposes a psychological stress, quite capable of producing serious permanent observable negative mental health effects; (c) reputable Canadian medical organizations such as the Canadian Medical Association, the College of Family Physicians of Canada, the Registered Nurses Association of Ontario regard administrative segregation as a harmful practice; (d) the harmful effects of sensory deprivation caused by solitary confinement can occur as early as forty-eight hours after segregation; (e) administrative segregation can change brain activity and becomes symptomatic within seven days or less; (f) administrative segregation of fifteen days duration posed a serious risk of psychological harm; (g) administrative segregation exacerbates existing mental illness; (h) prolonged administrative segregation poses a serious risk of negative psychological effects; (k) keeping a person in administrative segregation for an indefinite prolonged period exposes that person to abnormal psychological stress and will if the stay continues indefinitely result in permanent psychological harm; (l) the practice of keeping an inmate in administrative segregation for a prolonged period is harmful and offside responsible medical opinion; (m) lack of independent review of the warden's decisions amounted to virtually no accountability for the decision to segregate; (n) there was an inherent conflict between the administrative segregation sections of the *CCRA* and the mental health section of the Act (s. 87(a)) that entailed that the mental health of inmates could not be considered within the administrative segregation decision-making process; and, (o) CD 709 created a risk that the Institutional Head would exercise his or her discretion in a way that would contravene 87(a) of the Act and not consider mental health risk in the decision to release from administrative segregation.

[139]   Messrs. Brazeau and Kift also rely on the fact that in his decision, Associate Chief Justice Marrocco rejected the Colorado Study, the Zinger Study, and parts of Dr. Morgan's evidence.[24] These were the primary research studies relied on by Dr. Glancy in the immediate case

---

[23] *Canadian Civil Liberties Assn. v. Canada (Attorney General)*, 2018 ONCA 1038.

[24] It is a nice point that I need not for present purposes decide, about how far a party can rely on a judge's comments about the evidence of a witness in one proceeding when that witness gives similar evidence in a subsequent proceeding. In any event, what Associate Chief Justice Marrocco said was that he did not reject the totality of the evidence of any of the experts but that some aspects of the evidence of the experts were entitled to more weight than others. See *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, 2017 ONSC 7491 at para. 62.

## F.   *British Columbia Civil Liberties Association v. Canada (Attorney General)*

[140]   In 2017, in British Columbia, in *British Columbia Civil Liberties Association v. Canada (Attorney General)*, the British Columbia Civil Liberties Association and the John Howard Society of Canada sued the Federal Government challenging the administrative segregation legislation as contrary to the *Charter*.

[141]   I pause to note that the British Columbia action, which involved a 36-day trial with *viva voca* cross-examinations before Justice Leask, seems to have been used by Class Counsel and counsel for the Federal Government in the immediate case as a kind of litigation template for the five-day summary judgment motion. Some of the witnesses in the immediate case gave evidence in the British Columbia action and the evidence and the arguments in the cases were similar.

[142]   On January 17, 2018, Justice Leask held that the administrative segregation sections of the *Corrections and Conditional Release Act* contravened section 7 and section 15 of the *Charter*, and the contraventions could not be saved under section 1 of the *Charter*.[25] He did not find a breach of sections 9 and 12 of the *Charter*. The Federal Government was directed to redraft sections of the Act within twelve months of the decision. The Federal Government appealed the decision, which was heard by the British Columbia Court of Appeal on November 13-14, 2018 and is currently under reserve.[26] The Federal Government was granted an extension of time to redraft its legislation until June 17, 2019.[27]

[143]   Justice Leask made the following factual and legal findings that are relied on by Messrs. Brazeau and Kift on this summary judgment motion: (a) administrative segregation conforms to the definition of solitary confinement found in the Mandela Rules; (b) administrative segregation is a form of solitary confinement that places all Canadian federal inmates subject to it at significant risk of serious psychological harm, including mental pain and suffering, and increased incidence of self-harm and suicide; (c) some of the specific harms of administrative segregation include anxiety, withdrawal, hypersensitivity, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behaviour; (d) the risks of these harms are intensified in the case of mentally ill inmates; however, all inmates subject to segregation are subject to the risk of harm to some degree; (e) the indeterminacy of administrative segregation is a particularly problematic feature that exacerbates its painfulness, increases frustration, and intensifies the depression and hopelessness that is often generated in the restrictive environments that characterize segregation; (f) while many of the acute symptoms of mental illness caused by administrative segregation are likely to subside upon termination of segregation, many inmates are likely to suffer permanent harm as a result of their confinement; (g) the harm of administrative segregation is most commonly manifested by a continued intolerance of social interaction, which has adverse repercussions for an inmates' ability to successfully readjust to the social environment of the prison general population and to the broader community upon release

---

[25] *British Columbia Civil Liberties Association v. Canada (Attorney General),* 2018 BCSC 62.

[26] On the appeal, the Criminal Defence Advocacy Society, the Native Women's Association of Canada, the West Coast Legal Education and Action Fund, the Canadian Association of the Elizabeth Fry Societies, the Canadian Human Rights Commission, the Canadian Prison Law Association but not the Attorney General of Ontario were granted intervenor status for the appeal: *British Columbia Civil Liberties Association v. Canada (Attorney General),* 2018 BCCA 282.

[27] *British Columbia Civil Liberties Association v. Canada (Attorney General),* 2019 BCCA 5.

from prison; (h) negative health effects from administrative segregation can occur after only a few days in segregation, and those harms increase as the duration of the time spent in segregation increases; (i) although the fifteen-day maximum prescribed by the Mandela Rules is a generous standard given the overwhelming evidence that even within that space of time an individual can suffer severe psychological harm; nevertheless, it is a defensible standard; (j) the history of solitary confinement in the United States and more particularly in Germany, demonstrates that these harmful effects have been recognized since the late 19th and early 20th centuries; (k) inmates with mental disabilities are over-represented in administrative segregation; (l) CD 709 is deficient because its definition of serious mental illness was both unclear and too narrow and intermingled symptoms and diagnoses; and (m) the Federal Government's processes for dealing with mentally ill inmates were deficient and failed to appreciate the size and seriousness of the health issue.

[144]   Messrs. Brazeau and Kift also rely on the fact that in his decision, Justice Leask rejected the Colorado Study, the Zinger Study, and a meta-analysis co-authored by Dr. Morgan, which are the studies that Dr. Glancy relied on in the immediate case. (Dr. Morgan was a witness in the immediate case.)

## G. *Res Judicata*, Issue Estoppel, and Abuse of Process

[145]   *Res judicata*, issue estoppel, and abuse of process, which are related and partially overlapping legal doctrines, are bars to litigation that preclude a party from re-litigating a claim, a defence, or an issue that has already been determined. Cause of action estoppel, which is a branch of *res judicata*, precludes a litigant from asserting a claim or a defence that: (a) it asserted; or (b) it had an opportunity of asserting and should have asserted in past proceedings, which is the rule from *Henderson v. Henderson*.[28] Issue estoppel, another branch of *res judicata*, precludes a litigant from asserting a position that is inconsistent or contrary to a fundamental point already decided in a proceeding in which the litigant participated.

[146]   The requirements for an issue estoppel are: (1) the parties must be the same; (2) the same question must be involved in the initial and subsequent hearing; (3) the question must have been actually litigated and determined in the first hearing and its determination must have been necessary to the result; and (4) the decision on the issue must have been final.[29]

[147]   Abuse of process is a doctrine that a court may use to preclude re-litigation of a cause of action or an issue. The court has an inherent jurisdiction to prevent the misuse of its process that would be manifestly unfair to a party to the litigation or would in some other way bring the administration of justice into disrepute, and the court can and has used this jurisdiction to preclude re-litigation when the strict requirements of *res judicata* or issue estoppel are not satisfied.[30]

[148]   In *Danyluk v. Ainsworth Technologies Inc.*[31] and in *Penner v. Niagara (Regional Police Services Board)*,[32] the Supreme Court added a discretionary element to *res judicata* and to the

---

[28] (1843), 67 E.R. 313, 3 Hare 100.
[29] *Danyluk v. Ainsworth Technologies Inc.*, 2001 SCC 44.
[30] *Toronto (City) v. C.U.P.E., Local 79*, [2003] 3 S.C.R. 77; *Canam Enterprises Inc. v. Coles* (2000), 51 O.R. (3d) 481 at paras. 55-56, *per* Justice Goudge dissenting (C.A.), approved [2002] 3 S.C.R. 307.
[31] 2001 SCC 44.
[32] 2013 SCC 19.

flexible doctrine of abuse of process. The Supreme Court held that where a party establishes the pre-conditions for an issue estoppel or an abuse of process, a court must still determine whether, as a matter of discretion, issue estoppel ought to be applied. The court should stand back and, taking into account the entirety of the circumstances and consider whether an estoppel in the particular case would work an injustice.

[149]   In *Danyluk v. Ainsworth Technologies Inc*. and in *Penner v. Niagara (Regional Police Services Board)* the Court recognized that there may be situations where re-litigation would enhance the integrity of the judicial system; for example: (1) when the first proceeding is tainted by fraud or dishonesty; (2) when fresh, new evidence, previously unavailable conclusively impeaches the original results; or (3) when fairness dictates that the original result should not be binding in the new context. In these instances, the subsequent proceeding would not be an abuse of process.

[150]   In the immediate case, Messrs. Brazeau and Kift submit that there are estoppels binding on the Federal Government arising from *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*[33] and *British Columbia Civil Liberties Association v. Canada (Attorney General)*.[34] In particular, Messrs. Brazeau and Kift submit that it is res judicata that: (a) solitary confinement takes place in Canada; (b) solitary confinement is harmful, generally; (c) the harms of solitary confinement are amplified for people who suffer from mental illness; (d) Class Members suffered a section 7 breach when they could not access an independent review of the warden's decision to segregate; and, (e) the *CCRA* contains a legislative conflict that negatively impacts the *Charter* rights of the mentally ill.

[151]   In the immediate case, Messrs. Brazeau and Kift, however, submit that they are not bound by the findings in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* and *British Columbia Civil Liberties Association v. Canada (Attorney General)* that s. 31 of the *Corrections and Condition Release Act* does not violate section 9 of the *Charter* and does not violate section 12 of the *Charter*.

[152]   Messrs. Brazeau and Kift submit that these decisions are not binding on them because they are not privy to the applicants in those cases and the courts in those cases did not consider the seriously mentally ill. Therefore, Messrs. Brazeau and Kift submit that the claims of the Class Members in the immediate case have not been already determined and require separate scrutiny. They submit that the Class Members are a highly vulnerable group for whom administrative segregation will be an arbitrary detention or imprisonment and will constitute cruel and unusual treatment notwithstanding the findings in these cases.

[153]   In the immediate case without relying on *res judicata* and its related doctrines but based on the evidence and my own weighing of the evidence, I shall make my own findings of fact and law. In other words, I make my findings on the substantive merits and I exercise my discretion not to invoke any issue estoppels.

[154]   It was all of unnecessary and late-arriving opportunism for Messrs. Brazeau and Kift to raise an issue estoppel based on the findings *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*[35] and *British Columbia Civil Liberties Association v.*

---

[33] 2017 ONSC 7491.
[34] 2018 BCSC 62.
[35] 2017 ONSC 7491.

Canada (Attorney General).

[155]   It is oxymoronic to submit, as Messrs. Brazeau and Kift submit – with hindsight and after the fact - that the results in the immediate case have been predetermined except with the issues that were not decided favorably for them. The extensive evidence for the case was prepared before these decisions and what actually was predetermined is that the parties would repeat evidence and arguments that were being tested in other courts in judgments that were under reserve. It was and is too late to prevent re-litigation, and no purpose would now be served by imposing an issue estoppel, and it would not be fair nor in the interests of justice to do so.

[156]   Therefore, as I shall elucidate below, without evoking any issue estoppels, I find as a fact that: (a) administrative segregation as practiced by the Corrections Service is a form of solitary confinement; (b) administrative segregation is harmful and may cause psychiatric injuries; and (c) the harms of administrative segregation are amplified for people who suffer from mental illness. I find as a matter of *stare decisis*, which is a different doctrine than *res judicata*, and based on my own analysis of the facts in the immediate case, I concluded that Class Members suffered a section 7 breach when they could not access an independent review of the warden's decision to place them in administrative segregation. I also without evoking any issue estoppels make the findings set out later particularly in Part N of these Reasons for Decision.

[157]   For the purposes of the immediate case, on the issue of whether the *CCRA* contains a legislative conflict that negatively impacts the *Charter* rights of the mentally ill, it is not necessary on the merits for me to comment about Justice Marrocco's decision in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* on this point. I, therefore, shall say nothing more about it.

[158]   While I do not agree with Messrs. Brazeau and Kifts' submission that the *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* decision is distinguishable on the issue of whether administrative segregation is cruel and unusual treatment for the Class Members who are the sickest of the mentally ill inmates, I shall come to a decision on the merits of this issue, and, once again, I shall not rely on any issue estoppel. As noted in the introduction to these Reasons for Decision, I do find that section 12 of the *Charter* has been breached for a subclass of Class Members.

## H.  Evidentiary Record

[159]   Not counting the compendiums prepared for the argument of the motion, the evidentiary record for this summary judgment motion is approximately 31,000 pages. Messrs. Brazeau and Kift proffered: a five-volume motion record of 3,512 pages, a three-volume reply motion record of 2,129 pages, and a ten-volume brief of answers to undertakings of 6,196 pages. The Federal Government proffered a responding motion record of thirty-eight volumes and 14,288 pages. The six-volume transcript brief of the cross-examinations was 4,981 pages long.[36]

[160]   Messrs. Brazeau and Kift supported their summary judgment motion with the evidence of the following nineteen affiants:

- **James Austin** swore affidavits dated July 21, 2017 and January 29, 2018 and was cross-

---

[36] Messrs. Brazeau and Kifts' facta were 177 pages. The Federal Government's facta were 290 pages. The Books of Authorities were approximately 8,000 pages,

2019 ONSC 1888 (CanLII)

examined. He is an American sociologist with a Ph.D. in sociology from the University of California, at Davis. His expertise is in the management of prison populations, including the use of administrative segregation. He is the president of the JFA Institute which is non-government organization that works in partnership with federal, state, and local government agencies, and philanthropic foundations to evaluate criminal justice practices and design research-based policy solutions. He previously was the Director of the Institute of Crime, Justice and Corrections at the George Washington University (1999 to 2003) and the Executive Vice President for the National Council on Crime and Delinquency (1982 - 1998). From 1970 – 1975, he was employed by the Illinois Department of Corrections at the Stateville and Joliet prisons as a correctional sociologist. He has been an expert witness in three American cases about the segregation of inmates with significant mental illnesses. He has been retained as a consultant by the U.S. Federal Bureau of Prisons. Mr. Austin provided an opinion on the appropriateness of placing mentally ill inmates into administrative segregation and what alternatives to existing policies and practices should be pursued. Mr. Austin also responded to the affidavits of Drs. Morgan and Glancy and Messrs. Turgeon and Ryan, who provided evidence for the Federal Government.

- **Anthony Paul Blais** of Campbellford, Ontario, swore an affidavit dated July 17, 2017. Although he has serious mental health problems from childhood and throughout his life, the Federal Government disputes whether he satisfies the criteria for class membership. He was in penitentiary from 1990 to 1995, 2002 to 2007 and since 2014. He has been incarcerated at Millhaven Institution in Ontario, Kingston Penitentiary in Ontario, the Regional Treatment Centre ("RTC") in Saint-Anne-Des Plaines in Québec, Port-Cartier Institution in Québec, Donnacona Institution in Québec, Cowansville Institution in Québec, Edmonton Institution in Alberta, Bowden Institution in Alberta, Joyceville Institution in Ontario, Stoney Mountain Institution in Manitoba, Beaver Creek Institution in Ontario, and Warkworth Institution in Ontario. In his affidavit, Mr. Blais describes his experiences in prison, his confinements in administrative segregation, and the nature of the mental health care he received. He describes the effects on him of his experiences while in penitentiary.

- **Christopher Brazeau** of Kelona, British Columbia, one of the Representative Plaintiffs, swore an affidavit dated July 12, 2017. Mr. Brazeau has had serious mental health problems from childhood. In his affidavit, he describes his twelve-year incarceration between 2004 and 2016 at the following institutions: Stoney Mountain Institution in Manitoba, Saskatchewan Penitentiary, Kent Institution in British Columbia, a Regional Treatment Centre in British Columbia, Edmonton Institution in Alberta, Grand Cache Institution in Alberta, and Matsqui Institution in British Columbia. Mr. Brazeau described his frequent and prolonged confinements in administrative segregation and the nature of the treatment he received for his mental health problems. Among other experiences, he was transferred from administrative segregation to a Regional Treatment Centre for intensive psychiatric treatment for a year only to be returned to administrative segregation for a year's confinement. He described the severe adverse effects on him of having been in administrative segregation. The Federal Government denies that Mr. Brazeau's placements in administrative segregation were related to his mental health conditions. On a grievance by Mr. Brazeau, the Deputy Commissioner of Correctional

Service Canada concluded that Kent Institution did not endeavor to release him from segregation at the earliest appropriate time. By the time of his release in 2016, Mr. Brazeau was placed in administrative segregation on twenty-five occasions for a total of three years.

- **Gary Chaimowitz** swore affidavits dated July 28, 2017 and January 11, 2018 and was cross-examined. He is a psychiatrist, a professor in the Department of Psychiatry and Behavioral Neurosciences at McMaster University, and the Head of Forensic Psychiatry at St. Joseph's Health Care Centre in Hamilton. He was a member of the expert panel in the Ashley Smith Inquiry, which concerned Ms. Smith's death while in administrative segregation. Dr. Chaimowitz was an expert witness in In *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, discussed below. In his report for the immediate summary judgment motion, Dr. Chaimowitz opined that there is a methodology to assess the *Charter* damages in the aggregate for Class Members who have been subjected to solitary confinement, and he described that methodology.

- **Darek Chandler** of Calgary, Alberta swore an affidavit dated June 9, 2017. Mr. Chandler has suffered from severe paranoid schizophrenia, Post Traumatic Stress Disorder ("PTSD"), and generalized anxiety disorder. He was incarcerated at the Bowden Institution in Alberta. He did not spend time in administrative segregation. In his affidavit, he describes his experiences while in prison, and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Christopher Gismondi** of Fort Saskatchewan, Alberta, swore an affidavit dated July 14, 2017. Although from adolescence, he has suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), PTSD, Conduct Disorder, and Oppositional Defiant Disorder ("ODD"), the Federal Government disputes whether he satisfies the criteria for class membership. Mr. Gismondi has been convicted of numerous offences, and he has been incarcerated at Millhaven Institution in Ontario, Saskatchewan Penitentiary, and Edmonton Institution in Alberta. In his affidavit, he describes his experiences while in prison, his confinements in administrative segregation and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Stuart Grassian** swore affidavits dated July 7, 2017 and January 29, 2018 and was cross-examined. Dr. Grassian is a board-certified psychiatrist, licensed to practice medicine in Massachusetts, United States with over 40 years of experience, including a 25-year tenure at Harvard Medical School. He is a scholar about the psychiatric effects of solitary confinement on inmates, having assessed over 400 inmates and having written a seminal article in the *American Journal of Psychiatry*. He opined about the psychiatric effects of solitary confinement and on the extent to which the availability of psychiatric care (both psychotherapy and psychiatric medication) in Canadian federal penitentiaries would have an impact on Class Members' health and wellbeing. Dr. Grassian also responded to the expert's reports of Drs. Glancy and Morgan, who provided evidence for the Federal Government and whose reports were critical of Dr. Grassian's work studying the psychiatric effects of solitary confinement.

- **Craig Haney** swore an affidavit dated January 26, 2018 and was cross-examined. He is a

2019 ONSC 1888 (CanLII)

professor of psychology at the University of California with a PhD and a M.A. in psychology from Stanford University. He also has a J.D. from Stanford University. His specialization is psychology and law. His area of research is the psychological effects of prison conditions, including solitary confinement. He has been retained as a consultant by government agencies. He has inspected prisons in the Canada, Cuba, England, Hungary, Mexico, Russia, and the United States. He testified as an expert witness in *British Columbia Civil Liberties Association v. Canada (Attorney General).*[37] Dr. Haney was retained to review and to respond to the expert reports of Dr. Glancy and Dr. Morgan, who provided evidence for the Federal Government.

- **Scott Glenn Hastman** of Lockport, Manitoba swore an affidavit dated July 6, 2017. He was incarcerated at Stony Mountain Institution in Manitoba, Drumheller Institution in Alberta, and Bowden Institution in Alberta from 2003 until 2009 for armed robberies, trafficking cocaine, and property-related offences. Although he has been diagnosed with severe attention ADHD and PTSD, the Federal Government disputes whether he satisfies the criteria for class membership. In his affidavit, he describes his experiences while in prison, his confinements in administrative segregation, and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Michael Jackson, Q.C.** swore an affidavit dated July 4, 2017 and was cross-examined. He is a professor *emeritus* of the law faculty at the University of British Columbia, a lawyer, and the president of the West Coast Prison Justice Society. He was an advisor for the 1996 *Commission of Inquiry into Certain Events at the Prison for Women in Kingston* headed by the Honourable Louise Arbour, and a member of the Task Force on Administrative Segregation in 1997, which was a consultation and study group formed by the Correctional Service. From 1998-2006, he was a member of the Commissioner of Corrections Forum, an independent advisory group to the Commissioner of Corrections. For over 40 years, Professor Jackson has conducted research in the area of correctional law, policy and practice in Canadian prisons and has also been a member of government task forces and committees addressing correctional matters. He was given expert evidence on correctional standards in the Federal Court and in the superior courts of British Columbia, Alberta, and Ontario, including most recently in *R. v. Capay.*[38] Professor Jackson is regarded as one of the leading Canadian scholars in his field.

- **David Allan Kift** swore an affidavit dated July 12, 2017. Mr. Kift, the other Representative Plaintiff, is a former RCMP officer who suffered from PTSD caused by the grim and disturbing aspects of his work such as his involvement with the Clifford Olsen murder investigations and the death of a fellow officer during an investigation. He also suffers from sleep-related ailments and serious depression and anxiety. He was discharged from the RCMP on a medical discharge. After the career was over, he was convicted of gun-possession crimes. In his affidavit, he describes his incarcerations at Millhaven Institution in Ontario, Bath Institution in Ontario, Joyceville Institution (formerly Pittsburgh Institution) in Ontario, Quinte Regional Detention Centre in Ontario, Fenbrook Institution in Ontario, and at a Regional Treatment Centre in Ontario. Mr. Kift

---

[37] 2018 BCSC 62.
[38] 2019 ONSC 535.

2019 ONSC 1888 (CanLII)

was twice placed in administrative segregation, and he allegedly spent long periods without medications for his mental health problems. Mr. Kift was placed in administrative segregation in 2013 for seven days at his own request, which he denies, because of fears of being harmed by other inmates and again in 2016 for fourteen days because he was alleged to be misusing his medications. In making the second placement, the Warden of Joyceville did not follow the recommendation of medical staff that Mr. Kift was too ill for the placement. He decompensated while in administrative segregation and after fourteen days in administrative segregation, he was transferred to a Regional Treatment Centre for intensive psychiatric care for a year. In his affidavit, he describes his experiences while in prison, his confinements in administrative segregation, and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary. The Federal Government disputes that Mr. Kift was harmed by his time in administrative segregation.

- **Kevin Knight,** who is serving a twenty-year sentence for manslaughter at Beaver Creek Institution in Ontario, swore an affidavit dated June 28, 2017. Mr. Knight has been diagnosed with Attention Deficit Disorder ("ADD"), depression, anxiety, substance abuse, and mood disorders. Mr. Knight has numerous convictions and has been incarcerated in Kent Institution in British Columbia, William Head Institution in British Columbia, Saskatchewan Penitentiary, Matsqui Institution in British Columbia, Kingston Penitentiary in Ontario, Warkworth Institution in Ontario. In his affidavit, he describes his experiences in prison, his confinements in administrative segregation, and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Catherine MacDonald** swore affidavits dated July 28, 2017 and January 30, 2018. She is a Legal Assistant/Clerk with Koskie Minsky LLP, Class Counsel. She attached to her affidavit numerous documents (approximately seventy documents) including: the Annual Reports of the Correctional Investigator from 1993 to 2016; several special reports of the Correctional Investigator; the Report of the Honourable Louise Arbour entitled *Commission of Enquiry Into Certain Events At The Prison Women Kingston*; and several reports of the Correctional Service Canada.

- **Juan E. Mendez** swore an affidavit dated June 28, 2017 and was cross-examined. He is a law professor and was the United Nations Special Rapporteur on Torture from 2010 to 2016. As Rapporteur, he reports on solitary confinement as it is practiced across the world and he makes recommendations to prison authorities about compliance with international standards. In 2011, Professor Mendez delivered a report to the United Nations General Assembly that recommended a complete prohibition of solitary confinement for inmates with psychological disabilities and he recommended a complete prohibition on any solitary confinement in excess of fifteen days.

- **James Mustard** of Campbellford Ontario, swore an affidavit dated July 17, 2017. He had a psychotic breakdown in 2004 and was committed to a psychiatric hospital. The Federal Government disputes whether he satisfies the criteria for class membership. In 2008, he was convicted of possession of firearms and amphetamine. He was rearrested in 2012 and 2016. He has been incarcerated at Millhaven Institution in Ontario, Frontenac Institution in Ontario, Collins Bay Institution in Ontario, Joyceville Institution in Ontario, Fenbrook

2019 ONSC 1888 (CanLII)

Institution in Ontario, and Warkworth Institution in Ontario. In his affidavit, he describes his experiences in prison, his confinements in administrative segregation, and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Dalibor Orsag**, who is serving a life sentence for second degree murder. He is now incarcerated at the Bath Institution in Ontario. He swore an affidavit dated July 20, 2017. Mr. Orsag has been diagnosed with multiple mental illnesses, including severe depression, anxiety disorder, PTSD, Schizoaffective Disorder, and Borderline Personality Disorder. He has been incarcerated at Millhaven Institution in Ontario, Kingston Penitentiary in Ontario, the Ontario Regional Treatment Centre, Collins Bay Institution in Ontario. He did not spend time in administrative segregation. In his affidavit, he describes his experiences in prison and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Frank Ouimet**, who is serving a twenty-five-year to life sentence at Bath Institution in Ontario for first-degree murder, swore an affidavit dated July 5, 2017. He has been diagnosed with Bipolar Disorder, severe depression, anxiety disorder, ADD, PTSD, Obsessive Compulsive Disorder ("OCD"), and a sleep disorder. He has been incarcerated at Millhaven Institution in Ontario, Kingston Penitentiary in Ontario, Beaver Creek Institution in Ontario, Ontario's Regional Treatment Centre, and Bath Institution in Ontario. He did not spend time in administrative segregation. In his affidavit, he describes his experiences in prison and the nature of the mental health care he received. He describes the effects him from his experiences while in penitentiary.

- **Shawn Alfred Angelo Pugliese** of Toronto Ontario swore an affidavit dated June 23, 2017. Mr. Pugliese's mother is Cree, and Mr. Pugliese is a survivor of Indian Residential Schools in North Bay and London, Ontario. Although an adolescent, Mr. Pugliese suffered from depression, and although he has serious mental health problems, including Bipolar Personality Disorder, the Federal Government disputes whether he satisfies the criteria for class membership. He has been diagnosed as a psychopath. He had been convicted of robbery, firearm offences, and first-degree murder and has been incarcerated at Kingston Penitentiary in Ontario, Warkworth Institution in Ontario, Millhaven Institution in Ontario, Collins Bay Institution in Ontario, and Fenbrook Institution in Ontario. In his affidavit, he describes his experiences in prison, his placements in administrative segregation and the nature of the mental health care he received. He describes the effects on him from his experiences while in penitentiary.

- **Margo Rivera** swore an affidavit dated June 20, 2017 and was cross-examined. She is an Associate Professor and the Director of Psychotherapy in the Department of Psychiatry at Queen's University at Kingston, Ontario. In 2010, she authored a report for CSC entitled *"Segregation ls Our Prison Within the Prison": Operational Examination of Long-Term Segregation and Segregated Inmates with Mental Health Problems*. Her 2010 report was appended to her 2017 affidavit.

[161]  The Federal Government resisted the motion for summary judgment with the evidence of the following sixteen affiants: (In the description below, warden refers to warden, assistant warden, deputy warden, acting warden, acting assistant warden, *etc.*)

- **Sawinder Bains** of White Rock, British Columbia swore an affidavit dated December 1,

2019 ONSC 1888 (CanLII)

2017 and was cross-examined. Mr. Bains began work as a Correctional Officer in 2002 and was promoted to positions of Program Manager, Regional Administrator, Senior Project Manager, Warden, Executive Assistant to Senior Deputy Commissioner, Strategic Advisor and District Director, and Area Director. He is currently the Acting Regional Director, Health Services and the Warden of Fraser Valley Institution for Women in British Columbia.

- **Shawn Bird** of Prince Albert, Saskatchewan swore an affidavit dated December 1, 2017 and was cross-examined. He began work with the Correctional Service in 1997 in Saskatchewan Penitentiary as a Correctional Supervisor and rose through the ranks to be a warden at Saskatchewan Penitentiary and Okimaw Ohci Healing Lodge in Saskatchewan. He was Executive Director of the Regional Psychiatric Centre – Prairie Region. He is currently the Warden of the Saskatchewan Penitentiary

- **Julie Blasko** swore an affidavit dated December 7, 2017 and was cross-examined. Ms. Blasko began work with CSC in 1988 in administrative positions and then was promoted to be a warden at Collins Bay Institution in Ontario and to a series of Project Manager or Policy positions at National Headquarters in Ottawa. She is now the warden at Joyceville Institution in Ontario, after serving as Acting Assistant Commissioner of Correctional Operations for the Ontario Region.

- **Julie Cobb** of Sainte-Anne-des-Plaines, Québec, swore an affidavit dated December 4, 2017. Ms. Cobb is the Warden at Archambault Institution in Québec and began her career at the Correctional Service in 1988. During her career, she has been an Executive Director of a Regional Treatment Centre ("RTC"), a warden, a Unit Manager, a Parole Officer, and a Correctional Officer.

- **Patricia Leanne (Anne) Connell** swore two affidavits both dated December 1, 2017 and was cross-examined. She is the Senior Project Officer with the Correctional Service. She has a Ph.D. and M.A. in Criminological and Legal Psychology (University of Cambridge, 1991, 1996), and a Bachelor of Arts (Honours, Psychology, Queen's University). She is a Chartered Forensic Psychologist and an Associate Fellow of the British Psychological Society. She has employed by CSC since 1996, and her postings include Psychologist at Frontenac Institution in Ontario and at the RTC-Ontario. She deposed about six inmate case studies about health services for inmates with mental health problems. In her second affidavit, after a review of the CSC files of Messrs. Blais, Mustard, Orsag, and Pugliese, she responded to their affidavits.

- **Louise Desjardins** swore an affidavit dated December 7, 2017 and was cross-examined. She was a Nursing Project Manager with the Correctional Service. She has a BScN from the University of Ottawa (2005). She began work for CSC in 2010 in the position of Nursing Project Manager. After reviewing their affidavits and their files, Ms. Desjardins responded to the affidavits of Messrs. Brazeau, Chandler, Gismondi, Hastman, Kift, Knight, and Ouimet.

- **Graham David Glancy** swore affidavits dated December 12, 2017 and December 13, 2017 and was cross-examined. He is an associate professor in the Department of Psychology at the University of Toronto and an assistant clinical professor at McMaster University. He is the co-head of the Division of Forensic Psychiatry at the University of

2019 ONSC 1888 (CanLII)

Toronto. He also teaches Trial Advocacy at the Faculty of Law of the University of Toronto. He is a founding member of the PSILEX GROUP, which provides consultation to the legal/medical community, and correctional facilities. He is the co-author of *Mental Health and Social Work in Canada*, (Oxford University Press, 2010, 2015). He opined on whether, how, and when placement in administrative segregation causes psychological effects and what is the baseline for comparative purposes. He also opined on the reports of Mr. Austin, Dr. Grassian, Mr. Jackson, and Dr. Rivera who provided evidence for Messrs. Brazeau and Kift.

- **Mike Hayen** of Ottawa, Ontario swore an affidavit dated December 8, 2017 and was cross-examined. He is the manager in the Statistical Data Analysis unit in the Policy Sector at Correctional Service's headquarters in Ottawa. He manages a team of five analysts who analyze Offender Management System (OMS) data to respond to requests for information about the administration and operation of federal penitentiaries. He graduated from Mount Allison University in 1987 with a B. Comm. (economics). He began work with the Correctional Service in 1988 as an analyst at the Ottawa headquarters.

- **Curtis Jackson** swore an affidavit dated December 1, 2017 and was cross-examined. He is the Assistant Deputy Commissioner Correctional Operations, Ontario Region. He began his career at the Correctional Service in 2004, and served as a parole officer, parole supervisor, area director, and warden at Millhaven Institution in Ontario, Kingston Penitentiary in Ontario, and Collings Bay Institution in Ontario.

- **James D. Livingston** swore an affidavit dated December 17, 2017 and was cross-examined. He is an Assistant Professor in the Department of Criminology at Saint Mary's University, an Adjunct Professor in the School of Criminology, Simon Fraser University, and a former Clinical Instructor in the Department of Psychiatry, University of British Columbia. He has a M.A. and a Ph.D. in criminology from Simon Fraser University (2001, 2011) and a B.A. (Hon.) (psychology, 1999) from the University of Prince Edward Island in 1999. He has collaborated with correctional institutions in Australia, England, Ireland, and New Zealand to develop correctional service model in mental health. Dr. Livingston's report to a Parliamentary Committee became the basis for the Federal Government's mental health strategy for CSC. Dr. Livingston evaluated the quality of the Correctional Service's delivery of mental health services.

- **Robert D. Morgan** swore two affidavits dated December 12, 2017 and was cross-examined. Dr. Morgan is an American psychiatrist and is a Professor, Director and Chair of the Department of Psychological Sciences at Texas Tech University. He has a B.S. (psychology, 1991) from the University of Nebraska at Kearney, a M.S. (clinical psychology, 1993) from Fort Hays State University (Kansas), and a Ph.D. (psychology, 1999) from Oklahoma State University and completed a predoctoral internship in correctional psychology at the Federal Correctional Institution-Petersburg, Virginia in 1998-1999, and a postdoctoral fellowship in forensic psychology at the Department of Psychiatry, University of Missouri-Kansas City School of Medicine and Missouri Department of Mental Health in 1999-2000. He has approximately 20 years of research experience and has authored numerous publications regarding the effects of incarceration on inmates' mental health functioning and about prison mental health services. Dr.

Morgan was retained to opine as to the appropriateness of mental health services provided to six inmates and whether the services were commensurate with professional standards. Dr. Morgan was also a witness in other Canadian proceedings where he deposed about the effects of solitary confinement on the mentally ill.

- **Jay Pike** swore an affidavit dated December 5, 2017 and was cross-examined. Mr. Pike is currently the Warden of Collins Bay Penitentiary in Ontario. Previously has been a warden Joyceville Institution in Ontario, and Kingston Penitentiary in Ontario. Commencing his employment with the Correctional Service in 1999, he has also been a Correctional Officer, Parole Officer, and a Unit Manager.

- **Michael Ryan** of Kingston Ontario swore an affidavit dated December 8, 2017 and was cross-examined. Before his retirement from the Correctional Service in 2017, Mr. Ryan was Regional Deputy Commissioner in the Québec Region. Before that posting, in 32 years' employment with CSC, he held various positions including Deputy Commissioner and Assistant Deputy Commissioner of Ontario, Director General of Security and he was a Warden at several penitentiaries.

- **Kevin Sneddon** of Ottawa Ontario swore an affidavit dated December 6, 2017 and was cross-examined. Mr. Sneddon has been employed with the Correctional Service since 1995 and is a Regional Deputy Commissioner and Director General Security posted at National Headquarters. He has been a Warden at the Regional Treatment Centre (Ontario), Joyceville Institution in Ontario, Warkworth Institution in Ontario, Collins Bay Institution in Ontario, and Millhaven Institution in Ontario.

- **Crystal Thompson** of Kingston Ontario swore an affidavit dated December 7, 2017 and was cross-examined. An employee of the Correctional Service since 1993, she is the Executive Director of the Regional Treatment Centre (Ontario). She has been warden at Millhaven Institution in Ontario, Collins Bay Institution in Ontario, Kingston Penitentiary in Ontario, Pittsburgh Institution in Ontario, and the Grand Valley Institution for Women in Ontario.

- **Clarence Turgeon** of Ottawa, Ontario swore an affidavit dated December 6, 2017 and was cross-examined. In 1986, Mr. Turgeon graduated with a diploma in psychiatric nursing, and he obtained a B.A. in social work in 1998, after which he began his career at the Correctional Service, where he held positions as a psychiatric nurse, a clinical social worker, a program director of the psychiatric rehabilitation unit, a project managers at national headquarters, deputy warden at Regional Psychiatric Centre – Prairies, area director Saskatchewan Parole Services. He has been the Advisor to the Assistant Commissioner Health Services since 2017.

## I.   The Correctional Investigator of Canada

[162]   In this summary judgment motion, Messrs. Brazeau and Kift and their expert witnesses relied on the Correctional Investigator's reports for the truth of their contents and as evidence of what and when the Federal Government knew about the use and abuse of administrative segregation and about what the Federal Government did or did not do as a result of what they knew about the effects of administrative segregation on the physical and mental health of inmates in federal penitentiaries. They rely on the Correctional Investigator's reports for proof of

2019 ONSC 1888 (CanLII)

the facts about administrative segregation and its effects on seriously mentally ill inmates who are placed in either administrative segregation or disciplinary segregation.

[163]   Pursuant to sections 158 to 196 of the *Corrections and Conditional Release Act,* the Governor in Council may appoint a person to be known as the Correctional Investigator of Canada (*CCRA* s. 158). The function of the Correctional Investigator is to conduct investigations into the problems of offenders related to decisions, recommendations, acts or omissions of the Commissioner or any person under the control and management of, or performing services for or on behalf of, the Commissioner that affect offenders either individually or as a group. (*CCRA* s. 167).

[164]   In the course of an investigation, the Correctional Investigator may hold a hearing and make inquiries as he or she considers appropriate, but no person is entitled as of right to be heard by the Correctional Investigator (*CCRA* s. 171). In the course of an investigation, the Correctional Investigator may require any person to furnish information and documents (*CCRA* s. 172) and may summon and examine persons under oath (*CCRA* s. 173). The Correctional Investigator may, on satisfying any applicable security requirements, at any time enter any premises occupied by or under the control and management of the Commissioner and inspect the premises and carry out therein any investigation or inspection. The Correctional Investigator's authority to make findings, reports and recommendations is set out in sections 175-181 of the Act.

[165]   The Correctional Investigator may on his or her own initiative investigate the implementation of administrative segregation and disciplinary segregation, and as the discussion below will reveal, the Correctional Investigator has done so on several occasions and made recommendations to the Commissioner.

[166]   Annually, the Correctional Investigator is obliged to submit a report to the Minister about the Correctional Investigator's activities. The report is submitted to Parliament (*CCRA* s. 192). Pursuant to s. 196 of the Act, some Correctional Investigator's reports are confidential and protected by Crown Privilege.

[167]   The Correctional Investigator prepares its annual and special reports through direct access to the Correctional Services staff, facilities, and records.

[168]   The office of the Canadian Federal Correctional Investigator was established in 1973, and the Correctional Investigator at the time of the enactment of the *Corrections and Conditional Release Act* was Ronald R. Stewart, who had been appointed to office in 1977 under the old legislation. Mr. Stewart served until October 2004. He was succeeded by Howard Sapers, a lawyer, politician, and civil servant, who was appointed the Correctional Investigator in April 2004. Mr. Sapers served until November 2016, when he resigned to take office as the Independent Advisor on Corrections Reform to the Ontario provincial government. Dr. Ivan Zinger, a lawyer, adjunct law professor, civil servant with a Ph.D. in psychology of criminal conduct is the current Correctional Investigator, having been appointed in 2016. Dr. Zingler's thesis and published paper was one of the reports considered by the expert witnesses in the immediate case

## J.   The Correctional Investigator's Reports

[169]   There is no genuine issue that the Correctional Investigator's Reports are admissible for

39

having been made and having been received by the Federal Government, which is relevant evidence, at least, with respect to the claims for *Charter* and punitive damages, which claims turn, in part, on what the Federal Government knew and when it knew it. As I shall describe below, the Correctional Investigator's investigations and reports are part of the factual narrative of Messrs. Brazeau and Kifts' claim against the Federal Government.

[170]   However, Messrs. Brazeau and Kift also rely on the Correctional Investigator's Reports as proof of as admissions by the Federal Government of the truth of the report's factual assertions and conclusions.

[171]   The Federal Government disputes that the Correctional Investigator's Reports are admissions or that the reports are admissible for the truth of their contents. The Federal Government makes the categorical assertion that the reports are not admissible for the truth of their contents.

[172]   I disagree. In my opinion, depending on the material issue, the Correctional Investigator's may be relevant and admissible evidence.

[173]   The relevance and admissibility of the reports depends upon what material issue is being addressed, and as I have already noted, independent of the truth of their contents, the Correctional Investigator's Reports are relevant and admissible with respect to several issues associated with the knowledge and activities of the Correctional Service and the Federal Government and with respect to the factual narrative of Messrs. Brazeau and Kifts' claims on behalf of the Class Members.

[174]   Thus, for some issues, the Correctional Investigator's Reports are admissible simply for having been made and provided to the Federal Government, and for some issues, the delivery of a report from the Correctional Investigator is part of the factual narrative. Further, some of the factual content of the Correctional Investigator's Reports is uncontroversial and much of their factual content is confirmed by the evidence of other witnesses who were directly involved in the management of penitentiaries and of administrative segregation.

[175]   It is true that some of the factual content of the Correctional Investigator's Reports is hearsay, and while I agree with the Federal Government's submission that the Correctional Investigator's comments cannot be treated as admissions made by the Federal Government,[39] nevertheless, in my opinion, much of the hearsay statements made by the Correctional Investigator are admissible for the truth of the hearsay's content pursuant to the principled approach to hearsay exceptions[40] or pursuant to the public document exception to the rule against hearsay.[41]

[176]   Thus, depending on the issue, I shall admit the Correctional Investigator's Reports as relevant evidence and depending on the issue, I shall treat the report as proof of the truth of its content. Where the Correctional Investigator expresses a legal argument or a conclusion on a

---

[39] Messrs. Brazeau and Kift relied on: *R. v. Petro-Canada*, [2008] O.J. No. 2390 (S.C.J.); *R. v. Foreman*, [2002] O.J. No. 4332 (C.A.), leave to appeal to the S.C.C. ref'd [2003] S.C.C.A. No. 199; *R. v. Strand Electric Ltd*., [1968] O.J. No. 1291 (C.A.); *Moxley v. Canada Atlantic Railway* (1888), 15 S.C.R. 145.

[40] See *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* 2017 ONSC 7491; *British Columbia Civil Liberties Association v. Canada (Attorney General)*, 2018 BCSC 62; *R. v. Smith (Edward Dewey)*, [1992] 2 S.C.R. 915.

[41] Messrs. Brazeau and Kift relied on: *R. v. A.P*., [1996] O.J. No. 2986 (C.A.); *Levac v. James*, 2016 ONSC 7727, rev'd on other grounds 2017 ONCA 842.

legal issue, I shall come to my own conclusion about the matter.

## K.  The Battle of the Experts

[177]  Messrs. Brazeau and Kift supported their summary judgment motion with expert evidence from Drs. Austin, Chaimowitz, Grassian, Haney, Rivera, and from Professors Jackson and Mendez. The Federal Government supported their defence of the summary judgment motion with expert evidence from Drs. Glancy, Livingston, and Morgan.

[178]  I find as a fact that all of the experts are qualified to provide expert evidence and they all provided some relevant and informative evidence. I am not persuaded by the arguments respectively made that Dr. Glancy, Dr. Haney, and Professor Jackson should be disqualified because of partisanship.

[179]  However, I place very little weight on Dr. Glancy's review and analysis of the academic literature or on his opinion about the psychiatric effects of solitary confinement. His review of the literature was unreliable and methodologically unsound, and the evidence of Messrs. Brazeau and Kifts' experts persuaded me that Dr. Glancy's opinion about the effects of administrative segregation was not sound.

[180]  Among other problems, Dr. Glancy relied heavily on a research assistant who was not trained in scientific research, and he relied on research studies that were not pertinent or that had very serious methodological problems with ultimately unintelligible data and findings. In his review, Dr. Glancy relied on scientists who might be taken to be supporters of the use of administrative segregation as a therapy for some mental illness, which is absurd. Administrative segregation exacerbates and causes mental illness and is not a cure for anything. Dr. Glancy's analysis of the academic literature was flawed, and he failed to note the problems in the studies he relied on, and in other respects, he misread the literature.

[181]  Dr. Morgan was retained to give evidence about the quality of psychiatric care for inmates in administrative segregation, and he was not actually called to give evidence about his own research on the effects of administrative segregation or about his own meta-analysis of the academic literature made in a review article entitled *Quantitative Synthesis of the Effects of Administrative Segregation on Inmates' Well Being*.[42] Nevertheless, Dr. Morgan was extensively cross-examined on this work and heavily critiqued by Drs. Grassian and Haney for his review article.

[182]  The heavy criticism followed, in part, because Dr. Glancy had relied on Dr. Morgan's studies and so the rebuttal to Dr. Glancy also involved a substantial refutation of Dr. Morgan's meta-analysis. Once again, for the same reasons that I give very little weight on Dr. Glancy's review of the academic literature or to his opinion about the psychiatric effects of solitary confinement, I do not give much weight to Dr. Morgan's meta-analysis conclusions.  In cross-examination, while Dr. Morgan defended his research, he also conceded that Dr. Glancy's opinions derived from the meta-analysis were incorrect.

[183]  Dr. Haney's and Dr. Grassian's reviews of the academic literature were far more persuasive as were their opinion about the effects of administrative segregation on inmates generally and mentally ill inmates in particular.  Their reports and conclusions were based on

---

[42] (2016), 22 *Psychology, Public Policy and Law* 439-461.

2019 ONSC 1888 (CanLII)

personal extensive research. Their opinions were consistent with the academic literature and with the overwhelming consensus positions of the professional organizations that have taken positions about the effects of solitary confinement. Their opinions were also consistent with the experiential evidence of Messrs. Brazeau and Kifts' affiants who had personally experienced administrative segregation.

[184]   However, even with respect to Dr. Glancy or Dr. Morgan, on many issues, the opinions of the rival experts were in accord or not that far apart. During the argument and in the competing factums, it was ironic that an opponent's experts' evidence was frequently relied on at the same time as submissions were made that the expert's evidence should be rejected.

[185]   As the discussion below will reveal, I do not reject the totality of the evidence of any of the witnesses. However, some of the opinions expressed or parts of the opinions expressed were not persuasive and I accorded them less weight or no weight.

[186]   It will become apparent from the discussion below, what opinions I found persuasive. I foreshadow to say that it was the opinions of Messrs. Brazeau and Kifts' expert witnesses that persuaded me about the adverse effects of administrative segregation on mentally ill inmates who are placed in administrative segregation. For present purposes, I need only add that while the battle of the experts raised genuine issues, none of them required a trial to resolve.

## L.  Messrs. Brazeau and Kifts' Expert Evidence.

### 1.  Overview

[187]   As already noted above, Messrs. Brazeau and Kift supported their summary judgment motion with expert evidence from Drs. Austin, Chaimowitz, Grassian, Haney, Rivera, and from Professors Jackson and Mendez.

[188]   Messrs. Brazeau and Kift submitted that their expert evidence established that:

  a.   It is widely accepted by experts and by reputable professional organizations in the medical community that mentally ill prisoners should not spend any time in solitary confinement because it is not a therapeutic setting and is harmful to the inmates' mental health and to their treatment for their mental health problems.

  b.   Mentally ill prisoners are psychologically harmed by any time spent detained in solitary confinement. Solitary confinement denies the seriously mentally ill the treatment they require, and solitary confinement poses a particularly acute harm to the seriously mentally ill, who comprise the class in the immediate case.

  c.   The Federal Government's policies and practices, including the recent changes to CD 709, regarding administrative segregation fall below the accepted standard for this type of confinement because the Federal Government does not exclude serious mentally ill inmates from solitary confinement.

  d.   The Federal Government's policies and practices regarding solitary confinement fall below the accepted standard because the Federal Government has never placed a limit on the time an individual can spend in solitary confinement

  e.   The Federal Government's policies and practices regarding solitary confinement fall below the accepted standard because the Federal Government has never

implemented reasonable and independent checks involving psychiatrists or other staff on the front-end admission process to solitary confinement, leaving excessive discretion with non-medically trained prison personal.

f.   The Federal Government's policies and practices regarding solitary confinement fall below the accepted standard because the Federal Government's ongoing reviews of those serving time in solitary confinement lack particularity or thoroughness and fail to ensure meaningful and medically substantive reviews of the inmates' mental health.

### 2.   James Austin

[189]   Dr. Austin's opinion was that the placement of any inmate with mental illness into administrative segregation is inappropriate and should be forbidden in policy and practice, which was the situation in many states in the United States. He said that the prison authorities with which he had worked in the United States had made a concerted effort to remove all inmates with severe mental health orders from administrative segregation units, which he said should not be confused with protective custody units, where with same rights as inmates in the general population, inmates are housed for their own protection.

[190]   Dr. Austin said that before any inmate is admitted to segregation, they should be screened by a psychiatrist to ensure placement will not cause psychiatric harm. He opined that if an inmate already suffers from serious mental illness, then he or she should never be placed in solitary confinement.

[191]   Dr. Austin stated that it appeared that some of the inmates placed in administrative segregation by the Correctional Service would by inmates that in the United States would be placed in protective custody rather than in administrative segregation. He opined that inmates who are seeking protection from other inmates should be assigned to a protective custody unit and not a punitive administrative segregation unit and that protective custody units should provide, as much as possible, the same privileges afforded prisoners in the general population.

[192]   Dr. Austin opined that before and after the August 2017 changes to CD 709, the Correctional Service's policies were sub-standard because they did not include independent scrutiny in the form of an independent review, typically by a board at a central office with the assistance of a psychiatrist's report. He said that Correctional Service left too much discretion to inadequately trained prison personnel.

[193]   Dr. Austin said that the review made by the Correctional Service after a placement in administrative segregation was deficient. He said visits without a detailed procedure were not meaningful or productive. He said a psychiatrist should be making the assessment and re-assessment of inmates in administrative segregation.

### 3.   Gary Chaimowitz

[194]   Dr. Chaimowitz said that he had personally seen the detrimental effects of solitary confinement and although he recognized that security risk issues are a priority for the Correctional Service, placements in administrative segregation of a mentally ill inmate without treatment can produce long-lasting adverse psychiatric effects. It was his clinical opinion that symptom can intensify the longer the duration of the confinement. He said that if a mentally ill

2019 ONSC 1888 (CanLII)

inmate is placed in administrative segregation, then he or she should receive adequate psychiatric care within one day and a determination should be made whether the inmate can receive adequate psychiatric treatment in the correctional facility or whether the inmate should be transferred to an acute mental health service.

[195]   Dr. Chaimowitz's opinion was that solitary confinement for more than fifteen days posed a serious risk of psychological harm to an inmate and that the placement in segregation cells of mentally ill inmates without adequate psychiatric treatment can produce long-lasting negative psychological effects.

[196]   He stated that inmates in administrative segregation would not have the appropriate level of psychiatric treatment. He said that apart from the occasional need briefly to place a highly agitated and violent inmate in segregation, there are no other situations that would justify placing a mentally ill person in administrative segregation without providing active psychiatric treatment. He, therefore, said that solitary confinement was inappropriate for those suffering from acute mental illness.

[197]   He opined that although there is some idiosyncratic variation, the majority of individuals in solitary confinement, suffer significant negative psychological consequences. He opined that Class Members would invariably all suffer serious harm as a result of being placed in solitary confinement. He opined that the administrative segregation of mentally ill inmates without psychiatric medical care can have long-lasting negative psychological effects.

[198]   Dr. Chaimowitz said that his own clinical experience corresponded with the overwhelming consensus of mental health professionals that extended periods of solitary confinement was deleterious and caused and exacerbated mental illness.

[199]   Dr. Chaimowitz opined that given the medical certainty of common damages, a base level of damage would be suffered by every member in the class. In his view, damages above the base level could be quantified by two factors: (1) the length of time in solitary confinement; and, (2) the severity of symptoms of the mental illness as ranked using Global Assessment of Functioning Score (GAF Score) which ranks severity between 0-100.

[200]   In other words, it was Dr. Chaimowitz's opinion that a damages graph could be developed with the severity of illness on the x-axis of the graph and the length of time in administrative segregation on the y-axis of the graph. In his opinion-letter report, he stated:

> If the prisoner was in solitary confinement, they would suffer some harm. The longer they are in solitary confinement, the more severe the harm. Hence on the length of time in axis (variable) would be the length of in solitary confinement. The Court could also take into account the increasing time in solitary confinement as double the time may necessitate an exponential increase in damages assigned. This is because the harm increases.

> So, in summary, the methodology I would recommend to arrive at an assessment of damages for class members would place the level of illness on the one axis and the length of time in solitary confinement on another axis. Points would be given in ranking the class members under Global Assessment of Functioning on the one scale versus the length of time in solitary confinement.

> The courts would then be able to assign a value to the damages that each individual sustains by this methodology. The group can be defined as indicated, and the two variables would provide an ultimate value of damage.

[201]   Dr. Chaimowitz reviewed the revised CD 709 issued in August 2017, and he opined that

too much discretion remains with the Correctional Service. He opined that it was possible that inmates with major mental disorders would be placed in administrative segregation, notwithstanding the need for hospital treatment. He said removal from segregation still depended on the discretion of Correctional Service staff as opposed to being based on a clinical assessment of the extent of the inmate's psychiatric health.

[202]   Dr. Chaimowitz said that the 2017 version of CD 709 failed to prevent a "revolving door" where a person becomes acutely symptomatic after being placed in administrative segregation, is released for treatment, returned to the general population, but then the process repeats itself with another placement in administrative segregation.

### 4.  **Stuart Grassian**

[203]   Dr. Grassian stated that it has long been known that the severe restriction of environmental and social stimulation associated with solitary confinement has a profoundly deleterious effect on mental functioning. Numerous researchers, including himself, have observed and reported that after even a relatively brief period of time in such a situation, an individual will begin to descend into a mental torpor - a "fog" - in which alertness, attention and concentration all become impaired. These impairments can become severe enough to result in massive confusion and disorientation. After a relatively short period of time but intensifying over time, a person in conditions of solitary confinement will experience impairments and disturbances in thinking, thought content, concentration, and memory. He or she will become hyper-responsive and sensitive to external stimulation and may experience perceptual distortions, illusion, and hallucinations. He or she will experience affective disturbances including anxiety, depression, panic attacks, impulse control, and paranoia.

[204]   He deposed that adverse health effects can occur after only a few days and the risk of harm is acute for mentally ill inmates. He said that where the placement in segregation is indeterminate and the inmate does not know when he or she will be released, the harm of the placement is intensified. He said that while not all individuals will become serious ill after fifteen days of solitary confinement, all will suffer greatly as a consequence of experiencing it.

[205]   Dr. Grassian's opinion was that administrative segregation exacerbates pre-existing mental illness, is harmful and is a counter-productive treatment for mentally ill inmates. He said that persons with serious mental illness have poor and primitive means of copying with stress and are less resilient in the face of psychiatric stress. The already mentally ill are more readily symptomatic; more severely symptomatic and their functioning and behavior becomes more impaired by stress. He stated that the mentally ill will suffer more, and more permanent psychiatric harm from any psychiatric stress. The risks of harm from segregation are greater for inmates with mental illness.

[206]   In his reports, Dr. Grassian incorporated his 2006 article published in the *Washington University Journal of Law & Policy*,[43] which concludes as follows:

> The restriction of and social isolation associated with confinement in solitary are strikingly toxic to mental functioning, producing a stuporous condition associated with perceptual and cognitive impairment and affective disturbances. In more severe cases, inmates so confined have developed

---

[43] S. Grassian, "Psychiatric Effects of Solitary Confinement" (2006), 22 *Washington University Journal of Law and Policy* 325.

florid delirium -a confusional psychosis with intense agitation, fearfulness, and disorganization. But even those inmates who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement, especially when the confinement is prolonged, and especially when the individual experiences this confinement as being the product of an arbitrary exercise of power and intimidation. Moreover, harm caused by such confinement may result in prolonged or permanent psychiatric disability, including impairments which may seriously reduce the inmate's capacity to reintegrate into the broader community upon release from prison.

Many of the prisoners who are housed in long-term solitary confinement are undoubtedly a danger to the community and a danger to the corrections officers charged with their custody. But for many they are a danger not because they are coldly ruthless, but because they are volatile, impulse-ridden, and internally disorganized. As noted earlier in this statement, modem societies made a fundamental moral division between socially deviant behavior that was seen as a product of evil intent, and such behavior that was seen as a product of illness. Yet this bifurcation has never been as simple as might at first glance appear. Socially deviant behavior can in fact be described along a spectrum of intent. At one end are those whose behavior is entirely "instrumental"-ruthless, carefully planned, and rational; at the other are individuals whose socially deviant behavior is the product of unchecked emotional impulse, internal chaos, and often psychiatric or neurological illness.

It a great irony that as one passes through the levels of incarceration-from the minimum to the moderate to the maximum-security institutions, and then to the solitary confinement section of these institutions-one does not pass deeper and deeper into a subpopulation of the most ruthlessly calculating criminals. Instead, ironically and tragically, one comes full circle back to those who are emotionally fragile and, often, severely mentally ill. The laws and practices that have established and perpetuated this tragedy deeply offend any sense common human decency.

[207]  Dr. Grassian opined that the circumstances of administrative segregation made it impossible for a medical practitioner to be able to diagnose and provide appropriate psychiatric care. He said that the availability of television, books, exercise and other stimuli without meaningful human interaction did not ameliorate the experience of solitary confinement. He said that the harmful effects of solitary confinement have been recognized since the later part of the 19th century.

[208]  Dr. Grassian severely critiqued Dr. Glancy and Dr. Morgan's analysis of the academic literature and their opinions that there were no ill effects of solitary confinement. He stated that they ignored or unjustifiably disregarded relevant literature and that the reports that they relied on were irrelevant or fundamentally flawed methodologically.

### 5.  Craig Haney

[209]  Dr. Haney's opinion was based on forty years of personal research on evaluating conditions of isolated prison confinement. He said that his conclusions were observational and empirical based on data that he collected from his inspections of isolation units. Dr. Haney also reviewed the academic literature on the psychological impacts of solitary confinement. Dr. Haney was asked to review the reports of Dr. Glancy and Dr. Morgan.

[210]  Dr. Haney's deposed that administrative segregation was a type of solitary confinement and that the practice of administrative segregation in Canada was within the internationally accepted definition of solitary confinement, known as the Mandela Standard.

[211]  Dr. Haney stated that the overwhelming consensus of the academic literature was that

isolation was harmful. He said that there was a consensus that: (a) the duration that a person is exposed to solitary confinement must be kept to an absolute minimum; (b) the risks of harm are so great that solitary confinement should be used only when it is absolutely necessary and as a last resort; and (c) the added risk of harm to vulnerable groups or individual prisoners means that they should be exempted entirely from prolonged solitary confinement.

[212]   Dr. Haney said that the experience of solitary confinement is not only painful but also places prisoners at significant risk of serious psychological harm and of risk self-harm and suicide. He said that to be harmful, solitary confinement does not require complete isolation from human contact without books, TV or outside time. His opinion was that the the scientific literature, as well as his own research indicated that isolation creates a significant risk of serious psychological harm and that the harm is worse for prisoner's suffering from pre-existing vulnerabilities, such as mental illness. He said that the risks of psychological harm increased as a function of the duration of the isolation and that when the duration of segregation is indeterminate, the suffering of the inmate is severe. He said that the data showed that after between thirty to sixty days of isolation segregated prisoners were in psychologically worse condition and declining on most measures of their mental health.

[213]   He said that while the risks of psychological harm do depend in part on the personality of the inmate, mentally ill prisoners are generally more vulnerable to psychological stressors and prolonged segregation of inmates with serious mental illness with rare exceptions should be avoided due to the potential of severe, long-lasting, even permanent harm and in some instances suicide.

[214]   He stated that virtually every study had documented that all isolated prisoners suffer from their confinement and are exposed to serious psychological harm and the harms are far greater and dangerous for mentally ill prisoners. In his opinion, he stated:

> More recent studies have identified other symptoms that appear to be produced by those conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviours: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdowns, self-mutilation, and suicidal ideation and behavior.
>
> […]
>
> Not every prisoner housed in solitary-type confinement will suffer all of these adverse psychological reactions. However, the nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that it creates. The potentially devastating effects of these conditions are reflected in the characteristically high numbers of suicide deaths, and incidents of self-harm and self-mutilation that occur in many of these units.

[215]   In his report, in the context of critiquing a 1999 study by Dr. Ivan Zinger, which focused on Canadian penitentiaries, Dr. Haney discusses the significance of an inmate volunteering to be placed in solitary confinement and how data about the effect of solitary confinement can be skewed by co-mingling data from voluntary and involuntary placements. He stated:

[…] Of course, people who choose to be in administrative segregation (and who were presumably relieved to be in "safekeeping") would not be expected to report suffering to prison authorities. There are usually comparative few "voluntary" prisoners in solitary confinement or administrative segregation units and, because of their especially complicated situation (i.e., they not only want to be there but are fearful of being returned to the mainline prison housing units for which they came), are typically not the focus of most of the studies that have been done of isolated prisoners. They certainly cannot and should not be lumped together in studies of adverse psychological effects of isolation.

[…]

An additional issue with the study is that, although Zinger was relatively terse about the actual conditions of confinement that in the Ad Seg units that he studied (aside from the dry reporting of cell dimensions, etc.), he did mention the recommendations of a Canadian Task Force at the time that suggested making the country's Ad Seg units much tougher because too many prisoners were actually "requesting segregation. It is impossible from the written to know why so many Canadian prisoners were "requesting segregation" at the time, and Dr. Zinger did not discuss the issue at further length. It seems possible, however, that this "preference" for administrative segregation was caused by especially onerous, dangerous conditions inside Canadian mainline prisons, ones from which prisoners wanted to escape by entering administrative segregation. If so, the prisoners "relief" from escaping even more dangerous mainline prison conditions would mask the psychological pains of isolated confinement and their apparent "preference" for administrative segregation would mean only that they preferred the relative safety of isolation to even worse conditions elsewhere in the Canadian prison system. It would be a measure of how frightening and intolerable mainline conditions were,        a demonstration that administrative segregation was not equally or more harmful (but in ways that might have been difficult for frightened prisoners to recognize or acknowledge given the more tangible threats they faced in the dangerous mainline prisons from which they had come. The point is that the fact that Canadian prison officials were concerned about the fact that too many prisoners were "volunteering" to go into otherwise harsh units that most prisoners try to avoid is something that might have affected the results that Zigler obtained and required a more extended discussion and explanation. None was provided.

[216]  Dr. Haney said that depriving people of normal social contact and meaningful social interaction over long periods of time can damage or distort their social identities, destabilize their sense of self and, for some, destroy their ability to function normally in free society. He said that prisoners may develop habits, tendencies, perspectives, and beliefs that are difficult or impossible to relinquish once they are released. It was his view that over time the social deprivations of isolation caused a social pathology.

[217]  Dr. Haney stated that penal practices have changed to lessen the reliance on segregation. He testified that many states in the U.S. have significantly reduced solitary confinement and completely excluded the mentally ill from solitary confinement.

[218]  Dr. Haney was very critical of the Dr. Glancy's report and on his reliance on four studies namely: (1) a 1982 study lead by Dr. Peter Sudenfeld; (2) the 1999 study by Dr. Ivan Zinger, which focused on Canadian penitentiaries; (3) a 2010 study lead by Maureen O'Keefe, often referred to as the "Colorado Study;" and a 2016 meta-analysis review lead by Dr. Morgan, one of the Federal Government's witnesses in the immediate case.

[219]  In his report, Dr. Haney, at some considerable length, explained why methodologically these four studies were fundamentally flawed and why their data was unreliable and essentially uninterpretable or meaningless. Moreover, Dr. Haney said that the conditions of solitary confinement studied in the Colorado Study were different than the conditions of administrative segregation in Canada. Further, Dr. Haney said that Dr. Glancy's literature review omitted

significant important studies and that Dr. Glancy's opinion for the Federal Government could not be trusted.

### 6.   **Michael Jackson, Q.C.**

[220]   Professor Jackson, who has over four decades of experience studying Canadian penitentiaries, said that notwithstanding the denials and protestations of the Correctional Service, administrative segregation was a form of solitary confinement.

[221]   Professor Jackson, who had interviewed hundreds of prisoners in the segregation unit of Kent Maximum-Security Institution and other penitentiaries, said that the essential elements of the accepted definition of solitary confinement fit the reality of administrative segregation and that the Correctional Service's denials were based upon a formulaic recitation of provisions in the *Corrections and Conditional Release Act* that extended rights and protections to inmates, but, he said that the quotidian reality was that inmates' experience was the experience of solitary confinement.

[222]   Professor Jackson's opinion was that the use of administrative segregation for extended periods of time had a detrimental impact on the wellbeing of inmates. It was his opinion that segregation of the Class Members aggravated their pre-existing conditions, unnecessarily compounded the pains of imprisonment, limited inmates' access to appropriate psychological or psychiatric care, interfered with their abilities to interact positively with staff and other prisoners, and undermined their already difficult journey to safe reintegration into the community outside the penitentiary.

[223]   Professor Jackson testified that the disapproval and criticism of administrative segregation made by the Honourable Louise Arbour acting as a commissioner in 1996 in the *Commission of Inquiry into Certain Events at the Prison for Women in Kingston* (Arbour Commission) were repeated again by the Task Force Task Force on Segregation in 1996-1997. He deposed that the systemic problems identified in the Task Force's report were also identified again in the 2010 report of Dr. Margo Rivera and that the problems continue to this day.

[224]   It was Professor Jackson's opinion that the attempts at reform by the Correctional Service have been inadequate to effect substantive change. With respect to the 2015 CD 709, he stated:

> As a comprehensive reform the new Commissioner's Directive falls short of the recommendations that both I, the Arbour Commission, and the Correctional Investigator have made; more specifically, they do not provide for the independent adjudication of all administrative segregation cases, do not prohibit the segregation of mentally ill offenders and do not place limited on the amount of time that offence can spend in segregation. […]

[225]   With respect to the changes made in August 2017 to CD 709, Professor Jackson's opinion after reviewing the draft was that:

> In my opinion the prohibition on placing mentally ill prisoner based on the best evidence available to correction authorities, should have been entrenched in law many decades earlier and had it been, it is likely that prisoners within the class of prisoners defined in the Fresh as Amended Statement of Claim may have been spared the pains of a punishment that Charles Dickens in 1842 denounced 'as a secret punishment which slumbering humanity is not roused to stay.

2019 ONSC 1888 (CanLII)

### 7.  Juan E. Mendez

[226]  In his 2011 Report to the United Nations, Professor Mendez stated that solitary confinement reduces meaningful social contact to an absolute minimum and that the consequence is an insufficient stimulus and the inmate cannot maintain a reasonable state of mental health. He said these consequences had been confirmed by research that indicated that when a person is deprived of sufficient social stimulus, he or she becomes incapable of maintaining alertness and attention and that within even a few days brain activity becomes abnormal.

[227]  Professor Mendez testified that the internationally accepted definition of solitary confinement, known as the Mandela Standard, is the confinement of prisoners for twenty-two hours or more a day without meaningful human contact. The Nelson Mandela Rules defines prolonged solitary confinement as any period of solitary confinement in excess of fifteen consecutive days.

[228]  Professor Mendez said the Mandela Standards dates back to 1955, and he said that the most recent Mandela Standards reflect up-to-date minimum international law standards for the treatment of prisoners and for prison administration concerning accommodation, medical services, discipline, punishment, and solitary confinement. He noted that Rule 43 of the Mandela Rules prohibits indefinite solitary confinement and prolonged solitary confinement, defined as a period exceeding fifteen days. Rule 45 provides that solitary confinement shall be used in exceptional cases as a last resort and should be subject to an independent review. Rule 45 also prohibits solitary confinement in the case of prisoners with mental or physical disabilities when the confinement would exacerbate their disabilities.

[229]  Professor Mendez said that even though solitary confinement may be cruel, segregation can be used in exceptional circumstances under strict regulation to protect the institution, staff or inmates.

[230]  Professor Mendez deposed that for solitary confinement to not be considered cruel and inhuman, the practice must meet the following standards: (a) it should not be imposed as a means or modality of execution of a sentence; (b) it may legitimately be used as a disciplinary sanction for the more serious breaches of prison discipline, and then for a definite term and after a hearing with meaningful opportunity to challenge the decision; (c) it may not be imposed on the basis of an administrative determination of status of the inmate as dangerous in the absence of specific illegal behavior on the inmate's part that breaches prison regulations; (d) it must be subject to review and controls and safeguards, both internal and external, especially of a medical nature, that are frequent (*i.e.*, daily), impartial, independent and professional enough to prevent serious mental or physical pain and suffering; (e) it must never be imposed for an indefinite or prolonged period (defined as a period exceeding fifteen days), and the length of time spent in isolation should be limited so that it does not inflict severe pain or suffering on the inmate; (f) it must never be imposed, for any duration, on children, pregnant women, or persons with a psycho-social disability.

[231]  Professor Mendez opined that administrative segregation as practiced by the Federal Government violates minimum international standards because: (a) there is no limit on confinement beyond fifteen days; (b) there is no prohibition on the confinement of those with mental disabilities; and (c) administrative segregation is comparable to disciplinary segregation

without any of the due process afforded to punitive segregation.

[232]   He said as practiced by the Federal Government, administrative segregation was cruel, inhuman and degrading treatment. Further, it was torture to place an inmate in solitary confinement as a result of behaviour that is symptomatic of his or her mental illness and must be prohibited. Here it may be noted that Messrs. Brazeau and Kift submit that Mr. Kift's second placement in solitary confinement was an example of Corrections Canada torturing an inmate because Mr. Kift conduct of hoarding pills was a symptom of his mental illness and lead to his placement.

[233]   Professor Mendez suggested that the Federal Government's placement of mentally ill inmates in administrative segregation violated the United Nations' *Convention against Torture*. However, under cross-examination, Dr. Mendez agreed that, under the *Convention* there are four possible purposes of torture: (1) to obtain information or a confession from an inmate or third person; (2) to punish an inmate or a third person for an act they are alleged to have committed; (3) to intimidate or coerce an inmate or third person, and (4) for any discriminatory basis where the torture is inflicted at the instigation, consent, or acquiescence of a public official. He conceded that the Correctional Service did not use administrative segregation for the first, second, or third purposes but he asserted that Correctional Services resorts to administrative segregation for certain inmates simply because they suffer from mental disabilities or psychological disabilities.

[234]   Professor Mendez, who did not look at any individual cases in Canadian penitentiaries, had no evidence to support his assertion and there was no evidence that on a class-wide basis, the Correctional Service tortures Class Members as a form of discrimination tortures inmates that are Class Members. I, therefore, do not accept Professor Mendez's opinion on the matter of torture under the United Nations' *Convention against Torture*.

### 8.   **Margo Rivera**

[235]   Dr. Rivera was called as a witness for Messrs. Brazeau and Kift. She had previously done consulting work for the Correctional Service. As noted above, in 2010, she was retained by Correctional Service to prepare a report reviewing administrative segregation in federal prisons. Her report was entitled *Within the Prison: Operational Examination of Long-Term Segregation and Segregation Placements of Inmates with Mental Health Concerns in the Correctional Service of Canada.*

[236]   To prepare her report, Dr. Rivera examined the experiences of seventy-eight men and six women inmates who resided in long-term administrative segregation units in ten correctional facilities. She also interviewed and examined the experiences of the correctional staff.

[237]   Dr. Rivera found that 46% of the placements in administrative segregation were voluntary and 54% of the placements were involuntary, the majority of which were placements because the inmate was jeopardizing the safety of themselves, others, or the institution. A smaller number of placements were to facilitate the investigation of an incident.

[238]   In her 2010 report, she stated that: (a) inmates with serious mental issues were being harmed by administrative segregation; (b) Correctional Service staff indicated that they needed a higher level of education about mental health; and (c) the shortage of psychologists meant that that they were unable to deliver more than assessment services and crisis management.

2019 ONSC 1888 (CanLII)

2019 ONSC 1888 (CanLII)

[239]  Dr. Rivera recommended that: (a) the number of inmates in solitary confinement be reduced; (b) before an inmate can be admitted to segregation, a staff member, who may be a mental health nurse, elder or psychologist, should be involved in the process;  (c) protocols be developed for the prevention of and assessment of "isolation syndromes"; and (d) Correctional Service should improve recruitment and retention of psychologists to ensure those in segregation can access treatment.

[240]  Dr. Rivera said that there were better alternatives to administrative segregation and that salutary effects could be obtained if prisoners were separated otherwise than in solitary confinement. Dr. Rivera opined that alternatives such as increasing the level of intervention by mental health professionals, engaging in dynamic security, or creating day programs could also be used to address the problems associated with the segregation of inmates.

## M. The Federal Government's Expert and Correctional Service Evidence.

### 1. Overview

[241]  As noted above, the Federal Government supported their defence of the summary judgment motion with expert evidence from Drs. Glancy, Livingston, and Morgan. The Federal Government's expert evidence was closely connected to the evidence given by the witnesses from the Correctional Service that reported on the administration of federal penitentiaries and related institutions. Based on this evidence, the Federal Government submitted that administrative segregation is not solitary confinement because inmates have daily opportunities for meaningful human contact.

[242]  The Federal Government submitted that the psychological effects of segregation on inmates remain the subject of ongoing and vigorous scientific debate, and it disagreed with the categorical assertions of Messrs. Brazeau and Kift that administrative segregation was always harmful for the seriously mentally ill or that Class Members should never be placed in administrative segregation.

[243]  The Federal Government denied that administrative segregation adversely affects inmates to the extent as alleged by Messrs. Brazeau and Kifts' expert witnesses and by the inmates that swore affidavits. It submitted that the idiosyncratic circumstances of each placement meant that it was not true that administrative segregation was harmful to all Class Members.

[244]  Through its experts, the Federal Government submitted that maintaining institutional security and inmate and staff safety is a complicated task, and that administrative segregation is a necessary and appropriate tool. It submitted that while there were on an individual basis *Charter* breaches, it could not be categorically asserted that the *Charter* rights of the Class Members had been violated. The Federal Government submitted that the expert evidence and the evidence of the Correctional Service representatives revealed that administrative segregation did not contravene the Class Members' *Charter* rights.

### 2. Graham David Glancy

[245]  For the reasons expressed earlier, I do not place significant weight on the evidence of Dr. Glancy where it conflicts with the evidence of other expert witnesses.

[246]   It was Dr. Glancy's opinion that most inmates, with or without mental illness, do not automatically deteriorate or decompensate by a placement in administrative segregation. Dr. Glancy said that the O'Keefe study and his own research revealed that segregated inmates with mental illness may be quite psychologically disturbed upon admission to segregation, however within a short time, they tend to improve and stabilize. He said that it is an extremely rare case to have somebody decompensate as a result of their placement in segregation. It was Dr. Glancy's opinion that solitary confinement is not universally damaging or intolerable.

[247]   After identifying what he regarded as reliable academic studies, Dr. Glancy reviewed the academic literature and concluded that Dr. Morgan's 2016 meta-analysis was the most comprehensive analysis of research to determine if administrative segregation had an effect on the physical and mental health functioning of inmates.

[248]   Dr. Glancy agreed with Dr. Morgan that the O'Keefe and Zinger studies were significant studies and amongst few studies that had sound methodologies. Dr. Glancy reported that Dr. Morgan's conclusion was that the research did not support the propositions that administrative segregation produced lasting psychiatric damage.

[249]   As already noted above, I did not find Dr. Glancy's review of the academic literature and his opinions based on that review persuasive. Rather, I was convinced that his opinion about the effects of administrative segregation on inmates, especially mentally ill inmates, was unreliable and incorrect.

### 3.   James D. Livingston

[250]   Dr. Livingston was retained to respond to Messrs. Brazeau and Kifts' case about the quality of psychiatric care provided to Class Members regardless of whether the Class Member had been placed in administrative segregation. For the purposes of the summary judgment motion, this evidence, however, became less significant when Messrs. Brazeau and Kift abandoned the claims of Class Members who had not been placed in administrative segregation.

[251]   Similarly, some of the evidence of some of the inmate affiants who had not experienced administrative segregation, but who had experienced poor health care, became less significant. All this evidence, remained relevant, but it no longer went to the heart of the issues of the summary judgment motion that focused on Class Members who had been placed in administrative segregation.

[252]   For present purposes, all I need say is that Dr. Livingston evaluated the delivery of mental health care by the Correctional Service. Based on a comparison with the mental health delivery models of Australia, England, Ireland, and New Zealand, he concluded that the Correctional Service's mental health delivery model was comparable to the models used in these countries.

### 4.   Robert D. Morgan

[253]   In assessing the weight to be given Dr. Morgan's evidence, it is important to repeat that although as part of his practice as a psychiatrist and as an academic he had done research on the effects of solitary confinement, for the purpose of the immediate class action, he was not retained to provide an opinion on that issue. His views about the effects of solitary confinement were enlisted largely through being cross-examined. Dr. Morgan's actual retainer was to comment on

the quality of care that mentally ill inmates receive in Canadian penitentiaries.

[254]  With the discontinuance of the claims of Class Members who were not placed in administrative segregation, the general matter of the psychiatric care of the Class Members has a different significance than it did in the run up to the summary judgment motion. The focal point now is on the adverse effects of administrative segregation on the psychiatric health of the Class Members and when those adverse effects would present themselves.

[255]  In furtherance of his retainer, Dr. Morgan conducted site visits of four Canadian penitentiaries: Joyceville Institution, (Medium and Minimum Units), Collins Bay Institution, and Millhaven Institution, where he also toured the Regional Treatment Centre. The visits included a tour of the institution, and interviews. He interviewed three inmates placed in administrative segregation, and he reviewed six inmate case studies, all selected by the Correctional Service. Dr. Morgan opined that that the care provided to these prisoners was adequate.

[256]  Messrs. Brazeau and Kift were critical of Dr. Morgan's opinion for a variety of reasons including the criticism that his sample of inmates was not adequate to extract any conclusions.

[257]  In my opinion, once the nature of Dr. Morgan's retainer is understood, some of this criticism is unfair. He was not retained to draw an opinion based on statistical analysis; rather, he was retained to disprove the proposition then being advanced by Messrs. Brazeau and Kift that on  a class-wide basis, inmates, particularly mentally ill inmates, did not receive adequate psychiatric health care.

[258]  For the issue for which Dr. Morgan was actually retained, he concluded that the mental health services provided to the six case study inmates was delivered in a manner consistent with the Correctional Service's policies and procedures and was consistent with professional standards of care. He did find instances of questionable practices by health staff, but he stated that they appeared to be rare occurrences.

[259]  During cross-examination, Dr. Morgan confirmed that his report was not intended to provide any opinion of whether the inmates responded positively to segregation or were harmed by it.

[260]  During cross-examination, Dr. Morgan parted company with Dr. Glancy about the use that could be made about Dr. Morgan's research studies about solitary confinement which were not focussed on the special case of inmates with pre-existing serious psychiatric illnesses. Dr. Morgan admitted on cross-examination that the findings of his study, the Morgan Study, cannot be applied to the Class Members in this proceeding.

[261]  Dr. Morgan also disagreed with Dr. Glancy's suggestion that administrative segregation can be beneficial for some inmates.

## N.  The Nature of Administrative Segregation and its Relationship to Solitary Confinement

[262]  Based on the evidence on this summary judgment motion, I make the following findings of fact:

> a.  Administrative segregation as practiced by the Correctional Service is different from protective custody, where with same rights as inmates in the general population, inmates are housed for their own protection.

b. In practice and in experience, there is no meaningful difference between administrative segregation and solitary confinement as it is known around the world.

c. The policies, practices, and procedures for administrative segregation that arguably might make administrative segregation different from solitary confinement are more honoured in the breach than in the observance, but even if the policies were honoured, administrative segregation would still be a version of solitary confinement.

d. In practice and in experience there is also no meaningful difference between administrative segregation under s. 31 of the *Corrections and Conditional Release Act* and disciplinary segregation under the Act. If the Correctional Service's purpose was to make administrative segregation something different from solitary confinement or disciplinary segregation, then the evidence establishes that it failed in achieving that purpose. If anything, administrative segregation, because of its potential indeterminate duration, is more punishing than administrative segregation.

e. Given their different purposes, there is no justification for the terms and conditions of administrative segregation being as draconian as those of disciplinary segregation.

f. From time to time and more often at some penitentiaries than others, administrative segregation is used as a form of punishment for the inmate's behaviour in the penitentiary.

g. From time to time and more often at some penitentiaries than others, administrative segregation is used to avoid the administrative regime for disciplinary segregation.

h. A placement in administrative segregation can cause and does cause physical and mental harm to inmates, particularly to inmates that have serious pre-existing psychiatric illness.

i. A placement in administrative segregation imposes severe psychological stress, and for inmates who have or who develop serious mental illnesses a prolonged placement may cause permanent harm.

j. Negative health effects from administrative segregation can occur with a few days in segregation and those harms increase as the duration of the time in administrative segregation increases.

k. Some of the specific harms of administrative segregation include anxiety, withdrawal, hypersensitivity, cognitive dysfunction, significant impairment of ability to communicate; hallucinations, delusions, loss of control, severe obsessional rituals, irritability, aggression, depression, rage, paranoia, panic attacks, psychosis, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behaviour.

l. Depending on its duration, a placement of a seriously mentally ill inmate in administrative segregation is deleterious to the purpose of rehabilitating the

2019 ONSC 1888 (CanLII)

inmate and returning him or her to the society outside the penitentiary. Prolonged administrative segregation may impair the mentally ill inmate's capacity to return to society as a law-abiding citizen.

m. A placement in administrative segregation of a seriously ill inmate is contrary to one the purposes of the Correctional Service under s. 5 of the *Corrections and Conditional Release Act*; namely; that of assisting the rehabilitation of offenders and their reintegration into the community as law-abiding citizens through the provision of programs in penitentiaries and in the community.

n. Factors affecting the extent to which a placement in administrative segregation causes psychiatric harm include whether the inmate volunteered for the placement or whether the placement was involuntary.

o. Where the placement in solitary confinement is involuntary, it has substantial and adverse effects on the mental health of the inmate that may develop within a matter of days.

p. Where a placement is involuntary the placement can and likely will have substantial and adverse effects on mental health if the confinement is prolonged beyond thirty days. For some mentally ill inmates, the harm may occur sooner.

q. Where the placement in solitary confinement is voluntarily, depending on the resilience of the particular inmate, the placement can and likely will have substantial and adverse effects on mental health if the confinement is prolonged beyond sixty days. In some mentally ill inmates, the harm may occur sooner.

r. Some apparently involuntarily placements may in truth be voluntary. In other words, as recognized by Messrs. Brazeau's and Kifts' experts, an inmate, including a mentally ill inmate may choose to be segregated from the general prison population and thus be more resilient to the adverse effects of the isolation. Because, the inmate may anticipate eventually returning to the general population, he or she may contrive the placement to have the appearance of an involuntary placement. Messrs. Brazeau and Kifts' experts, among other things, pointed out that the data and the results of the studies of the harms caused by solitary confinement were skewed by mixing involuntary and voluntary placements, which it was expected would have less negative psychiatric repercussions than involuntary placements.

s. Administrative segregation is not a therapeutic setting and inmates with very serious mental illness belong in a setting where they can receive the treatment that they do not and cannot adequately receive in administrative segregation as it is currently constituted.

t. Assessment or determination of whether an inmate's mental state is such that he or she should not be placed in administrative segregation or that his or mental state is such that he should be released from the placement should be performed by health professionals (a psychologist or psychiatrist) or by specially trained para-health professionals.

u. Because of human resource issues of availability of health professionals and inadequate training of Correctional Services staff, the mental health assessments

of mentally ill inmates placed in administrative segregation is often ineffective and inadequate.

    v.   In some cases, but not all cases, the Correctional Service has failed to adequately monitor the current mental health status of an inmate in administrative segregation.

    w.   Save in exceptional circumstances of security threats, and even then, for thirty days for involuntarily placements and sixty days for voluntary placements, the use of solitary confinement should be prohibited for mentally ill prisoners.

    x.   There is no justification for placing an inmate suffering from a serious mental illness in administrative segregation for more than thirty days if the placement is involuntary or for more than sixty days if the placement is voluntary.

[263]  I also make the following finding of mixed fact and law about the review process for the placement of inmates in administrative segregation. As I will explain in more detail later, I find that the review process contravenes section 7 (arbitrary detention or imprisonment) of the *Charter*.

[264]  As will be detailed below, this finding is based on the factual record in the immediate case. And it is also based on *stare decisis,* the principle that like cases should be decided alike. For the reasons expressed earlier in this decision, the finding, however, is not based on *res judicata,* issue estoppel, or abuse of process. The issue has been relitigated, and based on the evidence in the immediate case, I find the review process for placements in administrative segregation to contravene section 7 of the *Charter*. This contravention is a class-wide contravention.

[265]  As noted above, in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*,[44] Associate Chief Justice Marrocco held that the administrative segregation sections of the *CCRA* contravened section 7 of the *Charter*, and the contravention could not be saved under section 1 of the *Charter*. Associate Chief Justice Marrocco held that every inmate suffered a section 7 breach because of the regimes failure to provide and independent review of the decision to place an inmate in administrative segregation. In British Columbia, in *British Columbia Civil Liberties Association v. Canada (Attorney General)*,[45] Justice Leask came to a similar legal conclusion.

[266]  As explained below, I have come to a similar conclusion in the immediate case. I accept the correctness of these judgments and adopt or follow them on the matter of whether the review procedures associated with administrative segregation contravene section 7 of the *Charter*.

## O.  Discussion and Analysis: Methodology

[267]  By way of overview of the analysis that will follow, I shall first discuss the jurisdictional question of whether the action is appropriate for a summary judgment.  Next, I shall address the major genuine issues, which are, of course, the eight questions that were certified under the *Class Proceedings Act, 1992* as common issues. I shall treat punitive damages separate from *Charter* damages. I shall add the issue of limitation periods, an issue that was raised by the Federal

---

[44] 2017 ONSC 7491.
[45] 2018 BCSC 62.

Government as an aspect of the summary judgment motion.

[268]   Thus, I shall deal with the substantive legal issues that are the underpinning of the common issues under six major headings; namely:

- Q. Did the Federal Government Breach section 7 of the *Charter?*
- R. Did the Federal Government Breach section 9 of the *Charter?*
- S. Did the Federal Government Breach section 12 of the *Charter?*
- T. Limitation Periods
- U.  *Charter* Damages and Aggregate Damages
- V. Punitive Damages

[269]   I shall then proceed with three parts that look forward to individual issues trials and the distribution of the *Charter* damages. These parts will address settling the distribution plan, possibly amending the class definition, and directing the procedure for the individual issues trials.

## P.  Jurisdiction to Grant Summary Judgment

[270]   Rule 20.04(2)(a) of the *Rules of Civil Procedure* provides that the court shall grant summary judgment if: "the court is satisfied that there is no genuine issue requiring a trial with respect to a claim or defence." With amendments to Rule 20 introduced in 2010, the powers of the court to grant summary judgment have been enhanced. Rule 20.04 (2.1) states:

> 20.04 (2.1) In determining under clause (2)(a) whether there is a genuine issue requiring a trial, the court shall consider the evidence submitted by the parties and, if the determination is being made by a judge, the judge may exercise any of the following powers for the purpose, unless it is in the interest of justice for such powers to be exercised only at a trial:
>
> > 1. Weighing the evidence.
> >
> > 2. Evaluating the credibility of a deponent.
> >
> > 3. Drawing any reasonable inference from the evidence.

[271]   *Hryniak v. Mauldin* does not alter the principle that the court will assume that the parties have placed before it, in some form, all of the evidence that will be available for trial. The court is entitled to assume that the parties have advanced their best case and that the record contains all the evidence that the parties will present at trial.[46] Thus, if the moving party meets the evidentiary burden of producing evidence on which the court could conclude that there is no genuine issue of material fact requiring a trial, the responding party must either refute or counter the moving party's evidence or risk a summary judgment.[47]

[272]   Under rule 20.02(1), the affidavits for a summary judgment motion may be made on information and belief, but on the hearing of the motion, the court may, if appropriate, draw an adverse inference from the failure of a party to provide the evidence of any person having

---

[46] *Canada (Attorney General) v. Lameman*, [2008] 1 S.C.R. 372 at para. 11; *Dawson v. Rexcraft Storage & Warehouse Inc*., [1998] O.J. No. 3240 (C.A.); *Bluestone v. Enroute Restaurants Inc*. (1994), 18 O.R. (3d) 481 (C.A.).
[47] *Toronto-Dominion Bank v. 466888 Ontario Ltd.,* 2010 ONSC 3798.

personal knowledge of contested facts. The principles governing the admissibility of evidence are the same as apply at trial save for the limited exception of permitting an affidavit made on information and belief.[48] Where an affidavit relied upon in support of a motion for summary judgment does not state the source of the information and the fact of the deponent's belief, the court may nevertheless rely upon the substance of the exhibits to the affidavit in evaluating the merits of the case.[49] However, evidence of an expert witness may not be provided by the information and belief evidence of an affiant because the responding party should have the opportunity to cross-examine the expert.[50]

[273]   In *Hryniak v. Mauldin*[51] and *Bruno Appliance and Furniture, Inc. v. Hryniak*,[52] the Supreme Court of Canada held that on a motion for summary judgment under Rule 20, the court should first determine if there is a genuine issue requiring trial based only on the evidence in the motion record, without using the fact-finding powers introduced when Rule 20 was amended in 2010. The analysis of whether there is a genuine issue requiring a trial should be done by reviewing the factual record and granting a summary judgment if there is sufficient evidence to fairly and justly adjudicate the dispute and a summary judgment would be a timely, affordable and proportionate procedure.

[274]   If, however, there appears to be a genuine issue requiring a trial, then the court should determine if the need for a trial can be avoided by using the powers under rules 20.04 (2.1) and (2.2). As a matter of discretion, the motions judge may use those powers, provided that their use is not against the interest of justice. Their use will not be against the interest of justice if their use will lead to a fair and just result and will serve the goals of timeliness, affordability, and proportionality in light of the litigation as a whole. To grant summary judgment, on a review of the record, the motions judge must be of the view that sufficient evidence has been presented on all relevant points to allow him or her to draw the inferences necessary to make dispositive findings and to fairly and justly adjudicate the issues in the case.[53]

[275]   If a judge is going to decide a matter summarily, then he or she must have confidence that he or she can reach a fair and just determination without a trial; this will be the case when the summary judgment process: (1) allows the judge to make the necessary findings of fact; (2) allows the judge to apply the law to the facts; and (3) is a proportionate, more expeditious and less expensive means to achieve a just result.[54] The motion judge is required to assess whether the attributes of the trial process are necessary to enable him or her to make a fair and just determination.[55]

[276]   Turning to the case at bar, the Federal Government submits that there are numerous genuine issues that require a trial. It submits that these genuine issues cannot be and ought not to

---

[48] *Sanzone v. Schecter*, 2016 ONCA 566 at para. 15; *Caithesan v. Amjad*, 2016 ONSC 5720 at para. 24.

[49] *Carevest Capital Inc. v. North Tech Electronics Ltd.*, 2010 ONSC 1290 at para. 16 (Div. Ct.).

[50] *Dutton v. Hospitality Equity Corp.*, [1994] O.J. No. 1071(Gen. Div.).

[51] 2014 SCC 7.

[52] 2014 SCC 8.

[53] *Campana v. The City of Mississauga*, 2016 ONSC 3421; *Ghaeinizadeh (Litigation guardian of) v. Garfinkle Biderman LLP*, 2014 ONSC 4994, leave to appeal to Div. Ct. refused, 2015 ONSC 1953 (Div. Ct.); *Lavergne v. Dominion Citrus Ltd.*, 2014 ONSC 1836 at para. 38; *George Weston Ltd. v. Domtar Inc.*, 2012 ONSC 5001.

[54] *Hryniak v. Mauldin*, 2014 SCC 7 at paras. 49 and 50.

[55] *Hryniak v. Mauldin*, 2014 SCC 7 at paras. 51-55; *Wise v. Abbott Laboratories, Ltd.*, 2016 ONSC 7275 at paras. 320-336; *Drywall Acoustic Lathing and Insulation Local 675 Pension Fund (Trustees of) v. SNC-Lavalin Group Inc.*, 2016 ONSC 5784 at paras. 122-131.

be dealt with summarily. For the reasons set out above and below that address the genuine issues, I disagree.

[277]   Although there are numerous issues, there is no paucity of evidence to resolve them, and, while there is a great deal of factual and legal work that has been done by the parties and that needs to be completed by the court, there is no need for that the work be completed by a trial process.

[278]   There is a ginormous evidentiary record, but apart from perhaps a more leisurely pace of presentation, the issues are capable of being fairly and proportionately resolved by a motion procedure.

[279]   There is no need to assume that the parties' put their best evidentiary foot forward; they did. Both parties lead their best trump hand that they could. While there are issues of credibility and reliability about the evidence of the inmates, those differences, which may make a difference at a Class Member's individual issues trial do not detract from my findings about how the Correctional Service manages and operates administrative segregation, which findings can be based on the Federal Government's own witnesses.

[280]   There was a fulsome cross-examination of the rival experts and the reports and the transcripts of the cross-examinations are all that is necessary to make findings of facts on a summary judgment motion.

[281]   Justice Marrocco in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* decided substantial issues about administrative segregation by an application procedure, and, in my opinion, it is in the interests of justice to decide the common issues in the immediate case by a motion procedure.

[282]   I am confident that the procedure will lead to a fair and just result that will also facilitate the individual issues trials that will follow.

**Q.  Did the Federal Government Breach Section 7 of the *Charter*?**

[283]   The first and second common issues are: (1) By its operation and management of the Federal Institutions from November 1, 1992 to the present, did the Defendant breach the Class Members' rights under section 7 of the *Charter*? and, (2) If so, were its actions saved by section 1 of the *Charter*?

[284]   With all of the evidentiary background above, I shall now address the first and second common issues. Structurally, the discussion will have the three overlapping themes of: first, the general legal principles associated with sections 1 and 7 of the *Charter;* second, the application of those legal principles to the factual circumstances of mentally ill inmates, and,  third, the extent to which the application of the law to the facts applies across the class of the immediate case.

[285]   Sections 1 and 7 of the *Charter* state:

> 1. The *Canadian Charter of Rights and Freedoms* guarantees the rights and freedoms set out in it subject only to such reasonable limits prescribed by law as can be demonstrably justified in a free and democratic society.

> 7. Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice.

2019 ONSC 1888 (CanLII)

[286]   Relying on the established case law that holds that every prisoner retains a residual liberty right under section 7 of the *Charter* relating to the nature of his incarceration,[56] Messrs. Brazeau and Kift submit that the Class Members' right to liberty under section 7 of the *Charter* is engaged in the case at bar.

[287]   Relying principally on *Schmidt v. The Queen*,[57] (risk of torture if extradited); *R. v. Morgentaler*,[58] (denial of access to abortions); *Hitzig v. Canada,*[59] (denial of access to medicinal marijuana); *Chaoulli v. Québec (Attorney General)*,[60] (restricting access to private healthcare); Messrs. Brazeau and Kift submit that the placement of a Class Member inmate into administrative segregation engages the right to life and to security of the person under section 7 of the *Charter* for four  reasons; namely: (a) because the psychiatric harm caused by administrative segregation to a Class Member infringe his or her right to security of the person (direct harm); (b) because the limited to non-existent access to psychiatric health care along with the exacerbating effects of administrative segregation infringe the Class Member's right to security of the person (restricting access to healthcare); (c) because self-harm and suicide is a common consequence of placing a Class Member in administrative segregation, a Class Member's right to life under section 7 of the *Charter* is infringed; and (d) because the placement of a Class Member in administrative segregation exposes the Class Member to a risk of torture and the exposure to a risk of torture is a breach of section 7 of the *Charter.*

[288]   Relying on *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*,[61] and *British Columbia Civil Liberties Association v. Canada (Attorney General)*,[62] Messrs. Brazeau and Kift advance an additional alleged breach of section 7 that they describe as a breach of section 9. They allege because administrative segregation wants for a constitutionally valid review system, it breaches sections 7 and 9 of the *Charter*. Although analytically, this breach which is associated with the review procedure for administrative segregation, is better considered as an aspect of section 7, I shall consider this particular alleged class-wide breach of the *Charter* as part of the discussion of section 9 below.

[289]   As foreshadowed in the introduction to these Reasons for Decision, I conclude that section 7 of the *Charter* has been violated for two subclasses and that there is a class-wide breach of section 7 with respect to the review of decisions to place a mentally ill inmate in administrative segregation.

[290]   The analysis of whether the Class Members' rights under section 7 of the *Charter* begins with the observation that as acknowledged by the *Corrections and Conditional Relief Act,* inmates of federal penitentiaries do not lose all their legal rights.  The Class Members' are protected by the *Charter*. The judiciary is the guardian of the Constitution and the *Charter* should be used for the "unremitting protection of individual rights and liberties": *Hunter v. Southam Inc.*,[63] *per* Justice Dickson, as he then was. Inmates are protected by the *Charter,* and as

---

[56] *R. v. Gamble*, [1988] 2 S.C.R. 595 at p. 645; *Martineau v. Matsqui Institution*, [1980] 1 S.C.R. 602 at p. 625.
[57] [1987] 1 S.C.R. 500.
[58] [1988] 1 S.C.R. 30.
[59] [2003] O.J. No. 3873 (C.A.), leave to appeal to the S.C.C. ref'd [2004] S.C.C.A. No. 5.
[60] 2005 SCC 35.
[61] 2017 ONSC 7491.
[62] 2018 BCSC 62.
[63] [1984] 2 S.C.R. 145 at p. 155.

Chief Justice McLachlin noted, prisoners are not outcasts from the Canadian system of rights.[64]

[291]     To demonstrate that government action has infringed section 7 of the *Charter*, a plaintiff must demonstrate that: (a) the action interferes with or deprives individuals of life, liberty, or security of the person; and (b) the deprivation is not in accordance with a principles of fundamental justice.[65] To demonstrate that government action has infringed section 7 of the *Charter*, a plaintiff must identify and define the relevant principles of fundamental justice that apply, and then show that the infringement or deprivation of rights does not accord with the identified principles.[66]

[292]   Principles of fundamental justice are basic tenets of the Canadian legal system.[67] To establish that a rule or principle is a principle of fundamental justice, the plaintiff must show that it is a legal principle about which there is significant societal consensus that it is fundamental to the way in which the legal system ought fairly to operate, and it must be identified with sufficient precision to yield a manageable standard against which to measure deprivations of life, liberty or security of the person.[68] The principles of fundamental justice are concerned not only with the interests of the person who claims that his or her liberty has been limited but with the protection of society; fundamental justice requires a fair balance, both procedurally and substantively, between these interests.[69] A principle of fundamental justice can be established through international law, if the international law is shown to be a principle that is part of international customary law or is incorporated into Canadian domestic law in some way.[70]

[293]   Imprisonment and the imminent threat of imprisonment engage the liberty interest under section 7 of the *Charter*.[71] Every prisoner retains a residual liberty right under section 7 of the *Charter* relating to the nature of his incarceration.[72] In *R. v. Boone*, the Ontario Court of Appeal noted that a decision to transfer an inmate to the more restrictive institutional setting of administrative segregation is a significant deprivation of the inmate's residual liberty interests and therefore engages section 7 of the *Charter*.[73] The Court also stated that there has been a growing recognition that solitary confinement is a very severe form of incarceration that can have a lasting psychological impact on prisoners.[74]

[294]   In the case at bar, the Federal Government concedes that a residual liberty interest of an inmate may be interfered with when an inmate, including a mentally ill inmate, is placed in administrative segregation; however, the Federal Government submits that there is a genuine issue requiring a trial whether the placement in administrative segregation is done in accordance with the principles of fundamental justice.

---

[64] *Sauvé v. Canada (Chief Electoral Officer)*, 2002 SCC 68 at para. 40.
[65] *Blencoe v. B.C. (Human Rights Commission).*, 2000 SCC 44.
[66] *R. v. Malmo-Levine*, 2003 SCC 74 *R v. White*, [1999] 2 S.C.R. 417.
[67] *Re B.C. Motor Vehicle Act*, [1985] 2 S.C.R. 486.
[68] *R. v. Malmo-Levine*, 2003 SCC 74; *R v. White*, [1999] 2 S.C.R. 417.
[69] *Cunningham v. Canada*, [1993] 2 S.C.R. 143 at pp. 151-2 *per* McLachlin, J.; *Re B.C. Motor Vehicle Act*, [1985] 2 S.C.R. 486 at pp. 502-3 *per* Lamer, J.; *Singh v. Minister of Employment and Immigration*, [1985] 1 S.C.R. 177 at p. 212 *per* Wilson, J.; *Pearlman v. Manitoba Law Society Judicial Committee*, [1991] 2 S.C.R. 869 at p. 828 *per* Iacobucci, J.
[70] *Kazemi Estate v. Islamic Republic of Iran*, 2014 SCC 62.
[71] *R. v. Vaillancourt*, [1987] 2 S.C.R. 636; *Re B.C. Motor Vehicle Act*, [1985] 2 S.C.R. 486.
[72] *R. v. Gamble*, [1988] 2 S.C.R. 595 at p. 645; *Martineau v. Matsqui Institution*, [1980] 1 S.C.R. 602 at p. 625.
[73] *May v. Ferndale Institution*, 2005 SCC 82; *R. v. Boone*, 2014 ONCA 515; *R v. Miller*, [1985] 2 S.C.R. 613.
[74] *R. v. Boone*, 2014 ONCA 515 at para. 3.

[295]   As already noted above, I disagree that a trial is necessary, and, therefore, I shall proceed with the analysis of whether the Federal Government's placement of seriously mentally ill inmates in administrative segregation is done in accordance with the principles of fundamental justice or whether the placement has breached the Class Members' rights under section 7 of the *Charter*.

[296]   Although the legal perch of the Class Member's residual liberty interest is sufficient to proceed with an analysis of whether the placement in administrative segregation in in accord with the principles of fundamental justice, before doing so. it is necessary for that analysis to consider Messrs. Brazeau and Kifts' argument that that administrative segregation is also an interference with an inmate's right to security of the person and or an interference to his or her right to life under section 7 of the *Charter*.

[297]   Government action deprives or infringes the security of the person when it seriously impairs one's physical or mental health or causes severe psychological harm.[75] State imposed serious psychological stress constitutes a breach of security of the person.[76] To constitute an infringement to a person's security of the person, the impact of the government action on psychological integrity need not rise to the level of nervous shock or psychiatric illness, but it must be greater than ordinary stress or anxiety.[77]

[298]   As my factual findings above establish, in the case at bar, the evidence establishes that administrative segregation has the potentiality and the actuality of causing serious physical and serious psychological harm to any inmate placed in administrative segregation and the potentiality and actuality of serious physical and serious psychological harm is particularly acute for those already suffering from serious mental diseases and disabilities. It follows that the psychological stress and harm caused by administrative segregation infringes the security of the person of the inmate, and thus the major issue again becomes whether this infringement is in accordance with the principles of fundamental justice.[78]

[299]   The right to life is engaged where a law or government action directly or indirectly imposes death or an increased risk of death on a person.[79] I conclude that the evidence on this summary judgment motion proves that the placement of a mentally ill inmate in administrative segregation engages the inmate's right not to be deprived of life because of the increased risk of suicide. And, thus, once again, the major issue becomes whether this infringement is in accordance with the principles of fundamental justice

[300]   In the immediate case, however, I do not agree with Messrs. Brazeau and Kifts' submission that section 7 is engaged for the Class Members because the placement of a Class Member in administrative segregation exposes the Class Member to a risk of torture. As I discussed above in the context of Professor Mendez's testimony, the evidence on this summary judgment does not establish that the Class Members are exposed to torture on a class-wide basis. The evidence does not establish that administrative segregation is a modality of discriminatory treatment for mentally ill inmates.

---

[75] *Carter v. Canada (Attorney General)*, 2015 SCC 5.
[76] *Blencoe v. B.C. (Human Rights Commission).*, 2000 SCC 44.
[77] *New Brunswick (Minister of Health and Community Services)* v. G. (J.), [1999] 3 S.C.R. 46 at para. 60.
[78] *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, 2017 ONSC 7491 at paras. 89-101.
[79] *Carter v. Canada (Attorney General)*, 2015 SCC 5.

[301]   Thus, I conclude that the Class Members' rights to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice are engaged in the immediate case and that their rights have been contravened by the Federal Government's management and administration of its penitentiaries.

[302]   Is this deprivation of the Class Members' rights in accord with the principles of fundamental justice?

[303]   An arbitrary, overbroad, or grossly disproportionate impact on a person's right to life, liberty, or the security of the person suffices to establish a breach of section 7 of the *Charter*.[80] Based on my factual findings above, I find that the imposition of administrative segregation on two subclasses of seriously mentally ill inmates is overbroad, and has a grossly disproportionate impact on the Class Members' right to life, liberty, or the security of the person.

[304]   From the perspective of a seriously mentally ill inmate, his or her separation from the general prison population because his or her safety or security of the person is threatened or because the safety or security of the person of others at the penitentiary is imperilled, especially if the placement is made voluntarily by the inmate, is a rational and reasonable response to a problem of prison security. A placement in administrative segregation is not arbitrary. The segregation of those threatened from the source of the threat is just common sense and is, in any event, a responsibility of the Correctional Service which under the *Corrections and Conditional Release* Act has an obligation to protecting the security of the penitentiary and the safety of persons in it. In this regard, it may be recalled that under s. 70 of the Act, the Correctional Service must take all reasonable steps to ensure that penitentiaries, the penitentiary environment, the living and working conditions of inmates and the working conditions of staff members are safe.

[305]   However, that separation for security purposes, as such, is rationale and not arbitrary does not address the where, when, how, how long, factors of segregation or how to deal with the predictable consequences of segregation to a mentally ill inmate. My findings of fact reveal that while it is in accord with the principles of fundamental justice to separate a seriously mentally ill inmate from the general population for security reasons, it is all of an overbroad, and a grossly disproportionate impact on that mentally ill inmate's right to life, liberty, and security of the person to do so by an administrative segregation that is brutal, prolonged, and often indeterminate.

[306]   In *British Columbia Civil Liberties Association v. Canada (Attorney General)*,[81] Justice Leask made a similar finding on a similar evidentiary record in at paragraphs 325-328 of his decision, where he stated:

> 325. I do not agree that the impugned provisions are arbitrary. There is clearly a rational connection be-tween the object of maintaining institutional security and personal safety, and the segregation of inmates in the circumstances identified in s. 31(3) of the *CCRA*. To reiterate, those circumstances are threefold: (a) the inmate's actions or intended actions jeopardize the security of the institution or the safety of people within it; (b) to prevent interference with an investigation that could lead to a criminal charge or a serious disciplinary offence; and (c) the inmate's own

---

[80] *Bedford v. Canada (Attorney General)*, 2013 SCC 72 at para. 127.
[81] 2018 BCSC 62.

safety is at risk. There are certainly legitimate reasons to segregate inmates, and in those appropriate cases, segregation is a valid means of promoting safety and security.

326. However, I find that the impugned provisions are overbroad in two respects. First, while temporary segregation is rationally connected to the objective of security and safety, prolonged segregation, which the provisions also permit, inflicts harm on inmates and ultimately undermines institutional security. Second, the provisions define segregation overly restrictively and authorize solitary confinement in circumstances where some lesser form of restriction would achieve the objective of the provisions. […]

327. Prolonged segregation is both unnecessary for and, indeed, even inconsistent with, the objective of maintaining institutional security and personal safety. While the separation of inmates can be justified for the limited time it legitimately takes to make alternative arrangements to ensure inmate safety or enable an investigation, indefinite and prolonged segregation with its attendant harms is simply not necessary to enable such steps to be taken. To my mind, there is no rational connection between, for example, the legitimate need for CSC to have the authority to separate inmates who have a conflict with one another and the authority to keep one or both in segregation indefinitely for periods of months or even years.

328. Not only that, prolonged segregation undermines the very security and safety the provisions are meant to promote. Based on the evidence, I find that segregation breaks down inmates' ability to interact with other human beings; deprives them of rehabilitative and educational group programming; risks mentally healthy inmates descending into mental illness; and exacerbates symptoms for those with pre-existing mental illness. I accept, as well, the evidence of Professor Jackson, based on his experience over the past 40 years, that the broad correctional discretion that can lead to extended placements in segregation "generate in prisoners a powerful and toxic mix of bitterness, resentment and anger that undermines respect not only for correctional authority but also for lawful society to which most inmates will return.

[307]   In the immediate case, the Federal Government has no explanation justifying responding to a security problem with solitary confinement for potentially indefinite periods of time and without a constitutionally adequate system of adjudicative review.

[308]   In the immediate case, the Federal Government has no explanation that would justify handling a security problem virtually in the same manner as a disciplinary manner. To do so is overbroad, or grossly disproportionate for the two subclasses of the class that the evidence establishes would be harmed by a placement in administrative segregation for security purposes.

[309]   A grossly disproportionate law or government practice is not be in keeping with the principles of fundamental justice.[82] The principle against gross disproportionality is infringed where the impact of a law's effects on an individual's life, liberty or security of the person is so grossly disproportionate to the law's purpose that it cannot be rationally supported.[83] In the immediate case the draconian impact of prolonged administrative segregation on the seriously mentally ill is drastically imbalanced against its object, which is to secure the safety of the institution. Granted that the Correctional Service may need some time to secure the penitentiary, but a prolonged and indeterminate time to do is grossly disproportionate when it imperils the life, liberty, and security of the person of the mentally ill inmate.

[310]   For decades, the Correctional Service has been aware that administrative segregation is especially harmful to the mentally ill, but it has not ameliorated that harm by making any meaningful effort to differentiate the operational and physical conditions of administrative

---

[82] *Bedford v. Canada (Attorney General)*, 2013 SCC 72.
[83] *Bedford v. Canada (Attorney General)*, 2013 SCC 72 at para. 130.

2019 ONSC 1888 (CanLII)

segregation from disciplinary segregation or from solitary confinement. It has not adequately responded to the circumstances that: solitary confinement is not remotely a therapeutic environment; and, when in solitary confinement, a mentally ill inmate, even one placed voluntarily, will need psychiatric therapy, particularly if the placement is prolonged.

[311]  Under the *Corrections and Conditional Release Act,* an inmate in administrative segregation must be released at the earliest appropriate time. In the immediate case, the evidence shows that in practice, the policy of a prompt release is a policy that the Correctional Services always talks but does not always walk.

[312]  The Correctional Service established that it may take some time to find a solution to the security risk, but it did not explain why the administrative segregation of a mentally ill inmate should have less safeguards than disciplinary segregation and why the conditions of administrative segregation should equate to the conditions of solitary confinement. It did not explain why, as it is the case in many American penitentiaries, security concerns are addressed by protective custody and with conditions of housing that approach the conditions of the housing of the general population rather than, as is the case in Canadian penitentiaries, with administrative segregation and conditions of housing that are the equivalent of solitary confinement and disciplinary segregation and indeed worse because of the possibility of a prolonged segregation.

[313]  The evidence establishes that the risk and the potential of psychiatric harm starts almost immediately after the doors are shut on the isolation cell, especially for those with pre-existing mental conditions, but there comes a point where the seriousness of the deprivations of life, liberty, and security of the person is totally out of sync with the safety and security objective of administrative segregation.

[314]  On an individual basis, a member of the Class may have suffered a deprivation of his or her section 7 *Charter* rights by any placement in administrative segregation, but based on the evidence, on a class-wide basis, I can identify only two subclasses that, for certain, suffered harm from the placement in administrative segregation. The first subclass is Class Members who were involuntarily placed in administrative segregation for more than thirty days. The second class is Class Members who were voluntarily placed in administrative segregation for more than sixty days.

[315]  The explanation for the parameters of the two subclasses is that the expert evidence revealed and the evidence of the inmates and penitentiary staff showed that whether the placement was voluntarily or involuntarily was a significant factor in determining whether the placement would harm or further harm the mentally ill inmate and in determining whether his or her placement was in accordance with the principles of fundamental justice.

[316]  I, therefore, conclude that while an individual Class Member might be able to assert that in his or her circumstances, his or her *Charter* rights had been violated by a placement in administrative basis, on a subclass wide basis, voluntary placements for less than sixty days are in accord with the principles of fundamental justice. However, where the placement in administrative segregation is voluntary, the Correctional Service has at the most sixty days to resolve the security problem; after that, the placement is contrary to the principles of fundamental justice.

[317]  Where the placement is involuntarily, I conclude that on a subclass-wide basis, it is not

contrary to the principles of fundamental justice, for the Correctional Service to take up to thirty days to resolve the security problem. However, for involuntary placements of a mentally ill inmate, more than thirty days in administrative segregation is a subclass-wide *Charter* breach.

[318]  I, therefore, conclude that based on the evidence in the immediate case that Messrs. Brazeau and Kift have demonstrated that the actions of the Federal Government have interfered with two subclasses of the Class Members' right to life, liberty, and security of the person and the interference is not in accordance with a principle of fundamental justice.

[319]  This brings the discussion to section 1 of the *Charter*, which states that the *Canadian Charter of Rights and Freedoms* guarantees the rights and freedoms set out in it subject only to such reasonable limits prescribed by law as can be demonstrably justified in a free and democratic society. The Federal Government submits that it has demonstrated that the implementation of administrative segregation including its implementation for seriously mentally ill inmates is a reasonable limit prescribed by law that can be demonstrably justified in a free and democratic society.

[320]  In *R. v. Oakes*,[84] the Supreme Court of Canada held that to establish that a limit is reasonable and demonstrably justified in a free and democratic society: (1) the objective of the limit must be of sufficient importance to override a constitutionally protected right or freedom and at a minimum the objective must relate to a concern that are pressing and substantial in a free and democratic society; and (2) the means of implementing that objective are reasonable and demonstrably justified, which involves a proportionality test balancing the interest of society with those of individuals and groups. The components of the proportionality test are that: (a) the means must be carefully designed for the objective and not be arbitrary, unfair, or based on irrational considerations; they must be rationally connected to the objective; (b) the means must impair as little as possible the right or freedom in question; (c) the effect of the means must be proportionate to its objective.

[321]  In the immediate case, Messrs. Brazeau and Kift concede that the safety of the penitentiary and its population, which is the objective of administrative segregation, is of sufficient importance to override a constitutionally protected right, but they dispute that the means of implementing that objective are reasonably and demonstrably justified. They submit that the Federal Government's *Charter* breaches of section 7 are not saved by section 1 of the *Charter*.

[322]  Relying on the juridical framework of *Loyola High School v. Quebec (Attorney General)*[85] *Doré v. Barreau du Québec*,[86] and *Law Society of British Columbia v. Trinity Western University*[87], rather than the framework of the *Oakes* test, the Federal Government submits that the court must consider whether the administrative decisions of the Correctional Service reflected a proportionate balance of the relevant *Charter* protections with the statutory objectives of the *Corrections and Conditional Release Act*. The Federal Government submits that when the *Charter* viability of a discretionary decision is at issue, the *Oakes* framework is replaced with a proportionality analysis consistent with administrative law principles. The Federal Government submits that the question for the reviewing court is whether, in assessing the impact of the

---

[84] [1986] 1 S.C.R. 103.
[85] 2015 SCC 12.
[86] 2012 SCC 12.
[87] 2018 SCC 32.

relevant *Charter* protection and given the nature of the decision and the statutory and factual contexts, the decision reflects a proportionate balancing of the *Charter* protections at play.

[323]   Messrs. Brazeau and Kift deny that the principles of *Loyola High School v. Quebec (Attorney General), Doré v. Barreau du Québec, and Law Society of British Columbia v. Trinity Western University* are applicable in the case at bar, and as already mentioned, they submit that the Federal Government's approach to administrative segregation for mentally ill inmates cannot be justified under section 1 of the *Charter*.

[324]   Although I rather doubt that there is any balancing of *Charter* rights such as occurred in the *Trinity Western* case, for present purposes, I need not decide whether *Loyola High School v. Quebec (Attorney General), Doré v. Barreau du Québec,* and *Law Society of British Columbia v. Trinity Western University* have displaced the framework of the *Oakes* test, because for the reasons already stated, the administrative decisions of the Correctional Service do not reflect a proportionate balance of the relevant *Charter* protections.

[325]   Whatever the analytical legal framework, the Federal Government has not shown that prolonged administrative segregation for security purposes for two subclasses of seriously mentally ill inmates is a reasonable limit on life, liberty, or the security of the person that can be demonstrably justified in a free and democratic society.

[326]   Therefore, based on the evidence in the immediate case, I conclude that without prejudice to any individual Class Member's claim at an individual issues trial to assert that his or her treatment was contrary to section 7 of the *Charter* in his or her particular circumstances, by its operation and management of the Federal Institutions from November 1, 1992 to the present, the Federal Government breached the rights under section 7 of the *Charter* of those Class Members: (a) who were <u>involuntarily</u> placed in administrative segregation for more than thirty days; and (b) who were voluntarily placed in administrative segregation for more than sixty days.

[327]   By way of a summary, the rationale for this conclusion has three main elements. First, while I have found that two subclasses of the class have viable claims under section 7 of the *Charter*, it is does not follow that the balance of the Class Members – as individuals – do not have claims that their treatment was contrary to section 7 of the *Charter*. Visualize, a Class Member might have involuntarily been placed in solitary confinement for less than thirty days, but in his or her particular circumstances, the placement may have violated his or her constitutional rights.

[328]   Second, I have found that if a Class Member is <u>involuntarily</u> placed in administrative segregation for more than thirty days, then his or her *Charter* rights have been violated. An involuntary placement of less than thirty may but does not necessarily infringe on a mentally ill Class Member's rights under section 7 of the *Charter*. However, once the duration of the involuntary (and possibly indeterminate placement) exceeds thirty days, the Correctional Service ought to have resolved the security risk in accordance with its responsibilities under the *CCRA* and an involuntary placement of more than thirty necessarily infringes on the inmates' rights to life, liberty, and security of the person. There is a common or systemic breach suffered by the subclasses comprised of Class Members who were involuntarily placed in administrative segregation for more than thirty days.

[329]   Third, I have found that if a Class Member is voluntarily placed in administrative segregation for more than sixty days, then his or her *Charter* rights have been violated. A

2019 ONSC 1888 (CanLII)

voluntary placement of less than sixty days may, but does not necessarily, infringe on a mentally ill Class Member's rights under section 7 of the *Charter*. However, once the duration of the voluntary (and possibly indeterminate placement) exceeds sixty days, the Correctional Service ought to have resolved the security risk in accordance with its responsibilities under the *CCRA* and a voluntary placement of more than sixty necessarily infringes on the inmates' rights to life, liberty, and security of the person. There is a common or systemic breach suffered by the subclass comprised of Class Members who were voluntarily placed in administrative segregation for more than sixty days.

[330]   For the subclasses (which may also be represented by Messrs. Brazeau and Kift as representative plaintiffs), the breach of section 7 of the *Charter* is <u>not</u> saved by section 1 of the *Charter*.

[331]   I foreshadow the discussion below to note that the size of the two subclasses will be truncated by limitation period defences available to the Federal Government.

## R.  **Did the Federal Government Breach Section 9 of the *Charter*?**

### 1.  **Introduction**

[332]   The third and fourth common issues are: (3) By its operation and management of the Federal Institutions from November 1, 1992 to the present, did the Defendant breach the Class Members' rights under section 9 of the *Charter*? and, (4) If so, were its actions saved by section 1 of the *Charter*?

[333]   With all of the evidentiary background above, I shall now address the third and fourth common issues. Structurally, the discussion will have the three overlapping themes of: first, the general legal principles associated with sections 1, 7, and 9 of the *Charter;* second, the application of those legal principles to the factual circumstances of mentally ill inmates; and, third, the extent to which the application of the law to the facts applies across the class of the immediate case.

[334]   Relying principally on *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*,[88] *British Columbia Civil Liberties Association v. Canada (Attorney General),*[89] *Charkaoui v. Canada (Citizenship and Immigration)*,[90] and *R. v. Duguay*,[91] Messrs. Brazeau and Kift submit that the placement of a Class Member inmate into administrative segregation breaches section 9 of the *Charter* for three reasons; namely: (a) because the lack of independent oversight and a meaningful review of placements in administrative segregation makes the detention or imprisonment arbitrary and contrary to section 9 of the *Charter*; (b) because of the arbitrary and unbridled discretion of the warden in making placements and in discharging inmates from administrative segregation, the detention or imprisonment is contrary to section 9 of the *Charter*; and (c) the placement of a Class Member into administrative segregation is a breach of s. 87 of the *Corrections and Conditional Release Act* and, therefore, is an unlawful and arbitrary detention or imprisonment.

---

[88] 2017 ONSC 7491.
[89] 2018 BCSC 62.
[90] 2007 SCC 9.
[91] [1989] 1 S.C.R. 93.

[335]   As foreshadowed in the introduction to these Reasons for Decision and in the discussion of section 7 above, I conclude that although described as a breach of s. 9, it is section 7 of the *Charter* that has been violated because administrative segregation wants for a constitutionally valid review system. I find no other breach of section 9 of the *Charter*.

### 2.   The Alleged s .7 and Section 9 Breach of the *Charter*

[336]   As noted above, Messrs. Brazeau and Kift advance three reasons in support of their argument that section 9 has been contravened. The first of these reasons is that the lack of independent oversight and a meaningful review of placements of mentally ill inmates in administrative segregation makes the detention or imprisonment an arbitrary one contrary to section 9 of the *Charter*. Analytically, this alleged section 9 breach, which concerns due process and the principles of natural and fundamental justice is better analyzed under section 7 of the *Charter*. However, I shall make that analysis in this part of my Reasons for Discussion, and then I shall consider Messrs. Brazeau and Kifts' other arguments about section 9 of the *Charter*.

[337]   In addition to its argument that the case is not appropriate for a summary judgment, the Federal Government asserts what might be regarded as a preliminary objection to the court answering whether in operation, the review process for placements in administrative segregation contravenes the *Charter*. The Federal Government submits that the issue of independent oversight is not actually or properly before the court. It submits that the Fresh as Amended Statement of Claim as well as the Notice of Motion for Summary Judgment does not raise the issue of independent oversight.

[338]   I rule against this preliminary objection. It is an odd objection given that the Federal Government did not appeal Justice Marrocco's decision in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*.[92] It is a highly technical pleadings point, but the evidence for the summary judgment motion would be no different than including this matter as before the court, even if was outside the ambit of Messrs. Brazeau and Kifts' pleading or notice of motion, which I find not to be the case. Further, if it were necessary, and I do not think it is, because I think the issue is captured by the common issues that are before the court, I would grant leave to amend the pleading at the summary judgment motion as it might have been amended at a trial.

[339]   Therefore, addressing Messrs. Brazeau and Kifts' argument on its merits, I begin by noting that on essentially the same evidence that was presented in the immediate case, in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, Justice Marrocco, and in *British Columbia Civil Liberties Association v. Canada (Attorney General)*, Justice Leask, concluded that section 7 of the *Charter* had been violated for all inmates in a penitentiary who had been placed in administrative segregation because of the absence of a meaningful review process. Justice Leask went further than Justice Marrocco and concluded that in practice and not just based on the design of the legislation, the Correctional Service "has shown an inability to fairly review administrative segregation decisions."[93]

[340]   In the immediate case, the focus was on mentally ill inmates, and it is all the more so that such inmates need and are constitutionally entitled to a meaningful and robust review process if

---

[92] 2017 ONSC 7491.

[93] *British Columbia Civil Liberties Association v. Canada (Attorney General)*, 2018 BCSC 62 at para. 409.

they are placed in administrative segregation for their own safety or for the safety of others.

[341]   Where section 7 applies, the principles of fundamental justice require, at a minimum, that the common law rules of procedural fairness are followed. In *Baker v. Canada (Minister of Citizenship and Immigration)*,[94] the Supreme Court set out the following non-exhaustive factors to consider when determining the required level of procedural protections: (1) the nature of the decision or the closeness of the administrative process to the judicial process; (2) the statutory scheme; (3) the importance of the decision to the individual affected; (4) the legitimate expectations of the person challenging the decision; and (5) the choice of the procedure by the agency itself.

[342]   Applying the criteria of *Baker v. Canada (Minister of Citizenship and Immigration)* to the circumstances of seriously ill inmates, the principles of fundamental justice would demand a very high level of scrutiny of the process and procedures that led to the placement of the inmate into administrative segregation, even in the cases where the inmate's placement is voluntary. The seriously mentally ill inmate is not only vulnerable to the imperatives of the security situation, but he is she is a vulnerable person in need of psychiatric treatment and the Corrections Service has a duty to consider the inmate's health when making a placement into administrative segregation. A placement, be it involuntary or voluntary, into administrative segregation is of profound significance to the individual affected. The placement is also of profound significance to the Corrections Service, which is pulled between the imperatives of safeguarding the security of the penitentiaries and of its responsibilities to the inmate and to society to rehabilitate him or her so that the inmate may be returned to society.

[343]   The decision to place a seriously mentally ill inmate in administrative segregation requires astute evaluations of the mental health of the inmates to determine: (a) whether the state of health of the inmate is such that no placement should be made at all; and (b) whether, after placement, the state of health of the inmate has deteriorated such that the inmate should be released. All the circumstances require a high degree of scrutiny.

[344]   That scrutiny and persons qualified to make the assessments have been missing, and it follows that the rights of the Class Members, all of whom suffer from the most serious mental illnesses, not to be arbitrarily detained have been violated not only as a matter of the interpretation of the legislation but as a matter of how that law is practiced by government action. This is a class wide breach to all Class Members whom were all placed in administrative segregation voluntarily or involuntarily.

[345]   I read and interpret the *Corrections and Conditional Release Act* as did Justice Marrocco in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen.*[95] I agree that after the institutional head or his or her delegate makes a decision to place an inmate in administrative segregation there is no meaningful or sufficient robust review system. As it is, the review of the placement decision is not an independent review because the review is made by the person who made the decision.

[346]   In effect, the decision-maker reviews his or her already made decision for its propriety. Thus, the decision about a fundamentally important matter that entails possible serious consequences to a Class Member is insulated from a meaningful review.

---

[94] [1999] 2 S.C.R. 817.
[95] 2017 ONSC 7491.

[347]   I agree with Justice Marrocco that his is procedurally unfair and not in accord with the principles of fundamental justice. I also agree with him that this conclusion is consistent with the finding in *Hamm v. Attorney General of Canada (Edmonton Institution)*[96] that a high degree of procedural fairness is required for decisions to place an inmate in involuntary segregation.[97] And I agree with his conclusion that the absence of an independent review means that there is virtually no accountability within a legislative scheme in which prolonged segregation is possible.[98]

[348]   I also agree with Justice Leask on this issue. In *British Columbia Civil Liberties Association v. Canada (Attorney General)*,[99] Justice Leask stated at paragraph 355:

> 355. Returning to the present case, the existing statutory regime permits the warden to quite literally be the judge in his or her own cause with respect to placement decisions. At a minimum, it creates a reasonable apprehension of bias, if not actual bias, in favour of continued segregation. Because of the serious risk of harm that arises from placements in administrative segregation, I conclude that this lack of impartiality in the review process is contrary to the principle of procedural fairness guaranteed by section 7 of the *Charter*.

[349]   One final point about this section 7 breach. In *R. v. Capay*,[100] Justice Fregeau agreed with Mr. Capay's argument that that the right to a prompt and meaningful review of the substantive basis for continued segregation is a right guaranteed by section 9, distinct from the right to a procedurally fair review process guaranteed by section 7 of the Charter. Justice Frageau's finding was based, in part, on the horrendous circumstances of solitary confinement experienced by Mr. Capay as he waited to be tried on murder charges and, in part, on the atrociously deficient and pathetic review process, where Mr. Capay's plight was ignored, overlooked, and not reviewed, and when it was reviewed, the information provided to the reviewers was inaccurate, insufficient, and essentially meaningless but, nevertheless, the information was accepted by the irresponsible supervisors who endorsed Mr. Capay's continued administrative segregation. So, Justice Frageau found a breach of both section 7 and section 9 of the *Charter*.

[350]   In the immediate case, ultimately it does not matter whether the breach is characterized as a section 7 breach or a section 9 breach, it is a singular breach of the *Charter* that applies on a class-wide basis and the finding of breach does not depend upon individual findings of fact.

[351]   For the same reasons that applied to the section 7 breaches of the *Charter*, discussed above, the Federal Government has not shown that this class wide breach is a reasonable limit to the Class Members' rights not to be arbitrarily detained or imprisoned. The breach be it a breach of section 7 or notionally a breach of section 9 is not excused by section 1 of the *Charter*.

[352]   I foreshadow the discussion below to note that the size of the class with section 7 (or notionally session 9) claims will be truncated by limitation period defences available to the Federal Government.

---

[96] 2016 ABQB 440.

[97] *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen,* 2017 ONSC 7491 at para. 146.

[98] *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* 2017 ONSC 7491 at para. 163.

[99] 2018 BCSC 62.

[100] 2019 ONSC 535.

### 3.   The Alleged Section 9 Breaches of the Charter

[353]   I turn now to Messrs. Brazeau and Kifts' two other reasons for arguing that in operation, the Correctional Service's use of administrative segregation breaches section 9 of the *Charter*. Section 9 of the *Charter* states:

> 9. Everyone has the right not to be arbitrarily detained or imprisoned.

[354]   Under section 9 of the *Charter* everyone has the right not to be arbitrarily detained or imprisoned. The state may not detain arbitrarily, but only in accordance with the law.[101] The section 9 guarantee against arbitrary detention or imprisonment is a specific application of the general principle enunciated in section 7 that the government cannot infringe a person's liberty except in accordance with the principles of fundamental justice.[102]

[355]   There are three factors in analyzing whether a detention or imprisonment is arbitrary: (1) whether the detention or imprisonment was authorized by law; (2) whether the standards set out in law limit the detention or imprisonment to a restricted category of people; and (3) whether the standards set out in law are rationally connected to the legislative objective.[103] Detention or imprisonment is not arbitrary where there are standards that are rationally related to the purpose of the power of detention or imprisonment.[104]

[356]   A detention or imprisonment made according to the law is not arbitrary unless the law authorizing the detention or imprisonment is arbitrary.[105] A law will be arbitrary if it either requires detention or imprisonment or if it grants discretion to detain a person without providing implied or express criteria to govern whether someone should be placed in detention or imprisonment.[106]

[357]   Notwithstanding the arguments of Messrs. Brazeau and Kift, I perceive no breach of section 9 of the *Charter* on a class-wide basis. Administrative segregation which applies to a discrete group posing or being exposed to security concerns is authorized by law; *i.e.,* by the *Corrections and Conditional Release Act* and that statute provides criteria associated with security concerns that specifies the circumstances that would call for administrative segregation. The statute also directs that the inmate subject to the security concern be released at the earliest appropriate time.

[358]   The standards are rationally related to the expressed purposes of administrative segregation. In *R. v. Lyons*,[107] the Supreme Court of Canada stated that the imprisonment of an individual cannot be said to be arbitrary where it is readily apparent that not only is the incarceration statutorily authorized, but that the legislation narrowly defines a class of offenders with respect to whom it may properly be invoked, and prescribes quite specifically the conditions under which incarceration may take place. Detention or imprisonment because of the existence of reasonable grounds to believe that person is a threat to security or safety is a rational, non-

---

[101] *Charkaoui v. Canada (Citizenship and Immigration),* 2007 SCC 9 at para. 88.
[102] *R. v. Grant*, 2009 SCC 32.
[103] *R. c. Perry*, 2013 QCCA 212.
[104] *Charkaoui v. Canada (Citizenship and Immigration)*, 2007 SCC 9.
[105] *R. v. Grant*, 2009 SCC 32.
[106] *R. v. Swain*, [1991] 1 S.C.R. 933; *R. v. Hufsky*, [1988] 1 S.C.R. 621.
[107] [1987] 2 SCR 309 at p. 347.

arbitrary standard for detention or imprisonment.[108]

[359]   Granted that a particular warden may with respect to particular inmates make a mistake in the exercise of his or her discretion to place a particular inmate in administrative segregation and granted that a particular warden may with respect to a particular inmate fail to comply with s. 87 of the *Corrections and Conditional Release* and fail take into consideration an offender's state of health and health care needs in regards to a placement in administrative segregation, but it does not follow that the error or omission makes the placement arbitrary and it certainly does not follow that all of the placements of all Class Members in administrative segregation where the warden does have regard to the safety of the Class Member and his or her health status and health care needs are arbitrary detentions or imprisonments.

[360]   I adopt what Justice Leask said in *British Columbia Civil Liberties Association v. Canada (Attorney General)* at paragraphs 542 and 543:

> 542. Applying those factors to the present case, administrative segregation is authorized by law, namely, s. 31 of the *CCRA*. Second, the law is limited to a restricted category of inmates. An inmate is only placed in administrative segregation where there is no reasonable alternative and there are reasonable grounds to believe that the inmate acted, or attempted to act, in a way that jeopardizes the security or safety of the penitentiary; allowing the inmate to associate with other inmates would interfere in an ongoing criminal investigation; or allowing the inmate to associate with other in-mates would jeopardize the inmate's own safety. Third, there is a rational connection between placing an inmate in segregation and the legislative purpose of maintaining the safety and security of the institution.
>
> 543   Accordingly, placing an inmate in administrative segregation is authorized by law. The law is not arbitrary because it limits administrative segregation to a narrow group of inmates and sets out standards to govern the exercise of the provision's exercise, thus structuring the warden's discretion under the *CCRA*. Any procedural concerns with administrative segregation, including review processes under the *CCRA*, are more appropriately dealt with under section 7. Accordingly, I find no section 9 violation on these facts.

[361]   Because I have found that there is no breach of section 9 of the *Charter*, it is not necessary to consider the application of section 1 of the *Charter.*

## S.   Did the Federal Government Breach Section 12 of the *Charter*?

[362]   The fifth and sixth common issues are: (5) By its operation and management of the Federal correctional facilities from November 1, 1992 to the present, did the Defendant breach the Class Members' rights under section 12 of the *Charter*? and (6) If so, were its actions saved by section 1 of the *Charter*?

[363]   With all of the evidentiary background above, I shall now address the fifth and sixth common issues. Structurally, the discussion will have the three overlapping themes of: first, the general legal principles associated with sections 1 and 12 of the *Charter;* second, the application of those legal principles to the factual circumstances of mentally ill inmates, and,  third, the extent to which the application of the law to the facts applies across the class of the immediate case. As foreshadowed in the introduction to these Reasons for Decision, I conclude that section 12 of the *Charter* has been violated for two subclasses.

---

[108] *Charkaoui v. Canada (Citizenship and Immigration)*, 2007 SCC 9; *British Columbia Civil Liberties Association v. Canada (Attorney General)*, 2018 BCSC 62; *Mahjoub v. Canada (Citizenship and Immigration)*, 2017 FCA 157

[364]   Before undertaking the analysis, it is necessary to point out that given the abandonment of the claims of Class Members who never experienced administrative segregation but who had grievances about whether their treatment in a federal penitentiary for their mental health conditions was cruel and unusual is no longer an issue for me to determine.

[365]   There was a great deal of evidence from the experts, from the inmates, and from the officials of Corrections Canada about how mentally ill inmates are treated. This evidence is relevant to the issues that I must decide about whether, when, and how a placement in administrative segregation might be cruel or unusual treatment but this class action is no longer about the treatment of mentally ill inmates generally.

[366]   Section 12 of the *Charter* states:

> 12. Everyone has the right not to be subjected to any cruel and unusual treatment or punishment

[367]   Messrs. Brazeau and Kift submit that it is cruel and unusual treatment to place any seriously mentally ill inmate in administrative segregation, which they equate to solitary confinement, and it is further cruel and unusual treatment to place any seriously ill inmate in administrative segregation for an extended basis.

[368]   Where it is alleged that section 12 of the *Charter* has been breached, the plaintiff has the burden of establishing that a given treatment or punishment constitutes cruel and unusual punishment on a balance of probabilities.[109] To demonstrate a violation of section 12, a plaintiff must show that the treatment or punishment is grossly disproportionate in the circumstances, such that it would outrage society's sense of decency."[110]  Demonstrating that a treatment or punishment was merely excessive is not sufficient to ground a finding that section 12 has been violated.[111]

[369]   In determining whether there has been a breach of section 12 of the *Charter*, he court must consider whether the treatment goes beyond what is necessary to achieve a legislative aim, whether there are adequate alternatives, whether the treatment is arbitrary and whether it has a value or a social purpose. Other considerations include whether the treatment is unacceptable to a large segment of the population, whether it accords with public standards of decency or propriety, whether it shocks the general conscience and whether it is unusually severe and hence degrading to human dignity and worth.[112]

[370]   Relying on *Canadian Doctors for Refugee Care v. Canada (Attorney General),*[113] *Ogiamien v. Ontario (Community Safety and Correctional Services),*[114] and on precedents in individual cases where placement in administrative segregation have been held to be a breach of section 12 of the *Charter,*[115] Messrs. Brazeau and Kift submit that the Class Members' rights not to be subjected to any cruel and unusual treatment or punishment have been contravened.

[371]   I agree. For the two subclasses identified above, the placement of a seriously mentally ill

---

[109] *Charkaoui v. Canada (Citizenship and Immigration)*, 2007 SCC 9 at para 95.

[110] *R. v. Smith (Edward Dewey),* [1987] 1 S.C.R. 1045 at para. 55; *R. v. Lloyd*, 2016 SCC 13 at para. 24.

[111] *R. v. Nur*, 2015 SCC 15 at para 39.

[112] *R. v. Smith (Edward Dewey),* [1987] 1 S.C.R. 1045 at p. 1068.

[113] 2014 FC 651.

[114] 2017 ONCA 667.

[115] *R. v. Palmantier*, 2014 NWTTC 10; *Bacon v. Surrey Pretrial Services Centre (Warden),* 2010 BCSC 805; *R. v. Macpherson*, [1996] N.B.J. No. 182 (Q.B.).

2019 ONSC 1888 (CanLII)

2019 ONSC 1888 (CanLII)

inmate in administrative segregation goes beyond what is necessary to achieve the genuine and legitimate aim of securing the safety of the institution. Once the placement in administrative segregation exceeds sixty days for a seriously mentally ill voluntarily-placed inmate and once the placement exceeds sixty days for a seriously mentally ill involuntarily-placed inmate, the evidence establishes that the treatment is unacceptable to a large segment of the population. It does not accord with public standards of decency or propriety in the treatment of a mentally ill inmate. It is also unnecessary because there could have been alternative ways less draconian than then equivalent of solitary confinement to address a security concern, and an indeterminate time to resolve a security concern cannot be justified.

[372]   After decades, a consensus has emerged that save in exceptional circumstances of security threats, and even then, for as briefly as possible, the use of solitary confinement should be prohibited for mentally ill prisoners. In 2007, an international group of correctional experts and mental health experts met in Istanbul, Turkey and issued the *Istanbul Statement on the Use and Effects of Solitary Confinement*, which stated that the use of solitary confinement should be absolutely prohibited for mentally ill prisoners. In his 2009-2010 and 2011-13 Annual Reports, the Corrections Investigator stated that mentally ill inmates should not be held in administrative segregation and that such treatment of them was cruel and inhumane treatment. In 2012, the American Psychiatric Association recommended that segregation lasting longer than four weeks of prisoners with serious mental illness should with rare exceptions be avoided due to the harm it causes. In 2013, the American Psychiatric Association repeated what it had stated in 1997 that no inmate should be placed in segregation housing solely because of symptoms of mental illness unless there is an immediate and serious danger for which there is no other reasonable temporary alternative. In 2015, the Registered Nurses' Association recommended the abolition of the use of solitary confinement for persons with serious or acute mental illness. The 2015 *Nelson Mandela Rules* states that a placement in solitary confinement should be prohibited in the case of prisoners with mental debilities when their conditions would be exacerbated by the placement. In 2016, in the United States, the National Commission on Correctional Health Care stated that mentally ill individuals should be excluded from solitary confinement of any duration. In 2017, the Special Rapporteur reported to the United Nations that the imposition of solitary confinement of any duration on persons with mental disabilities is cruel, inhuman or degrading punishment.

[373]   Without regard to whether the inmate suffers from a mental illness but especially for inmates that do suffer from a serious mental illness, if not a consensus about the precise duration of acceptable solitary confinement, there is a strongly prevalent view that prolonged and especially indeterminately prolonged solitary confinement should not be allowed and that there should be a maximum time-limit for on an inmate being kept in administrative segregation. The American Bar Association's 2010 Standards for Criminal Justice held that segregated housing should not exceed ninety days. The jury in the Coroner's inquest about the death of Ashley Smith recommended that segregation should not exceed fifteen consecutive days for all inmates. The Correctional Investigator recommended that segregation in excess of fifteen days of mentally ill inmates is prohibited. The Registered Nurses' Association of Ontario stated that all prisoners should not be placed in a segregation for more than fifteen days at a time. Rule 43 of the Mandela Rules prohibits indefinite solitary confinement and prolonged solitary confinement, defined as a period exceeding fifteen days. The American Psychiatric Association stated that segregation lasting more than four weeks of prisoners with serious mental illness with rare exceptions should be avoided.  The Arbour Commission of Inquiry recommended a maximum limit of thirty days consecutive and of sixty non-consecutive days for all inmates, which

recommendation was endorsed by the Task Force on Administrative Segregation.

[374]   It may be the case that there was a time that Canadians thought that prolonged solitary confinement of a mentally ill but criminal responsible convict was not cruel or unusual treatment but that is no longer the case. Academic research, commissions, inquiries, inquests, court cases, domestic and international organizations, and the Correctional Investigator have produced a vast body of knowledge that consistently proves the harm caused by administrative segregation to mentally ill inmates and to their chances of rehabilitation.

[375]   Recently, in *R. v. Prystay*,[116] Justice Pentelechuk, then of the Court of Queen's Bench of Alberta, in another case involving the placement of an inmate in administrative segregation, stated eloquently at paragraphs 128-129 of his judgment:

> 128. Societal views on what is acceptable treatment or punishment evolve over time. Forced sterilization, residential schools, lobotomies to treat mental disorders corporal punishment in schools and the death penalty are all examples of treatment once considered acceptable. Segregation ravages the body and the mind.  There is growing discomfort over its continued use as a quick solution to complex problems.

> 129. Informed Canadians also realize that indefinite placement in segregation thwarts an inmate's chance of successfully re-integrating into society. Certainly, Canadians find abhorrent that someone should remain in segregation for months or even years.   Perhaps one day, segregation will be ended. […]

[376]   I appreciate that in *British Columbia Civil Liberties Association v. Canada (Attorney General)*,[117] Justice Leask in the case before him, which has similar evidence to the immediate case, found that there was no basis for finding a breach of section 12 except in individual cases. He followed the precedents that establish that administrative segregation, as such, is not cruel and unusual punishment or treatment but may become so if it is so excessive as to outrage standards of decency.[118] In the context of considering the inmate population generally, Justice Leask said that while individual circumstances of administrative segregation might amount to cruel and usual punishment, it did not follow and he did not have the evidence to conclude that every instance of administrative segregation is cruel and unusual punishment.

[377]   In the case at bar, which focuses on seriously mentally ill inmates, I have the evidence to conclude: (a) that a Class Member (a seriously mentally ill inmate) who is involuntarily placed in administrative segregation is cruelly and unusually treated once the placement is longer than thirty days; and, (b) that a Class Member (a seriously mentally ill inmate) who is voluntarily placed in administrative segregation for more than sixty days is cruelly and unusually treated, in both cases contrary to section 12 of the *Charter.*

[378]   In the immediate case, I am not deciding the length of a placement of an inmate who is not a Class Member and I am not deciding anything about the appropriate length of a placement of an inmate in disciplinary confinement, but it is worth noting that there are time limits on disciplinary segregation similar to the time limits that define the two subclasses but there are presently none for administrative segregation and this possibility of indeterminacy of administrative segregation for the safety of an inmate, who may himself or herself have done nothing wrong, is shocking, unusually severe, and degrading to human dignity and worth.

---

[116] 2019 ABQB 8.
[117] 2018 BCSC 62 at paras. 525-524.
[118] *R. v. Olson* (1987), 38 C.C.C. (3d), 534 at para. 41 (Ont. C.A.), aff'd [1989] 1 S.C.R. 296.

[379]   Once again, for the reasons expressed above, the *Charter* breach is not saved by section 1 of the *Charter*.

[380]   I foreshadow the discussion below to note that the size of the two subclasses will be truncated by limitation period defences available to the Federal Government.

## T.  **Limitation Periods**

[381]   As I shall now explain, subject to assertions that an individual Class Member's claim was not discoverable or that their mental health suspended the running of the limitation period, there is no genuine issue requiring a trial that on a class-wide basis a six-year limitation period applies to all claims. From this conclusion, it follows that the start date for the Class Period is July 20, 2009 for all but the Estate claimants, for which the start date is July 20, 2013.

[382]   Limitations periods apply to a claim for damages under section 24 of the *Charter*.[119]

[383]   Section 32 of the *Crown Liability and Proceedings Act*[120] states:

> *Provincial laws applicable*
>
> 32. Except as otherwise provided in this Act or in any other Act of Parliament, the laws relating to prescription and the limitation of actions in force in a province between subject and subject apply to any proceedings by or against the Crown in respect of any cause of action arising in that province, and proceedings by or against the Crown in respect of a cause of action arising otherwise than in a province shall be taken within six years after the cause of action arose.

[384]   Section 32 of the *Crown Liability and Proceedings Act* provides that proceedings by or against the Crown in respect of a cause of action arising otherwise than in a province shall be taken within six years after the cause of action arose. Courts have interpreted "otherwise than in a province" to include actions arising in more than one province or a combination" of provinces.[121]

[385]   In the present case, collectively and individually, the facts giving rise to the *Charter* violations arise in more than one province. With a head office in Ottawa, Ontario, the Correctional Service operates and administers the federal penitentiaries by dividing the provinces and territories of Canada into five regions. Prisoners are moved from penitentiaries in one region to penitentiaries in another. Staff are moved from one province to another. For an inmate who has spent sixty days or more in administrative segregation, the case is reviewed by a national committee. I find as a fact that the Class Members' actions arise otherwise than in a province.

[386]   The practical consequence of this conclusion is that subject to individual rebuttals of the six-year limitation period in accordance with the laws relating to prescription and the limitation of actions in force in a province, the Class Members with claims, which currently includes inmates from 1992 to date (estimated to be a Class size of 6750), is reduced to inmates placed in administrative segregation from July 20, 2009 to date (estimated to be a Class size of 1,500).

[387]   The claims of inmates who were placed in administrative segregation only before July 20, 2009 are statute-barred unless they can rebut the running of the limitation period by establishing

---

[119] *Ravndahl v. Saskatchewan*, 2009 SCC 7.
[120] R.S.C. 1985, c. C-50.
[121] *Markevich v. Canada*, 2003 SCC 9; *Hislop v. Canada (Attorney General)*, 2008 O.J. No. 793 at paras. 14-15 (S.C.J.).

that: (a) their claim was not discoverable in their particular case: or (b) the running of the limitation period was suspended due to the inmate not having litigation guardian and being incapable of commencing a legal proceeding due to his or her mental condition (estimated to be 500 inmates). Thus, if there is an operative limitation period, Messrs. Brazeau and Kift estimate the total class size to be 2,000 inmates.

## U.  *Charter* Damages and Aggregate Damages

### 1.  Introduction and Overview

[388]   The seventh and eighth common issues are: (7) If the answer to any of common issues (1), (3), or (5) is "yes", and the answer to any of (2), (4) and (6) is no, are damages available to the Class under session 24 of the *Charter*? and (8) If the answer to common issue (7) is "yes", can the Court [pursuant to s. 24 of the *Class Proceedings Act, 1992*] make an aggregate assessment of the damages suffered by all Class Members as a part of the common issues trial [summary judgment motion]?

[389]   Underlying the seventh and eighth common issues are three major questions that raise issues of first instance; namely: (a) What, in general, is the nature of *Charter* damages in the context of a class proceeding: Are the Class Members entitled to *Charter* damages? (b) Are *Charter* damages available in the aggregate to the Class Members in the immediate case? and (c) How are *Charter* damages quantified in the context of a class proceeding? There is also a major issue about how *Charter* damages should be allocated and distributed, which I shall discuss later in these Reasons for Decision.

[390]   The aggregate assessment questions also raise an issue about punitive damages, which I shall ignore for immediate purposes to focus on *Charter* damages. In the next part of my Reasons for Decision, I shall discuss punitive damages. To foreshadow, I conclude that punitive damages is a matter for individual issues trials.

[391]   As for the first major question, Messrs. Brazeau and Kift submit that all of the Class Members have had their *Charter* rights violated in a variety of ways and that each Class Member is entitled to *Charter* damages.

[392]   As for the second major question, Messrs. Brazeau and Kift submit that there is a base amount of *Charter* damages (and of punitive damages) for deterrence and vindication that can be aggregated under the *Class Proceedings Act, 1992*, which damages can be followed by a top-up of compensatory damages for individual personal injuries, the quantum of which awards would be determined at individual issues trials.

[393]   Thus, in addition to the individual claims of each Class Member – which it is conceded cannot be aggregated under s. 24 of the *Class Proceedings Act, 1992*  - Messrs. Brazeau and Kift submit that the class as a whole is entitled to non-compensatory damages under section 24 of the *Charter*, and they submit that these damages, which are designed to achieve deterrence and vindication, can be aggregated under s. 24 of the *Class Proceedings Act, 1992*. Relying on the expert opinion of Dr. Chaimowitz, Messrs. Brazeau and Kift submit that there is a base-line level of *Charter* damages that can be aggregated and awarded to the Class Members before they proceed to individual issues trials of their individual personal injury claims.

[394]   As for the first and second major questions, in addition to its omnibus submission that the

case is inappropriate for a summary judgement, the Federal Government submits that because of: (a) the principle from *Mackin v. New Brunswick (Minister of Finance)*;[122] and (b) the general principles from *Vancouver (City) v. Ward*,[123] *Charter* damages are not available in the immediate case for the breaches of section 7 and 12 of the *Charter*. The Federal Government submits that there are countervailing policy considerations that stand against a base award of *Charter* damages. In paragraph 128 of its factum, the Federal Government stated:

> 128. Further to the submissions above in paragraphs 115 to 122, alternate remedies, such as declaratory relief, ought to be considered as a more appropriate form of relief. Such relief would allow the government to craft a legislative and/or policy response, including possibly with regards to Bill C-83. Whether this is in the form of additional mental health or program resources, or structural changes to institutions, either way, such remedies are more appropriate than an award of damages. Such alternatives responses serve a functional purpose in addressing alleged *Charter* violations. The principles of deterrence, vindication and compensation would all be met through such declaratory relief.

[395] As for the third major issue, Messrs. Brazeau and Kift submit that the quantum of *Charter* damages can be determined by multiplication; *i.e.*, by multiplying the number of Class Members by a symbolic sum for the purpose of deterrence and vindication. On this basis, if there are no limitation periods barring any claims, Messrs. Brazeau and Kift tentatively claim *Charter* damages of $337.5 million (6,750 x $50,000). If there is a limitation period to bar some of the claims, Messrs. Brazeau and Kift tentatively claim *Charter* damages of $100 million (2,000 x $50,000). The claims are tentative because the class size figures are only estimated figures and may not be accurate.

[396] The Federal Government disagrees and submits that if liability is established, then the quantification of *Charter* damages should be determined later with additional evidence and argument.

[397] As noted in the introduction to these Reasons for Decision, the answer to the seventh question is that notwithstanding the principles from *Mackin v. New Brunswick (Minister of Finance)*,[124] vindication and deterrence damages are available to the whole class under section 24 (1) of the *Charter* for the breach of section 7 of the *Charter* regarding the inadequate review procedure (misdescribed by Messrs. Brazeau and Kift as a breach of section 9) and vindication and deterrence damages are available to the subclasses that suffered a breach of sections 7 and 12 of the *Charter*.

[398] Further, as noted in the introduction to these Reasons for Decision, the answer to the eighth question is that the court can make an aggregate assessment of the *Charter* damages suffered by the whole class for the breach of section 7 of the Charter and of the *Charter* damages of the subclasses that suffered a breach of sections 7 and 12 of the *Charter*. I assess those damages as $20 million, which is to be distributed, less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct.

[399] The explanation for these answers follows.

---

[122] 2002 SCC 13.

[123] 2010 SCC 27.

[124] *Mackin v. New Brunswick (Minister of Finance)*, 2002 SCC 13.

80

## 2.  Are the Class Members Entitled to *Charter* Damages?

[400]   Turning to the first major question of whether pursuant to section 24 (1) of the *Charter,* the Class Members are entitled to damages for the breaches of sections 7 and 12 of the *Charter*, Messrs. Brazeau and Kifts' submit that the Class Members have established that their *Charter* rights have been breached and damages are an appropriate and just remedy.

[401]   They submit that the Federal Government in continuing with administrative segregation has ignored criticisms and recommendations from its own agents, professional medical organizations, coroners, and courts, as well as international organizations, international law and applicable standards for decades. Messrs. Brazeau and Kifts' submit that the Federal Government has acted grossly negligently or has been willfully blind to the *Charter* impacts of its actions on the seriously mentally ill for the entire Class Period. They submit that they have refuted the Federal Government's submissions that there are countervailing policy submissions and assert that there should be a significant base line award of *Charter* damages to be distributed to the class.

[402]   Further, Messrs. Brazeau and Kift submit that the principle from *Mackin v. New Brunswick (Minister of Finance),*[125] which would limit the availability of *Charter* damages, does not apply to the circumstances of the immediate case, but if it did, then it would apply only to exclude liability for the section 7 breach associated with the deficient review process for placements in administrative segregation.  Messrs. Brazeau and Kift submit that the principle would not apply to the other section 7 *Charter* breaches or to the breach of s. 12 of the *Charter*.

[403]   Section 24 (1) of the *Charter* is a remedies provision; it states:

> *ENFORCEMENT OF GUARANTEED RIGHTS AND FREEDOMS/ Exclusion of evidence bringing administration of justice into disrepute*
>
> 24 (1) Anyone whose rights or freedoms, as guaranteed by the Charter, have been infringed or denied may apply to a court of competent jurisdiction to obtain such remedy as the court considers appropriate and just in the circumstances.

[404]   As revealed by the leading case of *Vancouver (City) v. Ward*,[126] discussed below, section 24 (1) is distinct from section 52 (1) of the *Constitution Act 1982,* which provides a remedy when the purpose or effect of a law violates *Charter* rights. Pursuant to section 52, the Court may strike down or read down or qualify the operation of the impugned statute. In contrast, section 24 (1) of the *Charter* provides a personal remedy against unconstitutional government action.[127]

[405]   As revealed by the leading case of *Vancouver (City) v. Ward*, unlike section 52 (1), section 24 (1) can be invoked only by a party alleging a violation of that party's personal constitutional rights.[128] The nature of the section 24 (1) remedy is a matter for a court of competent jurisdiction to fashion. It is for the court functionally or purposely to design substantive legal remedies for *Charter* violations independent of, but informed by, the

---

[125] *Mackin v. New Brunswick (Minister of Finance*), 2002 SCC 13.

[126] 2010 SCC 27.

[127] *R. v. Ferguson*, 2008 SCC 6; *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen*, 2017 ONSC 7491 at paras. 15-22.

[128] *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* 2017 ONSC 7491 at para. 19.

81

substantive common and civil law. The remedies of section 24 (1) are new substantive legal territory and are to be developed incrementally without a pre-determined formula.

[406]   In *Vancouver (City) v. Ward*,[129] the Supreme Court of Canada held that damages may be available in appropriate cases where they would serve a functional purpose in remedying a *Charter* violation. Damages under section 24 (1) of the *Charter*, however, are not private law damages, but the distinct remedy of constitutional damages. The key to understanding section 24 (1) remedies is to understand their focused functionality directed at responding to the consequences of the *Charter* being breached.

[407]   The facts of In *Vancouver (City) v. Ward* were that the Vancouver Police Department wished to avoid the repeat of an incident where Prime Minister Chrétien while visiting the city for a political event or ceremony was struck by a pie-thrower. Mr. Ward, a Vancouver lawyer attending the event, was mistaken to be the pie-thrower. He was arrested, and his car was impounded. While in detention, he was strip-searched down to his underwear. He was held for several hours in jail, and then he was released. Mr. Ward sued the Police Department and others. Justice Tysoe, the trial judge, awarded Mr. Ward $5,000 tort damages for the wrongful imprisonment plus *Charter* damages of: (a) $5,000 for the imprisonment; and, (b) $100 for the seizure of the car.[130] The *Charter* breaches were of section 8 (the right to be free from an unreasonable search and seizure) and section  9 (the right to be free from an arbitrary detention or imprisonment). The tort award was not appealed, but the Police Department appealed the *Charter* damage awards. The trial decision about *Charter* damages was affirmed by the British Columbia Court of Appeal (Finch, C.J.B.C., Low, J. in the majority, Saunder, J., dissenting).[131] The Police Department appealed to the Supreme Court of Canada and submitted that *Charter* damages ought not to have been awarded.

[408]   In a unanimous judgment written by Chief Justice McLachlin, the Supreme Court upheld the $5,000 *Charter* damages but not the $100 award. The Chief Justice said the appeal raised the question of when damages may be awarded under section 24 (1) of the *Charter* and what the amount of such damages should be.

[409]   As to the nature of section 24 (1), the source of the court's jurisdiction to fashion personal *Charter* remedies, Chief Justice McLachlin observed that section 24 (1) provides the court with an extremely broad discretion - but not an unfettered or unguided discretion - to determine what remedy is appropriate and just in the circumstances of a particular case.[132]

[410]   She observed that the general parameters of a section 24 (1) remedy were set out by Justices Iacobucci and Arbour in *Doucet-Boudreau v. Nova Scotia (Minister of Education)*[133]. In that case, the Supreme Court established that a *Charter* remedy will: (a) meaningfully vindicate *Charter* rights; (b) employ means that respect the different roles of governments and courts in the Canadian constitutional democracy; (c) be a judicial remedy that vindicates the *Charter* right within the function and powers of a court; and (d) be fair to the government actor against whom the order is made.[134]

---

[129] 2010 SCC 27.

[130] *Ward v. Vancouver (City)*, 2007 BCSC 3.

[131] *Ward v. Vancouver (City)*, 2009 BCCA 23.

[132] *Vancouver (City) v. Ward*, 2010 SCC 27 at paras. 17 -19; *Mills v. The Queen,* [1986] 1 S.C.R. 863 at p. 965

[133] 2003 SCC 62.

[134] *Vancouver (City) v. Ward*, 2010 SCC 27 at para. 20.

[411]   The Chief Justice synthesized these general guidelines and concluded that a monetary award; *i.e., Charter* damages was a possible remedy under section 24 (1) of the *Charter*; she stated at paragraph 21:

> 21. Damages for breach of a claimant's *Charter* rights may meet these conditions. They may meaningfully vindicate the claimant's rights and freedoms. They employ a means well-recognized within our legal framework. They are appropriate to the function and powers of a court. And, depending on the circumstances and the amount awarded, they can be fair not only to the claimant whose rights were breached, but to the state which is required to pay them. I therefore conclude that s. 24 (1) is broad enough to include the remedy of damages for *Charter* breach. That said, granting damages under the *Charter* is a new endeavour, and an approach to when damages are appropriate and just should develop incrementally. *Charter* damages are only one remedy amongst others available under s. 24 (1), and often other s. 24 (1) remedies will be more responsive to the breach.

[412]   Before describing the approach and guidelines that Chief Justice McLachlin developed for determining when a monetary award of *Charter* damages is appropriate, it is necessary to examine more closely what happened in *Doucet-Boudreau v. Nova Scotia (Minister of Education)*. This examination is necessary because it was that case that informed the Chief Justice's analysis and because it is necessary to understand *Doucet-Boudreau v. Nova Scotia (Minister of Education)* to understand the principle from *Mackin v. New Brunswick (Minister of Finance),*[135] discussed below and relied on by the Federal Government.

[413]   And it is *Doucet-Boudreau v. Nova Scotia (Minister of Education)* that has largely informed my own decision in the immediate case to award $20 million, which is to be distributed, less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct.

[414]   *Doucet-Boudreau v. Nova Scotia (Minister of Education)* concerned a violation of section 23 of the *Charter* by the province of Nova Scotia, which had not adequately provided for French-language schools in the province. The province was not allocating sufficient funds for these schools. After finding that the *Charter* had been breached, Justice LeBlanc directed the province to build schools and to provide French language programs. He set deadlines, and he retained a supervisory jurisdiction. Justice Le Blanc's decision was overturned by the Nova Scotia Court of Appeal, but it was restored by the Supreme Court of Canada. (The order I shall make in the immediate case is like the order made by Justice Le Blanc.)

[415]   The Supreme Court accepted that the courts had been granted a very expansive plenary role to fashion remedies for *Charter* breaches. The Supreme Court's central concern in *Doucet-Boudreau v. Nova Scotia (Minister of Education)* was that when fashioning *Charter* remedies, courts not overstep their role in a constitutional democracy and usurp the role of the other branches of government.[136] Keeping in mind this concern, Justices Iacobucci and Arbour described at paragraphs 55 – 59 what is "an appropriate and just remedy" under section 24 (1) of the *Charter,* as follows:

> 55. First, an appropriate and just remedy in the circumstances of a *Charter* claim is one that meaningfully vindicates the rights and freedoms of the claimants. Naturally, this will take account of the nature of the right that has been violated and the situation of the claimant. A meaningful

---

[135] *Mackin v. New Brunswick (Minister of Finance)*, 2002 SCC 13.

[136] *Boudreau v. Nova Scotia (Minister of Education),* 2003 SCC 62 at para. 23.

remedy must be relevant to the experience of the claimant and must address the circumstances in which the right was infringed or denied. An ineffective remedy, on one which was "smothered in procedural delays and difficulties", is not a meaningful vindication of the right and therefore no appropriate and just (see *Dunedin, supra,* at para. 20, McLachlin C.J. citing *Mills, supra,* at p. 882, *per* Lamer J. (as he then was)).

56. Second, an appropriate and just remedy must employ means that are legitimate within the framework of our constitutional democracy. As discussed above, a court ordering a *Charter* remedy must strive to respect the relationships with and separation of functions among the legislature, the executive and the judiciary. This is not to say that there is a bright line separating these functions in all cases. A remedy may be appropriate and just notwithstanding that it might touch on functions that are principally assigned to the executive. The essential point is that the courts must not, in making orders under s. 24 (1), depart unduly or unnecessarily from their role of adjudicating disputes and granting remedies that address the matter of those disputes.

57. Third, an appropriate and just remedy is a judicial one which vindicates the right while invoking the powers of a court. It will not be appropriate for a court to leap into the kinds of decisions and functions for which its design and expertise are manifestly unsuited. The capacities and competence of the courts can be inferred, in part, from the tasks with which they are normally charged and for which they have developed procedures and precedent.

58. Fourth, an appropriate and just remedy is one that, after ensuring that the right of the claimant is fully vindicated, is also fair to the party against whom the order is made. The remedy should not impose substantial hardships that are unrelated to securing the right.

59. Finally, it must be remembered that s. 24 is part of a constitutional scheme for the vindication of fundamental rights and freedoms enshrined in the *Charter*. As such, s. 24, because of its broad language and the myriad of roles it may play in cases, should be allowed to evolve to meet the challenges and circumstances of those cases. That evolution may require novel and creative features when compared to traditional and historical remedial practice because tradition and history cannot be barriers to what reasoned and compelling notions of appropriate and just remedies demand. In short, the judicial approach to remedies must remain flexible and responsive to the needs of a given case.

[416]   In *Vancouver (City) v. Ward*, Chief Justice McLachlin had these insights about the roles of the different branches of government in mind from *Doucet-Boudreau v. Nova Scotia (Minister of Education)* when she set out a four-step enquiry to determine whether *Charter* damages may be awarded under section 24 (1) of the *Charter*.   The enquiry involved:

   a.   First, the claimant must establish that his or her *Charter* right has been breached.

   b.   Second, the claimant must establish that damages are an "appropriate and just" remedy, having regard to whether they would serve one or more of the functions of compensation, vindication, or deterrence. Compensation focuses on remedying the claimant's personal losses, physical, psychological, pecuniary, and non-pecuniary. As far as possible, the claimant should be placed in the same position as if his or her *Charter* rights had not been breached. Vindication remedies the harm caused to society, such as impaired public confidence and diminished faith in the efficacy of constitutional protections. Deterrence serves to influence government behaviour to ensure future compliance with the *Charter*.

   c.   Third, the government may establish that countervailing factors, such as alternative remedies and concerns for good governance negate exposure to civil liability or render a damages award inappropriate or unjust in the circumstances.

2019 ONSC 1888 (CanLII)

If other remedies adequately meet the need for compensation, vindication and/or deterrence, a further award of damages under section 24 (1) would serve no function and it would not be appropriate and just. A concurrent action in tort, or other private law claim, will bar *Charter* damages if it would result in double compensation.

d.  The fourth step is the determination of quantum. The quantum will be determined based on evidence of pecuniary or non-pecuniary loss, as well as in light of the other functional purposes of section 24 (1), such as vindication and deterrence.

[417]  In *Vancouver (City) v. Ward*, Chief Justice McLachlin recognized that there were qualifications or restriction on the availability of *Charter* damages. One of the qualifications emerges from the ideas that the courts should be cautious in usurping non-judicial government functions, many of which involve the allocation of government revenues, and that *Charter* damages must be functionally necessary. Thus, the Chief Justice stated at paragraphs 34 – 37 of her judgment:

34. A functional approach to damages under s. 24 (1) means that if other remedies adequately meet the need for compensation, vindication and/or deterrence, a further award of damages under s. 24 (1) would serve no function and would not be "appropriate and just". The *Charter* entered an existent remedial arena which already housed tools to correct violative state conduct. Section 24 (1) operates concurrently with, and does not replace, these areas of law. Alternative remedies include private law remedies for actions for personal injury, other *Charter* remedies like declarations under s. 24 (1), and remedies for actions covered by legislation permitting proceedings against the Crown.

35. The claimant must establish basic functionality having regard to the objects of constitutional damages. The evidentiary burden then shifts to the state to show that the engaged functions can be fulfilled through other remedies. The claimant need not show that she has exhausted all other recourses. Rather, it is for the state to show that other remedies are available in the particular case that will sufficiently address the breach. For example, if the claimant has brought a concurrent action in tort, it is open to the state to argue that, should the tort claim be successful, the resulting award of damages would adequately address the *Charter* breach. If that were the case, an award of *Charter* damages would be duplicative. In addition, it is conceivable that another *Charter* remedy may, in a particular case, fulfill the function of *Charter* damages.

36. The existence of a potential claim in tort does not therefore bar a claimant from obtaining damages under the *Charter*. Tort law and the *Charter* are distinct legal avenues. However, a concurrent action in tort, or other private law claim, bars s. 24 (1) damages if the result would be double compensation: *Simpson v. Attorney-General*, [1994] 3 N.Z.L.R. 667 (C.A.), at p. 678.

37. Declarations of *Charter* breach may provide an adequate remedy for the *Charter* breach, particularly where the claimant has suffered no personal damage. […]

[418]  The other qualification or restriction noted by Chief Justice McLachlin came from *Mackin v. New Brunswick (Minister of Finance)*,[137] where the Supreme Court of Canada manifested a concern about the principle of good governance and where it held that courts should not award damages for state conduct that is subsequently found to be unconstitutional, unless the conduct is clearly wrong, is in bad faith or is an abuse of power. The rationale for this limitation is that government actors acting in good faith pursuant to what is the express law of country should not be exposed to monetary liability when the law is later found to be unconstitutional.

---

[137] *Mackin v. New Brunswick (Minister of Finance)*, 2002 SCC 13.

2019 ONSC 1888 (CanLII)

[419]  The facts of *Macklin v. New Brunswick (Minister of Finance)* were that the province abolished the position of supernumerary judge for its provincial court judges. Judge Macklin, who was already a supernumerary judge, was given the choice of resuming as a full-time judge or of retiring. He successfully sued the province arguing that the legislation contravened the constitutional guarantees of judicial independent in section 11 (d) of the *Charter*. The Court declared the legislation unconstitutional but dismissed Judge Macklin's claim for *Charter* damages. The Court held that a claim for damages under section 24 (1) of the *Charter* cannot normally be combined with an action for a declaration of invalidity based on section 52 of the *Constitution Act, 1982*.

[420]  The principle that emerges from the *Macklin* line of authorities is that, generally speaking, absent conduct that was clearly wrong, in bad faith, or an abuse of power, an individual remedy under section 24 (1) will rarely be available in conjunction with an action where legislation has been struck down as contrary to the *Charter*.[138] In *Vancouver (City) v. Ward*, Chief Justice McLachlin explained that the *Macklin* principle meant that *Charter* remedies should respect the respective roles of the different branches of government, at paragraphs 38 – 41 of her judgment as follows:

> 38. Another consideration that may negate the appropriateness of s. 24 (1) damages is concern for effective governance. Good governance concerns may take different forms. At one extreme, it may be argued that any award of s. 24 (1) damages will always have a chilling effect on government conduct, and hence will impact negatively on good governance. The logical conclusion of this argument is that s. 24 (1) damages would never be appropriate. Clearly, this is not what the Constitution intends. Moreover, insofar as s. 24 (1) damages deter *Charter* breaches, they promote good governance. Compliance with *Charter* standards is a foundational principle of good governance.

> 39. In some situations, however, the state may establish that an award of *Charter* damages would interfere with good governance such that damages should not be awarded unless the state conduct meets a minimum threshold of gravity. This was the situation in *Mackin v. New Brunswick (Minister of Finance)*, 2002 SCC 13, [2002] 1 S.C.R. 405, where the claimant sought damages for state conduct pursuant to a valid statute. The Court held that the action must be struck on the ground that duly enacted laws should be enforced until declared invalid, unless the state conduct under the law was "clearly wrong, in bad faith or an abuse of power": para. 78. The rule of law would be undermined if governments were deterred from enforcing the law by the possibility of future damage awards in the event the law was, at some future date, to be declared invalid. Thus, absent threshold misconduct, an action for damages under s. 24 (1) of the *Charter* cannot be combined with an action for invalidity based on s. 52 of the *Constitution Act*, 1982: *Mackin*, at para. 81.

> 40. The *Mackin* principle recognizes that the state must be afforded some immunity from liability in damages resulting from the conduct of certain functions that only the state can perform. Legislative and policy-making functions are one such area of state activity. The immunity is justified because the law does not wish to chill the exercise of policy-making discretion. As Gonthier J. explained:

> > The limited immunity given to government is specifically a means of creating a balance between the protection of constitutional rights and the need for effective government. In other words, this doctrine makes it possible to determine whether a remedy is appropriate and just in

---

[138] *R. v. Ferguson*, 2008 SCC 6; *Québec (Commission des droits de la personne et des droits de la jeunesse) v. Communauté urbaine de Montréal*, 2004 SCC 30 at para. 9; *Mackin v. New Brunswick (Minister of Finance)*, 2002 SCC 13; *Guimond v. Québec (Attorney General)*, [1996] 3 S.C.R. 347; *Miron v. Trudel*, [1995] 2 S.C.R. 418.

the circumstances. Consequently, the reasons that inform the general principle of public law are also relevant in a *Charter* context. [para. 79]

41. The government argues that the *Mackin* principle applies in this case, and, in the absence of state conduct that is at least "clearly wrong", bars Mr. Ward's claim. I cannot accept this submission. *Mackin* stands for the principle that state action taken under a statute which is subsequently declared invalid will not give rise to public law damages because good governance requires that public officials carry out their duties under valid statutes without fear of liability in the event that the statute is later struck down. The present is not a situation of state action pursuant to a valid statute that was subsequently declared invalid. Nor is the rationale animating the *Mackin* principle — that duly enacted laws should be enforced until declared invalid – applicable in the present situation. Thus, the *Macklin* immunity does not apply to this case.

[421]   Applying the principles from *Vancouver (City) v. Ward*, *Doucet-Boudreau v. Nova Scotia (Minister of Education)* and *Mackin v. New Brunswick (Minister of Finance)* to the facts of the immediate case and beginning with the four-step approach of *Vancouver (City) v. Ward*, first, Messrs. Brazeau and Kift have established that the Class Members' rights under section 7 of the *Charter* have been breached and for two subclasses, the Class Members' rights under section 7 and section 12 of the *Charter* have been breached.

[422]   Second, Messrs. Brazeau and Kift have established that it would be appropriate and just for the Class Members who have had their *Charter* rights contravened to receive *Charter* damages. On a class-wide basis these *Charter* damages serve the functions of deterrence and especially of vindication. (It will also be appropriate and just for individual Class Members to receive compensatory *Charter* damages, but the entitlement and the quantum of the compensatory *Charter* damages is a matter for individual issues trials.)

[423]   Much like the situation in *Doucet-Boudreau v. Nova Scotia (Minister of Education)*, where the court ordered the province to do what it ought to have done in providing French language education, it is all of necessary, just, and appropriate to order the Federal Government to pay $20 million, which is to be distributed, less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct.

[424]   For decades, academic research, commissions, inquiries, inquests, court cases, domestic and international organizations, and the Correctional Investigator have recommended that the Correctional Service change its policies and practices with respect to the treatment of seriously-ill inmates placed in administrative segregation. The vindication of the Class Members' *Charter* rights requires that the Federal Government be directed to do what it ought to have done for decades.

[425]   None of these *Charter* damages are for compensatory purposes, which is a function that will be left to the individual issues trials. The funds are to remedy to the harm caused to society which has suffered from the Correctional Service's failure to comply with the *Charter* and also its failure to comply with the spirit of the *Corrections and Conditional Release Act* and its purpose of rehabilitating mentally ill inmates to return to society rather than worsening their capacity to do so by the harm caused by prolonged solitary confinement.

[426]   The court supervision of this investment of government funds respects the different roles of the different branches of government, and the directed order of *Charter* damages responds to the Federal Government's own submission, set out in its factum and noted above, that it should

be given the opportunity to craft a legislative and/or policy response possibly in the form of additional mental health or program resources, or structural changes to penal institutions. The supervision also fulfills the deterrence function because it will ensure future compliance with the *Charter*.

[427]  In my opinion, an award of *Charter* damages to be applied for the benefit of the collective that are mentally ill inmates is consistent with the evolution of *Charter* damages that Justices Iacobucci and Arbour noted may require novel and creative features when compared to traditional and historical remedial practices because tradition and history cannot be barriers to what reasoned and compelling notions of appropriate and just remedies demand.

[428]  Third and fourth, the government has not established any countervailing factors such as alternative remedies or good governance concerns, and there is no chance of double compensation given that the class-wide *Charter* damages are not being awarded for compensation. The quantum, as will be explained further in the next section of these Reasons for Decision, is determined based on the vindication and deterrence factors and is within the parameters of class action theories of aggregate damages.

[429]  I agree with Messrs. Brazeau and Kift that the restrictive principle from *Macklin v. New Brunswick* do not apply with respect to the *Charter* damages claims of the two subclasses for the breaches of sections 7 and 12 of the *Charter*.

[430]  I also agree that the in the circumstances of the immediate case the *Macklin* principle does not bar the class-wide claim with respect to the deficiencies of the review process for administrative segregation placements. In my opinion, the declaratory relief already provided by the courts in *Corporation of the Canadian Civil Liberties Association v. Her Majesty the Queen* and *British Columbia Civil Liberties Association v. Canada (Attorney General)* is inadequate to respond to the vindication and deterrence functions of a *Charter* remedy.

[431]  The Federal Government has not established that an award of *Charter* damages would interfere with good governance as was the situation in *Macklin* but is not the situation in the case at bar.

[432]  Further, I am satisfied that there has been a threshold of misconduct with respect to the review process for placements in administrative segregation that goes beyond its legislated imperfections. In other words, although perhaps not on a class-wide basis, even if the review of administrative segregation provisions of the *Corrections and Conditional Release Act* had not been struck down under s. 52 (1) of the *Constitution Act, 1982*, in individual cases there were breaches of section of 7 of the *Charter*. In the immediate case, the accounts of the mentally-ill inmates reveal that apart from the want of an independent and impartial reviewer, the reviews were often superficial or based on incomplete or inaccurate information about the mental health of the inmate and about the circumstances that led to his or her administrative segregation.

[433]  In short, the application of the *Macklin* principle is inappropriate. In the immediate case, an immunity does not create a balance between the protection of constitutional rights and the need for effective government. In the circumstances of the case at bar, an immunity from *Charter* damages does just the opposite, it balances the violation of constitutional rights with bad and ineffective governance.

[434]  For the above reasons, I conclude that the class and the two subclasses are entitled to *Charter* damages.

2019 ONSC 1888 (CanLII)

### 3.  Can *Charter* Damages be Awarded in the Aggregate pursuant to the *Class Proceedings Act, 1992*?

[435]  I turn now to the second major question of whether damages can be awarded in the aggregate pursuant to the *Class Proceedings Act, 1992*.

[436]  Section 24 (1) of the *Class Proceedings Act, 1992* empowers the Court to award aggregate damages, as follows:

> *Aggregate assessment of monetary relief*
>
> 24. (1) The court may determine the aggregate or a part of a defendant's liability to class members and give judgment accordingly where,
>
>> (a) monetary relief is claimed on behalf of some or all class members;
>>
>> (b) no questions of fact or law other than those relating to the assessment of monetary relief remain to be determined in order to establish the amount of the defendant's monetary liability; and
>>
>> (c) the aggregate or a part of the defendant's liability to some or all class members can reasonably be determined without proof by individual class members.

[437]  For an aggregate assessment of damages to be available under s. 24 of the *Class Proceedings Act, 1992*, no questions of fact or law other than those relating to the assessment of monetary relief must remain to be determined in order to establish the amount of the defendant's monetary liability.[139] The Federal Government submits that given the individual nature of the harm suffered by each inmate, there can be no aggregate assessment.

[438]  While it is true that the compensatory element of *Charter* damages cannot be determined in the aggregate for the class or for the subclasses, in theory, there could be an aggregate assessment of the type described by Dr. Chaimowitz for vindication and deterrence. Here, it should be recalled that *Charter* damages serve the function of vindicating not only the Class Members' interest in the protection of *Charter* rights and freedoms but vindicate the public's interest in compliance with the *Charter*.

[439]  In *Good v. Toronto*,[140] a class action where political protesters alleged that their *Charter* rights had been violated, the Court of Appeal stated:

> s. 24 (1) [of the *Class Proceedings Act, 1992*] asks whether the aggregated or a part of the defendant's liability can reasonably be determined without proof by class members. And, as the Divisional Court observed, it would be open to a common issues judge to determine that there was a base amount of damages that any member of the class (or subclass) was entitled to as compensation for breach of his or her rights. It wrote, at para 73 that "it does not require an individual assessment of each person's situation to determine that, if anyone is unlawfully detained in breach of their rights at common law or under section 9 of the *Charter*, a minimum award of damages in a certain amount is justified.

[440]  I apply these prescient observations from *Good v. Toronto* to the circumstances of the immediate case. The *Charter* damages for vindication and deterrence can reasonably be determined without proof by Class Members of their individual claims for compensation for

---

[139] *Bennett v. Hydro One Inc.*, 2017 ONSC 7065 at para. 104.
[140] 2016 ONCA 250 at para. 75, leave to appeal to the S.C.C. ref'd [2016] S.C.C.A. No. 255.

personal injury compensatory losses. There is a base amount, as calculated in the next part of these Reasons for Decision, that can be aggregated to be distributed across the class. A minimum award of *Charter* damages in a certain amount is justified.

### 4. How can the Amount of the *Charter* Damages be Quantified on a Class-wide Basis?

[441]  Turning to the third major question of determining the quantum of the base amount of *Charter* damages.

[442]  As noted in the introduction to this part of my Reasons for Decision, Messrs. Brazeau and Kift submit that the quantum of *Charter* damages can be determined by multiplication; *i.e.*, by multiplying the number of Class Members by a symbolic sum for the purpose of deterrence and vindication. For the reasons, described above, I have determined that there is a six-year limitation period. If there is a limitation period to bar some of the claims, Messrs. Brazeau and Kift tentatively claimed *Charter* damages of $100 million (2,000 x $50,000). The claims are tentative because the class size figures are only estimated figures and may not be accurate.

[443]  The multiplicand is 2,000 Class Members, and Messrs. Brazeau proposed the $50,000 multiplier by reference to awards in individual cases in which individual inmates have been awarded *Charter* damages for breaches of the *Charter,* typically including a breach of section 12 of the *Charter*. Awards in the cases referred to by Messrs. Brazeau and Kift of individual *Charter* damages have ranged from $5,000 to $60,000.[141]

[444]  I, however, do not find these cases helpful in the circumstances of the immediate case where compensatory damages are to be decided at individual issues trials and the matter to be determined is what is the appropriate sum for *Charter* damages that functionally serve the purpose of vindication and deterrence.

[445]  In my opinion, the appropriate sum is $20 million, which I arrive at by using the multiplier of $10,000 for each of the estimated 2,000 Class Members. While not derived from a contested adjudication, I selected the $10,000 multiplier by analogy to the common experience payment ("CEP") that the Federal Government agreed to pay in the Indian Residential School Settlement Agreement. That settlement was approved by courts across the country, and the courts adjudicated the reasonableness and fairness of the settlement.

[446]  Under the Indian Residential Schools Settlement Agreement, the Class Members advanced their individual personal injury claims through the Independent Assessment Process, but independent of their individually calculated claims, the Class Members also received a CEP payment.  In *Baxter v. Canada (Attorney General)*,[142] at para. 7 Justice Winkler, as he then was, described the compensatory elements and the other benefits of the Indian Residential Schools Settlement Agreement as follows:

---

[141] *Vancouver (City) v. Ward*, 2010 SCC 27 ($5,000); *Carr v. Ottawa Police Services Board*, 2017 ONSC 4331 ($7,500); *Curry v. Canada (Attorney General)*, 2006 FC 63 ($10,000); *Du-Lude v. Can*, [2000] F.C.J. No. 1454 (C.A.) ($10,000); *Henebry v. Her Majesty the Queen*, 2018 ONSC 6584 ($2,000); *Elmardy v. Toronto Police Services Board*, 2017 ONSC 2074 ($50,000); *Ogiamien v. Ontario (Community Safety and Correctional Services)*, 2016 ONSC 3080 ($60,000), rev'd on liability 2017 ONCA 667.

[142] (2006), 83 O.R. (3d) 481 (S.C.J.).

7. Under the proposed settlement, all members of the Survivor class will receive a cash payment, with the amount varying according to the length of time each individual spent as a student in the residential schools system. This class-wide compensatory payment, which is referred to as the Common Experience Payment ("CEP"), is one of five key elements of the settlement before the court. In addition, there is an Independent Assessment Process ("IAP"), which will facilitate the expedited resolution of claims for serious physical abuse, sexual assaults and other abuse resulting in serious psychological injury. The foregoing elements are aimed at personal compensation for the students who attended the schools. […]

[447]   The Class Members of the Indian Residential School Agreement did not have to prove that they suffered personal injuries to receive a CEP, which, in effect, was compensation for a horrible public policy decision made by the Federal Government, which decided to place Indigenous children in residential schools. In the immediate case, the $20 million of *Charter* damages will not provide compensatory damages, but, in my opinion, the $20 million does provide a base amount of damages that the class is entitled to as vindication and deterrence for the Federal Government's *Charter* breaches, which, as was the case in the Indian Residential Schools Settlement Agreement, are a product of a misguided public policy decision.

[448]   The $20 million is for the benefit of the class as a collective and its quantification does not depend upon whether the eligible Class Members actually totals 2,000 inmates. There actually may be more or less than 2,000 seriously mentally ill inmates that had their individual *Charter* rights violated, but, in any event, the $20 million is not to be divided among the Class Members *per capita* or in some other manner perhaps reflecting the amount of time spend in administrative segregation, rather it is to be applied for the benefit of the Class Members as a collective and the size of that collective is immaterial. As it happens, the $20 million will also benefit other inmates and also society, which benefits from a Correctional Service that rehabilitates inmates for a return to society.

[449]   To be transparent about my decision to award $20 million, I purposely determined that there should be sufficient funds to compensate Class Counsel for taking on the risk and expense of proving that the Class Members' *Charter* rights had been violated. The amount of those fees must be approved by the court, but given that compensatory damages will be determined at individual issues trials, it appeared to me that the award of *Charter* damages for vindication and deterrence should be ample enough to encourage Class Counsel to undertake risky and expensive actions to achieve vindication and deterrence for Class Members, especially those as vulnerable as the mentally ill inmates in the case at bar.

## V.  **Punitive Damages**

[450]   As noted in the last section, the eighth common issue question also involves the matter of whether the Class Members are entitled to an aggregate assessment of punitive damages. Messrs. Brazeau and Kift submit that if there has been a *Charter* breach, the Class Members either individually or collectively are entitled to punitive damages.[143]

[451]   As noted in the Introduction to these Reasons for Decision, it is my conclusion that the Federal Government is not liable for punitive damages on a class-wide basis but may be liable

---

[143] Messrs. Brazeau and Kift relied on: *Elmardy v. Toronto Police Services Board*, 2017 ONSC 207; *Good v. Toronto*, 2016 ONCA 250, leave to appeal to the S.C.C. ref'd [2016] S.C.C.A. No. 255; *Vancouver (City) v. Ward*, 2010 SCC 27; *Whiten v. Pilot Insurance Co.*, 2002 SCC 18.

for punitive damages after the *Charter* damages are determined at the individual issues trials. My explanation for this conclusion follows.

[452]   Justice Binnie examined the liability for and the quantification of punitive damages in the leading case of *Whiten v. Pilot Insurance Co.*[144] In that case, the Supreme Court of Canada restored a punitive damages award of $1 million made by a jury in an action against an insurer who had breached its duty of good faith and fair dealing to its insured. In paragraph 94 of his judgment, in the context of how a court should charge a jury about punitive damages, Justice Binnie explained the nature of punitive damages. He stated:

> 94. [I]t would be helpful if the trial judge's charge to the jury included words to convey an understanding of the following points, even at the risk of some repetition for emphasis. (1) Punitive damages are very much the exception rather than the rule, (2) imposed only if there has been high-handed, malicious, arbitrary or highly reprehensible misconduct that departs to a marked degree from ordinary standards of decent behaviour. (3) Where they are awarded, punitive damages should be assessed in an amount reasonably proportionate to such factors as the harm caused, the degree of the misconduct, the relative vulnerability of the plaintiff and any advantage or profit gained by the defendant, (4) having regard to any other fines or penalties suffered by the defendant for the misconduct in question. (5) Punitive damages are generally given only where the misconduct would otherwise be unpunished or where other penalties are or are likely to be inadequate to achieve the objectives of retribution, deterrence and denunciation. (6) Their purpose is not to compensate the plaintiff, but (7) to give a defendant his or her just desert (retribution), to deter the defendant and others from similar misconduct in the future (deterrence), and to mark the community's collective condemnation (denunciation) of what has happened. (8) Punitive damages are awarded only where compensatory damages, which to some extent are punitive, are insufficient to accomplish these objectives, and (9) they are given in an amount that is no greater than necessary to rationally accomplish their purpose. (10) While normally the state would be the recipient of any fine or penalty for misconduct, the plaintiff will keep punitive damages as a "windfall" in addition to compensatory damages. (11) Judges and juries in our system have usually found that moderate awards of punitive damages, which inevitably carry a stigma in the broader community, are generally sufficient.

[453]   It follows from Justice Binnie's remarks that an assessment of punitive damages requires: first, a determination that there has been high-handed, malicious, arbitrary or highly reprehensible conduct that departs to a marked degree from ordinary standards of decent behaviour; and second that the punitive damages be given in an amount that is no greater than necessary to rationally accomplish their non-compensatory purposes of retribution, deterrence, and denunciation. These assessments require an requires an appreciation of: (a) the degree of misconduct; (b) the amount of harm caused; (c) the availability of other remedies; (d) the quantification of compensatory damages; and (e) the adequacy of compensatory damages to achieve the objectives or retribution, deterrence, and denunciation. An analysis of these ensures that punitive damages are rational and in an amount that is not greater than is necessary to accomplish their purposes of retribution, deterrence, and denunciation.

[454]   In the case at bar, I shall assume without deciding that the conduct of the Correctional Service on a class wide basis departs to a marked degree from the ordinary standards of decent behaviour that would justify an award of punitive damages. With that assumption, the question becomes what amount of punitive damages is rationally necessary to serve the purposes of retribution, deterrence, and denunciation.   In the immediate case, given that I have already awarded $20 million on a class wide basis for vindication and deterrence, which serve the similar

---

[144] 2002 SCC 18.

purposes of retribution, deterrence, and denunciation, the answer to the question is that with the availability of this *Charter* remedy, the purposes of an award of punitive damages have already been served.

[455]   The conclusion of this analysis is that the Federal Government is not liable for punitive damages on a class-wide basis but may be liable for punitive damages after the *Charter* damages are determined at the individual issues trials.

## W. **The Distribution Plan**

[456]   I have already concluded that for *Charter* damages the Federal Government should pay $20 million, which is to be distributed, less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct. Relying on *Doucet-Boudreau v. Nova Scotia (Minister of Education)*[145] and *Vancouver (City) v. Ward,*[146] I found the authority to make this award under section 21 (1) of the *Charter.* There is also jurisdiction that supports this approach from s. 26 of the *Class Proceedings Act, 1992*, which empowers the court to distribute judgments.

[457]   Section 26 of the *Class Proceedings Act, 1992* states:

*Judgment distribution*

26. (1) The court may direct any means of distribution of amounts awarded under section 24 or 25 that it considers appropriate.

*Idem*

(2)  In giving directions under subsection (1), the court may order that,

(a) the defendant distribute directly to class members the amount of monetary relief to which each class member is entitled by any means authorized by the court, including abatement and credit;

[…]

[…]

*Supervisory role of the court*

(7) The court shall supervise the execution of judgments and the distribution of awards under section 24 or 25 and may stay the whole or any part of an execution or distribution for a reasonable period on such terms as it considers appropriate.

*Payment of awards*

(8)  The court may order that an award made under section 24 or 25 be paid,

(a) in a lump sum, forthwith or within a time set by the court; or

(b) in instalments, on such terms as the court considers appropriate.

---

[145] 2003 SCC 62.
[146] 2010 SCC 27.

[…]

[458]   I have granted the representative plaintiffs a judgment of $20 million. Section 26 (1) of the *Class Proceedings Act, 1992* provides that the court may direct any means of distribution that it considers appropriate. I consider it appropriate that the $20 million be distributed less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct.

[459]   Pursuant to s. 26 (7) of the Act, the court shall supervise the execution of judgments and the distribution of awards. Pursuant to s. 26 (8), the court may order that an award of aggregate damages be paid in a lump or in installments on such terms as the court considers appropriate. I read these provisions as empowering the court to order that the aggregate damages not be distributed to individual Class Members but rather distributed for the benefit of all Class Members. In the immediate case, that means that *Charter* damages can be distributed less Class Counsel's approved legal fees and disbursements, in the form of additional mental health or program resources for structural changes to penal institutions as the court on further motion may direct.

## X.  Amending the Class Definition

[460]   It will be recalled that this action was certified on consent which means that the class definition was negotiated. Class counsel agreed that to be a member of the class, the mentally-ill inmate have been "diagnosed by a medical doctor with an Axis I Disorder." In my opinion, this class definition is under-inclusive.

[461]   If the Class Member can prove that he or she had an undiagnosed Axis I Disorder or that a medical doctor ought to have diagnosed them as suffering from an Axis I Disorder, then he or she should be included in the class. Seriously mentally ill inmates may not have had their conditions diagnosed by a medical doctor before their imprisonment at a penitentiary, and it may be that the external medical doctors missed the diagnosis and the missed diagnosis was then not caught by the internal medical doctors at the penitentiary. What is significant is not whether the inmate was diagnosed as having an Axis I Disorder but whether the inmate actually suffered from an Axis I Disorder.

[462]   The inclusion of these inmates as Class Members will not change the aggregate award of *Charter* damages, but it would provide these inmates with an opportunity to claim *Charter* damages at the individual issues trials where they will have the additional burden of showing that they ought to have been diagnosed as having an Axis I disorder. If this is proven, then their circumstances are identical with the circumstances of the other seriously mentally-ill inmates, all of whom deserve access to justice.

[463]   I, therefore, recommend that the class definition be amended to define the class as: "All offenders in federal custody who had an Axis I Disorder …". I also recommend that the current definition should also be amended to so that the words: "where the diagnosis by a medical doctor occurred" be replaced with the words: "where the diagnosis occurred or could have occurred."

[464]   There may be better ways to amend the current class definition, and I leave this to Class Counsel and the Federal Government should Class Counsel be inclined to act on my recommendation.

2019 ONSC 1888 (CanLII)

## Y.  The Individual Issues Trials

[465]   I have already found that the whole class has suffered a breach of section 7 of the *Charter* and two subclasses have suffered a breach of sections 7 and 12 of the *Charter*. The quantification of their compensatory damages is a matter of individual issues trials. The court's jurisdiction to design the individual issues trials is found in s. 25 of the *Class Proceedings Act, 1992* which states:

*Individual issues*

25. (1) When the court determines common issues in favour of a class and considers that the participation of individual class members is required to determine individual issues, other than those that may be determined under section 24, the court may,

(a) determine the issues in further hearings presided over by the judge who determined the common issues or by another judge of the court;

(b) appoint one or more persons to conduct a reference under the rules of court and report back to the court; and

(c) with the consent of the parties, direct that the issues be determined in any other manner.

*Directions as to procedure*

(2) The court shall give any necessary directions relating to the procedures to be followed in conducting hearings, inquiries and determinations under subsection (1), including directions for the purpose of achieving procedural conformity.

*Idem*

(3) In giving directions under subsection (2), the court shall choose the least expensive and most expeditious method of determining the issues that is consistent with justice to class members and the parties and, in so doing, the court may,

(a) dispense with any procedural step that it considers unnecessary; and

(b) authorize any special procedural steps, including steps relating to discovery, and any special rules, including rules relating to admission of evidence and means of proof, that it considers appropriate.

*Time limits for making claims*

(4)  The court shall set a reasonable time within which individual class members may make claims under this section.

*Idem*

(5) A class member who fails to make a claim within the time set under subsection (4) may not later make a claim under this section except with leave of the court.

*Extension of time*

(6)  Subsection 24 (9) applies with necessary modifications to a decision whether to give leave under subsection (5).

*Determination under cl. (1) (c) deemed court order*

(7)  A determination under clause (1) (c) is deemed to be an order of the court.

[466]   As noted above, there is a range of awards that have been made in *Charter* damages cases. Given the running of limitation periods and given that the answers to the common issues are without prejudice to individual Class Members establishing that their *Charter* rights were contravened, it is estimated that approximately 2,000 Class Members may have individual issues trials with claims for compensatory *Charter* damages and possibly punitive damages. Some of these Class Members will not be members of the subclasses but nevertheless they may be able to demonstrate that their *Charter* rights were violated. In any event, compensatory damages are a matter of individual issues trials and there will be a range of compensation.

[467]   Where a Class Member has a substantial claim of general and special compensatory damages for his personal injuries, then his or her individual issues trial may require the full procedure provided for under the *Rules of Civil Procedure.* For less substantial claims, a more proportional procedure may be appropriate.

[468]   Section 25 provides the court with the jurisdiction to design the individual issues trials. Depending on the quantum of each individual inmate's claim, the principles of proportionality in procedure may require dispute resolution procedures ranging from a simple claims-qualification procedure to conventional trials pursuant to the *Rules of Civil Procedure.* I direct a motion to settle the procedures for the individual issues trials. For present purposes, I note that issue estoppels from the summary judgment motion shall carry forward into the individual issues trials.

## Z.  Summary and Conclusion

[469]   For the above reasons, the summary judgment motion is granted in part and dismissed in part.  See the Introduction and Overview section of these Reasons and parts Q to Y for the essential terms of my Order.

[470]   I shall use the idea of access to justice as a way to summarize the outcome of this summary judgment motion.

    a.  Subject to individual rebuttals of the six-year limitation period, the Class Members' with claims is reduced to inmates placed in administrative segregation from July 20, 2009 to date, estimated to be a Class size of 1,500 inmates.

    b.  The claims of inmates who were placed in administrative segregation before July 20, 2009 are statute-barred, unless they can rebut the running of the limitation period. Class Counsel estimates that perhaps 500 inmates may be able to rebut the running of the limitation period.

    c.  Thus, approximately 2,000 Class Members will have claims for a contravention of section 7 of the *Charter* because of the deficiencies in the review procedures for a placement in administrative segregation. *Charter* damages for this group have been awarded for vindication and deterrence.

    d.  Two subclasses of Class Members will have additional claims for breach of sections 7 and 12 of the *Charter*.  The two subclasses are comprised of Class

Members: (a) who were involuntarily placed in administrative segregation for more than thirty days; or, (b) who were voluntarily placed in administrative segregation for more than sixty days. I do not have an estimate of the number of Class Members in the two subclasses, but it will be considerably less than 2,000 inmates.

e.   The claims of individual Class Members who are not members of the two subclasses and who may have suffered breaches of section 7 or 12 of the *Charter* are preserved because the answers to the common issues are without prejudice to these claims. I do not have an estimate of the number of individual Class Members with these individual claims, but, once again, the number will be considerably less than 2,000 inmates.

[471]   If the parties cannot agree about the matter of costs, they may make submissions in writing beginning with Messrs. Brazeau and Kifts' submissions within thirty days of the release of these Reasons for Decision followed by the Federal Government's submissions within a further thirty days.

_____

Perell, J.

Released:  March 25, 2019

**CITATION:** Brazeau v. Attorney General (Canada) 2019 ONSC 1888
**COURT FILE NO.:** CV-15-53262500-CP
**DATE:** 2019/03/25

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

**CHRISTOPHER BRAZEAU and DAVID KIFT**

Plaintiffs

- and -

**THE ATTORNEY GENERAL OF CANADA**

Defendant

---

**REASONS FOR DECISION**

PERELL J.

Released: March 25, 2019

2019 ONSC 1888 (CanLII)