## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
### Big Stone Gap Division

WILLIAM THORPE, *et al.*,           )
                                    )
            Plaintiffs,             )
                                    )
v.                                  )        Case No. 2:20-cv-00007-JPJ-PMS
                                    )
VIRGINIA DEPARTMENT OF              )
CORRECTIONS, *et al.*,              )
                                    )
            Defendants.             )

## BRIEF IN SUPPORT OF DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239
moshea@oag.state.va.us

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*

September 8, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ......................................................................................... v

INTRODUCTION .......................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF") ........................... 4

I.    Origin and Purpose of the Step-Down Program ..................................................5

    A.  Evidence Based Practices .............................................................................6

    B.  Project Goals .................................................................................................8

II.   Step-Down Program Operation:  Addressing Clarke's Concerns By Implementing the EBP Principles .....................................................................................................9

    A.  Concern 1: Assignment to SL-S ................................................................10

    B.  Concern 2: Defined Pathway Out ..............................................................10

        1.  IM Path......................................................................................... 13

        2.  SM Path......................................................................................... 13

    C.  Concern 3: Re-Entry Program ....................................................................14

III.  Step-Down Program Review Process .................................................................15

    A.  ICA..............................................................................................................15

    B.  CCS .............................................................................................................16

    C.  Unit Management Team ("UMT") / Building Management Committee ("BMC") .......16

    D.  DTT.............................................................................................................18

    E.  Wardens / ROC ..........................................................................................18

    F.  External Review Team ("ERT")..................................................................18

IV.  Step-Down Program Conditions of Confinement................................................20

    A.  Consistent Conditions ................................................................................20

    B.  Variable Conditions ...................................................................................23

    C.  VDOC Eliminates Restrictive Housing .....................................................28

V.    Step-Down Program Mental Health Care ...........................................................28

    A.  Mental Health Classification Codes............................................................29

B. Inmate Screening ...................................................................................30

C. Participation in Step-Down Program Reviews .................................................30

D. Implementation of the Secure Diversionary Treatment Program .......................30

VI. Outside Interest in the Step-Down Program .......................................................31

VII. Legislation ...............................................................................................32

A. 2019 ..................................................................................................32

B. 2023 ..................................................................................................33

VIII. Legal Challenges to the Step-Down Program .....................................................33

IX. The Current Litigation ................................................................................35

A. Plaintiffs .............................................................................................35

B. Defendants ...........................................................................................47

LEGAL STANDARDS ...........................................................................................53

ARGUMENT ......................................................................................................54

I. Defendants are entitled to summary judgment on Plaintiffs' due-process claim (Count II). ...........................................................................................................55

A. Any facial challenge based on due process fails ..............................................57

1. The conditions of confinement under the Step-Down Program do not, in all circumstances, impose an atypical and significant hardship in relation to the ordinary incidents of prison life. ...........................................................59

2. The procedures of the Step-Down Program afford inmates minimally adequate process to protect their liberty interest. ..............................................62

B. Summary judgment is warranted on Plaintiffs' as-applied due-process claim. .............67

1. The conditions of confinement in the Step-Down Program do not impose on the named Plaintiffs an atypical and significant hardship in relation to the ordinary incidents of prison life. ...........................................................67

2. The procedures of the Step-Down Program afford the named Plaintiffs minimally adequate process to protect any liberty interest. ................................68

C. Defendants are entitled to qualified immunity on Plaintiffs' due-process claim ...........70

II. Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claim (Count V). .........................................................................................................76

A. Summary judgment is warranted on any facial challenge to the Step-Down Program based on the Eighth Amendment. ...................................................................77

1.   There is no evidence that the Step-Down Program objectively imposes a substantial risk of serious injury in all cases.......................................... 79

2.   There is no evidence that Defendants were subjectively aware that the Step-Down Program posed an excessive risk to inmates' health or safety in all circumstances, yet consciously disregarded that risk for no penological purpose. . 80

      a.   The evidence does not establish Defendants' awareness that the Step-Down Program poses an objectively intolerable risk of harm to all inmates in all circumstances...........................................................................81

      b.   The evidence does not show that Defendants disregarded a substantial risk of injury to all inmates without penological purpose. ....................................84

B.   Defendants are entitled to summary judgment on Plaintiffs' as-applied Eighth Amendment challenge. ............................................................................89

1.   The evidence does not show that the Step-Down Program objectively imposed a substantial risk of serious injury on any of the named Plaintiffs............................ 89

2.   There is no evidence that Defendants were subjectively aware that the Step-Down Program posed an excessive risk to the named Plaintiffs' health or safety, yet consciously disregarded that risk for no penological purpose. .......................... 91

      a.   The evidence does not establish Defendants' awareness that the Step-Down Program posed an objectively intolerable risk of harm to the named Plaintiffs.......................................................................................91

      b.   The evidence does not show that Defendants disregarded a substantial risk of injury to the named Plaintiffs without penological purpose.......................92

C.   Defendants are entitled to qualified immunity on Plaintiffs' Eighth Amendment claim.........................................................................................................96

1.   Even supposing there was a constitutional violation, the established law during the applicable time frame did not put Defendants on notice that their conduct violated the Eighth Amendment. .............................................................. 98

2.   At summary judgment, and in light of the facts established in discovery, the traditional, full qualified immunity analysis is appropriate here. ......................... 102

3.   The traditional, full qualified immunity analysis should always be applied. ........ 105

III.   Dr. Herrick should be dismissed with respect to Plaintiffs' constitutional claims. ...........106

IV.   Defendants are entitled to summary judgment on the Disability Plaintiffs' ADA and RA claims (Counts VI and VII) because there is no evidence of disability discrimination and no evidence a reasonable accommodation was denied. ...............................................107

A.   The Disability Plaintiffs' ADA and RA claims fail as a matter of law because there is no evidence they were subjected to discrimination because of a mental disability while participating in the Step-Down Program. ..........................................................108

B. The Disability Plaintiffs' ADA and RA claims fail as a matter of law because there is no evidence they sought reasonable accommodations to participate in the Step-Down Program, that VDOC should have known reasonable accommodations were needed, or that reasonable accommodations were denied. ...........................................109

V. The applicable statutes of limitations preclude the claims of some class members. ..........112

A. Defendants are entitled to summary judgment on the Eighth Amendment and due-process claims brought by any class members who left the Step-Down Program more than two years before the filing of the Complaint. ...............................................112

B. The Disability Plaintiffs' ADA and RA claims that accrued before May 6, 2018 are barred by the applicable statutes of limitation. ...........................................................113

   1. The continuing violations exception does not apply to individual disability discrimination claims. ................................................................................ 114

   2. Individual disability discrimination claims that accrued before May 6, 2018 are untimely. ................................................................................................... 117

   3. Even assuming the continuing violations exception could apply to the Disability Plaintiffs' disability discrimination claims that accrued before May 6, 2018— which VDOC denies—there is no evidence that they were personally subjected to disability discrimination while participating in the Step-Down Program during the relevant period. ....................................................................... 120

   4. All class claims predicated on allegedly discriminatory actions relating to the Step-Down Program that occurred before May 6, 2018, asserted by putative class members who did not participate in the Step-Down Program after May 6, 2018, are barred by the statute of limitations as a matter of law. .......................... 121

VI. Even if Plaintiffs' claims are not barred entirely, the scope of their recoverable relief is limited. ...................................................................................................................... 123

A. Given the PLRA's restriction on the scope of potential prospective relief, the Court should dismiss any request for injunctive relief against VDOC .................................123

B. Emotional distress and other compensatory damages are unrecoverable for the Disability Plaintiffs' ADA and RA claims. .................................................................125

   1. Cummings eliminated the availability of emotional distress damages for ADA and RA claims. ........................................................................................ 125

   2. The Disability Plaintiffs are not entitled to compensatory damages as a matter of law for the independent reason that there is no evidence of intentional discrimination due to a mental disability. ........................................................... 127

CONCLUSION .................................................................................................................... 128

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Soc'y Without a Name v. Virginia*,
  655 F.3d 342 (4th Cir. 2011) ........................................................................113, 122

*A.T. v. Oley Valley Sch. Dist.*,
  No. CV 17-4983, 2023 WL 1453143 (E.D. Pa. Feb. 1, 2023) .............................126

*Acken v. Kroger Co.*,
  58 F. Supp. 3d 620 (W.D. Va. 2014) ...................................................................54

*Alexander v. Collins*,
  No. 7:19CV00261, 2021 WL 1541033 (W.D. Va. Apr. 20, 2021)........................73

*Allgood v. Morris*,
  724 F.2d 1098 (4th Cir. 1984) ..............................................................................98

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................54

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016)...............................................................................60

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)..........................................................................71, 74, 97, 102

*Atkins v. Virginia*,
  536 U.S. 304 (2002)...............................................................................................82

*Baker v. Lyles*,
  904 F.2d 925 (4th Cir. 1990) ................................................................................73

*Barksdale v. Clarke*,
  No. 7:16cv00355, 2017 WL 3381370 (W.D. Va. Aug. 4, 2017)....................35, 73

*Barnes v. Gorman*,
  536 U.S. 181 (2002)..............................................................................................126

*Basta v. Novant Health Inc.*,
  56 F.4th 307 (4th Cir. 2022) ...............................................................................127

*Baze v. Rees*,
  553 U.S. 35 (2008).................................................................................................79

*Bell v. Wolfish*,
441 U.S. 520 (1979) ................................................................................. 1

*Booker v. S.C. Dep't of Corr.*,
855 F.3d 533 (4th Cir. 2017) ................................................................. 75

*Bouchat v. Balt. Ravens Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2003) ................................................................. 54

*Braun v. Maynard*,
652 F.3d 557 (4th Cir. 2011) .......................................................... 55, 86

*Breeden v. Jackson*,
457 F.2d 578 (4th Cir. 1972) ............................................... 98, 100, 101

*Bryan v. Prince George's Cnty., Md.*,
484 F. App'x 775 (4th Cir. 2012) ....................................................... 121

*Burgess v. Costco Wholesale Corp.*,
No. 4:10-CV-1678-RBH, 2013 WL 645982 (D.S.C. Feb. 21, 2013), *aff'd*, 533
F. App'x 271 (4th Cir. 2013) ............................................................... 117

*Cannon v. Vill. of Bald Head Island, N.C.*,
891 F.3d 489 (4th Cir. 2018) ................................................................. 71

*Catawba Riverkeeper Found. v. N.C. Dep't of Transp.*,
843 F.3d 583 (4th Cir. 2016) ............................................................... 125

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................... 53

*Cherosky v. Henderson*,
330 F.3d 1243 (9th Cir. 2003) ............................................................ 117

*City & Cnty. v. S.F. v. Sheehan*,
575 U.S. 600 (2015) ............................................................................... 97

*City of Los Angeles v. Patel*,
135 S. Ct. 2443 (2015) ........................................................................... 58

*Cooper v. Gilbert*,
No. 7:17cv00509, 2018 WL 1830735 (W.D. Va. Apr. 17, 2018) .......... 72

*CoreTel Va., LLC v. Verizon Va., LLC*,
752 F.3d 364 (4th Cir. 2014) ................................................................. 54

*Crowe v. Leeke*,
540 F.2d 740 (4th Cir. 1976) ................................................................. 98

vi

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   142 S. Ct. 1562 (2022)...........................................................................125

*Davis v. Ayala*,
   576 U.S. 257 (2015)...............................................................................77

*Delk v. Younce*,
   No. 7:14cv00643, 2017 WL 1011512 (W.D. Va. Mar. 14, 2017), *aff'd*, 709 F.
   App'x 184 (4th Cir. 2018) ................................................................35, 73

*DePaola v. Clarke*,
   884 F.3d 481 (4th Cir. 2018) ..............................................................112

*DePaola v. Va. Dep't of Corr.*,
   No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016), *aff'd*, 703 F.
   App'x 205 (4th Cir. 2017) ...................................................35, 73, 101

*Drewitt v. Pratt*,
   999 F.2d 774 (4th Cir. 1993) ...............................................................53

*Edwards v. Kanode*,
   No. 7:19CV00324, 2020 WL 1158253 (W.D. Va. Mar. 10, 2020) .........................35

*Estelle v. Gamble*,
   429 U.S. 97 (1976)...............................................................................80

*Faller v. Two Bridges Reg'l Jail*,
   No. 2:21-CV-00063-GZS, 2022 WL 3017337 (D. Me. July 29, 2022)...............................126

*Farmer v. Brennan*,
   511 U.S. 825 (1994)....................................................... *passim*

*Florence v. Bd. of Chosen Freeholders*,
   566 U.S. 318 (2012)...............................................................................55

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998)...............................................................................127

*Gillette v. Oregon*,
   No. 3:20-CV-00513-IM, 2022 WL 2819057 (D. Or. July 19, 2022) ....................................126

*Gonzales v. Bexar Cnty., Texas*,
   No. SA-13-CA-539, 2014 WL 12513177 (W.D. Tex. Mar. 20, 2014)................................110

*Grayson v. Peed*,
   195 F.3d 692 (4th Cir. 1999) ...............................................................80

*Greenhill v. Clarke*,
  944 F.3d 243 (4th Cir. 2019) ...................................................................................1

*Grissom v. Roberts*,
  902 F.3d 1162 (10th Cir. 2018) .......................................................................75, 102

*Hager v. First Va. Banks, Inc.*,
  CIV.A.7:01CV00053, 2002 WL 57249 (W.D. Va. Jan. 10, 2002)......................116

*Halcomb v. Ravenell*,
  992 F.3d 316 (4th Cir. 2021) .................................................................................74

*Hallett v. Morgan*,
  296 F.3d 732 (9th Cir. 2002) ...............................................................................124

*Halpern v. Wake Forest Univ. Health Scis.*,
  669 F.3d 454 (4th Cir. 2012) ...............................................................................110

*Hamner v. Burls*,
  937 F.3d 1171 (8th Cir. 2019) .............................................................................101

*Helling v. McKinney*,
  509 U.S. 25 (1993)..................................................................................................79

*Hewitt v. Helms*,
  459 U.S. 460 (1983)........................................................................................ *passim*

*Hill v. Hampstead Lester Morton Ct. Partners LP*,
  581 F. App'x 178 (4th Cir. 2014) .........................................................................115

*Hill v. SRS Distrib. Inc.*,
  No. CIV 21-370-TUC-CKJ, 2022 WL 3099649 (D. Ariz. Aug. 4, 2022)............126

*Hogan v. Carter*
  85 F.3d 1113, 1118 (4th Cir. 1996) (en banc) ................................................74, 75

*Holland v. Wash. Homes, Inc.*,
  487 F.3d 208 (4th Cir. 2007) ...............................................................................117

*Hope v. Harris*,
  861 F. App'x 571 (5th Cir. 2021), *cert. denied*, 143 S. Ct. 1746 (2023)................78

*Hubbert v. Washington*,
  No. 7:14cv00530, 2017 WL 1091943 (W.D. Va. Mar. 22, 2017)....................35 73

*Hutto v. Finney*,
  437 U.S. 678 (1978)................................................................................................77

*Incumaa v. Stirling,*
   791 F.3d 517 (4th Cir. 2015) ........................................................................59, 60, 73

*Jordan v. Va. Dep't of Corr.,*
   No. 7:16cv00228, 2017 WL 4127905 (W.D. Va. Sept. 18, 2017) ....................................35, 72

*Kaltenberger v. Ohio Coll. of Podiatric Med.,*
   162 F.3d 432 (6th Cir. 1998) .........................................................................110

*Koon v. North Carolina,*
   50 F.4th 398 (4th Cir. 2022) .........................................................................127

*Latson v. Clarke,*
   249 F. Supp. 3d 838 (W.D. Va. 2017) ................................................................72

*Latson v. Clarke,*
   346 F. Supp. 3d 831 (W.D. Va. 2018),
   *aff'd,* 794 F. App'x 266 (4th Cir. 2019)........................................................ 53, 54, 57

*Latson v. Clarke,*
   794 F. App'x 266 (4th Cir. 2019) ...................................................................100

*Lawrence v. Cooper,*
   398 F. App'x 884 (4th Cir. 2010) ...................................................................112

*Parrish ex rel. Lee v. Cleveland,*
   372 F.3d 294 (4th Cir. 2004) .....................................................................80, 81, 91

*Lopez v. Robinson,*
   914 F.2d 486 (4th Cir. 1990) .........................................................................98

*M.D. v. Nebraska,*
   No. 4:21CV3315, 2022 WL 4540390 (D. Neb. Sept. 28, 2022) .........................................126

*Malley v. Briggs,*
   475 U.S. 335 (1986)..................................................................................70

*Matarese v. Archstone Cmtys., LLC,*
   468 F. App'x 283 (4th Cir. 2012) ...................................................................123

*Mathews v. Eldridge,*
   424 U.S. 319 (1976).............................................................................. *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)..................................................................................54

*Mattison v. Md. Transit Admin.,*
   No. CV JKB-21-00168, 2021 WL 4503566 (D. Md. Oct. 1, 2021) .......................................116

*Mays v. Sprinkle*,
  992 F.3d 295 (4th Cir. 2021) ....................................................................97

*McKune v. Lile*,
  536 U.S. 24 (2002)...................................................................................55

*In re Medley*,
  134 U.S. 160 (1890)..................................................................................90

*Meyers v. Balt. Cnty.*,
  713 F.3d 723 (4th Cir. 2013) .............................................................70, 105

*Mickle v. Moore*,
  174 F.3d 464 (4th Cir. 1999) ...........................................................*passim*

*Miller v. Pilgrim's Pride Corp.*,
  No. 5:05CV00064, 2007 WL 2570219 (W.D. Va. Aug. 31, 2017)....................123

*Montgomery v. District of Columbia*,
  No. CV 18-1928 (JDB), 2022 WL 1618741 (D.D.C. May 23, 2022) ..................126

*Mora-Contreras v. Peters*,
  851 F. App'x 73 (9th Cir. 2021) .................................................................77

*Morrissey v. Brewer*,
  408 U.S. 471 (1972)..................................................................................62

*Muhammad v. Mathena*,
  No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017) .................35, 71

*Muhammad v. Smith*,
  No. 7:16cv00223, 2017 WL 3402971 (W.D. Va. Aug. 8, 2017)...............35, 72, 73

*Mukuria v. Clarke*,
  No. 7:15CV00172, 2016 WL 5396712 (W.D. Va. Sep. 27, 2016), *aff'd*, 706 F.
  App'x 139 (4th Cir. 2017) .........................................................*passim*

*Mullenix v. Luna*,
  136 S. Ct. 305 (2015)............................................................................70, 72

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) ..................................................................110

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002)...............................................................114, 115, 120, 122

*Obataiye-Allah v. Va. Dep't of Corr.*,
   No. 7:15CV00230, 2016 WL 5415906 (W.D. Va. Sept. 28, 2016), *aff'd sub
   nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017) ................................ *passim*

*Overton v. Bazzetta*,
   539 U.S. 126 (2003) ..................................................................................................... *passim*

*Patrick v. Martin*,
   No. 2:16-CV-216-D-BR, 2020 WL 4040969 (N.D. Tex. July 16, 2020) ............................110

*Pearson v. Callahan*,
   555 U.S. 223 (2009) .............................................................................................................70

*Pell v. Procunier*,
   417 U.S. 817 (1974) .............................................................................................................66

*Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*,
   No. 3:20-CV-11-MAB, 2023 WL 348320 (S.D. Ill. Jan. 20, 2023) ....................................126

*Pfaller v. Amonette*,
   55 F.4th 436 (4th Cir. 2022) ........................................................................................ *passim*

*Porter v. Clarke*,
   923 F.3d 348 (4th Cir. 2019) ........................................................................................ *passim*

*Porter v. Pa. Dep't of Corr.*,
   974 F.3d 431 (3d Cir. 2020) ...............................................................................................102

*Prieto v. Clarke*,
   780 F.3d 245 (4th Cir. 2015) ................................................................................... 55, 56, 60

*Reichle v. Howards*,
   566 U.S. 658 (2012) .............................................................................................................71

*Reyazuddin v. Montgomery Cnty., Md.*,
   789 F.3d 407 (4th Cir. 2015) ..............................................................................................110

*Rhodes v. Chapman*,
   452 U.S. 337 (1981) .............................................................................................................91

*Richardson v. Clarke*,
   52 F.4th 614 (4th Cir. 2022) ...............................................................................................108

*Riddick v. Dep't of Corr.*,
   No. 7:17CV00268, 2017 WL 6599007 (W.D. Va. Dec. 26, 2017) ................................. 35, 84

*Ross v. Reed*,
   719 F.2d 689 (4th Cir. 1983) ................................................................................................98

*Shrader v. White*,
    761 F.2d 975 (4th Cir. 1985) ......................................................................98, 101

*Smith v. Collins*,
    964 F.3d 266 (4th Cir. 2020) .................................................................................60

*Snodgrass v. Gilbert*,
    No. 7:16cv00091, 2017 WL 1049582 (W.D. Va. Mar. 17, 2017), *vacated in*
    *part*, 2018 WL 1972721 (Apr. 26, 2018) ...................................................35, 73, 84

*Spencer v. Earley*,
    278 F. App'x 254 (4th Cir. 2008) .......................................................................108

*Strickler v. Waters*,
    989 F.2d 1375 (4th Cir. 1993) ..............................................................................98

*Sweet v. S.C. Dept' of Corr.*,
    529 F.2d 854 (4th Cir. 1975) ...............................................................98, 100, 101

*Szedlock v. Tenet*,
    61 F. App'x 88 (4th Cir. 2003) ...........................................................................116

*Taylor v. Manis*,
    No. 7:19-CV-00434, 2020 WL 354753 (W.D. Va. Jan. 21, 2020) ......................106

*Thompson v. TD Bank, N.A.*,
    No. 3:22-CV-2547-SAL-PJG, 2023 WL 4838223 (D.S.C. July 28, 2023) .........116

*Thorpe v. Clarke*,
    37 F.4th 926 (4th Cir. 2022) ......................................................................... *passim*

*Thorpe v. Va. Dep't of Corr.*,
    No. 2:20CV00007, 2021 WL 2435868 (W.D. Va. June 15, 2021), *aff'd sub*
    *nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) ..................................... *passim*

*Thorpe v. Va. Dep't of Corr.*,
    No. 2:20CV00007, 2023 WL 2908575 (W.D. Va. Apr. 12, 2023).......................115

*Toevs v. Reid*,
    685 F.3d 903 (10th Cir. 2012) ..............................................................................75

*Tri Cnty. Paving, Inc. v. Ashe Cnty.*,
    281 F.3d 430 (4th Cir. 2002) ...........................................................................65, 70

*Trigiani v. New Peoples Bank, Inc.*,
    599 F. Supp. 3d 372 (W.D. Va. 2022) ...................................................................54

*Trulock v. Freeh*,
    275 F.3d 391 (4th Cir. 2001) ......................................................................106

*Turner v. Safley*,
    482 U.S. 78 (1987).................................................................................55, 81

*United States v. Chappell*,
    691 F.3d 388 (4th Cir. 2012) ...............................................................57, 85

*United States v. Hamilton*,
    699 F.3d 356 (4th Cir. 2012) .......................................................................57

*United States v. Moore*,
    666 F.3d 313 (4th Cir. 2012) .......................................................................87

*United States v. Salerno*,
    481 U.S. 739 (1987).....................................................................................58

*United States v. Sherman*,
    797 F. Supp. 2d 709 (W.D. Va. 2011) .......................................................57

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)...............................................................................57, 83

*Wells v. Bureau Cnty.*,
    723 F. Supp. 2d 1061 (C.D. Ill. 2010) ......................................................110

*West Virginia v. U.S. Dep't of Health & Human Servs.*,
    289 F.3d 281 (4th Cir. 2002) .......................................................................67

*Wilcox v. Brown*,
    877 F.3d 161 (4th Cir. 2017) .....................................................................106

*Wiley v. Doory*,
    14 F.3d 993 (4th Cir. 1994) .......................................................................101

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)............................................................................. *passim*

*Williams v. Branker*,
    462 F. App'x 348 (4th Cir. 2012) .......................................................99, 101

*Williams v. Colo. Dep't of Corr.*,
    No. 21-CV-02595-NYW-NRN, 2023 WL 3585210 (D. Colo. May 22, 2023)....................126

*Williams v. Giant Food Inc.*,
    370 F.3d 423 (4th Cir. 2004) .....................................................................116

*Williamson v. Stirling*,
   912 F.3d 154 (4th Cir. 2018) ...................................................................73

*Wolsky v. Med. Coll. of Hampton Rds.*,
   1 F.3d 222 (4th Cir. 1993) ...................................................................113

*Woodford v. Ngo*,
   548 U.S. 81 (2006) ................................................................................83

*Younger v. Crowder*,
   No. 21-6422, 2023 WL 5438173 (4th Cir. Aug. 24, 2023) .................102

*Ziskie v. Mineta*,
   547 F.3d 220 (4th Cir. 2008) ..............................................................121

**Statutes**

18 U.S.C. § 3626(a)(1)(A) .........................................................................55, 123

42 U.S.C. § 1983 ...............................................................34, 58, 106, 112

42 U.S.C. § 1997e(e) ..................................................................................125

Americans with Disabilities Act, Title II .................................................. *passim*

Rehabilitation Act of 1973 ........................................................................ *passim*

Va. Code § 51.5-46(B) ................................................................................113

Va. Code § 53.1-39.1 ..............................................................................32, 83

Va. Code § 53.1-39.2 ..........................................................................33, 82, 124

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................................53

Senate Joint Resolution No. 184 (Va. 2014)...............................................4

U.S. Const. amend. VIII ........................................................................... *passim*

U.S. Const. amend. XIV ........................................................................... *passim*

## **INTRODUCTION**

Like other correctional systems with custody over society's most antisocial and violent people, the Virginia Department of Corrections (VDOC) has the "unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (citation omitted).  Recognizing the critical function of prison administrators, the Supreme Court has directed that they "be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547–48  (1979).

In 2012, VDOC officials exercised that judgment to create a program for managing the most dangerous and disruptive inmates in its custody.  The Step-Down Program is a multi-step, incentive-based behavioral modification program designed to gradually transition these inmates from the most restrictive conditions back to general population, when periodic reviews of their conduct demonstrate that it is safe to do so.  As characterized by the Fourth Circuit, it is a "sophisticated, well-conceived program to better inmates' behavior and their confinement, as well as to improve safety and the overall operation of the prison."  *Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019).

The Step-Down Program has worked.  Over time, the number of inmates in the program has plummeted, as inmates have transitioned from the most restrictive conditions back to general population.  And over time, VDOC has extended increasingly greater privileges to inmates even at the highest security level—privileges that now include four hours of out-of-cell time a day for exercise, congregate activity, and other programming.  The conditions in VDOC's current system of "Restorative Housing" do not fit the widely accepted definitions of "solitary confinement" and have not for years.  And when the Virginia General Assembly this year debated further potential

1

restrictions on the conditions of confinement at the highest security level, it endorsed and codified the limitations VDOC already had imposed on itself.

The Step-Down Program has received national attention and commendation. It has been held up by the U.S. Department of Justice and reform groups as an example for other prison systems to follow. Indeed, delegations from other states and abroad regularly visit VDOC to study the Step-Down Program for possible adoption in their own jurisdictions.

All of this makes the Step-Down Program a rather curious target for impact litigation like this—curious, that is, unless the goal of Plaintiffs and their counsel is a prohibition on the use of restrictive housing in any circumstances. Even when it is used with adequate restrictions, safeguards, and protections. Even when its pairing with incentive-based programming has been widely praised. Even when it succeeds in improving inmates' behavior and returning them to general population. Even when there is no apparent alternative for managing the most violent and disruptive inmates in less secure settings. And even when its use is amply warranted by legitimate penological justifications, such as the security of other inmates and staff. But, in fact, this is the relief Plaintiffs and their counsel seek: that this Court "abolish the Step-Down Program" entirely. Compl. ¶ 271(1).

In this case, eleven former Step-Down Program participants—none of whom remains in the Program—ask this Court to override the considered judgment of prison officials and rule, on behalf of a sprawling class, that the Step-Down Program violates a host of constitutional and statutory provisions: the Due Process Clause, the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA").[1] Their overarching theory is that

---

[1] These are the claims remaining after the Court granted in part and denied in part Defendants' motion to dismiss: Plaintiffs' due-process and Eighth Amendment claims against the individual Defendants in their individual capacities; their claims under the Americans with

the Step-Down Program was adopted and implemented without a legitimate penological interest. Rather, they assert, Defendants are motivated by pecuniary interests to keep the Step-Down Program at full capacity to justify the allegedly profligate costs of operating Wallens Ridge State Prison ("Wallens Ridge" or "WRSP") and Red Onion State Prison ("Red Onion" or "ROSP"), the facilities where the program historically has operated.

The undisputed evidence adduced in discovery does not support Plaintiffs' theory, nor any of their claims. Defendants are entitled to summary judgment on each of them. The multi-layered review procedures of the Step-Down Program do not violate Plaintiffs' due-process rights, as a facial or as-applied matter; rather than trapping inmates indefinitely or permanently, these procedures merely ensure that inmates are returned to general population only when it is safe to do so (as the named Plaintiffs have been). The conditions of confinement associated with the Step-Down Program do not violate the Eighth Amendment, as a facial or as-applied matter. Qualified immunity precludes both the constitutional claims, and the individual Defendants not connected to those claims also are entitled to summary judgment. Plaintiffs' ADA and RA claims fare no better. There is no evidence that Plaintiffs were subjected to discrimination because of a disability or were denied an accommodation. Moreover, as is true for Plaintiffs' constitutional claims, the applicable statute of limitations limits the time period for their ADA and RA claims. The forms of relief available to Plaintiffs are also limited.

Over the past decade, many inmates have sued VDOC over the Step-Down Program, challenging its constitutionality and their placement or retention in it; several named Plaintiffs are

---

Disabilities Act and the Rehabilitation Act against VDOC and the individual Defendants in their official capacities; and their claims for injunctive relief against VDOC. *See Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2021 WL 2435868 (W.D. Va. June 15, 2021), *aff'd sub nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) [ECF No. 101]. The Court dismissed Plaintiffs' breach-of-contract and Equal Protection claims. *Id.*

among them.[2]  This Court has repeatedly rejected those challenges, and the Fourth Circuit has repeatedly affirmed those decisions.  The result here should be no different.

The Court should grant summary judgment to Defendants.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

1.      According to the analysis of Plaintiffs' expert, Russell Molter, there were 415 "class members" designated Security Level S ("SL-S") as of August 31, 2012 with no "class members" designated SL-6 ("SL-6") as of that date.[3]  Untitled document dated June 23, 2023 at Updated Exhibit 2, relevant portions attached as Exhibit 1.  According to Molter, the number of "class members" designated SL-S as of December 2022 was 57 and the number of "Class members" designated SL-6 was 70.  *Id.*

2.      As early as July 2013, the Southern Legislative Conference recognized VDOC's "diligent work in reducing administrative segregation and for developing a program model replicable in other states" with the STAR (State Transformation in Action Recognition).  Senate Joint Resolution No. 184, attached as Exhibit 2.  In March 2014, the Virginia General Assembly passed Senate Joint Resolution No. 184, commending VDOC for reducing the number of inmates in administrative segregation through implementation of the Step-Down Program.  *Id.*  In 2016, the U.S. Department of Justice, in its *Report and Recommendations Concerning the Use of Restrictive Housing*, identified Virginia as one of "five jurisdictions that have undertaken particularly significant reforms in recent years."  Exhibit 3 at 74.

_____

[2] The Court certified a class but, as of this filing, Plaintiffs have not proposed any class representatives that have been approved by the Court.  Defendants reserve the right to move for summary judgment with respect to any other representatives that Plaintiffs propose in the future to represent any class certified by the Court.

[3] Defendants dispute that Molter's analysis is accurate, but accept it for purposes of summary judgment only.

3.      In December 2016, the Vera Institute of Justice selected Virginia as one of five new states to join the Safe Alternatives to Segregation Initiative.  ECF No. 195-5 at 5.  In its findings and recommendations for VDOC, issued in December 2018 (the "Vera Report"), Vera described VDOC as "one of the agencies at the forefront of addressing restrictive housing" and VDOC's Restrictive Housing Reduction Step-Down Program as having made "considerable strides in reducing the use of restrictive housing in its facilities." *Id.*  It further describes the Step-Down Program as "a pioneering and significant program for reducing the number of people in long-term restrictive housing." *Id.*

4.      VDOC internal reports indicate that 461 inmates had graduated from the Step-Down Program as of July 31, 2021.  Red Onion State Prison: Administrative Step Down Progress, attached as Exhibit 4.

## I.      Origin and Purpose of the Step-Down Program[4]

5.      Harold Clarke became Director of VDOC in November 2010.  Remote Video Deposition of Harold Clarke dated September 10, 2020, relevant portions attached in Exhibit 5 at 49:3–9.  Clarke first visited Red Onion in December 2010.  *Id.* at 55:22–56:8.  Clarke testified that his review of operations at Red Onion caused him three concerns: (1) the ability of multiple individuals to place inmates in administrative segregation,[5] (2) the lack of a defined pathway out

---

[4] In recent years, VDOC has expanded its Step-Down Program concept (and name) to short-term restorative housing as used for inmates at security levels other than SL-S and SL-6.  As used in this brief, "Step-Down Program" refers to the program only as used with inmates designated SL-S and SL-6.

[5] Administrative segregation is used here to denote a status reserved for inmates who cannot be safely managed at lower security levels due to serious risks they pose to other inmates, staff, or the public.  *See generally* Evidence Based Practices Plan for Administrative Segregation at Red Onion and Wallens Ridge State Prisons, attached as Exhibit 6 (VADOC-00165115).  After VDOC initiated the Step-Down Program, the American Correctional Association ("ACA") adopted the defined term "restrictive housing," which VDOC also adopted.  This brief uses the

of administrative segregation, and (3) release of inmates from administrative segregation directly into the community.  Transcript of Harold Clarke dated April 12, 2023, relevant portions attached in Exhibit 5 at 150:16–151:10; 154:20–155:5.  Clarke's concerns were the impetus for the Step-Down Program.  *Id.*

6.     The Operations Strategy for the Segregation Reduction Step-Down Plan dated August 28, 2012 (the "2012 Operations Strategy") depicts the timeline for development of the Step-Down Program.  Exhibit 7 at VADOC-00038041.  The first step on that timeline was the targeting of Red Onion as an Evidence-Based Practices ("EBPs") prison at a statewide executive meeting in April 2011.  *Id.*

**A.     Evidence Based Practices**

7.     VDOC has modified the Step-Down Program multiple times during its existence, issuing six versions of the operations strategy: (1) the 2012 Operations Strategy; (2) the Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated March 4, 2014 (the "2014 Operations Strategy"), Exhibit 8; (3) the Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated August 2015 (the "2015 Operations Strategy"), Exhibit 9; (4) the Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated September 2016 (the "2016 Operations Strategy"), Exhibit 10; (5) the Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated September 2017 (the "2017 Operations Strategy"), Exhibit 11; and (6) the Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated February 2020 (the "2020 Operations Strategy"), Exhibit 12 (collectively,

---

ACA term, restrictive housing, unless a specific document that uses the term segregation is referenced.

the "Operations Strategies").  While key characteristics of the Step-Down Program have changed, key principles have remained constant.

8.      Appendix B to each of the Operations Strategies contains "a[n] outline[ of] the [EBP] principles that [were] used to guide the thinking and planning for" the Step-Down Program. *See, e.g.*, Ex. 12 at VADOC-00053707.  According to Scott Richeson, VDOC's Deputy Director of Re-entry and Programs, EBPs within VDOC are things that have been proven to "most likely reduce recidivism" and are based on research conducted around 2000.  Transcript of Helen Scott Richeson dated February 9, 2023, relevant portions attached in Exhibit 13 at 59:13–60:4; 60:22–62:6.

9.      The Operations Strategies identify the following EBP Principles:

- Risk Management and Risk Reduction - to be successful, Red Onion must not only manage risk but incorporate risk reduction strategies, *i.e.*, "deliver treatment to offenders to reduce their criminogenic risk factors."

- Social Learning - changing the fundamental culture at Red Onion by addressing the "three primary components that make up that culture:" (1) staff beliefs, attitudes, skills, and practices, (2) facility resources and operating procedures, and (3) inmate beliefs, values, goals, attitudes, and behavior.

- Responsivity - identifying the sub-groups that make up the SL-S population "so that strategies can be applied that respond to the specific risks, needs, and characteristics of the target groups." For example, an inmate who displays non-violent nuisance behavior to stay in restrictive housing should not be managed with the same methods as an inmate who poses a serious risk of extreme violence towards others just as the latter inmate "cannot be treated as low risk because they have not misbehaved even for an extensive period of time while in high security."

- Motivational - using privileges to motivate and introduce desirable behavior, balancing privileges and sanctions, getting the right timing between the behavior and the privilege or sanction, identifying privileges from the inmate's point of view, and establishing privileges as earned rather than entitled.

*See, e.g.*, Ex. 12 at VADOC-00053707–08. According to Randall Mathena, Director of Security and Correctional Enforcement, VDOC implements the responsivity principle by separating the inmates into groups and programming based on the needs of each group." Transcript of Randall Mathena Designated Representative – Day 1 dated April 4, 2023 ("Mathena Tr. Day 1"), relevant portions attached in Exhibit 14 at 175:14–176:1.

10.     This motivational principal warrants a separate appendix in the Operations Strategies.  *Id.* at VADOC-00053710–11.  As described in Appendix C, the concept is to define the rehabilitative behavior to be promoted, then balance incentives and sanctions to motivate good behavior while deterring unwanted behavior.  *Id.*  Positive behaviors include accepting the rules and taking responsibility for oneself as measured by disciplinary charges, carrying oneself with pride as measured by personal hygiene and cell cleanliness, setting goals and using days to move toward those goals as measured by program participation, being polite and cordial to others as measured by general attitude.  *Id.*

**B.     Project Goals**

11.     The Operations Strategies also identify the Step-Down Program's project goals, including to "develop a prison management system that will create a pathway for offenders to step-down from Level S to lower security levels in a way that maintains public, staff, and offender safety by applying the principles of" EBPs to Red Onion and Wallens Ridge Operations" and "infuse evaluation into the operational design by setting observable and measurable standards as a means to ensure fidelity." *See, e.g.*, Ex. 12 at VADOC-00053674.

12.     Up to and including the 2016 Operations Strategy, another goal was to link, through the Step-Down Program, Red Onion with Wallens Ridge to take advantage of already successfully established EBPs at Wallens Ridge.  *See, e.g.*, Ex. 10 at VADOC-00056794.  VDOC accomplished

this linkage by transferring certain SL-S inmates to Wallens Ridge, while transferring some Security Level 5 (SL-5) inmates from Wallens Ridge to Red Onion. *Id.*

13.     As EBPs became more ingrained at Red Onion and VDOC reduced the number of inmates in Restrictive Housing such that there was sufficient space at Red Onion to house all of the inmates in the Step-Down Program as well as inmates at SL-5, VDOC removed this goal with the 2017 Operations Strategy. Ex. 11 at VADOC-00053110.  Mathena testified that SL-6 inmates never were housed at Wallens Ridge and estimated the remaining SL-S inmates housed there were moved to Red Onion around 2016.  Mathena Tr. Day 1 at 142:12–143:6.

## II.     Step-Down Program Operation:  Addressing Clarke's Concerns By Implementing the EBP Principles

14.     When VDOC executives approved the 2012 Operations Strategy on August 30, 2012, it provided that SL-S inmates be managed per Special Housing Guidelines policy 861.3 ("O.P. 861.3").  Ex. 7 at VADOC-00037972, 00037979.  Future Operations Strategies continued to include this provision through the 2017 Operations Strategy. *See, e.g.*, Ex. 11 at VADOC-00053113.  O.P. 861.3, in turn, referenced more than a dozen other operating procedures.  O.P. 861.3, Special Housing, attached as Exhibit 15, at VADOC-00003220.

15.     In addition to the VDOC-wide operating procedures, Red Onion and Wallens Ridge approved Local Operating Procedure 830.A, titled "Segregation Reduction Step-Down Program" ("O.P. 830.A"), with an effective date of February 18, 2013 that, as updated and amended, continues to govern the Step-Down Program.  Exhibit 16.  That first issue of O.P. 830.A referenced the following operating procedures: 425.4, Management of Bed and Cell Assignments ("O.P. 425.4"); 830.1, Institution Classification Management ("O.P. 830.1"); 830.2, Security Level Classification ("O.P. 830.2"); O.P. 841.7, Structured Living Unit, and O.P. 861.3, Special Housing ("O.P. 861.3").  *Id.* at VADOC-00003156.  The current version of O.P. 830.A, with an effective

date of October 1, 2021, replaces the last two of those operating procedures with O.P. 841.4, Restrictive Housing Units ("O.P. 841.4"). Exhibit 17 at VADOC-00134604.

### A.   Concern 1: Assignment to SL-S

16.    In anticipation of the implementation of the Step-Down Program, O.P. 830.2 was amended in June 2012 such that Central Classification Services ("CCS") no longer had final authority to approve assignment to SL-S.   Ex. 18 at VADOC-00003121.   Instead, after CCS approval, the Warden of Red Onion and the Regional Operations Chief ("ROC") or designee had to review the assignment.   *Id.*   Only after the Warden and ROC or designee approved the assignment could the inmate be assigned to SL-S and transferred to Red Onion.   *Id.*; O.P. 830.2, with an effective date of October 1, 2021, attached as Exhibit 19, at 11.

### B.   Concern 2: Defined Pathway Out

17.    O.P. 830.A details how the pathway out of SL-S begins with intake/orientation at Red Onion. Ex. 16 at VADOC-00003148; Ex. 17 at VADOC-00134593.  It provides that inmates be provided an orientation to the case plan including goals, expectations, privilege earning process, and step-down process and be given an initial battery of assessments to establish a baseline for the inmate.   *Id.*

18.    At the completion of intake orientation, inmates are referred to the Dual Treatment Team ("DTT") for assignment to a path (Intensive Management ("IM") or Special Management ("SM") "based on their identified risk level."   *Id.*

19.    O.P. 830.A identifies IM inmates, in part, as those "with the potential for extreme and/or deadly violence" who "may have an institutional adjustment history indicating the capability for extreme deadly violence against staff or other inmates." Ex. 17 at VADOC-00134591. Further, "[t]his group most often would have an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic. . . .

Alternatively, the offender may present a routinely disruptive and threatening pattern of behavior and attitude." *Id.*

20.     It identifies SM inmates as those "who may display an institutional adjustment history indicating repeated disruptive behavior at lower level facilities, a history of fighting with staff or offenders, and/or violent resistance towards a staff intervention resulting in harm to staff, other offenders without the intent to invoke serious harm or the intent to kill, or serious damage to the facility, and where reasonable interventions at the lower security level have not been successful in eliminating disruptive behaviors." *Id.*

21.     As detailed in O.P. 830.A, inmates on both pathways are "challenged to meet goals in three areas" that track with the positive behaviors identified in the motivational EBP principles in Appendix C to the Operations Strategies: (1) eliminating disciplinary violations (accepting rules and taking responsibility); (2) responsible behavior goals that include personal hygiene and cell compliance (carrying oneself with pride), standing for count (accepting rules and taking responsibility), and respect (being polite and cordial to others); and participating in programming (setting goals and moving toward those goals).  Ex. 17 at VADOC-00134594, 596.  According to the Operations Strategies:

> The disciplinary violation goals are designed to improve respect for authority, improved decision making, and replace impulsivity with forward thinking.  The responsible behavior goals are designed to develop a routine pattern of responsible and mature behavior.  The program participation goals are to involve offenders in evidence-based programs that are proven to have a positive impact on offender thinking, beliefs, and attitudes which, in turn, support and reinforce responsible and mature behavior.

*See, e.g.*, Ex. 12 at VADOC-00053687.

22.     To progress from each privilege level to the next, inmates must, regardless of path, have less than the same defined number of specific charges, meet the same specific responsible

11

behavior goals, and complete the same specified *Challenge Series* journals. *See, e.g.*, Ex. 12 at VADOC-00053717–18, 53722. The one difference is that, consistent with the responsivity EBP principle, IM inmates must demonstrate improved decision making and modified behavior for a longer period of time (6 months) than SM inmates (3 months) at each privilege level. *Id.*

23. As set forth in those same appendices, as inmates meet goal levels they advance in status from privilege level 0 to 1 to 2 to SL-6,[6] earning additional privileges (outlined on separate IM and SM Privilege Levels charts) consistent with the EBP motivational principle of using privileges to motivate and introduce desirable behavior. *See, e.g.*, Ex. 12 at VADOC-00053719, 53723. Also consistent with that principle, sanctions for deterring unwanted behavior can include being demoted to a lower privilege level. *Id.*

24. SL-6 was created in June 2012 as, and continues to be, "SL-S Step-down." O.P. 830.2, with an effective date of January 1, 2012, attached as Exhibit 18 at VADOC-00003115; O.P. 830.2, with an effective date of October 1, 2021, attached as Exhibit 19 at 4. The Operating Strategies explain that "[f]ollowing a successful period in IM or SM, offenders will be eligible for advancement and to step-down from Level S to their first introduction into General Population at Level 6. The purpose of Level 6 is to reintroduce offenders into a social environment with other offenders and as a proving ground and preparation for stepping down to level 5." *See, e.g.*, Ex. 12 at VADOC-00053697. Consistent with the responsivity EBP principle, SL-6 always has included several different housing options designed for inmates with certain characteristics, *e.g.*, the Secure Allied Management ("SAM") unit "for offenders that tend to be easily bullied, manipulated, or

---

[6] With approval of the 2020 Operations Strategy SM2 became a SL-6 privilege level in light of the increase in privileges for that level, in particular the opportunity for congregate meals and recreation. *Compare* Ex. 11 at VADOC-00053165 with Ex. 12 at VADOC-00053721; ECF No. 201-2 ¶¶ 15–16.

taken advantage of by other offenders." *Id.*   The pathway out of SL-6 differs for IM and SM inmates.

### 1.   IM Path

25.   Although inmates on the IM pathway always have stepped down to the SL-6 IM Closed Pod when eligible, beginning with the 2015 Operations Strategy this step further was sub-divided into a Phase 1 and Phase 2.   *Compare* Ex. 8 at VADOC-00002680 with Ex. 9 at VADOC-00002748.

26.   With the sub-division of the SL-6 IM Closed Pod, inmates advance to Phase 1 upon stepping down from SL-S and then to Phase 2 after twelve successful and charge-free months in Phase 1, as described in the 2020 Step-Down Program Guide.   Ex. 12 at VADOC-00053697.   As depicted in Appendix F to the Operations Strategies beginning in 2015, "success" continues to be measured using the same goals used for progressing through SL-S.   Ex. 9 at VADOC-00002752.

27.   The pathway out of SL-6 for inmates on the IM path goes through the SM path.   As explained by Mathena, IM inmates who show satisfactory progress in the Step-Down Program are eligible to transition to the SM path.   ECF No. 201-2 ¶ 14.   In fact, several of Named Plaintiffs transitioned from the IM path to the SM path on their pathway out of SL-6.   *See, e.g.*, External Review Team Recommend Change Forms dated October 23, 2019, attached as Exhibit 20. Further, as demonstrated by the External Review Team Recommend Change Form, inmates can be transitioned at the same privilege level without starting the SM path at SM-0.   *See, e.g.*, External Review Team Recommend Change Form dated October 17, 2018, attached as Exhibit 21.

### 2.   SM Path

28.   As noted above, SM-2 became an SL-6 privilege level with approval of the 2020 Operations Strategy.   But the SL-6 path after SM-2 has remained similar since the first Operations

Strategy: inmates progress to one of two specialty housing units (SAM or Secure Integrated Pod ("SIP")) or the Step-Down unit.  *See, e.g.*, Ex. 12 at VADOC-00053698.

29.     Each of these SM SL-6 programs has a Phase 1 and Phase 2 as described in the Operating Strategies.  *See, e.g.*, Ex. 12 at VADOC-00053700.  Following successful completion of Phase 2, inmates are eligible to be reclassified to SL-5.  *Id.*

### C.     Concern 3: Re-Entry Program

30.     As explained in the Operations Strategies, VDOC considers it

> unconscionable that a Level S offender might be considered too dangerous for unrestrained contact with others in prison, yet they would be released directly from segregation onto an unsuspecting citizenry in the community.  Therefore, given that this population may pose a risk, the department's position is that the facility is in the best position to bear that risk.  The department has a professional responsibility to work to effectively reduce the offender's danger to the community and the risk of reoffending, and improve the likelihood of reentry success.

*See, e.g.*, Ex. 12 at VADOC-00053690.  Although the Operations Strategies indicate that VDOC has modified the re-entry program over time, they indicate at least one characteristic has remained unchanged: inmates are diverted to the re-entry program from whatever point they may be in the Step-Down Program (SL-S or SL-6) at two years before their release.  *Id.*

31.     The initial version of O.P. 830.A provided that, for the final six months of re-entry, SL-S inmates would be stepped down to SL-6 to continue re-entry programming, with those demonstrating appropriate behavior stepped down to SL-5 and transferred to the re-entry program at a facility determined by the region of the state to which their plan called for release.  Exhibit 16 at VADOC-00003153.  The next version of O.P. 830.A, effective February 15, 2018, divided the re-entry program along the IM and SM paths with SM inmates at SL-6 eligible to be stepped down to SL-5 and transferred to the re-entry program at a facility determined by the region of the state

to which their plan called for release.  O.P. 830.A, with an effective date of February 15, 2018, attached as Exhibit 22 at VADOC-00108213.

32.     With the 2020 Operations Strategy and the next version of O.P. 830.A, effective October 1, 2020, the re-entry program was in its current version.  According to the 2020 Operations Strategy, "[a]t two-years prior to release[, SL-S] and [SL-6] offenders will be diverted into the Level 6 Reentry Program from whatever point they may be in the Level S step-down program." Ex. 12 at VADOC-00053690.  According to the 2020 version of O.P. 830.A, "[f]or the final ten (10) months of reentry, Level 6 Re-Entry offenders may be reduced to [SL-5] and transferred to a [SL-5] intensive re-entry site."  O.P. 830.A, with effective date of October 1, 2020, attached as Exhibit 23 at VADOC-00069659.

III.    **Step-Down Program Review Process**

33.     The Vera Report identifies the requirement that inmates be assessed regularly by multidisciplinary teams of staff  as an "integral part of the Step-Down Program model."  ECF No. 195-5 at 10.  As detailed in the Operating Strategies and VDOC's operating procedures, the Step-Down Program involves multiple levels of review.

A.    **ICA**

34.     According to Operating Procedure 830.1, the ICA is an experienced senior staff member appointed by the Facility Unit Head who has contact with the inmate but who is impartial to the inmate being presented for review.  O.P. 830.1, with effective date of February 1, 2021, attached as Exhibit 24 at 7.  A formal due process hearing—requiring formal notification to the inmate indicating the reason for, purpose of, and possible results of the classification hearing 48 hours in advance of the scheduled hearing, the inmate's right to be present at the hearing, and notice of the results of the hearing and the reason for the decision—is required before assignment to SL-

S.  *Id.* at 3, 8. Inmates may appeal any classification decision through the offender grievance procedure.  *Id.* at 13.

35.     The ICA conducts several types of hearings, *see generally id.* at 4–6, including, as previously discussed, a hearing necessary to assign an inmate to SL-S.  But the ICA reviews specific to progression in the Step-Down Program have changed over time.  The 2012 Operations Strategy provided that each SL-S and SL-6 inmate would be reviewed at a minimum of every 90 days by the ICA, or more frequently as necessary, to ensure the reclassification of SL-S and SL-6 inmates was consistent with policy.  Ex. 25 at VADOC-00037981.  This requirement was changed in 2016 such that each SL-S would be reviewed at a minimum of every 90 days by the ICA, or more frequently as necessary, to ensure the reclassification of SL-S inmates was consistent with policy.  Ex. 26 at VADOC-00056800.

**B.    CCS**

36.     CCS consists of staff members from the Offender Management Services Unit.  Ex. 27 at 3.  As discussed in a previous section, CCS reviews each inmate reclassification assignment to SL-S but does not have final approval.  The 2020 Operations Strategy contains the following descriptor of the approval process: "Referring facility -> Central Classification Services-> Warden of the primary Maximum Security Prison (currently ROSP)-> Regional Operations Chief (ROC) or designee Regional Administrator (RA)."  Ex. 12 at VADOC-00053677.

**C.    Unit Management Team ("UMT") / Building Management Committee ("BMC")**

37.     The 2013 O.P. 830.A defined the UMT as a "multi-disciplinary team comprised of staff assigned to work in a housing unit that tracks, measures, and advances or lowers offenders to appropriate privilege levels within SL-S based on established criteria.  Ex. 16 at VADOC-00003147.  Membership could consist of the unit manager, security supervisor, counselor, mental

16

health, investigator, and other members as needed. *Id.* The UMT was responsible for assigning inmates on both the IM and SM pathways to privilege levels as they met program goals. *Id.* at VADOC-00003149, 3150.

38.     With issuance of the 2015 Operations Strategy, the UMT's role was taken over by the BMC, "a grouping of individuals directly involved in the operations of a specific unit at Red Onion and Wallens Ridge." Exhibit 19 at VADOC-00002708. The BMC was described as being made up of, but not limited to, the Chief of Housing and Programs ("CHAP"), Unit Manager, Counselor, Unit Security Supervisor, Security Line Staff, and Treatment Officers. *Id.* The 2017 Operations Strategy specifically added the Qualified Mental Health Professional ("QMHP") to the list of BMC members. Ex. 11 at VADOC-00053116. The BMC continues to include all of these members in the 2020 Operations Strategy.[7] Ex. 12 at VADOC-00053679.

39.     The 2015 and later Operations Strategies require the BMC to convene at least monthly to discuss inmate statuses and unit incentives and sanctions. *Id.* In addition to assigning inmates to privilege levels in SL-S, the 2015 and later Operations Strategies identify the BMC as being responsible for the following reviews and recommendations: discussing and preparing recommendations to the DTT discussing and adjusting individual pod incentives and sanctions; and reviewing inmates upon being removed from security protocols before they are returned to normal status. *Id.* According to Mathena, the BMC also determines which SL-6 program inmates should be placed in once they are approved to move from SL-S to SL-6. Mathena Tr. Day 1 at 260:10–262:6.

---

[7] The QMHP is referred to as the Mental Health Associate in the 2020 Operations Strategy. These individuals also have been referred to as Psychology Associates.

### D.     DTT

40.     The DTT always has been a component of the Step-Down Program with the Operations Strategies reflecting its membership, meeting frequency, and responsibilities evolving over time. *Compare* Exs. 7 at VADOC-00037980–81, 8 at VADOC-00002641–42, 9 at VADOC-00002706–07, 10 at VADOC-00056798–99, 11 at VADOC-00053114–15, 12 at VADOC-00053677–78. But the DTT always has been responsible for assigning inmates to a path and recommending when an inmate should transition from SL-S to SL-6. *Id.* The DTT meets as deemed necessary. Ex. 12 at VADOC-00053678.  As of the 2017 Operations Strategy, the DTT is required to meet with and interview inmates as part of assigning them to a path.  Ex. 11 at VADOC-00053115.  The DTT is made up of the Chief of Housing and Programs, IPM/Cognitive Counselor, Unit Manager, Investigator/Intelligence Officer, Mental Health Associate, Counselor(s), and a Corrections Officer.  Ex. 12 at VADOC-00053677.

### E.     Wardens / ROC

41.     The Operations Strategies identify the following decision as the responsibility of the Wardens with an external review by the ROC: reassignment from SL-S to SL-6, reassignment from SL-6 to SL-5, and SL-5 transfers from Red Onion to Wallens Ridge with the decision referred to the ROC if the Wardens cannot reach consensus. *See, e.g.*, *id.*

### F.     External Review Team ("ERT")

42.     The Operations Strategies reflect that the ERT's mandate has remained relatively constant: review the case of each inmate assigned to the Step-Down Program, including, but not limited to the following areas: whether the inmate is appropriately assigned to SL-S; whether the inmate meets the criteria for the IM or SM path to which they are assigned; and whether the DTT has made appropriate decisions to advance the inmate through the step-down process. *See, e.g.*, Ex. 7 at VADOC-00037979.  In addition, the 2020 Operations Strategy specifies an additional

18

area: review IM inmates for SL-6 Re-Entry if they will fall within their 24-month time frame before release before the next review.  Ex. 12 at VADOC-00053676.

43.     Although the 2012 Operations Strategy indicates that the ERT reviews were annual and the Operations Strategies before 2017 indicate that the ERT reviewed only SL-S inmates, the ERT review documents show that the ERT has conducted biannual reviews from the beginning and always has reviewed the cases of SL-S and SL-6 inmates.  *See, e.g.*, Red Onion State Prison Segregation Reduction Step Down Plan, attached as Exhibit 28 (indicating a date of 6/3/2013 at VADOC-00001776 and SL-6 review starting at VADOC-00001806); Red Onion State Prison Segregation Reduction Step Down Plan, attached as Exhibit 29 (indicating a date of 12/3/13 at VADOC-00001830 and SL-6 review starting at VADOC-00001857).

44.     The Operations Strategies reflect that the membership of the ERT always has included a mix of operations, mental health, and medical professionals.  For example, the Chief of Mental Health Services always has been an identified member, and the Chief Physician was replaced in the membership by the Chief Nurse with the 2016 Operations Strategy.  *See, e.g.*, Ex. 7 at VADOC-00037979; Ex. 10 at VADOC-00056797.

45.     Mathena testified that the ERT began consistently interviewing inmates as part of its review process in 2017.  Transcript of Randall Mathena – Day 2 dated April 5, 2023 ("Mathena Tr. Day 2"), relevant portions attached in Exhibit 14 at 462:4–15.  Multiple Plaintiffs testified that they were interviewed by the ERT.  *See, e.g.*, Transcript of Vernon Brooks, Jr., dated March 21, 2023 ("Brooks Tr."), relevant portions attached in Exhibit 30 at 223:3–18; Transcript of Brian Cavitt, dated March 20, 2023 ("Cavitt Tr."), relevant portions attached in Exhibit 31 at 262:3–15; Transcript of Derek Cornelison dated April 11, 2023 ("Cornelison Tr."), relevant portions attached

19

in Exhibit 32 at 291:17–21; Transcript of Gerald McNabb dated April 4, 2023 ("McNabb Tr."), relevant portions attached in Exhibit 33 at 180:14–181:10.

## IV.   Step-Down Program Conditions of Confinement

46.    During the entire period that the Step-Down Program has been operational, Red Onion has been an ACA accredited facility.   Commission on Accreditation for Corrections Standards Compliance Reaccreditation Unit Audit [VDOC Red Onion] dated October 1–3, 2012, attached as Ex. 34; dated October 19–21, 2015, attached as Exhibit 35; dated October 24–26, 2018, attached as Exhibit 36; American Correctional Association Accreditation Report, attached as Exhibit 37. As part of the accreditation process, ACA experts examine hundreds of aspects of VDOC's policies and practices, including with respect to restrictive housing.  *See, e.g.*, *id.* VDOC's Step-Down Program has always been in compliance with ACA standards relevant to restrictive housing.  *Id.*

47.    The conditions of confinement have evolved over time as VDOC has expanded privileges to inmates in SL-S and 6.  But certain conditions, are, and always have been, consistent with the conditions in general population at Red Onion and Wallens Ridge.  Each of the Operations Strategies specifies that inmates in the Step-Down Program "are provided with their basic requirements that meet constitutional standards such as, but not limited to, medical care, access to a law library, hygiene items, access to phone, in-cell education and religious programs, recreation, showers, and meals." *See, e.g.*, Ex. 12 at VADOC-00053687.

### A.    Consistent Conditions

Cells

48.    VDOC houses inmates in the Step-Down Program in cells of the same size and configuration in which it houses inmates in general population.  Transcript of Frederick Hammer dated March 21, 2023 ("Hammer Tr."), relevant portions attached in Exhibit 38 at 187:21–188:8;

Cornelison Tr. at 218:19–220:6, Ex. 32.  The vast majority of inmates in general population share their cell with a cellmate, whereas inmates in the Step-Down Program have a cellmate only in the last phase of the program, if at all.[8]  *See, e.g.*, Ex. 12 at VADOC-00053699-700, 53716, 53721.

49.     The lighting in the cells used for SL-S and SL-6, like the lighting in general population, remains on at all times.  Brooks Tr. at 212:1–9; Transcript of Kevin Snodgrass dated April 12, 2023 ("Snodgrass Tr."), relevant portions attached in Exhibit 39 at 258:5–18; Transcript of Peter Mukuria, dated March 28, 2023 ("Mukuria Tr."), relevant portions attached in Exhibit 40 at 65:8–11.  Jessica King testified that  the lighting remains on in all cells so the corrections officers can check on inmates.  Transcript of Jessica King dated June 1, 2022, relevant portions attached in Exhibit 41 at 229:17–230:16.  The lighting is dimmed at night.  Hammer Tr. at 103:11–14; Snodgrass Tr. at 258:5–18.

50.     Further Plaintiff testimony establishes that inmates were able to converse with each other while in their cells, in group settings, and at recreation.  Brooks Tr. at 12:7–13:5, 244:20–245:17; Cavitt Tr. at 222:5–224:4; Cornelison Tr. at 37:11–38:5, 42:6–20, 64:20–67:14, 221:11–222:9; Hammer Tr. at 14:1–18:1; Mukuria Tr. at 17:10–18:17, 33:10–34:22, 237:19–239:9.

Food

51.     O.P. 861.3 provided from the beginning of the Step-Down Program that inmates in the Step-Down Program should receive the same number and type of meals served the general population.  Ex. 42 at VADOC-0003213.  That requirement has not changed.  O.P. 841.4, attached as Ex. 43 at 14.  During operation of the Step-Down Program, VDOC procedures never have

---

[8] The 2012 Operations Strategy provided that inmates on the SM path at SL-6 Phase 2 are double celled.  Ex. 7 at VADOC-00037998.  Starting with the 2014 Operations Strategy, this aspect no longer applies to inmates in the SAM and SIP programs.  Ex. 8 at VADOC-00002660–61.

allowed for the provision of food to be used as disciplinary measure.  Ex. 44 at VADOC-0000313.

For example, punitive diets (*i.e.*, bread and water) for inmates is prohibited.  *Id.*

Personal Hygiene

52.     O.P. 861.3 provided from the beginning of the Step-Down Program that inmates in the Step-Down Program should receive laundry, barbering, and hair care services and be issued exchange clothing, bedding, and linen on the same basis as inmates in the general population.  *Id.*

53.     It further provided that inmates in the Step-Down Program should be permitted to shower and shave not less than three times per week and have the opportunity to sponge bathe whenever they choose.  *Id.*  That requirement has not changed.  Ex. 43 at 16.

Others

54.     O.P. 861.3 provided that inmates in the Step-Down Program have the same mail regulations and privileges, including sending and receiving legal mail, as inmates in the general population.  Ex. 42 at VADOC-00003214.  Further, it provided that they have the ability to continue to conduct litigation on their own behalf and be afforded access to facility legal services, including the Facility Attorney and the use of Law Library materials.  *Id.*  Those requirements have not changed.  Ex. 43  at 15.

55.     O.P. 861.3 further provided that inmates in the Step-Down Program will have access to religious guidance and library books for personal use.  Ex. 42 at VADOC-00003215.  Those requirements have not changed.  Ex. 43 at 17.

56.     The Operations Strategies consistently have indicated that inmates, regardless of path, have access to library books, religious materials, and legal materials.  *See, e.g.*, Ex. 12 at VADOC-00053716, 721.  They further consistently have provided that all inmate in the Step-

Down Program have access to visitation, at a minimum, once per week for one hour with access to increased visitation at higher privilege levels. *Id.* at VADOC-00053725.

    **B.**    **Variable Conditions**

    57.    As discussed above, key aspects of the motivational EBP principle involve establishing privileges as earned rather than entitled and using privileges to motivate and introduce desirable behaviors. Hence, as shown in the tables titled "SM Privilege Levels" and "IM Privilege Levels" in the appendices of the Operations Strategies, certain privileges, like the amount of commissary allowed per week and the number of phone calls allowed per month, increase as inmates advance in privilege levels within a path. *See, e.g.*, Ex. 12 at VADOC-00053716, 721.

    58.    Further, a comparison of those same tables between Operations Strategies indicates that privileges have increase over time at a given privilege level within each path. For example, in the 2012 Operations Strategy, inmates at SL-S on either path were not eligible to have access to an MP3 player (a device for playing audio files). Ex. 7 at VADOC-00038017, 8022. With the 2017 Operations Strategy, inmates at all privilege levels were eligible to have access to JP5 players (a tablet device that provides access to audio files, email, photo files, etc.). Ex. 11 at VADOC-00053158, 166. In the 2012 Operations Strategy, inmates on the IM path were not eligible for a job until they reached SL-6. Ex. 7 at VADOC-00038021. In the 2014 Operations Strategy, they became eligible for a job at the IM-2 privilege level. Ex. 8 at VADOC-00002680. For example, Brian Cavitt testified that he had a job while he was at SL-6 on the IM path and that other inmates had jobs at privilege level IM-2. Cavitt Tr. at 248:7–249:13; Kevin Snodgrass also testified that he had a job at SL-6 on the IM path. Snodgrass Tr. at 260:13–18.

    59.    A summary of the privileges at the various privilege levels can be found in the Operations Strategies. Conditions related to time out of cell specifically are addressed here.

Recreation

60.     The Operations Strategies indicate that VDOC always has followed the ACA standards, at a minimum, for recreation.  For example, the 2012 Operations Strategy indicates VDOC permitted one hour per day of recreation outside in recreation cages, per the ACA standards, at all privilege levels in the Step-Down Program.  Ex. 7 at VADOC-00038021, 8028. The 2017 Operations Strategy indicates that VDOC increase that time to two hours per day of recreation outside in recreation cages, per the ACA standards, at all privilege levels in the Step-Down Program.  Ex. 11 at VADOC-00053157, 165.

61.     Further, the 2012 Operations Strategy indicates VDOC permitted inmates on the SM path, after a seven-day assessment period, in-pod recreation one tier at a time for one hour on days there was no outside recreation, as well as outside recreation one tier at a time for one hour twice a week at SL-6 Phase 1.  Ex. 7 at VADOC-00037997.  It further indicates VDOC permitted in-pod recreation with both tiers at the same time for one hour on days there was no outside recreation and outside recreation with both tiers at the same time for one hour twice a week at SL-6 Phase 2.  *Id.* at VADOC-00037998.

62.     The 2014 Operations Strategy indicates that SM path SL-6 further was divided by program.  It indicates that inmates in the SAM and SIP units had the option as approved by staff to participate in in-pod group recreation.  Ex. 8 at VADOC-00002660.  It indicates inmates in the Step-Down Program had the same privileges as the 2012 Operations Strategy.  *Id.* at VADOC-00002661.

63.     The 2015 Operations Strategy indicates that the outside congregate recreation for Step-Down Program Phase 2 inmates increased to three days per week.  Ex. 9 at VADOC-00002730.  The 2017 Operations Strategy indicates that the outside congregate recreation for

Phase 1 also increased to three days per week.  Ex. 11 at VADOC-00053138.  It also indicates that inmates in the SAM and SIP units had the option, at a minimum of 30 days and with BMC approval, for in-pod and outside group recreation up to one tier at a time.  *Id.* at VADOC-00053137.

64.     The 2020 Operations Strategy indicates that outside recreation for the Step-Down Program Phase 1 and Phase 2 increased to four days per week, with in-pod recreation three days per week.  Ex. 12 at VADOC-00053700.  It further indicates that inmates at the SM-2 privilege level will have recreation in unrestrained small groups (maximum of 5).  *Id.*  For example, Plaintiff Gary Wall testified that, when he reached SM-2, he had daily, unrestrained, "congregate" recreation with other inmates in a recreation yard with a basketball court.  Transcript of Gary Wall dated March 20, 2023 (Wall Tr.), relevant portions attached in Exhibit 46 at 61:5–62:8.

Meals

65.     The 2012 Operations Strategy indicates VDOC permitted inmates on the SM path to walk to meals unrestrained, one tier at a time, with both tiers collected in the dining hall at SL-6 Phase 2.  Ex. 7 at VADOC-00037998.

66.     The 2014 Operations Strategy indicates that SM path SL-6 was further divided by program.  Inmates in the SAM and SIP units had the option as approved by staff to have group meals in the pod.  Ex. 8 at VADOC-00002660.  It indicates that inmates in the Step-Down Program could walk to the dining hall one tier at a time with no more than one tier in the dining hall at a time beginning at Phase 1.  *Id.* at VADOC-00002661-2.

67.     The 2020 Operations Strategy indicates that, at a minimum of 30 days, the SAM and SIP unit inmates can have group meals in pod up to one tier at a time with review and approval by the BMC.  Ex. 12 at VADOC-00053700.

25

Programming

68.     The 2012 Operations Strategies noted that programming is part of engaging and promoting "pro-social behaviors in offenders as a cultural group including their social influences and lifestyle." Ex. 7 at VADOC-00037977.  As noted in the Operations Strategies, programming begins in cell for all SL-S inmates, but they recognize that "more effective programming is possible with increased counselor and offender direct contact and in groups of peers facilitated by counselors or other treatment staff." *See, e.g.*, Ex. 12 at VADOC-00053687.

69.     The Operations Strategies provide that the basic program used with SL-S inmates will be the *Challenge Series*, a seven-journal series developed by the Federal Bureau of Prisons in conjunction with the Change Companies specifically for inmates in restrictive housing.  *Id.* at VADOC-00053688.  The 2020 Operations Strategy adds an alternative curriculum consisting of four Life Skills journals and a stand-alone DVD and self-assessment journal as an alternative curriculum to encourage inmates to participate in the Step-Down Program.  *Id*.

70.     They identify the primary curriculum for SL-6 as *Thinking for a Change* ("T4C"). *Id.* at VADOC-00053700.  They also indicate that Reentry programs increased from the five identified in the 2012 Operations Strategy to the list found in the 2020 Operations Strategy, which includes, but is not limited to, the following: Aggression Alternative Skills, Resources for Successful Living, P.R.E.P.S., *Challenge Series*, T4C, T4C Aftercare, ServSafe, Ready to Work, Cognitive Self Change, Re-Entry Planning, Re-Entry – Money Smart, and Decision Points.  *Id.* at VADOC-00053690-91.

71.     In addition, the Operations Strategies indicate that inmates on the IM path have been eligible for a structured art program and structured creative writing program at SL-6 since the 2012 Operations Strategy. Ex. 7 at VADOC-00038022.

72.     The 2012 Operations Strategy identifies program delivery as follows:

26

**For IM offenders**, in-cell programming will continue until the offender's pattern of programming and motivation are better understood, and counselor to offender rapport has had time to be established.  Dialogue is continuing to determine at what point IM Level 6, Level 1 and Level 2 might be implemented and when these program tools are appropriate.  These factors can be used to help determine a safe time to begin moving the offender from their cell to Therapeutic Modules for programming.  Therapeutic Modules and Program Chairs will be used with offenders during Level 1 in the SL6 Closed Pod.  At Level 2 in the SL6 Closed pod, programming can be expanded to include small groups.  Each offender should be assessed to determine their individual readiness and level of safety as they progress to increasing levels of freedom in greater contact with others during programming.

**For SM offenders**, programming is recommended to be limited to in-cell for SMO.  At SM1, programming can expand to include Therapeutic Modules.  Program Chairs can be added at SM2.  When SM offenders advance to Level 6 for the SIP, SAM, and Step-Down pods, programming can be expanded to include unrestrained small groups.  Each offender should be assessed to determine their individual readiness and level of safety as they progress to increasing levels of freedom in greater contact with others during programming.

*Id.* at VADOC-00037989–90.

73.    The 2020 Operations Strategy changes the paragraph for SM inmates as follows:

For SM offenders, programming will be in approved program areas.  When SM offenders advance to Level 6 for the SIP, SAM, and Step-Down pods, programming can be expanded to include unrestrained small groups.  Each offender should be assessed to determine their individual readiness and level of safety as they progress to increasing levels of freedom in greater contact with others during programming.

Ex. 12 at VADOC-00053689.

74.    The 2012 and 2014 Operations Strategies limit small groups to no more than five inmates for both the SM and IM paths.  *See, e.g.,* Ex. 8 at VADOC-00002681, 2689.  With the 2015 Operations Strategy, small groups were increased to a maximum of 15 inmates at SL-6 on the SM path.  Ex. 9 at VADOC-00002757.

27

### C.    VDOC Eliminates Restrictive Housing

75.    The ACA defines "restrictive housing" as "a placement that requires an inmate to be confined to a cell at least 22 hours per day for the safe and secure operation of the facility." Performance Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, selected portions attached as Exhibit 47 at PACHOLKE001095.

76.    In the Vera Report, Vera recommended that VDOC expand strategies to further increase out-of-cell time for inmates in restrictive housing.  ECF No. 195-5 at 15.  In October 2018, VDOC issued new guidance for out-of-cell recreation, mandating a minimum of 12 hours per week in outside recreation for inmates in IM-0 and SM-0, increasing to 18 hours per week for inmates at IM-2 and 20 hours per week for inmates at SM-2.  ECF No. 195-13.

77.    On September 17, 2019, David Robinson, Chief of Corrections Operations, issued Chief of Corrections Operations Memorandum #040-2019, directing that, for male inmates in SL-S and SL-6, among others, "[e]ffective no later than January 6, 2020, each offender in the restrictive housing unit will be provided the opportunity to participate in a minimum of four hours out of cell activity, seven days a week."  ECF No. 195-14 at 1.  Clarke reported to the Virginia General Assembly in VDOC's Fiscal Year 2021 Report that, "in practice, the end of restrictive housing took place in January 2020."  Adoption of Restorative Housing in the Virginia Department of Corrections FY 2021 Report, attached as Exhibit 48 at VADOC-00134473.

## V.    Step-Down Program Mental Health Care

78.    Operating Procedure 730.2, Mental Health Services: Screening, Assessment, and Classification ("O.P. 730.2") has required that all inmates receive an initial mental health screening at the time of admission to a VDOC facility to identify mental health services needs since before implementation of the Step-Down Program.  Exhibit 49 at VADOC-00002893.

A.  **Mental Health Classification Codes**

79.    O.P. 730.2 describes the VDOC Mental Health Classification Code System ("MH Code") as providing "a standard approach through which the mental health status and service needs of individual inmates may be examined." *Id.* at VADOC-00002897.  Before issuance of O.P. 730.2 with an effective date of January 1, 2019, it identified the MH Codes as MH-X, MH-0, MH-1, MH-2, MH-3, and MH-4. *See, e.g.*, *id.*

80.    O.P. 730.2 issued with an effective date of January 1, 2019, identifies a sixth MH Code:

- MH-2S (Substantial Impairment) – must have a documented significant DSM diagnosis that meets SMI criteria that requires monitoring by a QMHP and may require medication intervention—admission to an acute care treatment unit or other designated VDOC mental health unit is a probable periodic occurrence.

Ex. 50 at VADOC-00002934.

81.    It also defined "Offender with Serious Mental Illness (SMI)" as one "diagnosed with a Psychotic Disorder, Bipolar Disorder, Major Depressive Disorder, Posttraumatic Stress Disorder (PTSD) or Anxiety Disorder, or any diagnosed mental disorder (excluding substance abuse disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living."  *Id.* at VADOC-00002926.

82.    The current version of O.P. 730.2 issued with an effective date of June 1, 2021 defines SMI as "Psychotic Disorders, Bipolar Disorders, and Major Depressive Disorder; any diagnosed mental disorder (excluding substance use disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health clinician."  Exhibit 51 at 3-4.

B.      **Inmate Screening**

83.     Since the beginning of the Step-Down Program, VDOC policy has required that inmates placed in the Step-Down Program be screened by a QMHP before their placement or within one day of their placement in the Step-Down Program. *See, e.g.*, Ex. 42 at VADOC-00003210.  O.P. 730.2 requires that an SMI determination be completed upon assignment to the Step-Down Program if the inmate was last screened for an SMI more than one year ago.  Ex. 51 at 14.  Further, O.P. 730.2 requires, upon transfer from one VDOC facility to another, that a Psychology Associate (formerly QMHP) review an inmate's health records within three days of admission into the Step-Down Program and conduct an interview as indicated by the inmate's MH Code. *Id.* at 7.

C.      **Participation in Step-Down Program Reviews**

84.     As discussed above, the Operations Strategies detail mental-health staff participating in multiple review bodies that meet with and assess inmates' progress in the Step-Down Program, including the BMC, DTT, and ERT.  Dr. Denise Malone, VDOC's Director of Mental Health, testified that participating in these reviews and assessments helps ensure that mental health staff are aware of an inmate's mental health status and needs throughout their time in the Step-Down Program.  Transcript of Denise Malone, Designated Representative & Individually dated April 12, 2023 ("Malone Tr."), relevant portions attached in Exhibit 52 at 124:9–18.

D.      **Implementation of the Secure Diversionary Treatment Program**

85.     VDOC implemented The Secure Diversionary Treatment Program ("SDTP") in January 2018.  ECF No. 201-7 at 1.  The August 2018 Preliminary Analysis of VDOC SDTP states that the SDTP "provides a pathway for stabilizing [inmates] identified as SMI by providing appropriate mental health treatment services and programs based on individual evaluations and

assessments." *Id.*  The SDTP Manual states that VDOC's goal in implementing the SDTP is to minimize and/or eliminate the use of restrictive housing for SMI inmates.  ECF No. 201-6 at 14. Dr. Malone testified that another goal is to create "structured and supportive environments" that helps SMI inmates function better both within a prison environment and upon their re-entry into the community.  Malone Tr. at 260:4–9.

86.     O.P. 841.4 bars the assignment of an inmate to restrictive for more than 28 days without an exemption request.  Ex. 43 at 7.  Dr. Malone testified that, within ten days of being assigned to restorative housing, VDOC needs to have a plan for the inmate and, within 28 days, must move the inmate out of restorative housing.  Malone Tr. at 257:3–6.

87.     According to the Vera Report, VDOC transferred all SMI inmates out of Red Onion and into SDTP facilities, and no additional SMI inmates were transferred to Red Onion after implementation of the SDTP.  ECF No. 195-5 at 37.

## VI.    Outside Interest in the Step-Down Program

88.     In a 2019 presentation, VDOC identified individuals and entities seeking to learn more about the Step-Down Program for which it had hosted tours, including Departments of Corrections from 12 other states: Georgia, Iowa, Kentucky, Maine, New York, Ohio, Pennsylvania, North Carolina, South Carolina, South Dakota, Tennessee, and Wyoming. Red Onion State Prison "Partnering Science with Corrections," attached as Exhibit 53, at VADOC-00043386. Robinson testified that the ACA had asked VDOC to provide training on restrictive housing and that most states that attend when VDOC has done such training want to visit to implement VDOC's approach. Transcript of A. David Robinson dated February 16, 2023 ("Robinson Tr."), relevant portion attached in Exhibit 54 at 384:12–385:2.

## VII.  Legislation

### A.  2019

89.     The Virginia General Assembly directed, effective July 1, 2019 that, among other things, VDOC's "restrictive housing shall, at a minimum, adhere to the standards adopted by the American Correctional Association, the accrediting body for the corrections industry."  Va. Code § 53.1-39.1(A).

90.     The same statute requires VDOC to report certain information to the General Assembly and the Governor on or before October 1 of each year for the previous fiscal year.  Va. Code § 53.1-39.1(B).  The required information includes the number of inmates placed in and released from restrictive housing;[9] the number of days spent in restrictive housing; the number of inmates released from restrictive housing directly into the community; and changes to VDOC procedures relating to the use and conditions of restrictive housing and SAM units.  *Id.*

91.     VDOC reported that there were 37 SL-S inmates as of June 30, 2019 in the FY2019 Report.  *The Reduction of Restrictive Housing in the Virginia Department of Corrections: FY2019 Report*, attached as Ex. 55 at VADOC-00003291.  It reported that there were 36 SL-S inmates as of June 30, 2020 in the FY2020 Report.  *The Reduction of Restrictive Housing in the Virginia Department of Corrections: FY2020 Report*, attached as Ex. 56 at VADOC-00133191.  It reported that there were 63 SL-S inmates as of June 30, 2021 in the FY2021 Report.  *Adoption of Restorative Housing in the Virginia Department of Corrections: FY2021 Report*, attached as Ex. 57 at

---

[9] Restrictive housing in this context includes inmates in short-term restrictive housing who are not in the Step-Down Program at issue in this case.

VADOC-00134476.  It reported that there were 55 SL-S inmates as of June 30, 2022 in the FY2022 Report.[10]

### B.    2023

92.    The Virginia General Assembly codified certain aspects of the current Step-Down Program, effective July 1, 2023, in Va. Code § 53.1-39.2.  That statute states in relevant part that "[n]o incarcerated person in a state correctional facility shall be placed in restorative housing unless (i) such incarcerated person requests placement in restorative housing with informed voluntary consent, (ii) such incarcerated person needs such confinement for his own protection, (iii) there is a need to prevent an imminent threat of physical harm to the incarcerated person or another person; or (iv) such person's behavior threatens the orderly operation of the facility . . . .." Va. Code § 53.1-39.2(B).  It further states that "[a]n incarcerated person who has been placed in restorative housing shall be offered a minimum of four hours of out-of-cell programmatic interventions or other congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior, which may include recreation in a congregate setting, unless exceptional circumstances mean that doing so would create significant and unreasonable risk to the safety and security of other incarcerated persons, the staff, or the facility" and that less than four hours per day may be provided "only in the circumstance that the facility administrator determines a lockdown is required to ensure the safety of the incarcerated persons in the facility."  Va. Code § 53.1-39.2(B)(5), (D).

### VIII.   Legal Challenges to the Step-Down Program

93.    Numerous inmates have brought suit challenging the constitutionality of the Step-Down Program, on a variety of grounds.  These suits have not been successful.  For instance, In

---

[10] Publicly available at https://rga.lis.virginia.gov/Published/2022/RD472/PDF.

April 2015, Plaintiff Peter Mukuria filed a civil rights action under 42 U.S.C. § 1983 alleging, among other things, that the Step-Down Program unfairly prolonged his confinement under segregation conditions in violation of his Due Process rights and that his living conditions as an IM-0 inmate violated his Eighth Amendment rights. *Mukuria v. Clarke*, No. 7:15CV00172, 2016 WL 5396712 (W.D. Va. Sep. 27, 2016) (Jones, J.), *aff'd*, 706 F. App'x 139 (4th Cir. 2017). After careful review of O.P. 830.A, this Court concluded that Mukuria had no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under VDOC policy. *Id.* at *18–19. This Court also granted the defendants summary judgment on the Eighth Amendment claim because Mukuria failed to allege that the restrictions caused him any serious or significant harm. *Id.* at *11.

94. In a similar lawsuit, this Court granted the defendants summary judgment where the plaintiff alleged that his conditions of confinement at IM status "caused him to suffer anxiety, headaches, loss of sleep, physical deterioration, weight loss, and "'(to [his] belief) akathisia.'" *Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15CV00230, 2016 WL 5415906, at *6 (W.D. Va. Sept. 28, 2016), *aff'd sub nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017). The Court concluded that the inmate failed to state facts "showing that any of these health concerns qualifies as a serious or significant harm." *Id.*

95. Between the filing of Mukuria's first lawsuit challenging the Step-Down Program and this lawsuit, multiple VDOC inmates, including other named Plaintiffs in this lawsuit, filed more than a dozen separate lawsuits challenging the Step-Down Program on Due Process grounds,

Eighth Amendment grounds, or both.[11]  Every sitting federal district court judge in the Western District of Virginia at the time of the filing of this lawsuit had rejected those claims.  *Id.*

## IX.    The Current Litigation

### A.    Plaintiffs

Vernon Brooks

96.    Vernon Lee Brooks[12] is a 38-year-old male serving a 35-year sentence for two counts of malicious wounding, two counts of use of a firearm in a felony, and possession of a firearm as a felon.[13]  *See* VADOC-00007480, VADOC-00007458; *see also* Brooks Tr. at 93:10–95:13 (describing how Brooks shot two individuals following an altercation in Chesapeake, Virginia).  Brooks is scheduled to be released on April 12, 2038.[14]

---

[11] *See, e.g.*, *Edwards v. Kanode*, No. 7:19CV00324, 2020 WL 1158253 (W.D. Va. Mar. 10, 2020) (Conrad, J.); *Riddick v. Dep't of Corr.*, No. 7:17CV00268, 2017 WL 6599007 (W.D. Va. Dec. 26, 2017) (Conrad, J.); *Jordan v. Va. Dep't of Corr.*, No. 7:16cv00228, 2017 WL 4127905 (W.D. Va. Sept. 18, 2017) (Dillon, J.); *Muhammad v. Smith*, No. 7:16cv00223, 2017 WL 3402971 (W.D. Va. Aug. 8, 2017) (Conrad, J.); *Barksdale v. Clarke*, No. 7:16cv00355, 2017 WL 3381370 (W.D. Va. Aug. 4, 2017) (Kiser, J.); *Snodgrass v. Gilbert*, No. 7:16cv00091, 2017 WL 1049582 (W.D. Va. Mar. 17, 2017) (Conrad, C.J.), *vacated in part*, 2018 WL 1972721 (Apr. 26, 2018);  *Delk v. Younce*, No. 7:14cv00643, 2017 WL 1011512 (W.D. Va. Mar. 14, 2017) (Moon, J.), *aff'd*, 709 F. App'x 184 (4th Cir. 2018); *Hubbert v. Washington*, No. 7:14cv00530, 2017 WL 1091943 (W.D. Va. Mar. 22, 2017) (Urbanski, J.); *Muhammad v. Mathena*, No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017) (Conrad, J.); *DePaola v. Va. Dep't of Corr.*, No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd*, 703 F. App'x 205 (4th Cir. 2017); *Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15cv00230, 2016 WL 5415906 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd sub nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017).

[12] Brooks changed his name to "Asiatic Royal Prince Allah" in 2008.  *See* Brooks Tr. at 5:18–21.  Produced records variously refer to him as either Brooks or Allah.  Because the Complaint and other case materials still refer to him as Vernon Brooks, this Motion also uses that name.

[13] All documents cited in this section regarding Vernon Brooks are attached as Exhibit 30.

[14] Information publicly available at https://vadoc.virginia.gov/general-public/offender-locator/.

97.     In August 2015, Brooks's security level was changed from Level 5 to Level S due to a high number of institutional charges, which culminated in an April 2015 incident in which Brooks stabbed two other inmates behind the ear with a knife, causing puncture wounds.  *See* VADOC-00007814.  As a result, Brooks was transferred to Red Onion and placed in the Step-Down Program on the IM pathway.  *Id.*  Brooks progressed through the IM pathway and advanced from Level S to Level 6 on July 30, 2017, when he was assigned to the IM Closed Pod, Phase 1.  *See* VADOC-00007832.  In February 2018, Brooks was reclassified to SL-S and IM-0 status after he was found attempting to make a weapon in his cell.  *See* VADOC-00007836  In August 2019, Brooks was moved to IM Closed Pod (VADOC-00007763), and, in November 2019, his pathway was changed from IM to SM, where he was moved to Step Down Phase 1. VADOC-00135481.  In May 2020, Brooks was transferred to the general population in Red Onion, ending his time in the Step-Down Program.  ECF No. 174-19 ¶ 40.

98.     Brooks has received approximately 30 institutional charges during his time in prison.  In addition to his stabbing of two other inmates, Brooks received several charges related to fighting or assaults on other inmates.  In May 2013, Brooks was charged with attempting to kill another offender, although the charge was later dismissed on a procedural error.  *See* VADOC-00007777.

99.     When Brooks was first placed in VDOC custody, he was assigned a mental health code of MH-1.  VADOC-00007434.  Over the first several years of his incarceration, Brooks's mental health codes alternated between MH-1 and MH-0.  *See, e.g*., VADOC-00007432 (downgrading to MH-0 in April 2005); VADOC-00007421 (upgrading to MH-1 in October 2006).  During this time, Brooks engaged in a repeated pattern of self-harm, including a hanging attempt that was disguised as a "suicidal gesture" (although he later stated that he made the attempt to

avoid interacting with officers and was not actually suicidal).  *See* VADOC-00007403, VADOC-00007411, VADOC-00007420.   He has been consistently classified as MH-0 since 2008 (VADOC-00007384), but though was placed on "at risk" watch in both May 2015 and December 2015.  *See* VADOC-00007329, VADOC-00007326.

Brian Cavitt

100.    Brian Cavitt is a 40-year-old male serving a life sentence for two counts of first degree murder, arson, robbery, and assault and battery.[15]   *See* VADOC-00004070.   Cavitt originally was incarcerated in Massachusetts where, while housed in the Hampden County jail in November 2016, he assaulted an officer and beat him over the head with a telephone receiver until he was physically pulled away.  *See* VADOC-00003704. In May 2008, Cavitt broke through a recreation cage to attack another inmate with a weapon.  VADOC-00003815.  In December 2015, Cavitt again attempted to break through a recreation cage to fight with another inmate until guards deployed a "chemical agent" to force him away from the fence.  VADOC-00003679.  Cavitt also formulated several involved escape plots, including plans that involved murdering corrections officers to facilitate an escape during a court visit.  VADOC-00003840.

101.    Cavitt was transferred into the custody of VDOC in November 2016 due to the high potential of gang-related violence if he stayed in a Massachusetts facility.[16]  *Id.*  Upon his transfer to VDOC, Cavitt was classified at Level S and placed in the Step Down Program at ROSP on the IM pathway.  *Id.*  In February 2017, the ICA first recommended that Cavitt remain in segregation because he had not met all the requirements of the Step-Down Program. VDOC-00004043. The ICA made the same recommendation in May 2017, and again in July 2017. VADOC-00004072;

---

[15] All documents cited in this section regarding Brian Cavitt are attached as Exhibit 31.

[16] Cavitt is/was affiliated with the Gun Square Bloods gang.  *See* VADOC-00003866.

VADOC-00004073; CP-20-cv-7_00003341. Between December 2017 and January 2018, the ICA again failed to advance Cavitt through the Step-Down Program, and advised that he needed to continue to work to meet the Program's requirements, including completing the Challenge Series and maintaining infraction-free behavior. VADOC-00004075.  In August 2018, Cavitt was moved to the IM-Closed Pod and reclassified to SL-6.  VADOC-00004078.  In November 2020, Cavitt was moved from the IM pathway to the SM pathway.  VADOC-00174786  On April 9, 2021, Cavitt was moved to general population.  ECF No. 174-20 ¶ 21.

102.    During his time within VDOC's custody, Cavitt has been consistently classified as MH-0.  *See, e.g.*, VADOC-0016088, VADOC-0010704, VADOC-0016087.  During a December 2019 "Serious Mental Illness" Determination, Cavitt was found not to meet any of the criteria for an SMI. VADOC-00160712.

Derek Cornelison

103.    Derek Cornelison is a 38-year-old male serving a thirty-year sentence for armed robbery, grand larceny, and related offenses.[17]  VADOC-0000068.  He has been incarcerated since 2004 and is scheduled to be released on December 26, 2045.[18]

104.    Cornelison was placed in the Step-Down Program in May 2016 following a December 2015 incident in which he attempted to kill another offender at Sussex I Prison, connecting approximately 20 times with a weapon.  *See* VADOC-00004553.  He was assigned to the IM pathway.  ECF No. 174-21 ¶ 7.  Cornelison progressed to IM-1 on January 20, 2017 and then to IM-2 on August 15, 2017.  *See* VADOC-00135648.  In February 2018 he was moved to

---

[17] All documents cited in this section regarding Derek Cornelison are attached as Exhibit 32.

[18] Information publicly available at https://vadoc.virginia.gov/general-public/offender-locator/.

the IM-Closed Pod and reclassified to Level 6.  *Id.*  Cornelison was transferred to the SM pathway in May 2019 and moved to Step-Down Phase 1.  *Id.*  Cornelison was released to general population a few months later, in August 2019.  ECF No. 174-21 ¶ 23.

105.   Outside of the above-stated charge that resulted in his being placed in the Step Down Program, Cornelison has also received several other charges for fighting and for making gang-related threats.  *See* VADOC-00135637.  Cornelison has been consistently classified as MH-0 throughout his time in VDOC.  *See e.g.*, VADOC-00004305, 00004610, 00004801.

Frederick Hammer

106.   Frederick Hammer is a sixty-three-year-old male serving multiple life sentences for capital murder, burglary, and robbery.[19]  *See* VADOC-00006159.  Hammer was convicted of killing three men during a botched robbery at a Grayson County, Virginia Christmas tree farm in January 2008.  VADOC-00006042.[20]

107.   Hammer was transferred from Wallens Ridge to the Step-Down program at Red Onion in April 2012 because of the notorious nature of his crime and was assigned to IM-2. VADOC-00001721.  He reached the IM-Closed Pod in August 2013, before being placed back to IM-0 in October 2014.  ECF No. 174-22 ¶ 14.  He returned to SL-6 and the IM-Closed Pod in February 2016.  *Id.* ¶ 17.  Hammer stayed in the IM-Closed Pod until October 2019, when he was transferred to the SM pathway and Step Down Phase 2.  *Id.* ¶ 22.  In March 2020, Hammer completed the Step-Down Program and was released into the general population at Red Onion.  *Id.* ¶ 23.

---

[19] All documents cited in this section regarding Frederick Hammer are attached as Exhibit 38.

[20] Hammer also has confessed to committing at least three additional murders, including that of a Philadelphia police officer in 1978.  *See* Hammer Tr. at 152:18–22, 169:7–181:18.

108.    When he was first placed in the custody of VDOC in 2009, Hammer was classified with the mental health code of MH-2.  See VADOC-00005971, VADOC-00005952.  Hammer had been diagnosed with Depressive Disorder, Impulse Control Disorder, and Antisocial Personality Disorder, for which he was being treated with Celexa, Vistaril and Trazadone.  VADOC-00005952.  Hammer had progressed off medication around December 2012.  VADOC-00005894.  From July 2013 until early 2015, Hammer was classified MH-1.  See VADOC-00005951.  In January 2015, his status was changed to MH-0, where it has remained since.  VADOC-00005951.

Dmitry Khavkin

109.    Dmitry Khavkin is a 39-year-old male serving a 45-year sentence for crimes that include first-degree murder and unlawful wounding.[21]  *See* VADOC-00000555.  Khavkin has a release date of May 28, 2052.[22]

110.    Between February and March 2013, the ICA recommended a security level change for Khavkin to segregation because he was under investigation for the killing of his cellmate at Lawrenceville Correctional Facility.  VADOC-00000176.  Khavkin was assigned to the SM pathway.  ECF No. 174-23 ¶ 5.  In January 2014, Khavkin was transferred to the IM pathway.  *Id.* ¶ 7.  Khavkin continued to make forward progress through the Step-Down Program, either advancing or remaining at the same status level, VADOC-00000168, VADOC-00000171-172, until around December 2016, when ICA recommended that he be moved to SL-S and advised that he could not stay in the IM Closed Pod due to poor adjustment, VADOC-00000166–167.  Throughout 2018, he continued to progress through the Step-Down Program, culminating in his

---

[21] All documents cited in this section regarding Dmitry Khavkin are attached as Exhibit 58.

[22] Information publicly available at https://vadoc.virginia.gov/general-public/offender-locator/.

transfer from SL-S to SL-6 on the SM path in or around October 2018.  *Id.* ¶ 10; CP-20-cv-7_00003343; VADOC-00000163.  By April 2019, Khavkin was transferred to general population.  Khavkin Tr. at 235:4–238:16; VADOC-00000161.  Khavkin consistently has been classified as MH-0.  VADOC-00006868, VADOC-00006869.

Gerald McNabb

111.    Gerald McNabb is a 66-year-old male serving a single life sentence, plus additional time, for crimes including homicide, kidnapping, robbery, burglary, and unlawful wounding.[23]  *See* VADOC-00135777.

112.    McNabb has an extensive history of violence within VDOC institutions, both against fellow inmates and officers.  McNabb Tr. at 132:8–160:13 (describing history of violence within prisons, including stabbings of at least two officers and three inmates, plus multiple additional charges for fighting and possessing weapons).  McNabb was placed in the Step-Down Program following an incident in August 2012 in which he assaulted a female officer at Sussex I State Prison, stabbing her with a weapon.  McNabb Tr. at 160:1–21; 161:6–9.  By January 2016 he had completed the *Challenge Series* programming and the Step-Down Program and was back in general population at Red Onion. VADOC-00135762.  One month later, however, in February 2016, McNabb was reclassified as SL-S following an incident in which a knife was found inside his television.  *Id.*  In November 2020, McNabb requested to be transferred out of state, asserting that he would be "better adjusted if he was in another state" due to his history of poor performance within VDOC facilities.   VADOC-00164819.   In May 2021, McNabb was transferred to the Wyoming State Penitentiary.  McNabb Tr. at 28:1–3.

---

[23] All documents cited in this section regarding Gerald McNabb are attached as Exhibit 33.

113.    McNabb is classified as mental health code MH-0 and does not have a history of mental health diagnoses.  VADOC-00164819.

Peter Mukuria

114.    Peter Mukuria is a 36-year-old male serving a 44-year sentence for crimes that include murder, assault, grand larceny, and malicious wounding.[24]  *See* VADOC-00000687.  He is scheduled for release on February 21, 2051.[25]

115.    In November 2012, Mukuria stabbed a guard at Suffolk II State Prison who was attempting to break up an "incident" occurring between Mukuria and another inmate.  *See* VADOC-00010385.  The attack was described as so severe that the officer required immediate emergency surgery.  *Id.*  Following this incident, Mukuria was reclassified to Level S and placed in the Step-Down Program at ROSP on the IM pathway.[26]  *See* VADOC-00010320.  Mukuria moved to IM-1 in June 2014 (VADOC-00010329) and then to IM-2 in July 2015.  VADOC-00010337. In August 2016, Mukuria moved to the IM Closed Pod Phase I, and then in September 2017 to Phase II.  *See* VADOC-00010344, VADOC-00013051.  In May 2019, Mukuria was moved from the IM pathway to the SM pathway and placed in the SL-6 Phase 1 Pod.  VADOC-00010355. In August 2019, Mukuria's ICA review noted that he had received multiple disciplinary infractions, including attempting to incite a riot among other offenders.  VADOC-00010359.  He was subsequently downgraded to SM0 status.  *Id.*  In March 2022, Mukuria was transferred to a

---

[24] All documents cited in this section regarding Peter Mukuria are attached as Exhibit 40.

[25] https://vadoc.virginia.gov/general-public/offender-locator/

[26] In the spring of 2014, Mukuria was temporarily transferred back to Sussex II for court appearances related to the stabbing.  During this time he was incorrectly classified at Security Level 5.  The May 29, 2014 ICA hearing makes clear that this was an error and he was meant to remain classified at SL-6.  VADOC-000010328.

correctional facility in Maryland under the terms of the Interstate Corrections Compact.  VADOC-00146043.

116.    When he was first incarcerated in 2007, Mukuria received a mental health code of MH-1 for "minimal impairment."  See VADOC-00009855.  By January 2010, Mukuria's mental health code was reclassified to MH-0, where he has consistently remained since.  See VADOC-00010130; VADOC-00146183; VADOC-00009845.

Steven Riddick

117.    Steven Riddick is a 49-year-old male serving a 50-year sentence for crimes that include first-degree murder, unlawful wounding, and shooting from a vehicle.[27]  See VADOC-000011178.  He is currently scheduled for release on December 20, 2058.[28]

118.    In 2011, Riddick was housed in segregation at Wallens Ridge "by choice" because he did not want a cellmate or to interact with other inmates.  See Riddick Tr. at 65:21–66:6.  In August 2011, he was transferred from Wallens Ridge to Red Onion and, after a period of segregation, was placed in the SIP/SAM Pod.  Id. at 66:7–14; VADOC-00000731.  After being notified in August 2014, Riddick was reclassified in September to SL-S and SM0 due to poor behavior and adjustment to population.  VADOC-00011206.  Over the previous few months, Riddick had racked up a number of institutional charges, including refusing to participate in programming and threatening to kill an officer.  Id.

119.    In the years since, Riddick showed a consistent pattern of refusing to participate in the Step-Down Program, which has resulted in him repeatedly moving up and down the SM pathway.  See, e.g., Riddick Tr. at 259:14–260:10, 282:5–9; VADOC-00011234 (ICA Hearing

---

[27] All documents cited in this section regarding Steven Riddick are attached as Exhibit 59.

[28] https://vadoc.virginia.gov/general-public/offender-locator/

from September 2017 stating that Riddick "refuses to participate" in the Step Down Program, and "would not have a cell partner"); VADOC-00135931 (January 2020 ICA Hearing notes Riddick's "continued refusal to participate in the *Challenge Series* Program"); VADC-00135934 (August 2020 ICA hearing notes Riddick "has displayed pathetic behavior for this review period" and refuses to participate in the programs that have been offered to him"); *see also* VADOC-00136052; VADOC-00011105; VADOC-00175521; VADOC-00175543; VADOC-00175551; VADOC-00175552; VADOC-00175522; VADOC-00011205; VADOC_00011234; VADOC-00011233, VADOC-00011235; VADOC-00011236; VADOC-00011237; VADOC-00011238-1240; VADOC-00011242-1243; CP-20-cv-7_00002100; VADOC-00011246; CP-20-cv-7_00002080; VADOC-00011247; CP-20-cv-7_00002175; CP-20-cv-7_00002364; CP-20-cv-7_00004364; VADOC-00011249; VADOC-00135931-5933; VADOC-00135935-5936; CP-20-cv-7_00002118; CP-20-cv-7_00002150; CP-20-cv-7_00002622; VADOC-00135937.   Riddick has received over 40 institutional charges, mostly relating to refusing to obey orders or making threats. *See* VADOC-00135929.  Riddick exited the Step-Down Program in March 2023.  Riddick Tr. at 285:4–286:19; VADOC-00175548; VADOC-00175549.

120.    Riddick's mental health status was changed from MH-0 to MH-2 in July 2018 when he was diagnosed with major depressive order and recurrent mood disorder. *See* CP-20-cv-7_00003350.  As of February 2023, Riddick remains MH-2.  CP-20-cv-7_00002121.

Kevin Snodgrass

121.    Kevin Snodgrass is a 41-year-old male serving a 47-year sentence for crimes that include first-degree murder and possession of drugs and firearms.[29]  VADOC-00019976, -19990. He is scheduled to be released on May 10, 2055.[30]

122.    Snodgrass was transferred into the Step-Down program on the SM pathway as a result of a December 2013 incident in which he was charged with possessing a weapon while in general population.  VADOC-00012428.  Snodgrass was downgraded to SL-6 in October 2014 when he was moved to the Step-Down Pod Phase 1.  VADOC-00089724.  Snodgrass was placed back in Level S in November 2015.  *Id.*  Snodgrass worked his way to general population in September of that year.  ECF No. 174-26.

123.    Snodgrass's mental health status has consistently remained at MH-0 during his time in VDOC custody.  *See, e.g.*, VADOC-00012436.

William Thorpe

124.    William Thorpe is a 66-year-old male serving an 81-year sentence for crimes including robbery, malicious wounding, assault, kidnapping, and escape.[31]  VADOC-00014576, 00051096.  He is currently scheduled to be released on June 10, 2041.  Thorpe participated in the August 1984 riot at Mecklenburg Correctional Center, in which he and other inmates took control of a cell block and held multiple corrections officers hostage.  Thorpe Tr. at 27:4–13.

---

[29] All documents cited in this section regarding Kevin Snodgrass are attached as Exhibit 39.

[30] https://vadoc.virginia.gov/general-public/offender-locator/.

[31] All documents cited in this section regarding William Thorpe are attached as Exhibit 60.

125.     Thorpe's time in restrictive housing predates the Step-Down Program.  Thorpe was assigned to the IM Pathway when the Step-Down Program was initiated in 2012.  ECF No. 174-27 ¶ 8. In the fall of 2013, Thorpe was moved from SL-S to SL-6.  VADOC-00015212.   In September 2015, Thorpe publicly masturbated during an IM-Closed contact visitation.  VADOC-00014576.  As a result, Thorpe was moved back to IM-0.  *Id.*  From this point onward, Thorpe refused to participate in any Step Down programming and remained at IM-0.  *See, e.g.*, VADOC-00014617 (March 2016:  Thorpe "refuses programs and has poor status ratings."); VADOC-00014624 (May 2017: "Thorpe has not completed all the requirements of the Step Down Program."); VADOC-00014634 (May 2018: "Offender is to remain IM[-]0 until offender decides to program.").  In May 2019, Thorpe was transferred to a facility in Texas for being a security risk.  VADOC-00013801; VADOC-00113055.

126.     Thorpe's mental health status has consistently been MH-0.  *See, e.g.*, VADOC-00015460, 00015447, 00015446.

Gary Wall

127.     Gary Wall is a 47-year-old male serving an approximately 45-year sentence for crimes that include unlawful wounding, robbery, and injury to a corrections employee.[32]  VADOC-00020177-00020192, 00001717.  He is scheduled to be released on November 24, 2027.[33]

128.     When the Step-Down Program was implemented at Wallens Ridge in 2012, Wall was assigned to SL-S and placed in the Step-Down Program.  ECF No. 174-28 ¶ 3.  By September 2013, Wall had completed Step-Down Phase 1, but was downgraded to SM-0 for receiving a charge for "gathering around or approaching a person in a threatening manner."   VADOC-

---

[32] All documents cited in this section regarding Gary Wall are attached as Exhibit 46.

[33] https://vadoc.virginia.gov/general-public/offender-locator/.

00001678.  Wall reached Level 6 again in September 2014 and then returned to general population at Red Onion in May 2015.  *Id.*  In or about September 2015 Wall was placed back at SL-S at IM-0 due to assaultive behavior.  Wall worked his way back to IM-2 but was again returned to IM-0 in February 2018 for receiving disciplinary infractions.  *Id.*  ICA hearing forms indicate that Wall refused to program in April 2016, March 2018, and mid-2018.  VADOC-00001678; CP-20-cv-7_00003260; VADOC-00175655; VADOC-00175656   After two more years, Wall was reclassified to SM-2 in March 2019 and then to Level 6 in May 2019.  *Id.*  Wall was returned to the general population in June 2020.  Step-Down Phase II Graduates, excerpted from VADOC-00131924.

129.   Wall was consistently classified as MH-0 until 2014, but was reclassified to MH-2 in April of that year after showing signs of mental illness.  VADOC-00001598.  After a period of stability, his mental health code was reduced to MH-1 in June 2017, *see id.*, but he was returned to MH-2 in July 2017 and has remained there since.  VADOC-00148900.

**B.   Defendants**

130.   <u>Harold Clarke</u>.  Clarke is the Director of VDOC, responsible for supervising and managing VDOC and its system of correctional institutions.  In response to Plaintiffs' interrogatories, Clarke stated that "[n]either the activities that I have identified nor my experience as a correctional professional has led me to believe that placement in VDOC's Restrictive or Restorative housing poses an unreasonable risk of a deleterious effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning." Def. Harold Clarke's Objs. & Answers to Pls.' First Set of Interrogs. to Harold Clarke at 3, located in Exhibit 5.

131.   <u>Randall Mathena</u>. Mathena is VDOC's Director of Security and Correctional Enforcement.  Mathena served as the Warden of Red Onion between 2011 and 2015.  In his current

position, he visits Red Onion 3-4 times a year and participates in the bi-annual ERT meetings, as well as reviewing other security measures.  Mathena Tr. at 365:22–366:10. In response to Plaintiffs' interrogatories, Mathena stated that "[n]one of my training or experience led me to believe that placement in VDOC's Restrictive or Restorative housing posed an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning."  Def. Randall Mathena's Objs. & Answers to Pls.' First Set of Interrogs. to Randall Mathena at 3, located in Exhibit 14.

132.  H. Scott Richeson. Richeson is the VDOC Deputy Director of Reentry and Programs. Richeson Tr. at 34:22–35:6.  In her current position, she is responsible for ensuring that COMPAS (Correctional Offender Management Profiling for Alternative Sanctions) is being monitored and updated.  These assessments extend beyond the Step-Down Program. *Id.* at 48:14–21, 53:19–54:5.  Prior to holding her current position, she was the Director of Re-Entry.  Richeson Tr. at 75:6–76:2.  In 2011, the Correctional Education program was added to her division, and in 2018, Mental Health program services was added.  *Id.* at 77:14–18; 81:8–17. In response to Plaintiffs' interrogatories, Richeson stated that "[n]either the articles I have reviewed nor my work in VDOC, including my work with Dr. Malone, has [led] me to believe that placement in VDOC's Restrictive or Restorative Housing poses an unreasonable risk of harmful effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning." Def. H. Scott Richeson's Objs. & Answers to Pls.' First Set of Interrogs. to H. Scott Richeson at 3, located in Exhibit 13.

133.  David Robinson.  Robinson is the VDOC Chief of Corrections Operations. He assumed this role on August 16, 2011.  Robinson Tr. at 79:9–10.  Mathena is one of his direct reports.  *Id.* at 80:14–16.  He has been responsible for shepherding the process of moving from

restrictive housing to restorative housing.  *Id.* at 88:8–11. In response to Plaintiffs' interrogatories, Robinson stated that "[n]either my activities related to the assessment and development of a program to address long-term segregation nor my experience as a correctional professional has led me to believe that placement in VDOC's Restrictive or Restorative housing poses an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning."  Def. David Robinson's Objs. & Answers to Pls.' First Set of Interrogs. to David Robinson at 4, located in Exhibit 54.

134.  <u>Henry Ponton</u>.  Ponton is the Regional Operations Chief for the Central Region of VDOC.  He previously served as Regional Operations Chief for the Western Division, which includes Red Onion and Wallens Ridge, and as the Regional Operations Administrator.  Ponton testified that he believed the goal of the Step-Down Program was to ultimately reduce the number of inmates in long-term restrictive housing and get them back into a general population setting.  Ponton Tr. at 143:22–146:11.  In response to Plaintiffs' interrogatories, Ponton stated that "[n]one of those articles or that training led me to believe that placement in VDOC's Restrictive or Restorative Housing has posed an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning." Def. Henry Ponton's Objs. & Answers to Pls.' First Set of Interrogs. to Henry Ponton at 2–3, located in Exhibit 61.

135.  <u>Marcus Elam</u>.  Elam is the Regional Administrator for the Central Region of Virginia.  He previously served as Regional Administrator for the Western and Eastern Regions.  While serving as Regional Administrator for the Western Region, he was the direct supervisor of Jeffrey Kiser, Warden at Red Onion, and Carl Manis, Warden at Wallens Ridge.  Elam Tr. at 19:11–14 and 20:2–4.  He reported to Henry Ponton.  *Id.* at 19:8–10 and 36:8–12.  When he became

Regional Administrator, he had more responsibilities related to inmate care, grievances, medical and mental health issues, education and other areas related to inmate care. *Id.* at 32:1–16. As part of his role he would talk to inmates when he visited the facilities on a monthly basis. *Id.* at 34:8– 35:17. In response to Plaintiffs' interrogatories, Elam stated that "[n]one of the articles I have read or my training leads me to believe that placement in VDOC's Restrictive or Restorative housing has posed an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning." Def. Marcus Elam's Objs. & Answers to Pls.' First Set of Interrogs. to Marcus Elam at 3, located in Exhibit 62.

136.   <u>Denise Malone</u>. Dr. Malone is the Chief of Mental Health Services for VDOC. Malone Tr. at 9:6–10. She has held this role since 2012. *Id.* at 73:19–20. Prior to this, she was the mental health clinical supervisor for the Eastern Region for two years. *Id.* at 71:8–12. She reports to Scott Richeson. *Id.* at 49:7–10. She also works directly with Clarke. She sits on his executive team, which meets every Monday. *Id.* at 49:14–20. She is the co-facilitator on the External Review Team with Mathena. *Id.* at 50:6–9. She testified that she works with Robinson facilitating a multi-disciplinary approach to mental health. *Id.* at 51:7–14. She has also worked with Ponton on issues where security and mental health overlap. *Id.* at 52:6–18. Dr. Malone works with Tori Raiford, who was designated to set up and manage SDTP, SAM, and restorative housing units. *Id.* at 54:17–21. In her roles as unit head for mental health and wellness, she provides an overview of the procedures, practices and standards for mental health services. *Id.* at 62:2–6. She testified that she meets with the inmates during her site visits, and she is part of the External Review Team that does interviews. *Id.* at 88:9–13. In response to Plaintiffs' interrogatories, Dr. Malone stated that "[n]one of the activities I have identified has led me to believe that placement in VDOC's Restrictive or Restorative housing has posed an unreasonable

risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning." Def. Denise Malone's Objs. & Answers to Pls.' First Set of Interrogs. to Denise Malone at 5, located in Exhibit 52.

137.   Steve Herrick. Dr. Herrick is VDOC's Health Services Director. He started his position at VDOC in 2016. Herrick Tr. at 78:5–7. When he started at VDOC, Mental Health Services reported to him. *Id*. at 79:4–7. Mental Health Services transferred out in 2018. *Id*. at 91:406. He meets with Dr. Malone when there is a medical need associated with any offender move based on mental health. *Id*. at 32:18–33:6; 104:8–15. His staff makes determinations about accommodations for prisoners with physical disabilities. *Id*. at 55:19–22. Until 2018 or 2019, he signed off on medical grievance responses in an administrative, not clinical, role, *i.e.*, to verify that VDOC's procedure had been followed. *Id*. at 107:16–112:9. In response to Plaintiffs' interrogatories, Dr. Herrick stated that "[n]one of the activities I have identified has led me to believe that placement in VDOC's Restrictive or Restorative housing has posed an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning." Def. Steve Herrick's Objs. & Answers to Pls.' First Set of Interrogs. to Steve Herrick at 3, located in Exhibit 63.

138.   Tori Raiford. Raiford is the Central Classification Supervisor for VDOC. Raiford Tr. at 32:14–19. She previously served as a Unit Manager at Red Onion, as Statewide Restrictive Housing Coordinator, and as the Chief of Restrictive Housing and Serious Mental Illness. She served as Chief of Restrictive Housing and Serious Mental Illness from November 2017 to February 2020, and moved into her current role in May 2022 after a time as Superintendent of Caroline Correctional Unit 2. *Id.* at 31:18–32:16. As Unit Manager, she would have contact with inmates when she made rounds. *Id.* at 24:16–25:3. During her time at Red Onion, Raiford served

51

on committees that revised the Step Down Program.  *Id.* at 35:16–21.  Her duties included reviewing the existing manual and making recommendations for revisions and changes.  *Id.* at 36:19–37:4.  Before 2020, she was involved in the biannual External Review Team.  Her role varied as she progressed from each position.  Early in her career, her role was primarily information gathering.  Later she attended the ERT interviews.  *Id.* at 60:3–21.  In response to Plaintiffs' interrogatories, Raiford stated that "[d]uring my time working with Restrictive Housing I do not recall reviewing any information or participating in any training  that led me to believe that placement in VDOC's Restrictive or Restorative housing posed an unreasonable risk of a negative effect or impact on the physical or mental health of the inmate, particularly as it relates to their long-term functioning."  Def. Tori Raiford's Objs. & Answers to Pls.' First Set of Interrogs. to Tori Raiford at 4, located in Exhibit 64.

139.   <u>Jeffrey Kiser</u>.  Kiser was warden at Red Onion, holding this position from 2017 to 2021.  Kiser Tr. at 45:12–19.  He started as a Corrections Sergeant in 1997 and worked his way up, spending some of the time at other facilities.  *Id.* at 38:1-45:15.  He became Assistant Warden at Red Onion in 2011.  *Id.* at 44:3–5.  He retired in February 2021, spending his last day at Red Onion on December 19, 2020.  *Id.* at 45:17–19.  He had some level of interaction with most of the named plaintiffs while making rounds at Red Onion.  *Id.* at 18:14–27:11; 49:2–9.  In response to Plaintiffs' interrogatories, Kiser stated that "[n]one of those things or my experience as warden of ROSP led me to believe that placement in VDOC's Restrictive or Restorative housing posed an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning."  Def. Jeffrey Kiser's Objs. & Answers to Pls.' First Set of Interrogs. to Jeffrey Kiser at 3, located in Exhibit 65.

140.   <u>Carl Manis</u>.   Carl Manis is VDOC's Regional Administrator for Probation and Parole in the Central Region.   He started at that position in January 2023.   Manis Tr. at 27:3–4. He previously served as Warden of Wallens Ridge from 2017 to 2019, and as Regional Administrator for Facilities in the Western Region 2020 to 2022.   *Id.* at 17:9–10; 26:21–27:2.   His involvement with the Step Down Program was limited to interacting with inmates while making rounds.   He had no responsibility for inmate movement.   *Id.* at 103:5–14. In response to Plaintiffs' interrogatories, Manis stated that "[n]one of those articles or that training has led me to believe that placement in VDOC's Restrictive or Restorative housing has posed an unreasonable risk of a negative effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning."   Def. Carl Manis's Objs. & Answers to Pls.' First Set of Interrogs. to Carl Manis at 3, located in Exhibit 66.

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   It is not a "disfavored procedural shortcut," but instead "an integral part of the Federal Rules . . . , which are designed to secure the just, speedy, and inexpensive determination of every action."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation omitted).   Summary judgment is "an important mechanism for disposing of 'claims and defenses [that] have no factual basis.'"   *Latson v. Clarke*, 346 F. Supp. 3d 831, 857 (W.D. Va. 2018) (Jones, J.) (quoting *Celotex Corp.*, 477 U.S. at 327), *aff'd*, 794 F. App'x 266 (4th Cir. 2019).   Indeed, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."   *Id.* (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (cleaned up)).

If a party moving for summary judgment demonstrates the absence of a genuine issue of material fact, *Celotex Corp.*, 477 U.S. at 323, "[t]he burden then shifts to the nonmoving party to

come forward and establish a specific material fact in dispute," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "While . . . all reasonable inferences [must be drawn] in the light most favorable to the nonmoving party, it is ultimately the nonmovant's burden to persuade [the court] that there is indeed a dispute of material fact." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014). "Factual disputes that are irrelevant or unnecessary will not be counted." *Trigiani v. New Peoples Bank, Inc.*, 599 F. Supp. 3d 372, 379 (W.D. Va. 2022) (Jones, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

"To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Latson*, 346 F. Supp. 3d at 857 (quoting *Anderson*, 477 U.S. at 248). "[N]either unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment." *Acken v. Kroger Co.*, 58 F. Supp. 3d 620, 629 (W.D. Va. 2014) (Jones, J.) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (cleaned up)). "The mere existence of a scintilla of evidence in support of [Plaintiffs'] position will be insufficient; there must be evidence on which the jury could reasonably find for [Plaintiffs]." *Anderson*, 477 U.S. at 252.

## ARGUMENT

Summary judgment is warranted on each of Plaintiffs' challenges to the Step-Down Program—on the basis of due process, the Eighth Amendment, the ADA, and the RA. While these challenges fail for the claim-specific reasons set forth below, the background for evaluating them is the Supreme Court's instruction that courts owe "substantial deference to the professional judgment of prison administrators." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). When "[a]ccommodating [an inmate's] demands . . . would impair the ability of corrections officers to protect all who are inside a prison's walls. . . . [courts] are 'particularly deferential' to prison

administrators' regulatory judgments." *Id.* at 135 (quoting *Turner v. Safley*, 482 U.S. 78, 90 (1987)); *cf.* 18 U.S.C. § 3626(a)(1)(A) (in weighing prospective relief regarding prison conditions, requiring that courts "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief").

The Supreme Court has repeatedly "emphasized . . . that '[t]he difficulties of operating a detention center must not be underestimated by the courts,' and that 'correctional officials  . . . must have substantial discretion to devise reasonable solutions to the problems they face.'" *Prieto v. Clarke*, 780 F.3d 245, 255 (4th Cir. 2015) (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012)).  It is prison officials' "significant responsibility"—not the courts'—"for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them," *Overton*, 539 U.S. at 132, and "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise," *McKune v. Lile*, 536 U.S. 24, 39 (2002).  Indeed, "[f]ederal judicial micromanagement of state prison administration risks unforeseen and counterproductive consequences, and courts therefore afford prison administrators latitude in dealing with this volatile environment and the risks it poses to the health and safety both of prison staff and of the inmates themselves." *Braun v. Maynard*, 652 F.3d 557, 563 (4th Cir. 2011) (citations omitted).

## I.     Defendants are entitled to summary judgment on Plaintiffs' due-process claim (Count II).

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV. Plaintiffs' Complaint alleges that Defendants violated their due-process rights by using arbitrary criteria to evaluate the progression of Plaintiffs in the Step-Down Program to general population, and denying them meaningful and periodic administrative review of their progression, all without

any valid penological purpose. *Thorpe*, 2021 WL 2435868, at *4. To prevail on their due-process claim, Plaintiffs "must [first] identify a protected liberty . . . interest." *Prieto*, 780 F.3d at 248. Establishing such an interest requires that Plaintiffs "point to a Virginia law or policy providing [them] with an expectation of avoiding the conditions of [their] confinement and demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life." *Id.* at 252. Then, assuming the existence of a protected liberty interest, Plaintiffs must "demonstrate deprivation of that interest without due process of law." *Id.* at 248.

Defendants are entitled to summary judgment on this claim for at least three reasons.

*First*, the Court should grant summary judgment to the extent that Plaintiffs pursue their due-process claim on a *facial* basis. The record evidence undermines any argument Plaintiffs may be making that the process afforded in the Step-Down Program is unconstitutional in *all* circumstances, and that the process afforded to inmates going through the Program can *never* be constitutionally adequate. The Step-Down Program's undeniable success in transitioning inmates from Level S back to general population refutes Plaintiffs' assertion that, in all circumstances, the Program's procedures trap inmates permanently. Compl. ¶¶ 16, 179, 192.

*Second*, Plaintiffs' due-process claim also fails on an *as-applied* basis. The evidence of the named Plaintiffs' experiences in the Step-Down Program—none of whom remains in it now— disproves that they were trapped within it because of due-process deprivations. Indeed, the record establishes that the individual named Plaintiffs received adequate notice, a hearing, and consideration, and that the pace of their progress through the Step-Down Program was a consequence of their own choices.

*Third*, Defendants also are protected by qualified immunity from liability on Plaintiffs' due-process claim. Although immunity was denied at the motion-to-dismiss stage, the summary

judgment record now establishes that Defendants did not violate any clearly established constitutional right.

### A.    Any facial challenge based on due process fails.

"A facial challenge asserts that a statute is unconstitutional in all situations, whereas an as-applied challenge attacks the statute's application only as to the party before the court.  *United States v. Sherman*, 797 F. Supp. 2d 709, 710–11 (W.D. Va. 2011) (Jones, J.).  In litigating this constitutional challenge to the Step-Down Program as a class action, Plaintiffs have not always made clear whether their challenge is facial in nature.  This Court previously recognized that "[P]laintiffs have not claimed to be mounting a facial challenge."  *Thorpe*, 2021 WL 2435868, at *4.  *But see id.* (noting at the motion-to-dismiss phase that Plaintiffs' "allegations would be appropriate for a facial challenge because they allow for the reasonable inference that" their allegations touch "every inmate in the Step-Down Program"); *Thorpe*, 37 F.4th at 947 (noting that Plaintiffs' request to "abolish the Step-Down program" is facial relief).  Consistent with its "affirmative obligation . . . to prevent factually unsupported claims . . . from proceeding to trial," *Latson*, 346 F. Supp. 3d at 857, the Court should grant summary judgment on any facial due-process claim that Plaintiffs purport to assert.

Facial claims, the Supreme Court has "repeatedly stated," are "disfavored."  *United States v. Hamilton*, 699 F.3d 356, 366 (4th Cir. 2012).  "Facial invalidation is . . . contrary to principles of judicial restraint, under which 'courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'"  *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012) (cleaned up; citation omitted); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) (cautioning that courts weighing facial invalidity "must be careful not to go beyond . . . facial requirements and speculate about 'hypothetical' or

'imaginary' cases").  Moreover, a facial challenge is "the most difficult" challenge "to mount successfully." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2449 (2015) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  That is not surprising, given that the general rule for evaluating facial challenges is that the challenger of the policy "must establish that *no set of circumstances exists* under which the [policy] would be valid." *Salerno*, 481 U.S. at 745 (emphasis added).

Here, Plaintiffs cannot demonstrate that there is "no set of circumstances" in which the Step-Down Program's procedures could be constitutionally applied.  As set forth below, the policies that Plaintiffs assail are valid on their face.  Nor does the evidence support the contention that the Step-Down Program is arbitrarily applied in all cases and that the opportunities for advancement through the Step-Down Program are hollow for all inmates. *See, e.g.*, Compl. ¶ 233. The evidence disproves that.  In fact, the vast majority of all inmates who have ever been in the Step-Down Program have proceeded through it and returned to general population.  SUMF ¶ 4.

The experience of Plaintiffs' proposed class representative Peter Mukuria provides one example (of many) why a claim of facial invalidity must fail.  Years ago Mukuria brought suit under 42 U.S.C. § 1983 against numerous VDOC officials alleging that "application of OP 830.A as to him has unfairly prolonged his confinement under segregation conditions in violation of" due process and other constitutional rights. *Mukuria v. Clarke*, No. 7:15CV00172, 2016 WL 5396712 (W.D. Va. Sept. 27, 2016) (Jones, J.), *aff'd*, 706 F. App'x 139 (4th Cir. 2017).  He challenged "his classification . . . under OP 830.A and the subsequent classification adjustment decisions within [the IM] pathway.  He apparently believe[d] that these procedures stand in his way of being released from segregation to general population conditions." *Id.* at *6 (noting Mukuria's complaint that he remained "in IM-2 status despite his participation in the *Challenge Series* and another

education program and despite his remaining free from disciplinary infractions for months"). The Court rejected Mukuria's due-process claim, noting that his "classification history . . . belies the contention that assignment to IM status is a permanent or indefinite assignment to the harshest segregation conditions." *Id.* at *8. Likewise, the experiences of the other named Plaintiffs—none of whom remains in the Step-Down Program—also rebut any contention that the Step-Down Program's procedures are permanent. *See* Part I.B *infra*.

In short, the Court should grant Defendants summary judgment on any facial claim that Plaintiffs are asserting. The evidence adduced in discovery shows that Plaintiffs cannot prove either that the conditions of confinement in the Step-Down Program in all circumstances impose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," or that in all circumstances the Step-Down Program's procedures "fail[] to provide 'minimally adequate process to protect [a] liberty interest' in avoiding security-detention." *Thorpe*, 2021 WL 2435868, at *4.

        1.      **The conditions of confinement under the Step-Down Program do not, in all circumstances, impose an atypical and significant hardship in relation to the ordinary incidents of prison life.**

As on their motion to dismiss, Defendants assume without conceding that VDOC policy provides Plaintiffs with an expectation of avoiding the conditions of confinement that accompany the Step-Down Program. *See Thorpe*, 37 F.4th at 942 (citing *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015)). But any facial claim by Plaintiffs falters with the requirement to demonstrate that those conditions are "harsh and atypical in relation to the ordinary incidents of prison life." *Prieto*, 780 F.3d at 252.

At the motion-to-dismiss stage, the Court found that the Complaint "plausibly alleged harsh and atypical" conditions because the "magnitude of the restrictions on the plaintiffs are 'severe in comparison' to the conditions of general population." *Thorpe*, 2021 WL 2435868, at *4 (quoting

*Smith v. Collins*, 964 F.3d 266, 269 (4th Cir. 2020)).  Even assuming that the correct comparative baseline is general population,[34] Plaintiffs' claim fails because the evidence adduced in discovery does not validate the Complaint's allegations regarding the severity of the conditions of their confinement.  The evidence supersedes the previous analysis of the Fourth Circuit—which, like this Court, was required to accept Plaintiffs' allegations as true—finding the conditions alleged in the Complaint to be "sufficiently harsh and atypical" to trigger a protected liberty interest, based on a comparison of those conditions with those in *Wilkinson*.  For instance, the Fourth Circuit noted the following alleged conditions that it construed to be the same "as in *Wilkinson*":

1) "Plaintiffs 'must remain in their cells' for about '23 hours per day.'" *Thorpe*, 37 F.4th at 942 (quoting *Wilkinson*, 545 U.S. at 214).

   But that's not true here, as the evidence now shows.  Every day of the week, every inmate in the Step-Down Program is entitled to at least *four times* the out-of-cell time as in *Wilkinson*:  each inmate is "provided the opportunity to participate in a minimum of four hours out of cell activity consisting of showers, outdoor exercise, visitation, interactive journaling, programming, and other group elective options."  SUMF ¶ 77.[35]

---

[34] The Fourth Circuit has so held, *see Incumaa*, 791 F.3d at 527, but not the Supreme Court, *see Prieto*, 780 F.3d at 252 (noting the "Supreme Court has yet to identify the baseline for determining whether a state regulation imposes . . . an atypical and significant hardship").  In *Wilkinson*, the Supreme Court recognized that "the Courts of Appeals have not reached consistent conclusions for identifying the baseline," but it did not "resolve the issue."  *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005).  Most Courts of Appeals find the appropriate comparative baseline to be administrative segregation or something more restrictive than general population; these "divergences in the baseline often lead to divergences in outcome."  *Aref v. Lynch*, 833 F.3d 242, 253–56 (D.C. Cir. 2016) (collecting cases).  Defendants expressly reserve the argument that, contrary to current Fourth Circuit precedent, the conditions in general population should not be the comparative baseline, particularly as to inmates—such as Plaintiffs—who challenge the sufficiency of process provided after assignment to segregation, rather than in connection with the initial segregation assignment itself.

[35] Beginning in 2017, all inmates were entitled to *two* out-of-cell hours per day, SUMF ¶ 60; beginning in 2018, some inmates were permitted *up to four* out-of-cell hours per day, depending on their Step-Down Program level SUMF ¶ 76; and, beginning in 2020, all inmates became entitled to *at least four* out-of-cell hours per day.  SUMF ¶ 77.

2) Plaintiffs' cell conditions "'prevent conversation or communication with other inmates.'"  *Id.* (quoting *Wilkinson*, 545 U.S. at 214).

But here, the evidence is that Plaintiffs *can* and *do* communicate with other inmates while in their cells.   SUMF ¶ 50.   That is on top of other opportunities for conversation while recreating or in congregate activity.  *Id.*

3) Plaintiffs "have 'rare' visitations."  *Id.* (quoting *Wilkinson*, 545 U.S. at 214).

Here, by contrast, Plaintiffs have the opportunity for at least one one-hour in-person visit per week, as well as video visits.  SUMF ¶ 56.

The Fourth Circuit also took as true Plaintiffs' allegation that they "cannot partake in 'productive activities,' like art or education or voluntary work . . . ."  *Thorpe*, 37 F.4th at 942; *see also id.* at 931–32 ("VDOC . . . denies Plaintiffs *all* productive activities, save for the *Challenge Series* workbooks that are supposed to aid prisoners' progress through Step Down.").   The evidence adduced in discovery does not support that, either.   All inmates in the Step-Down Program "are provided"—among other "basic requirements that meet constitutional standards"—"in-cell education and religious programs."  SUMF ¶ 47.  And inmates at certain levels have been eligible for jobs since the Step-Down Program began.  SUMF ¶ 58.

In any event, the conditions experienced by inmates in the Step-Down Program are not so different from those experienced in general population at Red Onion and Wallens Ridge.  Inmates in the Step-Down Program all receive the same "basic requirements" as those in general population.  SUMF ¶ 47.  Plaintiffs complain about the size and features of their cells, *see* Compl. ¶¶ 96–97, but VDOC houses inmates in general population in cells of the same size and configuration—the chief difference being that, in general population, two cellmates share the same-sized space, SUMF ¶ 48.  Plaintiffs also complain that lights remain on in their cells at all times.   Compl. ¶ 100; *see also Thorpe*, 37 F.4th at 942 (referencing that, like the inmates in *Wilkinson*, Plaintiffs "must live—and sleep—with the light on 'at all times'" (quoting *Wilkinson*,

61

545 U.S. at 214)), but the lighting in general population cells also remains on at all times, so that corrections officers can conduct checks on inmates, SUMF ¶ 49.

Finally, even if Plaintiffs could establish that the alleged hardship of the Step-Down Program's conditions are, in some circumstances, atypical in relation to the comparative baseline, that is not sufficient to prevail on a facial claim. Given the variability of privileges afforded to inmates with the levels within the Step-Down Program, at least some inmates experience conditions that are not atypical and harsh.

### 2. The procedures of the Step-Down Program afford inmates minimally adequate process to protect their liberty interest.

Even if Plaintiffs had a protected liberty interest in avoiding continued placement in the Step-Down Program, Plaintiffs are provided more than "minimally adequate process" to protect that interest. *Thorpe*, 2021 WL 2435868, at *4.

Because the requirements of due process are "'flexible and cal[l] for such procedural protections as the particular situation demands,'" the Supreme Court has "declined to establish rigid rules." *Wilkinson*, 545 U.S. at 224 (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). It "instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures. The framework, established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires consideration of three distinct factors," *id.* (internal citation omitted):

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* at 224–25 (internal citation omitted) (quoting *Mathews*, 424 U.S. at 335). Applying those three factors here compels the conclusion that, like the inmates in *Wilkinson*, inmates in the Step-Down

Program receive sufficient process.  And the relevant evidence certainly forecloses the conclusion that the Step-Down Program denies due process in *all* circumstances.

First, the "private interest that will be affected" here is the length of time they spend in the Step-Down Program.  But their time in the Step-Down Program is a function of their own willingness to participate in programming and comply with stated behavioral expectations.  In any event, as the Supreme Court counseled, it must be remembered that "[p]risoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all."  *Wilkinson*, 545 U.S. at 225.

As to the second *Mathews* factor, the risk is low of an "erroneous deprivation" of inmates' interest in avoiding prolonged placement in the Step-Down Program.  Low too is "the probable value, if any, of additional or substitute procedural safeguards."  *Wilkinson*, 545 U.S. at 225.  Under the "procedures used" currently in the Step-Down Program, inmates are assessed regularly by multidisciplinary teams of staff, with these reviews affecting the pace of their progression through the Step-Down Program and eventually back to general population.  This is an "integral part of the Step-Down Program model."  SUMF ¶ 33.  By policy, inmates receive regular reviews—both internal and external, formal and informal—from the following groups:

1) formal ICA hearings every 90 days, which require advance notice, an opportunity to be heard, and an opportunity to appeal the decision through the inmate grievance procedure, SUMF ¶¶ 34–35;

2) bi-annual informal reviews by the External Review Team,  SUMF ¶ 43;

3) informal reviews, as deemed necessary, by the Dual Treatment Team, SUMF ¶ 40; and

4) informal reviews by the Building Management Committee at least monthly, SUMF ¶ 39.

These regular reviews, which minimize the risk that inmates spend any more time than is necessary

(much less, languish indefinitely) in the Step-Down Program, largely mirror the procedural protections that the Supreme Court has previously upheld. *See Wilkinson*, 545 U.S. at 225–29. And they more than satisfy the Supreme Court's requirement that prison officials minimally engage in "some sort of periodic review" of the confinement of such inmates. *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983).

The kinds of characteristics identified in *Wilkinson* as risking erroneous deprivation include the following, none of which is a feature of the Step-Down Program:

- A single-layered review process. *Wilkinson*, 545 U.S. at 209. Here, by contrast, there are multiple layers of review, with evaluations conducted by the ICA, ERT, DTT and BMC, and multiple opportunities for progression within the Step-Down Program (or removal from it).

- Regulations that do not require the authority to provide a factual basis for its decision, including providing only a perfunctory explanation. *Wilkinson*, 545 U.S. at 209–10. Here, by contrast, the ICA must inform the inmate of the recommendation and the reason for the recommendation. SUMF ¶ 34.

- Regulations that do not give the inmate the right to contest the factual basis for his detention or for not being released from the detention before the decision is made. *Wilkinson*, 545 U.S. at 209–10. Here, by contrast, inmates may appeal all classification decisions through the Offender Grievance Procedure. SUMF ¶ 34.

Notably, Plaintiffs do not contend that the Step-Down Program is deficient in these respects. *See Thorpe*, 37 F.4th at 944 (Plaintiffs "do not challenge Step Down as failing to live up to *Wilkinson*'s multitiered standard. Nor do they request any discrete procedures like advance notice, an opportunity to offer witnesses, or a possibility of appeal.").

Instead, Plaintiffs assert that the reviews and procedures built into the Step-Down Program, "however impressive they sound on paper, do nothing for Plaintiffs in practice." *Id.*; *see also* Compl. ¶ 16 (pronouncing the Step-Down Program a "system of vague standards, contradictory goals, and malleable jargon used to conceal what is nothing more than an indefinite or permanent solitary confinement regime"); Compl. ¶ 178 (criticizing the use of allegedly "non-substantive

'rationales' for a prisoner's long-term solitary confinement").  To the extent Plaintiffs are suggesting that each successive review must be influenced by new information, that is not true.  In *Hewitt*, the Supreme Court noted that the required "periodic review" does "not necessarily require that prison officials permit the submission of any additional evidence or statements"; rather, the Court anticipated that review decisions "will be based on facts . . . which will have been ascertained when determining to confine the inmate to administrative segregation" as well as "the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner."  459 U.S. at 477 n.9.  Plaintiffs' criticisms that inmates are denied "meaningful" review of their placement in the Step-Down Program, Compl. ¶ 233, and that Defendants use "non-substantive 'rationales' for a prisoner's long-term solitary confinement," *id.* ¶ 178, are really challenges to the outcome of the reviews, such as prison officials' determination that a certain inmate "needs a longer period of stable adjustment," *id.*  But due process "does not require certain results—it requires only fair and adequate procedural protections."  *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002).

In any event, the evidence adduced in discovery puts the lie to Plaintiffs' core accusation: that they have been deprived of due process because the Step-Down Program "is nothing more than . . . [a] permanent solitary confinement regime."  Compl. ¶ 16.  It is now clear, and cannot be disputed, that the vast majority of inmates that were ever in the Step-Down Program—*hundreds* of them—have returned to general population after proceeding through the allegedly deficient review process.  SUMF ¶ 4.  Every named Plaintiff still in a VDOC facility has returned to general population, SUMF ¶¶ 97, 101, 104, 107, 110, 119, 122, 128, having "fulfilled all requirements of the Step-Down Program," Compl. ¶ 177.  In sum, no "additional or substitute procedural safeguards" are necessary to make the process work—it is working already.  *See Wilkinson*, 545

65

U.S. at 225, 229 (if a policy "provides informal, nonadversary procedures comparable to those [previously] upheld, . . . no further procedural modifications are necessary in order to satisfy due process under the *Mathews* test").

The third *Mathews* factor—"the Government's interest, including . . . the fiscal and administrative burdens" entailed by additional procedures, *Wilkinson*, 545 U.S. at 225—also weighs against Plaintiffs. Recognizing that the "problem of scarce resources is another component of the State's interest," the Supreme Court has instructed that "courts must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior." *Id.* at 228. But a more fundamental interest also is at stake here: Defendants' obligation to maintain internal security, which "[i]n the context of prison management . . . is a dominant consideration." *Id.* at 227; *see also Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."). To the extent that the additional "process" Plaintiffs insist on in periodic reviews is really just a different outcome—*i.e.*, one other than "Remain Segregation"—that would seriously imperil "the Government's interest" in allowing into general population only those inmates who do not "need[] a longer period of stable adjustment." Compl. ¶ 178; *see also Hewitt*, 459 U.S. at 477 n.9 (in holding that "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates," emphasizing that the "decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner"). Any process must reflect that the "State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227.

In sum, weighing the *Mathews* factors in the context of Plaintiffs' facial claim, it is evident that the Step-Down Program's procedures do not deprive inmates of the minimally adequate process to which they are due—and certainly not in *all* circumstances.  Plaintiffs have not met and cannot meet their "very heavy burden" of showing that the Step-Down Program is facially unconstitutional and, therefore, Defendants are entitled to summary judgment on this claim.  *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002) (a plaintiff mounting a facial challenge "has a very heavy burden to carry, and must show that [the challenged scheme] cannot operate constitutionally under any circumstance").

**B.    Summary judgment is warranted on Plaintiffs' as-applied due-process claim.**

Plaintiffs' as-applied claim that, through the Step-Down Program, Defendants have violated their due-process rights fares no better than their facial claim.  The record demonstrates that proposed class representative Peter Mukuria, as well as every other named Plaintiff, has had the opportunity to participate and proceed through the Step-Down Program.  Indeed, *none* of the 11 named Plaintiffs remains in the Step-Down Program.  SUMF ¶¶ 97, 101, 104, 107, 110, 112, 115, 119, 122, 125, 128.  Even if the named Plaintiffs could demonstrate a protected liberty interest, the record establishes that each has been provided with more than the "minimally adequate process" to which he is due under the Constitution.  *Thorpe*, 2021 WL 2435868, at *4.

**1.    The conditions of confinement in the Step-Down Program do not impose on the named Plaintiffs an atypical and significant hardship in relation to the ordinary incidents of prison life.**

The foregoing analysis of Plaintiffs' facial claim shows, as a general matter, that the conditions of confinement in the Step-Down Program are not dissimilar from those in general population—certainly not so different as to constitute an atypical and significant hardship, compared to that baseline.  *See* Part I.A.1 *supra*.  This conclusion applies at the level of the individual named Plaintiffs too.

67

The record shows that the named Plaintiffs, consistent with what VDOC policy provides, did not experience the deprivations found significant in *Wilkinson*.  For instance, they all received a daily opportunity for hours of out-of-cell activity—at least four hours every day since 2019.  SUMF ¶ 77.  They all could communicate with other inmates even in their cell.  SUMF ¶ 50.  They had the opportunity for visitations, SUMF ¶ 56, and could "partake in 'productive activities,' like art or education or voluntary work."  SUMF ¶ 58.  Because the conditions they experienced in the Step-Down Program are not so different from general population, *see* Part I.A.1 *supra*, they did not experience an atypical and significant hardship sufficient to create a protected liberty interest.

### 2.     The procedures of the Step-Down Program afford the named Plaintiffs minimally adequate process to protect any liberty interest.

Even if the named Plaintiffs had a protected liberty interest, application of the *Mathews* factors compels the conclusion that the procedures of the Step-Down Program adequately protected that interest.  As shown above, there is no dispute that, under the policies governing the Step-Down Program, inmates are assessed regularly by various multidisciplinary teams.  *See* Part I.A.2 *supra*.  The record does not show that any named Plaintiff was deprived of these regular reviews.[36]  And there is no dispute that, pursuant to these regular reviews, hundreds of inmates have transitioned out of segregated confinement and returned to general population—including each of the named Plaintiffs still in VDOC custody.  The multi-tiered review process established by the Step-Down Program is more than sufficient to safeguard any protected liberty interest Plaintiffs might possess, satisfying the requirements of due process.

As noted above, however, Plaintiffs do not purport to challenge any of the "discrete procedures" they are afforded in the Step-Down Program.  *See Thorpe*, 37 F.4th at 944.  Rather,

---

[36] Although participation in the review process is not required, a number of the named Plaintiffs have availed themselves of the opportunity to participate.  SUMF ¶ 45.

they assert that the reviews and procedures embedded in the Step-Down Program, "however impressive they sound on paper, do nothing for [them] in practice," *id.* at 944—and, therefore, are not "meaningful," Compl. ¶ 16.  But Plaintiffs' allegations and the review processes embedded in the Step-Down Program cannot be so easily divorced.  Defendants are policy-makers, and they are being sued for their alleged roles in creating and maintaining the Step-Down Program as a whole. In this specific case, Plaintiffs do not identify any specific segregation review, conducted by any specific Defendant, that was not "meaningful."  Thus, any assessment of the "meaningfulness" of the overall review process necessarily links back to the procedures embodied in the Step-Down Program itself, as that is the only factual tie through which Plaintiffs seek to hold these named Defendants liable.  By essentially conceding that, "on paper," the Step-Down Program provides for adequate reviews, Plaintiffs have conceded, too, that there is no factual basis for liability as to these Defendants.

Moreover, it is undisputed that, after establishing a record of positive choices and rule-compliant behavior, *every* named Plaintiff still in a VDOC facility has been released from the Step-Down Program and back to general population.  SUMF ¶¶ 97, 101, 104, 107, 110, 119, 122, 128. It is difficult to comprehend how a review scheme cannot be "meaningful" when it has yielded the very result Plaintiffs seek.

Additionally, the named Plaintiffs' individual histories show that, contrary to their allegations of arbitrary treatment, the length of time they spent in the Step-Down Program was directly associated with their own behavioral choices.  *Mukuria*, 2016 WL 5396712, at *8 (noting that, "under OP 830.A, an inmate's confinement in segregation at Red Onion is, for Mukuria and a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior").  These choices included committing further disciplinary infractions or simply refusing

69

to take the steps to advance.  For instance, Brooks ensured himself more time in the Step-Down Program when he was found attempting to make a weapon in his cell.  SUMF ¶ 97.  Mukuria did the same when he attempted to incite a riot among other inmates.  SUMF ¶ 115.  Riddick intentionally looked for ways to stay in segregated housing so that he "would not have a cell partner" and simply refused to participate in programming.  SUMF ¶ 119.  Thorpe followed both those paths; in September 2015, he was demoted for publicly masturbating during an IM-Closed contact visitation, and he thereafter refused to participate in programming.  SUMF ¶ 125.

As is true more broadly, the procedures of the Step-Down Program have meaningfully worked for the individual named Plaintiffs.  Except for those now incarcerated in other states (McNabb, Thorpe and Mukuria), they all earned release from the Step-Down Program.  While some of them may have wished for an earlier release, due process "does not require certain results—it requires only fair and adequate procedural protections."  *Tri Cnty. Paving, Inc.*, 281 F.3d at 436.  The record shows that the named Plaintiffs received those protections.

### C.     Defendants are entitled to qualified immunity on Plaintiffs' due-process claim.

With the benefit of the evidence developed in discovery, and considering the undisputed factual record now before the Court, the individual Defendants renew their position that they are entitled to qualified immunity on Plaintiffs' due-process claim. Because qualified immunity is immunity "from suit rather than merely [immunity from] liability," the question of qualified immunity should be decided before trial.  *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013).

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The doctrine "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also*

*Cannon v. Vill. of Bald Head Island, N.C.*, 891 F.3d 489, 497 (4th Cir. 2018) ("To overcome qualified immunity," Plaintiffs "must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'").  For a right to be clearly established, it must be "'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "The dispositive question is whether the violative nature of *particular* conduct is clearly established," an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* (internal quotations omitted).

Accordingly, to recover monetary damages against the individual Defendants, Plaintiffs must show that a reasonable prison official would have known, at the time of the challenged conduct, that the multi-layered procedural protections embodied in the Step-Down Program were insufficient as a matter of law.  Plaintiffs cannot meet that standard—whether as a facial matter or as applied to the individual named Plaintiffs.  First, as set forth above, the record evidence does not show that any Defendant violated any Plaintiff's due-process right in connection with the Step-Down Program's adoption or implementation.  *See* Part I.A–B *supra*.  But second, even if there were a constitutional violation, it was not clearly established that the "contours of" Plaintiffs' due-process right were "sufficiently clear" such that every "reasonable official would have understood that" the Step-Down Program, with its various procedural protections, "violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The factual record is much different than it was at the motion-to-dismiss phase, when Defendants were denied qualified immunity.  *See Thorpe*, 37 F.4th at 930 (noting that "[t]he problem for Defendants . . . is that they invoke qualified immunity at the motion to dismiss, before

71

any of the evidence is in").  This Court, and then the Fourth Circuit, had to accept as true Plaintiffs' allegations that, for instance, "Defendants designed the [Step-Down] [P]rogram for an improper purpose, . . . economic gain," and ruled that *Hewitt* had "plainly established, in 1983, that Defendants can do no such thing." *Id.* at 946.  Now, with the benefit of the summary judgment record, a different result is warranted. *See, e.g.*, *Latson v. Clarke*, 249 F. Supp. 3d 838, 867 (W.D. Va. 2017) (Jones, J.) (noting that at the motion-to-dismiss stage a court is limited by plaintiffs' allegations, so "[m]ost often . . . qualified immunity is tested at the summary judgment stage after the facts have been developed through discovery" (citation omitted)).  The facts adduced in discovery, as described above, cast a different light on the "dispositive question . . . whether the violative nature of *particular* conduct [was] clearly established." *Mullenix*, 136 S. Ct. at 308.

As the Fourth Circuit previously recognized in this case, "neither the Supreme Court nor this Circuit's precedent has clearly established the exact process prisoners must receive while in long-term administrative segregation." *Thorpe*, 37 F.4th at 945.  And what the Fourth Circuit then held—"that by 2012, when VDOC instituted Step Down, case law had clearly established that solitary-confinement conditions comparable to those Plaintiffs allege here engendered a protected liberty interest under the Fourteenth Amendment," *id.* at 943—is irrelevant because the "conditions . . . Plaintiffs allege" do not actually exist, *see* Part I.A.2 *supra*.  To the contrary, at the time this suit was filed, multiple district court decisions—considering the *actual* conditions of confinement at ROSP—had held that those conditions were not sufficiently onerous to create a protected liberty interest, and the decisions that were appealed to the Fourth Circuit were affirmed.[37]

---

[37] *See, e.g.*, *Cooper v. Gilbert*, No. 7:17cv00509, 2018 WL 1830735, at *3–4 (W.D. Va. Apr. 17, 2018) (Conrad, J.); *Jordan v. Va. Dep't of Corr.*, No. 7:16cv00228, 2017 WL 4127905, at *6–7 (W.D. Va. Sept. 17, 2017) (Dillon, J.); *Muhammad v. Smith*, No. 7:16cv00223, 2017 WL

That aside, even if clearly established law confirmed the existence of a protected liberty interest under the conditions as they existed at ROSP, that does not end the qualified immunity inquiry. Rather, the dispositive question is whether Plaintiffs had a clearly established right to any form of procedural review exceeding what is already provided through the Step-Down Program. No court has ever held, in the context of continuing segregation reviews, that some greater due process or an adversarial hearing is necessary to make a review "meaningful." Following *Hewitt*, cases specify that "some sort of periodic review" of segregation assignment is required, but informal reviews have been held to satisfy constitutional standards. *See Williamson v. Stirling*, 912 F.3d 154, 176–77 (4th Cir. 2018); *Baker v. Lyles*, 904 F.2d 925, 930 (4th Cir. 1990). As noted above, these informal periodic reviews do not "require that prison officials permit the submission of any additional evidence or statements"; do not require advance notice, a right to appeal, or the presence of the inmate; and may include "the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner." *Hewitt*, 459 U.S. at 477 n.9. Indeed, after balancing the *Mathews* factors, the Supreme Court in *Wilkinson* upheld a segregation-review scheme that featured only a single formal annual review, analogous to the ICA reviews that the Step-Down Program provides every ninety days. *Wilkinson*, 545 U.S.

---

3402971, at *11–12 (W.D. Va. Aug. 8, 2017) (Conrad, J.); *Barksdale v. Clarke*, No. 7:16cv00355, 2017 WL 3381370, at *7–8 (W.D. Va. Aug. 4, 2017) (Kiser, J.); *Snodgrass v. Gilbert*, No. 7:16cv00091, 2017 WL 1049582, at *10–11 (W.D. Va. Mar. 17, 2017) (Conrad, C.J.), *vacated in part*, 2018 WL 1972721 (Apr. 26, 2018); *Delk v. Younce*, No. 7:14cv00643, 2017 WL 1011512, at *9–10 (W.D. Va. Mar. 14, 2017) (Moon, J.), *aff'd*, 709 F. App'x 184 (4th Cir. 2018); *Hubbert v. Washington*, No. 7:14cv00530, 2017 WL 1091943, at *6–7 (W.D. Va. Mar. 22, 2017) (Urbanski, J.); *Alexander v. Collins*, No. 7:19CV00261, 2021 WL 1541033, at *10 (W.D. Va. Apr. 20, 2021) (Cullen, J.); *Muhammad v. Mathena*, No. 7:14cv00529, 2017 WL 395225, at *1 (W.D. Va. Jan. 27, 2017) (Conrad, J.); *DePaola v. Va. Dep't of Corr.*, No. 7:14cv00692, 2016 WL 5415903, at *9–10 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd*, 703 F. App'x 205 (4th Cir. 2017); *Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15cv00230, 2016 WL 5415906, at *1–2 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd sub nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017).

at 224–28.  The informal reviews in the Step-Down Program are therefore *in addition* to a formal review scheme that is in all material respects not just analogous to *Wilkinson*, but exceeds the minimum standards upheld in that decision.

Accordingly, there is no clearly established law that would have informed Defendants that any particular conduct in developing the Step-Down Program's multitiered reviews, or participating in any of those reviews, denied any named Plaintiff of his due-process rights.  *Cf. Halcomb v. Ravenell*, 992 F.3d 316, 322 (4th Cir. 2021) ("While it is clear from *Hewitt*, *Wilkinson*, and *Incumaa* that inmates are entitled to *some* level of procedural protection, none of those cases definitively require *prior notice of administrative segregation hearings*.") (second emphasis added).  Rather, decisions about the Step-Down Program and the named Plaintiffs' progress through it comported with the clearly established law that corrections officers use "institutional safety and security (or another valid administrative justification) as their guiding principles." *Thorpe*, 37 F.4th at 944 (citing *Hewitt*, 459 U.S. 460).

A contrary conclusion—that "it is 'beyond debate' that existing legal precedent establishes the illegality of [Defendants'] conduct," *Ashcroft*, 563 U.S. at 741—would ignore the slew of decisions from this Court and the Fourth Circuit, cited above, finding that the Step-Down Program does not violate inmates' due-process rights.  To be sure, these are unpublished decisions, and the Fourth Circuit has constrained its consideration of such decisions in the qualified-immunity analysis.[38]  Even if decisions cannot show that the law was not clearly established, they show that

---

[38] The Fourth Circuit observed in *Hogan v. Carter* that unpublished opinions "cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity."  85 F.3d 1113, 1118 (4th Cir. 1996) (en banc).  That is because, it explained, "[w]e could not allow liability to be imposed upon public officials based upon unpublished opinions that we ourselves have determined will be binding only upon the parties immediately before the court."  *Id.*  But "[a]lthough unpublished opinions do not clearly *establish* constitutional rights and thus cannot be relied upon to *impose* liability on a government

the proposition was unsettled.  *Grissom*, 902 F.3d at 1168 (noting that "an unpublished opinion can be quite relevant in showing that the law was *not* clearly established").

To deny Defendants qualified immunity would be to hold that they were "plainly incompetent" to rely on these decisions, even in the absence of any published Fourth Circuit decision clarifying the law one way or the other.  "Could [a court] properly say that an official was plainly incompetent for taking guidance from an unpublished appellate opinion?"  *Id.*  The answer is no, because that would also mean saying that decisions of the Fourth Circuit (not to mention those of this Court), even if unpublished, themselves fly in the face of clearly established law.  *See id.* ("If we make the . . . legitimate[] assumption that panels of [the Fourth Circuit] render reasonable decisions, we would be hard pressed to say that a proposition of law was clearly established at a time when an unpublished opinion by a panel of [the Fourth Circuit] said the opposite.  To do so we would have to say that the panel's decision was contrary to clearly established law at the time it was rendered.").

Because Defendants' conduct did not violate clearly established law, and in fact comported with available decisional law, they are entitled to qualified immunity on Plaintiffs' due-process claim.  *See Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) (granting qualified immunity to prison officials on due-process claim, reasoning that the "state of the law" had not given "defendants fair warning that the [segregation] review [program] was not meaningful").

---

official," *Hogan* does not "preclude[] consideration of unpublished opinions when *declining* to impose liability." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 551 n.1 (4th Cir. 2017) (Traxler, dissenting) (emphasis added); *see also Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018) ("The role of an unpublished nonprecedential opinion in this enterprise depends on whether the opinion is being used to show that the plaintiff's proffered proposition is clearly established law or to show that the proposition is unsettled.").

## II.    Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claim (Count V).

The Eighth Amendment prohibits prisons from imposing conditions of confinement that constitute "cruel and unusual punishments."  U.S. CONST. amend. VIII.  Plaintiffs' complaint alleges that the Defendants have violated their Eighth Amendment rights "by subjecting them to indefinite and long-term solitary confinement that serves no legitimate penological purpose and that results in serious deprivations of basic human needs, significant mental and physical harms, and substantial risk of such harms," to which Defendants "have been deliberately indifferent." Compl. ¶ 247; *see also Thorpe*, 2021 WL 2435868, at *6.  But "[w]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."  *Farmer*, 511 U.S. at 845.

Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claim for three reasons.

*First*, to the extent Plaintiffs are asserting a facial claim, summary judgment is warranted because, based on the evidence adduced in discovery, Plaintiffs cannot show that conditions in the Step-Down Program posed, in all circumstances, an objectively intolerable risk of harm that Defendants were aware of but nonetheless disregarded.

*Second*, Plaintiffs' as-applied claim likewise fails, because the evidence does not show that Defendants knew of, but ignored, an objectively intolerable risk of harm that the Step-Down posed to any of the named Plaintiffs.

*Third*, Defendants are entitled to qualified immunity.  Even assuming that Plaintiffs could show a violation of an Eighth Amendment right, that right, defined at the appropriate level, was not clearly established at the time of the alleged violation.

**A.    Summary judgment is warranted on any facial challenge to the Step-Down Program based on the Eighth Amendment.**

As with Plaintiffs' due-process claim, it is not clear whether they are asserting their Eighth Amendment deliberate-indifference claim on a facial or as-applied basis.  *Compare Thorpe*, 2021 WL 2435868, at *4 (noting that "[P]laintiffs have not claimed to be mounting a facial challenge."), *with Thorpe*, 37 F.4th at 947 (noting that Plaintiffs' request to "abolish the Step-Down program" constitutes facial relief).  To the extent Plaintiffs assert that the policies governing the Step-Down Program *facially* violate the Eighth Amendment, the Court should grant Defendants summary judgment on that claim.

Neither the Supreme Court nor the Fourth Circuit has ever held that "solitary confinement" generally—much less the specific conditions in the Step-Down Program—violates the Constitution in all circumstances.  Far from it.  While individual Justices have floated concerns about the potential harms of long-term segregation,[39] the Supreme Court has never prohibited its use as per se unconstitutional.  *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 686 (1978) ("It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual."); *Wilkinson*, 545 U.S. at 229 (acknowledging that "[p]rolonged confinement in Supermax may be the State's only option for the control of some inmates"); *Mora-Contreras v. Peters*, 851 F. App'x 73 (9th Cir. 2021) ("Plaintiffs assert that extended solitary confinement is inherently cruel and unusual punishment under the Eighth Amendment.  This argument is contrary to the law of the Supreme Court . . . .");

---

[39] For instance, Plaintiffs have previously seized on Justice Kennedy's comments in a concurring opinion in *Davis v. Ayala*, 576 U.S. 257 (2015).  But Justice Kennedy himself conceded that his stated concerns were legally gratuitous because they had "no direct bearing on the precise legal questions presented in th[at] case." *Id.* at 286 (Kennedy, J., concurring).

*Hope v. Harris*, 861 F. App'x 571, 582 (5th Cir. 2021) ("[L]ong-term solitary confinement is not

per se cruel and unusual."), *cert. denied*, 143 S. Ct. 1746 (2023).

Challenges seeking to abolish the use of so-called solitary confinement often fail—as

Plaintiffs' should—because of the legitimate penological objectives that underlie prison systems'

use of it.[40]  For instance, the Fourth Circuit has made crystal-clear that "a legitimate penological

justification *can* support prolonged detention of an inmate in segregated or solitary

confinement . . . *even though* such conditions create an objective risk of serious emotional and

psychological harm." *Porter v. Clarke*, 923 F.3d 348, 362–63 (4th Cir. 2019) (emphasis added).[41]

That acknowledgment is fatal to any facial challenge Plaintiffs make here.  So too, as set forth

below, is Plaintiffs' inability to establish, as a facial matter, either the objective or subjective

component of their deliberate-indifference claim.[42]

---

[40] Indeed, the fact that numerous class members have already challenged—and lost—lawsuits predicated on these same theories demonstrates why a facial claim cannot succeed.  For instance, in the same 2016 case that he asserted due-process deficiencies with the Step-Down Program, named Plaintiff and proposed class representative Peter Mukuria asserted that "his confinement under segregation conditions . . . violated the Eighth Amendment's prohibition against cruel and unusual punishment." *Mukuria*, 2016 WL 5396712, at *4.  This Court entered summary judgment against Mukuria on that claim also, concluding that, despite his "complain[t] about higher levels of restraint and fewer privileges," he had not "suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion." *Id.* at *11.

[41] The result in *Porter*—that the previous conditions of confinement on Virginia's death row violated the Eighth Amendment—is a consequence of the Fourth Circuit's "treat[ing] . . . as waived" the "argument that legitimate penological considerations justified the challenged conditions." *Porter*, 923 F.3d at 363.

[42] As the Fourth Circuit has observed, "the exact role of penological justification in analyzing an Eighth Amendment conditions of confinement case is unsettled." *Porter*, 923 F.3d at 362.  Some courts "treat penological justification as a component of the objective prong analysis" and "others appear to treat it as a separate inquiry." *Id.*  But the Fourth Circuit believes that "[p]erhaps the clearest way penological justification factors into 'conditions of confinement cases' is through the subjective prong inquiry." *Id.* (citations omitted); *see also Thorpe*, 37 F.4th at 941 ("Absence of penological purpose plays a part in [this] inquir[y], as it helps establish that corrections officers acted with culpable mental state rather than for justifiable reasons." (citation

### 1.   There is no evidence that the Step-Down Program objectively imposes a substantial risk of serious injury in all cases.

To satisfy the objective prong of a facial challenge, Plaintiffs would need to show that, in all circumstances, the conditions of confinement in the Step-Down Program "inflict harm that is, 'objectively, sufficiently serious' to deprive prisoners of 'the minimal civilized measure of life's necessities.'" *Thorpe*, 37 F.4th at 933 (quoting *Farmer*, 511 U.S. at 834, 838). "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from . . . exposure to the challenged conditions.'" *Porter*, 923 F.3d at 355. "[T]he conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (quoting and emphasizing *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)).

Plaintiffs cannot make this showing. To be sure, Plaintiffs' proposed expert witnesses, such as the ubiquitous Craig Haney, offer opinions about what the literature indicates. But the literature is both inconclusive and of questionable validity. At most, the literature shows that solitary confinement *may* pose a substantial risk of harm to inmates' mental health in *some* circumstances (though not in the individual Plaintiffs', *see* Part II.B *infra*). It does not show that any stay in restrictive housing, for any period of time, poses a risk of serious injury, as would be required to support a facial challenge to the Step-Down Program. Indeed, the wide variability in the amount of time that inmates spend in the Step-Down Program undermines the susceptibility of Plaintiffs' claim to facial resolution.[43]

---

omitted)). Accordingly, we address as part of the subjective prong the legitimate penological interests that support the Step-Down Program. *See* Part II.A.2.b *infra*.

[43] Although Plaintiffs say they seek to end "long-term solitary confinement," s*ee generally* Compl., they have steadfastly refused in this litigation to define what constitutes "long-term." Nor

Because Plaintiffs cannot establish that the actual conditions of confinement in the Step-Down Program pose an objectively unreasonable risk of harm as to all inmates under all circumstances, any facial Eighth Amendment claim fails at the outset.

> **2.     There is no evidence that Defendants were subjectively aware that the Step-Down Program posed an excessive risk to inmates' health or safety in all circumstances, yet consciously disregarded that risk for no penological purpose.**

"To satisfy the subjective prong in an Eighth Amendment case, a plaintiff challenging his conditions of confinement must demonstrate that prison officials acted with deliberate indifference." *Porter*, 923 F.3d at 361.  This "is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).   Rather, in *Farmer* the Supreme Court adopted "subjective recklessness as used in the criminal law" as the appropriate standard for deliberate indifference under the Eighth Amendment.  511 U.S. at 839–40.  Plaintiffs must establish both that Defendants *actually knew of* a substantial risk that the Step-Down Program posed to inmates' health or safety—and that they then intentionally *disregarded* that risk.  *Porter*, 923 F.3d at 361.  "In making this assessment, it is important to remember that to cross the threshold from mere negligence to conscience-shocking deliberate indifference, the officers not only must recognize the facts giving rise to the risk, but they also must draw the additional causal inference." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303–04 (4th Cir. 2004).

To prevail on a facial challenge, proving deliberate indifference would mean showing that Defendants knew that the Step-Down Program posed an objectively intolerable risk of harm to inmates in all circumstances, yet they totally ignored that risk without penological justification.

can they credibly dispute that, for years, the conditions of confinement in the Step-Down Program have not fit commonly accepted definitions of "solitary confinement."

This, Plaintiffs cannot do.   The evidence does not support a showing of either awareness or conscious disregard.

> ### a. The evidence does not establish Defendants' awareness that the Step-Down Program poses an objectively intolerable risk of harm to all inmates in all circumstances.

Plaintiffs allege that Defendants adopted and implemented the Step-Down Program "despite either knowing about the[] risks through scientific literature, or in spite of the obviousness of the risks due to the duration of the confinement, threatened investigations, and Fourth Circuit decisions regarding similar conditions." *Thorpe*, 2021 WL 2435868, at *6.  The Fourth Circuit has previously acknowledged the possibility that Defendants "did not *know* . . . that the solitary-confinement conditions they promulgated posed a substantial risk of serious harm in violation of the Eighth Amendment"—and recognized that Defendants "may well end up on the winning side of that argument after the evidence comes in . . . ." *Thorpe*, 37 F.4th at 935 (internal punctuation omitted).  The evidence that has come in supports summary judgment in favor of Defendants.  The evidence does not bear out that Defendants were actually aware that the conditions in the Step-Down Program have ever posed an "objectively intolerable risk of harm" in any case, let alone in *every* case.  *Farmer*, 511 U.S. at 846.

The individual Defendants have stated, unequivocally, that they were not aware of any such risk.  *See, e.g.*, SUMF ¶¶ 130–40.  And even if the scientific literature had concluded that solitary confinement poses a substantial risk of significant harm in all cases—which it does not, *see* Part II.A.1 *supra*—to the extent Defendants were aware of that literature, it did not lead Defendants to believe that there was an unreasonable risk given the conditions of confinement in the Step-Down Program.  *See Parrish*, 372 F.3d at 303–04 (noting that "to the extent the officers recognized any risk at all, we are concerned with the risk as they perceived it, not as a reasonable

officer under the circumstances should have perceived it, and not as it now may be perceived enlightened by the benefit of hindsight") (citations omitted)).

Nor was it "obvious" that the Step-Down Program posed a substantial risk of injury to all inmates in all circumstances. *Thorpe*, 2021 WL 2435868, at *6 (deliberate indifference can be shown through "circumstantial evidence that a risk was so obvious that it had to have been known" (quoting *Porter*, 923 F.3d at 361)). A number of undisputed facts belie the conclusion that such a risk of an Eighth Amendment violation was "obvious."

*First*, despite awareness of the issue and strenuous advocacy by some reformers, Defendants have been unable to identify any federal or state legislation that categorically prohibits "solitary confinement," or even limits it to 15 days—much less, prohibits the conditions challenged here. The Supreme Court has said that, in assessing what constitutes cruel and unusual punishment against the "evolving standards of decency that mark the progress of a maturing society," "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (also noting that "those evolving standards should be informed by objective factors to the maximum possible extent").

The example of Virginia is particularly relevant and illuminating. Earlier this year, as in several years past,[44] the General Assembly debated enacting legislative limits to restrictive housing. After much debate and advocacy, including by Plaintiffs' counsel, the legislature codified the reforms VDOC had already adopted—that inmates receive 4 hours of out-of-cell time per day. Va. Code § 53.1-39.2. Plaintiffs have not challenged the constitutionality of that law (nor has anyone else). That the General Assembly has very recently endorsed VDOC's approach underscores why Plaintiffs' facial challenge—and their demand that the Court "abolish the Step-

---

[44] *See, e.g.*, H.B. 795 (Va. 2018); S.B. 1301 (Va. 2021).

Down Program," Compl. ¶ 271(1)—is so problematic: "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. The Court "must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* (internal quotations omitted).[45]

*Second*, the Step-Down Program complies with industry standards. Red Onion is accredited by the American Correctional Association ("ACA"), the accrediting body for the corrections industry, and has been during the entire period of the Step-Down Program. SUMF ¶ 46. As part of the accreditation process, ACA experts examine hundreds of aspects of VDOC's policies and practices, including with respect to restrictive housing. *Id.* VDOC's Step-Down Program has always been in compliance with ACA standards relevant to restrictive housing. *Id.* And, under Virginia law, it will remain in compliance—in 2019, the General Assembly imposed a requirement that "restrictive housing shall, at a minimum, adhere to the [ACA] standards." Va. Code § 53.1-39.1.

*Third*, the Step-Down Program has repeatedly been cited, including by reform groups, as a positive model for other correctional systems around the country. In July 2013, the Southern Legislative Conference recognized VDOC's national leadership with an award for its "diligent work in reducing administrative segregation and for developing a program model replicable in other states." SUMF ¶ 2. In 2016, the U.S. Department of Justice, in its *Report and*

---

[45] *See also Woodford v. Ngo*, 548 U.S. 81, 94 (2006) ("[I]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.") (internal citation omitted). Because the task of prison administration "has been committed to the responsibility of [the legislative and executive] branches, . . . separation of powers concerns counsel a policy of judicial restraint." *Turner*, 482 U.S. at 85. And "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Id.*

*Recommendations Concerning the Use of Restrictive Housing*, commended Virginia for being one of the "five jurisdictions that have undertaken particularly significant reforms in recent years." SUMF ¶ 2.  In 2018 it was held up as a model by the Vera Institute of Justice, which called the Step-Down Program "a pioneering and significant program for reducing the number of people in long-term restrictive housing."  SUMF ¶ 3.  Other prison systems' officials have looked to the Step-Down Program as a model, and visited VDOC to study its success.  SUMF ¶ 88.

*Fourth*, this Court and the Fourth Circuit have repeatedly rejected Eighth Amendment challenges to the Step-Down Program, including by some of the named Plaintiffs.[46]  It would defy logic to conclude that the risk of constitutional harm was "obvious" to prison officials—but, somehow, not to the courts that were squarely asked to evaluate the Step-Down Program's constitutionality.

In light of the Step-Down Program's compliance with Virginia law, conformance to industry standards, national reputation for progressive reform, and repeated vindication in the courtroom, it is difficult to conceive that the conditions of confinement associated with the program posed a risk of substantial harm—not just to a particular inmate, but to *every* inmate in *all* circumstances—that was "so obvious that it had to have been known" to Defendants.  *Porter*, 923 F.3d at 361.

> **b.    The evidence does not show that Defendants disregarded a substantial risk of injury to all inmates without penological purpose.**

Even supposing the existence of a substantial risk of serious injury, the evidence does not show that Defendants subjectively disregarded or ignored that risk, instead adopting and

---

[46] *See, e.g.*, *Mukuria*, 2016 WL 5396712, at *4 (Jones, J.); *Snodgrass*, 2017 WL 1049582, at *14 (Conrad, J.); *Riddick v. Dep't of Corr.*, No. 7:17CV00268, 2017 WL 6599007, at *3–4 (W.D. Va. Dec. 26, 2017) (Conrad, J.).

implementing the Step-Down Program for no legitimate penological purpose.  Accordingly, they could not have had the "culpable mental state" required for a finding of deliberate indifference. *Thorpe*, 37 F.4th at 941.

*First*, it cannot be said that that there's a total lack of penological purpose behind the Step-Down Program, such that it could never be constitutional in *any* circumstances.  To the contrary, the Step-Down Program has a "plainly legitimate sweep" that "serves the Commonwealth's critical interest in public safety."  *Chappell*, 691 F.3d at 392.  As the Fourth Circuit has acknowledged, "prison officials tasked with the difficult task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective." *Porter*, 923 F.3d at 363.  Indeed, "internal security [is] perhaps the most legitimate of penological goals."  *Overton*, 539 U.S. at 133.

The record evidence establishes that these penological interests motivated the Step-Down Program's adoption and programming, and that they continue to underlie its operation.  *The documentary evidence* reveals that.  SUMF ¶¶ 8–10.  VDOC officials have testified to it.  *See, e.g.*, Deposition of James Gallihar ("Gallihar Tr.") dated April 7, 2023, relevant portions attached in Exhibit 45 at 200–01 ("The programs are designed to enhance security."); King Dep. at 111–12 ("[T]he whole goal of the program is to change behavior to where we increase public safety."); Robinson Dep. at 304 (noting that those in Step-Down Program "have demonstrated [a] risk" to the facility, a security risk, or a risk of escape).  *Experts* have confirmed it.  *See, e.g.*, Beard Rep. at 5 (noting that restorative housing "units exist to provide for the safety of staff and inmates and for the security of the institution"); *id.* at 16 (opining that "VDOC works hard to ensure that inmates are not kept in the Step-Down Program any longer than is necessary from a penological

and safety standpoint").  Even *Plaintiffs* have admitted it.  *See, e.g.*, Snodgrass Dep. at 108–09 ("[T]he whole purpose of solitary confinement is to establish institutional order."); Riddick Dep. at 155 (acknowledging times he was "necessarily kept in segregation"); Mukuria Dep. at 199–200 (testifying that "absolutely" "segregation is necessary for some inmates . . . . Just like policing is necessary in society.").[47]

In seeking to "abolish the Step-Down Program" and "end long-term solitary confinement," Compl. ¶ 271(1), Plaintiffs have no responsibility to acknowledge the "risks [that] poses to the health and safety both of prison staff and of the inmates," *Braun*, 652 F.3d at 563 (citations omitted).  But this Court does.  It owes "substantial deference to the professional judgment of prison administrators"; and where, as here, "[a]ccommodating [an inmate's] demands . . . would impair the ability of corrections officers to protect all who are inside a prison's walls, . . . [courts] are 'particularly deferential' to prison administrators' regulatory judgments."  *Overton*, 539 U.S. at 132, 135.  Unlike Plaintiffs, the Court must not ignore the legitimate penological interests that undergird the Step-Down Program.[48]

---

[47] *See also id.* at 197–98 (noting that "you choose the behavior, you choose the consequences.  You understand that at the end of the day, this is a prison.  So, you know, you can't just have people committing whatever acts and just completely going without being held accountable despite the fact that this is prison.  So I do believe that there is a need, you know, to have segregation units for those purposes.").

[48] Discovery produced no valid support for Plaintiffs' overarching theory of the case:  that they were "confined [in the Step-Down Program] for a pecuniary rather than penological purpose." *Thorpe*, 2021 WL 2435868, at *7.  There is no evidence for this "economic gain" theory, including that "Step Down placements rest on 'reasons having nothing to do with' prisoners' security risk and everything to do with justifying the two high-ticket supermaxes."  *Thorpe*, 37 F.4th at 946. Indeed, the record testimony is that the Step-Down Program was designed to *lower* the number of inmates in restrictive housing.  *See, e.g.*, Ponton Tr. at 143–44; Deposition of Everett McDuffie ("McDuffie Tr.") dated April 14, 2023, relevant portions attached in Exhibit 45 at 387; Clarke Dep. at 151; Deposition of Quinn Reynolds dated May 17, 2022 ("Reynolds Tr."), relevant portions attached in Exhibit 45 at 242–43.  As noted above, the program has been indisputably successful in that regard.

As shown below, these valid penological interests also help defeat Plaintiffs' as-applied deliberate-indifference claims. *See* Part II.B *infra*. And the fact "that a legitimate penological justification can support even prolonged solitary detention of a *particular* inmate," *Porter*, 923 F.3d at 363 n.2 (emphasis added)—such as each of the named Plaintiffs—underscores that any facial claim must fail, *see, e.g.*, *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012) ("Under the well recognized standard for assessing a facial challenge to the constitutionality of a statute, the Supreme Court has long declared that a statute cannot be held unconstitutional if it has constitutional application."). Combined with the undisputed record evidence, that forecloses Plaintiffs' facial claim.[49]

*Second*, the evidence does not establish that, under VDOC policies governing the Step-Down Program, prison officials disregard any risk of injuries to Plaintiffs' mental health, such as by completely ignoring inmates' needs or taking no action when any needs are identified. To the contrary, VDOC policies impose safeguards that "respond[] reasonably to the risk." *Farmer*, 511 U.S. at 844 (cleaned up) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Under VDOC policies, inmates in the Step-Down Program are provided comprehensive protections to guard against the mental-health effects of their detention. The following are among

---

[49] The Court also construed Plaintiffs' complaint to have alleged an Eighth Amendment violation because "the Step-Down Program inflicts upon plaintiffs unnecessary and wanton pain that shocks the conscience without a penological justification." *Thorpe*, 2021 WL 2435868, at *6. *But see Thorpe*, 37 F.4th at 941 n.5 (noting the existence of a "discrete Eighth Amendment path[]" by showing "excessive force" but indicating that path is not "discussed here"). To the extent that Plaintiffs are making a facial claim on that theory, it too fails because "[a]bsence of penological purpose plays a part" in that theory too. *Thorpe*, 37 F.4th at 941 n.5; *see also Porter*, 923 F.3d at 362 ("[p]rison conditions are unconstitutional if they constitute an unnecessary and wanton infliction of pain and are totally without penological justification" (citation omitted)).

the measures that prison officials are directed to take—and do, in fact, take—pursuant to the policies Plaintiffs say are facially unconstitutional.

- <u>VDOC makes individualized assessments of all inmates' mental health status and tracks that status</u>.

- Under O.P. 730.2, all inmates receive an initial mental health screening at the time of admission to a VDOC facility to identify any needs for mental health services; this procedure has been place since before the Step-Down Program. SUMF ¶ 78; *see also* SUMF ¶ 79 (describing the VDOC Mental Health Classification Code System as providing "a standard approach through which the mental health status and service needs of individual inmates may be examined"). When inmates are placed in the Step-Down Program, VDOC policy requires that they be screened by a Qualified Medical Health Professional [Psychology Associate] before, or within one day of, their placement. *See* SUMF ¶ 83.

- <u>VDOC incorporates consideration of inmates' mental health in decisions regarding the Step-Down Program</u>.

  Mental health staff participate in several of the review bodies that meet with and assess inmates' progress in the Step-Down Program, including the BMC, DTT, and ERT. SUMF ¶¶ 37, 38, 40, 44. Mental health staff's participation in these reviews and assessments helps ensure that staff are aware of an inmate's mental health status and needs throughout their time in the Step-Down Program. Malone Dep. at 124:9–18.

- <u>VDOC diverts inmates with serious mental illness from restorative housing settings</u>.

  In January 2018, VDOC implemented the SDTP. SUMF ¶ 85. The goal of this comprehensive alternative program to restorative housing is to keep SMI inmates out of restrictive housing except when absolutely necessary. *Id.* Under this program, VDOC transferred all SMI inmates out of Red Onion and into SDTP facilities; no additional SMI inmates were transferred to Red Onion following implementation of the SDTP. SUMF ¶ 87.

These protections in VDOC's policy, among others, show that Defendants satisfy their "duty under the Eighth Amendment . . . to ensure 'reasonable safety'" to those in its custody in the Step-Down Program. *Farmer*, 511 U.S. at 844 (cleaned up and internal citations omitted). The record certainly does not support a conclusion that Defendants have been deliberately indifferent as a facial matter. *See Mickle v. Moore*, 174 F.3d 464, 472 (4th Cir. 1999) (holding that the plaintiffs

could not establish deliberate indifference where the prison's "procedures for administrative segregation provide for periodic visits by medical personnel and for the referral of inmates displaying mental health problems for treatment").

**B.     Defendants are entitled to summary judgment on Plaintiffs' as-applied Eighth Amendment challenge.**

Plaintiffs' as-applied Eighth Amendment claims also fail.  The evidence does not show that Defendants were aware of, yet completely ignored, a substantial risk of serious injury to the named Plaintiffs' mental health.

**1.     The evidence does not show that the Step-Down Program objectively imposed a substantial risk of serious injury on any of the named Plaintiffs.**

Just as Plaintiffs have not adduced evidence that conditions in the Step-Down Program cause a substantial risk of serious injury to all inmates in general, *see* Part II.A *supra*, there's no evidence that any of these Plaintiffs were subjected to a serious and substantial risk of harm.  The only potentially contrary evidence Plaintiffs could point to is offered by their proposed expert witness Michael Hendricks, whose testimony should be excluded for the reasons set forth in a contemporaneously filed *Daubert* motion.

Notably, the question here is not whether so-called "solitary confinement," in general, poses a constitutionally unacceptable risk of harm.  Rather, the relevant inquiry is whether the actual conditions of confinement experienced by *these* Plaintiffs were so onerous as to constitute cruel and unusual punishment.  Plaintiffs have alleged that their risk of harm arose from a single source:  the isolation inherent in segregated confinement.  But the factual record here does not nudge their claims of "isolation" into unconstitutional territory.

As amply demonstrated by the factual record now before the Court, Plaintiffs have not been placed in "solitary confinement."  While confined at ROSP in SL-S, it is true that they were

89

segregated from the rest of the prison population and confined to their cells for part of the day. But, without question, even when confined at the lowest privilege level within the Step-Down Program (IM-0 or SM-0), they were not overwhelmingly deprived of "direct intercourse with or sight of any human being." *In re Medley*, 134 U.S. 160, 168 (1890).  To the contrary, Plaintiffs interacted with each other in their cells and during their concurrent recreation, communicated with various VDOC staff, including corrections officers and mental health professionals, and were permitted non-contact visits on a weekly basis.  SUMF ¶¶ 50, 56.  Their ability to interact with each other, prison staff, and the outside world disproves that they were placed in "isolation" conditions posing an objectively intolerable risk of harm.

The lack of a serious risk of substantial harm from the Step-Down Program is underscored by the absence of such evidence as to the named Plaintiffs.  Rather, the record shows that, while in the program, the vast majority of named Plaintiffs had either no mental health treatment needs at all or a stable or improved mental health classification.

Throughout their time in the Step-Down Program, eight of the eleven named Plaintiffs—Brooks, Cavitt, Cornelison, Khavkin, McNabb, Mukuria, Snodgrass, and Thorpe—consistently had a mental health classification code of MH-0, SUMF ¶¶ 99, 102, 105, 110, 113, 116, 123, 126, an assessment that the inmate has no mental health treatment needs, *see* OP 730.2(VI)(C).  There is no credible evidence of any mental health injury, let alone a serious one, with respect to those Plaintiffs.  The remaining three named Plaintiffs—Hammer, Riddick, and Wall—were classified as something other than MH-0 at some point during their time in the Step-Down Program.  SUMF ¶¶ 108, 120, 129.  Hammer's mental health classification *improved*, from MH-2 before the Step-Down Program, to MH-1 in 2013 and then to MH-0 in 2015, where it has remained since.  SUMF ¶ 108.  Except for a one-month period in 2017, Wall's mental health classification has remained

90

stable at MH-2 since 2014.   SUMF ¶ 129.  The only named Plaintiff whose mental health classification deteriorated at all in the Step-Down Program is Riddick, whose classification changed from MH-0 to MH-2 in July 2018 when he was diagnosed with major depressive disorder and recurrent mood disorder.  SUMF ¶ 120.  But an expert's review of Riddick's "extensive history does [not] support his claims of disability due to serious mental illness."  Saathoff Rep. at 104.

Accordingly, the conditions of confinement actually experienced by these Plaintiffs, although restrictive, did not pose a significant and objectively intolerable risk of serious harm. And absent such a risk, their Eighth Amendment claims must fail.  *See generally Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("The Constitution does not mandate comfortable prisons.").

> **2.     There is no evidence that Defendants were subjectively aware that the Step-Down Program posed an excessive risk to the named Plaintiffs' health or safety, yet consciously disregarded that risk for no penological purpose.**

As with Plaintiffs' facial claim, there is no evidence for the conclusion that Defendants were deliberately indifferent to any known risk to the health of the named Plaintiffs, as would be necessary for Plaintiffs' as-applied claim to succeed.   Again, the evidence does not support a showing either that Defendants were aware of an objectively intolerable risk or that they then ignored that risk without penological justification.  *Parrish*, 372 F.3d at 303–04.

> **a.     The evidence does not establish Defendants' awareness that the Step-Down Program posed an objectively intolerable risk of harm to the named Plaintiffs.**

The same facts that show Defendants were not aware that conditions in the Step-Down Program were facially unconstitutional, *see* Part II.A *supra*, also disprove that Defendants were aware of any "objectively intolerable risk of harm" with respect to the named Plaintiffs in particular.  *Farmer*, 511 U.S. at 846.  The record shows that Defendants were not aware—whether from literature or its supposed obviousness—of any broadly applicable risk from so-called solitary

confinement.  Indeed, such an awareness would be inconsistent with VDOC's compliance with industry guidelines, national recognition of the Step-Down Program, and the General Assembly's endorsement of VDOC's policy.  *See* Part II.A *supra*.

> **b.** **The evidence does not show that Defendants disregarded a substantial risk of injury to the named Plaintiffs without penological purpose.**

The record evidence also does not show that Defendants subjectively disregarded or ignored any risk of serious injury to any of the named Plaintiffs, considering the valid penological reasons for confirming them in segregated housing.

*First*, the evidence shows that no Defendant actually disregarded a known risk of injury to the named Plaintiffs, such as by completely ignoring any mental health needs.  Not even close.  As noted above, the policies that these Defendants adopted were designed to identify and prevent any potential risks associated with confinement in segregation.  While in the Step-Down Program, most of the named Plaintiffs had a mental health classification code of MH-0—an assessment that they had no mental health treatment needs.  SUMF ¶¶ 99, 102, 105, 110, 113, 116, 123, 126.  Nevertheless, there is no evidence that the named Plaintiffs were not provided regular assessments from qualified mental health professionals, denied appropriate medications, or deprived of necessary mental health services when they were warranted.  *See Mickle*, 174 F.3d at 472 (no deliberate indifference in light of "periodic visits by medical personnel and . . . referral of inmates displaying mental health problems for treatment").

*Second*, the penological purposes that motivate the Step-Down Program are present with respect to each of the named Plaintiffs.  *See Porter*, 923 F.3d at 363 n.2 (noting that "a legitimate penological justification can support even prolonged solitary detention of a particular inmate"). Indeed, the evidence shows that considerations for internal security—"perhaps the most legitimate

of penological goals," *Overton*, 539 U.S. at 133—were the driving factor behind each named

Plaintiff's placement in and progress through the Step-Down Program:

- <u>Vernon Brooks</u>.  Brooks was placed in the Step-Down Program for a large number of institutional charges, some including violence, which culminated in an April 2015 incident in which Brooks stabbed two offenders behind the ear with a knife, causing puncture wounds.  SUMF ¶ 97.  Although he progressed through the IM pathway to the Closed Pod, in February 2018 he was reclassified to IM-0 status after he was found attempting to make a weapon in his cell.  *Id.*[50]

- <u>Brian Cavitt</u>.  Cavitt, a convicted murderer, was transferred from incarceration in Massachusetts into the custody of VDOC and the Step-Down Program due to the high potential of gang-related violence if he stayed in a Massachusetts facility.  SUMF ¶ 101.  In Massachusetts he had attempted to break through a recreation cage to fight with another inmate until guards deployed a "chemical agent" to force him away from the fence.  SUMF ¶ 100.  Cavitt had also formulated several involved escape plots, including plans that involved murdering corrections officers to facilitate an escape during a court visit.  *Id.*[51]

- <u>Derek Cornelison</u>.  Cornelison was placed in the Step-Down Program after a December 2015 incident in which he tried to kill a fellow inmate at Sussex I State Prison, striking the inmate approximately 20 times with a weapon.  SUMF ¶ 104.[52]

- <u>Frederick Hammer</u>.  Hammer, who had been convicted of killing three men, entered the Step-Down Program for safety reasons in April 2012.  SUMF ¶ 107.[53]

---

[50] In May 2020, Brooks progressed back to general population.  SUMF ¶ 97.

[51] Cavitt entered the Step-Down Program in November 2016,and progressed to IM-Closed Pod in August 2018, to the SM pathway in November 2020, and to general population in April 2021.  SUMF ¶ 101.

[52] Cornelison progressed to IM-1 in January 2017; to IM-2 in August 2017; to the IM-Closed Pod in February 2018; to the SM pathway and Step-Down Phase 1 in May 2019; and to general population in August 2019.  SUMF ¶ 104.

[53] Hammer progressed and retreated along the IM pathway, reaching the IM-Closed Pod in August 2013, returning to IM-0 in October 2014, and then back to the IM-Closed Pod in February 2016.  He remained there until October 2019, when he was transferred to the SM pathway, and in March 2020 he was released to general population.  SUMF ¶ 107.

- <u>Dmitry Khavkin</u>.  Khavkin, a convicted murderer, was placed in the Step-Down Program because he was under investigation for the killing of his cellmate at Lawrenceville Correctional Center.  SUMF ¶ 110.[54]

- <u>Gerald McNabb</u>.  McNabb, who is serving for variety of crimes including homicide, has an extensive history of committing violence within VDOC institutions, both against fellow inmates and officers.  He was placed in the Step-Down Program following an incident in August 2012 in which he assaulted a female officer at Sussex I State Prison, stabbing her with a weapon.  He proceeded through the Step-Down Program, but a month after returning to general population, he was back in the Step-Down Program in February 2016 due to an incident in which a knife was found inside his television. He thereafter failed to proceed all the way through the Step-Down Program, due to numerous charges and infractions.[55]  SUMF ¶ 112.

- <u>Peter Mukuria</u>.  Mukuria is a convicted murderer who entered the Step-Down Program after a November 2012 incident in which he stabbed a guard at Suffolk II State Prison who was attempting to break up an altercation between Mukuria and another inmate.  *See* SUMF ¶¶ 114–15. The guard required immediate emergency surgery.  *Id.*  Despite progressing to IM Closed Pod Phase II by September 2017, Mukuria returned to SM-0 after receiving multiple disciplinary infractions, including attempting to incite a riot among other offenders.[56]  SUMF ¶ 115.

- <u>Steven Riddick</u>.  Riddick is a convicted murderer who was transferred to the Step-Down Program, then transferred to the SIP/SAM pod. SUMF ¶ 118. In September 2014, he was transferred to SM0 following months of racking up institutional charges, including threatening to kill an officer.  *Id.* Until his release to general population earlier this year, he thereafter

---

[54] Khavkin entered the Step-Down Program on the SM pathway in March 2013; was transferred to the IM pathway in January 2014; returned to the SM pathway in October 2018; and was released to general population in February 2021.  SUMF ¶ 110.

[55] In November 2020, McNabb requested to be transferred out of state, asserting that he would be "better adjusted if he was in another state" due to his history of poor performance within VDOC facilities, and in May 2021 that transfer request was granted.  SUMF ¶ 112.

[56] Mukuria moved to IM-1 in June 2014, to IM-2 in July 2015, to IM Closed Pod Phase in August 2016, to Phase II in September 2017, and in May 2019 to the SM pathway and the SL-6 Phase 1 Pod.  SUMF ¶ 115.  In March 2022, Mukuria was transferred to a correctional facility in Maryland. *Id.*

remained in the Step-Down Program "by choice," to avoid having a cellmate.[57]  SUMF ¶ 119.

- <u>Kevin Snodgrass</u>.  Snodgrass is a convicted murderer who was transferred into the Step-Down Program after a December 2013 incident in which he was caught possessing a weapon in general population.[58]  SUMF ¶ 122.

- <u>William Thorpe</u>. Thorpe is serving time for multiple crimes including malicious wounding, assault, and escape.  SUMF ¶ 124.  He participated in the August 1984 riot at Mecklenburg Correctional Center, in which he and other inmates took control of a cell block and held multiple corrections officers hostage. *Id.*  Thorpe's time in restrictive housing predates the Step-Down Program.  SUMF ¶ 125.  After being demoted within the IM pathway for publicly masturbating during visitation, Thorpe refused to participate in any Step-Down programming and remained at IM-0 until he was transferred out-of-state due to a security risk. *Id.*

- <u>Gary Wall</u>.  Wall is serving time for multiple crimes including unlawful wounding and injury to a corrections employee, and received more than a dozen institutional charges related to fighting or assaults before being placed in the Step-Down Program in 2012.  SUMF ¶ 127.  Although he was released to general population in 2015, he returned to the Step-Down Program the next year for "assaultive behavior."  A series of charges and infractions, including threatening behavior, delayed Wall's release back to general population until 2020.  SUMF ¶ 128.

None of Plaintiffs' documented propensity for violence, threats, and other misconduct—including *while in the Step-Down Program*—is acknowledged in the Complaint, of course. Instead, Plaintiffs make the conclusory allegation that their time in the Step-Down Program "serves no legitimate penological purpose."  Compl. ¶ 247.  The undisputed evidence summarized above belies that claim.  Rather, the record shows that each named Plaintiff's trajectory within (and eventually out of) the Step-Down Program reflects a series of reasonable decisions by VDOC

---

[57] Riddick showed a consistent pattern of refusing to participate in the Step-Down Program, which has resulted in him repeatedly moving up and down the SM pathway.  SUMF ¶ 119 .

[58] Snodgrass reached the Step-Down Pod Phase 1 in October 2014, but was placed back as Level S in October 2015, worked his way back to Level 6 by June 2017, and then was released to general population in September of that year.  SUMF ¶ 122.

in service of its "obligation . . . to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227.[59]

Thus, the evidence fails to show that these Defendants disregarded a known and substantial risk of injury to the named Plaintiffs without any penological purpose justifying their actions. Rather, paying appropriate deference to the security decisions of prison administrators, the existence of these unquestionably valid penological reasons for confining Plaintiffs in segregated housing, subject to release through the Step-Down Program, defeats their as-applied Eighth Amendment claims.

### C. Defendants are entitled to qualified immunity on Plaintiffs' Eighth Amendment claim.

With the benefit of the evidence developed in discovery, Defendants renew their position that they are entitled to qualified immunity on Plaintiffs' Eighth Amendment claim. *See Thorpe*, 2021 WL 2435868, at *8 (accepting as true Plaintiffs' allegations supporting their Eighth Amendment claim, including that "VDOC had no legitimate penological purpose" in imposing the conditions of confinement, but noting that it could "properly consider the [D]efendants' asserted penological justification and any evidence in support at the summary judgment stage"). The record is now sufficiently clear that the Court can conclude not only that there was no constitutional violation (whether as a facial or as-applied matter), *see* Part II.A–B *supra*, but that the Eighth Amendment right that Defendants supposedly violated was not clearly established at the time of the alleged violation.

---

[59] As was true for Plaintiffs' facial claim, *see* Part II.A *supra*, the presence of a legitimate penological interest here also defeats Plaintiffs' as-applied claim on any theory Plaintiffs may be pursuing that "the Step-Down Program inflicts upon plaintiffs unnecessary and wanton pain that shocks the conscience without a penological justification." *Thorpe*, 2021 WL 2435868, at *6.

The evidence now shows that conditions of confinement in the Step-Down Program are far less restrictive than Plaintiffs alleged. The chasm between the facts alleged in the Complaint and the facts adduced in discovery has been described above in connection with the harsh-and-atypical analysis of Plaintiffs' due-process claim. *See* Part I.A.1 *supra*. For instance, the Court was told, and it accepted, that "Plaintiffs must remain in their cells for about 23 hours per day." *Thorpe*, 37 F.4th at 942 (cleaned up). But the reality is that, since 2017, all inmates have been entitled to two out-of-cell hours per day, *see* SUMF ¶ 60; between 2018 and 2020, inmates at some Step-Down Program levels were permitted up to four out-of-cell hours per day, SUMF ¶ 76; and, beginning in 2020, *all* inmates became entitled to at least four out-of-cell hours per day, *see* SUMF ¶ 77. Other allegations regarding the conditions of confinement in the Step-Down Program are similarly incompatible with the evidentiary record. *See* Part I.A.1 *supra*. On this fuller factual record, it is clear that Defendants have not violated the Eighth Amendment in connection with the conditions of confinement in the Step-Down Program, and, thus, they are entitled to qualified immunity.

But even if this Court were to find a violation of the constitutional right claimed by Plaintiffs—the "right" to avoid so-called "solitary confinement" conditions for anything more than some unspecified, nominal length of time—Defendants are still protected by qualified immunity because that right was not "'clearly established' at the time of the challenged conduct." *Ashcroft*, 563 U.S. at 735. As the Fourth Circuit has emphasized, the "right must not be defined 'at a high level of generality' but with precision. And that precision requires looking to the law *at the time* of the conduct in question." *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (quoting *City & Cnty. v. S.F. v. Sheehan*, 575 U.S. 600 (2015)).

1.    **Even supposing there was a constitutional violation, the established law during the applicable time frame did not put Defendants on notice that their conduct violated the Eighth Amendment.**

Until fairly recently, Eighth Amendment challenges to administrative segregation conditions were generally unsuccessful.  In *Sweet v. South Carolina Department of Corrections*, decided in 1975, the *en banc* Fourth Circuit described existing Eighth Amendment law as requiring that "the conditions of segregated confinement" must "meet basic sanitation and nutrition requirements," but that general "isolation from companionship, [and] restriction on intellectual stimulation and prolonged inactivity . . . will not render segregated confinement unconstitutional absent other illegitimate deprivations."  529 F.2d 854, 860–61 (4th Cir. 1975) (internal quotations omitted); *accord Breeden v. Jackson*, 457 F.2d 578, 580–81 (4th Cir. 1972).

A series of reported decisions followed *Sweet* and *Breeden*, reaffirming the general proposition that administrative segregation, regardless of duration, was not constitutionally objectionable as long as the inmates were provided some opportunity for out-of-cell exercise and their nutritional and sanitation needs were otherwise met.  *See, e.g.*, *Shrader v. White*, 761 F.2d 975, 981 (4th Cir. 1985); *Allgood v. Morris*, 724 F.2d 1098, 1101 & n.1 (4th Cir. 1984); *Ross v. Reed*, 719 F.2d 689 (4th Cir. 1983); *Crowe v. Leeke*, 540 F.2d 740, 741 (4th Cir. 1976); *see also Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990) (citing *Sweet* and *Shrader* as supplying the appropriate legal standard).

Following further articulation of the two-part deliberate indifference analysis for Eighth Amendment challenges to prison conditions, *see Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993), the Fourth Circuit maintained its conclusion that "conditions in administrative segregation" would not constitute an Eighth Amendment violation as long as the inmates were provided with "'adequate food, clothing, shelter, and medical care.'"  *Mickle*, 174 F.3d at 471–72 (quoting *Farmer*, 511 U.S. at 832).  Moreover, the court specifically held that "the isolation inherent in

98

administrative segregation or maximum custody is not itself constitutionally objectionable," nor does "the indefinite duration of the inmates' segregation," alone, violate the Eighth Amendment. *Id.* at 472.[60]   As recently as 2012—when the Step-Down Program went into effect—the Fourth Circuit continued to cite *Mickle* as controlling precedent for Eighth Amendment conditions-of-confinement cases challenging segregated confinement.   *See, e.g.*, *Williams v. Branker*, 462 F. App'x 348 (4th Cir. 2012).

Fourth Circuit precedent regarding Eighth Amendment claims in the context of segregated confinement remained stable until May 2019, when—three days before Plaintiffs initiated this suit—the Fourth Circuit decided *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), which addressed a challenge to the conditions of confinement on Virginia's death row.   Upholding an injunction issued by the district court, the court opined that, "[i]n recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of adverse psychological effects attributable to prolonged placement of inmates in isolated conditions."  *Id.* at 355.   Citing out-of-circuit precedent, *Porter* concluded that, as to the objective prong of the deliberate indifference analysis, "solitary confinement poses an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment."  *Id.* at 357.   With respect to the subjective prong, *Porter* held that "the district court erred in failing to consider State Defendants' penological justification for housing death row inmates in conditions amounting to solitary confinement," a consideration that fits most neatly into the "subjective prong inquiry."  *Id.* at 362; *see also id.* at 363.   But because the issue was not raised in the appellant's opening brief, the Court treated it as waived.  *Id.* at 363–64.

---

[60] Finding no constitutional violation, *Mickle* did not address the correctional officials' argument that they were entitled to qualified immunity.  174 F.3d at 473 n.6.

*Porter* distinguished the factual circumstances presented in *Mickle*, noting that, where the inmates in *Mickle* "were placed in segregation based on their *in-prison conduct*" and therefore had an opportunity to be removed from segregation, "the challenged Virginia procedures and regulations place death row inmates in solitary confinement based on their sentence alone and do not provide death row inmates with an avenue for removing themselves from segregation." *Id.* at 359.  The Fourth Circuit explicitly stated that, "[b]ecause *Mickle* involved a different set of facts than those adduced by Plaintiffs, our decision cannot—and does not—overrule *Mickle*." *Id.*

A few months later, the Fourth Circuit described *Porter* as having changed "the state of the law" in this Circuit.  *Latson*, 794 F. App'x at 270 (citing *Mickle*, *Sweet*, and *Breeden* as standing for the proposition "that long-term solitary confinement did not violate the Eighth Amendment").  Affirming the lower court's grant of qualified immunity in a case challenging the imposition of segregated confinement for an inmate with a mental disability, the Fourth Circuit also rejected the plaintiff's argument that, based on "a handful of district court opinions from outside this Circuit," the defendants "nevertheless had fair notice of the unconstitutional nature of solitary confinement as applied to prisoners with mental disabilities." *Id.*

In sum, *Porter* changed the baseline analysis for Eighth Amendment challenges to segregated confinement.  Until 2019, it had been the law in the Fourth Circuit that an indefinite stay in segregated confinement would not amount to an Eighth Amendment violation as long as the inmate was provided basic life necessities, such as food, clothing, exercise, and shelter.  It was equally clear that claims regarding the alleged deleterious effects of being alone—in other words, the "solitary" part of "solitary confinement"—would not give rise to an Eighth Amendment claim, even where the inmate alleged negative mental health effects from general isolation.  *See Mickle*,

174 F.3d at 471–72; *see also Williams*, 462 F. App'x at 354; *Shrader*, 761 F.2d at 981; *Sweet*, 529 F.2d at 860–61; *Breeden*, 457 F.2d at 580–81.

Against that backdrop, no reasonable corrections official (let alone *every* reasonable official) would have known, *at the time of the alleged misconduct* (2012–2019), that the then-prevailing conditions of confinement associated with the Step-Down Program violated the Eighth Amendment, particularly considering the penological justifications for imposition of those conditions in the first instance. Nor, as discussed above, did any of these Defendants *actually* know that those conditions of confinement were unconstitutional, given that the use of long-term administrative segregation had been repeatedly upheld as constitutional by numerous courts.[61] When determining the reasonableness of Defendants' continuing reliance on pre-*Porter* legal precedent, these decisions are certainly relevant, for "if there is a 'legitimate question' as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994). Thus, until the issuance of *Porter*—which "changed the state of the law" with respect to Eighth Amendment challenges to segregated confinement—Defendants were entitled to rely upon the existing precedent in this Circuit and allow those decisions to guide their conduct.

In conclusion, no Defendant, charged with knowledge of existing law, would have believed that, because of the conditions of confinement within the Step-Down Program (which, in fact, became less restrictive over time), they were violating Plaintiffs' Eighth Amendment rights. For existing precedent did not establish, "beyond debate," that the conditions challenged by Plaintiffs

---

[61] As noted above, prior to *Porter*, several district court cases had held that the conditions of confinement at ROSP, based on allegations virtually indistinguishable from those of these Plaintiffs, did not violate the Eighth Amendment, and at least three of those opinions were affirmed on appeal. *See Obataiye-Allah*, 688 F. App'x at 212; *DePaola*, 703 F. App'x at 206; *Mukuria*, 706 F. App'x at 139.

were unconstitutional. *Ashcroft*, 563 U.S. at 741. This being the gravamen of any qualified immunity analysis, Defendants are entitled to qualified immunity as to Plaintiffs' Eighth Amendment claim for damages. *See Hamner v. Burls*, 937 F.3d 1171, 1179 (8th Cir. 2019); *accord Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 450 (3d Cir. 2020); *Grissom*, 902 F.3d at 1174.

> ### 2. At summary judgment, and in light of the facts established in discovery, the traditional, full qualified immunity analysis is appropriate here.

The Fourth Circuit has, by its own characterization, "effectively done away with the clearly established prong of qualified immunity for a subset of deliberate indifference" claims. *Younger v. Crowder*, No. 21-6422, 2023 WL 5438173, at *9 n.17 (4th Cir. Aug. 24, 2023) (citing *Pfaller v. Amonette*, 55 F.4th 436, 445–48 (4th Cir. 2022)). Specifically, in the earlier appeal in this case, the Fourth Circuit reasoned, "when plaintiffs have made a showing sufficient to demonstrate an intentional violation of the Eighth Amendment, they have also made a showing sufficient to overcome any claim to qualified immunity," at least at the motion to dismiss phase of litigation. *Thorpe*, 37 F.4th at 934 (internal quotation marks omitted); *see also Pfaller*, 55 F.4th at 448.

The Fourth Circuit's reasoning does not apply at this stage of the litigation, however, because the actual record evidence now before the Court does not demonstrate any knowing and intentional violation of the Eighth Amendment, particularly in light of the penological justifications underlying the Step-Down Program, which were not considered at the motion-to-dismiss phase. The full qualified immunity analysis, set forth above, is therefore appropriate.

As explained in *Pfaller*, "Eighth Amendment cases exist on a spectrum of intent and harm." 55 F.4th at 446. And, according to the Fourth Circuit, there is no need to specifically evaluate whether a constitutional right was "clearly established" if "each prong merely duplicates the other's work." *Id.* But the Fourth Circuit acknowledged that, as to some cases, "there may be more attenuation between the risk of harm and the defendant's knowledge that his conduct is

*constitutionally deficient*." *Id.* The Fourth Circuit appears to have created a sliding scale, by which some but not other Eighth Amendment defendants may avail themselves of the full analytical range of qualified immunity. Perhaps the distinction turns on what the defendant is *alleged* to have known and done (if qualified immunity is raised at the motion-to-dismiss phase) and what the record evidence establishes the defendant *actually* knew and did (if, as here, qualified immunity is raised at the summary judgment phase).

In the prior appeal in this case, the Fourth Circuit interpreted *allegations* "that prison officials knew the harm that long-term solitary confinement caused, yet disregarded it," were actually aware of "a serious risk of harm," "had daily contact with [the p]laintiffs," and "had been pressured to abandon similar solitary-confinement systems several times before." *Id.* at 447 (discussing *Thorpe*, 37 F.4th at 933–35). It determined that the Plaintiffs sufficiently alleged a knowing and intentional violation of the Eighth Amendment, which the court deemed enough to overcome a qualified immunity defense at that phase of the litigation. *Id.* The Fourth Circuit evidently concluded that, if the allegations against a defendant are so alarming that the defendant's alleged conduct would violate the law under any standard (obvious harm plus actual knowledge plus intentional failure to act), then there is no need to address the objective prong of the deliberate indifference analysis or more deeply analyze the probable effect of clearly established law on a defendant's actions—at least, when qualified immunity is raised in a motion to dismiss. *Id.* at 448.

In *Pfaller*, however, the Fourth Circuit retreated from this position, observing that if there is no case law identifying "what minimum procedures a prison had to use," and "no precedent . . . would have made clear to [the defendants] that they were overseeing a system that violated the constitution," then a policymaker-defendant may receive the full benefit of the qualified immunity analysis: "In such a case, the 'clearly-established' prong of the qualified-immunity analysis

103

continues to perform work independent of the 'constitutional violation' prong," and "a court may still inquire into whether a right was clearly established to determine if the defendants are entitled to qualified immunity." *Id*.

The Fourth Circuit has not yet resolved the apparent disconnect between these analytical approaches.  On the one hand, the Fourth Circuit seems to be saying that the precise contours of the law don't matter in deliberate indifference cases, where defendants are alleged to have been intentionally indifferent (*Thorpe*).  On the other hand, the Fourth Circuit seems to recognize that, if the law doesn't clearly prohibit the defendants' conduct, then a court should still decide whether the constitutional right was clearly established at the time of the defendants' actions, particularly if the defendants are policymakers who are somewhat removed from day-to-day actions directly affecting the plaintiff (*Pfaller*).  The Fourth Circuit does not explain how courts should determine where a defendant falls on this "spectrum of intent and harm" (and therefore how to consistently ascertain which approach to follow).  *Id*. at 446.

Nevertheless, each of the Defendants here—policy makers who created and oversaw the Step-Down Program, not individuals who directly or regularly interacted with the named Plaintiffs—are entitled to the "full" qualified immunity analysis.  In *Pfaller*, for example, the Fourth Circuit engaged in the full qualified immunity analysis for a VDOC official who "designed" treatment guidelines for hepatitis C but did not personally interact with the plaintiff; it held that the official was entitled to qualified immunity because he "was not on sufficient notice that he was violating a clearly established right."  *Id.* at 454.  Although the court found that the case law "sufficed to give [a treating physician] fair warning that he could not deny necessary medical treatment," the law "was not enough to give [the policymaker] fair warning that his system-wide treatment Guidelines . . . were constitutionally deficient," because "[t]hose contexts differ."  *Id.*

104

In applying qualified immunity, the court emphasized the "varying case law" at the time the guidelines were adopted, which showed "the inherent gray area that [the official] was operating in." *Id.* at 455.

Similarly, here, there was "no precedent on the books"—and certainly not before *Porter*—that would have made clear to Defendants that, by creating a program that would allow inmates to progress through and out of segregation, they were designing or overseeing "a system that violated the Constitution." *Id*. And even in *Porter*, the Fourth Circuit recognized that placing inmates in segregation as a result of their "in-prison conduct" remained permissible, particularly where there is "an avenue for removing themselves from segregation." 923 F.3d at 359. As discussed above, each of the named Plaintiffs here was placed into segregation based on their in-prison conduct and/or because he posed risks to other prisoners, and each named Plaintiff still housed in a VDOC facility ultimately transitioned through and out of restrictive housing. Even under the more stringent standard articulated in *Porter*, then, Defendants here were not sufficiently on notice that their *actual* conduct (as opposed to their *alleged* conduct) might violate the Eighth Amendment.

### 3. The traditional, full qualified immunity analysis should always be applied.

Defendants expressly preserve their argument that the Fourth Circuit erred in collapsing qualified immunity's two-pronged inquiry for certain deliberate indifference claims. *See Thorpe*, 37 F.4th at 938–39 (acknowledging the Ninth Circuit's contrary approach). Doing so eviscerates the full protections of qualified immunity—intended to protect defendants "from suit" as well as liability, *Meyers*, 713 F.3d at 731—for officials who look to decisional law to inform their decisionmaking. For instance, as noted above, here there are many decisions from this Court, some affirmed by the Fourth Circuit, rejecting Eighth Amendment challenges to the Step-Down Program. While it is true that prison officials' awareness of these decisions may ultimately help

establish that they lacked a "culpable mental state" for the subjective prong of a deliberate-indifference claim to be established, the decisions are first relevant to determining whether the objective prong is established.  It should matter that, for instance, "*Porter* was the first case in this Circuit to hold severe isolation alone can deprive prisoners of 'the minimal civilized measure of life's necessities,' violating the Eighth Amendment."  *Thorpe*, 37 F.4th at 937 (quoting *Farmer*, 511 U.S. at 838).  Instead, the Fourth Circuit's approach imposes the possibility of liability—and the certainty of litigation burdens—on prison officials who, despite not being equipped to cast judgment on the constitutionality of conditions, merely had awareness of those conditions.

Defendants submit that the approach adopted in *Thorpe*, as modified in *Pfaller*, does not comport with the underlying purpose of qualified immunity and Supreme Court precedent establishing the scope of its protections.

## III.    Dr. Herrick should be dismissed with respect to Plaintiffs' constitutional claims.

To hold an official liable under 42 U.S.C. § 1983, an inmate must show that the official was personally involved in the alleged constitutional violation.  In the words of the Fourth Circuit, liability under Section 1983 "will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights."  *Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (liability under § 1983 is "personal, based upon each defendant's own constitutional violations").  Thus, in *Taylor v. Manis*, No. 7:19-CV-00434, 2020 WL 354753 (W.D. Va. Jan. 21, 2020), for instance, this Court dismissed an inmate's case where the plaintiff failed to allege that any prison official "personally took any particular action or made any relevant decision."  *Id.* at *1.

Here, discovery produced no evidence that Dr. Steve Herrick, VDOC's Health Services Director, committed any of the conduct Plaintiffs challenge in connection with their due-process claim.  There is no evidence that Dr. Herrick had any involvement in promulgating the policies

governing the procedures of the Step-Down Program, determining named Plaintiffs' progress through the Step-Down Program, or interacting with named Plaintiffs in any other respect legally relevant to their due-process claim.  Likewise, Dr. Herrick had no involvement in setting the conditions of confinement in the Step-Down Program.  And, there being no evidence that he had any personal interactions with any of the named Plaintiffs, he cannot be held liable for any Eighth Amendment violation.

Given the absence of evidence that Dr. Herrick "personally took any particular action or made any relevant decision," the constitutional claims against him should be dismissed.  *Taylor*, 2020 WL 354753, at *1.

## IV. Defendants are entitled to summary judgment on the Disability Plaintiffs' ADA and RA claims (Counts VI and VII) because there is no evidence of disability discrimination and no evidence a reasonable accommodation was denied.

Summary judgment is warranted on the claims under Title II of the Americans with Disabilities Act and the Rehabilitation Act brought by the Disability Plaintiffs,[62] for two independent reasons.  First, the record does not show that the Disability Plaintiffs were discriminated against because of a mental disability while participating in the Step-Down Program.  Second, the record does not show that the Disability Plaintiffs sought a reasonable accommodation to participate in the Step-Down Program that VDOC knew of or denied.  There is no evidence to the contrary.

---

[62] The "Disability Plaintiffs" are named Plaintiffs Steven Riddick, Dmitry Khavkin, Brian Cavitt, and Gary Wall.  *See, e.g.*, Compl. ¶¶ 214, 251, 260.

**A.      The Disability Plaintiffs' ADA and RA claims fail as a matter of law because there is no evidence they were subjected to discrimination because of a mental disability while participating in the Step-Down Program.**

To advance a disability discrimination claim under the ADA or RA, a plaintiff must establish, among other things, that he was (1) disabled and (2) "excluded from participation in or denied the benefits of [a] service, program, or activity, or otherwise discriminated against, on the basis of his disability."  *Spencer v. Earley*, 278 F. App'x 254, 261 (4th Cir. 2008); *see also Richardson v. Clarke*, 52 F.4th 614, 619 (4th Cir. 2022).

Every named Disability Plaintiff completed the Step-Down Program.  Even Riddick, who testified at deposition that he did not "think [he] could get through [the Step-Down Program] because of [his] mental health symptoms," Riddick Dep. at 109:8–110:6, undisputedly completed the Step-Down Program, SUMF ¶ 119.

Cavitt completed the Step-Down Program and admits that his purported disabilities did not prevent him from completing the program.  Cavitt Dep. at 296:6–8.  He was moved to general population on or about April 9, 2021.  SUMF ¶ 101.

Khavkin alleges he suffered from mental health issues, but he does not complain that these issues made it more difficult for him to progress through the Step-Down Program.  Khavkin Dep. at 235:8–238:16.  Indeed, Khavkin successfully completed the Step-Down Program, testifying that he "completed every program Red Onion had to offer" and "spoke very highly of the program," and was assigned to general population by April 2019.  SUMF ¶ 110.

While Wall alleges he suffers from anxiety and PTSD, and admits these impairments did not keep him from participating in the Step-Down Program, he contends that they "hindered" his progress through the Step-Down Program because he was "triggered due to his disability" to catch "some charges" that he believes counted against him completing the program "all the way."  Wall Dep. at 265:18–266:17.  But, when pressed, Wall admitted that his alleged mental disabilities did

not prevent him from satisfying any of the Step-Down Program's requirements, including completing the required journals, *id.* at 269:6–13; standing for count, *id.* at 269:14–270:9; maintaining personal grooming, *id.* at 270:10–12; keeping his cell orderly, *id.* at 270:13–16; and maintaining proper rapport with officers, *id.* at 270:17–271:18.

As to each of these Named Plaintiffs, there is no evidence that VDOC took any adverse action against them in relation to the Step-Down Program due to any alleged mental disability. Without competent evidence supporting this fundamental showing, VDOC is entitled to summary judgment on their disability discrimination claims as a matter of law.

Moreover, as to Riddick and Wall's ADA and RA claims, it is undisputed that, on multiple occasions, Riddick and Wall voluntarily refused to participate in and progress through the Step-Down Program or participate in the *Challenge Series*. SUMF ¶¶ 119, 128.  In fact, Riddick admitted that he did not attempt to participate in the Step-Down Program in earnest until after February 2021.  SUMF ¶ 119.  Thus, to survive summary judgment, Riddick and Wall must not only show that VDOC took adverse action against them in relation to the Step-Down Program due to their alleged mental impairments, they also must show that the adverse action was taken while they were participating in the program for which they now claim they were denied access, as they cannot legally or logically claim that VDOC excluded them from participating in a program or denied them its benefits during the period of time when they voluntarily refused to participate.

**B.    The Disability Plaintiffs' ADA and RA claims fail as a matter of law because there is no evidence they sought reasonable accommodations to participate in the Step-Down Program, that VDOC should have known reasonable accommodations were needed, or that reasonable accommodations were denied.**

To advance a disability discrimination claim under the ADA or RA for failing to provide a reasonable accommodation, a plaintiff must establish, among other things, that he proposed a reasonable modification to the challenged public program that would have allowed him the

meaningful access he seeks, and that the defendant denied the reasonable accommodation that was proposed. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012) (defendant medical school was not "obligated to accommodate [the student's] disability until he 'provided a proper diagnosis . . . and requested specific accommodation'") (quoting *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998)); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016); *see also Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 414 (4th Cir. 2015) (plaintiff must allege defendant "had notice" of her disability and then deliberately "refused to make any reasonable accommodation").

*Patrick v. Martin*, No. 2:16-CV-216-D-BR, 2020 WL 4040969 (N.D. Tex. July 16, 2020), is instructive. In *Patrick*, the court granted summary judgment on a prison inmate's ADA and RA claims after finding the plaintiff made no specific requests for accommodation to the defendant criminal justice center. The plaintiff could not show that the alleged need for an accommodation for an alleged mental disability was "open, obvious, and apparent," and there was "no evidence that [the plaintiff] requested an accommodation in direct and specific terms from [the defendant] during the relevant time." *Id.* at *42; *see also Gonzales v. Bexar Cnty., Texas*, No. SA-13-CA-539, 2014 WL 12513177, at *5 (W.D. Tex. Mar. 20, 2014) (granting summary judgment to defendant county jail where the prison inmate plaintiff "did not ask for any mental health treatment and that his need for additional suicide prevention treatment was not 'open, obvious, and apparent'"); *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1087 (C.D. Ill. 2010) (summary judgment on ADA Title II claim where plaintiffs did not "demonstrate a factual basis for finding that any request for accommodation or medical treatment was made or that the need for such treatment was obvious").

Here, there is no evidence that any of the named Disability Plaintiffs sought a reasonable accommodation to participate in VDOC's Step-Down Program.  Nor is there evidence that VDOC knew or should have known that they each needed a reasonable accommodation to participate in the Step-Down Program.  And there is no evidence that VDOC denied such an accommodation to any of them.  To be sure, named Plaintiffs Riddick,[63] Khavkin,[64] and Cavitt[65] asserted that they complained to various people about various issues from time to time—*e.g.*, asking to be removed from solitary confinement or long-term segregation altogether, requesting mental health treatment and medication, asking for certain religious accommodations—but none of these issues concern VDOC's alleged failure to provide a reasonable accommodation to participate in the Step-Down Program.  As for named Plaintiff Wall, he complained that unnamed "officers" would "trigger to get [him] to react and start [him] over with the program, *see* Wall Dep. at 237:2–17, but he does not claim that he requested an accommodation to participate in the program, and admits he completed the program, *see id.* In the absence of a showing, with competent evidence, that VDOC denied them a reasonable accommodation, VDOC is entitled to summary judgment as a matter of law on their reasonable accommodation claim.

Moreover, no evidence has been adduced that the named Disability Plaintiffs have identified any reasonable accommodation for their alleged mental disability that allegedly was needed to *participate* in the Step-Down Program.  To the contrary, Riddick and Cavitt testified that they should not have been placed in long-term segregation at all, which is immaterial to the

---

[63] Riddick Dep. at 28:13–43:19, 89:9–90:9, 113:14–119:10, 123:2–124:13, 128:22–132:12, 143:2–144:2.

[64] Khavkin Dep. at 83:12–84:19, 101:17–102:18, 105:11–21.

[65] Cavitt Dep. at 39:18–42:9, 44:12–46:9, 57:12–58:6, 58:11–59:7, 136:4–9, 137:10–16.

claims they make.  Riddick Dep. at 113:14–119:10; Cavitt Dep. at 149:8–155:19.  Unless the named Disability Plaintiffs can each identify a reasonable accommodation that VDOC failed to provide, VDOC is entitled to summary judgment on their claims.

**V.   The applicable statutes of limitations preclude the claims of some class members.**

**A.   Defendants are entitled to summary judgment on the Eighth Amendment and due-process claims brought by any class members who left the Step-Down Program more than two years before the filing of the Complaint.**

Plaintiffs' Section 1983 claims are subject to a two-year statute of limitations for personal injuries under Virginia law.  *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018).  This applies to Plaintiffs' claims under the Eighth and Fourteenth Amendments.  *Id.*; *Lawrence v. Cooper*, 398 F. App'x 884, 887 (4th Cir. 2010) (finding state personal injury statute of limitations applied to Section 1983 claims for Fourteenth Amendment violations).  Claims accrue from the date a plaintiff becomes aware of, or has reason to know, of the harm inflicted.  *Id.*  Under certain circumstances, particularly in the context of an Eighth Amendment claim, a plaintiff may extend a statute of limitations under a continuing violations theory, but in any case, cannot extend the accrual date beyond the point when they stopped experiencing any violative conditions.  *Id.*

Here, Plaintiffs' claims are specific to the Step-Down Program at Red Onion and Wallens Ridge.  They do not allege general harm from incarceration elsewhere in VDOC custody.  Thus, they must have filed their claims within two years of their exposure to the Step-Down Program, as they could not have experienced any of the violative conditions alleged in the suit after re-assignment to other conditions of confinement.

Plaintiffs filed their Complaint on May 6, 2019.  ECF No. 1.  Thus, the Court should dismiss the individual claims for damages for any named Plaintiffs or class members who left the Step-Down Program on or before May 5, 2017.

**B.     The Disability Plaintiffs' ADA and RA claims that accrued before May 6, 2018 are barred by the applicable statutes of limitation.**

As a general rule, "the one-year limitations period in the Virginia [Rights of Persons with] Disabilities Act" applies to ADA and RA claims brought in Virginia.  *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011); *see also Wolsky v. Med. Coll. of Hampton Rds.*, 1 F.3d 222, 224 (4th Cir. 1993); Va. Code § 51.5-46(B). The limitations period begins to run when the plaintiff knows or should have known of the alleged discriminatory event.  *ASoc'y Without a Name*, 655 F.3d at 347–48.

Plaintiffs initiated this lawsuit by filing their Complaint on May 6, 2019.  Applying the general rule to the Disability Plaintiffs' ADA and RA claims, the one-year statute of limitations extends back to May 6, 2018.  All allegedly discriminatory actions that occurred before that date are barred as a matter of law.

As explained below, while the Disability Plaintiffs have asserted that the continuing violations exception saves any individual ADA and RA claims predicated on events that occurred before May 6, 2018, they cannot invoke that exception to revive claims based on discrete acts of discrimination, such as discriminatory decisions not to progress a plaintiff through the Step-Down Program (*i.e.*, "failures to promote") or decisions to move a plaintiff back in the Step-Down Program (*i.e.*, "demotions").  Nor can they invoke the continuing violations exception to revive claims of discriminatory failures to accommodate that are otherwise facially time-barred.  And, as also explained below, even assuming that if the Court decides to apply the continuing violations exception (it should not), (1) the Disability Plaintiffs' individual disability discrimination claims still fail as a matter of law because there is no evidence they were personally subjected to at least one discrete act of disability discrimination during the relevant time period, which is required to establish the exception, and (2) all disability discrimination claims that occurred before May 6,

2018 which are asserted by putative class members who did not participate in the Step-Down Program since May 6, 2018 fail as a matter of law for the same reason.

### 1. The continuing violations exception does not apply to individual disability discrimination claims.

Each of the Disability Plaintiffs argues that any allegedly discriminatory actions that occurred before May 6, 2018, are timely despite the one-year statute of limitations because the Step-Down Program has existed since 2012 and, under the continuing violations exception, all adverse actions taken since then against inmates with mental health disabilities relating to the Step-Down Program are timely and actionable.

They are wrong. There is no logical or legal basis for the continuing violations exception to apply to Plaintiffs' individual disability discrimination claims, as explained below.[66]

The analysis of the named Disability Plaintiffs' continuing violations argument is controlled by *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)—a seminal decision in which the U.S. Supreme Court eliminated the continuing violations doctrine when applied to discrete discriminatory acts.[67]   Before *Morgan*, lower courts offered a variety of

---

[66] The Court recently amended its certification of the disabilities classes, defining them to require that an inmate be classified at the MH-2S "Substantial Impairment" code or higher at the time of their Level S or Level 6 security level classification. ECF No. 358. No Disability Plaintiff (indeed, no named Plaintiff) meets this definition and, thus, they are not members of the class.

[67] In denying VDOC's motion to dismiss, the Court rejected VDOC's arguments that the relevant statutes of limitation barred certain disability discrimination claims, noting that Plaintiffs pleaded that "[t]he prison committee meets monthly to conduct internal reviews." *See Thorpe*, 2021 WL 2435868, at *9. This presumably was a reference to Plaintiffs' allegation that the monthly meetings of the BMC are held "in secret, with no notice to the prisoner and no opportunity to be heard." Compl. ¶ 169.. Assuming the truth of Plaintiffs' allegations for purposes of adjudicating VDOC's motion to dismiss, the Court ruled that, because the monthly meetings Plaintiffs referenced would have occurred within one year from the Complaint's filing in May 2019, Plaintiffs could invoke the continuing violations exception to revive claims occurring before May 2018 that otherwise would have been facially time-barred. *See Thorpe*, 2021 WL 2435868, at *9.

divergent solutions to the question of whether misconduct falling outside the statutory time period was actionable. In *Morgan*, however, the Supreme Court substantially limited the application of the continuing violations exception, holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Rejecting arguments that the continuing violations doctrine should apply to revive purported "serial violations" that were otherwise time-barred, the Court explained that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.*[68]

It is well-established that claims for unlawful discrimination—including discriminatory demotion claims, discriminatory "failure to promote" claims, and discriminatory "failure to accommodate" claims—are not "continuing violations," and therefore they are time-barred. *See, e.g.*, *Morgan*, 536 U.S. at 114 (explaining that "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or refusal to hire" would not be subject to the continuing violations doctrine); *Hill v. Hampstead Lester Morton Ct. Partners LP*, 581 F. App'x 178, 181

---

The Court's previous order does not preclude an award of summary judgment to Defendants. Summary judgment requires an application of the law to the undisputed facts, not to mere allegations in a complaint that the Court must accept as true. Here, the undisputed facts surrounding Plaintiffs' claims for unlawful discrimination—including discriminatory demotion claims, discriminatory "failure to promote" claims, and discriminatory "failure to accommodate" claims—establish that the named Plaintiffs received written notice every 90 days of the allegedly discriminatory decisions. Thus, under applicable law, the continuing violations exception cannot apply. Indeed, as a result, "the accrual determination" now requires "more than limited individualized inquiries," such that both summary judgment and decertification is warranted. *See Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2023 WL 2908575, at *12 (W.D. Va. Apr. 12, 2023) [ECF No. 229 at 33–34].

[68] The Court carved out an exception for hostile work environment claims because, by their very nature, those claims involve repeated acts of misconduct that must be deemed sufficiently "pervasive" to rise to the level of actionable harassment. *Morgan*, 536 U.S. at 127. Thus, hostile environment claims "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id*. But the exception for hostile work environment claims does not apply to claims for unlawful discrimination.

(4th Cir. 2014) ("a defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission," and as such, the continuing-violation doctrine is inapplicable to failure to accommodate claims); *Williams v. Giant Food Inc*., 370 F.3d 423, 429 (4th Cir. 2004) ("Because failure to promote is a discrete act of discrimination . . . , the continuing violation doctrine does not apply here and cannot save Williams's untimely claims."). This Court, and many others within the Fourth Circuit, have applied this principle.[69]

*Szedlock v. Tenet*, 61 F. App'x 88, 93 (4th Cir. 2003), is instructive here. There, a hearing-impaired employee alleged that the CIA failed to provide her with reasonable accommodations, such as an oral interpreter or note-taker for large group meetings. *Id.* at 90–91. The CIA moved to dismiss the plaintiff's RA claim, asserting (among other reasons) that the statute of limitations barred certain violations that predated the applicable period of limitations. *Id.* at 91–92. The plaintiff argued that the earlier claims were part of a continuing violations and, therefore, were timely. *Id.* at 93. But the Fourth Circuit rejected the plaintiff's argument, finding that "unless the plaintiff alleges a hostile work environment (which [the plaintiff] did not do), each instance of discrimination is a discrete act" that is time-barred, and the earlier discriminatory actions would not be revived "simply because they resemble later discriminatory actions." *Id.*

The same reasoning applies here. Under binding Supreme Court and Fourth Circuit precedent, the named Disability Plaintiffs cannot invoke the continuing violations exception to

---

[69] *See, e.g.*, *Hager v. First Va. Banks, Inc.*, CIV.A.7:01CV00053, 2002 WL 57249, at *8 (W.D. Va. Jan. 10, 2002) ("the doctrine of continuing violation does not apply" to plaintiff's failure to accommodate claim); *Mattison v. Md. Transit Admin.*, No. CV JKB-21-00168, 2021 WL 4503566, at *5 n.3 (D. Md. Oct. 1, 2021) ("the continuing violation doctrine does not apply to discrete acts, such as his demotion in 2012"); *Thompson v. TD Bank, N.A.*, No. 3:22-CV-2547-SAL-PJG, 2023 WL 4838223, at *2 (D.S.C. July 28, 2023) ("the continuing violation theory does not apply to allegations of failure to promote because each instance of failure to promote is a discrete act of discrimination").

revive individual claims for discriminatory demotions and failures to promote within the Step-Down Program, or discriminatory failures to accommodate, that are otherwise facially time-barred, as these are claims for discrete acts of disability discrimination—*not* hostile work environment claims that are subject to the continuing violations exception.

Importantly, this is true even if the named Disability Plaintiffs argue that the discrete acts of disability discrimination directed to them were part of a larger systemic policy.  The Fourth Circuit has "declined to extend the limitations periods for discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 220 (4th Cir. 2007); *Burgess v. Costco Wholesale Corp.*, No. 4:10-CV-1678-RBH, 2013 WL 645982, at *3 (D.S.C. Feb. 21, 2013), *aff'd*, 533 F. App'x 271 (4th Cir. 2013) (finding continuing violations doctrine inapplicable to make plaintiff's claims timely because the later claims were directed at others, not plaintiff); *see also Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) ("[I]f the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful [] policy could be untimely.").

### 2. Individual disability discrimination claims that accrued before May 6, 2018 are untimely.

It is undisputed that all inmates, including each named Disability Plaintiff, received written notice of any failures to promote or demotions within the Step-Down program, every ninety days, when VDOC issued Institutional Classification Authority Forms to its inmates.  SUMF ¶ 34.

For example, Riddick was placed on written notice that VDOC returned him to segregation in August 2014 for the stated reasons that he was unable to stay infraction-free and because he exhibited poor behavior and adjustment to population.  SUMF ¶ 119.  The written notice also stated that the ICA recommended he be returned to segregation where he could benefit from the security,

117

supervision, and programs of segregation. *Id.* There can be no dispute that this signified a demotion in his progress through the Step-Down Program. *Id.*; Riddick Dep. at 31:18–20. Yet, although Riddick sent several requests stating that he wanted to be removed from programming, he failed to complain that his demotion was discriminatory or that he needed a reasonable accommodation to progress through the Step-Down Program and out of segregation. *Id.*

For another example, Khavkin was placed on written notice that VDOC demoted him in as early as 2013 (or when they failed to advance him or demoted him in the Step-Down Program between 2014 and 2016). Specifically, between February and March 2013, ICA recommended a security level change for Khavkin to segregation because he was under investigation for the killing of his cell partner. SUMF ¶ 110. Between 2014 and 2016, Khavkin continued to make forward progress through the Step-Down Program, either advancing or remaining at the same status level, until around December 2016, when ICA recommended that he be moved to SL-S and advised that he could not stay in the IM Closed Pod due to poor adjustment. *Id.* It is undisputed that Khavkin was aware of these security level changes and status changes, as all inmates received written notice of their status, including any failures to promote or demotions within the Step-Down program, every ninety days when VDOC issued ICA forms to its inmates. SUMF ¶ 34.

Cavitt's claim fares no better. He was placed on written notice that VDOC demoted him as early as 2017. In February 2017, the ICA recommended that Cavitt remain in segregation because he had not met the requirements of the Step-Down Program. SUMF ¶ 101. The ICA made the same recommendation in May 2017, and again in July 2017. *Id.* Between December 2017 and January 2018, the ICA again failed to advance Cavitt through the Step-Down Program, and advised that he needed to continue to work to meet the Program's requirements, including completing the *Challenge Series* and maintaining infraction-free behavior. *Id.* It cannot be disputed that Cavitt

was aware of these security level changes and status changes, as all inmates received written notice of their status, including any failures to promote or demotions within the Step-Down program, every ninety days when VDOC issued ICA forms to its inmates.  SUMF ¶ 34.

Finally, Wall was placed on reasonable notice that VDOC returned him to segregation in as early as September 2015, or when it failed to advance him through the Step-Down Program between April 2016 and March 2018.  For example, after being assigned to general population in or around May 2015, he was placed back in segregation starting in or about September 2015.  SUMF ¶ 128.  He then refused to participate in the Step-Down Program, including in or around April 2016 and March 2018.  *Id.*  It is undisputed that Wall was aware of these security level changes and status changes, as all inmates received written notice of their status, including any failures to promote or demotions within the Step-Down Program, every ninety days when VDOC issued ICA forms to inmates.  SUMF ¶ 34.

Bottom line:  the Disability Plaintiffs' disability discrimination claims that are predicated on allegations they were subjected to disability discrimination when VDOC demoted them within the Step-Down Program before May 6, 2018, failed to promote them within the Step-Down Program before May 6, 2018, and failed to provide a reasonable accommodation to allow them to participate in the Step-Down Program before May 6, 2018, are untimely.  These are inherently individualized acts of alleged discrimination that are independently actionable in and of themselves—not instances of hostile work environment harassment that must be aggregated to demonstrate they are sufficiently "pervasive" in order to become actionable.  Accordingly, these individual disability discrimination claims are not subject to the continuing violations exception under existing Supreme Court and Fourth Circuit precedent.

**3.     Even assuming the continuing violations exception could apply to the Disability Plaintiffs' disability discrimination claims that accrued before May 6, 2018—which VDOC denies—there is no evidence that they were personally subjected to disability discrimination while participating in the Step-Down Program during the relevant period.**

To invoke the continuing violations exception to revive claims that are otherwise time-barred under the one-year statute of limitations, a plaintiff must establish as a "necessary requirement" that at least one of the acts that allegedly comprises the continuing violations is timely. *Morgan*, 536 U.S. at 117.

But there is no evidence that VDOC took any adverse action against the named Disability Plaintiffs in relation to the Step-Down Program between May 6, 2018 to May 6, 2019 because of their alleged mental disability.[70]  Unless they can make this fundamental showing, within the relevant limitations period, with competent evidence, they cannot avail themselves of the continuing violations exception.[71]

To the extent that Riddick points to disciplinary charges he received since May 6, 2018 for disruptions and making threats against VDOC officers,[72] or Cavitt points to disciplinary charges he received since then for disruptions and making threats against VDOC officers,[73] or Wall points

---

[70] Indeed, there is no evidence that they were disabled or that VDOC took adverse action against them at any time they were in the Step-Down Program.

[71] The Disability Plaintiffs can no longer rely on their mere allegations about allegedly "secret" monthly prison committee meetings, Compl. ¶ 169,  as (1) pleading allegations are not evidence, and (2) the Named Plaintiffs have no evidence that adverse actions were taken against them due to their alleged mental disabilities at any such "secret" meeting.

[72] *See, e.g.*, CP-20-cv-7_00002648; VADOC-00135946; VADOC-00135947; VADOC-00135948; CP-20-cv-7_00004203; VADOC-00175542 (collectively attached as Ex. 69).

[73] *See, e.g.*, VADOC-00004082, VADOC-00135597 (collectively attached as Ex. 70).

to disciplinary charges he received since then,[74] Plaintiffs have presented no evidence that these charges were imposed *because of* Plaintiffs' alleged mental disability, and not for the non-discriminatory reason that VDOC rules of conduct apply to and are enforced against all inmates. The ADA or RA cannot insulate inmates from discipline for violating institutional rules or disrupting the correctional facility.  *See Bryan v. Prince George's Cnty., Md.*, 484 F. App'x 775, 777 (4th Cir. 2012) (plaintiff "points to no evidence tending to show that Defendant's non-discriminatory reasons for disciplining him were a pretext for intentional discrimination"); *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (insubordination or poor workplace demeanor can constitute a legitimate and nondiscriminatory basis for disciplining plaintiff).

Likewise, Khavkin cannot identify any denial of accommodation, demotion, or failure to advance in the Step-Down Program since May 6, 2018.  Indeed, he continued to progress through the Step-Down Program throughout 2018, culminating in his transfer from SL-S to SL-6 in or around October 2018.  He entered general population in or around April 2019.  SUMF ¶ 110. Given his successful progress through the Step-Down Program, Khavkin cannot demonstrate that he was discriminated against during the relevant period, and he therefore cannot establish that the continuing violations exception is applicable.

> **4.      All class claims predicated on allegedly discriminatory actions relating to the Step-Down Program that occurred before May 6, 2018, asserted by putative class members who did not participate in the Step-Down Program after May 6, 2018, are barred by the statute of limitations as a matter of law.**

As with the Disability Plaintiffs' ADA and RA claims, a one-year limitations period applies to class members' ADA and RA claims, and the limitations period began to run when the class

---

[74] *See, e.g.*, VADOC-00175655, VADOC-00175656, VADOC-00175657, VADOC-00175658, VADOC-00175660) (collectively attached as Ex. 71).

members knew or should have known of the alleged discriminatory event. *A Soc'y Without a Name*, 655 F.3d at 347–48. Because the Complaint in this case was filed on May 6, 2019, the one-year statute of limitations on class members' ADA and RA claims began to accrue no earlier than May 6, 2018, and any allegedly discriminatory adverse actions that occurred before then are barred by limitations as a matter of law.

As set forth above, the continuing violations exception does not apply to individual acts of disability discrimination relating to the Step-Down Program. However, assuming for purposes of argument that the continuing violation exception could apply, which VDOC denies, it could not apply as a matter of law to claims asserted by putative class members who have not participated in the Step-Down Program since May 6, 2018. That is because, to invoke the continuing violations exception to revive claims that otherwise are time-barred, a plaintiff must establish as a "necessary requirement" that at least one of the acts that allegedly comprises the continuing violation is timely. *See Morgan*, 536 U.S. at 117. Thus, only those class members who were housed at VDOC and participated in the Step-Down Program as of May 6, 2018 can possibly have timely claims, as they are the only class members who conceivably could point to an allegedly discriminatory act that occurred in the relevant time frame.[75] Class members who were not housed at VDOC or who did not participate in the Step-Down program since May 6, 2018 cannot point to an allegedly discriminatory act adverse to them that allegedly comprises the continuing violations within the applicable limitations period. Thus, they cannot seek to revive time-barred claims by and through the continuing violations exception.

---

[75] Again, stating the obvious, whether class members can point to an allegedly discriminatory act adverse to them that allegedly comprises the continuing violation within the applicable limitations period is an inherently individualized inquiry and cannot be addressed on a class-wide basis.

**VI.     Even if Plaintiffs' claims are not barred entirely, the scope of their recoverable relief is limited.**

    **A.     Given the PLRA's restriction on the scope of potential prospective relief, the Court should dismiss any request for injunctive relief against VDOC.**

Plaintiffs make bold demands of this Court: that it "(1) abolish the Step-Down Program; and (2) end long-term solitary confinement at Red Onion and Wallens Ridge."  Compl. ¶ 270 (though not defining "long-term" or "solitary confinement").[76]  The Prison Litigation Reform Act ("PLRA") precludes such sweeping relief.  The PLRA requires that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A). Any relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right."  *Id.*  And in considering prospective relief, courts "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

Plaintiffs' requests for injunctive relief are neither appropriate nor necessary.  In light of the PLRA's requirements, any relief that might be granted (assuming Plaintiffs could even show a violation) is much more limited in scope than what Plaintiffs demand.  But, as with their substantive claims, changes both in the Step-Down Program and Virginia law have overtaken any requests for even "narrowly drawn" relief that Plaintiffs might have more appropriately sought.

---

[76] Their request for "permanent injunctive relief enjoining Defendants . . . from further violation of the Eighth and Fourteenth Amendments of the U.S. Constitution, the Americans with Disabilities Act, and the Rehabilitation Act," Compl. ¶ 272—*i.e.*, "an injunction that simply orders [D]efendant[s] to obey the law"—"is impermissible," *Miller v. Pilgrim's Pride Corp.*, No. 5:05CV00064, 2007 WL 2570219 at \*4 (W.D. Va. Aug. 31, 2017); *see also Matarese v. Archstone Cmtys., LLC*, 468 F. App'x 283, 284–85 (4th Cir. 2012) (vacating award of injunctive relief requiring defendant "to do nothing more than follow the law it is already required to follow").

As discussed above, the undisputed facts demonstrate that the conditions of confinement in the Step-Down Program do not resemble the conditions alleged in the Complaint, especially regarding inmates' out-of-cell time and group programming.   Meanwhile, all of the named Plaintiffs have left the Step-Down Program, and the overall number of inmates in the program has decreased precipitously.   SUMF ¶¶ 4, 97, 101, 104, 107, 110, 112, 115, 119, 122, 125, 128.   The Step-Down Program of 2023 is not the same as the Step-Down Program of 2019, when Plaintiffs filed the Complaint, and it resembles even less the program described in the Complaint.

Even if the Court finds that the Step-Down Program violated Plaintiffs' constitutional rights at some point during the relevant period (it did not), the Court should not order any injunctive relief, because it is not necessary based on changes to the Step-Down Program and Virginia law not reflected in the Complaint.   When a defendant discontinues allegedly unlawful conduct, a party seeking injunctive relief must demonstrate that such relief is "needed" such that there is some cognizable danger of a recurrent violation.   *Porter*, 923 F.3d at 364.   No injunctive relief is needed here.   The undisputed facts demonstrate that there is no cognizable risk of reversion to previous versions of the Step-Down Program.   Because injunctive relief is not "necessary to correct the violation of [a] Federal right," it is therefore foreclosed under the plain language of the PLRA. *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002).   As the Ninth Circuit has recognized, "if a violation no longer exists, the [PLRA] does not permit the court to order prospective relief."   *Id.*

Moreover, Virginia law already *requires* the types of things that a more "narrowly drawn" request for relief might have included.   *See* Va. Code § 53.1-39.2.   A new statute (effective as of July 1, 2023) outlines only four permissible reasons to place Virginia inmates in restorative housing; mandates weekly review of an inmate's placement in restorative housing; and requires VDOC to offer "a minimum of four hours of out-of-cell programmatic interventions or other

congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior, which may include recreation in a congregate setting." *Id*.  With this legislation, the Virginia General Assembly has provided, via other means, the relief Plaintiffs might have sought, and it moots their request for injunctive relief.  *See Catawba Riverkeeper Found. v. N.C. Dep't of Transp.*, 843 F.3d 583, 590 (4th Cir. 2016) (finding legislative action distinct from voluntary cessation of challenged conduct and supporting mootness).

### B.  Emotional distress and other compensatory damages are unrecoverable for the Disability Plaintiffs' ADA and RA claims.

Plaintiffs seek relief related to emotional distress under the ADA and the RA.  Compl. ¶ 258 ("Plaintiffs suffered injuries including pain and suffering, emotional distress, and an exacerbation of their mental illness."); *id.* ¶ 274 (praying for "compensatory damages for Defendants' contractual, constitutional, and statutory violations, including damages for emotional pain and suffering").  But such relief is not available in light of the Supreme Court's decision last year in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022); *see also* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act.").  And Plaintiffs are not entitled to any other compensatory damages they may be seeking because there is no evidence that Defendants intentionally discriminated against them based on a mental disability.

### 1.  *Cummings* eliminated the availability of emotional distress damages for ADA and RA claims.

In *Cummings*, the Supreme Court determined "emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes," including the Rehabilitation Act. 142 S. Ct. at 1576.  In the wake of that decision, the lower courts have extended the preclusive effect of *Cummings* to claims under Title II of the ADA.  Indeed, "district courts substantively

addressing this issue have seemingly unanimously concluded that, post-*Cummings*, emotional distress damages are not recoverable under Title II of the ADA." *Williams v. Colo. Dep't of Corr.*, No. 21-CV-02595-NYW-NRN, 2023 WL 3585210, at *6 (D. Colo. May 22, 2023).

These courts have reasoned that, because the ADA expressly incorporates Section 504's rights and remedies,[77] "if a certain category of damages is not available under Section 504, it is not available under Title II [of the ADA] either." *Montgomery v. District of Columbia*, No. CV 18-1928 (JDB), 2022 WL 1618741, at *24 (D.D.C. May 23, 2022); *see also A.T. v. Oley Valley Sch. Dist.*, No. CV 17-4983, 2023 WL 1453143, at *3 (E.D. Pa. Feb. 1, 2023) ("[A]lthough the ADA is not Spending Clause legislation, its text expressly incorporates the remedies available under a statute that is—the RA.  Plaintiffs may therefore not seek compensatory emotional damages under the ADA in this action."); *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023) ("Because Title II of the ADA incorporates the remedies set forth in the Rehab Act . . . , it therefore follows that emotional distress damages are also not available in suits brought under the ADA."); *M.D. v. Nebraska*, No. 4:21CV3315, 2022 WL 4540390, at *1 (D. Neb. Sept. 28, 2022) ("Because the Rehabilitation Act does not allow such [emotional distress] damages, neither does the ADA.").[78]

---

[77] *See Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("Section 203 of the ADA declares that the 'remedies, procedures, and rights set forth in [§ 505(a)(2) of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides' for violations of § 202.").

[78] *See also Hill v. SRS Distrib. Inc.*, No. CIV 21-370-TUC-CKJ, 2022 WL 3099649, at *5 (D. Ariz. Aug. 4, 2022) (finding it "unlikely [emotional distress] damages are available under the ADA"); *Faller v. Two Bridges Reg'l Jail*, No. 2:21-CV-00063-GZS, 2022 WL 3017337, at *4 n.8 (D. Me. July 29, 2022) ("It is likely that this limitation on compensatory damages extends to Plaintiff's ADA claim as well."); *Gillette v. Oregon*, No. 3:20-CV-00513-IM, 2022 WL 2819057, at *7 n.5 (D. Or. July 19, 2022) (noting that "the Supreme Court recently held that damages for emotional distress are not recoverable under the Rehabilitation Act, and therefore likely also under the ADA").

Because emotional distress damages are unavailable under the ADA or the RA, the Court should rule that Plaintiffs cannot recover such damages in connection with either claim.

>    **2.      The Disability Plaintiffs are not entitled to compensatory damages as a matter of law for the independent reason that there is no evidence of intentional discrimination due to a mental disability.**

A plaintiff cannot recover compensatory damages under either ADA Title II or the RA absent a showing of intentional discrimination, which is determined under a deliberate indifference standard.  *See Koon v. North Carolina*, 50 F.4th 398, 403 (4th Cir. 2022) (analyzing an ADA discrimination case under the deliberate indifference framework); *Basta v. Novant Health Inc.*, 56 F.4th 307, 316 (4th Cir. 2022) (same under RA).  Deliberate indifference is a "high bar," *Koon*, 50 F.4th at 406, and Plaintiffs cannot meet it.

Deliberate indifference is, at bottom, an "actual notice" standard.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).  "Simple failure to comply with the law is not deliberate indifference.  It is not enough simply to point to what could or should have been done. That is the language of negligence." *Koon*, 50 F.4th at 406.  Rather, deliberate indifference requires knowledge that a federally protected right is "substantially likely to be violated," and "a failure to act despite that knowledge."  *Id*. at 405.  A plaintiff must begin by showing "an ongoing or likely violation of a federally protected right . . . .  If there wasn't any ADA [or RA] violation . . . , there was nothing to be deliberately indifferent about."  *Id*.  The defendant "must know of the facts from which a federal-rights violation could be inferred and then actually draw the damning inference."  *Id.* at 406–07.

As detailed above, the Disability Plaintiffs did not:  identify any facts showing that their alleged disabilities prevented them from participating in the Step-Down Program; make any specific request for an accommodation to participate in the Step-Down Program; or show that any alleged demotion or failure to promote him in their progress through the Step-Down Program was

due to any alleged disability.  *See* Part IV.A–B *supra*.  But even assuming they had demonstrated a right to a reasonable accommodation to participate in the Step-Down Program—which Defendants deny—the Disability Plaintiffs have not made the showing required to create a genuine issue of fact that Defendants were deliberately indifferent with respect to this alleged right. Plaintiffs would need to show that Defendants knew Plaintiffs could not meaningfully participate in the Step-Down Program without reasonable accommodation, but then deliberately refused to make any reasonable accommodation.  There is no evidence this occurred.  Because Plaintiffs cannot make this fundamental showing with competent evidence, VDOC is entitled to summary judgment on their claim for compensatory damages.

## CONCLUSION

The Court should grant summary judgment in favor of Defendants.

September 8, 2023

Respectfully submitted,

**/s/ *Maya M. Eckstein***

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239
moshea@oag.state.va.us

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By:    */s/ Maya M. Eckstein*
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Defendants*

## INDEX OF EXHIBITS

1) Untitled document dated June 23, 2023 at Updated Exhibit 2

2) Senate Joint Resolution No. 184

3) U.S. Department of Justice, in its *Report and Recommendations Concerning the Use of Restrictive Housing* RO Admin Step Down Progress

4) Red Onion State Prison: Administrative Step Down Progress

5) Deposition of Harold Clarke dated September 10, 2020 (relevant portions); Def. Harold Clarke's Objs. & Answers to Pls.' First Set of Interrogs. to Harold Clarke

6) Evidence Based Practices Plan for Administrative Segregation at Red Onion and Wallens Ridge State Prisons

7) Operations Strategy for the Segregation Reduction Step-Down Plan dated August 28, 2012

8) Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated March 4, 2014

9) Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated August 2015

10) Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated September 2016

11) Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated September 2017

12) Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated February 2020

13) Deposition of Helen Scott Richeson dated February 9, 2023 (relevant portions)

14) Deposition of Randall Mathena Designated Representative – Day 1 dated April 4, 2023; Deposition of Randall Mathena – Day 2 dated April 5, 2023 (relevant portions)

15) Operating Procedure 861.3, Special Housing

16) Operating Procedure 830.A, February 18, 2013

17) Operating Procedure 841.4, Restrictive Housing Units

18) Operating Procedure 830.2, effective January 1, 2012

19) Operating Procedure 830.2, effective October 1, 2021

20) External Review Team Recommend Change Forms dated October 23, 2019

21) External Review Team Recommend Change Form dated October 17, 2018

22) Operating Procedure 830.A, effective February 15, 2018

23) Operating Procedure 830.A, effective October 1, 2020

24) Operating Procedure 830.1, effective February 1, 2021

25) Operations Strategy for the Segregation Reduction Step-Down Plan dated August 28, 2012

26) Operations Strategy for the Restrictive Housing Reduction Step-Down Program dated September 2016

27) Virginia Department of Corrections: Agency at a Glance 2021

28) Red Onion Segregation Reduction Step Down Plan, June 3, 2013

29) Red Onion Segregation Reduction Step Down Plan, December 3, 2013

30) Deposition of Vernon Brooks Jr. dated March 21, 2023 (relevant portions) & other documents relating to Vernon Brooks Jr.

31) Deposition of Brian Cavitt dated March 20, 2023 (relevant portions) & other documents relating to Brian Cavitt

32) Deposition of Derek Cornelison dated April 11, 2023 (relevant portions) & other documents relating to Derek Cornelison

33) Deposition of Gerald McNabb dated April 4, 2023 (relevant portions) & other documents relating to Gerald McNabb

34) Commission on Accreditation for Corrections Standards Compliance Reaccreditation Unit Audit [VDOC Red Onion] dated October 1–3, 2012

35) Commission on Accreditation for Corrections Standards Compliance Reaccreditation Unit Audit [VDOC Red Onion] dated October 19–21, 2015

36) Commission on Accreditation for Corrections Standards Compliance Reaccreditation Unit Audit [VDOC Red Onion] dated October 24–26, 2018

37) American Correctional Association Accreditation Report

38) Deposition of Frederick Hammer dated March 21, 2023 (relevant portions) & other documents relating to Frederick Hammer

39) Deposition of Kevin Snodgrass dated April 12, 2023 (relevant portions) & other documents relating to Kevin Snodgrass

40) Deposition of Peter Mukuria dated March 28, 2023 (relevant portions) & other documents relating to Peter Mukuria

41) Deposition of Jessica King dated June 1, 2022 (relevant portions)

42) Operating Procedure 861.3

43) Operating Procedure 841.4

44) Operating Procedure 861.3, effective April 1, 2015

45) Depositions of James Gallihar dated April 7, 2023 (relevant portions); Everett McDuffie dated April 14, 2023 (relevant portions); Quinn Reynolds dated May 17, 2022 (relevant portions)

46)  Deposition of Gary Wall dated March 20, 2023 (relevant portions) & other documents relating to Gary Wall

47)  Performance Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition

48)  Adoption of Restorative Housing in the Virginia Department of Corrections FY 2021 Report

49)  Operating Procedure 730.2, Mental Health Services: Screening, Assessment, and Classification

50)  Operating Procedure 730.2, effective January 1, 2019

51)  Operating Procedure 730.2, effective June 1, 2021

52)  Deposition of Dr. Denise Malone dated April 12, 2023, relevant portions; Def. Denise Malone's Objs. & Answers to Pls.' First Set of Interrogs. to Denise Malone

53)  Red Onion State Prison "Partnering Science with Corrections"

54)  Deposition of A. David Robinson dated February 16, 2023 (relevant portions)

55)  *The Reduction of Restrictive Housing in the Virginia Department of Corrections: FY2019 Report*

56)  *The Reduction of Restrictive Housing in the Virginia Department of Corrections: FY2020 Report*

57)  *Adoption of Restorative Housing in the Virginia Department of Corrections: FY2021 Report*

58)  Deposition of Dmitry Khavkin dated March 22, 2023 (relevant portions) & other documents relating to Dmitry Khavkin

59)  Deposition of Steven Riddick dated March 23, 2023 (relevant portions) & other documents relating to Steven Riddick

60)  Deposition of William Thorpe dated April 10, 2023 (relevant portions) & other documents relating to William Thorpe

61)  Def. Henry Ponton's Objs. & Answers to Pls.' First Set of Interrogs. to Henry Ponton

62)  Def. Marcus Elam's Objs. & Answers to Pls.' First Set of Interrogs. to Marcus Elam

63)  Def. Steve Herrick's Objs. & Answers to Pls.' First Set of Interrogs. to Steve Herrick

64)  Def. Tori Raiford's Objs. & Answers to Pls.' First Set of Interrogs. to Tori Raiford

65)  Def. Jeffrey Kiser's Objs. & Answers to Pls.' First Set of Interrogs. to Jeffrey Kiser

66)  Def. Carl Manis's Objs. & Answers to Pls.' First Set of Interrogs. to Carl Manis

67)  Expert Report of Dr. Jeffrey Beard (relevant portions)

68)  Expert Report of Dr. Robert Saathoff (relevant portions)

69)  CP-20-cv-7_00002648; VADOC-00135946; VADOC-00135947; VADOC-00135948; CP-20-cv-7_00004203; VADOC-00175542

70)  VADOC-00004082, VADOC-00135597

71)  VADOC-00175655, VADOC-00175656, VADOC-00175657, VADOC-00175658, VADOC-00175660