**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

WILLIAM THORPE, *et al*.,

                     *Plaintiffs*,

          v.                                    Civil Case No. 2:20-cv-00007-JPJ-PMS

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al*.,

                     *Defendants*.

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

I.   The Step-Down Program Causes Grave Harms that Violate Plaintiffs' Eighth
     Amendment Rights. ...................................................................................................... 3

     A.   The Conditions of the Step-Down Program Pose A Substantial Risk of
          Serious Psychological and Emotional Harm. ................................................. 5

          1.   Prisoners in the Step-Down Program are Deprived of Almost All
               Forms of Social Contact and Environmental Stimulation. ................ 6

          2.   Plaintiffs are Subjected to These Conditions for Extended Periods
               of Time. ............................................................................................... 11

          3.   The Step-Down Program Caused Plaintiffs Emotional, Physical,
               and Psychological Injuries. ................................................................ 12

     B.   Defendants were Deliberatively Indifferently to Plaintiffs' Harms. ............. 14

II.  The Conditions of the Step-Down Program Violate Plaintiffs' Due Process
     Rights. ........................................................................................................................ 22

     A.   Plaintiffs Have a Liberty Interest in Avoiding the Harsh Conditions of the
          Step-Down Program. ..................................................................................... 23

          1.   Plaintiffs' Liberty Interest Arises from State Policies and
               Regulations. ........................................................................................ 23

          2.   Conditions in VDOC's Step-Down Program Impose An Atypical
               and Significant Hardship. ................................................................... 23

     B.   The Step-Down Program Does Not Provide Meaningful Review
          Mechanisms. ................................................................................................. 29

          1.   Step-Down Committees Do Not Meaningfully Review The
               Reasons For Continuing A Prisoner's Solitary Confinement. ........... 30

          2.   Step-Down Reviews Are Procedurally Inadequate And Fail To
               Provide Even Minimal Procedural Protections Under Wilkinson
               and Thorpe. ......................................................................................... 38

III. Plaintiffs Are Entitled to Summary Judgment on Defendants' Affirmative
     Defenses. .................................................................................................................... 43

i

A.    Defendants Have Not Met the Prerequisites for Asserting Fundamental Alteration and Undue Burden Defenses. ............................................................. 44

B.    There Is No Evidence that Reasonable Accommodations Would Fundamentally Alter the Step-Down Program. ..................................................... 46

    1.    Defendants Have Not Adduced Factual Evidence in Support of Their "Fundamental Alteration" Defense. .................................................. 46

    2.    Defendants Have Not Adduced Expert Testimony in Support of Their "Fundamental Alteration" Defense. .................................................. 48

C.    There Is No Evidence that Granting Disabled Prisoners Reasonable Accommodations Would Result in an Undue Burden. ........................................ 50

    1.    Defendants Have Adduced No Evidence of the Financial Cost of Any Modification to the Step-Down Program. ......................................... 50

    2.    Defendants Have Adduced No Evidence of Undue Administrative Burden, Complexity, or Negative Impact. ................................................. 51

Conclusion .................................................................................................................. 53

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amer. Council of Blind of N.Y., Inc., v. City of New York*,
   495 F. Supp. 3d 211 (S.D.N.Y. 2020) ...........................................................................46

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................................2, 3

*Apodaca, et al. v. Raemisch*,
   139 S. Ct. 5 (2018) ........................................................................................................4

*Ball v. Bailey*,
   No. 7:15-CV-00003, 2015 WL 4591410 (W.D. Va. July 29, 2015) ...........................20

*Boddie v. Schnieder*,
   105 F.3d 857 (2d Cir. 1997) ........................................................................................20

*Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ....................................................................................................49

*Brown v. Landon*,
   No. 81-0853-R (E.D. Va.) ..............................................................................................2

*Bryant v. Better Bus. Bureau of Greater Md., Inc.*,
   923 F. Supp. 720 (D. Md. 1996) .................................................................................50

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................................2

*Constantine v. Rectors &Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ................................................................................45, 46

*Culvahouse v. City of Laporte*,
   679 F. Supp. 2d 931 (N.D. Ind. 2009) ........................................................................51

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ....................................................................................................51

*Davis v. Ayala*,
   576 U.S. 257 (2015) ......................................................................................................4

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ..................................................................................................3, 5

*Farmer v. Kavanagh*,
  494 F. Supp. 2d 345 (D. Md. 2007) ................................................................................14

*Glossip v. Gross*,
  576 U.S. 863 (2015) ...........................................................................................................4

*Gregg v. Georgia*,
  428 U.S. 153 (1976) .........................................................................................................21

*Hewitt v. Helms*,
  459 U.S. 460 (1983) ................................................................................................. *passim*

*Hutto v. Finney*,
  437 U.S. 678 (1978) .........................................................................................................11

*Incumaa v. Stirling*,
  791 F.3d 517 (4th Cir. 2015), *as amended* (July 7, 2015) ............................................ *passim*

*Jackson v. Meachum*,
  699 F.2d 578 (1st Cir. 1983) ...........................................................................................31

*Johnston v. Wetzel*,
  431 F. Supp. 3d 666 (W.D. Pa. 2019) .........................................................................4, 10

*Kelly v. Brewer*,
  525 F.2d 394 (8th Cir. 1975) ...........................................................................................34

*Kennedy v. Louisiana*,
  554 U.S. 407 (2008) ...........................................................................................................3

*King v. Rubenstein*,
  825 F.3d 206 ...................................................................................................................14

*Makdessi v. Fields*,
  789 F.3d 126 (4th Cir. 2015) ...........................................................................................15

*Marion v. Columbia Corr. Inst.*,
  559 F.3d 693 (7th Cir. 2009) .....................................................................................26, 32

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) .........................................................................................................39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...........................................................................................................3

*May v. Dover Elevator Co.*,
  845 F. Supp. 377 (E.D. Va. 1994) ...................................................................................49

*Mayo v. Wetzel*,
  No. 1:18-CV-878, 2021 WL 11132203, at *7 (M.D. Pa. Aug. 24, 2021),
  *report and recommendation adopted*, 1:18--CV-878, 2022 WL 19835737
  (M.D. Pa. Jan 4, 2022) .......................................................................................................14

*McClary v. Kelly*,
  4 F. Supp. 2d 195 (W.D.N.Y. 1998) ..................................................................................14

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
  172 F. Supp. 2d 680 (D. Md. 2000), *aff'd*, 11 F. App'x 279 (4th Cir. 2001) .........................49

*Miller v. Hinton*,
  288 F. App'x 901 (4th Cir. 2008) .......................................................................................44

*Nat'l Fed'n of the Blind v. Lamone*,
  438 F. Supp. 3d 510 (D. Md. 2020) ....................................................................................50

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) .......................................................................................45, 46

*Olmstead v. L.C.*,
  527 U.S. 581 (1999).............................................................................................44, 45, 46

*Palakovic v. Wetzel*,
  854 F.3d 209 (3d Cir. 2017)...........................................................................................4, 10

*Pierce v. County of Orange*,
  761 F. Supp. 2d 915 (C.D. Cal. 2011) ................................................................................49

*Porter v. Clarke*,
  923 F.3d 348 (4th Cir. 2019) ................................................................... *passim*

*Porter v. Pennsylvania Dep't of Corr.*,
  974 F.3d 431 (3d Cir. 2020)...........................................................................................4, 14

*Prieto v. Clarke*,
  780 F.3d 245 (4th Cir. 2015) ........................................................................................22, 28

*Proctor v. LeClaire*,
  846 F.3d 597 (2d Cir. 2017)....................................................................................29, 33, 38

*Quintanilla v. Bryson*,
  730 Fed. App'x 738 (11th Cir. 2018) ..................................................................................14

*Reynolds v. Arnone*,
  402 F. Supp. 3d 3 (D. Conn. 2019), *aff'd in part, vacated in part, remanded*
  *sub nom. Reynolds v. Quiros*, 990 F.3d 286 (2d Cir. 2021).......................................................14

*Rivera v. Mathena*,
    795 Fed. App'x 169, 176 (4th Cir. 2019) ...............................................................19

*Robinette v. Wal–Mart Stores, Inc. Store #650*,
    2016 WL 8737153 (W.D. Va. Feb. 5, 2016) ............................................................51

*Roper v. Simmons*,
    543 U.S. 551 (2005)..................................................................................................4

*Ruiz v. Texas*,
    137 S. Ct. 1246 (2017)..............................................................................................4

*Schaub v. VonWald*,
    638 F.3d 905 (8th Cir. 2011) ............................................................................19, 20

*Scinto v. Stansberry*,
    841 F.3d 219 (4th Cir. 2016) ...............................................................................5, 15

*Seabury Mgmt., Inc. v. Professional Golfers' Ass'n of America, Inc.*,
    1995 WL 241379 (4th Cir. 1995) ...........................................................................49

*Skinner v. Cunningham*,
    430 F.3d 483 (1st Cir. 2005)....................................................................................26

*Smith v. Collins*,
    964 F.3d 266 (4th Cir. 2020) ........................................................................ *passim*

*Strickler v. Waters*,
    989 F.2d 1375 (4th Cir. 1993) .............................................................................12, 14

*Sweet v. South Carolina Dep't of Corr.*,
    529 F.2d 854 (4th Cir. 1975) ....................................................................................3

*Tennessee v. Lane*,
    541 U.S. 509 (2004)................................................................................................44

*Thomas M. Gilbert Architects, P.C. v. Accent Builders & Devs., LLC*,
    629 F. Supp. 2d 526 (E.D. Va. 2008), *aff'd*, 377 F. App'x 303 (4th Cir. 2010).....................43

*Thorpe v. Clarke*,
    37 F.4th (4th Cir. 2022) .....................................................................................22, 29

*Thorpe v. Virginia Dep't of Corr.*,
    No. 2:20CV00007, 2021 WL 2435868 (W.D. Va. June 15, 2021), *aff'd sub
    nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) ..................................... *passim*

*Toevs v. Reid*,
    685 F.3d 903 (10th Cir. 2012) .................................................................................35

vi

*Tolan v. Cotton*,
    572 U.S. 650 (2014)..............................................................................................................3

*Trop v. Dulles*,
    356 U.S. 86 (1958)..............................................................................................................3

*Walker v. Shansky*,
    28 F.3d 666 (7th Cir. 1994) ..............................................................................................11

*Wilkerson v. Stalder*,
    639 F. Supp. 2d 654 (M.D. La. 2007)..........................................................................12, 20

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)................................................................................................. *passim*

*Williams v. Fountain*,
    77 F.3d 372 (11th Cir. 1996) .......................................................................................27, 32

*Williams v. Griffin*,
    952 F.2d 820 (4th Cir. 1991) ............................................................................................12

*Williams v. Hobb*s,
    662 F.3d 994 (8th Cir. 2011) ............................................................................................38

*Williams v. Sec'y Pennsylvania Dep't of Corr.*,
    848 F.3d 549 (3d Cir. 2017)..................................................................................28, 40, 42

*Wilson v. Seiter*,
    501 U.S. 294 (1991)............................................................................................................3

*Young v. Martin*,
    801 F.3d 172 (3d Cir. 2015)................................................................................................4

**Rules**

Fed. R. Civ. P. 56..................................................................................................................2

Fed. R. Evid. 702................................................................................................................51

**Statutes**

Americans with Disabilities Act ................................................................................. *passim*

Rehabilitation Act ..................................................................................................... *passim*

**Regulations**

28 C.F.R. § 35.106..............................................................................................................52

28 C.F.R. § 35.150 ......................................................................................................... 45, 46

28 C.F.R. § 35.164 ...................................................................................................... 44, 45, 46

# INTRODUCTION[1]

Plaintiffs and the members of the certified classes ("Plaintiffs") are—or were at some point during the class period—prisoners in the custody of Defendant Virginia Department of Corrections ("VDOC") who were housed for many months or years in VDOC's long-term solitary confinement program known as the "Step-Down Program."  During their tenure in the Step-Down Program, Plaintiffs were isolated in their cells for most hours of every day with little human contact; little to no natural light; and severe restrictions on their access to reading materials, television, radio, personal property, and visitation from loved ones.  They had few opportunities to participate in educational or therapeutic programming, and no opportunity to participate in group activities, including meals with others.  These extreme conditions plainly qualify as "solitary confinement." *See Porter v. Clarke*, 923 F.3d 348, 360 (4th Cir. 2019).  And because the Step-Down Program deprives these prisoners of basic procedural protections to challenge their ongoing confinement, such as notice of alleged violations and meaningful opportunities for rebuttal, prisoners are trapped in solitary confinement for unjustifiably long periods of time—in some cases, *years* longer than modern standards of decency would reasonably allow.  As the undisputed record evidence makes clear, these inhumane practices violate bedrock principles of the Eighth and Fourteenth Amendments, as well as the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").

This is not the first time VDOC has ignored correctional and mental health science to deploy a "behavioral modification" program that leaves prisoners in lengthy solitary confinement with no valid penological justification.  In 1984, the Virginia Board of Corrections documented that VDOC ignored the advice of its retained correctional psychologists in designing a system nearly identical to the Step-Down Program—known as the "Phase Program"—at Mecklenburg Correctional Center ("Mecklenburg"), Virginia's then maximum-security prison.  In *Brown v.*

---

[1] Plaintiffs file the attached Amended Statement of Undisputed Facts in Support of Their Amended Motion for Partial Summary Judgment to correct certain citation errors in the original Statement.  Plaintiffs also file contemporaneously herewith corrected versions of certain exhibits submitted to the Court by email on September 8, 2023

*Landon*, No. 81-0853-R (E.D. Va.), a class of Mecklenburg prisoners alleged that, through the Phase Program, VDOC violated their constitutional rights to due process and freedom from cruel and unusual punishment. VDOC settled the case, promising to forever end the Phase Program. Following that lawsuit, VDOC replaced Mecklenburg with two larger maximum-security prisons—Red Onion ("ROSP") and Wallens Ridge State Prisons ("Wallens Ridge"). These prisons are home to the Step-Down Program that is the subject of this litigation.

VDOC introduced the Step-Down Program in 2012. As with the failed Phase Program at Mecklenburg, the Step Down-Program imposes draconian conditions; creates a byzantine maze of classifications, and vague and confusing processes; and gives VDOC staff highly discretionary decision-making authority. These factors make it effectively impossible for many people to ever exit the Program.

A class of incarcerated persons who are (or at some point during the class period were) enrolled in the Step-Down Program now come before the Court to challenge violations of their constitutional and statutory rights. Specifically, Plaintiffs seek redress for the deprivation of their due process rights, the cruel and unusual punishment to which they have been subjected, and the systematic violation of their rights under the ADA and RA. Now that discovery is closed, the record evidence makes clear that Plaintiffs are entitled to summary judgment on their Eighth Amendment and Due Process claims, and on Defendants' fundamental alteration and undue burden affirmative defenses to Plaintiffs' ADA and RA claims.

## STANDARD OF REVIEW

Summary judgment is appropriate where materials in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323. Once this showing has been made, the burden shifts to the nonmoving

party to establish the specific material facts that are in dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In considering a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The court does not weigh evidence or determine credibility, but instead only determines whether the record demonstrates a genuine dispute of material fact. *Id.*; *Anderson*, 477 U.S. at 255.

## ARGUMENT

**I.  The Step-Down Program Causes Grave Harms that Violate Plaintiffs' Eighth Amendment Rights.**

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement[.]" *Farmer v. Brennan*, 511 U.S. 825 (1994). Prisoners asserting that they have been subjected to unconstitutional conditions of confinement must satisfy the two-pronged test set forth in *Farmer*. First, plaintiffs must demonstrate that "the deprivation alleged [was], objectively, 'sufficiently serious.'" *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, plaintiffs must show that prison officials acted with "deliberate indifference" to the plaintiffs' needs, which requires a showing that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837.

When applying this test, a court must measure the conditions of confinement against "the evolving standards of decency that mark the progress of a maturing society." *Porter*, 923 F.3d at 355 (quoting *Trop v. Dulles*, 356 U.S. 86 (1958)). As courts have underscored, the country's "changing concepts of civilized conduct and treatment," *Sweet v. South Carolina Dep't of Corr.*, 529 F.2d 854, 860 (4th Cir. 1975), must grow over time to "embrace and express respect for the dignity of the person," *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). In this way, the Eighth Amendment is dynamic and requires a court to bring its "own judgment . . . to bear on the question" of whether there is sufficient evidence in the record to show defendants' conduct violates the

Eighth Amendment.  *Roper v. Simmons*, 543 U.S. 551, 563 (2005).  Here, that judgment should be informed by the near-universal scientific consensus about the harms of solitary confinement, and a growing recognition by courts that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa v. Stirling*, 791 F.3d 517,534 (4th Cir. 2015); *see also Palakovic v. Wetzel*, 854 F.3d 209, 217 (3d Cir. 2017) (acknowledging "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation").[2]

When judged by these modern standards of decency, the record evidence establishes that the long-term solitary confinement Plaintiffs experienced in the Step-Down Program violates the Eighth Amendment.  The Step-Down Program subjects Plaintiffs to prolonged isolation from social and environmental stimulation, housing them in small cells with minimal access to

---

[2] *See also, e.g.*, *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441–42 (3d Cir. 2020) ("A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that '[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term ... damage.'"); *Young v. Martin*, 801 F.3d 172, 180 & n.8 (3d Cir. 2015) (recognizing that a prisoner's six-year term in solitary confinement raised "serious concerns under the Eighth Amendment's conditions of confinement test" and that the record in the case, including details of prisoner's visual and auditory hallucinations and numerous suicide attempts "makes palpable '[t]he human toll wrought by extended terms of isolation'") (citation omitted); *Thorpe v. Virginia Dep't of Corr.*, No. 2:20CV00007, 2021 WL 2435868, at *7 (W.D. Va. June 15, 2021) ("The studies [cited in the Complaint] outlined shocking harms caused from conditions similar to those in the Step-Down Program.  In one anecdotal report, an prisoner stated, 'As soon as I got in, I started cutting my wrists.  I figured it was the only way to get out of here.'"), *aff'd sub nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022); *Johnston v. Wetzel*, 431 F. Supp. 3d 666, 677 (W.D. Pa. 2019) (prisoner's claim based on seventeen years of solitary confinement, which deprived prisoner of exercise, sleep, social interaction, and environmental stimulation, was objectively harmful enough to constitute a constitutional violation).

In recent years, several Supreme Court justices also have expressed concerns about the serious harms isolation inflicts on prisoners.  *See Apodaca, et al. v. Raemisch*, 139 S. Ct. 5, 6 (2018) (Sotomayor, J., dissenting from denial of certiorari where prisoners were denied any out-of-cell exercise other than the prescribed hour in one room for between 11 and 25 months); *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution where prisoner had been in isolation on death row for 22 years, and had "developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting and noting the dehumanizing effect of solitary confinement in death penalty context); *Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring where prisoner was held for all or most of the past 20 years in a windowless cell for 23 hours a day, with little or no opportunity for human interaction).

educational, recreational, and therapeutic programming.  Some class members have been subjected to these draconian conditions indefinitely; all class members have been subjected to them for prolonged periods proven in the scientific and medical literature (and determined by many courts) to cause grave and, in some cases, permanent harm.  *See* Ex. 66,  May 26, 2023 Expert Report of Craig Haney (Haney Rep.) ¶ 273 (the ███████████████████████████████ in the Program create a serious risk of substantial harm).[3]  These harms are profound and well-documented; the record is replete with unrebutted evidence detailing the deterioration of the mental and physical health of Plaintiffs who were trapped in the Step-Down Program for many months or years.  *See infra* § I.A.3.  Moreover, the unrebutted evidence makes clear that Defendants were deliberately indifferent to the risks these conditions posed—risks that were longstanding, pervasive, and well-documented.  *See, e.g.*, SUF ¶¶ 185, 201; Ex. 103, VADOC-00161495 at -497 (Lee Dep. Ex. 36); Ex. 18, Mathena Dep. at 527:12–528:20; Ex. 73, Lee Dep. at 180:18–181:5 (testifying that in 2018, Dr. Lee was notified when "█████████████████████████████ ██████████████████████").  Accordingly, Plaintiffs are entitled to summary judgment on their Eighth Amendment claim.  *See Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (describing *Farmer* two-part test).

> **A.      The Conditions of the Step-Down Program Pose A Substantial Risk of Serious Psychological and Emotional Harm.**

To satisfy the first prong of the *Farmer* test, Plaintiffs must "demonstrate that 'the deprivation alleged [was], objectively, sufficiently serious.'"  *Porter*, 923 F.3d at 355 (citations omitted).  "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or

---

[3] All exhibit references are to the Amended Declaration of Vincent Glynn, submitted herewith.  All references to "SUF" are to the Amended Statement of Undisputed Facts, submitted herewith.

'a substantial risk of serious harm resulting from ... exposure to the challenged conditions.'" *Id.* The conditions of the Step-Down Program easily satisfy this standard.

### 1.   Prisoners in the Step-Down Program are Deprived of Almost All Forms of Social Contact and Environmental Stimulation.

Prisoners in the Step-Down Program are given extremely limited time outside of their cells. SUF ¶ 144.  While they are confined to their cells for the majority of every day, they endure Spartan conditions, with limited access to communications with others, and have little to engage their minds or keep them busy.  The cells in which the prisoners are confined for extensive periods of time are small and sparsely furnished and measure 7 by 10 feet.  SUF ¶ 133.  Cells are furnished with only a bed and a toilet and small wall-mounted desk and shelf, with a quarter-inch slot in the door through which communication with prison officials must take place.  SUF ¶ 137.  The cells have a narrow rectangular window that is frosted over which prevents prisoners from actually seeing out.  SUF ¶ 148.  An artificial light is kept on at all times.  SUF ¶ 140.  In addition, prisoners at Level S eat all of their meals alone in their cell.  SUF ¶ 143.

Prisoners in the Step-Down Program have limited access to property or programming that would provide stimulation to mitigate the idleness of long periods of confinement in their cells. Prisoners at IM-0 and SM-0 are permitted to borrow only two library books every two weeks and are not permitted to have a radio or television in their cells.  SUF ¶¶ 124, 131.  The only programming available to people at IM-0 or SM-0 is a series of seven workbooks known as the "Challenge Series," which is completed independently and in-cell.  SUF ¶¶ 125, 131.  Even after progressing through the initial phases of the program, prisoners' access to property and programming remains restricted.  SUF ¶¶ 128–134.

Further, prisoners in the Step-Down Program have severely restricted phone and visitation privileges.  Prisoners in both IM-0 through IM-2 and SM-0 through SM-2 pathways are allowed

6

between two and four phone calls per month, depending on privilege level. SUF ¶¶ 123–127, 129–132. They are not permitted contact visits at any level of the program, and at some levels they are limited to certain approved video visits, whereas incarcerated persons in general populations may have contact visits. SUF ¶¶ 127, 132. These restrictions damage Plaintiffs' ability to maintain relationships with family and friends in the community, which only increases their sense of isolation. *See, e.g.*, SUF ¶ 233.

The out-of-cell time provided to prisoners in the Step-Down Program also fails to provide meaningful social interaction or positive environmental stimulation. Prior to a policy change in September 2019, the Step-Down policy provided for *at most* only two hours per day out-of-cell. SUF ¶ 144. Since September 2019 (shortly after this lawsuit was filed), VDOC policy purports to allow prisoners in Level S four hours of out of cell time per day, meaning confinement in their cells for 20 hours per day. SUF ¶¶1148–149. However, it is clear that this out-of-cell time is not consistently provided. The prisoners that Dr. Haney interviewed in on April 19–21, 2023 at Red Onion, for example, indicated that there were times when their outdoor recreation was cancelled. Ex. 66, Haney Rep. ¶ 136. According to VDOC records of the amount of out-of-cell time offered, the average number of hours regularly fell below four hours per day, especially prior to April 2021. SUF ¶ 150. Deposition testimony from corrections staff also suggested that in or around April 2021, they were under pressure to increase out-of-cell time and so they changed the way they recorded out-of-cell hours offered to Level S prisoners, giving the appearance that more time was being offered while not actually changing the offering. *Id*.

VDOC employees and officials acknowledge that prisoners have been denied out-of-cell time, with ███████████████████████████████████████████████ Ex. 66, Haney Rep. ¶ 137. For example, during regular shake-downs that occur quarterly, prisoners are

entirely confined to their cells for seven to ten days in a row.  SUF ¶ 154.  In addition, "



"  Ex. 66, Haney Rep. ¶ 138.  Given that "

"  *Id.*

Even when prisoners in the Step-Down Program are provided with recreation time, that recreation time offers little benefit.  They are

*Id.* ¶ 139; SUF ¶ 156.  Prisoners, Dr. Haney, and even VDOC officials confirm this description of the recreation area.  Ex. 66, Haney Rep. ¶ 139; Ex. 72, Snodgrass Dep. at 107:21–108:4; Ex. 16, 2023 Cornelison Declaration (2023 Cornelison Decl.) ¶ 21; Ex. 50, 2023 Cavitt Declaration (2023 Cavitt Decl.) ¶ 27.  The recreation cages do not have exercise equipment or toilet facilities.  Ex. 66, Haney Rep. ¶ 138; Ex. 16, 2023 2023 Cornelison Decl. ¶ 21; Ex. 50, 2023 2023 Cavitt Decl. ¶ 27; SUF ¶ 156.  Prisoners have repeatedly complained that if they had to go to the bathroom during recreation time, they were forced to either terminate their out-of-cell time or to relieve themselves in the recreation cage, and as a result the recreation cages are often soiled with urine.  Ex. 66, Haney Rep. ¶ 138, Photographs 5–6.  Prisoners have also reported that there are often K-9 dogs near the recreation cages, which have attacked or bitten prisoners engaging in recreation.  *Id.* ¶ 140; ECF No. 174-28 ¶ 4 (Wall Affidavit); SUF ¶ 158.

To access out-of-cell activities, including recreation, showers, and programming, prisoners in the Step-Down Program

Ex. 66, Haney Rep. ¶ 135; SUF ¶ 166.  Prisoners have described this cavity search process as humiliating and dehumanizing, as it requires them to



and afterwards ███████████ have ███████████████████████ and █████████████████████████ before they may ████████████████████████████████ Ex. 66, Haney Rep. ¶ 135. ████████████████████████████

███████████████████████████████████

███████ *Id.* ███████████████████████████

███████████████████████████████████

█████████████████████████ *Id.* As one named Plaintiff testified:

[The strip search procedure is] really dehumanizing.

Another person after that. Another person after that. And, you know, maybe out of the whole tier, out of 22 cells in a pod, maybe three people passed . . . the strip search procedure. So, you know, it's something that was very systemic, and it went on day in, day out. The supervisors knew about it. Everybody knew about it. But the guards were pretty much allowed to continue to do it. And really, because it made their job easier. The less people that went out, the less work they had to do.

Ex. 66, Haney Rep. ¶ 135 (quoting Mukuria Dep. at 235:5–236:7). The disincentive that the cavity search procedure creates to utilizing what little bit of out-of-cell time is offered further exacerbates the isolation and lack of stimulation that prisoners in the Step-Down Program endure.

Other than outdoor recreation time, out-of-cell programing is extremely limited. Ex. 66, Haney Rep. ¶ 142; SUF ¶ 159. When out-of-cell programming does occur, ████████████

██████████████████████████████████████████████████

Ex. 66, Haney Report ¶ 142, Photographs 8–9; SUF ¶ 159. Programming may also take place in what VDOC refers to as ██████████████████ which ███████████████████████

9

████████████████████████ Ex. 66, Haney Rep. ¶ 142, Photograph 7; SUF ¶ 159.

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ Ex. 66, Haney Rep. ¶ 142

(citing Collins Dep. at 161:10–20).  For prisoners in the Step-Down Program, their four hours of out-of-cell time—which the undisputed evidence shows often did not occur—is spent in conditions that exclude any meaningful social contact.  *Id.* ¶ 143.

These conditions are materially indistinguishable from those that the scientific literature has concluded cause serious harm or universal risk thereof.  *See, e.g.*, *Palakovic*, 854 F.3d at 217 (holding that inmate's parents sufficiently pled an Eighth Amendment claim by alleging *inter alia* that their mentally ill son was subject to "multiple 30–day stints in solitary confinement," isolated for approximately 23 to 24 hours each day, and recognizing "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation"); *Johnston*, 431 F. Supp. 3d at 677 (concluding prisoner's claim based on seventeen years of solitary confinement was objectively harmful enough to constitute a constitutional violation).  The conditions also mirror those the Fourth Circuit ruled unconstitutional in *Porter v. Clarke.*  923 F.3d at 357 ("The challenged conditions of confinement on Virginia's death row—under which Plaintiffs spent, for years, between 23 and 24 hours a day 'alone, in a small ... cell' with 'no access to congregate religious, educational, or social programming'—pose a 'substantial risk' of serious psychological and emotional harm.").

## 2. Plaintiffs are Subjected to These Conditions for Extended Periods of Time.

The lengthy periods of time Plaintiffs spend in the Step-Down Program also support the conclusion that the Program violates their Eight Amendment rights.  *See Hutto v. Finney*, 437 U.S.

678, 686–87 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Walker v. Shansky*, 28 F.3d 666, 672–73 (7th Cir. 1994) (holding that a jury could conclude that the plaintiff's prolonged solitary confinement together with his other allegations of deprivations and abuse violated the Eighth Amendment).  For example, the SM pathway of the Step-Down Program takes a *minimum* of 9 months to complete, and then prisoners must spend additional months in Level 6 pods before returning to the general prison population (although in practice, very few people complete the program that quickly).  Ex. 1, VADOC-0052689 at -741(2012 Step-Down Manual); Ex. 2, 2020 Step-Down Manual at -529 ; Ex. 18, Mathena Dep. at 392:2–393:4, 396:17–397:2, 397:9–13; SUF ¶ 49.  People placed in the IM pathway must spend a *minimum of 18 months* at Level S before becoming eligible to progress to Level 6 pod, and during that time they have no route back to general population.  SUF ¶ 48.  As a result, some Plaintiffs have spent over 10 years in segregation or restrictive housing, *see* Ex. 22, Collins Dep. at 54:17–21; SUF ¶ 52, while others have spent over 18 years in Level S, *see* Ex. 14, Clarke Dep. at 318:18–319:4; SUF ¶ 53.  Among the eleven Plaintiffs in this case, three (Mr. Mukuria, Mr. Hammer, and Mr. Riddick) spent over seven years in the Step-Down Program, and Mr. Thorpe spent almost seven years in the Step-Down Program at ROSP, but almost 24 in long-term solitary confinement altogether.  SUF ¶¶ 247, 253, 261, 263.  Three others (Mr. Cavitt, Mr. Brooks, and Mr. Wall) spent over four years in the Program.  SUF ¶¶ 243, 248, 254.

### 3.   The Step-Down Program Caused Plaintiffs Emotional, Physical, and Psychological Injuries.

The evidence in this case overwhelmingly establishes that the Step Down Program deprived Plaintiffs of two fundamental human needs: social interaction and environmental stimulation, *see Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 679 (M.D. La. 2007), thereby subjecting them to an unconstitutional risk of significant emotional, physical, and psychological

harm. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993); *cf. Williams v. Griffin*, 952 F.2d 820, 824–25 (4th Cir. 1991) (inferring "psychological harm" from prison conditions).

For example, after reviewing copious records and interviewing and conducting psychological testing of each named plaintiff, Dr. Hendricks concluded that the social and environmental deprivations in the Step-Down Program caused depression, anxiety, paranoia, hallucinations, suicidal ideation, PTSD, memory problems, sleep problems, difficulty concentrating, mood swings, digestive problems, hypertension, cardiac issues, shortness of breath, headaches, migraines, and restlessness. Ex. 89, Mar. 9, 2023 Expert Report of Michael Hendricks (Hendricks Rep.) ¶¶ 38, 44–45, 52–54, 60, 68, 70, 77, 82–85, 97–100, 108–110, 114–116. Similarly, Dr. Haney documented class members' accounts of suffering from PTSD, schizophrenia, bi-polar disorder, anxiety, and depression while in the Step-Down Program, and concluded that ███████████████████████████████████ described by the prisoners he interviewed are the type of conditions that create a ████████████████ ██ Ex. 66, Haney Rep. ¶¶ 178–79, 183, 190, 273.

Drs. Hendricks and Haney's findings are corroborated by other unrebutted facts. For example, Plaintiff Brooks testified that his short-term memory loss began when he was in long–term segregation. Ex. 94, Brooks Dep. at 152:15–153:18; SUF ¶ 249. He also testified that he began to have trouble concentrating and developed paranoia. Ex. 94, Brooks Dep. at 154:14–16; 157:9–22; SUF ¶ 249. Plaintiff Mukuria similarly testified that he began to develop memory problems and have difficulty staying focused after he was placed in solitary confinement, and that he also struggles with paranoia. Ex. 93, Mukuria Dep. at 171:12–174:3; SUF ¶ 246–247. Plaintiff Riddick testified that while "[a]t ROSP, in addition to [his prior] depression and anxiety, [he] began experiencing new and worsening symptoms, including paranoia, trouble sleeping,

nightmares, mood swings, difficulty concentrating, lack of focus, racing thoughts, hallucinations, and hearing voices." Ex. 43, Riddick Declaration (Riddick Decl.) ¶ 30; SUF ¶ 262. Plaintiff Wall testified that "[his] mental health suffered while [he] was in solitary confinement" and he "began experiencing a lot of symptoms, including heart palpitations, sweaty hands, insomnia, night sweats, nightmares, and anxiety." Ex. 15, Wall Declaration (Wall Decl.) ¶ 15; SUF ¶ 255. Plaintiff Cornelison experienced anxiety, depression, mood swings, and an inability to concentrate while in the Step-Down Program, none of which he had experienced before. Ex. 16, 2023 Cornelison Decl. ¶¶ 35–36.

These harms, and the risks Plaintiffs were exposed to, are sufficiently serious to establish the "deprivation of a basic human need" for purposes of the Eighth Amendment. *See Porter*, 923 F.3d at 357 (collecting cases and finding that "solitary confinement pose[] an objective risk of serious psychological and emotional harm to inmates, and therefore can violate the Eighth Amendment"). In *Porter*, for example, the court granted the plaintiffs' motion for summary judgment in light of the unrebutted expert testimony that by denying prisoners the opportunity for congregate programming, recreation, or religious practice, and restricting prisoners to their cells for between 23 and 24 hours a day, defendants put the prisoners at risk of psychological and emotional harms in violation of the Eighth Amendment. 923 F.3d at 358–360.

Courts analyzing conditions of confinement claims since *Porter* have reached similar conclusions. *See, e.g.*, *Mayo v. Wetzel*, No. 1:18-CV-878, 2021 WL 11132203, at *7 (M.D. Pa. Aug. 24, 2021), *report and recommendation adopted*, 1:18--CV-878, 2022 WL 19835737 (M.D. Pa. Jan 4, 20222022) (denying defendants' motion for summary judgment where mentally ill plaintiff was kept in solitary confinement for more than five years); *Porter*, 974 F.3d at 443 (reversing district court's grant of summary judgment to defendant on prisoner's Eighth

Amendment claim where prisoner provided, among other things, sworn testimony concerning his "severe anxiety, depression, panic, paranoia, bipolar mood swings, and at sometimes [sic] suicidal impulses"); *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 20 (D. Conn. 2019), *aff'd in part, vacated in part, remanded sub nom. Reynolds v. Quiros*, 990 F.3d 286 (2d Cir. 2021) (granting plaintiff's motion for summary judgment where plaintiff was "detained in his 12 foot by 7-foot cell for nearly twenty-two hours a day" and "unable to interact with other prisoners in general population"); *see also Thorpe v. Virginia Dep't of Corr.*, No. 2:20CV00007, 2021 WL 2435868, at *7 (W.D. Va. June 15, 2021) (discussing Step-Down Program under the Eighth Amendment), *aff'd sub nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022).[4]

## B. Defendants were Deliberatively Indifferently to Plaintiffs' Harms.

The undisputed facts in the record also show that Defendants were deliberately indifferent to Plaintiffs' basic human needs, satisfying the Eighth Amendment's second prong. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (citation omitted). An individual acts with deliberate indifference when she knows of "an excessive risk to inmate health or safety" and disregards that risk. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Subjective knowledge of such risk can be shown through "direct evidence of a prison official's actual knowledge," "circumstantial evidence tending to establish such knowledge," or "circumstantial evidence . . . 'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* at 226;

---

[4] Courts before *Porter* have also reached similar conclusions. *See Farmer v. Kavanagh*, 494 F. Supp. 2d 345, 366–67 (D. Md. 2007) (noting in a solitary confinement case that mental health and sanity are human needs, the deprivation of which can constitute an Eighth Amendment violation); *King v. Rubenstein*, 825 F.3d 206, 218–1919 & 223 n.3 (4th Cir. 2016) (mental and physical injuries, including depression and mental anguish, resulting from being compelled to remove penile implants upon threat of segregation, were sufficient to satisfy objective prong); *Quintanilla v. Bryson*, 730 Fed. App'x 738, 747 (11th Cir. 2018) (acknowledging "migraines, heartburn, stomach cramps, severe neck and back pain, stiffness in his joints, constipation, lethargy, and depression" to be sufficient deprivations to state an Eighth Amendment claim); *see also McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").

*Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015).  A plaintiff may satisfy this standard by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known." *Id*. at 136.

The risk of harm in this case was obvious, based on credible scientific literature that pre–dated the creation of the Step-Down Program.  For example, in *Porter*, the court referenced numerous studies pre-dating the creation of the Step-Down Program, all of which concluded that prolonged detention of prisoners in conditions like those present in the Step-Down Program leads to "psychological deterioration," "declines in mental functioning," "difficulty thinking," and "concentration and memory problems."  923 F.3d at 356–60 (quoting Jesenia Pizario & Vanja M.K. Stenius, *Supermax Prisons: Their Rise, Current Practices, and Effect on Inmates*, 84 Prison J. 248, 256 (2004)).  Moreover, as the court explained, "[a] leading survey of the literature [published in 2003] regarding such confinement found that 'there is *not a single published study* of solitary or supermax–like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, *that failed to result in negative psychological effects*.'" *Id*. at 356 (quoting Craig Haney, *Mental Health Issues in Long–Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003)). The court recognized that "the associated adverse psychological reactions to solitary confinement detailed in th[e] literature include psychotic-spectrum symptoms of paranoia and hallucinations; mood–spectrum symptoms of depression, withdrawal, appetite and sleep disturbance, fatigue and lethargy, and suicidal ideation," as well as "anxiety spectrum symptoms of subjective distress, feelings of impending doom, somatic complaints, dissociative experience, and ruminative thoughts; affective lability characterized by irritability, rage, and aggressive impulses; and

behavioral self-control symptoms of aggression, assaults, and self–mutilation." 923 F.3d at 356–60 (quoting a report by expert Dr. Mark Cunningham).

In addition to the obvious risks made clear by decades of scientific research and literature on the subject, the record evidence makes clear that Defendants actually knew that the conditions of confinement in the Step-Down Program posed an excessive risk to the health and safety of prisoners.  For example, VDOC officials testified that they were aware that solitary confinement creates particular risk for prisoners with mental illness.  *See* Ex. 14, Clarke Dep. at 116:6-8, 265:8–266:1 ("And in our estimation, individuals with mental health diagnoses are individuals who, when placed in [restrictive housing] conditions . . . may respond in a manner that is not appropriate. It . . . may be injurious to them, ultimately."); Ex. 73, Lee Dep. at 112:13–17 (testifying that among prisoners who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 52, McDuffie Dep. at 140:14–18 (testifying that he has observed prisoners who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; SUF ¶¶ 170, 201–204.  This knowledge is documented even prior to the creation of the Step-Down Program.  *See* Ex. 103, VADOC-00161495 (Lee Dep. Ex. 36).

Moreover, VDOC officials acknowledged receiving communications from people in the Step-Down Program describing the harms the Program was causing.  Former Director Clarke testified, for example, that people in Level S have raised issues about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14, Clarke Dep. at 116:6–8; *see also* Ex. 18, Mathena Dep. at 379:2–12 (testifying that he takes "steps to monitor the concerns that offenders in level S or 6 are raising").  Dr. McDuffie testified that he

16

has been on " ███████████ " to discuss prisoner litigation, hunger strikes, and housing.  SUF ¶ 171.

In addition, VDOC officials personally viewed the conditions in the Step-Down Program. *See, e.g.*, Ex. 47, Younce Dep. at 32:5–8; 33:2–3; 57:5–6 (former unit manager at ROSP testifying that he would rounds by cells in his unit every day).  For example, the former warden at Wallens Ridge testified that he would make rounds, including through the D building, which "had some of your restorative housing, and then they also had D3, which was the SMI program, the HSDTP program," and he would sometimes do these rounds with the unit manager or the major.  Ex. 68, Manis Dep. at 64:22–65:11, 66:4–6, 67:6–10.   Moreover, Collins, a unit manager at ROSP, testified that he receives a daily report of out-of-cell hours offered to prisoners and that he has for "at least probably the last three years."  Ex. 22, Collins Dep. at 92:22–93:9; 93:17–94:4; SUF ¶ 151. Thus, he should be aware that people in the Step-Down Program are frequently denied out-of-cell time.  "Given [] Defendants' status as corrections professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction on death row could cause."  *Porter*, 923 F.3d at 361.

VDOC employees also expressed concerns over the mental health of inmates in segregation.  According to a February 2, 2012 email exchange, VDOC mental health staff were aware that 149 out of 186 total offenders at ROSP with a mental health code were in segregated housing.  These staff explained that despite █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████  Ex. 103, VADOC-00161495 (Lee Dep. Ex. 36); *see also* Ex. 18, Mathena Dep. at 534:21–535:3.  Dr. Lee

also testified that there was "an ongoing discussion" about whether ███████████████

███████████████████████████████████████████████████ Ex. 73, Lee Dep. at 150:6–20;

VADOC-00044033 (Lee Ex. 22).  Additionally, VDOC's statistics demonstrate that about half of

the incidents of self–injurious behavior every year occur in restrictive housing.  *Id.* at 189:14–

190:20; Ex. 75, VADOC-00131129 at -134 (Lee Ex. 31); SUF ¶ 182.

Grievance data produced by VDOC contains numerous examples of grievances submitted

by prisoners in the Step-Down Program complaining of mental health symptoms, including

depression, anxiety, hallucinations, and suicidal ideation. Ex. 79, VADOC-00174671 (VDOC

Spreadsheet); SUF ¶ 202.  Mr. Riddick testified that he wrote to Harold Clarke starting in 2014

about the conditions of his confinement, mental health challenges, and the time he had spent in

solitary. *See* Ex. 104, Riddick Dep. at 28:13–29:19.  Mr. Cornelison similarly wrote a letter to

Harold Clarke describing how the conditions of confinement in the Step-Down Program were

impacting him, and received a response acknowledging his letter. Ex. 91, Cornelison Dep. 25:10–

26:8.

Despite being aware of the harms that conditions like those in the Step-Down Program

cause to people with mental illness, VDOC has continued to place people with mental illness in

the Step-Down Program.  VDOC does not consider a prisoner's mental health during the process

of placing someone in Level S. *See* Ex. 18, Mathena Dep. at 537:6–21 (testifying that a prisoner's

mental health status is no more important than "understanding what their eye color is" when

assigning a security classification); SUF ¶ 22.  There is no formal health screening that takes place

prior to classifying a prisoner as Level S, Ex. 48, King Dep. at 170:10–14; SUF ¶ 179, and no

policy requires that any mental health staff even participate in the process of assigning someone

to Level S, Ex. 4, Mathena 30(b)(6) Dep. at 237:3–9, 238:4–8; SUF ¶ 21.  As a predictable result,

people with mental illness are placed in the Step-Down Program and remain there. *See e.g.* SUF ¶ 246; *see also* Ex. 52, McDuffie Dep. at 308:7–12 (testifying that there are more than one hundred prisoners in restrictive housing at ROSP to whom he has prescribed SSRIs, a class of medications used to treat depression, PTSD, and anxiety); Ex. 105, VDOC's Objs. and Resps. to Pls.' 1st Set of Interrogs., at No. 1 (identifying 74 prisoners who were assigned mental health classification codes of MH–2S, MH–3, or MH–4 while they were also classified as Security Level S or 6, between August 1, 2012 and July 31, 2021); Ex. 19, Malone 30(b)(6) Dep. at 151:4–8; SUF ¶ 180 (acknowledging that prisoners deemed at risk of deterioration in restorative housing can still be placed in the Step-Down Program).

Given these obvious and well-documented risks to prisoner health and safety posed by the Step-Down Program, this Court can conclude "that [defendants] subjectively disregarded a substantial risk of serious harm to the inmate." *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011). Indeed, the Fourth Circuit examined similar facts in *Rivera v. Mathena*, and concluded that a prisoner's use of the grievance system and other written correspondence can provide notice to prison officials of the risk of harm from the conditions of confinement. 795 Fed. App'x 169, 176 (4th Cir. 2019). In *Rivera*, the plaintiff had filed numerous grievances challenging the denial of showers and recreation, among other issues. *Id.* He also left notes on his door stating that he wanted showers and recreation. *Id.* The court reasoned that prison staff would have seen the log sheets posted on the plaintiff's cell door that he had missed extensive shower and exercise opportunities. Therefore, "even if certain defendants were not advised by Rivera that he was suffering mental and physical harm as a result of the denial of regular recreation and showers, the risks posed would have been obvious to them." *Id.* The same conclusion is warranted here.

Moreover, several VDOC officials involved in this case have been the subject of lawsuits that adjudicated this very issue.  The *Porter* case, for example, was filed in 2014.  Because Harold Clarke was a defendant (and was deposed) in that case, he and VDOC were put on notice that conditions like those in the Step-Down Program created risks of harm to Plaintiffs.  In 2019, the Fourth Circuit held that "Plaintiffs' evidence established that State Defendants, in fact, were aware of the substantial risk of psychological or emotional harm posed by solitary confinement" and in doing so, cited Mr. Clarke's status as a defendant in a case decided in 2013 that examined the same conditions challenged in *Porter*.  923 F.3d at 361.

Defendants' deliberate indifference is further illustrated by their lack of a legitimate penological justification for the use of long-term solitary confinement.  *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 680 (M.D. La. 2007).  *See also Porter*, 923 F.3d at 362 ("[I]f a prison official lacks a legitimate penological justification for subjecting an inmate to a condition of confinement that poses a substantial risk of serious harm—like prolonged solitary confinement . . . then the official is presumptively acting with deliberate indifference to that risk").  In *Ball v. Bailey*, the court explained that "[w]here no legitimate law enforcement or penological purpose can be inferred from" Defendants' policies, the condition "itself may . . . be sufficient evidence of a culpable state of mind."  *Ball v. Bailey*, No. 715CV00003, 2015 WL 4591410, at *9 (W.D. Va. July 29, 2015) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)).  Policies that are "totally without penological justification" cause "the gratuitous infliction of suffering" and thus violate the Eighth Amendment.  *Gregg v. Georgia*, 428 U.S. 153, 182–83 (1976) (opinion of Stewart, J.).

VDOC asserts that the Step-Down Program is "based on evidence," but VDOC's binding 30(b)(6) testimony is that it does not know whether the principles underlying the Step-Down

Program are in fact based on any evidence.  Ex. 4, Mathena 30(b)(6) Dep. at 168:4–8.  Further, VDOC is not "aware of any scientific studies that were used to establish the[] principles" of the Program.  Ex. 4, Mathena Dep. at 164:15–21; SUF ¶¶ 9–12.  The rationale that VDOC provides for housing prisoners in solitary confinement in the Step-Down Program is that past bad behavior is the best indicator for future violence.  Ex. 4, Mathena 30(b)(6) Dep. at 201:18–20.  However, even the 2020 S–D Manual states "[d]espite a review of the literature and consultation with experts,

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Ex. 2, VADOC-00053480

at –506 (2020 Step-Down Manual).  By VDOC's own admission, then,  there is no valid penological justification for the use of long–term solitary confinement in the Step-Down Program.

Moreover, VDOC concedes that many of the draconian restrictions imposed by the Step-Down Program do not relate to security and lack any valid penological purpose at all.  For example, Mathena, director of security and correctional enforcement for VDOC, admitted as a 30(b)(6) witness that "[t]here's no security reason that I can think of" for exclusion of Level S prisoners from certain programming, such as the "Cognitive Stimulation program."  Ex. 4, Mathena 30(b)(6) Dep. at 56:9–20; SUF ¶ 123.  Likewise, King. a former ADA coordinator at ROSP, testified that some of the criteria used to evaluate a prisoner's progress through the Program—such as personal hygiene, whether he stands when required, and "respect"—have nothing to do with security.  Ex. 48, King Dep. at 190:20–191:6.

Because the risk of harm to all prisoners in the Step-Down Program from the conditions of confinement were both obvious and known to Defendants, and because modern standards of

21

decency cannot tolerate the imposition of such risks for no valid penological purpose, this Court should grant Plaintiffs' motion for summary judgment on their claim under the Eight Amendment.

## II.    The Conditions of the Step-Down Program Violate Plaintiffs' Due Process Rights.

Prisoners have a constitutionally recognized interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2015), *as amended* (July 7, 2015). To establish a due process claim, plaintiffs must first show that they have "an interest in avoiding onerous or restrictive confinement conditions that 'arises from state policies or regulations.'" *Id.* Once a liberty interest has been established, plaintiffs must "demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). The undisputed evidence in the record establishes each of these elements.

The conditions of confinement for individuals placed in the Step-Down Program are substantially harsher than those experienced by the general prison population, triggering a protectable liberty interest in avoiding them. Plaintiffs were placed in the Step-Down Program, and remained there, because VDOC does not provide prisoners in the program with fundamental due process protections. Specifically, individuals in the Step-Down Program are not afforded (1) meaningful, periodic review of whether they should remain in the program; and (2) basic procedural protections, such as notice of alleged violations, notice of hearing times, access to evidence and factual findings, and meaningful opportunities for rebuttal. *See Thorpe*, 37 F.4th at 945–46. Instead, Plaintiffs have been subjected to a patchwork of procedures in which decisions are made outside their presence and without their input, offering no meaningful protections against erroneous placement in solitary confinement. As a result, they remain trapped for years in the Step-Down Program in violation of their constitutional rights to process.

22

A.   **Plaintiffs Have a Liberty Interest in Avoiding the Harsh Conditions of the Step-Down Program.**

1.   **Plaintiffs' Liberty Interest Arises from State Policies and Regulations.**

Prison housing policies that require periodic review, such as those that govern the Step-Down Program, establish a protectable liberty interest for purposes of the Due Process Clause.  *See Incumaa*, 791 F.3d at 527 ("Because there is uncontroverted evidence that the Department policy here mandates review of Appellant's security detention every 30 days, we have no trouble concluding that Appellant has met the first prong of his burden under *Sandin* and its progeny."); *see also Smith*, 964 F.3d at 275 (prong one of *Sandin* satisfied "because VDOC policy provides for a security-level review for Level S prisoners in the Step-Down Program every ninety days" (citations omitted)).  As the Fourth Circuit explained at an earlier stage of this case, because the "Step Down [Program] mandates review at least once every 90 days, Defendants sensibly do not dispute that Plaintiffs have adequately traced their interest to state regulations."  *Thorpe*, F.4th at 942; *see* Ex. 2, 2020 Step-Down Manual at -488–492 (setting forth various Step-Down periodic reviews).  Nor can Defendants dispute that conclusion here.  *See, e.g.*, Ex. 5, VADOC-00134589 at -604 (2021 O.P. 830.A) (noting that Step-Down Program requires review of Level S prisoners every 90 days by the ICA).

2. **Conditions in VDOC's Step-Down Program Impose An Atypical and Significant Hardship.**

The touchstone of establishing a protected liberty interest is whether one's "confinement constitute[s] an 'atypical and significant hardship' in relation to th[e] general–population norm." *Smith v. Collins*, 964 F.3d 266, 275 (4th Cir. 2020) (citing *Incumaa*, 791 F.3d at 527); *see also Wilkinson*, 545 U.S. at 223 (describing the atypicality analysis as relative to the "ordinary incidents of prison life").  The Fourth Circuit has interpreted the atypical–and–significant–hardship analysis

"as turning on primarily three factors: '(1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence.'" *Smith*, 964 F.3d at 275 (quoting *Incumaa*, 791 F.3d at 257).  All three factors are met here.

First, the magnitude of the confinement conditions in Level S (a security level reserved for offenders who are managed in a segregation setting, *see* Ex. 5, VADOC-00134589 at 591 (2021 O.P. 830.A), at 1) and in Level 6 (the first step down from Level S before returning to the general population, *see id.* at 2) differs starkly  from the conditions experienced by the general prison population.  Prisoners in the Step-Down Program are confined to cells measuring approximately 7-by-10 feet—a size that falls short of American Correctional Association standards—for nearly all hours of the day.  Ex. 22, Collins Dep. at 46:22–47:2 (SUF ¶ 133); Ex. 48, King Dep. 302:22–303:4 (SUF ¶ 134); *see Wilkinson*, 545 U.S. at 214 (7-by-14 foot cells).  By contrast, even in maximum-security prison, prisoners assigned to the general population can socialize with other prisoners outside of their cells for several hours each day.  Ex. 98, Hammer Declaration (2023 Hammer Decl.) ¶¶ 7, 43.

During outside recreation, prisoners in Level S are confined to 8x10 recreation cages made out of chain link fence that contain no recreational equipment or toilet facilities.  *Id*. ¶¶ 21, 27; SUF ¶ 156.  Prisoners in the general population, by contrast, can congregate socially while unrestrained in large groups for several hours each day, are not confined to cages, and have access to group facilities including basketball courts and gyms.  Ex. 33, Turner Dep. at 82:20–83:4, 189:6–10, 191:11–13, 210:10–211:11; *see* SUF ¶ 162; Ex. 98, 2023 Hammer Decl. ¶¶ 7-8, 43.  Compounding their social isolation, prisoners at Level S and Level 6 are assigned to individual cells, while those in the general population usually have a cell partner.  Ex. 33, Turner Dep. at

24

83:11–85:1, 188:17–18, 189:3–5; *see* SUF ¶ 162.  Prisoners in the Step-Down Program are initially required to complete programming in their cells while at IM-0 and SM-0.  Ex. 26, VADOC-00053104 at -126 (2017 Step-Down Manual); Ex. 11, Duncan Dep. at 106:16–19; SUF ¶¶ 123, 128.  They become eligible under VDOC policy for restrained, out-of-cell programming at IM-1 and SM-1.  Ex. 26, VADOC-00053104 at -126 (2017 Step-Down Manual); SUF ¶ 130.  For prisoners on the IM pathway, all of their programming is restrained, while some prisoners on the SM pathway become eligible for unrestrained small group programming in Level 6.  *Id.*  By contrast, prisoners in the general population are not restrained during programming.  Ex. 33, Turner Dep. at 188:15–17, 211:3–5 (SUF ¶ 165).  Prisoners at Level S and Level 6 are typically restrained in handcuffs and shackles while outside of their cell, while prisoners in the general population can leave their cell unrestrained.  SUF ¶ 167; *see also* Ex. 98, 2023 Hammer Decl. ¶¶ 7–8.  Prisoners at Level S also must undergo a cavity search whenever they leave their cell, while prisoners in the general population generally need not, and only undergo cavity searches upon specific suspicion or as part of a prison-wide inspection.  SUF ¶ 166; *see also* Ex. 98, 2023 Hammer Decl. ¶¶ 7, 19, 43; Ex. 17, 2023 Arrington Declaration ¶ 14.

In addition to these onerous security procedures, Level S and Level 6 prisoners are given far fewer privileges than prisoners in the general population.  Individuals on both the IM and SM pathways are permitted a single one-hour, non-contact visit per week while on Level S (prisoners on IM-2 or SM-2 may request additional time); and between two and four phone calls per month.  Ex. 6, VADOC-00003146 (2013 O.P. 830.A) at -158–65.  Once in Level 6, IM and SM prisoners are entitled to a second hour of non-contact visitation per week and either five phone calls per month (IM pathway) or unlimited phone calls during out-of-cell time (SM pathway).  *Id.*  By contrast, prisoners at Security Level 5 and below receive between one and four visiting hours per

visiting day, including contact visits, and free use of the phones when they are available.  Ex. 99, VADOC-00003072 at -075–76 (2019 O.P. 801.4); Ex. 33, Turner Dep. 209:13–18, 210:11–22. Prisoners in the Step-Down Program also receive less commissary than prisoners in the general population, *id.* at 210:22–211:2, and either are not permitted to hold jobs or are permitted to have fewer jobs than prisoners in the general population, Ex. 10, VADOC-00002765 at -818, -826 (2017 Step-Down Manual); Ex. 33, Turner Dep. 211:8–11.

*Second,* Plaintiffs' confinement in the Step-Down Program is extraordinary in its duration. The Supreme Court has "stressed" the length of stay in administrative segregation as an especially important factor in the typicality analysis, particularly when the duration approaches indefiniteness. *Skinner v. Cunningham*, 430 F.3d 483, 487 (1st Cir. 2005) (citing *Wilkinson*, 545 U.S. at 224).  Incarceration in the Step-Down Program is effectively indefinite, because there is no maximum amount of time that a prisoner may be required to spend in the program.  Ex. 23, Kiser Dep. at 279:19:280:1–4.

Indeed, several Plaintiffs spent years in the Step-Down Program, and many class members have spent decades in Level S.  SUF ¶ 52; *see* Ex. 91, Cornelison Dep. at 27:12–13; Ex. 114, Hammer Dep. at 77:8–10; 78:17–21.  These extreme durations far exceed those found by other courts to create a protectable liberty interest.  *E.g.*, *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698–99 (7th Cir. 2009) (240 days); *Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (one year).

Lengthy stays in the Step-Down Program are not accidental anomalies, but are imposed by design.  Even before prisoners are assigned a pathway, they spend an indeterminate amount of time—most often 30 days—in conditions and privileges similar to those at the most restrictive levels of the Step-Down Program, waiting for the DTT to meet to assign them to a pathway.  SUF

¶¶ 33-37.  After receiving a pathway assignment, the Step-Down Program requires prisoners in the SM pathway to spend a minimum of nine additional months in Level S to progress to a Level 6 unit, or at least eighteen additional months in the IM pathway to progress to IM-Closed Pod.  SUF ¶ 49.  But, as described below in Section II.B.1.a, *infra* at 31, even this extensive time period is unrealistically short because of the required approval steps built into the program's bureaucracy. And once someone in the SM pathway advances to Level 6, there is neither a minimum nor a maximum period for which they must remain, under policy; instead, the decision as to when a prisoner may leave the Step-Down Program and progress to Level 5 relies on a determination that the prisoner has successfully "adjusted" to Level 6, a term that is not defined.  SUF ¶ 53; *see also* Ex. 29, Gallihar Dep. (*Reyes*) at 192:22–195:6.  Those in Level 6 within the IM Pathway (i.e. IM-Closed Pod) may not leave the Step-Down Program at all unless and until the External Review Team decides to reassign them to the SM Pathway so that they may make their way through Level 6 from the SM pathway.  SUF ¶ 48.  All the while, prisoners in Level 6 may be sent back to Level S and forced to restart the pathway for charges and behavior that would not normally permit placement into Level S from a scored security level.  SUF ¶ 54.

Nor is the length of stay in the Step-Down Program necessarily determined by factors related to safety or the prisoner's reason for being in the program.  A prisoner's progression through the Step-Down Program and return to the general prison population can be halted or reversed for reasons wholly unrelated to the reasons for their confinement in restrictive housing, such as a prisoner's failure to complete a series of workbooks or satisfy amorphous personal hygiene standards.  SUF ¶¶ 65-68, 74, 75, 80; Ex. 2, VADOC-00053480 (2020 Step-Down Manual) at -529; Ex. 22, Collins Dep. at 167:14–17, 168:9–16, 169:19–171:1; Ex. 44, Duncan Dep (*DePaola*) Dep. 191:11–16.  Thus, a prisoner can be stuck in Level S indefinitely, even after he is

no longer considered a safety or behavioral threat. *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 561 (3d Cir. 2017) (concluding there was a protectable liberty interest because, among other factors, plaintiffs were kept in segregation "for years . . . after the initial justification for subjecting them to such extreme deprivation . . . ceased to exist."); *see also infra* § II.B.2.

*Finally,* as to the third factor of the atypical-and-significant-hardship test—whether assignment to the Step-Down Program has any collateral consequences on the prisoner's sentence—placement in Level S impacts prisoners' ability to earn good-time credit, which "is a collateral consequence." *Smith*, 964 F.3d at 280. Offenders in Level S cannot earn good-time credit unless they participate in the Step-Down Program, and *no* good-time credit is available to individuals at SM-0 or IM-0 at all. SUF ⁋ 122; *see* Ex. 11, Duncan Dep. at 94:9–16, 95:1–6. Thus, prisoners who are stuck at the entry level of each pathway (i.e., SM-0 or IM-0) or who have not made progress in the Step-Down Program for any reason are denied good-time credit, which often affects the overall length of their sentences. *See, e.g.*, *Smith*, 964 F.3d at 280 (describing an individual who was denied good-time credit in the Step-Down Program "despite zero infractions").[5]

Under well-established precedent, these factors amount to an atypical and significant hardship in relation to the general population, which implicates a liberty interest in avoiding such conditions.

**B.    The Step-Down Program Does Not Provide Meaningful Review Mechanisms.**

---

[5] Participants in the Step-Down program have the same types of convictions and sentences as other individuals in VDOC custody. *See Prieto*, 780780 F.3d3d at 253 ("When determining the baseline for atypicality, a court must consider whether the confinement conditions are imposed on a prisoner *because of* his conviction and sentence."). Yet, unlike other inmates, they are subject to categorically harsher conditions with little to no possibility for relief.

Once a court finds a liberty interest, it "turn[s] to the question of what process is due" to protect it. *Wilkinson*, 545545 U.S. at 224.

As the Fourth Circuit explained in this case, prisoners in administrative segregation are entitled to both (1) meaningful periodic review of whether the reasons for their ongoing confinement are valid and subsisting, *see Thorpe v. Clarke*, 37 F.4th at 945–46 (4th Cir. 2022) (meaningful review under *Hewitt* "must reflect legitimate penological necessities," such that "when a precarious situation ends, with it ends the State's authority to maintain prisoners in solitary confinement"); *see also Proctor*, 846 F.3d at 610–11 (meaningful periodic reviews must evaluate whether continued administrative segregation *remains* justified on the date of the review in light of safety, security, or other valid justifications); as well as (2) review procedures that satisfy the elementary requirements of due process, namely, notice or explanation of the case against the prisoner and an opportunity to rebut it, *see Thorpe*, 37 F.4th at 945 (compiling cases that stand for the proposition that, if due process means anything, it requires notice of the factual basis for a decision and an opportunity to rebut). To succeed on their due process claim, Plaintiffs need only prove that Defendants failed to satisfy one of these two independent requirements. *Thorpe*, 37 F.4th at 945 (crediting Plaintiffs' argument that Defendants failed to provide notice and opportunity for rebuttal, and "more" that Defendants failed to "use institutional safety and security (or another valid administrative justification) as their guiding principles" (internal quotation marks omitted)).

On this record, and as described below, the undisputed material facts demonstrate that the Step-Down Program fails both tests. As to the first test (for periodic review of ongoing risk), the review committee that assesses whether prisoners can advance within the Step-Down Program utilizes vague or irrelevant conduct requirements that are not probative of whether a prisoner's

continued segregation reflects legitimate and ongoing penological necessities (i.e., serving time minimums in each phase, meeting behavioral and disciplinary goals, and completing the Challenge Series).  SUF ¶¶ 60, 65–78.  The other review committees either review something other than whether a prisoner should remain in segregation (e.g. whether they should be in the IM or SM pathway) or their "reviews" are entirely contingent on the first committee's findings and are therefore little more than rubber stamps.  And even assuming there was some dispute as to whether the program's review structure periodically reviewed prisoners' ongoing risk, the program cannot satisfy due process because, by policy, none of these committees provides minimally adequate due process safeguards of notice and opportunity for rebuttal under *Wilkinson*, *Incumaa*, and *Thorpe*.

### 1.    Step-Down Committees Do Not Meaningfully Review The Reasons For Continuing A Prisoner's Solitary Confinement.

Once a prisoner enters the Step-Down Program, the only way he can become eligible for return to the general population is by completing the requirements of the Step-Down Program.  SUF ¶ 56.  VDOC uses the Step-Down Program's advancement criteria as the sole proxy for determining whether a prisoner's conduct in solitary confinement demonstrates whether they pose an institutional risk.  SUF ¶ 57.  VDOC policy instructs various teams to review prisoners once a month, once every three months, and twice a year.  SUF ¶ 43, 57, 94.  But, as the Fourth Circuit concluded at the pleading stage, these Step-Down Reviews "rest on 'reasons having nothing to do with' prisoners' security risk" and there is a "dissonance between legitimate penological goals and the processes Step Down institutes."  *Thorpe*, 37 F.4th at 946 (assessing Plaintiffs' factual allegations derived from the text of VDOC policies).

On the fuller factual record now before the Court, there is no genuine dispute that Step-Down Reviews do not evaluate whether there is a valid and sustaining penological reason for continuing to house a prisoner in solitary confinement.  *Jackson v. Meachum*, 699 F.2d 578, 584

(1st Cir. 1983) ("[D]efendants should . . . devise a system of periodic review incorporating such criteria and procedures as may be suitable to determine the feasibility of release to the general population or other ameliorative actions.").  This explains why VDOC routinely retains prisoners in solitary confinement—even if they demonstrate no continuing risk of harm—for years on end. See SUF ¶¶ 53, 243, 248, 245, 251, 254, 259, 261; *id.* ¶ 72 (noting that Reyes remained in Level S solely for failure to complete Challenge Series).

a)  **The BMC Does Not Review a Prisoner's Ongoing Risk, And Holds People in Level S For Failing to Meet Any of Four Requirements That Are Largely Unconnected To Ongoing Institutional Risk.**

The BMC is the committee that reviews whether a prisoner should progress through the Program's privilege levels towards a return to the general population.  SUF ⁋ 58.  The BMC's review is based on the prisoner's satisfaction of all Step-Down Program requirements—not whether returning the prisoner to general population would still present a "precarious situation." *Thorpe*, 37 F.4th at 945; SUF ⁋ 60.  These requirements are as follows:

**Requirement #1: Serving the mandatory minimum periods of time at each privilege level in the SM/IM Pathway.**

During each BMC review, the reviewing entity determines whether each prisoner has spent the requisite number of months at their privilege level, and prohibits the prisoner from advancing unless the mandatory minimum (along with all other requirements) are met.  SUF ⁋⁋ 50, 51, 58. When these minimums-per-level are added together, they amount to no less than 18 months for IM prisoners, or 9 months for SM prisoners.  *See, e.g.*, Ex. 22, Collins Dep. at 149:6–13 (explaining that there is no way for an ICA to accelerate the Step-Down Program timeline from its mandatory minimum number of months).[6]  Those figures represent the *fastest* a prisoner could theoretically advance through Level S after their pathway assignment (which itself takes 30 days), and does not account for delays caused by having to restart the Program, lack of bed space in subsequent privilege levels, SUF ⁋ 107, or the requirement that they obtain approval from multiple reviewing

---

[6] As discussed in Subsection III.B, *supra*, these durations approach or exceed thresholds which other courts have found begin to implicate due process concerns.  *See, e.g.*, *Marion*, 559 F.3d at 698–99 (240 days); *Williams*, 77 F.3d at 374 n.3 (one year); *Baker*, 904 F.2d at 929 (thirteen months).

entities under the Step-Down Program's Kafkaesque bureaucracy.[7] SUF ¶¶ 105–06; Ex. 54, Pacholke Rebuttal Rep. ¶¶ 15–18 (describing the nearly two–month delay between BMC decision and ICA stamp on Plaintiff Wall's progression to Level 6).  Further, as explained *supra*, § I.2.A, IM prisoners are categorically ineligible for return to the general population.

While past conduct can serve as a penological reason for a pre-determined sentence to *disciplinary* segregation, *administrative* segregation reviews must evaluate if there is a sustaining, legitimate reason for continuing the prisoner's solitary confinement because he *currently* remains a security risk.  *Compare Thorpe*, 37 F.4th at 946, *with Proctor*, 846 F.3d at 601 (explaining this difference between administrative and disciplinary segregation); *Hewitt v. Helms*, 459 U.S. 460, 463 n.1 (1983) (same).  Whether the prisoner has served a mandatory minimum period in solitary confinement, or is assigned to the IM Pathway based on their conduct from years earlier, cannot alone serve as a proxy for whether the prisoner *currently* poses a sufficient institutional safety risk to retain them in solitary confinement.  *Thorpe*, 36 F.4th at 946 (concluding that "when a precarious situation ends, with it ends the State's authority to maintain prisoners in solitary confinement").

### Requirement #2: Completing required programming.

The BMC also requires every person in Level S to complete the Challenge Series.  *See* SUF ¶ 65.  Prisoners who do not complete these workbooks cannot advance within the Step-Down Program.  SUF ¶ 66; *see, e.g.*, Ex. 40, Collins Dep. (*Reyes*) at 271:3–11.  As a result, individuals have for years been stuck at their privilege level in the Step-Down Program due to a failure to complete the required programming.  SUF ¶ 68.  This is the case even though VDOC does not

---

[7] Indeed, the Program requires four layers of approval by multiple entities (without corresponding time limits by which any of those entities are required to act), to move someone from Level S to Level 6.

provide its treatment officers with criteria for grading the Challenge Series workbooks.  SUF ¶ 69.
Even individuals with documented mental health issues or other learning or language barriers are
required to complete the Challenge Series.  SUF ¶ 65; *see* Ex. 19, Malone 30(b)(6) Dep. at 206:14–
208:6.   For example, one prisoner was not progressed out of the Step-Down Program solely
because he refused to complete the Challenge Series even though a unit manager testified that the
prisoner had a language barrier and mental health issues that may have prevented him from
understanding the unit manager or the workbooks. *See* Ex. 38, Mathena 30(b)(6) (*Reyes*) Dep.
287:1–304:5; Ex. 40, Collins (*Reyes*) Dep. 155:10–15, 197:1–18, 219:18–220:18; 223:22–224:14;
233:5–236:1.  Such rigid adherence to the workbook requirement without regard to common sense,
let alone ongoing risk justifying continued segregation, undermines any suggestion that the BMC's
review assesses a "valid and subsisting reason" for segregation.  *Thorpe*, 37 F.4th at 945 (citing
*Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975)).

### Requirement #3: Adherence to "Responsible Behavior" Requirements.

The BMC also considers the number of positive and negative grades prisoners receive on
factors such as the prisoner's personal hygiene and rapport with staff, that are vague, highly
subjective, and at best only tenuously related to whether a prisoner would present a risk to the
general population.  SUF ¶ 76–77; *see* Ex. 2, VADOC-00053480 at -529–531, -534–535 (2020
Step-Down Manual); Ex. 3, Beard Dep. at 128:6–131:8 (noting that such goals reflect an intent to
"shape their behavior," and are not for the purpose of assessing security risk).  Prisoners are
regularly denied progress through the Step-Down Program on the basis of obtaining too many
"poor" or not enough "good" ratings on these subjective measures.[8]  SUF ¶¶ 76–81; *Smith v.*

---

[8] The requirement that prisoners receive a certain number of good grades is particularly arbitrary given that prisoners'
rating charts are not consistently filled out in practice.  SUF ¶ 13.

*Collins*, 964 F.3d 266, 271 (4th Cir. 2020) (describing the plaintiff's denial of advancement through the Step-Down Program for failing to meet behavioral goals); ECF No. 174–24 ¶ 14 (Mukuria Aff.).   The enforcement of arbitrary and irrelevant factors such as these frustrates an prisoner's ability to progress out of confinement. *See Toevs v. Reid*, 685 F.3d 903, 913 (10th Cir. 2012) ("[A] 'meaningful' review for a prisoner in a behavior-modification program is one that evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted.").

**Requirement #4: Adherence to Stringent Disciplinary Charge Limits.**

The BMC also evaluates whether prisoners in Level S have met stringent disciplinary charge requirements that become progressively more strict as they advance through privilege levels.[9]  SUF ⫫ 61.  If a prisoner fails to meet any one of these requirements, he is forced to repeat the mandatory time requirements at that privilege level, and may even be moved back to the earlier level.  SUF ⫫⫫ 48, 55, 74.  Under policy, this is true whether or not the charge has any bearing on the individual's ongoing risk or whether they indicate any continued need for ongoing segregation. Thus, prisoners can be forced to spend an additional 3–12 months in Level S for even a single low-level charge.  SUF ⫫⫫ 99–104.[10]

Consequently, when prison officials concluded that Plaintiff Snodgrass's complaint of verbal sexual harassment was untrue, he was not only prevented from progressing within his

---

[9] These requirements include that the prisoner receive (a) no more than three total charges to advance to IM-1 / SM-1; (b) no more than one total charge to advance to IM-2 / SM-2; and (c) no charges whatsoever to advance from IM-2 / SM-2 to IM-Closed or any of the other Security Level 6 units in the SM pathway.  SUF ⫫⫫ 90–92.

[10]   These charges include, among others, disobeying an order; failing to follow count procedures; unauthorized possession of a lottery ticket or a negotiable instrument; vulgar or insolent language or gestures toward employees; accepting compensation for legal services; tattooing or piercing; intentionally discarding food, trash, body wastes/fluids, or other substances, except into an approved receptacle; failure to follow posted or written facility rules and regulations; consensual sexual acts; or lying or giving false information to an employee.

pathway but was moved backwards from SM-2 to SM-1 because he allegedly lied.  SUF ¶ 92.  When questioned about this incident, former Warden Mathena noted that under the policy the BMC had moved people backwards in the program for behavior less serious than that, including kicking on doors or demonstrating insufficient respect.  SUF ¶ 74.  And while more "serious" 100-level charges can cause a prisoner to be sent back to the beginning of their pathway, extending their time in Level S by up to 18 months (not counting the additional opportunities for further delays that entails), such charges encompass behavior like ripping up one's own state-issued pants—the basis on which Plaintiff Wall was sent all the way back to the beginning of the IM pathway for a 100–level charge of intentionally destroying, altering, damaging, or defacing state or any person's property.  Ex. 15, Wall Decl. ¶ 44; Ex. 115, O.P. 861.1 (June 1, 2023) at 6; Ex. 100, Gary Wall Disciplinary Action Report, VADOC-00136273; ECF No. 174-28 at ¶ 16 (Affidavit of Gary Wall); Ex. 79, VADOC-00175822 at row 12308 (Internal Status Spreadsheet); Ex. 101, VADOC-0013601 (Gary Wall Officer's Log Sheet).  As these examples demonstrate, the policy's stringent requirements, which hold people back on the basis of *any* charges regardless of whether they are connected in any way to ongoing risk, fails to meaningfully consider whether the prisoner's continued retention in segregation remains warranted.  *Thorpe*, 37 F.4th at 945 (describing the periodic review decision that must be made as determining "whether a prisoner remains a security risk").

        **b)**        **Other Step-Down Review Committees Do Not Provide An Individualized, Risk-Based Assessment Of Whether The Prisoner Should Advance Towards General Population.**

As noted above, in addition to the BMC, various other committees also perform some review of prisoners in the Step-Down Program—including the ICA, the DTT, and the ERT.  But the record is undisputed that these review committees do not independently evaluate whether the

prisoner's recent behavior demonstrates that he would pose an ongoing risk to the general population. Rather, review by each of these committees is either limited in scope or contingent on the BMC's findings.

**ICA Reviews**: The ICA performs reviews of a prisoner's security level status every three months. SUF ¶ 94. But it is undisputed that the ICA does not review whether a prisoner should advance in "privilege level" through the Program towards release to the general population. SUF ¶ 97; *see* Ex. 44, Duncan (DePaola) Dep. at 190:2–6, 191:11–16, 193:20–22. Those decisions are made by the BMC, through its separate, *monthly* review process. Until the BMC permits the prisoner to advance to a point in the Program that requires a security level change, such as from IM-2 to IM-Closed Pod, the ICA's 90–day reviews are worse than "rubber stamped." *Incumaa*, 761 F.3d at 534. They are pointless, ministerial exercises. And when the BMC does determine that a prisoner has met Step-Down Program requirements and permits a prisoner to advance to Level 6, the ICA, when it next meets, simply presents the result of that pre–determined decision to the prisoner. *See* Ex. 11, Duncan Dep. at 272:15–274:1.

**DTT Reviews**: It is also undisputed here that the DTT does not provide periodic review of whether or not a prisoner's current behavior justifies ongoing solitary confinement. First, the DTT's review is not *periodic.* Rather, **t**he DTT conducts *ad hoc* reviews on two occasions: when a prisoner enters the Step-Down Program, the DTT reviews the prisoner for the limited purpose of assigning them to either the IM or the SM Pathway. SUF ¶¶ 29, 104; *see* Ex. 4, Mathena 30(b)(6) Dep. at 213:6–14, 257:14–15; Ex. 5, VADOC-00134589 at -593 (2021 O.P. 830.A). And after the BMC decides that a prisoner in the Step-Down Program should advance to a Level 6 classification, such as from IM-2 to IM-Closed Pod, the DTT may approve this decision. Second, DTT review is a secondary, one-way valve. If the BMC recommends a

prisoner remain at their privilege level or move backwards to an earlier level, the DTT conducts no review of this decision whatsoever.  Ex. 4, Mathena 30(b)(6) Dep. at 264:19–265:4. To the extent the DTT operates as a check on the BMC at all, it is a check only on early release, rather than on erroneous continued segregation.

ERT Reviews: The External Review Team ("ERT") also fails to provide a meaningful procedural check on the Step-Down program.  First, the ERT does not provide an independent check on the BMC's decisions with respect to a Step-Down prisoner's progression through their assigned Step-Down pathway.  SUF ¶ 115; see Ex. 18, Mathena Dep. at 419:21–420:3 (noting BMC privilege level determinations are final), 478:20–479:9 (ERT reviews limited to pathway assignment review and review of initial placement in Level S).  Rather, the ERT reviews whether the original decision to place a prisoner in Level S accords with VDOC policy, in addition to whether the prisoner should remain in the pathway to which the DTT assigned them.  Ex. 18, Mathena Dep. at 478:20–479:9.  Thus, the ERT cannot remove someone from Level S who had not met Step-Down Program Requirements even if they believed they posed no ongoing safety or security concern justifying continued segregation.  SUF ¶ 56.  Because ERT reviews do not attempt to determine whether someone should remain in solitary confinement based on their present "security risk," this process also fails to provide meaningful procedural due process.  Hewitt, 459 U.S. at 477 n.9; see Proctor v. LeClaire, 846 F.3d 597, 610–12 (2d Cir. 2017) (concurring with a consensus of circuits that Hewitt requires prisons to determine a "valid administrative justification" for an prisoner's solitary confinement); Williams v. Hobbs, 662 F.3d 994, 999 (8th Cir. 2011).

2.    **Step-Down Reviews Are Procedurally Inadequate And Fail To Provide Even Minimal Procedural Protections Under Wilkinson and Thorpe.**

Even if Step-Down reviews meaningfully evaluated whether a prisoner continues to present a security risk to the general population, there is no genuine dispute of material fact here that none of these "reviews actually lives up to 'basic' due process scrutiny." *Thorpe*, 37 F.4th at 944.  The essential status reviews and decisions—such as progressing an prisoner through each pathway— are done without notice or even an prisoner's presence, do not result in factual findings,[11] and offer prisoners no meaningful opportunity to know, let alone rebut or contest, the factual bases for their continued confinement in the program.  These procedures offer no assurance that the Plaintiffs have not been erroneously confined in the Step-Down Program.

*Wilkinson* explained that the procedural adequacy of administrative segregation reviews is determined against three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used" and "the probable value" of other safeguards," and (3) "the Government's interest."  *Wilkinson*, 545 U.S. at 224–225 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  As to the first factor, Prisoners who are housed in prolonged solitary confinement with regular cavity searches — as are Plaintiffs — have a "significant private interest" in rejoining the general population.  *Incumaa*, 791 F.3d at 534.  As to the second factor — whether the procedures protect against the risk of erroneous deprivation — the Fourth Circuit explained the bare-minimum process applicable to Step-Down reviews as follows:

> *Hewitt* demanded corrections officers provide prisoners a notice or explanation of the charges against them and an opportunity to present their views through written statement or oral presentations[;] *Wilkinson* insisted that officials provide a brief summary of the factual basis for the classification review and allow a rebuttal opportunity[; and] *Incumaa* allowed prisoners to prove review committees failed to

---

[11] To the extent that any rationale for their continued confinement in the Step-Down Program is provided to inmates after the fact, it consists only of "listing in 'rote repetition' the same justification" each time. *Incumaa*, 791 F.3d at 534.

provide a factual basis for their decisions, merely rubber-stamping solitary incarceration.

*Thorpe*, 37 F.4d at 945 (citations, quotation marks, and internal alterations omitted).

On this record, there is no genuine dispute of material fact that Step-Down Reviews fail to provide prisoners with these bedrock procedural protections.

### a) The BMC's Reviews Lack Proper Notice, Do Not Keep a Factual Record, And Are Non-Grievable

The BMC does not even attempt to meet the minimum standards of due process. The record in this case is undisputed that prisoners are not given an opportunity to make any oral presentation in their favor or to verbally hear the case against them, because prisoners are not given advanced notice of their hearings or told when the evaluation will take place, nor permitted to be present under policy or practice. SUF ¶¶ 62–64; *see Williams*, 848 F.3d at 576 ("Inmates must also have a meaningful opportunity to respond to the reasons provided. These procedures would be of little value absent the attendant right of a hearing."). Further, prisoners are not provided with the evidence considered by the BMC or any written record of its findings against them, or the reasons for any such findings, and thus are unable to rebut allegations of behavioral misconduct. Ex. 4, Mathena 30(b)(6) Dep. at 305:14–16; SUF ¶ 62; Ex. 2, VADOC00052680 at -637 (2020 Step-Down Manual); *see Wilkinson v. Austin*, 545 U.S. 209, 211 (2005) ("Notice of the factual basis for a decision and a fair opportunity for rebuttal are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations."); *Incumaa*, 791 F.3d at 535 ("The fact that the ICC is not required to provide a factual basis for its decision further increases the possibility of an erroneous deprivation because Appellant has no basis for objection to support his grievance against the ICC's decision.") (internal quotation marks omitted). Moreover, prisoners who attempt to file a grievance disputing the BMC's decision not to advance them through the Step-Down Program's privilege levels are told that these "internal status" decisions are non-grievable. SUF ¶ 64. And, even if there were an available process to appeal the BMC's monthly

review decisions, it would not be timely, as prisoners receive formal notice of these decisions during the next ICA review, which can be up to three months later.  SUF ⁋ 62.

### b)   ICA Reviews Afford No Opportunity for Prisoners to Understand or Dispute Administrative Segregation Decisions.

Even as it carries out its ministerial "review" of someone's housing status, as pre-determined by the BMC, the ICA does not provide basic procedural protections.  Because the ICA review is a formulaic one, and a decision has essentially been made by the BMC before prisoners are asked for their statement, those statements have no effect on the process.  Ex. 102, Kegley (*Reyes*) Dep. at 110:20–111:1; *see Wilkinson*, 545 U.S. at 226 (emphasizing the importance of "allowing the prisoner a rebuttal opportunity" as a procedural "safeguard[]").  Accordingly, it is no surprise that the notice provided to prisoners gives no indication of the evidence the ICA is considering or the decision VDOC contemplates based on that evidence, SUF ⁋ 100, and that prisoners' "attendance" consists of giving a statement through the crack in their cell door, SUF ⁋ 101.

ICA paperwork provides no assurances that any meaningful evaluation was done, either; ICA dispositions frequently cite to a conclusory need for a ███████████████████ as reasoning to keep an incarcerated person in his current housing assignment.  SUF ⁋ 103; Ex. 93, Mukuria Dep. at 203:7–204:8; ECF No. 174-24 ¶ 11 (Mukuria Aff.); *see Smith*, 964 F.3d at 278 (considering VDOC's motion for summary judgment in a restricted housing due process case and finding that the "conclusory nature" of the "longer period of stable adjustment" rationale for preventing an prisoner's progression along the Step-Down program suggested "that the ICA reviews did not offer [the prisoner] any real opportunity for release from segregation").

### c)   The External Review Team Does Not Provide Adequate Notice or Opportunity for Rebuttal.

Even if the ERT provided ongoing review of whether staff have an adequate security justification for continuing to house a prisoner in solitary confinement, the record leaves no genuine dispute that ERT reviews fail to offer minimally adequate process under *Wilkinson*.  Prior

to 2018, the ERT did not conduct prisoner interviews at all.  SUF ¶ 110, 111; *see Williams*, 848 F.3d at 576 ("Prisoners must also have a meaningful opportunity to respond to the reasons provided.").   While the ERT now interviews certain prisoners at their discretion, this basic procedure is not available as a matter of course to all prisoners in the Step-Down Program; rather, the ERT interviews those who are "stuck" in the program or are otherwise under consideration for a pathway change.  SUF ¶¶ 112–114.  And the ERT does not even document the rationale for its decisions, and therefore could not provide notice of the reasons for its decision-making to prisoners even if it wanted to.  SUF ¶¶ 117–18.  And in fact, prisoners receive no documentation explaining the outcome of their ERT reviews, which, like BMC reviews, are not grievable.  SUF ¶ 119.  The ERT thus adds no process at all, much less the meaningful process due to class members under the Fourteenth Amendment.[12]

For the reasons provided above, the record reflects no genuine dispute of material fact that Defendants have failed to provide Plaintiffs with constitutionally adequate procedural due process during administrative segregation reviews, as required under *Hewitt*, *Thorpe*, *Wilkinson* and *Incumaa*. BMC reviews, and the criteria that the BMC applies in them, do not meaningfully evaluate the risk an individual prisoner would pose to the general population environment and whether this risk requires that the prisoner remain in solitary confinement, in violation of *Hewitt* and *Thorpe*.   Reviews by the other Step-Down committees—the ERT, ICA, and DTT—are conditional on the BMC's decisions, or do not decide whether a prisoner is fit for release to the general population.  Additionally, and in the alternative, none of these reviews provides prisoners with notice or a factual basis for the decision to retain them in solitary confinement, or an

---

[12] VDOC's grievance procedure likewise does not provide meaningful due process, as inmates' privilege status within the IM or SM pathway is not grievable.  SUF ¶ 64.

opportunity to present the decision-maker with written or oral rebuttals, in violation of *Wilkinson* and *Incumaa*.  The Court should grant summary judgment to Plaintiffs on Count II of the Class Action Complaint.

### III.   Plaintiffs Are Entitled to Summary Judgment on Defendants' Affirmative Defenses.

Four months after the close of fact discovery, Defendants raised new affirmative defenses to Plaintiffs' ADA and RA claims—fundamental alteration, undue burden, and direct threat—with the promise that existing fact discovery and forthcoming expert discovery would adduce the evidence necessary to support these defenses.  *See, e.g.*, ECF No. 331 at 8–9 (Defs.' Mot. for Leave to File Amended Answer).  With discovery now closed, the undisputed facts show that Defendants cannot carry their burden with respect to at least two of these defenses: fundamental alteration and undue burden.  Plaintiffs therefore move for summary judgment with respect to these affirmative defenses.  *Thomas M.  Gilbert Architects, P.C.  v. Accent Builders & Devs., LLC*, 629 F. Supp. 2d 526, 530–37 (E.D. Va. 2008) (granting plaintiff's partial motion for summary judgment on affirmative defenses where defendant failed to present sufficient evidence to carry burden), *aff'd*, 377 F. App'x 303 (4th Cir. 2010).[13]

Defendants' fundamental alteration and undue burden defenses fail for at least two reasons. *First*, Defendants have not conducted any specific assessment of the modifications proposed by Plaintiffs, as required by the regulations implementing Title II of the ADA, and have therefore failed to satisfy the prerequisites for asserting the defenses.[14]  *Second*, Defendants failed to adduce

---

[13] Plaintiffs recognize their Objection to the Order Granting Defendants' Motion for Leave to File an Amended Answer, ECF No. 351, is currently pending before the Court.  This motion for partial summary judgment on Defendants' affirmative defenses should be considered in the alternative, should the Court overrule Plaintiffs' Objection and allow Defendants to proceed on their affirmative defenses.

[14] VDOC conceded that it "has not identified any request for accommodation to the Step–Down Program made by any potential Class Member on the basis of a mental health disability between August 1, 2012 and the present," Ex. 36, VDOC Responses and Objections to Plaintiffs' First Set of Requests for Admission at No. 36, and it attributes its need for affirmative defenses to Mr. Wells's Report, ECF No. 331 at 8–9.  Through Mr. Wells, a thirty-nine-year veteran of the corrections field who regularly works as a court monitor to enforce ADA compliance, and Named Plaintiffs'

any evidence—in either fact or expert discovery—to support either defense.  Instead, they have elicited only vague assertions that accommodating prisoners with mental health disabilities would require "extensive modifications" and involve "tremendous cost[s]," without identifying any *facts* in support of these assertions.  Ex. 81, Vare Rep. at 82; *see also* SUF ¶¶ 212–17.[15]  This, of course, is insufficient to meet their burden.  Because no reasonable jury could return a verdict in Defendants' favor on their fundamental alteration and undue burden defenses, summary judgment should be granted in Plaintiffs' favor.

> **A.** **Defendants Have Not Met the Prerequisites for Asserting Fundamental Alteration and Undue Burden Defenses.**

Public entities like VDOC must provide reasonable modifications to discriminatory policies, practices, or procedures unless such modifications "result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."[16] 28 C.F.R. § 35.164; *cf. Miller v. Hinton*, 288 F. App'x 901, 902 (4th Cir. 2008).  To invoke such defenses, however, the head of a covered entity—here, defendant and former director[17] Harold Clarke—must undertake a specific assessment of the accommodations at issue to determine the impact of the accommodation on the covered entity.  28 C.F.R. § 35.164; *see also Olmstead v. L.C.*, 527 U.S. 581, 582–83 (1999) ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, . . . its views warrant respect," and "courts and litigants may properly resort [to its regulations] for guidance.").

---

Interrogatory Responses, Plaintiffs provided possible modifications and accommodations to the Step–Down Program and to the practices, policies, and procedures at ROSP.  *Id.*; Ex. 85, Wells Rep. ¶¶ 3, 63–64, 66–66, 72.

[15] Plaintiffs have moved to exclude the testimony and opinions of Mr. Vare.  That motion is pending at the time of filing.

[16] The "reasonable modification" requirement is synonymous with the duty to make reasonable accommodations pursuant to the ADA.  *See Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004).  VDOC is subject to the ADA and to the RA.  SUF ¶¶ 203–04.

[17] Defendant Clarke announced that he would resign as VDOC Director in the beginning of September 2023; he was appointed to the role in 2010.  *See* Dave Ress, *Youngkin's Parole Board Chair to Take Charge of State Prison*

Here, the undisputed evidence shows that VDOC's former director, Harold Clarke, *never* analyzed the accommodations proposed in this lawsuit, the potential cost of such accommodations, or the accommodations' impact on the Step-Down Program or VDOC's operations.  Ex. 14, Clarke Dep. at 222:2–5 ("I have not been involved in any conversations about anyone needing accommodations to be able to complete the program.").  Absent such analysis, VDOC cannot demonstrate that *any* of the proposed accommodations in this case would fundamentally alter the services or programs it provides or impose an undue financial or administrative burden on VDOC.  *See Olmstead*, 527 U.S. at 604–07; *Constantine v. Rectors* & *Visitors of George Mason Univ.*, 411 F.3d 474, 489 (4th Cir. 2005) (public entities "retain the right not to 'take any action that [they] can *demonstrate* would result in a fundamental alteration in the nature of a service, program, or activity.'" (citing 28 C.F.R. § 35.150(a)) (emphasis added); *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016).

Even if VDOC were able to substantiate their claim that the specific accommodations that Plaintiffs have proposed result in a fundamental alteration of the Step-Down Program or impose an undue burden, VDOC has *still* failed to comply with relevant regulations.  For example, 28 C.F.R. § 35.164 provides that, if a proposed accommodation results in a fundamental alteration to a program or service or an undue burden on a covered entity, the entity "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity."  Once again, the undisputed evidence shows that Mr. Clarke has not considered any alternative accommodations—beyond those proposed by Plaintiffs—for individuals with mental health disabilities in the Step-Down Program.  Ex. 14, Clarke Dep. at 222:2–5; *see also* 28 C.F.R. § 35.164 ("The decision that compliance would result in such

alteration or burdens must be made *by the head of the public entity* or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion . . . .") (emphasis added). Absent such assessment, VDOC cannot rely on its fundamental alteration and undue burden defenses. *See, e.g.*, *Amer. Council of Blind of N.Y., Inc.*, *v. City of New York*, 495 F. Supp. 3d 211, 239–40 (S.D.N.Y. 2020) ("decision not to comply with the prerequisites" that regulation "imposes on the pursuit of an undue burden defense" amounts to "elect[ion] to forgo that defense as to liability (collecting cases)).

**B.      There Is No Evidence that Reasonable Accommodations Would Fundamentally Alter the Step-Down Program.**

Separate and apart from VDOC's failure to comply with the requirements of 28 C.F.R. § 35.164, VDOC has failed to adduce evidence to support a claim that granting individuals with mental health disabilities reasonable accommodations, as it is affirmatively obligated to do,[18] would fundamentally alter the Step-Down Program.

**1.      Defendants Have Not Adduced Factual Evidence in Support of Their "Fundamental Alteration" Defense.**

When filing their motion for leave to assert affirmative defenses, Defendants represented that they would support their new defenses, in part, through evidence already contained in the record—*i.e.*, documents produced and testimony given before the close of fact discovery. ECF No. 331 at 8–9 (Defs.' Mot. for Leave to File Amended Answer). It is clear, however, that no such evidence exists. On the contrary, VDOC witnesses *repeatedly* testified about the need for VDOC

---

[18] *See Olmstead*, 527 U.S. at 604–07; *Constantine v. Rectors &Visitors of George Mason Univ.,* 411 F.3d 474, 489 (4th Cir. 2005) (citing 28 C.F.R. § 35.150 (a)); *see also Lamone*, 813 F.3d at 508; Ex. 111, WELLS001826 at -831 (2023 Dep't. of Justice Ltr. to Ariz. Dep't. of Corrs., Rehab. & Reentry) (To comply with Title II regulations, states operating correctional facilities "have an affirmative obligation to evaluate the needs of newly incarcerated individuals with disabilities—as well as individuals who become disabled while incarcerated or whose disabilities change over time—and to ensure they receive necessary auxiliary aids, services, and reasonable modifications.").

to grant accommodations to inmates with mental health disabilities in order to comply with the ADA and RA.  *See, e.g.*, Ex. 19, Malone 30(b)(6) Dep. at 206:4–213:17 (testifying that a prisoner's mental health issues may affect his ability to satisfy the requirements of the Step-Down Program); Ex. 73, Lee Dep. at 137:20–138:5  (testifying that "there was a set of offenders . . . who were stuck ████████████████" because "they could not complete the step–down programming due to their mental health issues"; *see also* Ex. 18, Mathena Dep. at 583:21–584:3; Ex. 23, Kiser Dep. at 248:11–14.  Yet VDOC witnesses concede that VDOC has not made *any* modifications to the Step-Down Program to accommodate prisoners with mental health disabilities.  Ex. 19, Malone 30(b)(6) Dep. at 206:4–213:17; *see also* Ex. 51, Marano Dep. at 142:20–22.

Indeed, it is unclear how Plaintiffs' proposed modifications to the Step-Down Program could possibly "fundamentally alter" the nature of the Step-Down Program.  *See* SUF ¶¶ 217–18. As VDOC concedes, the Step-Down Program is meant to facilitate VDOC's operation of "████ ████████████ that will create a pathway for offenders to ████████████ ████████ in a way that maintains public, staff, and offender safety by ████████████ ████████████████████████████████."  Ex. 2, VADOC-00053480 at –486 (2020 Step-Down Manual); SUF ¶ 8.  There is nothing inconsistent between the purpose of Step-Down Program and accommodating prisoners with mental health disabilities, particularly when VDOC witnesses *acknowledge* that prisoners' mental health disabilities *impede* their ability ██ ████████████████████████████████████[19]  Nor have Defendants put forth evidence that accommodating prisoners with mental health disabilities would jeopardize "public, staff, and offender safety."  Ex. 2, VADOC-00053480 at -486; SUF ¶¶ 217–19.

---

[19] VDOC cannot point to any "Evidence-Based Practices" that are incompatible with the proposed modifications. Indeed, the "Evidence-Based Practices" the Step–Down Program identifies as its purported guiding principles affirm that certain prisoners, including those with "mental health related conditions," "deserve[] a specific behavior management strategy and a specific program strategy."  Ex. 2, VADOC-00053480 at –519 (2020 Step–Down Manual); SUF ¶ 8b.  Another Principle further pledges to deliver programs in a way "the offender is most likely to gain" from them, which is precisely what Plaintiffs request.  Ex. 2, VADOC-00053480 at –520 (2020 Step–Down Manual); SUF ¶ 8c.

Defendants' arguments about fundamental alteration are particularly specious in light of the evidence that *Plaintiffs* have put forward in support of their ADA and RA claims. For example, Plaintiffs' ADA expert, Richard Wells, has identified several prison systems—including California Department of Corrections and Rehabilitation ("CDCR"), Michigan Department of Corrections ("Michigan DOC"), Alameda County jail system, Orange County jail system, and Monterey County jail system—that have implemented the accommodations for which Plaintiffs advocate, including "a comprehensive real–time networked tracking system." SUF ¶¶ 212, 220–21; Ex. 87, Wells Dep. at 106:11, 106:15–17, 108:11–12, 115:3–6; *see also, e.g.*, Ex. 85, Wells Report ¶¶ 195–223. That other institutions maintain restrictive housing programs that incorporate the accommodations at issue in this suit is proof positive that such accommodations can be implemented without fundamentally altering the nature of those programs.

### 2. Defendants Have Not Adduced Expert Testimony in Support of Their "Fundamental Alteration" Defense.

In addition to their statements about fact discovery, Defendants also claimed that evidence in support of their fundamental alteration defense would be established through expert discovery. *See, e.g.*, ECF No. 331 at 8 (Defs.' Mot. for Leave to File Amended Answer) ("Plaintiffs will not be prejudiced because the expert discovery deadline does not close for two more months, which provides Plaintiffs with sufficient time to conduct discovery on these affirmative defenses."). But Defendants' proffered ADA expert, Lenard Vare, did not offer any such expert testimony. SUF ¶¶ 216–18. Instead, Mr. Vare offered conclusory statements that "extensive modifications to current safety and security protocols" would be required, at "███████████████████ ████████████████████████████████████████████████ ███████" Ex. 81, Vare Rep. at 82. Mr. Vare does not identify the "additional access" he refers to, the "extensive modifications" he contemplates, or the "additional cost and risk" associated with

such changes.  *See generally* Ex. 81, Vare Rep.; Ex. 82, Vare Dep.; SUF ¶ 212-13.[20]  *See Pierce v. County of Orange*, 761 F. Supp. 2d 915, 953–54 (C.D. Cal. 2011) (enjoining County for ADA violations after its failure to "offer any specific budgetary evidence" and otherwise "fell short of justifying" other policies alleged to be discriminatory).  Mr. Vare's opinions—devoid of any factual support or discernible analysis—do not qualify as admissible expert testimony, and thus do not provide support for Defendants' affirmative defenses. *Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[When an] "expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Seabury Mgmt., Inc. v. Professional Golfers' Ass'n of America, Inc.,* 1995 WL 241379, at *4 (4th Cir. 1995) (affirming grant of summary judgment where the defendant failed to present sufficient evidence to support its argument and defendant's expert's conclusion was not supported by the facts); *Microbix Biosystems, Inc.  v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 701 (D. Md. 2000) (granting summary judgment in defendant's favor where the plaintiffs failed to adduce evidence to support their claim and the record rendered the expert's opinions in support of plaintiffs' claims "factually unsupportable"), *aff'd*, 11 F. App'x 279 (4th Cir. 2001); *May v. Dover Elevator Co*., 845 F. Supp. 377, 381 (E.D. Va. 1994) ("It is also established that, if an expert lacks a sufficiently reliable factual or scientific basis for an opinion, it would not be admissible at trial and hence cannot create a genuine dispute as to a material issue of fact.").

---

[20] And he ignores entirely the proposed modifications Plaintiffs suggested in their responses to Defendants' interrogatories.  *See* Ex. 106, Class Plaintiff Wall's Answers and Objs. to Defs.' 1st Set of Interrogs., at Nos. 4, 9; Ex. 107, Class Plaintiff Wall's Supp. Answers and Objs. to Defs.' 1st Set of Interrogs., at Nos. 4, 9; *see also* Ex. 81, Vare Rep. at 101–109; Ex. 82, Vare Dep. at 48:5–11 (admitting that the list of materials considered appended to Mr. Vare's report was complete).

### C.  There Is No Evidence that Granting Disabled Prisoners Reasonable Accommodations Would Result in an Undue Burden.

To establish an undue burden defense, a defendant must present evidence relevant to four factors: "'(1) financial cost, (2) additional administrative burden, (3) complexity of implementation, and (4) any negative impact which the accommodation may have.'"  *E.g.*, *Nat'l Fed'n of the Blind v. Lamone*, 438 F. Supp. 3d 510, 544 (D. Md. 2020) (quoting *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 737 (D. Md. 1996)).  As with their fundamental alteration defense, Defendants represented that they would carry their burden on their undue burden defense based on documentary evidence and deposition testimony provided before the close of fact discovery as well as through expert testimony.  ECF No. 331 at 8–9 (Defs.' Mot. for Leave to File Amended Answer); ECF No. 344 at 8–9 (Defs.' Reply Br. ISO Mot. for Leave to File Amended Answer).  No such evidence appears in the record.  SUF ¶¶ 206, 213–16.

### 1.  Defendants Have Adduced No Evidence of the Financial Cost of Any Modification to the Step-Down Program.

Defendants have adduced no factual evidence—none—related to the financial cost of any modification to the Step-Down Program.  SUF ¶¶ 213–14, 216.  Of the more than 175,000 pages of discovery that Defendants produced in this litigation, none specifies the cost associated with any change to the Step-Down Program or explains why such cost makes the change unduly burdensome.  *Id.* at ¶¶ 213–15.  As courts in the Fourth Circuit have explained, such cost estimate information is critical to an assessment of undue burden.  *See, e.g.*, *Lamone*, 438 F. Supp. 3d at 534–35, 539 & n.16.

Defendants have similarly failed to adduce evidence of financial cost in expert discovery.  While Defendants' ADA expert, Mr. Vare, opines that Defendants should not be required to make any changes to the Step-Down Program because of the "tremendous additional cost" associated with those changes, Mr. Vare does not identify the specific modifications he is referencing, quantify the "cost[s]" he claims are "tremendous," or provide any benchmark by which the Court (or anyone else) can adjudicate whether or not a cost is "tremendous."  Ex. 81, Vare Rep. at 82.  It

is well established that such vague and standard–less testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Daubert*, 509 U.S. at 590 (holding that expert testimony "must be based on more than subjective belief or unsupported speculation"); *Robinette v. Wal–Mart Stores, Inc. Store #650*, 2016 WL 8737153, at *5 (W.D. Va. Feb. 5, 206) (Jones, J.) (excluding proffered expert testimony where the expert's opinions were "speculative because they are not based on sufficient facts in the record").

Indeed, if anything, the record establishes that cost does not provide a barrier to implementing changes to the Step-Down Program. The operating budget for both Red Onion and VDOC is substantial—and growing. In 2016, VDOC's operating budget exceeded $1.1 billion, SUF ¶ 206, and from 2012 to 2022, the budget for Red Onion grew from $25.9 million to $38.5 million in Fiscal Year 2022—a more than 48% increase. SUF ¶ 206; *see Culvahouse v. City of Laporte*, 679 F. Supp. 2d 931, 945–46 (N.D. Ind. 2009) (finding City did not prove "undue financial burden" where it demonstrated budgetary limitations but did not discuss alternative financing options or proposed alternative modifications). Moreover, the record reflects that VDOC has considerable flexibility in spending budgeted funds. For example, former VDOC Director Harold Clarke testified that he can control 40% of VDOC's budget and could use such funds " ███████████████████████████████ SUF ¶ 210. Based on this evidence—and the absence of any countervailing evidence—Defendants cannot meet their burden of establish that changes to the Step-Down Program impose an undue financial cost.

### 2. Defendants Have Adduced No Evidence of Undue Administrative Burden, Complexity, or Negative Impact.

Defendants have similarly failed to adduce evidence showing that implementing modifications to the Step-Down Program would result in any undue administrative burden, complexity, or negative impact on VDOC's operations.

*First*, neither Defendants nor VDOC employees involved in operations nor Defendants' expert, Mr. Vare, identified any administrative difficulties related to implementing modifications

to the Step-Down Program.   SUF ¶ 214.   On the contrary, Amee Duncan, a former ADA coordinator at Red Onion, testified that she ████████████████████████████████████ ██████████████████████████████████ Ex. 11, Duncan Dep. at 91:14–16.   Nor were other senior VDOC employees able to identify accommodation requests that were denied because they would have constituted an undue hardship for Red Onion.   *See* Ex. 51, Marano Dep. at 232:8–9; Ex. 113, Durbin Dep. at 213:1–17.

*Second*, the undisputed evidence shows that numerous modifications to the Step-Down Program that Plaintiffs have propose simply require VDOC to enforce its *existing* practices, operating procedures, and policies, which VDOC drafted and adopted voluntarily.   SUF ¶ 213. For example, VDOC could identify incarcerated persons with mental impairments or other disabilities upon intake at the Red Onion or Wallens Ridge.   SUF ¶ 211(n).   VDOC's Operating Procedure on Managing Prisoners with Disabilities requires a medical screening and "comprehensive health appraisal," but did not require a mental health screening until 2019. *Compare* Ex. 108, VADOC-00040782 (2016 OP 801.3) *with* Ex. 109, VADOC-00040788 at -792 (2019 OP 801.3).   VDOC mental health staff, including ROSP's psychiatrist and VDOC's former Regional Mental Health Clinical Supervisor, admitted that the employees tasked with mental health screening did not always ask for mental health records and that the screening itself omitted factors necessary to properly identify mental health conditions.   Ex. 52, McDuffie Dep. at 254:6– 9, 256:16–257:13; Ex. 73, Lee Dep. at 20:8–15, 49:12–20.   VDOC could also inform incarcerated persons of their right to nondiscrimination under the ADA, a Title II requirement.   SUF ¶ 212(m); *see* 28 C.F.R. § 35.106.   VDOC policy already requires such notice, but VDOC does not uniformly provide it.   Ex. 109, VADOC-00040788 at -790 (2019 OP 801.3); Ex. 112, King 30(b)(6) Dep. at 204:22–206:10.   VDOC can point to no evidence in support of the undue administrative burden associated with *these*, or any other, modifications.   *See* SUF ¶ 215.

*Third*, the undisputed evidence shows that *other* penological institutions have adopted the modifications that Plaintiffs have proposed, obviating the argument that an institution's adoption of such programs and accommodations is unduly burdensome.   SUF ¶¶ 219–20.   For example,

Plaintiffs have proposed that VDOC begin tracking mentally ill inmates "to ensure disabled incarcerated persons are accommodated commensurate to disability(ies) and their respective accommodation needs." Ex. 86, Wells Rebuttal Rep. ¶ 63; SUF ¶ 211(*l*). The undisputed evidence shows that other prison systems, including the Michigan DOC and CDCR, have adopted such tracking systems, and Defendants offer no evidence to explain why VDOC's adoption of such a system would be administratively burdensome, complex, or inadvisable. SUF ¶¶ 214, 219; *see also* Ex. 87, Wells Dep. at 108:9–17, 109:9–16. Indeed, the only "evidence" in the record suggesting that any undue burden exists is testimony from Mr. Vare, who claims—without any citation or support in the record—that implementing a tracking system would be "extremely onerous" and would ███████████████████████████████ Ex. 81, Vare Rep. at 90. Once again, such conclusory statements are not admissible as expert testimony. *See supra* at § III.B.2.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court GRANT their Amended Motion for Partial Summary Judgment on their Due Process claims, Eighth Amendment claims, and on Defendants' fundamental alteration and undue burden affirmative defenses to Plaintiffs' ADA and RA claims.

Dated:  September 11, 2023

Respectfully Submitted,

/s/ Megan A. Crowley
Megan A. Crowley (*pro hac vice*)
Jared Frisch (*pro hac vice*)
Paul Wilson (*pro hac vice*)
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
mcrowley@cov.com
jfrisch@cov.com
pwilson@cov.com

William O'Neil (*pro hac vice*)
Matthew Phelps (*pro hac vice*)
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
woneil@cov.com
mphelps@cov.com

Vishal Agraharkar (VSB #93265)
Eden B. Heilman (VSB #93554)
Matthew Callahan (*pro hac vice*)
ACLU of Virginia
701 E. Franklin Street, Ste. 1412
Richmond, VA 23219
Telephone: (804) 644-8022
vagraharkar@acluva.com
eheilman@acluva.com
mcallahan@acluva.com

Kathryn Ali (VSB #97966)
Ali & Lockwood LLP
300 New Jersey Avenue, NW, Ste. 900
Washington, DC 20001
Telephone: (202) 651-2475
katie.ali@alilockwood.com

Maxwell J. Kalmann (*pro hac vice* admission
forthcoming)
1818 Library Street, 10th Floor

Reston, VA 20190
Telephone: (650) 586-1043
maxkalmann@meta.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the September 11, 2023, I electronically mailed the foregoing Memoranda in support of Plaintiffs' Amended Motion for Partial Summary Judgment to the following:

Margaret Hoehl O'Shea, AAG, (VSB No. 66611)
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
T: (804) 225–2206
moshea@oag.state.va.us

Maya M. Eckstein (VSB No. 41413)
Robert Dennis Fairbanks (VSB No. 90435)
Trevor S. Cox (VSB No. 78396)
Hunton Andrews Kurth LLP
951 E. Byrd St.
Richmond, VA 23219
T: (804) 788–8200
meckstein@huntonAK.com
dfairbanks@huntonAK.com
tcox@huntonAK.com

*Counsel for Defendants*

*/s/ Vincent Glynn*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001–4956
Telephone: (202) 662–5815
vglynn@cov.com