# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
**Big Stone Gap Division**

| | | |
|---|---|---|
| WILLIAM THORPE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00007-JPJ-PMS |
| | ) | |
| VIRGINIA DEPARTMENT OF | ) | |
| CORRECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO
PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
PLAINTIFFS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs "Amended Statement of Undisputed Material Facts in Support of Plaintiffs'

Amended Motion for Summary Judgment" ("Plaintiffs' Statement"), ECF No. 383-119, contains

allegations that Defendants Harold Clarke, Randall Mathena, H. Scott Richeson, A. David

Robinson, Henry Ponton, Marcus Elam, Denise Malone, Steve Herrick, Tori Raiford, Jeffrey

Kiser, and Carl Manis, and the Virginia Department of Corrections ("VDOC," collectively,

"Defendants") dispute, that are not material to this litigation, or both. Defendants respond to the

numbered paragraphs in Plaintiffs' Statement as follows.[1,2]

1.    **Disputed in part**. The Step-Down Program is not used to "manage incarcerated

persons;" it is used to provide "a pathway for inmates to step-down from Level S ["SL-S"] to lower

security levels in a way that maintains public, staff, and offender safety." 2020 Step-Down

---

[1] Defendants do not respond to the headings and subheadings in Plaintiffs' Statement as they are
argument, not alleged facts supported by specific record citations as required by Local Rule 56(b).

[2] Defendants elect not to dispute or otherwise respond to certain statements in Plaintiffs' Statement
for purposes of opposing Plaintiffs' Amended Motion for Partial Summary Judgment. In doing so,
Defendants do not concede that the statements are accurate, material, or relevant or that the
material cited in support of them is admissible evidence.

Manual[3] [ECF No. 383-2] at VADOC-00053486. The Step-Down Manual dated February 2020, *id.*, does not use the term "segregation," administrative or otherwise, and Defendants dispute that the current conditions of confinement in the Step-Down Program constitute "segregation" as that term is used elsewhere in Plaintiffs' Statement.

2.    **Undisputed**.

3.    **Undisputed**.

4.    **Disputed in part**. Plaintiffs have not identified all "[p]revious versions" of the "Step-Down Manual."[4] *See*, Brief in Support of Defendants' Motion for Summary Judgment ("Defs.' Br.") [ECF No. 381] at 6, ¶ 6. There are five previous versions of the Step-Down Manual: (1) the 2012 Step-Down Manual; (2) the 2014 Step-Down Manual; (3) the 2015 Step-Down Manual; (4) 2016 Step-Down Manual; and (5) the 2017 Step-Down Manual. *Id.*

5.    **Undisputed**.

6.    **Undisputed**.

7.    **Disputed in part**: Defendants define the Evidence Based Practice Principles as they are defined in the Step-Down Manuals, and those documents speak for themselves. *See, e.g.,* 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053519-21.

8.    **Disputed in part**: The referenced 2020 Step-Down Manual identifies only four sub-groups based on the characteristics that differentiate the sub-groups, *i.e.*, the characteristics associated with the Responsivity Principle listed by Plaintiffs. *Id.* at VADOC-00053520.

---

[3] Defendants use Plaintiffs' terminology, where possible, in responding to Plaintiffs' Statement.

[4] In their Brief in Support of Defendants' Motion for Summary Judgment, ECF No. 381, Defendants refer to as "Operations Strategies" the documents that Plaintiffs Statement refers to as "Step-Down Manuals." *See, e.g, id,* at ¶ 7. Here, Defendants adopt Plaintiffs' nomenclature.

9. **Disputed**: During her deposition, Scott Richeson specifically referenced research conducted "[a]round 2000" in describing the Evidence-Based Practices. Videotaped Deposition of Helen Scott Richeson dated February 9, 2023 ("Richeson Dep.") [ECF No. 383-12] at 60:22-63:19. Plaintiffs' expert, Dan Pacholke, recognizes the Evidence-Based Practice Principles in the Step-Down Manuals as being associated with the "risk-needs-responsivity ('RNR') model" for which he cites James Bonta & D. A. Andrews, *Risk-need-responsibility model for offender assessment and rehabilitation* 2007-06 (2007). Expert Report of Dan Pacholke ("Pacholke Report") [ECF No. 370-1] at ¶ 71, fn. 102. Mr. Pacholke identifies information about the RNR model as being available at nicic.gov, *id.* at fn. 103, the same resource Defendants identified in answering Plaintiffs' interrogatory requesting support for the scientific justification for aspects of the Step-Down Program. VDOC's Objections and Answer's to Plaintiffs' Third Set of Interrogatories [ECF No. 383-13] at 5. In response to Plaintiffs' assertions that Randall Mathena was insufficiently prepared on the topic of the scientific basis for the Step-Down Program, Defendants offered to provide Ms. Richeson for additional time as a 30(b)(6) deponent on that subject. Plaintiffs declined that offer. Email from Maya Eckstein to Vishal Agraharkar and others dated April 28, 2023, Subject: RE: Thorpe v VDOC – meet and confer on 30b6 testimony of Mathena, Celi, and Crenshaw, attached as Exhibit 2.

10. **Not Material**: Whether one person—even if the Director of VDOC—who was not testifying as a 30(b)(6) deponent, was able to recall, during his deposition, the evidence used to develop the policies, procedures, and practices underlying the Step-Down Program is not material to the dispute.

11.    **Disputed**: See response to paragraph 9, *supra*. The fact that Ms. Richeson could not recall at deposition the name or exact date of the referenced research does not establish that she did not know of it.

12.    **Undisputed**.

13.    **Disputed**: As described in VDOC Operating Procedure 830.2 ("O.P. 830.2"), VDOC does not assign each inmate to a security level based on the security level scoring instrument but, instead, determines the inmate's ***eligibility*** for a specific security level based on the instrument. "Security level classification decisions involve the assessment of each case based on a determination of eligibility, suitability, and acceptability." O.P. 830.2 [ECF No. 381-19] at 4. VDOC also recognizes several specialty security levels to which an inmate can be assigned, such as level "D" (hearing impaired), "P" (protective custody), "S" (security qualifier), and "W" (work center). *Id.* at 4.   Assignment to these specialty security levels depends on certain eligibility criteria, which are assessed separately from the scored security level classification.  *See, e.g., id.* at 5, 7-8, 10-11. As with a scored security level, designation to a specialty security level affects the institution(s) to which an inmate may properly be assigned. *Id.* at 4.

14.    **Disputed in part**: Security Level 6 ("SL-6")[5] is a security level to which SL-S inmates may progress and where they obtain further programming and opportunities to adapt to general population housing. *Id.* at 11.

15.    **Disputed**: As described in O.P. 830.2, placement of an inmate in SL-S is not based on the security qualifiers. Rather, the security qualifiers listed in O.P. 830.2 "indicate that the inmate

---

[5] With approval of the 2020 Step-Down Manual, privilege level SM-2 was changed from a SL-S to a SL-6 privilege level. Defs.' Br. [ECF No. 381] at 12, fn. 6. In responding to allegations in Plaintiffs' Statement, Defendants do not include the SL-6 population, including the SM-2 privilege level, in any response that is by its terms applicable only to the current SL-S population.

should be **considered** for assignment to [SL-S]." O.P. 830.2 [ECF No. 381-19] at 10 (emphasis

added). The placement of an inmate in SL-S requires an ICA hearing followed by a multi-tiered

approval process. The cited testimony of Mr. Mathena contains no discussion of the use of security

qualifiers.

16.   **Undisputed**.

17.   **Undisputed**.

18.   **Disputed**: The declaration cited by Plaintiffs does not establish that Gary Wall "did not

receive notice of his security level increase." In his declaration, Mr. Wall claims only that he "did

not receive any notice in advance that [he] was being considered **for the Step-Down Program**,"

Declaration of Gary Wall ("Wall Decl.") [ECF No. 383-15] at ¶ 5 (emphasis added), not that he

did not receive notice of his security level increase. But Mr. Wall also states that he already was

designated SL-S before the Step-Down Program ever began. *Id.* at ¶ 3. Thus, Mr. Wall did not

receive a "change in security level status" that required prior notice or participation in an ICA

hearing at the time he was being considered for the Step-Down Program. Finally, the ICA Hearing

forms, each of which is signed by Mr. Wall, reflect that Mr. Wall was present at the hearing where

he it was recommended he be assigned to segregation, Exhibit 3 at VADOC-0000900, at the

hearing where it was recommended that he be transferred to ROSP, *id.* at VADOC-00000896, and

at the hearing where it was recommended that he remain at SL-S upon intake at ROSP, *id.* at

VADOC-00000892.

19.   **Disputed**: The declaration cited by Plaintiffs neither establishes that Derek Cornelison

"did not receive notice of his security level increase" nor that he "did not receive an explanation

of the reasons why he was being reviewed for a possible security level increase," stating only that

Mr. Cornelison "was not present at any hearing that resulted in my security level being changed to

Level S, me being assigned to ROSP, or being placed in the Step-Down Program." Declaration of

Derek Cornelison ("Cornelison Decl.") [ECF No. 383-16] at ¶ 5. VDOC Operating Procedure

830.1 ("O.P. 830.1") permits an inmate to be present at a formal due process hearing but does not

require him to be present if he chooses not to be. O.P. 830.1 [ECF No. 381-24] at 8. Further, Mr.

Cornelison admits that he had a "conversation with a counselor who gave [him] ICA paperwork

and told [him] that [his] classification was going to be changed to [SL-S]." [ECF No. 383-16] at

¶ 4. Finally, the ICA form for the hearing where Mr. Cornelison was recommended for a Security

Level change to SL-S for attacking another inmate with a weapon—an incident to which he

admitted and took a penalty offer—establishes that not only was he present but that he made a

statement: "I told them that I don't even want to go to the hearing." Exhibit 4 at VADOC-

00004587-88. And the ICA form where he was recommended to be placed in the Step-Down

Program upon intake at ROSP also reflects that not only was he present but that he made a

statement: "I have pending charges, I'm not saying anything." Exhibit 4 at VADOC-00004586.

20.    **Disputed**: The declaration cited by Plaintiffs does not establish that Javon Arrington did

not receive notice of his security level increase in 2011 or in 2022, or that he was in the Step-Down

Program in 2012. Mr. Arrington is silent on the topic of whether he received notice of his security

level increase in 2011 and whether he was in the Step-Down Program in 2012, Declaration of

Javon Arrington ("Arrington Decl.") [ECF No. 383-17] at ¶ 3, and states only things that he "do[es]

not recall" about his assignment to SL-S in 2022, *id.* at ¶ 5. The only facts that Mr. Arrington's

lack of recollection establish are that he neither knows whether he was given prior notice nor

whether he was provided an explanation of the reasons he was being reviewed for a possible

security level increase. Further, the ICA Hearing Notification Form for the hearing where Mr.

Arrington was recommended for SL-S indicates that Mr. Arrington both waived his right to 48-

hour notice and indicated that he did not wish to attend the hearing. Exhibit 5. And the ICA form for the hearing where Mr. Arrington was recommended for SL-S establishes that, not only was he present for the ICA hearing but that he made statement: "I don't understand why I am being recommended for Security Level S." *Id*. Regardless whether Mr. Arrington was being truthful, he clearly understood that he ***was*** being recommended for SL-S. *Id.* Further, his ICA form showed the multiple reasons why he was being recommended for SL-S, including assaulting another inmate and threatening to "that the next time he gets a chance that he will stab an officer with a weapon in the face." *Id.*

21.   **Disputed in part**. Although VDOC policy does not require mental health staff to "participate in the process of assigning" an inmate to SL-S, they are involved in determining whether the inmate remains assigned to SL-S. VDOC Operating Procedure 830.5 ("O.P. 830.5") provides that inmates assigned to SL-S who are classified with a Serious Mental Illness ("SMI")— a classification assigned by mental health professionals—automatically are eligible for a Secure Diversionary Treatment Program ("SDTP"). O.P. 830.5, attached as Exhibit 6, at 15-16. Further a mental health professional must conduct an SMI determination upon assignment to the Step-Down Program if the inmate has not been screened for an SMI in the previous year. Defs.' Br. [ECF No. 381] at 30, ¶ 83.

22.   **Disputed**: The cited deposition testimony, in which Mr. Mathena was testifying in his personal capacity, does not support Plaintiffs' allegation. Mr. Mathena was not asked, and did not testify, as to the relative importance of an inmate's mental health status versus eye color with respect to assigning a security level classification. He did testify that knowing an inmate's mental health status is "as essential as understanding what their security levels are." Videotaped

Deposition of Randall Mathena Day 2 dated April 5, 2023 ("Mathena Individual Dep.") [ECF No. 383-18] at 537:6-11.

23.    **Disputed**: See response to ¶ 21, *supra*. Further, Dr. Malone was not designated as a 30(b)(6) representative on the topic of the initial decision to classify inmates as SL-S and, thus, was not speaking for VDOC as a 30(b)(6) representative in the subject testimony. *See* Exhibit 7 (Dr. Malone designated for topics 13, 15, 16 e. and f.; initial decision to classify inmates as SL-S is topic 7. a.).

24.    **Undisputed**.

25.    **Undisputed**.

26.    **Undisputed**.

27.    **Disputed**: As explained in Defs.' Br.,

> IM inmates who show satisfactory progress in the Step-Down Program are eligible to transition to the SM path. ECF No. 201-2 ¶ 14. Several of Named Plaintiffs transitioned from the IM path to the SM path on their pathway out of SL-6. See, e.g., External Review Team Recommend Change Forms dated October 23, 2019, attached as Exhibit 20. Further, as demonstrated by the External Review Team Recommend Change Form, inmates can be transitioned at the same privilege level without starting the SM path at SM-0. See, e.g., External Review Team Recommend Change Form dated October 17, 2018, attached as Exhibit 21.

ECF No. 381 at 13, ¶ 27.

28.    **Undisputed**.

29.    **Undisputed**.

30.    **Disputed**. The cited deposition testimony does not support Plaintiffs' allegation. Mr. Mathena was not asked, and did not testify, as to what the DTT reviews. Rather, he was asked whether there were any other decisions for which the DTT was responsible.

31.    **Disputed in part**. Although there is no "requirement" that the DTT include a mental health professional who has actually observed or treated the individual being reviewed, Arvil

Gallihar testified that he could not think of a situation where the DTT would not have included such an individual. Videotaped Deposition of Arvil James Gallihar dated April 7, 2023 ("Gallihar Dep.") [ECF No. 383-20] at 127:5-18.

32.    **Disputed in part**. Defendants understand the reference to the "Step-Down Program Manual" to be the document that Plaintiffs refer to elsewhere as the "Step-Down Manual." It is not accurate that all versions of the Step-Down Manual provide that the "may include" a mental health associate. *See, e.g.,* 2015 Step-Down Manual [ECF No. 381-9] at VADOC_00002706 ("Representatives from both ROSP and WRSP will make up the DTT to include, but not limited to, the following individuals or their designees: … [Qualified Mental Health Professional] …."). The cited deposition testimony does not support Plaintiffs' allegation that Mr. Trent was "the psychology associate who was solely responsible for monitoring the mental health of Level S offenders between 2015 and 2020." Further, other individuals also had responsibility to "monitor" SL-S offenders between 2015 and 2020, including Terrence Huff (as a supervising psychology associate) and Dr. McDuffie (with respect to offenders who have received a referral to a psychiatrist). *See, e.g.,* Exhibit 8 (Mental Health Progress Notes signed by Terence Huff); Plaintiffs' Statement at ¶¶ 187-188.

33.    **Undisputed**.

34.    **Undisputed**.

35.    **Disputed**: The cited deposition testimony, which is not included in the cited Exhibit, does not support Plaintiffs' allegation. Amee Duncan testified only that the time an inmate is not participating in the Step-Down Program does not count towards the inmate's time for progressing from SM-0. Transcript of Amee Beth Duncan dated March 14, 2023 ("Duncan Dep."), cited portions attached as Exhibit 35, at 228:4-11.

36.   **Disputed in part**: The cited deposition testimony does not support that the DTT never has met with a standard frequency, only that it does not do so at the present time. For example, in the 2012 Step-Down Manual, the DTT was directed to meet at least monthly. ECF No. 381-7 at VADOC_00037981. Further, Mr. Gallihar testified that there was guidance to meet at least monthly, but that the DTT may meet more often, depending on when inmates arrived. Transcript of Arvil James Gallihar dated April 7, 2023 ("Gallihar Dep."), cited portions attached as Exhibit 10, at 129:2-129:10.

37.   **Disputed**: Plaintiffs claim as an undisputed fact at ¶ 245 that Mr. Mukuria was classified as SL-S on February 17, 2013 and assigned to the IM pathway at that time. Plaintiffs' "example" provides no information regarding the frequency with which the DTT meets.

38.   **Undisputed**.

39.   **Disputed in part**: The cited deposition testimony does not establish that "four factors … determine an inmate's pathway," only that the DTT is required to consider four specific factors in deciding an inmate's pathway. The Step-Down Manual specifically states that the four identified factors in ¶ 38 above as those the DTT should ***include*** in its determination, but does not limit their consideration to those four factors. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053499 (emphasis added).

40.   **Disputed in part**: To the extent that Plaintiffs' allegation is intended to imply that no attempt is made to reach consensus before defaulting to the safer option, Ms. Duncan testified that, in determining a pathway, the DTT does not take a vote but "hash[es] it out with those definitions until we come to consensus." Exhibit 9, Duncan Dep. at 265:1-9. She further testified that, in her time participating in DTT reviews, she could not recall the group not being able to reach consensus. *Id.* at 270:8-11. Jonathan Gibson testified that, during his involvement in more than 50 DTTs, the

10

DTT failed to come to consensus "like two times, two to three times, potentially." Videotaped

Deposition of Jonathan Gibson ("Gibson Dep."), cited portions attached as Exhibit 11, at 146:4–

147:2. Finally, no "team" is assigned to the IM pathway; inmates are so assigned.

41.    **Disputed**: The cited deposition testimony contains one individual's estimate for the

average time for DTT reviews in 2015, not for any other time period. Ms. Duncan testified that

there was "no set time on how long we spend on an inmate, how long we let an inmate talk during

the interview process." Exhibit 9, Duncan Dep. at 265:13-18. VDOC is not aware of any evidence

in the record that establishes the average time spent by the DTT to review each inmate in 2012–

2014, or 2016–present. Further, there is no set time on how long the DTT spends on a particular

inmate; it depends on the inmate's situation. Declaration of Amee Duncan dated October 5, 2023

("Duncan Decl."), attached as Exhibit 12, at ¶ 5.

42.    **Disputed in part**: Mr. Mukuria has not been designated by the Court as a "class

representative." Opinion and Order dated August 8, 2023 [ECF No. 358] at 14.

43.    **Disputed in part**: Plaintiffs second statement contradicts their first statement: a decision

is not "final" when, as Plaintiffs admit, it can be modified by a subsequent review.

44.    **Disputed in part**: Although Plaintiffs' statement regarding inmates in the IM pathway

beginning at the IM-0 privilege level status is accurate as to the current iteration of the Step-Down

Program, it is not accurate for all previous iterations. *See, e.g.,* 2012 External Review Team

("ERT") document, attached as Exhibit 13, at VADOC-00001727–30 (reflecting that some

inmates on the IM pathway initially were assigned to IM-1 or IM-2 when the Step-Down Program

began). As an inmate progresses through these privilege levels, he maintains his existing privileges

and receives additional privileges; he does not receive "different" privileges. 2020 Step-Down

Manual [ECF No. 383-2] at VADOC-00053528.

45.    **Disputed**: An inmate assigned to the IM pathway can progress to general population. S*ee* response to ¶ 27, *supra.* Notwithstanding Mr. Cornelison's most recent statement of hearsay, he has progressed further than the IM Closed Pod and currently is in general population. Affidavit of Derek Cornelison dated June 20, 2022 [ECF No. 174-21] at ¶ 23.

46.    **Disputed in part**: Although Plaintiffs' statement regarding inmates in the SM pathway beginning at the SM-0 privilege level status is accurate as to the current iteration of the Step-Down Program, it is not accurate for all previous iterations. *See, e.g.,* 2012 External Review Team ("ERT") document, Exhibit 13, at VADOC-000000001741–47, 1749–50, 1757–58, 1760–63, 1765–66, 1768 (reflecting that some inmates on the SM pathway initially were assigned to SM-1, SM-2, or one of the SL-6 units when the Step-Down Program began).

47.    **Undisputed**.

48.    **Disputed**. In the deposition testimony cited by Plaintiffs' it is unclear whether Mr. Mathena was addressing the circumstance of William Thorpe specifically and whether his testimony is limited to the 2012 time frame. Transcript of Randall Mathena (Individual) dated April 5, 2023 ("Mathena Dep."), cited portions attached as Exhibit 14 at 604:15-610:7. Regardless, inmates do not have to progress to the Level 6 IM Closed Pod before being reclassified to the SM pathway. *See, e.g.,* External Review Team Recommend Change Forms, attached as Exhibit 15 at VADOC-00024217, 221, 225 (reflecting reclassifications from IM-1 to SM-1 and IM-2 to SM-2. Further, Mr. Gallihar testified to several instances that he knew of where inmates moved directly from SL-S to Security Level 5 ("SL-5"), *i.e.*, general population for various reasons, including medical, mental health, and other policy-related reasons. Gallihar Dep., Exhibit 10 at 247:18–249:13.

49.    **Undisputed**.

50.    **Undisputed**.

51.    **Undisputed**.

52.    **Disputed**: The deposition testimony cited by Plaintiffs does not support that any inmate has spent more than a decade at SL-S *in the Step-Down Program*. In each case, the deponent was asked about time spent in segregation or restrictive housing, not time spent in the Step-Down Program. *See, e.g.,* Gallihar Dep. [ECF No. 383-20] at 231:20-232:3 ("Q: Are you aware of other offenders who served ten years or more in segregation? A: Are you asking that – am I aware throughout my whole career or just in this time frame? Q. Through your career."). Harold Clarke was asked about an email from 2017, when the Step-Down Program had not been in existence for more than a decade. Video Deposition of Harold Clarke dated April 12, 2023, ("Clarke Dep.") [ECF No. 383-14] at 316:18–319:4. The Step-Down Program began in 2012 as noted in Plaintiffs' Statement at ¶ 2. Further, the deposition testimony cited by Plaintiffs does not establish that VDOC *officials* are aware of any length of stay. Mr. Clarke is the only VDOC official and only Defendant in this case whose testimony Plaintiffs cite. Larry Collins in a unit manager. Transcript of Larry Collins dated April 5, 2023 ("Collins Dep."), cited portions attached as Exhibit 16, at 8:4-5. Mr. Gallihar is a former Chief of Housing and Programs. Gallihar Dep., Exhibit 10 at 27:21-28:4; 32:3–5.

53.    **Undisputed**.

54.    **Undisputed**.

55.    **Disputed**: The deposition testimony cited by Plaintiffs does not support that inmates must satisfy all Step-Down Program requirements to progress out of Level S and eventually return to general population. Mr. Mathena testified that "any director or deputy director" could supersede the policy requirements of the Step-Down Program. Videotaped Deposition of Randall C. Mathena

dated September 22, 2020 ("Mathena *Reyes* Dep.") [ECF No. 383-27] at 78:14-21. Mr. Clarke testified that the warden could convene an ERT to make an exception to the Step-Down Program. Clarke Dep. [ECF No. 383-28] at 77:12-78:3. And, although he testified that it would be "very unlikely" that a person would be removed without completing the requirements, Mr. Clarke did not say that it cannot be done. *Id.* at 78:4-12. Plaintiffs do not attach the cited testimony of Tori Raiford, which indicates only that, if an inmate refuses to participate in the Step-Down Program, he cannot advance but also that there may have been instances where the inmate did not remain at IM-0 or SM-0 when that happened. Transcript of Tori Michelle Raiford dated March 22, 2023 ("Raiford Dep."), cited portions attached as Exhibit 17, at 144:14–146:1. Similarly, the cited testimony of Dr. Malone, who was not designated as a 30(b)(6) designee on the topic of the requirements to progress out of SL-S, *see*  Exhibit 7, addresses only her understanding that an inmate in SL-S needs to complete the *Challenge Series*. Further, Mr. Gallihar testified to several instances that he knew of where inmates moved directly from SL-S to Security Level 5 ("SL-5"), *i.e.*, general population for various reasons, including medical, mental health, and other policy-related reasons. Gallihar Dep., Exhibit 10 at 247:18–249:13. Finally, the Step-Down Manuals consistently have identified one of the ERT's responsibilities as reviewing whether an inmate is currently appropriately assigned to SL-S. ECF No. 381 at 18, ¶ 42.

56.    **Disputed**: See response to paragraph 55, *supra*.

57.    **Disputed**: The material cited by Plaintiffs does not support their allegations. The cited page of the 2020 Step-Down Manual states that the BMC "will convene ***at least*** monthly …." ECF No. 383-2 at -491 (Emphasis added). None of the cited material addresses whether an inmate who has met all requirements for progression within his pathway must "wait" for the next BMC meeting to progress.

58.    **Undisputed**.

59.    **Undisputed**.

60.    **Disputed in part**: The responsible behavior goals in the Step-Down Manual do not reference any "mandatory minimum period[] of review." *See, e.g.,* 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053717.

61.    **Disputed in part**: Although, inmates are not provided with formal written notice prior to a specific BMC meeting, they are otherwise generally aware that the BMC has ongoing, periodic meetings and discussions about whether to advance inmates within the Step-Down Program. Duncan Decl., Exhibit 12 at ¶ 6; Collins Dep. [ECF No. 383-22] at 199:7–13 (testifying that inmates know when their status is coming up).

62.    **Disputed in part**: The suggestion that the "subsequent ICA review" does not occur as a result of the BMC's determination is inaccurate. *See* Duncan Dep., [ECF No. 383-11] at 272:7-20 (testifying that, after the review, the ICA will conduct a classification showing advancement or regression); Collins Dep. [ECF No. 383-22] at 200:1–14 (testifying that, after the BMC meeting is over, somebody will make a round and inform inmates of the outcome); *see also*, Defs' Br. [ECF No. 381] at 16, ¶ 35 (ICAs conducted more frequently than every 90 days as necessary).

63.    **Undisputed**.

64.    **Disputed**. The cited materials, which address privilege levels, not security levels or housing assignments, do not support Plaintiffs' allegations. An inmate can challenge his security level and housing assignment through VDOC's grievance process. O.P. 830.1 [ECF No. 381-24] at 13 ("[i]nmates may appeal all classification decisions through the *Offender Grievance Procedure*.").

65.    **Disputed**: Only those inmates properly classified as Level S are required to engage in certain programming as part of the Step-Down Program, including the *Challenge Series*. Inmates have, at times, been classified as Level S but soon thereafter re-classified to another security level, without completing any programming that is part of the Step-Down Program. Declaration of Randall Mathena dated October 5, 2023 ("Mathena Decl."), attached as Exhibit 18, at ¶ 8.

66.    **Undisputed**.

67.    **Disputed**: The deposition testimony cited by Plaintiffs does not support Plaintiffs' allegation. Dwayne Turner was not asked about inmate who "failed" to complete the *Challenge Series,* he was asked about inmates who "refused to participate in programming." Videotaped Deposition of Dwayne Turner dated March 17, 2023 ("Turner Dep.") [ECF No. 383-33] at 229:12-17. Further, the fact that a single VDOC employee could not recall an instance of an inmate who refused to participate in programming progressing in the Step-Down Program does not establish that it has never happened.

68.    **Disputed**: The material cited by Plaintiffs does not support Plaintiffs' allegation. Neither the deposition testimony nor the document cited addresses inmates who "failed" to complete the *Challenge Series*. Both address inmates who were not progressing in the Step-Down Program because they refused to participate in programming.

69.    **Undisputed**.

70.    **Disputed**: Nicolas Reyes did not participate in the Step-Down Program from 2012 to 2019. Instead, Mr. Reyes refused to participate in the Step-Down Program during extended time periods in that time frame. *See, e.g.,* Offender Internal Status Report, attached as Exhibit 19 [VADOC-00099046], at VADOC-00099050 (noting that Mr. Reyes "used to refuse programs" but will be eligible for SM-1 once he completes *Challenge Series* books 1 and 2). Further, allegations

regarding Mr. Reyes are not material. He is not a member of the class, having settled his claims

that are at issue in this case in previous litigation. *See* Order of Dismissal, Case No. 2:19cv00035

ECF No. 166 (dismissing with prejudice Mr. Reyes's Constitutional and statutory claims based on

settlement agreement).

71.    **Not Material**: Allegations regarding Mr. Reyes are not material. He is not a member of

the class, having settled his claims that are at issue in this case in previous litigation. *Id.*

72.    **Not Material**: Allegations regarding Mr. Reyes are not material. He is not a member of

the class, having settled his claims that are at issue in this case in previous litigation. *Id.*

73.    **Not Material**: Allegations regarding Mr. Reyes are not material. He is not a member of

the class, having settled his claims that are at issue in this case in previous litigation. *Id.*

74.    **Not Material**: Allegations regarding Mr. Reyes are not material. He is not a member of

the class, having settled his claims that are at issue in this case in previous litigation. *Id.*

75.    **Disputed**: Mr. Mathena denied that "[f]ailure to meet behavioral goals can result in

demotion of incarcerated persons to lower privilege levels within the IM or SM pathway."

Videotaped Deposition of Randall Mathena – Day 1 dated April 4, 2023 ("Mathena 30(b)(6)

Dep.") [ECF No. 383-4] at 308:3-309:17. He testified, rather, that he's "never known of anybody

to be moved because of behavior goals." *Id.* at 306:18-19; 308:3-6 ("Q: Okay. So it's policy that

people who do not meet behavior goals can be moved to a lower incentive level within their

pathway, correct? A: *That's an inaccurate statement.*"). Regarding "kicking on doors," he testified

that it can be a disciplinary charge, in addition to a reflection of the behavioral goals. Mathena

Individual Dep. [ECF No. 383-18] at 409:4-16.

76.    **Undisputed**.

77.    **Disputed in part**: None of the deposition testimony cited by Plaintiffs supports that the ratings are "arbitrary." Further, Mr. Mathena testified that individuals in a management role review the ratings given by VDOC personnel to determine whether an employee "would have an agenda against a certain inmate . . . ." Mathena 30(b)(6) Dep. [ECF No. 383-4] at 294:20-297:4.

78.    **Disputed in part**: Although Mr. Mathena testified that there was no "formal" training, he also noted the existence of on-the-job training: "that over in the building, the unit manager and the sergeant and lieutenant, whoever it is, works with new officers when they come to the building, especially when they haven't worked in this type of program, as extensive as it is, to give them a briefing as to what's going on." *Id.* at 298:10-16.

79.    **Undisputed**.

80.    **Undisputed**.

81.    **Disputed in part**: None of the material cited by Plaintiffs supports the allegation that "VDOC personnel sometimes fail to record participants' ratings on their status rating charts."

82.    **Disputed**: Multiple VDOC personnel testified that inmates were told what they needed to do to get a better rating or avoid getting a poor rating. *See, e.g.,* King Dep. [ECF No. 383-48] at 184:16-185:9; Mathena 30(b)(6) Dep. [ECF No. 383-4] at 299:12-301:4; Transcript of Michael Clayton Younce dated May 26, 2022 ("Younce Dep."), cited portions attached as Exhibit 20, at 138:20-139:2; *see also* VDOC Operating Procedure 864.1, *Inmate and CCAP Probationer/Parolee Grooming and Hygiene*, attached as Exhibit 21, which is available to inmates.

83.    **Disputed in part**: Multiple VDOC personnel testified that inmates are aware of their ratings on the responsible behavior goals. *See, e.g.*, Transcript of Rebecca Mefford dated January 10, 2023 ("Mefford Dep."), cited portions attached as Exhibit 22, at 127:15-128:6; Younce Dep.,

Exhibit 20 at 138:20-139:2; Transcript of A. David Robinson dated February 16, 2023 ("Robinson Dep."), cited portions attached as Exhibit 23, at 297:13-298:3.

84. **Undisputed**.

85. **Undisputed**.

86. **Disputed in part**: Receipt of the proscribed number and type of disciplinary charges does not "disqualify" an inmate from proceeding to the next privilege level but does prevent him from advancing to that privilege level during the period in question. 2020 Step-Down Manual [ECF No. 383-20] at VADOC-00053529, 534.

87. **Undisputed**.

88. **Undisputed**.

89. **Undisputed**.

90. **Undisputed**.

91. **Disputed in part**. SM-2 is a SL-6 privilege level. Defs.' Br. [ECF No. 381] at 12, fn. 6, 13 at ¶ 28.

92. **Disputed in part**. Defendants dispute that disciplinary charges relate to "minor rules violations." Mathena Decl., Exhibit 18, at ¶¶ 5–6 (explaining why 200-lelvel disciplinary charges, including blocking a vent, *i.e.* the tray slot, are not minor rule violations).

93. **Undisputed**.

94. **Undisputed**.

95. **Undisputed**.

96. **Disputed**: The cited document does not support Plaintiff's allegation. ECF No. 383-57 (O.P. 830.1) identifies "Segregation assignment, review and release," and "Segregation reviews resulting in no status change" as "[e]xamples of formal due process hearings." at VADOC-

00107516. Further, as noted in ¶ 95 of Plaintiffs' Statement. O.P. 830.1 identifies only examples of hearings that require due process, not all hearings that require due process. Regardless, the current version of O.P. 830.1 identifies "Interim reviews of on-going restorative housing assignments" as formal due process hearings, excepting the right to call and question witnesses. O.P. 830.1 [ECF No. 381-24] at 8.

97.    **Disputed**. The cited deposition testimony does not support Plaintiffs' allegation. The deposing attorney "turn[ed] the page" to a new form during the deposition that was a housing status review. Deposition of Amee Duncan dated October 3, 2018 ("Duncan *Depaola* Dep.") [ECF No. 383-44] at 189:23-25. Ms. Duncan specifically stated that the new form was a housing status review. *Id.*

98.    **Disputed**. The cited deposition testimony does not support Plaintiffs' allegation. See response to ¶ 97, *supra*.

99.    **Undisputed**.

100.   **Undisputed**.

101.   **Undisputed**.

102.   **Disputed in part**. Ms. Duncan testified that the inmate is provided the BMC's decision at the ICA hearing itself. Duncan Dep., Exhibit 12 at 273:11-274:1. She further testified that the inmate is provided a copy of the ICA form five days after the initial hearing that contains the ICA recommendation, then a copy of the completed form once the recommendation had completed the review process. *Id.* at 287:7-288:4.

103.   **Disputed in part**. Mr. Turner testified that the phrase "longer period of stable adjustment" means that the time that the inmate has been at SL-S has not been long enough to ensure that he is no longer a threat to the orderly operation of the institution. Transcript of Dwayne

Turner dated March 17, 2023 ("Turner Dep."), cited portions attached as Exhibit 24 at 124:17–125:17.

104. **Undisputed**.

105. **Undisputed**.

106. **Undisputed**.

107. **Undisputed**.

108. **Undisputed**.

109. **Disputed in part**: The purpose identified by Plaintiffs is not the only purpose of the ERT review. *See, e.g.,* 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053488 (noting that the ERT's review "will include, but not be limited to" whether the inmate is appropriately assigned to SL-S, whether the inmate meets the criteria for the pathway to which he is assigned, whether the inmate requires a pathway change, whether the DTT has made appropriate decisions to advance the inmate through the step-down process, and whether IM inmates should be moved to SL-6 Re-Entry if they will fall within their 24 month time frame before release prior to the next schedule ERT meeting). Mr. Gallihar testified to several instances that he knew of where inmates moved directly from SL-S to Security Level 5 ("SL-5"), *i.e.*, general population, for various reasons, including medical, mental health, and other policy-related reasons. Gallihar Dep., Exhibit 10 at 247:18–249:13.

110. **Disputed**: The deposition testimony cited by Plaintiffs is contrary to their allegation. Mr. Mathena testified that he knew that the ERT had interviewed "a few in the early going on." Mathena Individual Dep. [ECF No. 383-18] at 461:19-21. Further, he testified only that "the current practice" started in about 2017, not that no one was interviewed before that time. *Id.* at 462:4-10.

111. **Disputed**: See response to ¶ 110, *supra*. Mr. Mathena testified only that the interviews since 2017 have been recorded. *Id.* at 471: 9-472:1.

112. **Disputed in part**: Plaintiffs mischaracterize Mr. Mathena's testimony. Mr. Mathena testified that the primary reasons that the ERT would interview an inmate are if the inmate is being considered for a pathway change from IM to SM "or vice versa" or if an inmate (not just an IM inmate) was identified as stuck in a privilege level. *Id.* at 459: 2-21. But, he did not testify that those were the "only" reasons and, in fact, Mr. Mathena testified that his recollection was that the ERT had interviewed every inmate in the IM path one time. *Id.* at 460:12-16.

113. **Undisputed**.

114. **Disputed**: The testimony of one individual, who is not a member of the ERT, that he could not recall the ERT adjusting the privilege status of an inmate does not establish that the ERT never has done so. Further, the ERT has done so. *See, e.g.*, June 3, 2013 External Review Team document, attached as Exhibit 25 [VADOC-00019676], at VADOC-00019687 (recommending change to IM-1), 700 (recommending change to SM-0); Annual External Review Team Recommended Change Form dated December 4, 2014, attached as Exhibit 26 [VADOC-00088065], at VADOC-00088066 (recommending change to SM-0).

115. **Disputed**: The 2020 Step-Down Manual provides that one of the areas that the ERT will review is "[h]as the Dual Treatment Team made appropriate decisions to advance the offender through the step-down process?" ECF No. 383-2 at VADOC-00053488. The cited testimony from Mr. Mathena was given in his personal capacity. Mathena Individual Dep. [ECF No. 383-18] at 1.

116. **Undisputed**.

117. **Undisputed**.

118. **Undisputed**.

119. **Undisputed**.

120. **Undisputed**.

121. **Disputed in part**: Inmates at IM-0 are permitted one 1-hour non-contact visitation in-person per week. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053537. Further, the 2020 Step-Down Manual provides that video visitation is "[a]s approved in accordance to Visitation Policy 851.1 ["O.P. 851.1"]," which provides that inmates at IM-0 can have one video visit per month after six months infraction free. *Id.* at VADOC-00053528; O.P. 851.1, attached as Exhibit 27, at 18. In other words, an inmate who remains at IM-0 for more than 6 months can have the prescribed video visitation as long as he remains infraction free. Additionally, inmates at IM-0 are allowed to possess a JP5 media player. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053528. And the permitted three showers per week are no more restrictive than any other level of the IM pathway. *Id.*

122. **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. Further, Ms. Duncan specifically testified that all inmates, including inmates enrolled in the Step-Down Program, are eligible to earn good time credit. Duncan Dep., [ECF No. 383-11] at 93:15-94:4; *see also* Operating Procedure 830.3: *Good Time Awards*, attached as Exhibit 28, at 5 ("***All inmates*** are eligible for recognition under one or more of the following good time award systems …." (emphasis added)).

123. The 2020 Step-Down Manual specifically provides that IM-0 inmates may participate in an alternative program with the Road Map to Change Video and Starting Point Journal. ECF No. 383-2 at VADOC-00053529. Mr. Mathena identified another program listed in the manual in his testimony. Mathena 30(b)(6) Dep. ECF No. 383-4 at 199:3-17.

124.  **Disputed**: Defendants dispute Plaintiffs' characterization of the increases as "modest." Defendants also incorporate by reference their responses to paragraphs 121-123, *supra*.

125.  **Undisputed**.

126.  **Disputed in part**: Plaintiffs have not identified all additional privileges that inmates receive once they reach the Level 6 IM Closed Pod. For example, inmates in IM Closed Pod Phase I get a total of 2-hours of non-contact visitation on Saturday and Sunday. 22020 Step-Down Manual [ECF No. 383-2] at VADOC-00053537. Inmates in IM Closed Pod Phase II, in addition, get 2-hour contact visitation on Friday in a secure chair scheduled by the Unit Manager. *Id.*

127.  **Disputed in part**: All inmates in general population are not permitted contact visits. For example, inmates in general population assigned to a Restorative Housing Unit are limited to non-contact visits, except for visits with their attorney. O.P. 851.1, attached as Exhibit 27, at 12. A Facility Unit Head also may restrict an inmate in general population to non-contact visits. *Id.* at 20.

128.  **Undisputed**.

129.  **Undisputed**.

130.  **Undisputed**.

131.  **Undisputed**.

132.  **Disputed**: Inmates on the SM pathway are not limited to video visitation. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053537 (noting that inmates in the SM pathway get from 1-hour to 2-hour non-contact visitation on a scheduled day depending on security level and SL-6 unit). Defendants also incorporate their response to ¶ 127, *supra*.

133.  **Disputed / Objection**: Mr. Collins testified that he did not know the exact measurements of the cells. Collis Dep. [ECF No. 383-22] at 47:3-5. Dr. Haney asserts that the cells are 8X10 feet,

though he cites generically "documents [he has] reviewed" and his "observations." for those dimensions. Expert Report of Craig Haney, Ph.D., J.D. ("Haney Report") [ECF 383-66] at ¶ 133. Mr. Arrington's Declaration does not identify cell dimensions.

134. **Disputed**: The cited testimony refers to "segregation spaces," which refers to exercise areas, not cells. King Dep. [ECF No. 383-48] at 302:22-303:2. Plaintiffs' counsel knows this fact because it was the deficiency identified by Ms. King that counsel asked further questions about. *Id.* at 301:9-14, 302:22-303:2. Plaintiffs' counsel subsequently asked Ms. King about segregation living conditions. *Id.* at 303:9-14. During the audit discussed in Ms. King's deposition, VDOC was not in compliance with two, non-mandatory ACA standards—the recreation space discussed in the response to ¶ 156, *infra*, for which it received a waiver, and the lack of a full-time chaplain, with an accepted plan of action. Committee on Accreditation for Corrections Standards Compliance Reaccreditation Unit Audit of Red Onion State Prison dated October 24–26, 2018 ("ROSP Audit"), attached as Exhibit 29 [VADOC-00132162], at VADOC-00132190–193.

135. **Undisputed**.

136. **Disputed**: The cited testimony does not establish that inmates ever could close a flap over the cell door window. Instead, Mr. Collins' testimony suggests he was referring to VDOC staff being able to close the flap "at one time." Collins Dep. [ECF No. 383-22] at 52:10–53:2.

137. **Undisputed**.

138. **Undisputed**.

139. **Undisputed**.

140. **Disputed**: Mr. Arrington's declaration states that the lights "are turned on at 6:00 a.m. and they aren't turned off until 10:00 p.m." Arrington Decl. [ECF No. 383-17] at ¶ 9. The light in the cell does not remain at the same brightness at all times. Defs.' Br. [ECF No. 381] at 21, ¶ 49.

141. **Undisputed**.

142. **Undisputed**.

143. **Disputed in part**: Plaintiffs' second statement contradicts their first statement. An inmate's out-of-cell time does not "consist[] of outdoor recreation, shower time, and kiosk time" where it also includes programming.

144. **Undisputed**.

145. **Undisputed**.

146. **Disputed**: Mr. Mathena did not unequivocally state that the September 14, 2018 memo represented the first time that the amount of time out of cell was increased. Immediately after saying that he believed that to be the case, without the benefit of actually being shown the Step-Down Manual, he noted that he said it "with a question mark." Transcript of Randall Mathena 30(b)(6) Deposition dated April 4, 2023 ("Mathena 30(b)(6) Dep."), cited portions attached as Exhibit 30 at 37: 11-19. In response to the next question, he testified that the ACA policy (with which VDOC was in compliance) was two hours at one point and that VDOC wanted to exceed the two hours. *Id.* at 37:20-38:6.

147. **Disputed**: Plaintiffs offer no evidence that VDOC "purported to begin" offering the out-of-cell time. VDOC did begin offering it. Duncan Decl., Exhibit 12 at ¶ 7. Defendants also dispute the suggestion that VDOC increased out-of-cell time to three hours/day as a result of this lawsuit. Mathena Decl., Exhibit 18 at ¶ 7.

148. **Disputed in part**: The September 2019 memorandum states that inmates in restrictive housing units "will be provided the opportunity to participate in a ***minimum*** of four hours out of cell activity, seven days a week." ECF No. 383-70 at VADOC-00118556 (Emphasis added).

149.  **Disputed**: The out-of-cell time values noted by Plaintiffs are minimums. Collins Dep. [ECF No. 383-22] at 93:17-94:4.

150.  **Disputed**: The material cited by Plaintiffs does not support their allegation. Plaintiffs' base their characterization that "many prisoners often spend less than four hours out-of-cell per day" on testimony about a single document showing three months of data in the first quarter of 2021, i.e., during the COVID-19 Delta variant outbreak. Collins Dep. [ECF No. 383-22] at 121:20-122:6. The characterization of Defendants' expert is based on the same document. Mr. Arrington's declaration is too vague to establish Plaintiffs' allegation as an undisputed fact.

151.  **Undisputed**.

152.  **Objection**: Dr. Haney's characterization of deposition testimony constitutes opinion, not facts. Mr. Collins' testimony speaks for itself.

153.  **Undisputed**.

154.  **Objection**: Plaintiffs' characterization of "significant periods of time" is argument, not facts.

155.  **Disputed / Objection**: The testimony of Mr. Snodgrass, whose own expert opined that he fabricated allegations during his clinical interview and testing, Hendricks Report, ECF No. 368-1 at ¶ 90-91, should not be used to establish any fact as undisputed. Further, although Ms. Duncan testified that the amount of time at "recreation" could be affected by the number of inmates who want recreation that day, she also noted that the additional out-of-cell time would be provided by other means, like the socialization tables—"we utilize all of it, everything that we have, all of our tools we have in place to maximize the out-of-cell time, which doesn't – is not defined by recreation." Duncan Dep. [ECF No. 383-11] at 232:12-234:11.

156. **Disputed in part**: The Red Onion State Prison recreation cages are 96 square feet. ROSP Audit, Exhibit 29 [VADOC-00132162], at VADOC-00132191.

157. **Disputed in part**: The ACA provided VDOC a waiver on the size of the recreation cages due to the availability of space and building costs. *Id.* at VADOC-00132192. King Dep. [ECF No. 383-48] at 302:22-303:4.

158. **Disputed in part**: The material cited by Plaintiffs does not support their allegation that inmates "have been attacked or bitten while engaging in recreation." Plaintiffs' expert cites only Mr. Wall's declaration for the allegation. Mr. Wall's declaration states only that he received a dog bite "while on the yard," not while "engaging in recreation" and omits the fact that he was engaged in a fight with another inmate and had refused several direct orders to stop fighting at the time he was bitten. *See, e.g.,* Incident Report, attached as Exhibit 31[VADOC-00147996].

159. **Disputed in part**: Out-of-cell programming at other privilege levels is not limited to program chairs or therapeutic modules. Inmates in Sl-6 can have unrestrained programming. 2020 Step-Down Manual [ECF 383-2] at VADOC-00053511-512 (programming delivered in "Secure Chairs or small groups in pod;" programming "conducted in small groups").

160. **Undisputed**.

161. **Undisputed**.

162. **Undisputed**.

163. **Undisputed**.

164. **Undisputed**.

165. **Undisputed**.

166. **Disputed in part**: The characterization of Plaintiffs' expert of a strip search as an "intrusive cavity search" is incorrect. A strip search is distinctly different from, and less intrusive

than, a cavity search. Robinson Dep., Exhibit 23 at 141:20-142:14 (explaining the differences between strip searches and cavity searches).

167. **Undisputed**.

168. **Disputed**: The deposition testimony cited by plaintiffs does not support their allegation. Mr. Clarke testified only that he receives information about "[e]verything from food, to noise, to their sentence structure, good time, you name it." Clarke Dep. [ECF No. 383-14] at 116:6–8. Further, the testimony of one person testifying in his individual capacity— even if the Director of VDOC—does establish what "VDOC officials are aware of." Defendants also incorporate by reference their responses to the "above stated" paragraphs, *supra*.

169. **Undisputed**.

170. **Undisputed**.

171. **Disputed in part**: Dr McDuffie did not testify that he had been on multiple group phone calls regarding the alleged subject. Rather his testimony was in reference to a single phone call. Videotaped Deposition of Everett Ellison McDuffie dated April 14, 2023 [ECF No. 383-52] at 43:4-15.

172. **Undisputed**.

173. **Disputed in part / Not Material**: The rounds testified to by Mr. Manis were not "similar[]" to the daily rounds made by Mr. Younce. The cited testimony does not identify the frequency with which Mr. Manis conducted rounds while at WRSP. Further, Mr. Manis became warden of WRSP around August 1, *2017*. Videotaped Transcript of Carl Alan Manis, dated February 22, 2023 ("Manis Dep."), cited portions attached as Exhibit 32, at 63:13-22. Plaintiffs' Statement ¶ 5 states as an undisputed fact that inmates were held in the Step-Down Program at WRSP before *2016*.

174. **Disputed in part**: The material cited by Plaintiffs does not establish that "VDOC employees also expressed concerns over the mental health of inmates in segregation." They reflect only that the then-warden at WRSP wanted the mental health staff at that facility to respond to a question regarding inmate mental health in light of a recently-made proposal by the ACA.

175. **Disputed in part**: "[H]ad a mental health code" in this context means the inmate had an MH1 or higher mental health code. Videotaped Deposition of Dr. William Lee dated March 15, 2023 ("Lee Dep.") [ECF No. 383-73] at 182:19-22. Neither the cited testimony nor the exhibit referenced in that testimony distinguishes between restrictive housing for Security Level 5 inmates at ROSP and restrictive housing subject to the Step-Down Program at issue in this case. *Id.* at 180:18–181:5; Email from Terrance Huff to Denise Malone dated August 30, 2018, attached as Exhibit 33 [Lee Deposition Exhibit 27].

176. **Disputed**. VDOC policy has required, since the beginning of the Step-Down Program, that inmates placed in the program be screened by a QMHP before their placement or within one working day of their placement in the program. Defs.' Br. [ECF No. 381] at 30, ¶ 83. *See also* Operating Procedure 730.2 with Effective Date November 1, 2012 ("O.P. 730.2 (2012)"), attached as Exhibit 34 [VADOC-00002892], at 2 ("Each offender will receive an initial mental health screening at the time of admission to a DOC facility to identify those with mental health needs;" for "intra-system transfers," that screening should be conducted "by health trained or qualified health care personnel upon arrival at a facility," and must include, *inter alia*, inquiry into suicidal ideation or history, whether the inmate has been prescribed psychotropic medication, has a current mental health complaint, is being treated for mental health issues, and has a history of mental health treatment, and also requires observation of the inmate's general appearance, any evidence of abuse or trauma, and whether there are current symptoms of psychosis, depression, anxiety, or

aggression); Operating Procedure 730.5 with Effective Date September 1, 2012 ("O.P. 730.5 (2012)"), attached as Exhibit 35 [VADOC-00003034], at 3 ("All intra-system (within the DOC) transfer offenders will receive an initial mental health screening by trained staff at the time of admission ….").

177.   **Disputed in part**: A health assessment is performed before the inmate is placed in restrictive housing, King Dep. [ECF No. 383-48] at 169:21-170:9, and also upon intake at a new facility following transfer from one VDOC institution to another, Operating Procedure 730.2 ("O.P. 730.2") [ECF No 383-78] at 2–3, 4–5.

178.   **Disputed**: The material cited by Plaintiffs does not support their allegation. Ms. Duncan's testimony references scored security levels; SL-S is not a scored security level. Mr. Wall alleges that he did not have a mental health evaluation before entering the Step-Down Program, not that he did not have one before the decision was made to classify him as SL-S.

179.   **Disputed**: Although Plaintiffs reference to "formal health screening" is vague, but Ms. King testified that heath screening does occur when an inmate is transferred from general population to restrictive housing, which occurs before the inmate is assigned to a pathway. King Dep. [ECF No . 383-48] at 169:21-170:4; *see also* Operating Procedure 720.2 ("O.P. 720.2"), attached as Exhibit 36, ("All inmates will receive a medical and mental health screening by health-trained staff or a health care provider upon arrival to a facility.").

180.   **Undisputed**.

181.   **Undisputed**.

182.   **Disputed in part**: The material cited by Plaintiffs does not support their allegation for any year other than 2018. Further, the reference to "restrictive housing" applies not only to the

31

Step-Down Program at issue in this litigation, but to all forms of restrictive housing, including short-term restrictive housing.

183. **Disputed / Not Material**: The material cited by Plaintiffs does not support their allegation. Neither the cited document nor the cited testimony says anything about the number of inmates with mental health codes at ROSP. Further, the number of inmates with mental health codes at ROSP housed in restrictive housing in February 2012, before the Step-Down Program was implemented, is material.

184. **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. It establishes only that "at least 100 of [Dr. McDuffie's] patients are prescribed to SSRIs or antipsychotic … medications," McDuffie Dep. [ECF No. 383-52] at 309:4-8, and that he "prescribe[s] antidepressants for anxiety, PTSD, and depression." *id.* at 309:12-13. Dr. McDuffie did not specify whether his response was limited to inmates in restrictive housing, in long-term restrictive housing, or the time period covered by his response.

185. **Disputed in part**: "[H]ad a mental health code" in this context means the inmate had an MH1 or higher mental health code. Lee Dep. [ECF No. 383-73] at 182:19-22. Neither the cited testimony nor the exhibit referenced in that testimony distinguishes between restrictive housing for Security Level 5 inmates at ROSP and restrictive housing subject to the Step-Down Program at issue in this case. *Id.* at 180:18–181:5; Email from Terrance Huff to Denise Malone dated August 30, 2018, attached as Exhibit 33 [Lee Deposition Exhibit 27].

186. **Undisputed**.

187. **Disputed**: "[M]anag[ing] medications" is not Dr. McDuffie's only responsibility. *See, e.g.,* McDuffie Dep. [ECF No. 383-52] at 86:19-88:21 (testifying that his duties include consultations with warden, prison administration, psychology associates and primary care doctors,

as well as lab monitoring, telehealth, and otherwise seeing patients); *see also* Operating Procedure 720.9 ("O.P. 720.9"), attached as Exhibit 37, at 5–6 (listing duties of psychiatric providers at VDOC facilities).

188.  **Undisputed**.

189.  **Disputed in part**: The deposition testimony cited by Plaintiffs does not support that psychology associates are not qualified to diagnose mental illness. Dr. Lee was asked about "*medical* diagnoses," not the diagnosis of mental illness. Lee Dep. [ECF No. 383-73] at 44:12-16. He went on to distinguish between mental health treatment and medical treatment. *Id.* at 44:17-22. Although Psychology Associates are not required to be licensed, VDOC provides for them to be registered as Qualified Mental Health Professionals ("QMHPs"). Transcript of Remote Videotaped Deposition of Denise Malone, Psy.D. dated October 20, 2020 ("Malone *Reyes* Dep."), cited portions attached as Exhibit 38, at 210:14-211:3. A Qualified Mental Health Professional ("QMHP") must meet the Department of Health Professions Board of Counseling regulatory standards, have at least a bachelor's degree, have supervised experience with patients, have registered with the Department of Health Professions as a QMHP, and must complete ongoing education in mental health topics. Regulations Governing the Registration of [QMHPs], attached as Exhibit 39, at 6–7. But VDOC requires its psychology associates to go beyond the requirements of a QMHP by requiring that they have at least a master's degree. Malone *Reyes* Dep. at 209:11–210:13.

190.  **Undisputed**.

191.  **Disputed in part**: Dr. McDuffie testified that, over the years, he has "had situations where maybe they have to get to a crisis or point of behavior," not that it happens "[i]n some circumstances." McDuffie Dep. [ECF No. 383-52] at 200:6-9. He further testified that he did not

have any inmates in restrictive housing now that he would want to see sooner, "[b]ut several years ago, I've encountered patients that I believe" should have been brought to the attention of mental health staff sooner. *Id.* at 201:16-202:3. He did not testify that it was "as a result" of those inmates getting to a crisis or point of behavior.

192. **Undisputed**.

193. **Undisputed**.

194. **Undisputed**.

195. **Disputed in part**: Inmates with a Serious Mental Illness are not limited to being given a mental health classification code of MH-2s. Depending on the level of functional impairment, the potential to be a danger to oneself or other, and other characteristics, the inmate may be given a mental health classification code of MH-3 or MH-4. Operating Procedure 730.2 ("O.P. 730.2") [ECF No. 383-78] at VADOC-00002937-38.

196. **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. To be given a mental health classification of MH-2, an inmate neither needs a diagnosis "from the psychiatrist" nor needs to be prescribed medication. Videotaped Deposition of Denise Malone dated April 12, 2023 ("Malone Dep.") [ECF No. 383-19] at 169:2-18 (diagnosis needs to be countersigned by a licensed mental health clinician, which can include the psychiatrist); Transcript of Donnie Lee Trent dated June 17, 2022 ("Trent Dep.") [ECF No. 383-25] at 197:22-198-20; McDuffie Dep. [ECF No. 383-52] at 286:21-287:5 (taking medication *or* have a – a mood disorder or thought disorder); . O.P. 730.2 [ECF No. 383-78] at VADOC-00002937 ("[t]he inmate *may be* prescribed psychotropic medication" (emphasis added.)).

197. **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. "I don't see a lot of that" is not the equivalent of "not offered."

198. **Undisputed**.

199. **Undisputed**.

200. **Undisputed**.

201. **Undisputed**.

202. **Undisputed**.

203. **Objection**: Plaintiffs' statement is a legal conclusion, not an undisputed fact.

204. **Undisputed**.

205. **Disputed in part**: VDOC's annual budget for FY 2016 was more than $1.1 billion. Other documents produced by VDOC reflect annual budgets for other years. *See, e.g.*, Presentation dated August 16, 2019, attached as Exhibit 40 [VADOC-00108342], at 8. Moreover, information about VADOC's annual budgets is publicly available. Finally, VDOC produced yearly budget information for ROSP, starting in FY 2012. *See* Plaintiffs' Statement at ¶ 206.

206. **Undisputed**.

207. **Disputed**: The budget clearly identifies medical and dental equipment, medical and dental supplies, laboratory supplies, X-Ray & Laboratory services, medical services, and pharmaceutical drugs as line item expenses. ECF No. 383-83 at VADOC-00140551 (Medical Services Budget Amount - 259,550.00 and X-Ray & Laboratory Services 10,000); 552 (Medical & Dental Supplies $100,000), (553 Medical & Dental Equipment $2,000).

208. **Undisputed**.

209. **Disputed**: Plaintiffs have not adduced evidence that any ADA-related or accommodation-related expenses are not subsumed within another expense in the budget.

210. **Disputed**: Mr. Clarke testified that he can direct discretionary expenditures to certain categories (such as maintenance, food service, overtime) but cannot control other categories (such

as compensation, salaries, health care). Clarke Dep. [ECF No. 383-14] at 127:7 - 128:7. Further, he testified that such direction of funds is decided through deliberation with other individuals in various divisions. *Id.* at 128:8 - 128:19.

211. **Disputed**: The proposed changes listed in this paragraph, and in the cited report, do not "underly," or even target, the Step-Down Program. They are not proposed as reasonable accommodations for inmates with mental disability to allow participation in the Step-Down Program, as opposed to vaguely worded suggestions as to Mr. Wells's opinion of good practices in a prison setting generally. VDOC further disputes that the list is comprised entirely of proposed changes, as some of them are already in place. For example, as to item (h), Plaintiffs assert as an undisputed fact that VDOC personnel worked with Mr. Reyes individually to complete the Challenge Series (Plaintiffs' Statement at ¶ 73), and, as to item (p), mental health professionals do participate in DTT, BMC, and ERT hearings. *See* Transcript of Denise Malone dated April 12, 2023 ("Malone Dep."), cited portions attached as Exhibit 41 at 121:13 - 122:2 (mental health associate included in DTT); at 195:11 - 195:21 (both Dr. Cary and Dr. Malone serve as voting members on the ERT; and local teams that provide presentations on the inmates include mental health representation from Marion, WRSP and ROSP); Collins Dep., Exhibit 16 at 270:4 - 271:1 (confirming that required members of the BMC included the unit psychologist). VDOC further disputes that others of these proposed changes are efficient, effective, needed, or not already in place.

212. **Not Material**: Because Mr. Wells has proposed only vague, broad concepts that amount to his opinions of general incarceration best practices, not targeted to the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability, what

Wells proposes does not constitute reasonable accommodations to participate in the Step-Down Program. These proposals are too vague to be able to respond.

213. **Not Material**: Beyond the proposed vague, broad concepts that amount to general incarceration best practices, not targeted to the Step-Down Program, Plaintiffs have not proffered any specific, definable changes that would represent reasonable accommodations to participate in the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability. Therefore, there is nothing for which VDOC has an obligation to respond. Moreover, VDOC is not required to provide evidence related to the monetary cost of implementing "*any*" change to the Step-Down Program, only those changes that constitute requested reasonable accommodations, which do not exist.

214. **Not Material**: Because Mr. Wells has only proposed vague, broad concepts that amount to his opinion of general incarceration best practices, and not targeted to the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability, VDOC does not agree that what Wells proposes constitutes reasonable accommodations to participate in the Step-Down Program. These proposals are too vague to be able to respond.

215. **Not Material**: Beyond the proposed vague, broad concepts that amount to general incarceration best practices, not targeted to the Step-Down Program, Plaintiffs have not proffered any specific, definable changes that would represent reasonable accommodations to participate in the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability. Therefore, there is nothing for VDOC to respond to. Moreover, VDOC is not required to provide evidence related to the monetary cost of implementing *any* change to the Step-Down Program, only those changes that constitute requested reasonable accommodations, which do not exist.

37

216. **Not Material**: Because Mr. Wells has only proposed vague, broad concepts that amount to his opinion of general incarceration best practices, and not targeted to the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability, VDOC does not agree that what Wells proposes constitutes reasonable accommodations to participate in the Step-Down Program. These proposals are too vague to be able to respond.

217. **Not Material**: Beyond the proposed vague, broad concepts that amount to general incarceration best practices, not targeted to the Step-Down Program, Plaintiffs have not proffered any specific, definable changes that would represent reasonable accommodations to participate in the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability. Therefore, there is nothing for VDOC to respond to. Moreover, VDOC is not required to provide evidence related to the monetary cost of implementing "*any*" change to the Step-Down Program, only those changes that constitute requested reasonable accommodations, which do not exist.

218. **Not Material**: This paragraph does not specify which specific changes have been instituted at other penological institutions. Defendants also dispute that changes were made at other penological institutions because they were required by law, as opposed to other reasons, such as part of a consent settlement. In fact, Mr. Wells affirms that one of the county jail systems that implemented a real-time network tracking system did so as part of an agreed resolution to avoid litigation. Deposition of Richard Wells dated August 11, 2023 ("Wells Dep.") [ECF No. 383-87] at 106:9 - 106:23; 107:2 - 107:6

219. **Disputed**: Mr. Wells testified that California Department of Corrections and Rehabilitation ("CDCR"), Alameda County jail system, Orange County jail system, and Monterey County jail system employ or are in the process of implementing real-time, networked tracking

systems, but produced no documentary evidence that those systems have actually done so. Wells testified that the Michigan Department of Corrections ("Michigan DOC") purchased or upgraded software but did not clearly state that it had implemented a real-time, networked tracking system. Transcript of Richard Wells dated August 11, 2023 ("Wells Dep."), cited portions attached as Exhibit 42,  at 116:21-122:2.

220.  **Disputed**: A "real-time network tracking system" does not automatically include all such functions listed in this paragraph. Rather, these software systems "can be molded" to provide certain functions. Wells Dep. [ECF No. 383-85] ¶ 111. Moreover, what "should" be in such a system is an opinion, not a fact.

221.  **Disputed**: The Haney Report states that there is a "significant" body of research regarding the "***risk*** of harm to which prisoners are exposed in solitary confinement." Haney Report [ECF No. 383-66] at ¶ 40. Dr. Robert Morgan testified that there is a "body of research that would suggest that there is some potential risk of inmates decompensating or deteriorating in segregation, but where I disagree is in the significance of that harm and does it rise to the level of substantive risk or harm." Deposition of Robert D. Morgan, Ph.D. ("Morgan Deposition") [ECF No. 383-88] at 101:8 - 14.  Further, Dr. Haney testified as to a "risk" not a causation: "The literature that I described earlier addresses a significant risk of serious harm that prisoners who are in solitary confinement are exposed to, and so I took that literature into account, and reached conclusions about whether or not they were, as other people in solitary confinement are, exposed to a significant risk of serious harm." Transcript of Craig W. Haney, Ph.D., J.D., Volume 2 dated August 17, 2023 ("Haney Dep. Vol. 2"), cited portions attached as Exhibit 43, at 136:4 - 18. This does not necessarily lead to the conclusion that "harms" are "caused" by restrictive housing and solitary confinement.

222. **Undisputed**.

223. **Disputed in part / Not Material**: Dr. Morgan's testimony does not support Plaintiffs' allegation. Dr. Morgan testified as to some physical health effects associated with incarceration— he did not identify a disproportionate experience by those in restrictive housing. Morgan Dep. [ECF No. 383-88] at 106:18-107:8. Further, because the conditions of confinement in the studies are not the same as those in the Step-Down Program, the studies are inapplicable in the context of this litigation.

224. **Disputed**: Dr. Hendricks provides no support for his allegation, which constitutes opinion, not fact. The cited portions of the Haney Report indicate only that the studies found a correlation between the time spent in solitary-type confinement and suicide, homicide, and opioid overdose. Consistent with that information, Dr. Morgan testified that the research about life expectancies for inmates who served time in restrictive housing suggests that any difference in life span is "tied to unnatural causes as opposed to natural causes." Morgan Dep. [ECF No. 383-88] at 108:14 - 108:19.

225. **Disputed in part / Not Material**: The Hendricks Report does not state the research purports to show that symptoms will always last well beyond time incarcerated in solitary confinement; rather that was observed "often." Report of Michael L. Hendricks, Ph.D., ABPP ("Hendricks Report") [ECF 383-89] at ¶ 24 Apart from one study on the issue, the Hendricks Report refers only, generally, to the Haney Report. Further, because generalized studies regarding "isolated confinement" or "solitary confinement" conditions not analogous to the conditions of confinement within VDOC's Step-Down Program, they are not determinative or even relevant to assessing the prevalence of any risk of harm for purposes of this litigation.

226. **Disputed**: Dr. Morgan testified that he "recalled speaking generally to that." Morgan Dep. [ECF No. 383-88] at 96:14–22.

227. **Disputed in part**: Although Dr. Morgan does not disagree with the "body of literature in terms of the types  of symptomatology that can occur and that is associated with the use of restrictive housing," he does disagree that the literature establishes the significance of the potential harm and whether it is a substantive risk. Morgan Dep. [ECF No. 383-88] at 101:4-101:14.

228. **Disputed**: Dr. Morgan did not testify simply that there was a potential risk of inmates decompensating or deteriorating in segregation, but rather that there exists a "body of research that would suggest that there is some potential risk of inmates decompensating or deteriorating in segregation." Morgan Dep. [ECF No. 383-88] at 101:8 - 101:11.

229. **Disputed**: Dr. Morgan did not testify that segregation may exacerbate the conditions listed. He testified that the conditions are some of the physical health effects associated with incarceration. Morgan Dep. [ECF No. 383-88] at 106:18-107:3. When asked if any of the symptoms worsen for people housed in segregation, he testified, "They can." *Id.* at 107:6-8. That testimony says nothing about segregation exacerbating the conditions.

230. **Undisputed**.

231. **Undisputed**.

232. **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. Dr. Morgan testified that he would expect that inmates who spend years in segregation would experience some of the symptomology cited by Plaintiffs and that it is possible that some of those symptoms can be permanent. Morgan Dep. [ECF No. 383-88] at 115:18-116:14. He did not testify that the symptoms were effects of restrictive housing.

233. **Undisputed.**

234. **Disputed**: Dr. Saathoff did not agree with Plaintiffs' allegation. He testified that the statement was very broad but, in general, would not disagree. Deposition of Gregory B. Saathoff, M.D. ("Saathoff Dep.") [ECF No. 383-90] at 137:14 - 138:2. Deciding not to disagree with such a broad statement is not a wholesale agreement to the same, particularly in the absence of a precise definition of "solitary confinement."

235. **Disputed**: Dr. Saathoff did not agree with Plaintiffs' allegation in an isolated context. He agreed that inmates with serious mental illness who are placed in segregation should be provided therapeutic activities, unstructured out of cell time, and access to programming. Saathoff Dep. [ECF No. 383-90] at 146:5 - 146:20.

236. **Undisputed**.

237. **Undisputed**.

238. **Undisputed**.

239. **Disputed in part** The identified diagnoses were assigned by Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. In addition, The cited portion of the Hendricks Report does not say that Mr. Cornelison previously had received the alleged diagnosis. Rather, Dr. Hendricks opined that his testing of Mr. Cornelison reflected that certain symptoms, Hendricks Report [ECF No. 383-89] at ¶53, and Mr. Cornelison's report of ongoing symptoms of anxiety was "consistent with" the diagnosis, *id.* at ¶54.

240. **Disputed**: Mr. Cornelison's testimony reflects he alleges with multiple caveats that he weighed himself on different scales and noticed the difference was more than 20 pounds. Deposition of Derek Cornelison dated April 11, 2023 ("Cornelison Dep.") [ECF No. 383-91] at 137:9–12; 138:4–18. It further reflects that the alleged weight loss occurred over a period of more than eight months. "[U]pon arrival" in segregation, he claims he weighed 158. *Id.* at 137:7-10. He

claims that he was in segregation "for six months waiting for transfer to Red Onion." *Id.* at 8-9.

He then claims that, after arriving at Red Onion, he went through a 30-day intake and was sent to

C Building to start his "time in solitary confinement." *Id.* at 137:15-18. Once in C Building, he

thought to step on the scale in the general area of the showers. *Id.* at 137:15-16; 138:6-11. At that

time, he "probably weighed like about 130 pounds, 132 pounds, somewhere in there, give or take

a pound or two." *Id.* at 138:14-16. At that time, he had been "solitary confinement, segregation

conditions … for a period of ten weeks." *Id.* at 138:21-139:1. Further, a sick call slip on 8/24/2016

notes that he complained of weight loss of only 11 pounds. Exhibit 44 at VADOC-00160533. A

nursing report dated October 12, 2023 reflects that Mr. Cornelison weighed 156 pounds on June

7, 2016 and 143 pounds on September 22, 2016. Exhibit 44 at VADOC-00160571. A follow-up

on Mr. Cornelison's sick call dated October 13, 2016 reflects that the doctor reviewed his chart

and found that, for his height, Mr. Cornelison's body weight was WNL ("within normal limits").

Exhibit 44 at VADOC-00160570.

241. **Not Material**: Plaintiffs offer no proof that Mr. Cornelison's condition was caused by
his time in the Step-Down Program.

242. **Not Material**: Plaintiffs offer no proof that Mr. Cornelison's condition was caused by
his time in the Step-Down Program.

243. **Not Disputed**.

244. **Disputed**: Mr. Cavitt did not testify that he experienced the alleged issues "during his
time in the Step-Down Program." In his declaration, he specifically alleges that he experienced the
alleged issues "only after [his] time in the Step-Down Program." Declaration of Brian Cavitt dated
September 1, 2023 ("Cavitt Decl.") [ECF No. 383-50] at ¶ 76. Contrary to these allegations,
Plaintiffs' own mental-health expert reported that he had issues while growing up and had multiple

diagnoses. Hendricks Report [ECF No. 368-1] at 20-21. Further, Defendants' psychiatric expert opined that Mr. Cavitt's developmental history is a type that creates anxiety for children. Expert Report of Gregory Saathoff, M.D. ("Saathoff Report") [ECF No. 381-68] at 30. During his deposition, Mr. Cavitt testified that had a conversation with Mr. Elam about the alleged issues but not when that conversation took place. Deposition of Brian Cavitt dated March 20, 2023 ("Cavitt Dep.") ECF No. 383-92 at 49:10-50:22. Plaintiffs offer no proof that Mr. Cavitt's issues were caused by his time in the Step-Down Program. In fact, he testified that he had migraines since he was a kid. Transcript of Brian Cavitt dated March 20, 2023 ("Cavitt Dep."), cited portions attached as Exhibit 45, at 208:10-21.

245.  **Undisputed**.

246.  **Disputed**: Mr. Mukuria did not testify that he experienced the alleged issues "during his time in the Step-Dow Program." He testified that he started taking medication for anxiety "while … at Red Onion," Deposition of Peter Mukuria dated March 28, 2023 ("Mukuria Dep.") [ECF No. 383-93] at 173:17, and that, at the time of his deposition in March 2023, he allegedly sometimes had the alleged issues. *Id.* at 173:7-13. Plaintiffs offer no proof that Mr. Mukuria's issues were caused by his time in the Step-Down Program. In fact, he testified that he had ADHD before being incarcerated. *Id.* 173:20-22

247.  **Disputed**: The identified diagnoses were assigned by Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. The Henricks Report states that certain of Mr. Mukuria's are "fairly stable, though still present," meaning they meet the diagnostic criteria for a diagnosis of persistent depressive disorder. ECF No. 383-89 at 34. The Hendricks Report does not state that Mr. Mukuria's alleged short-term memory problems are reflected by any testing

performed by Dr. Hendricks. Dr. Hendricks cannot establish that any symptoms are "attributable to" the Step-Down Program.

248. **Undisputed**.

249. **Disputed**: Mr. Brooks did not allege that he had experienced the identified symptoms "[d]uring his time in the Step-Dow Program" in either of the cited sources. In his affidavit, he asserts that he was transferred to general population in May 2020, Affidavit of Vernon Brooks dated June 20, 2022 [ECF No. 174-19] at ¶ 40 and that, at the time of the affidavit, he allegedly suffered from various issues, *id.* at ¶ 42. He subsequently testified that, at the time of his deposition in March 2023, he allegedly suffered from various issues. Deposition of Vernon Brooks, Jr. dated March 21, 2023 [ECF No. 383-94] at 149:6-19. Plaintiffs offer no proof that Mr. Brooks's issues were caused by his time in the Step-Down Program. In fact, he testified that he had been a mental health patient since he was a youth with multiple diagnoses and was on medication before he was incarcerated. *Id.* at 148:12-21.

250. **Disputed**: The identified diagnoses were assigned by Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. Mr. Brooks did not testify that he "began" taking medication for his mental health issues in October 2021. He testified that he was taking medication before he was incarcerated. *Id.* at 148:12-148:19.

251. **Disputed in part**: The materials cited by Plaintiffs do not support that William Thorpe spent any time in "long-term solitary confinement."

252. **Not Material**: Plaintiffs offer no proof that Mr. Thorpe's alleged impairments were caused by his time in the Step-Down Program.

253. **Disputed**: The identified diagnoses were assigned by Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. Dr. Hendricks claims Mr. Thorpe meets the

criteria for certain diagnoses based on his interpretation of psychological testing performed by another psychologist retained by Plaintiffs, who diagnosed Mr. Thorpe differently. Transcript of Mollimichelle Cabeldue, Ph.D. dated August 14, 2023 ("Cabeldue Dep."), cited portions attached as Exhibit 46, at 89:11-90:7. Defendants dispute that Dr. Hendricks's opinion establishes the allegation as undisputed fact.

254.  **Disputed in part**: Gary Wall asserted under penalty of perjury that he was assigned to SL-S at Wallens Ridge State Prison in December 2012. Affidavit of Gary Wall dated June 20, 2022 [ECF No. 174-28] at ¶ 3.

255.  **Not Material**: Plaintiffs offer no proof that Mr. Wall's alleged issues were caused by his time in the Step-Down Program, as opposed to the dog bite or other pre-existing conditions/experiences.

256.  **Disputed**: The identified testing and confirmations were performed by Plaintiffs' expert for this litigation; they are not prior assessments and are opinion, not fact.

257.  **Disputed / Not Material**: An unsubstantiated statement as to what a Plaintiff "thought" at a given point in time cannot be considered an "undisputed fact" because its truth or falsity necessarily requires assessing the credibility of the declarant. Plaintiffs offer no proof that Mr. Wall's alleged thoughts were caused by his time in the Step-Down Program, as opposed to other issues.

258.  **Not Material**: Plaintiffs offer no proof that Mr. Wall's alleged issues were caused by his time in the Step-Down Program, as opposed to other issues. In fact, Mr. Wall described to Defendant's psychiatric expert a traumatic childhood. Saathoff Report [ECF No. 381] at 105-108.

259.  **Disputed**: The class period for the beginning of the Step-Down Program begins on August 1, 2012. Plaintiffs offer no proof that Frederick Hammer was "in the Step-Down Program"

before that date. Using the beginning of the class period, the correct calculation for Mr. Hammer's time in the Step-Down Program is 7 year, 7 months, and 9 days.

260.  **Disputed**: Mr. Hammer did not allege that he currently suffers from the alleged ailments in the first statement, only that he "[has] experienced" them. Declaration of Frederick Hammer dated September 6, 2023 [ECF No. 383-98] at ¶ 44. Mr. Hammer is not qualified to determine that his alleged ailments were caused by his time in the Step-Down Program.

261.  **Undisputed**.

262.  **Disputed**: Plaintiffs offer no proof that Mr. Riddicks's alleged issues were caused by his time in the Step-Down Program, as opposed to other issues. In fact, he told Defendant's psychiatric expert that he had certain mental health issues as a child because of traumatic incidents. Saathoff Report [ECF No. 381-68] at 71. He also claimed to have mental health issues during his time in the U.S. Navy. *Id.* at 71-72. Further testing done during Mr. Riddick's time in the Step-Down Program revealed no significant issues. *Id.* at 78. In summary, Dr. Saathoff opines that Mr. Riddick's "claims of some of the most serious and severe symptoms that any psychiatric patient can experience are inconsistent with someone who is completely stable without psychiatric medication." *Id.* at 104.

263.  **Disputed**: The identified diagnosis was assigned by Plaintiffs' expert for this litigation; it was not a prior diagnosis and is opinion, not fact. Plaintiffs offer no proof that Mr. Riddicks's alleged issues were caused by his time in the Step-Down Program, as opposed to other issues.

October 5, 2023                                      Respectfully submitted,

                                                    **/s/ *Maya M. Eckstein***

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239
moshea@oag.state.va.us

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*