**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF VIRGINIA**
**Big Stone Gap Division**

| | | |
|---|---|---|
| WILLIAM THORPE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00007-JPJ-PMS |
| | ) | |
| VIRGINIA DEPARTMENT OF | ) | |
| CORRECTIONS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239
moshea@oag.state.va.us

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph : (804) 788-8200
Fax : (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*

October 24, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

I.   The Court should grant summary judgment on any facial claims Defendants purport to raise. ..................................................................................................................................3

II.  Defendants are entitled to summary judgment on Plaintiffs' due-process claim. .....................8

   A.  Plaintiffs offer no disputed material facts precluding summary judgment on Plaintiffs' as-applied claims.................................................................................................................9

      1.  The conditions of confinement under the Step-Down Program do not impose an atypical and significant hardship in relation to the ordinary incidents of prison life. ......................................................................................................................... 11

      2.  The Step-Down Program's procedures afford inmates minimally adequate process to protect any liberty interest. .................................................................................. 14

   B.  Defendants are entitled to qualified immunity on Plaintiffs' due-process claim...............17

III. Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claim. .......20

   A.  Defendants are entitled to summary judgment on Plaintiffs' as-applied Eighth Amendment challenge. .................................................................................................21

      1.  The Step-Down Program did not objectively impose a substantial risk of serious injury on any of the named Plaintiffs....................................................................... 22

      2.  There is no evidence that Defendants were subjectively aware that the Step-Down Program posed an excessive risk to the named Plaintiffs' health or safety, yet consciously disregarded that risk for no penological purpose. ................................... 25

         a.  The evidence does not establish Defendants' awareness that the Step-Down Program posed an objectively intolerable risk of harm to the named Plaintiffs. ...26

         b.  Defendants did not disregard a substantial risk of injury to the named Plaintiffs without penological purpose. ..............................................................30

   B.  Defendants are entitled to qualified immunity on Plaintiffs' Eighth Amendment claim..............................................................................................................................34

IV. Defendants are entitled to summary judgment on Plaintiffs' ADA and RA disability discrimination claims. .....................................................................................................36

A. Plaintiffs' class ADA and RA claims fail as a matter of law because no named Plaintiff meets the class definition and Plaintiffs have not designated a new class representative. ........................................................................................................36

    1. There is no evidence that the Disability Plaintiffs were subjected to discrimination because of a mental disability while participating in the Step-Down Program. ......... 37

    2. There is no evidence that the Disability Plaintiffs sought reasonable accommodations to participate in the Step-Down Program, that VDOC should have known reasonable accommodations were needed, or that reasonable accommodations were denied. ................................................................... 44

V. The applicable statutes of limitations preclude the claims of some class members. ...............52

    A. Defendants are entitled to summary judgment on the Eighth Amendment and due-process claims brought by any class members who left the Step-Down Program more than two years before the filing of the Complaint. ...........................................................52

        1. The reasonable discovery exception to accrual should not apply to the claims of class members who left the Step-Down Program before May 5, 2017. ..................... 52

        2. Plaintiffs make no serious argument for equitable tolling and the Court should not apply it. ................................................................................................ 54

    B. The Disability Plaintiffs' ADA and RA claims that accrued before May 6, 2018 are barred by the applicable statutes of limitation. ....................................................55

        1. The continuing violations exception does not apply to individual disability discrimination claims. ............................................................................... 55

        2. Discrete acts alleged to be part of a general policy are not subject to the continuing violations exception. ................................................................... 60

        3. The Disability Plaintiffs' claims accrued with each alleged demotion or failure to advance through the Step-Down Program. ................................................. 62

        4. Equitable tolling does not apply to Plaintiffs' claims under the ADA and RA. .......... 65

VI. Even if Plaintiffs' claims are not barred entirely, the scope of their recoverable relief is limited. .........................................................................................................67

    A. The PLRA's restriction on the scope of potential prospective relief require the dismissal of Plaintiffs' request for injunctive relief. ..........................................67

        1. Plaintiffs tacitly acknowledge that the relief requested in their Complaint is too extreme to meet the PLRA's appropriateness prong. .................................... 67

        2. The voluntary cessation doctrine does not apply to Plaintiffs' claims given the actions of the Virginia legislature, and the Court should not override the legislature's judgment. ............................................................................... 68

    B. Defendants are entitled to summary judgment on any purported damages claims for physical and psychological injuries. ................................................................70

CONCLUSION ................................................................................................ 75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A Soc'y Without A Name v. Virginia*,
  655 F.3d 342 (4th Cir. 2011) ..........................................................................55, 57

*A.T. v. Oley Valley Sch. Dist.*,
  No. 17-4983, 2023 WL 1453143 (E.D. Pa. Feb. 1, 2023) ......................................73

*Akins v. United States*,
  204 F.3d 1086 (11th Cir. 2000) ............................................................................66

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...............................................................................................61

*Amini v. Oberlin College*,
  259 F.3d 493 (6th Cir. 2001) ................................................................................63

*Andrews v. United States*,
  No. 17–1693, 2017 WL 6376401 (6th Cir. Dec. 12, 2017) ..................................65

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)...............................................................................................20

*Avina v. Adams*,
  No. 1:10-CV-00790-AWI, 2012 WL 2995473 (E.D. Cal. July 23, 2012)..............15

*Basta v. Novant Health Inc.*,
  56 F.4th 307 (4th Cir. 2022) .................................................................................74

*Baxley v. Jividen*,
  508 F. Supp. 3d 28 (S.D.W. Va. 2020)..............................................................44, 45

*Blum v. Yaretsky*,
  457 U.S. 991 (1982)...............................................................................................37

*Breeden v. Jackson*,
  457 F.2d 578 (4th Cir. 1972) ................................................................................35

*Brooks v. City of Winston-Salem, N.C.*,
  85 F.3d 178 (4th Cir. 1996) ..................................................................................63

*Bucklew v. Precythe*,
  139 S. Ct. 1112 (2019)............................................................................................6

*Burgess v. Costco Wholesale Corp.*,
No. 4:10-CV-1678-RBH, 2013 WL 645982 (D.S.C. Feb. 21, 2013), *aff'd*, 533
F. App'x 271 (4th Cir. 2013) ........................................................................................61

*Burns v. Bd. of Sup'rs of Stafford Cnty.*,
227 Va. 354, 315 S.E.2d 856 (1984)............................................................................54

*Californians for Disability Rts., Inc. v. Cal. Dep't of Transp.*,
No. C 06-5125, 2009 WL 2982840 (N.D. Cal. Sept. 14, 2009) ...................................56

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) ...........................................................................................37

*Cherosky v. Henderson*,
330 F.3d 1243 (9th Cir. 2003) .........................................................................56, 57, 61

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)....................................................................................................6, 8

*City & Cnty. of S.F. v. Sheehan*,
575 U.S. 600 (2015)......................................................................................................35

*Clark v. Coupe*,
55 F.4th 167 (3d Cir. 2022) ..........................................................................................28

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*,
423 F. App'x 314 (4th Cir. 2011) ...........................................................................66, 67

*Cross–Bey v. Gammon*,
322 F.3d 1012 (8th Cir. 2003) ................................................................................65, 66

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
142 S. Ct. 1562 (2022)...............................................................................70, 71, 72, 73

*Davenport v. DeRobertis*,
844 F.2d 1310 (7th Cir. 1988) ......................................................................................28

*Davis v. Richmond, Fredericksburg & Potomac R. Co.*,
803 F.2d 1322 (4th Cir. 1986) ......................................................................................68

*DePaola v. Clarke*,
884 F.3d 481 (4th Cir. 2018) ..................................................................................52, 59

*DePaola v. Va. Dep't of Corr.*,
No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016), *aff'd*, 703 F.
App'x 205 (4th Cir. 2017) .............................................................................................35

*Doe v. Fairfax Cnty. Sch. Bd.*,
  No. 1:18-cv-00614-MSN-IDD, 2023 WL 424265 (E.D. Va. Jan. 25, 2023) ........................72

*Doe v. Va. Polytechnic Inst. & State Univ.*,
  400 F. Supp. 3d 479 (W.D. Va. 2019) ....................................................................................53

*Doe next friend of Doe v. City of Pawtucket*,
  633 F. Supp. 3d 583 (D.R.I. 2022)..........................................................................................72

*Dring v. McDonnell Douglas Corp.*,
  58 F.3d 1323 (8th Cir. 1995) ...................................................................................................63

*Duvall v. Cnty. of Kitsap*,
  260 F.3d 1124 (9th Cir. 2001) .................................................................................................44

*E.E.O.C. v. AutoZone, Inc.*,
  707 F.3d 824 (7th Cir. 2013) ...................................................................................................68

*Farmer v. Brennan*,
  511 U.S. 825 (1994).........................................................................................22, 25, 32, 35

*Fuller v. Kelly*,
  No. CIV.A.7:09-CV-00117, 2009 WL 1675710 (W.D. Va. June 15, 2009) ..........................66

*Fusaro v. Howard*,
  19 F.4th 357 (4th Cir. 2021) .........................................................................................5, 7, 8

*Geness v. Pennsylvania*,
  364 F. Supp. 3d 448 (W.D. Pa. 2019) .....................................................................................58

*Graham v. Florida*,
  560 U.S. 48 (2010)...................................................................................................................27

*Grissom v. Roberts*,
  902 F.3d 1162 (10th Cir. 2018) ...............................................................................................24

*Hager v. First Va. Banks, Inc.*,
  No. CIV. A. 7:01-cv-00053, 2002 WL 57249 (W.D. Va. Jan. 10, 2002)................................60

*Halpern v. Wake Forest Univ. Health Scis.*,
  669 F.3d 454 (4th Cir. 2012) .........................................................................................45, 46

*Hamilton v. 1st Source Bank*,
  928 F.2d 86 (4th Cir. 1990) .....................................................................................................64

*Hecox v. Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020), *aff'd*, No. 20-35813, 2023 WL 1097255
  (9th Cir. Jan. 30, 2023), and *aff'd*, 79 F.4th 1009 (9th Cir. 2023)...........................................8

*Hewitt v. Helms*,
  459 U.S. 460 (1983) ................................................................................17, 19

*Hill v. Hampstead Lester Morton Ct. Partners LP*,
  581 F. App'x 178 (4th Cir. 2014) ..............................................................60

*Hodge v. Fifth Quarter of Charleston, Inc.*,
  No. 2:06-CV-00223, 2007 WL 9718213 (S.D.W. Va. May 9, 2007) ..............................36, 37

*Holland v. Fla.*,
  560 U.S. 631 (2010) ..................................................................................66

*Holland v. Wash. Homes, Inc.*,
  487 F.3d 208 (4th Cir. 2007) .....................................................................61

*Hulsey v. Kmart, Inc.*,
  43 F.3d 555 (10th Cir. 1994) .....................................................................63

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990) ....................................................................................65

*J.H. ex rel. J.P. v. Bernalillo Cnty.*,
  No. CIV 12-0128, 2014 WL 3421037 (D.N.M. July 8, 2014), *aff'd*, 806 F.3d
  1255 (10th Cir. 2015) ................................................................................46

*Jensen v. Shinn*,
  609 F. Supp. 3d 789 (D. Ariz. 2022), *amended*, No. CV-12-00601-PHX-ROS,
  2022 WL 2910835 (D. Ariz. July 18, 2022) ..............................................28

*Koon v. North Carolina*,
  50 F.4th 398 (4th Cir. 2022) .....................................................................74

*Latson v. Clarke*,
  794 F. App'x 266 (4th Cir. 2019) ..............................................................35

*Lukovsky v. City & Cnty. of San Francisco*,
  535 F.3d 1044 (9th Cir. 2008) ...................................................................63

*Marsh v. Soares*,
  223 F.3d 1217 (10th Cir. 2000) .................................................................65

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ..................................................................................16

*Mattison v. Md. Transit Admin.*,
  No. CV JKB-21-00168, 2021 WL 4503566 (D. Md. Oct. 1, 2021) ..............60

*Mays v. Sprinkle*,
    992 F.3d 295 (4th Cir. 2021) ............................................................35

*McClary v. Kelly*,
    4 F. Supp. 2d 195 (W.D.N.Y. 1998) ...............................................28

*McKee v. SCM Corp.*,
    No. R-79-162, 1981 WL 27082 (D. Md. Mar. 12, 1981) ...............37

*Merrill v. S. Methodist Univ.*,
    806 F.2d 600 (5th Cir. 1986) ...........................................................64

*Mezu v. Dolan*,
    75 F. App'x 910 (4th Cir. 2003) ...............................................55, 67

*Mickle v. Moore*,
    174 F.3d 464 (4th Cir. 1999) .....................................................32, 35

*Miller v. Marr*,
    141 F.3d 976 (10th Cir. 1998) .........................................................66

*Miller v. N.J. State Dep't of Corrs.*,
    145 F.3d 616 (3d Cir. 1998) ............................................................66

*Mukuria v. Clarke*,
    No. 7:15CV00172, 2016 WL 5396712 (W.D. Va. Sept. 27, 2016), *aff'd*, 706
    F. App'x 139 (4th Cir. 2017) ........................................... *passim*

*Mullenix v. Luna*,
    136 S. Ct. 305 (2015) .......................................................................35

*Nat'l Black Police Ass'n v. D.C.*,
    108 F.3d 346 (D.C. Cir. 1997) ........................................................70

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ..............................................................55, 56, 57

*Ney v. Landmark Educ. Corp.*,
    No. 92–1979, 1994 WL 30973 (4th Cir. Feb. 2, 1994) ..................71

*Nieves v. Bartlett*,
    139 S. Ct. 1715 (2019) ...............................................................52, 53

*Obataiye-Allah v. Va. Dep't of Corr.*,
    No. 7:15CV00230, 2016 WL 5415906 (W.D. Va. Sept. 28, 2016), *aff'd sub
    nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017) .........................35

*Overton v. Bazzetta,*
    539 U.S. 126 (2003) .................................................................................................33

*Pace v. DiGuglielmo,*
    544 U.S. 408 (2005) ...........................................................................................65, 66

*Palakovic v. Wetzel,*
    854 F.3d 209 (3d Cir. 2017) ...................................................................................24

*Parrish ex rel. Lee v. Cleveland,*
    372 F.3d 303–04 (4th Cir. 2004) ...........................................................................29

*Paulone v. City of Frederick,*
    787 F. Supp. 2d 360 (D. Md. 2011) ........................................................................44

*Pearson v. Callahan,*
    555 U.S. 223 (2009) .................................................................................................35

*Peralta v. Dillard,*
    744 F.3d 1076 (9th Cir. 2014) ................................................................................59

*Perez v. Ohio Bell Tel. Co.,*
    655 F. App'x 404 (6th Cir. 2016) ............................................................................68

*PETA v. N.C. Farm Bur. Fed'n, Inc.,*
    60 F.4th 815 (4th Cir. 2023) ...............................................................................7, 8

*Pierce v. District of Columbia,*
    128 F. Supp. 3d 250 (D.D.C. 2015) ........................................................................44

*Porter v. Clarke,*
    923 F.3d 348 (4th Cir. 2019) ......................................................................... *passim*

*Porter v. Pennsylvania Department of Corrections,*
    974 F.3d 431 (3d Cir. 2020) ........................................................................... *passim*

*Price v. City of Charlotte, N.C.,*
    93 F.3d 1241 (4th Cir. 1996) ..................................................................................71

*Prieto v. Clarke,*
    780 F.3d 245 (4th Cir. 2015) ..................................................................................11

*Riddick v. Dep't of Corr.,*
    No. 7:17CV00268, 2017 WL 6599007 (W.D. Va. Dec. 26, 2017) .........................22

*Rivera v. Witt,*
    257 Va. 280, 512 S.E.2d 558 (1999) .......................................................................54

*Rizk v. United States*,
   No. 22-3834, 2023 WL 5275505 (6th Cir. Feb. 27, 2023) ...................................................65

*Robertson v. Las Animas Cnty. Sheriff's Dep't*,
   500 F.3d 1185 (10th Cir. 2007) .............................................................................44

*Robinson v. Nationstar Mortg. LLC*,
   No. CV TDC-14-3667, 2019 WL 4261696 (D. Md. Sept. 9, 2019).......................................37

*Roseboro v. Brown*,
   No. 1:13cv513, 2015 WL 631352 (E.D. Va. Feb. 12, 2015)............................................54, 55

*Sanders v. Shelby Cnty. Bd. of Educ.*,
   No. 2:19-CV-02056-JTF-CGC, 2023 WL 5690291 (W.D. Tenn. July 28, 2023) ...............................................................................................................46, 47

*Shomo v. City of New York*,
   579 F.3d 176 (2d Cir. 2009)...............................................................................56, 59

*Smith v. Collins*,
   964 F.3d 266 (4th Cir. 2020) ..................................................................................19

*Smith v. Travelpiece*,
   31 F.4th 878 (4th Cir. 2022) ................................................................................52, 53

*Snodgrass v. Gilbert*,
   No. 7:16cv00091, 2017 WL 1049582 (W.D. Va. Mar. 17, 2017).......................................22

*Socha v. Boughton*,
   763 F.3d 674 (7th Cir. 2014) ..................................................................................65

*Sosna v. Iowa*,
   419 U.S. 393 (1975).............................................................................................37

*Speech First, Inc. v. Schlissel*,
   939 F.3d 756 (6th Cir. 2019) ..................................................................................70

*Summers v. Louisiana*,
   No. CV 20-21-JWD-SDJ, 2022 WL 4490161 (M.D. La. Sept. 27, 2022).............................46

*Sweet v. S.C. Dep't of Corr.*,
   529 F.2d 854 (4th Cir. 1975) ..................................................................................35

*Szedlock v. Tenet*,
   61 F. App'x 88 (4th Cir. 2003) ...............................................................................60

*Taylor v. Manis*,
   No. 7:19-CV-00434, 2020 WL 354753 (W.D. Va. Jan. 21, 2020).......................................14

ix

*Thelen v. Marc's Big Boy Corp.*,
    64 F.3d 264 (7th Cir.1995) ...........................................................................................63

*Thompson v. TD Bank, N.A.*,
    No. 3:22-CV-2547- SAL-PJG, 2023 WL 4838223 (D.S.C. July 28, 2023) ...........................60

*Thorpe v. Clarke*,
    37 F.4th 926 (4th Cir. 2022) .............................................................. *passim*

*Thorpe v. Va. Dep't of Corr.*,
    No. 2:20CV0007, 2021 WL 2435868 (W.D. Va. June 15, 2021), *aff'd sub*
    *nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) ...............................................9, 14, 18, 67

*Toevs v. Reid*,
    685 F.3d 903 (10th Cir. 2012) ......................................................................................19

*Town of Portsmouth, R.I. v. Lewis*,
    813 F.3d 54 (1st Cir. 2016) ...........................................................................................70

*Trulock v. Freeh*,
    275 F.3d 391 (4th Cir. 2001) ........................................................................................29

*United States v. Hansen*,
    599 U.S. 762 (2023) ....................................................................................................7

*United States v. Robinson-Davis*,
    No. 7:22-CR-00045, 2023 WL 2495805 (W.D. Va. Mar. 14, 2023)........................................7

*United States v. Salerno*,
    481 U.S. 739 (1987) ...............................................................................................6, 7, 8

*United States v. Sherman*,
    797 F. Supp. 2d 709 (W.D. Va. 2011) .............................................................................3

*United States v. Stevens*,
    559 U.S. 460 (2010)................................................................................................6, 7, 8

*Wade v. Danek Med., Inc.*,
    182 F.3d 281 (4th Cir. 1999) ........................................................................................54

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................36, 61

*Wallace v. Kato*,
    549 U.S. 384 (2007)....................................................................................................53

*White Coat Waste Project v. Greater Richmond Transit Co.*,
    35 F.4th 179 (4th Cir. 2022) .........................................................................................7

x

*Wilkerson v. Stalder*,
   639 F. Supp. 2d 654 (M.D. La. 2007) ................................................................28

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) ...................................................................................... *passim*

*Williams v. Giant Food Inc.*,
   370 F.3d 423 (4th Cir. 2004) ..............................................................................60

*Williams v. Secretary of the Pa. Dep't of Corr.*,
   848 F.3d 549 (3d Cir. 2017) ...............................................................................24

*Wolff v. McDonnell*,
   418 U.S. 539 (1974) .............................................................................................15

*Wright v. Kelly*,
   No. 1:11CV86, 2011 WL 13196289 (E.D. Va. Mar. 24, 2011) ..........................66

## Constitutional Provisions

U.S. CONST. amend. I ..............................................................................................7, 8

U.S. CONST. amend. IV ............................................................................................53

U.S. CONST. amend. VIII ................................................................................. *passim*

U.S. CONST. amend. XIV ..........................................................................................68

## Statutes

42 U.S.C. § 1983 .............................................................................................. *passim*

42 U.S.C. § 1997e(e) ................................................................................................72

Va. Code § 53.1-39.2 ...........................................................................11, 23, 26, 69

## Other Authorities

ACLU, *Silent Injustice: Solitary Confinement in Virginia* (2018),
   https://tinyurl.com/29f4tymy ..........................................................................29, 69

Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28
   U.S.C. App. ..........................................................................................................61

CNN, *Trend Towards Solitary Confinement Worries Experts* (Jan. 9, 1998),
   http://www.cnn.com/US/9801/09/solitary.confinement/index.html ......................28

Interim Report of the Special Rapporteur on Torture (Solitary Confinement)
(Aug. 5, 2011), (https://tinyurl.com/yevaa5hh) ....................................................................28

*United Nations Standard Minimum Rules for the Treatment of Prisoners*, Rule 44
(https://tinyurl.com/zv55zbun)....................................................................................69

## INTRODUCTION

Plaintiffs' opposition demonstrates how far short they have fallen of proving the allegations in their Complaint, let alone demonstrating why the Step-Down Program should be "abolished." To be sure, their theory has always been a heavy lift, and their requested relief a big ask. And now, a robust record of undisputed facts reveals the dearth of support for any of their far-reaching claims.[1] Their central assertion that VDOC "traps" inmates indefinitely in the Step-Down Program—allegedly to justify the maintenance of costly prison facilities—collapsed with the evidence that, in fact, the number of inmates in the Step-Down cratered years ago. And the facts also show that the decline in the Step-Down Program's size is consistent with its beneficial purposes of both protecting other inmates and staff from the Commonwealth's most violent and disruptive inmates, while also providing those inmates with opportunities for behavioral modification such that they can make a safe transition to general population. Given the success of the program, it is no wonder that the Step-Down Program has been widely praised and held up by the U.S. Department of Justice and reform groups as a national model for correctional systems across the country.

Plaintiffs raise nothing in their opposition that precludes summary judgment for Defendants. Nor does it answer critical questions about their case, which remain unresolved even as the possibility of trial looms on the horizon. Among them are the following, which Defendants' opening brief raised and Plaintiffs' opposition ignores.

---

[1] In opposition to Defendants' Statement of Undisputed Material Facts, *see* Defs.' Br. [ECF No. 381] at 4–53, Plaintiffs filed a Statement of Genuine Disputes of Material Facts as an exhibit to their opposition brief, ECF No. 400-103. Defendants' Reply to Plaintiffs' Statement of Genuine Disputes of Material Facts in Opposition to Defendants' Motion for Summary Judgment is attached as Exhibit 1 to this brief.

*What "solitary confinement" do Plaintiffs seek to end?*  Discovery has proved that the Step-Down Program does not impose the extreme social isolation that the term "solitary confinement" conjures up.  The evidence is that inmates at all levels of the Step-Down Program can and do regularly communicate with each other (both while in and out of their cells), engage in exercise and recreation, take advantage of visits, and participate in a variety of religious activities and educational programming.  And it is undisputed that, for years, inmates in the Step-Down Program have been entitled to at least four hours of out-of-cell time per day—a measure that places it considerably above industry standards and well outside the commonly-accepted meaning of "solitary confinement."  That amount of out-of-cell time is now prescribed by Virginia statute and, moreover, is the very antidote that Plaintiffs' counsel, the American Civil Liberties Union, has advocated as a solution to alleged "solitary confinement" in VDOC facilities.  With no evidence that the Step-Down Program imposes extreme isolation on inmates, Plaintiffs' conclusory charge of "solitary confinement" is insufficient to avoid summary judgment.

*What is the nature of Plaintiffs' constitutional claims?*  Plaintiffs continue to dodge and ignore Defendants' best efforts to clarify, for themselves as well as the Court, whether Plaintiffs' Eighth Amendment and due-process claims are facial or as-applied in nature.  That obviously affects what Plaintiffs must prove in this litigation.  In light of their refusal to confirm that they are *not* asserting facial claims—which Defendants have shown, in any event, to be meritless—the Court should grant summary judgment to Defendants.

*How have the named Plaintiffs been harmed by Defendants' conduct?*  From the beginning, Plaintiffs have relied on unsourced allegations and grievances by unnamed inmates to claim that "Defendants" have violated the Constitution, the ADA, and the Rehabilitation Act.  But the factual record does not reveal that any individual named Plaintiff has suffered any harm at the hands of

any individual Defendant.  Notably absent from their opposition is any attempt to make that required direct connection.  Indeed, they generally point to the experience of *other* inmates and without any reference to any particular individual Defendant.  That Plaintiffs seek to bring their claims on behalf of a sprawling class—whether they can remains another open question—does not relieve them of their burden of proof.[2]

Without answers to these questions and clear contours to Plaintiffs' claims, it is not surprising that what began as a challenge to the alleged harms of isolation in "solitary confinement" has devolved into a mess of allegations about unrelated conditions of confinement: strip searches, lack of exercise equipment, size of recreation cages, etc.  And, tellingly, their requested relief is now more vague.  Deemphasizing their demand that the Court order the abolishment of the Step-Down Program, they ask for a special master to conduct unspecified fact-finding to investigate conditions and determine how to bring VDOC into compliance with unidentified "court orders."

The natural result of Plaintiffs' efforts to elide their obligation to address these critical questions, and their failure to present material evidence challenging the factual record presented by Defendants, is the entry of summary judgment for Defendants.

## **ARGUMENT**

### I.  **The Court should grant summary judgment on any facial claims Defendants purport to raise.**

Perhaps the most striking aspect of Plaintiffs' opposition is their continuing refusal—now 4.5 years into this litigation—to clarify whether they are challenging the Step-Down Program on a facial or as-applied basis.  *See United States v. Sherman*, 797 F. Supp. 2d 709, 710–11 (W.D.

---

[2] To their credit, Plaintiffs agree that Dr. Herrick should be dismissed.  Pls.' Resp. at 40 n.29.  But so should all the other individual Defendants.

Va. 2011) (Jones, J.) ("A facial challenge asserts that a statute is unconstitutional in all situations, whereas an as-applied challenge attacks the statute's application only as to the party before the court.").  They bend over backwards to avoid doing so, despite the need for Defendants and the Court to know, finally, what they aim to prove in this case.  Is their assertion that the Step-Down Program is unconstitutional as adopted—its policies invalid as written—and could never be constitutionally applied?  Or that it's unconstitutional with respect to certain Plaintiffs, in light of their specific experience and circumstances?  Even with a trial looming on the horizon, Plaintiffs still won't say.  Instead, their opposition offers only feints and dodges, all of which are meritless.

Plaintiffs attempt to elide their as-applied claims with any facial claims they may have, treating "their claims" collectively and apparently indistinguishably.  Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment (ECF No. 400) ("Pls.' Resp.") at 3.  This is intentional.  They acknowledge that Defendants have "raise[d] the distinction between facial and as[-]applied challenges."  Pls.' Resp. at 17 n.14.  Indeed, Defendants carefully structured their opening brief to address separately Plaintiffs' as-applied and facial claims (to the extent they have any).  *Compare* Defs.' Br. Part I.A *with id.* Part I.B; *compare id.* Part II.A *with id.* Part II.B.  But Plaintiffs plainly admit that they "do not address these arguments . . . or attempt to distinguish between facial and as-applied relief here."  Pls.' Resp. at 17 n.14.

Whether or not Plaintiffs choose to acknowledge the distinction, it exists—and it matters, as one of their cited cases illustrates.  In *Porter v. Pennsylvania Department of Corrections*, 974 F.3d 431 (3d Cir. 2020), it was critical to the court's analysis that the plaintiff was "not making a broader claim that the conditions for all death row inmates violate the Eighth Amendment; he ma[de] only an as-applied challenge based on his own conditions of confinement."  *Id.* at 440.  In other words, the Third Circuit specifically distinguished between, on the one hand, the plaintiff's

4

"as-applied Eighth Amendment challenge to his specific conditions of confinement" and, on the other hand, "a class action making a facial challenge to death row conditions generally." *Id.* at 443. The effect was that a decision regarding Porter's particular circumstances "would not determine that the Commonwealth's death row procedures and policies are facially unconstitutional." *Id.* at 443–44.

Plaintiffs make the corollary argument that "the distinction between an as-applied [and] a facial challenge" collapses here because their challenge is "brought by a class of everyone" in the Step-Down Program, rather than "by one or more plaintiffs within a larger universe of people." Pls.' Resp. at 3–4 n.1. But the class-action vehicle does not relieve Plaintiffs of their obligation to prove their claims (whatever they may be). Plaintiffs' protest merely lays bare their apparent strategy in this litigation: demand facial relief ("abolish the Step-Down Program," (ECF No. 1) Compl. ¶ 271(1)), but only bother to try proving the as-applied claims belonging to a handful of class representatives or named Plaintiffs. Plaintiffs themselves concede they can't do more than that, given that "the sheer number of prisoners affected renders [an] individualized risk assessment . . . wildly impracticable." Pls.' Resp. at 21–22. Whether they can identify suitable class representatives remains to be seen, but it is already apparent, as shown below, that they cannot prove the as-applied claims of the named Plaintiffs—and that itself dooms any facial claim they may be raising. *See, e.g.*, *Fusaro v. Howard*, 19 F.4th 357, 373 (4th Cir. 2021) (concluding that a plaintiff's "facial challenge . . . necessarily fails" since, "if a litigant loses an as-applied challenge because the court rules as a matter of law that the statute or ordinance was constitutionally applied to [him], it follows *a fortiori* that the law is not unconstitutional in all applications") (citations omitted).

Plaintiffs next argue that, even if there were a "relevant" distinction between a facial and as-applied challenge, "that relevance is at the remedy phase."  Pls.' Resp. at 3 (citing *Thorpe*, 37 F.4th at 947 (which quotes *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)). It is undoubtedly true that the nature of a claim, if proven, can affect the "breadth of the remedy." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127–28 (2019) (quoting *Citizens United*, 558 U.S. at 331). But, contrary to Plaintiffs' assertion, that does not mean that the contours of the claim are *not* relevant in "pretrial litigation."  Pls.' Resp. at 17 n.14.  As the Supreme Court has explained, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.   So classifying a lawsuit as facial or as-applied *affects the extent to which the invalidity of the challenged law must be demonstrated . . . .*" *Bucklew*, 139 S. Ct. at 1127–28 (emphasis added).  Indeed, that's why the Supreme Court reiterated in *United States v. Stevens*, 559 U.S. 460 (2010)—issued shortly after *Citizens United*—that "[t]o succeed in a typical facial attack, Stevens *would have to establish* 'that no set of circumstances exists under which [the challenged law] would be valid' . . . ." *Id.* at 472 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Further, again lumping "their claims" together, Plaintiffs argue that Defendants cite the wrong standard for evaluating them.  Pls.' Resp. at 3.  As an initial matter, contrary to Plaintiffs' suggestion, Defendants have not argued that, to succeed on their *as-applied* claims, Plaintiffs must satisfy *Salerno*'s no-set-of-circumstances test.  Defendants merely pointed out that's the standard Plaintiffs must satisfy to the extent they are raising *facial* claims.  *See* Br. in Supp. of Defs.' Mot. for Summ. J. (ECF No. 381) ("Defs.' Br.") at 58 (referring to "the general rule for evaluating facial challenges").

Plaintiffs next contend that the Fourth Circuit has "disavowed" the Supreme Court's no-set-of-circumstances test, "even for facial challenges."  Pls.' Resp. at 3 (citing *PETA v. N.C. Farm Bur. Fed'n, Inc.*, 60 F.4th 815, 834 (4th Cir. 2023)).  That proposition is as dubious as it sounds.  The Supreme Court has regularly relied on that test in assessing facial challenges, including in recent cases.  *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 769 (2023) ("Litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" (quoting and adding emphasis to *Salerno*, 481 U.S. at 745)).  So has the Fourth Circuit.  *See, e.g.*, *Fusaro*, 19 F.4th at 373; *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022).  And so has this Court—even after the *PETA* case purportedly "disavowed" the test.  *United States v. Robinson-Davis*, No. 7:22-CR-00045, 2023 WL 2495805, at *1 (W.D. Va. Mar. 14, 2023) ("Defendant brings a facial challenge . . . ; accordingly, he bears the burden of establishing 'that no set of circumstances exists under which the Act would be valid.'" (quoting *Salerno*, 481 U.S. at 745)).

What Plaintiffs fail to appreciate is that *PETA* arose, and offers analysis, in the particular context of a First Amendment claim.  In that context, a plaintiff *can* mount a facial challenge without satisfying the no-set-of-circumstances test.  *See, e.g.*, *Stevens*, 559 U.S. at 473 (explaining that, "[i]n the First Amendment context . . . this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad").  As *PETA* itself emphasized,

"*Salerno* is not 'a speech case.'"  60 F.4th at 834 (quoting *Stevens*, 559 U.S. at 472).  And neither is this one.[3]

Plaintiffs understandably want to lower or sidestep altogether the "particularly demanding standard" they must satisfy to make any facial challenge here.  *Fusaro*, 19 F.4th at 373.  It is, after all, the "most difficult challenge to mount successfully."  *Id.* (quoting *Salerno*, 481 U.S. at 745).  But they offer no valid basis for applying a different standard, for the reasons stated above.  Nor, for the reasons stated below, do they come close to satisfying the applicable standard.

## II.   Defendants are entitled to summary judgment on Plaintiffs' due-process claim.

Defendants specifically asked the Court to grant them summary judgment to the extent Plaintiffs are pursuing their due-process claim on a facial basis.  Defs.' Br. at 77–89.  But, as discussed above, Plaintiffs' opposition intentionally "do[es] not address" Defendants' request or the arguments supporting it.  Pls.' Resp. at 17 n.14.  In fact, there is nothing Plaintiffs *could* say, on this record, to rebut the evidence that the Step-Down Program's policies and review procedures are valid on their face and work as advertised.

Contrary to Plaintiffs' allegations, *see* Compl. ¶¶ 16, 179, 192, the evidence is that those procedures do not permanently trap inmates in restrictive housing.  Nor does the evidence show that opportunities for advancement in the Step-Down Program ring hollow for inmates.  *See, e.g.*, *id.* ¶ 233.  By operation of the same procedures they challenge, most inmates who have ever been in the Step-Down Program—including every named Plaintiff still in a VDOC facility—have

---

[3]  Plaintiffs' focus on the "breadth of the remedy"—language originating in *Citizens United*—as the only "relevant" distinction between facial and as-applied claims, *see* Pls.' Resp. at 3, is misplaced for this additional reason.  "*Citizens United* appears inapplicable to cases where, as here, Plaintiffs['] facial challenges do not involve the First Amendment."  *Hecox v. Little*, 479 F. Supp. 3d 930, 970–71 (D. Idaho 2020), *aff'd*, No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023), and *aff'd*, 79 F.4th 1009 (9th Cir. 2023).

progressed back to general population.  Defs.' Br., SUMF ¶ 4.  As this Court noted in rejecting one named Plaintiff's previous due-process challenge to the Step-Down Program, his "classification history . . . belies the contention that assignment to IM status is a permanent or indefinite assignment to the harshest segregation conditions."  *Mukuria v. Clarke*, No. 7:15CV00172, 2016 WL 5396712, at *8 (W.D. Va. Sept. 27, 2016) (Jones, J.), *aff'd*, 706 F. App'x 139 (4th Cir. 2017).  Far from showing that in *all* circumstances the Step-Down Program's procedures "fail[] to provide 'minimally adequate process to protect [a] liberty interest' in avoiding security-detention," *Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2021 WL 2435868, at *4 (W.D. Va. June 15, 2021), *aff'd sub nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) [ECF No. 101], the evidence leaves Plaintiffs hard-pressed to identify *any* such circumstance.  Thus, it is not surprising that Plaintiffs make no attempt to prove a facial due-process claim, though they refuse to deny that they make such a claim.

The Court should streamline this case and focus the parties on any remaining issues by clarifying that the Step-Down Program is not facially unconstitutional.  Defendants confine their arguments below to addressing Plaintiffs' as-applied claims—which, although meritless, they still pursue—and to Defendants' entitlement to qualified immunity.

### A. Plaintiffs offer no disputed material facts precluding summary judgment on Plaintiffs' as-applied claims.

In opposition to Defendants' motion for summary judgment on their as-applied due process claim, Plaintiffs fail to identify any disputed material facts that stand in the way.  The record evidence shows that, even if the named Plaintiffs could demonstrate a protected liberty interest, the procedures of the Step-Down Program afforded them the "minimally adequate process" required to protect any liberty interest.  *Thorpe*, 2021 WL 2435868, at *4.  As a result of those

procedures and reviews, each named Plaintiff had the opportunity to participate in and proceed through the Step-Down Program.  And not one of them remains in the Step-Down Program today.[4]

One overarching point is worth emphasizing at the outset. Although Plaintiffs attempt to fault Defendants for not including more references to the factual record,[5] it is Plaintiffs' brief that suffers from not "addressing the actual factual record in this case."  Pls.' Resp. at 19.  Plaintiffs have had more than four years to develop their theory that the Step-Down Program's procedures deprive Plaintiffs of due process by artificially prolonging their time in the program.  But they fail to cite a single review in which a named Plaintiff was denied adequate notice, a hearing, or consideration to which he was entitled.  Nor do they point to evidence refuting that the individual named Plaintiffs' progress and pace through the Step-Down Program was a consequence of their own choices.[6]  In evaluating the meaningfulness and adequacy of Step-Down procedures, the Court should note these deficiencies and grant summary judgment to Defendants.

---

[4] *See* Defs.' Br., SUMF ¶¶ 97, 101, 104, 107, 110, 112, 115, 119, 122, 125, 128. Recognizing the damning effect on their claims, Plaintiffs make a passing attempt to cast doubt on the "decisional process that led to the named Plaintiffs' return to general population." Pls.' Resp. at 16. They cite zero evidence to fuel that doubt, however. *See id.* at 16–17. The fact that a small number of the named Plaintiffs progressed to general population between August 2019 and June 2020 (approximately three months and thirteen months after the filing of the Complaint), *see* Pls.' Resp. at 17 n.13, hardly seems notable.

[5] Plaintiffs express false amazement that Parts I.A.2 and I.B.2 of Defendants' brief "include[s] exactly two cites to the factual record." Pls.' Resp. at 19. In return, Defendants wonder that Plaintiffs failed to account for the internal references in those sections to the Statement of Material Facts—the cited paragraphs of which point to *a hundred* different documents.

[6] Indeed, at one point they make the unexpected suggestion that the named Plaintiffs' "records of misbehavior" should have kept them in the program longer. *See* Pls.' Resp. at 17.

1.   **The conditions of confinement under the Step-Down Program do not impose an atypical and significant hardship in relation to the ordinary incidents of prison life.**

Plaintiffs' opposition makes three attempts to rebut Defendants' arguments and show that the conditions in the Step-Down Program are "harsh and atypical in relation to the ordinary incidents of prison life." *Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015). None of these attempts goes anywhere.

*First*, Plaintiffs attempt to manufacture disputes of fact regarding Step-Down conditions and those in general population. *See* Pls.' Resp. at 6–7. But what is more notable is what Plaintiffs do *not* dispute—for instance, that the conditions alleged in the Complaint (and considered by the Fourth Circuit) are *not* the same "as in *Wilkinson*." *Thorpe v. Clarke*, 37 F.4th 926, 942 (4th Cir. 2022) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005)). Plaintiffs no longer contend that "Plaintiffs 'must remain in their cells' for about '23 hours per day.'" *Id.* Instead, they only quibble whether extenuating circumstances sometimes prevent inmates from getting the four daily out-of-cell hours long provided by policy and now by statute, and the conditions of their recreation time. Pls.' Resp. at 6.[7] Plaintiffs also no longer assert that their cell conditions "'prevent conversation or communication with other inmates.'" *Thorpe*, 37 F.4th at 942 (quoting *Wilkinson*, 545 U.S. at 214). There is no dispute that Step-Down inmates can and do communicate with other inmates while in their cells, as well as while recreating or in congregate activity. Defs.' Br., SUMF ¶ 50. Instead, Plaintiffs appear to believe they are entitled to communicate with more inmates, to see

---

[7] Plaintiffs appear to suggest that the out-of-cell time is spent entirely in recreation. Pls.' Resp. at 6. But the out-of-cell activities include not only "outdoor exercise" but also "visitation, interactive journaling, programming, and other group elective options." Defs.' Br., SUMF ¶ 77; *see also* Va. Code § 53.1-39.2(B) (providing that inmates in restorative housing "shall be offered a minimum of four hours of out-of-cell programmatic interventions or other congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior, which may include recreation in a congregate setting").

their conversation partners, and to be physically closer to them.  *See* Pls.' Resp. at 7; *id.* at 8 (suggesting that "Plaintiffs' isolation is no less severe because they can communicate with a small handful of other prisoners by standing on their sink or yelling across the yard").  But those grievances do not take away from the fact that communication is possible and does occur.  Nor do Plaintiffs dispute any longer the opportunities for visitation that Step-Down inmates enjoy, *see* Defs.' Br., SUMF ¶ 56, but that were not afforded the plaintiff in *Wilkinson*, *see Thorpe*, 37 F.4th at 942.  They just wish those visits were "contact" visits.  Pls.' Resp. at 7.  Plaintiffs also have abandoned their allegation that they "cannot partake in 'productive activities,' like art or education or voluntary work . . . ."  *Thorpe*, 37 F.4th at 942, complaining instead that inmates in general population are eligible for more jobs.  They do not dispute any longer that all Step-Down inmates "are provided" "in-cell education and religious programs," among other "basic requirements that meet constitutional standards."  Defs.' Br., SUMF ¶ 47.  In short, the Step-Down Program hardly resembles what the Complaint alleged.

*Second*, Plaintiffs make other unsupported allegations that the Step-Down conditions impose a greater hardship than general population conditions.  They find "most notabl[e]" that Step-Down inmates "are subject to intrusive and dehumanizing cavity searches whenever they leave their cells."  Pls.' Resp. at 7.  Except they aren't.  The required procedure indisputably is not a cavity search but a much less intrusive strip search.  Defs.' Resp. to Pls.' Statement of Undisputed Material Facts in Supp. of Pls.' Am. Mot. for Partial Summ. J. (ECF No. 402-1) ("Resp. to Pls.' SUF") ¶ 166.  And that grievance, along with their preference not to be restrained while being

transported,[8] has nothing to do with the *isolation* conditions they challenge in this case.  With respect to the one isolation-related condition that Plaintiffs identify—that Step-Down inmates do not share a cell with others, Pls.' Resp. at 7, for obvious safety reasons—it is not apparent that the absence of a cell partner is a "hardship."  In general population, two cellmates share the same-sized space, Defs.' Br., SUMF ¶ 48, a reality that at least some Step-Down inmates wish to avoid.  For instance, named Plaintiff Riddick looked for ways to stay in segregated housing so that he "would not have a cell partner."  Defs.' Br., SUMF ¶ 119.

*Third*, Plaintiffs conclude with a smattering of largely repeated arguments, none of which establishes a significant and atypical hardship.  Pls.' Resp. at 8.  They find significant that Step-Down placement "is for an indefinite period of time."  *Id.* (citation omitted).  Not so.  The Supreme Court based its finding of indefiniteness in *Wilkinson* on the fact that an inmate's maximum-security confinement was "reviewed just annually," 545 U.S. at 224 and "there [was] *no* indication how long he may be incarcerated" in those conditions "once confined there," *id.* at 215 (emphasis added).  But that's not the situation here, where it is undisputed the Step-Down Program has defined processes and more frequent review opportunities, with associated time periods, through which inmates can progress from more restrictive to less restrictive levels and out of the program altogether and into general population.  *See* Am. Statement of Undisputed Material Facts in Supp. of Pls.' Am. Mot. for Partial Summ. J. (ECF No. 383-119) ("Pls.' SUF") ¶¶ 49–50; Defs.' Resp. at 28–29.  And to the extent Plaintiffs suggest that the Step-Down Program poses an atypical and significant hardship because of "prisoners' inability to earn good-time credit," Pls.' Resp. at 6

---

[8] Plaintiffs assert that "Step-Down Program prisoners are restrained using handcuffs and leg irons while out-of-cell," Pls.' Resp. at 7, but the testimony they cite in support indicates only that "level S inmates are restrained, handcuffs and legal irons, when they're escorted by two officers *to showers or recreations*," ECF No. 383-33 (Turner Dep.) at 188:12–14 (emphasis added).

(citing Pls.' Br. in Supp. of Summ. J. at 26–28), that is not true either.  As Defendants have more fully addressed in response to Plaintiffs' motion, *see* Defs.' Resp. at 30–31, Plaintiffs offer no evidence in support of that proposition.  Indeed, the relevant testimony in the record is that *all* inmates—including those in the Step-Down Program—are eligible to earn good-time credit.  Resp. to Pls.' SUF ¶ 122 (citing ECF No. 383-11 at 93:15–94:4).

### 2.    The Step-Down Program's procedures afford inmates minimally adequate process to protect any liberty interest.

Even if Plaintiffs had a protected liberty interest in avoiding placement in the Step-Down Program, the record now shows that Plaintiffs receive more than "minimally adequate process" to protect that interest.  *Thorpe*, 2021 WL 2435868, at *4.  Plaintiffs argue that this is not so in two ways: first, that Step-Down policies do not provide inmates "notice of the charges against them and an opportunity to be heard"; and second, that the policies "fail to provide meaningful periodic review of whether a prisoner's continued segregation is justified."  Pls.' Resp. at 9 (citing *Thorpe*, 37 F. 4th at 944, 945).

*First*, it must be noted that Plaintiffs do not cite a factual basis for withholding summary judgment in favor of any individual Defendants.  Plaintiffs do not even attempt to show that *any* individual Defendant "personally took any particular action or made any relevant decision" with respect to their due-process claims.  *Taylor v. Manis*, No. 7:19-CV-00434, 2020 WL 354753, at *1 (W.D. Va. Jan. 21, 2020).  They fail to identify any specific segregation review, conducted by any specific Defendant, that violated any inmate's rights (let alone any named Plaintiff's).  Because there is no factual basis for liability against the individual Defendants, they are entitled to summary judgment.

*Second*, Plaintiffs focus on the wrong part of the multi-tiered review.  They devote several pages to explaining why periodic reviews conducted by the BMC and ERT are insufficient.  Pls.'

Resp. at 11–15. But the process to which Step-Down inmates are due is provided by the Institutional Classification Authority ("ICA"). As Plaintiffs state, the ICA reviews inmates' "status as a Level S prisoner," *id.* at 14, and those recommendations are a significant factor in how long an inmate is in the Step-Down Program. The formal ICA hearings occur every 90 days and, contrary to Plaintiffs' assertion, basic procedural protections are provided—advance notice, an opportunity to be heard, and an opportunity to appeal the decision through the inmate grievance procedure. Defs.' Br., SUMF ¶¶ 34–35.[9] The informal reviews provided by the BMC and the ERT are an extra safeguard, providing additional layers of review to ensure the sufficiency of the overall process. That a single BMC review or a single ERT review, viewed in isolation, might not provide the same level of procedural protections is not controlling. It is the review scheme, as a whole, that must be "meaningless" in order for Plaintiffs to have even the slightest chance of success on their generalized, non-Plaintiff-specific due-process claim.

Plaintiffs do not assert that any inmates, in general or in particular, have been deprived of these regular reviews. Nor do they dispute that inmates have the opportunity to attend and participate in the ICA hearing. Instead, they are critical of the fact that the hearing typically occurs at an inmate's cell door. Pls.' Resp. at 14. But they fail to explain why the mere location of the hearing violates due process. *See, e.g.*, *Avina v. Adams*, No. 1:10-CV-00790-AWI, 2012 WL 2995473, at *9 (E.D. Cal. July 23, 2012) ("Petitioner's claim that his hearing was held at his cell door is not cognizable. There is no requirement that disciplinary hearings be held at a specific [location]." (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)). Plaintiffs also criticize the "after-

---

[9] A formal due process hearing—requiring formal notification to the inmate indicating the reason for, purpose of, and possible results of the classification hearing 48 hours in advance of the scheduled hearing, the inmate's right to be present at the hearing, and notice of the results of the hearing and the reason for the decision—is required before assignment to Security Level S. *See* Defs.' Br. Ex. 24 [ECF No. 381-24] (O.P. 830.1, effective Feb. 1, 2021) at 3, 8.

the-fact 'reports'" for concluding that "the inmate needs a 'longer period of stable adjustment.'" Pls.' Resp. at 14.  But the mere phrasing of a decision made in an ICA hearing does not render it suspect.

*Third*, as to whether inmates' periodic reviews are "meaningful," the undisputed evidence is against Plaintiffs.  Instead of "do[ing] nothing for Plaintiffs in practice," *Thorpe*, 37 F.4th at 944, the undisputed evidence shows that the Step-Down procedures have successfully returned to general population the vast majority of inmates that were ever in the Step-Down Program— numbering in the hundreds.  Defs.' Br., SUMF ¶ 4.  On this factual record, it is difficult to square Plaintiffs' charge that Step-Down reviews are somehow not "meaningful" with the undeniably "meaningful" results they have produced.  Indeed, each named Plaintiff's classification history demonstrates what this Court has previously and repeatedly found: that, "under OP 830.A, an inmate's confinement in segregation at Red Onion is . . . only as lengthy and restrictive as dictated by his own effort and behavior."  *Mukuria*, 2016 WL 5396712, at *8.  Plaintiffs do not offer any evidence of arbitrary treatment of the named Plaintiffs, or identify a single review that was not "meaningful."  Rather, contrary to their arguments, the directness and pace of the named Plaintiffs' progress out of the Step-Down Program depended on their own behavioral choices.[10]

*Fourth*, the reviews that inmates are provided easily pass muster under the *Mathews* three-factor analysis, as Defendants have shown.  *See* Defs.' Br. at 62–66, 68–70 (discussing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).  Plaintiffs devote a separate section to arguing that the state's

---

[10] For example, Brooks regressed in the program when he was found attempting to make a weapon in his cell, Defs.' Br., SUMF ¶ 97; Mukuria, when he attempted to incite a riot among other inmates, *id.* at ¶ 115.  Riddick was resolved "not [to] have a cell partner" and intentionally refused to participate in programming to avoid progressing back to general population.  *Id.* at ¶ 119.  Thorpe regressed after publicly masturbating during an IM-Closed contact visitation, and he thereafter refused to participate in programming.  *Id.* at ¶ 125.

interests in administrative efficiency and prison security "make little sense."  Pls.' Resp. at 15.

Defendants' point is that Plaintiffs' request for a more "meaningful" process appears to be a

challenge to review outcomes—such as determinations that a certain inmate "needs a longer period

of stable adjustment."  Compl. ¶ 178; Pls.' Resp. at 14.  And that determination means that the

inmate remains a threat to the orderly operation of the institution.  ECF No. 402-24 (Turner Tr.

(Mar. 17, 2023)) at 124:17–125:17.[11]  To the extent that the additional "process" Plaintiffs insist

on in periodic reviews is really just a different outcome, that would compromise the "State's first

obligation[;] . . . to ensure the safety of guards and prison personnel, the public, and the prisoners

themselves."  *Wilkinson*, 545 U.S. at 227.

## B.   Defendants are entitled to qualified immunity on Plaintiffs' due-process claim.

Defendants' opening brief explained at length why, even if Plaintiffs could establish a due-

process violation, Defendants are entitled to qualified immunity.  Defs.' Br. at 70–75.  Plaintiffs'

opposition arguments miss the mark in two primary ways.

*First*, Plaintiffs are wrong to dismiss Defendants' argument as "unchanged" from the

motion-to-dismiss stage.  Pls.' Resp. at 19.  In particular, Plaintiffs doubt that the "'facts adduced

in discovery . . . cast a different light on' the qualified immunity analysis."  *Id.* (quoting Defs.' Br.

at 72).[12]

---

[11] Plaintiffs offer no evidence that such a conclusion cannot be the outcome of a "meaningful" review process.  The "decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner," *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983), and Plaintiffs provide no specific examples where the outcome of a review should have been different.

[12] Strangely, they also assert that "Defendants do not mention what those facts are."  *Id.* Their attention, and the Court's, is respectfully directed to Parts I.A.2 and I.B.2 of Defendants' opening brief.  *See also* Part II.A *supra*.

Yet, Defendants' opening brief walked through the factual developments that have undermined Plaintiffs' allegations—allegations that this Court and the Fourth Circuit previously were required to accept as true. *See, e.g.*, *Thorpe*, 37 F.4th at 942 ("Plaintiffs must remain in their cells for about 23 hours per day.") (cleaned up); *id.* (Plaintiffs' conditions "prevent conversation or communication with other inmates") (cleaned up).  The Fourth Circuit found those alleged conditions to be "sufficiently harsh and atypical" and that their "harshness has been clearly established" since *Wilkinson*.  *Id.*  Back then, the courts also had to credit even Plaintiffs' far-fetched theory of the case: that they were "confined [in the Step-Down Program] for a pecuniary rather than penological purpose," *Thorpe*, 2021 WL 2435868, at *7, with "Step Down placements rest[ing] on 'reasons having nothing to do with' prisoners' security risk and everything to do with justifying the two high-ticket supermaxes."  *Thorpe*, 37 F.4th at 946.  Plaintiffs long ago abandoned that narrative in the absence of any supporting evidence.  *See* Defs.' Br. at 86 n.48.  But it was on the alleged strength of that theory that the Fourth Circuit found "qualified immunity would be plainly inappropriate at" the motion-to-dismiss stage.  *Thorpe*, 37 F. 4th at 946.  These factual developments have an obvious impact on the qualified-immunity analysis.  *See id.* at 930–31 (noting that "[t]he problem for Defendants . . . is that they invoke qualified immunity at the motion to dismiss, before any of the evidence is in. . . . Defendants' contentions boil down to disagreements over the facts: what they knew and when, and what procedures they offered in practice.  But at this stage, we take Plaintiffs' allegations as true . . . .").  Now the Court can consider the facts as they are, rather than as Plaintiffs allege them.

*Second*, Plaintiffs too quickly reject the Fourth Circuit's observation that "neither the Supreme Court nor this Circuit's precedent has clearly established the exact process prisoners must receive while in long-term administrative segregation."  *Id.* at 944.  At least for Plaintiffs' theory

that they were denied "meaningful" reviews, it is not as simple as assuming that *Hewitt* clearly established a right to such reviews. *Toevs v. Reid*, 685 F.3d 903 (10th Cir. 2012), cited by Plaintiffs, illustrates this point. As Plaintiffs pointed out, the Tenth Circuit held there that, "[s]ince *Hewitt*, it has been clearly established that prisoners cannot be placed indefinitely in administrative segregation without receiving meaningful periodic reviews." *Id.* at 916 (quoting *Hewitt*, 459 U.S. at 477 n.9). But the court then went on to qualify that statement:

> This court, however, has not previously interpreted "meaningful" to require officials to inform prisoners placed in a stratified behavior-modification program of the reasons for their continued placement, so as to provide a guide for future behavior. Moreover, this court has never considered the due-process implications of the QLLP. Accordingly, we cannot conclude that the state of the law from 2005 to 2009 gave defendants fair warning that the QLLP review process was not meaningful, or that the lack of reviews at QLLP Levels 4 through 6 was a due-process violation.

*Id.* In other words, what is "meaningful" depends on the circumstances.

Here, Plaintiffs do not cite any court holding, in the context of continuing segregation reviews, that some greater due process or an adversarial hearing is necessary to make Step-Down reviews "meaningful." *See* Defs.' Br. at 72–75. Nor does the Fourth Circuit's denial of qualified immunity at the motion-to-dismiss stage mean that it's clearly established that the procedures in the Step-Down Program are not "meaningful." *Cf.* Pls.' Resp. at 19 (asserting that qualified immunity must be denied again because "Defendants' substantive argument rests on written policies that were already considered at the motion to dismiss stage"). In fact, the opposite is true. The reason the Fourth Circuit gave in denying qualified immunity at the motion-to-dismiss stage was that, "notwithstanding what Step Down lays out on paper, qualified immunity often 'turn[s] on whether the multiple review mechanisms . . . were meaningful in practice.'" *Thorpe*, 37 F.4th at 945 (quoting *Smith v. Collins*, 964 F.3d 266, 282 (4th Cir. 2020)). Taking "[j]udicial notice of

Step-Down provisions" could not "end the controversy" because further discovery was needed. *Id.*

The evidentiary record now establishes that the Step-Down Programs' "multiple review mechanisms . . . *were* meaningful in practice." *Id.* (cleaned up; emphasis added). But even if they were not, qualified immunity applies because, as Defendants amply showed, *see* Defs.' Br. at 70–75, no reasonable prison official would have known that any greater procedural protections were required to satisfy due process. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (to be clearly established, the "contours of" the right must be "sufficiently clear" such that every "reasonable official would have understood that" the challenged conduct "violates that right."). Far from violating clearly established law, Defendants' conduct comported with available decisional law. *See* Defs.' Br. at 72–73 n.37.

The Court should grant qualified immunity on Plaintiffs' due-process claim.

## III. Defendants are entitled to summary judgment on Plaintiffs' Eighth Amendment claim.

Plaintiffs also fail to cite a dispute of material fact that precludes awarding summary judgment to Defendants on Plaintiffs' Eighth Amendment claim. Nothing in their opposition shows that the conditions in the Step-Down Program posed an objectively intolerable risk of harm that Defendants were aware of but nonetheless disregarded. And even if Plaintiffs could show that Step-Down conditions were the same as those in *Porter*—they are not—qualified immunity protects Defendants from liability (and the burdens of trial) because the alleged right to be free from those conditions was not clearly established until *Porter*, days before this suit was filed. Each of these points is addressed in corresponding sections below.

There is no need, however, to rehash at length Defendants' arguments why Plaintiffs' Eighth Amendment claim fails as a facial matter. *See* Defs.' Br. at 77–89. That is because, as

with their due-process claim, Plaintiffs "do not address" and therefore waive any opposition to those arguments.  Pls.' Resp. at 17 n.14.  To be sure, Plaintiffs are right to characterize as "extraordinary" the "burden of adducing evidence that the conditions of confinement imposed by the Step-Down Program have harmed or risk harming every individual prisoner subject to those conditions."  *Id.* at 21.  But Plaintiffs do not even try to carry that burden.  According to them, this Court absolved them of any such evidentiary obligation when it concluded, in certifying a class, that Step-Down conditions "have affected '[all] persons who at any time from August 1, 2012, to the present have been confined at Red Onion or Wallens Ridge . . . ."  *Id.* (citing ECF Nos. 299 and 358).  Nor do Plaintiffs argue, let alone show, that Defendants were aware that the Step-Down Program posed an excessive risk to all inmates' health or safety, yet ignored those risks for no penological purpose.  The fact that multiple class members have previously unsuccessfully asserted as-applied Eighth Amendment claims shows that a facial claim cannot succeed.  *See* Defs.' Br., SUMF ¶¶ 93–95 (citing cases); *see also Mukuria*, 2016 WL 5396712, at *4.

Thus, to the extent the Complaint can be construed to make a facial Eighth Amendment claim—and in light of Plaintiffs' refusal to say they are *not* bringing a facial claim—the Court should award Defendants summary judgment on it.

### A.  Defendants are entitled to summary judgment on Plaintiffs' as-applied Eighth Amendment challenge.

Defendants' opening brief showed why Plaintiffs cannot satisfy either the objective or subjective component of their deliberate-indifference claim.  *See* Defs.' Br. at 89–96.  Plaintiffs' opposition fails to identify a dispute of material fact on either prong.  They cite no Supreme Court or Fourth Circuit precedent holding that the particular conditions of confinement at issue here violate the Constitution.  Indeed, none exists.  What case law there is—which largely consists of

21

this Court's rejections of class members' previous challenges to the Step-Down Program—supports Defendants' position.[13]  This case should be next in that long line.

### 1.  The Step-Down Program did not objectively impose a substantial risk of serious injury on any of the named Plaintiffs.

As Defendants' opening brief explained at length, *see* Defs.' Br. at 89–91, Plaintiffs have not shown that the conditions of confinement in the Step-Down Program "inflict harm that is, 'objectively, sufficiently serious' to deprive prisoners of 'the minimal civilized measure of life's necessities.'"  *Thorpe*, 37 F.4th at 933 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994)).  Plaintiffs' opposition fails to rebut these points.  Indeed, they offer no meaningful analysis of the experience of individual inmates in this case.  They merely cite testimony that class members were housed "in small cells," were limited in their contact with others, and had few programming opportunities, Pls.' Resp. at 23—and therefore invite the assumption that they simply must have been harmed.  But the evidence rebuts any allegation that they were subjected to "isolation" conditions that posed an objectively intolerable risk of harm.  Rather, the evidence shows that the named Plaintiffs could (though may have chosen not to) interact with each other in their cells and during their concurrent recreation, communicate with various VDOC staff, including corrections officers and mental health professionals, and have non-contact visits on a weekly basis.  Defs.' Br., SUMF ¶¶ 50, 56.

Plaintiffs take three stabs at making up for the absence of evidence regarding the effect of Step-Down conditions on any of the named Plaintiffs.  None of them creates a dispute that precludes summary judgment.

---

[13] *See, e.g., Mukuria*, 2016 WL 5396712, at *4 (Jones, J.); *Snodgrass v. Gilbert*, No. 7:16cv00091, 2017 WL 1049582, at *14 (W.D. Va. Mar. 17, 2017) (Conrad, J.); *Riddick v. Dep't of Corr.*, No. 7:17CV00268, 2017 WL 6599007, at *3–4 (W.D. Va. Dec. 26, 2017) (Conrad, J.).

*First*, Plaintiffs double-down on what the generic "literature" says regarding the alleged harms of "solitary confinement." But the literature Plaintiffs cite does not address the conditions experienced by the named Plaintiffs. The conditions of confinement in the Step-Down Program do not fit commonly accepted definitions of "solitary confinement," and they have not for years. Defendants pointed that out in their opening brief and Plaintiffs offer little response—certainly, they do not discuss literature studying conditions like those here, which include at least four hours of out-of-cell time per day, including congregate activities, programming, and recreation. Defs.' Br., SUMF ¶ 50; *see also* Va. Code § 53.1-39.2 (requiring VDOC to offer "a minimum of four hours of out-of-cell programmatic interventions or other congregate activities per day aimed at promoting personal development or addressing underlying causes of problematic behavior, which may include recreation in a congregate setting"). It is not enough for Plaintiffs to claim that scientific studies have shown the harms of "solitary confinement," simply label the conditions here "solitary confinement," and assume they've carried their evidentiary burden.

*Second*, and for similar reasons, Plaintiffs can claim no meaningful support from caselaw in which other courts have acknowledged the existence of studies regarding the alleged harms of "solitary confinement." For instance, they cite *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019),for the proposition that the Fourth Circuit found the "scientific literature" has "establish[e]d that solitary confinement poses a substantial risk of serious harm." Pls.' Resp. at 22. But the studies cited by the Fourth Circuit examined "conditions akin to those Plaintiffs faced on Virginia's death row"—and those conditions were more restrictive than those at issue here. *Porter*, 923 F.3d at 356. The plaintiffs in *Porter* spent "*between 23 and 24 hours a day alone*, in a small cell with *no access* to congregate religious, educational, or social programming." *Id.* at 357 (cleaned up;

emphasis added).[14]  Plaintiffs' other cases are similarly distinguishable.  *See Grissom v. Roberts*, 902 F.3d 1162 (10th Cir. 2018) (confinement in a cell 23 to 24 hours a day); *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017) (confinement in a cell 23 to 24 hours each day); *Williams v. Secretary of the Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017) (due-process case involving confinement in a cell 22 to 24 hours a day).  The conclusion Plaintiffs draw from these cases is unwarranted. Remarkably, they claim that "this Court [cannot] depart from Circuit precedent on this score," Pls.' Resp. at 23—as if the Fourth Circuit has determined, as a fact pre-established in all future cases, that so-called "solitary confinement" imposes an unconstitutional harm on inmates.  Not so. The issue in a case like this one is not whether so-called "solitary confinement," in general, poses a constitutionally unacceptable risk of harm; rather, it is whether the conditions of confinement actually experienced by Plaintiffs were sufficiently onerous to constitute cruel and unusual punishment.  Regardless of the "solitary confinement" label that Plaintiffs apply, the particular conditions challenged here and the actual experience of *these* named Plaintiffs remain critical to the Eighth Amendment analysis.

*Third*, Plaintiffs suggest that the testimony of Defendants' expert, Dr. Robert Morgan, supports their position.  But they read far too much into Dr. Morgan's observation that "prisoners in segregation, on average, are worse off than prisoners in general population."  Pls.' Resp. at 24 (citing Pls.' Resp. (ECF No. 400-53) Ex. 52 (Morgan Dep.) at 111:1–3).  To begin with, that prisoners in (an undefined form of) segregation are "worse off" than those in general population

---

[14] Moreover, the Fourth Circuit found it "[n]otabl[e]" that the defendants in *Porter* "adduced no evidence refuting Plaintiffs' expert evidence establishing the risks and serious adverse psychological and emotional effects of prolonged solitary confinement, or the surveys of the scholarly literature supporting that evidence."  *Id.* at 356.  Defendants here *have* adduced such evidence. *See, e.g.*, Expert Report by Robert D. Morgan, Ph.D. [ECF No. 367-1], and Expert Report of Gregory Saathoff, M.D. [ECF No. 381-68].

is a far cry from showing that Step-Down conditions are unconstitutional—namely, that they "inflict harm that is, 'objectively, sufficiently serious' to deprive prisoners of 'the minimal civilized measure of life's necessities.'"  *Thorpe*, 37 F.4th at 933 (quoting *Farmer*, 511 U.S. at 834, 838).

In any event, the effects of segregation "on average" say nothing about the effects on any individual named Plaintiff or class representative.  Dr. Morgan made this precise point in deposition testimony omitted by Plaintiffs:  "[S]ome inmates *with mental illness* are going to experience more problems while placed in restrictive housing, some inmates are going to adapt without problems, and some inmates will experience some benefits with their placement in restrictive housing."  Deposition of Robert D. Morgan, Ph.D., dated August 10, 2023 ("Morgan Dep.") at 118:6–12 (emphasis added), excerpt attached as Exhibit 17.  In fact, the record evidence is that the named Plaintiffs "on average" had *no* mental health issues or needs.  While in the Step-Down Program, eight of the eleven named Plaintiffs—Brooks, Cavitt, Cornelison, Khavkin, McNabb, Mukuria, Snodgrass, and Thorpe—consistently had a mental health classification code of MH-0 (an assessment that the inmate had no mental health treatment needs, *see* OP 730.2(VI)(C)).  Defs.' Br., SUMF ¶¶ 99, 102, 105, 110, 113, 116, 123, 126.

### 2. There is no evidence that Defendants were subjectively aware that the Step-Down Program posed an excessive risk to the named Plaintiffs' health or safety, yet consciously disregarded that risk for no penological purpose.

Plaintiffs assert that the record is "replete" with evidence that Defendants were deliberately indifferent to Plaintiffs' alleged harms.  Wrong again.  They do not identify any evidence that Defendants *actually knew of* a substantial risk that the Step-Down Program posed to inmates' health or safety—and that they then intentionally *disregarded* that risk.  *Porter*, 923 F.3d at 361.

a. **The evidence does not establish Defendants' awareness that the Step-Down Program posed an objectively intolerable risk of harm to the named Plaintiffs.**

Plaintiffs do not address most of Defendants' evidence showing that the supposed risk of harm posed by the Step-Down Program was not "so obvious that it had to have been known" to Defendants. *Porter*, 923 F.3d at 361. This evidence includes the General Assembly's approval of significant aspects of the Step-Down Program (such as the daily opportunity for at least four hours of out-of-cell time); the program's national reputation and recognition as a model for reform among correctional institutions; and courts' repeated rejection of challenges to it. *See* Defs.' Br. at 82–84.

Plaintiffs respond to only two aspects of Defendants' evidence. They dispute the relevance of VDOC's compliance with industry standards, stating that such standards are "not a substitute for the constitutional and statutory requirements that Defendants are obligated to adhere to." Pls.' Resp. at 30. That is true—and among those statutory requirements is Virginia Code § 53.1-39.2, which commits VDOC to provide inmates an amount of daily out-of-cell time (which it had already adopted) that indisputably is far in excess of industry requirements.[15] With respect to Defendants' observation that there are no legislative prohibitions on the use of "solitary confinement" (much less, prohibitions of conditions like those of the Step-Down Program), Plaintiffs fail to cite any counter-examples. Rather, they quibble with the notion that the absence of such prohibitions means anything, because "legislative consensus" is "incomplete and unavailing." Pls.' Resp. at

---

[15] Plaintiffs also assert that VDOC is not in compliance with American Correctional Association standards with respect to the size of outdoor recreation cages and the amount of natural light in cells. Pls.' Resp. at 30 & n.25. These two items, the latter of which "auditors deemed permissible," are unrelated to the claims in this case. *Id.* Plaintiffs fail to explain how the "failure[] to adhere to [these unrelated] standards may themselves suggest that the risk of harm to prisoners was obvious," *id.*—especially in light of their position that industry standards are irrelevant.

30 (quoting *Graham v. Florida*, 560 U.S. 48, 62 (2010)).  But what *Graham* clarifies is that "[a]ctual . . . practices are an important part of the Court's inquiry into consensus."  *Graham*, 560 U.S. at 62.  And Plaintiffs fail to explain how the "actual . . . practices" of state correctional institutions weigh in their favor.  Indeed, the Step-Down Program has been recognized by reform groups as a positive model for other correctional systems around the country.  *See* Defs.' Br. at 83–84; Defs.' Br., SUMF ¶¶ 2–3, 88.

Plaintiffs make three other attempts to show that "Defendants"—Plaintiffs do not distinguish among them—were aware that Step-Down conditions posed an objectively intolerable risk of harm to the named Plaintiffs.  Three swings, three misses.

*First*, Plaintiffs assert that "Defendants" were "aware of the scientific consensus about the harms of solitary confinement" from a variety of sources.  Pls.' Resp. at 25–27.  As shown above, however, no such "scientific consensus" exists—certainly no consensus that the conditions of confinement at issue in *this case* impose unconstitutional harms.  *See* Part III.A.1 *supra*.  Indeed, the historical materials regarding "solitary confinement" that Plaintiffs cite, and which they say Defendants knew of, concern more restrictive conditions than those here, including in-cell confinement of 22 and 23 hours per day and limited opportunities for programming and human

contact.[16]  Likewise for all the cases Plaintiffs cite, which involve far less out-of-cell time than the Step-Down Program allows inmates.[17]

Thus, while it may have "def[ied] logic to suggest that [the corrections officials in *Porter*] were unaware of" the potential harm of the conditions at issue there, Pls.' Resp. at 27 (quoting *Porter*, 923 F.3d at 361), that's because the plaintiffs in *Porter* spent "between 23 and 24 hours a day alone, in a small cell with no access to congregate religious, educational, or social programming."  *Porter*, 923 F.3d at 357 (cleaned up); *see also id.* at 356 (noting that the *Porter* defendants did not attempt to rebut evidence of the harms of "solitary confinement").  The same conditions are not presented here.  Rather, what is "obvious" is that the sources cited by Plaintiffs, even if known to Defendants, would not have put them on notice that the Step-Down Program's significantly less restrictive conditions risked serious harm to inmates.  Indeed, in a 2018 report challenging "solitary confinement," Plaintiffs' own counsel, the ACLU, expressly *advocated* that inmates receive exactly what the Step-Down Program today provides: "a minimum of four hours

---

[16] *See* CNN, *Trend Towards Solitary Confinement Worries Experts* (Jan. 9, 1998), http://www.cnn.com/US/9801/09/solitary.confinement/index.html (inmates "are in these cells, 23 hours per day").  Plaintiffs also cite a press release regarding the advocacy of a United Nations Special Rapporteur on Torture for a ban on the use of "solitary confinement."  Pls.' Resp. at 25 & n.22.  They do not cite the report itself, which acknowledges that there "is no universally agreed upon definition of solitary confinement" but for purposes of the report defines "solitary confinement" as "the physical and social isolation of individuals who are confined to their cells for 22 to 24 hours a day."  Interim Report of the Special Rapporteur on Torture (Solitary Confinement) ¶¶ 25–26 (Aug. 5, 2011), https://tinyurl.com/yevaa5hh.

[17] *See Davenport v. DeRobertis*, 844 F.2d 1310, 1314 (7th Cir. 1988) ("165 out of 168 hours" a week in cell); *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 659 (M.D. La. 2007) (23 hours per day); *McClary v. Kelly*, 4 F. Supp. 2d 195, 204 (W.D.N.Y. 1998) (23 hours per day); *Clark v. Coupe*, 55 F.4th 167, 173 (3d Cir. 2022) ("alone in his cell except for three one-hour intervals per week"); *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 436 (3d Cir. 2020) (out of cell "ten hours per week"); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 797 (D. Ariz. 2022), *amended*, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022) ("22 or more hours each day").

of out-of-cell time each day."  ACLU, *Silent Injustice: Solitary Confinement in Virginia* at 14, 58 (2018), https://tinyurl.com/29f4tymy.

*Second*, Plaintiffs point to comments "by various VDOC officials" purportedly showing that "restrictive housing creates particular risk at least for prisoners with mental illness."  Pls.' Resp. at 27 n.24 (citing depositions of Clarke, Lee, and McDuffie).  Plaintiffs' inability to cite testimony by any other individual Defendants is noteworthy, given that liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  In any event, the individual Defendants have stated, unequivocally, that they were not aware that placement in Step-Down Program "poses an unreasonable risk of a deleterious effect or impact on the physical or mental health of inmates, particularly as it relates to their long-term functioning."  *See* Defs.' Br., SUMF ¶¶ 130–40.  And the legal inquiry is directed at a defendant's perception of the risk, not what "risk a reasonable officer under the circumstances should have perceived . . . , and not as it now may be perceived enlightened by the benefit of hindsight."  *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 303–04, 294 (4th Cir. 2004) (citations omitted).[18]

*Third*, Plaintiffs find it significant that Defendants "would have" observed the conditions of confinement Plaintiffs experienced "or were notified about such conditions and subsequent harm."  Pls.' Resp. at 28.  But to the extent that Plaintiffs are suggesting that mere knowledge of

---

[18] Nor does the creation of the Secure Diversionary Treatment Program operate as a "tacit acknowledgment by VDOC officials that Level S may cause or exacerbate the psychological harms caused by solitary confinement."  Pls.' Resp. at 28.  Rather, it is an example of the precautionary measures undertaken by Defendants, specific to inmates with already-established mental health needs, that refute the conclusion that they subjectively disregarded or ignored a risk of injury.  *See* Part III.A.2.b *infra*.

Step-Down conditions necessarily confers an awareness of their supposed harm, that is merely a repackaging of their meritless arguments that the supposed harms are "obvious."

Moreover, the specific evidence Plaintiffs cite, *see id.*, fails to show that VDOC officials were aware of unconstitutional conditions.  For instance, Director Clarke's testimony that people in Level S have raised issues about "[the] full gamut of issues," Pls.' Resp. Ex. 36 (Clarke Dep.) at 116:3–8 ("[e]verything from food, to noise, to their sentence structure, good time") (citation omitted)), hardly demonstrates he had actual notice of any serious harms allegedly caused by the Step-Down Program in particular.  For the same reason, the fact that some class members filed grievances that mentioned mental-health conditions does not prove that the Step-Down Program caused those conditions, nor do Plaintiffs assert that any particular Defendant saw those grievances.  Pls.' Resp. at 28.  Likewise, Plaintiffs' passing reference to the incidence of mental illness among inmates in the Step-Down Program, *id.* at 29, does not prove causation.  Plaintiffs provide no context for interpreting the cited data, including the corresponding incidence among inmates in general population and whether mental illness is correlated with behaviors that lead to justifiable placement in the Step-Down Program.  Finally, Plaintiffs' citation to testimony by a former warden of Wallens Ridge State Prison ("WSRP"), *see* ECF No. 400-48, Manis Dep. at 65:1–11, 66:13–16, 67:6–10, likewise does not help them.  Pls.' Resp. at 28.  Manis testified to making rounds (of an unspecified frequency) at WRSP *after* inmates in the Step-Down Program were no longer housed at that facility.

### b.      Defendants did not disregard a substantial risk of injury to the named Plaintiffs without penological purpose.

Even if Plaintiffs had compelling evidence that any individual Defendant knew of a substantial risk of injury to the named Plaintiffs—and, as shown above, they have presented none—Defendants would still be entitled to summary judgment on Plaintiffs' Eighth Amendment

claim because no Defendant had the "culpable mental state" required for a finding of deliberate indifference. *Thorpe*, 37 F.4th at 941. Plaintiffs have offered no evidence that any individual Defendant subjectively disregarded or ignored a substantial risk of injury for no legitimate penological purpose. *Porter*, 923 F.3d at 362–63 (noting that "a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement . . . even though such conditions create an objective risk of serious emotional and psychological harm").

On this prong, Plaintiffs put up very little opposition—and nothing that sticks. They present no evidence, for instance, that Defendants disregarded any risk of substantial harm to inmates (let alone to the named Plaintiffs in particular), such as by completely ignoring inmates' needs or taking no action when any needs were identified. They fail to address, either as a general matter or with respect to any individual Plaintiff, the comprehensive protections VDOC takes to guard against the mental-health effects of detention. For instance, their arguments in opposition do not dispute that VDOC:

- makes individualized assessments of all inmates' mental health status, which is continually tracked, *see* O.P. 730.2 (ECF No. 381-49); Defs.' Br., SUMF ¶ 78;

- considers inmates' mental health in decisions regarding inmates' placement and progress in the Step-Down Program, *see* Defs.' Br., SUMF ¶¶ 37, 38, 40, 44; and

- diverts inmates with serious mental illness from restorative housing, *see id.* at 30 ¶ 85.

Plaintiffs do not assert (let alone present competent evidence) that Defendants subjectively disregarded a risk of substantial harm to any named Plaintiff, such as by choosing to ignore his

31

known mental health needs.[19]  Nor do Plaintiffs contest that no named Plaintiff was denied regular evaluations by qualified mental health professionals, appropriate medications, or warranted mental health services.

All these measures more than satisfy Defendants' "duty under the Eighth Amendment . . . to ensure 'reasonable safety'" to those in its custody in the Step-Down Program.  *Farmer*, 511 U.S. at 844 (cleaned up and internal citations omitted).  And the absence of any contrary evidence regarding Defendants' conduct forecloses Plaintiffs' ability to withstand summary judgment.  *See Mickle v. Moore*, 174 F.3d 464, 472 (4th Cir. 1999) (holding that the plaintiffs could not establish deliberate indifference where the prison's "procedures for administrative segregation provide for periodic visits by medical personnel and for the referral of inmates displaying mental health problems for treatment").

Although Plaintiffs concede (by ignoring) the evidence that Defendants did not totally disregard the supposed risks of Step-Down conditions, Plaintiffs do make some attempt to challenge the Step-Down Program as lacking legitimate penological justification.  But the narrow points they make are unavailing.

Notably, Plaintiffs do *not* argue that the named Plaintiffs' time in the Step-Down Program "serve[d] no legitimate penological purpose."  Compl. ¶ 247.  Indeed, they could hardly dispute that their well-documented propensity for violence, threats, and other misconduct—even during their time in the Step-Down Program—justified their placement in the Step-Down Program.  *See* Defs.' Br. at 85–86 (explaining the record evidence, expert testimony, and Plaintiff testimony all supporting that conclusion).  Although Plaintiffs quibble with exact dates for some Plaintiffs'

---

[19] As noted above, most of the named Plaintiffs had a mental health classification code of MH-0 during their time in the Step-Down Program—an assessment that they had no mental health treatment needs.  Defs.' Br., SUMF ¶¶ 99, 102, 105, 110, 113, 116, 123, 126.

movement through the Step-Down Program, they fail to show any material deviation from Defendants' methodical presentation of the evidence of named Plaintiffs' trajectory through and out of the Step-Down Program. *See id.* at 92–96. They apparently do not dispute that security considerations explain each named Plaintiff's experience in the Step-Down Program—and such considerations are "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003); *see also Wilkinson*, 545 U.S. at 227 (noting prison administrators' "obligation . . . to ensure the safety of guards and prison personnel, the public, and the prisoners themselves").

Instead, the narrow points Plaintiffs offer in opposition are not tied to the experience of any specific named Plaintiff or the conduct of any specific Defendant, as would be necessary to impose liability. First, Plaintiffs object that some behavioral expectations imposed on Step-Down inmates "have nothing to do with security." Pls.' Resp. at 21. But Plaintiffs do not dispute, nor can they, that good grooming, cell compliance, respect for others, compliance with the rules, and a commitment to complete programming are well designed to give an inmate tools to function successfully in a general population setting. Ex. 1, Reply SUMF ¶ 23. Plaintiffs next argue that the Step-Down Program lacks penological justification because former Red Onion Warden Mathena testified that he was not "aware of any scientific studies that were used to establish the [ ] principles" of the Program. *Id.* at 21. Plaintiffs now characterize that testimony as binding on VDOC but, in response to their earlier assertions that Mathena was insufficiently prepared on that topic, Defendants offered to provide H. Scott Richeson for additional time as a Rule 30(b)(6) deponent on that subject, but Plaintiffs opted not to continue their deposition of her. Reply SUMF ¶ 6. In any event, there *is* undisputed evidence that the Step-Down Program is based on evidence-based practices ("EBP"). For instance, the 2012 Operations Strategy, which contains the timeline

for development of the Step-Down Program and discusses implementation of EBPs, constitutes such evidence.  *Id.*   At deposition, Richeson also specifically referenced research conducted "[a]round 2000" in describing EBP.  *Id.* (citing Richeson Tr. [ECF No. 383-12] at 60:22–63:19).

In sum, Plaintiffs make no argument and offer no evidence that preclude an award of summary judgment to Defendants on Plaintiffs' as-applied Eighth Amendment claim.  Even supposing that conditions in the Step-Down Program posed an objectively intolerable risk of harm *and* that Defendants were aware of that risk, the Court can scarcely conclude that Defendants totally disregarded or ignored the risk for no penological purpose.

**B.    Defendants are entitled to qualified immunity on Plaintiffs' Eighth Amendment claim.**

Even if Plaintiffs could demonstrate a constitutional violation, Defendants would be entitled to qualified immunity because, at the time of the alleged violation, there was no clearly established constitutional right to be free from the conditions in the Step-Down Program.  Plaintiffs make two points in opposition to Defendants' qualified-immunity arguments.  Neither is sufficient to withstand summary judgment.

*First*, Plaintiffs urge that the right at issue here should be considered to have been established long before the adoption of the Step-Down Program.  Plaintiffs posit that any conditions-of-confinement challenge—such as to "inadequate ventilation" and "limited exercise opportunities"—rests on the same Eighth Amendment right to be free from conditions causing "serious or significant physical or emotional injury."  Pls.' Resp. at 33.  Accordingly, they emphasize, the "*Porter* decision did not create a new Eighth Amendment right out of whole cloth." *Id.*  Plaintiffs' suggested approach runs contrary to the Supreme Court's oft-repeated instruction regarding qualified immunity.  The "right must not be defined 'at a high level of generality' but with precision.  And that precision requires looking to the law *at the time* of the conduct in

question." *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (quoting *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600 (2015)). Thus, it is not sufficient for Plaintiffs to point generally to unrelated conditions-of-confinement cases and assert that Defendants' conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Moreover, the Fourth Circuit itself has explained the significance of *Porter*. "*Porter* was the first case in this Circuit to hold severe isolation alone can deprive prisoners of 'the minimal civilized measure of life's necessities,' violating the Eighth Amendment." *Thorpe*, 37 F.4th at 937 (quoting *Farmer*, 511 U.S. at 838). As Defendants described at length in their opening brief, Defs.' Br. at 98–102, before *Porter* the case law in the Fourth Circuit indicated that "that long-term solitary confinement did not violate the Eighth Amendment." *Latson v. Clarke*, 794 F. App'x 266, 270 (4th Cir. 2019) (citing *Mickle*, 174 F.3d at 464; *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854 (4th Cir. 1975); and *Breeden v. Jackson*, 457 F.2d 578 (4th Cir. 1972)). But *Porter* changed "the state of the law." *Id.* Until that point, no reasonable corrections official (let alone *every* reasonable official) would have known that an indefinite stay in segregated confinement can violate the Eighth Amendment.[20]

*Second*, Plaintiffs disagree with Defendants regarding the proper qualified immunity analysis, but they conclude that "regardless of how the Court conducts the analysis, the end-result

---

[20] Indeed, in numerous cases rejecting challenges to the Step-Down Program similar to this one, this Court and the Fourth Circuit did not recognize any constitutional right. *See Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15CV00230, 2016 WL 5415906, at *6 (W.D. Va. Sept. 28, 2016), *aff'd sub nom. Obataiye-Allah v. Clarke*, 688 F. App'x 211 (4th Cir. 2017); *DePaola v. Va. Dep't of Corr.*, No. 7:14cv00692, 2016 WL 5415903, at *9–10 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd*, 703 F. App'x 205 (4th Cir. 2017); *Mukuria v. Clarke*, No. 7:15CV00172, 2016 WL 5396712 (W.D. Va. Sep. 27, 2016) (Jones, J.), *aff'd*, 706 F. App'x 139 (4th Cir. 2017).

is the same" because Plaintiffs have substantiated their allegations of "solitary confinement."  Pls.' Resp. at 36.  Not so.  This argument fails for much the same reason as Plaintiffs' other arguments. Namely, it is not enough for Plaintiffs to label Step-Down conditions as "solitary confinement" and then cite that self-serving label to prove that *Porter* clearly established their right under the Eighth Amendment to be free from those conditions.  Pls.' Resp. at 36–37.  As noted above, the conditions of confinement in the Step-Down Program have, for years, not resembled what is commonly termed "solitary confinement"—and there is no clearly established right to avoid them.[21]

## IV.   Defendants are entitled to summary judgment on Plaintiffs' ADA and RA disability discrimination claims.

### A.   Plaintiffs' class ADA and RA claims fail as a matter of law because no named Plaintiff meets the class definition and Plaintiffs have not designated a new class representative.

Plaintiffs make arguments throughout their response brief referencing "Disabilities Classes," "class members," and "Disabilities Class members' rights."  But no class claim currently exists, as it is undisputed that (i) no named Plaintiff meets the Court's definition for the disabilities classes, ECF No. 358, and (ii) Plaintiffs have not designated a new named Plaintiff who meets that definition.

"It is well-settled that the named representative must be a member of the purported class." *Hodge v. Fifth Quarter of Charleston, Inc.*, No. 2:06-CV-00223, 2007 WL 9718213, at *2 (S.D.W. Va. May 9, 2007); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members.").  In the class-action context, class plaintiffs must satisfy Article III

---

[21] Plaintiffs' suggestion that inmates do not receive four hours out of their cell on certain limited occasions, *see* Pls.' Resp. at 37, is insufficient to defeat summary judgment.

requirements "at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) (quoting *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)). Class representatives must "demonstrate standing through a 'requisite case or controversy between themselves personally and [defendants],' not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Cent. Wesleyan Coll.*, 6 F.3d at 188 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982)).

When purported class representatives are not part of the class they seek to represent, class claims are subject to dismissal. *See, e.g.*, *Robinson v. Nationstar Mortg. LLC*, No. CV TDC-14-3667, 2019 WL 4261696 (D. Md. Sept. 9, 2019); *Hodge*, 2007 WL 9718213, at *4; *McKee v. SCM Corp.*, No. R-79-162, 1981 WL 27082, at *1 (D. Md. Mar. 12, 1981). Without a class representative, the same is true of Plaintiffs' class claims here. None of the Disability Plaintiffs can represent the disability class because they are not members of the defined class. Because they cannot represent the class, and no new class representative has been identified, summary judgment on the disability class claims should be granted.

**B.      The Disability Plaintiffs' individual ADA and RA disability discrimination claims fail as a matter of law.**

**1.      There is no evidence that the Disability Plaintiffs were subjected to discrimination because of a mental disability while participating in the Step-Down Program.**

Plaintiffs offer numerous arguments in opposition to VDOC's request for summary judgment as to the named Plaintiffs who assert individual ADA and RA claims (Cavitt, Riddick, Wall, and Khavkin; collectively, the "Disability Plaintiffs"). But Plaintiffs fail to establish a dispute of material fact to counter VDOC's assertions that the Disability Plaintiffs were not subjected to discrimination because of a mental disability while participating in VDOC's Step-

37

Down program.  *See* Defs.' Br. at 108–09.  Nor do they establish a dispute of material fact regarding VDOC's argument that each of the Disability Plaintiffs successfully completed the Step-Down program and that none requested (or even needed) a reasonable accommodation for their alleged mental disability in order to do so.  *See id.*

*First*, Plaintiffs assert that the Disability Plaintiffs' completion of the Step-Down Program is irrelevant in the face of "evidence" that their "meaningful access" to the Step-Down Program was denied.  *See* Pls.' Resp. at 43 (analogizing the named Plaintiffs' experiences in the Step-Down program to a "prisoner without the use of his legs [leaving] his wheelchair at the bottom of the stairwell and crawl[ing] up [stairs] to the library").  But, Plaintiffs present *no evidence* that the Disability Plaintiffs were denied "meaningful access" to VDOC's Step-Down Program due to alleged mental disabilities.  Instead, Plaintiffs merely repeat conclusory allegations that "Defendants employed policies and practices that failed to meet their obligations under [the ADA and RA], discriminated against prisoners with mental health disabilities, and violated the ADA and RA rights of members of the Disabilities Classes" and that "Defendants' policies regarding identification and accommodation of mental health disabilities are inadequate on their face to protect Disabilities Class members' rights under the ADA and RA."  Pls.' Resp. at 40–41.  Conclusory allegations, though, are not evidence. And Plaintiffs make no effort to connect these conclusory allegations to the individual claims of the Disability Plaintiffs.

*Second*, Plaintiffs point to data provided by VDOC and analyzed by Plaintiffs' consultant, Russell Molter, allegedly showing that "prisoners with mental health issues"— purportedly including the Disability Plaintiffs—"spend far more time in the Step-Down Program than prisoners

without mental health issues." *Id.* at 44.[22]  But Plaintiffs offer nothing more than rote speculation that the reason the Disability Plaintiffs spent as much time as they did in the Step-Down Program was because of an alleged mental impairment that rose to the level of a disability.  Indeed, Plaintiffs ignore that there is abundant, undisputed evidence that the Disability Plaintiffs repeatedly either violated basic rules of the Step-Down Program, refused to participate in the program, or failed to complete status level goals—all of which contributed to the amount of time they spent in the

---

[22] Plaintiffs also argue that "VDOC's data also indicates that prisoners with mental illnesses are disproportionately assigned to the Step-Down Program," but the cited evidence does not refer to the named Plaintiffs.  There is no evidence (or even competent allegation) that any of the named Plaintiffs were assigned to the Step-Down Program while suffering from a mental illness.  Rather, they were assigned to restrictive housing (and thus eligible to participate in the Step–Down Program) after engaging in certain conduct while imprisoned, and based on an assessment of the risks they presented to the safety and security of the other inmates, VDOC employees, and themselves.  See Vare Rep. [ECF No. 383-81] at 23–32 (detailing convictions, infractions, and risk factors); Deposition of Richard Wells, dated August 11, 2023 ("Wells Dep.") at 81–91, attached as Exhibit 18 (admitting he is aware of no facts suggesting that VDOC's placement of the named Plaintiffs in Level S classifications was unjustified).

program.    Wall,[23]   Riddick,[24]   Cavitt,[25]   and   Khavkin[26]   each   received   multiple   disciplinary infractions and failed to complete status level goals, and Wall and Riddick repeatedly refused to participate in the program.   Thus, to the extent Plaintiffs argue that the Disability Plaintiffs failed to progress through the Step-Down Program as quickly as others based on "average length of stay," there are legitimate and nondiscriminatory reasons for that, Plaintiffs point to no evidence of pretext, and there is no evidence that disability discrimination was the true reason.

*Third*, Plaintiffs make other arguments about "evidence" that has no connection to the Disability Plaintiffs' individual claims.   For example, Plaintiffs argue that "participants in the Step-Down Program . . . are subjected to performance criteria that disproportionately prevent prisoners with mental health disabilities from progressing through the Program and returning to general

---

[23] While in the Step-Down Program, Disability Plaintiff Wall received at least 10 infractions for, among other things, "providing or possessing contraband," "tampering with security materials," "threatening bodily harm," "intentionally destroying property," "making (unwelcome) sexual advances," and "vulgar language / gesture towards employee," "disobeying orders," all of which were cited by VDOC as reasons for not advancing Wall through the Step-Down program.  *See* VADOC-00000732, attached as Exhibit 19.

[24] While in the Step-Down Program, Disability Plaintiff Riddick received at least 25 infractions for, among other things, "killing or attempting to kill any person," "threatening bodily harm," "threatening to commit a Cat. I offense," "intentionally destroying property," "vulgar language / gesture towards employee," "failure to follow posted or written facility rules," "refusing to perform work or assignments as instructed," "unauthorized use or abuse of mail or telephone," "disobeying orders," "providing or possessing contraband," and "intentionally delaying, hindering, or interfering with an employee,"  all of which were cited by VDOC as reasons for not advancing Riddick through the Step-Down program.  *See* VADOC-00135929, attached as Exhibit 20.

[25] While in the Step-Down Program, Disability Plaintiff Cavitt received at least three infractions for, among other things, "threatening bodily harm," "vulgar or insolent language / gestures," and "disobeying orders," all of which were documented by VDOC.  *See* VADOC-00135595, attached as Exhibit 21.

[26] While in the Step-Down Program, Disability Plaintiff Khavkin received infractions for, among other things, "lewd or obscene acts directed toward or in the presence of another," all of which were documented by VDOC.  *See* VADOC-00135689, attached as Exhibit 22.

population." Pls.' Resp. at 46. But Plaintiffs present no evidence connecting this argument to the Disability Plaintiffs, and instead overstate their testimony.[27] For example:

- While Riddick testified that his "mental health diagnosis" made it "difficult for [him] to get through the program and complete it," he did not identify any performance criteria that he could not meet due to any alleged mental health impairment; did not explain why any alleged mental health impairment made any performance criteria more difficult; and did not identify any reasonable accommodation that would have allowed him to better participate in the Step-Down Program. *See* ECF No. 400-58, Riddick Dep. at 110:19–22.

- While Wall alleged in a declaration that he believes his mental health deteriorated while he was in the Step-Down Program, that his memories from that time are "fuzzy," and that he was depressed, he did not identify any performance criteria that he could not meet due to any alleged mental health impairment; did not attempt to explain why any alleged mental health impairment made any performance criteria more difficult; and did not identify any reasonable accommodation that would have allowed him to better participate in the Step-Down Program. *See* ECF No. 383-15, Wall Decl. ¶¶ 19, 29.

- While Cavitt alleged in a declaration that he suffered from depression and that his resulting anger and aggression "delayed [his] progression through the Step-Down program because staff viewed [his] mental health issues as [him] not complying with the requirements of the program," he did not identify any performance criteria that he could not meet due to any alleged mental health impairment; did not attempt to explain why exhibiting anger or reacting with aggression made any performance criteria more difficult; and did not identify

---

[27] Plaintiffs also argue that VDOC witnesses are "well aware" that "a prisoner's mental health issues may impact their ability to satisfy several of [the] performance criteria [for the Step-Down program]" but again misstate the evidence. Pls.' Resp. at 46. For example, while Dr. William Lee, VDOC's former Mental Health Clinical Supervisor, acknowledged that some inmates "could not complete the step-down programming due to their mental health issues," he was referring to a specific situation that arose in 2016, not the named Plaintiffs. *See* Lee Dep. (ECF No. 400-60) at 137:20–138:5, 140:14–141:4. Additionally, while Randall Mathena, VDOC's former Warden, testified that some offenders had difficulties completing the Step-Down Program due to mental health issues, Plaintiffs omit his further testimony that, when this happened, the offenders were "walk[ed] through" the Step-Down programming and that, when needed, "the staff may read the manuals to them, help them understand," and, in any event, he did not know of any offender who, "because of their mental health would have totally stalled out in the process." *See* Mathena Dep. (ECF No. 400-5) at 582:12–583:7. And, for yet another example, Larry Collins, VDOC's Unit Manager, did not agree "that it is more difficult for prisoners with mental health issues to progress through the Step-Down program," as Plaintiffs assert. Pls.' Resp. at 46. To the contrary, Collins testified "I don't want to say difficult," explaining that "you really have to encourage them," remind them, and "you['ve] got to spend a little more time talking to them." *See* Collins Dep. (ECF No. 400-26) at 249:5–14.

any reasonable accommodation that would have allowed him to better participate in the Step-Down Program.  *See* ECF No. 383-50, Cavitt Decl. ¶¶ 8–9, 37.

- While Khavkin alleged in a declaration that he was diagnosed with various mental, physical, and psychological health impairments, he did not refer to the Step-Down Program; did not identify any performance criteria that he could not meet due to any alleged health impairment, did not attempt to explain why any alleged health impairment made any performance criteria more difficult; and did not identify any reasonable accommodation that would have allowed him to better participate in the Step-Down Program.  *See* ECF No. 174-23, Khavkin Aff. ¶¶ 18–20.

In addition, none of the testimony Plaintiffs cite is responsive to VDOC's argument that the reasons the named Plaintiffs did not progress through the Step-Down Program as quickly as they now claim they should have were because they received disciplinary infractions, refused to participate in the program, and failed to complete status level goals, not because of any alleged mental disability.  *See* nn.23–26 *supra*.

Plaintiffs make numerous other arguments that fail to connect purported "evidence" to the Disability Plaintiffs' individual claims.  For example:

- Plaintiffs argue that "VDOC fails to adequately consider a prisoner's mental health history when deciding whether to place them in the Step-Down Program in the first place."  Pls.' Resp. at 45.  Not only do Plaintiffs repeatedly misrepresent the testimony of VDOC employees in support of this argument,[28] but they fail to connect this argument to any

---

[28] VDOC's Jessica King was asked questions about "formal health screenings," not *mental* health screenings, as Plaintiffs suggest.  *See* King Dep. (ECF No. 400-22) at 170:10–14.  And King testified to the "multiple ways" inmates could access mental health professionals.  *See id.* at 170:20–171:22. Similarly, VDOC's Randall Mathena was not asked whether mental health staff "participate in the decision-making when assigning someone to Level S," as Plaintiffs assert.  Pls.' Resp. at 45.  Rather, he was asked whether "*VDOC policy requires* the involvement of a mental health official" in the "process of an offender's assignment to level S."  *See* Mathena 30(b)(6) Dep. (ECF No. 400-12) at 237:3–9.  And when Mathena was asked "whether VDOC assesses whether the behavior qualifying someone for Level S is a symptom of possible mental health issues," he explained when and how "mental health would be brought into the conversation," notwithstanding that this is not "laid out in policy" documents, explaining "[w]e bring [mental health officials] into the conversation so the offender is evaluated."  *See id.* at 237:10–239:21.  For yet another example, VDOC's Dr. William Lee was not asked whether VDOC's "mental health screening omitted factors necessary to identify mental health conditions," and certainly did not make this statement, as Plaintiffs assert.  Pls.' Resp. at 46.  Rather, he was asked whether "psychology associates [] always ask for past mental health records as part of [an inmate's] initial screening," and answered "[t]hey don't always do that [], again, if they self-report, if they are saying, no, I've never been

Disability Plaintiff.  Plaintiffs point to no evidence that any Disability Plaintiff complained that VDOC failed to consider his mental health history when he was placed in the Step-Down program.  And Plaintiffs' expert, Mr. Wells, admitted at deposition that he was unaware of any facts suggesting that VDOC's placement of any named Plaintiff in Level S was unjustified.[29]  Wells Dep. at 81–91.

- Plaintiffs argue that, "[d]espite its awareness of the challenges Disabilities Class members face in navigating the Step-Down Program, VDOC does not make any exceptions to the Program's requirements, even when prisoners' failure to meet the Program's requirements are clearly linked to their mental health disabilities."  Pls.' Resp. at 47.  Again, Plaintiffs fail to connect this argument to any Disability Plaintiff's individual claim.  And while Plaintiffs suggest that their argument is "evident in grievance data provided by VDOC," none of the grievance data they reference concerns the Disability Plaintiffs.

- Plaintiffs argue that "the BMC . . . applies [] discriminatory criteria to routinely hold prisoners in the Step-Down Program without regard to whether a prisoner's mental health condition might be an impediment to his ability to progress through the Program," and complain that "mental health professionals did not always attend BMC meetings."  Pls.' Resp. at 48.  Setting aside that VDOC's summary judgment argument does not depend on BMC meetings, Plaintiffs again fail to connect this argument to any named Plaintiff.  None of the evidence they reference concerns the named Plaintiffs.

- Citing the report of their expert, Wells, Plaintiffs argue "there are a number of critical gaps that, both individually and in combination, result in discrimination, including: (1) VDOC's intake and other procedures are inadequate to identify prisoners with disabilities (including mental disabilities), (2) VDOC's failure to fully inform prisoners of their ADA rights at orientation and fails to track prisoners with disabilities, (3) that VDOC's staff are not adequately trained in ADA compliance, and (4) that VDOC's grievance procedure does not offer prisoners a meaningful process to resolve ADA- or disability-related issues."  Pls.' Resp. at 49.  Again, Plaintiffs fail to connect this argument to any Disability Plaintiff; while Wells may advocate for the adoption of various policies and procedures at VDOC, no named Plaintiff alleges individual claims that turn on an alleged violation of these policies and procedures.

---

treated for this [condition] before or if they are not showing any signs currently, then there's no reason to ask for information."  *See* Lee Dep. (ECF No. 400-60) at 49:12–20.

[29] The only inmate-specific "evidence" Plaintiffs cite in support of this argument—a declaration from prisoner Michael McClintock, who is not a Disability Plaintiff or a named Plaintiff at all—has nothing to do with the Disability Plaintiffs.

2.   **There is no evidence that the Disability Plaintiffs sought reasonable accommodations to participate in the Step-Down Program, that VDOC should have known reasonable accommodations were needed, or that reasonable accommodations were denied.**

According to Plaintiffs, VDOC believes that a reasonable accommodation need be provided only if an inmate requests one. Pls.' Resp. at 51. Not so. VDOC expressly recognized in its opening brief that a reasonable accommodation may be required if the need for one is "open, obvious, and apparent." Defs.' Br. at 110. The problem for Plaintiffs is that the undisputed evidence shows that the Disability Plaintiffs did not request accommodations and their supposed need for an accommodation was not obvious to VDOC (or did not exist at all).

Tellingly, the cases on which Plaintiffs rely in support of their position that it was obvious that the Disability Plaintiffs required reasonable accommodations involve *physical* disabilities that are facially obvious, not *mental health* disabilities that often are difficult to discern. For example, Plaintiffs rely extensively on *Pierce v. District of Columbia*, 128 F. Supp. 3d 250 (D.D.C. 2015), which involved a plaintiff who was "profoundly deaf and communicates with American Sign Language." *Pierce*, 128 F. Supp. 3d at 253. As a result, the "prison staff was indisputably aware that Pierce was deaf" but never assessed whether he needed an accommodation or auxiliary aid that would allow him to "communicate effectively with others during his incarceration." *Id.* The other cases Plaintiffs rely on similarly involve plaintiffs who were deaf or hard of hearing, which made it obvious that they needed an accommodation to effectively communicate. *See Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 404 (D. Md. 2011); *see also Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196–97 (10th Cir. 2007); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1129–30 (9th Cir. 2001).

Plaintiffs' reliance on *Baxley v. Jividen*, 508 F. Supp. 3d 28 (S.D.W. Va. 2020), also is unavailing. While the *Baxley* court denied the motion for summary judgment as to one plaintiff

who had an obvious physical disability (spinal stenosis and degenerative disc disease), it *granted* summary judgment against two plaintiffs who did not have obvious disabilities (illiteracy) and who had not requested accommodations.  *Id.* at 62–63.  The court explained that "there may be times where an individual does not have to expressly ask for an accommodation," but "such an exception only applies where it is apparent that one is needed."  *Id.* at 62.  The same analysis applies here.

Plaintiffs cite to evidence that they argue establishes that Disability Plaintiffs Cavitt, Khavkin, Riddick, and Wall had certain mental health symptoms.  Pls.' Resp. at 53–54.  But they only conclusorily assert that, "[b]ased on these symptoms and reports, VDOC was plainly on notice of Plaintiffs' need for accommodations."  *Id.* at 54.  As in *Baxley*, Plaintiffs offer no evidence that these supposed symptoms rendered it "obvious" that: (1) the Disability Plaintiffs needed an accommodation to progress through the Step-Down Program; or (2) what accommodation(s) they needed to do so.

Moreover, Plaintiffs offer *no* evidence that Disability Plaintiffs Cavitt, Khavkin, or Wall ever requested an accommodation.  Pls.' Resp. at 54–56.  As to Riddick, they refer only to his request "to be transferred out of the Step-Down Program to the SIP/SAM pod or other mental health unit where he could obtain treatment for his mental illness."  *Id.*  at 54. But that is not a request for a "reasonable" accommodation.  Public entities must make "reasonable" accommodations; they are not required to make "'substantial' or 'fundamental,' modifications to accommodate persons with disabilities."  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012).  "A modification to 'an essential aspect' of the program constitutes a 'fundamental alteration' and, therefore, is an unreasonable accommodation."  *Id.*  Summary judgment may be granted to a defendant if the plaintiff fails to present evidence from which the

45

factfinder "may infer that the accommodation [requested] is 'reasonable on its face, *i.e.,* ordinarily or in the run of cases.'"  *Id.*  In the context of correctional facilities, courts have held that requests for outright removal or transfer from a program or system is not a reasonable request.  *See, e.g., J.H. ex rel. J.P. v. Bernalillo Cnty.*, No. CIV 12-0128 JB/LAM, 2014 WL 3421037, at *111 (D.N.M. July 8, 2014), *aff'd*, 806 F.3d 1255 (10th Cir. 2015); *Summers v. Louisiana*, No. CV 20-21-JWD-SDJ, 2022 WL 4490161, at *8 (M.D. La. Sept. 27, 2022).  Accordingly, Riddick's request that he be released from the Step-Down Program as an accommodation is not reasonable.

Furthermore, Plaintiffs have not presented evidence supporting their proposition that VDOC's policies and procedures prevented the Disability Plaintiffs from requesting accommodations.  Plaintiffs do not explain how VDOC's many mental health policies somehow prevented them from requesting accommodations.  *See*, *e.g.*, ECF No. 381-51 (Operating Procedure 730.2).  Nor do they show how VDOC's applicable grievance and complaint procedures, when read together with an express policy directing inmates to inquire about mental health services, was insufficient to allow Plaintiffs to request accommodations.  *See*, *e.g.*, ECF No. 400-49, VADOC-00040809 (revised June 2021); ECF No. 400-28, VADOC-00041095 (revised Nov. 2020); ECF No. 400-80, VADOC-00041041 (revised Apr. 2020).

In an effort to discredit the grievance process, Plaintiffs complain that an inmate's ADA-related grievance could be returned to him if it did not identify the right department.  Pls.' Resp. at 60.  But they offer no evidence that an inmate could not simply resubmit the grievance to the correct department.  Ultimately, such a delay does not rise to an actionable level, as isolated or temporary interruptions in service cannot amount to a denial of access or failure to accommodate. *See Sanders v. Shelby Cnty. Bd. of Educ.*, No. 2:19-CV-02056-JTF-CGC, 2023 WL 5690291, at

46

*12 (W.D. Tenn. July 28, 2023).  And, more importantly, Plaintiffs do not allege that this is an issue any named Plaintiff ever faced.

As to Plaintiffs' argument that they were unaware that ROSP had an ADA coordinator, the only named Plaintiff they cite in support of this argument is Wall.  In his deposition, Wall testified that he first learned about the ADA coordinator role at a separate facility.  ECF No. 400-81, Wall Dep. at 258:12–19.  When he returned to ROSP, he asked about the ADA coordinator role verbally and via written request.  *Id.* at 259:4-19.  Though he testified that there was some back and forth with different prison officials, Wall admitted that VDOC ultimately advised him of the ADA coordinator through whom requests for accommodation could be made.  Deposition of Gary Wall, dated March 20, 2023 ("Wall Dep.") at 257:5–265:17, 265:18–266:5, attached as Exhibit 23.  But even after Wall found out who his ADA Coordinator was, he *did not make any requests for accommodation*.  *Id.* at 264:7–17.[30]

Next, Plaintiffs argue that there is "confusion" over who is responsible for determining whether a prisoner should receive an accommodation due to a mental health disability.  Not so.  None of the mental health staff cited by Plaintiffs disputed that they were charged with providing mental health services to inmates.  And, as the ADA coordinators testified, the mental health team's analysis would inform actions that ADA coordinators ultimately took related to the accommodations process.  ECF No. 400-24, Duncan Dep. at 62:13–20, 63:18–65:8; ECF No. 400-22, King Dep. at 233:9–234:2; ECF No. 400-82, Marano Dep. at 94:10–97:3.  At most, this evidence shows that ADA coordinators sought guidance from and cooperated with mental health staff on issues regarding mental health impairments and identifying disabilities.

---

[30] While Plaintiffs cite to declarations submitted by inmates Arrington and Bowman, neither are named Plaintiffs in this case, and so their allegations have no bearing on the Disability Plaintiffs' individual claims.

In any event, Plaintiffs' argument about "confusion" is a red herring.  The fundamental issue is whether any of the Disability Plaintiffs ever requested an accommodation.  Whether there was a debate as to who was responsible for determining if an inmate received an accommodation, Plaintiffs fail to present evidence that VDOC did not provide an accommodation after a request was made, nor that Plaintiffs were incapable of relying on various prison employees to request an accommodation.[31]

Plaintiffs further argue that the lack of a tracking system for institution-wide accommodations inhibited Plaintiffs' ability to request an accommodation.  Notwithstanding the fact that Plaintiffs' own expert admitted that the ADA does not require such a tracking system, ECF No. 400-22, Wells Dep. at 58:1–10, Plaintiffs themselves fail to explain how the absence of a tracking system for accommodations offered to other inmates would have impeded them from requesting an accommodation.

Next, Plaintiffs suggest that VDOC's policies were not sufficient in practice to identify inmates' disabilities at intake, citing Jessica King's testimony that it was "absolutely not" her understanding that medical and mental health staff explained qualifying mental disabilities to prisoners at intake.  This misstates her testimony, which states in full:

> Q: So the medical and mental health staff at VDOC explain to every offender upon intake that there can be a disability based on mental impairment?
>
> MS. ECKSTEIN: Object to form.
>
> A: It's on the survey that they fill out. And they go over that individually with them either that day or at a later date, to go over the results of what they submitted.

---

[31] While Plaintiffs cite grievance documents filed by inmate Arrington to argue that grievances were not passed on to the ADA coordinator, they present no evidence that any of the Disability Plaintiffs experienced a similar issue.  See ECF No. 400-59, VADOC-00174671 at lines 27082, 29627.

> Q: The survey they fill out explains that they can have a disability based on mental impairment?
>
> A: The survey itself does not; the mental health provider does.
>
> Q: And it's your testimony that every mental health provider makes that explanation to an offender upon intake?
>
> A: Absolutely not --
>
> MS. ECKSTEIN: Objection.
>
> A: – that's the expectation.

ECF No. 400-78, King 30(b)(6) Dep. at 205:13–206:10.  While Ms. King noted that she could not speak to what *every* mental health provider actually explained to *every* inmate at *every* intake, she explicitly testified that VDOC policies and procedures create the expectation that mental health providers explain to inmates that they can have a disability based on a mental impairment.

Finally, no evidence has been adduced that the Disability Plaintiffs have identified any reasonable accommodation for their alleged mental disability that allegedly was needed to *participate* in the Step-Down Program. Plaintiffs cite interrogatory responses to argue that certain accommodations were available that would have allowed them to more meaningfully participate in the Step-Down Program.  *See* Pls.' Resp. at 61 (citing Class Plaintiff Wall's Resps. and Objs. to Defs.' First Set of Interrogs., at Interrogatory Nos. 4 & 9 at 8–9, 14–15; Class Plaintiff Wall's Suppl. Resps. and Objs. to Defs.' First Set of Interrogs., at Interrogatory Nos. 4 & 9 at 8–9, 14–15).  But again, this argument ignores that *none of the named Plaintiffs ever made such requests for accommodation while in the Step-Down Program*.  And, in any case, these after-the-fact accommodation proposals still fail to provide detail sufficient to determine what type of accommodation is being sought.  If anything, they suggest that no such reasonable accommodation exists:

- "Programming should make allowances for the particular circumstances of prisoners with mental health disabilities." ECF No. 383-107 (Class Plaintiff Wall's Suppl. Resps. and Objs. to Defs.' First Set of Interrogs., at Interrogatory No. 9). This "accommodation" does not identify the "allowances" that would have permitted Plaintiffs to progress through the Step-Down Program.

- "Prisoners who cannot complete the Challenge Series, workbook series, or Step-Down Program because of educational background, learning disability, cognitive disability, or mental illness should not be evaluated on the same criteria as prisoners without those disabilities or barriers, and when such prisoners inevitably fail to complete programming, VDOC should not continue to hold them in solitary confinement." *Id.* On its face, this is simply a request that certain prisoners be excused from segregation and, thus, the Step-Down program altogether. This is not a request for a reasonable accommodation to complete the Step-Down Program.

- "The disciplinary infraction category should accommodate prisoners who cannot comply with institutional rules due to his mental health disability and should account for the unique stressors solitary confinement causes." *Id.* Again, this appears to be a request that certain safety and security policies not apply to certain prisoners. This is not a request for a reasonable accommodation to complete the Step-Down Program.

- "Reasonable alternatives to solitary confinement for individuals with mental health disabilities should exist and be reasonably provided." *Id.* This also appears to be a request that certain prisoners be excused from segregation and, therefore, the Step-Down Program altogether. This is not a request for a reasonable accommodation to complete the Step-Down Program.

- "Prisoners with mental health disabilities should be provided with an effective opportunity to progress out of solitary confinement." *Id.* Plaintiffs do not identify what reasonable accommodation would qualify as "an effective opportunity."

- "Red Onion and Wallens Ridge staff should be required to meaningfully consider whether a prisoner has a mental health disability in determining whether a prisoner will be held in solitary confinement." *Id.* Again, broad language requiring a "meaningful[] consider[ation]" does not identify a specific reasonable accommodation.

- "Red Onion and Wallens Ridge staff should be required to meaningfully review the necessity of solitary confinement for prisoners with mental health disabilities with greater frequency, giving special consideration to the impact of solitary confinement on the mental health and wellbeing of prisoners with mental health disabilities." *Id.* Setting aside the imprecise demand for "meaningful[] review[s]," Plaintiffs do not explain how more frequent review would have assisted the Disability Plaintiffs in completing the Step-Down Program. And such review is unconnected to whether they ultimately sought an accommodation. This appears to be a veiled request to be excused from the Step-Down Program altogether, not a request to assist in their progression through the program.

- "Prisoners with mental health disabilities who are nonetheless retained in solitary confinement should be accommodated with fewer restrictions, including but not limited to, more out-of-cell time, increased mental health treatment and other programming, relaxation of strict property restrictions, and a reduction in the use of strip searches." *Id.* These requests essentially are requests that the restrictions of segregation and, therefore, the Step-Down Program, not apply to certain prisoners altogether.  These are not requests for reasonable accommodations to complete the Step-Down program.

Plaintiffs' reliance on Wells's Report for a list of supposed "accommodations" also is unavailing.  Pls.' Resp. at 61 (citing ECF No. 400-63 ¶ 196). Not only is there no evidence that the Disability Plaintiffs sought such accommodations, but many of his proposals are vague and essentially suggest that certain inmates not be required to participate in the program altogether:

- Wells identifies "a change in housing assignment" or "a change in housing conditions (single cell, change in cell mate, etc.)."  ECF No. 400-63 ¶ 196.  To the extent this vague proposal can be understood, it is simply a recommendation that inmates not participate in the Step-Down Program altogether.

- Wells recommends "incarcerated person or staff assistance with activities as necessary," *id.*, which is a vague proposal that does not identify an accommodation to the Step-Down Program.

- Wells suggests "modified work or program schedules," *id.*, but offers no details for this vague "accommodation."

- Wells recommends "additional monitoring," *id.*, without any description of the actual reasonable accommodation sought.

- Wells recommends "counseling and/or therapy (group or individual)," *id.*, but does not explain the type of counseling and/or therapy recommended, nor how it would have helped the Disability Plaintiffs better progress through the Step-Down Program.  He even takes the position that "requiring incarcerated persons to actively participate in discussion of their feelings in a group setting may be particularly fraught for an incarcerated person suffering from depression, anxiety, or PTSD, to name just some mental impairments . . . ."  *Id.* ¶ 175.

- Finally, Wells recommends "additional assistance to navigate programs and procedures," *id.* ¶ 196, but fails to shed light on what reasonable accommodation would have assisted the named Plaintiffs' progress through the Step-Down Program.

Again, these generalized requests are not grounded in any request for accommodation that any named Plaintiff has ever made.  Expert testimony is insufficient to meet Plaintiffs' burden to have made a request for reasonable accommodation.

**V.      The applicable statutes of limitations preclude the claims of some class members.**

      **A.      Defendants are entitled to summary judgment on the Eighth Amendment and due-process claims brought by any class members who left the Step-Down Program more than two years before the filing of the Complaint.**

            **1.      The reasonable discovery exception to accrual should not apply to the claims of class members who left the Step-Down Program before May 5, 2017.**

Plaintiffs concede their constitutional claims are subject to a two-year statute of limitations for personal injuries under Virginia law.  Pls.' Resp. at 38; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018).  But Plaintiffs argue the Court should allow class members who left the Step-Down Program before May 5, 2017 to maintain their 14th-Amendment claims because they could not have reasonably discovered their injury until later.  *Id.*  They also appear to claim the Eighth Amendment equitable claims[32] for class members who left the Program more than two years before the Complaint should survive.  *Id.* at 38–39.  Plaintiffs' argument fails because any alleged constitutional *injury* was known to all class members before they left the Step-Down Program.

As an initial matter, the Fourth Circuit has indicated that it may reject the "reasonable discovery" rule in the context of Section 1983 claims based on the Supreme Court's decision in *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019).  *See Smith v. Travelpiece*, 31 F.4th 878, 883 n.4 (4th Cir. 2022).  In *Nieves*, the Supreme Court found "when defining the contours of a claim under

---

[32] Plaintiffs concede that Eighth Amendment claims for damages for class members who left the Step-Down Program before May 5, 2017 should be dismissed.  Pls.' Resp. at 39 n.28.  It's unclear why Plaintiffs believe different statutes of limitations should apply depending on the nature of the requested relief.

§ 1983, we look to 'common-law principles that were well settled at the time of its enactment'" in 1871. 139 S. Ct. at 1726. Because the "reasonable discovery" rule was not "well-settled" in 1871, *Nieves* suggests it should not apply to claims under Section 1983. *Smith*, 31 F.4th at 886.

Plaintiffs base their argument about reasonable discovery on their claim that not all class members knew the details of the ICA review process during their time in the Step-Down Program. Pls.' Resp. at 38. But they do not dispute that after each ICA review, Plaintiffs knew the facts regarding their opportunity to be heard and the outcome of the process. Under the law, their claims accrued when VDOC notified them of the outcome of their review, not at some unknown later time. *Smith*, 31 F.4th at 887 (finding Fourth Amendment claim accrued at time of unlawful search, not at later date when plaintiffs learned trooper obtained warrant through unlawful means); *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (finding "the standard rule is that accrual occurs when the plaintiff has a complete and present cause of action"); *see also Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 490 (W.D. Va. 2019) (finding students' due process claim accrued when notified of findings related to university policy violations). Even if Plaintiffs did not know every fact about the review process until some later date, they had knowledge of their alleged injury—continued placement in the Step-Down Program—and could have sued at any time before leaving the Step-Down Program. Their failure to do so renders their claims untimely.

On the Eighth Amendment equitable claims, Plaintiffs argue their claims could not accrue until Plaintiffs had been held in solitary confinement "for a prolonged period of time." Pls.' Resp. at 39. But class members transferred out of the Step-Down Program before May 5, 2017 could

not have accrued any claims based on longer periods in confinement after their transfer.[33]
Plaintiffs cannot reasonably argue that such class members did not experience the alleged harm of
incarceration in the Step-Down Program until after their release.

> ### 2. Plaintiffs make no serious argument for equitable tolling and the Court should not apply it.

Plaintiffs half-heartedly argue that equitable tolling should apply to claims that accrued
before May 5, 2017.  Pls.' Resp. at 38–39.  The Court must apply Virginia law to any tolling
analysis.  *Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999) (citing cases that analyzed
state tolling rules for Section 1983 claims).  Virginia law dictates that "statutes of limitations are
strictly enforced and must be applied unless the General Assembly has clearly created an exception
to their application."  *Rivera v. Witt*, 257 Va. 280, 283, 512 S.E.2d 558, 559 (1999).  The Supreme
Court of Virginia has held "[w]here there exists any doubt, it should be resolved in favor of the
operation of the statute of limitations."  *Burns v. Bd. of Sup'rs of Stafford Cnty.*, 227 Va. 354, 359,
315 S.E.2d 856, 859 (1984).  Federal courts apply Virginia's strict interpretation of equitable
tolling to actions under Section 1983.  *See, e.g.*, *Roseboro v. Brown*, No. 1:13cv513 LO/TRJ, 2015
WL 631352, at *3 (E.D. Va. Feb. 12, 2015).  In *Roseboro*, the Court held that plaintiffs seeking to
apply equitable tolling must prove "by clear, precise and unequivocal evidence that (1) a party
knowingly and falsely concealed a material fact, with the intention that the opposing party would
rely on this representation; (2) the party invoking equitable estoppel did not know the true nature
of the material fact; (3) the party invok[ing] estoppel relied on the misrepresentation; and (4) the

---

[33] Defendants did not seek summary judgment on the basis that the statute of limitations
should bar the claims of class members who remained in the Step-Down Program after May 5,
2017.  Thus, the bulk of Plaintiffs' argument in Section IV of their opposition is not relevant at
this juncture.  Pls.' Resp. at 39–40 (arguing that claims for Plaintiffs who remained in the Program
within two years of filing of Complaint are not time-barred).

party invoking estoppel 'was misled to his injury.'" *Id.* (internal quotations omitted). Here, Plaintiffs cite no facts to meet those elements under Virginia law, and no cases suggesting equitable tolling should apply under the facts of the case. The only case Plaintiffs cite regarding the standard for equitable tolling does not involve Virginia law. *See* Pls.' Resp. at 38–39 (citing *Mezu v. Dolan*, 75 F. App'x 910, 912 (4th Cir. 2003)). Because they failed to show any evidence to justify tolling, much less "clear, precise and unequivocal evidence," the Court should reject their request for relief from the relevant statute of limitations.

### B. The Disability Plaintiffs' ADA and RA claims that accrued before May 6, 2018 are barred by the applicable statutes of limitation.

#### 1. The continuing violations exception does not apply to individual disability discrimination claims.

As Defendants explained in their opening brief, the Supreme Court has substantially limited the notion of continuing violations: "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Nonetheless, Plaintiffs argue that *Morgan*'s analysis of the continuing violations doctrine does not apply to Title II claims.[34]

This argument has been rejected. "Although *Morgan* involved Title VII of the Civil Rights Act of 1964, the Supreme Court's analysis of the continuing violations doctrine is not limited to Title VII actions. It applies with equal force to the Rehabilitation Act and to actions arising under

---

[34] Plaintiffs argue that, unlike Title VII, the statutory text of Title II does not contain an express limitations period. Pls.' Resp. at 64. Their argument appears to be that *Morgan*'s "discrete acts" approach to Title VII should not apply to Title II because Title II does not explicitly require filing within a specific time frame. But the fact that Title II does not contain a statute of limitations does not mean Title II claims are not subject to any statute of limitations. Virginia's one-year limitations period for claims under the Virginia Rights of Persons with Disabilities Act applies to the ADA and RA claims at issue. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). Plaintiffs do not explain why this distinction precludes the application of *Morgan* to Title II claims.

other civil rights laws." *Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003).  This includes Title II.  *See Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) (agreeing that continuing violations in the Title II context should be assessed consistently with "*Morgan*'s application of the continuing violation doctrine to a series of predicate acts forming the basis for a single claim").

None of the cases cited by Plaintiffs establish that *Morgan*'s analysis of the continuing violations doctrine should not apply in the Title II context.  To start, Plaintiffs' reliance on *Californians for Disability Rts., Inc. ("CDR") v. Cal. Dep't of Transp.*, No. C 06-5125 SBA, 2009 WL 2982840, at *1 (N.D. Cal. Sept. 14, 2009), is misplaced.  *CDR* involved a certified class brought by persons with mobility and vision impairments who alleged they were denied access to sidewalks, cross-walks, pedestrian underpasses, and other public rights of way.  The plaintiffs contended the non-compliant pedestrian facilities all resulted from allegedly deficient design policies and guidelines.  *Id*. at *2.  In holding that evidence related to the continuing violations doctrine could not be excluded, the *CDR* court relied on the fact that the design and construction of these public rights of way led to ongoing violations.  *Id.*

But in reaching this conclusion, *CDR* did not hold *Morgan* inapplicable to Title II cases. Rather, the *CDR* court recognized *Morgan*'s binding conclusion that plaintiffs are not permitted to disguise discrete, time-barred acts as "policy and practice" claims.  *Id*.  The *CDR* court illustrated the difference by analyzing another case, *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003), wherein the Ninth Circuit applied *Morgan*'s analysis.  In *Cherosky*, the plaintiffs sued the Postal Service for denying their individual requests to wear respirators.  The *Cherosky* court denied the application of the continuing violations doctrine, reasoning that the plaintiffs were not asserting that the defendant was prohibiting the use of respirators as a general rule.  Rather,

plaintiffs were challenging "the Postal Service's *individualized decision* to deny their accommodation requests." *Id*. at 1247 (emphasis added).  The same follows here, where the theory of plaintiffs' case depends on whether Plaintiffs were denied any individualized requests for accommodation.  As in *Morgan* and *Cherosky*, such discrete acts cannot be disguised as "policy and practice" claims, particularly where Plaintiffs have not alleged (nor provided evidence to demonstrate) that such requests were routinely denied.

*A Society Without A Name ("ASWAN") v. Virginia*, 655 F.3d 342 (4th Cir. 2011), is a helpful example in the Title II context that helms more closely to the facts in this case than *CRD*. In *ASWAN*, the Fourth Circuit considered the applicability of the continuing violations theory to ASWAN's Title II claim against the defendants.  *Id*. at 348–49.  ASWAN alleged that the defendants' decision to open a homeless shelter miles away from downtown Richmond constituted discrimination under Title II because the general public regarded homeless people as disabled and the defendants were trying to exclude the homeless from the defendants' services, programs, and activities.  *Id*. at 345.  The defendants opened the homeless shelter in February 2007, and ASWAN sued in February 2009.  *Id*. at 344–45.  The Fourth Circuit first concluded that Virginia's one-year statute of limitations applied to ASWAN's ADA claim and, second, that ASWAN's ADA claim was untimely.  *Id*. at 348.  The Court also rejected ASWAN's argument that the defendants' conduct, *i.e.*, the continued operation of the homeless shelter and the addition of new services offered, constituted a continuing violation of the ADA.  *Id*.  The court explained that "[t]he fact that the [homeless shelter] is still located on Oliver Hill Way and continues to offer services to the homeless . . . does not amount to a continuing violation, but rather amounts to the continuing effect of the original decision to locate the [homeless shelter] on Oliver Hill Way."  *Id*. at 349 (citation omitted).  Thus, the Fourth Circuit held that ASWAN's ADA claim was time-barred.  As in

*ASWAN*, Plaintiffs' remaining in segregation is nothing more than the "continuing effect" of prior discrete and individualized decisions to allegedly stall or demote their progress through the Step-Down Program.

Plaintiffs' citation to *Geness v. Pennsylvania*, 364 F. Supp. 3d 448 (W.D. Pa. 2019), similarly is unavailing. *Geness* involved a pretrial detainee who was diagnosed with mental illness and with mental retardation, possessing a full scale IQ of 51, which is in the extremely low range. *Id.* at 450.  The plaintiff was held in custody for more than a decade awaiting trial, even though it was determined early in the proceedings that he was incompetent to stand trial and unlikely to improve.  *Id*.  Throughout the duration of his incarceration, the warden of the prison made numerous complaints directly to the judge in charge of the plaintiff's competency hearings.  *Id.* at 451.  The warden insisted on multiple occasions that the court remove the plaintiff from the prison and repeatedly asked the judge to take action with regard to the plaintiff.  In spite of the warden's efforts, the plaintiff remained subject to monthly proceedings attended by a judge, the district attorney, and public defender's office.  *Id.*  At each of these proceedings, the plaintiff's case was continued and it was determined that he remained incompetent to stand trial.  *Id.*

While the circumstances in that case supported application of the continuing violations doctrine, the same connected pattern of indifference is not at issue here.  Unlike in *Geness*, there were no persistent complaints regarding the Disability Plaintiffs' purported inability to complete the Step-Down Program without an accommodation.  Rather, the Disability Plaintiffs do not demonstrate that they ever requested any accommodation.  And, contrary to *Geness*, it is not obvious that the Disability Plaintiffs needed an accommodation to complete the Step-Down Program.

Plaintiffs also cite cases involving the Eighth Amendment in support of the application of the continuing violations exception to ADA claims, but they fail to explain why such cases would be relevant when they deny the same interpretive force to Title VII cases.  Setting aside this logical inconsistency, the cases Plaintiffs cite are distinguishable.  They all assert continuing violations on the theory that prison officials—after being notified of an inmate's persistent health problems—refused to provide medical attention for the inmate's ongoing serious conditions.  *See DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018) (plaintiff "alleges that he notified VDOC of his mental illnesses during the prison intake process and 'repeatedly' sought 'help' from officials and medical staff at Red Onion" and that, "despite this notice to the defendants," they "'continue to' violate his rights by failing to provide any treatment or access to a psychiatrist or a psychologist"); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (while incarcerated, plaintiff complained of tooth pain, cavities, and bleeding gums, but plaintiff was forced to wait several months to see a dentist); *Shomo*, 579 F.3d at 182 ("The complaint suggests a pattern where DOC medical personnel and security staff, despite prior treatment recommendations, refused to assist Shomo with ADLs, to transfer him to specialized infirmary housing, or to provide recommended treatments.").

Even though these cases arise in the context of prison administration, the similarities to Plaintiffs' claims end there.  In alleging a theory of deliberate indifference to serious medical needs, these cases all assume—and expressly allege—that plaintiffs are complaining about medical issues that remain untreated.  In contrast, Plaintiffs do not allege any pattern of conduct in which prison officials were placed on notice of Plaintiffs' alleged need for an accommodation but repeatedly denied such requests.  Plaintiffs have not presented evidence that they ever requested a reasonable accommodation to progress through the Step-Down Program.  The deliberate-indifference cases cited by Plaintiffs are therefore distinguishable.

59

Here, the Title VII cases cited by VDOC are a closer analytical analogue.  Each time they were notified of a failure to progress through the Step-Down Program, Plaintiffs were subjected to a discrete act of alleged discrimination.  *See*, *e.g.*, *Hill v. Hampstead Lester Morton Ct. Partners LP*, 581 F. App'x 178, 181 (4th Cir. 2014) ("a defendant's failure to accommodate constitutes a discrete act rather than an ongoing omission," and as such, the continuing-violation doctrine is inapplicable to failure to accommodate claims); *Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) ("Because failure to promote is a discrete act of discrimination . . . , the continuing violation doctrine does not apply here and cannot save Williams's untimely claims."); *Szedlock v. Tenet*, 61 F. App'x 88, 93 (4th Cir. 2003) ("unless the plaintiff alleges a hostile work environment (which [the plaintiff] did not do), each instance of discrimination is a discrete act" that is time-barred, and the earlier discriminatory actions would not be revived "simply because they resemble later discriminatory actions"); *Hager v. First Va. Banks, Inc.*, No. CIV. A. 7:01-cv-00053, 2002 WL 57249, at *8 (W.D. Va. Jan. 10, 2002) ("the doctrine of continuing violation does not apply" to plaintiff's failure to accommodate claim); *Mattison v. Md. Transit Admin.*, No. CV JKB-21-00168, 2021 WL 4503566, at *5 n.3 (D. Md. Oct. 1, 2021) ("the continuing violation doctrine does not apply to discrete acts, such as his demotion in 2012"); *Thompson v. TD Bank, N.A.*, No. 3:22-CV-2547- SAL-PJG, 2023 WL 4838223, at *2 (D.S.C. July 28, 2023) ("the continuing violation theory does not apply to allegations of failure to promote because each instance of failure to promote is a discrete act of discrimination").  Thus, the continuing violations doctrine has no application here.

### 2.   Discrete acts alleged to be part of a general policy are not subject to the continuing violations exception.

Plaintiffs do not dispute nor distinguish authority holding that the Fourth Circuit has "declined to extend the limitations periods for discrete acts of discrimination merely because the

plaintiff asserts that such discrete acts occurred as part of a policy of discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 220 (4th Cir. 2007); *Burgess v. Costco Wholesale Corp.*, No. 4:10-CV-1678-RBH, 2013 WL 645982, at *3 (D.S.C. Feb. 21, 2013), *aff'd*, 533 F. App'x 271 (4th Cir. 2013) (finding continuing violations doctrine inapplicable to make plaintiff's claims timely because the later claims were directed at others, not plaintiff); *see also Cherosky*, 330 F.3d at 1248 ("[I]f the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful [] policy could be untimely.").

In opposition, Plaintiffs cite this Court's class certification order to argue that VDOC's "policies and practices" already have been held to be "a continuing series of acts."  Pls.' Resp. at 62 (citing ECF No. 299 at 32). However, this Court's class certification ruling has no bearing on whether the Court—at the *summary judgment* stage—should apply the continuing violations exception.  As the Supreme Court has explained, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 n.6 (2011) (a district court has no "'authority to conduct a preliminary inquiry into the merits of a suit'" at class certification unless it is necessary "to determine the propriety of certification"); Advisory Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 144 ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision.").  VDOC's argument for restricting the ADA and RA claims based on the applicable limitations period goes to the very merits of Plaintiffs' claims, and this statute of limitations

argument was not ruled on at that early stage of the proceedings.  And, in any event, the evidence before the Court at the summary judgment stage is different and more developed than the evidence in the record at the time of class certification.

Any particular failure to advance or demotion in the Step Down Program cannot be reduced to a single, monolithic policy or procedure covering every ICA hearing held for the Disability Plaintiffs.  Rather, any allegedly adverse decision becomes an actionable violation of the ADA and RA only when it is placed in the context of a request for accommodation.  It is the combination of (1) a decision not to advance or to demote a named Plaintiff in the Step-Down Program (2) despite a *request* for reasonable accommodation that would violate the ADA and RA.  Plaintiffs did not request any reasonable accommodation to progress through the Step-Down Program.  As such, the continuing violation exception is not applicable simply because Plaintiffs assert the discrete acts they experienced were part of a policy of discrimination.

### 3. The Disability Plaintiffs' claims accrued with each alleged demotion or failure to advance through the Step-Down Program.

Defendants assert that each of the alleged acts against the Disability Plaintiffs were discrete and actionable at the time they occurred, and that the named Plaintiffs knew, or at least should have known, of their alleged injuries when they occurred.  Plaintiffs *do not dispute* that all ICA determinations relating to the named Plaintiffs fall outside the statute of limitations period.  Nonetheless, they argue that such conduct remains actionable because the ICA reviews did not sufficiently put them on notice of their claims.  In other words, Plaintiffs argue that they were not "on notice" of their alleged injury until they discovered VDOC's alleged discriminatory intent.

Plaintiffs are wrong.  Their claims accrued upon awareness of their alleged injury—the failure to advance or demotion in the Step-Down Program, not when any named Plaintiff suspected

or could prove a legal wrong.[35]  As the Sixth Circuit opined in *Amini v. Oberlin College*, 259 F.3d 493 (6th Cir. 2001):

> Amini learned of his injury when Oberlin informed him that he would not be hired for its vacant statistics position.  As stated, the proper focus for purposes of determining the commencement of the [statute of] limitations period is on the discriminatory act itself and when that act was communicated to the plaintiff.  Amini's attempt to stop the running of the [ ] clock until he discovered the facts that led him to suspect discrimination is best addressed as a question of equitable tolling.

*Id*. at 500; *see also Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) ("At this point, the plaintiffs knew they had been injured and by whom, even if at that point in time the plaintiffs did not know of the legal injury, i.e., that there was an allegedly discriminatory motive underlying the failure to hire.") (citation omitted); *Thelen v. Marc's Big Boy Corp*., 64 F.3d 264, 267 (7th Cir.1995) (claim accrued upon termination, even though plaintiff did not discover he was replaced by younger employee until later; "[a] plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful"); *Dring v. McDonnell Douglas Corp*., 58 F.3d 1323, 1327–28 (8th Cir. 1995) (limitations period runs from date discriminatory act occurs, not when victim first perceives discriminatory motive); *Hulsey v. Kmart, Inc*., 43 F.3d 555, 558–59 (10th Cir. 1994) ("notice or knowledge of discriminatory motivation is not a prerequisite for a cause of action to accrue . . . .  [I]t is the knowledge of the adverse employment decision itself that triggers the running of the statute of limitations[.]"); *Hamilton v. 1st Source Bank*, 928 F.2d 86, 88–89 (4th Cir. 1990) ("To the extent that notice enters the analysis,

---

[35] *Brooks v. City of Winston-Salem, N.C*., 85 F.3d 178 (4th Cir. 1996), is distinguishable. *Brooks* did not alter the "general rule" that a § 1983 claim seeking damages for an allegedly unconstitutional warrantless arrest accrues when the plaintiff knows or should know of the injury, i.e. at the time of arrest.  *Id*. at 183.  The case recognized that an exception exists when the plaintiff's criminal proceedings end because the arrest was found to lack probable cause.  *Id.* Plaintiffs do not explain how this reasoning extends to the ADA and RA context.

it is the notice of the employer's actions, not the notice of a discriminatory effect or motivation, that establishes the commencement of the pertinent filing period."); *Merrill v. S. Methodist Univ.*, 806 F.2d 600, 604–05 (5th Cir. 1986) (rejecting argument that court should focus on the date the victim perceives a discriminatory motive rather than the actual date of the act itself).

Even taking Plaintiffs' assertions about the ICA determinations at face value, it does not matter that the ICA reviews "do nothing more than rubber-stamp decisions made by VDOC's BMC." Pls.' Resp. at 66. Nor does it matter that "ICA review determinations use boilerplate language and give no individualized reason or rationale for the outcomes, making it impossible to discern whether discrimination based on mental disability is occurring." *Id*. And it is of no moment that "[t]he BMC's decisions do not take into account the opinions of a mental health professional, whom the committee has included since 2017." *Id*. at 67. Rather, the critical issue is: did Plaintiffs receive notice of failures to progress or demotions in the Step-Down Program through ICA notices? The Disability Plaintiffs do not dispute that they did. Nor do they dispute that any alleged demotions or failures to promote through the Step-Down Program occurred before May 6, 2018.[36] Thus, Plaintiffs' claims are untimely.[37]

---

[36] To the extent Plaintiffs rely on named Plaintiff Wall's declaration, he does not aver that he failed to receive notice of ICA determinations. ECF No. 383-15, Wall Decl. ¶ 14. Nor does Hammer (who does not allege an ADA or RA claim) or non-named Plaintiff Arrington. ECF No. 383-17, Arrington Decl. ¶ 17; ECF No. 383-98, Hammer Decl. ¶ 26. And non-named Plaintiff Bowman's assertion that he did not regularly receive notice of ICA hearings, ECF No. 400-14, Bowman Decl. ¶ 10, does not provide evidence in support of the Disability Plaintiffs' individual ADA and RA claims.

[37] The same would be true for any putative class members who left the Step-Down Program before May 6, 2018.

> **4.      Equitable tolling does not apply to Plaintiffs' claims under the ADA and RA.**

A plaintiff asserting equitable tolling bears the burden of establishing: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *see also Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) (equitable tolling "is only available when an inmate diligently pursues his claims and demonstrates that the failure to timely file was caused by extraordinary circumstances."). Federal courts have applied equitable tolling "only sparingly." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).

> We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

*Id.*

Plaintiffs argue in favor of equitable tolling because they are housed in "maximum security," have strictly limited time out of their cells, limited access to forms for filing complaints, grievances, or requests for accommodation, and no control over the ICA hearing process. But even if true, these allegations do not establish the "extraordinary circumstances" that justifying tolling. *See*, *e.g.*, *Rizk v. United States*, No. 22-3834, 2023 WL 5275505, at *2 (6th Cir. Feb. 27, 2023) (holding that an inmate's "lack of access to the law library [and] legal forms, lack of legal training, and transfers between institutions did not justify equitable tolling"); *Andrews v. United State*s, No. 17–1693, 2017 WL 6376401, at *2 (6th Cir. Dec. 12, 2017) ("general allegations of placement in segregation and lack of access to legal materials are not exceptional circumstances warranting equitable tolling, . . . "); *Socha v. Boughton*, 763 F.3d 674, 685 (7th Cir. 2014) (incarceration alone, even in administrative segregation, does not justify equitable tolling); *Cross–*

65

*Bey v. Gammon*, 322 F.3d 1012, 1015 (8th Cir. 2003) (rejecting equitable tolling where petitioner alleged lack of legal knowledge and legal resources); *Akins v. United States*, 204 F.3d 1086 (11th Cir. 2000) (prison conditions, such as lockdowns or misplacement of legal papers, are typically not grounds for equitable tolling); *Wright v. Kelly*, No. 1:11CV86 (CMH/IDD), 2011 WL 13196289, at *2 (E.D. Va. Mar. 24, 2011) (rejecting equitable tolling for inmate "housed at a maximum security facility that goes on mandatory lockdown for two weeks every three months," and "was confined to his cell without access to the law library where he was using the typewriter to prepare his federal petition"); *Fuller v. Kelly*, No. CIV.A.7:09-CV-00117, 2009 WL 1675710, at *2 (W.D. Va. June 15, 2009) ("Fuller's bare allegations that he was denied access to adequate legal resources are not sufficient, standing alone, to entitle him to equitable tolling.").

Even assuming the grounds Plaintiffs assert for equitable tolling were colorable, their arguments still would fail because they present no evidence of the steps they took to diligently pursue their remedies. *See Pace*, 544 U.S. at 419 (refusing to apply equitable tolling when a petitioner waited for years to assert claim without explanation); *Miller v. N.J. State Dep't of Corrs.*, 145 F.3d 616, 618 (3d Cir. 1998) (for equitable tolling to apply, petitioner must show reasonable diligence); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) (plaintiff "provided no specificity regarding . . . the steps he took to diligently pursue his federal claims").

Absent adequate grounds for equitable tolling and without evidence that Plaintiffs took steps to diligently pursue their ADA and RA claims, Plaintiffs' argument for equitable tolling must be rejected.[38]

---

[38] The cases Plaintiffs cite in support of equitable tolling are distinguishable. *Holland v. Fla.*, 560 U.S. 631, 653 (2010) (plaintiff established diligence where he repeatedly contacted his attorney for information and direction, repeatedly contacted the state courts and the Florida State Bar Association, and prepared his own habeas petition the day he discovered that the statute of limitations had expires); *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 321

VI.    **Even if Plaintiffs' claims are not barred entirely, the scope of their recoverable relief is limited.**

   A.    **The PLRA's restriction on the scope of potential prospective relief require the dismissal of Plaintiffs' request for injunctive relief.**

Plaintiffs argue the Court cannot decide whether they may obtain injunctive relief at the summary judgment stage.  Pls.' Resp. at 71.  But the arguments they advance in support of that proposition are neither compelling nor correct.  Courts can and regularly do decide issues of relief at summary judgment.

   1.    **Plaintiffs tacitly acknowledge that the relief requested in their Complaint is too extreme to meet the PLRA's appropriateness prong.**

Plaintiffs' argument for the appropriateness of their requested relief appears to acknowledge that their Complaint sought more relief than they ever could be entitled to receive. In the Complaint, Plaintiffs asked the Court to "abolish the Step-Down Program," and altogether end long-term solitary confinement at Red Onion and Wallens Ridge.  Compl. ¶ 270.  These are extreme remedies that fail to meet the requirements of the PLRA.  Implicitly acknowledging as much, Plaintiffs' brief instead focuses on their request that the Court appoint a special master to undertake fact-finding and bring Defendants into compliance with unspecified "court orders." Pls.' Resp. at 72; Compl. ¶ 273.  But they fail to identify what "fact-finding" is needed or the "court orders" with which VDOC purportedly is not complying.[39]  Nor do they explain how such

---

(4th Cir. 2011) (record showed plaintiff was "extremely diligent" in pursuing her claim); *Mezu v. Dolan*, 75 F. App'x 910, 912 (4th Cir. 2003) (dismissing Title VII claim because plaintiff failed to show that defendant attempted to mislead her and that she reasonably relied on a misrepresentation in neglecting to timely assert a claim).

   [39]  To the extent Plaintiffs' reference to "court orders" refers to orders relating to a settlement agreement reached regarding the Mecklenberg Correctional Center, this Court already dismissed Plaintiffs' claim for breach of contract regarding that settlement agreement.  *Thorpe*, 2021 WL 2435868, at *4.

relief would satisfy the appropriateness prong of the PLRA injunction analysis.  Plaintiffs cite no law to suggest that either the drastic remedies sought in their Complaint, including complete abolition of the Step-Down Program, or the other relief they advocate in their brief can satisfy the appropriateness prong of the PLRA injunction analysis.

Plaintiffs also downplay Defendants' argument that the Court cannot issue an injunction requiring Defendants to "obey the law."  Pls.' Resp. at 72 n.43; Compl. ¶ 272.  But this is an important point on the issue of the appropriateness of Plaintiffs' requested relief.  Ample precedent supports Defendants' argument that the Court cannot simply order a party to stop violating the Eighth and Fourteenth Amendments, the ADA and the RA.  ECF No. 381 at 123 n.76; *see also Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 411 (6th Cir. 2016) (surveying circuit court opinions against "obey the law" injunctions); *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) (finding "[a]n injunction that does no more than order a defeated litigant to obey the law raises several concerns" including overbreadth and vagueness); *Davis v. Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322, 1328 (4th Cir. 1986) (vacating injunction that required defendant to "obey the statute").  Contrary to Plaintiffs' suggestion, Pls.' Resp. at 72 n.43, the Fourth Circuit's decision in *Porter* is not to the contrary.  In *Porter*, the Court supported a limited injunction prohibiting VDOC from reverting to its pre-2015 prison policies; it did not issue a general "obey the law" injunction.  923 F.3d at 353.  Plaintiffs' failure to request more specific, appropriate relief here supports Defendants' request for summary adjudication of their request for injunctive relief.

> **2.    The voluntary cessation doctrine does not apply to Plaintiffs' claims given the actions of the Virginia legislature, and the Court should not override the legislature's judgment.**

Plaintiffs argue both that injunctive relief is necessary because VDOC has not changed its practices since the onset of the litigation, Pls.' Resp. at 73, but then, in the same breath, argue that

policy changes that have occurred constitute "voluntary cessation," *id.* at 75.   Amid this doublespeak, Plaintiffs do not dispute that VDOC changed its policy to increase out-of-cell opportunities.   Pls.' Resp. at 74.   There is no dispute that VDOC's policy—and Virginia law— now requires prison officials to offer inmates at least four hours of out-of-cell time per day.   Defs.' Br., SUMF ¶ 50; Va. Code § 53.1-39.2.

In the face of these revised policies, Plaintiffs nonetheless assert that their requested relief remains necessary because even four hours of out-of-cell time remains "solitary."   Pls.' Resp. at 74. This argument is inconsistent with the facts, the reports of Plaintiffs' experts, findings of other courts, and the definition of solitary confinement advanced by Plaintiffs' own counsel, the ACLU. *See, e.g.*, ECF No. 400-50, Haney Rep. ¶ 35 n.6 (finding "solitary confinement" involves "upwards of 22 hours a day or more" of involuntary confinement in cells but citing one case involving confinement of 21 hours per day or more); ACLU, *Silent Injustice: Solitary Confinement in Virginia* at 14, 58 (2018) (https://tinyurl.com/29f4tymy) (defining "solitary confinement" as the "isolation of a person in a cell for approximately 22 to 24 hours a day with little human contact or interaction . . . ."); *United Nations Standard Minimum Rules for the Treatment of Prisoners*, Rule 44  (https://tinyurl.com/zv55zbun)  (defining  "solitary  confinement"  as  "the  confinement  of prisoners for 22 hours or more a day").

Plaintiffs offer the alternative argument that VDOC could simply abandon the changes it made, necessitating injunctive relief based on voluntary cessation principles.   But the Virginia General Assembly precluded that outcome.   As discussed in Defendants' opening brief, Virginia Code § 53.1-39.2 mandates that prison officials offer persons in restorative housing at least four hours of out-of-cell time, among other due process requirements for inmates in Virginia detention facilities.   It is well-established that changes in legislation, as opposed to policies or regulation,

69

can moot requests for injunctive relief. *See, e.g.*, *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019). The court in *Speech First* recognized that the nature of legislative changes render them unique from other forms of voluntary cessation like individual policy changes within a government organization. *Id.* Here, there is no indication that the General Assembly intends to reverse the law. Other courts have similarly noted the unique power of legislative change to moot requests for injunctive relief as compared to ordinary voluntary cessation. *See Town of Portsmouth, R.I. v. Lewis*, 813 F.3d 54, 59 (1st Cir. 2016) (finding state legislative action did not qualify as voluntary cessation and "we presume that a state legislature enacts laws in good faith"); *Nat'l Black Police Ass'n v. D.C.*, 108 F.3d 346, 349 (D.C. Cir. 1997) (finding that, to show new legislation qualifies for voluntary cessation exception allowing injunctive relief, plaintiff must prove likeliness of reenactment of previous law).

Again, Plaintiffs cite to *Porter* to support their arguments on voluntary cessation and mootness. Pls. Resp. at 76. And again, Plaintiffs miss the mark. In *Porter*, the voluntary cessation involved the independent decision of corrections officials to stop engaging in the challenged conduct. 923 F.3d at 364. Here, the General Assembly acted to require VDOC to follow specific rules about conditions of confinement for prisoners in restorative housing. Thus, for the reasons explained above, the circumstances of *Porter* and the present case are readily distinguishable.

## B. Defendants are entitled to summary judgment on any purported damages claims for physical and psychological injuries.

Plaintiffs acknowledge that the Supreme Court's decision in *Cummings* precludes recovery of compensatory damages for emotional distress. Pls.' Resp. at 79; *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022). Their Complaint seeks relief for "compensatory damages for Defendants' contractual, constitutional and statutory violations, including damages for emotional pain and suffering." Compl. ¶ 274. It *does not* seek damages for physical injuries,

despite Plaintiffs' attempt to expand their request for relief through their opposing brief.  Pls.' Resp. at 79.  Even the paragraph of the Complaint cited by Plaintiffs to support their claim does not mention physical injury at all.  *Id.* (citing Compl. ¶ 258).

Nevertheless, even if the Court finds that Plaintiffs did request relief for physical or "psychological" injuries, the Court should grant summary judgment for Defendants.

*First*, Plaintiffs cannot recover for "psychological" injuries because *Cummings* precludes such relief.  Psychological injuries and emotional distress are the same.  Cases in the Fourth Circuit recognize that psychological injuries can support claims for emotional distress, and do not recognize standalone compensatory damages for "psychological injuries."  *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1254 (4th Cir. 1996) (discussing evidence required to show emotional distress, including psychological treatment or counseling); *Ney v. Landmark Educ. Corp.*, No. 92–1979, 1994 WL 30973 (4th Cir. Feb. 2, 1994).  In *Ney*, for example, a plaintiff filed a claim for negligent infliction of emotional distress, which the trial court dismissed.  Plaintiff appealed, claiming, like Plaintiffs here, that her complaint actually asserted distinct claims for emotional distress, "psychological" injuries and physical injuries.  The Fourth Circuit did not buy her sleight of hand, finding "[d]espite her attempt to segregate her claims into three distinct sorts of injuries, at bottom, she seeks relief for infliction of emotional distress."  *Id*. at *3.  The Court acknowledged that Virginia law required some physical manifestation of emotional distress to allow recovery, so rather than separate bases for compensatory damages, plaintiff only plead allegations of physical and psychological injuries to support potential damages for emotional distress.

More recently, and in direct response to *Cummings*, courts similarly have refused to allow plaintiffs to expand demands for relief based on "repackaged damages for emotional harm that are

not compensable after *Cummings*." *Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-00614-MSN-IDD, 2023 WL 424265, at *5 (E.D. Va. Jan. 25, 2023). In *Doe*, plaintiff alleged physical symptoms that occurred based on plaintiff's alleged emotional anguish, including vomiting and loss of appetite. *Id*. at *6. Plaintiff presented invoices for counseling and medical treatment for stomach issues to support her damages claims. But the Court determined "these damages resemble varying forms or descriptions of emotional distress and are therefore unavailable under *Cummings*." *Id.*

The *Doe* court relied in part on *Doe next friend of Doe v. City of Pawtucket*, 633 F. Supp. 3d 583, 590 (D.R.I. 2022). In that case, the plaintiff sought both damages for physical injuries resulting from a sexual assault, and compensatory damages for "pain and suffering." *Id*. The Court determined that plaintiff may be able to recovery for physical injuries suffered as a result of the sexual assault[40] after *Cummings*, but could not recover for pain and suffering. The Court found that "[t]he non-medical expense, non-emotional distress damages requested in the complaint—psychological damage, post traumatic syndrome, and loss of enjoyment—resemble varying forms or descriptions of emotional distress" barred by *Cummings. Id.* at 591. The same result should hold here, where the Complaint seeks damages for "emotional pain and suffering" and only alleges "injuries including pain and suffering, emotional distress, and an exacerbation of their mental illness." Compl. ¶¶ 258, 274; *see also* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or

---

[40] Plaintiffs here allege no similar battery or physical assaults by VDOC, and certainly could not seek relief for such claims on a class-wide basis.

emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act.").

Even the cases Plaintiffs cite in support of allowing some forms of compensatory damages after *Cummings* indicate their attempt to recategorize emotional distress damages as something else should fail.  In *A.T. v. Oley Valley Sch. Dist.*, No. 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023), the Court granted summary judgment for the defendant related to the plaintiff's claim for compensatory emotional distress damages under Title IX, and found that emotional distress damages included "Plaintiffs' claims for past, present and future medical expenses based on emotional distress such as bipolar disorder, anxiety, humiliation, embarrassment, frustration and alcohol and drug addiction and past, present and future emotional pain and suffering/mental distress."  Thus, the Court treated psychological issues like bipolar disorder as a subset of emotional distress damages, and precluded medical expenses arising out of physical symptoms caused by emotional distress.  Those are the same types of damages Plaintiffs attempt to segregate from emotional distress here, and the Court should reject their efforts.

Moreover, even if the Court determined Plaintiffs' Complaint sought relief for compensatory damages from physical injuries not precluded by *Cummings*, the Disability Plaintiffs point to alleged physical injuries suffered by *other* inmates. Pls.' Resp. at 79–80 (referring to physical injuries purportedly suffered by non-Disability Plaintiffs Hammer, Mukuria, Cornelison, Brooks, and Thorpe).  The only evidence cited of a purported physical injury suffered by a Disability Plaintiff is the allegation in the Hendricks Report that Disability Plaintiff Wall complained of migraines. But there is no evidence of any connection between Wall's migraines

and the alleged failure to provide a reasonable accommodation to allow Wall to participate in the Step-Down Program.[41]  *See* ECF No. 400-55, Hendricks Rep. ¶¶ 92–100.

Finally, even if the Disability Plaintiffs could show physical injuries, Defendants still are entitled to summary judgment because Plaintiffs have presented no evidence of intentional discrimination.  *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022); *see also Basta v. Novant Health Inc.*, 56 F.4th 307, 316 (4th Cir. 2022).  Intentional discrimination requires Plaintiffs to show deliberate indifference, which is a "high bar" that requires Plaintiffs to show that an official knew of the "dangers to federal rights and nonetheless disregard[ed] them."  *Koon*, 50 F.4th at 406.  Furthermore, a plaintiff must also prove that a defendant "acted with an intent to discriminate."  *Basta*, 56 F.4th at 316.

Plaintiffs offer no evidence of intent to discriminate, instead proffering notes from a single, clinical interview for a psychological evaluation of one Disability Plaintiff, Riddick, which stated that his continued placement in VDOC's restrictive housing "may" have contributed to his PTSD symptoms.  Pls.' Resp. at 80, ECF No. 400-99, VADOC- 00163104 at 111.  Even this assertion has been contradicted by another psychologist, who opined that Riddick's incidents of acting out were "volitional" and not a result of mental health issues.  *Id.*  Thus, VDOC's failure to remove Riddick from restrictive housing based on contradicted evidence that solitary confinement "may" have contributed to his PTSD symptoms does not satisfy the high bar for showing deliberate

---

[41]  Plaintiffs also cite to several cases in which courts allowed plaintiffs to seek compensatory damages for alleged "loss of opportunity."  The Disability Plaintiffs do not state in their Complaint that they are seeking "loss of opportunity" damages.  *See* Compl. ¶¶ 258, 274–277.

indifference.[42]  For this independent and additional reason, Defendants are entitled to summary judgment.

## **CONCLUSION**

The Court should grant summary judgment in favor of Defendants.

October 24, 2023

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239
moshea@oag.state.va.us

Respectfully submitted,

/s/ *Maya M. Eckstein*

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*

---

[42] While Plaintiffs contend that "VDOC mental health staff complained that mental health offenders were 'still being sent to ROSP for segregation housing,'" *see* Pls.' Resp. at 81, ECF No. 383-103, they rely on a February 2012 email that does not relate in any way to any of the Disability Plaintiffs.  Thus, this evidence also is not relevant.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By:     <u>*/s/ Maya M. Eckstein*</u>
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Defendants*

## INDEX OF EXHIBITS

| Ex. | Description |
| --- | --- |
| 1 | Defendants' Reply to Plaintiffs' Statement of Genuine Disputes of Material Facts in Opposition to Defendants' Motion for Summary Judgment |
| 2 | VDOC's Supplemental Objections and Answers to Plaintiffs' Third Set of Interrogatories to VDOC (relevant pages) |
| 3 | Molter Deposition Transcript (relevant pages) |
| 4 | VDOC's Objections and Answers to Plaintiffs' Fourth Set of Interrogatories to Defendant VDOC (relevant pages) |
| 5 | Declaration of Keith Sykes |
| 6 | 2014 VADOC-00001876; VADOC-00001919; |
| 7 | VADOC-00001978; VADOC-00002042 |
| 8 | VADOC-00002083; VADOC-00002160; VADOC-00002214; |
| 9 | VADOC-00002244; VADOC-00002301 |
| 10 | Declaration of Amee Duncan |
| 11 | Declaration of Larry Collins |
| 12 | Declaration of Edward Creech |
| 13 | Mental Health Serious Mental Illness (SMI) Determination (under seal) |
| 14 | Hendricks Deposition Transcript (relevant pages) |
| 15 | VADOC-0011009 |
| 16 | VADOC-0011010 |
| 17 | Morgan Deposition Transcript (relevant pages) |
| 18 | Wells Deposition Transcript (relevant pages) |
| 19 | VADOC-00000732 |
| 20 | VADOC-00135929 |
| 21 | VADOC-00135595 |
| 22 | VADOC-00135689 |
| 23 | Wall Deposition Transcript (relevant pages) |