**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

WILLIAM THORPE, *et al.*,

                             *Plaintiffs*,

            v.

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al.*,

                             *Defendants*.

Civil Case No. 2:20-cv-00007-JPJ-PMS

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Table of Authorities .................................................................................................... ii

Introduction.................................................................................................................. 1

Argument ..................................................................................................................... 2

I.    Plaintiffs Are Entitled to Summary Judgment on Their Eighth Amendment Claim. ......... 2

      A.    The Conditions of the Step-Down Program Create a Significant Risk of
            Injury........................................................................................................ 3

      B.    Evidence in the Record Shows That Defendants Acted with Deliberate
            Indifference to Harms Plaintiffs Suffered in the Step-Down Program................. 14

II.   Plaintiffs Are Entitled to Summary Judgment on Their Due Process Claim................... 22

      A.    Plaintiffs Have a Liberty Interest in Avoiding Level S and the Step-Down
            Program.................................................................................................... 22

      B.    The Step-Down Program Does Not Provide Meaningful Review
            Mechanisms. ............................................................................................. 32

III.  Plaintiffs Are Entitled to Summary Judgment on VDOC's ADA Affirmative
      Defenses.......................................................................................................... 39

      A.    Named Plaintiffs Can Seek Summary Judgment, Either on a Class-Wide
            Basis or on Their Individual Claims. ............................................................ 39

      B.    VDOC Had a Duty to Assess Any Alleged Undue Burden or Fundamental
            Alteration, Which It Did Not Do. ................................................................. 41

      C.    VDOC Has Not Identified Any Genuine Disputes of Material Fact to
            Avoid Dismissal of its Affirmative Defenses. ................................................ 43

Conclusion ................................................................................................................. 46

## TABLE OF AUTHORITIES

CASES                                                                                           Page(s)

*Abron v. Black & Decker (U.S.) Inc.*,
    654 F.2d 951 (4th Cir. 1981) ..................................................................................40

*Bennett v. Westfall*,
    640 F. Supp. 169 (S.D.W. Va. 1986), *aff'd*, 836 F.2d 1342 (4th Cir. 1988) ..........................40

*Carmouche v. Hooper*,
    77 F.4th 362 (5th Cir. 2023) ..................................................................................28

*Coffey v. Chem. Specialties, Inc.*,
    4 F.3d 984, 1993 WL 318886 (4th Cir. 1993) ..........................................................19

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..............................................................................................3

*Dean v. Univ. at Buffalo Sch. of Med. & Biomed. Scis.*,
    804 F.3d 178 (2d Cir. 2015)....................................................................................43

*Doe v. Citadel*,
    2022 WL 2806473 (D.S.C. July 18, 2022), *aff'd sub nom. Doe v. The Citadel*,
    2023 WL 3944370 (4th Cir. June 12, 2023) ...........................................................14

*Farmer v. Brennan*,
    511 U.S. 825 (1994)..............................................................................................2

*Forsyth v. Barr*,
    19 F.3d 1527 (5th Cir. 1994), *cert. denied sub nom. Forsyth v. Vines*, 513 U.S.
    871, 115 S. Ct. 195, 130 L.Ed.2d 127 (1994) ..........................................................19

*Graham v. Florida*,
    560 U.S. 48 (2010)................................................................................................17

*Grissom v. Roberts*,
    902 F.3d 1162 (10th Cir. 2018) .............................................................................12

*Heard v. Caruso*,
    351 F. App'x 1 (6th Cir. 2009) ..............................................................................26

*Hewitt v. Helms*,
    459 U.S. 460 (1983)..............................................................................................34

*Incumaa v. Stirling*,
    791 F.3d 517 (4th Cir. 2015) ........................................................................ *passim*

*Jones v. UPS Ground Freight*,
    683 F.3d 1283 (11th Cir. 2012). ............................................................5

*Kennedy v. Louisiana*,
    554 U.S. 407 (2008)............................................................................17

*Lee v. City of Richmond, Va.*,
    100 F. Supp. 3d 514 (E.D. Va. 2015) ..................................................43

*Luckey v. Harris*,
    860 F.2d 1012 (11th Cir. 1988) ...........................................................14

*Marion v. Columbia Corr. Inst.*,
    559 F.3d 693 (7th Cir. 2009) .........................................................29, 35

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)........................................................................37, 38

*McClary v. Kelly*,
    4 F. Supp. 2d 195 (W.D.N.Y. 1998) .....................................................8

*McCord v. Maggio*,
    927 F.2d 844 (5th Cir. 1991) .........................................................10, 11

*Nat'l Fed'n of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) ...............................................................44

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
    804 F.3d 646 (4th Cir. 2015) .........................................................38, 39

*Palakovic v. Wetzel*,
    854 F.3d 209 (3d Cir. 2017)....................................................1, 10, 12

*Palmer v. Richards*,
    364 F.3d 60 (2d Cir. 2004).................................................................29

*Piscitello v. Berge*,
    2002 WL 32349400 (W.D. Wis. June 13, 2002), *aff'd*, 94 F. App'x 350 (7th
    Cir. 2004) .............................................................................................11

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019) ............ *passim*

*Prieto v. Clarke*,
    780 F.3d 245 (4th Cir. 2015) ...............................................................38

*Quintanilla v. Bryson*,
    730 F. App'x 738 (11th Cir. 2018) .......................................................14

*Reid v. Clarke*,
    2017 WL 706352 (W.D. Va. Feb. 22, 2017) ..............................................14

*Reyazuddin v. Montgomery Cnty., Md.*,
    789 F.3d 407 (4th Cir. 2015) ...................................................................40

*Robinson v. EMC Mortg. Corp.*,
    2013 WL 1245863 (N.D. Tex. Mar. 26, 2013) ........................................19

*Salmon v. Cable & Wireless USA, Inc.*,
    2003 WL 1730413 (D. Md. Mar. 18, 2003)........................................18, 19

*Smith v. Collins*,
    964 F.3d 266 (4th Cir. 2020) ..............................................................22, 32

*Smith v. Shettle*,
    946 F.2d 1250 (7th Cir. 1991) .................................................................30

*TFWS, Inc. v. Franchot*,
    572 F.3d 186 (4th Cir. 2009) ...................................................................38

*Thomas M. Gilbert Architects, P.C. v. Accent Builders & Devs., LLC*,
    629 F. Supp. 2d 526 (E.D. Va. 2008) ......................................................44

*Thorpe v. Clarke*,
    37 F.4th 926 (4th Cir. 2022) .......................................................... *passim*

*Thorpe v. Va. Dep't of Corr.*,
    2021 WL 2435868 (W.D. Va. June 15, 2021) ......................................15, 40

*Toevs v. Reid*,
    685 F.3d 903 (10th Cir. 2012) ............................................................33, 35

*United States v. Barnette*,
    211 F.3d 803 (4th Cir. 2000) ...................................................................15

*Veal v. Lane*,
    14 F.3d 605 (7th Cir. 1993) .....................................................................11

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ...................................................................15

*Wilkinson v. Austin*,
    545 U.S. 209 (2005)........................................................................ *passim*

*Williams v. Fountain*,
    77 F.3d 372 (11th Cir. 1996) ...................................................................29

*Williams v. Sec'y Pa. Dep't of Corr.*,
    848 F.3d 549 (3d Cir. 2017)..............................................................10, 12, 26, 30

STATUTES

Americans with Disabilities Act ....................................................................... *passim*

Rehabilitation Act ...........................................................................................40, 41

REGULATIONS

28 C.F.R. § 35.130(b)(7) .......................................................................................43

28 C.F.R. § 35.150(a)(3) .......................................................................................42

28 C.F.R. § 35.160(a)(1) .......................................................................................42

28 C.F.R. § 35.164 ..........................................................................................41, 42

RULES

Fed. R. Civ. P. 23 .................................................................................................40

Fed. R. Civ. P. 56 ...................................................................................................1

OTHER AUTHORITIES

Alex Kozinski, *Worse Than Death*, 125 YALE L.J. F. 230 (2016)................................8

Craig Haney, *Mental Health Issues in Long–Term Solitary and "Supermax"
    Confinement*, 49 CRIME & DELINQUENCY 124, 132 (2003)....................................16

Jesenia Pizario & Vanja M.K. Stenius, *Supermax Prisons: Their Rise, Current
    Practices, and Effect on Inmates*, 84 PRISON J. 248, 256 (2004)...........................16

## INTRODUCTION

Defendants' opposition brief falls well short—both factually and legally—of the showing required to defeat Plaintiffs' motion for summary judgment.  Although Defendants baldly assert that much of the factual record is in dispute, their say-so is not enough.  Indeed, Defendants do not even attempt to dispute many critical facts, and where they do, they often rely entirely on legal arguments or speculation, rather than record evidence, as Rule 56 requires.  This is plainly insufficient to create a genuine issue of fact.  As a result, what few factual disputes exist are immaterial, and Plaintiffs' claims are amply supported by the undisputed factual record.

Because Defendants have failed to muster any record evidence to create a material dispute as to the elements of Plaintiffs' claims, they instead strain to distinguish the relevant case law that should guide the Court's analysis of Plaintiffs' claims.  Defendants draw meaningless distinctions between the conditions and processes of the Step-Down Program and the conditions and processes described in other precedential decisions, including *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), and *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019).  But they ultimately fail to show why this case should not follow in the long—and growing—line of cases that have found constitutional injuries arising from solitary confinement schemes like the Step-Down Program.

With discovery now closed, the factual record demonstrates what Plaintiffs have alleged all along:  Defendants designed and implemented a program that subjects its participants to unconscionable conditions that create a substantial risk of physical and psychological harm, without any procedural protections to meaningfully evaluate participants' continued confinement in the program.  The Virginia Department of Corrections ("VDOC") and the individual defendants knew of these risks and deficiencies but disregarded them.  The Step-Down Program

1

continues to operate largely as it always has, and the people subjected to it continue to experience the significant harm that inevitably results.

Because Plaintiffs have shown as a matter of law that the conditions of the Step-Down Program violate both the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment, and that Defendants are not entitled to avail themselves of certain affirmative defenses to Plaintiffs' ADA claims, this Court should grant judgment in Plaintiffs' favor on those claims.

## ARGUMENT

### I.    Plaintiffs Are Entitled to Summary Judgment on Their Eighth Amendment Claim.

The undisputed facts set out in Plaintiffs' summary judgment motion establish that (1) long-term confinement in the conditions of VDOC's Step-Down Program creates a universal risk of serious injury, and (2) Defendants were deliberately indifferent to this risk. *See Porter*, 923 F.3d at 355; *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (establishing the elements of an Eighth Amendment conditions-of-confinement claim). As discussed below, Defendants have largely conceded the material facts regarding the conditions of confinement in the Step-Down Program and have offered no rebuttal to Plaintiffs' expert's opinion that the Step-Down Program does constitute solitary confinement. Because it is not possible to dispute the harshness of these conditions, Defendants rely solely on the amount of out-of-cell time currently offered to argue that the Step-Down Program is distinguishable from other solitary confinement schemes that courts have found unconstitutional. This argument ignores the reality that where out-of-cell time consists mainly of spending several hours per day alone in a barren, inhospitable cage—for which a prerequisite is an invasive and humiliating strip search—the quantity of such out-of-cell time does not materially change the quality of the overall conditions of confinement.

Based on their fundamental mischaracterization of the definition of solitary confinement, Defendants insist that they did not and could not have known of the risks of harm posed by the Step-Down Program. But Defendants concede many material facts that establish their awareness that solitary confinement creates a significant risk of harm to people housed in it, especially those with mental illness. *See infra* § I.B. Similarly, Defendants attempt to paint the conclusions of Plaintiffs' expert, Dr. Craig Haney—the preeminent scholar in this area who has conducted many of his own studies and reviewed hundreds if not thousands of other studies and articles to reach his conclusions, and whose work in this field has been cited and credited by the United States Supreme Court—as "heavily disputed," or not applicable to the Step-Down Program.[1] ECF No. 402, Defs.' Br. Opp. Plfs.' Mot. Summ. J. [hereinafter "Opp."] at 11. But these arguments lack any basis in the record, and the opinions of Defendants' expert on these topics are unreliable and internally inconsistent; accordingly, they do not meet the admissibility standard for expert opinions. *See* ECF No. 367, Mem. in Supp. of Mot. to Exclude Dr. Robert Morgan [hereinafter "Morgan Mot."]. Based on the undisputed material facts in the record, Defendants cannot credibly claim that the risk of harm from solitary confinement was not obvious or known to them. The undisputed facts establish as a matter of law that Defendants violated Plaintiffs' Eighth Amendment rights and that Plaintiffs are entitled to summary judgment.

## A. The Conditions of the Step-Down Program Create a Significant Risk of Injury.

Plaintiffs have established, as a matter of law, that the conditions of confinement they experienced posed a significant and objectively intolerable risk of serious harm warranting relief

---

[1] Notably, Defendants have not challenged Dr. Haney's opinions as inadmissible pursuant to the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

under the Eighth Amendment. First, Defendants do not dispute an overwhelming majority of the

material facts supporting Plaintiffs' claim that the conditions of confinement in the Step-Down

Program provide extremely limited opportunities for meaningful social interaction and

environmental stimulation, and subject prisoners to intolerable living conditions. For example:

- **General Conditions**. Each Step-Down Program cell is furnished with only a bed, a toilet, and a small wall-mounted desk and shelf, and has a steel door two inches thick. ECF No. 383-119, Plfs.' Am. Stmt. Undisputed Material Facts [hereinafter "Plfs.' SUMF"] ¶¶ 135, 137; ECF No. 402-1, Defs.' Resp. Plfs.' Am. Stmt. Undisputed Material Facts [hereinafter "Defs.' SUMF Response"] ¶¶ 135, 137. Cells have only a narrow rectangular external window that is frosted over, which prevents prisoners from seeing out. ECF No. 383-119, Plfs.' SUMF ¶ 138; ECF No. 402-1, Defs.' SUMF Response ¶ 138. The cell doors have a window so that guards can see into the cell at all times. ECF No. 383-119, Plfs.' SUMF ¶ 136; ECF No. 402-1, Defs.' SUMF Response ¶ 136. Step-Down Program prisoners have no cell partner. ECF No. 383-119, Plfs.' SUMF ¶ 162; ECF No. 402-1, Defs.' SUMF Response ¶ 162. Prisoners in the Step-Down Program eat all meals alone in their cells. ECF No. 383-119, Plfs.' SUMF ¶¶ 138, 161; ECF No. 402-1, Defs.' SUMF Response ¶¶ 138, 161. While Defendants claim that prisoners are able to communicate with each other, *see* ECF No. 402, Opp. at 24 n.28, the evidence cited by Defendants in support of this allegation demonstrates that conversations can only occur when prisoners yell through tray slots in the steel doors of their cells or stand on their sinks to shout through the ventilation system.[2]

- **Limited Time Out of Cell**. Step-Down Program policy provided prisoners only one hour of out-of-cell time from 2012-2017, two hours of out-of-cell time from 2017-2018, two to four hours of out-of-cell time from 2018-2019, and three hours out of cell for parts of 2019. ECF No. 383-119, Plfs.' SUMF ¶¶ 144–45, 147; ECF No. 402-1, Defs.' SUMF Response ¶¶ 144–45, 147. After this litigation commenced, a policy memo was circulated providing four hours out-of-cell time. *See* ECF No. 383-119, Plfs.' SUMF ¶¶ 147–48; ECF No. 402-1, Defs.' SUMF Response ¶¶ 147–48.[3] In addition, Step-Down prisoners have been

---

[2] *See* Ex. 155, Brooks Dep. at 254:2–4; ECF No. 400-95, Cavitt Dep. at 222:19–20; ECF No. 400-95, Cornelison Dep. at 37:19–21, 221:18–19; Ex. 123, Hammer Dep. at 14:17–19; ECF No. 400-96, Mukuria Dep. at 17:20–22.

[3] Notably, Defendants misquote the September 2019 memo to suggest that the out-of-cell activity for persons in Level S include "outdoor exercise, visitation, interactive journaling, programming, and other group elective options," ECF No. 402, Opp. at 23 (citing ECF No. 383-70, VADOC-00118556), and rely on the same memo to suggest it is undisputed that prisoners have opportunities for "congregate activity," *id.* at 24 (citing ECF No. 402-1, Defs.' SUMF Response ¶ 148). In fact, the section of that memo that applies to Level S and Level 6 provides only that each prisoner "will (continued…)

denied the out-of-cell time to which they are entitled under the policy memo for various reasons, including on holidays, because of inclement weather, and during quarterly shakedowns that last 7-10 days and during which Step-Down Program prisoners may not leave their cells at all. ECF No. 383-119, Plfs.' SUMF ¶ 154; ECF No. 402-1, Defs.' SUMF Response ¶ 154.[4] The only record evidence quantifying time out of cell *in practice* indicates that Step-Down Program prisoners get less than four hours per day. *Compare* ECF No. 383-119, Plfs.' SUMF ¶ 150 (citing numbers from VDOC's internal records) *with* ECF No. 402-1, Defs.' SUMF Response ¶ 150 (citing only VDOC policy). And prisoners in practice are often given even less time than this, because, for example, their recreation is cut off if they need to use the bathroom. *See* ECF No. 383-119, Plfs.' SUMF ¶ 155; ECF No. 402-1, Defs.' SUMF Response ¶ 155.[5]

- **Strip Searches**. Unlike the general population, Step-Down Program prisoners must be strip searched as a precondition to leaving their cell for any reason. ECF No. 383-119, Plfs.' SUMF ¶ 166; ECF No. 402-1, Defs.' SUMF Response ¶ 166. Defendants attempt to distinguish strip searches from body cavity searches, ECF No. 402-1, Defs.' SUMF Response ¶ 166, but the record evidence they cite for this point shows that the dispute is one of semantics, and does nothing to dispute the dehumanizing nature of these routine strip searches, which require prisoners to ███████████████████ while under observation by corrections staff ████████████████████ then staff visually inspect the insides of prisoners' ears and then have them ██████████████████ ████  and  ███████████████ Ex. 119, Robinson Dep. at 143:9–145:11.

---

[4] Defendants argue that Plaintiffs rely only on their expert's characterization of inadmissible hearsay to support this point. ECF No. 402, Opp. at 7. That is both incorrect and irrelevant. First, Plaintiffs rely on the testimony of VDOC employees, which confirm these facts. Second, Defendants acknowledge that an expert may rely on information that an "expert[] in the field would reasonably rely on . . . in forming an opinion on [a] subject." *Id*. at 7 n.9. Further, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (internal quotation marks omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Id*. at 1294. Plaintiffs' evidence on this point includes sworn declarations by Plaintiffs in this case, who could testify at trial to corroborate these facts. *See, e.g.*, ECF No. 383-50, Cavitt Decl.

[5] Defendants critique Plaintiffs' reliance on testimony by Plaintiff Kevin Snodgrass to support this point, *see* ECF No. 402-1, Defs.' SUMF Response ¶ 155, but Plaintiffs cite corroborating testimony by former ROSP Unit Manager Michael Younce, as well, *see* ECF No. 383-119, Plfs.' SUMF ¶ 155; *see also* ECF No. 383-47, Younce Dep. at 236:17–237:2.

---

be provided the opportunity to participate in a minimum of four hours out of cell activity, seven days a week," whereas the references to visitation, recreation, interactive journals, and elective options are in the section of the memo that applies to restrictive housing units in Levels 1-5—*not* Levels S or 6—and there is no reference whatsoever to congregate activity for prisoners in Level S or 6. *See* ECF No. 383-70, VADOC-00118556.

- **Limited Out-of-Cell Activity**.  Out-of-cell programming other than recreation time is limited.  ECF No. 383-119, Plfs.' SUMF ¶ 159; ECF No. 402-1, Defs.' SUMF Response ¶ 159.  Even after being strip searched, Step-Down Program prisoners are usually restrained while out of their cell.  ECF No. 383-119, Plfs.' SUMF ¶ 167; ECF No. 402-1, Defs.' SUMF Response ¶ 167.  Outdoor recreation for prisoners in the Step-Down Program is conducted alone, in solitary cages smaller than those recommended by the American Correctional Association (the "ACA"), and without access to any recreational equipment or toilet facilities, ECF No. 383-119, Plfs.' SUMF ¶¶ 156–57; ECF No. 402-1, Defs.' SUMF Response ¶¶ 156–57.  Defendants only response to these facts—which are all undisputed—is to refer to evidence, *see* ECF No. 402, Opp. at 24 n.28, indicating that prisoners can communicate with other prisoners in recreation cages by yelling across the yard, *see* ECF No. 400-95, Cornelison Dep. at 42:17–18; Ex. 123, Hammer Dep. at 15:25–16:7.  As far as programming, it is undisputed that prisoners in at least the IM-0 and SM-0 privilege levels must "participate" alone in their cells.  ECF No. 383-119, Plfs.' SUMF ¶ 159; ECF No. 402-1, Defs.' SUMF Response ¶ 159.  Level S prisoners who are permitted to program out-of-cell must do so while shackled or otherwise restrained in secure chairs or small cages euphemistically referred to as "therapeutic modules."  ECF No. 383-119, Plfs.' SUMF ¶ 159 (citing Ex. 120, Haney Rep. ¶ 142, Photograph 7), ¶ 165; ECF No. 402-1, Defs.' SUMF Response ¶¶ 159, 165.

- **Visit Restrictions**.  Prisoners in the IM and SM pathways are not permitted to have contact visits with loved ones, so all visits are conducted through plexiglass.  *See* ECF No. 383-119, Plfs.' SUMF ¶ 132 (SM pathway prisoners cannot have contact visits), ¶¶ 129–30 (analogizing SM pathway and IM pathway privileges); ECF No. 402-1, Defs.' SUMF Response ¶¶ 129–30, 132.  And Step-Down Program prisoner visits are rare.  For example, IM-0 prisoners have at most one 1-hour non-contact visit per week.  *See* ECF No. 402-1, Defs.' SUMF Response ¶ 121; ECF No. 383-2, VADOC-00053480 at -537 (2020 Step-Down Manual).

- **Restrictions on Other Privileges**.  In addition to spending nearly every hour of every day alone, Step-Down program participants also have little access to other forms of environmental stimulation.  Prisoners in IM-0, IM-1, IM-2, SM-0, and SM-1 are limited to between two and four phone calls a month, depending on privilege level.  ECF No. 383-119, Plfs.' SUMF ¶¶ 121, 124–25, 129–30; ECF No. 402-1, Defs.' SUMF Response ¶¶ 121, 124–25, 129–30.  Prisoners at IM-0 and SM-0 are not permitted to have a TV or radio in their cells, may borrow only two library books biweekly, and may not purchase food items from commissary.  ECF No. 383-119, Plfs.' SUMF ¶¶ 121, 129; ECF No. 402-1, Defs.' SUMF Response ¶¶ 121, 129; Plfs.' Reply to Defs.' Response to Plfs.' Am. Stmt. Undisputed Material Facts [hereinafter "Plfs.' SUMF Reply"] ¶ 121.  Prisoners at other privilege levels within the Step-Down Program may borrow additional library books and may purchase food from commissary, but their access to these privileges is still restricted.  *See* ECF No. 383-119, Plfs.' SUMF ¶¶ 121, 123–30; ECF No. 402-1, Defs.' SUMF Response ¶¶ 121, 123–30.

- **Length of Confinement**.  Prisoners in the Step-Down Program spend many months or, more often, years in these draconian and isolated conditions.  It takes a minimum of 18

months to progress through the IM Pathway (IM-0, IM-1, and IM-2), and a minimum of 9 months to progress through the SM Pathway (SM-0, SM-1, and SM-2). ECF No. 383-119, Plfs.' SUMF ¶ 49; ECF No. 402-1, Defs.' SUMF Response ¶ 49. There is no maximum length of time that a prisoner may remain in the IM or SM Pathways. ECF No. 383-119, Plfs.' SUMF ¶ 51; ECF No. 402-1, Defs.' SUMF Response ¶ 51. Once a prisoner progresses to Level 6, there is no maximum amount of time that they may remain there. ECF No. 383-119, Plfs.' SUMF ¶ 53; ECF No. 402-1, Defs.' SUMF Response ¶ 53. While at any stage of the IM or SM Pathways, including at Level 6, a prisoner may be required to start the program over from the IM-0 or SM-0 for violating program requirements. ECF No. 383-119, Plfs.' SUMF ¶¶ 50, 54, 74; ECF No. 402-1, Defs.' SUMF Response ¶¶ 50, 54, 74. Each of the named Plaintiffs in this case spent multiple years in the Step-Down Program. ECF No. 402-1, Defs.' SUMF Response ¶¶ 237, 243, 245, 248, 251, 254, 259, 261.



The unrebutted opinion of Plaintiffs' expert, Craig Haney, is that these conditions █████ █████ and that the scientific research establishing the harms of solitary confinement ████████████████████████ █████ Ex. 120, Haney Rep. ¶ 132. The length of time that prisoners frequently spend in the Step-Down Program is ████████████████████ *Id.* ¶ 145. Dr. Haney's report makes clear that his conclusions are based on facts that remain undisputed. *Id.* ¶¶ 133–44. None of Defendants' experts offer any credible opinion—let alone any opinion that conflicts with Dr. Haney's—on whether the conditions of the Step-Down Program are qualitatively equivalent to the sorts of conditions studied in the scientific literature. *See, e.g.*, Ex. 121, Morgan Dep. at 24:7–12; Ex. 122, Saathoff Dep. at 167:11–168:2; *cf.* Ex. 158, Beard Rep. at 41 (noting only that the ACA and Mandela Rules define solitary confinement as confinement in cell for 22 hours a day or more and concluding on that basis alone that the Step-Down Program is not "solitary confinement").

The only aspect of the Step-Down Program that Defendants cite to differentiate it from conditions that are routinely characterized as solitary confinement is the fact that, beginning in January of 2020, prisoners in the Step-Down Program are supposed to be allowed four hours of

out-of-cell time per day.  ECF No. 402, Opp. at 4, 7.  Even setting aside the undisputed evidence

described above showing that in practice, Step-Down prisoners have access to many fewer than

four hours per day of out-of-cell time, the touchstone of Plaintiffs' Eighth Amendment claim is

whether they were "deprived [ ] of the basic human need for 'meaningful social interaction and

positive environmental stimulation.'"  *Porter*, 923 F.3d at 368 (citation omitted); *see also, e.g.,*

*McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) (key inquiry is whether conditions

impose the sort of "prolonged isolation from social and environmental stimulation" that creates a

significant risk of harm); *see also* Ex. 120, Haney Rep. ¶ 36 ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████).[6]  The undisputed facts show that people in the Step-

Down Program were and remain deprived of such social contact and stimulation.

    Defendants entirely fail to address the evidence in the record that simply increasing the

time spent alone in what is essentially an empty outdoor cell does not in any way ameliorate the

harms stemming from the lack of meaningful social interaction and environmental stimulation in

solitary confinement.  ECF No. 400-55, Hendricks Rep. ¶ 22 (noting how critical it is to consider

the *quality* of out-of-cell time in addition to the quantity offered); Ex. 120, Haney Rep. ¶ 37 ██

████████████████████████████████████████████████████████████

---

[6] As one former federal judge observed, "[M]an is a social animal.  The human mind craves
interaction with other people, and being deprived of human companionship is as damaging to the
psyche as deprivation of food and water is to the body.  Psychologists now understand that much
of who we are depends on our contact with other people, the social context in which we function,
and when you remove people from that context, they begin to lose their very sense of self."  Alex
Kozinski, *Worse Than Death*, 125 YALE L.J. F. 230 (2016) (internal quotation and citation
omitted).

███████████████████████████████████████████████).  Further,

Defendants concede that prisoners are routinely denied out-of-cell time for a variety of reasons,

which seriously undermines their argument.  Plfs.' SUMF Reply ¶ 150 (citing Ex. 128, Mathena

30(b)(6) Dep. at 85:12–17), ¶ 147.

Nor does the evidence support Defendants' argument that prisoners in the Step-Down

Program are not isolated from social and environmental stimulation because they "can interact

with each other while in their cells and during their concurrent recreation, communicate with

various VDOC staff, including corrections officers and mental health professionals."  ECF No.

402, Opp. at 8.  Communication among prisoners in the Step-Down Program is severely

restricted and thus falls short of fulfilling the basic human need for connection with other people.

While in their cells, prisoners can only communicate with their cell neighbors—whom they

cannot see or communicate with face-to-face—and even then, only by yelling through the tray

slots in their otherwise solid steel cell doors or by standing on the sink to shout through the

ventilation system (to other prisoners who they also cannot see).  *See, e.g.*, Ex. 155, Brooks Dep.

at 245:1–5; ECF No. 400-57, Cavitt Dep. at 222:18–22; ECF No. 400-95, Cornelison Dep. at

37:18–22, 221:11–20; Ex. 123, Hammer Dep. at 14:13–22; ECF No. 400-96, Mukuria Dep. at

17:15–18:2.  Defendants offer no evidence that any prisoner in the Step-Down Program has

regularly had any kind of positive social interaction with corrections officers or other security,

administrative, medical, or mental health staff, such that these interactions could possibly be

deemed sufficient to relieve the isolation of the Step-Down Program.  The argument that some

limited ability to communicate with other people eliminates the risk of harm from a solitary

confinement scheme has already been rejected by the Fourth Circuit.  *Porter*, 923 F.3d at 360

("Put simply, if the ability to 'easily communicate' with fellow inmates and engage in

congregate programming did not prevent the Supreme Court from characterizing Ohio's

administrative control unit as a 'highly restrictive form of solitary confinement,' then the limited

contacts Virginia's death row inmates had with prison officials and health professionals do not

render the challenged conditions of confinement meaningfully less restrictive or isolating from a

legal or factual perspective." (discussing *Wilkinson v. Austin*, 545 U.S. 209 (2005))).

Defendants' disregard of the other hardships imposed by the Step-Down Program beyond

in-cell isolation for most of each day, ECF No. 402, Opp. at 9, also fails to address the evidence

that such deprivations, including deprivations of property, access to programming, access to

other forms of environmental stimulation, and access to work opportunities, ██████████

██████████████████████████████████████ Ex. 120, Haney Rep. ¶¶ 37–

38. Thus, this Court—consistent with the practice of other courts—should consider the

conditions of the Step-Down Program as a whole, not piece by piece or solely based on the

number of hours spent out-of-cell, in order to determine whether those conditions create a

significant risk of harm. *See, e.g., Palakovic*, 854 F.3d at 217 (describing how, in addition to

limited out-of-cell time, the plaintiff lived "in a tiny cement cell of less than 100 square feet with

only small slit windows affording him minimal outside visibility. He was not permitted to make

phone calls, his possessions were limited to one small box, and his social interaction and

environmental stimulation were severely reduced."); *Williams v. Sec'y Pa. Dep't of Corr.*, 848

F.3d 549, 554–55 (3d Cir. 2017) (reciting that in addition to limited time out-of-cell, the plaintiff

also had restricted visiting privileges, lived in a windowless cell, at his meals in his cell, was

subjected to a strip search when leaving his cell, and had medical consults conducted at his cell

door); *McCord v. Maggio*, 927 F.2d 844, 846 (5th Cir. 1991) ("[T]he Court determines whether

conditions of confinement violate the constitutional prohibition against cruel and unusual

punishment by looking to the totality of the conditions in the prison rather than institutional practices separately."); *Veal v. Lane*, 14 F.3d 605 (7th Cir. 1993) ("In determining whether prison conditions constitute cruel and unusual punishment, a court must focus on the totality of the conditions of confinement."); *Piscitello v. Berge*, 2002 WL 32349400, at *2 (W.D. Wis. June 13, 2002), *aff'd*, 94 F. App'x 350 (7th Cir. 2004) ("The totality of the conditions at Supermax constitute cruel and unusual punishment . . .").  Viewing the Step-Down Program holistically, there is no genuine dispute that the conditions of the Step-Down Program can and should be considered solitary confinement.

Although Defendants argue that Plaintiffs have failed to identify any scientific literature supporting the conclusion that the Step-Down Program creates a universal risk of serious harm, the literature discussing the emotional and psychological harms of solitary confinement is robust and conclusive.  ECF No. 383, Am. Mem. L. Supp. Plfs.' Am. Mot. Part. Summ. J. [hereinafter "Mot."] at 4–10.  The validity of this body of research has been acknowledged not just by Plaintiffs' experts, but also by *Defendants'* experts.  For example, Defendants' expert, Dr. Morgan, testified that segregation poses a universal risk of harm, Ex. 121, Morgan Dep. at 96:14–22, and that prisoners in solitary confinement are at an elevated risk of suffering adverse mental health and physical effects as compared to prisoners in general population, *id.* at 133:8–15; *see also id.* at 163:22–164:19 (agreeing that a large body of research shows that ██████████ ████████████████████████████████████████████████████████████████).  Defendants' expert psychiatric consultant agreed that there is a general consensus among researchers and mental health professionals that ███████████████████████████ ██████████████████████████████████████████ Ex. 122, Saathoff Dep. at 133:5–15.

This scientific consensus has been recognized by several courts, including the Fourth

Circuit, as establishing that solitary confinement poses a substantial risk of serious harm

sufficient to establish an Eighth Amendment claim, and Defendants do not convincingly

distinguish those cases from this one.  *See Porter*, 923 F.3d at 356 (explaining that "[n]umerous

studies reveal that prolonged detention of inmates" in solitary conditions on death row has

damaging results); *Grissom v. Roberts*, 902 F.3d 1162, 1175–78 (10th Cir. 2018) (Lucero, J.,

concurring) (citing research on solitary confinement including the work of Terry Kupers, Craig

Haney, and Stuart Grassian); *Williams*, 848 F.3d at 566 (citing "[t]he robust body of scientific

research on the effects of solitary confinement" as support for the conclusion that "the

deprivations of protracted solitary confinement so exceed the typical deprivations of

imprisonment" as to create a liberty interest in avoiding solitary confinement); *Palakovic*, 854

F.3d at 225–26 (acknowledging "the robust body of legal and scientific authority recognizing the

devastating mental health consequences caused by long-term isolation").

Because Plaintiffs have established that the Step-Down Program poses a significant risk

of serious harm, a showing of actual harm to any Plaintiff—let alone *all* Plaintiffs—is not

required.  *See Porter*, 923 F.3d at 360 (a dispute of fact over whether plaintiffs suffered actual

harm as a result of their conditions of confinement "did not preclude a determination that the

undisputed evidence established that Plaintiffs faced a 'substantial risk' of serious harm from

their conditions of confinement").  Nonetheless, there is ample undisputed evidence that

Plaintiffs have in fact suffered such harm.

For example, it remains undisputed that Plaintiffs experienced new and worsening mental

and physical symptoms while in long-term segregation, and in some cases after their return to

general population.  *See, e.g.*, ECF No. 402-1, Defs.' SUMF Response ¶ 238 (Mr. Cornelison

experienced symptoms of anxiety, depression, mood swings, anger, disorientation, and an

inability to concentrate during his time in the Step-Down Program.); Plfs.' SUMF Reply ¶ 244

(Mr. Cavitt has experienced anxiety, paranoia, sensitivity to loud noises, headaches, and other

ailments.), ¶ 249 (Mr. Brooks experienced paranoia, memory problems, agitation, insomnia, and

depression.), ¶ 260 (Mr. Hammer has experienced anxiety, depression, agitation, migraines, type

2 diabetes, and other ailments.), ¶ 262 (Mr. Riddick testified that he experienced paranoia,

trouble sleeping, nightmares, mood swings, difficulty concentrating, lack of focus, racing

thoughts, and hallucinations.); Ex. 123, Hammer Dep. at 39:19–40:10 (experiencing anxiety

around 2011–2012), 273:17–274:12 (experiencing migraines while in solitary confinement),

33:8–34:8 (experiencing thoughts of suicide, including up to "a couple of weeks" prior to his

deposition); ECF No. 383-50, Cavitt Decl. ¶ 34 (depression, sleep disorder, weight loss), ¶ 35

(disorientation and vertigo), ¶ 53 (mental health suffered; self-isolation, depression), ¶ 54

(depression, emotional breakdowns), ¶ 75 (migraines exacerbated by the lights in the Step-Down

Program).

　　　　Nor have Defendants rebutted the conclusions of Plaintiffs' expert, Dr. Michael

Hendricks, that several named Plaintiffs currently suffer from mental illness that was caused or

exacerbated by their time in the Step-Down Program.  Plfs.' SUMF Reply ¶ 239 (Mr.

Cornelison's symptoms are consistent with a diagnosis of generalized anxiety disorder that

████████████████████████████████████████████████████

████), ¶ 247 (Mr. Mukuria has been diagnosed with persistent depressive disorder and

suffers from short-term memory problems █████████████████████ the Step-

Down Program.), ¶ 250 (Mr. Brooks has been diagnosed with major depressive disorder, PTSD,

and mild neurocognitive disorder.), ¶ 253 (Mr. Thorpe meets the diagnostic criteria for PTSD

and major depressive disorder, severe, with psychotic features.), ¶¶ 255–56 (Mr. Wall has been

diagnosed with and exhibits symptoms of PTSD.), ¶ 263 (Mr. Riddick has been diagnosed with

PTSD, major depressive disorder, and anxiety disorder.).

Plaintiffs' expert, Dr. Haney, describes that the literature establishes that solitary

confinement causes psychological and emotional harms akin to the symptoms suffered by

Plaintiffs, including:  appetite and sleep disturbances, headaches, anxiety, panic, a sense of

impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression,

rage, loss of control, ruminations, paranoia, nightmares, perceptual distortions, cognitive

dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and

social withdrawal.  *See, e.g.*, Ex. 120, Haney Rep. ¶ 53.

Accordingly, Plaintiffs have satisfied their burden of demonstrating an objectively

sufficient risk of harm.

**B.    Evidence in the Record Shows That Defendants Acted with Deliberate
Indifference to Harms Plaintiffs Suffered in the Step-Down Program.**

Again, Defendants fail to create any genuine dispute of material fact that Defendants

were deliberately indifferent to Plaintiffs' basic human needs while Plaintiffs were in the Step-

Down Program.[7]  As discussed above, Defendants cannot credibly claim that there is any doubt

---

[7] Defendants argue that Plaintiffs present no evidence that any of the individual Defendants
personally violated any Plaintiffs' Eighth Amendment rights.  *See* ECF No. 402, Opp. at 2–3.
However, aside from the fact that there is ample evidence of the deliberate indifference of the
individual Defendants, such a showing is not required at this stage.  Where, as here, Plaintiffs are
seeking summary judgment on their Eighth Amendment injunctive relief claim against Defendants
in their official capacity, "no direct personal involvement" by individual defendants "is required."
*Reid v. Clarke*, 2017 WL 706352, at *4 (W.D. Va. Feb. 22, 2017) (rejecting Harold Clarke's
similar argument); *see also Quintanilla v. Bryson*, 730 F. App'x 738, 748 n.5 (11th Cir. 2018)
("personal action by defendants is not a necessary condition of injunctive relief against state
officers in their official capacity" (cleaned up) (citing *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th
Cir. 1988))); *Doe v. Citadel*, 2022 WL 2806473, at *4 (D.S.C. July 18, 2022), *aff'd sub nom. Doe
v. The Citadel*, 2023 WL 3944370 (4th Cir. June 12, 2023) (same).

about the excessive risk that the use of long-term solitary confinement poses to Plaintiffs' health and safety.  That risk was obvious when the Step-Down Program was created and throughout the years of its operation, and remains obvious today.  Defendants again recycle their argument that because the Step-Down Program now allows for four hours of out-of-cell time, it is not solitary confinement, and none of the scientific literature can be applied to the conditions of the Step-Down Program.  ECF No. 402, Opp. at 11.  However, Defendants still provide no evidence or expert opinion as to why the Court should accept this argument, when the unrebutted opinion of Plaintiffs' experts establishes that the conditions of the Step-Down Program, taken as a whole, are equivalent to conditions considered to be solitary confinement, and that the scientific literature on solitary confinement is applicable.  *Supra* § I.A.  Further, this Court and the Fourth Circuit have already rejected this argument in this case.  *Thorpe v. Clarke*, 37 F.4th 926, 940 (4th Cir. 2022) ("Insistence on finding precedent that held the same exact confinement conditions invalid also transforms the objective prong into something that it is not."); *Thorpe v. Va. Dep't of Corr.*, 2021 WL 2435868, at *7 (W.D. Va. June 15, 2021) ("Although the conditions and harms detailed in these studies were not identical with what the plaintiffs allege here, they are sufficiently similar and numerous to have plausibly made the alleged dangers of the Step-Down Program obvious.").

Defendants again attempt to dispute that the vast weight of the scientific evidence establishes the risks of solitary confinement.  ECF No. 402, Opp. at 11–12.  To do so, they rely on the opinions of Dr. Robert Morgan, which are outliers and so lacking in evidentiary basis that they fail to meet the standard for admissibility.  *See* ECF No. 367, Morgan Mot. at 5–13; *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999).  There should be no question that the robust and longstanding

body of scientific literature about the harmful effects of solitary confinement is not, and never

has been, "heavily disputed." Ex. 120, Haney Rep. ¶ 108; ECF No. 400-54, Haney Rebuttal

Rep. ¶ 64; ECF No. 400-55, Hendricks Rep. ¶ 150; *Porter*, 923 F.3d at 356–60 (quoting Jesenia

Pizario & Vanja M.K. Stenius, *Supermax Prisons: Their Rise, Current Practices, and Effect on

Inmates*, 84 Prison J. 248, 256 (2004)).

This consensus was recognized by the Fourth Circuit in *Porter* as convincing

circumstantial evidence that the risks of harm from solitary confinement were obvious, and that

because Defendants were corrections professionals, "it would defy logic to suggest that they were

unaware of the potential harm that the lack of human interaction" could cause, 923 F.3d at 361.

The *Porter* court noted that, "[A] leading survey of the literature [published in 2003] regarding

such confinement found that 'there is *not a single published study* of solitary or supermax–like

confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants

were unable to terminate their isolation at will, *that failed to result in negative psychological

effects*.'" *Porter*, 923 F.3d at 356 (quoting Craig Haney, *Mental Health Issues in Long–Term

Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003)). As Plaintiffs'

expert explained, the ███████████████████████ of solitary confinement are

███████████████████████ and ███████████████████

███████████████████ Ex. 120, Haney Rep. ¶ 17. Moreover, ███████████

████████████████████████████████████████████

██████████ and ████████████████████████████ and ███████████████████

███████████████████ *Id.* ¶¶ 18–19.

████████████████████████████████████████████

███████████████████ *Id.* ¶ 18. Moreover, this knowledge and consensus is not

new—it reaches back decades. Ex. 124, Haney Dep. at 377:19–379:22 (testifying that by the year

2000, ████████████████████████████████████████████████████

████████████████████████████████ that solitary confinement exacerbates

mental illness).

Defendants do not meaningfully engage with this evidence, but instead point to legislation

and accrediting standards as a basis for ignoring the risk of harm of which they were aware. As

the Supreme Court has said, relying on legislative consensus alone is "incomplete and unavailing,"

particularly when "[t]here are measures of consensus other than legislation." *Graham v. Florida*,

560 U.S. 48, 62 (2010) (citing *Kennedy v. Louisiana*, 554 U.S. 407, 433 (2008)). Moreover,

accreditation and industry standards are not, and do not claim to be, a substitute for the

constitutional and statutory requirements that Defendants are obligated to adhere to. *See* ECF No.

383-54, Pacholke Rebuttal Rep. ¶¶ 8–11, 44 (detailing numerous problems with the ACA and its

accreditation process); ECF No. 400-64, Wells Reply Rep. ¶¶ 10–37 (detailing limitations of ACA

audits generally, and VDOC's ACA audits specifically, for assessing ADA compliances).

In addition, as in *Porter*, there is unrebutted evidence in this case that Defendants were

actually aware of the risk of harm from solitary confinement, and even more so aware of the risk

of harm from solitary confinement to people with mental illness. *See, e.g.*, ECF No. 400-39,

VADOC-00163939 ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ ) (Mar. 23, 2012 E-mail from White to Richeson); ECF No. 400-41,

VADOC-00045021 at -028 ("[I]t is important to further expand the program's efforts to make

restrictive housing less isolating in order to mitigate the negative impacts of living in segregation,

particularly on mental health.") (Dec. 4, 2017 Vera Institute of Justice Interim Report); ECF No.
400-43, Herrick Dep. at 222:14–16 (testifying that the SMI "population is particularly vulnerable
when entering long-term restorative housing"); ECF No. 400-45, VADOC-00049867 at -875–76
(making recommendations for the Step-Down Program ████████████████████████████
████████████████████████████) (Nov. 2018 Vera Institute of Justice
Report).  As the Fourth Circuit noted in this case, according to policy, officers must evaluate
prisoners in the program on behavioral standards including refusal to engage in programming,
failure to maintain an orderly cell, and poor grooming—which are some of "the very symptoms
solitary confinement generates." *Thorpe*, 37 F.4th at 935.

Because Defendants had daily contact with people in the Step-Down Program, received
grievances and other correspondence from people in the Program complaining about the conditions
and harms, and documented these harms in their medical and mental health records, they could
and should have "'draw[n] the inference' that confining Plaintiffs to solitary existence caused those
harms." *Id.*; *see also* ECF No. 383, Mot. at 23–31 (explaining that Defendants were aware of the
risk of harm based on the scientific literature, communications from people in the Step-Down
Program, grievance data, internal correspondence, and exposure to the conditions of the Step-
Down Program).

Defendants' conclusory statements in interrogatory responses that attempt to deny this
knowledge, ECF No. 402, Opp. at 21; ECF No. 381, Br. Supp. Defs.' Mot. Summ. J. [hereinafter
"Defs.' Summ. J. Br."] at 47–53, ¶¶ 130–40; ECF No. 400-103, Plfs.' Stmt. Gen. Disputed
Material Facts Opp. Defs.' Mot. Summ. J. [hereinafter "Plfs.' SUMF Response"] ¶ 131; *see also
id*. ¶¶ 130, 132–40, are insufficient to create a genuine dispute of material fact on this issue.
*Salmon v. Cable & Wireless USA, Inc.*, 2003 WL 1730413, at *4 (D. Md. Mar. 18, 2003)

(granting summary judgment in movant's favor where non-moving party offered "bare conclusory assertions"); *Coffey v. Chem. Specialties, Inc.*, 4 F.3d 984, 1993 WL 318886, at *3 (4th Cir. 1993) ("Coffey's self serving testimony which is utterly lacking in foundation does not establish a genuine issue of material fact."); *Robinson v. EMC Mortg. Corp.*, 2013 WL 1245863, at *3 (N.D. Tex. Mar. 26, 2013) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence." (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied sub nom. Forsyth v. Vines*, 513 U.S. 871, 115 S. Ct. 195, 130 L.Ed.2d 127 (1994))).  Instead, the totality of the direct and circumstantial evidence is sufficient to establish as a matter of law that Defendants knew of the risks of harm to Plaintiffs from the Step-Down Program.

The record is also replete with undisputed evidence that Defendants disregarded these risks.  Defendants' culpable mental state is evident from the fact that even as the body of scientific evidence regarding the harms of solitary confinement has grown over the years, and the case law has consistently recognized those harms, Defendants have made no meaningful changes to the conditions of confinement for people subjected to the Program that might help prevent or ameliorate those harms.  *Supra* § I.A.  As discussed above, the increase in out-of-cell time does not provide any additional opportunities for meaningful social interaction, nor was that the intent of the change.  Instead, Defendants' goal was to avoid the need to comply with industry standards for restrictive housing, and to be able to claim that VDOC no longer uses solitary confinement.  *See* Ex. 125, VADOC-00051912; Ex. 126, VADOC-00044850.  And aside from that one difference, prisoners in the Step-Down Program remain subject to the same mandatory minimum lengths of time in the Program, under essentially the same privilege restrictions and the same physical and security conditions as existed when the Program was first implemented.

Defendants also have not taken steps to mitigate the risk of severe harm to people in the Step-Down program, particularly those with mental illness. Most notably, the undisputed evidence shows that VDOC has put inadequate systems in place to avoid placing people with mental illness in the Step-Down Program, or to identify and respond to the serious mental health needs of people in the Step-Down Program. ECF No. 383, Mot. at 18–19 (noting that VDOC does not consider an individual's mental health condition before placing them in Level S); Ex. 121, Morgan Dep. at 146:14–22, 147:1–17, 157:1–22, 158:1–22, 159:1–11 (stating that if someone is in need of psychotherapeutic services and they are not available, they will have a problem, and noting that individuals with prior mental health problems face a particular risk in restrictive housing). Defendants present no evidence to dispute the opinion of Plaintiffs' expert, Dr. Michael Hendricks, that ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ECF No. 400-55, Hendricks Rep. ¶ 117. And the evidence establishes that VDOC does not adequately account for mental illness when assigning prisoners to the Step-Down Program. Ex. 133, Mathena Dep. at 537:6–21 (testifying that a prisoner's mental health status is no more important than "understanding what their eye color is" when assigning a security classification); Ex. 128, Mathena 30(b)(6) Dep. at 237:3–9, 238:4–8 (no policy requires that mental health staff participate in the process of assigning someone to Level S); Ex. 151, Malone 30(b)(6) Dep. at 151:4–8 (acknowledging that prisoners deemed at risk of deterioration in restorative housing can still be placed in the Step-Down Program.); ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at 45 n.34 ("Fifty-eight percent of people in the Step-Down Program have had a mental health code of MH-2 or higher during their incarceration.").

Defendants make a final effort to avoid summary judgment on Plaintiffs' Eighth Amendment claim by arguing that the Step-Down Program has a legitimate penological justification—*i.e.* it increases security.  ECF No. 402, Opp. at 25.  But that is always the rationale prison officials invoke, and without additional explanation of exactly how the Step-Down Program increases security, it is insufficient.  Further, Defendants conflate the penological justification for segregation generally with the penological justification for the Step-Down Program specifically.  When asked about the penological justification of the Step-Down Program specifically, VDOC officials have been unable to point to any evidence underlying the design of the Step-Down Program, or any evidence of its effectiveness.  ECF No. 383, Mot. at 29–30.  Defendants point to no evidence that there is any justification for the excessive length of time prisoners spend in the Step-Down Program, or whether the harsh conditions and byzantine behavioral requirements actually result in any behavioral change.  In fact, VDOC has conceded that certain aspects of the Program lack any relation to security concerns, which casts doubt on the design of the program as a whole.  ECF No. 383, Mot. at 30.  Further, the Defendants offer no evidence for the penological justification for each named Plaintiffs' placement in the Step-Down Program specifically, rather than administrative segregation generally.  In short, Defendants offer no real defense of the Step-Down Program beyond a general argument that there are some justified uses of segregation.

Given Defendants' first-hand observation of the conditions of confinement in the Step-Down Program, the extensive and longstanding body of scientific literature on the adverse effects of prolonged solitary confinement, the direct evidence of Defendants' knowledge of those effects, the insubstantial changes to the Program over the years, and the lack of legitimate penological justification for the Program, this Court should conclude that "the types of harms deemed obvious [by the Fourth Circuit in *Porter*] show themselves here," and that Defendants disregarded them.

*Thorpe*, 37 F.4th at 938.  Accordingly, Plaintiffs are entitled to summary judgment on their Eighth

Amendment claim.

## II.    Plaintiffs Are Entitled to Summary Judgment on Their Due Process Claim.

The undisputed factual record establishes that the Step-Down Program lacks the

meaningful periodic review and basic procedural protections necessary to protect Plaintiffs'

liberty interests.  While Defendants quibble with minor aspects of the factual record, they leave

the substance of Plaintiffs' claims unchallenged and unrefuted.  Accordingly, the Court should

grant summary judgment on Plaintiffs' due process claims.

### A.    Plaintiffs Have a Liberty Interest in Avoiding Level S and the Step-Down Program.

The undisputed factual record shows that the severity, duration, and indefiniteness of

Plaintiffs' confinement in the Step-Down Program impose an atypical and significant hardship in

relation to the general prison population and therefore give rise to a liberty interest.  *See Incumaa*

*v. Stirling*, 791 F.3d 517, 531 (4th Cir. 2015) (noting that severity of restrictive conditions and

their duration are key factors in the liberty interest analysis); *Smith v. Collins*, 964 F.3d 266, 275

(4th Cir. 2020) (discussing the three factors to be weighed in the liberty interest analysis).

Regarding the magnitude of the restrictions, the Fourth Circuit concluded at the motion to

dismiss stage that it had "*no doubt*" that the Step-Down Program conditions as alleged are

"sufficiently harsh and atypical" in comparison to the general prison population to establish a

liberty interest.  *Thorpe*, 37 F.4th at 942 (emphasis added); *see also Incumaa*, 791 F.3d at 529

(outlining the standard).  The undisputed facts corroborate Plaintiffs' allegations, and Defendants

have identified no genuine dispute of material fact such that a different conclusion could be

reached.

- **General Conditions**.  Each Step-Down Program cell has a steel door two inches thick,
  ECF No. 383-119, Plfs.' SUMF ¶ 135; ECF No. 402-1, Defs.' SUMF Response ¶ 135, and

only a narrow rectangular window that is frosted over, which prevents prisoners from seeing out, ECF No. 383-119, Plfs.' SUMF ¶ 138; ECF No. 402-1, Defs.' SUMF Response ¶ 138. Unlike most general population prisoners, Step-Down Program prisoners have no cell partner. ECF No. 383-119, Plfs.' SUMF ¶ 162; ECF No. 402-1, Defs.' SUMF Response ¶ 162. Defendants refer to record evidence for the proposition that prisoners in their cells can and do communicate with each other. *See* ECF No. 402, Opp. at 24 n.28. What Defendants fail to state, however, is that this so-called "communication" consists of prisoners yelling through tray slots in the steel doors of their cells or standing on their sinks to shout through the ventilation system.[8]

- **Limited Time Out of Cell**. Step-Down Program policy provided prisoners only one hour of recreation from 2012-2017, two hours of recreation from 2017-2018, two to four hours of recreation from 2018-2019, and three hours out of cell for portions of 2019. ECF No. 383-119, Plfs.' SUMF ¶¶ 144–45, 147; ECF No. 402-1, Defs.' SUMF Response ¶¶ 144–45, 147. After this litigation commenced, a policy memo was circulated providing for four hours out-of-cell time. *See* ECF No. 383-119, Plfs.' SUMF ¶ 147–48; ECF No. 402-1, Defs.' SUMF Response ¶¶ 147–48.[9] But even this four hours of out-of-cell time is significantly less than that provided in the general population, where inmates are entitled to a minimum of seven hours per day "out of bed area to include movement and meals." *See* ECF No. 383-99, VADOC-00003072 at -075 (providing between seven and 14 minimum hours, depending on security level) (O.P. 801.4); *see also* Ex. 127, Duncan Dep. at 119:4-120:10 (confirming that ███████████████████████ ███████). In addition, prisoners in the Step-Down Program have been denied the out-of-cell time to which they are entitled under the policy memo, due to holidays, inclement weather, and cell shakedowns lasting 7-10 days four times per year—during which Step-Down Program prisoners may not leave their cells at all. ECF No. 383-119, Plfs.' SUMF ¶ 154; ECF No. 402-1, Defs.' SUMF Response ¶ 154. The only record evidence quantifying actual time out of cell indicates that Step-Down Program prisoners get less than four hours per day. *Compare* ECF No. 383-119, Plfs.' SUMF ¶ 150 (citing numbers from VDOC's internal records) *with* ECF No. 402-1, Defs.' SUMF

---

[8] *See* Ex. 155, Brooks Dep. at 254:2–4; ECF No. 400-95, Cavitt Dep. at 222:19–20; ECF No. 400-95, Cornelison Dep. at 37:19–21, 221:18–19; Ex. 123, Hammer Dep. at 14:17–19; ECF No. 400-96, Mukuria Dep. at 17:20–22.

[9] Notably, Defendants misquote the September 2019 memo to suggest that the out-of-cell activity for persons in Level S include "outdoor exercise, visitation, interactive journaling, programming, and other group elective options," ECF No. 402, Opp. at 23 (citing ECF No. 383-70, VADOC-00118556), and they rely on the same memo to suggest it is undisputed that these prisoners have opportunities for "congregate activity," *id.* at 24 (citing ECF No. 402-1, Defs.' SUMF Response ¶ 148). In actual fact, the section of that memo that applies to Level S and Level 6 provides only that each prisoner "will be provided the opportunity to participate in a minimum of four hours out of cell activity, seven days a week," and the references to visitation, recreation, interactive journals, and elective options are in the section of the memo that applies to restrictive housing units in Levels 1-5—*not* Levels S or 6. *See* ECF No. 383-70, VADOC-00118556. Moreover, the memo contains no reference whatsoever to congregate activities for prisoners in Levels S or 6. *Id.*

Response ¶ 150 (citing only VDOC policy). And prisoners in practice are given even less time than this because their recreation time is cut off if they need to use the bathroom. *See* ECF No. 383-119, Plfs.' SUMF ¶ 155; ECF No. 402-1, Defs.' SUMF Response ¶ 155.[10]

- **Strip Searches**. Unlike general population prisoners, Step-Down Program prisoners must be strip searched as a condition for leaving their cells for any reason. ECF No. 383-119, Plfs.' SUMF ¶ 166; ECF No. 402-1, Defs.' SUMF Response ¶ 166. Defendants attempt to distinguish strip searches from body cavity searches. *See* ECF No. 402-1, Defs.' SUMF Response ¶ 166. But the record evidence they cite only underscores the point that strip searches are unquestionably dehumanizing, in that (a) they first require prisoners to ██████████████████ while under observation by corrections staff ██████████, and (b) they then entail staff visually inspecting the insides of prisoners' ears and having them ██████████████████████████████████████ and ██████████ Ex. 119, Robinson Dep. at 143:9–145:11.

- **Limited Out-of-Cell Activity**. Even after being strip searched, Step-Down Program prisoners are usually restrained while out of their cell —which again stands in contrast to how general population prisoners are treated. ECF No. 383-119, Plfs.' SUMF ¶ 167; ECF No. 402-1, Defs.' SUMF Response ¶ 167. General population prisoners can play basketball or use the gym in groups, ECF No. 383-119, Plfs.' SUMF ¶ 163; ECF No. 402-1, Defs.' SUMF Response ¶ 163, but recreation for Step-Down Program prisoners is conducted in solitary cages smaller than those recommended by the ACA, with no recreational equipment or toilet facilities, ECF No. 383-119, Plfs.' SUMF ¶¶ 156–57; ECF No. 402-1, Defs.' SUMF Response ¶¶ 156–57. Defendants refer to record evidence, *see* ECF No. 402, Opp. at 24 n.28, to argue that prisoners can communicate with other prisoners in recreation cages, but they again fail to state that this so-called "communication" consists of yelling across the yard, *see* ECF No. 400-95, Cornelison Dep. at 42:17–18; Ex. 123, Hammer Dep. at 15:25–16:7. As far as programming, it is undisputed that prisoners in at least the IM-0 and SM-0 privilege levels must conduct programming alone in their cell. ECF No. 383-119, Plfs.' SUMF ¶ 159; ECF No. 402-1, Defs.' SUMF Response ¶ 159; Plfs.' SUMF Reply ¶ 159. Level S prisoners who are permitted to program out-of-cell must do so while they are shackled, or otherwise restrained in secure chairs or small cages known as "therapeutic modules." ECF No. 383-119, Plfs.' SUMF ¶159 (citing ECF No. 383-66 ¶ 142, Photograph 7), ¶ 165; ECF No. 402-1, Defs.' SUMF Response ¶¶ 159, 165; Plfs.' SUMF Reply ¶ 159. There are no similar restrictions for general population prisoners. ECF No. 383-119, Plfs.' SUMF ¶ 165; ECF No. 402-1, Defs.' SUMF Response ¶ 165.

- **Lack of Contact Visits**. Prisoners in the IM and SM pathways are not permitted to have contact visits. *See* ECF No. 383-119, Plfs.' SUMF ¶ 132 (SM pathway prisoners cannot

---

[10] Defendants critique Plaintiffs' reliance on testimony by Plaintiff Kevin Snodgrass to support this point, *see* ECF No. 402-1, Defs.' SUMF Response ¶ 155, but Plaintiffs have also cited corroborating testimony by former ROSP Unit Manager Michael Younce, *see* ECF No. 383-119, Plfs.' SUMF ¶ 155; *see also* ECF No. 383-47, Younce Dep. at 236:17–237:2; Plfs.' SUMF Reply ¶ 155.

have contact visits), ¶¶ 129–30 (analogizing SM pathway and IM pathway privileges); ECF No. 402-1, Defs.' SUMF Response ¶¶ 129–30 (not disputing Plaintiffs' SUMF ¶¶ 129–30), ¶ 132; Plfs.' SUMF Reply ¶ 132. By contrast, with few exceptions, general population prisoners can have contact visits. ECF No. 383-119, Plfs.' SUMF ¶ 127; ECF No. 402-1, Defs.' SUMF Response ¶ 127; Plfs.' SUMF Reply ¶ 127. Additionally, Step-Down Program prisoner non-contact visits are rare. For example, IM-0 prisoners have at most one 1-hour non-contact visit per week. *See* ECF No. 402-1, Defs.' SUMF Response ¶ 121; ECF No. 383-2, VADOC-00053480 at -537 (2020 Step-Down Manual).

These conditions are not only significantly harsher than those experienced in the general population, but they are also substantially the same as those that the Fourth Circuit concluded were sufficiently harsh to create a liberty interest. *See Thorpe*, 37 F.4th at 942 (holding that a liberty interest was adequately pleaded by reference to conditions that limit "conversation or communication with other inmates," force inmates to "remain in their cells" for nearly the whole day, require "dehumanizing, daily cavity searches," limit inmates' ability to "partake in productive activities," and provide for only "rare visitations conducted through glass walls" (internal quotation marks omitted)).

Defendants argue that Plaintiffs do not have a liberty interest, because they must spend no more than 20 hours in their cell per day rather than the 23 hours of in-cell time at issue in *Wilkinson*. *See* ECF No. 402, Opp. at 23–24. But this is at best misleading: *Wilkinson* did not create a 23-hour bright-line rule to define the circumstances that create a liberty interest, and Defendants cite no authority to that effect. Instead, *Wilkinson* balanced the plaintiffs' amount of time in-cell with other conditions—including their limited out-of-cell activities, inability to congregate with other prisoners, and lack of contact visitation—as well as the indefiniteness and collateral consequences of their confinement. *See Wilkinson*, 545 U.S. at 214–15. Consistent with this balancing approach, courts have found a protected liberty interest even where a prisoner was confined to his cell for fewer than 23 hours per day. *See, e.g.*, *id.* at 555, 572 (concluding that the district court "incorrectly concluded that [the plaintiff] did not have a protected liberty

25

interest" at the summary judgment stage where he was "confined to his cell for almost twenty-two hours a day"); *see also Heard v. Caruso*, 351 F. App'x 1, 8–9 (6th Cir. 2009) (unpublished opinion) (reversing an order that granted summary judgment against a plaintiff who alleged 21 hours per week out-of-cell—which translates to 21 hours per day in-cell—and remanding for post-discovery re-evaluation of the *Wilkinson* factors).

As discussed previously, applying *Wilkinson*-type balancing to the facts of this case indicates that Plaintiffs *do* have a liberty interest. Indeed, in at least one crucial respect, Plaintiffs here face worse conditions than did the plaintiffs in *Wilkinson*, who "were not subject to invasive strip searches when they left their cells." *Williams*, 848 F.3d at 564. Furthermore, VDOC issued its 20-hour in-cell policy only *after* this litigation commenced, and the only record evidence quantifying time out of cell indicates that VDOC staff do not substantially comply with it. *Compare* ECF No. 383-119, Plfs.' SUMF ¶ 150 (citing numbers from VDOC's internal records) *with* ECF No. 402-1, Defs.' SUMF Response ¶ 150 (citing only VDOC policy).

Defendants also argue that the conditions of the Step-Down Program "vary widely," because there are additional privileges available to prisoners at the later stages of the Program. *See* ECF No. 402, Opp. at 23. But Defendants cite no authority suggesting that the conditions in the later stages of the Program are materially improved such that prisoners no longer possess a liberty interest in their release. Nor do they cite authority for the proposition that a program that offers a marginal increase in privileges to certain of its prisoners cannot create an atypical and significant hardship.

Indeed, such a rule would make little sense where, as here, the conditions of the program commonly experienced by all of its prisoners *do* impose hardships that are atypical of those that exist for general population prisoners. For example, mandatory minimums ensure that *all* Step-

Down Program prisoners will be confined in the Program's most restrictive conditions for at least six months or three months, depending on whether they are assigned to the IM or SM pathway.  ECF No. 383-119, Plfs.' SUMF ¶ 49; ECF No. 402-1, Defs.' SUMF Response ¶ 49. Additionally, prisoners in the Step-Down Program routinely spend *years* in these most restrictive conditions.  Finally, prisoners in the least restrictive levels of the program are constantly at risk of being sent back to Level S to restart their designated pathway for disciplinary infractions that would not permit them to be placed in Level S in the first place.  *See* ECF No. 383-119, Plfs.' SUMF ¶¶ 50, 54; ECF No. 402-1, Defs.' SUMF Response ¶¶ 50, 54 (not disputing Plaintiffs' SUMF ¶¶ 50, 54).  Thus, even those prisoners who happen to be in the later stages of the Step-Down Program and have accordingly been granted some marginal increase in privileges have (a) suffered from several of the Program's atypical and significant hardships in the past, and (b) are continuing to suffer from other atypical and significant hardships of the Program in the present, including the ever-present threat of being sent back to earlier stages of the Program for relatively minor infractions.

Regarding the duration and indefiniteness of confinement, Defendants do not dispute that the Step-Down Program contains lengthy mandatory minimums—*i.e.*, at least 9 months to complete the SM pathway, and at least 18 months to complete the IM pathway.  *See* ECF No. 383-119, Plfs.' SUMF ¶ 49; ECF No. 402-1, Defs.' SUMF Response ¶ 49.  Defendants likewise do not dispute that there is no *maximum* amount of time after which a prisoner will necessarily be removed from the Step-Down Program—meaning that confinement in the program is for an indefinite period.  *See* ECF No. 383-119, Plfs.' SUMF ¶ 51; ECF No. 402-1, Defs.' SUMF Response ¶ 51.  It is also undisputed that one of the two Level S pathways—the IM Pathway— ends at a Level 6 pod and provides no route back to the general population absent a pathway

change by the External Review Team. *See* ECF No. 383-119, Plfs.' SUMF ¶¶ 27, 109; ECF No. 402-1, Defs.' SUMF Response ¶¶ 27, 109 (not disputing the facts referenced here); Plfs.' SUMF Reply ¶ 27. Next, Defendants do not dispute that even after a prisoner has completed the Step-Down Program, there is no maximum amount of time after which the prisoner will be returned from Level 6 to the general population. *See* ECF No. 383-119, Plfs.' SUMF ¶ 53; ECF No. 402-1, Defs.' SUMF Response ¶ 53. And finally, it is undisputed that the VDOC Operations Manual provides only that prisoners must "successfully adjust" to return to the general population but contains no criteria explaining what this requires. *See* ECF No. 383-119, Plfs.' SUMF ¶ 53; ECF No. 402-1, Defs.' SUMF Response ¶ 53.[11]

Defendants admit that, just as these uncontested policies would predict, numerous named Plaintiffs have spent *years* in the Step-Down Program.[12] These named Plaintiffs are not alone, as Defendants admit that many prisoners were confined in Level S for more than a decade. *See*

---

[11] These policies are consistent, and have been applied, across all class members, revealing the specious nature of Defendant's argument that the existence of a liberty interest "is not susceptible to class-wide resolution." ECF No. 402, Opp. at 28. Indeed, the leading Supreme Court case on this issue held that a liberty interest existed for a "class of plaintiff inmates." *Wilkinson*, 545 U.S. at 218. The out-of-Circuit case cited by Defendants does not relate to the issue of class certification and calls only for a "nuanced analysis" of whether the conditions of confinement are atypical, rather than using a temporal "threshold"—an approach that is entirely consistent with Plaintiffs' position. *See Carmouche v. Hooper*, 77 F.4th 362, 367 (5th Cir. 2023).

[12] *See* ECF No. 383-119, Plfs.' SUMF ¶ 237 (Mr. Cornelison, more than three years), ¶ 243 (Mr. Cavitt, more than four years), ¶ 245 (Mr. Mukuria, more than seven years), ¶ 248 (Mr. Brooks, more than four years), ¶ 251 (Mr. Thorpe, nearly seven years), ¶ 254 (Mr. Wall, more than four years in one stint), ¶ 259 (Mr. Hammer, more than seven years), ¶ 261 (Mr. Riddick, more than eight years); ECF No. 402-1, Defs.' SUMF Response ¶¶ 237, 243, 245, 248, 251, 254, 259, 261.

While named Plaintiffs have been released from the Step-Down Program, this does not appear to reflect the Program's success, as Plaintiffs suddenly progressed or were removed from the Program shortly after this lawsuit was filed on May 6, 2019. *See, e.g.*, ECF No. 383-119, Plfs.' SUMF ¶ 237 (Mr. Cornelison; returned to the general population on August 26, 2019), ¶ 248 (Mr. Brooks, upgraded to Level 6 on August 30, 2019), ¶ 251 (Mr. Thorpe, transferred to Texas on May 29, 2019), ¶ 254 (Mr. Wall, upgraded to Level 6 on May 29, 2019); ECF No. 402-1, Defs.' SUMF Response ¶¶ 237, 248, 251, 254.

ECF No. 383-119, Plfs.' SUMF ¶ 52. Defendants take issue with the amount of time these prisoners were "in the Step-Down Program," as opposed to merely being classified as Security Level S. *See* ECF No. 402-1, Defs.' SUMF Response ¶ 52. Notably, however, Defendants do *not* dispute the accuracy of the reported statistics—*i.e.* that as of 2017, at least sixteen prisoners had been in the Step-Down Program for the entire duration of its existence, or nearly five years. *See* Ex. 137, Clarke Dep. at 316:18–321:3; ECF No. 383-24, VDOC026082 (Clarke Dep. Ex. 20); *see also* ECF No. 383-119, Plfs.' SUMF ¶ 2 (Step-Down Program was introduced in 2012); ECF No. 402-1, Defs.' SUMF Response ¶ 2.

Even the 9- and 18-month mandatory minimum periods, on their own, are sufficient to create a constitutionally-protected liberty interest that entitles prisoners to procedures to review their continued confinement in the Step-Down Program. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698–99 (7th Cir. 2009) (240 days); *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004) (305 days); *Williams v. Fountain*, 77 F.3d 372, 374 n.3 (11th Cir. 1996) (one year). The frequent *multi-year* tenures in the Step-Down Program that its prisoners face easily qualify as creating a protected liberty interest under the same standard.

Defendants next assert that confinement in the Step-Down Program is not "indefinite"—both because of the presence of "defined processes and review opportunities . . . through which prisoners can progress," and because confinement depends on the prisoner's "individual behavior choices." ECF No. 402, Opp. at 28–29. Notably, this argument parrots the district court's analysis in *Incumaa*, which the Fourth Circuit reversed. *See* 791 F.3d at 530–32 (rejecting district court's conclusion that a prisoner's solitary confinement was not "indefinite" because prison "procedure puts the duration of his confinement into his own hands to a significant degree").

29

The Fourth Circuit's decision in *Incumaa* is consistent with *Wilkinson*'s holding that solitary confinement is "indefinite," if the policy does not limit the confinement to a particular period of time. *See Wilkinson*, 545 U.S. at 215 (noting that "there is no indication how long he may be incarcerated at OSP once assigned there"). In *Wilkinson*, Ohio's supermax policy provided for the possibility of release from solitary confinement after an annual review, but the Supreme Court nonetheless concluded that confinement was for an "indefinite period of time." *Id.* at 214–15, 224; *see also id.* at 217 (noting that prisoners' placement was "reviewed on at least an annual basis"). Other circuits have followed this plain reasoning. *See Williams*, 848 F.3d at 553, 562 (contrasting "indefinite" solitary confinement on death row with definite periods of disciplinary segregation that are "often predetermined and fixed," and holding that the plaintiffs' confinement was indefinite even though they had actually been released from death row); *cf. Smith v. Shettle*, 946 F.2d 1250, 1255 (7th Cir. 1991) (suggesting that ongoing review may not be necessary "if the period of administrative segregation were fixed in advance on the basis of an estimate of future conditions," but "it is not; it is an indefinite term").

There is no genuine dispute that solitary confinement through the Step-Down Program is indefinite under the standards set forth in the case law described above, because the Program does not fix or specify a limit to the amount of time a prisoner can be confined. *See* ECF No. 383-119, Plfs.' SUMF ¶ 51; ECF No. 402-1, Defs.' SUMF Response ¶ 51; *Thorpe*, 37 F.4th at 942 (noting that Step-Down Program placement "is for an indefinite period of time").

Defendants argue that Plaintiffs have no liberty interest, because Defendants' review procedures are constitutionally adequate (which they are not). But putting aside the adequacy of the review procedures for a moment, this argument flips *Wilkinson*'s analytical order and puts the cart before the horse. *See, e.g.*, *Wilkinson*, 545 U.S. at 224 ("A liberty interest having been

30

established, we turn to the question of what process is due . . . .").  According to Defendants'

unsupported theory and twisted logic, one can find sufficient process and thereby eliminate the

possibility of a liberty interest ever coming into being.

It is also worth pointing out that the key to a prisoner's ability to advance in the Step-

Down Program is not *his* behavioral choices but is instead *VDOC's evaluation* of those

choices—an evaluation that, as discussed in the following section, is based on irrelevant criteria

applied through woefully deficient procedures.  *See, e.g.*, ECF No. 383-119, Plfs.' SUMF ¶ 53

(there is no maximum amount of time in Level 6 after a prisoner completes the Step-Down

Program, and a return to the general population is contingent on "successfully adjust[ing]"—a

concept left unexplained in VDOC policy), ¶ 77 (whether prisoners meet behavioral goals is

"subjective" and is at least partially dependent on the VDOC employee rating the prisoner), ¶

109 (prisoners on the IM pathway can only return to the general population if the External

Review Team adjusts their pathway); ECF No. 402-1, Defs.' SUMF Response ¶¶ 53, 77, 109;

Plfs.' SUMF Reply ¶ 77.

Regarding collateral consequences, Defendants offer no evidence to dispute Plaintiffs'

claims with respect to good time credits.[13]  *See Thorpe*, 37 F.4th at 942 (noting that Step-Down

Program prisoners are limited in their ability to attain "good time credit they could have

otherwise earned in general population" (internal quotation marks omitted)).  As an initial

matter, a prisoner's refusal to participate in the Step-Down Program ███████████████████

███████  Ex. 127, Duncan Dep. at 95:2–6.  Additionally, a prisoner in the Step-Down Program

is "not eligible for advancement to Class Level I"—the classification that provides the prisoner

---

[13] In any event, the Fourth Circuit is clear that a liberty interest may be found even where this third
*Wilkinson* factor is not implicated.  *See Incumaa*, 791 F.3d at 532.

with the greatest level of good conduct allowance, ECF No. 402-28 at 15 (O.P. 830.3, *Good Time Awards*); *see also id.* at 3 (indicating that the ineligibility extends to "step-down statuses"), 12 (defining the class levels).  Moreover, prisoners in the Step-Down Program "will not be eligible for [Extraordinary Good Time]."  *Id.* at 12; *see also id.* at 3 (defining "EGT").  Altering prisoners' ability to achieve certain good time class levels is clearly a "collateral consequence" to assignment to the Step-Down Program, a fact that further compels a finding that Plaintiffs have a liberty interest in avoiding the Step-Down Program.  *Smith*, 964 F.3d at 280.

## B.  The Step-Down Program Does Not Provide Meaningful Review Mechanisms.

On this record, there is no genuine dispute that the Step-Down Program's procedures fail to provide constitutionally adequate process under either of Plaintiffs' independent theories of relief[14] because:  (1) none of the four layers of review provide periodic review of whether there is a valid and subsisting penological reason to retain a prisoner in segregation, *i.e.* the "meaningful review" demanded by the Fourth Circuit in this very case, *Thorpe*, 37 F.4th at 945; (2) the only reviewing entity that Defendants claim provides constitutionally adequate procedures (the ICA),[15] does not in fact do so; and (3) even if the four Step-Down Program

---

[14] Defendants do not challenge that summary judgment is warranted on Plaintiffs' due process claims if the Court finds for the Plaintiffs on either of Plaintiffs' theories, *i.e.*, lack of "meaningful periodic review of whether the reasons for their ongoing confinement are valid and subsisting," and lack of "review procedures that satisfy the elementary requirements of due process, namely, notice or explanation of the case against the prisoner and an opportunity to rebut it."  ECF No. 402, Opp. at 31; ECF No. 383, Mot. at 29.

[15] In their Opposition, Defendants essentially concede, as they must, that three of the Step-Down Program's four layers of review—including the Building Management Committee ("BMC"), the only step in the process to substantively evaluate prisoners' cases—do not provide constitutionally adequate procedural protections.  *Compare* ECF No. 402, Opp. at 38 ("Defendants have never claimed that inmates are entitled, for instance, to participate in BMC and ERT proceedings or to contest the outcomes through the grievance process.  Rather, *the process to which Plaintiffs are due is provided by the Institutional Classification Authority*.") *with* ECF No. 381, Defs.' Summ. J. Br. at 64 (attempting to distinguish *Wilkinson* by pointing to "multiple layers of review, with evaluations conducted by the ICA [Institutional Classification Authority], ERT [External Review Team], DTT [Dual Treatment Team] and BMC").

requirements *were* a sufficient proxy for whether there was a valid and subsisting reason justifying continued segregation, Defendants concede that the ICA provides neither notice of the factual bases for, nor an opportunity to rebut, the decision-making of the BMC—the only entity reviewing whether a prisoner has met those requirements such that they may progress through the program towards general population, ECF No. 383-119, Plfs.' SUMF ¶¶ 100, 102; ECF No. 402-1, Defs.' SUMF Response ¶¶ 100, 102; Plfs.' SUMF Reply ¶ 102.  In other words, prisoners do not have notice or an opportunity to present their case to the entity tasked with enabling or impeding their progress in the program (the BMC); instead, that entity conducts its review in secret before another entity (the ICA) simply presents the result of the earlier BMC review to the prisoner while offering a meaningless opportunity to make a statement.  This mismatch, between the entity that comes closest to (but fails at) providing ongoing risk review and the entity that comes closest to (but fails at) providing procedural protections, is itself fatal to the Step-Down Program's constitutionality under the Due Process Clause.

*First,* Defendants do not dispute the fact that the Step-Down Program does not provide the kind of "meaningful periodic review" required.  *Toevs v. Reid*, 685 F.3d 903, 907 (10th Cir. 2012); *see Thorpe*, 37 F.4th at 945–46.  Under the terms of the Step-Down Program, the BMC is the only entity in the entire process that  provides a substantive review of a prisoner's case.[16] But Defendants are unable to provide any evidence that the BMC, in conducting this substantive review, considers or takes into account the kind of safety-related factors that would constitute a "meaningful" review of whether someone's continued placement in the Program is appropriate.

---

[16] *See* ECF No. 383-119, Plfs.' SUMF ¶¶ 57–59 (the BMC decides whether to progress or regress a prisoner's privilege level); ECF No. 402-1, Defs.' SUMF Response ¶¶ 57–59 (undisputed except as to timing of BMC reviews); ECF No. 383, Mot. at 36–38 (the ICA, External Review Team, and Dual Treatment Team "do not independently evaluate whether the prisoner's recent behavior demonstrates that he would pose an ongoing risk to the general population").

Although Defendants assert that the BMC considers factors relevant to security risks, *see* ECF No. 402, Opp. at 35, they also acknowledge that the BMC relies on factors wholly unrelated to any security concerns that would justify continued placement in the Step-Down Program. *See Thorpe*, 37 F.4th at 945 ("And when a precarious situation ends, with it ends the State's authority to maintain prisoners in solitary confinement."); *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) (describing the periodic-review decision as "whether a prisoner remains a security risk"). For example, Defendants admit that advancement decisions hinge on, among other factors, subjective evaluations of a prisoner's hygiene, cell compliance, standing for the count, and respect— evaluations for which there are no written policies, procedures, or guidance. *See* ECF No. 383-119, Plfs.' SUMF ¶¶ 74-75, 77, 79; ECF No. 402-1, Defs.' SUMF Response ¶¶ 74-75, 77, 79 (offering no substantive dispute); Plfs.' SUMF Reply ¶¶ 74–75, 77. It is likewise undisputed that a prisoner may be sent back in the Step-Down Program for disciplinary charges that would not be sufficient to place him in the Step-Down Program in the first place, *see* ECF No. 383-119, Plfs.' SUMF ¶ 54; ECF No. 402-1, Defs.' SUMF Response ¶ 54, and that prisoners cannot advance if they do not participate in Challenge Series programming, *see* ECF No. 383-119, Plfs.' SUMF ¶ 66; ECF No. 402-1, Defs.' SUMF Response ¶ 66.

Perhaps for these reasons, Defendants cannot genuinely dispute the fact that they make no exception to *any* of the Step-Down program requirements, even for persons who they *acknowledge* present no ongoing security risk justifying continued segregation. ECF No. 383-119, Plfs.' SUMF ¶¶ 55–56, 72; ECF No. 402-1, Defs.' SUMF Response ¶¶ 55–56, 72; Plfs.' SUMF Reply ¶¶ 55–56, 72; *see Thorpe*, 37 F.4th at 945. And the ICA, whose ministerial housing status review is entirely dependent upon and preordained by the BMC's privilege level review, is unable to make up for the BMC's deficient review, even for a prisoner who presents

no security risk.[17]  Plfs.' SUMF Reply ¶¶ 97–98; Ex. 150, Duncan (*DePaola*) Dep. at 190:2–4,

193:20–22 (ICA is a housing status review); Ex. 132, Collins Dep. at 149:6–13 (ICA cannot

accelerate a prisoner's timeline out of the Step-Down Program unless it learns of a problem with

the reason for which they were placed in Level S to begin with).

In arguing that the Step-Down Program offers meaningful review, Defendants repeat

their confused point that some prisoners have progressed from the Step-Down Program back into

the general prison population.  ECF No. 402, Opp. at 32; *see* ECF No. 381, Defs.' Summ. J. Br.

at 65.  But the mere fact that *some* prisoners have progressed out of the Program says nothing

about whether that progression was the result of "meaningful periodic review," an entirely

arbitrary and subjective decision, or something in between.  *See Toevs*, 685 F.3d at 916.  And as

Plaintiffs have previously pointed out, permanent placement in solitary confinement is not a

necessary element of a due process claim.  *See* ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at

16 (citing *Marion*, 559 F.3d at 699).

*Second*, Defendants' procedural analysis whistles past the core process claim brought by

Plaintiffs and analyzed by the Fourth Circuit—*i.e.*, that the Step-Down Program "transgresses

even the most foundational building blocks of due process:  notice of the charges against them

and an opportunity to be heard."  *Thorpe*, 37 F.4th at 944; *see* ECF No. 402, Opp. at 38□41.

Defendants concede a lack of adequate procedures with respect to most components of the Step-

Down Program and state that the ICA alone—and not the BMC, DTT, or ERT—provides "the

---

[17] Defendants purport to dispute the facts that the ICA serves as a mere housing status review, and that it does not change a prisoner's housing status if the prisoner has not met the Step-Down Program requirements.  ECF No. 402-1, Defs.' SUMF Response ¶¶ 97–98; *see* ECF No. 383-119, Plfs.' SUMF ¶¶ 97–98.  Their only claim on this point is that the deposition testimony cited by Plaintiffs was actually about a separate housing status review that was not the ICA.  ECF No. 402-1, Defs.' SUMF Response ¶¶ 97–98.  But this is very obviously a misreading of the transcript. Plfs.' SUMF Reply ¶¶ 97–98.

process to which Plaintiffs are due is provided by the Institutional Classification Authority." ECF No. 402, Opp. at 38; *supra* note 16.

But notwithstanding Defendants' desire to hang their hat on the ICA, the process offered by the ICA is lacking. Defendants do not dispute that the ICA fails to provide prisoners with advance notice of the evidence being considered in the review, that the ICA's decisions are often accompanied by the conclusory line that the prisoner needs a "longer period of stable adjustment,"[18] and that prisoners' statements to the ICA have no effect on the committee's decision. ECF No. 402-1, Defs.' SUMF Response ¶ 100 (no dispute that the ICA does not provide advance notice of the evidence being considered and its contemplated decision), ¶ 103 (no dispute that the phrase "longer period of stable adjustment" is frequently used on ICA forms); ECF No. 383, Mot. at 41 (unchallenged statement that, "Because the ICA review is a formulaic one, and a decision has essentially been made by the BMC before prisoners are asked for their statement, *those statements have no effect on the process*." (emphasis added) (citing ECF No. 383-102, Kegley (*Reyes*) Dep. at 110:20–111:1)). And, more importantly, Defendants fail to engage with Plaintiffs' main point regarding the ICA, which is that the ICA does not

---

[18] Defendants take issue with Plaintiffs' contention that the phrase "longer period of stable adjustment," which appears frequently throughout ICA paperwork, "provides no assurance that any meaningful evaluation was done." ECF No. 383, Mot. at 41; ECF No. 402, Opp. at 36–37. Instead, Defendants claim, the phrase means "that the time that an inmate has been at SL-S is insufficiently long to ensure that he is no longer a threat to the orderly operation of the institution." ECF No. 402, Opp. at 36. But that amounts to a concession that the ICA's evaluative process is circular: the prisoner needs to stay longer in SL-S, because he has not stayed long enough in SL-S. Defendants also do not dispute that this phrase (or another phrase like it) is frequently used, and that there is no policy guidance as to the meaning of "longer period of stable adjustment." ECF No. 383-119, Plfs.' SUMF ¶ 103; ECF No. 402-1, Defs.' SUMF Response ¶ 103; Plfs.' SUMF Reply ¶ 103. And the *pro forma* language used on ICA forms is unsurprising given that, as Duncan testified, notwithstanding any language on such forms, "in actuality the only thing I am reviewing is his housing [status]," Ex. 150, Duncan (*DePaola*) Dep. at 188:9–13—which is dependent on a different entity's review of underlying compliance with the Step-Down Program requirements. *See supra* note 17; Plfs.' SUMF Reply ¶¶ 97–98.

conduct its own review of a prisoner's progress through the Step-Down Program.  Instead, as discussed above and throughout Plaintiffs' briefing, the ICA operates as a ministerial check on the housing status decision; it does not have a substantive role in the antecedent decisions of whether to progress a prisoner to the next privilege level.  *See* ECF No. 383, Mot. at 37; ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at 14.  Any enhanced procedures found in the ICA are therefore meaningless because they do not provide notice and an opportunity to be heard on the substantive matter of preventing erroneous deprivation of a prisoner's protected liberty interest.

Despite their concession that the substantive evaluations in the Step-Down Program— *i.e.*, BMC reviews—are done without due process, Defendants march through a similar *Mathews v. Eldridge* balancing as they did in their affirmative brief.[19]  *See* ECF No. 402, Opp. at 39-41 (discussing *Mathews v. Eldridge*, 424 U.S. 319 (1976)); ECF No. 381, Defs.' Summ. J. Br. at 62–67.  Yet, their argument fails at every prong of the test, and most notably at the second. Citing neither record facts nor the Fourth Circuit's analysis of the *Mathews* issues in this case, Defendants argue that the Step-Down Program's periodic reviews are enough to satisfy Plaintiffs' procedural concerns.  But Defendants do not—and cannot—overcome the key problem with this argument:  "although Step Down offers multiple levels of review on paper, some occurring as frequently as every 30 days, not one of those reviews actually lives up to 'basic' due process scrutiny."  *Thorpe*, 37 F.4th at 944.

On the other parts of the *Mathews* test, Defendants misstate the law, Plaintiffs' arguments, or both.  For example, Defendants' argument that Plaintiffs' own behavior prevented them from progressing out of the Step-Down Program ignores the facts that the prisoners face a

---

[19] For additional argument against Defendants' *Mathews* analysis, see ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at 9□16.

mandatory minimum amount of time in the Program, that the Program uses arbitrary and

subjective criteria to assess prisoners' behavior, and that the private interest analysis turns on the

fact of the prisoners' confinement in administrative segregation, not its length.  *See* ECF No.

400, Plfs.' Opp. Defs.' Mot. Summ. J. at 9☐10.  On the government interest factor, Defendants'

invocation of prison security concerns falls flat given the Program's lack of tailoring towards

prison security, as well as the bedrock principle that "the prison's interest does not eclipse [the

prisoner's] well-established rights to receive notice of the grounds of his ongoing confinement

and to present his rebuttal to those grounds."  *Incumaa*, 791 F.3d. at 535; *see* ECF No. 400, Plfs.'

Opp. Defs.' Mot. Summ. J. at 15–16.

  The Court should analyze Plaintiffs' due process claims in light of the more fundamental

procedural issues identified in both Plaintiffs' briefing and by the Fourth Circuit.  But to the

extent the Court wishes to use Defendants' *Mathews* framework, the Court should recognize that

this framework, too, shows an unconstitutional lack of process.[20]

---

[20] Defendants assert that there is "no basis for holding any individual Defendant liable" for these
Due Process violations.  ECF No. 402, Opp. at 31–32.  This argument is barred by the law-of-the-
case doctrine as to Defendants Mathena, Richeson, Robinson, and Raiford.  *See TFWS, Inc. v.
Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) ("[W]hen a court decides upon a rule of law, that
decision should continue to govern the same issues in subsequent stages in the same case." (citation
omitted)).  The Fourth Circuit held that the Complaint adequately stated a claim as to these four
Defendants.  *See Thorpe*, 37 F.4th at 947 ("To the extent Defendants protest Plaintiffs have not
adequately alleged their individual involvement, that is simply not so.  The Complaint
painstakingly sets forth each Defendant's role in either creating or administering Step Down.");
*see* ECF No. 1 ¶¶ 40–42, 47.  Defendants' Answer admitted the Complaint's substantive
allegations about the role of Mathena, Richeson, Robinson, and Raiford in creating or
administering the Step-Down Program, contesting only whether each "knows or has reason to
know" certain facts.  *See* ECF No. 24 ¶¶ 40–42, 47.  This partial dispute is immaterial for Plaintiffs'
Due Process claim, which does not require Plaintiffs to establish Defendants' state of mind.  *See
Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015) (listing the elements of a constitutional
procedural due process claim).  By foreclosing the possibility of presenting "different evidence,"
*TFWS*, 572 F.3d at 191, Defendants' Answer conceded that these four individual Defendants had
the required "individual involvement" to be liable for violating Plaintiffs' Due Process rights, *see
Thorpe*, 37 F.4th at 947.  Because any argument to the contrary would violate the law-of-the-case
doctrine, *see U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 665–66 (4th
(continued…)

III.    **Plaintiffs Are Entitled to Summary Judgment on VDOC's ADA Affirmative Defenses.**

Defendants do not identify any disputed *factual* evidence that supports their affirmative defenses of undue burden or fundamental alteration. Instead, Defendants argue that (a) the Court should refuse to evaluate the sufficiency of Defendants' affirmative defenses *at all*, whether on a class-wide or individual basis; (b) Defendants can assert their affirmative defenses of fundamental alteration and undue burden without complying with the regulatory prerequisites for asserting such defenses; and (c) Defendants can rely only on the unsupported opinions of their "consultant" to create a genuine dispute of material fact. Each argument ignores the applicable law and otherwise fails to identify genuine disputes for trial. The Court should therefore grant summary judgment to Plaintiffs on Defendants' affirmative defenses.

A.    **Named Plaintiffs Can Seek Summary Judgment, Either on a Class-Wide Basis or on Their Individual Claims.**

Defendants argue that Plaintiffs are not entitled to seek summary judgment on a class-wide basis because no named Plaintiff is a member of the Disabilities Classes certified by the Court's August 8, 2023 Order, and Plaintiffs have yet to identify a new named Plaintiff to serve as class representative. ECF No. 402, Opp. at 42. Defendants' argument is premature. Plaintiffs have moved for reconsideration of this Court's August 8 Order, *see* ECF No. 359, and are seeking certification of an amended Disabilities Class, *see* ECF No. 359-1 at 7, of which Plaintiffs Gary Wall and Steven Riddick are indisputably members, *see, e.g.*, ECF No. 400-34, VADOC-00165197 at lines 4440, 7040–42 (Mental Health Codes Spreadsheet). Moreover, the Court has stayed Plaintiffs' deadline to identify lead class representatives for the Disabilities

---

Cir. 2015) (holding that the law-of-the-case doctrine applied where the record "confirmed the existence of the[] facts" relied on in considering a motion to dismiss), Plaintiffs are entitled to judgment as to Mathena, Richeson, Robinson, and Raiford (in addition to the official capacity defendants, against whom Plaintiffs seek only injunctive relief on their due process claim).

Classes until 21 days after the Court has ruled on Plaintiffs' motion for reconsideration and confirmed the scope of those classes. *See* ECF No. 364. Regardless, as Defendants' own cases make clear, Defendants' arguments go to the adequacy of a proposed class representative under Rule 23, not the merits of Plaintiffs' ADA and RA claims or Defendants' affirmative defenses. *See Bennett v. Westfall*, 640 F. Supp. 169, 170 (S.D.W. Va. 1986), *aff'd*, 836 F.2d 1342 (4th Cir. 1988) (assessing adequacy of plaintiff under Rule 23(a)(4)); *Abron v. Black & Decker (U.S.) Inc.*, 654 F.2d 951, 953 (4th Cir. 1981) (reviewing only Court's order on class certification).

     In the alternative, Defendants argue that Plaintiffs are not entitled to summary judgment on Defendants' affirmative defenses, even with respect to their individual claims, because Plaintiffs have not shown that they requested a reasonable accommodation. Opp. at 43–44. The Court rejected this same argument when Defendants made it at the motion to dismiss stage and held that "[t]he Fourth Circuit has not so required" that a plaintiff formally request an accommodation in order to be able to maintain an ADA or RA claim. *Thorpe*, 2021 WL 2435868, at *10. Instead, for a plaintiff to prevail on a failure-to-accommodate theory, a defendant need only have "notice" of the plaintiff's disability, *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 414 (4th Cir. 2015), which is established when the plaintiff requests an accommodation (whether formally or informally) *or* when the need for an accommodation is obvious, *Thorpe*, 2021 WL 2435868, at *10; *see also* ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at 52, 57 (collecting cases). As explained in Plaintiffs' opposition to Defendants' motion for summary judgment, there is ample evidence from which a jury could find that (a) Plaintiffs *did* request ADA accommodations for their mental disabilities, such as by submitting grievances or by speaking with VDOC staff; (b) Plaintiffs' need for accommodations were obvious to Defendants; and (c) to the extent no Plaintiff or Disability Class member submitted a

formal request for accommodations based on his mental health disability, that is because VDOC made it virtually impossible for such individuals to submit such a request.  *See* ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at 51–60.[21]

For these reasons, Defendants' arguments about Plaintiffs' purported attempts to request reasonable accommodations through their ADA expert and/or their interrogatory responses are beside the point.  *See* ECF No. 402, Opp. at 45–46.  Plaintiffs do not argue that they have *requested* reasonable accommodations through their expert report and discovery responses; rather, they cite to these materials as examples of potential accommodations that could be made to the Step-Down Program *for which Defendants have offered no evidence in support of their fundamental alteration and undue burden defenses*.

**B.    VDOC Had a Duty to Assess Any Alleged Undue Burden or Fundamental Alteration, Which It Did Not Do.**

Defendants contest Plaintiffs' argument that Defendants' affirmative defenses should be rejected because Defendants have failed to comply with 28 C.F.R. § 35.164's requirement that VDOC undertake a specific assessment of the accommodations at issue before invoking a fundamental alteration or undue burden defense.  In particular, Defendants argue that the requirements of 28 C.F.R. § 35.164 do not apply to this case because that section is found in the "Communications" portion of the DOJ regulations.  ECF No. 402, Opp. at 49.  This argument fails for two reasons.

---

[21] Even if the Court were to agree with Defendants and find that Plaintiffs cannot maintain their ADA and RA claims based on a failure-to-accommodate theory of discrimination because they did not submit a formal request for an accommodation, dismissal of Defendants' affirmative defenses would still be required.  Indeed, all three of Defendants' ADA-related affirmative defenses are responsive only to claims of ADA discrimination based on a failure to accommodate.  The defenses have no applicability to Plaintiffs' other theories of ADA discrimination.  *See* ECF No. 400, Plfs.' Opp. Defs.' Mot. Summ. J. at 41–51, 61 n.40.

*First*, Defendants ignore that Plaintiffs' theory of ADA discrimination is based, in part, on VDOC's failure to ensure effective communication with prisoners with mental health disabilities, contributing to such prisoners languishing in the Step-Down Program for long periods of time. *See, e.g.*, ECF No. 400-63, Wells Rep. ¶¶ 195–204; *see also* 28 C.F.R. § 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.").

*Second*, the requirements of 28 C.F.R. § 35.164 are materially indistinguishable from the requirements of 28 C.F.R. § 35.150(a)(3)—the regulation on which Defendants rely in asserting their undue burden and fundamental alteration defenses. *See* ECF No. 331, Defs.' Mot. Leave to File Am. Ans. at 5–6 (citing 28 C.F.R. § 35.150(a)(3)). Just like 28 C.F.R. § 35.164, 28 C.F.R. § 35.150(a)(3) requires that "[t]he decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion." 28 C.F.R. § 35.150(a)(3). Defendants' current position that § 35.150(a)(3) "also is inapplicable here," ECF No. 402, Opp. at 49, is contrary to the position they took when they asked this Court for leave to add their affirmative defenses, *see* ECF No. 331, Defs.' Mot. Leave to File Am. Ans. at 5–6 (arguing that § 35.150(a)(3) allows Defendants to assert fundamental alteration and undue burden as affirmative defenses here). Defendants cannot have it both ways. If 28 C.F.R. § 35.150(a)(3) does not apply, then Defendants have no basis for asserting their affirmative defenses. If it does,

then Defendants must comply with *all* of the regulation's requirements, which they indisputably have not done.[22]

### C.    VDOC Has Not Identified Any Genuine Disputes of Material Fact to Avoid Dismissal of its Affirmative Defenses.

In a final bid to avoid the entry of judgment in Plaintiffs' favor, Defendants claim that the opinions offered by their ADA "consultant," Lenard Vare, preclude Plaintiffs from obtaining summary judgment on Defendants' affirmative defenses. ECF No. 402, Opp. at 46–48. But as Plaintiffs explain in their motion to exclude Mr. Vare's testimony, Mr. Vare does not cite to any *factual information* in support of his opinions about the burden or effect of implementing changes to the Step-Down Program. *See* ECF No. 377, Plfs. Mem. L. Supp. Mot. to Exclude the Testimony of Lenard Vare at 24–25. Nor are Mr. Vare's opinions about those issues well-founded, given that Mr. Vare did not identify any particular modification to the Step-Down Program when opining on issues of fundamental alteration or undue burden or review any of VDOC's financial or budgetary information. *See* ECF No. 383-81, Vare Rep. at 82; *see also id.* at 101–09 (listing materials considered); ECF No. 383-82, Vare Dep. at 47:19–48:2 (admitting he did not review budget information for VDOC or ROSP). Courts within this Circuit have held that such unreliable opinions—unsupported by any factual evidence—cannot on their own create a genuine dispute of material fact to survive summary judgment. *See* ECF No. 383, Mot. at 49 (collecting cases).

---

[22] Defendants half-heartedly argue that undue burden and fundamental alteration affirmative defenses also "may be raised pursuant to 28 C.F.R. § 35.130(b)(7)(i)," though they do not claim to be invoking that regulation here. ECF No. 402, Opp. at 50 n.54; *see also generally* ECF No. 331, Defs.' Mot. Leave to File Am. Ans.; ECF No. 344, Defs.' Reply Br. Supp. Mot. Leave to File Am. Ans. Regardless, that regulation does not absolve Defendants of their burden "to submit a factual record establishing that . . . they diligently assessed whether the alteration would allow [plaintiffs] the opportunity to continue in the . . . program without imposing undue financial and administrative burdens . . . or requiring a fundamental alteration . . . ." *Dean v. Univ. at Buffalo Sch. of Med. & Biomed. Scis.*, 804 F.3d 178, 191 (2d Cir. 2015); *see also id.* at 187 (explaining standard under 28 C.F.R. § 35.130(b)(7)).

Instead of identifying any factual evidence that supports Defendants' affirmative defenses, Defendants claim that the evidence cited by Plaintiffs "does not support *Plaintiffs'* arguments." ECF No. 402, Opp. at 51–52 (emphasis added).  That gets the standard exactly backwards.  While Plaintiffs bear the burden of establishing the absence of any material factual dispute in order to obtain summary judgment on their *claims*, it is Defendants who must show the existence of factual disputes in order to avoid the entry of summary judgment on their *affirmative defenses*.  *See, e.g.*, *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016) ("Defendants bear the burden of proving that the requested modification would be a fundamental alteration to the program."); *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Devs., LLC*, 629 F. Supp. 2d 526, 530 (E.D. Va. 2008) ("Where a party will have the burden of proof on an essential element of a claim or defense at trial and does not, after adequate time for discovery, make a showing sufficient to establish the existence of that essential element, there can be no genuine issue as to any material fact."), *aff'd*, 377 F. App'x 303 (4th Cir. 2010).  Plaintiffs need not preemptively rebut evidence that Defendants have not disclosed—and do not disclose in their opposition to Plaintiffs' motion.

Indeed, although Defendants take issue with Plaintiffs' citations to certain deposition testimony, ECF No. 402, Opp. at 50–53, they do not actually dispute the underlying material facts. For example, Defendants do not point to any evidence to rebut Plaintiffs' contention that VDOC fails to make any "modifications *to the Step-Down Program* to accommodate prisoners with mental health disabilities."  ECF No. 383, Mot. at 47 (emphasis added).  While Defendants cite portions of Dr. Malone's deposition testimony for the proposition that staff "work with" prisoners or attempt to "address[] underlying issues," Dr. Malone confirmed (in response to the very next questions) that VDOC does not make any changes to the requirements of the Step-Down Program

*itself* to accommodate prisoners with disabilities. *See* Ex. 151, Malone 30(b)(6) Dep. at 207:17–

208:6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also id.* at 208:22–209:4 (no change in

requirement for cell cleanliness); *id.* at 211:5–8 (same for personal hygiene requirement).[23]

Defendants also make much of the fact that Harold Clarke testified only that he was "not

aware of whether accommodations are provided to people who might have difficulty completing

the programming in the Step-Down program" because he has "not been involved" in any such

conversations. ECF No. 402, Opp. at 51. But Defendants do not identify any evidence that Mr.

Clarke *has*, in fact, "analyzed the accommodations proposed in this lawsuit, the potential cost of

such accommodations, or the accommodations' impact on the Step-Down Program or VDOC's

operations," ECF No. 383, Mot. at 45, as required to establish Defendants' undue burden and

fundamental alteration defenses, *id.* at 44–46; *supra* § III.B. Mr. Clarke's lack of awareness of

and involvement in discussions regarding such accommodations only underscores that no such

analysis occurred.

Nor have Defendants raised *any* factual disputes (much less genuine ones) that: (a)

modifying the Step-Down Program to accommodate prisoners with mental health disabilities

would not be inconsistent with the purpose of the Step-Down Program or the Evidence-Based

Practices on which it supposedly relies, ECF No. 383, Mot. at 47 & n.19; (b) other institutions

_____

[23] Defendants argue that Barry Marano did not "concede that VDOC has not made *any* modifications to the Step-Down Program to accommodate prisoners with mental health disabilities," but rather testified only that he "do[es] not recall being asked to look into accommodations specifically for [the Step-Down] Program." ECF No. 402, Opp. at 51. Again, it is Defendants' burden to identify factual evidence in support of its affirmative defenses. The fact that Mr. Marano purportedly "do[es] not recall" making changes to the Step-Down Program is insufficient to create a dispute of fact as to whether or not VDOC has made changes to the Step-Down Program. *See, e.g.*, *Lee v. City of Richmond, Va.*, 100 F. Supp. 3d 514, 523 (E.D. Va. 2015) ("[A] lack of recollection does not create an issue of fact that will defeat a motion for summary judgment.").

readily maintain restrictive housing programs that incorporate many of the accommodations at issue in this suit, *id.* at 48; (c) there is no factual evidence in the record of the cost (financial, administrative, or otherwise) that might be associated with any of Plaintiffs' proposed modifications to the Step-Down Program, *id.* at 50–52; and (d) numerous modifications to the Step-Down Program that Plaintiffs have proposed would simply require VDOC to enforce its existing practices, operating procedures, and policies, *id.* at 52. In light of these undisputed facts, no reasonable jury could possibly return a verdict in Defendants' favor on their fundamental alteration and undue burden defenses, and summary judgment should therefore be granted.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for partial summary judgment on Plaintiffs' Eighth Amendment claim, due process claim, and VDOC's ADA-related affirmative defenses.

Dated:  October 24, 2023                    Respectfully submitted,


                                           */s/ Megan A. Crowley*
                                           Megan A. Crowley (*pro hac vice*)
                                           Jared Frisch (*pro hac vice*)
                                           Paul Wilson (*pro hac vice*)
                                           Covington & Burling LLP
                                           850 Tenth Street, NW
                                           Washington, DC 20001-4956
                                           Telephone: (202) 662-6000
                                           mcrowley@cov.com
                                           jfrisch@cov.com
                                           pwilson@cov.com

                                           William O'Neil (*pro hac vice*)
                                           Matthew Phelps (*pro hac vice*)
                                           Covington & Burling LLP
                                           The New York Times Building
                                           620 Eighth Avenue
                                           New York, NY 10018-1405
                                           Telephone: (212) 841-1000
                                           woneil@cov.com
                                           mphelps@cov.com

                                           Vishal Agraharkar (VSB #93265)
                                           Eden B. Heilman (VSB #93554)
                                           Geri Greenspan (VSB #76786)
                                           Matthew Callahan (pro hac vice)
                                           ACLU of Virginia
                                           701 E. Franklin Street, Ste. 1412
                                           Richmond, VA 23219
                                           Telephone: (804) 644-8022
                                           vagraharkar@acluva.org
                                           eheilman@acluva.org
                                           ggreenspan@acluva.org
                                           mcallahan@acluva.org

                                           Kathryn Ali (VSB #97966)
                                           Ali & Lockwood LLP
                                           300 New Jersey Avenue, NW, Ste. 900
                                           Washington, DC 20001
                                           Telephone: (202) 651-2475
                                           katie.ali@alilockwood.com

                                           Maxwell J. Kalmann (*pro hac vice*)

1818 Library Street, 10th Floor
Reston, VA 20190
(650) 586-1043
maxkalmann@meta.com

*Counsel for Plaintiffs*

**Certificate of Service**

I hereby certify that on the 24th day of October 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants.

*/s/ Megan A. Crowley*
Megan A. Crowley (*pro hac vice*)
Jared Frisch (*pro hac vice*)
Paul Wilson (*pro hac vice*)
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
mcrowley@cov.com
jfrisch@cov.com
pwilson@cov.com

William O'Neil (*pro hac vice*)
Matthew Phelps (*pro hac vice*)
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
woneil@cov.com
mphelps@cov.com

*Counsel for Plaintiffs*