**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | |
|---|---|
| WILLIAM THORPE, *et al*., | |
| *Plaintiffs*, | |
| v. | Civil Case No. 2:20-cv-00007-JPJ-PMS |
| VIRGINIA DEPARTMENT OF CORRECTIONS, *et al*., | |
| *Defendants*. | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS'
STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs hereby submit their Reply ("Plaintiffs' SUMF Reply") to Defendants'

Response, ECF No. 402-1 ("Defendants' SUMF Response") to Plaintiffs' Amended Statement of

Undisputed Material Facts, ECF No. 383-119 ("Plaintiffs' SUMF") in support of their Amended

Motion for Partial Summary Judgment, ECF No. 380, pursuant to Federal Rule of Civil

Procedure 56(c). Plaintiffs retained the section titles, text, and footnotes included in Plaintiffs'

SUMF and Defendants' SUMF Response except as otherwise indicated. *See* ECF No. 380; ECF

No. 402-1.[1],[2]

---

[1] [*Defendants' SUMF Response Footnote 1*] Defendants do not respond to the headings and subheadings in Plaintiffs' Statement as they are argument, not alleged facts supported by specific record citations as required by Local Rule 56(b).

**Plaintiffs' Reply:** No reply is necessary.

[2] [*Defendants' SUMF Response Footnote 2*] Defendants elect not to dispute or otherwise respond to certain statements in Plaintiffs' Statement for purposes of opposing Plaintiffs' Amended Motion for Partial Summary Judgment. In doing so, Defendants do not concede that the statements are accurate, material, or relevant or that the material cited in support of them is admissible evidence.

**Plaintiffs' Reply:** Summary judgment is appropriate when the moving party establishes that there is no genuine dispute as to material facts. Where Defendants have failed to dispute a fact (continued…)

I.     **The Step-Down Program[3]**

   A.     **Development and Structure of the Step-Down Program**

      1.     **VDOC Created the Step-Down Program to Manage Incarcerated Persons Classified as "Level S."**

1.     The "Segregation Reduction Step-Down Program" ("Step-Down Program") is a form of administrative segregation that is used to manage incarcerated persons housed at Red Onion State Prison ("ROSP" or "Red Onion") who are classified as "Level S."  Ex. 1, VADOC-00052689 at -694 (Aug. 28, 2012 Segregation Reduction Step-Down Plan (hereinafter "2012 Step-Down Manual"); Ex. 2, VADOC-00053480 at -486 (Feb. 2020 Segregation Reduction Step-Down Plan (hereinafter "2020 Step-Down Manual"); Ex. 3, Beard Dep. at 73:5–7.

Defendants' SUMF Response ¶ 1:  **Disputed in part.** The Step-Down Program is not used to "manage incarcerated persons;" it is used to provide "a pathway for inmates to step-down from Level S ["SL-S"] to lower security levels in a way that maintains public, staff, and offender safety." 2020 Step-Down Manual[4] [ECF No. 383-2] at VADOC-00053486. The Step-Down Manual dated February 2020, *id.*, does not use the term "segregation," administrative or otherwise, and Defendants dispute that the current conditions of confinement in the Step-Down Program constitute "segregation" as that term is used elsewhere in Plaintiffs' Statement.

**Plaintiffs' Reply ¶ 1**:  Defendants' evidence does not create a genuine dispute of material fact. Whether the Step-Down Program is used to "manage" people in Level S or provide a pathway to step-down is not a material dispute.  There is no genuine dispute that the Step-Down Program is

---

by offering specific facts supported by record citations, the Court should treat Plaintiffs' facts as undisputed.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."); *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).

[3] [*Plaintiffs' SUMF Footnote 1*] Plaintiffs file the attached Amended Statement of Undisputed Facts in Support of Their Amended Motion for Partial Summary Judgment to correct certain citation errors in the original Statement.  Plaintiffs also file contemporaneously herewith corrected versions of certain exhibits submitted to the Court by email on September 8, 2023.

[4] [*Defendants' SUMF Response Footnote 3*] Defendants use Plaintiffs' terminology, where possible, in responding to Plaintiffs' Statement.

**Plaintiffs' Reply**:  No reply is necessary.

a form of administrative segregation. Defendants' own correctional expert agreed the Step-Down Program ████████████████████████████ ECF No. 383-3, Beard Dep. at 73:8–11.

2.      VDOC introduced the Step-Down Program at ROSP and Wallens Ridge State Prison ("WRSP" or "Wallens Ridge") in 2012. Ex. 4, Mathena 30(b)(6) Dep. at 31:1–4; Ex. 1, 2012 Step-Down Manual.

Defendants' SUMF Response ¶ 2:  **Undisputed**.

3.      The Step-Down Program is governed by VDOC Operating Procedures, as well as the policy document referred to as the Step-Down Manual. Local Operating Procedure ("O.P.") 830.A applies to the Step-Down Program at ROSP. The current version of O.P. 830.A is effective as of October 1, 2021. Ex. 5, VADOC-00134589 (2021 O.P. 830.A). Previous versions are dated February 18, 2013. Ex. 6, VADOC-00003146 (2013 O.P. 830.A); Ex. 7, VADOC-00051172 (Feb. 15, 2018 O.P. 830.A); Ex. 8, VADOC-00047946 (June 27, 2018 O.P. 830.A); and Ex. 9, VADOC-00053728 (2020 O.P. 830.A).

Defendants' SUMF Response ¶ 3:  **Undisputed**.

4.      The current version of the Step-Down Manual was finalized in February 2020. Previous versions were dated August 28, 2012 and September 2017. Ex. 1, 2012 Step-Down Manual; Ex. 10, VADOC-00002765 (2017 Step-Down Manual); Ex. 2, 2020 Step-Down Manual.

Defendants' SUMF Response ¶ 4:  **Disputed in part.** Plaintiffs have not identified all "[p]revious versions" of the "Step-Down Manual."[5] *See,* Brief in Support of Defendants' Motion for Summary Judgment ("Defs.' Br.") [ECF No. 381] at 6, ¶ 6. There are five previous versions of the Step-Down Manual: (1) the 2012 Step-Down Manual; (2) the 2014 Step-Down Manual; (3) the 2015 Step-Down Manual; (4) 2016 Step-Down Manual; and (5) the 2017 Step-Down Manual. *Id.*

**Plaintiffs' Reply ¶ 4**:  Defendants' evidence does not create a genuine dispute of material fact as to whether the current version of the Step-Down Manual was finalized in February 2020, or whether previous versions were dated August 28, 2012 and September 2017, which are the subjects of the stated fact.  Plaintiffs do not dispute that there are additional versions of the Step-Down Manual, but this is immaterial.  Non-material facts are not appropriate in a statement in opposition to summary judgment and should be disregarded or stricken.  *Anderson*, 477 U.S. at 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."); *accord HP Tuners, LLC v. Cannata*, 2022 WL 562625, at *1, *5 (D. Nev. Feb. 24, 2022) (granting motion to strike non-material facts); *Knidel v. T.N.Z., Inc.*, 189 F. Supp. 3d 283, 284–85 (D. Mass. 2016) ("giv[ing] little to no consideration to extraneous factual and legal assertions propounded").  Mr. Mathena, VDOC's Security Operations Manager and the former Warden of ROSP, testified that only signed versions of the Manual went into effect, and those are the three versions that Plaintiffs described in their SUMF paragraph 4.  *Compare* ECF No. 383-1, VADOC-000052689 (2012 Step-Down Manual); ECF No. 383-2, VADOC-00053480 (2020 Step-Down Manual); ECF No. 383-10, VADOC-00002765 (2017 Step-Down Manual) *with* ECF No. 381-8, VADOC-00002632 (2014 Step-Down Manual); ECF No. 381-9, VADOC-00002698

---

[5] [*Defendants' SUMF Response Footnote 4*] In their Brief in Support of Defendants' Motion for Summary Judgment, ECF No. 381, Defendants refer to as "Operations Strategies" the documents that Plaintiffs Statement refers to as "Step-Down Manuals." *See, e.g., id,* at ¶ 7. Here, Defendants adopt Plaintiffs' nomenclature.

**Plaintiffs' Reply**:  No reply is necessary.

(2015 Step-Down Manual); ECF No. 381-10, VADOC-00056788 (2016 Step-Down Manual);
*see* Ex. 128, Mathena 30(b)(6) Dep. at 211: 2–17 (testifying that only signed versions of the
Manual went into effect); *see also* ECF No. 400-103, Plaintiffs' Statement of Genuine Disputes
of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs'
Response to Defendants' SUMF") ¶ 7.  Thus, Plaintiffs' second sentence could be more
accurately stated as "Previous versions were made effective August 28, 2012 and in September
2017."  Nonetheless, Defendants have failed to create a genuine dispute of Plaintiffs' fact as
stated.


5.      Since approximately 2016, participants in the Step-Down Program have been held at
ROSP.  Ex. 4, Mathena 30(b)(6) Dep. at 143:2–6.  Before 2016, certain participants in the Step-
Down Program were housed at WRSP.  During the time that Step-Down participants were used
at WRSP, the same "local operating procedure" that governed the Step-Down Program at ROSP
applied to the Step-Down Program at WRSP.  *Id*. at Dep. at 142:19–143:6; Ex. 11, Duncan Dep.
at 24:15–25:1; Ex. 6, VADOC-00003146, -146 (Feb. 18, 2013 O.P. 830.A).

Defendants' SUMF Response ¶ 5:  **Undisputed**.


6.      The Virginia Department of Corrections ("VDOC") has no current plans to end the Step-
Down Program; on the contrary, VDOC plans to continue requiring incarcerated persons
classified as Level S to participate in the Step-Down Program going forward.  ECF. No. 24  ¶
134 ("Answer"); ECF. No. 1 ¶ 134 ("Complaint").

Defendants' SUMF Response ¶ 6:  **Undisputed**.


   **2.      The Step-Down Program Is Not Based on Evidence-Based Practices.**

7.      VDOC claims that the strategy of the Step-Down Program is ███████████

██████████████      Ex. 1, 2012 Step-Down Manual at -694; Ex. 10, VADOC-

00002765, -771 (2017 Step-Down Manual); Ex. 2, 2020 Step-Down Manual at -486).  VDOC

defines Evidence-Based Practices as "those things that have been proven to reduce recidivism, or

most likely to reduce recidivism."  Ex. 12, Richeson Dep. at 60:1–4, 63:12–19.

Defendants' SUMF Response ¶ 7:  **Disputed in part**: Defendants define the Evidence Based
Practice Principles as they are defined in the Step-Down Manuals, and those documents speak
for themselves. *See, e.g.*, 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053519-21.

**Plaintiffs' Reply ¶ 7**:  Defendants' evidence does not create a genuine dispute of material fact.

Defendants say that the Step-Down Manual speaks for itself, but Defendants' cited evidence

does not create a genuine dispute of material fact as to the testimony of a VDOC official's

understanding of Evidence-Based Practices, which is the subject of the stated fact.  Moreover,

nothing in Ms. Richeson's testimony is inconsistent with the Manual cited by Defendants.


8.      VDOC claims that the Step-Down Program applies Evidence-Based Practices to ROSP

and to WRSP operations.  Ex. 2, 2020 Step-Down Manual at -486.  The "Evidence-Based

Principles" that purportedly govern the Step-Down Program are "spelled out in Appendix B to

the Step-Down Plan."  Ex. 13, VDOC Resps. and Objs. to Pls.' 3rd Set of Interrogs., No. 5.

Those "Evidence-Based Principles" include:

      a.      ████████████████████████████████████

████████████████████████████ The Principle

focuses on changing: (1) ███████████████████"; (2) ████████

███████████████; and (3) ████████████████████████

████████      Ex. 2, 2020 Step-Down Manual at -519.

b. 

*Id*. This Principle identifies five sub-groups based on the following characteristics: 

*Id.* The Principle states that 

*Id.*

c. 

*Id*. at -520.

Defendants' SUMF Response ¶ 8:  **Disputed in part**: The referenced 2020 Step-Down Manual identifies only four subgroups based on the characteristics that differentiate the sub-groups, *i.e.*, the characteristics associated with the Responsivity Principle listed by Plaintiffs. *Id.* at VADOC-00053520.

**Plaintiffs' Reply ¶ 8**:  Defendants' response disputes only the narrow point of whether the 2020 Step-Down Manual includes five (and not four) subgroups based on the Responsivity Principle listed in Plaintiffs' SUMF paragraph 8(b).  Defendants do not dispute any of the rest of Plaintiffs' stated fact, and as such, the remainder of Plaintiffs' SUMF should be treated as wholly undisputed.  Nevertheless, the evidence cited by Defendants does not create a genuine dispute as to the narrow fact of whether there are four or five sub-groups.  The 2020 Step-Down Manual referenced by Defendants, like earlier versions of the Step-Down Manual, notes specifically that, 

*See, e.g.*, ECF No. 383-2, VADOC-

00053480 at -519 (2020 Step-Down Manual); ECF No. 383-1, VADOC-00052689 at -726 (2012

Step-Down Manual). Earlier versions of the manual indicated that the fifth sub-group was

known as ████████████████ *see, e.g.*, ECF No. 383-1, VADOC-00052689 at -727

(2012 Step-Down Manual); ECF No. 383-10, VADOC-00002765 at -809 (2017 Step-Down

Manual), but this text does not appear in the 2020 version of the Manual, even as the reference to

the fifth sub-group remains, *see* ECF No. 383-2, VADOC-00053480 at -519–20 (2020 Step-

Down Manual).


9.      VDOC is not "aware of any scientific studies that were used to establish" the "Evidence-

Based Practices that underlie the Step-Down Program" or whether such practices "are based on

evidence." Ex. 4, Mathena 30(b)(6) Dep. at 164:15–21; 168:4–8.

Defendants' SUMF Response ¶ 9: **Disputed**: During her deposition, Scott Richeson specifically
referenced research conducted "[a]round 2000" in describing the Evidence-Based Practices.
Videotaped Deposition of Helen Scott Richeson dated February 9, 2023 ("Richeson Dep.") [ECF
No. 383-12] at 60:22-63:19. Plaintiffs' expert, Dan Pacholke, recognizes the Evidence-Based
Practice Principles in the Step-Down Manuals as being associated with the "risk-needs-
responsivity ('RNR') model" for which he cites James Bonta & D. A. Andrews, *Risk-need-
responsibility model for offender assessment and rehabilitation* 2007-06 (2007). Expert Report
of Dan Pacholke ("Pacholke Report") [ECF No. 370-1] at ¶ 71, fn. 102. Mr. Pacholke identifies
information about the RNR model as being available at nicic.gov, *id.* at fn. 103, the same
resource Defendants identified in answering Plaintiffs' interrogatory requesting support for the
scientific justification for aspects of the Step-Down Program. VDOC's Objections and Answer's
to Plaintiffs' Third Set of Interrogatories [ECF No. 383-13] at 5. In response to Plaintiffs'
assertions that Randall Mathena was insufficiently prepared on the topic of the scientific basis
for the Step-Down Program, Defendants offered to provide Ms. Richeson for additional time as a
30(b)(6) deponent on that subject. Plaintiffs declined that offer. Email from Maya Eckstein to
Vishal Agraharkar and others dated April 28, 2023, Subject: RE: Thorpe v VDOC – meet and
confer on 30b6 testimony of Mathena, Celi, and Crenshaw, attached as Exhibit 2.

**Plaintiffs' Reply ¶ 9**: Defendants' evidence does not create a genuine dispute of material fact as

to the testimony of their 30(b)(6) designee about VDOC's lack of knowledge of any scientific

basis for the program. Even if Defendants' cited evidence was material, it does not create a

genuine dispute of fact as to the testimony of VDOC's designated witness on the topic of

evidence-based practices.  *See* Ex. 129, Notice of 30(b)(6) Deposition of Defendant Virginia

Department of Corrections at 3, 5 (Topics 3, 7, and 8 requesting testimony on "the scientific

basis for, and motivation or purpose behind" the Step-Down Program policies and practices);

ECF No. 402-7, Feb. 7, 2023 E-mail from D. Fairbanks to J. Frisch, et al. ("VDOC's designees

for the 30(b)(6) topics are as follows:  ***Topics 1-12***, 19, and 21 – ***Randall Mathena*** . . .")

(emphases added).  There is no factual dispute that Randall Mathena was the Warden of Red

Onion, responsible for ensuring all Red Onion policies were followed during implementation of

the Step-Down Program and later became the Chair of External Review Team.  Ex. 130,

Mathena (*Reyes*) Dep. (Sept. 22, 2020) at 74:10–20.  There is additionally no factual dispute that

Mr. Mathena, as Security Operations and Corrections Enforcement Coordinator, had

responsibility over Restrictive Housing and was the VDOC employee to whom the Restrictive

Housing Coordinator reported.  Ex. 130, Mathena (*Reyes*) Dep. (Sept. 22, 2020) at 62:3–64:18.


10.     Former VDOC Director Harold Clarke does not know what evidence was used to develop

the policies, procedures, and practices underlying the Step-Down Program.  Ex. 14, Clarke Dep.

at 206:17–207:7.

Defendants' SUMF Response ¶ 10:  **Not Material**: Whether one person—even if the Director of
VDOC—who was not testifying as a 30(b)(6) deponent, was able to recall, during his deposition,
the evidence used to develop the policies, procedures, and practices underlying the Step-Down
Program is not material to the dispute.

**Plaintiffs' Reply ¶ 10**:  Defendants cite no evidence in their response to this statement and have

therefore failed to create a factual dispute.  *See Salmon v. Cable & Wireless USA, Inc.*, 2003 WL

1730413, at *4 (D. Md. Mar. 18, 2003) (granting summary judgment in movant's favor where

non-moving party offered "bare conclusory assertions").  It is further undisputed that the Step-

Down Program was the vision of Harold Clarke, *see* Ex. 130, Mathena (*Reyes*) Dep. at 153:1–7,

who was unable to identify what evidence was used to develop the Program, which is material to

Plaintiffs' claims.  Moreover, Defendants do not explain why this testimony would be

immaterial.  As such, Defendants have failed to create a genuine dispute of material fact.

11.    Helen Scott Richeson, VDOC's Programs Director, does not know of any scientific

studies that were used to establish the Evidence-Based Practices that underlie the Step-Down

Program.  Ex. 12, Richeson Dep. at 60:1–4, 63:12–19.

Defendants' SUMF Response ¶ 11:  **Disputed**: See response to paragraph 9, *supra*. The fact that
Ms. Richeson could not recall at deposition the name or exact date of the referenced research
does not establish that she did not know of it.

**Plaintiffs' Reply ¶ 11**:  Defendants' response does not create a genuine dispute as to the

testimony of Ms. Richeson, which is the subject of the stated fact.

12.    VDOC did not "consider any scientific studies about the effects of solitary confinement

on prisoners" in developing the Step-Down Program.  Ex. 4, Apr. 4, Mathena 30(b)(6) Dep. at

164:22–165:4.

Defendants' SUMF Response ¶ 12:  **Undisputed**.

## II.    Procedures Governing the Step-Down Program

### A.    Initial Placement into Level S

13.    VDOC assigns each incarcerated person under its control to a security level based on a

security level scoring system pursuant to which each scored security level corresponds to a point

score range that is calculated using security level score sheets.  The scored security levels range

from 1, which is minimum security, to 5, which is maximum security.  Ex. 116, VDOC O.P.

830.2 (effective Oct. 1, 2021) at 4–5, https://vadoc.virginia.gov/files/operating-

procedures/800/vadoc-op-830-2.pdf (hereinafter "O.P. 830.2").

Defendants' SUMF Response ¶ 13:  **Disputed**: As described in VDOC Operating Procedure
830.2 ("O.P. 830.2"), VDOC does not assign each inmate to a security level based on the
security level scoring instrument but, instead, determines the inmate's *eligibility* for a specific
security level based on the instrument. "Security level classification decisions involve the
assessment of each case based on a determination of eligibility, suitability, and acceptability."
O.P. 830.2 [ECF No. 381-19] at 4. VDOC also recognizes several specialty security levels to
which an inmate can be assigned, such as level "D" (hearing impaired), "P" (protective custody),
"S" (security qualifier), and "W" (work center). *Id.* at 4. Assignment to these specialty security
levels depends on certain eligibility criteria, which are assessed separately from the scored
security level classification. *See, e.g., id.* at 5, 7-8, 10-11. As with a scored security level,
designation to a specialty security level affects the institution(s) to which an inmate may properly
be assigned. *Id.* at 4.

**Plaintiffs' Reply ¶ 13**:  Defendants do not dispute the use of scoring instruments to assign

security levels or that there are scored security levels from 1 (minimum security) to 5 (maximum

security), and Defendants' evidence does not create a dispute of material fact as to whether

VDOC policy generally contemplates that incarcerated persons are assigned to a security level

based on a scoring system, unless they are deemed eligible for certain non-scored specialty

security levels such as "S," which is the subject of the stated fact.


14.     Level S is not a scored security level but rather a housing level reserved for special

purpose bed assignments utilized for the "protective care and management" of inmates.  *Id*. at 10.

Level 6 is not a scored security level either, but rather it is a security level to which Level S

prisoners may progress and in which prisoners are assigned to housing within ROSP, purportedly

for further programming and adaption to general population housing.  *Id*. at 5, 11.

<u>Defendants' SUMF Response ¶ 14</u>: **Disputed in part**: Security Level 6 ("SL-6")[6] is a security level to which SL-S inmates may progress and where they obtain further programming and opportunities to adapt to general population housing. *Id.* at 11.

**<u>Plaintiffs' Reply ¶ 14</u>**: Defendants' evidence does not create a genuine dispute of material fact.


15.     Pursuant to Operating Procedure 830.2, the placement of a prisoner in Level S is based

on the prisoner's "security qualifier." *Id.* at 10; *see also* Ex. 4, Mathena 30(b)(6) Dep. at 212:8–

16.

<u>Defendants' SUMF Response ¶ 15</u>: **Disputed**: As described in O.P. 830.2, placement of an inmate in SL-S is not based on the security qualifiers. Rather, the security qualifiers listed in O.P. 830.2 "indicate that the inmate should be ***considered*** for assignment to [SL-S]." O.P. 830.2 [ECF No. 381-19] at 10 (emphasis added). The placement of an inmate in SL-S requires an ICA hearing followed by a multi-tiered approval process. The cited testimony of Mr. Mathena contains no discussion of the use of security qualifiers.

**<u>Plaintiffs' Reply ¶ 15</u>**: Defendants' response does not create a genuine dispute of material fact

as to whether a prisoner's security qualifier is relevant to his placement in Level S.  Plaintiffs do

not dispute that the cited policy indicates that there is a multi-tiered approval process before a

person is assigned to Level S; however, the cited policy does not indicate that any of those tiers

of approval look to anything except for the security qualifier in approving the Level S

determination.  ECF No. 381-19, VDOC O.P. 830.2 (effective Oct. 1, 2021) at 10–11.

Moreover, Mr. Mathena testified that Central Classification Services ("CCS") simply looks to

see if the qualifier is met, Ex. 128, Mathena 30(b)(6) Dep. at 229:20–230:6, and that the Warden

---

[6] [*Defendants' SUMF Response Footnote 5*] With approval of the 2020 Step-Down Manual, privilege level SM-2 was changed from a SL-S to a SL-6 privilege level. Defs.' Br. [ECF No. 381] at 12, fn. 6. In responding to allegations in Plaintiffs' Statement, Defendants do not include the SL-6 population, including the SM-2 privilege level, in any response that is by its terms applicable only to the current SL-S population.

<u>Plaintiffs' Reply</u>:  No reply is necessary.

and Regional Operations Chief similarly just look to see if the person meets a qualifier, *id.* at

233:12–19, 236:4–20.

16.     Pursuant to VDOC policy, the assignment of a prisoner to Level S requires a formal

hearing in front of the Institutional Classification Authority ("ICA").  The ICA is then required

to make a recommendation to the Central Classification Service, which is required to approve or

disapprove the ICA's recommendation.  The Central Classification Service's decision to

reclassify an incarcerated person as Level S must then be approved by the Warden of ROSP or

WRSP as well as the Regional Operations Chief.  Ex. 2, 2020 Step-Down Manual at -489; Ex.

116, O.P. 830.2 at 11.

Defendants' SUMF Response ¶ 16:  **Undisputed**.

17.     Pursuant to VDOC policy, when an incarcerated person is being considered for a security

level increase, he is entitled, among other things, to written notification of the hearing 48 hours

in advance of the hearing and an explanation of "the reasons for the review as a possible increase

in security level."  The incarcerated person is also entitled to be present at the hearing and to be

advised verbally at the hearing and in writing within five working days of the ICA/Multi-

Disciplinary Team ("MDT") recommendation and the reason for the decision.  *Id*. at 9.

Defendants' SUMF Response ¶ 17:  **Undisputed**.

18.     Gary Wall, one of the named Plaintiffs in this case, did not receive notice of his security

level increase, as required by O.P. 830.2.  In fact, Mr. Wall did not receive any prior notice of his

change in security level status, nor did he participate in any ICA hearing.  Ex. 15, 2023 Wall

Decl. ¶ 5.

<u>Defendants' SUMF Response ¶ 18</u>:  **Disputed**: The declaration cited by Plaintiffs does not establish that Gary Wall "did not receive notice of his security level increase." In his declaration, Mr. Wall claims only that he "did not receive any notice in advance that [he] was being considered ***for the Step-Down Program***," Declaration of Gary Wall ("Wall Decl.") [ECF No. 383-15] at ¶ 5 (emphasis added), not that he did not receive notice of his security level increase. But Mr. Wall also states that he already was designated SL-S before the Step-Down Program ever began. *Id.* at ¶ 3. Thus, Mr. Wall did not receive a "change in security level status" that required prior notice or participation in an ICA hearing at the time he was being considered for the Step-Down Program. Finally, the ICA Hearing forms, each of which is signed by Mr. Wall, reflect that Mr. Wall was present at the hearing where he it was recommended he be assigned to segregation, Exhibit 3 at VADOC-0000900, at the hearing where it was recommended that he be transferred to ROSP, *id.* at VADOC-00000896, and at the hearing where it was recommended that he remain at SL-S upon intake at ROSP, *id.* at VADOC-00000892.

<u>Plaintiffs' Reply ¶ 18</u>:  Plaintiffs concede that this fact is disputed.

19.     Derek Cornelison, another named Plaintiff, did not receive notice of his security level increase, as required by O.P. 830.2.  Mr. Cornelison did not receive an explanation of the reasons why he was being reviewed for a possible security level increase, nor did he participate in any ICA hearing.  Ex. 16, 2023 Cornelison Decl. ¶ 5.

<u>Defendants' SUMF Response ¶ 19</u>:  **Disputed**: The declaration cited by Plaintiffs neither establishes that Derek Cornelison "did not receive notice of his security level increase" nor that he "did not receive an explanation of the reasons why he was being reviewed for a possible security level increase," stating only that Mr. Cornelison "was not present at any hearing that resulted in my security level being changed to Level S, me being assigned to ROSP, or being placed in the Step-Down Program." Declaration of Derek Cornelison ("Cornelison Decl.") [ECF No. 383-16] at ¶ 5. VDOC Operating Procedure 830.1 ("O.P. 830.1") permits an inmate to be present at a formal due process hearing but does not require him to be present if he chooses not to be. O.P. 830.1 [ECF No. 381-24] at 8. Further, Mr. Cornelison admits that he had a "conversation with a counselor who gave [him] ICA paperwork and told [him] that [his] classification was going to be changed to [SL-S]." [ECF No. 383-16] at ¶ 4. Finally, the ICA form for the hearing where Mr. Cornelison was recommended for a Security Level change to SL-S for attacking another inmate with a weapon—an incident to which he admitted and took a penalty offer—establishes that not only was he present but that he made a statement: "I told them that I don't even want to go to the hearing." Exhibit 4 at VADOC-00004587-88. And the ICA form where he was recommended to be placed in the Step-Down Program upon intake at ROSP also reflects that not only was he present but that he made a statement: "I have pending charges, I'm not saying anything." Exhibit 4 at VADOC-00004586.

<u>Plaintiffs' Reply ¶ 19</u>:  Plaintiffs concede that this fact is disputed.

14

20.    Javon Arrington, a member of the Class who is currently participating in the Step-Down

Program, did not receive notice of his security level increase, as required by O.P. 830.2.  Mr.

Arrington was not given prior notice of any ICA hearing or provided with an explanation of the

reasons why he was being reviewed for a possible security level increase.  Ex. 17, 2023

Arrington Decl. ¶¶ 3, 5.

Defendants' SUMF Response ¶ 20:  **Disputed**: The declaration cited by Plaintiffs does not
establish that Javon Arrington did not receive notice of his security level increase in 2011 or in
2022, or that he was in the Step-Down Program in 2012. Mr. Arrington is silent on the topic of
whether he received notice of his security level increase in 2011 and whether he was in the Step-
Down Program in 2012, Declaration of Javon Arrington ("Arrington Decl.") [ECF No. 383-17]
at ¶ 3, and states only things that he "do[es] not recall" about his assignment to SL-S in 2022, *id.*
at ¶ 5. The only facts that Mr. Arrington's lack of recollection establish are that he neither knows
whether he was given prior notice nor whether he was provided an explanation of the reasons he
was being reviewed for a possible security level increase. Further, the ICA Hearing Notification
Form for the hearing where Mr. Arrington was recommended for SL-S indicates that Mr.
Arrington both waived his right to 48-hour notice and indicated that he did not wish to attend the
hearing. Exhibit 5. And the ICA form for the hearing where Mr. Arrington was recommended for
SL-S establishes that, not only was he present for the ICA hearing but that he made statement: "I
don't understand why I am being recommended for Security Level S." *Id.* Regardless whether
Mr. Arrington was being truthful, he clearly understood that he *was* being recommended for SL-
S. *Id.* Further, his ICA form showed the multiple reasons why he was being recommended for
SL-S, including assaulting another inmate and threatening to "that the next time he gets a chance
that he will stab an officer with a weapon in the face." *Id.*

**Plaintiffs' Reply ¶ 20**:  Plaintiffs concede that this fact is disputed.


21.    No VDOC policy requires that any mental health staff member participate in the process

of assigning an incarcerated person to Level S. Ex. 4, Mathena 30(b)(6) Dep. at 237:3–9,

237:21–238:8.

Defendants' SUMF Response ¶ 21:  **Disputed in part**. Although VDOC policy does not require
mental health staff to "participate in the process of assigning" an inmate to SL-S, they are
involved in determining whether the inmate remains assigned to SL-S. VDOC Operating
Procedure 830.5 ("O.P. 830.5") provides that inmates assigned to SL-S who are classified with a
Serious Mental Illness ("SMI")— a classification assigned by mental health professionals—
automatically are eligible for a Secure Diversionary Treatment Program ("SDTP"). O.P. 830.5,

attached as Exhibit 6, at 15-16. Further a mental health professional must conduct an SMI determination upon assignment to the Step-Down Program if the inmate has not been screened for an SMI in the previous year. Defs.' Br. [ECF No. 381] at 30, ¶ 83.

**Plaintiffs' Reply ¶ 21**:  Defendants' evidence does not create a genuine dispute of material fact as to whether VDOC policy requires that any mental health staff member participates in the process of assigning an incarcerated person to Level S, which is the subject of the stated fact. Defendants' response begins by conceding the stated fact.  Defendants' cited evidence merely adds information from the cited Operating Procedure, and Plaintiffs do not dispute that the cited Operating Procedure includes the statements quoted.  However, Defendants selectively quote the cited evidence, which provides that people classified with an SMI are merely "eligible" for the SDTP, not automatically assigned to it.  *See* ECF No. 402-6, VDOC O.P. 830.5 (effective Nov. 1, 2020) at 16.

22.    Defendant Randall C. Mathena, VDOC's Security Operations Manager and the former Warden of ROSP, considers "mental health status" to be no more important than "understanding what [an incarcerated person's] eye color is" when assigning a security level classification to an incarcerated person.  Ex. 18, Mathena Dep. at 537:6–21.

Defendants' SUMF Response ¶ 22:  **Disputed**: The cited deposition testimony, in which Mr. Mathena was testifying in his personal capacity, does not support Plaintiffs' allegation. Mr. Mathena was not asked, and did not testify, as to the relative importance of an inmate's mental health status versus eye color with respect to assigning a security level classification. He did testify that knowing an inmate's mental health status is "as essential as understanding what their security levels are." Videotaped Deposition of Randall Mathena Day 2 dated April 5, 2023 ("Mathena Individual Dep.") [ECF No. 383-18] at 537:6-11.

**Plaintiffs' Reply ¶ 22**:  Plaintiffs do not dispute that Mr. Mathena's testimony regarding the importance of ███████████ in relation to ████████████████ ███████████ is more accurately characterized as a relevant ████████ when attempting

16

to ███████████████████████ rather than assigning a security level classification.

*See* ECF No. 400-5, Mathena Dep. at 537:6–21.

23.     Dr. Denise Malone, speaking for VDOC as a 30(b)(6) representative, could not think of a

time when information provided by mental health staff impacted whether an incarcerated person

was classified as Level S.  Ex. 19, Malone 30(b)(6) Dep. at 118:13–19.

Defendants' SUMF Response ¶ 23:  **Disputed**: See response to ¶ 21, *supra*. Further, Dr. Malone
was not designated as a 30(b)(6) representative on the topic of the initial decision to classify
inmates as SL-S and, thus, was not speaking for VDOC as a 30(b)(6) representative in the
subject testimony. *See* Exhibit 7 (Dr. Malone designated for topics 13, 15, 16 e. and f.; initial
decision to classify inmates as SL-S is topic 7. a.).

**Plaintiffs' Reply ¶ 23**:  Defendants' evidence does not create a genuine dispute of material fact

as to what Denise Malone, VDOC's Chief of Mental Health and Wellness Services and 30(b)(6)

designee on various mental health-related topics, *see* Ex. 129, Notice of 30(b)(6) Deposition of

Defendant Virginia Department of Corrections at 6–7 (Topics 13, 15 ("Policies and practices

related to mental health screenings and assessments of, and any forms of treatment or services

provided to, prisoners in the Step-Down Program from 2012 to the present . . ."), and 16

("Accommodations of prisoners assigned to or in the Step-Down Program who have

disabilities . . .")); ECF No. 402-7, Feb. 7, 2023 E-mail from D. Fairbanks to J. Frisch, et al.

("VDOC's designees for the 30(b)(6) topics are as follows: . . . ***Topics 13, 15, 16 e. and f.*** –

***Denise Malone*** . . .") (emphasis added), testified regarding whether information provided by

mental health staff impacted whether an incarcerated person was classified as Level S, which is

the subject of the stated fact.


      **B.**    **Placement into a Pathway Within the Step-Down Program**

24.     Incarcerated persons classified as Security Level S at ROSP are automatically enrolled in the Step-Down Program.  Ex. 11, Duncan Dep. at 24:15–25:1.

Defendants' SUMF Response ¶ 24:  **Undisputed**.

25.     The stated purpose of the Step-Down Program is to ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 1, 2012 Step-Down Manual, at -694.

Defendants' SUMF Response ¶ 25:  **Undisputed**.

26.     The Step-Down Program contains two pathways: the Intensive Management ("IM") pathway and the Special Management ("SM") pathway. *See generally* Ex. 6, VADOC-00003146 (O.P. 830.A); Ex. 1, 2012 Step-Down Manual; Ex. 2, 2020 Step-Down Manual.

Defendants' SUMF Response ¶ 26:  **Undisputed**.

27.     The IM Pathway ends at a Level 6 pod and does not provide a pathway back to general population. *Id*. at -149 ██████████████████████ for the IM population).

Defendants' SUMF Response ¶ 27:  **Disputed**: As explained in Defs.' Br.,

> IM inmates who show satisfactory progress in the Step-Down Program are eligible to transition to the SM path. ECF No. 201-2 ¶ 14. Several of Named Plaintiffs transitioned from the IM path to the SM path on their pathway out of SL-6. See, e.g., External Review Team Recommend Change Forms dated October 23, 2019, attached as Exhibit 20. Further, as demonstrated by the External Review Team Recommend Change Form, inmates can be transitioned at the same privilege level without starting the SM path at SM-0. See, e.g., External Review Team Recommend Change Form dated October 17, 2018, attached as Exhibit 21.

ECF No. 381 at 13, ¶ 27.

**Plaintiffs' Reply ¶ 27**:  Defendants' self-serving declaration lacks foundation and does not create a genuine dispute of fact as to whether the *IM Pathway* provides a pathway back to general population and Mr. Mathena's testimony in this regard should be disregarded.  *See, e.g.*, *Coffey v. Chem. Specialties, Inc.*, 4 F.3d 984, 1993 WL 318886, at *3 (4th Cir. 1993) ("Coffey's self serving testimony which is utterly lacking in foundation does not establish a genuine issue of material fact."); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").  Defendants' argument that an inmate can be reassigned to the SM Pathway, which does have a pathway back to general population, is not responsive to Plaintiffs' statement, nor does it create a genuine dispute; it merely affirms that prisoners on the IM Pathway do not have a pathway back to the general population; the only way for an inmate on the IM Pathway to get back to general population is to be taken off of the IM Pathway and reassigned to a wholly different pathway.  *See* ECF No. 383-5, VADOC-00134589 at -594 ██████████████████████████████████████████████████ (2021 O.P. 830.A).  Defendants' argument about "satisfactory progress" is therefore immaterial, and it is also unsupported by the record.  None of the versions of either O.P. 830.A or the Step-Down Manual has ever stated that "satisfactory progress"—or anything akin to that—can make an IM prisoner eligible for SM, let alone defined the term.  *See* ECF No. 400-103, Plaintiffs' Response to Defendants' SUMF ¶ 27 (explaining that the criteria for "eligibility" to be reassigned to the SM Pathway is undefined and VDOC provides no rationale for the reassignment). In fact, until the language was omitted from the 2020 version, the Step-Down Manual explicitly stated in relation to people in IM that ████████████████████████████████ ████████  *Compare* ECF No. 381-11, VADOC-00053104 at -131 (2017 Step-Down Manual);

ECF No. 381-7, VADOC-00037971 at -993 (2012 Step-Down Manual) *with* ECF No. 381-12, VADOC-00053668 at -694 (2020 Step-Down Manual).  And the current version of O.P. 830.A still contains this language.  *See* ECF No. 383-5, VADOC-00134589 at -594 ████████████ ██████████████████████████████████████████ (2021 O.P. 830.A).  Further, the proposition that IM prisoners can transition to SM by showing "satisfactory progress" in the Step-Down Program contradicts the substance of Mr. Mathena's testimony at deposition, which was that, in determining whether a person is appropriate for Level S, the ERT primarily looks to the initial decision to classify the person as Level S and whether there are any problems with that decision or the rationale underlying that decision, such as when charges leading to someone's placement in Level S are subsequently dropped.  ECF No. 400-5, Mathena Dep. at 480:1– 482:17.  Because the ERT often does not provide any rationale for moving someone from IM to SM it is often impossible to derive the reason for any such move, including whether the decision was made for reasons unrelated to someone's "satisfactory progress" in the Step-Down Program. *See, e.g.*, ECF No. 381-20, VADOC-00020350 at -350 and -366 (including no comments or rationale for decisions) (2019 External Review Signature Pages).  For example, in the four months after Plaintiffs filed this action, the ERT met twice and moved six of the named Plaintiffs out of IM and into SM after they had spent a collective 27 years in Level S, and without listing any rationale for doing so, *see* ECF No. 383-79, VADOC-00175822 at lines 3156–75, 7675–86, 12305–11, 19907–13, 20264–87, and 24852–62 (Internal Status Spreadsheet), raising a question whether the moves were made in the ordinary course of the Step-Down Program as part of any "satisfactory progress" review, or instead because of this litigation.  Multiple plaintiffs in IM status have been told that they would never make it out of IM, including by Mr. Mathena.  ECF No. 400-15, Mukuria Decl. ¶¶ 4, 7, 32; ECF No. 383-16, Cornelison Decl. ¶ 23.

28.    The IM and SM pathways provide for different privilege levels and require different

lengths of time to achieve those privilege levels.  *See generally id.*; Ex. 1, 2012 Step-Down

Manual.

<u>Defendants' SUMF Response ¶ 28</u>:  **Undisputed**.


29.    The Dual Treatment Team ("DTT") is tasked with assigning inmates in Level S to one of

the two pathways upon their arrival at ROSP.  Ex. 4, Mathena 30(b)(6) Dep. at 255:9–257:18;

Ex. 5, VADOC-00134589 at -603 (2021 O.P. 830.A).  The DTT is headed by the Chief of

Housing and Programs, and members include unit managers, Institutional Program Manager,

Intelligence Officer, Mental Health Associate, Facility Medical Director, counselors, correctional

officers, and other staff members with relevant information.  Ex. 5, VADOC-00134589 at -591

(2021 O.P. 830.A).

<u>Defendants' SUMF Response ¶ 29</u>:  **Undisputed**.


30.    The DTT does not review whether someone is properly placed in Level S.  Ex. 4,

Mathena 30(b)(6) Dep. at 264:19–265:4.

<u>Defendants' SUMF Response ¶ 30</u>:  **Disputed**. The cited deposition testimony does not support
Plaintiffs' allegation. Mr. Mathena was not asked, and did not testify, as to what the DTT
reviews. Rather, he was asked whether there were any other decisions for which the DTT was
responsible.

**<u>Plaintiffs' Reply ¶ 30</u>**:  Merely responding that a party "disputes" a material fact is insufficient

under Rule 56; because Defendants have failed to dispute this fact by offering specific facts

supported by record citations, the Court should treat this fact as undisputed.  *Othentec*, 526 F.3d

at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon

which a jury could properly proceed to find a verdict for the party producing it, upon whom the

onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The

nonmoving party, however, cannot create a genuine issue of material fact through mere

speculation or the building of one inference upon another."); *Amos v. Welles*, 477 F. Supp. 3d

408, 411 n.1 (E.D.N.C. 2020); *see also Salmon*, 2003 WL 1730413, at \*4  (granting summary

judgment in movant's favor where non-moving party offered only "bare conclusory assertions

and [a] self-serving declaration of material facts in genuine dispute").  Nevertheless, Defendants'

response is contradicted by the evidence presented by the Plaintiffs.  Mr. Mathena was asked

about the Dual Treatment Team's ███████████ other than with respect to moving someone

within Level S and moving someone from Level 5 to 6, and whether it was responsible for any

other decisions, and his response was, ████████ Ex. 128, Mathena 30(b)(6) Dep. at 264:19–

265:4.  Defendants do not point to any policy documents or any other evidence in the record to

suggest that the DTT is responsible for reviewing whether someone is properly in Level S (nor

do they assert as much in their response brief in the due process section, *see* ECF No. 402,

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 20–41).


31.    The DTT does not include a psychiatrist, and there is no requirement that the DTT

include a mental health professional who has actually observed or treated the individual being

reviewed.  *Id.* at 267:8–14; Ex. 20, Gallihar Dep. at 127:19–128:1.

Defendants' SUMF Response ¶ 31:  **Disputed in part**. Although there is no "requirement" that
the DTT include a mental health professional who has actually observed or treated the individual
being reviewed, Arvil Gallihar testified that he could not think of a situation where the DTT
would not have included such an individual. Videotaped Deposition of Arvil James Gallihar
dated April 7, 2023 ("Gallihar Dep.") [ECF No. 383-20] at 127:5-18.

**Plaintiffs' Reply ¶ 31**:  Defendants admit that the DTT does not include a psychiatrist and that

there is no requirement that the DTT include a mental health professional who has actually

observed or treated the individual being reviewed, which are the subjects of the stated fact.  They

have therefore failed to create a genuine dispute of material fact.  Evidence regarding whether or

not the DTT in fact includes mental health professionals, or whether they meaningfully

participated in such meetings, is not responsive to Plaintiffs' SUMF and is disputed.  *See* ECF

No. 400-103, Plaintiffs' Response to Defendants' SUMF ¶ 84.


32.    Although the Step-Down Program Manual provides that the DTT "may include" a mental

health associate, the psychology associate who was solely responsible for monitoring the mental

health of Level S offenders between 2015 and 2020 did not have a speaking role in DTT

meetings unless called upon, and was not called upon in numerous DTT meetings.  Ex. 25, Trent

Dep. at 30:15–20, 276:17–278:4.

Defendants' SUMF Response ¶ 32:  **Disputed in part**. Defendants understand the reference to
the "Step-Down Program Manual" to be the document that Plaintiffs refer to elsewhere as the
"Step-Down Manual." It is not accurate that all versions of the Step-Down Manual provide that
the "may include" a mental health associate. *See, e.g.,* 2015 Step-Down Manual [ECF No. 381-9]
at VADOC_00002706 ("Representatives from both ROSP and WRSP will make up the DTT to
include, but not limited to, the following individuals or their designees: … [Qualified Mental
Health Professional] ….").  The cited deposition testimony does not support Plaintiffs' allegation
that Mr. Trent was "the psychology associate who was solely responsible for monitoring the
mental health of Level S offenders between 2015 and 2020." Further, other individuals also had
responsibility to "monitor" SL-S offenders between 2015 and 2020, including Terrence Huff (as
a supervising psychology associate) and Dr. McDuffie (with respect to offenders who have
received a referral to a psychiatrist). *See, e.g.,* Exhibit 8 (Mental Health Progress Notes signed by
Terence Huff); Plaintiffs' Statement at ¶¶ 187-188.

**Plaintiffs' Reply ¶ 32**:  Defendants' evidence does not create a genuine dispute of material fact.

It is immaterial whether different versions of the Step-Down Manual say that the DTT "may

include," a mental health associate, *see, e.g.*, ECF No. 383-2, VADOC-00053480 at -489 (2020

Step-Down Manual), or use more compulsory language as to their attendance, because the

material fact here is that in practice, mental health associates did not have a meaningful role in

such meetings, as Mr. Trent indicates.  Non-material facts are not appropriate in a statement in

opposition to summary judgment and should be disregarded or stricken. *Anderson*, 477 U.S. at

248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."); *accord*

*HP Tuners, LLC*, 2022 WL 562625, at *1, *5 (granting motion to strike non-material facts);

*Knidel*, 189 F. Supp. 3d at 284–85 ("giv[ing] little to no consideration to extraneous factual and

legal assertions propounded").  Moreover, Mr. Trent testified that he was the psychology

associate with sole responsibility of monitoring the mental health of prisoners in C building

(where all Level S prisoners were housed) for almost all of his five years as a mental health

associate between 2015 and 2020.  ECF No. 400-13, Trent Dep. at 45:10–47:6.  Mr. Huff

confirmed in a deposition in 2020 that when he was previously in Mr. Trent's role as the junior

mental health associate (previously known as Psychology Associate 1), between 2012 and 2015,

he was the only person assigned to C building and it was his responsibility to monitor the

prisoners there unless he was absent for some reason, Ex. 131, Huff (*Reyes*) Dep. at 48:16–50:6,

76:9–12, and that when he became a senior mental health associate (Psychology Associate 2), he

no longer performed rounds in any housing unit unless he needed to fill in for someone who was

overwhelmed or needed consultation, *id.* at 76:21–77:9.  Thus, Mr. Huff's testimony further

corroborates that he only would have conducted such monitoring if he was filling in for or

assisting Mr. Trent in some manner, but that the responsibility of monitoring Level S prisoners

generally lay solely with Mr. Trent.  Defendants' citation to Plaintiffs' SUMF paragraphs 187–

88, of which the subjects are the management of medications and Dr. McDuffie's schedule at

Red Onion, does not create a genuine dispute regarding Mr. Trent's testimony about monitoring

of the mental health of Level S prisoners.

33.      While incarcerated persons at Level S wait for a pathway assignment from the DTT, they

are housed in an orientation pod.  Ex. 4, Mathena 30(b)(6) Dep. at 242:12–15; Ex. 5, VADOC-

00134589 at -591 (2021 O.P. 830.A).  In the orientation pod, the inmate's privileges and security

protocols are similar to those used at SM-0 or IM-0—the most restrictive levels within the Step-

Down Program.  Ex. 4, Mathena 30(b)(6) Dep. at 243:11–15; *see also* Ex. 5, VADOC-00134589

at -593 (2021 O.P. 830.A) (the Intake/Orientation Unit ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████); Ex. 17, 2023

Arrington Decl. ¶ 8.

<u>Defendants' SUMF Response ¶ 33</u>:  **Undisputed**.


34.      According to VDOC, incarcerated persons generally spend 30 days in the orientation pod.

Ex. 4, Mathena 30(b)(6) Dep. at 320:15–18; Ex. 11, Duncan Dep. at 224:16–18.

<u>Defendants' SUMF Response ¶ 34</u>:  **Undisputed**.


35.      The time that an inmate spends in the orientation pod does not count towards the

minimum time he is required to spend at each level within his Step-Down pathway.  *Id*. at 228:4–

11.

<u>Defendants' SUMF Response ¶ 35</u>:  **Disputed**: The cited deposition testimony, which is not
included in the cited Exhibit, does not support Plaintiffs' allegation. Amee Duncan testified only
that the time an inmate is not participating in the Step-Down Program does not count towards the
inmate's time for progressing from SM-0. Transcript of Amee Beth Duncan dated March 14,
2023 ("Duncan Dep."), cited portions attached as Exhibit 35, at 228:4-11.

**<u>Plaintiffs' Reply ¶ 35</u>**:  Defendants' response does not create a genuine dispute of material fact

as to whether the time an inmate spends in the orientation pod counts towards the minimum time

he is required to spend at each level within his Step-Down pathway.  Both the testimony of

VDOC employees and the Step-Down Manual itself make clear that the Step-Down Program

does not contemplate that the time period prior to assignment to IM-0 or SM-0 counts toward the

minimum time.  *See* ECF No. 383-2, VADOC-00053480 at -529–30, -534 (2020 Step-Down

Manual); Ex. 132, Collins Dep. at 145:22–146:7, 147:17–148:4; Ex. 133, Mathena Dep. at

391:6–393:4, 396:2–398:1.[7]


36.     There is no required timeframe by which the DTT must meet with the inmate to evaluate

him for a pathway assignment, Ex. 4, Mathena 30(b)(6) Dep. at 245:12–16, and the DTT does

not meet with a standard frequency.  *Id*. at 118:15–19.

Defendants' SUMF Response ¶ 36:  **Disputed in part**: The cited deposition testimony does not
support that the DTT never has met with a standard frequency, only that it does not do so at the
present time. For example, in the 2012 Step-Down Manual, the DTT was directed to meet at
least monthly. ECF No. 381-7 at VADOC_00037981. Further, Mr. Gallihar testified that there
was guidance to meet at least monthly, but that the DTT may meet more often, depending on
when inmates arrived. Transcript of Arvil James Gallihar dated April 7, 2023 ("Gallihar Dep."),
cited portions attached as Exhibit 10, at 129:2-129:10.

**Plaintiffs' Reply ¶ 36**:  Defendants do not dispute the fact as it pertains to the present and

therefore have failed to create a genuine dispute as to the subject of the stated fact.  The cited

testimony from Mr. Gallihar was limited to the period in which he was involved with the DTT,

and he testified that the DTT "may meet" more than monthly, that it "may be as needed, you

know more than monthly," and that at minimum they merely "tried" to get together monthly.

This does not create a genuine factual dispute.  Defendants' dispute as to the 2012 period is

based only on the written policy and not actual practice, which is the subject of the stated fact.

---

[7] The cited page of Ms. Duncan's deposition transcript was inadvertently omitted from Plaintiffs'
Exhibit 11 (ECF No. 383-11).  The page can be found in Defendants' Exhibit 9 to their
Opposition (ECF No. 402-9) and in Plaintiffs' Exhibit 127.

37.    For example, Class Representative Peter Mukuria was sent to ROSP on November 16,

2012, but was not placed into a pathway until at least February 6, 2013.  ECF No. 174-24 ¶¶ 2, 9

(Mukuria Aff.)

Defendants' SUMF Response ¶ 37:  **Disputed**: Plaintiffs claim as an undisputed fact at ¶ 245
that Mr. Mukuria was classified as SL-S on February 17, 2013 and assigned to the IM pathway at
that time. Plaintiffs' "example" provides no information regarding the frequency with which the
DTT meets.

**Plaintiffs' Reply ¶ 37**:  Defendants have not identified any inconsistency between the phrases

"until at least February 6, 2013" and "on February 17, 2013," and thus have identified no

genuine dispute of material fact.  Moreover, merely responding that a party "disputes" a material

fact is insufficient under Rule 56; because Defendants have failed to dispute this fact by offering

specific facts supported by record citations, the Court should treat this fact as undisputed.

*Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than

a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing

it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769

F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp.

3d at 411 n.1; *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in

movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-

serving declaration of material facts in genuine dispute").  Nevertheless, their response is

contradicted by the evidence presented by the Plaintiffs.  Mr. Mukuria was brought to Red Onion

on November 15, 2012 and was not placed in the IM Pathway, as a result of a DTT meeting,

until February 2013, which indicates that a person can wait for months after transfer to Red

Onion for placement in Level S before placement in a pathway.  *See* Ex. 134, VADOC-

00175822 at lines 20255–20310 (Internal Status Spreadsheet); *see also* ECF No. 174-24,

Mukuria Aff. ¶¶ 2, 9.  As such, Defendants have failed to create a genuine dispute of material fact.

38.      According to VDOC policy, the DTT is required to consider four factors in deciding an inmate's pathway: motivators and triggers; institutional adjustment and street behavior and crimes; offender intent and the result of their actions; and the inmate's ███████████████ ██████ Ex. 2, 2020 Step-Down Manual at -699; Ex. 4, Mathena 30(b)(6) Dep. at 277:12–21.

Defendants' SUMF Response ¶ 38:  **Undisputed**.

39.      No guidance is provided to the DTT on how to weigh the four factors that determine an inmate's pathway.  Ex. 4, Mathena 30(b)(6) Dep. at 277:12–21.  No formal training is provided to the DTT on how to weigh these factors.  *Id*. at 277:22–278:5.

Defendants' SUMF Response ¶ 39:  **Disputed in part**: The cited deposition testimony does not establish that "four factors … determine an inmate's pathway," only that the DTT is required to consider four specific factors in deciding an inmate's pathway. The Step-Down Manual specifically states that the four identified factors in ¶ 38 above as those the DTT should ***include*** in its determination, but does not limit their consideration to those four factors. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053499 (emphasis added).

**Plaintiffs' Reply ¶ 39**:  Defendants do not dispute that no guidance or training is provided on how to weigh the four factors.  Defendants suggest only that there may be *other* factors that the DTT considers that are *not* listed in the Manual, and they point to language in the Step-Down Manual that does not commit the DTT to considering only the four factors listed.  Not only have Defendants failed to create a genuine dispute of material fact, but Defendants' response also makes clear that the DTT's review is even more discretionary and standardless than Plaintiffs asserted in their SUMF.

40.    If there is no consensus among DTT members about whether a prisoner should be placed

in the IM or the SM pathway, policy provides that the team is assigned to the IM pathway.  Ex.

2, 2020 Step-Down Manual at -490; Ex. 21, Gibson Dep. at 145:3–6.

Defendants' SUMF Response ¶ 40:  **Disputed in part**: To the extent that Plaintiffs' allegation is
intended to imply that no attempt is made to reach consensus before defaulting to the safer
option, Ms. Duncan testified that, in determining a pathway, the DTT does not take a vote but
"hash[es] it out with those definitions until we come to consensus." Exhibit 9, Duncan Dep. at
265:1-9. She further testified that, in her time participating in DTT reviews, she could not recall
the group not being able to reach consensus. *Id.* at 270:8-11. Jonathan Gibson testified that,
during his involvement in more than 50 DTTs, the DTT failed to come to consensus "like two
times, two to three times, potentially." Videotaped Deposition of Jonathan Gibson ("Gibson
Dep."), cited portions attached as Exhibit 11, at 146:4-147:2. Finally, no "team" is assigned to
the IM pathway; inmates are so assigned.

**Plaintiffs' Reply ¶ 40**:  Defendants do not dispute Plaintiffs' stated fact as to policy requiring

assignment to the IM pathway when consensus is not achieved.  Instead, they suggest that failure

to reach consensus is not common.  Defendants fail to identify any inconsistency in Plaintiffs'

stated fact, however, and have thus failed to create a genuine dispute of material fact.  Plaintiffs

acknowledge that the use of the word "team" was a typo and do not dispute that inmates, not

"teams," are assigned to the IM pathway.


41.    The DTT review takes on average five minutes for each inmate.  Ex. 21, Gibson Dep. at

139:2–9.

Defendants' SUMF Response ¶ 41:  **Disputed**: The cited deposition testimony contains one
individual's estimate for the average time for DTT reviews in 2015, not for any other time
period. Ms. Duncan testified that there was "no set time on how long we spend on an inmate,
how long we let an inmate talk during the interview process." Exhibit 9, Duncan Dep. at 265:13-
18. VDOC is not aware of any evidence in the record that establishes the average time spent by
the DTT to review each inmate in 2012–2014, or 2016–present. Further, there is no set time on
how long the DTT spends on a particular inmate; it depends on the inmate's situation.
Declaration of Amee Duncan dated October 5, 2023 ("Duncan Decl."), attached as Exhibit 12, at
¶ 5.

**Plaintiffs' Reply ¶ 41**:  Plaintiffs concede that this fact is disputed.

42.    Prior to 2017, inmates did not have the option to participate in DTT pathway assignment

reviews.  Gibson Dep. at 152:2:6; s*ee also* ECF No. 174-24 ¶ 9 (Mukuria Aff.) (class

representative Mukuria attesting that he was not afforded an opportunity to be heard when he

was first assigned to the IM pathway upon his arrival at ROSP in February 2013); Ex. 16, 2023

Cornelison Decl. ¶ 8 ("I did not attend any hearing to determine my pathway in the Step-Down

Program").

Defendants' SUMF Response ¶ 42:  **Disputed in part**: Mr. Mukuria has not been designated by
the Court as a "class representative." Opinion and Order dated August 8, 2023 [ECF No. 358] at
14.

**Plaintiffs' Reply ¶ 42**:  Defendants' response is false.  Contrary to Defendants' assertion, the

Court "f[ou]nd that Mukuria is a satisfactory representative of the Constitutional Violation

Damages Class" and so designated him as a class representative.  ECF No. 358, Opinion and

Order dated Aug. 8, 2023 at 9.  In any event, Mr. Mukuria's status as a class representative is not

material to the asserted fact.  As such, Defendants have failed to create a genuine dispute of

material fact.


43.    The DTT decision on a pathway is final.  Ex. 4, Mathena 30(b)(6) Dep. at 257:21–258:3.

It may only be modified by the External Review Team ("ERT"), described below, during the

biannual review process.  Ex. 2, 2020 Step-Down Manual at -488.

Defendants' SUMF Response ¶ 43:  **Disputed in part**: Plaintiffs second statement contradicts
their first statement: a decision is not "final" when, as Plaintiffs admit, it can be modified by a
subsequent review.

**Plaintiffs' Reply ¶ 43**:  Defendants' response does not create a genuine dispute as to Plaintiffs'

SUMF that the DTT's decision on a pathway is final, subject only to ERT modification during

biannual review.  Defendants' semantic disagreement regarding the meaning of "final" is not

sufficient.  Merely responding that a party "disputes" a material fact is insufficient under Rule

56; because Defendants have failed to dispute this fact and others by offering specific facts

supported by record citations, the Court should treat Plaintiffs' facts as undisputed.  *Othentec*,

526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a

'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it,

upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769

F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp.

3d at 411 n.1; *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in

movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-

serving declaration of material facts in genuine dispute").


### C.    Overview of the IM and SM Pathways

44.    As part of the IM pathway, an inmate begins at the IM-0 privilege status, and may

progress, successively, through the IM-1, IM-2, Security Level 6 IM Closed Phase I, and

Security Level 6 IM Closed Phase II privilege statuses.  Ex. 2, 2020 Step-Down Manual at -640.

As an inmate progresses through these privilege levels, he gradually receives different privileges.

*Id.*

Defendants' SUMF Response ¶ 44:  **Disputed in part**: Although Plaintiffs' statement regarding
inmates in the IM pathway beginning at the IM-0 privilege level status is accurate as to the
current iteration of the Step-Down Program, it is not accurate for all previous iterations. *See, e.g.,*
2012 External Review Team ("ERT") document, attached as Exhibit 13, at VADOC-00001727–
30 (reflecting that some inmates on the IM pathway initially were assigned to IM-1 or IM-2
when the Step-Down Program began). As an inmate progresses through these privilege levels, he
maintains his existing privileges and receives additional privileges; he does not receive
"different" privileges. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053528.

**Plaintiffs' Reply ¶ 44**:  Defendants' response does not create a genuine dispute of material fact as to the privilege status progression as outlined in the 2020 Step-Down Manual—the subject of the stated fact—which Defendants admit is "the current iteration of the Step-Down Program."

45.    An inmate assigned to the IM pathway may progress no further than the IM Closed Pod, Security Level 6.  *Id.* at -517; s*ee also* Ex. 16, 2023 Cornelison Decl. ¶ 23 ("I was told that [the IM Closed Pod] was the end of the line for me and was a dead end.").

Defendants' SUMF Response ¶ 45:  **Disputed**: An inmate assigned to the IM pathway can progress to general population. S*ee* response to ¶ 27, *supra.* Notwithstanding Mr. Cornelison's most recent statement of hearsay, he has progressed further than the IM Closed Pod and currently is in general population. Affidavit of Derek Cornelison dated June 20, 2022 [ECF No. 174-21] at ¶ 23.

**Plaintiffs' Reply ¶ 45**:  Defendants have failed to create a genuine dispute of material fact.  As explained *supra* in Plaintiffs' SUMF Reply paragraph 27, there is no genuine dispute of material fact that an inmate assigned to the IM Pathway may progress no further than the IM Closed Pod, Security Level 6; the fact that an inmate on the IM Pathway can be *reassigned* to the SM Pathway is immaterial to Plaintiffs' stated fact.  *See* Plaintiffs' SUMF Reply ¶ 27; *see also* ECF No. 400-103, Plaintiffs' Response to Defendants' SUMF ¶ 27.

46.    The SM pathway has a similar privilege progression framework.  After assignment to the SM pathway, an inmate begins at the SM-0 privilege status, and may progress, successively, through the SM-0, SM-1, SM-2, Security Level 6 Phase I & Level 6 Re-Entry, and Security Level 6 Phase II privilege statuses.  Ex. 2, 2020 Step-Down Manual at -533.  As with the IM pathway, an inmate receives more privileges as he advances within the SM pathway.  *Id.*

Defendants' SUMF Response ¶ 46:  **Disputed in part**: Although Plaintiffs' statement regarding inmates in the SM pathway beginning at the SM-0 privilege level status is accurate as to the current iteration of the Step-Down Program, it is not accurate for all previous iterations. *See, e.g.,*

2012 External Review Team ("ERT") document, Exhibit 13, at VADOC-000000001741–47, 1749–50, 1757–58, 1760–63, 1765–66, 1768 (reflecting that some inmates on the SM pathway initially were assigned to SM-1, SM-2, or one of the SL-6 units when the Step-Down Program began).

**Plaintiffs' Reply ¶ 46**:  Defendants' response does not create a genuine dispute of material fact as to the privilege status progression as outlined in the 2020 Step-Down Manual—the subject of the stated fact—which Defendants admit is "the current iteration of the Step-Down Program."

47.    Incarcerated persons must ████████████ to become eligible to advance in status; those who fail to ███████████████████████████████████

████████████████████████████████████████████████████

████████████████    Ex. 6, VADOC-00003146 (O.P. 830.A) at -149.

Defendants' SUMF Response ¶ 47:  **Undisputed**.

48.    Once an incarcerated person is assigned to the IM pathway, he may return to the general population only if he progresses through the Step-Down Program to Security Level 6 IM Closed Pod and is subsequently reclassified to the SM pathway.  Ex. 18, Mathena Dep. at 609:5–17.

Defendants' SUMF Response ¶ 48:  **Disputed**. In the deposition testimony cited by Plaintiffs' it is unclear whether Mr. Mathena was addressing the circumstance of William Thorpe specifically and whether his testimony is limited to the 2012 time frame. Transcript of Randall Mathena (Individual) dated April 5, 2023 ("Mathena Dep."), cited portions attached as Exhibit 14 at 604:15-610:7. Regardless, inmates do not have to progress to the Level 6 IM Closed Pod before being reclassified to the SM pathway. *See, e.g.,* External Review Team Recommend Change Forms, attached as Exhibit 15 at VADOC-00024217, 221, 225 (reflecting reclassifications from IM-1 to SM-1 and IM-2 to SM-2. Further, Mr. Gallihar testified to several instances that he knew of where inmates moved directly from SL-S to Security Level 5 ("SL-5"), *i.e.*, general population for various reasons, including medical, mental health, and other policy-related reasons. Gallihar Dep., Exhibit 10 at 247:18–249:13.

**Plaintiffs' Reply ¶ 48**:  Defendants' response does not create a genuine dispute of material fact. The context of Mr. Mathena's testimony is clear and concerned inmates on the IM pathway.

Defendants' Exhibit 15 contains only one of the three examples (and pages) they purport to cite. *See* ECF No. 402-15, VADOC-00024217 (May 10, 2018 ███ ERT Recommended Change Form). In that example, although the person, ███████, was said to have gone from IM-1 to SM-1, *see id.*, VDOC's records show that he was in fact made to go to IM Closed Pod 1 and 2, as he had already done previously, before he was transferred to the SIP Pod in October 2018, notwithstanding the change of pathway in May 2018. Ex. 134, VADOC-00175822 at lines 24176–89 (Internal Status Spreadsheet). Defendants cite two more examples, but in one of them, the person, ████████, had in fact progressed through the IM Pathway and entered the IM Closed Pod previously, and even after he was supposedly changed to the SM Pathway in May 2018, he was made to spend three more months in IM-2 before he was transferred to the SM Pathway in October 2018. *Id.* at lines 16704–19 (Internal Status Spreadsheet); *see* Ex. 135, VADOC-00024221 (Oct. 17, 2018 ██████ ERT Recommended Change Form). This leaves only a single instance Defendants identify where the ERT has moved a person from IM to SM where he had not gone through the entire IM Pathway in Level S and to IM-Closed before being transferred to the SM Pathway. *See* Ex. 134, VADOC-00175822 at lines 12362–89 (Internal Status Spreadsheet); Ex. 136, VADOC-00024225 (Oct. 17, 2018 ████████ ERT Recommended Charge Form). The ERT's decision to make a handful of (or just one, as shown by Defendants' own evidence) exceptions does not create a genuine dispute as to the practice to which Mr. Mathena testified.

### 1.      Length of Stay in Pathways

49.     The Step-Down Program requires a minimum of nine months to progress through SM-0, SM-1 and SM-2, with at least three months required at each privilege level. The Step-Down Program requires a minimum of 18 months to progress through IM-0, IM-1, and IM-2, with at

least six months required at each privilege level.  Ex. 1, 2012 Step-Down Manual at -741; Ex. 2, 2020 Step-Down Manual at -529; Ex. 18, Mathena Dep. at 392:2–393:4 ("[A]n offender assigned to IM-0 must spend at least 18 months in the step-down program"), 396:17–397:2, 397:9–13 ("[A] 9-month period if you add up the periods of time at each level of the SM pathway"); Ex. 22, Collins Dep. at 145:22–146:7; 146:16–20; 148:5–10; Ex. 23, Kiser Dep. at 279:19–280:4, 286:5–8.

Defendants' SUMF Response ¶ 49:  **Undisputed**.

50.     If a prisoner is sent back from SM-1 or SM-2 to SM-0, or IM-1 or IM-2 to IM-0, the clock restarts and he must spend an additional three or six months, respectively, at requisite SM or IM levels.  Ex. 22, Collins Dep. at 147:17–148:4.

Defendants' SUMF Response ¶ 50:  **Undisputed**.

51.     There is no maximum amount of time that an incarcerated person may remain in the SM or IM pathway.  Ex. 23, Kiser Dep. at 279:19–280:4.

Defendants' SUMF Response ¶ 51:  **Undisputed**.

52.     Certain incarcerated persons have spent over a decade at Level S in the Step-Down Program.  *See* Ex. 22, Collins Dep. at 54:17–21 (prisoners spent more than 10 years); Ex. 20, Gallihar Dep. at 231:20–232:5 (many offenders spent 20 or more years); Ex. 14, Clarke Dep. at 316:18–321:4; Ex. 24, Clarke Dep. Ex. 20 (listing 16 prisoners who at the time had been housed in Level S at ROSP for at least 10 consecutive years).  VDOC officials are aware of the lengths of these individuals' stays in the Program.  *See* Ex. 14, Clarke Dep. at 318:18–319:4; Ex. 22, Collins Dep. at 54:17–21; Ex. 20, Gallihar Dep. at 231:20–232:5.

Defendants' SUMF Response ¶ 52:  **Disputed**: The deposition testimony cited by Plaintiffs does not support that any inmate has spent more than a decade at SL-S ***in the Step-Down Program***. In each case, the deponent was asked about time spent in segregation or restrictive housing, not time spent in the Step-Down Program. *See, e.g.,* Gallihar Dep. [ECF No. 383-20] at 231:20-232:3 ("Q: Are you aware of other offenders who served ten years or more in segregation? A: Are you asking that – am I aware throughout my whole career or just in this time frame? Q. Through your career."). Harold Clarke was asked about an email from 2017, when the Step-Down Program had not been in existence for more than a decade. Video Deposition of Harold Clarke dated April 12, 2023, ("Clarke Dep.") [ECF No. 383-14] at 316:18–319:4. The Step-Down Program began in 2012 as noted in Plaintiffs' Statement at ¶ 2. Further, the deposition testimony cited by Plaintiffs does not establish that VDOC ***officials*** are aware of any length of stay. Mr. Clarke is the only VDOC official and only Defendant in this case whose testimony Plaintiffs cite. Larry Collins in a unit manager. Transcript of Larry Collins dated April 5, 2023 ("Collins Dep."), cited portions attached as Exhibit 16, at 8:4-5. Mr. Gallihar is a former Chief of Housing and Programs. Gallihar Dep., Exhibit 10 at 27:21-28:4; 32:3–5.

**Plaintiffs' Reply ¶ 52**:  Plaintiffs clarify that certain incarcerated persons in the Step-Down Program had spent over a decade at Level S, including in programs that preceded the Step-Down Program.  Defendants have not created a genuine dispute of material fact as to the first statement of Plaintiffs' SUMF that certain incarcerated persons have spent over a decade at Level S. Further, the email chain shown to Harold Clarke and cited by Plaintiffs, ECF No. 383-24, VDOC026082, includes as recipients Defendants Harold Clarke, Tori Raiford, Randall Mathena and David Robinson, *see id.* at -082–83.

53.    Once an incarcerated person progresses to Level 6, there is no maximum amount of time that an inmate may remain in Level 6 pursuant to the Step-Down Manual, which provides only that ██████████████████████████████████████████████ without any further criteria explaining what an inmate must do to demonstrate successful adjustment at Level 6.  Ex. 2, 2020 Step-Down Manual at -512.

Defendants' SUMF Response ¶ 53:  **Undisputed**.

54.     While in Level 6, an incarcerated person can be sent back to Level S as a result of a disciplinary charge, even if that charge that would not be sufficient to place the individual in Level S were he at some lower security level.  *Compare* Ex. 4, Mathena 30(b)(6) Dep. at 217:1–220:12 (discussing segregation qualifiers) *with* Ex. 2, 2020 Step-Down Manual at -531, -535 and Ex. 26, VADOC-00053104 at -162, -168 (2017 Step-Down Manual) (noting that persons in Level 6 who commit serious disciplinary offenses resulting in assignment to restrictive housing or refuses over a period of time to meet standards for responsible behavior or program participation, their housing status may be lowered).

Defendants' SUMF Response ¶ 54:  **Undisputed**.

55.     Incarcerated persons in Level S must satisfy all Step-Down Program requirements to progress out of Level S and eventually return to general population.  Ex. 27, Mathena (*Reyes*) Dep. at 76:19–79:10; Ex. 28, Clarke (*Reyes*) Dep. at 76:19–78:21; Ex. 29, Raiford Dep. at 144:14–1454:5; Ex. 19, Malone 30(b)(6) Dep. at 207:17–208:6.

Defendants' SUMF Response ¶ 55:  **Disputed**: The deposition testimony cited by Plaintiffs does not support that inmates must satisfy all Step-Down Program requirements to progress out of Level S and eventually return to general population. Mr. Mathena testified that "any director or deputy director" could supersede the policy requirements of the Step-Down Program. Videotaped Deposition of Randall C. Mathena dated September 22, 2020 ("Mathena *Reyes* Dep.") [ECF No. 383-27] at 78:14-21. Mr. Clarke testified that the warden could convene an ERT to make an exception to the Step-Down Program. Clarke Dep. [ECF No. 383-28] at 77:12-78:3. And, although he testified that it would be "very unlikely" that a person would be removed without completing the requirements, Mr. Clarke did not say that it cannot be done. *Id.* at 78:4-12. Plaintiffs do not attach the cited testimony of Tori Raiford, which indicates only that, if an inmate refuses to participate in the Step-Down Program, he cannot advance but also that there may have been instances where the inmate did not remain at IM-0 or SM-0 when that happened. Transcript of Tori Michelle Raiford dated March 22, 2023 ("Raiford Dep."), cited portions attached as Exhibit 17, at 144:14–146:1. Similarly, the cited testimony of Dr. Malone, who was not designated as a 30(b)(6) designee on the topic of the requirements to progress out of SL-S, *see* Exhibit 7, addresses only her understanding that an inmate in SL-S needs to complete the *Challenge Series*. Further, Mr. Gallihar testified to several instances that he knew of where inmates moved directly from SL-S to Security Level 5 ("SL-5"), *i.e.*, general population for various reasons, including medical, mental health, and other policy-related reasons. Gallihar

Dep., Exhibit 10 at 247:18–249:13. Finally, the Step-Down Manuals consistently have identified one of the ERT's responsibilities as reviewing whether an inmate is currently appropriately assigned to SL-S. ECF No. 381 at 18, ¶ 42.

**<u>Plaintiffs' Reply ¶ 55</u>**:  Defendants' evidence does not create a genuine dispute of material fact as to whether incarcerated persons in Level S must satisfy all Step-Down Program requirements to progress out of Level S, and the testimony they point to, suggesting at best that it might theoretically be possible for a high-level official to bypass the Program requirements, only supports Plaintiffs' statement.  The cited testimony by Mr. Mathena was clear that under the policy, there were no exceptions, and nothing in the Step-Down Manual suggests otherwise.  *See, e.g.*, ECF No. 383-2, VADOC-00053480 at -535 (2020 Step-Down Manual).  Mr. Mathena identified a theoretical possibility that Director Clarke or a deputy director *could* supersede policy and *could* create an exception but was unaware of any exceptions ever being permitted. Ex. 130, Mathena (*Reyes*) Dep. at 78:5–21.  Defendants selectively quote Mr. Clarke's testimony, which is mischaracterized and taken out of context.  Just before the portion cited by Defendants, Mr. Clarke specifically said that even when the Warden convenes an ERT to review someone, they would not be granting an exception to the program requirements: "It will not be an exception. It's going to be whether or not – to review whether or not that person has met the requirements and should be released. That doesn't make it an exception." Ex. 137, Clarke Dep. at 76:19–77:11.  Thus, while the Warden has authority to make a request that someone be removed, if someone had not met the requirements, "it's very unlikely that the person would be removed."  *Id.* at 78:4–12.  Mr. Gallihar's testimony is not any more helpful to Defendants.  In the excerpt cited by Defendants, which is not included in Defendants' Exhibit 10, Mr. Gallihar was testifying in relation to a May 2018 email from VDOC's research unit, Ex. 138, VADOC-00054932 (Gallihar Dep. Ex. 24), seeking to understand an odd discrepancy in CORIS data whereby a handful of people appeared to jump directly from Level S to Level 5, *see* Ex. 139,

Gallihar Dep. at 247:11–248:3.  When he was asked why the data might show some people as

going directly from Level S to Level 5, Mr. Gallihar speculated at his deposition that it may be

for ██████████████████ such as ████████████ and that ████████████

████████████████ *Id.* at 248:4–249:13.  But Mr. Gallihar's testimony was speculative

insofar as he did not have any personal knowledge of the specific prisoners' classifications, and

indicates that he was generally referring to a handful of people with exceptional health

circumstances being moved and reclassified, and that those were the only reasons he could think

of for the data presented.  *Id.*  But in fact, the email listed the offender IDs of specific persons

who were found to have gone to Level 5 from Level S, and a review of those specific

individuals' CORIS data confirms that some, if not all, of those S-to-5 transitions merely reflect

problems with the data.  *See* Ex. 138, VADOC-00054932 (Gallihar Dep. Ex. 24).  For example,

offender ID ██████, associated with ██████████, is shown as having been in Level S from

June 8, 2012 until early 2016.  *See* Ex. 134, VADOC-00175822 at lines 301–367 (Internal Status

Spreadsheet).  However, his first internal status was "pending intake" (which means that the

prisoner has just entered VDOC custody, *see* Ex. 140, VADOC-00070172 at -172 (Internal

Status Description)), on November 24, 2015, indicating that his Level S designation was merely

a holdover from earlier incarceration.  Ex. 134, VADOC-00175822 at line 301, Columns, F-J

(Internal Status Spreadsheet); ECF No. 194-2, Celi Decl. ¶ 10 ("Security Level is not changed in

CORIS for an inmate who has been released unless and until the inmate is returned to VDOC

custody.").  Offender ID ██████, associated with ██████████, is shown as having been moved

to Level 5 from Level S in February 2013, Ex. 134, VADOC-00175822 at lines 16476–16479

(Internal Status Spreadsheet), but his internal status shows he was in Step-Down Phase 2 (what is

now a Level 6 unit) when that occurred, *id.*  There was no Level 6 classification in CORIS at that

time, even though the Level 6 unit existed.  *See* ECF No. 400-103, Plaintiffs' Response to

Defendants' SUMF ¶ 1.  The research unit appears to have been mistaken altogether about

Offender ID ███████, associated with ████████, who appears to have been moved from

Levels S to 6 to 5, not directly from Level S to 5.  Ex. 134, VADOC-00175822 at lines 411–419,

Columns F-N (Internal Status Spreadsheet).  Offender ID ███████ shows the prisoner was

moved Level S to Level 5 on November 8, 2012, but this was when the Step-Down Program was

in its infancy, and there is no indication in the data that he was ever in the Step-Down Program

prior to that date, *id.* at lines 16383–16384, and his prior designation as Level S is listed as

"conversion," which VDOC's Research Director of Policy and Planning, Tama Celi, indicated

meant that the records predated CORIS, Ex. 141, Celi 30(b)(6) Dep. at 81:18–20.  And the

person associated with Offender ID ███████ is not a class member (and thus Plaintiffs have no

data about him), indicating that he may have been in Level S prior to the class period and before

the creation of the Step-Down Program.  Thus, even the few examples that the research unit

identified as aberrations where people had gone from Level S to Level 5 demonstrate only that

VDOC has a poor understanding of its own data, and in any event does not create a genuine

dispute as to Plaintiffs' SUMF paragraph 55.

56.    A belief by any or even all ROSP officials that an incarcerated person in Level S no

longer poses a security risk justifying his ongoing segregation cannot justify making an

exception to the requirement that incarcerated persons must satisfy all requirements of the Step-

Down Program to progress out of the Program.  Ex. 27, Mathena (*Reyes*) Dep. at 76:19–79:10;

Ex. 28, Clarke (*Reyes*) Dep. at 76:19–78:21.

Defendants' SUMF Response ¶ 56:  **Disputed**: See response to paragraph 55, *supra*.

**Plaintiffs' Reply ¶ 56**:  Defendants' response, and cross-reference to its response to paragraph 55, does not create a genuine dispute of material fact as to whether "a belief . . . that an incarcerated person in Level S no longer poses a security risk justifying his ongoing segregation cannot justify making an exception to" the Step-Down Program requirements.  At most, Mr. Gallihar offered speculative testimony suggesting that a few people may have been reclassified for health reasons, including long-term cancer.  *See* Ex. 139, Gallihar Dep. at 248:16–249:13; Plaintiffs' SUMF Reply ¶ 55.  This does not create a genuine dispute of material fact as to the testimony of Warden Mathena or Director Clarke.

## 2.  Programming Requirements

57.     The decision to progress a Level S inmate within the SM or IM pathway is made by the Building Management Committee ("BMC"),[8] which meets only once a month.  Ex. 2, 2020 Step-Down Manual at -491; Ex. 4, Mathena 30(b)(6) Dep. at 301:11–14; Ex. 22, Collins Dep. at 178:3–8, 184:15–19.  A prisoner who has met all requirements for progression within his pathway must wait for the next BMC meeting to progress.  *Id.*

Defendants' SUMF Response ¶ 57:  **Disputed**: The material cited by Plaintiffs does not support their allegations. The cited page of the 2020 Step-Down Manual states that the BMC "will convene ***at least*** monthly …." ECF No. 383-2 at -491 (Emphasis added). None of the cited material addresses whether an inmate who has met all requirements for progression within his pathway must "wait" for the next BMC meeting to progress.

**Plaintiffs' Reply ¶ 57**:  Defendants do not dispute that the decision to progress a Level S inmate within the SM or IM pathway is made by the BMC, so that fact should be treated as wholly undisputed.  Defendants' response pointing to the words "at least" before "monthly" in the Step-

---

[8] [*Plaintiffs' SUMF Footnote 2*] The BMC is also known as the Building Management Team ("BMT"), and the BMC review is also known as the monthly status review.  Ex. 29, Gallihar (*Reyes*) Dep. at 83:22–85:9, 90:6–11.

Down Manual does not create a genuine dispute that the BMC's monthly status reviews—which, as Larry Collins's cited testimony makes clear, were called the "monthly" status reviews—ever took place more frequently than monthly in practice.  Collins makes this explicit elsewhere in his testimony when he says, "we do the building management team once a month."  Ex. 132, Collins Dep. at 195:13–14.  This is further corroborated by Counselor Gilliam, who was responsible for keeping records for the BMC's monthly status reviews in 2017 and 2018.  Ex. 142, Gilliam (*Reyes*) Dep. at 149:6–20.  As Collins notes, both privilege level changes as well as recommendations for security level changes "start" with the BMC, before they may go to the DTT or other reviewing bodies if applicable.  Ex. 132, Collins Dep. at 184:15–186:16.  This is consistent with the BMC's role as the entity tasked with determining whether someone has met the requirements of the Step-Down Program.  *See* ECF No. 383-2, VADOC-00053480 at -491 (listing responsibilities of the BMC including assigning inmates to SM-0, SM-1, IM-0, IM-1, and IM-2, as well as



and                                                           ), -525 (listing criteria that the BMC                    ) (2020 Step-Down Manual).  Thus, it is evident from the record that once someone has met the requirements, they would need to wait until the following BMC meeting just to *begin* the process of progressing out of their pathway, and would require further approval by the DTT, ICA, and Warden.  Ex. 132, Collins Dep. at 184:15–186:16.


58.    The DTT plays no role in evaluating an incarcerated person's progress through the SM or IM pathways, except that the DTT approves a BMC recommendation to advance an incarcerated

person from Level S to Level 6.  Ex. 29, Gallihar (*Reyes*) Dep. at 91:16–92:14; Ex. 4, Mathena

30(b)(6) Dep. at 213:6–14, 255:9–257:18; Ex. 5, VADOC-00134589 at -603 (2021 O.P. 830.A).

Defendants' SUMF Response ¶ 58:  **Undisputed**.

59.    The BMC also decides whether to regress an incarcerated person to a more restrictive

privilege level ████████████████████████████████████████ Ex. 2,

2020 Step-Down Manual at -491.

Defendants' SUMF Response ¶ 59:  **Undisputed**.

60.    In determining whether an incarcerated person is eligible to progress through the SM or

IM pathway, the BMC evaluates whether the incarcerated person has met certain behavioral

goals (which, in turn, incorporate certain mandatory minimum periods of review), including

personal hygiene, standing for the count, cell compliance, and respect / satisfactory rapport with

staff and offenders.  *Id*. at -525, -529–531, -534–535.

Defendants' SUMF Response ¶ 60:  **Disputed in part**: The responsible behavior goals in the
Step-Down Manual do not reference any "mandatory minimum period[] of review." *See, e.g.,*
2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053717.

**Plaintiffs' Reply ¶ 60**:  Defendants cannot create a genuine dispute about how the BMC

evaluates mandatory minimum periods by pointing to a lack of clear language specifying this

evaluation in their policy manual.  In any event, Defendants do not dispute Plaintiffs' SUMF

paragraph 50, which notes that if a person is sent back to an earlier privilege level within their

pathway "the clock restarts and he must spend an additional three or six months," at that level

(depending on whether they are in SM or IM).  *See* Defendants' SUMF Response ¶ 50.  This

acknowledges a mandatory minimum time period, whether or not it is expressly described as

such in the Step-Down Manual.

61.     Incarcerated persons are not given formal notice regarding when their case will be

discussed by the BMC.  Ex. 22, Collins Dep. at 199:7–13; Ex. 11, Duncan Dep. at 272:15–273:1.

Defendants' SUMF Response ¶ 61:  **Disputed in part**: Although, inmates are not provided with
formal written notice prior to a specific BMC meeting, they are otherwise generally aware that
the BMC has ongoing, periodic meetings and discussions about whether to advance inmates
within the Step-Down Program. Duncan Decl., Exhibit 12 at ¶ 6; Collins Dep. [ECF No. 383-22]
at 199:7–13 (testifying that inmates know when their status is coming up).

**Plaintiffs' Reply ¶ 61**:  Defendants do not even attempt to dispute Plaintiffs' fact, which is

about formal notice, but they attempt to add information suggesting that prisoners are "generally

aware that the BMC has ongoing, periodic meetings."  As such, Plaintiffs' SUMF paragraph 61

should be treated as undisputed.  Any testimony from Defendants regarding what any prisoner is

aware of (let alone all prisoners) is inadmissible based on speculation, lack of personal

knowledge, and/or hearsay.  Fed. R. Evid. 602.  Ms. Duncan's conclusory statement about the

knowledge of others would be not admissible at trial because it is pure speculation.  Such

affidavits are insufficient to create a genuine dispute precluding summary judgment.  *See* Fed. R.

Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made

on personal knowledge, set out facts that would be admissible in evidence, and show that the

affiant or declarant is competent to testify on the matters stated."); *Coffey,* 1993 WL 318886, at

*3 ("[T]he nonmoving party may not create a general issue of material fact based on mere

speculation or the building of one inference upon another." (citing *Beale*, 769 F.2d at 214)).

Moreover, Defendants do not provide any examples of the way in which prisoners are made

aware—even informally—of when BMC reviews are taking place, and as such, they have failed

to create a dispute of fact, both as to formal and informal notice.  *See Othentec*, 526 F.3d at 140

("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which

a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of

proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)).


62.     Incarcerated persons are not given formal notice of the BMC's determination, except that

during the subsequent ICA review, the ICA will tell the incarcerated person whether the BMC

progressed him through the pathway or if the BMC kept him at the same privilege level or

moved him backwards.  *Id*. at 273:3–22.

Defendants' SUMF Response ¶ 62:  **Disputed in part**: The suggestion that the "subsequent ICA
review" does not occur as a result of the BMC's determination is inaccurate. *See* Duncan Dep.,
[ECF No. 383-11] at 272:7-20 (testifying that, after the review, the ICA will conduct a
classification showing advancement or regression); Collins Dep. [ECF No. 383-22] at 200:1–14
(testifying that, after the BMC meeting is over, somebody will make a round and inform inmates
of the outcome); *see also*, Defs' Br. [ECF No. 381] at 16, ¶ 35 (ICAs conducted more frequently
than every 90 days as necessary).

**Plaintiffs' Reply ¶ 62**:  Rather than respond to the stated fact, Defendants purport to identify a

dispute with what the fact may "suggest[]."  That is insufficient to create a relevant dispute of

fact.  *See Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue

of material fact through mere speculation or the building of one inference upon another.").  In

any event, Plaintiffs do not make the "suggestion" Defendants claim.  On the contrary, Plaintiffs

agree with Defendants that the ICA review simply presents the result of the BMC review.  Larry

Collins' testimony that "somebody" will make a round and inform inmates of the outcome does

not dispute that there is no formal notice provided.  As such, Defendants have failed to create a

genuine dispute of material fact.


63.     VDOC policy does not require incarcerated persons to be present at BMC meetings, and

incarcerated persons are not, in fact present for monthly BMC meetings.  Ex. 2, 2020 Step-Down

Manual at -491; Ex. 22, Collins Dep. at 197:21–198:1; Ex. 11, Duncan Dep. at  272:4–6.

Defendants' SUMF Response ¶ 63:  **Undisputed**.


64.     As a matter of VDOC policy, an incarcerated person's security level and housing

assignment cannot be challenged through VDOC's grievance process.  Ex. 4, Mathena 30(b)(6)

Dep. at 250:11–15; Ex. 30, VADOC-00004369 at -70 (Dec. 25, 2016 Cornelison Grievance); Ex.

31, Elam Dep. at 259:13–260:6.  To the extent such grievances are entertained, VDOC staff

consider only whether the proper procedures were followed.  Ex. 31, Elam Dep. at 258:10–19;

*see also* Ex. 15, 2023 Wall Decl. ¶¶ 17–18; Ex. 16, 2023 Cornelison Decl. ¶ 8.

Defendants' SUMF Response ¶ 64:  **Disputed**. The cited materials, which address privilege
levels, not security levels or housing assignments, do not support Plaintiffs' allegations. An
inmate can challenge his security level and housing assignment through VDOC's grievance
process. O.P. 830.1 [ECF No. 381-24] at 13 ("[i]nmates may appeal all classification decisions
through the *Offender Grievance Procedure*.").

**Plaintiffs' Reply ¶ 64**:  Plaintiffs acknowledge that the cited materials indicate that while a

person's privilege level (e.g., placement or retention in SM-1, SM-2, etc.) is not grievable

whatsoever under policy, one's security level or housing status (e.g., Level S) is technically

permitted to be grieved under policy.  But Defendants do not dispute the cited testimony of

Marcus Elam who agreed that "the substance of the classification would never be investigated"

as a result of a grievance.  This is consistent with the structure of the Step-Down Program's

review processes, whereby the entity that purports to offer procedural protections as to a

prisoner's security level / housing status (the ICA) does not review whether someone has met the

underlying Step-Down requirements to progress within the program (because that is the BMC's

job), and its review is instead dependent on the BMC's determination.  Thus, it makes sense that

a grievance of a security level review would not result in a substantive investigation of the

classification, because the substance of the classification is determined by the BMC, whose

privilege-level reviews are non-grievable. *See* ECF No. 400, Plaintiffs' Opposition to

Defendants' Motion for Summary Judgment at 10–14.

<strong>a)</strong>   <strong>Programming Requirements</strong>

65.     All Level S inmates are required to engage in certain programming as part of the Step-

Down Program, including completing a set of workbooks called the "Challenge Series." Ex. 4,

Mathena 30(b)(6) Dep. at 199:18–21; Ex. 19, Malone 30(b)(6) Dep. at 206:14–208:6. Ex. 2,

2020 Step-Down Manual at -500.

<u>Defendants' SUMF Response ¶ 65</u>:  **Disputed**: Only those inmates properly classified as Level S
are required to engage in certain programming as part of the Step-Down Program, including the
*Challenge Series*. Inmates have, at times, been classified as Level S but soon thereafter re-
classified to another security level, without completing any programming that is part of the Step-
Down Program. Declaration of Randall Mathena dated October 5, 2023 ("Mathena Decl."),
attached as Exhibit 18, at ¶ 8.

**<u>Plaintiffs' Reply ¶ 65</u>**:  Defendants have failed to create a genuine dispute of material fact.  Mr.

Mathena contradicts his earlier testimony by suggesting, without citing to any evidence other

than his own testimony, that some prisoners have at times been classified as Level S but shortly

thereafter were reclassified without being made to do the Challenge Series.  *Compare* Ex. 128,

Mathena 30(b)(6) Dep. at 199:18–21 ███████████████████████

████████████████████████████████████████

*with* ECF No. 402-18, Mathena Decl. at ¶ 8.  Mathena's conclusory statement in his affidavit is

insufficient to create a genuine dispute.  *See Coffey*, 1993 WL 318886, at *3 ("[T]he nonmoving

party may not create a general issue of material fact based on mere speculation or the building of

one inference upon another." (citing *Beale*, 769 F.2d at 214)).  In any event, it appears even Mr.

Mathena is suggesting merely that the requirement may not apply to a few people who may have

mistakenly been briefly classified as Level S.

47

66.    Level S inmates who do not participate in the Challenge Series ████████
████████████████████████████████ Ex. 32, Raiford Dep. at 144:14–145:5; *see also*

Ex. 23, Kiser Dep. at 231:21–232:4; Ex. 33, Turner Dep. at 228:21–229:4; Ex. 34, Mefford Dep.

at 137:17–1384.

Defendants' SUMF Response ¶ 66:  **Undisputed**.


67.    VDOC has never progressed an incarcerated person in the Step-Down Program who fails

to complete the Challenge Series.  Ex. 33, Turner Dep. at 229:12–17.

Defendants' SUMF Response ¶ 67:  **Disputed**: The deposition testimony cited by Plaintiffs does
not support Plaintiffs' allegation. Dwayne Turner was not asked about inmate who "failed" to
complete the *Challenge Series,* he was asked about inmates who "refused to participate in
programming." Videotaped Deposition of Dwayne Turner dated March 17, 2023 ("Turner Dep.")
[ECF No. 383-33] at 229:12-17. Further, the fact that a single VDOC employee could not recall
an instance of an inmate who refused to participate in programming progressing in the Step-
Down Program does not establish that it has never happened.

**Plaintiffs' Reply ¶ 67**:  This fact is a corollary of Plaintiffs' SUMF paragraph 66 that people

who do not participate in the Challenge Series may not progress, which is undisputed by

Defendants.  It also follows from Plaintiffs' SUMF paragraphs 55 and 56, which concern the

lack of any exceptions to the Step-Down Program requirements.  Defendants have access to all

records needed to dispute this fact, yet Defendants do not cite any contrary evidence to indicate

that people have been permitted to progress without completing the required parts of the

Challenge Series.  The lack of even a single contrary example is informative.  Mr. Turner was a

Unit Manager of the building where Level S people are housed, a Chief of Housing and

Programs at Red Onion, and an Assistant Warden of Red Onion.  Ex. 143, Turner Dep. at 9:11–

17, 49:6–8, 51:17–18, 62:8–64:11.  As such, Defendants have failed to create a dispute of

material fact.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some

evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for

the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").

68.    Incarcerated persons have thus been stuck at a certain privilege level for years due to a failure to complete the Challenge Series. *Id*. at 249:18–250:22; Ex. 35, VADOC-00158303 (Dec. 10, 2020 Email from D. Turner).

Defendants' SUMF Response ¶ 68:  **Disputed**: The material cited by Plaintiffs does not support Plaintiffs' allegation. Neither the deposition testimony nor the document cited addresses inmates who "failed" to complete the *Challenge Series*. Both address inmates who were not progressing in the Step-Down Program because they refused to participate in programming.

**Plaintiffs' Reply ¶ 68**:  Defendants have failed to create a genuine dispute of material fact as to Plaintiffs' statement that people have been stuck at certain privilege levels for failing to complete programming.  Defendants' characterization of such people as "refusers" indicates only the *reason* that Defendants believe such people have failed to complete the programming (and for which they cite *no* supporting evidence), not that such persons have not failed to complete programming.  Further, Plaintiffs' statement is a corollary of Plaintiffs' SUMF paragraph 66 that people who do not participate in the Challenge Series may not progress, which is undisputed by Defendants.  Merely responding that a party "disputes" a material fact is insufficient under Rule 56; because Defendants have failed to dispute this fact by offering specific facts supported by record citations, the Court should treat this fact as undisputed.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere

speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1;

*see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where

non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of

material facts in genuine dispute").

69.     VDOC does not provide treatment officers with any criteria by which to grade

incarcerated persons' Challenge Series workbooks.  Ex. 36, VDOC Resps. and Objs. to Pls.'

First Set of Admis., No. 24.

Defendants' SUMF Response ¶ 69:  **Undisputed**.

70.     Incarcerated person Nicolas Reyes participated in the Step-Down Program from 2012 to

2019.  Ex. 37, VADOC-00175822 (Internal Status Spreadsheet) (*see* lines 12564–12569).

Defendants' SUMF Response ¶ 70:  **Disputed**: Nicolas Reyes did not participate in the Step-
Down Program from 2012 to 2019. Instead, Mr. Reyes refused to participate in the Step-Down
Program during extended time periods in that time frame. *See, e.g.,* Offender Internal Status
Report, attached as Exhibit 19 [VADOC-00099046], at VADOC-00099050 (noting that Mr.
Reyes "used to refuse programs" but will be eligible for SM-1 once he completes *Challenge
Series* books 1 and 2). Further, allegations regarding Mr. Reyes are not material. He is not a
member of the class, having settled his claims that are at issue in this case in previous litigation.
See Order of Dismissal, Case No. 2:19cv00035 ECF No. 166 (dismissing with prejudice Mr.
Reyes's Constitutional and statutory claims based on settlement agreement).

**Plaintiffs' Reply ¶ 70**:  Defendants' suggestion that Mr. Reyes was not a "participant" in the

Step-Down Program because Defendants claim he was "refusing" to complete the Challenge

Series (which is only one aspect of the Step-Down Program) does not create a genuine dispute as

to whether he was a Step-Down Program participant.  Defendants do not and cannot dispute that

Mr. Reyes was in the Step-Down Program, whether he understood this or not, and that he was

assigned internal status codes associated with the Step-Down Program between 2012 and 2021

(Special Management 0, Special Management 1, Special Management 2, and then SAM).  Ex.

134, VADOC-00175822 at lines 12564–68 (Internal Status Spreadsheet); *see also* Ex. 144,

Defs.' Suppl. Resp. to Plfs.' Third Set of Interrogs. at 4–5 (noting that these are among the

internal status IDs that should be used for prisoners in the Step-Down Program); *see also* Ex.

145, Answer, *Reyes v. Clarke*, No. 2:19-cv-00035-JPJ-PMS (W.D. Va. Oct. 24, 2018), ECF No.

27, ¶ 73 (admitting that Mr. Reyes was placed in the SM pathway).  Defendants do not claim that

he was not reviewed in the same manner as everyone else in the Step-Down Program for

completion of Step-Down Program requirements.  Defendants' objection that facts relating to

Mr. Reyes are immaterial is not well taken because, although he settled his claims, he was

nevertheless in the Step-Down Program and would be a class member but for that settlement.

The application of Step-Down Program policies to Mr. Reyes is just as relevant to Plaintiffs'

claims—including the manner in which such policies operate in practice—as they are to any

other class member.

71.     In 2016, VDOC reviewed Mr. Reyes's progress in the Step-Down Program.  As part of

the review, VDOC personnel noted that Mr. Reyes "[r]equires translation, need[s] closer look."

Ex. 38, Mathena 30(b)(6) (*Reyes*) Dep. at 281:14–282:9,

Defendants' SUMF Response ¶ 71:  **Not Material**: Allegations regarding Mr. Reyes are not
material. He is not a member of the class, having settled his claims that are at issue in this case in
previous litigation. *Id.*

**Plaintiffs' Reply ¶ 71**:  Defendants do not dispute this fact but claim it is immaterial because

Mr. Reyes settled his claims.  This is not well taken for the reasons stated above in Plaintiffs'

SUMF Reply paragraph 70.

72.     In early 2018, former Psychology Associate Senior Terrence Huff noted that there were

"no violent charges in [Mr. Reyes's] record to indicate a continued need to remain in Level S,"

and that he ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ex. 39,

VADOC-00014677 (Mathena 30(b)(6) (*Reyes*) Dep. Ex. 37).

<u>Defendants' SUMF Response ¶ 72</u>:  **Not Material**: Allegations regarding Mr. Reyes are not material. He is not a member of the class, having settled his claims that are at issue in this case in previous litigation. *Id.*

**<u>Plaintiffs' Reply ¶ 72</u>**:  Defendants do not dispute this fact but claim it is immaterial because Mr. Reyes settled his claims.  This is not well taken for the reasons stated above in Plaintiffs' SUMF Reply paragraph 70.


73.    Mr. Reyes was able to progress out of the Step-Down Program only after certain VDOC personnel worked with Mr. Reyes individually to complete the Challenge Series.  Ex. 40, Collins (*Reyes*) Dep. at 155:4–156:7; 219:14–220:18; 233:9–236:8; 237:18–239:1; 272:4–18; 303:20–304:4.

<u>Defendants' SUMF Response ¶ 73</u>:  **Not Material**: Allegations regarding Mr. Reyes are not material. He is not a member of the class, having settled his claims that are at issue in this case in previous litigation. *Id.*

**<u>Plaintiffs' Reply ¶ 73</u>**:  Defendants do not dispute this fact but claim it is immaterial because Mr. Reyes settled his claims.  This is not well taken for the reasons stated above in Plaintiffs' SUMF Reply paragraph 70.


       **b)**    **Behavioral Goals**

74.    VDOC policy requires VDOC personnel to rate incarcerated persons in the Step-Down Program on certain behavioral goals.  Step-Down Program participants must maintain sufficient ratings on those behavioral goals in order to progress to a different privilege level within the

Step-Down Program.  Ex. 38, Mathena 30(b)(6) (*Reyes*) Dep. at 131:18–133:17; Ex. 4, Mathena

30(b)(6) Dep. at 292:9–293:17; Ex. 41, Fleming Dep. at 135:21–136:3; Ex. 42, VADOC-

00162510 at -566 (Fleming Dep. Ex. 2).  Failure to meet behavioral goals can result in demotion

of incarcerated persons to lower privilege levels within the IM or SM pathway.  Ex. 4, Mathena

30(b)(6) Dep. at 308:11–17; Ex. 18, Mathena Dep. at  409:5–410:17 (noting that people have

been sent backwards within their pathway for kicking on doors, which is seen as disrespectful);

*see also* Ex. 43, 2023 Riddick Decl. ¶ 25 (returned to SM-0 from SM-2 due to poor status

ratings).

Defendants' SUMF Response ¶ 74:  **Not Material**: Allegations regarding Mr. Reyes are not
material. He is not a member of the class, having settled his claims that are at issue in this case in
previous litigation. *Id.*

**Plaintiffs' Reply ¶ 74**:  Defendants' response is not responsive to this SUMF, which is not about

Mr. Reyes.  Plaintiffs interpret Defendants' response to be an error and will interpret their

response to SUMF paragraph 75 as an attempt to respond in part to Plaintiffs' SUMF paragraph

74.  *See* Defendants' SUMF Response ¶ 75.

        As to that response, Defendants do not attempt to dispute the first two sentences of

Plaintiffs' SUMF paragraph 74; as such, they should be treated as undisputed.  *Amos*, 477 F.

Supp. 3d at 411 n.1 ("Merely responding that a party 'disputes' a material fact is insufficient

under Rule 56[.]").  Defendants' response as to the proposition that "[f]ailure to meet behavioral

goals can result in demotion of incarcerated persons to lower privilege levels" does not create a

genuine dispute as to this fact because it is based only on Warden Mathena's incorrect reading of

the policy language and is inconsistent with other testimony he has provided.

        First, VDOC's written policy is clear on this.  The plain language of the Operating

Procedure governing the Step-Down Program provides that, within both the IM and SM

pathways, "Offenders that do not meet the standards for disciplinary, responsible behavior,

*and/or* self-improvement and programming can be placed back to a lower incentive level by decision of the Building Management Team." ECF No. 383-8, VADOC-00047964 at -967–69 (O.P. 830.A (2018) (emphasis added); *see also* ECF No. 383-5, VADOC-00134589 at -595–96 (O.P. 830.A. (2021)) (same); ECF No. 383-6, VADOC-00003146 at -149–50 (O.P. 830.A (2013)) (same). At his deposition, Mr. Mathena did not dispute that this was the policy, but offered his own interpretation: ██████████████████████████████████ ████████████████████████████████████████████ Ex. 128, Mathena 30(b)(6) Dep. at 308:11–309:17. This was based solely on his own personal reading of the policy at the deposition. Ex. 128, Mathena 30(b)(6) Dep. at 310:3–19.

Second, Mr. Mathena was clear that he himself ███████ sent people back within the program for ██████████████████████████ and noted that ████████████ was ████████████████████ on a person's behavioral goal rating, indicating that he had sent people back for failing to satisfy their behavioral goals. Ex. 133, Mathena Dep. at 409:13–20 (emphasis added); *see* ECF No. 383-2, VADOC-00053480 at -532 ████████████████████ ████████). Mr. Mathena's misreading of the policy, without more, cannot create a genuine dispute as to this fact.

Further, since there is no formal documentation or notice of the precise *reasons* for which the BMC might decide to send a prisoner back, Mr. Mathena's assertion that the policy is something other than what's written in 830.A is speculation, at best. *See* ECF No. 400-17, VDOC Ans. to Written Dep. Questions at 2–4 (noting that there were no formal records documenting BMC decisions prior to some point in 2016 and that after that point, BMC meeting notes were input into a prisoner's electronic record that would record only "the date of the review and whether a status change was recommended," and claiming further that "notes of

determinations made by the BMC . . . were surplus to need after the determinations were

conveyed verbally and the inmate facesheets were updated"); ECF No. 400-18, VADOC-

0013601 at -313 (example of prisoner's electronic record on CORIS showing typical

documentation of BMC monthly status reviews, showing no reasons provided or, at best,

explaining that the person would remain "due to one or more of the following: Incompletion of

programs, time served in current status, recent charges, or poor status reviews," or other in

words, one or more of the Step-Down Program requirements); ECF No. 383-54, Pacholke

Rebuttal Rep. ¶ 16.  As such, Defendants have failed to create a genuine dispute of material fact.

*Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than

a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing

it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769

F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another.").

75.     The behavioral goals on which Step-Down Program participants are rated include: ███

███████████████████████████████████████████ VDOC policy requires that

Step-Down Program participants be graded once per week each by the unit manager, unit

counselor, and frontline corrections officer on each goal, earning a grade of G (good), A

(acceptable), or P (poor).  Ex. 2, 2020 Step-Down Manual) at -529; Ex. 22, Collins Dep. at

167:14–17, 168:9–16, 169:19–171:5.

Defendants' SUMF Response ¶ 75:  **Disputed**: Mr. Mathena denied that "[f]ailure to meet
behavioral goals can result in demotion of incarcerated persons to lower privilege levels within
the IM or SM pathway." Videotaped Deposition of Randall Mathena – Day 1 dated April 4, 2023
("Mathena 30(b)(6) Dep.") [ECF No. 383-4] at 308:3-309:17. He testified, rather, that he's
"never known of anybody to be moved because of behavior goals." *Id.* at 306:18-19; 308:3-6
("Q: Okay. So it's policy that people who do not meet behavior goals can be moved to a lower
incentive level within their pathway, correct? A: *That's an inaccurate statement.*"). Regarding

"kicking on doors," he testified that it can be a disciplinary charge, in addition to a reflection of the behavioral goals. Mathena Individual Dep. [ECF No. 383-18] at 409:4-16.

**Plaintiffs' Reply ¶ 75**:  Defendants' response to SUMF paragraph 75 is not responsive to Plaintiffs' SUMF paragraph 75 (and appears to have been intended to respond to Plaintiffs' SUMF paragraph 74, *see supra*, Plaintiffs' SUMF Reply ¶ 74).  Plaintiffs understand this SUMF to be undisputed.

76.    Incarcerated persons' progress on behavioral goals is documented on status rating charts, which document the number of good, poor, or acceptable ratings that an incarcerated person receives.  Ex. 44, Duncan (*DePaola*) Dep. at 103:17–108:7; Ex. 45, VADOC-00021251 (Mathena Dep. Ex. 13).  These status rating charts are utilized by the BMC during its monthly meeting to determine if an incarcerated person has met the behavioral goals.  Ex. 44, Duncan (*DePaola*) Dep. at 109:3–11; 113:7–23.

Defendants' SUMF Response ¶ 76:  **Undisputed**.

77.    VDOC personnel admit that the ratings used to determine whether incarcerated persons are meeting behavior goals are "subjective," "arbitrary," and at least partially dependent on the VDOC employee who is rating the Step-Down Program participant.  Ex. 4, Mathena 30(b)(6) Dep. at 296:10–297:4, 301:5–8; Ex. 46, Robinson Dep. at 303:21–304:5; Ex. 22, Collins Dep. at 171:20–172:14; Ex. 47, Younce Dep. at 174:8–20; Ex. 23, Kiser Dep. at 213:3–15; Ex. 20, Gallihar Dep. at 72:12–22, 73:1–3.

Defendants' SUMF Response ¶ 77:  **Disputed in part**: None of the deposition testimony cited by Plaintiffs supports that the ratings are "arbitrary." Further, Mr. Mathena testified that individuals in a management role review the ratings given by VDOC personnel to determine whether an employee "would have an agenda against a certain inmate . . . ." Mathena 30(b)(6) Dep. [ECF No. 383-4] at 294:20-297:4.

**Plaintiffs' Reply ¶ 77**:  Defendants apparently do not dispute that VDOC personnel admit the goals are subjective, but dispute that the testimony demonstrates arbitrariness.  Plaintiffs acknowledge that the cited materials do not specifically use the word "arbitrary."  However, Mr. Mathena's testimony does not create a genuine dispute as to, and even demonstrates, the arbitrariness of the ratings, because although a prisoner's progression is dependent on the *number* of poor and good grades that prisoners receive on their status rating charts, (a) the status rating charts are not consistently filled out, which means that a prisoner's ability to receive the requisite number of poor or good grades will vary, arbitrarily, based on the extent to which his status rating charts were completed (*e.g.*, if a chart was filled out only by a unit manager, they have fewer opportunities to receive the requisite number of "good" ratings than if their chart was filled out by a unit manager and a correctional officer and/or a counselor), *see* Plaintiffs' SUMF ¶ 81; Plaintiffs' SUMF Reply ¶ 81; (b) there are no written policies, procedures, guidance, or formal trainings on how to fill out the status rating charts, which means a prisoner's ability to meet their behavioral goals depends in large part on the subjective views of the corrections officer who happens to fill their chart in a given week, *see* Plaintiffs' SUMF ¶¶ 78–79; Ex. 128, Mathena 30(b)(6) Dep. at 301:5–8; and (c) Defendants' claim that Mr. Mathena testified that management reviews ratings to determine if an employee would have an agenda against a certain inmate is not an accurate characterization of his testimony.  Rather, Mr. Mathena's testimony was that his review consisted only of looking for patterns in grades, primarily to ensure that employees were not giving people *consistent* grades (which in turn could be an indication of an employee not paying attention, simply giving someone the same grades, or having an agenda against an inmate).  Specifically, he was ███████████████████████

████████████████████████████████████████

████████████████████████████████████████████ Ex. 128, Mathena 30(b)(6)

Dep. at 295:15–19.  Further, ████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 128, Mathena 30(b)(6)

Dep. at 296:5–9.  And if he noticed that an employee was consistently giving the same grades to

prisoners, he would call them into the chief of security's office to question them about it and

determine if they needed to be pulled out of working with Level S prisoners or even lose their

job.  Ex. 128, Mathena Dep. at 297:5–18.  This ad hoc method of review to ensure *variability* in

grades (rather than accuracy or consistency in the criteria used to grade people) does not create a

genuine dispute about whether the behavioral goal reviews were arbitrary.  If anything, it

suggests that management's role was to encourage arbitrary, or at least variable, grading by

officers.

78.     There is no formal training provided for staff to evaluate whether Step-Down Program

participants are meeting behavioral goals.  Ex. 4, Mathena 30(b)(6) Dep. at 298:6–299:18; Ex.

48, King Dep. at 56:21–58:12; Ex. 49, Reynolds Dep. at 209:8–21.

Defendants' SUMF Response ¶ 78:  **Disputed in part**: Although Mr. Mathena testified that there
was no "formal" training, he also noted the existence of on-the-job training: "that over in the
building, the unit manager and the sergeant and lieutenant, whoever it is, works with new
officers when they come to the building, especially when they haven't worked in this type of
program, as extensive as it is, to give them a briefing as to what's going on." *Id.* at 298:10-16.

**Plaintiffs' Reply ¶ 78**:  Defendants do not dispute the fact that no formal training is provided for

staff to evaluate behavioral goals; as such, that fact should be treated as undisputed.  Mr.

Mathena's suggestion that Red Onion officials "give [] a briefing" to new officers about "what's

going on," Defendants' SUMF Response ¶ 78, does not establish that any meaningful on-the-job

training is provided as to how behavioral goals are to be graded, let alone any formal training.

Nor do Defendants corroborate in any other manner that there is on-the-job training specifically as to how prisoners are to be graded on behavioral goals. Defendants have therefore failed to create a genuine dispute of material fact as to whether "formal training [is] provided for staff to evaluate whether Step-Down Program participants are meeting behavioral goals." *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.").

79.    VDOC has no written policies, procedures, or guidance related to how to rate a Step-Down Program participant or distinguish between poor, acceptable, and good ratings. Ex. 4, Mathena 30(b)(6) Dep. at 298:6–299:18; Ex. 48, King Dep. at 56:21–58:12, 186:16–20; Ex. 20, Gallihar Dep. at 72:12–22, 73:1–3; Ex. 49, Reynolds Dep. at 209:8–21.

Defendants' SUMF Response ¶ 79:    **Undisputed**.

80.    The Step-Down Manual specifies a minimum number of "Good" ratings a Step-Down Program participant must receive in order to progress to the next privilege level. The Step-Down Manual similarly specifies a maximum number of "Poor" ratings a Step-Down Program participant can receive to be allowed to progress to the next privilege level. Ex. 22, Collins Dep. at 168:9–21; Ex. 2, 2020 Step-Down Manual at -529, -534.

    a.    To progress from IM-0 to IM-1 or SM-0 to SM-1, there may be: ████████

████████████████████████████████████

████████████████ Ex. 2, 2020 Step-Down Manual at -529, -534.

b.     To progress from IM-1 to IM-2 or SM-1 to SM-2, there may be:



*Id.*

c.     To progress from IM-2 or SM-2 to Security Level 6:

*Id.*

Defendants' SUMF Response ¶ 80:  **Undisputed**.


81.     VDOC's ratings of Step-Down Program participants are supposed to recorded on status

rating charts.  Ex. 4, 30(b)(6) Mathena Dep. at 294:8-19; Ex. 45, VADOC-00021251 (Mathena

Dep. Ex. 13).  In practice, VDOC personnel sometimes fail to record participants' ratings on

their status rating charts.  *See, e.g.*, Ex. 45, VADOC-00021251 (Mathena Dep. Ex. 13).

Defendants' SUMF Response ¶ 81:  **Disputed in part**: None of the material cited by Plaintiffs
supports the allegation that "VDOC personnel sometimes fail to record participants' ratings on
their status rating charts."

**Plaintiffs' Reply ¶ 81**:  The exhibit cited by Plaintiffs shows that the charts are not consistently

filled out, which Mr. Mathena acknowledged at his deposition (although he said that by policy

they should be).  ECF No. 383-45, VADOC-00021251; Ex. 128, Mathena 30(b)(6) Dep. at

285:18–288:10.  Defendants do not cite any evidence to indicate that they are consistently filled

out.  And in fact, other examples of status rating charts produced in discovery demonstrate they

were not consistently filled out in all three staff rows.  Ex. 146, VADOC-00021228 (SM and IM

Status Rating Charts from Mar. to May 2015); Ex. 147, VADOC-00021376 (SM and IM Status

Rating Charts from Sept. to Nov. 2014).  Merely responding that a party "disputes" a material

fact is insufficient under Rule 56; because Defendants have failed to dispute this fact by offering

specific facts supported by record citations, the Court should treat this fact as undisputed.

*Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1; *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of material facts in genuine dispute"). Defendants have therefore identified no genuine dispute that the status rating charts are not consistently filled out. Nevertheless, their response is contradicted by the evidence presented by the Plaintiffs.

82.     Although incarcerated persons receive an explanation of personal hygiene, cell compliance, and standing for count when they enter the Step-Down Program, they do not receive information about what qualifies as acceptable behavior as compared to poor behavior. Ex. 48, King Dep. at 185:20–186:15.

Defendants' SUMF Response ¶ 82:  **Disputed**: Multiple VDOC personnel testified that inmates were told what they needed to do to get a better rating or avoid getting a poor rating. *See, e.g.,* King Dep. [ECF No. 383-48] at 184:16-185:9; Mathena 30(b)(6) Dep. [ECF No. 383-4] at 299:12-301:4; Transcript of Michael Clayton Younce dated May 26, 2022 ("Younce Dep."), cited portions attached as Exhibit 20, at 138:20-139:2; *see also* VDOC Operating Procedure 864.1, *Inmate and CCAP Probationer/Parolee Grooming and Hygiene*, attached as Exhibit 21, which is available to inmates.

**Plaintiffs' Reply ¶ 82**:  Defendants have failed to create a genuine dispute of material fact.

First, to the extent Defendants suggest that their testimony demonstrates what inmates understood, any testimony from Defendants regarding what any prisoner is aware of (let alone all prisoners) is inadmissible based on speculation, lack of personal knowledge, and/or hearsay.

Fed. R. Evid. 602.  Second, the Operating Procedure cited by Defendants is further evidence that

incarcerated persons "do not receive information about what qualifies as acceptable behavior as

compared to poor behavior."  Not only does Operating Procedure 864.1 not include any

information on how the grooming and hygiene policy maps to the Step-Down Program rating

system on which Step-Down prisoners are graded (i.e., poor, acceptable, good), but it also

includes only vague statements that incarcerated persons ███████████████████████

███████  without any explanation of what qualifies as ██████  even outside of the Step-Down

context.  ECF No. 400-21 at 5 (O.P. 864.1 (2022)).

83.    Incarcerated persons do not receive a copy of their ratings on responsible behavioral

goals.  Ex. 23, Kiser Dep. at 332:1–5; Ex. 4, Mathena 30(b)(6) Dep. at 305:14–16; Ex. 43, 2023

Riddick Decl. ¶ 24; Ex. 50, 2023 Cavitt Decl. ¶ 37.

Defendants' SUMF Response ¶ 83:  **Disputed in part**: Multiple VDOC personnel testified that
inmates are aware of their ratings on the responsible behavior goals. *See, e.g.*, Transcript of
Rebecca Mefford dated January 10, 2023 ("Mefford Dep."), cited portions attached as Exhibit
22, at 127:15-128:6; Younce Dep., Exhibit 20 at 138:20-139:2; Transcript of A. David Robinson
dated February 16, 2023 ("Robinson Dep."), cited portions attached as Exhibit 23, at 297:13-
298:3.

**Plaintiffs' Reply ¶ 83**:  Defendants have failed to create a genuine dispute of material fact.

Defendants do not dispute that Step-Down Program prisoners do not receive their grades

in writing and do not have access to their status rating charts, and any testimony from VDOC

employees regarding what any prisoner is otherwise aware of (let alone all prisoners) is

inadmissible based on speculation, lack of personal knowledge, and/or hearsay and is therefore

insufficient to contradict Plaintiffs' cited evidence or create a genuine dispute of material fact.

Fed. R. Evid. 602.

84.      VDOC's ADA Coordinator Barry Marano testified that incarcerated persons with mental impairments may have difficulty maintaining proper hygiene, which is one of VDOC's behavior goals.  Ex. 51, Marano Dep. at 158:9–19.

Defendants' SUMF Response ¶ 84:  **Undisputed**.


85.      Dr. McDuffie, a consultant psychiatrist at VDOC, testified that certain mental health conditions can affect a person's ability to cope with daily problems, including stress, ability to socialize, energy level, and hygiene.  Ex. 52, McDuffie Dep. at 314:11–315:8.

Defendants' SUMF Response ¶ 85:  **Undisputed**.


### c)      Response to Disciplinary Infractions

86.      The Step-Down Program sets limits on the number and type of disciplinary charges a Step-Down Program participant may receive within defined time periods at each privilege level before that participant is disqualified from proceeding to the next privilege level.  Ex. 2, 2020 Step-Down Manual at -529, -534.

Defendants' SUMF Response ¶ 86:  **Disputed in part**: Receipt of the proscribed number and type of disciplinary charges does not "disqualify" an inmate from proceeding to the next privilege level but does prevent him from advancing to that privilege level during the period in question. 2020 Step-Down Manual [ECF No. 383-20] at VADOC-00053529, 534.

**Plaintiffs' Reply ¶ 86**:  Defendants' response does not identify any substantive, let alone *material*, distinction between "disqualify[ing] an inmate from proceeding to the next privilege level" within a defined time period and "preventing [an inmate] from advancing to that privilege level during the period in question," and they do not cite any evidence that would support such a distinction.  The Step-Down Manual speaks for itself:  a Step-Down Program participant may not advance to the next privilege level if he exceeds certain numbers and types of disciplinary

charges within defined time periods at each privilege level.  ECF No. 383-2, VADOC-00053480 at -529, -534 (2020 Step-Down Manual).

87.    VDOC divides disciplinary charges into 100-series charges and 200-series charges, with 200-series charges considered less serious and, in some cases, eligible for informal resolution. Ex. 53, 2016 O.P. 861.1 at 2, 5–12 (Beard Dep. Ex. 7).

Defendants' SUMF Response ¶ 87:  **Undisputed**.

88.    200-series charges include such offenses as, disobeying an order (201); failing to follow facility count procedures (213); unauthorized possession of a lottery ticket or a negotiable instrument (217); vulgar or insolent language or gestures toward employees (222); accepting compensation for legal services (223); tattooing or piercing of self or others (236); intentionally discarding food, trash, body wastes/fluids, or other substances, except into an approved receptacle (237); failure to follow posted or written facility rules and regulations (243); consensual sexual acts (209); and lying or giving false information to an employee (206).  *Id*. at 10–12.[9]

Defendants' SUMF Response ¶ 88:  **Undisputed**.

89.    To progress from IM-0 to IM-1, there must be  and                                                        within a continuous six-month period.  Ex. 2, 2020 Step-Down Manual at -529.  To progress from SM-0 to SM-1, there must be

---

[9] [*Plaintiffs' SUMF Footnote 3*] All VDOC disciplinary charges were removed from the most recent version of the publicly-available operating procedure on offender discipline, but these charges were all included in procedure through the version effective on June 1, 2023.

 and

within a continuous three-month period. *Id*. at -534.

Defendants' SUMF Response ¶ 89: **Undisputed**.

90.    To progress from IM-1 to IM-2, there must be  within a continuous six-month period. *Id*. at -529.  To progress from SM-1 to SM-2, there must be                                   and

within a continuous three-month period. *Id*. at -534.

Defendants' SUMF Response ¶ 90: **Undisputed**.

91.    To progress from IM-2 to IM-Closed, the incarcerated person must remain charge-free for a continuous six-month period. *Id*. at -529.  To progress from SM-2 to any of the SL-6 units, the incarcerated person must remain charge free for a continuous three-month period. *Id*. at -534.

Defendants' SUMF Response ¶ 91: **Disputed in part**. SM-2 is a SL-6 privilege level. Defs.' Br. [ECF No. 381] at 12, fn. 6, 13 at ¶ 28.

**Plaintiffs' Reply ¶ 91**: Defendants' response does not create a genuine dispute of material fact. Because SM-2 is now a Level 6 unit (though it has not always been), Plaintiffs accept the clarification that to progress from SM-2 to any of the *other* SL-6 units, the incarcerated person must remain charge free for a continuous three-month period.  This small clarification does not materially change the meaning of Plaintiffs' fact as originally stated.

92.    Incarcerated persons' receipt of disciplinary charges can block their progression through the Step-Down Program, even if those charges relate to minor rules violations.  For example,

Plaintiff Gary Wall was required to stay in IM-2 for at least six additional months after receiving

a 200-level disciplinary infraction for allegedly blocking the vent in his cell.  Ex. 15, 2023 Wall

Decl. ¶ 43; Ex. 54, Pacholke Rebuttal Rep. ¶¶ 15–19 and accompanying footnotes.  200-level

charges can lead to an incarcerated person's demotion to an earlier privilege level.  Ex. 18,

Mathena Dep. at 402:9–415:3; Ex. 55, VADOC-00090616 at -620 (Mathena Ex. 14).  For

example, a 200-level disciplinary charge for lying result in a prisoner being sent back to an

earlier privilege level.  Plaintiff Kevin Snodgrass received such a 200-level charge and was

moved from SM-2 back to SM-1.  Ex. 18, Mathena Dep. at 402:9–415:3; Ex. 55, VADOC-

00090616 at -620 (Mathena Ex. 14).

Defendants' SUMF Response ¶ 92:  **Disputed in part**. Defendants dispute that disciplinary
charges relate to "minor rules violations." Mathena Decl., Exhibit 18, at ¶¶ 5–6 (explaining why
200-lelvel disciplinary charges, including blocking a vent, *i.e.* the tray slot, are not minor rule
violations).

**Plaintiffs' Reply ¶ 92**:  Defendants have failed to create a genuine dispute of material fact.

First, Mr. Mathena's conclusory statement in his affidavit is insufficient to create a genuine

dispute.  *See Coffey*, 1993 WL 318886, at *3 ("[T]he nonmoving party may not create a general

issue of material fact based on mere speculation or the building of one inference upon another."

(citing *Beale*, 769 F.2d at 214)).  Second, even if Mr. Mathena's declaration was sufficient to

dispute the characterization of "minor rules violations"—and it is not—it does not materially

dispute the meaning of Plaintiffs' fact as originally stated.  Defendants do not dispute that 200-

series disciplinary charges are the lowest-level, or least serious, disciplinary charges under

VDOC operating procedures. *See* Defs' Resp. to Pls' SUF 87, *supra*.  Finally, Mr. Mathena's

statement that the vent and the tray slot in the cells are the same (ECF No. 402-18 ¶ 5) is plainly

wrong, *see, e.g.*, Ex, 132, Collins Dep. at 47:14–18, 48:5–11; Ex. 148, McDuffie Dep. at 395:5–

15, but in any event, the distinction does not materially dispute the meaning of Plaintiffs' fact as originally stated.  As such, Defendants have not identified any genuine dispute of a material fact.

### d)   ICA Reviews

93.   ICA hearings are inmate case reviews, which may be held for various reasons.  Ex. 56, VADOC-00003090 at -092–93, -096–98 (2014 O.P. 830.1).  Depending on the purpose of the ICA hearing, an incarcerated person may or may not receive formal process.  *Id.*  As a matter of VDOC policy, incarcerated persons receive formal process when ICA hearings relate to increasing an incarcerated person's security level, removing an incarcerated person from general population, or transferring an incarcerated person to a higher security level institution.  *Id*. at 6.

Defendants' SUMF Response ¶ 93:  **Undisputed**.

94.   According to the Step-Down Manual, each Level S inmate is to be given an ICA hearing at least every 90 days ("90-Day ICA Hearing") as part of the Step-Down Program.  Ex. 2, 2020 Step-Down Manual at -492.

Defendants' SUMF Response ¶ 94:  **Undisputed**.

95.   In the version of Operating Procedure 830.1 with an effective date of June 1, 2017 and amended on January 1, 2018, segregation review hearings were listed as an example of hearings that required formal process procedures.  Ex. 57, VADOC-00107513 at -516 (2017 O.P. 830.1).

Defendants' SUMF Response ¶ 95:  **Undisputed**.

96.     The current version of Operating Procedure 830.1 does not include restorative housing

review hearings, or 90-Day ICA Hearings, as types of hearings that require formal process

protections.  *Id*. at -518.

Defendants' SUMF Response ¶ 96:  **Disputed**: The cited document does not support Plaintiff's
allegation. ECF No. 383-57 (O.P. 830.1) identifies "Segregation assignment, review and
release," and "Segregation reviews resulting in no status change" as "[e]xamples of formal due
process hearings." at VADOC-00107516. Further, as noted in ¶ 95 of Plaintiffs' Statement. O.P.
830.1 identifies only examples of hearings that require due process, not all hearings that require
due process. Regardless, the current version of O.P. 830.1 identifies "Interim reviews of on-
going restorative housing assignments" as formal due process hearings, excepting the right to
call and question witnesses. O.P. 830.1 [ECF No. 381-24] at 8.

**Plaintiffs' Reply ¶ 96**:  Plaintiffs do not dispute that Operating Procedure 830.1 includes the

language quoted by Defendants and concede that this fact is not material to our claims.


97.     The 90-Day ICA Hearing is a housing status review, meaning it determines only whether

an inmate is eligible for general population or must remain in segregation.  Ex. 44, Duncan

(*DePaola*) Dep. at 190:2–4.

Defendants' SUMF Response ¶ 97:  **Disputed**. The cited deposition testimony does not support
Plaintiffs' allegation. The deposing attorney "turn[ed] the page" to a new form during the
deposition that was a housing status review. Deposition of Amee Duncan dated October 3, 2018
("Duncan *Depaola* Dep.") [ECF No. 383-44] at 189:23-25. Ms. Duncan specifically stated that
the new form was a housing status review. *Id.*

**Plaintiffs' Reply ¶ 97**:  Defendants' response does not create a dispute as to SUMF paragraph

97.  They wrongly suggest that Ms. Duncan may have been looking at a different, unrelated,

page in the deposition exhibit when she confirmed that 90-day ICA reviews were housing status

reviews (and not privilege status reviews), meaning that they look at only whether a prisoner is

eligible for general population or must remain in segregation, and not whether they may progress

within the levels of the Step-Down Program.  In fact, the exhibit itself confirms what is evident

from the transcript itself:  that both pages of the exhibit were related to ICA reviews.  The second

page of the exhibit is the ICA notification form (DOC-11G) and the first page is the disposition

(DOC-11H), but both pages relate to the same 90-day segregation review for persons in Level S.

Ex. 149, *DePaola* Ex. PX-13 at -494–495; *see also* Ex. 150, Duncan (*DePaola*) Dep. at 185:23–

186:25.  Ms. Duncan's testimony on pages 187–190 is instructive and makes clear that ICA

reviews are not used to advance people from one privilege level to the next ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████).  Ex. 127, Duncan Dep. at 187:1–190:19.

Thus, the statement on ICA forms stating that "the ICA recommends: Internal status change to

Intensive Management 0" is *pro forma* language used to document people's internal status for

institutional count reasons and for the records department, *see* Ex. 150, Duncan (*DePaola*) Dep.

at 187:2–16, 187:17–188:3, but is not a reflection of the nature of the review or the decision

being made by the ICA because, "in actuality the only thing I am reviewing is his housing, in

which I remained him segregation because he had not completed the requirements of the step-

down, meaning I could not release him to Level 6 population," *id.* at 188:9–13; *see also id.* at

189:23–190:5 ("This is a housing status review. It is, is he eligible for general population or does

he remain in segregation? I wouldn't have used this process to say I'm making him an IM-1.").

This is consistent with Mr. Mathena's testimony on behalf of VDOC.  *See* Ex. 128, Mathena

30(b)(6) Dep. at 301:11–18.  It is also consistent with responses to grievances, which indicate

that privilege levels are non-grievable but housing status reviews (i.e., 90-day ICA reviews) are

grievable.  *See* VADOC-00174671 at line 12551 ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████) (Grievance Spreadsheet).

98.    The ICA does not change an inmate's housing status if the inmate has not met the Step-Down Program requirements. *Id.* at 193:20–22.

Defendants' SUMF Response ¶ 98:  **Disputed**. The cited deposition testimony does not support Plaintiffs' allegation. See response to ¶ 97, *supra*.

**Plaintiffs' Reply ¶ 98**:  Defendants' response does not create a genuine dispute, or any dispute at all, as to SUMF paragraph 98.  As stated in Plaintiffs' SUMF Reply at paragraph 97, *supra*, Ms. Duncan was in fact looking at a 90-day ICA review, and specifically stated that in conducting such a review, she is looking to see if the prisoner has completed the requirements of the Step-Down Program such that he can be released to Level 6, because the ICA is reviewing only the prisoner's housing status in Level S and not their privilege status *within* Level S.


99.    Pursuant to VDOC policy, there is no way for the ICA to accelerate the Step-Down Program timeline from its mandatory minimum number of months spent at each step of the SM or IM pathways.  Ex. 22, Collins Dep. at 149:6–13.

Defendants' SUMF Response ¶ 99:  **Undisputed**.


100.    Advance notice of an ICA review is provided to the incarcerated person via a DOC-11G form.  The DOC-11G form does not indicate the evidence the ICA is considering or the decision VDOC contemplates based on that evidence.  *See* Ex. 58, VADOC-00006446 (July 22, 2014 Hammer DOC-11G Form).

Defendants' SUMF Response ¶ 100:  **Undisputed**.

101.    ICA reviews take place predominately at an offender's cell door.  Ex. 32, Raiford Dep. at

105:14–106:6.  *See also* Ex. 15, 2023 Wall Decl. ¶ 20; Ex. 16, 2023 Cornelison Decl. ¶ 13; Ex.

43, 2023 Riddick Decl. ¶ 56; Ex. 50, 2023 Cavitt Decl. ¶ 31.

Defendants' SUMF Response ¶ 101:  **Undisputed**.


102.    Incarcerated persons receive the results of an ICA review after the review, when they

receive a copy of the DOC-11H form.  The DOC-11H form is sometimes days or weeks after the

ICA review.  Ex. 15, 2023 Wall Decl. ¶ 20; Ex. 16, 2023 Cornelison Decl. ¶ 13; Ex. 43, 2023

Riddick Decl. ¶ 57.

Defendants' SUMF Response ¶ 102:  **Disputed in part**. Ms. Duncan testified that the inmate is
provided the BMC's decision at the ICA hearing itself. Duncan Dep., Exhibit 12 at 273:11-
274:1. She further testified that the inmate is provided a copy of the ICA form five days after the
initial hearing that contains the ICA recommendation, then a copy of the completed form once
the recommendation had completed the review process. *Id.* at 287:7-288:4.

**Plaintiffs' Reply ¶ 102**:  Defendants have failed to create a genuine dispute of material fact.

The testimony from Ms. Duncan that a copy of the completed ICA form is not provided to

incarcerated persons for at least five days after the initial hearing does not contradict Plaintiffs'

stated fact.  Moreover, her testimony about the BMC's decision being provided at the ICA

hearing not only does not contradict the stated fact, which does not concern the BMC's decision,

but it also provides further evidence that the ICA process merely presents the result of the

previously-determined BMC's decision to the prisoner; in other words, it is a rubber stamp.  *See*

ECF No. 400, Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 36;

Plaintiffs' SUMF Reply ¶¶ 62–63, 97.


103.    ICA forms provided to incarcerated persons often refer to the need for a "longer period of

stable adjustment" as the reasoning to keep an incarcerated person in his current housing

assignment. *See, e.g.*, Ex. 59, VADOC-00010341 (Feb. 18, 2016 Mukuria DOC-11H Form); Ex.

33, Turner Dep. at 131:7–9 (testifying that at least one corrections officer repeatedly used this

shorthand in completing ICA paperwork); Ex. 32, Raiford Dep. at 118:22–122:3 (testifying that

this shorthand is used as a catch-all to mean that an inmate is ██████████████████████████

███████████████ or ██████████████████); Ex. 29, Gallihar *(Reyes)* Dep. at

192:22–195:6 (noting that the phrase "stable adjustment" was used "a lot" in ICA forms and was

not defined anywhere in policies or guidance)*.*  The term "stable adjustment" is not defined

anywhere in VDOC policies or guidance.  Ex. 29, Gallihar *(Reyes)* Dep. at 194:8–10.

Defendants' SUMF Response ¶ 103:  **Disputed in part**. Mr. Turner testified that the phrase
"longer period of stable adjustment" means that the time that the inmate has been at SL-S has not
been long enough to ensure that he is no longer a threat to the orderly operation of the institution.
Transcript of Dwayne Turner dated March 17, 2023 ("Turner Dep."), cited portions attached as
Exhibit 24 at 124:17-125:17.

**Plaintiffs' Reply ¶ 103**:  Defendants' response does not create a dispute as to SUMF paragraph

103.  That Mr. Turner offered his own definition of "longer period of stable adjustment" at

deposition does not contradict Plaintiffs' supported assertion that the term is not defined in

policies or guidance.  Further, the tautological definition offered by Mr. Turner confirms that the

term is a catch all that does not provide any guidance as to the actual reason(s) for retaining a

prisoner in segregation: ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  ECF No. 402-24, Turner Dep. at 124:17-125:17 (emphasis

added).


### 3.    Reclassification to Level 6 Pods

104.    Incarcerated persons who have advanced in the Step-Down Program may be eligible to

progress from Level S to Level 6.  For an incarcerated person to progress from Level S to Level

6, four separate reviews must take place.  Ex. 4, Mathena 30(b)(6) Dep. at 264:11–14.  First, the BMC must make a recommendation to the DTT to progress the inmate to Level 6.  Second, the DTT must meet and recommend that the inmate be progressed to Level 6.  Third, upon the DTT's recommendation, the Warden must approve the security level reduction.  Ex. 2, 2020 Step-Down Manual at -489–91; Ex. 4, Mathena 30(b)(6) Dep. at 261:12–264:14.  And finally, once the Warden approves the security level reduction, the BMC must meet a second time to determine the Level 6 unit into which the inmate will be assigned.  Ex. 4, Mathena 30(b)(6) Dep. at 262:2–6.

Defendants' SUMF Response ¶ 104:  **Undisputed**.

105.    VDOC policy provides no time limits within which these four reviews must take place. *Id*. at 264:15–18; *see generally* Ex. 2, 2020 Step-Down Manual at -489–91.  While an inmate waits for these four reviews to take place, he remains in Level S.  Ex. 4, Mathena 30(b)(6) Dep. at 263:5–9.

Defendants' SUMF Response ¶ 105:  **Undisputed**.

106.    If there is a lack of bed space in the Level 6 unit into which an incarcerated person is recommended to be transferred, the incarcerated person can remain in Level S for additional time until bed space opens.  Ex. 50, 2023 Cavitt Decl. ¶ 47; Ex. 60, VADOC-00023965 (DTT Review recommending Peter Mukuria for IM-Closed on June 9, 2016); Ex. 61, VADOC-00010343 (ICA review dated 8/6/2016 continuing to keep Peter Mukuria in segregation in IM-2 because "Offender waiting bed space in IM Closed"); Ex. 62, VADOC-00175652 (ICA review noting Gary Wall had been approved by the Dual Treatment to be released to IM Closed Pod "pending bed space").

73

Defendants' SUMF Response ¶ 106:  **Undisputed**.


107.    As a matter of VDOC policy, an incarcerated person is not interviewed in connection

with a decision to move him from Level S to Level 6 (or from Level 6 to Level 5).  Ex. 20,

Gallihar Dep. at 143:14–21; *see also* Ex. 15, 2023 Wall Decl. ¶ 21.

Defendants' Response¶ 107:  **Undisputed**.


### 4.    ERT Reviews

108.    The ERT is a group of VDOC employees who are not employed at ROSP or WRSP who

perform bi-annual reviews of each inmate housed at ROSP and classified at Levels S or 6.  Ex. 2,

2020 Step-Down Manual at -488.

Defendants' SUMF Response ¶ 108:  **Undisputed**.


109.    According to VDOC, the purpose of the ERT review is to make sure that an incarcerated

person is appropriately classified as Level S or 6 and is in the right pathway—IM versus SM.

Ex. 18, Mathena Dep. at 478:20–479:9.  For inmates in the IM pathway, a pathway change by

the ERT is the only way to progress to Security Level 5.  Ex. 2, 2020 Step-Down Manual at -

507; Ex. 11, Duncan Dep. at 194:2–16; Ex. 33, Turner Dep. at 208:5–9.

Defendants' SUMF Response ¶ 109:  **Disputed in part**: The purpose identified by Plaintiffs is
not the only purpose of the ERT review. *See, e.g.,* 2020 Step-Down Manual [ECF No. 383-2] at
VADOC-00053488 (noting that the ERT's review "will include, but not be limited to" whether
the inmate is appropriately assigned to SL-S, whether the inmate meets the criteria for the
pathway to which he is assigned, whether the inmate requires a pathway change, whether the
DTT has made appropriate decisions to advance the inmate through the step-down process, and
whether IM inmates should be moved to SL-6 Re-Entry if they will fall within their 24 month
time frame before release prior to the next schedule ERT meeting). Mr. Gallihar testified to
several instances that he knew of where inmates moved directly from SL-S to Security Level 5
("SL-5"), *i.e.*, general population, for various reasons, including medical, mental health, and
other policy-related reasons. Gallihar Dep., Exhibit 10 at 247:18–249:13.

**Plaintiffs' Reply ¶ 109**:  Defendants' citation to vague language from the Step-Down Manual

cannot create a genuine dispute as to the meaning of that language in practice, which is the

subject of SUMF paragraph 109 and of the cited testimony of Mr. Mathena, who, as the former

chair of the ERT (and who incidentally was VDOC's Rule 30(b)(6) designee as to the policies

and practices of the ERT, although this testimony was given in his individual capacity), was

asked if there are "any other decisions [other than those cited in Plaintiffs' SUMF paragraph

109] that the external review team is making during their reviews," to which he answered,

"Decisions, that's the key components, yes, what you laid out."  Ex. 133, Mathena Dep. at

478:20–479:9.


110.    Prior to 2018, the ERT did not interview incarcerated persons in connection with its

review.  Ex. 18, Mathena Dep. at 461:7–462:15.

Defendants' SUMF Response ¶ 110:  **Disputed**: The deposition testimony cited by Plaintiffs is
contrary to their allegation. Mr. Mathena testified that he knew that the ERT had interviewed "a
few in the early going on." Mathena Individual Dep. [ECF No. 383-18] at 461:19-21. Further, he
testified only that "the current practice" started in about 2017, not that no one was interviewed
before that time. *Id.* at 462:4-10.

**Plaintiffs' Reply ¶ 110**:  Defendants do not create a genuine dispute as to substance of

Plaintiffs' SUMF paragraph 110.  Mr. Mathena claimed only that the review team "may have

went to a housing unit to interview one or two" individuals "in the early going on," without

defining what he meant by "the early going on."  Ex. 133, Mathena Dep. at 461:19–462:1.


111.    While the ERT began interviewing incarcerated persons in 2018, the ERT did not begin

interviewing incarcerated persons in sizeable numbers until 2019.  Indeed, all but six ERT

interviews of incarcerated persons were conducted on or after May 14, 2019.  *Id.* at  471:9–472:4

(noting that all interviews have been recorded and all recordings are preserved); Ex. 63, May 9,

2023 Email from Meghan Podolny and accompanying attachment indicating that only 5

interview recordings were from 2018.

Defendants' SUMF Response ¶ 111:  **Disputed**: See response to ¶ 110, *supra*. Mr. Mathena
testified only that the interviews since 2017 have been recorded. *Id.* at 471: 9-472:1.

**Plaintiffs' Reply ¶ 111**:  Defendants' response does not create a genuine dispute of fact as to

Plaintiffs' SUMF paragraph 111 because Mr. Mathena's testimony indicates that, at most, one to

two ERT interviews were conducted prior to 2018.  *See* Plaintiffs' SUMF Reply ¶ 110.  Further,

Defendants' response fails altogether to dispute that, after these one to two "early going on"

interviews, all but six ERT interviews were conducted on or after May 14, 2019.


112.    VDOC does not keep records that identify which inmates have been interviewed by the

ERT, with the exception of records from certain interviews conducted in November 2021.  *Id.*

The ERT does not interview all incarcerated persons in the IM pathway.  Ex. 18, Mathena Dep.

at 457:2–4.  Instead, the ERT only interviews incarcerated persons in the IM pathway who are

being considered for a pathway change or who are considered "stuck" in the program.  *Id.* at

459:2–12.

Defendants' SUMF Response ¶ 112:  **Disputed in part**: Plaintiffs mischaracterize Mr.
Mathena's testimony. Mr. Mathena testified that the primary reasons that the ERT would
interview an inmate are if the inmate is being considered for a pathway change from IM to SM
"or vice versa" or if an inmate (not just an IM inmate) was identified as stuck in a privilege level.
*Id.* at 459: 2-21. But, he did not testify that those were the "only" reasons and, in fact, Mr.
Mathena testified that his recollection was that the ERT had interviewed every inmate in the IM
path one time. *Id.* at 460:12-16.

**Plaintiffs' Reply ¶ 112**:  Defendants' response fails to create a genuine dispute of material fact

as to Plaintiffs' stated fact.  Defendants do not dispute the first sentence of Plaintiffs' SUMF

paragraph 112, so that fact should be treated as wholly undisputed.  And Defendants' response

that Mr. Mathena testified that the ERT interviewed every prisoner on the SM path one time, *see*

Ex. 133, Mathena Dep. at 459:16–19, does not create a factual dispute as to the practice of the

ERT; indeed it confirms that, as a matter of general practice, the ERT does not interview every

prisoner at every review.  Finally, the distinction Defendants draw regarding the reasons the ERT

may interview a prisoner is one without material difference.  As such, Defendants' response does

not create any genuine dispute as to any of the material facts in Plaintiffs' SUMF paragraph 112.


113.     The ERT does not interview all incarcerated persons in the SM pathway.  *Id*. at 456:13–

18, 456:19–21 (SM inmates are interviewed less frequently than IM inmates).  Indeed, the

current chairman of the ERT does not "ever remember doing any interviews of SM-0s or SM-1s

or SM-2s."  Ex. 4, Mathena 30(b)(6) Dep. at 227:5–6; Ex. 18, Mathena Dep. at 455:8–9.

Defendants' SUMF Response ¶ 113:  **Undisputed**.


114.     The ERT has never adjusted the privilege level status of an inmate.  Ex. 33, Turner Dep.

at 172:2–11, 177:17–22.

Defendants' SUMF Response ¶ 114:  **Disputed**: The testimony of one individual, who is not a
member of the ERT, that he could not recall the ERT adjusting the privilege status of an inmate
does not establish that the ERT never has done so. Further, the ERT has done so. *See, e.g.*, June
3, 2013 External Review Team document, attached as Exhibit 25 [VADOC-00019676], at
VADOC-00019687 (recommending change to IM-1), 700 (recommending change to SM-0);
Annual External Review Team Recommended Change Form dated December 4, 2014, attached
as Exhibit 26 [VADOC-00088065], at VADOC-00088066 (recommending change to SM-0).

**Plaintiffs' Reply ¶ 114**:  Defendants have not created a genuine dispute as to the practice or

responsibility of the ERT.  It is undisputed that the ERT is not responsible for adjusting a

prisoner's privilege level status, *see* Ex. 128, Mathena 30(b)(6) Dep. at 301:11–14; ECF No.

383-2, VADOC-00053480 at -491 (listing responsibilities of the BMC including assigning

inmates to SM-0, SM-1, IM-0, IM-1, and IM-2), and such a determination is not within the

purpose of the ERT's review, *see* Plaintiffs' SUMF ¶ 109; Plaintiffs' SUMF Reply ¶ 109.  It is

immaterial whether the ERT, on two occasions, has recommended a change to the privilege level

for some reason.  Non-material facts are not appropriate in a statement in opposition to summary

judgment and should be disregarded or stricken.  *Anderson*, 477 U.S. at 248 (1986) ("Factual

disputes that are irrelevant or unnecessary will not be counted."); *accord HP Tuners, LLC* , 2022

WL 562625, at *1, *5 (granting motion to strike non-material facts); *Knidel*, 189 F. Supp. 3d at

284–85 ("giv[ing] little to no consideration to extraneous factual and legal assertions

propounded").

115.    The ERT is not involved in the decision to move an inmate from Level S to Level 6 or

from Level 6 to Level 5.  Ex. 18, Mathena Dep. at 482:18–21, 483:2–4.

Defendants' SUMF Response ¶ 115:  **Disputed**: The 2020 Step-Down Manual provides that one
of the areas that the ERT will review is "[h]as the Dual Treatment Team made appropriate
decisions to advance the offender through the step-down process?" ECF No. 383-2 at VADOC-
00053488. The cited testimony from Mr. Mathena was given in his personal capacity. Mathena
Individual Dep. [ECF No. 383-18] at 1.

**Plaintiffs' Reply ¶ 115**:  Defendants' citation to language from the Step-Down Manual does not

create a genuine dispute as to the meaning of that language in practice, which is the subject of

Plaintiffs' SUMF paragraph 115 and of the cited testimony of Mr. Mathena, who was the former

chair of the ERT (and who incidentally was VDOC's Rule 30(b)(6) designee as to the policies

and practices of the ERT, although this testimony was given in his individual capacity solely

because Plaintiffs had already questioned Mr. Mathena for 7 hours in his capacity as a designee

for VDOC).  Whether the ERT *reviews* the DTT's decision is not material to the question of

whether the ERT is involved in the decision itself, which is the subject of the stated fact.  The

language cited by Defendants in fact confirms that the ERT is *not* involved in that decision.  As

such, Defendants have failed to create a genuine dispute of material fact.

116.     The ERT does not document the rationale for its decisions.  *Id*. at 496:4–497:19

Defendants' SUMF Response ¶ 116:  **Undisputed**.


117.     While one could presumably interview the members of the ERT to try to learn the

rationale for individual decisions, ERT members do not keep contemporaneous notes of their

meetings.  *Id*. at 497:20–498:6.

Defendants' SUMF Response ¶ 117:  **Undisputed**.


118.     VDOC does not provide incarcerated persons documentation explaining the outcome of

their ERT reviews.  *Id*. at 497:8–19; Ex. 44, Duncan (*DePaola*) Dep. at 124:2–19; ECF No. 174-

24 (Mukuria Aff.) ¶ 18; Ex. 64, Wall Dep. at 203:9–14; Ex. 50, 2023 Cavitt Decl. ¶ 51.

Defendants' SUMF Response ¶ 118:  **Undisputed**.


119.     The outcome of an ERT review is not grievable.  Ex. 4, Mathena 30(b)(6) Dep. at

254:22–255:3; Ex. 65, VADOC-00007200 at -02 (Mathena Dep. Ex. 12).

Defendants' SUMF Response ¶ 119:  **Undisputed**.


        **D.**     **Conditions of Confinement**

            **1.**     **Privileges at Different Levels of the Program**

                  **a)**     **IM Pathway**

120.     Incarcerated persons in the IM pathway have fewer privileges than incarcerated persons

in general population.  Ex. 33, Turner Dep. at 210:10–16.

Defendants' SUMF Response ¶ 120:  **Undisputed**.

121.    IM-0 is the most restrictive level of the IM pathway.  Currently, incarcerated persons at IM-0 are prohibited from holding jobs, are prohibited from having a TV or radio in their cell, and may borrow only two library books biweekly.  They are prohibited from purchasing food from commissary and can spend only $15 per week on non-food items.  Ex. 2, 2020 Step-Down Manual at -528; Ex. 16, 2023 Cornelison Decl. ¶ 8.  They are allotted only two phone calls per month.  They are not permitted any in-person visitation, and video visits must be specifically approved.  Ex. 2, 2020 Step-Down Manual at -528.  They are permitted only three showers per week.  *Id*.  Ex. 1, 2012 Step-Down Manual at -740; Ex. 26, VADOC-00053104 at -158 (2017 Step-Down Manual).

Defendants' SUMF Response ¶ 121:  **Disputed in part**: Inmates at IM-0 are permitted one 1-hour non-contact visitation in-person per week. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053537. Further, the 2020 Step-Down Manual provides that video visitation is "[a]s approved in accordance to Visitation Policy 851.1 ["O.P. 851.1"]," which provides that inmates at IM-0 can have one video visit per month after six months infraction free. *Id.* at VADOC-00053528; O.P. 851.1, attached as Exhibit 27, at 18. In other words, an inmate who remains at IM-0 for more than 6 months can have the prescribed video visitation as long as he remains infraction free. Additionally, inmates at IM-0 are allowed to possess a JP5 media player. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053528. And the permitted three showers per week are no more restrictive than any other level of the IM pathway. *Id.*

**Plaintiffs' Reply ¶ 121**:  Defendants have failed to create a genuine dispute of material fact that IM-0 is not the most restrictive level of the IM Pathway.  *See* ECF No. 383-2, VADOC-00053480 at -528, -533 (illustrating the privileges available at each level of the IM and SM pathways) (2020 Step-Down Manual).  Whether some individual privileges available at the IM-0 level are available at other levels does not dispute the fact that IM-0 is more restrictive than any other privilege level.  Plaintiffs do not dispute that the Step-Down Manual and O.P. 851.1 include the respective quoted language cited by Defendants or that O.P. 851.1 outlines the visitation policy.

122.    Incarcerated persons at IM-0 are not eligible to earn good time credit.  Ex. 11, Duncan

Dep. at 94:9–16.

Defendants' SUMF Response ¶ 122:  **Disputed**: The deposition testimony cited by Plaintiffs
does not support their allegation. Further, Ms. Duncan specifically testified that all inmates,
including inmates enrolled in the Step-Down Program, are eligible to earn good time credit.
Duncan Dep., [ECF No. 383-11] at 93:15-94:4; *see also* Operating Procedure 830.3: *Good Time
Awards*, attached as Exhibit 28, at 5 ("***All inmates*** are eligible for recognition under one or more
of the following good time award systems …." (emphasis added)).

**Plaintiffs' Reply ¶ 122**:  Plaintiffs do not dispute that O.P. 830.3 includes the language quoted

by Defendants.  Plaintiffs clarify that prisoners in restorative housing units "are not eligible for

advancement to Class Level I," *see* ECF No. 402-28, VDOC O.P. 830.3 (effective July 1, 2022)

at 15, and "will not be eligible for [Extraordinary Good Time]," *see id.* at 12, but otherwise do

not dispute Defendants' response.


123.    Incarcerated persons at IM-0 currently do not have access to programming other than the

Challenge Series, which they must complete while in their cells.  *Id.* at 106:16–19; Ex. 4,

Mathena 30(b)(6) Dep. at 199:22–200:7, 56:9–20 ("there's no security reason that I can think of"

for exclusion of Level S prisoners from certain programming, such as the "Cognitive Stimulation

program.")

Defendants' SUMF Response ¶ 123:  The 2020 Step-Down Manual specifically provides that
IM-0 inmates may participate in an alternative program with the Road Map to Change Video and
Starting Point Journal. ECF No. 383-2 at VADOC-00053529. Mr. Mathena identified another
program listed in the manual in his testimony. Mathena 30(b)(6) Dep. ECF No. 383-4 at 199:3-
17.

**Plaintiffs' Reply ¶ 123**:  Defendants do not dispute that incarcerated persons must complete

their programming while in their cells, so that fact should be treated as undisputed.  Plaintiffs do

not dispute that the Manual identifies the Road Map to Change Video and Starting Point Journal

program, but Defendants have not adduced any evidence that any IM-0 prisoner has participated

in the alternative program, so its existence is not sufficient to create a genuine dispute of material

fact as to Plaintiffs' SUMF paragraph 123.


124.    The current privilege restrictions at IM-1 are similar to those at IM-0, with some modest

increases.  Incarcerated persons at IM-1 are eligible to purchase $15 per week of food from the

commissary as well as $10 of non-food items.  They are able to borrow 3 library books biweekly,

are allowed three phone calls per month, and are allowed to have a TV and radio in their cells.

Ex. 2, 2020 Step-Down Manual at -528.

Defendants' SUMF Response ¶ 124:  **Disputed**: Defendants dispute Plaintiffs' characterization
of the increases as "modest." Defendants also incorporate by reference their responses to
paragraphs 121-123, *supra*.

**Plaintiffs' Reply ¶ 124**:  Defendants have failed to create a genuine dispute of material fact.

Defendants' dispute of Plaintiffs' use of the word "modest" is not material.  *See also* Plaintiffs'

SUMF Reply ¶¶ 121–23.


125.    Incarcerated persons at IM-2 receive some additional privileges.  At IM-2, incarcerated

persons become eligible for employment as a shower sanitation worker.  Incarcerated persons at

IM-2 are allowed to spend up to $30 per week at the commissary, receive up to four library

books biweekly, and receive four phone calls per month.  *Id.*

Defendants' SUMF Response ¶ 125:  **Undisputed**.


126.    Once incarcerated persons reach the Level 6 IM Closed Pods, they are allowed to spend

additional amounts at the commissary ($35 per week at Phase I and $45 per week at Phase II),

receive additional library books (five bi-weekly), and receive additional phone calls (10 per

month at Phase I and 15 per month at Phase II).  *Id*. at -528; Ex. 26, VADOC-00053104 at -158

(2017 Step-Down Manual) .

Defendants' SUMF Response ¶ 126:  **Disputed in part**: Plaintiffs have not identified all
additional privileges that inmates receive once they reach the Level 6 IM Closed Pod. For
example, inmates in IM Closed Pod Phase I get a total of 2-hours of non-contact visitation on
Saturday and Sunday. 22020 Step-Down Manual [ECF No. 383-2] at VADOC-00053537.
Inmates in IM Closed Pod Phase II, in addition, get 2-hour contact visitation on Friday in a
secure chair scheduled by the Unit Manager. *Id.*

**Plaintiffs' Reply ¶ 126**:  Defendants' response does not create a genuine dispute of material

fact; it merely provides additional information but does not contradict the fact as stated by

Plaintiffs.


127.    Incarcerated persons in the general population receive a greater amount of commissary

than Level S inmates, they can watch TV anytime, they can have contact visits, and they have

more access to different jobs than incarcerated persons at Level S.  Ex. 33, Turner Dep. at

210:18–211:14.

Defendants' SUMF Response ¶ 127:  **Disputed in part**: All inmates in general population are
not permitted contact visits. For example, inmates in general population assigned to a Restorative
Housing Unit are limited to noncontact visits, except for visits with their attorney. O.P. 851.1,
attached as Exhibit 27, at 12. A Facility Unit Head also may restrict an inmate in general
population to non-contact visits. *Id.* at 20.

**Plaintiffs' Reply ¶ 127**:  Defendants have failed to create a genuine dispute of material fact as to

whether incarcerated persons in general population generally have more privileges than those

assigned to Level S; indeed, VDOC claims that the Step-Down Program is structured as an

incentive-based system wherein incarcerated persons earn more privileges as they progress

towards a return to general population.  *See, e.g.*, VADOC-00053480 at -512 ███████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ ) (2020 Step-Down Manual) (emphasis added).

Defendants' identification of exceptions to the visitation practices in general population is not sufficient to create a genuine dispute of material fact.

128.    Although incarcerated persons in the Security Level 6 IM Closed Pod have greater privileges than those at IM-0 through IM-2, they lack privileges that are enjoyed by incarcerated persons in the general population. *See* Ex. 14, Clarke Dep. at 280:9–16.

Defendants' SUMF Response ¶ 128: **Undisputed**.

b)    **SM Pathway**

129.    The privilege restrictions at SM-0 are identical to the privilege restrictions at IM-0. Ex 2, 2020 Step-Down Manual at -533; Ex. 26, VADOC-00053104 at -165 (2017 Step-Down Manual); Ex. 1, 2012 Step-Down Manual at -746; Ex. 17, 2023 Arrington Decl. ¶ 10.

Defendants' SUMF Response ¶ 129: **Undisputed**.

130.    At SM-1, incarcerated persons are eligible for employment as a barber, shower sanitation worker, or housekeeping worker. Otherwise, the privilege restrictions at SM-1 are identical to the privilege restrictions at IM-1. Ex. 2, 2020 Step-Down Manual at -533.

Defendants' SUMF Response ¶ 130: **Undisputed**.

131.    To the extent any out-of-cell programming is provided for incarcerated persons at Level S in the SM pathway, it is provided to them while they are in restraints. *Id*. at -501, -510.

Defendants' SUMF Response ¶ 131: **Undisputed**.

132.    Incarcerated persons in the SM pathway are not allowed contact visits and are limited to

video visitation.  Incarcerated persons in the general population are allowed contact visits.  *Id*. at

-533; Ex. 33, Turner Dep. at 209:13–18, 210:22.

Defendants' SUMF Response ¶ 132:  **Disputed**: Inmates on the SM pathway are not limited to
video visitation. 2020 Step-Down Manual [ECF No. 383-2] at VADOC-00053537 (noting that
inmates in the SM pathway get from 1-hour to 2-hour non-contact visitation on a scheduled day
depending on security level and SL-6 unit). Defendants also incorporate their response to ¶ 127,
*supra*.

**Plaintiffs' Reply ¶ 132**:  Defendants' response does not create a material dispute of fact that

prisoners in the Step-Down Program have significantly less visitation than prisoners in general

population.  Defendants point only to exceptions to the general rule for general population to

dispute this fact, and those exceptions are not sufficient to equate the visitation opportunities for

people in general population with visitation opportunities for people in the Step-Down Program.

VDOC Operating Procedure 801.4 establishes the total number of hours that general population

prisoners may have visitation.  *See* ECF No. 402-27, VDOC O.P. 851.1, Visiting Privileges

(effective April 1, 2021) at 12.  That Operating Procedure provides that prisoners in security

levels W through 5 may have between 1 and 4 hours of visitation per visiting day, and that video

visitation and home internet video visitation are also available.  ECF No. 383-117, O.P. 801.4,

Privileges by Security Level (effective Dec. 1, 2022) at 6.

### E.    Cells

133.    Incarcerated persons in the Step-Down Program are housed in single cells that are

roughly 7-by-10 feet.  Ex. 22, Collins Dep. at 46:22–47:2; *see also* Ex., 66, Haney Rep. ¶ 133,

██████████████████████████████████████████████████████

███████████; Ex. 17, 2023 Arrington Decl. ¶ 9 ("My cell in SM-0 is tiny, even compared

to other prisons in VDOC").

Defendants' SUMF Response ¶ 133: **Disputed / Objection**: Mr. Collins testified that he did not know the exact measurements of the cells. Collis Dep. [ECF No. 383-22] at 47:3-5. Dr. Haney asserts that the cells are 8X10 feet, though he cites generically "documents [he has] reviewed" and his "observations." for those dimensions. Expert Report of Craig Haney, Ph.D., J.D. ("Haney Report") [ECF 383-66] at ¶ 133. Mr. Arrington's Declaration does not identify cell dimensions.

**Plaintiffs' Reply ¶ 133**: Defendants' response does not create a dispute of material fact, in that

the dimensions provided by Defendants are not materially different than those stated in

Plaintiffs' SUMF.

134.    ROSP's cells do not meet standards set by the American Corrections Association

("ACA") for the size of segregation spaces.  Ex. 48, King Dep. at 302:22–303:4.

Defendants' SUMF Response ¶ 134: **Disputed**: The cited testimony refers to "segregation spaces," which refers to exercise areas, not cells. King Dep. [ECF No. 383-48] at 302:22-303:2. Plaintiffs' counsel knows this fact because it was the deficiency identified by Ms. King that counsel asked further questions about. *Id.* at 301:9-14, 302:22-303:2. Plaintiffs' counsel subsequently asked Ms. King about segregation living conditions. *Id.* at 303:9-14. During the audit discussed in Ms. King's deposition, VDOC was not in compliance with two, non-mandatory ACA standards—the recreation space discussed in the response to ¶ 156, *infra*, for which it received a waiver, and the lack of a full-time chaplain, with an accepted plan of action. Committee on Accreditation for Corrections Standards Compliance Reaccreditation Unit Audit of Red Onion State Prison dated October 24–26, 2018 ("ROSP Audit"), attached as Exhibit 29 [VADOC-00132162], at VADOC-00132190–193.

**Plaintiffs' Reply ¶ 134**: Plaintiffs concede that this fact as stated is disputed.  However, there is

no genuine dispute of material fact that ROSP's segregation spaces do not meet standards set by

the ACA for the size of segregation spaces.

135.    Each cell has a steel door that is approximately two inches thick.  Ex. 22, Collins Dep. at

48:13–14.

Defendants' SUMF Response ¶ 135: **Undisputed**.

136.    While prisoners "could at one time" close a flap over a cell door window so that guards could not see in, "those were removed" and "now you can always see in that window into the offender's unit." *Id*. at 52:10–53:2.

Defendants' SUMF Response ¶ 136:  **Disputed**: The cited testimony does not establish that inmates ever could close a flap over the cell door window. Instead, Mr. Collins' testimony suggests he was referring to VDOC staff being able to close the flap "at one time." Collins Dep. [ECF No. 383-22] at 52:10–53:2.

**Plaintiffs' Reply ¶ 136**:  Defendants' response does not create a genuine dispute of material fact, in that Defendants do not dispute that there is no way to close the window into a prisoner's cell in the Step-Down Program, and that "you can always see in that window into the offender's unit."

137.     Ex. 66, Haney Rep. ¶ 133, Photograph 1; *see also* Ex. 67, Thorpe Dep. at 131:3–133:6 (the cell includes a bed, a table, a toilet, and a sink.); Ex. 17, 2023 Arrington Decl. ¶ 9.

Defendants' SUMF Response ¶ 137:  **Undisputed**.

138.     which Ex. 66, Haney Rep. ¶ 133, Photographs 2–4.

Defendants' SUMF Response ¶ 138:  **Undisputed**.

139.    Cells have no mirrors.  Ex. 17, 2023 Arrington Decl. ¶ 9.

Defendants' SUMF Response ¶ 139:  **Undisputed**.

140.    Ex. 66, Haney Rep. ¶ 133.

Defendants' SUMF Response ¶ 140:  **Disputed**: Mr. Arrington's declaration states that the lights "are turned on at 6:00 a.m. and they aren't turned off until 10:00 p.m." Arrington Decl. [ECF No. 383-17] at ¶ 9. The light in the cell does not remain at the same brightness at all times. Defs.' Br. [ECF No. 381] at 21, ¶ 49.

**Plaintiffs' Reply ¶ 140**:  Whether the light in the cell remains at the same brightness at all times is immaterial to the stated fact and should be disregarded.  Non-material facts are not appropriate in a statement in opposition to summary judgment and should be disregarded or stricken.

*Anderson*, 477 U.S. at 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."); *accord HP Tuners, LLC* , 2022 WL 562625, at *1, *5 (granting motion to strike non-material facts); *Knidel*, 189 F. Supp. 3d at 284–85 ("giv[ing] little to no consideration to extraneous factual and legal assertions propounded").  Plaintiffs concede that whether the light is kept on at all times is disputed.

141.    ██████████████████████████████████████    *Id.*

Defendants' SUMF Response ¶ 141:  **Undisputed**.

### 1.    Time Inside and Outside of Cell

142.    Conditions of confinement in the Step-Down Program include limited out-of-cell time.  *Id.* ¶ 134.

Defendants' SUMF Response ¶ 142:  **Undisputed**.

143.    For Level S offenders, out-of-cell time consists of outdoor recreation, shower time, and kiosk time (e.g., for downloading music).  Ex. 22, Collins Dep. at 68:19–21, 78:9–16; Ex. 34, Mefford Dep. at 73:18–74:1; Ex. 68, Manis Dep. at 210:11–15, 217:14–22.  Time spent in programming also counts toward out-of-cell time totals.  Ex. 11, Duncan Dep. at 96:21–97:3.

Defendants' SUMF Response ¶ 143:  **Disputed in part**: Plaintiffs' second statement contradicts their first statement. An inmate's out-of-cell time does not "consist[] of outdoor recreation, shower time, and kiosk time" where it also includes programming.

**Plaintiffs' Reply ¶ 143**:  Defendants' response does not create a genuine dispute of material fact.  Plaintiffs' original statement indicates that out of cell time includes all of the following: outdoor recreation, shower time, kiosk time, and time spent in programming.  Nothing in Plaintiffs' original statement is internally inconsistent or contradictory.

144.    The amount of outdoor recreation time that incarcerated persons in the Step-Down Program are permitted has changed over the life of the Program.  The 2012 Step-Down Manual provided that people at all levels of the Step-Down Program were permitted one hour per day of outside recreation.  Ex. 1, 2012 Step-Down Manual at -740, -746; *see also* Ex. 15, 2023 Wall Decl. ¶¶ 10, 19.  The 2017 Step-Down Manual provided that people at all levels of the Step-Down Program were permitted 2 hours per day of outside recreation.  Ex. 26, VADOC-00053104 at -157, -165 (2017 Step-Down Manual); *see also* Ex. 66, Haney Rep. ¶ 136.  The 2017 Step-Down Manual provided that individuals in Phase 1 and 2 of the Level 6 Step-Down Program should have outdoor recreation time for one hour, three times a week in one portion of the manual, and in another portion of the manual that they should have two hours of outdoor recreation time per day.  Ex. 10, VADOC-00002765 at -799, -818, -826 (2017 Step-Down Manual).

Defendants' SUMF Response ¶ 144:  **Undisputed**.

145.    On September 14, 2018, VDOC issued a memo setting recreation times as follows:

██████████████████████████████████

██████████████████████████████████



Ex. 69, VADOC-00150626 (Mathena Ex. 2).

Defendants' SUMF Response ¶ 145:  **Undisputed**.

146.    One VDOC employee testified that the increase in out-of-cell time mandated by the

September 14, 2018 memo was the "first time since the step-down program became operational

that the amount of hours out of cell were increased," even though parts of the 2017 Step-Down

Manual called for 2 hours of recreation time per day.  Ex. 4, Mathena 30(b)(6) Dep. at 37:11–19;

*but see* Ex. 10, VADOC-00002765 at -818, -826.

Defendants' SUMF Response ¶ 146:  **Disputed**: Mr. Mathena did not unequivocally state that
the September 14, 2018 memo represented the first time that the amount of time out of cell was
increased.  Immediately after saying that he believed that to be the case, without the benefit of
actually being shown the Step-Down Manual, he noted that he said it "with a question mark."
Transcript of Randall Mathena 30(b)(6) Deposition dated April 4, 2023 ("Mathena 30(b)(6)
Dep."), cited portions attached as Exhibit 30 at 37: 11-19. In response to the next question, he
testified that the ACA policy (with which VDOC was in compliance) was two hours at one point
and that VDOC wanted to exceed the two hours. *Id.* at 37:20-38:6.

**Plaintiffs' Reply ¶ 146**:  Defendants' response does not create a genuine dispute of material

fact.  Defendants do not point to any other evidence, either from Mr. Mathena's deposition or

elsewhere in the record, that contradicts Mr. Mathena's 30(b)(6) testimony on behalf of VDOC,

for which Defendants maintained he was adequately prepared.  *See* ECF No. 402-2, Apr. 13,

2023 E-mail from M. Eckstein to V. Agraharkar, et al. at 10–11 (setting forth Defendants'

position that Mr. Mathena was adequately prepared to testify on his designated topics).  Nor does

Defendants' response cite any evidence to show that VDOC was in compliance with any ACA

policy requiring two hours out-of-cell time.  In fact, the ACA audit documents that Defendants

cite for the proposition that they are accredited by ACA indicate that, as late as October 2021,

people in Level S were allowed ███████████████████████████████████████████

████████████████████████████ ECF No. 381-37, VADOC-00174801 at -841 (2022

ACA Accreditation Report for ROSP); *see also* ECF No. 381-36, VADOC-00132162 at -180

(noting in 2018 that █████████████████████████████████████████████████

███████████████████) (2018 ACA Standards Compliance Reaccreditation Audit of

ROSP).

147.    After Plaintiffs filed suit, in August 2019, VDOC purported to begin to offer prisoners in

restrictive housing three hours of out-of-cell time seven days per week pursuant to a directive by

now-former VDOC Director Clarke.  Ex. 14, Clarke Dep. at 245:9–20.

Defendants' SUMF Response ¶ 147:  **Disputed**: Plaintiffs offer no evidence that VDOC
"purported to begin" offering the out-of-cell time. VDOC did begin offering it. Duncan Decl.,
Exhibit 12 at ¶ 7. Defendants also dispute the suggestion that VDOC increased out-of-cell time
to three hours/day as a result of this lawsuit. Mathena Decl., Exhibit 18 at ¶ 7.

**Plaintiffs' Reply ¶ 147**:  Defendants' response does not create a genuine dispute of material

fact.  Moreover, to the extent Defendants purport to identify with what the fact may "suggest[],"

that is insufficient to create a relevant dispute of fact.  Whether VDOC did or did not actually

begin offering three hours out-of-cell time is irrelevant to this SUMF; the cited testimony speaks

for itself and is fairly characterized as describing that the increase in out-of-cell time in August

2019 was as a result of then-Director Clarke's directive.  Ms. Duncan's declaration does not

contradict that testimony, nor does it lay any foundation for her statement that ROSP in fact

began offering a minimum of three hours of out-of-cell time to prisoners in the Step-Down

Program in August 2019.  Nor does it cite to any evidence in the record to support that

conclusory assertion.  *See*, *e.g.*, *Coffey*,  1993 WL 318886, at *3 ("Coffey's self serving

testimony which is utterly lacking in foundation does not establish a genuine issue of material

fact.").

148.    A memo issued in September 2019 and effective in January, 2020, "changed the policy to

give everyone in level S four hours out of cell."  Ex. 4, Mathena 30(b)(6) Dep. at 47:5–8; Ex. 70,

VADOC-00118556 (Mathena Ex. 3); *see also* Ex. 66, Haney Rep. ¶ 136.  There have not "been

any subsequent policy changes to the number of hours people in Level S are allowed out of cell"

since the September 2019 memo.  Ex. 4,  Mathena 30(b)(6) Dep. at 47:17–20.

Defendants' SUMF Response ¶ 148:  **Disputed in part**: The September 2019 memorandum
states that inmates in restrictive housing units "will be provided the opportunity to participate in
a ***minimum*** of four hours out of cell activity, seven days a week." ECF No. 383-70 at VADOC-
00118556 (Emphasis added).

**Plaintiffs' Reply ¶ 148**:  Defendants' response does not create a genuine dispute of material

fact.  Mr. Mathena's 30(b)(6) testimony is binding upon VDOC and describes what the memo

was understood to mean in practice, regardless of the actual wording of the memo.

149.    Today, the amount of out-of-cell time allotted by VDOC policy for incarcerated persons

at Level S and Level 6 depends on security and privilege level, and ranges from four to six hours

per day.  Ex. 22, Collins Dep. at 94:20–95:15.

Defendants' SUMF Response ¶ 149:  **Disputed**: The out-of-cell time values noted by Plaintiffs
are minimums. Collins Dep. [ECF No. 383-22] at 93:17-94:4.

**Plaintiffs' Reply ¶ 149**:  Defendants' response does not create a genuine dispute of material

fact, in that it does not cite to any evidence in the record that contradicts Plaintiffs' statement of

fact.  The subject of Plaintiffs' SUMF paragraph 149 is the amount of time "allotted," or

required, under VDOC policy.  Ex. 132, Collins Dep. at 94:9–19 ("Q:  And it's [sic] accurate that

by policy, as of 2020, you were required to offer [sic] Level S offenders four hours of out-of-cell

time per day?  A:  Yes.").  This is not materially different than "minimum" time values, contrary

to Defendants' assertion.  Plaintiffs clarify that the language "ranges from four to six hours per

day" in Plaintiffs' SUMF paragraph 149 refers to the time allotted for Level S and Level 6,

respectively.

150.    In practice, however, many prisoners often spend less than four hours out-of-cell per day.

In February 2021, "none of the units in Level S or Level 6 were getting out of cell for the full

amount of time that they were entitled to under policy."  Ex. 4, Mathena 30(b)(6) Dep. at 85:12–

17.  "Each of the units in Level S were getting 2.8 hours … max hours per day."  *Id*. at 85:21–

86:2; *see also* Ex. 66, Haney Rep. ¶ 136 (citing Mathena Dep. Ex. 5) ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ ); Ex. 17, 2023 Arrington Decl. ¶ 12

("The amount of time we are allowed to take for recreation varies.").

Defendants' SUMF Response ¶ 150:  **Disputed**: The material cited by Plaintiffs does not support
their allegation. Plaintiffs' base their characterization that "many prisoners often spend less than
four hours out-of-cell per day" on testimony about a single document showing three months of
data in the first quarter of 2021, i.e., during the COVID-19 Delta variant outbreak. Collins Dep.
[ECF No. 383-22] at 121:20-122:6. The characterization of Defendants' expert is based on the
same document. Mr. Arrington's declaration is too vague to establish Plaintiffs' allegation as an
undisputed fact.

**Plaintiffs' Reply ¶ 150**:  Defendants' response does not create a genuine dispute of material

fact.  The stated fact that "[i]n practice, however, many prisoners often spend less than four

hours out-of-cell per day[]" is supported by additional facts in Plaintiffs' SUMF paragraphs 151

through 159, most of which Defendants do not attempt to dispute.

151.    Unit Manager Larry Collins receives a daily report of out-of-cell hours offered to

inmates.  Ex. 22, Collins Dep. at 92:22–93:9; 93:17–94:4.

Defendants' SUMF Response ¶ 151:  **Undisputed**.


152.    Around April 2021, Collins noticed that documentation on out-of-cell time showed that,

"offenders who were in Level S were, on average, being offered less than four hours of out-of-

cell time per day."  *Id*. at 122:22–123:5; *see also* Ex. 66, Haney Rep. ¶ 136 (citing Ex. 22,

Collins Dep. at 121:4–12, 122:22–123:5, 129:10–18) ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ ).

Defendants' SUMF Response ¶ 152:  **Objection**: Dr. Haney's characterization of deposition
testimony constitutes opinion, not facts. Mr. Collins' testimony speaks for itself.

**Plaintiffs' Reply ¶ 152**:  Defendants' response does not create a genuine dispute of material

fact, because even if Defendants' objection regarding Dr. Haney's report was well-founded (and

it is not), Mr. Collins' testimony establishes the fact at issue and is not disputed.


153.    On April 5, 2021, Collins emailed his staff, ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Ex. 71, VADOC-00158348 (Collins Ex. 47).

Defendants' SUMF Response ¶ 153:  **Undisputed**.


154.    VDOC employees and officials acknowledge that incarcerated persons have been denied out-of-cell time, including because of prison-wide quarterly shake-downs, holidays, and inclement weather.  *See, e.g.*, Ex. 33, Turner Dep. at 272:9–276:11.  Certain of these events can result in the denial of out-of-cell time for significant periods of times.  For example, during regular shakedowns, incarcerated persons in the Step-Down Program may be entirely confined to their cells for 7–10 days at a time.  Ex. 22, Collins Dep. at 110:8–9; 111:7–11.

Defendants' SUMF Response ¶ 154:  **Objection**: Plaintiffs' characterization of "significant periods of time" is argument, not facts.

**Plaintiffs' Reply ¶ 154**:  Defendants' objection is not well-founded.  Plaintiffs clarify that an example of an "extended period of time" would be 7–10 days.  Further, any characterization of this length of time is not material to establishing the underlying fact, which is not disputed.


155.    Out-of-cell time can be denied or limited for various reasons.  For example, because there are no restrooms in the recreation cages, if an incarcerated person needs to use the restroom during his recreation time, an officer will take him back to his cell and the incarcerated person will forfeit the rest of his recreation time.  *See* Ex. 47, Younce Dep. at 236:17–237:2; Ex. 72, Snodgrass Dep. at 108:7–9 ████████████████████████████ ████████████████████████████████).  The length of recreation time could also be affected by the number of incarcerated persons who want recreation that day, ████████████████████████████ Ex. 11, Duncan Dep. at 233:15, 19–21.

<u>Defendants' SUMF Response ¶ 155</u>: **Disputed / Objection**: The testimony of Mr. Snodgrass, whose own expert opined that he fabricated allegations during his clinical interview and testing, Hendricks Report, ECF No. 368-1 at ¶ 90-91, should not be used to establish any fact as undisputed. Further, although Ms. Duncan testified that the amount of time at "recreation" could be affected by the number of inmates who want recreation that day, she also noted that the additional out-of-cell time would be provided by other means, like the socialization tables—"we utilize all of it, everything that we have, all of our tools we have in place to maximize the out-of-cell time, which doesn't – is not defined by recreation." Duncan Dep. [ECF No. 383-11] at 232:12-234:11.

**<u>Plaintiffs' Reply ¶ 155</u>**: Defendants' response does not specify which portion of the paragraph is disputed and which is objected to. Defendants' objection on the basis of Mr. Snodgrass's credibility as to certain allegations is not a basis to argue that he is not competent to testify generally or to exclude his testimony on points on which he has not been impeached. Further, Defendants ignore that Plaintiffs do not rely solely on Mr. Snodgrass's testimony to establish the fact in this paragraph. Defendants' citation to Ms. Duncan's testimony that recreation time can be affected by the number of inmates who "want" recreation that day (which Plaintiffs do not concede) is further support for Plaintiffs' SUMF that "[o]ut-of-cell time can be denied or limited for various reasons." As such, Defendants have failed to create any genuine dispute of material fact.

156.    When incarcerated persons in the Step-Down Program are provided with recreation time, they are placed in a recreation cage. Ex. 66, Haney Rep. ¶ 138. The recreation cage is about eight by ten feet, made out of chain link fence with Plexiglas around it. Ex. 22, Collins Dep. at 63:2–17, 63:18–64:5. The recreation cages are empty and prisoners are not provided any recreational equipment or toilet facilities. Ex. 16, 2023 Cornelison Decl. ¶ 21; Ex. 50, 2023 Cavitt Decl. ¶ 27; Ex. 66, Haney Rep. ¶ 138.

<u>Defendants' SUMF Response ¶ 156</u>: **Disputed in part**: The Red Onion State Prison recreation cages are 96 square feet. ROSP Audit, Exhibit 29 [VADOC-00132162], at VADOC-00132191.

**Plaintiffs' Reply ¶ 156**:  Defendants' response does not create a dispute of material fact, in that the dimensions provided by Defendants are not materially different than those stated in Plaintiffs' SUMF.

157.    An ACA inspection found that the recreation cages at ROSP were smaller than the cage size recommended by the ACA.  Ex. 48, King Dep. at 301:9–14.

Defendants' SUMF Response ¶ 157:  **Disputed in part**: The ACA provided VDOC a waiver on the size of the recreation cages due to the availability of space and building costs. *Id.* at VADOC-00132192. King Dep. [ECF No. 383-48] at 302:22-303:4.

**Plaintiffs' Reply ¶ 157**:  Defendants' response does not create a genuine dispute of material fact; it merely provides additional information but does not contradict the fact as stated by Plaintiffs.

158.    Dogs are stationed near the recreation cages, and there have been instances in which incarcerated persons have been attacked or bitten while engaging in recreation.  Ex. 66, Haney Rep. ¶ 140; ECF No. 174-28 ¶ 4 (Wall Aff.).

Defendants' SUMF Response ¶ 158:  **Disputed in part**: The material cited by Plaintiffs does not support their allegation that inmates "have been attacked or bitten while engaging in recreation." Plaintiffs' expert cites only Mr. Wall's declaration for the allegation. Mr. Wall's declaration states only that he received a dog bite "while on the yard," not while "engaging in recreation" and omits the fact that he was engaged in a fight with another inmate and had refused several direct orders to stop fighting at the time he was bitten. *See, e.g.,* Incident Report, attached as Exhibit 31[VADOC-00147996].

**Plaintiffs' Reply ¶ 158**:  Defendants do not dispute that dogs are stationed near the recreation cages. ECF No. 383-2, VADOC-00053480 at -492 ███████████████████ ███████████████████████████████████████████████████ ██████████████████████████████ (2020 Step Down Manual);

ECF No. 400-50, Haney Rep. ¶ 140 (describing the dogs' aggressive behavior and reporting

instances of dog attacks and bites).  Plaintiffs concede that the remainder of this fact is disputed.

159.    Out-of-cell programing other than recreation time is limited.  Ex. 66, Haney Rep. ¶ 142.

Programming at IM-0 and SM-0 is conducted entirely in-cell.  Ex. 4, Mathena 30(b)(6) Dep. at

199:22–200:7 ("people at the lowest level of Level S, meaning SM-0 or IM-0, don't have access

to programming other than the challenge series.").  When out-of-cell programming occurs at

other privilege levels, ████████████████████████████████████████████████████████████

████████████████████████████████████     Ex. 66, Haney Rep. ¶ 142, Photographs 8–9.

Programming may also take place in what VDOC refers to as ████████████████████  in which

incarcerated persons are also restrained.  Ex. 66, Haney Report ¶ 142, Photograph 7.

Defendants' SUMF Response ¶ 159:  **Disputed in part**: Out-of-cell programming at other
privilege levels is not limited to program chairs or therapeutic modules. Inmates in Sl-6 can have
unrestrained programming. 2020 Step-Down Manual [ECF 383-2] at VADOC-00053511-512
(programming delivered in "Secure Chairs or small groups in pod;" programming "conducted in
small groups").

**Plaintiffs' Reply ¶ 159**:  Defendants' response does not create a dispute of material fact.

Defendants do not dispute the first two sentences of Plaintiffs' SUMF paragraph 159, so those

facts should be treated as wholly undisputed.  Nor do they dispute that programming may take

place in program chairs or "therapeutic modules."  Regarding whether out-of-cell programming

at other privilege levels is "limited to" program chairs and therapeutic modules, Defendants have

still failed to identify a genuine dispute of material fact.  That a certain subgroup of SL-6 inmates

*may* be allowed unrestrained programming does not create a genuine dispute as to the stated fact,

let alone a *material* one, that out-of-cell programming at privilege levels other than IM-0 and

SM-0 occurs in "program chairs" or "therapeutic modules."  The Manual cited by Defendants is

clear that:  In Level 1 of the SL-6 Closed Pod, prisoners ████████  in program chairs; only at

Level 2 of the SL-6 Closed Pod are they potentially able to have programming in small groups

and individuals in such small groups are still, at least sometimes, restrained.  ECF No. 383-2,

VADOC-00053480 at -501 (specifying for IM SL-6 Closed Pod Level 2 inmates that

██████████████████████████████████ and for SM SL-6 for SIP, SAM, and

Step-Down pods█████████████████████████████████ (2020

Step-Down Manual) (emphasis added).  Further, the Step-Down Manual pages cited by

Defendants refer to protocols for the SIP, SAM, and SL-6 Step-Down units only and do not

require programming to be unrestrained.  Defendants note the term "Secure Chairs" and

Plaintiffs take this as referring to "Security Chairs" that restrain a person's movement.  ECF No.

383-2, VADOC-00053480 at -493 (Figure 2 shows a "Security Chair" which appears to include

binding the wrists of persons sitting at the chair); *see also* Ex. 120, Haney Rep. at 131 (showing

pictures of "Security Chairs" in D-Building).


## 2.    Security Restrictions

160.    Incarcerated persons in Level S are subject to additional security restrictions, as

compared to incarcerated persons housed in the prison's general population.  Ex. 117, VDOC

O.P. 801.4 (effective Dec. 1, 2022) at 4, https://vadoc.virginia.gov/files/operating-

procedures/800/vadoc-op-801-4.pdf; Ex. 33, Turner Dep. at 210:10–16, 213:1–3.

Defendants' SUMF Response ¶ 160:  **Undisputed**.


161.    Incarcerated persons in Security Level S receive meals in their cell; those in the general

population typically eat communally.  Complaint ¶ 98; Answer ¶ 98.

Defendants' SUMF Response ¶ 161:  **Undisputed**.

162.     Incarcerated persons in Security Level S are all assigned to individual cells; those in the general population usually have a cell partner.  Ex. 33, Turner Dep. at 188:17–18, 189:3–5.

Defendants' SUMF Response ¶ 162:  **Undisputed**.


163.     Incarcerated persons in Security Level S recreate alone in recreation cages as described above; those in the general population have outside recreation with a group of inmates, and can play basketball or go to the gym.  *Id*. at 189:6–10, 191:12–13, 211:7–8.

Defendants' SUMF Response ¶ 163:  **Undisputed**.


164.     Incarcerated persons in Security Level S begin programming alone in their cells.  Ex. 2, 2020 Step-Down Manual at -499.  People in the IM pathway will continue to program in their cells ████████████████████████████████████████████
████████████████████████████████████  *Id*. at -501.

Defendants' SUMF Response ¶ 164:  **Undisputed**.


165.     Out-of-cell programming in Level S is conducted while restrained in ████████████ or ████████████  those in the general population do not need to conduct programming in program chairs or therapeutic modules.  Ex. 33, Turner Dep. at 188:15–17, 211:3–5.  People in IM-0 conduct programming alone in their cells.  *Id*.

Defendants' SUMF Response ¶ 165:  **Undisputed**.


166.     Incarcerated persons in Security Level S undergo strip searches every time they are brought out of their cells; there are many times a general population inmate does not need to be strip searched when leaving his cell.  *Id*. at 189:13–20; Complaint ¶ 108; Answer ¶ 108; Ex. 66,

Haney Rep. ¶ 135 (prisoners in the Step-Down Program ████████████████████

████████████████████████████████████████).

Defendants' SUMF Response ¶ 166:  **Disputed in part**: The characterization of Plaintiffs' expert
of a strip search as an "intrusive cavity search" is incorrect. A strip search is distinctly different
from, and less intrusive than, a cavity search. Robinson Dep., Exhibit 23 at 141:20-142:14
(explaining the differences between strip searches and cavity searches).

**Plaintiffs' Reply ¶ 166**:  Defendants' response does not create a dispute of material fact, in that

the term used to describe a strip search is not material and the Defendants' do not dispute the

substance of Plaintiffs' stated fact.  *See* Ex. 119, Robinson Dep. at 142:17–146:5 (noting, for

instance, that the strip search performed whenever Level S prisoners leave their cells requires

looking inside prisoners' mouths, requires prisoners to spread their cheeks to examine their anus,

and requires them to raise their testicles, etc.).

167.    Incarcerated persons in Security Level S are typically restrained using handcuffs and leg

irons while outside of their cell; those in the general population can come out of their cell

unrestrained.  Ex. 33, Turner Dep. at 188:12–14, 190:12–13, 210:18–19; Ex. 2, 2020 Step-Down

Manual at -492–93.

Defendants' SUMF Response ¶ 167:  **Undisputed**.

### 3.    VDOC's Awareness of the Conditions of Confinement

168.    VDOC officials are aware of the above stated and other conditions of confinement in the

Step-Down Program through direct observation and prisoner's grievances about these conditions.

Ex. 14, Clarke Dep. at 116:6–8.

Defendants' SUMF Response ¶ 168:  **Disputed**: The deposition testimony cited by plaintiffs
does not support their allegation. Mr. Clarke testified only that he receives information about
"[e]verything from food, to noise, to their sentence structure, good time, you name it." Clarke
Dep. [ECF No. 383-14] at 116:6–8. Further, the testimony of one person testifying in his

individual capacity— even if the Director of VDOC—does establish what "VDOC officials are aware of." Defendants also incorporate by reference their responses to the "above stated" paragraphs, *supra*.

**Plaintiffs' Reply ¶ 168**:  Defendants' response does not create a dispute of material fact, in that it does not dispute Mr. Clarke's testimony and ignores that Plaintiffs' SUMF paragraphs 169 through 175 also support the allegation that "VDOC officials are aware of the above stated and other conditions of confinement in the Step-Down Program through direct observation and prisoner's grievances about these conditions," most of which are undisputed.

169.    Larry Collins, an ROSP Unit Manager, testified that he receives a daily report of out-of-cell hours offered to inmates and that he has for "at least probably the last three years."  Ex. 22, Collins Dep. at 92:22–93:9; 93:17–94:4.

Defendants' SUMF Response ¶ 169:  **Undisputed**.

170.    Randall Mathena, VDOC's Director of Security and Correctional Enforcement, testified that he takes "steps to monitor the concerns that offenders in level S or 6 are raising."  Ex. 18, Mathena Dep. at 379:2–12.

Defendants' SUMF Response ¶ 170:  **Undisputed**.

171.    Dr. Everett McDuffie, a consultant psychiatrist who works at ROSP, testified that he's been on ██████████████ to discuss prisoner litigation, hunger strikes, and housing.  Ex. 52, McDuffie Dep. at 43:4–15; 44:2–45:3.

Defendants' SUMF Response ¶ 171:  **Disputed in part**: Dr McDuffie did not testify that he had been on multiple group phone calls regarding the alleged subject. Rather his testimony was in reference to a single phone call. Videotaped Deposition of Everett Ellison McDuffie dated April 14, 2023 [ECF No. 383-52] at 43:4-15.

**Plaintiffs' Reply ¶ 171**:  Defendants' response mischaracterizes Dr. McDuffie's testimony.  It is clear that he is testifying about what happened on group calls that he regularly participated in, not just one phone call.  *See, e.g.*, ECF No. 383-52, McDuffie Dep. at 45:1–4 (████████████████

████████████████████████████████████

████████████ ).

172.    Michael Younce, a former Unit Manager at ROSP, testified that he would make rounds by cells in his unit every day.  Ex. 47, Younce Dep. at 32:5–8; 33:2–3; 57:5–6.

Defendants' SUMF Response ¶ 172:  **Undisputed**.

173.    Similarly, Carl Manis, VDOC's Regional Administrator for the Central Region, testified that he would make rounds at WRSP when he was the Warden there, including through the D building, which "had some of your restorative housing, and then they also had D3, which was the SMI program, the HSDTP program," and he would sometimes do these rounds with the unit manager or the major.  Ex. 68, Manis Dep. at 65:1–11; 66:13–16; 67:6–10.

Defendants' SUMF Response ¶ 173:  **Disputed in part / Not Material**: The rounds testified to by Mr. Manis were not "similar[]" to the daily rounds made by Mr. Younce. The cited testimony does not identify the frequency with which Mr. Manis conducted rounds while at WRSP. Further, Mr. Manis became warden of WRSP around August 1, *2017*. Videotaped Transcript of Carl Alan Manis, dated February 22, 2023 ("Manis Dep."), cited portions attached as Exhibit 32, at 63:13-22. Plaintiffs' Statement ¶ 5 states as an undisputed fact that inmates were held in the Step-Down Program at WRSP before *2016*.

**Plaintiffs' Reply ¶ 173**:  Defendants' response does not create a dispute of material fact.  Mr. Manis's testimony speaks for itself and Defendants do not dispute it but seek to introduce additional information that does not contradict Plaintiffs' stated fact.  Moreover, Defendants do not explain why this testimony would be immaterial.

174.    VDOC employees also expressed concerns over the mental health of inmates in

segregation.  A February 2, 2012 email exchange among VDOC mental health staff discussed

whether ███████████████████████████████████████████████████████████████████

Ex. 73, Lee Dep. at 150:6–20; Ex. 74, VADOC-00044033 (Lee Ex. 22).

Defendants' SUMF Response ¶ 174:  **Disputed in part**: The material cited by Plaintiffs does not
establish that "VDOC employees also expressed concerns over the mental health of inmates in
segregation." They reflect only that the then-warden at WRSP wanted the mental health staff at
that facility to respond to a question regarding inmate mental health in light of a recently-made
proposal by the ACA.

**Plaintiffs' Reply ¶ 174**:  Defendants' response does not create a dispute of material fact.  The

record shows that VDOC employees expressed concerns over the mental health of inmates in

segregation.  *See, e.g.*, ECF No. 400-56, VADOC-00163433 at -440 (email from Tori Raiford to

David Robinson, Randall Mathena, Denise Malone, Scott Richeson, and Wendy Beckstoffer,

stating in part: ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████ ).

175.    As of 2018, Dr. Denise Malone, VDOC's Chief of Mental Health and Wellness, and Dr.

William Lee, a former mental health supervisor, would receive a notification when ██████████

████████████████████████████████████████████████████  Ex. 73, Lee Dep. at

180:18–181:5.

Defendants' SUMF Response ¶ 175:  **Disputed in part**: "[H]ad a mental health code" in this
context means the inmate had an MH1 or higher mental health code. Videotaped Deposition of
Dr. William Lee dated March 15, 2023 ("Lee Dep.") [ECF No. 383-73] at 182:19-22. Neither the
cited testimony nor the exhibit referenced in that testimony distinguishes between restrictive
housing for Security Level 5 inmates at ROSP and restrictive housing subject to the Step-Down
Program at issue in this case. *Id.* at 180:18–181:5; Email from Terrance Huff to Denise Malone
dated August 30, 2018, attached as Exhibit 33 [Lee Deposition Exhibit 27].

**Plaintiffs' Reply ¶ 175**:  Defendants' response does not create a genuine dispute of material fact; it merely provides additional information but does not contradict or change the nature of the fact as stated by Plaintiffs.

### III.    Mental Healthcare Within the Step-Down Program

####     A.    VDOC Does Not Screen Mentally Ill Persons Out of the Step-Down Program.

176.    Until 2017, the VDOC policies governing the intake process at ROSP did not provide for a mental health evaluation.  Ex. 1, 2012 Step-Down Manual at -704; Ex. 10, VADOC-00002765 at -783 (2017 Step-Down Manual).

Defendants' SUMF Response ¶ 176:  **Disputed**. VDOC policy has required, since the beginning of the Step-Down Program, that inmates placed in the program be screened by a QMHP before their placement or within one working day of their placement in the program. Defs.' Br. [ECF No. 381] at 30, ¶ 83. *See also* Operating Procedure 730.2 with Effective Date November 1, 2012 ("O.P. 730.2 (2012)"), attached as Exhibit 34 [VADOC-00002892], at 2 ("Each offender will receive an initial mental health screening at the time of admission to a DOC facility to identify those with mental health needs;" for "intra-system transfers," that screening should be conducted "by health trained or qualified health care personnel upon arrival at a facility," and must include, *inter alia*, inquiry into suicidal ideation or history, whether the inmate has been prescribed psychotropic medication, has a current mental health complaint, is being treated for mental health issues, and has a history of mental health treatment, and also requires observation of the inmate's general appearance, any evidence of abuse or trauma, and whether there are current symptoms of psychosis, depression, anxiety, or aggression); Operating Procedure 730.5 with Effective Date September 1, 2012 ("O.P. 730.5 (2012)"), attached as Exhibit 35 [VADOC-00003034], at 3 ("All intra-system (within the DOC) transfer offenders will receive an initial mental health screening by trained staff at the time of admission ….").

**Plaintiffs' Reply ¶ 176**:  Plaintiffs concede that this fact is disputed.

177.    There is no formal health screening that takes place prior to classifying an incarcerated person as Level S.  Ex. 48, King Dep. at 170:10–14.

Defendants' SUMF Response ¶ 177:  **Disputed in part**: A health assessment is performed before the inmate is placed in restrictive housing, King Dep. [ECF No. 383-48] at 169:21-170:9, and also upon intake at a new facility following transfer from one VDOC institution to another, Operating Procedure 730.2 ("O.P. 730.2") [ECF No 383-78] at 2–3, 4–5.

**Plaintiffs' Reply ¶ 177**:  Defendants' response does not create a dispute of material fact.

Defendants offer no evidence that a formal health screening occurs prior to classifying an

incarcerated person as Level S (which is distinct from the placement of an incarcerated person in

restrictive housing).


178.    No mental health evaluation is conducted as part of the decision to classify an

incarcerated person as Level S.  Ex. 11, Duncan Dep. at 69:8–15; Ex. 15, 2023 Wall Decl. ¶ 8.

Defendants' SUMF Response ¶ 178:  **Disputed**: The material cited by Plaintiffs does not support
their allegation. Ms. Duncan's testimony references scored security levels; SL-S is not a scored
security level. Mr. Wall alleges that he did not have a mental health evaluation before entering
the Step-Down Program, not that he did not have one before the decision was made to classify
him as SL-S.

**Plaintiffs' Reply ¶ 178**:  Defendants cite no evidence in their response to this statement and

have therefore failed to create a factual dispute.  *See Salmon v. Cable & Wireless USA, Inc.*,

2003 WL 1730413, at *4 (D. Md. Mar. 18, 2003) (granting summary judgment in movant's favor

where non-moving party offered "bare conclusory assertions").  Nevertheless, their response is

contradicted by evidence in the record that shows there is no mental health evaluation that is

conducted as part of the decision to classify an incarcerated person as Level S.  *See, e.g.*, ECF

No. 383-2, VADOC-00053480 at -489 ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ ) (2020 Step-Down Manual); Ex 128, Mathena Dep. at 237:3–237:9 ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ).

179.    No formal health screening takes place prior to assigning an incarcerated person to either

the IM or SM pathway.  Ex. 48, King Dep. at 170:15–19.

Defendants' SUMF Response ¶ 179:  **Disputed**: Although Plaintiffs reference to "formal health
screening" is vague, but Ms. King testified that heath screening does occur when an inmate is
transferred from general population to restrictive housing, which occurs before the inmate is
assigned to a pathway. King Dep. [ECF No . 383-48] at 169:21-170:4; *see also* Operating
Procedure 720.2 ("O.P. 720.2"), attached as Exhibit 36, ("All inmates will receive a medical and
mental health screening by health-trained staff or a health care provider upon arrival to a
facility.").

**Plaintiffs' Reply ¶ 179**:  Defendants' response does not create a dispute of material fact.  People

may be transferred to restrictive housing months before they are assigned to either the IM or SM

pathway (and these are separate decisions), during which both their physical and mental health

status could change.  *See, e.g.*, Ex. 134, VADOC-00175822 at lines 20222–54 (showing that Mr.

Riddick was consistently housed at ROSP and moved among segregation units, and thus would

not have received a health screening upon placement from general population to segregation or

transfer from one facility to another), lines 19905–09 (showing that Mr. Cornelison was placed

in Segregation-Administration status on December 28, 2015 and remained in segregated status

until he was placed in IM-0 on June 21, 2016, though he was transferred from Sussex to ROSP in

the meantime, so he would have had an intrasystem transfer exam then) (Internal Status

Spreadsheet).

180.    An incarcerated person deemed at risk of deterioration in restorative housing can still be

placed in the Step-Down Program.  Ex. 19, Malone 30(b)(6) Dep. at 151:4–8.

Defendants' SUMF Response ¶ 180:  **Undisputed**.

181.    The absence of a present mental health complaint during an incarcerated person's intake

screening at ROSP does not mean the absence of a mental health condition.  Ex. 52, McDuffie

Dep. at 254:6–9.

Defendants' SUMF Response ¶ 181:  **Undisputed**.


182.    About half of the annual acts of self-injurious behavior among people in VDOC custody

████████████████████████ and with ████████████████████████ Ex. 73, Lee Dep. at

189:14–190:20; Ex. 75, VADOC-00131129 at -134 (Lee Dep. Ex. 31) at slides 2, 4.

Defendants' SUMF Response ¶ 182:  **Disputed in part**: The material cited by Plaintiffs does not
support their allegation for any year other than 2018. Further, the reference to "restrictive
housing" applies not only to the Step-Down Program at issue in this litigation, but to all forms of
restrictive housing, including short-term restrictive housing.

**Plaintiffs' Reply ¶ 182**:  Defendants' response does not create a genuine dispute of material

fact; it merely provides additional information but does not contradict the fact as stated by

Plaintiffs.


183.    149 out of 186 incarcerated persons with mental health codes at ROSP were housed in

restrictive housing in February 2012.  Ex. 75, VADOC-00161495 at -497 (Lee Dep. Ex. 36); *see*

*also* Ex. 18, Mathena Dep. at 527:12–528:20.

Defendants' SUMF Response ¶ 183:  **Disputed / Not Material**: The material cited by Plaintiffs
does not support their allegation. Neither the cited document nor the cited testimony says
anything about the number of inmates with mental health codes at ROSP. Further, the number of
inmates with mental health codes at ROSP housed in restrictive housing in February 2012,
before the Step-Down Program was implemented, is material.

**Plaintiffs' Reply ¶ 183**:  Defendants have failed to create a genuine dispute of fact as to the

number of incarcerated persons with mental health codes at ROSP in restrictive housing in

February 2012.  *See* ECF No. 383-103, VADOC-00161495 at -496–97 (Email from Richard

Saylor to Randall Mathena).[10]  Moreover, Defendants' response is internally inconsistent as they say the fact is "not material" but then admit that "the number of inmates with mental health codes at ROSP in restrictive housing in February 2012 . . . is material."  In any event, Defendants have not explained why the fact would not be material to Plaintiffs' claims, which is insufficient under Rule 56.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").

184.    More than one hundred incarcerated persons in restrictive housing at ROSP have been prescribed SSRIs, a medication used to treat depression, PTSD, and anxiety.  Ex. 52, McDuffie Dep. at 309:4–13.

Defendants' SUMF Response ¶ 184:  **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. It establishes only that "at least 100 of [Dr. McDuffie's] patients are prescribed to SSRIs or antipsychotic … medications," McDuffie Dep. [ECF No. 383-52] at 309:4-8, and that he "prescribe[s] antidepressants for anxiety, PTSD, and depression." *id.* at 309:12-13. Dr. McDuffie did not specify whether his response was limited to inmates in restrictive housing, in long-term restrictive housing, or the time period covered by his response.

---

[10] Although a clerical error caused Plaintiffs to misidentify the cited evidence as Exhibit 75, the document was correctly identified as VADOC-00161495, a document produced in this litigation by Defendants, and was attached as Exhibit 103 to the Amended Declaration of Vincent Glynn, Jr. (ECF No. 383-120).  *See* ECF No. 383-103.  Indeed, Defendants' response suggests they successfully located the "cited document."

**Plaintiffs' Reply**:  Plaintiffs concede that this fact is disputed.  It is undisputed, however, that

Dr. McDuffie only treats VDOC patients at ROSP and WRSP.  *See* Ex. 148, McDuffie Dep. at

81:12–16, 83:11–17, 86:19–87:5.


185.    In 2018, Dr. Lee was notified when ███████████████████████████████

████████████████████████ Ex. 73, Lee Dep. at 180:18–181:5.

Defendants' SUMF Response ¶ 185:  **Disputed in part**: "[H]ad a mental health code" in this
context means the inmate had an MH1 or higher mental health code. Lee Dep. [ECF No. 383-73]
at 182:19-22. Neither the cited testimony nor the exhibit referenced in that testimony
distinguishes between restrictive housing for Security Level 5 inmates at ROSP and restrictive
housing subject to the Step-Down Program at issue in this case. *Id.* at 180:18–181:5; Email from
Terrance Huff to Denise Malone dated August 30, 2018, attached as Exhibit 33 [Lee Deposition
Exhibit 27].

**Plaintiffs' Reply ¶ 185**:  Defendants' response does not create a genuine dispute of material

fact; it merely provides additional information but does not contradict the fact as stated by

Plaintiffs.  Dr. Lee's deposition testimony speaks for itself.


### B.    VDOC's Mental Healthcare System is Inadequate.

186.    Mental health staff providing services to prisoners in the Step-Down Program at ROSP

include a psychiatrist and persons in a role called "psychology associate" or "qualified mental

health professionals" ("QMHP").  Ex. 76, VADOC-00002882 at -884 (2018 O.P. 730.1); *see*

*also* Ex. 52, McDuffie Dep. at 16:19–17:11 (recognizing QMHP ████████████████

██████ to a Psych Associate I).

Defendants' SUMF Response ¶ 186:  **Undisputed**.

187.    Dr. Everett McDuffie, VDOC's licensed contract psychiatrist, is tasked with ███

██████████████████████████████████████████████████████████

Ex. 52, McDuffie Dep. at 7:22–8:2, 77:13–15, 82:10–13.

Defendants' SUMF Response ¶ 187:  **Disputed**: "[M]anag[ing] medications" is not Dr.
McDuffie's only responsibility. *See, e.g.,* McDuffie Dep. [ECF No. 383-52] at 86:19-88:21
(testifying that his duties include consultations with warden, prison administration, psychology
associates and primary care doctors, as well as lab monitoring, telehealth, and otherwise seeing
patients); *see also* Operating Procedure 720.9 ("O.P. 720.9"), attached as Exhibit 37, at 5–6
(listing duties of psychiatric providers at VDOC facilities).

**Plaintiffs' Reply ¶ 187**:  Defendants' response does not create a dispute of material fact.  Dr.

McDuffie's quoted testimony speaks for itself.  Dr. McDuffie later expanded on what tasks are

included within his role as the provider tasked with managing his patients' mental health

medications, but none of that testimony contradicts his quoted testimony, which supports the

stated fact.


188.    Dr. McDuffie spends no more than 16 hours over two days per week at ROSP.  *Id*. at

86:21–87:5, 102:6–103:5.

Defendants' SUMF Response ¶ 188:  **Undisputed**.


189.    Neither psychology associates nor QMHPs are required to be licensed mental health

providers. Ex. 76, VADOC-00002882 at -884 (2018 O.P. 730.1); Ex. 77, VADOC-00107259 at -

261 (2020 O.P. 720.10). Psychology associates are not qualified to diagnose mental illness.  Ex.

73, Lee Dep. at 44:12–16.

Defendants' SUMF Response ¶ 189:  **Disputed in part**: The deposition testimony cited by
Plaintiffs does not support that psychology associates are not qualified to diagnose mental
illness. Dr. Lee was asked about "*medical* diagnoses," not the diagnosis of mental illness. Lee
Dep. [ECF No. 383-73] at 44:12-16. He went on to distinguish between mental health treatment
and medical treatment. *Id.* at 44:17-22. Although Psychology Associates are not required to be
licensed, VDOC provides for them to be registered as Qualified Mental Health Professionals

("QMHPs"). Transcript of Remote Videotaped Deposition of Denise Malone, Psy.D. dated October 20, 2020 ("Malone *Reyes* Dep."), cited portions attached as Exhibit 38, at 210:14-211:3. A Qualified Mental Health Professional ("QMHP") must meet the Department of Health Professions Board of Counseling regulatory standards, have at least a bachelor's degree, have supervised experience with patients, have registered with the Department of Health Professions as a QMHP, and must complete ongoing education in mental health topics. Regulations Governing the Registration of [QMHPs], attached as Exhibit 39, at 6–7. But VDOC requires its psychology associates to go beyond the requirements of a QMHP by requiring that they have at least a master's degree. Malone *Reyes* Dep. at 209:11–210:13.

**Plaintiffs' Reply ¶ 189**:  Defendants' response does not create a genuine dispute of material

fact; it merely provides additional information but does not contradict the fact as stated by

Plaintiffs.  Defendants do not point to any evidence to dispute the allegations that QMHPs are

not required to be licensed, and that psychology associates are not qualified to diagnose mental

illness.  *See* Plaintiffs' SUMF ¶ 189; *see also* Ex. 151, Malone 30(b)(6) Dep. at 169:2–171:2

(testifying that psych associates are not required to be licensed, and that only licensed mental

health clinicians can diagnose a mental health condition).

190.    Psychology associates make referrals to the psychiatrist for psychiatric treatment.  Ex. 77,

VADOC-00107259 at -261 (2020 O.P 720.10); Ex. 73, Lee Dep. at 45:9–19.

Defendants' SUMF Response ¶ 190:  **Undisputed**.

191.    In some circumstances, patients may ████████████████████████████████

psychology associates get the psychiatrist involved.  Ex. 52, McDuffie Dep. at 200:6–9.  As a

result, Dr. McDuffie has had patients he ████████████████████████████████

████████████████████████████████████████    *Id*. at 201:16–202:3.

Defendants' SUMF Response ¶ 191:  **Disputed in part**: Dr. McDuffie testified that, over the years, he has "had situations where maybe they have to get to a crisis or point of behavior," not that it happens "[i]n some circumstances." McDuffie Dep. [ECF No. 383-52] at 200:6-9. He further testified that he did not have any inmates in restrictive housing now that he would want to see sooner, "[b]ut several years ago, I've encountered patients that I believe" should have been

brought to the attention of mental health staff sooner. *Id.* at 201:16-202:3. He did not testify that it was "as a result" of those inmates getting to a crisis or point of behavior.

**Plaintiffs' Reply ¶ 191**:  Defendants' response does not create a genuine dispute of material fact; it merely provides additional information but does not contradict the fact as stated by Plaintiffs.  Dr. McDuffie's deposition testimony speaks for itself.

192.    VDOC uses a mental health classification system to indicate "the inmate's current mental status and services needs."  Ex. 78, VADOC-00002925 at -933 (2019 O.P. 730.2).

Defendants' SUMF Response ¶ 192:  **Undisputed**.

193.    Mental health codes are assigned and changed by psychology associates.  Ex. 52, McDuffie Dep. at 263:21–264:4.

Defendants' SUMF Response ¶ 193:  **Undisputed**.

194.    VDOC defines Serious Mental Illness as: "Psychotic Disorder, Bipolar Disorder, and Major Depressive Disorder … any diagnosed mental disorder (excluding substance use disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health clinician."  Ex. 118, VDOC O.P. 730.1 (effective April 1, 2021) at 3, https://vadoc.virginia.gov/files/operating-procedures/700/vadoc-op-730-1.pdf.

Defendants' SUMF Response ¶ 194:  **Undisputed**.

195.    Incarcerated persons determined to have a Serious Mental Illness are given the mental health code MH-2S.  Ex. 78, VADOC-00002925 at -934 (2019 O.P. 730.2).

<u>Defendants' SUMF Response ¶ 195</u>:  **Disputed in part**: Inmates with a Serious Mental Illness are not limited to being given a mental health classification code of MH-2s. Depending on the level of functional impairment, the potential to be a danger to oneself or other, and other characteristics, the inmate may be given a mental health classification code of MH-3 or MH-4. Operating Procedure 730.2 ("O.P. 730.2") [ECF No. 383-78] at VADOC-00002937-38.

**<u>Plaintiffs' Reply ¶ 195</u>**:  Plaintiffs do not dispute that prisoners with Serious Mental Illness are given a mental health classification code of MH-2S or higher, as shown by Defendants' SUMF Response paragraph 195.

196.    Incarcerated persons are given a mental health classification code of MH-2 if they both have a diagnosis from the psychiatrist and are prescribed medication to treat their symptoms. Ex. 33, Trent Dep. at 197:5–11; Ex. 52, McDuffie Dep. at 286:21–287:8; Ex. 19, Malone 30(b)(6) Dep. at 168:4–9.

<u>Defendants' SUMF Response ¶ 196</u>:  **Disputed**: The deposition testimony cited by Plaintiffs does not support their allegation. To be given a mental health classification of MH-2, an inmate neither needs a diagnosis "from the psychiatrist" nor needs to be prescribed medication. Videotaped Deposition of Denise Malone dated April 12, 2023 ("Malone Dep.") [ECF No. 383-19] at 169:2-18 (diagnosis needs to be countersigned by a licensed mental health clinician, which can include the psychiatrist); Transcript of Donnie Lee Trent dated June 17, 2022 ("Trent Dep.") [ECF No. 383-25] at 197:22-198-20; McDuffie Dep. [ECF No. 383-52] at 286:21-287:5 (taking medication ***or*** have a – a mood disorder or thought disorder); . O.P. 730.2 [ECF No. 383-78] at VADOC-00002937 ("[t]he inmate ***may be*** prescribed psychotropic medication" (emphasis added.)).

**<u>Plaintiffs' Reply ¶ 196</u>**:  Defendants' response does not create a dispute of material fact.  It is not material whether a diagnosis of mental illness must be made by the psychiatrist or other licensed mental health clinician.  This does not dispute the fact that a diagnosis is required for someone to receive a mental health code of MH-2, which is the stated fact.  Further, the evidence cited by Plaintiffs in their SUMF and Defendants in their response establishes that people with a mental health code of MH-2 in practice are generally prescribed medication, and if they are not taking medication, it is because they are refusing it.  *See* Plaintiffs' SUMF ¶ 196; Defendants'

SUMF Response ¶ 196; *see also* Ex. 152, Trent Dep. at 203:6–22 ("[W]hen I was practicing as a

mental health practitioner in DOC, we typically would leave a person at a code below a 2 if they

were not taking medication.").

197.    Individual psychotherapy is not offered at ROSP.  Ex. 52, McDuffie Dep. at 124:3–10 ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████).

<u>Defendants' SUMF Response ¶ 197</u>:  **Disputed**: The deposition testimony cited by Plaintiffs
does not support their allegation. "I don't see a lot of that" is not the equivalent of "not offered."

**<u>Plaintiffs' Reply ¶ 197</u>**:  Defendants cite no evidence in their response to this statement, and

their response is contradicted by the evidence presented by Plaintiffs.  As such, Defendants have

failed to create a genuine dispute of material fact.  Merely responding that a party "disputes" a

material fact is insufficient under Rule 56; because Defendants have failed to dispute this fact by

offering specific facts supported by record citations, the Court should treat this fact as

undisputed.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some

evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for

the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S.

at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue

of material fact through mere speculation or the building of one inference upon another."); *Amos*,

477 F. Supp. 3d at 411 n.1; *see also Salmon*, 2003 WL 1730413, at *4 (granting summary

judgment in movant's favor where non-moving party offered only "bare conclusory assertions

and [a] self-serving declaration of material facts in genuine dispute").  Moreover, Defendants'

response is argument and does not provide any evidence to contradict Plaintiffs' stated fact.  Dr.

McDuffie's testimony makes clear that, generally, prisoners in the Step-Down Program do not have access to individual therapy.  *See* Ex. 148, McDuffie Dep. at 124:3–10.

198.    Dr. McDuffie believes that individual therapy could and should be available to prisoners at ROSP.  *Id*. at 127:9–14 

Defendants' SUMF Response ¶ 198:  **Undisputed**.

   **C.    VDOC Is Aware that Restrictive Housing Harms People with Mental Illnesses.**

199.    Dr. William Lee testified that ███████████████ that ███████████████ ███████████████████████████████████████ Ex. 73, Lee Dep. at 112:13–17.

Defendants' SUMF Response ¶ 199:  **Undisputed**.

200.    Clarke conceded that it was "important" to divert mental health populations out of restrictive housing "because they are potentially at risk.  And in our estimation, individuals with mental health diagnoses are individuals who, when placed in those conditions, those restrictive conditions, may respond in a manner that is not appropriate.  It may have a -- may be injurious to them, ultimately."  Ex. 14, Clarke Dep. at 265:8–266:1.

Defendants' SUMF Response ¶ 200:  **Undisputed**.

201.    Dr. McDuffie has ███████████████████████

████████████████████████████████████ Ex. 52, McDuffie Dep. at 140:14–

18.

Defendants' SUMF Response ¶ 201:  **Undisputed**.


202.    Grievance data produced by VDOC contains numerous examples of grievances submitted

by prisoners in the Step-Down Program complaining of mental health symptoms including

depression, anxiety, hallucinations, and suicidal ideation.  Ex. 79, VADOC-00174671 (Internal

Status Spreadsheet) (*see, e.g.*, lines 36, 1365, 1674, 3430, 4490, 4822, 6894, 10642, 12005,

12191, 13957, 15267, 15415, 17966, 25228, 27373).

Defendants' SUMF Response ¶ 202:  **Undisputed**.


**D.    There Is a Lack of Evidence in Support of Defendants' Affirmative Defenses.**

**1.    VDOC and Red Onion Budgets Have Increased Year-over-Year and Include Discretionary Line Items.**

203.    VDOC is subject to the requirements of the Americans with Disabilities Act ("ADA")

and the Rehabilitation Act ("RA").  Answer ¶¶ 252, 261.

Defendants' SUMF Response ¶ 203:  **Objection**: Plaintiffs' statement is a legal conclusion, not
an undisputed fact.

**Plaintiffs' Reply ¶ 203**:  Defendants cite no evidence in their response to this statement, and

their response is contradicted by the evidence presented by the Plaintiffs, namely, their own

admissions.  As such, Defendants have failed to create a genuine dispute of material fact that

Defendants have admitted that VDOC is subject to the requirements of the ADA and the RA.


204.    VDOC receives federal funding within the meaning of the RA.  Answer ¶ 261.

Defendants' SUMF Response ¶ 204:  **Undisputed**.

205.    VDOC adduced no evidence of its annual budgets between Fiscal Year 2012 and Fiscal

Year 2022 with the exception of Fiscal Year 2016.  In Fiscal Year 2016, VDOC 

████████████████    Ex. 80, VADOC-00167941 at -991 (VDOC Academy for Staff

Development, Instructor Manual 2019); *see generally*, Ex. 81, Vare Report; Ex. 82, Vare Dep.

Defendants' SUMF Response ¶ 205:  **Disputed in part**: VDOC's annual budget for FY 2016
was more than $1.1 billion. Other documents produced by VDOC reflect annual budgets for
other years. *See, e.g.*, Presentation dated August 16, 2019, attached as Exhibit 40 [VADOC-
00108342], at 8. Moreover, information about VADOC's annual budgets is publicly available.
Finally, VDOC produced yearly budget information for ROSP, starting in FY 2012. *See*
Plaintiffs' Statement at ¶ 206.

**Plaintiffs' Reply ¶ 205**:  Defendants' response does not create a dispute of material fact but

simply adds additional evidence that supports Plaintiffs' claims.


206.    ROSP's budget increased from $25.9 million in Fiscal Year 2012 to $38.5 million in

Fiscal Year 2022.  Ex. 83, VADOC-00140551 at -553, -592 (Red Onion Fiscal Year 2012-22

Budgets).

Defendants' SUMF Response ¶ 206:  **Undisputed**.


207.    ROSP's budget does not include clinical, dental, hospital, medical, x-ray and laboratory,

and pharmaceutical expenses.  *Id.* at -554.

Defendants' SUMF Response ¶ 207:  **Disputed**: The budget clearly identifies medical and dental
equipment, medical and dental supplies, laboratory supplies, X-Ray & Laboratory services,
medical services, and pharmaceutical drugs as line item expenses. ECF No. 383-83 at VADOC-
00140551 (Medical Services Budget Amount - 259,550.00 and X-Ray & Laboratory Services
10,000); 552 (Medical & Dental Supplies $100,000), (553 Medical & Dental Equipment $2,000).

**Plaintiffs' Reply ¶ 207**:  Plaintiffs do not dispute Defendants' cited evidence.

208.    WRSP's budget increased from $26.1 million in Fiscal Year 2012 to $40.2 million in

Fiscal Year 2022.  Ex. 84, VADOC-00140508 at -510, -549 (Wallens Ridge Fiscal Year 2012-22

Budgets).

<u>Defendants' SUMF Response ¶ 208</u>:  **Undisputed**.


209.    Neither ROSP's nor WRSP's budget identifies an ADA-related or accommodation-

related line item.  *See generally*, Ex. 83, VADOC-00140551 (Red Onion Fiscal Year 2012-22

Budgets); Ex. 84, VADOC-00140508 (Wallens Ridge Fiscal Year 2012-22 Budgets).

<u>Defendants' SUMF Response ¶ 209</u>:  **Disputed**: Plaintiffs have not adduced evidence that any
ADA-related or accommodation-related expenses are not subsumed within another expense in the
budget.

**<u>Plaintiffs' Reply ¶ 209</u>**:  Defendants' response does not create a dispute of material fact in that

they do not produce any evidence to show any "ADA-related or accommodation-related line

item" in ROSP or WRSP's budget.  Instead, they offer conjecture that such expenses may be

"subsumed within another expense in the budget."  That is insufficient to create a genuine

dispute of material fact.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce

some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a

verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*,

477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a

genuine issue of material fact through mere speculation or the building of one inference upon

another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a

material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4

(granting summary judgment in movant's favor where non-moving party offered only "bare

conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").

210.    VDOC's Former Director Harold Clarke is able to direct approximately 40% of VDOC's

budget as he sees fit.  Ex. 14, Clarke Dep. at 127:4–13.

Defendants' SUMF Response ¶ 210:  **Disputed**: Mr. Clarke testified that he can direct
discretionary expenditures to certain categories (such as maintenance, food service, overtime)
but cannot control other categories (such as compensation, salaries, health care). Clarke Dep.
[ECF No. 383-14] at 127:7 - 128:7. Further, he testified that such direction of funds is decided
through deliberation with other individuals in various divisions. *Id.* at 128:8 - 128:19.

**Plaintiffs' Reply ¶ 210**:  Defendants' response does not create a genuine dispute of material

fact; it merely provides additional information but does not contradict the fact as stated by

Plaintiffs.  Mr. Clarke's deposition testimony speaks for itself.


### 2.    VDOC Has Not Adduced Evidence in Support of Its Fundamental Alteration and Undue Burden Defenses.

211.    Plaintiffs' ADA expert, Richard Wells, has proposed more than 17 changes to the

policies, procedures, and practices underlying the Step-Down Program based on his experience

working on ADA compliance issues in state and federal prisons.  *See, e.g.*, Ex. 85, Wells Rep. ¶¶

195–223.  Those proposed changes, which are not exhaustive, are:

     a.  a change in housing assignment or in housing conditions (single cell, change in

        cell mate, etc.);

     b.  assistance with activities as necessary;

     c.  modified work or program schedules;

     d.  prompting or coaching by staff;

     e.  additional monitoring;

     f.  counseling and/or therapy (group or individual);

     g.  instituting effective communication practices (e.g., using respectful language,

        active listening, open body language, creating time and space for communication,

120

etc.), repeating or rephrasing instructions, and effective communication that maximize an incarcerated person's ability to comprehend and understand the information;

h.  additional assistance to navigate programs and procedures, etc.

i.  greater guidance for staff to provide effective communication during health care encounters, due process events, or other high stakes or significant events;

j.  adequate training for staff on effective communication, on where and how to document communication, on identification of disabled incarcerated persons, on their accommodation and communication needs, and on coordination among staff in different departments for referrals and identification of disabilities.

k.  effective, ADA-specific training for staff in the context of their employment at VDOC with attention to provision for ADA-related concerns across the medical and mental health disciplines;

l.  comprehensive, real-time, network tracking system to identify the incarcerated person's documented disability, communication accommodations or assistance needed, and the assessment applied to determine whether the information communicated was understood;

m.  informing incarcerated persons of their right to nondiscrimination under the ADA;

n.  identifying mental impairments, disabilities, and accommodation information at intake;

o.  providing an effective accommodation request process and a dedicated grievance procedure;

p.  inclusion of mental health professionals in DTT, BMC, and ERT hearings; and

q.  appropriate, reasonable accommodations and modifications to the Step-Down

Program, including the Challenge Series.

*Id.*

Defendants' SUMF Response ¶ 211:  **Disputed**: The proposed changes listed in this paragraph, and in the cited report, do not "underly," or even target, the Step-Down Program. They are not proposed as reasonable accommodations for inmates with mental disability to allow participation in the Step-Down Program, as opposed to vaguely worded suggestions as to Mr. Wells's opinion of good practices in a prison setting generally. VDOC further disputes that the list is comprised entirely of proposed changes, as some of them are already in place. For example, as to item (h), Plaintiffs assert as an undisputed fact that VDOC personnel worked with Mr. Reyes individually to complete the Challenge Series (Plaintiffs' Statement at ¶ 73), and, as to item (p), mental health professionals do participate in DTT, BMC, and ERT hearings. *See* Transcript of Denise Malone dated April 12, 2023 ("Malone Dep."), cited portions attached as Exhibit 41 at 121:13 - 122:2 (mental health associate included in DTT); at 195:11 - 195:21 (both Dr. Cary and Dr. Malone serve as voting members on the ERT; and local teams that provide presentations on the inmates include mental health representation from Marion, WRSP and ROSP); Collins Dep., Exhibit 16 at 270:4 - 271:1 (confirming that required members of the BMC included the unit psychologist). VDOC further disputes that others of these proposed changes are efficient, effective, needed, or not already in place.

**Plaintiffs' Reply ¶ 211**:  Defendants have failed to create a genuine dispute of material fact that

Mr. Wells has proposed more than 17 changes to the policies, procedures, and practices

underlying the Step-Down Program based on his experience working on ADA compliance issues

in state and federal prisons, which is the stated fact.  Moreover, Defendants ignore that the ADA

is not limited to reasonable accommodations but applies equally to reasonable *modifications* to

facilities and practices.  *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 505–06 (4th Cir.

2016).  Defendants' cited evidence does not create a genuine dispute of fact, let alone material

fact.

212.    Defendants have not adduced any evidence related to the monetary cost of implementing

any of Mr. Wells's proposed changes.  *See generally*, Ex. 81, Vare Rep.; Ex. 82, Vare Dep.

Defendants' SUMF Response ¶ 212:  **Not Material**: Because Mr. Wells has proposed only vague, broad concepts that amount to his opinions of general incarceration best practices, not

targeted to the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability, what Wells proposes does not constitute reasonable accommodations to participate in the Step-Down Program. These proposals are too vague to be able to respond.

**Plaintiffs' Reply ¶ 212**:  Defendants asserted an undue burden affirmative defense.  It is material to that defense that Defendants demonstrate the monetary costs of the proposed modifications to the Program.  *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016).  Defendants' argument regarding the "vagueness" and "breadth" of Mr. Wells's proposals does not create a genuine dispute of material fact.  Moreover, Defendants ignore that the ADA is not limited to reasonable accommodations but applies equally to reasonable *modifications* to facilities and practices.  *See id.* at 505–06.  As such, Plaintiffs' SUMF paragraph 212 should be treated as undisputed.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").


213.    Defendants have not adduced any evidence related to the monetary cost of implementing any change to the Step-Down Program.  *See generally, id.*

Defendants' SUMF Response ¶ 213:  **Not Material**: Beyond the proposed vague, broad concepts that amount to general incarceration best practices, not targeted to the Step-Down Program, Plaintiffs have not proffered any specific, definable changes that would represent reasonable accommodations to participate in the Step-Down Program practices/procedures that Plaintiffs

contend they seek accommodation for due to disability. Therefore, there is nothing for which VDOC has an obligation to respond. Moreover, VDOC is not required to provide evidence related to the monetary cost of implementing "*any*" change to the Step-Down Program, only those changes that constitute requested reasonable accommodations, which do not exist.

**Plaintiffs' Reply ¶ 213**:  Defendants asserted an undue burden affirmative defense.  It is material to that defense that Defendants demonstrate the monetary costs of the proposed modifications to the Program.  *See Lamone*, 813 F.3d at 508.  Defendants' argument regarding the "vagueness" and "breadth" of Mr. Wells's proposals does not create a genuine dispute of material fact.  Moreover, Defendants ignore that the ADA is not limited to reasonable accommodations but applies equally to reasonable *modifications* to facilities and practices.  *See id.* at 505–06.  As such, Plaintiffs' SUMF paragraph 213 should be treated as undisputed. *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").

214.    Defendants have not adduced any evidence related to the administrative burden of implementing any of Mr. Wells's proposed changes.  *See generally*, *id*.

Defendants' SUMF Response ¶ 214:  **Not Material**: Because Mr. Wells has only proposed vague, broad concepts that amount to his opinion of general incarceration best practices, and not

targeted to the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability, VDOC does not agree that what Wells proposes constitutes reasonable accommodations to participate in the Step-Down Program. These proposals are too vague to be able to respond.

**Plaintiffs' Reply ¶ 214** :  Defendants asserted an undue burden affirmative defense.  It is material to that defense that Defendants demonstrate the alleged financial burden of the proposed modifications to the Program.  *See Lamone*, 813 F.3d at 508.  Defendants' argument regarding the "vagueness" and "breadth" of Mr. Wells's proposals does not create a genuine dispute of material fact.  Moreover, Defendants ignore that the ADA is not limited to reasonable accommodations but applies equally to reasonable *modifications* to facilities and practices.  *See id.* at 505–06.  As such, Plaintiffs' SUMF paragraph 214 should be treated as undisputed. *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").

215.    Defendants have not adduced any evidence related to the monetary cost of implementing *any* change to the Step-Down Program.  *See generally*, *id*.

Defendants' SUMF Response ¶ 215:  **Not Material**: Beyond the proposed vague, broad concepts that amount to general incarceration best practices, not targeted to the Step-Down Program,

Plaintiffs have not proffered any specific, definable changes that would represent reasonable accommodations to participate in the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability. Therefore, there is nothing for VDOC to respond to. Moreover, VDOC is not required to provide evidence related to the monetary cost of implementing **any** change to the Step-Down Program, only those changes that constitute requested reasonable accommodations, which do not exist.

**Plaintiffs' Reply ¶ 215**:  Defendants asserted an undue burden affirmative defense.  It is

material to that defense that Defendants demonstrate the monetary costs of the proposed

modifications to the Program.  *See Lamone*, 813 F.3d at 508.  Defendants' argument regarding

the "vagueness" and "breadth" of Mr. Wells's proposals does not create a genuine dispute of

material fact.  Moreover, Defendants ignore that the ADA is not limited to reasonable

accommodations but applies equally to reasonable *modifications* to facilities and practices.  *See*

*id.* at 505–06.  As such, Plaintiffs' SUMF paragraph 215 should be treated as undisputed.

*Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than

a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing

it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769

F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp.

3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under

Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in

movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-

serving declaration of material facts in genuine dispute").

216.    Defendants have not adduced evidence demonstrating that Mr. Wells's proposed changes

would result in a "fundamental alteration" of the Step-Down Program.  *See generally*, *id*.

<u>Defendants' SUMF Response ¶ 216</u>:  **Not Material**: Because Mr. Wells has only proposed
vague, broad concepts that amount to his opinion of general incarceration best practices, and not
targeted to the Step-Down Program practices/procedures that Plaintiffs contend they seek
accommodation for due to disability, VDOC does not agree that what Wells proposes constitutes
reasonable accommodations to participate in the Step-Down Program. These proposals are too
vague to be able to respond.

**<u>Plaintiffs' Reply ¶ 216</u>**:  Defendants asserted a fundamental alteration affirmative defense.  It is

material to that defense that Defendants demonstrate that the proposed modifications to the

Program would require a fundamental alteration of the Program.  *See Lamone*, 813 F.3d at 508.

Defendants' argument regarding the "vagueness" and "breadth" of Mr. Wells's proposals does

not create a genuine dispute of material fact.  Moreover, Defendants ignore that the ADA is not

limited to reasonable accommodations but applies equally to reasonable *modifications* to

facilities and practices.  *See id.* at 505–06.  As such, Plaintiffs' SUMF paragraph 216 should be

treated as undisputed.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce

some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a

verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*,

477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a

genuine issue of material fact through mere speculation or the building of one inference upon

another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a

material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4

(granting summary judgment in movant's favor where non-moving party offered only "bare

conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").

217.    Defendants have not adduced evidence demonstrating that *any* change to the Step-Down

Program would result in a "fundamental alteration" of the Program.  *See generally*, *id*.

Defendants' SUMF Response ¶ 217:  **Not Material**: Beyond the proposed vague, broad concepts that amount to general incarceration best practices, not targeted to the Step-Down Program, Plaintiffs have not proffered any specific, definable changes that would represent reasonable accommodations to participate in the Step-Down Program practices/procedures that Plaintiffs contend they seek accommodation for due to disability. Therefore, there is nothing for VDOC to respond to. Moreover, VDOC is not required to provide evidence related to the monetary cost of implementing "***any***" change to the Step-Down Program, only those changes that constitute requested reasonable accommodations, which do not exist.

**Plaintiffs' Reply ¶ 217**:  Defendants asserted a fundamental alteration affirmative defense.  It is material to that defense that Defendants demonstrate that the proposed modifications to the Program would require a fundamental alteration of the Program.  *See Lamone*, 813 F.3d at 508. Defendants' argument regarding the "vagueness" and "breadth" of Mr. Wells's proposals does not create a genuine dispute of material fact.  Moreover, Defendants ignore that the ADA is not limited to reasonable accommodations but applies equally to reasonable *modifications* to facilities and practices.  *See id.* at 505–06.  As such, Plaintiffs' SUMF paragraph 217 should be treated as undisputed.  *Othentec*, 526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769 F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp. 3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-serving declaration of material facts in genuine dispute").

128

218.    Other penological institutions have implemented certain of the changes proposed to

VDOC by Mr. Wells in his Report.  Ex. 86, Wells Rebuttal Rep. ¶ 86; Ex. 87, Wells Dep. at

106:9–12, 106:15–17, 108:11–12, 115:3–6.

Defendants' SUMF Response ¶ 218:  **Not Material**: This paragraph does not specify which
specific changes have been instituted at other penological institutions. Defendants also dispute
that changes were made at other penological institutions because they were required by law, as
opposed to other reasons, such as part of a consent settlement. In fact, Mr. Wells affirms that one
of the county jail systems that implemented a real-time network tracking system did so as part of
an agreed resolution to avoid litigation. Deposition of Richard Wells dated August 11, 2023
("Wells Dep.") [ECF No. 383-87] at 106:9 - 106:23; 107:2 - 107:6

**Plaintiffs' Reply ¶ 218**: Defendants asserted a fundamental alteration affirmative defense.  It is

material to that defense that Defendants demonstrate that the proposed modifications to the

Program would require a fundamental alteration of the Program.  Whether other penological

institutions have implemented the same changes is material to that defense.  Defendants cite no

evidence to dispute that other penological institutions have implemented certain of the changes

proposed to VDOC by Mr. Wells in his report.  Defendants' response includes immaterial,

superfluous information, which should be disregarded.  Non-material facts are not appropriate in

a statement in opposition to summary judgment and should be disregarded or stricken. *Anderson*,

477 U.S. at 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be

counted."); *accord HP Tuners, LLC* , 2022 WL 562625, at *1, *5 (granting motion to strike non-

material facts); *Knidel*, 189 F. Supp. 3d at 284–85 ("giv[ing] little to no consideration to

extraneous factual and legal assertions propounded").



219.    The California Department of Corrections and Rehabilitation ("CDCR"), the Michigan

Department of Corrections ("Michigan DOC"), Alameda County jail system, Orange County jail

system, and Monterey County jail system employ or are in the process of implementing real-

time, networked tracking systems.  Ex. 87, Wells Dep. at 106:9–12, 106:15–17, 108:11–12,

115:3–6.

Defendants' SUMF Response ¶ 219:  **Disputed**: Mr. Wells testified that California Department
of Corrections and Rehabilitation ("CDCR"), Alameda County jail system, Orange County jail
system, and Monterey County jail system employ or are in the process of implementing real-
time, networked tracking systems, but produced no documentary evidence that those systems
have actually done so. Wells testified that the Michigan Department of Corrections ("Michigan
DOC") purchased or upgraded software but did not clearly state that it had implemented a real-
time, networked tracking system. Transcript of Richard Wells dated August 11, 2023 ("Wells
Dep."), cited portions attached as Exhibit 42, at 116:21-122:2.

**Plaintiffs' Reply ¶ 219**:  Defendants' response does not create a dispute of material fact.

Plaintiffs' expert has personal knowledge of the tracking systems at CDCR, the Michigan DOC,

the Alameda County jail system, the Orange County jail system, and the Monterey County jail

system.  *See* ECF No. 400-63, Wells Rep. App'x A at 141–45, 151–54.  Defendants had the

opportunity to probe the facts underlying Mr. Wells's report at his deposition.  Mr. Wells's

deposition testimony indicates that the Michigan DOC is in the process of implementing a

similar tracking system, and Defendants have not cited any evidence to dispute that.  *Othentec*,

526 F.3d at 140 ("Rather, a nonmoving party must produce some evidence (more than a

'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it,

upon whom the onus of proof is imposed.'" (quoting *Anderson*, 477 U.S. at 251)); *Beale*, 769

F.2d at 214 ("The nonmoving party, however, cannot create a genuine issue of material fact

through mere speculation or the building of one inference upon another."); *Amos*, 477 F. Supp.

3d at 411 n.1 ("Merely responding that a party "disputes" a material fact is insufficient under

Rule 56[.]"); *see also Salmon*, 2003 WL 1730413, at *4 (granting summary judgment in

movant's favor where non-moving party offered only "bare conclusory assertions and [a] self-

serving declaration of material facts in genuine dispute").

220.    A real-time networked tracking system includes: disability-related information, such as type of disability; reasonable accommodation requirements; adaptive support services needed; and techniques for effective communication.  Such a system should support the user's ability to identify the disabled incarcerated person, their housing, and their programming assignments/schedules; allow for staff to review related disability and programming information; and allow for staff to enter information, such as documentation verifying effective communication was provided and achieved for significant encounters or events.  Ex. 85, Wells Rep. ¶ 111.

Defendants' SUMF Response ¶ 220:  **Disputed**: A "real-time network tracking system" does not automatically include all such functions listed in this paragraph. Rather, these software systems "can be molded" to provide certain functions. Wells Dep. [ECF No. 383-85] ¶ 111. Moreover, what "should" be in such a system is an opinion, not a fact.

**Plaintiffs' Reply ¶ 220**:  Plaintiffs do not dispute that a real-time network tracking system does not necessarily include all of the listed criteria but rather *could* include those items.  Defendant's response therefore does not create a genuine dispute of material fact.

IV.    **The Step-Down Program Poses a Significant Risk of Harm, and Plaintiffs Have Been Harmed by Defendants' Policies.**

    A.    **There Is Scientific Consensus that Restrictive Housing Is Harmful.**

221.    There is a large body of research regarding the harms caused by restrictive housing and solitary confinement.  Ex. 66, Haney Rep. ¶¶ 40, 46; Ex. 88, Morgan Dep. at 101:4–11.

Defendants' SUMF Response ¶ 221:  **Disputed**: The Haney Report states that there is a "significant" body of research regarding the "***risk*** of harm to which prisoners are exposed in solitary confinement." Haney Report [ECF No. 383-66] at ¶ 40. Dr. Robert Morgan testified that there is a "body of research that would suggest that there is some potential risk of inmates decompensating or deteriorating in segregation, but where I disagree is in the significance of that harm and does it rise to the level of substantive risk or harm." Deposition of Robert D. Morgan, Ph.D. ("Morgan Deposition") [ECF No. 383-88] at 101:8 - 14. Further, Dr. Haney testified as to a "risk" not a causation: "The literature that I described earlier addresses a significant risk of serious harm that prisoners who are in solitary confinement are exposed to, and so I took that

literature into account, and reached conclusions about whether or not they were, as other people in solitary confinement are, exposed to a significant risk of serious harm." Transcript of Craig W. Haney, Ph.D., J.D., Volume 2 dated August 17, 2023 ("Haney Dep. Vol. 2"), cited portions attached as Exhibit 43, at 136:4 - 18. This does not necessarily lead to the conclusion that "harms" are "caused" by restrictive housing and solitary confinement.

**Plaintiffs' Reply ¶ 221**:  Defendants' response is argument and does not create a dispute of material fact.  Dr. Haney's report examines both the literature about the risk of harm posed by solitary confinement, and the actual harm that is caused by solitary confinement.  *See, e.g.*, Ex 120, Haney Rep. at ¶¶ 40–43, 45–46, 51–54.  Defendants point to no additional evidence in the record that contradicts Plaintiffs' fact.


222.    Social isolation and social exclusion have been studied by scientific researchers and determined to be harmful to mental and physical health.  Ex. 66, Haney Rep. ¶ 37.

Defendants' SUMF Response ¶ 222:  **Undisputed**.


223.    Scientific studies of persons housed in solitary confinement have identified the following symptoms from which such persons disproportionately suffer: appetite and sleep disturbances, headaches, anxiety, panic, a sense of impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, nightmares, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal.  *Id*. ¶ 53; Ex. 88, Morgan Dep. at 107:1–3.

Defendants' SUMF Response ¶ 223:  **Disputed in part / Not Material**: Dr. Morgan's testimony does not support Plaintiffs' allegation. Dr. Morgan testified as to some physical health effects associated with incarceration—he did not identify a disproportionate experience by those in restrictive housing. Morgan Dep. [ECF No. 383-88] at 106:18-107:8. Further, because the conditions of confinement in the studies are not the same as those in the Step-Down Program, the studies are inapplicable in the context of this litigation.

**Plaintiffs' Reply ¶ 223**:  Defendants' response that "because the conditions of confinement in the studies are not the same as those in the Step-Down Program, the studies are inapplicable in the context of this litigation" is argument, is not supported by any evidence from the record, and therefore does not create a genuine dispute of material fact.  *See* Ex. 120, Haney Rep. ¶¶ 130–31, 271–75.  The testimony that Defendants cite from Dr. Morgan speaks for itself: ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████    Ex. 121, Morgan Dep. at 106:18–107:8.

224.    Scientific studies have identified correlations between time spent in solitary confinement and certain cardiac conditions, including hypertension, arrhythmia, and tricuspid insufficiency. Ex. 89, Hendricks Rep. ¶ 54.  Scientific studies have also found correlations between time spent in solitary-type confinement and lower life expectancies.  Ex. 66, Haney Rep. ¶¶ 98–99.

Defendants' SUMF Response ¶ 224:  **Disputed**: Dr. Hendricks provides no support for his allegation, which constitutes opinion, not fact. The cited portions of the Haney Report indicate only that the studies found a correlation between the time spent in solitary-type confinement and suicide, homicide, and opioid overdose. Consistent with that information, Dr. Morgan testified that the research about life expectancies for inmates who served time in restrictive housing suggests that any difference in life span is "tied to unnatural causes as opposed to natural causes." Morgan Dep. [ECF No. 383-88] at 108:14 - 108:19.

**Plaintiffs' Reply ¶ 224**:  Defendants' response constitutes argument and does not create a dispute of material fact.  Dr. Hendricks is not required to provide support for his knowledge related to his expertise in order to establish it as fact, and Defendants point to no evidence in the record that would contradict this.  Further, whether the reduced life expectancy correlated to time spent in solitary confinement is related to natural or unnatural causes is not material and does not contradict Plaintiffs' stated fact.  *See* Plaintiffs' SUMF ¶ 230 (undisputed).

225.    Scientific studies have identified correlations between housing type and various kinds of

incident reports in prison.  For example, studies show that self-mutilation and suicide are more

prevalent in isolated housing units.  Ex. 66, Haney Rep. ¶ 54; Ex. 88, Morgan Dep. at 109:16–

110:3.  Scientific studies have also found that, for incarcerated persons who had prior mental

health diagnoses, time spent solitary confinement resulted in worsening symptom expression,

with exacerbating lasting beyond the time spent in solitary confinement.  Ex. 89, Hendricks Rep.

24.

Defendants' SUMF Response ¶ 225:  **Disputed in part / Not Material**: The Hendricks Report
does not state the research purports to show that symptoms will always last well beyond time
incarcerated in solitary confinement; rather that was observed "often." Report of Michael L.
Hendricks, Ph.D., ABPP ("Hendricks Report") [ECF 383-89] at ¶ 24 Apart from one study on
the issue, the Hendricks Report refers only, generally, to the Haney Report. Further, because
generalized studies regarding "isolated confinement" or "solitary confinement" conditions not
analogous to the conditions of confinement within VDOC's Step-Down Program, they are not
determinative or even relevant to assessing the prevalence of any risk of harm for purposes of
this litigation.

**Plaintiffs' Reply ¶ 225**:  Defendants' assertion that because "generalized studies regarding

'isolated confinement' or 'solitary confinement' conditions [are] not analogous to the conditions

of confinement within VDOC's Step-Down Program, they are not determinative or even relevant

to assessing the prevalence of any risk of harm for purposes of this litigation" is argument, is not

supported by any evidence in the record, and in fact, undisputed evidence in the record supports

the opposite. *See* Plaintiffs' SUMF ¶ 223; Plaintiffs' SUMF Reply ¶ 223; *see* ECF No. 400-55,

Hendricks Rep. ¶ 24 (citing Jaquelyn L. Jahn et al., *Clustering of Health Burdens in Solitary*

*Confinement: A Mixed-Methods Approach*, 2 Qualitative Rsch. Health (2022)); Ex. 120, Haney

Rep. ¶¶ 21–23, 105–29, 268; *see also generally id.* App'x D (Craig Haney, *The Science of*

*Solitary: Expanding the Harmfulness Narrative*, 115 Nw. L.J. 211 (2020)), App'x E (Brief of

Ctr. For L., Brain & Behavior and Neuroscientists as *Amici Curiae* in Support of Plaintiff-

Appellant Jwainus Perry, *Perry v. Spencer*, No. 16-2444 (1st Cir. Mar. 11, 2022)), App'x F ¶¶
11–17, 25.

**B.      Defendants' Experts Agree that Restrictive Housing Causes Harm.**

226.    Defendants' correctional mental health expert, Robert D. Morgan, testified that
segregation poses a universal risk of harm.  Ex. 88, Morgan Dep. at 96:14–22.

Defendants' SUMF Response ¶ 226:  **Disputed**: Dr. Morgan testified that he "recalled speaking
generally to that." Morgan Dep. [ECF No. 383-88] at 96:14–22.

**Plaintiffs' Reply ¶ 226**:  Dr. Morgan's testimony speaks for itself: ███████████████



███████████████████  Ex. 121, Morgan Dep. at 96:14–18.  Defendants' response
therefore does not raise any genuine dispute of material fact.

227.    Dr. Morgan does not disagree with the body of scientific literature that identifies ███



██████  *Id*. at 101:4–11.

Defendants' SUMF Response ¶ 227:  **Disputed in part**: Although Dr. Morgan does not disagree
with the "body of literature in terms of the types of symptomatology that can occur and that is
associated with the use of restrictive housing," he does disagree that the literature establishes the
significance of the potential harm and whether it is a substantive risk. Morgan Dep. [ECF No.
383-88] at 101:4-101:14.

**Plaintiffs' Reply ¶ 227**:  Dr. Morgan's testimony speaks for itself.  Defendants' response does
not create a genuine dispute of material fact; it merely provides additional information but does
not contradict the fact as stated by Plaintiffs.

228.    Dr. Morgan does not disagree that ███████████████████████

████████████████████████████████    *Id*. at 101:9–11.

Defendants' SUMF Response ¶ 228:  **Disputed**: Dr. Morgan did not testify simply that there was
a potential risk of inmates decompensating or deteriorating in segregation, but rather that there
exists a "body of research that would suggest that there is some potential risk of inmates
decompensating or deteriorating in segregation." Morgan Dep. [ECF No. 383-88] at 101:8 -
101:11.

**Plaintiffs' Reply ¶ 228**:  Dr. Morgan's testimony speaks for itself, which was: ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████    Ex. 121, Morgan Dep. at 101:4–11.


229.    Dr. Morgan testified that the following physical effects may be exacerbated by

segregation: ██████████████████████████████████    *Id*. at 107:1–8.

Defendants' SUMF Response ¶ 229:  **Disputed**: Dr. Morgan did not testify that segregation may
exacerbate the conditions listed. He testified that the conditions are some of the physical health
effects associated with incarceration. Morgan Dep. [ECF No. 383-88] at 106:18-107:3. When
asked if any of the symptoms worsen for people housed in segregation, he testified, "They can."
*Id.* at 107:6-8. That testimony says nothing about segregation exacerbating the conditions.

**Plaintiffs' Reply ¶ 229**:  Defendants' response concedes this fact because "worsen" and

"exacerbate" are synonyms in this context.  In addition, Defendants' response attempts to stretch

Dr. Morgan's testimony beyond its plain meaning.  Defendants have failed to create a genuine

dispute of material fact supported by record evidence.  *See Othentec*, 526 F.3d at 140; *Beale*, 769

F.2d at 214; *Amos*, 477 F. Supp. 3d at 411 n.1; *see also Salmon*, 2003 WL 1730413, at *4.


230.    Dr. Morgan agrees that ████████████████████████████████

████████████████████████████████████████████    *Id*. at 108:7–11,

108:14–16 ███████████████████████████████████████████

█████████████████████

<u>Defendants' SUMF Response ¶ 230</u>:  **Undisputed**.


231.    Dr. Morgan agrees that ███████████████████████████████████

███████████████████████████████  *Id*. at 109:22–110:3.

<u>Defendants' SUMF Response ¶ 231</u>:  **Undisputed**.


232.    Dr. Morgan agrees that certain psychological and physical effects of restrictive housing—

including feelings of loneliness, hypersensitivity, depressed mood, feelings of anxiety, and social

withdrawal—can be permanent.  Ex. 88, Morgan Dep. at 116:1–14.

<u>Defendants' SUMF Response ¶ 232</u>:  **Disputed**: The deposition testimony cited by Plaintiffs
does not support their allegation. Dr. Morgan testified that he would expect that inmates who
spend years in segregation would experience some of the symptomology cited by Plaintiffs and
that it is possible that some of those symptoms can be permanent. Morgan Dep. [ECF No. 383-
88] at 115:18-116:14. He did not testify that the symptoms were effects of restrictive housing.

**<u>Plaintiffs' Reply ¶ 232</u>**:  Dr. Morgan's testimony speaks for itself and is consistent with

Plaintiffs' stated fact:  █████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████  Ex. 121, Morgan Dep. at 115:18–116:14.  Nothing in this

testimony contradicts Plaintiffs' stated fact, and Defendants point to nothing else in the record that would contradict it.

233.    Dr. Gregory Saathoff, a licensed contract psychiatrist who treats patients at several VDOC facilities and who was retained by Defendants as an expert psychiatric consultant, also agrees that carceral conditions that impose significant social isolation can create a significant risk of mental and physical harm to those who are housed in such conditions.  Ex. 90, Saathoff Dep. at 27:18–22, 74:7–19, 133:5–15.

Defendants' SUMF Response ¶ 233:  **Undisputed**.

234.    Dr. Saathoff agrees with that persons with mental illness are particularly vulnerable to the harms of solitary confinement.  *Id*. at 137:17–138:2.

Defendants' SUMF Response ¶ 234:  **Disputed**: Dr. Saathoff did not agree with Plaintiffs' allegation. He testified that the statement was very broad but, in general, would not disagree. Deposition of Gregory B. Saathoff, M.D. ("Saathoff Dep.") [ECF No. 383-90] at 137:14 - 138:2. Deciding not to disagree with such a broad statement is not a wholesale agreement to the same, particularly in the absence of a precise definition of "solitary confinement."

**Plaintiffs' Reply ¶ 234**:  Dr. Saathoff's testimony speaks for itself:



ECF No. 383-90, Saathoff Dep. at 137:14–138:2.

Defendants' response that "Deciding not to disagree with such a broad statement is not a wholesale agreement to the same, particularly in the absence of a precise definition of 'solitary

confinement.'" is an argument over semantics and in any event is not sufficient to raise a genuine

dispute of material fact.

235.    Dr. Saathoff further agrees that prolonged segregation of adult inmates with serious

mental illness should be avoided due to the potential for harm to so such inmates.  *Id*. at 146:5–

20.

Defendants' SUMF Response ¶ 235:  **Disputed**: Dr. Saathoff did not agree with Plaintiffs'
allegation in an isolated context. He agreed that inmates with serious mental illness who are
placed in segregation should be provided therapeutic activities, unstructured out of cell time, and
access to programming. Saathoff Dep. [ECF No. 383-90] at 146:5 - 146:20.

**Plaintiffs' Reply ¶ 235**:  Dr. Saathoff's testimony speaks for itself:



ECF No. 383-90, Saathoff Dep. at 146:5–20.

Defendants' response fails to point to any evidence in the record that would contradict Plaintiffs'

stated fact.

### C.    Plaintiffs Have Been Harmed by Defendants' Policies.

236.    Class members also report suffering physical and psychological harms during and after

being placed in the Step-Down Program's restrictive housing unit**s.**

Defendants' SUMF Response ¶ 236:  **Undisputed**.


### 1.    Derek Cornelison

237.    Derek Cornelison was reclassified as Level S on June 7, 2016, and was assigned to the IM pathway at ROSP.  He was reclassified as Level 6 on March 26, 2018 and entered the IM Closed Pod on March 27, 2018.  He was reclassified as Level 5 on August 26, 2019 and entered general population on August 29, 2019.  Ex. 79, VADOC-00175822 (Internal Status Spreadsheet).  He spent a total of three years, two months, and twenty-three consecutive days in the Step-Down Program.

Defendants' SUMF Response ¶ 237:  **Undisputed**.


238.    Mr. Cornelison testified that he experienced symptoms of anxiety, depression, mood swings, anger, disorientation, and an inability to concentrate during his time in the Step-Down Program.  Ex. 16, 2023 Cornelison Decl. ¶¶ 35–36; Ex. 91, Cornelison Dep. at 247:6–248:12, 250:8–19, 251:15–252:13.

Defendants' SUMF Response ¶ 238:  **Undisputed**.


239.    Mr. Cornelison has been diagnosed with ▮▮▮▮▮▮▮▮▮▮.  Hendricks Report ¶ 54.  This diagnosis ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮  Ex. 89, Hendricks Rep. ¶ 54.



Defendants' SUMF Response ¶ 239:  **Disputed in part** The identified diagnoses were assigned by Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. In addition, The cited portion of the Hendricks Report does not say that Mr. Cornelison previously had received the alleged diagnosis. Rather, Dr. Hendricks opined that his testing of Mr. Cornelison reflected that certain symptoms, Hendricks Report [ECF No. 383-89] at ¶53, and Mr. Cornelison's report of ongoing symptoms of anxiety was "consistent with" the diagnosis, *id.* at ¶54.

**Plaintiffs' Reply ¶ 239**:  Defendants' response does not create a genuine dispute of fact that Mr.

Cornelison has been diagnosed with  or that Dr. Hendricks observed

that the ████████████████████████████████████████████████████████████

██████████████████  ECF No. 400-55, Hendricks Rep. ¶ 54.  The fact that Mr. Cornelison has

been diagnosed with ██████████████████ is a fact, not an opinion.  That this diagnosis is

accurate is the expert opinion of Dr. Hendricks that has not been rebutted.


240.    Over the course of Cornelison's first ten weeks in the Step-Down Program, he lost more

than 20 pounds.  Ex. 91, Cornelison Dep. at 137:15–138:9.

Defendants' SUMF Response ¶ 240:  **Disputed**: Mr. Cornelison's testimony reflects he alleges
with multiple caveats that he weighed himself on different scales and noticed the difference was
more than 20 pounds. Deposition of Derek Cornelison dated April 11, 2023 ("Cornelison Dep.")
[ECF No. 383-91] at 137:9–12; 138:4–18. It further reflects that the alleged weight loss occurred
over a period of more than eight months. "[U]pon arrival" in segregation, he claims he weighed
158. *Id.* at 137:7-10. He claims that he was in segregation "for six months waiting for transfer to
Red Onion." *Id.* at 8-9. He then claims that, after arriving at Red Onion, he went through a 30-
day intake and was sent to C Building to start his "time in solitary confinement." *Id.* at 137:15-
18. Once in C Building, he thought to step on the scale in the general area of the showers. *Id.* at
137:15-16; 138:6-11. At that time, he "probably weighed like about 130 pounds, 132 pounds,
somewhere in there, give or take a pound or two." *Id.* at 138:14-16. At that time, he had been
"solitary confinement, segregation conditions … for a period of ten weeks." *Id.* at 138:21-139:1.
Further, a sick call slip on 8/24/2016 notes that he complained of weight loss of only 11 pounds.
Exhibit 44 at VADOC-00160533. A nursing report dated October 12, 2023 reflects that Mr.
Cornelison weighed 156 pounds on June 7, 2016 and 143 pounds on September 22, 2016.
Exhibit 44 at VADOC-00160571. A follow-up on Mr. Cornelison's sick call dated October 13,
2016 reflects that the doctor reviewed his chart and found that, for his height, Mr. Cornelison's
body weight was WNL ("within normal limits"). Exhibit 44 at VADOC-00160570.

**Plaintiffs' Reply ¶ 240**:  Defendants' response does not create a genuine dispute of material

fact, as any minor discrepancy in how much weight he lost is immaterial.  *See, e.g.*, Ex. 153,

VADOC-00160474 (recording ██████████████████ on March 6, 2017).

241.    After returning to general population, Cornelison was diagnosed with pulmonary

hypertension.  *Id.* at 239:13–240:4; Ex. 16, 2023 Cornelison Decl. ¶ 40.

Defendants' SUMF Response ¶ 241:  **Not Material**: Plaintiffs offer no proof that Mr.
Cornelison's condition was caused by his time in the Step-Down Program.

**Plaintiffs' Reply ¶ 241**:  Defendants do not dispute these facts, but rather argue that they are not

material.  However, hypertension, insomnia, digestive issues, and body aches are some of the

physical ailments that can result from or worsen because of time spent in solitary confinement.

*See, e.g.*, ECF No. 400-55, Hendricks Rep. ¶¶ 23–24, 54; Ex 120, Haney Rep. ¶¶ 56, 100.  A jury

could conclude that this happened in Mr. Cornelison's case, and therefore the fact, while not

conclusive standing alone, is still material.


242.    Cornelison testified that he currently suffers from digestive issues, insomnia, and body

aches.  *Id.* ¶ 41.

Defendants' SUMF Response ¶ 242:  **Not Material**: Plaintiffs offer no proof that Mr.
Cornelison's condition was caused by his time in the Step-Down Program.

**Plaintiffs' Reply ¶ 242**:  Defendants do not dispute these facts, but rather state that they are not

material.  However, hypertension, insomnia, digestive issues, and body aches are some of the

physical ailments that can result from or worsen because of time spent in solitary confinement.

*See, e.g.*, ECF No. 400-55, Hendricks Rep. ¶¶ 23–24, 54; Ex. 120, Haney Rep. ¶¶ 56, 100.  A

jury could conclude that this happened in Mr. Cornelison's case, and therefore the fact, while not

conclusive standing alone, is still material.


## 2.    Brian Cavitt

243.    Brian Cavitt was transferred to ROSP in 2016 from the Massachusetts Department of

Corrections under the Interstate Corrections Compact.  Ex. 50, 2023 Cavitt Decl. ¶ 3.  He was

placed in the IM pathway on November 29, 2016 and classified as Level S on December 7, 2016.

He was reclassified as Level 6 on August 29, 2018 and placed in the IM Closed Pod. On

November 9, 2020, he was reassigned to the SM pathway and was placed in the SM Phase I pod

November 30, 2020.  He was reclassified as Level 5 on April 9, 2021 and placed in general

population on that same date.  Ex. 79, VADOC-00175822 (Internal Status Spreadsheet).  He

spent four years, four months, and twelve consecutive days in the Step-Down Program.

Defendants' SUMF Response ¶ 243:  **Not Disputed**.


244.    Mr. Cavitt testified that he experienced feelings of anxiety, paranoia, sensitivity to loud

noises during his time in the Step-Down Program.  Ex. 50, 2023 Cavitt Decl. ¶ 76.  Mr. Cavitt

also testified that he experienced ███████████████████████████████

█████████████  while in the Step-Down Program.  Ex. 92, Cavitt Dep. at 50:18–4

Defendants' SUMF Response ¶ 244:  **Disputed**: Mr. Cavitt did not testify that he experienced
the alleged issues "during his time in the Step-Down Program." In his declaration, he specifically
alleges that he experienced the alleged issues "only after [his] time in the Step-Down Program."
Declaration of Brian Cavitt dated September 1, 2023 ("Cavitt Decl.") [ECF No. 383-50] at ¶ 76.
Contrary to these allegations, Plaintiffs' own mental-health expert reported that he had issues
while growing up and had multiple diagnoses. Hendricks Report [ECF No. 368-1] at 20-21.
Further, Defendants' psychiatric expert opined that Mr. Cavitt's developmental history is a type
that creates anxiety for children. Expert Report of Gregory Saathoff, M.D. ("Saathoff Report")
[ECF No. 381-68] at 30. During his deposition, Mr. Cavitt testified that had a conversation with
Mr. Elam about the alleged issues but not when that conversation took place. Deposition of Brian
Cavitt dated March 20, 2023 ("Cavitt Dep.") ECF No. 383-92 at 49:10-50:22. Plaintiffs offer no
proof that Mr. Cavitt's issues were caused by his time in the Step-Down Program. In fact, he
testified that he had migraines since he was a kid. Transcript of Brian Cavitt dated March 20,
2023 ("Cavitt Dep."), cited portions attached as Exhibit 45, at 208:10-21.

**Plaintiffs' Reply ¶ 244**:  Mr. Cavitt's declaration makes clear that he experienced many new or

worsening symptoms while he was in the Step-Down Program.  *See, e.g.*, ECF No. 383-50,

Cavitt Decl. ¶¶ 34 (depression, sleep disorder, weight loss), 35 (disorientation and vertigo), 53

(mental health suffered; self-isolation, depression), 54 (depression, emotional breakdowns), 75

(migraines exacerbated by the lights in the SDP). The testimony, in its entirety, makes clear that the symptoms complained of began while in long-term segregation and continue after Mr. Cavitt's return to general population: "I believe that long term segregation led to me developing anxiety. I feel paranoid about the people around me, I'm suspicious of others, and am sensitive to loud noises, all of which has caused me to distance myself from others and isolate myself. I often feel overwhelmed by the complexity of interactions with other people. I never experienced these symptoms while imprisoned in general population prior to long term segregation, only after my time in the Step Down Program. I only realized the effect that anxiety was having on me after I returned to general population." *Id.* ¶ 76. The juxtaposition of "general population prior to long term segregation" and "after my time in the Step-Down Program" does not necessarily mean exclusively after he left the Step-Down Program but more likely, in context, means after he spent some time in the Step-Down Program. Plaintiffs do not allege as undisputed fact that Mr. Cavitt's symptoms were caused by the Step-Down Program, only that he experienced the stated symptoms, nor are Plaintiffs required to establish causation in order to establish the relevant fact that Mr. Cavitt experienced these symptoms. Further, Dr. Saathoff did not offer any opinion as to whether Mr. Cavitt's anxiety was in fact caused by his developmental history, *see* ECF No. 381-68, Saathoff Rep. at 30 (remaking that ███████████████████████████ ███████████████ but observing that Mr. Cavitt did not report anxiety until after being subjected to the Step-Down Program), so his testimony does not contradict any part of the stated fact (which is silent on causation). Further, whereas Defendants argue for other Plaintiffs that their described symptoms are not material, they make no such claim here, calling that claim into question generally. *See* Defendants' SUMF Response ¶¶ 241–42, 252, 255, 257–58.


### 3.    Peter Mukuria

245.    Peter Mukuria was classified as Level S on February 17, 2013 and assigned to the IM

pathway.  Ex. 79, VADOC-00175822 (Internal Status Spreadsheet).  He was reclassified as

Level 6 on August 24, 2016 and placed in the IM Closed Pod on August 30, 2016.  *Id*.  He was

reclassified as Level S on August 15, 2019 and placed in the SM pathway.  *Id*.  He was

reclassified as Level 6 on March 9, 2020.  *Id*.  He was reclassified as Level 5 on September 7,

2020 and entered general population the next day.  *Id*.  He spent seven years, six months, and

twenty-three consecutive days in the Step-Down Program at ROSP.

Defendants' SUMF Response ¶ 245:  **Undisputed**.


246.    Mr. Mukuria testified that he experienced anxiety, for which he was prescribed

medication during his time in the Step-Down Program.  Ex. 93, Mukuria Dep. at 173:15–17.  Mr.

Mukuria also experienced difficulty concentrating.  Ex. 79, VADOC-00175822 (Internal Status

Spreadsheet) at 173:7–13.

Defendants' SUMF Response ¶ 246:  **Disputed**: Mr. Mukuria did not testify that he experienced
the alleged issues "during his time in the Step-Dow Program." He testified that he started taking
medication for anxiety "while … at Red Onion," Deposition of Peter Mukuria dated March 28,
2023 ("Mukuria Dep.") [ECF No. 383-93] at 173:17, and that, at the time of his deposition in
March 2023, he allegedly sometimes had the alleged issues. *Id.* at 173:7-13. Plaintiffs offer no
proof that Mr. Mukuria's issues were caused by his time in the Step-Down Program. In fact, he
testified that he had ADHD before being incarcerated. *Id.* 173:20-22

**Plaintiffs' Reply ¶ 246**:  Mr. Mukuria was prescribed medication in July 2021, Ex. 154,

VADOC-00146608 at -608–609 (Medication Record of Mr. Mukuria); *see* Ex. 134, VADOC-

00175822 at lines 20255–20310 (Internal Status Spreadsheet).  His deposition testimony does

not contradict this.  Plaintiffs do not allege any facts here related to causation, so Defendants'

response does not create any dispute of fact on this issue.  Further, whereas Defendants argue for

other Plaintiffs that their described symptoms are not material, they make no such claim here,

calling that claim into question generally.  *See* Defendants' SUMF Response ¶¶ 241–42, 252,

255, 257–58.

247.    Mr. Mukuria has been diagnosed with persistent depressive disorder.  Ex. 89, Hendricks

Rep. ¶ 77.  Testing also indicates that Mukuria suffers from short-term memory problems ███

████████████████████████ the Step-Down Program and that meet the diagnostic

criteria for mild neurocognitive disorder.  *Id.*

Defendants' SUMF Response ¶ 247:  **Disputed**: The identified diagnoses were assigned by
Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. The
Henricks Report states that certain of Mr. Mukuria's are "fairly stable, though still present,"
meaning they meet the diagnostic criteria for a diagnosis of persistent depressive disorder. ECF
No. 383-89 at 34. The Hendricks Report does not state that Mr. Mukuria's alleged short-term
memory problems are reflected by any testing performed by Dr. Hendricks. Dr. Hendricks
cannot establish that any symptoms are "attributable to" the Step-Down Program.

**Plaintiffs' Reply ¶ 247**:  Defendants do not cite any evidence to dispute the fact that Mr.

Mukuria has been diagnosed with persistent depressive disorder.  The fact that Mr. Mukuria has

been diagnosed with persistent depressive disorder is a fact, not an opinion. That this diagnosis is

accurate is the expert opinion of Dr. Hendricks that has not been rebutted. Defendants' response

is argument and they do not point to any evidence in the record that would contradict Plaintiffs'

stated fact.  Dr. Hendricks' report states: ███████████████████████████

████████████████████████████████████████████████████

████████████████████████  ECF No. 400-55, Hendricks Rep. ¶ 76. The CVLT-3 is a

test of memory.  *Id*. App'x, Psychological Testing Report, at 2 ███████████████

███████████████████).  Further, whereas Defendants argue for other Plaintiffs that their

described symptoms are not material, they make no such claim here, calling that claim into

question generally.  *See* Defendants' SUMF Response ¶¶ 241–42, 252, 255, 257–58.

      **4.**    **Vernon Brooks**

248.    Vernon Brooks was classified as Level S on August 5, 2015 and placed in the IM

pathway on September 3, 2015.  Ex. 79, VADOC-00175822 (Internal Status Spreadsheet).  He

was reclassified as Level 6 on August 1, 2017 and placed in the IM Closed Pod.  *Id*.  He was

reclassified as Level S on February 16, 2018 and restarted the IM pathway at IM-0.  *Id*.  He was

reclassified as Level 6 on August 30, 2019 and placed in the IM Closed Pod.  *Id*.  He was

reclassified as Level 5 on March 9, 2020 and returned to general population two days later.  *Id*.

He spent four years, seven months, and seven consecutive days in the Step-Down Program.

Defendants' SUMF Response ¶ 248:  **Undisputed**.


249.    During his time in the Step-Down Program, Mr. Brooks experienced depression,

agitation, inability to concentrate, insomnia, short-term memory lapses, and paranoia.  ECF No.

174-19 ¶ 42 (Brooks Decl.); Ex. 94, Brooks Dep. at 149:6–19.

Defendants' SUMF Response ¶ 249:  **Disputed**: Mr. Brooks did not allege that he had
experienced the identified symptoms "[d]uring his time in the Step-Dow Program" in either of
the cited sources. In his affidavit, he asserts that he was transferred to general population in May
2020, Affidavit of Vernon Brooks dated June 20, 2022 [ECF No. 174-19] at ¶ 40 and that, at the
time of the affidavit, he allegedly suffered from various issues, *id*. at ¶ 42. He subsequently
testified that, at the time of his deposition in March 2023, he allegedly suffered from various
issues. Deposition of Vernon Brooks, Jr. dated March 21, 2023 [ECF No. 383-94] at 149:6-19.
Plaintiffs offer no proof that Mr. Brooks's issues were caused by his time in the Step-Down
Program. In fact, he testified that he had been a mental health patient since he was a youth with
multiple diagnoses and was on medication before he was incarcerated. *Id*. at 148:12-21.

**Plaintiffs' Reply ¶ 249**:  Mr. Brooks testified in his deposition that his memory problems began

while he was in long-term segregation.  Ex. 155, Brooks Dep. at 152:20–153:18.  He testified

that he first experienced paranoia while in long-term segregation.  *Id*. at 157:9–10.  He testified

that he first felt agitated while in solitary confinement.  *Id*. at 158:1–4.  He testified that his

experience in the Restorative Housing Program worsened his depression.  *Id*. at 161:4–10.  He

testified that he first experienced insomnia while in solitary confinement.  *Id*. at 161:14–162:12.

Plaintiffs do not allege any facts related to causation, so Defendants' response does not create

any dispute of fact on this issue.  Further, whereas Defendants argue for other Plaintiffs that their

described symptoms are not material, they make no such claim here, calling that claim into

question generally.  *See* Defendants' SUMF Response ¶¶ 241–42, 252, 255, 257–58.


250.    Mr. Brooks has been diagnosed with ████████████████████████████

████████████████     Ex. 89, Hendricks Rep. ¶ 38.  Mr. Brooks began taking medication for

his mental health issues in around October 2021.  ECF No. 174-19 ¶ 42 (Brooks Decl.).

Defendants' SUMF Response ¶ 250:  **Disputed**: The identified diagnoses were assigned by
Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. Mr.
Brooks did not testify that he "began" taking medication for his mental health issues in October
2021. He testified that he was taking medication before he was incarcerated. *Id.* at 148:12-
148:19.

**Plaintiffs' Reply ¶ 250**:  Although Plaintiffs accept Defendants' clarification that when he

began taking medications in October 2021, it was not the first time Mr. Brooks had ever taken

medication for mental illness; rather, October 2021 was when Mr. Brooks began taking

medications again after a long period of being denied mental health care while in VDOC

custody, including in the Step-Down Program.  *See also* Ex. 155, Brooks Dep. at 155:5–156:4;

Ex. 156, VADOC-00050605 at -605–606 (email regarding Mr. Brooks' mental health

complaint); Ex. 157, VADOC-00174671 at lines 3785, 3861, 3864 (Grievance Spreadsheet).  In

addition, the fact that Mr. Brooks has been diagnosed with ████████████████████████

████████████████     is a fact, not an opinion.  That this diagnosis is accurate is the expert

opinion of Dr. Hendricks that has not been rebutted.  Further, whereas Defendants argue for

other Plaintiffs that their described symptoms are not material, they make no such claim here,

calling that claim into question generally.  *See* Defendants' SUMF Response ¶¶ 241–42, 252,

255, 257–58.

5.    **William Thorpe**

251.    William Thorpe was classified as Level S and held in long-term solitary confinement prior to the implementation of the Step-Down Program.  ECF No. 174-27 ¶ 3 (Thorpe Decl.); Ex. 79, VADOC-00175822 (Internal Status Spreadsheet) (*see* lines 3636–3650).  He was reclassified as Level 6 on September 4, 2013.  *Id*.  He was briefly classified as Level 5 from January 1–26, 2016.  *Id*.  He was then reclassified as Level S on January 26, 2016, and remained at that classification until he was transferred to the Texas Department of Criminal Justice under the Interstate Corrections Compact on May 29, 2019.  *Id*.; ECF No. 174-27 ¶ 3 (Thorpe Decl.).  Thorpe spent over 24 years in long-term solitary confinement while in VDOC custody, including almost seven years in the Step-Down Program at ROSP.  ECF No. 174-27 ¶ 10 (Thorpe Decl.).

Defendants' SUMF Response ¶ 251:  **Disputed in part**: The materials cited by Plaintiffs do not support that William Thorpe spent any time in "long-term solitary confinement."

**Plaintiffs' Reply ¶ 251**:  The nature of Defendants' dispute is unclear.  *See* ECF No. 299, Opinion and Order dated Apr. 12, 2023, at 3 n.3 ("After the filing of this suit, VDOC began calling the subject housing 'restorative housing.'  Prior to 2021, VDOC referred to it as 'restrictive housing.'  I will refer to this housing arrangement in the more traditional way as solitary confinement.").  Mr. Thorpe stated:  "I was one of the first inmates at ROSP when it opened in 1998.  I underwent a brief transfer to Wallens Ridge State Prison ("WRSP") in 2002, but then was transferred back to ROSP in 2003.  I remained in long-term solitary confinement the entire time."  ECF No. 174-27, Thorpe Aff. ¶ 7.  He also stated:  "Before being transferred out of state, I had spent over twenty-four years in long-term solitary confinement including approximately seven years at ROSP on the IM pathway."  *Id.* ¶ 10.  He also stated, "While confined at ROSP in the IM pathway, I was subject to long-term solitary confinement."  *Id.* ¶ 11.

These statements clearly support the fact that Mr. Thorpe spent many years—in fact, decades—in long-term solitary confinement. This is additionally supported by the Internal Status Spreadsheet, columns F and G, which reflect that Mr. Thorpe was classified as Level S as of September 7, 2010 at the latest. Ex. 134, VADOC-00178522 at lines 3636–3650 (Internal Status Spreadsheet).

252. Mr. Thorpe claims to suffer from the following impairments: non-mobility, high blood pressure, glaucoma, restlessness, agitation, anxiety, irregular bowel movements, loss of hair, kidney disease, tingling in his right hand, and hearing loss. *See generally* Ex. 67, Thorpe Dep. at 58:9–64:12. Mr. Thorpe claims he is restless and experiences racing thoughts. *Id*. at 100:12–15.

Defendants' SUMF Response ¶ 252:  **Not Material**: Plaintiffs offer no proof that Mr. Thorpe's alleged impairments were caused by his time in the Step-Down Program.

**Plaintiffs' Reply ¶ 252**:  Defendants do not dispute these facts but rather argue that they are not material. However, the symptoms reported by Mr. Thorpe are some of the physical and psychiatric ailments that can result from or worsen because of time spent in solitary confinement. *See, e.g.*, ECF No. 400-55, Hendricks Rep. ¶¶ 23–24, 54; Ex. 120, Haney Rep. ¶¶ 56, 100. A jury could conclude that this happened in Mr. Thorpe's case, and therefore the facts, while not conclusive standing alone, are still material.

253. Psychological testing indicates that Thorpe meets the diagnostic criteria for ███████ ██████████████████████████████████ Ex. 89, Hendricks Rep. ¶ 116.

Defendants' SUMF Response ¶ 253:  **Disputed**: The identified diagnoses were assigned by Plaintiffs' expert for this litigation; they are not prior diagnoses and are opinion, not fact. Dr. Hendricks claims Mr. Thorpe meets the criteria for certain diagnoses based on his interpretation of psychological testing performed by another psychologist retained by Plaintiffs, who diagnosed Mr. Thorpe differently. Transcript of Mollimichelle Cabeldue, Ph.D. dated August 14, 2023

("Cabeldue Dep."), cited portions attached as Exhibit 46, at 89:11-90:7. Defendants dispute that
Dr. Hendricks's opinion establishes the allegation as undisputed fact.

**Plaintiffs' Reply ¶ 253**:  Defendants do not dispute that psychological testing indicates that Mr.

Thorpe meets the diagnostic criteria for ████████████████████████████████

████████████████    The fact that Mr. Thorpe has been diagnosed with PTSD and major

depressive disorder, severe with psychotic features, is a fact, not an opinion.  That this diagnosis

is accurate is the expert opinion of Dr. Hendricks that has not been rebutted.  Defendants'

argument and cited evidence do not create a genuine dispute of material fact, and in any event, it

mischaracterizes the evidence.  *See* ECF No. 393, Pls.' Opp. to Defs.' Mot. to Exclude the Rep.

and Testimony of Michael L. Hendricks at 6–10.


### 6.    Gary Wall

254.    Gary Wall was classified as Level S prior to the implementation of the Step-Down

Program in 2012.  Ex. 79, VADOC-00175822 (Internal Status Spreadsheet) (*see* lines 12278–

12326).  He was reclassified as Level 6 on August 30, 2013.  *Id*.  He was then reclassified as

Level S on September 24, 2013 and placed in the SM pathway at ROSP.  *Id*.  He was reclassified

as Level 6 on September 23, 2014, and as Level 5 on May 5, 2015. *Id*.  From the start of the

Class Period (August 1, 2012) until his reclassification as Level 5, Mr. Wall spent two years,

nine months and five consecutive days in the Step-Down Program.  He was then reclassified as

Level S on September 3, 2015 and placed in the IM pathway.  *Id*.  He was reclassified as Level 6

on May, 29, 2019.  *Id.*  He was reclassified as Level 5 on June 1, 2020 and placed in general

population the next day.  Ex. 79, VADOC-00175822 (Internal Status Spreadsheet).  Mr. Wall's

second placement in the Step-Down Program lasted four years, eight months, and thirty

consecutive days.

Defendants' SUMF Response ¶ 254:  **Disputed in part**: Gary Wall asserted under penalty of perjury that he was assigned to SL-S at Wallens Ridge State Prison in December 2012. Affidavit of Gary Wall dated June 20, 2022 [ECF No. 174-28] at ¶ 3.

**Plaintiffs' Reply ¶ 254**:  Mr. Wall's affidavit reflected his best understanding of his security classification history at the time it was executed.  That information was clarified by data provided by VDOC in the Internal Status Spreadsheet.  Plaintiffs now rely on the data provided by VDOC, which Defendants do not dispute.

255.    Mr. Wall testified that he was diagnosed by VDOC mental health providers with PTSD in 2014 after suffering a dog bite while housed in the Step-Down Program at ROSP.  Ex. 15, 2023 Wall Decl. ¶¶ 15–16.  His symptoms included heart palpitations, sweaty hands, insomnia, night sweats, nightmares, and anxiety.  *Id.* ¶ 15.  He was prescribed medication for his symptoms, and his mental health code was increased to MH-2.  *Id.* ¶ 16.

Defendants' SUMF Response ¶ 255:  **Not Material**: Plaintiffs offer no proof that Mr. Wall's alleged issues were caused by his time in the Step-Down Program, as opposed to the dog bite or other pre-existing conditions/experiences.

**Plaintiffs' Reply ¶ 255**:  Defendants do not dispute these facts but rather argue that they are not material.  However, Mr. Wall's mental health, regardless of the cause of any mental illness, is relevant to many aspects of Plaintiffs' claims, and Defendants do not adequately argue why it is not.

256.    Subsequent psychological testing confirmed that Mr. Wall exhibits the symptoms of ███.  Ex. 89, Hendricks Rep. ¶ 100.

Defendants' SUMF Response ¶ 256:  **Disputed**: The identified testing and confirmations were performed by Plaintiffs' expert for this litigation; they are not prior assessments and are opinion, not fact.

**Plaintiffs' Reply ¶ 256**:  Defendants do not dispute that Dr. Hendricks observed that Mr. Wall

exhibits the symptoms of ████ and cite no evidence to the contrary.  The fact that Mr. Wall has

been diagnosed with ████ is a fact, not an opinion.  That this diagnosis is accurate is the expert

opinion of Dr. Hendricks that has not been rebutted.  *See* ECF No. 383-98, Saathoff Dep. at

221:19–222:22 (defendants' expert agrees that Mr. Wall has been diagnosed with PTSD and

considers possible causes).

257.    While in the IM pathway in 2016, he began to have thoughts of suicide.  Ex. 15, 2023
Wall Decl. ¶ 29.

Defendants' SUMF Response ¶ 257:  **Disputed / Not Material**: An unsubstantiated statement as
to what a Plaintiff "thought" at a given point in time cannot be considered an "undisputed fact"
because its truth or falsity necessarily requires assessing the credibility of the declarant. Plaintiffs
offer no proof that Mr. Wall's alleged thoughts were caused by his time in the Step-Down
Program, as opposed to other issues.

**Plaintiffs' Reply ¶ 257**:  A Plaintiffs' declaration can establish a fact even if uncorroborated by

other evidence.  *See* Fed. R. Civ. P. 56 ("An affidavit or declaration used to support or oppose a

motion must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant or declarant is competent to testify on the matters stated."); *see also*

*Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 159–60 (4th Cir. 2018) (noting that

evidence corroborating plaintiff's affidavit was not necessary); *In re Apex Exp. Corp.*, 190 F.3d

624, 635 (4th Cir. 1999) (accepting evidence from affiant who was competent to testify on the

subject).  Defendants have not produced any evidence to show that Mr. Wall is not competent to

testify, lacks personal knowledge of his own mental and emotional state, and that his description

of his own mental and emotional state would not be admissible at trial.  Nor have Defendants

identified any evidence in the record that would contradict Mr. Wall's testimony on this fact.

Plaintiffs do not allege in this SUMF that Mr. Wall's suicidal thoughts were caused by the Step-

Down Program, so Defendants' response does not create a genuine issue of fact on that point.

Nonetheless, the fact that Mr. Wall experienced suicidal thoughts is material to various aspects

of Plaintiffs' claims.


258.    Since returning to general population, Mr. Wall continues to have a hard time sleeping,

feels anxious and paranoid around other people, and has panic attacks.  *Id*. ¶ 52.  VADOC

documents show that Mr. Wall lost weight while in the Step Down program.  Ex. 95, VADOC-

00001279 (Wall Medical Records) at -358 (Wall weighed 154 pounds on December 18, 2012), -

309 ██████████████████████████████ ), -307 (Wall weighed 135.8

pounds on July 7, 2017, his height was 6 foot, 1 inches, and he was prescribed Boost, a

supplement for weight gain), -298 (On November 18, 2018, Wall was 6 feet and 1 inch tall,

weighed 140.2 pounds, and was deemed ████████ and prescribed a Boost supplement).

VDOC documents also show that Mr. Wall's mental health deteriorated while he was in the

Step-Down Program and he suffered from depression.  Ex. 96, VADOC-00148900 (July 22,

2017 Wall Mental Health Coding Classification Review/Update) (Wall's mental health code was

changed from MH-1 ████████████ to MH-2 ████████ on July 22, 2017

without explanation); Ex. 7, VADOC-00149015 (July 22, 2017 Wall Mental Health Screen:

Special Housing Assignment) (In a July 22, 2017 Mental Health Screening, Mr. Wall is

diagnosed with depression and prescribed Prozac).

Defendants' SUMF Response ¶ 258:  **Not Material**: Plaintiffs offer no proof that Mr. Wall's
alleged issues were caused by his time in the Step-Down Program, as opposed to other issues. In
fact, Mr. Wall described to Defendant's psychiatric expert a traumatic childhood. Saathoff
Report [ECF No. 381] at 105-108.

**Plaintiffs' Reply ¶ 258**:  Defendants do not dispute these facts but rather argue that they are not

material.  However, they do not explain why, simply arguing without citing any evidence in the

record that Plaintiffs offer no proof that Mr. Wall's issues were caused by his time in the Step-

Down Program. Plaintiffs are not required to establish causation in order to establish the

relevant fact that Mr. Wall suffered from the symptoms described.


### 7.    Frederick Hammer

259.    Frederick Hammer was classified as Level S on April 4, 2012 and assigned to the IM

pathway. Ex. 79, VADOC-00175822 (*See* Rows 24852–24866). He was reclassified as Level 6

on August 28, 2013 and placed in the IM Closed Pod on September 23, 2013. *Id*. He was

reclassified as Level S on July 31, 2014 and placed in the IM pathway. *Id*. He was reclassified

as Level 6 on July 25, 2016 and placed in the IM Closed Pod. *Id*. He was reclassified as Level 5

on March 9, 2020 and returned to the general population two days later. *Id*. He spent seven

years, eleven months, and six consecutive days in the Step-Down Program.

Defendants' SUMF Response ¶ 259:  **Disputed**: The class period for the beginning of the Step-
Down Program begins on August 1, 2012. Plaintiffs offer no proof that Frederick Hammer was
"in the Step-Down Program" before that date. Using the beginning of the class period, the
correct calculation for Mr. Hammer's time in the Step-Down Program is 7 year, 7 months, and 9
days.

**Plaintiffs' Reply ¶ 259**:  Defendants do not (and cannot) dispute that Mr. Hammer was

classified as Level S on April 4, 2012. Ex. 134, VADOC-00178522 at lines 24852–24866,

Columns F-G (Internal Status Spreadsheet). And Defendants do not (and cannot) dispute that

Mr. Hammer had an internal status ID of ROSP Intensive Management as of October 19, 2012.

*Id.* at line 24852. Plaintiffs do not dispute that, using August 1, 2012 as the start date, Mr.

Hammer spent 7 years, 7 months, and 9 days in the Step-Down Program; this difference is not

material, however, and Defendants have failed to create a genuine dispute of material fact.

260.    Mr. Hammer testified that he suffers the following ailments: anxiety, depression, agitation, anger, mood swings, bouts of disorientation, inability to concentrate, thoughts of suicide and other self-harm, shortness of breath, headaches, migraines, restlessness, and insomnia.  He also now suffers from physical ailments such as type 2 diabetes, acid reflux, and arthritis.  Ex. 98, Hammer Decl. ¶ 44.

Defendants' SUMF Response ¶ 260:  **Disputed**: Mr. Hammer did not allege that he currently suffers from the alleged ailments in the first statement, only that he "[has] experienced" them. Declaration of Frederick Hammer dated September 6, 2023 [ECF No. 383-98] at ¶ 44. Mr. Hammer is not qualified to determine that his alleged ailments were caused by his time in the Step-Down Program.

**Plaintiffs' Reply ¶ 260**:  Mr. Hammer's declaration states that he currently suffers from "physical ailments such as type 2 diabetes, acid reflux, and arthritis."  ECF No. 383-98, Hammer Decl. ¶ 44.  Plaintiffs accept Defendants' clarification that Mr. Hammer "has experienced" the other symptoms listed, but this difference is not meaningful enough to create genuine issue of material fact.  Mr. Hammer testified about these symptoms in his deposition.  *See* Ex. 123, Hammer Dep. at  33:8–34:8 (experiencing thoughts of suicide, including up to "a couple of weeks" prior to his deposition), 39:19–40:10 (experiencing anxiety around 2011-2012), 273:17– 274:12 (experiencing migraines while in solitary confinement).  Plaintiffs' fact does not allege that Mr. Hammer provides any cause of his ailments, so Defendants' response does not create any dispute of fact on that point.  Further, whereas Defendants argue for other Plaintiffs that their described symptoms are not material, they make no such claim here, calling that claim into question generally.  *See* Defendants' SUMF Response ¶¶ 241–42, 252, 255, 257–58.

### 8.    Steven Riddick

261.    Steven Riddick was classified as Level S prior to the implementation of the Step-Down Program, and was reclassified as Level 6 on August 30, 2013, after which he was

housed primarily in the Level 6 Secure Integration Pod at ROSP.  Ex. 79, VADOC-00175822

(*see* lines 506-534).  He was reclassified as Level S on September 12, 2014 and placed in the SM

pathway.  *Id*.  He was reclassified as Level 6 on September 22, 2017, but on October 2, 2017 was

again classified as Level S and restarted the SM pathway.  *Id*.  He was reclassified as Level 6 on

October 28, 2021.  *Id*.  He was reclassified as Level 5 and returned to general population on

March 17, 2023.  *Id*.  After being removed from the SIP Pod and before returning to general

population, Mr. Riddick spent eight years, six months and six consecutive days in the Step-Down

Program.

Defendants' SUMF Response ¶ 261:  **Undisputed**.


262.    While in the Step-Down Program, Mr. Riddick testified that he experienced paranoia,

trouble sleeping, nightmares, mood swings, difficulty concentrating, lack of focus, racing

thoughts, and hallucinations.  Ex. 43, 2023 Riddick Decl. ¶  30.  He also heard voices.  *Id.*

Defendants' SUMF Response ¶ 262:  **Disputed**: Plaintiffs offer no proof that Mr. Riddicks's
alleged issues were caused by his time in the Step-Down Program, as opposed to other issues. In
fact, he told Defendant's psychiatric expert that he had certain mental health issues as a child
because of traumatic incidents. Saathoff Report [ECF No. 381-68] at 71. He also claimed to have
mental health issues during his time in the U.S. Navy. *Id.* at 71-72. Further testing done during
Mr. Riddick's time in the Step-Down Program revealed no significant issues. *Id.* at 78. In
summary, Dr. Saathoff opines that Mr. Riddick's "claims of some of the most serious and severe
symptoms that any psychiatric patient can experience are inconsistent with someone who is
completely stable without psychiatric medication." *Id.* at 104.

**Plaintiffs' Reply ¶ 262**:  Defendants do not cite any evidence to dispute Plaintiffs' alleged facts.

Instead, they simply argue that Plaintiffs offer no proof that Mr. Riddick's issues were caused by

his time in the Step-Down Program.  But Plaintiffs' stated fact makes no such claim.  Plaintiffs

are not required to establish causation in order to establish the relevant fact that Mr. Riddick

suffered from the symptoms described.  Further, whereas Defendants argue for other Plaintiffs

that their described symptoms are not material, they make no such claim here, calling that claim

into question generally.  *See* Defendants' SUMF Response ¶¶ 241–42, 252, 255, 257–58.


263.    Mr. Riddick was eventually diagnosed by VDOC mental health staff with ████████

███████████████████████, and was prescribed medications.  *Id.* ¶ 51.

Psychological testing confirmed a diagnosis of ██████████████████████████████

████    Ex. 89, Hendricks Rep. ¶ 85.

Defendants' SUMF Response ¶ 263:  **Disputed**: The identified diagnosis was assigned by
Plaintiffs' expert for this litigation; it was not a prior diagnosis and is opinion, not fact. Plaintiffs
offer no proof that Mr. Riddicks's alleged issues were caused by his time in the Step-Down
Program, as opposed to other issues.

**Plaintiffs' Reply ¶ 263**:  Defendants do not cite any evidence to dispute the fact that Mr.

Riddick was diagnosed with ████████████████████████████, and was

prescribed medications, and that Dr. Hendricks confirmed a diagnosis of ████████████

███████████████████    Defendants apparently do not dispute the diagnosis of

Mr. Riddick by VDOC mental health staff in the first sentence of Plaintiffs' SUMF paragraph

263.  Further, whereas Defendants argue for other Plaintiffs that their described symptoms are

not material, they make no such claim here, calling that claim into question generally.  *See*

Defendants' SUMF Response ¶¶ 241–42, 252, 255, 257–58.

Dated:  October 24, 2023                              Respectfully submitted,


                                                     */s/ Megan A. Crowley*
                                                     Megan A. Crowley (*pro hac vice*)
                                                     Jared Frisch (*pro hac vice*)
                                                     Paul Wilson (*pro hac vice*)
                                                     Covington & Burling LLP
                                                     850 Tenth Street, NW
                                                     Washington, DC 20001-4956
                                                     Telephone: (202) 662-6000
                                                     mcrowley@cov.com
                                                     jfrisch@cov.com
                                                     pwilson@cov.com

                                                     William O'Neil (*pro hac vice*)
                                                     Matthew Phelps (*pro hac vice*)
                                                     Covington & Burling LLP
                                                     The New York Times Building
                                                     620 Eighth Avenue
                                                     New York, NY 10018-1405
                                                     Telephone: (212) 841-1000
                                                     woneil@cov.com
                                                     mphelps@cov.com

                                                     Vishal Agraharkar (VSB #93265)
                                                     Eden B. Heilman (VSB #93554)
                                                     Geri Greenspan (VSB #76786)
                                                     Matthew Callahan (*pro hac vice*)
                                                     ACLU of Virginia
                                                     701 E. Franklin Street, Ste. 1412
                                                     Richmond, VA 23219
                                                     Telephone: (804) 644-8022
                                                     vagraharkar@acluva.org
                                                     eheilman@acluva.org
                                                     ggreenspan@acluva.org
                                                     mcallahan@acluva.org

                                                     Kathryn Ali (VSB #97966)
                                                     Ali & Lockwood LLP
                                                     300 New Jersey Avenue, NW, Ste. 900
                                                     Washington, DC 20001
                                                     Telephone: (202) 651-2475
                                                     katie.ali@alilockwood.com

                                                     Maxwell J. Kalmann (*pro hac vice*)

1818 Library Street, 10th Floor
Reston, VA 20190
(650) 586-1043
maxkalmann@meta.com

*Counsel for Plaintiffs*

<u>**Certificate of Service**</u>

I hereby certify that on the 24th day of October 2023, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to all CM/ECF participants.

*/s/ Megan A. Crowley*
Megan A. Crowley (*pro hac vice*)
Jared Frisch (*pro hac vice*)
Paul Wilson (*pro hac vice*)
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
mcrowley@cov.com
jfrisch@cov.com
pwilson@cov.com

William O'Neil (*pro hac vice*)
Matthew Phelps (*pro hac vice*)
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1000
woneil@cov.com
mphelps@cov.com