# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF VIRGINIA
### Big Stone Gap Division

| | |
|---|---|
| WILLIAM THORPE, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 2:20-cv-00007-JPJ-PMS |
| VIRGINIA DEPARTMENT OF CORRECTIONS, *et al.*, | ) |
| Defendants. | ) |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

Under the guise of seeking a protective order, Plaintiffs ask this Court to issue a preliminary injunction based on claims not a part of this litigation. The primary purpose of Plaintiffs' motion is to enjoin Red Onion State Prison's use of its Safety Agreement for Inmates ("Safety Agreement"), particularly as related to cell outlet electrical power; it is not to address any alleged retaliation for participation in this lawsuit. Plaintiffs' stale, unsubstantiated, hearsay allegations of retaliation do not establish otherwise. Plaintiffs do not satisfy the requirements for injunctive relief, and this Court should not grant such an injunction labelled as a protective order.

Nor does any compelling reason exist for the Court to entertain evidentiary rulings at this stage of the case. Plaintiffs' purported concern that Defendants might seek to use statements in signed Safety Agreements as party admissions constitutes an evidentiary issue that, along with multiple other evidentiary issues, can and should be resolved at the appropriate time, if necessary. Nevertheless, for the avoidance of any doubt, Defendants consent not to attempt to use any of the form statements on a signed Safety Agreement as a party admission in this litigation.

I.      FACTS

Each cell at Red Onion State Prison ("ROSP") contains a standard electrical outlet that inmates at ROSP can use to power a television and/or charge a JP6 player. Inmates are not allowed to have other items in their cell that require electrical power. Affidavit of D. Turner ("Turner Aff."), attached as Exhibit 1, at ¶ 9. ROSP staff can externally deactivate the cell outlet without affecting the flow of electricity to the lighting in the cell or any other condition of confinement. *Id.* at ¶ 10.

Over the past calendar year, a small number of inmates at ROSP has used the outlet in their cells to inflict burns on their arm or leg, typically by inserting pieces of wire into the outlet and applying the wires to their skin. These burns typically have been superficial and not sufficiently serious to warrant the need for outside medical attention. *Id.* at ¶ 4.

Nevertheless, when an incident like this occurs, the inmate is evaluated by a Mental Health Clinician as soon as possible. At the time of each of these incidents, none of the inmates involved had a mental health diagnosis indicating that they were seriously mentally ill. *Id.* at ¶ 6. When asked about the reason for their behavior, several of the inmates expressed the belief that their actions might result in a transfer from ROSP. The inmates' reasons focused on ROSP's location or a protest for disciplinary action, not the Step-Down Program, or the availability or sufficiency of mental health services at ROSP. *Id.* at ¶ 7. With the exception of one inmate who engaged in the behavior on two separate occasions, none of the other inmates were deemed to be at risk of further self-injurious behavior, so were not placed on specialized precautions. Affidavit of D. Malone ("Malone Aff."), attached as Exhibit 2, at ¶ 5.

As incidents like this get publicized and gain attention, they can lead to copycat attempts by other inmates. Turner Aff. at ¶¶ 8, 11. Following an increase in the prevalence of these incidents in the fall of 2024, ROSP identified a need to take action to address the issue in an attempt to avoid

an increase in the rate that they were occurring and the potential for accidental infliction of a more serious injury. ROSP leadership considered multiple approaches, including turning off the power to all in-cell outlets. Turner Aff. at ¶ 11. They concluded, however, that it would be preferable not to eliminate in-cell outlet privileges for all inmates because of the actions of a few inmates. *Id.* at ¶ 12.

Further discussion between ROSP security leadership and mental-health leadership resulted in the decision to keep the in-cell outlets active for those inmates who agreed to refrain from using the outlets to attempt to burn themselves. The in-cell outlets for inmates who refused to agree not to attempt to burn themselves would be deactivated. *Id.* at ¶ 13. In addition, the interdisciplinary leadership team decided to offer those inmates who signed the agreement additional incentives over time as they continue to honor their commitment. *Id.* at ¶ 17. ROSP introduced the resulting Safety Agreement to the inmate population on or about January 20, 2025. *Id.* at ¶ 15.

The Safety Agreement is based on a technique known as a safety plan that is used both inside and outside of correctional settings. For example, inmates who wish to self-administer their medications are asked to sign a Keep on Person Contract, verifying that they will use their medication only as prescribed and will immediately report any lost or missing medication to the medical department. VDOC Operating Procedure 720.5, Pharmacy Services, at VIII. Similarly, inmates placed on self-management housing plans or enrolled in an intensive reentry program are asked to agree to a specific action plan. Malone Aff. at ¶ 12. Outside correctional settings, safety plans are used in clinical and therapeutic settings and have been used as a resource in other community settings, such as schools and substance abuse support groups. *Id.* at ¶ 8. The focus of

a safety plan is to obtain the individual's buy-in to their own safety, strengthen their sense of accountability, and make them aware of available resources. *Id.* at ¶ 7.

The Safety Agreement employs this technique. The goal of the Safety Agreement is "to establish a clear understanding of the expectations and resources available to prevent self-harm and other risky behaviors." Turner Aff. at Enclosure A. By signing, the inmate commits to his "mental and emotional health while incarcerated" and agrees to "actively engage in" the facility's safety protocols. *Id.* In particular, the inmate agrees to refrain from self-harm, use mental health and other local resources if he feels "overwhelmed or in distress," and to immediately inform staff if he experiences "thoughts or urges related to self-harm or … feel[s] unsafe in any way." *Id.* To further strengthen the inmate's commitment to abiding by their agreement, the Safety Agreement includes incentives, based on the period of maintaining their commitment to safety and good behavior, that include an option to view movies and an exclusive television series on their personal television, an opportunity for congregate recreation for inmates in privilege levels that do not currently have that option, a free commissary bag containing consumable commissary items, and a special meal. Turner Aff. at ¶¶ 17–23.

ROSP implemented the Safety Agreement by first distributing copies of that agreement to all inmates in the Step Down Program for their review, then offering each inmate an opportunity to speak privately with members of the Multi-Disciplinary Team ("MDT"). The MDT then gave the inmate the opportunity to ask questions and have any concerns addressed before he was asked to sign it. No inmate was threatened with harm or retaliation for refusing to sign. Turner Aff. at ¶ 15. ROSP devised the Safety Agreement to ensure that inmates within the Step-Down Program knew how and when to seek help from mental-health staff and to encourage positive behaviors in that environment. Malone Aff. at ¶ 13.

For those inmates who signed the Safety Agreement, the conditions of confinement have remained unchanged with the exception of the availability of the additional incentives. The agreement is reviewed with the inmate every 30 days to ensure that he has the opportunity to discuss any concerns related to his safety or mental health. Turner Aff. at ¶ 24. For those inmates who have not signed the Safety Agreement, only the in-cell outlets have been deactivated. *Id.* at ¶ 16. They can continue to view wall-mounted televisions in the pods during pod recreation. *Id.* at ¶ 28. They can continue to use the pod kiosks during pod recreation to access their JPay accounts to send and receive electronic messages. They also can charge their personal JP6 players using the kiosks. *Id.* at ¶ 29. Their visitation and telephone privileges, as well as other privileges like sending and receiving mail, requesting and receiving publications and other items from the prison library, recreation, etc., remain unaffected. *Id.* at ¶ 30. For the handful of inmates who have refused to sign the Safety Agreement and access religious programming, ROSP has made accommodations: a television is placed outside the inmate's cell door at the time of the religious programming, and the religious programming also is displayed on the television mounted on the pod wall. *Id.* at ¶ 31.

To date, the Safety Agreement appears to have been successful. All but thirteen of the inmates in the Step-Down Program have signed the agreement, and participation has increased as the inmates see ROSP meeting its commitment to provide the incentives milestones. *Id.* at ¶ 25. Further, ROSP has not experienced an incident of an inmate attempting to use his in-cell outlet to attempt to burn himself since it implemented the Safety Agreement. *Id.* at ¶ 26.

II.  **ARGUMENT**

Plaintiffs' arguments and the facts they put before this Court demonstrate that they seek an order not to prevent alleged threats to the proper functioning of this litigation or alleged retaliation, threatened or otherwise, directed at inmates for participating in this litigation, but rather, to enjoin ROSP from continuing to use an initiative intended to reduce incidents of self-harm. In other

5

words, Plaintiffs seek not a protective order, but a preliminary injunction. Labelling their motion as one for a "protective order" neither changes its basic nature nor obviates Plaintiffs' obligation to establish all of the elements necessary to grant the interlocutory injunctive relief that they seek. Plaintiffs make no attempt to meet those elements; nor could they do so if they had tried. Accordingly, this Court should deny Plaintiffs' motion.

### A. Legal Standard

The party seeking a preliminary injunction must establish by a preponderance of the evidence all four of the following elements: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) the injunction is in the public interest. *Wood v. Felts*, No. 7:23-CV-00636, 2024 WL 3933866, at *1 (W.D. Va. Aug. 23, 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Courts should grant preliminary injunctive relief involving the management of prisons only under exceptional and compelling circumstances." *Maddox v. Johnson*, No. 7:09CV00179, 2010 WL 1030926, at *3 (W.D. Va. Mar. 15, 2010) (citing *Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir.1994)).

### B. Plaintiffs Seek a Preliminary Injunction That Is Not Warranted.

Plaintiffs devote the "Legal Standard" portion of their brief on this Court's authority to grant a protective order to protect the proper functioning of this litigation and to prevent the fear of retaliation for participating in the case. ECF 487 ("Ps' Br.") at 7–9. They then preface their argument by alleging that Defendants are punishing Plaintiffs for refusing to make allegedly untrue statements with which Plaintiffs disagree before turning to the actual purpose of their motion.

The crux of Plaintiffs' argument does not revolve on any threat to the proper functioning of this case, but rather, on arguments for a case that has not been filed. They assert that use of the "Safety Agreement is blatantly unconstitutional" because it allegedly violates the inmates' First

Amendment Right to freedom of speech. *Id*. at 9. They then argue that it violates the Religious Land Use and Institutionalized ("RLUIPA") and the Free Exercise Clause of the First Amendment. *Id.* at 9–10. But neither a First Amendment, whether freedom of speech or free exercise clause, nor a RLUIPA claim is at issue in this case. Enjoining VDOC from using the Safety Agreement based on those arguments necessarily would entail granting injunctive relief on claims that have not been brought in this lawsuit or any other.

The analysis of the court in *Adams v. NaphCare, Inc.* provides useful context here. No. 2:16-CV-229, 2016 WL 10492102, at *9–13 (E.D. Va. July 25, 2016), report and recommendation adopted sub nom. *Adams v. NaphCare, Inc.*, No. 2:16CV229, 2016 WL 4618894 (E.D. Va. Sept. 6, 2016). Like Plaintiffs here, the plaintiff in *Adams* filed a motion for protective order on the premise that the court could issue a protective order to protect inmates from alleged retaliation by corrections personnel. *Id.* at *9. Like Plaintiffs here, the plaintiff in *Adams* filed the motion under Federal Rule of Civil Procedure 26(c). In support, that plaintiff cited a District of New Jersey case that, in turn, relied heavily on *Ben David v. Travisono*, 495 F.2d 562 (1st Cir. 1974), i.e., the same case cited by Plaintiffs here, in affirming that it had the inherent equitable power to enter such protective order. *Adams* at *9. After analyzing the *Travisono* decision and decisions in other courts where similar protective orders had been sought, the *Adams* court concluded that, while it likely had the authority to issue a protective order "directing jail personnel to not 'retaliate' against the inmate witnesses for their participation in the lawsuit," the plaintiff was requesting relief more commonly sought under a motion for preliminary injunction. *Id.* at *10–11. Citing multiple Fourth Circuit cases that caution against courts' micromanagement of prisons, the court concluded that it likely did not have the authority to issue a protective order granting the relief sought by plaintiff. *Id.* at *12–13. Moreover, it concluded that, given the plaintiff's failure "to establish that the Court's

fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order," entry of any type of protective order was not justified. *Id.* at \*14.

This Court should reach the same conclusion here. Plaintiffs seek relief more commonly sought under a motion for preliminary injunction: enjoining Defendants from continuing to implement an ROSP initiative designed to prevent self harm. Plaintiffs make no attempt to establish by a preponderance of the evidence any, much less all four, of the elements that they have the burden to establish by a preponderance of the evidence to succeed on such a motion. Absent such an attempt, Defendants are under no obligation to establish that Plaintiffs have not met their burden.

Nevertheless, Defendants note that Plaintiffs could not carry such a burden. As to the first element, likelihood of success on the merits, "a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997). This rule furthers the overarching purpose of a preliminary injunction, which "is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Sun Microsystems, Inc. v. Microsoft Corp. (In re Antitrust Litig.)*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). Accordingly, a motion for a preliminary injunction must be tied to the merits of the underlying complaint; it is not an appropriate vehicle for asserting new claims. *See Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (affirming denial of motion for preliminary injunction based on prisoner's allegations that prison officials had retaliated against him after he filed suit); *see also Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 199 (2d Cir. 1985) ("hold[ing] that no

jurisdictional basis existed upon which the district court herein could have issued its preliminary injunctive relief" where plaintiff's motion presented issues entirely different from those raised in the complaint). Because Plaintiffs' basis for attacking the Safety Agreement is predicated on unpled constitutional arguments and claims, rather than the merits of this underlying lawsuit, their motion fails at the outset.

As to the second element, Plaintiffs are not likely to suffer irreparable harm absent preliminary relief. A claim or injury is not "irreparable" if there is an adequate remedy at law for such claim or injury. *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). In addition, to qualify as "irreparable," the harm must be "neither remote nor speculative, but actual and imminent," *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989), such that it imposes a real and immediate threat, *Dan River, Inc. v. Icahn*, 701 F.2d 278, 283 (4th Cir. 1983). That is, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

Here, no Named Plaintiff even has submitted a declaration in support of Plaintiffs' motion. Regardless, any inability to watch personal television or charge a JP6 Player in the inmate's cell during the remaining pendency of this litigation does not constitute irreparable harm. Because Plaintiffs' allegations do not establish that implementation of the Safety Agreement creates a real and immediate threat of irreparable injury, Plaintiffs are not entitled to preliminary injunctive relief. *See, e.g.*, *Blount v. Tate*, No. 7:08CV00471, 2009 WL 102443, at *2 (W.D. Va. Jan. 14, 2009) ("Blount's assertions that without court intervention, further acts of 'retaliation' may occur in response to his lawsuits are nothing but speculation. His self-serving version of defendants'

comments alone is not sufficient to offer any indication that he is in imminent danger of any harm to himself or his litigation efforts at the hands of these defendants or anyone else. Accordingly, his motions for interlocutory injunctive relief must be denied.").

As to the third factor, the balance of equities tips in Defendants' favor, not Plaintiffs'. Those inmates who have signed the Safety Agreement should not be deprived of its benefits to mollify the small minority of inmates who have refused. This Agreement was not implemented on a whim or for any improper purpose, but rather, was developed by a VDOC interdisciplinary team, relying on established mental health techniques, to address and halt a potential trend of self-injurious behavior among inmates. VDOC's desire—and duty—to protect all inmates within its care far outstrips any minimal inconvenience caused to a small handful of inmates who cannot watch a personal television (if they have one) or charge a personal JP6 player (again, if they have one).

Finally, as to the fourth factor, the public interest weighs in favor of Defendants, too. Defendants have an interest in implementing programs designed to protect the inmate population form harm, including self harm. Defendants have implemented just such a voluntary program designed to have minimal impact on those inmates who do not want to participate. And that program seems to be working based on the available evidence. It bears repeating in this context that federal courts should be hesitant to become involved in the day-to-day affairs of prison administration. Because "[t]he difficulties of operating a detention center must not be underestimated by the courts[,] . . . the importance of deference to correctional officials" cannot be overstated. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012). As the Fourth Circuit has stated—when vacating a preliminary injunction issued by a district court—

> Federal courts have traditionally been reluctant to interfere in the problems of prison administration. Indeed, the decisions made by prison administrators in their

informed discretion have been accorded "wide-ranging deference" by the federal courts. . . . Judicial recognition that courts are ill-equipped to deal with problems of prison administrators "reflects no more than a healthy sense of realism."

*Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir.1980)(quoting *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 126 (1977); *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). A preliminary court order directing that VDOC halt its implementation of an inmate safety measure—one imposed for reasons entirely unrelated to this underlying litigation—would constitute an unnecessary intrusion into the administration of this VDOC facility.

### C. Plaintiffs Fail to Establish the Need for a Protective Order.

Only after setting forth their arguments as to why they believe the Safety Agreement is unconstitutional—again, based on claims not at issue in this case—do Plaintiffs devote a single sentence to the intersection of the Safety Agreement and this lawsuit: "But it also directly impedes Plaintiffs' free and full participation in this lawsuit, because the statements they are being pressured to affirm are facts that are directly relevant to the claims they are prosecuting in this case." Ps' Br.. at 10. Plaintiffs do not argue that there has been ***any*** allegation that implementation of the Safety Agreement is somehow related to an act of retaliation or threat of retaliation for participating in this lawsuit.

Further, Plaintiffs lack any factual basis for making such an argument. The only inmate declaration Plaintiffs put before the Court comes from Sidney Bowman, which Plaintiffs rely on primarily to establish the use of the Safety Agreement and support their unpled constitutional claims. Nowhere in his declaration does Bowman assert that any ROSP staff member raised the issue of this lawsuit specifically, or even litigation generally, when discussing the Safety Agreement with him. ECF No. 487-2 ("Bowman Decl."). Nowhere in his declaration does Bowman suggest ROSP's decision to deactivate the power to his in-cell outlet had anything to do with this lawsuit or anything else other than his own voluntary decision to decline to sign the Safety

11

Agreement. *Id.* Bowman does not even suggest that he has a concern that signing the Safety Agreement would affect his ability to participate in this lawsuit. *Id.* He simply fails to mention this lawsuit at all. *Id.* As for the alleged concern actually raised by Bowman, the Safety Agreement does not seek agreement with a statement that ROSP has "adequate mental health care" or that there is therapy, groups, counseling, or other specific types of treatment. *Id.* at ¶ 5.

Plaintiffs' allegations do not rise to the level of conduct or communications toward prospective class members identified in the case law that they cite as threatening the proper functioning of the litigation, i.e., coercing the prospective class members into excluding themselves from the litigation, misleading them, or undermining their cooperation with or confidence in class counsel. Ps' Br. at 8–9. At best, Plaintiffs raise a potential evidentiary issue— whether statements in signed Safety Agreements could be used as party admissions—that, along with multiple other potential evidentiary issues, can and should be resolved at the appropriate time, if necessary. Nevertheless, for the avoidance of any doubt, Defendants consent not to attempt to use any form statement from a signed Safety Agreement as a party admission in this litigation.

Plaintiffs devote the rest of their argument to repeating allegations from their argument for partial summary judgment and putting before the Court unsubstantiated hearsay allegations, including stale allegations of retaliation that have been included in previously filed materials. But hearsay allegations of retaliation, or threats thereof, from 2022 and 2023, many from unidentified inmates, do not justify this Court enjoining ROSP from using an unrelated safety measure that, to date, is having the desired effect.[1] Plaintiffs did not deem those alleged actions sufficiently credible

---

[1] As previously explained to the Court, Plaintiffs' counsel consistently waited until long after the alleged incidents that they brush off yet again for this motion to raise these issues with Defendants' counsel.

or serious to seek a protective order based on them at the time that they allegedly occurred. And they should not now be the basis for a protective order unrelated to them.

## III. CONCLUSION

For the reasons stated, this Court should deny Plaintiffs' Motion for Protective Order.

April 9, 2025

Respectfully submitted,

**/s/ *Maya M. Eckstein***

Jason S. Miyares
*Attorney General of Virginia*

Margaret Hoehl O'Shea (VSB #66611)
Assistant Attorney General,
Criminal Justice & Public Safety Division

OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
Ph: (804) 786-2206
Fax: (804) 786-4239
moshea@oag.state.va.us

Maya M. Eckstein (VSB #41413)
Thomas R. Waskom (VSB #68761)
Trevor S. Cox (VSB #78396)
R. Dennis Fairbanks (VSB #90435)

HUNTON ANDREWS KURTH LLP
951 E. Byrd St.
Richmond, VA 23219
Ph: (804) 788-8200
Fax: (804) 788-8218
meckstein@HuntonAK.com
twaskom@HuntonAK.com
tcox@HuntonAK.com
dfairbanks@HuntonAK.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2025 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all CM/ECF participants.

By: */s/ Maya M. Eckstein*
Maya M. Eckstein (VSB # 41413)
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone: (804) 788-8200
Facsimile: (804) 788-8218
meckstein@HuntonAK.com

*Counsel for Defendants*