# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Abingdon Division

WILLIAM THORPE, *et al.*,

    Plaintiffs,

v.                                                                     Civil Action No. 2:20CV00007

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendants.

## AFFIDAVIT

Commonwealth of Virginia, County of Wise, to-wit:

    D. TURNER, first being duly sworn, states as follows:

    1.     I am the Assistant Warden at Red Onion State Prison ("ROSP"), a Virginia Department of Corrections ("VDOC") facility.

    2.     The information contained in this affidavit is based on personal knowledge and records maintained in the regular and ordinary course of business.

    3.     I am aware that a motion is pending before this Court regarding the recent implementation of a Safety Agreement for inmates within the Restorative Housing Reduction Step-Down Program at ROSP.

    4.     Over the past calendar year, a handful of inmates at ROSP have used the power outlet within their assigned cell to self-inflict burns upon their person. Most typically, the inmate obtains a spare piece of wire and then inserts that wire into the power outlet to cause a burn wound on a leg or arm. There was one incident in March 2024, one incident in August 2024, six incidents in September 2024, and one incident in January 2025. Typically, the burns inflicted in these incidents were largely superficial and not sufficiently serious to warrant the need for outside medical attention.

1

5. As reflected on the following, anonymized chart, three of these inmates were housed in the general population at the time of the relevant incident, one inmate was in the restorative housing unit pending reassignment to security level S, one inmate was temporarily in the restorative housing unit, and the remaining four inmates were in some phase of the Step-Down Program.

| Date of Incident | Location of Incident | Security/ Privilege Level at Time of Incident |
|---|---|---|
| 3/27/2024 | Housing Unit C3 | SL S/IM 0 |
| 8/23/2024 | Housing Unit B4 | SL 5/Alt-GP |
| 9/10/2024 | Housing Unit B4 | SL 5/RHU (Pending SL S) |
| 9/10/2024 | Housing Unit B4 | SL 5/RHU |
| 9/12/2024 | Housing Unit C4 | SL S/SM 0 |
| 9/15/2024 | Housing Unit B6 | SL 5/GP |
| 9/15/2024 | Housing Unit B6 | SL 5/GP |
| 9/20/2024 | Housing Unit C4 | SL S/IM 2 |
| 1/12/2025 | Housing Unit C3 | SL S/IM 2 |

6. Each inmate involved in these incidents was evaluated by a Mental Health Clinician as soon as possible. At the time of the relevant incident, none of these inmates had a mental health diagnosis indicating that they were seriously mentally ill (SMI). Upon further assessment, the inmates' complaints focused on being housed at ROSP, not the Step-Down Program, or the availability or sufficiency of mental health services at ROSP.

7. For example, one inmate stated that he self-inflicted burns because he wanted to be transferred to a VDOC facility closer to VCU, which is where his preferred physician is located. Another inmate stated that he self-inflicted burns because he wanted to be transferred to

2

MCV's Security Care Unit so that he could receive face to face visitation. Another inmate, who is present in Virginia from another jurisdiction, stated that he burned himself because he wanted to be transferred back to his home state. And another inmate stated that he burned himself to protest the fact that his JP6 tablet had been previously confiscated.

8. The inmates who were involved in these incidents had at least some degree of connection. Five of these inmates had been housed, at one time or another, in the medical unit with Inmate A, prior to their burning incident. (Inmate A burned himself on 3/27/24 and had one prior, similar act.) Two of the inmates were cellmates, housed in the general population, who burned themselves at the same time.

9. Cells at ROSP have an ordinary power outlet that may be used to plug in a television or charge a JP6 player. Inmates are not allowed other electronic items in their cells that could be plugged into these power outlets.

10. The power outlets may be externally deactivated, so that no electricity flows through that outlet. Turning off the power outlet does not turn off or otherwise affect other electrical elements within the cell, such as the overhead lighting.

11. Following the cluster of incidents in the fall of 2024, ROSP leadership determined that we needed to address the evident trend of inmates using the power outlets to inflict burns upon their person. Of particular concern, as incidents like this get publicized and gain attention, they can lead to copycat attempts by other inmates. To stop this behavior, we discussed simply turning off all the power outlets in the cells, which would have meant that no inmates would be able to use a personal television or a personal JP6 player.

12. However, we determined that it would be preferable to allow inmates to retain these privileges, if possible, but in a manner that reflected our commitment to the safety of our inmate population.

3

13. Security leadership and mental health leadership collaborated on potential solutions, and we ultimately decided that if an inmate agreed not to use the cell's power outlet to burn himself, the power outlet in that inmate's cell could remain active. Inmates who refused to agree not to burn themselves would be placed in a cell where the power outlet had been deactivated.

14. We therefore devised a Safety Agreement, a copy of which is attached to this filing as Enclosure A. By signing the agreement, the inmate agrees that he is "commit[ed] to [his] mental and emotional health while incarcerated and agree[s] to actively engage in the safety protocols set forth by the facility." Specific areas of agreement include: (1) a promise to refrain from committing an act of self-harm, (2) a recognition that mental health services are available and should be requested if the inmate feels "overwhelmed or in distress," and (3) a promise to inform facility staff if the inmate is experiencing thoughts of self-harm or otherwise feels unsafe.

15. On January 20, 2025, the Safety Agreement was offered to all inmates within the Step-Down Program at ROSP. Officers and supervisors rounded through the housing units to provide inmates with a copy of the Agreement so they would have time to review it. Each inmate—including inmate Bowman—was then offered the opportunity to speak with the Multi-Disciplinary Team (MDT), individually, to ask any questions and address any concerns before being asked to sign the Agreement. Some inmates refused to speak with the MDT, and they were not forced to do so. No inmate was threatened with harm or retaliation if they elected not to sign the Agreement.

16. When an inmate signs the Safety Agreement, the power outlet in that inmate's cell remains active, meaning that the inmate can continue to watch their personal television and charge a personal JP6 device, if they have either of those items. If an inmate refuses to sign, the only consequence is that the power to the outlet in the inmate's cell is turned off.

17. In addition, certain other incentives are offered to inmates who sign the Safety Agreement, and who continue to remain free from self-harm or other risky behaviors.

18. Specifically, after 7 days have passed, the inmate is allowed an option to view movies and an exclusive TV series on their personal television. Currently, the TV series being offered for viewing is "Yellowstone."

19. After 30 days, the inmate is offered an additional, congregate recreation option. Specifically, the inmate is allowed to request recreation with one other inmate, of equivalent security and privilege level. That recreation—which is in addition to other recreation opportunities provided—occurs outside and unrestrained. For example, an inmate on the Intensive Management Pathway at privilege level 0 (IM-0) may request unrestrained recreation with another IM-0 inmate. The recreation occurs in an exterior recreation yard, equipped with a basketball hoop. Basketballs are also provided. A sample Recreation Request is attached as Enclosure B.

20. Each Recreation Request is reviewed by the Building Review Committee and the Warden, to ensure that the inmates are compatible (e.g., they are not designated as known enemies). If the inmates who have requested congregate recreation are deemed incompatible for safety reasons, they are allowed to submit other requests. A sample Approval Form is attached as Enclosure C.

21. The congregate recreation option was first offered on March 17, 2025. Although two inmates became involved in an altercation on that first day, there have been no subsequent incidents. Thus, ROSP leadership intends to continue offering this additional privilege to all level S inmates who sign the Safety Agreement and successfully complete the 30-day period without engaging in self-harm or other risky behaviors.

22. After 45 days, inmates will be offered a free commissary bag, which will contain items such as a candy bar, chips, and other items that could ordinarily be purchased from the commissary.

23. And after 90 days, inmates will be offered a special meal (such as a fish fry), to be determined based on ingredient availability at the time.

24. After an inmate signs the Safety Agreement, that agreement is reviewed periodically—every 30 days—to make sure that the inmate has an opportunity to discuss any concerns related to his safety or mental health.

25. Since ROSP implemented the Safety Agreement, all but 13 inmates within the Step-Down Program have elected to sign this document.

26. No inmate at ROSP has used the power outlet to burn himself since the Safety Agreement was introduced. The last incident occurred on January 12, 2025.

27. The only two privileges impacted when the power outlet in a cell is turned off is the ability to use a personal television, and the ability to charge a personal JP6 player within the cell.

28. The housing units at ROSP contain wall-mounted televisions within the pods, which inmates may continue to view during pod recreation.

29. The housing units also have kiosks, which the inmates may continue to use, during pod recreation, to access their JPay accounts to send and receive electronic messages. Personal JP6 players may also be charged at those kiosks during pod recreation.

30. Visitation and telephone privileges remain unaffected, along with other privileges such as sending and receiving mail, and requesting and receiving publications and other items from the prison library.

31. For inmates who use a television to access religious services or religious programming, accommodations have been made to ensure that inmates are able to participate in those activities. For inmates who have signed the Agreement but do not possess a television, ROSP provides those inmates with loaner televisions to facilitate their access to the religious services. For inmates who have not signed the Agreement, televisions are placed in front of the inmate's cell at the time of the religious programming, and the religious services are also broadcast on the televisions that are mounted on the pod walls.

32. Inmates who elect not to sign the Safety Agreement are not retaliated against or deprived of any other privileges appropriate to their assigned pathway and privilege level. They are not subject to disciplinary action simply because they elect not to sign.

33. If an inmate violates the terms or conditions of a signed Safety Agreement, the consequences for that breach will be assessed on a case-by-case basis. Depending upon the nature and severity of the misconduct, the power outlet in that inmate's cell may again be deactivated, resulting in a potential inability to watch a personal television or charge a JP6 player. Other privileges that had otherwise accrued—such as the one-on-one recreation opportunity described above—may also be rescinded. However, the baseline privileges afforded to that inmate—relative to the inmate's internal pathway and privilege level—are not otherwise affected. Inmates are not subject to disciplinary sanctions simply for violating the Safety Agreement itself.[1]

34. Similarly, any inmate—regardless of whether they have signed the Safety Agreement—who engages in any act of self-harm would be assessed by a Mental Health

---

[1] Inmates could, however, receive disciplinary charges for misconduct that would independently warrant an infraction—for example, an inmate who stabs another inmate could still be charged with assault.

7

Clinician as soon as feasible, and that assessment would be followed by any intervention deemed appropriate by mental health staff.

D. TURNER

_____
Affidavit

    Sworn and subscribed to before me, a Notary Public, in and for the Commonwealth of Virginia, County of Wise, on this ___ day of April 2025.

_____
Notary Public

My commission expires: 9-30-2025

CHRISTOPHER L. COX
NOTARY PUBLIC
Commonwealth of Virginia
Registration No. 7940048
My Commission Expires Setember 30, 2025

8

## Safety Agreement for Inmates

This agreement is made between the undersigned inmate and the facility staff, with the purpose of ensuring your well-being and promoting your safety during your time in custody. The goal is to establish a clear understanding of the expectations and resources available to prevent self-harm and other risky behaviors. By signing this agreement, you are committing to your mental and emotional health while incarcerated and agreeing to actively engage in the safety protocols set forth by the facility.

### 1. Acknowledgment of the Agreement:

I, the undersigned, acknowledge that I have read, understand, and voluntarily agree to the following terms:

1. **Commitment to Safety:**
    - I commit to refraining from any form of risky behavior, including but not limited to self-harm or any actions that could cause injury to myself or others.
    - I understand that self-harm is dangerous, harmful, and not an acceptable method of coping with stress or difficult emotions.

2. **Access to Support Services:**
    - I recognize that I have access to mental health and other local resources, including multiple forms of support, and I agree to utilize these services if I feel overwhelmed or in distress.
    - I understand that I can reach out to facility staff for assistance or to request mental health services at any time.

3. **Immediate Reporting of Concerns:**
    - I agree to immediately inform facility staff if I experience any thoughts or urges related to self-harm or if I feel unsafe in any way.
    - I understand that the facility staff is committed to my well-being and will provide assistance to address any concerns I may have.

4. **Review Process:**
    - This agreement will be reviewed every 30 days, at which time I will have the opportunity to discuss any concerns or adjustments related to my safety and mental health.
    - If necessary, the agreement may be revised or updated during the review process to reflect changes in my mental health needs.

5. **Good Behavior Incentives:**
    - I understand that if I remain free from self-harm and other risky behaviors for a continuous period, I will be eligible for an incentive for maintaining my commitment to safety and good behavior.

- 7 Day incentives (example: new movies and episodes of exclusive TV series)
- 30 Day incentives (example: opportunities for group rec and activities, sports)
- 45 Day incentives (example: free commissary bags)
- 90 Day incentives (example: special meals, fish fry)
- These incentives will be awarded only if I consistently demonstrate adherence to the terms of this agreement and exhibit positive behavior.

6. **Consequences of Violations:**
    - I understand that if I violate this agreement by engaging in self-harm, other risky behaviors, or refusing to cooperate with the safety protocols, the facility may take appropriate actions to ensure my safety, including additional monitoring or interventions.
    - I further understand that repeated violations of this agreement may result in the loss of privileges, such as access to television, recreation time, or other amenities, as deemed necessary by facility staff to maintain safety and promote positive behavior.

7. **Acknowledgment of Alternatives:**
    - I am aware that there are alternative coping strategies available to me, including but not limited to stress management techniques, communication with support staff, and engaging in recreational or vocational activities.

### 2. Inmate's Declaration:

By signing below, I confirm that I voluntarily agree to this Safety Agreement. I understand the importance of this agreement and will make a good faith effort to follow the outlined guidelines. I also acknowledge that I have been informed of my right to seek mental health and other services at any time.

**Inmate Name/Number (Printed):** _____

**Inmate Signature:** _____ **Date:** _____

### 3. Facility Staff Acknowledgment:

By signing below, I acknowledge that I have explained the terms of this agreement to the inmate, and I will ensure that the inmate receives the necessary resources and support outlined in this document.

**Staff Name/Position (Printed):** _____

**Staff Signature:** _____ **Date:** _____

### 4. Review Date:

The next review of this agreement will take place on:

**Next Review Date:** _____

# Red Onion State Prison
# Group Recreation Request

I, _____#_____ _____ am requesting to
      (Name Print)          (Number)     (Cell)

participate in group recreation with inmate_____ _____.
                                             (Name Print)    (Cell)

Inmate Signature:_____ Date: _____

Inmate Signature:_____Date: _____

Building Supervisor Signature:_____Date: _____

# Red Onion State Prison Group Recreation Request Approval Form

| Inmate: | Inmate: |
|---|---|
| Number: | Number: |
| Housing Assignment: | Housing Assignment: |
| Pathway: | Pathway: |
| HRSA/HRSV: | HRSA/HRSV: |

| | YES | NO |
|---|---|---|
| Are the two inmates known enemies according to CORIS: | | |
| Have both inmates signed that they wish to rec together: | | |

| Approved: | Disapproved: |
|---|---|
| Building Review Committee Signature: | |

| Approved: | Disapproved: |
|---|---|
| Facility Unit Head Signature: | |