# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRIGNIA
Abingdon Division

WILLIAM THORPE, *et al.*,

    Plaintiffs,

v.                                      Civil Action No. 2:20CV00007

VIRGINIA DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendants.

## AFFIDAVIT

Commonwealth of Virginia, City of Richmond, to-wit:

    D. MALONE, first being duly sworn, states as follows:

    1.    I am the Chief of Mental Health and Wellness Services for the Virginia Department of Corrections (VDOC).

    2.    The information contained in this affidavit is based on personal knowledge and records maintained in the regular and ordinary course of business.

    3.    I am aware that a motion is pending before this Court regarding the recent implementation of a Safety Agreement for inmates within the Restorative Housing Reduction Step-Down Program.

    4.    Over the past calendar year, a handful of inmates at ROSP have used the power outlet within their assigned cell to self-inflict burns upon their person. By my understanding, there was one incident in March 2024, one incident in August 2024, six incidents in September 2024, and one incident in January 2025.

    5.    When an inmate causes self-injury, that inmate is assessed by a Mental Health Clinician as soon as possible to evaluate whether the inmate needs to be placed on special

precautions or receive any other form of appropriate intervention, up to and including involuntary commitment to an inpatient mental health facility. Of the above-listed incidents, with one exception,[1] none of the inmates were deemed to be at risk of further self-injurious behavior and, therefore, none were placed on specialized precautions.

6. However, VDOC leadership recognized that it would be in the best interests of the inmate population to address and halt this emerging trend. Security leadership and mental health leadership ultimately determined that a Safety Agreement could prove workable: If an inmate agreed not to use the cell's power outlet to burn himself, the power outlet in that inmate's cell could remain active.

7. Safety planning is an evidence-based, effective technique that is widely used in the mental health field to reduce the risk of self-harm. Safety planning is collaborative in nature, helping individuals identify warning signs, develop coping strategies, and access support, and thereby encouraging these patients to exert responsibility and choose to keep themselves safe. This focus on returning control to the individual—obtaining their "buy in"—strengthens their sense of accountability and reduces the risk that the individual will later engage in an act of self-harm.

8. Within the mental health field, safety plans are used in clinical and therapeutic settings. They also have been introduced and used as a resource in other community settings, such as schools and substance abuse support groups.

---

[1] One inmate engaged in similar behavior on two separate occasions. In early January, he was therefore placed on a self-management housing plan to address the repeated behavior, and he has now transitioned away from the additional precautions and has been returned to his regular status.

9. Implementing the Safety Agreement at ROSP posed slightly different challenges than devising a safety plan specific to one individual, for most of the inmates at ROSP do not present with a demonstrated or otherwise acknowledged risk of self-harm. Nevertheless, the critical elements of this Safety Agreement highlight an action plan: if the inmate feels overwhelmed or in distress, the inmate should request mental health services, and if the inmate is experiencing thoughts of self-harm, the inmate should inform facility staff.

10. To further incentivize the inmates and reduce the potential for self-injurious behavior, the Safety Agreement also provides opportunities for additional rewards if the inmate goes for a certain length of time without engaging in negative behavior. As seen in cognitive behavioral therapy, positive reinforcement is a powerful tool for encouraging a desired type of behavior, helping individuals learn and maintain healthy behaviors and coping mechanisms.

11. ROSP's Safety Agreement—coupling a system of positive reinforcement with a safety plan that encourages inmates to seek help if in distress or experiencing thoughts of self-harm—was deliberately structured and tailored for this unique context in which it has been offered. And the Agreement appears to have been successful: To my knowledge, there have been no incidents of ROSP inmates burning themselves by using their power outlets since the Agreement was implemented.

12. Safety planning is a technique that is used in other correctional aspects as well. For example, inmates who wish to self-administer their medications are asked to sign a Keep on Person Contract, verifying that they will use their medication only as prescribed and will immediately report any lost or missing medication to the medical department. VDOC Operating Procedure 720.5, *Pharmacy Services*, at VIII. Similarly, inmates who are placed on Self-Management Housing Plans or enroll in an intensive reentry program are asked to agree to a

specific action plan and adhere to its terms and conditions. Inmates with a substance abuse disorder also execute a Continuing Care Plan as a part of their treatment programming.

13. ROSP's Safety Agreement was not devised for punitive or retaliatory purposes, but rather, to ensure that all inmates within the Step-Down Plan know how and when to seek help from mental health staff, and to encourage continued positive behaviors in that environment.

14. Finally, I understand that a question has been raised as to the availability and sufficiency of mental health services at ROSP. ROSP maintains a full staff of mental health professionals who are available 24-hours per day, 7 days per week. Mental Health Clinicians round through the Level "S" housing units at ROSP at least once per week. In addition to these weekly checks, any inmate who wishes to speak to a member of the mental health staff may request for further services through the submission of an Offender Request Form, and that inmate will be seen as soon as possible. Office visits with Mental Health Clinicians, which are conducted in a private setting, are also available.

15. For emergency situations, any inmate may submit an emergency grievance or verbally request emergency mental health care to receive immediate assessment. And by VDOC policy, any staff member who believes that an inmate may be suicidal or otherwise at risk of self-harm must immediately report that suspicion to a member of the mental health staff, and precautions will be implemented. Also, any staff member can refer an inmate for assessment and monitoring if they note a difference in the inmate's presentation and/or functioning.

16. Inmates who might benefit from mental health medications are referred to ROSP's institutional psychiatrist, who evaluates the inmate in a confidential setting and determines whether—and what—medications should be prescribed. In addition to the weekly checks performed by the Mental Health Clinicians, inmates who are prescribed mental health

medications also have scheduled, periodic visits with the psychiatrist to evaluate their progress and determine whether there are any needed changes to their medications or prescribed dosage.

17. Wellness materials are distributed to inmates at ROSP, including inmates within the Step-Down Program, and group services are also available. Specially-trained treatment and correctional crisis intervention trained officers work various posts at ROSP, and crisis and risk management strategies are employed by mental health and multidisciplinary staff on an ongoing basis.

18. Overall, the mental health of all inmates at ROSP is consistently and carefully monitored by trained mental health professionals. Although no prison environment can be made free of any and all risk of harm, VDOC's mental health policies are specifically targeted to address and alleviate—to the greatest extent feasible—any latent risk that may exist.

D. MALONE

*[signature]*
Affidavit

Sworn and subscribed to before me, a Notary Public, in and for the Commonwealth of Virginia, City of Richmond, on this 8th day of April 2025.

*[signature]*
Notary Public

My commission expires: Dec 31, 2026
Reg # 200434

STACY M. BEVERLY
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #200434
My Commission Expires ___