CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

May 05, 2025

LAURA A. AUSTIN, CLERK
BY: s/ FELICIA CLARK
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA

WILLIAM THORPE, ET AL.,          )
                                 )
                Plaintiffs,      )          Case No. 2:20CV00007
                                 )
v.                               )          **OPINION AND ORDER**
                                 )          **RE MOTION FOR**
                                 )          **PROTECTIVE ORDER**
                                 )
VIRGINIA DEPARTMENT OF           )          JUDGE JAMES P. JONES
CORRECTIONS, ET AL,              )
                                 )
                Defendants.      )

*Argued:  Geri Greenspan, ACLU OF VIRGINIA, Richmond, Virginia, for Plaintiffs; Margaret Hoehl O'Shea, Assistant Attorney General, CRIMINAL JUSTICE & PUBLIC SAFETY DIVISION, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Defendants.*

In this long-running class action, the plaintiffs claim that solitary confinement[1] in a prison operated by the Virginia Department of Corrections (VDOC) is unlawful under the Eighth Amendment and that the pathways for inmates to receive less severe confinement and eventually leave solitary confinement altogether — called the Step-Down Program — violate due process principles. See

---

[1] The prison housing known as "solitary confinement," or "segregation," is more recently referred to as "restrictive housing" or "restorative housing." 2019 Va. Acts chs. 453, 516 (codified as Va. Code. Ann. § 53.1-39.1(A)) (defining restrictive housing); Va. Dep't of Corr*., RD579 – Restorative Housing in the Virginia Department of Corrections FY2024 Report* (2024), https://rga.lis.virginia.gov/Published/2024/RD579 (last visited May 3, 2025).

*Thorpe v. Va. Dep't of Corr.*, No. 2:20CV00007, 2020 WL 10354128 (W.D. Va. Sept. 4, 2020), *R. & R. adopted in part, rejected in part*, 2021 WL 2435868 (W.D. Va. June 15, 2021) (denying motion to dismiss), *aff'd sub nom. Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022) (affirming denial of qualified immunity as to Eighth Amendment claim).

The plaintiffs have now filed a Motion for Protective Order (Motion), in which they contend that VDOC employees have "interfered with the fair adjudication of the case by intimidating and retaliating against . . . Plaintiffs." Mot. 1, ECF No. 486. The motion has been fully briefed and argued.

For the following reasons, I will deny the Motion with conditions.

## I. BACKGROUND.

Inmates subject to the Step-Down Program at Red Onion State Prison (Red Onion), a maximum-security facility, are housed in individual eight-by-ten cells that each contain a standard electrical outlet that can be used to power a television set and charge a tablet device, items that the inmate may purchase. Each cell's electrical outlet can be separately turned off from outside the cell by the prison authorities.

Recently, inmates at Red Onion have used their electrical outlet to intentionally burn themselves by inserting a piece of wire into the outlet and placing it on their arm or leg. According to the Assistant Warden, "[t]here was one incident in March 2024, one incident in August 2024, six incidents in September 2024, and

one incident in January 2025." Defs.' Opp. to Mot. Ex. 1, D. Turner Aff. ¶ 4, ECF No. 493-1. One inmate was involved in two incidents. Of the inmates involved, four were in some phase of the Step-Down Program.

After the incidents, the prison authorities devised a so-called Safety Agreement, which is attached to D. Turner's Affidavit as Enclosure A, and submitted a copy to each inmate, requesting him to read it and sign it. If the inmate signed the two-page document, his cell's electrical outlet was kept on; if he declined to sign, the outlet was turned off. Ongoing incentives are promised in the Safety Agreement for signees who remain free from self-harm and "risky behaviors." *Id*. ¶ 17. These include more television options, recreation periods with inmates of their choice, a free commissary bag containing treats, and a "special meal (such as a fish fry)." *Id*. ¶ 23.

In addition, by signing the Safety Agreement, the inmate agreed not to harm himself, agreed that mental health facilities are available to him if he requests, and agreed to advise staff if he is experiencing "thoughts or urges related to self-harm or if [he] feel[s] unsafe in any way." Safety Agreement 1, ECF No. 493-1. According to the defendants, all but 13 inmates have signed the Safety Agreement, and no further burning incidents have occurred. The defendants deny that they have retaliated in any way against the inmates who have refused to sign the Safety Agreement.

The defendants assert that inmates who have their power turned off may view television in a communal area during pod recreation and may charge their tablets at a kiosk. However, the plaintiffs assert that in practice inmates do not have sufficient time while in pod recreation to charge their tablets.

The defendants have submitted the affidavit of the Chief of Mental Health and Wellness Services for VDOC, Denise Malone, reporting that all of the inmates who burned themselves, but one, were thereafter deemed not to be at risk of further self-injury. The one inmate who was found to be of further risk has since been returned to his "regular status." Defs.' Opp. to Mot. Ex. 2, D. Malone Aff. ¶ 5 n.1, ECF No. 493-2.

Malone asserts that within the mental health field, safety plans are used in clinical and therapeutic settings, as well as in "community settings, such as schools and substance abuse support groups." *Id.* ¶ 8. She also avers that the "Safety Agreement was not devised for punitive or retaliatory purposes, but rather, to ensure that all inmates within the Step-Down [Program] know how and when to seek help from mental health staff, and to encourage continued positive behaviors in that environment." *Id.* ¶ 13.

The plaintiffs rely on the declaration of Michael Hendricks, Ph.D., an expert previously disclosed, who opines that the scientific consensus is that documents such as the Safety Agreement are not effective in preventing self-harm and "can often be

-4-

counterproductive," particularly when they include punitive measures, coercion, or are used with persons who have not previously evidenced a risk of self-harm. Pls.' Reply Ex. 1, Michael Hendricks Decl. ¶¶ 3, 4, 6, ECF No. 494-1.

The plaintiffs have also submitted the sworn statements of an inmate, Sidney Bowman, who refused to sign the Safety Agreement because he felt it too vague and because it contained statements regarding the availability of mental health treatment that he believes are untrue. Bowman expressed the concern that if he were to be asked to testify at trial in this case, he did not want to be "on record agreeing with statements I do not believe." Pls.' Reply Ex. 2, Sidney Bowman Decl. ¶ 7, ECF No. 494-2. Bowman claims that adequate mental health treatment is not available to inmates at Red Onion, contrary to the Safety Agreement's assertion. In addition, Bowman described his situation after refusing to sign the Safety Agreement:

> Without power in my cell, I cannot watch my TV, listen to the radio, or charge my tablet. I access all religious programming through my TV and tablet in my cell because I am not able to leave my cell for religious services. Using my tablet for email is also the main way I keep in touch with my loved ones outside of prison, but now I am not able to do that. I also listen to the radio and read the newspaper through my tablet, which I am currently unable to do. Not being able to use my property has made the conditions here even harder and more isolating than before.

Pls.' Mem. Supp. Ex. B, Sidney Bowman Decl. ¶ 12, ECF No. 487-2.

The plaintiffs contend that the defendants' use of the Safety Agreement is unconstitutional in its own right, but as directly relevant to the Motion, and as

described by inmate Bowman, its use improperly pressures class members to disclaim facts that are asserted in the present case, namely that the defendants provide inadequate mental health care to those in the Step-Down Program. In addition, plaintiffs seek a broad Protective Order including the following:

1. Prohibiting Defendants from imposing any consequence or punishment, or taking other adverse action against any Plaintiff who refuses to sign the Safety Agreement on the basis of that refusal;

2. Requiring Defendants to immediately restore power to the outlets in the cells of class members who have refused to sign the Safety Agreement;

3. Prohibiting Defendants from turning off the power to the cell of any Plaintiff absent an individualized determination supported by specific findings, made by a licensed mental health provider, that an individual is at significant risk of self-harm and that such measures are necessary to prevent an act of self-harm;

4. Prohibiting VDOC staff from threatening, warning of, suggesting, imposing or attempting to impose any punitive or undesired consequences in retaliation for Plaintiffs' participation in the preparation or litigation of this Motion, including any communications with Plaintiffs' counsel, experts, investigators, or other persons, including but not limited to: cell transfer, facility transfer, disciplinary charges, cell shakedowns, destruction of personal property, withholding of necessities or privileges such as food, laundry, recreation, mail, phone, programming, religious observation, etc., placement in segregated housing or strip cells, infliction of physical pain or harm, verbal abuse, etc.;

5. Order[ing] VDOC to issue guidance to Red Onion staff on what constitutes retaliation and the requirements of any protective order issued by the Court.

Mot. 2–3, ECF No. 486.

In opposition, the defendants argue that the Motion ought to be considered under the more strenuous standards applicable to preliminary injunctions. Alternatively, the defendants object to the Motion on the ground that it has not been shown beyond speculation that the ability of the plaintiffs to adequately present their case will be impaired by the use of the Safety Agreement.

## II. ANALYSIS.

According to Rule 26, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). A district court has "the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). "[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. "Before entering an order, the court should be satisfied (1) that 'a particular form of communication has occurred or is threatened to occur' and (2) that the communication is 'abusive in that threatens the proper functioning of the litigation.'" *Randolph v. PowerComm Const., Inc.*, 41 F. Supp. 3d 461, 465 (D. Md. 2014) (quoting *Ross v. Wolf Fire Protection, Inc.*, 799 F. Supp. 2d 518, 526 (D. Md. 2011)). "Abusive practices that have been considered sufficient to warrant a

protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Id.* at 465 (quoting *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 698 (S.D. Ala. 2003)).

That standard is the same as that in *Ben David v. Travisono*, 495 F.2d 562 (1st Cir. 1974). The court in *Ben David* decided that the "findings necessary to support . . . a protective order are simply that the plaintiffs reasonably fear retaliation and that the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order." *Id.* at 564. In *Ben David*, a putative class of prison inmates had alleged "that prison rules had been suspended and that they were being subject to unconstitutional treatment in the form of beatings, mental abuse, inhumane and unsanitary conditions, mail censorship, and the like." *Id.* at 563 (footnote omitted). They sought a protective order "for the protection of plaintiffs and their class . . . to insure a complete and thorough investigation of the claim raised herein." *Id.* (internal quotation marks omitted). The First Circuit affirmed the district court's grant of the protective order but struck the first requirement for being too vague and expansive, as more appropriate for a preliminary injunction.

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). A party seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Here, the application of the preliminary injunction standard would be more appropriate than that of a protective order. "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Therefore, prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* The Protective Order sought here would reach into the "policies and practices" meant by the Red Onion administrators to maintain the safety of the inmates. *Id.* That broad reach justifies applying the preliminary injunction standard.

However, "a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997). The plaintiffs argue that the order would protect "[p]laintiffs who choose to exercise their First Amendment right to refuse to sign the Safety Agreement, at least in part in order to participate in the lawsuit." Pls.' Mem. Supp. 2, ECF No. 487. They also claim that the defendants are violating the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA). But neither the First Amendment nor RLUIPA are at issue in this case. Therefore, a preliminary injunction is not appropriate here.

Even if the motion were addressed under the more lenient protective order standard, it should still be denied.

A district court in the Third Circuit addressed a dispute over whether a protective order or preliminary injunction was more appropriate for the relief sought. *Disability Rts. N.J., Inc. v. Velez*, No. 10-3950 (DRD), 2011 WL 2937355 (D.N.J. July 19, 2011). There, the plaintiff sought a protective order for a "very similar" situation to prison inmates: patients at psychiatric hospitals who alleged retaliation for their participation in the lawsuit. *Id.* at *5. The defendants argued that the motion was better adjudicated as a preliminary injunction. The court applied the First

Circuit's decision in *Ben David*.  It found that a protective order was the appropriate standard, but denied the motion because the plaintiff did not provide evidence of "any conduct giving rise to a reasonable fear of retaliation." *Id.* at *5.

Here, the logical connection between inmates using electrical outlets to burn themselves and the Safety Agreement serving as a gateway to a powered cell outlet defeats a "reasonable fear of retaliation."  Furthermore, the incentive structure contained in the Safety Agreement has not been shown to impair this court's fact-finding.  The incentives might encourage inmates not to participate in the litigation for fear of losing them.  But such harm is undefined and vague in the briefing.  And it is, at this point, too speculative a harm to conclude that this court's "fact-finding may be materially impaired." *Ben David*, 495 F.2d at 564.

### III.  CONCLUSION.

For the reasons stated, I do not find it appropriate to grant the relief requested. It appears that the use of the Safety Agreement was not an unreasonable response to the self-harm incidents, considering the deference I must give to the decisions of prison administrators.  I have two concerns, however.  First, I do not understand the necessity of requiring inmates to agree in the Safety Agreement that adequate mental health care is available to them, considering the allegations in the present lawsuit. The parties have waived a jury trial and if impeachment by the defendants is attempted based on the contents of the Safety Agreement, I must advise the parties

that I may find that a witness's agreement concerning mental health treatment availability at Red Onion as asserted in the Safety Agreement is not sufficient impeachment of his contrary testimony at trial, considering the incentives to sign the agreement.

Secondly, I hereby prohibit any retribution by prison authorities, including without limitation any withdrawal of the incentives promised in the Safety Agreement, in the event an inmate witness testifies contrary to his statements made in the Safety Agreement concerning mental health treatment availability at Red Onion.

It is **ORDERED** that Plaintiffs' Motion for Protective Order, ECF No. 486, is DENIED, subject to the directions above set forth.

ENTER:  May 5, 2025

/s/  JAMES P. JONES
Senior United States District Judge